# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

RANDY BANKS,

*Defendant - Appellant,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

**JOINT APPENDIX - VOLUME IX OF XXII**
**(Pages 3843 - 4408)**

Gerald T. Zerkin
ATTORNEY AT LAW
P. O. Box 5665
Richmond, VA 23220
804-921-4885
*Counsel for Appellant*
  *Randy Banks*

Allen H. Orenberg
THE ORENBERG
LAW FIRM, PC
12505 Park Potomac Avenue
6th Floor
Potomac, MD 20854
301-984-8005
*Counsel for Appellant*
  *Jamal Lockley*

Adam B. Schwartz
SHEARMAN &
STERLING LLP
401 9th Street, NW
Suite 800
Washington, DC 20008
202-508-8009
*Counsel for Appellant*
  *Dante Bailey*

Stuart A. Berman
LERCH, EARLY &
BREWER, CHARTERED
7600 Wisconsin Avenue
Suite 700
Bethesda, MD 20814
301-657-0729
*Counsel for Appellant*
  *Shakeen Davis*

Carmen D. Hernandez
ATTORNEY AT LAW
7166 Mink Hollow Road
Highland, MD 20777
240-472-3391
*Counsel for Appellant*
  *Corloyd Anderson*

Counsel for Appellee on Inside Cover

Brandon K. Moore
Assistant United States Attorney
United States Attorney's Office for the District of Maryland
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
410-209-4826

*Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME IX OF XXII

JA Page

Transcript of Jury Trial Vol. IX
Before the Honorable Catherine C. Blake
   On April 2, 2019 [ECF1364] ........................................................... 3843

   JAMES WAGSTER
      Voir Dire Direct Examination by Ms. Hoffman ................................. 3871
      Voir Dire Cross Examination by Ms. Whalen ................................... 3874
      Direct Examination by Ms. Hoffman ................................................ 3877
      Cross Examination by Ms. Whalen ................................................... 3893
      Redirect Examination by Ms. Hoffman ............................................ 3900

   DERRAN HANKINS
      Direct Examination by Ms. Perry ...................................................... 3905
      Cross Examination by Mr. Enzinna ................................................... 3964
      Cross Examination by Mr. Sardelli .................................................... 3977
      Cross Examination by Ms. Amato ..................................................... 3981
      Redirect Examination by Ms. Perry .................................................. 3986

   DET. PHILIP WILSON
      Direct Examination by Ms. Hoffman ................................................ 3991
      Cross Examination by Mr. Hazlehurst ............................................... 4022

   DET. JOSEPH COHAN
      Direct Examination by Ms. Hoffman ................................................ 4039

Transcript of Jury Trial Vol. X
Before the Honorable Catherine C. Blake
   On April 3, 2019 [ECF1365] ........................................................... 4048

   PO CHRISTOPHER FOWLER
      Direct Examination by Ms. Perry ...................................................... 4057
      Cross Examination by Mr. Trainor..................................................... 4104
      Cross Examination by Mr. Davis ...................................................... 4107

DET. VICTOR VILLAFANE
    Direct Examination by Ms. Hoffman ................................................... 4113

SA ROBERT PULLIAM
    Direct Examination by Ms. Perry .................................................... 4131
    Cross Examination by Ms. Whalen ................................................... 4137

LT. DAWN COPPER
    Direct Examination by Ms. Hoffman ................................................. 4139
    Cross Examination by Ms. Whalen ................................................... 4149

DET. DAVID PIETRYAK
    Direct Examination by Ms. Perry .................................................... 4155

SA LINDSAY ERBE
    Direct Examination by Ms. Perry .................................................... 4184
    Cross Examination by Mr. Trainor ................................................... 4213
    Cross Examination by Mr. Hazlehurst ............................................... 4217

Transcript of Jury Trial Vol. XI
Before the Honorable Catherine C. Blake
    On April 4, 2019 [ECF1366] ....................................................... 4225

BRANDON ROBINSON
    Direct Examination by Ms. Hoffman ................................................. 4237
    Cross Examination by Mr. Trainor ................................................... 4247

SHANNON ROBINSON
    Direct Examination by Ms. Perry .................................................... 4251
    Cross Examination by Mr. Trainor ................................................... 4256

SA TROY DANNENFELSER
    Direct Examination by Ms. Hoffman ................................................. 4260

MICHAEL PRATT
    Direct Examination by Ms. Perry .................................................... 4277
    Cross Examination by Mr. Hazlehurst ............................................... 4282

DEVIN FERGUSON
    Direct Examination by Ms. Hoffman .................................................... 4292
    Cross Examination by Ms. Whalen .................................................... 4343
    Cross Examination by Mr. Sardelli .................................................... 4358
    Redirect Examination by Ms. Hoffman ............................................ 4368

DET. LUIS DELGADO
    Direct Examination by Ms. Hoffman .................................................... 4369
    Cross Examination by Mr. Enzinna .................................................... 4376
    Cross Examination by Mr. Trainor.................................................... 4379

SA TIMOTHY MOORE
    Direct Examination by Ms. Perry.................................................... 4387
    Cross Examination by Ms. Whalen.................................................... 4402

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3    UNITED STATES OF AMERICA,    )
            Plaintiff,             )
 4                                 )
            vs.                    ) CRIMINAL CASE NO. CCB-16-0267
 5                                 )
      DANTE BAILEY, et al.,        )
 6          Defendants.            )
      _____)
 7

 8
                          Tuesday, April 2, 2019
 9                            Courtroom 1A
                            Baltimore, Maryland
10

11          BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                      (AND A JURY)
12

13                             VOLUME IX

14    For the Plaintiff:

15    Christina Hoffman, Esquire
      Lauren Perry, Esquire
16    Assistant United States Attorneys

17    For the Defendant Dante Bailey:

18    Paul Enzinna, Esquire
      Teresa Whalen, Esquire
19

20    _____

21

22
                            Reported by:
23
                   Douglas J. Zweizig, RDR, CRR, FCRR
24                  Federal Official Court Reporter
                    101 W. Lombard Street, 4th Floor
25                     Baltimore, Maryland  21201
```

```
 1    For the Defendant Randy Banks:

 2    Brian Sardelli, Esquire

 3
      For the Defendant Corloyd Anderson:
 4
      Elita Amato, Esquire
 5

 6    For the Defendant Jamal Lockley:

 7    Harry Trainor, Esquire

 8
      For the Defendant Shakeen Davis:
 9
      Paul Hazlehurst, Esquire
10

11    For the Defendant Sydni Frazier:

12    Christopher Davis, Esquire

13

14    Also Present:

15    Special Agent Christian Aanonsen, ATF

16

17

18

19

20

21

22

23

24

25
```

```
 1                        P R O C E E D I N G S

 2          (10:47 a.m.)

 3          THE COURT:  Good morning, everyone.

 4          Best-laid plans don't work.  So we had a delay in a

 5   sentencing, so here we are now obviously, presumably with the

 6   jury waiting for us.

 7          I know we need to discuss -- presumably that's still

 8   sort of first up, needs to be discussed, the ballistics issue.

 9          Is there some other issue?

10          MS. WHALEN:  Your Honor, I just wanted to interpose

11   some objections to iCloud exhibits that I anticipate will be

12   coming in today.

13          THE COURT:  Okay.  All right.  Well, let's get back to

14   iCloud.

15          Okay.  As far as the ballistics, I have obviously read

16   your memos and various opinions.

17          I'm happy -- I guess I'll start with whoever is

18   speaking for the defense.  Anything else you want to say about

19   the ballistics issue?

20          MS. WHALEN:  Your Honor, just in terms of the Daubert

21   motion that includes the exclusion completely, I think we have

22   briefed that extensively.  Your Honor has indicated that you

23   are more likely to limit rather than exclude.  So I think that

24   record has been preserved enough.

25          With regard to the limitations, I submitted yesterday
```

```
 1   some limitations on the expert's testimony that I referenced to

 2   the Medley opinion by Judge Grimm dealing with the terms that

 3   would be used:  "Match", "certainty," and the like.

 4            And all of that, I think, goes to the heart of what

 5   the examiner should be able to say based on the fact that he

 6   has a subjective conclusion relating to the comparisons that

 7   he's made.

 8            Your Honor pointed out the Johnson case, and I have

 9   had an opportunity to take a look at that Southern District of

10   New York opinion.

11            I think the -- which cites to Medley.  And the way I

12   interpret that opinion is that the distinction is the examiner

13   was able -- unlike in Medley -- able to use the term "match,"

14   for instance.

15            And that was mostly, I think, because after a Daubert

16   hearing, the judge felt that he had sufficiently used a

17   methodology.  And the Government conceded that he was not going

18   to be talking about the level of certainty.

19            So I think the difference here is we have not heard

20   from the examiner as to what a match means, so we have to take

21   that at face value.

22            His exhibits are specific to -- or his conclusions put

23   into report form are specific that a firing-pin impression was

24   made by the same firing pin.

25            I think -- and then he also uses the term "match."
```

1    And he also indicates with certainty, I think, in his language

2    that, again, that the firing-pin impressions were made from the

3    same firing pin.  And then further on he says that --

4    questioned bullets, I believe, were fired with the same unknown

5    firearm.

6            So take that at face value.  That is, to the examiner,

7    a hundred percent certainty.  He's not using any term that

8    would allow the jury to infer anything but that, I would

9    suggest.

10           And so I am still requesting that there be limitations

11   on his ultimate conclusion, consistent with Medley.

12           We have no information at this stage that he --

13   because his reports and the expert notice do not indicate that

14   he used, for instance, a methodology as in Johnson.  That

15   examiner used the CMS methodology or a quantitative

16   methodology.

17           So because we have no information relating to that, I

18   would ask Your Honor to take the conservative, more prudent, in

19   my judgment, determination that the Medley restrictions and

20   limitations should be applied, because since there's no notice,

21   since there wasn't an actual hearing, we are left shooting in

22   the dark.

23           In other words, if he says there's a match, I can't

24   effectively cross-examine because I can't be sure that this

25   expert will not say, Well, it is a match to the exclusion of

```
1    all other weapons, because that's what his language in his
2    report says.
3             Thank you.
4             THE COURT:  Okay.  Thank you.
5             Would the Government like to address that?
6             MS. HOFFMAN:  Yes, Your Honor.
7             I think we've been clear in our brief that we are not
8    attempting to elicit any testimony about Mr. Wagster or
9    Mr. Lamont's level of certainty.
10            And Mr. Wagster, if questioned about it -- I spoke to
11   him about it this morning -- he would acknowledge that, you
12   know, of course, he can never be a hundred percent certain.  He
13   can't examine every single firearm in the world in order to
14   determine that there are no two firearms that ever make
15   identical markings.
16            What we have proposed in our motions response is that
17   he be permitted to state his conclusion, which is that
18   particular ammunition components did come from the same known
19   or unknown firearm -- with respect to the Bangout murder, it's
20   the same unknown firearm.  With respect to the Johnson murder,
21   it's a known firearm -- and that we would not elicit any
22   testimony about certainty level, whether it's a hundred percent
23   or a reasonable level of certainty or anything along those
24   lines.
25            I did -- I suppose I'll start with the Johnson SDNY
```

1    opinion since Your Honor flagged that for us yesterday.

2          I did have a chance to review it and to go over it

3    with Mr. Wagster briefly this morning.

4          And both Mr. Wagster and Mr. Lamont, the BPD lab in

5    general, they used the AFTE method of identification, which is

6    what the Johnson opinion finds is essentially the gold standard

7    in the field.  There is no claim here that the experts didn't

8    properly follow that AFTE methodology.

9          Furthermore, the BPD lab is a certified lab.  It's

10   certified by an institution known as ANAB.  And they do use

11   blind reanalysis in every case by an independent co-examiner,

12   which the Johnson opinion found significant.  And Johnson

13   disagreed with Medley on that score and said that that's an

14   important factor.

15         Like the examiner in Johnson, Mr. Wagster and

16   Mr. Lamont both undergo proficiency testing every year in every

17   subfield.  And both of them have perfect records of passing

18   those proficiency tests, which the Johnson court also found

19   significant.

20         Like the examiner in Johnson, Mr. Wagster would resist

21   articulating the sufficient agreement standard in definitive,

22   quantitative terms.  So there was the same issue in Johnson.

23   Mr. Fox didn't want to give an absolute number for a floor for

24   the number of markings that match.

25         But Mr. Wagster did say that in this case, he could

1  say -- in reviewing his notes, he could say there were -- and

2  looking at the photographs, he could see there were at least 15

3  matching striations in breech face and at least eight in

4  firing-pin impressions, which is much more than what the CMS

5  method requires.

6         The photographs here -- I think even an untrained

7  observer can certainly see matching marks in the photographs

8  that both Mr. Wagster and Mr. Lamont have included in their

9  reports.

10         However, I think it's very important to note -- and we

11  noted this in our brief -- that -- and Mr. Wagster would

12  testify that the photographs are not nearly as revealing as

13  what a trained examiner sees through an $80,000,

14  three-dimensional microscope.

15         That the -- he used the -- he said, The microscope

16  costs $80,000, but the camera is not even as good as your

17  iPhone camera.  So, I mean, these photographs are just -- are

18  not -- they don't reveal everything that you see through the

19  microscope.  And we shouldn't be critiquing his conclusions

20  based on -- based on the photographs alone.

21         The purpose of the photographs is just to document the

22  areas that they're looking at for future, if someone wants to

23  re-examine the evidence in the future, whether it's them or

24  someone else.

25         I did kind of want to take a step back and address the

```
 1   PCAST report, too.  I don't know -- we put a lot of this in our
 2   brief.  Our brief was very long.  I apologize for its length,
 3   but I wanted to kind of summarize and hit -- there are five
 4   reasons why we think that PCAST got it wrong.
 5            First, PCAST focuses on one of the Daubert factors to
 6   the exclusion of the others.  So Daubert lays out five
 7   nonexhaustive factors:  Testability, peer review, error rate,
 8   uniform standards, and general acceptance.
 9            And PCAST really has tunnel vision just as to one of
10   those factors, which is known or potential error rate.
11            Second, in focusing on that one factor, PCAST casts
12   aside large bodies of validation research.  They limit
13   themselves to what they call black box studies which, in my
14   opinion, I don't think they gave really a satisfactory
15   definition of what black box studies are or certainly why we
16   should limit our review to those under Daubert.  Daubert
17   doesn't say anything about, you know, black box studies only.
18            And we've cited a number of compelling validation
19   studies in our brief, including studies of consecutively
20   manufactured firearms where you would expect the false-positive
21   rate to be at its highest.  And those studies find an error
22   rate of zero or close to zero.
23            Third, the PCAST report, it fails to account for
24   standard quality assurance measures used by laboratories like
25   BPD's that further reduce the error rate.
```

1          So PCAST fixates on the Ames study, which finds an

2    error rate of 1 percent or a range of .36 percent to

3    2.26 percent with a 95 percent confidence level.

4          But the study -- the Ames study itself actually

5    provides reasons why this is likely an overestimation.

6          Most of the false identifications were made by a very

7    small number of examiners, meaning that there were really a few

8    outliers, a few bad apples who greatly inflated the error rate.

9          Here we have highly, highly trained experts who have

10   been doing this -- both of them have been doing it for decades.

11   They've -- like I said, they've gotten perfect scores on all

12   their proficiency testing.  There's every reason to think that

13   their error rate is exceedingly low.

14         And, furthermore, we have, you know, the requirement

15   of blind reanalysis in every case, which means that even if you

16   accept the worst-case scenario error rate that the defendants

17   want us to use, which is the 1 in 46 error rate from the

18   Ames report, the odds of two independent examiners both getting

19   it wrong would be 1 in 2,116, which is less than a 20th of a

20   percent, and I think that's really exceedingly low.

21         Fourth -- and this is really important, too -- the

22   PCAST report I don't think acknowledges that firearms and

23   tool mark identification is nonconsumptive, meaning that in

24   every case, the defendant can hire his or her own expert to

25   examine the evidence and reach their own conclusions.  And

1    that's -- that's really important.  We're not dealing with DNA

2    or chemical analysis that can't be tested, can't be retested by

3    the defense.  They have an equal ability to look at the

4    evidence and test those conclusions.

5         And, fifth, PCAST imposes an unrealistic standard when

6    it comes to error rate.  I think the Johnson SDNY case that

7    Your Honor flagged talks about this.

8         There's a possibility of error in every forensic

9    science:  DNA, fingerprint, chemical analysis, handwriting

10   analysis, medical and psychiatric diagnoses.  No forensic

11   science is error-proof, and we shouldn't impose a higher

12   standard on firearms experts than we do on fingerprint or

13   handwriting experts.  And I promise I'm almost done.

14        But I did want to talk just very briefly about the

15   Fourth Circuit's opinion in United States versus Crisp.  We

16   cited Crisp in our brief.  It's at 324 F.3d 261.

17        Crisp is a 2003 opinion by Judge King, joined by

18   Chief Judge Wilkins.  And it rejected nearly identical

19   challenges to expert testimony regarding fingerprint matches

20   and handwriting matches.

21        And in Crisp, like here, the defendant alleged that it

22   hasn't been proven that no two people have the same

23   fingerprints or no two people have the same handwriting and

24   that there weren't established error rates in those fields.

25        And as here, they also relied on a publication by the

1    National Institute of Justice calling for more validation

2    studies, citing a dearth of such studies.

3         And the Fourth Circuit agreed that, quote, Further

4    research, more searching scholarly review, and the development

5    of even more consistent professional standards is desirable,

6    unquote.  But it held that those shortcomings did not warrant

7    rejection of, quote, a form of evidence that has so ably

8    withstood the test of time, unquote.

9         And the Fourth Circuit placed primary emphasis on the

10   fact that fingerprint and handwriting analysis have achieved

11   strong general acceptance in the scientific community and in

12   the courts.

13        They stressed the Daubert language about how vigorous

14   cross-examination, presentation of contrary evidence, and

15   careful instruction on the burden of proof are the traditional

16   and appropriate means of attacking shaky but admissible

17   evidence.

18        Notably, with respect to handwriting analysis in

19   particular, the Court actually noted in a footnote that the

20   error rate may be as high as 6 percent for handwriting analysis

21   but, nonetheless, held that to the extent that a given

22   handwriting analysis is flawed or flimsy, an able defense

23   lawyer will bring that fact to the jury's attention.

24        So that was an error rate of 6 percent.  What we have

25   here is something much closer to zero, and we think that Crisp

```
 1    should dictate the result in this case.

 2           We think, respectfully, that Judge Grimm got it wrong

 3    in Medley, but that also there are a number of factual

 4    distinctions between this case and Medley.

 5           And as we said in our brief and as I said at the

 6    outset, we think that the examiner -- the examiner should be

 7    able to state their ultimate conclusions that particular

 8    ammunition components came from the same -- and using the word

 9    "same," the same known or unknown firearm.  Even using the word

10    "match."  But they should -- like I said, they should not

11    testify to absolute certainty.

12           We won't elicit any testimony about certainty level.

13    They can certainly be crossed about error rates in the field,

14    and they will truthfully respond based on their review of the

15    literature and their own experience.  I think they will

16    acknowledge that they can't ever be a hundred percent certain.

17           And so we ask that the Court not impose the

18    restrictions that were imposed in Medley but allow the

19    examiners to state their conclusions.

20           THE COURT:  Yes.  If it is pressed on

21    cross-examination, would your witness have any difficulty with

22    the upper limit of certainty being a reasonable certainty in

23    the field of ballistics?  Because I think we need to set some

24    upper limit.

25           MS. HOFFMAN:  I haven't gone over that language with
```

1    him.  I certainly can such that, you know, if he's crossed, he

2    can use the magic words "reasonable level of certainty."

3           I would point out what I pointed out yesterday, which

4    is that the defense has stated that they might call their own

5    expert, and so it does get a little bit tricky.

6           I think that to the extent that they plan to call a

7    defense expert who's going to testify that, you know, the error

8    rate is, I don't know what, 3 percent in the field and that

9    it's entirely subjective and that you can never be more than

10   70 percent certain or -- you know, I don't know what their

11   expert's going to say, but we do need to have a chance to rebut

12   that.

13          And maybe that means just re-calling Mr. Wagster in

14   rebuttal.  You know, we can see what comes and then re-call him

15   if we need to.

16          **THE COURT:**  Yes.

17          Ms. Whalen, I know you've requested more limits, but

18   what the Government -- with the Government proposing not to

19   elicit any degree of certainty, although using, in his opinion,

20   the word "same" or "match" when describing the marks that are

21   left, where would you see that going on cross?  And would you

22   want an upper limit of reasonable certainty in the field of

23   ballistics or something like that?

24          **MS. WHALEN:**  Your Honor, I can't -- without knowing

25   more of what the expert would say, I can't envision exactly

```
 1   where it would go.
 2          THE COURT:  Okay.
 3          MS. WHALEN:  However, my concern is, as I stated
 4   before, that if questioned about that language, "same" or
 5   "match," while he may be saying to the Government, "I can't say
 6   that I'm a hundred percent sure," when you start talking
 7   percentages, if he starts using any other numbers that are
 8   high, such as what I'm saying "same" and "match" mean, then I
 9   would suggest that at that point -- at that point he is being
10   allowed to testify beyond what I think he should be allowed to
11   testify, because it is a subjective.  It's his own opinion, and
12   he's getting into that realm of "my opinion is to the exclusion
13   of other firearms" or "to the exclusion of other bullets or
14   cartridge casings."
15          So my suggestion is he shouldn't be allowed to get
16   into any level of certainty.  But I come back to he has -- any
17   opinion that he gives, consistent with what his report says, is
18   a level of certainty.
19          So we're -- the Government's basically doing an end
20   run on, okay, we're not going to ask him if he's a hundred
21   percent sure, but we're going to ask him:
22          Did it match?
23          Yes.
24          Is it the same?
25          Yes.
```

1         That's a hundred percent certainty.

2         **THE COURT:**  Well, I think that saying that something

3   is the same or a match, in his opinion, is not the same as

4   saying, "And I'm a hundred percent convinced that my opinion is

5   correct."

6         I understand you.  But I don't think that -- well, for

7   reasons I'm about to explain, I'm not going to prevent him from

8   saying that, in his opinion, it came from the same gun or that

9   it is a match within a reasonable degree of certainty in the

10  field of ballistics.

11        This is a -- obviously can be, and has become

12  recently, a complicated question.

13        Let me explain where I think we are.  And I certainly

14  have considered Medley and have great respect for Judge Grimm.

15  Each of us has to make a decision based on the particular

16  evidence that's in front of us.

17        I appreciate being proffered by the Government, and I

18  assume I will hear that the firearms examiner found at least 15

19  what he believes to be matching marks as to one of the examples

20  and at least eight as to the other.  That is higher, I would

21  note, than the six that was the CMS methodology the examiner

22  testified to in United States v. Johnson.

23        So what we're considering here is the admissibility of

24  testimony under Federal Rule of Evidence 702 and, of course,

25  Daubert.

1        And I think it's always ironic, but I do point out

2   that Daubert initially was intended to relax the standard for

3   admitting scientific evidence.  It was seen as an expansion

4   beyond the Frye test that used to control us.

5        I recognize that it hasn't always been -- seemed to

6   have that result.  And, of course, there is a gatekeeping

7   function that the Court is required to apply, which is what I'm

8   doing.

9        The question is whether there -- first of all, whether

10  this would be testimony, opinion testimony that would be

11  helpful and beyond the ken, if you will, the experience of the

12  average juror.

13       And I do think that this is at least technical or

14  specialized evidence, if not scientific.  But at least

15  technical or specialized evidence that is not something that

16  the jury would ordinarily be able to clearly understand on its

17  own.  And it is within the scope of Rule 702.

18       In this particular instance proffered to me, and I

19  think fairly thoroughly -- although I have not heard them

20  testify in this case in person yet -- but it's been fairly

21  thoroughly proffered, and I assume we'll follow-up, that the

22  firearms examiners in this case have extensive experience.

23       They've been doing this for years.  They work in a

24  certified lab.  They follow the AFTE methods.  There is a

25  check, a second examiner, doing what the Government just called

 1    blind reanalysis.  They don't know the results ahead of doing

 2    that same analysis again.  I think that's a significant check

 3    on the opinion.

 4         In addition to the experience and training and the

 5    certified lab, I'm relying on the proficiency testing that I

 6    believe these examiners go through frequently.

 7         So I think their qualifications -- their

 8    qualifications are good.

 9         Is the evidence -- is it relevant?  It's certainly

10    relevant.

11         Is it reliable?  Looking at the various <u>Daubert</u>

12    functions -- excuse me, standards and criteria, of course, also

13    recognizing that the Supreme Court has said not every criterion

14    applies equally in every case.

15         In terms of testability, it appears that this is

16    testable as a general matter.

17         I would say that even the PCAST report -- and the

18    PCAST report itself has many challenges.  Even the PCAST report

19    identified the one study, the Ames study, as what it did think

20    was a sufficient test of an error rate.

21         And even accepting the error rate found in that one

22    study that PCAST did recognize, it was at most about 2 percent.

23    I think that's well within the range.  There's always going to

24    be some degree of error rate.

25         So I think there are studies that have been and can be

```
1    done, and I guess there's -- then there's the proficiency

2    testing as well and the -- as I said, the review by a second

3    examiner.

4           In this case we did have photographs and reports and

5    notes in the reports.  And this isn't directly a matter of

6    testability, but I think it's a significant point that the

7    defense has access to its own experts.

8           The evidence is available to be reviewed, studied,

9    examined by other experts retained by the defense, and that

10   certainly can both assist with cross-examination.  And if they

11   come to a different result, that can be presented as well.

12          In terms of peer review and publication, there are a

13   lot of publications.  The AFTE journal has been recognized as

14   peer-reviewed literature.

15          And, again, it's a form of peer review, I believe,

16   when people go through the proficiency, the blind testing.  I

17   believe there's been reference to testing on consecutively

18   manufactured guns, indeed.

19          And we have that proficiency testing and reanalysis

20   here as well as the AFTE methodology and peer-reviewed

21   standards -- journals, rather.

22          The controlling standards of sufficient agreement -- I

23   recognize that that is, perhaps, the greatest issue for

24   cross-examination.  There is, necessarily, some subjectivity in

25   the opinion.  I think that's true in other fields as well.  The
```

1    medical field would come to mind.

2          But the matching is something, again, that is verified

3    by a second examiner, can be challenged by a defense expert.

4          And in this instance, while the methodology does not

5    put a specific number as to how many matches there must be,

6    what's been proffered to me seems sufficient.  It's not just

7    one or two.  It's eight as to one and fifteen as to the other

8    that has been -- at least that's been proffered to me.

9          In terms of the -- well, I guess I've addressed the

10   error rate.  It just seems to be fairly low, even if the

11   Ames study is correct.  And the backup examination by a second

12   examiner should make that error rate even lower.

13         And in terms of acceptance, this is still a widely

14   accepted technique.

15         Having said all that, there is language in the reports

16   that this results in an opinion to a level of certainty to the

17   exclusion of all other firearms.  I think that would be clearly

18   too much of a degree of certainty to express.  I will not

19   permit that.

20         It is, I believe, more of a technical discipline than

21   scientific, and it has to recognize the limits inherent in the

22   field of ballistics.  So that would be the maximum level of

23   certainty as to his opinion that he would be allowed to express

24   if that comes up on cross-examination, because I'm

25   understanding that the Government's not going to elicit any

1    degree of certainty in his opinion.

2          So I am -- again, I think this case is distinguishable

3    from Medley.  I think there are limitations that are

4    appropriate, but I don't think in this case that we are at a

5    point of precluding these examiners from saying that they

6    believe there are matching marks and, therefore, they believe

7    that the same gun is involved, subject, as I've said -- and I

8    have a great deal of faith in cross-examination and in the

9    defense ability to call their own experts.  And I think this is

10   the way to do it.

11         I will also -- unless someone doesn't want me to --

12   but I would also remind the jury, when the testimony is about

13   to be given, that the fact that someone is allowed to testify

14   as an expert does not mean that the jury has to accept that

15   opinion.  It's up to them to evaluate those opinions like those

16   of other witnesses, and they don't have to accept an expert

17   opinion.

18         So I would be happy to give that instruction, both at

19   the time of the testimony and also in the jury instructions at

20   the end of the case.

21         **MS. WHALEN:**  I think, on behalf of Mr. Bailey, we

22   would request an instruction.

23         **THE COURT:**  Okay.  All right.

24         **MS. HOFFMAN:**  And, Your Honor, in light of the --

25   Your Honor's careful ruling -- and I apologize, because I know

1  the jury's waiting -- but could I have five to ten minutes to

2  speak with Mr. Wagster to explain what your ruling was, what

3  the limitations are, what he can and cannot say?

4          **THE COURT:**  Yes.  I think it would be a good idea for

5  you to speak to him first.

6          **MS. HOFFMAN:**  Okay.  Thank you.

7          **THE COURT:**  Okay.  But I think we'll -- I don't know

8  that that makes sense to take a whole break, so perhaps you can

9  go out and speak to him and let's see if -- your co-counsel is

10 here.  Perhaps there's something else, some other issue we can

11 take up.

12         And, by the way, I'll reserve -- that is obviously an

13 oral ruling.  I will reserve the right to edit it for my errors

14 of grammar and style but not for substance.

15         Ms. Whalen.

16         **MS. WHALEN:**  Your Honor, I'm not sure exactly which

17 witnesses some of this evidence will come in, so I'm sure

18 Government's counsel will just let me know if that's something

19 that Ms. Hoffman should be handling.

20         **THE COURT:**  Sure.

21         **MS. WHALEN:**  So my understanding is that there will be

22 iCloud 87, which shows my client making hand signs like we've

23 seen in several others.  He's with another in a car.

24         ICloud 88, which is my client and Nick and another

25 person.

1        ICloud 109, which is Dirt and Spittle.

2        And 134 is a video.  I guess, Your Honor, for the same

3   reasons that we've been noting and we've put in our pleadings,

4   we believe that these are cumulative and that it should be to

5   the Government to distinguish them for having some purpose

6   other than what's already been presented to the jury, which

7   there have been pictures of my client and Nick.  There have

8   been certainly the signs.

9        The video, it's very short and it's at the gas

10  station, but it's like a jumble of things.  And what I hear in

11  the background -- and I apologize for using these terms -- but

12  it's something like, Bitch ass Bo.

13       There's a woman that's in it.  There's just nothing

14  distinguishing that I see in that video, so we'd object to

15  that.

16       There's one -- this is kind of just for consistency,

17  this objection.  Social Media 10, SM-10, it's actually, I

18  believe, Mr. Davis' account, per the Government's

19  identification of it.  And there are -- on four of the

20  different slides, there are those little boxes.

21       So this is a certified business record, and I believe

22  we objected early on in the trial to those little boxes where

23  the Government has included on the business record something

24  from their work.  And for the same reasons that we objected

25  before, we're objecting to the actual alteration of the

```
 1   business record with -- and I don't think there will be
 2   testimony from an agent today about how or why those things got
 3   put in the box.
 4           And I believe I've hit them all, Your Honor.
 5           MR. HAZLEHURST:  Your Honor, on behalf of Mr. Davis, I
 6   would join the objection.  I would agree that that is an
 7   alteration of that business record; those red boxes were
 8   supplied by the Government.
 9           THE COURT:  Okay.
10           MS. AMATO:  And excuse me, Your Honor.  I just wanted
11   to join as to the objection regarding the small, little video.
12   I think it was IC-34 [sic].  There's no relevance.
13           There is a woman that is speaking.  There's no
14   allegation that what she says, whatever she says -- it's hard
15   to understand -- but that she's a co-conspirator.  And, so
16   therefore, I mean, whatever she's saying is hearsay, but the
17   whole thing is just not relevant.
18           THE COURT:  Okay.  On the four boxes, what I
19   understood the initial testimony to be was that those four
20   boxes were filled in in the original business record, had
21   emojis or whatever in them.  But it was a matter of how they
22   had to be transferred, if you will, or extracted from the
23   business records to be produced here that caused the boxes to
24   appear as if they were empty but that they were not empty in
25   the original business record.  Is that --
```

1      **MS. PERRY:**  That is correct, Your Honor.  That

2  information was embedded in the actual business record

3  returned.  It was just the way that they needed to be placed on

4  the PDFs in order to be an exhibit.

5      **THE COURT:**  Yes.  So if that's the objection on SM-10,

6  I will overrule it.

7      The other four, do you want to tell me why they are

8  not cumulative.

9      **MS. PERRY:**  Sure, Your Honor.

10      The first two that Ms. Whalen pointed out, the

11  photographs, including Mr. Bailey, do also include the witness

12  who we intend to introduce them through.  We believe that

13  they're relevant and probative to corroborate that he was at

14  these locations and hanging out with these individuals during

15  the time period of his testimony.

16      As to the other two photographs, including the one

17  that has Mr. Banks in it and the one that has Mr. Anderson in

18  it, there are particular things about the vehicles that the

19  individuals are in that the witness who we intend to introduce

20  them through is able to identify.  So it is, again,

21  corroborative.

22      The witness will identify how he knew these people and

23  what kind of vehicles that they commonly drove in, and these

24  photographs are those people and those vehicles.  So we believe

25  that they are just illustrative and corroborative of the

```
 1   witness who's testifying.

 2             I don't intend to --

 3        THE COURT:  You said Photographs -- 109 was a

 4   photograph --

 5        MS. PERRY:  Yes, Your Honor.  I apologize.  109 is a

 6   photograph and includes Mr. Banks in a vehicle that the witness

 7   will identify as the vehicle he knew Mr. Banks to be in.

 8        THE COURT:  So the vehicle is relevant as to 109 --

 9        MS. PERRY:  Yes, Your Honor.

10        THE COURT:  -- as to Mr. Randy Banks.

11        MS. PERRY:  That is correct.

12        THE COURT:  The video?

13        MS. PERRY:  The same with the video in IC-134.  It is

14   a video.  The witness, I believe, will identify that it is

15   Mr. Bailey speaking; that it is taken at the gas station; and

16   that Mr. Anderson drives up in a vehicle he knows to be

17   Mr. Anderson's vehicle.  So the vehicle is what is relevant

18   there.

19             I do intend to ask the witness if he recognizes the

20   voice on the video, the male voice on the video.  I don't

21   intend to ask him anything about the female voice and can

22   probably -- I don't exactly remember -- probably stop the video

23   before we even get to the female voice.  Certainly the very

24   beginning of the video is Mr. Anderson driving up in a car that

25   the witness will testify about.
```

1           **MS. AMATO:**  Your Honor, as to Mr. Anderson in that

2    video, I'm not quite sure what the relevance of the vehicle is,

3    but it's not that we are going to be objecting to Mr. Anderson,

4    the identification of a particular vehicle that's connected

5    with him.  At his residence there was that vehicle, I believe,

6    the black Honda.  And they searched the vehicle.

7           So I'm not quite sure what the relevance is.  We're

8    not claiming that the black Honda was not Mr. Anderson's.

9           **THE COURT:**  Are you offering some sort of stipulation?

10          **MS. AMATO:**  Well, we could.

11          **THE COURT:**  Why don't you have a little more

12   conversation about that and the video and also see if the video

13   can be shortened to eliminate the unrelated woman, and let me

14   know before that actually gets played.

15          **MS. PERRY:**  Yes, Your Honor.

16          **MR. SARDELLI:**  Your Honor, as to 109 that was

17   discussed with Mr. Banks -- excuse me, Your Honor -- I didn't

18   hear any relevance.

19          I believe the vehicle -- the pictures are of him

20   sitting in a vehicle.  It's a Mercedes.  He's sitting in the

21   vehicle with another person.  I didn't hear what the relevance

22   is.

23          I don't believe the vehicle is registered to him or

24   linked to him in any other way.  So I'm not sure besides

25   taking -- having a picture of him sitting in the vehicle, how

1   it's relevant in any type of way, Your Honor.  I didn't hear

2   any.

3        **THE COURT:**  I gather it's for his connection with the

4   vehicle.  That's what I -- that's what I heard, that it's that

5   he is connected to that vehicle.

6        **MR. SARDELLI:**  Beyond saying that they think that's

7   relevant, I didn't hear them explain how that's relevant.  I'm

8   still lost as to what the relevance of the vehicle is,

9   Your Honor.

10       **THE COURT:**  Okay.  Relevance of the vehicle?

11       **MS. PERRY:**  Your Honor, first of all, it just

12  corroborates what the witness was able to observe and see and

13  what he knows and what other witnesses will say about Mr. Banks

14  and what vehicle he drove in to corroborate those witnesses as

15  well.

16       It's Mr. Banks sitting in a vehicle.  It's a

17  photograph from Mr. Bailey's iCloud account.  So we think that

18  the corroborative nature is relevant and there's certainly

19  nothing prejudicial about it.

20       I mean, there's no hand signs I will be asking about.

21  He also appears with another person in that photograph who is

22  alleged to be a co-conspirator, so I believe it is relevant.

23       **THE COURT:**  Okay.  We've probably spent more time

24  arguing about these photographs than it would have taken to

25  just show them.  But for right now, I don't see an issue with

1    87, 88, and 109.  We can talk further about the 134, the video,

2    before it's actually played.

3              Are we ready for the jury?

4         **MS. HOFFMAN:**  I think so.

5         **THE COURT:**  Okay.

6    (Jury entered the courtroom at 11:27 a.m.)

7         **THE COURT:**  So welcome back, ladies and gentlemen.  I

8    apologize.  There were events this morning that have nothing to

9    do with any of these folks that pushed us back.  So I really

10   appreciate your patience, but I do think we're ready for the

11   next witness.

12        **MS. HOFFMAN:**  The Government calls James Wagster.

13        JAMES WAGSTER, GOVERNMENT'S WITNESS, SWORN.

14        **THE CLERK:**  Please be seated.

15        Please speak directly into the microphone.

16        State and spell your full name for the record, please.

17        **THE WITNESS:**  James L. Wagster.  J-A-M-E-S L. Wagster,

18   W-A-G-S-T-E-R.

19        **THE CLERK:**  Thank you.

20              DIRECT EXAMINATION ON VOIR DIRE

21   BY MS. HOFFMAN:

22   **Q.**   Good morning, Mr. Wagster.

23   **A.**   Good morning.

24   **Q.**   Where do you work?

25   **A.**   Baltimore City Police firearms analysis unit.

1  **Q.**   And can you tell the ladies and gentlemen of the jury a

2  little bit about what you do at the firearms examination unit.

3  **A.**   We examine all the firearms-related evidence that comes

4  through the police department:  The firearms themselves; fired

5  ammunition components, which are bullets and cartridge cases;

6  and any live ammunition that's submitted.

7  **Q.**   And do you conduct comparisons of ammunition components?

8  **A.**   Yes, ma'am.

9  **Q.**   And what's the purpose of conducting those comparisons?

10 **A.**   A, to determine caliber.  Also, to determine if they were

11 fired with the same firearm or different firearms.

12 **Q.**   How long have you been employed with BPD's firearms

13 examination unit?

14 **A.**   A little over 26 years.

15 **Q.**   And were you in law enforcement before that?

16 **A.**   Yes.

17 **Q.**   Where were you before that?

18 **A.**   I was a Baltimore County officer.

19 **Q.**   How long were you with Baltimore County?

20 **A.**   20 years.

21 **Q.**   And were you also involved in firearms examination with

22 Baltimore County?

23 **A.**   From '86 on, yes, ma'am.

24 **Q.**   From '86 until -- and when did you start with BPD?

25 **A.**   '92.

1    **Q.**   Okay.  So does that mean you have at least 32 years of

2    experience in firearms examination?

3    **A.**   Yes, ma'am.

4    **Q.**   Do you have specialized training that assists you in the

5    performance of your duties?

6    **A.**   There was no schools that teach firearms identification in

7    1986.  I was assigned to the Maryland State Police and trained

8    under one of their examiners, Mr. Don Floor (ph).  I'm also a

9    member of AFTE, which is the Association of Firearm and

10   Tool Mark Examiners.

11   **Q.**   And can you describe a little bit more about what sort of

12   activities you've undertaken that have helped you with your

13   training.

14   **A.**   AFTE puts on yearly seminars, and usually there's a small

15   seminar East Coast Regional.  I've attended 'em when the City

16   will let us.  I've been to various firearms manufacturers;

17   Beretta here in Maryland; Walther Armorer School; Ruger Armorer

18   School; and Mossberg Firearms; Wilson Barrels; and several

19   other entities in New England.

20   **Q.**   And what's the purpose of touring the firearms

21   manufacturing facilities?

22   **A.**   To observe how the firearms are made.

23   **Q.**   Do you undergo continuing training in your field?

24   **A.**   Yes, ma'am.

25   **Q.**   And do you undergo proficiency testing?

1   **A.**    Yes.

2   **Q.**    How often do you undergo proficiency testing?

3   **A.**    Every year.

4   **Q.**    And what's your record of -- what's your pass report?

5   **A.**    Satisfactory on all of 'em so far.

6   **Q.**    How many examinations of firearms would you say you've

7   conducted?

8   **A.**    Thousands.  I couldn't tell you the exact number.

9   **Q.**    Have you ever been qualified to testify as an expert in

10  the field of firearms identification?

11  **A.**    Yes, ma'am.

12  **Q.**    Approximately how many times?

13  **A.**    It's 623 previous times.

14  **Q.**    And what courts have you been qualified as an expert in?

15  **A.**    Baltimore City, Baltimore County, Howard County,

16  Harford County, U.S. District Court in Baltimore and Greenbelt.

17         **MS. HOFFMAN:**  Your Honor, at this point I would ask

18  that James Wagster be qualified as an expert in the field of

19  firearms identification.

20         **MS. WHALEN:**  Your Honor, if I may voir dire?

21         **THE COURT:**  Yes, certainly.

22                   CROSS-EXAMINATION ON VOIR DIRE

23  BY MS. WHALEN:

24  **Q.**    Good morning, Mr. Wagster.

25  **A.**    Good morning.

1    **Q.**    Just a couple questions.

2        Have you taken any college courses in, for instance,

3    statistics or probabilities?

4    **A.**    No, ma'am.

5    **Q.**    And have you taken any college courses in, like,

6    metallurgy or anything relating to the components of metal?

7    **A.**    Not metallurgy, no, ma'am.

8    **Q.**    And how about tribology; have you taken any courses in

9    that?

10   **A.**    No.

11   **Q.**    And can you explain for us what that is.

12   **A.**    I'm not sure.

13   **Q.**    Okay.  The study of sort of metal moving against each

14   other or metal in movement, any courses on that?

15   **A.**    No.

16   **Q.**    Okay.  And your career, certainly has been a lengthy

17   career; and you listed Baltimore County Police Department where

18   you did firearms examinations; correct?

19   **A.**    Yes, ma'am.

20   **Q.**    And Baltimore City now; is that correct?

21   **A.**    Yes.

22   **Q.**    All right.  And have there been any other positions that

23   you've held outside of law enforcement?

24   **A.**    I worked for Whitman, Requardt and Associates for several

25   years.

1    **Q.**    And was that prior to being a police --

2    **A.**    Yes.

3    **Q.**    -- officer?

4         All right.  But since your tenure with law enforcement way

5    back in 19 --

6    **A.**    '72.

7    **Q.**    Let me check -- 72, yes, everything has been

8    law enforcement?

9    **A.**    Yes, ma'am.

10   **Q.**    All right.  And the programs, AFTE, the Association of

11   Firearms and Tool Marks Examiners; right?

12   **A.**    Yes, ma'am.

13   **Q.**    Okay.  And AFTE is a compilation of, generally speaking,

14   law enforcement officers; is that correct?

15   **A.**    It's a combination of that.  Some scientific people also.

16   Some -- most of the firearms have representatives that are

17   members.

18   **Q.**    All right.

19   **A.**    And the ammunition manufacturers.

20   **Q.**    So firearms and ammunition manufacturers?

21   **A.**    Yes, ma'am.

22   **Q.**    All right.  Great.

23              **MS. WHALEN:**  Thank you, sir.

24              That's all I have, Your Honor.

25              **THE COURT:**  Okay.  Anything else?

```
 1            (No response.)

 2            THE COURT:  All right.  Based on Mr. Wagster's

 3   training and experience, I'm going to find him qualified to

 4   give opinion testimony in the field of firearms identification.

 5            I will remind the jury, as I think I said at the very

 6   outset of the case, the fact that a witness is found qualified

 7   to give you opinion testimony, it's still up to you whether to

 8   accept that testimony.  It's up to you to listen; to consider

 9   the reasons, the training and experience; and then you give an

10   expert's opinion the weight, if any, that you believe it should

11   have, just as you do with any other witness.

12            But we will allow him to express opinion testimony in

13   this field.

14            MS. HOFFMAN:  Thank you.

15                        DIRECT EXAMINATION

16   BY MS. HOFFMAN:

17   Q.   Mr. Wagster, you mentioned that you conduct comparisons of

18   firearms and ammunition components; is that right?

19   A.   Yes, ma'am.

20   Q.   And can you start by explaining for us how a cartridge or

21   a round of ammunition is structured.

22   A.   Basically, a cartridge consists of the cartridge case,

23   which is basically a metal tube.  In one end would be the

24   primer; the other end would be the bullet; and in between would

25   be the gunpowder.
```

1  **Q.**   And are cartridge cases sometimes referred to as shells or

2  casings?

3  **A.**   Yes, ma'am.

4  **Q.**   Can you tell us how the actual firing process works.

5  **A.**   Depends on the firearm.  On a semi-automatic, you'd first

6  have to load the magazine.  The magazine would have to be

7  inserted into the firearm and then the first round chambered.

8  When you pull the trigger, hammer, the firing-pin strikes the

9  primer, ignites the gunpowder.  It doesn't explode.  It burns

10 very, very fast.

11       The bullet's pushed down the barrel.  The cartridge case

12 comes back against the rear or the inside of the slide, the

13 breech face.  That pushes the slide back.  The cartridge is

14 then -- the fired cartridge case is then extracted and ejected

15 out of the firearm.  Under spring tension, the slide comes

16 forward, chambers another round, and you get the same action

17 again with each pull of the trigger.

18       If it was a revolver, you'd have to physically open the

19 cylinder, load the cylinder, close the cylinder, and you'd

20 still get one shot with each pull of the trigger.  But the

21 fired cartridge case would stay in the firearm until you

22 physically took it out.

23 **Q.**   So when a semi-automatic firearm is fired, the

24 cartridge casings are ejected?

25 **A.**   Correct.

1    **Q.**   And do they land, presumably, somewhere in the vicinity of

2    where the firearm was fired?

3    **A.**   Yes, ma'am.

4    **Q.**   Now, you just described the firing mechanism.  Does that

5    mechanism leave markings on the ammunition components?

6    **A.**   It can.

7    **Q.**   And can you explain.

8    **A.**   When the firing pin is going to leave impressions on the

9    primer and when that cartridge case comes back, it comes back

10   against the breech face with the same force that the bullet

11   goes forward.

12       So those markings on the breech face are stamped onto the

13   head of the cartridge case.  They're the two main marks that we

14   use to identify cartridge cases being fired with the same

15   firearm.

16   **Q.**   And what about with respect to bullets; are there

17   markings -- are there unique markings left on bullets?

18   **A.**   When the bullet goes down the barrel of the firearm, the

19   lands and grooves, which are the -- lands and grooves are cut

20   into the barrel that in part spin into the bullet.  They're

21   impressed into the surface of the bullet.

22       However, bullets tend to hit objects that destroy their

23   surfaces or can destroy their surfaces.

24   **Q.**   Can you tell us how you go about conducting your

25   comparison analysis.

1    **A.**    The evidence is received in my office from the property

2    room.  When the evidence envelopes are opened, the evidence is

3    marked.  I usually mark it with our Q number, which is --

4    cartridge cases would be Q-1 through however many you had.

5    Bullets would be Q-1-B, Q-2-B, et cetera.  My initials are on

6    there and also the property number that the items were received

7    under.

8    **Q.**    And what happens next?  How do you actually examine the

9    ammunition when you conduct that comparison?

10   **A.**    After I mark 'em, they're cleaned off just to make 'em

11   safe.  And then the cartridge cases and bullets are put onto a

12   comparison microscope, which is just a low-powered microscope,

13   but it lets you see two objects side by side.

14        So you can look at the cartridge cases against each other

15   and then the bullets against each other and make a

16   determination:  Either they were fired, they weren't fired, or

17   I can't tell.

18   **Q.**    So you said there are some cases where you can't tell.

19   And why might you not be able to tell whether ammunition was

20   fired from a particular firearm?

21   **A.**    Damage to it, run over by cars, whatever the bullet

22   struck.

23   **Q.**    And what are you -- when you make the conclusion that a

24   particular ammunition component was fired from a particular

25   known or unknown firearm, what are you basing that conclusion

1    on?

2    **A.**    If it's the bullets, it's the land and grooves

3    impressions, the microscopic marks from manufacturer wear and

4    tear of the gun on the surface.

5        And on cartridge cases, it's generally the breech-face

6    marks and the firing-pin impressions on the head of the

7    cartridge case.

8    **Q.**    I want to ask you a bit about the BPD, Baltimore Police

9    Department, firearms examination unit that you work for.

10       Is that laboratory certified?

11   **A.**    Yes, ma'am.

12   **Q.**    Who is it certified by?

13   **A.**    ANAB.

14   **Q.**    And what's ANAB?

15   **A.**    It's a -- I'm not going to say it right.  It's a

16   combination of -- used to be ASCLD.  They've changed the names.

17   But it's the laboratory certification.  They come out and

18   inspect us every several years and have many inspections every

19   year.

20   **Q.**    Do you have a -- is there -- when you conduct a comparison

21   examination, is there a co-examiner?

22   **A.**    Yes, ma'am.

23   **Q.**    And is that in every case that you conduct a comparison?

24   **A.**    It's on every case, yes, ma'am.

25   **Q.**    And do you know your co-examiner's conclusions when you

1  form your conclusions?

2  **A.**  No.

3  **Q.**  And does your co-examiner know your conclusions when he or

4  she forms his or her conclusions?

5  **A.**  No.

6  **Q.**  What happens if you -- did you have a co-examiner in this

7  case?

8  **A.**  Yes.

9  **Q.**  And is your co-examiner's -- do you take -- do you make

10  reports when you conduct comparison examinations?

11  **A.**  When we're done, yes, ma'am.

12  **Q.**  Is your co-examiner's name also on your report?

13  **A.**  Yes.

14  **Q.**  And what happens, by the way, if -- if your co-examiner

15  reached a different conclusion, what would happen?

16  **A.**  Then he would have to show me what he saw.  And if I

17  didn't agree with it, we'd go to a third examiner.

18  **Q.**  And did that happen in this case?

19  **A.**  No, ma'am.

20  **Q.**  I believe you testified -- you started to explain how you

21  identify evidence when it comes to you.

22      Did you say that your initials go onto each piece of

23  evidence?

24  **A.**  Yes, ma'am.

25  **Q.**  And can you explain that.

1    **A.**    When it comes in, it's marked, like I said, with a Q

2    number, also with my initials and the property number that it

3    was received under.

4    **Q.**    Can you tell the members of the jury what a CC number is.

5    **A.**    It's just a central complaint number, call for service.

6    **Q.**    And is the evidence that comes to you also marked by CC

7    number?

8    **A.**    The package it comes in has the CC number on it.  But when

9    it's taken to the property room, they assign it a property

10   number.

11   **Q.**    Got you.

12        I'm going to approach and show you

13   Government's Exhibit F-3, which has already come into evidence

14   as six casings and one live round from the scene of the

15   February 8th, 2015 shooting at the BP gas station in the

16   5200 block of Windsor Mill Road.

17        (Handing.)

18        Do you recognize this exhibit?

19   **A.**    This is -- the 3133, is that the correct --

20   **Q.**    Yes.  It should say on there.

21   **A.**    Okay.  Yes, ma'am.  The envelope's marked when it was

22   sealed, and it had my name on the seal.  And the

23   cartridge cases, there was also one live cartridge submitted

24   under that property number.  And the cartridge cases are marked

25   by myself.  I generally put like a black Magic Marker and then

```
 1   scratch my initials and the property number and the item number
 2   on it.
 3   Q.   And if you don't mind, I'm going to approach again and
 4   take the evidence from you and put it up on the ELMO.
 5        It will be a little hard to see.  I don't know if that's
 6   quite going to work.
 7             MS. HOFFMAN:  Your Honor, may I actually -- would it
 8   be possible to publish the exhibit to the jury?
 9             THE COURT:  Are you expecting them to pour the bullets
10   out -- I mean the casings out and look at them?  Or do you want
11   to just maybe just send one around?
12             MS. HOFFMAN:  One works just fine (indicating).
13             THE COURT:  Okay.  You can send one around.  Just hold
14   it really carefully.
15        MS. WHALEN:  Your Honor, while that's happening, we
16   have a monitor that's not turning on.
17             THE COURT:  It's not working at all?
18             MS. WHALEN:  It's black and I pushed the button, but
19   nothing happened.
20             THE COURT:  Let's see.  Ms. Moyé to the rescue.
21             MS. WHALEN:  Thanks.
22        (Above-identified exhibit was published to the jury.)
23        (Pause.)
24             THE COURT:  You have retrieved the casing?
25             MS. HOFFMAN:  I have retrieved the casing and returned
```

1    it to the envelope, which I've returned to Mr. Wagster.

2         **THE COURT:**  Let's see how we're doing on the monitor.

3    Still working.  Is there anything that's about to go on the

4    monitor?

5         **MS. HOFFMAN:**  No.

6         **THE COURT:**  Okay.

7         **MS. HOFFMAN:**  Should I continue?

8         **THE COURT:**  Go ahead.

9    **BY MS. HOFFMAN:**

10   **Q.**   Turning your attention back to Government's Exhibit F-3,

11   which you identified as having the CC number ending in 3133,

12   first, I want to ask you about the six cartridge casings in

13   Government's Exhibit F-3.

14        First of all, did there come a time when you were asked to

15   examine this evidence?

16   **A.**   Yes, ma'am.

17   **Q.**   And what conclusions were you able to draw about those six

18   cartridge casings?

19   **A.**   They were caliber .40 Smith & Wesson and that they were

20   fired with the same unknown firearm.

21   **Q.**   And how were you able to make that determination?

22   **A.**   By microscopic comparison of the breech face and

23   firing-pin marks on those six cartridge cases.

24   **Q.**   Do you take photographs when you conduct examinations?

25   **A.**   Yes, ma'am.

1    **Q.**   And what's the purpose of those photographs?

2    **A.**   As a refresher for myself later on and should another

3    examiner want to look at that five years down the line, I can

4    show 'em how I had the cartridge cases oriented.

5    **Q.**   And did you review the photographs taken in this case

6    prior to coming in here today?

7    **A.**   Yes, ma'am.

8    **Q.**   And can you tell us, when you conducted the comparison of

9    those six cartridge casings, how many -- approximately how many

10   markings -- can you tell us -- can you describe what markings

11   you were looking at and how many you looked at.

12   **A.**   On this -- the six cartridge cases, all had decent

13   firing-pin impressions.  There were a lot of marks in the

14   firing pin.  And the breech face also has marks, both from the

15   stamping of the firing and on the shear marks.  And I was able

16   to identify the shear marks, the firing-pin impressions and the

17   breech face markings.

18   **Q.**   Now, you mentioned that there's also a live round.

19        First of all, why might there be a live cartridge found at

20   the scene of a shooting?

21   **A.**   Could be several reasons.  Could have jammed when the gun

22   was cleared.

23        On a semi-automatic, if you're not sure that the first

24   round is chambered, when you rack the gun to see if it's

25   loaded, you may rack one out.  And there's always a possibility

1    it just fell out of a pocket.

2    **Q.**   In this case did you examine the live round that was

3    recovered from the scene as well?

4    **A.**   Yes, ma'am.

5    **Q.**   And what conclusions were you able to draw about that live

6    round?

7    **A.**   It had a firing-pin impression on it, and I was able to

8    match the firing pin on the unfired cartridge to the firing-pin

9    impressions on the fired cartridges.

10   **Q.**   And was that, again, through the -- using the comparison

11   microscope?

12   **A.**   Yes, ma'am.

13   **Q.**   So in conclusion, does that mean that you concluded that

14   all six cartridge casings and the one live round from the scene

15   of the February 8th, 2015 shooting were fired with the same

16   unknown firearm?

17   **A.**   The six were fired.  The one was struck with the

18   firing pin.  It was not fired.

19   **Q.**   I believe you referred to caliber earlier.  What caliber

20   was this ammunition?

21   **A.**   It was .40 Smith & Wesson.

22   **Q.**   And what does the term "caliber" refer to in relation to a

23   gun or a bullet?

24   **A.**   It's basically the size of the bullet, the size of the

25   cartridge.

1   **Q.**   I'm going to approach now and show you

2   Government's Exhibit F-5, which has come into evidence as

3   cartridge casings and live rounds from the scene of the

4   February 12th, 2015 murder of James Edwards, also known as

5   Bangout.

6        I'm also going to show you Government's Exhibit F-5-C and

7   Government's Exhibit F-5-D, which have come into evidence as

8   bullets from the body of the victim.

9        (Handing.)

10       Do you recognize those exhibits?

11  **A.**   Yes, ma'am.

12  **Q.**   Did there come a time when you were asked to examine this

13  evidence?

14  **A.**   Yes, ma'am.

15  **Q.**   And I want to start with -- again, with the

16  cartridge casings that you examined from the scene of this

17  murder.

18       What conclusions were you able to draw about those

19  cartridge casings?

20  **A.**   They were caliber .40 Smith & Wesson, and those four

21  cartridge cases were fired with the same firearm, same unknown

22  firearm.

23  **Q.**   And how were you able to determine that the four

24  cartridge cases were fired with the same unknown firearm?

25  **A.**   By identifying the breech face and firing-pin impressions.

```
 1    Q.   Now I want to ask you about the live cartridges, the live

 2    rounds.

 3         What conclusions were you able to draw with respect to the

 4    live cartridges from the scene?

 5    A.   There were seven live cartridges.  One of 'em had a

 6    firing-pin impression on it.  I was able to identify that to

 7    the firing-pin impressions on those four cartridge cases.

 8    Q.   And what do you mean when you say you were able to

 9    identify it?

10    A.   That they were made with the same firing pin.

11    Q.   What about the other -- you said there were seven

12    cartridge cases -- seven -- I'm sorry, seven cartridges and one

13    you were able to identify as having the same firing pin.  What

14    about the other six cartridges?

15    A.   I couldn't identify them as being chambered in the same

16    firearm.

17    Q.   And why not?

18    A.   Just didn't have any marks on 'em.

19    Q.   Did you also examine the bullets from the body of the

20    victim?

21    A.   Yes.

22    Q.   And what conclusions were you able to draw with respect to

23    the bullets?

24    A.   There again, they were too surface-damaged for me to

25    conclude they were fired with the same unknown firearm.  They
```

1   did bear similar class characteristics.

2   **Q.**   Can you explain what a class characteristic is.

3   **A.**   That in this case is the land-and-groove impressions and

4   widths.  In this case they were all five right, but I was, like

5   I say, couldn't make the identification.

6   **Q.**   What does "five right" mean?

7   **A.**   That the barrel they went down had five lands and grooves

8   with a right twist.

9   **Q.**   And is there a particular manufacturer that is commonly

10  associated with five right?

11  **A.**   It's most common to Smith & Wesson.

12  **Q.**   So in conclusion, does that mean -- or in summary, does

13  that mean that you concluded that all four cartridge casings

14  and one of the live rounds from the scene of the Bangout murder

15  were fired with the same unknown firearm?

16  **A.**   The four cartridge cases were fired with the same unknown

17  firearm.  And the one live cartridge had the same firing-pin

18  impression on it, but it's an unfired cartridge.

19  **Q.**   Right.  And you were not able to rule in or rule out

20  whether the other live cartridges or bullets were fired with

21  the same unknown firearm; is that right?

22  **A.**   Yes, ma'am.

23  **Q.**   Did there come a time when you were asked to conduct a

24  comparison between Government's Exhibit F-3, the casings and

25  live round from the scene of the February 8th, 2015 shooting at

 1   the BP gas station, and Government's Exhibits F-5, F-5-C, and

 2   F-5-D, the casings, live rounds, and bullets from the

 3   February 12th, 2015 murder of Bangout?

 4   **A.**   Yes.

 5   **Q.**   And starting again with the cartridge casings, what

 6   conclusions were you able to draw with respect to the

 7   cartridge casings from both scenes?

 8   **A.**   That they were fired with -- excuse me, the same unknown

 9   firearm.

10   **Q.**   And how were you able to make that conclusion?

11   **A.**   By there again, identifying the breech face and firing-pin

12   impressions.

13   **Q.**   And can you remind us again what sort of markings you're

14   looking at.

15   **A.**   On the firing pin, you're looking at all the little marks,

16   ticks.  There are some parallel marks.  There's little just

17   highlights all through that firing pin.

18        And on the breech face marks, it's the breech face marks

19   were stamped when it was fired; but it also has some shearing

20   from movement, and they're the large parallel lines.  They were

21   all in sufficient agreement for me to make my conclusions.

22   **Q.**   And based on -- did you also take photographs to document

23   your analysis with respect to this comparison?

24   **A.**   Yes, ma'am.

25   **Q.**   And did you review those photographs before coming in

1    today?

2    **A.**    Yes, ma'am.

3    **Q.**    And can you tell us, if you can, is there an approximate

4    number of markings that you were able to tell just based on the

5    photographs were in sufficient agreement?

6    **A.**    Just looking at the photographs this morning on the

7    shearing, there's, I guess, maybe 15 that look good.  And on

8    the firing pin, there was about eight marks.

9        But when you look at it under a comparison scope, you see

10   a lot more than these photographs show.

11   **Q.**    Turning now to the live cartridges from both scenes, what

12   conclusions were you able to draw about those live cartridges?

13   **A.**    That they were made -- the firing-pin impressions on the

14   one live cartridge from each different CC number was made by

15   the same firing pin that were on the fired cartridge cases.

16   **Q.**    And, again, were you able to rule in or rule out the other

17   six live rounds from the scene of the Bangout murder?

18   **A.**    There was nothin' to identify them.

19   **Q.**    What about the bullets?  What conclusions were you able to

20   draw from the bullets from both scenes?  Were there any bullets

21   recovered that you examined from February 8th, 2015?

22   **A.**    There was just one bullet jacket fragment, and it was too

23   small to do anything with.

24   **Q.**    So were you able to draw any conclusion with respect to

25   the bullets from both scenes?

1   **A.**   No, ma'am.

2   **Q.**   So, again, to summarize, does that mean that you concluded

3   that the six casings and one live round from the scene of the

4   February 8th, 2015 shooting at the BP gas station were fired

5   from the same unknown firearm as the four casings and one of

6   the live rounds from the scene of the February 12th, 2015

7   murder of James Edwards or Bangout?

8   **A.**   Yes, ma'am.

9   **Q.**   Now, one final question for you:  Do your microscopic

10  comparisons tell you who actually pulled the trigger?

11  **A.**   No, ma'am.

12          **MS. HOFFMAN:**  Thank you, Mr. Wagster.

13          No further questions.

14          **THE COURT:**  All right.  Thank you.

15          Ms. Whalen.

16          **MS. WHALEN:**  Thank you, Your Honor.

17                         CROSS-EXAMINATION

18  **BY MS. WHALEN:**

19  **Q.**   Just a few questions, Mr. Wagster.

20          You were talking about some shearing effect when you were

21  just giving us some conclusions, and that was metal scraping

22  against metal (indicating); is that correct?

23  **A.**   Yes, ma'am.

24  **Q.**   Sort of -- remember I asked you the question about that

25  science of metal scraping against metal?

1   **A.**   Yes.

2   **Q.**   Okay.  And so that would be something that perhaps another

3   person who studies it would be able to look at that shearing

4   and make some conclusions about it; correct?

5   **A.**   Probably.

6   **Q.**   Now, you indicated early on in your testimony that if a

7   gun jammed and -- now, we're not talking necessarily about a

8   revolver.  We're talking about a semi-automatic.  The

9   semi-automatic actually ejects its cartridge casings; is that

10  correct?

11  **A.**   Yes, ma'am.

12  **Q.**   Or it's designed to do so; correct?

13  **A.**   Correct.

14  **Q.**   And do you know whether it is designed -- well, let me ask

15  it this way:

16      Are all semi-automatics designed, to your knowledge, to

17  eject a cartridge casing?

18  **A.**   Yes, ma'am.

19  **Q.**   And do you know whether they are all designed to eject to

20  one side of the other -- or the other of the gun?

21  **A.**   No, they're not.

22  **Q.**   Okay.  So they could be to the right?  They could be to

23  the left?

24  **A.**   Or straight up.

25  **Q.**   Or straight up.  Okay.

1          But you would expect, based on their design, that the

2    cartridge casings would land somewhere in the perimeter of the

3    weapon itself?

4    **A.**   Yes, ma'am.

5    **Q.**   Not designed, for instance, to go 20 feet down the road;

6    right?

7    **A.**   Not particularly, but . . .

8    **Q.**   Now, you were asked whether you can tell who had a gun

9    when you're doing your examination; right?

10   **A.**   Correct.

11   **Q.**   That's pretty obvious.  You were not at any of these crime

12   scenes; right?

13   **A.**   Correct.

14   **Q.**   You're just taking what a police officer picks up at the

15   scene and looking at that evidence; correct?

16   **A.**   Yes, ma'am.

17   **Q.**   All right.  And along that same vein, you are not able to

18   tell who had a gun; correct?

19   **A.**   Correct.

20   **Q.**   Not able to tell, necessarily, what the gun looked like

21   because no gun was submitted to you; correct?

22   **A.**   Correct.

23   **Q.**   Now, were you asked in this case to compare any

24   other .40-caliber bullets or casings, cartridge casings, other

25   than the ones with the number ending in -- CC number ending in

1    133 and then I believe the other one ending in 442?

2    **A.**    No, ma'am.

3    **Q.**    Okay.  So you were not asked to compare any .40-caliber

4    bullets that were picked up at the scene of the Terrell Gale

5    shooting back in, I believe it was, January 14th of 2013; is

6    that correct?

7    **A.**    No, ma'am.  I have no records that I looked at any other

8    CC -- CC numbers.

9    **Q.**    Okay.  And does that shooting of a Mr. Terrell Gale

10   have -- is that anything you know about?

11   **A.**    No, ma'am.

12   **Q.**    Now, you indicated that you're looking through a

13   microscope, is that correct, when you're trying to make an

14   examination of either bullets or cartridge casings?

15   **A.**    Yes, ma'am.

16   **Q.**    And the microscope has the two items placed side by side;

17   correct?

18   **A.**    Correct.

19   **Q.**    And you're looking through -- well, it's pretty

20   high-powered; right?

21   **A.**    Not really.  10, 15 power, not, you know, like you're

22   looking at microbes.  It's nothing like that.

23   **Q.**    All right.  But it does assist you a little bit more than

24   the naked eye; is that correct?

25   **A.**    Yes, ma'am.

1    **Q.**   And do you wear your glasses when you are looking through

2    the microscope?

3    **A.**   No, ma'am.

4    **Q.**   All right.  So are you looking at these two objects and

5    attempting to see similarities?  Is that correct?

6    **A.**   Yes, ma'am.

7    **Q.**   And you're also looking to see if there are

8    dissimilarities; correct?

9    **A.**   Yep.

10   **Q.**   And you then -- when you see something that you think is

11   important, you take a photograph of that; correct?

12   **A.**   Take the general photographs of just not each and every

13   piece of evidence; just the general photograph of at least two

14   of the items.

15   **Q.**   And so in this case you follow that procedure where you

16   took two photographs?

17   **A.**   Photographs of two separate, you know, Q-1 and Q-6 or

18   whatever the case may be.

19   **Q.**   All right.  And did that in this case ultimately end up

20   being two photographs overall?

21   **A.**   Yes, ma'am.  The firing pin and the breech face.

22   **Q.**   Firing pin and the breech face; is that correct?

23   **A.**   Yes, ma'am.

24   **Q.**   All right.  Did you take photographs -- I guess the answer

25   is, no, you did not take photographs of any dissimilarities

1    that you may have seen; is that correct?

2    **A.**    Correct.

3    **Q.**    All right.  And you mentioned that you looked to see if

4    there's sufficient agreement to make some conclusions; right?

5    **A.**    Right.

6    **Q.**    Now, that is a purely subjective aspect, is it not?  In

7    other words, you're looking and you're trying to find

8    sufficient agreement; correct?

9    **A.**    Yes, ma'am.

10   **Q.**    Okay.  And there is, for instance, no measuring device

11   that you can use to help you, for instance, determine the

12   length of a line you might see; correct?

13   **A.**    If you had a microscope that was capable of doing

14   measurements, you may be able to.

15   **Q.**    All right.  And yours was not of that caliber or quality,

16   was it?

17   **A.**    No, ma'am.

18   **Q.**    All right.  And so you're just looking, eyeballing, again,

19   whatever lines to see if they match up?

20   **A.**    Yes, ma'am.

21   **Q.**    And then the same would be true, there's no measurement in

22   your microscope, for instance, that allows for you to determine

23   depth, if you know what I'm saying; right?

24   **A.**    No, ma'am.

25   **Q.**    Okay.  And striations?

1  **A.**    No, ma'am.

2  **Q.**    And, for instance, depth of the land or the groove?

3  **A.**    You're looking at the patterns of that stuff.  You don't

4  actually measure the depths, 'cause that can vary depending on

5  the hardness of the primers.

6  **Q.**    All right.  And so I guess the question really -- or

7  really comes down to you're making a subjective determination

8  of what you think looks like a pattern; right?

9  **A.**    Yes, ma'am.

10 **Q.**    Okay.  Now, just like you really don't know who would fire

11 a weapon that would, you know, net or result in the officers

12 picking up the bullets or the cartridge casings for you to look

13 at, you are not, in your experience, looking at every firearm

14 or every bullet out there that actually is fired from a weapon;

15 correct?

16 **A.**    Correct.

17 **Q.**    All right.  So you're not taking a look to determine, you

18 know -- for instance, let's take the -- I mentioned the

19 .40-calibers from the Terrell Gale shooting.  Assume, if you

20 will, that there were .40-caliber bullets collected at the

21 Terrell Gale shooting.  You can't, without looking at them and

22 without studying, say that they are, because they're

23 .40-caliber, a likely match to those found at the BP or the

24 Edwards shooting; correct?

25 **A.**    Correct.

```
 1              MS. WHALEN:  Court's indulgence.

 2              Thank you.  That's all the questions I have for

 3    Mr. Wagster.

 4              THE COURT:  Okay.  Great.

 5              Anybody else?

 6         (No response.)

 7              THE COURT:  Any redirect?

 8              MS. HOFFMAN:  Just briefly.

 9                        REDIRECT EXAMINATION

10    BY MS. HOFFMAN:

11    Q.  Mr. Wagster, you were asked about casings recovered from a

12    different shooting, Terrell Gale shooting.  Are you familiar

13    with NIBIN?

14    A.  Yes, ma'am.

15    Q.  What's NIBIN?

16              MS. WHALEN:  Objection.

17              THE COURT:  Come up to the bench.

18         (Bench conference on the record:

19              MS. WHALEN:  It's beyond the scope.  I haven't

20    approached that, nor did they in --

21              MS. HOFFMAN:  Well, Your Honor, Ms. Whalen has clearly

22    put a suggestion into the jury's mind that the casings from the

23    Terrell Gale shooting might match the casings here.  In fact,

24    there was no match between those casings.  And so I would like

25    to be able to correct that suggestion that NIBIN -- the casings
```

1    from each scene are uploaded generally into the NIBIN database,

2    and there was no NIBIN hit for those casings.

3              MS. WHALEN:  It's totally separate.

4              THE COURT:  I agree.  I'm sustaining the objection.)

5         (Bench conference concluded.)

6              THE COURT:  Anything else?

7    BY MS. HOFFMAN:

8    Q.   Mr. Wagster, when you conduct your comparison examination

9    of ammunition components, are the ammunition components

10   destroyed or preserved?

11   A.   They should be preserved.

12   Q.   And can they be examined by another examiner?

13   A.   Yes, ma'am.

14   Q.   So could the defense have their examiner --

15             MS. WHALEN:  Objection, Your Honor.

16             THE COURT:  Sustained.

17             MS. WHALEN:  Move to strike.

18             THE COURT:  The jury will disregard.

19             MS. HOFFMAN:  No further questions.

20             THE COURT:  Anything else?

21        (No response.)

22             THE COURT:  All right.  Thank you very much, sir.

23        You are excused.

24        (Witness excused.)

25             THE COURT:  And I guess there will be another witness,

```
 1    but perhaps we should take a short recess.

 2          So while Mr. Wagster and everybody is gathering up all

 3    the exhibits, we'll excuse the jury for a short break.

 4       (Jury left the courtroom at 12:09 p.m.)

 5          THE COURT:  Any issues for whoever is the next

 6    witness?

 7          MS. PERRY:  I believe that the video that we were

 8    discussing is related to -- is something we'll seek to play

 9    with the next witness.  I don't know that we will get that far

10    before the lunch break with that particular witness.

11          But if I could just have a moment to pull up the video

12    and see where I can stop it.

13          THE COURT:  Why don't you go discuss that with

14    Ms. Amato, see if you can work anything out.  And if not, we'll

15    look at it before it gets played or something like that.

16          All right.  We'll excuse the gallery.

17          All right.  We'll take a short recess.

18       (Recess taken.)

19          THE COURT:  All right.  Looks like the monitors are

20    working again.

21          MR. ENZINNA:  Yes, the monitor is working, Your Honor.

22          THE COURT:  Okay.

23          MR. ENZINNA:  And, Your Honor, before we bring the

24    jury in, I'd like to make a motion for a mistrial based on

25    prosecutorial misconduct -- I apologize.
```

1          I'd like to make a motion for a mistrial based on

2    prosecutorial misconduct based on Ms. Hoffman's questioning of

3    Mr. Wagster and the burden-shifting.

4          **THE COURT:**  Okay.  I'll deny the motion for mistrial.

5    I think I quickly struck that question.  I don't expect to hear

6    anything like that again.

7          If you would like me to remind the jury, as I have

8    done on many occasions and will do on the final instructions,

9    that the defendants have absolutely no burden to present any

10   evidence or call any witnesses, I'd be happy to do that again

11   now, if you'd like.

12         **MR. ENZINNA:**  No, Your Honor.  I think that's --

13         **THE COURT:**  No?  Okay.

14         **MR. SARDELLI:**  Your Honor, just a housekeeping matter.

15   I don't think it's -- obviously, we'd join that motion.

16         Is it necessary -- there's a blanket coverage that we

17   don't need to get up and say, for just saving-time purposes,

18   I'd join the motion, or anything else?

19         **THE COURT:**  I assume that everybody joins in that sort

20   of motion that is generally applicable to all defendants.

21         **MR. SARDELLI:**  Yes, ma'am.  Thank you.

22         **MR. TRAINOR:**  Thank you.

23         **MR. ENZINNA:**  Your Honor, I apologize.  I may have

24   been unclear.  We would like you to instruct the jury.

25         **THE COURT:**  Oh, okay.  I misunderstood.

```
 1              MR. ENZINNA:  I apologize.

 2              THE COURT:  I'll be happy to do that before we bring

 3    the witness in.

 4              MS. AMATO:  Your Honor, and as to the issue of that

 5    video, I had asked the Government to stipulate, but they are

 6    not inclined to stipulate.

 7              So I would still ask them, though, to at least cut the

 8    video to the part where we don't hear other people that are

 9    speaking that are not charged as part of the conspiracy.

10              THE COURT:  Can we do that?

11              MS. PERRY:  Your Honor, so the video starts with --

12    what the testimony we believe will be is Mr. Bailey speaking as

13    Mr. . . .

14         (Jury entered the courtroom at 12:28 p.m.)

15              THE COURT:  All right.  We'll take this up maybe after

16    lunch.

17              All right.  Ladies and gentlemen, before we call in

18    the next witness, let me just remind you, of course -- I think

19    I've said this a few times, and I'll probably say it again --

20    but in a criminal case, the defendants have absolutely no

21    obligation to call any witnesses or present any evidence.  They

22    are presumed innocent.  That presumption continues unless and

23    until you find that the Government has met its proof -- its

24    burden of proof of showing every element beyond a reasonable

25    doubt.
```

```
 1              And, again, the defendants have no obligation to
 2   present any evidence or call any witnesses, and you may not
 3   consider that against them in any way if that ultimately is
 4   their choice.
 5              Now, the Government has another witness?
 6         MS. PERRY:  At this time the Government calls
 7   Derran Hankins.
 8         THE CLERK:  Please raise your right hand.
 9         DERRAN HANKINS, GOVERNMENT'S WITNESS, SWORN.
10         THE CLERK:  Please speak directly into the microphone.
11              State and spell your full name for the record, please.
12         THE WITNESS:  Derran Hankins.  D-E-R-R-A-N; last name
13   Hankins, H-A-N-K-I-N-S.
14         THE CLERK:  Thank you.
15                       DIRECT EXAMINATION
16   BY MS. PERRY:
17   Q.   Good afternoon.
18   A.   Good afternoon.
19   Q.   How old are you?
20   A.   36.
21   Q.   And where did you grow up?
22   A.   West Baltimore.
23   Q.   What do -- do you go by any nicknames?
24   A.   Do I go by a nickname?
25   Q.   Yes.
```

1    **A.**    Derran -- D.

2    **Q.**    Mr. Hankins, are you currently under the supervision of

3    the U.S. Department of Probation?

4    **A.**    Yes.

5    **Q.**    Is that because you've been convicted of a crime?

6    **A.**    Yes.

7    **Q.**    What crime were you convicted of?

8    **A.**    Bank fraud and identity theft.

9    **Q.**    And when you were charged with bank fraud and identity

10   theft, were you already on federal supervision?

11   **A.**    Yes.

12   **Q.**    What for?

13   **A.**    For aiding and abetting bank fraud.

14   **Q.**    Did you plead guilty to the bank fraud and identity theft

15   charges?

16   **A.**    Yes.

17   **Q.**    And did you also plead guilty to violating your federal

18   supervision?

19   **A.**    Yes.

20   **Q.**    Approximately when did you plead guilty?

21   **A.**    The first time or which time are you talking about?

22   **Q.**    When did you first plead guilty to the bank fraud, aiding

23   and abetting?

24   **A.**    In 2016.

25   **Q.**    As part of your guilty plea, did you agree to cooperate

```
 1    with the Government?

 2    A.    Yes.

 3    Q.    What is your understanding of your cooperation agreement?

 4    A.    As long as I tell the truth, I'll get a lenient -- more

 5    lenient sentence, possibly.

 6    Q.    And as part of your agreement, did you agree to testify?

 7    A.    Yes.

 8    Q.    And what are you required to do?

 9    A.    Tell the truth.

10    Q.    Have you been sentenced yet?

11    A.    No.

12    Q.    Have you been made any promises as to what your sentence

13    will be?

14    A.    No.

15    Q.    Do you expect to receive a benefit from your cooperation?

16    A.    Hopefully, yes.

17    Q.    What benefit do you expect to receive?

18    A.    A more lenient sentence.

19    Q.    And who will make that determination?

20    A.    My judge.

21    Q.    Do you know what happens if you lie?

22    A.    Yes; my plea will be off the table.

23    Q.    Now, in addition to the bank fraud conviction you just

24    told us about, as well as the bank fraud aiding and abetting

25    conviction, do you have any other criminal convictions?
```

1    **A.**    Yes.  I was convicted for weed, possession and

2    distribution of weed, and third-degree auto theft.  And that's

3    it.

4    **Q.**    Do you have a conviction from 2015?

5    **A.**    Yes.  Oh, aid -- and fleeing and eluding.

6    **Q.**    Have you been arrested again since you pled guilty in this

7    particular case?

8    **A.**    No.

9    **Q.**    Now, you told us about your criminal history.  Can you

10   tell us a little bit your education and work history.

11   **A.**    I went to college.  I didn't complete college.  I worked

12   in the automotive industry in sales and in the finance

13   industry.

14   **Q.**    One more background question for you:  Are you currently

15   on any medication?

16   **A.**    Yes.  Abilify.

17   **Q.**    Is that because you have a diagnosis of something?

18   **A.**    Bipolar.

19   **Q.**    And does your bipolar disorder affect your ability to

20   perceive things?

21   **A.**    No.

22   **Q.**    Does it affect your ability to remember?

23   **A.**    No.

24   **Q.**    Now, Mr. Hankins, you told us you grew up around

25   West Baltimore.  From around 2010 until early 2016, what part

1    of Baltimore were you spending time in?

2    **A.**   Windsor Mill and Forest Park.

3    **Q.**   Now, was there another area that you were spending some

4    time in?

5    **A.**   Liberty Heights and Gwynn Oak.

6    **Q.**   I'm going to show you, first, MAP-34.

7          Do you recognize this?

8    **A.**   Yes.

9    **Q.**   What are we looking at here?

10   **A.**   A map of Windsor Mill and Forest Park.

11   **Q.**   And where during that time frame were you spending time?

12   **A.**   Around here (indicating).

13   **Q.**   And you're indicating around the BP?

14   **A.**   Yes.  And around in here (indicating).

15   **Q.**   And that's the area of the Blue Fountain apartments?

16   **A.**   Yes.

17   **Q.**   I'm going to show you MAP-28.

18         What are we looking at here?

19   **A.**   Liberty Heights and Gwynn Oak.

20   **Q.**   And what area around here were you spending time in?

21   **A.**   Just all over in this area right here (indicating).

22   **Q.**   And you're indicating sort of south of Gwynn Oak Avenue?

23   **A.**   Yes.

24   **Q.**   I want to start by talking about Windsor Mill.

25         Can you describe what that area was like during the time

1  that you were frequenting it.

2  **A.**   It was pretty open.  A lot of drug traffic.  A lot of

3  young guys just hangin' out.

4  **Q.**   Is there a particular group that frequented that area?

5  **A.**   The 5200 neighborhood guys and the mobsters or Bloods.

6  **Q.**   Now, you said the mobsters and the Bloods.  Were the

7  mobsters a part of the Bloods?

8  **A.**   Yes.

9  **Q.**   How did you know that?

10 **A.**   That's what I was told.

11 **Q.**   And did you become friends with any of the mobsters?

12 **A.**   Yes.

13 **Q.**   How did you become friends with the mobsters?

14 **A.**   Through association with -- with a friend of mine.  He

15 introduced me to 'em, and I started hangin' around with 'em on

16 a regular basis.

17 **Q.**   How often were you in that area?

18 **A.**   Almost daily.  I mean, in a week I might go up there

19 anywhere between four and -- four and six times, sometimes

20 every day.

21 **Q.**   How were you able to identify when someone was a member of

22 the mobsters?

23 **A.**   Generally, through handshakes, tattoos, and symbols, or if

24 somebody just told me that they was a mobster.

25 **Q.**   Now, you said tattoos.  Were there any specific tattoos

1    that led you to believe someone was a mobster?

2    **A.**    M's or mob, stuff like that.

3    **Q.**    You also mentioned a handshake.  Was there a particular

4    handshake that you were able to identify?

5    **A.**    If I saw it.  I couldn't duplicate it, though.

6    **Q.**    But there was something specific --

7    **A.**    Yes.

8    **Q.**    -- that you would see people do that led you to believe

9    they were members of the mobsters?

10   **A.**    Yes.

11   **Q.**    Did you ever see anyone throwing any gang signs?

12   **A.**    In pictures and things like that, but it was -- it was

13   rare.  It's not like, you know, on the West Coast where they

14   just runnin' around in the areas and just throwin' up gang

15   signs.  I mean, it's more so like a little for show, like.

16   **Q.**    And when you saw gang signs in photographs, what were the

17   signs you were able to recognize?

18   **A.**    Like, people making up M's with their fingers and hands.

19   **Q.**    Now, you mentioned that there were -- there was another

20   group beside the mobsters hanging out there, and you said they

21   were people who were from the neighborhood.  Did they go by a

22   specific name?

23   **A.**    Just like 5200.

24   **Q.**    And what does 5200 mean?  Where does that number come

25   from?

1   **A.**   Just the area.

2   **Q.**   What do you mean by "the area"?

3   **A.**   I believe it's the 5200 block of one of the streets.

4   **Q.**   Were individuals who were at that area in the 5200 block

5   or in the Windsor Mill-Forest Park area, were those individuals

6   exclusively members of the mobsters?

7   **A.**   No.

8   **Q.**   Could anyone hang out in that area?

9   **A.**   Anyone kind of could hang out, but you couldn't, like, be

10  doing, like, selling drugs or nothin' up there if you wasn't

11  from around there or somebody brought you around there.

12  **Q.**   What would happen if you were selling drugs in that area

13  and were not from around there or not a mobster?

14  **A.**   I mean, you probably be asked to leave or told to leave.

15  **Q.**   What happened if you didn't leave?

16         **MR. ENZINNA:**  Objection, Your Honor.

17         **THE COURT:**  Sustained.

18  **BY MS. PERRY:**

19  **Q.**   You mentioned, Mr. Hankins, that there were individuals

20  selling drugs in the area.  Did you ever personally see drugs

21  being sold in that area?

22  **A.**   Yes.

23  **Q.**   What kinds of drugs did you see being sold?

24  **A.**   Cocaine, heroin, marijuana, Percocets.

25  **Q.**   And who was selling drugs at that location?

1    **A.**    Like everybody that was up there, basically.

2    **Q.**    How often did you see drugs being sold in that area?

3    **A.**    Daily.

4    **Q.**    And based on your time out there and what you personally

5    observed, how many -- how much drugs were being sold, how much

6    money was being made in that area?

7    **A.**    Probably like ten or fifteen thousand a day, give or take.

8             **MR. ENZINNA:**  Objection, Your Honor.

9             **THE COURT:**  Basis of knowledge?

10            **MR. ENZINNA:**  Basis of knowledge.

11            **THE COURT:**  Sustained.

12   **BY MS. PERRY:**

13   **Q.**    Mr. Hankins, do you know how much drugs were being sold

14   for in that area?

15   **A.**    It varied.  You know, you had some people that was gettin'

16   small stuff and some people that was gettin' a little bit more

17   than small stuff.

18   **Q.**    And how often would you see -- I believe you told us that

19   you saw drugs being sold frequently.  What kind of quantities

20   were you being sold -- were you observing being sold?

21   **A.**    Dimes, nickels, fifties, hundreds, eight balls.

22   **Q.**    And how many people would you see out there selling at any

23   given time?

24   **A.**    It was -- I mean, it was a lot.  The younger guys -- it

25   was a lot of younger guys out there just sellin' stuff.

1  **Q.**  And who?  Members of which groups were selling in that

2  particular area?

3  **A.**  Explain.  What do you mean?

4  **Q.**  Did you see mobsters selling drugs in that particular

5  area?

6  **A.**  Yes.

7  **Q.**  Did you also see people you identified as 5200 boys

8  selling in that particular area?

9  **A.**  Yes.

10  **Q.**  Did the mobsters sell drugs out of any other territory

11  that you knew of?

12  **A.**  Well, I mean, they would hit off cell phones.  So it could

13  be anywhere, like, you know, so they could be discrete and --

14  in that area between Liberty Heights and Liberty Road and the

15  Windsor Mill-Forest Park area.

16  **Q.**  Mr. Hankins, did there come a time when you were able to

17  identify who the leader of the mobsters was?

18  **A.**  Yes.

19  **Q.**  Who was that?

20  **A.**  Gutta.

21  **Q.**  Did you know Gutta by any other names?

22  **A.**  Dante Bailey.

23  **Q.**  I'll show IND-3.

24      Can you tell us who we're looking at here.

25  **A.**  That's Gutta.

1    **Q.**   And do you see Gutta in the courtroom today?

2    **A.**   Yes.

3    **Q.**   Could you please point to him and indicate an article of

4    clothing he's wearing.

5    **A.**   (Indicating.)

6          Like a taupe-colored shirt.

7    **Q.**   How did you meet Mr. Bailey?

8    **A.**   Through S-Dot.

9    **Q.**   And who is S-Dot?

10   **A.**   He was, like, a good friend of mine at the time.

11   **Q.**   When did you first meet Mr. Bailey?

12   **A.**   Between 2011 and 2013, somewhere in there.

13   **Q.**   And approximately how many times did you speak to or hang

14   out with Mr. Bailey during the time you were frequenting the

15   Windsor Mill area?

16   **A.**   A lot.

17   **Q.**   I'm going to show you Government's Exhibit IC-87, which is

18   an excerpt from an iCloud account belonging to Dante Bailey.

19          Can you tell us what we're looking at here.

20   **A.**   A picture of me and Gutta.

21   **Q.**   Now, you said you identified Mr. Bailey as -- or Gutta as

22   the leader of the gang.  How did you come to believe he was the

23   leader?

24   **A.**   He told me.

25   **Q.**   How did you communicate with Mr. Bailey?

1    **A.**   By way of phone or in person.

2    **Q.**   And did you have a phone number for Mr. Bailey?

3    **A.**   Several.

4    **Q.**   Did you also contact Mr. Bailey through any other

5    individuals?

6    **A.**   His -- his wife, Tiffany Bailey.

7    **Q.**   And why would you contact Tiffany Bailey?

8    **A.**   'Cause, you know, he run around, take -- he might get rid

9    of his phone.  He might say if his phone off, contact her to

10   get to me.

11   **Q.**   Now, Mr. Hankins, when you were arrested, did the

12   Government search your phones?

13   **A.**   Yes.

14   **Q.**   And do you recall if you had one or more than one phone at

15   the time?

16   **A.**   I believe it was three.

17   **Q.**   I'm going to show you Government's Exhibit CELL-18.

18         And turn to Page 4 -- Page 5 of this exhibit.

19         Can you tell us if you recognize what we're looking at

20   here.

21   **A.**   A list of my contacts.

22   **Q.**   Now, I'm going to turn to Page 7.

23         Do you see down here on the screen, what is the name here?

24   **A.**   "T gutter."

25   **Q.**   And is there a phone number?

| 1 | **A.** | Yes. |

1    **A.**    Yes.

2    **Q.**    And is this how Gutta was saved in your phone?

3    **A.**    One of the ways, yes.

4    **Q.**    Did you have other numbers for him?

5    **A.**    Yes.

6    **Q.**    Turning to Page 9, can you tell me what we're looking at

7    here.

8    **A.**    Gutta's phone number again.

9    **Q.**    Is that another contact from your phone --

10    **A.**    Yes.

11    **Q.**    -- for Mr. Bailey?

12    **A.**    Yes.

13    **Q.**    And, finally, Page 10, what are we looking at here?

14    **A.**    Another number -- another one of Gutta's phone number.

15    **Q.**    Another -- is "t gut" another way you saved Mr. Bailey's

16    number in your phone?

17    **A.**    Yes.

18    **Q.**    Now, I want to turn to Government's Exhibit CELL-19.

19         And turning to Page 3, do you see a phone number here?

20    **A.**    Yes.

21    **Q.**    Whose phone number is that?

22    **A.**    Mine.

23    **Q.**    Turning now to Page 22, you'll notice the name on this.

24    Is this one of the contacts from your phone?

25    **A.**    Yes.

```
 1   Q.    And what's the name?

 2   A.    Gutta.

 3   Q.    And what's the phone number?

 4   A.    (443) 415-9975.

 5   Q.    Is this another number you used to contact Mr. Bailey?

 6   A.    To my knowledge, yes.

 7   Q.    And, finally, turning to Page 38, do you see these two

 8   contacts here?

 9   A.    Yes.

10   Q.    What are these contacts for?

11   A.    Tiffany, Gutta's wife.

12   Q.    And were these numbers you used to contact Mr. Bailey?

13   A.    Yes.

14   Q.    Now, Mr. Hankins, you said that you contacted Mr. Bailey

15   by phone on occasion.

16         Did you always contact him on making -- by making a voice

17   call?

18   A.    For the most part, unless he wanted to talk on FaceTime.

19   Q.    And why might he ask you to talk on FaceTime?

20             MR. ENZINNA:   Objection.

21             THE COURT:   Sustained.

22   BY MS. PERRY:

23   Q.    Were there times where Mr. Bailey asked you to talk on

24   FaceTime?

25   A.    Yes.
```

HANKINS - DIRECT

1   **Q.**   And did you actually talk to him on FaceTime on those

2   occasions?

3   **A.**   Yes.

4   **Q.**   And when you spoke to him on FaceTime, what did you speak

5   about?

6   **A.**   Probably money.

7   **Q.**   Now, I want to turn at this point to talking about money.

8   Did you assist Mr. Bailey or did you have any involvement with

9   Mr. Bailey and money?

10  **A.**   Yes.

11  **Q.**   Can you explain your involvement with Mr. Bailey and his

12  finances.

13  **A.**   Either automotive or I would take money and flip it for

14  him.

15  **Q.**   Now, I want to take that apart a little bit, but you said

16  you would take money and flip it for him.

17  **A.**   Yes.

18  **Q.**   Can you explain what you mean.

19  **A.**   He would give me an allotted amount of money, and I would

20  give him back that money plus half.

21  **Q.**   And so you had an arrangement with -- if I understand it,

22  you had an arrangement with Mr. Bailey where he would provide

23  you with money and you were supposed to provide him with that

24  money, plus?

25  **A.**   Yes.

1   **Q.**   And what -- how would he provide you the money?

2   **A.**   Cash.

3   **Q.**   Did you know -- you said you hung around with Mr. Bailey

4   on numerous occasions.

5   **A.**   Yes.

6   **Q.**   Did Mr. Bailey have a job, to your knowledge?

7   **A.**   No.

8   **Q.**   Did Mr. Bailey have a source of income, to your knowledge?

9   **A.**   Music and drugs.

10  **Q.**   Now, what would you do with the money when Mr. Bailey

11  would provide it to you?  How would you go about flipping it?

12  **A.**   Either purchase cars and sell 'em or insurance, do an

13  insurance scram [sic] or the casino.

14  **Q.**   I'm going to start, first of all, with the casino.

15       Tell us how that worked.

16  **A.**   Well, I play blackjack.  So I would go in, take an

17  allotted amount of money, and I would double it or triple it

18  and then distribute his part and the rest I would keep.

19  **Q.**   Now, Mr. Hankins, did you go to the casino often already?

20  **A.**   Yes.

21  **Q.**   Why?

22  **A.**   To gamble.

23  **Q.**   Did you like to gamble?

24  **A.**   Yes.

25  **Q.**   And were you looking for ways to gamble?

1    **A.**    Yes.

2    **Q.**    So when Mr. Bailey would provide you, I believe you said

3    it was cash and you would go to the casino with it, how much

4    would you be expected to provide back to him?

5    **A.**    If he gave me 10,000, I had to give him back 15.  So it's

6    always 50-cent extra on the dollar.

7    **Q.**    And how many times did Mr. Bailey provide you money that

8    you took to the casino?

9    **A.**    Less than five.

10   **Q.**    And do you recall how much money he provided to you on

11   those occasions?

12   **A.**    The most was 12,000.

13   **Q.**    And what about the other times?

14   **A.**    Like two -- like two or three thousand.

15   **Q.**    And did you actually provide him with the money or the

16   winnings?

17   **A.**    Yes.

18   **Q.**    Was Mr. Bailey the only mobster who you would gamble at

19   the casino for?

20   **A.**    He brought -- he brought in Dirt one time.

21   **Q.**    Explain how that happened.

22   **A.**    We met at a -- at the studio, and he told Dirt that I had

23   a guaranteed way to make him back some money.

24        And he said, All right.

25        And they gave me, collectively, $12,000.  And I was due to

```
 1    give them back eighteen.
 2    Q.   And did you do that?
 3    A.   Yes.
 4    Q.   I'm going to show you Government's Exhibit IND-7.
 5         Can you tell me who we're looking at here.
 6    A.   Dirt.
 7    Q.   And do you see Dirt in the courtroom today?
 8    A.   Yes.
 9    Q.   Could you please point to him and indicate an article of
10    clothing he's wearing.
11    A.   A white button-down.
12    Q.   Now, I'm going to come back to Dirt in a few moments.
13         But you told us there were some other ways that you would
14    flip the money.  I believe you said insurance?
15    A.   Yes.  So I had different -- a lot of different connections
16    in spots.  So I would get, like, what's called FR-19s.  I would
17    purchase them from an unknown source, and then I would sell 'em
18    to other people.  And in that process, they would be able to
19    clear up insurance violations through the State of Maryland.
20    Q.   What is the document, the thing you just described, an
21    FR-19?
22    A.   It's proof of insurance.
23    Q.   And so tell us again.  You would provide proof of
24    insurance to individuals?
25    A.   Yes.
```

1   **Q.**   And this was not a legitimate business, was it,

2   Mr. Hankins?

3   **A.**   No.  I would purchase 'em from one source for a really low

4   amount of money as long as I'm buying 'em in bulk, and then I

5   would sell 'em back for an extraordinary amount of money.

6   **Q.**   And how did that make you and Mr. Bailey money?

7   **A.**   Because I would allow him to pay for the forms, and I

8   would already have preordered enough to pay for -- like,

9   somebody might want to spend 2500.  They might have insurance

10  violation for $5,000.  I might charge 'em half, which is 2500.

11  And I might buy 30 forms, 30 FR-19s.  The 30 FR-19s might cost

12  me a thousand dollars.

13       So Dante would have paid for -- Gutta would have paid for

14  all of the forms plus gave me profit, and then I would wait and

15  recoup the rest of the money later.

16  **Q.**   And when you did this for Mr. Bailey or with Mr. Bailey's

17  money, how much money would you give him back?

18  **A.**   It's always -- he -- he never knew exactly what the money

19  was being used for.  He just knew that he was giving me a

20  certain amount, and I had to give him back that plus half of

21  whatever he gave me.

22  **Q.**   You also mentioned, I believe you said, automobiles.  How

23  would that work?

24  **A.**   He would purchase -- I would use his money to purchase the

25  vehicle and then sell it to somebody else.

1  **Q.**  And so you said you were purchasing vehicles.  How were

2  you purchasing vehicles?

3  **A.**  Cash from the auction or off the street.

4  **Q.**  And was that -- the purchase of those vehicles legitimate?

5  **A.**  Most of the time.

6  **Q.**  What do you mean?

7  **A.**  There was a time when I was buying vehicles that were

8  stolen.  But I didn't -- I didn't know, but I didn't really

9  care, because I had all the paperwork.  So they seemed like

10  they was legitimate enough to me.

11  **Q.**  And were you, in fact, making fraudulent paperwork for

12  some of these vehicles?

13  **A.**  I was clearing liens.  I would clear the lien on the

14  vehicle.  So if the vehicle had a lien on it, say Lexus

15  Financial, I would take it off so Lexus Financial wouldn't know

16  that the lien is cleared; but in the eyes of Motor Vehicle,

17  there was no longer a financial obligation.

18  **Q.**  Now, in total, about how much money would you say that

19  Mr. Bailey provided you to gamble or purchase cars or do this

20  insurance?

21  **A.**  Less than 25,000.

22  **Q.**  And, Mr. Hankins, what was the benefit to you?

23  **A.**  I made money.

24  **Q.**  And did Mr. Bailey tell you why he was asking you to do

25  it?

**A.**   Just a faster -- a faster, guaranteed, legitimate way to

make -- to make -- for him to make money.

**Q.**   And when you say "legitimate," what do you mean?

**A.**   He would have money that he don't have to worry about

nobody being able to take because if -- if ever it was a time,

I could provide receipts and everything through my businesses.

**Q.**   So did you understand it to be a way that Mr. Bailey was

trying to make his money seem legitimate?

**A.**   Yes, in a way.

**Q.**   Mr. Hankins, did you ever purchase a car and lease it to

Mr. Bailey?

**A.**   Yes.

**Q.**   Can you tell us about that.

**A.**   It was a 2007 Lexus LS 460 L.

**Q.**   What color was that vehicle?

**A.**   Navy blue.

**Q.**   And can you tell us anything about the windows of that

car.

**A.**   They were tinted.

**Q.**   And you said it was a -- I think you said it was an

LS 460 L.  What does that last L mean?

**A.**   Luxury edition.

**Q.**   What does that mean?

**A.**   It has rear reclining seats and, you know, other -- other

amenities that the other cars wouldn't have.

1    **Q.**    And why would you lease this car to him?

2    **A.**    Initially, it was to make money, make a profit, and

3    because he was a person that I was -- I was frequenting on a --

4    on a -- on a, you know, a regular basis.

5    **Q.**    And what was the benefit to Mr. Bailey, if he told you?

6    **A.**    He would have a nice car that he didn't have to spend

7    40,000 for up front.

8    **Q.**    Now, in addition to assisting Mr. Bailey with his

9    financial transactions, did you ever observe Mr. Bailey engaged

10   in activities with the mobsters?

11   **A.**    I -- I observed him giving orders and -- and being, you

12   know, the normal, you know, leader he is.

13   **Q.**    Did you ever see him handling drugs?

14   **A.**    Yes.

15   **Q.**    Can you explain.

16   **A.**    It was an opportunity -- he told me that he was -- that

17   they took a loss; and based on my connections, he needed me to

18   find him some -- some -- some drugs.

19   **Q.**    And I want to get into that in just a second, but did you

20   ever see him actually sell drugs?

21   **A.**    Yes.

22   **Q.**    Can you describe when that happened.

23   **A.**    I was at the gas station one day, and he -- he didn't have

24   to be out front.  But for some odd reason, he didn't mind being

25   in the front, on the front line actually doing all his personal

 1   hand-to-hand.  And somebody came up to the gas station and they

 2   wanted something, and he got it for 'em.

 3   **Q.**   Do you recall what kind of drug it was?

 4   **A.**   No.

 5   **Q.**   Mr. Hankins, did you ever see Mr. Bailey purchase drugs?

 6   **A.**   Yes.

 7   **Q.**   Can you tell us about that time.

 8   **A.**   He called me one day and told me to take him to meet

 9   somebody.  I took him just below North Avenue to a barbershop

10   and we waited.

11   **Q.**   What happened when you got to the barbershop?

12   **A.**   We had to wait for a while until somebody pulled up.  They

13   was having a conversation.  He got in and out of the car a few

14   times.  And then he finally came back and told me that, you

15   know, that he was good.  He had two or three hundred grams

16   comin'; if I needed something, let him know, 'cause he trying

17   to run it through.

18   **Q.**   Let me unpack that a little bit.

19        You said you drove him up to a location where there was a

20   barbershop near North Avenue?

21   **A.**   Yes.

22   **Q.**   And when you got there, you and Mr. Bailey waited in your

23   car for a little while?

24   **A.**   Yes.

25   **Q.**   And then I believe you said someone else pulled up.

1   **A.**   Yes.

2   **Q.**   And when someone else pulled up, what did Mr. Bailey do?

3   **A.**   He got out and he talked to him.

4   **Q.**   The person in the other vehicle?

5   **A.**   Yes.

6   **Q.**   And then at some point did he get back into your vehicle?

7   **A.**   Yes.

8   **Q.**   And what, if anything, did he tell you when he got back

9   in?

10  **A.**   That we good.  We straight, you know, things going to be

11  all right.  He got two or three hundred grams comin' and he can

12  make moves now, and if I had somebody that needed something, to

13  let him know.

14  **Q.**   And did -- when he said two to three hundred grams, did

15  you know what he was talking about?

16  **A.**   I believe heroin.

17          **MR. ENZINNA:**  Objection, Your Honor.

18          **THE COURT:**  Overruled.

19  **BY MS. PERRY:**

20  **Q.**   Now, you mentioned, I believe, a time that you actually --

21  or you were alluding to a time that you actually provided

22  Mr. Bailey with drugs yourself?

23  **A.**   Yes.

24  **Q.**   Can you tell us about that.

25  **A.**   Well, he came to me; he said that they had took a loss,

1   and he needed to -- to get something because it was dry.

2   **Q.**   Let me stop you there for a second.

3       You said "took a loss."  What does that mean?

4   **A.**   Basically, they -- the police had -- had confiscated some

5   drugs.

6   **Q.**   Okay.  So after he told you they took a loss, what else

7   did he tell you?

8   **A.**   That he needed to get something else.  It's a gold mine up

9   there, and he needed to find something to get this money.

10  **Q.**   What did you do after he told you that?

11  **A.**   I made some phone calls, and I got him some testers.  And

12  one of the testers was something like what he wanted.

13  **Q.**   What's a tester?

14  **A.**   A small quantity of a drug so that you can test it out.

15  **Q.**   And how did you have a contact who could get you a tester?

16  **A.**   Well, being as though I've been in the automotive industry

17  so long, it's -- I know everybody, you know.  And a lot of the

18  guys buy cars from me.  So -- and I know roughly, you know,

19  what they into.

20      So if it's somebody that sold -- sold coke, I can call

21  somebody that sold coke.  If it's somebody that sold heroin, I

22  can call somebody that sold heroin.  And if I needed something,

23  I can get it.

24  **Q.**   So you said that you got some testers for Mr. Bailey.

25  Testers of what?

1    **A.**    Heroin.

2    **Q.**    And did you provide him with those testers?

3    **A.**    Yes.

4    **Q.**    And what did he tell you after you gave him the testers?

5    **A.**    He rated 'em on a scale of 1 to 10, and he told me which

6    ones he didn't like and which ones he did.

7    **Q.**    What happened next?

8    **A.**    One of 'em was something that was real good that he liked,

9    and he told me to get him some.  I got 50 grams of it from --

10   from a person.  And I gave him a portion of it, spoon-fed him

11   it, like, so he can get rid of that and waited for the money.

12   And that was it.

13   **Q.**    So you gave him a portion of the 50 grams?

14   **A.**    Yes.

15   **Q.**    And when you gave him that portion, did he provide you

16   with any money?

17   **A.**    He gave me half of it.

18   **Q.**    Half of the money?

19   **A.**    Yes.

20   **Q.**    Do you recall how much money he was supposed to give you?

21   **A.**    Dollar amount-wise, no, but he was supposed to give me the

22   money for the whole 50, but he didn't.  So I wounded up -- at

23   the time when he gave me part of the money for the first 20 or

24   25 that I gave him, I gave him the rest of the -- the heroin.

25   **Q.**    So you gave him half; he gave you money for half; and then

1    you gave him the full amount?

2    **A.**    Yes.

3    **Q.**    And were you ever provided the other half of the money?

4    **A.**    No.

5    **Q.**    Now, Mr. Hankins --

6         **THE COURT:**  Let me know when you're at a good breaking

7    point.

8         **MS. PERRY:**  I think now would be fine, Your Honor.

9         **THE COURT:**  Okay.  All right.

10        Ladies and gentlemen, we're going to take the lunch

11   recess until 2 o'clock.

12        So I'm going to start by excusing the jury.

13     (Jury left the courtroom at 12:59 p.m.)

14        **THE COURT:**  All right.  And then we'll excuse the

15   witness.

16        Hold on just a second.  Are you going to go -- just

17   because the jury is in there, too, so . . .

18        Okay.  We're going through.  All right.

19        So where are we on this video?  Do you want to show me

20   the video?

21        **MS. PERRY:**  I'm certainly happy to, Your Honor.

22     (Video was played but not reported.)

23        **MS. PERRY:**  So, Your Honor, I believe that the witness

24   will be able to identify the voice as that of Mr. Bailey and

25   the person who pulled up in the car as Mr. Anderson.

---

```
1    Mr. Bailey describes that Bo is there.

2          There is a short part where the female is talking, and

3    it's difficult to hear what she says.  But Mr. Bailey is

4    speaking after that, identifying the person as Mr. Anderson.

5          The Government believes that this is relevant as

6    Mr. -- the witness will identify the vehicle, but also it is

7    Mr. Anderson at the gas station which has been identified as

8    the headquarters of the gang.  And he is there with Mr. Bailey

9    as well as there are some other members of the gang who are

10   seen panned in the video.

11         This witness will not testify about who those people

12   are, but it may come up later.  So that's why the Government

13   believes this video is relevant.

14         THE COURT:  This witness is going to testify as to

15   Mr. Bailey and Mr. Anderson --

16         MS. PERRY:  Yes.

17         THE COURT:  -- being there?

18         MS. HOFFMAN:  Yes.

19         THE COURT:  Okay.

20         MS. AMATO:  Your Honor, they don't have to show the

21   whole video.  I mean, they can show the very first part where

22   you see Mr. Anderson, his face.  He's looking back in the

23   vehicle, and you hear Mr. Bailey's voice, I guess.  And then

24   just cut it off at that point, but they don't need to play the

25   whole video.  I mean, this part we just see a vehicle.
```

```
 1              But the better shot that they want is just of
 2    Mr. Anderson in the beginning of the video.
 3              THE COURT:  Right.
 4              MS. AMATO:  So just to show that part and then cut it
 5    off at that point.
 6              MS. PERRY:  Your Honor, it is later in the video that
 7    the other members of the gang appear in the background, that
 8    you can see that there are other people who are at the
 9    particular location.  And the latter part is where Mr. Bailey
10    identifies it as Bo, talking about him pulling up at the gas
11    station.
12              So we do -- we would rather play the whole video.  We
13    do believe it is relevant.  It is not very long.  And the
14    portions that have other people talking are not going to be
15    highlighted.  I don't think that they're difficult to hear.
16              The other male behind the female is an individual
17    who's been identified as Cameron Allen and who's been
18    identified as a co-conspirator.  But, again, it is simply
19    relevant and probative that Mr. Bailey is speaking and
20    identifying Mr. Anderson.
21              THE COURT:  And that is after the unidentified
22    woman --
23              MS. PERRY:  That is correct.
24              THE COURT:  -- speaks?
25              So I don't think we can -- all right.  You can play
```

1    the video.

2           Anything else for this afternoon that we should

3    anticipate?  Any issues?

4           **MS. PERRY:**  Nothing from our perspective, Your Honor.

5           **THE COURT:**  Okay.  I'll see you all at 2 o'clock.

6           We're excusing the gallery first.

7        (Luncheon recess taken.)

8           **THE COURT:**  All right.  We're ready to maybe have the

9    witness get back on the stand.

10          And we'll get the jury.

11       (Jury entered the courtroom at 2:07 p.m.)

12          **THE CLERK:**  Sir, you're still under oath.

13          **THE WITNESS:**  Yes, ma'am.

14          **THE COURT:**  If you'd like to continue, Ms. Perry.

15          **MS. PERRY:**  Thank you.

16   **BY MS. PERRY:**

17   **Q.**   Mr. Hankins, before the break, I believe we had been

18   talking about some financial transactions you had done for

19   Mr. Bailey, and you were telling us about a time that you

20   provided Mr. Bailey with heroin.

21   **A.**   Yes.

22   **Q.**   And you also had talked about a time that you went with

23   Mr. Bailey to purchase some drugs and about a time that you saw

24   Mr. Bailey actually making a sale.

25          With respect to the financial transactions, what was your

1  understanding of where the money came from?

2  **A.**   The streets.

3  **Q.**   And what do you mean by that?

4  **A.**   By way of -- of hustling, selling drugs or whatever.

5  **Q.**   Now, Mr. Hankins, have you ever personally heard

6  Mr. Bailey discussing gang dues?

7  **A.**   Not really.  A side conversation, kind of.

8  **Q.**   Can you tell us about that conversation.

9  **A.**   Just that, you know, everybody got to pay up, you know,

10  and just makin' sure that everything is going towards the team,

11  you know, stuff like that.

12  **Q.**   And is this something you heard from Mr. Bailey?

13  **A.**   Yes.

14  **Q.**   Who was he talking to?

15  **A.**   I'm not sure exactly.

16  **Q.**   Have you ever been a part of a gang meeting?

17  **A.**   No.

18  **Q.**   Do you know if gang meetings exist?

19  **A.**   Through way of -- I mean, I assumed that they were gang

20  meetings 'cause everybody was there was --

21           **MS. AMATO:**   Objection; speculative.

22           **THE COURT:**   Sustained.

23  **BY MS. PERRY:**

24  **Q.**   Without telling us what you assumed, did you ever have a

25  conversation with Mr. Bailey or another member of the gang

1  about meetings?

2  **A.**   Yes.

3  **Q.**   Can you tell us about that conversation.

4  **A.**   He was just basically saying -- he told me that, you know,

5  he got to meet with everybody to make sure everything good and

6  keep the money straight and just -- just that everything was

7  going towards making sure, like, if bails or anything like

8  that -- if somebody needed to be bailed out, they would add up

9  them funds to do it or if they wanted to do something, the

10 money would be there.

11 **Q.**   Now, Mr. Hankins, have you ever been to -- had you ever

12 been to Mr. Bailey's house?

13 **A.**   Yes.

14 **Q.**   Approximately how many times?

15 **A.**   Several.

16 **Q.**   And did you ever see any paperwork in Mr. Bailey's house?

17 **A.**   There was -- a notepad was flipped over, and he just had

18 some things scribbled on it.  Kind of out of my peripheral, I

19 seen it, but never directly as far as, like, sittin' down and

20 readin' anything, no.

21 **Q.**   Mr. Hankins, were there -- were you ever with Mr. Bailey

22 when he was engaged in or discussing other gang activities that

23 involved violence?

24 **A.**   One day he told me he came back from taking care of

25 something down on Cooks Lane, and he was just, like, basically

1    saying that a situation had happened and they dealt with them
2    niggas or something.
3    **Q.**   What did he tell you about what happened on Cooks Lane
4    specifically?
5    **A.**   Just that they got into it with somebody and they went and
6    took care of the beef 'cause niggas was robbin' niggas up at
7    the gas station, and he went and handled it.
8    **Q.**   What did he mean by "took care of it"?
9         **MR. ENZINNA:**  Objection.
10        **THE COURT:**  Sustained.
11   **BY MS. PERRY:**
12   **Q.**   Mr. Hankins, what was your understanding of Mr. Bailey's
13   use of the phrase "took care of it"?
14        **MR. ENZINNA:**  Objection.
15        **THE COURT:**  Can you explain what it might be based on.
16   **BY MS. PERRY:**
17   **Q.**   Did you -- did Mr. Bailey tell you specifically what had
18   happened?
19   **A.**   They got into a shootout.
20   **Q.**   Now, you said "they."  Did Mr. Bailey tell you who was
21   with him?
22   **A.**   It was J-Rock, Jack, and I don't remember who else was
23   with him.
24   **Q.**   Now, you said that they got into a shootout.  Did you
25   yourself ever see Mr. Bailey carrying firearms?

1   **A.**   Yes.

2   **Q.**   Can you describe the firearms you've seen him with.

3   **A.**   I seen him with handguns.  One of 'em had an extended

4   clip.  I seen him with a fatigue gun, handgun, all green but

5   was fatigue.  Like, it was painted.

6   **Q.**   And what do you mean by "fatigue"?

7   **A.**   Army-issue fatigue, like, camouflage.

8   **Q.**   Did you -- where were Mr. Bailey -- where did you see

9   these guns?

10  **A.**   Either on his person or in a car with him.

11  **Q.**   Did you ever see Mr. Bailey storing a gun somewhere?

12  **A.**   Mr. Bailey, per se, no.  But I've seen other people around

13  him.

14  **Q.**   And who were these people you're referring to?

15  **A.**   A gentleman named Champagne.

16  **Q.**   And what did you see?

17  **A.**   I seen him put some guns in a -- in a Crown Vic in front

18  of his house.

19  **Q.**   Did you know where in the -- in front of whose house,

20  first?

21  **A.**   Don -- Bailey's.

22  **Q.**   And you said you saw him putting them in a Crown Vic.

23  Where was the Crown Vic?

24  **A.**   Parked in front of his house.

25  **Q.**   Do you know where in the vehicle he was putting them?

1    **A.**    In the trunk.

2    **Q.**    Mr. Hankins, did you ever see -- did you yourself ever see

3    Mr. Bailey actually use a firearm?

4    **A.**    Yes.

5    **Q.**    Can you tell us when this was.

6    **A.**    One night we was all out in the apartment complex, and we

7    was all out there kind of chillin'.  It was a dude walkin' down

8    with a hoodie, hoodie on.

9         Gutta yelled at him and said, you know, "Who that?"

10        And the guy didn't respond, and he just kept on walkin'.

11        And out of nowhere, Gutta came up with the gun and

12   started -- and let off like three or four shots.  And the guy

13   started runnin' off.

14   **Q.**    Now, you said "at the apartment complex."  Which apartment

15   complex are you talking about?

16   **A.**    I don't want to quote, but I think it's Blue Fountain.  I

17   think the apartment complex was called Blue Fountain.

18   **Q.**    I'm going to show you again MAP-34.  I believe you looked

19   at this exhibit earlier.

20        Can you tell us where specifically you're referring to.

21   **A.**    In this parking lot right here (indicating).

22   **Q.**    Indicating the first parking lot on the screen next to the

23   words "Blue Fountain Apartments"?

24   **A.**    Yes.

25   **Q.**    And what were you doing in the Blue Fountain apartments or

1    in that apartment complex on that particular night?

2    **A.**    Basically, hangin' out with Gutta, meetin' up with him,

3    discussing business and stuff like that.

4    **Q.**    And the person that you described in the hoodie, had you

5    seen this person before?

6    **A.**    I couldn't even tell you who it was.  If he walked in here

7    right now, I couldn't.  He just had on a dark hoodie.

8    **Q.**    And where -- what was this person doing?

9    **A.**    He basically had his hands inside his dip, and he was

10   walkin' -- walkin' past us.

11   **Q.**    And as he was walking past, what happened?

12   **A.**    Gutta called out to him.  He didn't say nothin', so Gutta

13   just let out some shots.

14   **Q.**    What did Gutta say?

15   **A.**    "Who dat?  What's up?"

16   **Q.**    And did the person in the hood respond?

17   **A.**    No.

18   **Q.**    Do you know where the gun came from?

19   **A.**    I believe it was on the tire of a car.

20   **Q.**    Was anyone injured that you know of?

21   **A.**    No.

22   **Q.**    What did you do after this particular incident?

23   **A.**    Well, everybody left.  Everybody that was sittin' in the

24   parking lot talkin', smokin' weed, we all left.

25   **Q.**    Mr. Hankins, was there a time that you went with

```
 1    Mr. Bailey to Frederick, Maryland?

 2    A.    Yes.

 3    Q.    Why did you go to Frederick?

 4    A.    Gutta told us there was somebody down that was holding

 5    like eighty, eighty to a hundred thousand in the house.

 6    Q.    And after he -- did he tell you -- why did he tell you

 7    that?

 8    A.    Just 'cause we -- we all was lookin' for money at all

 9    times.  You know what I mean?  By -- kind of by any means

10    necessary.

11    Q.    And what happened after he told you this?

12    A.    I was down a ride.  I went and jumped in the car.  I drove

13    him and a few other gentlemen down to -- to the guy's house.

14    Q.    Who else was in the car with you?

15    A.    Boojie, S-Dot, and Jack.

16    Q.    And were these other people who hung out in the area of

17    Windsor Mill?

18    A.    Yes.

19    Q.    Was anything else in the car with you?

20    A.    Was anything else?

21    Q.    (Nods head.)

22    A.    Yes.  We had guns and tasers.

23    Q.    And where did you go?

24    A.    We went somewhere in Frederick, Maryland.

25    Q.    How did you know where to go?
```

1    **A.**    I was told by Gutta.

2    **Q.**    And did -- when you got to Frederick, what happened?

3    **A.**    We all got out -- well, except for Dot, we got out and

4    walked over and looked at the house.  And we waited and waited.

5    And then we was talkin' about ways to go in.  And a guy winded

6    up coming out to walk his dog and kind of, like, caught us,

7    like, trying to come in his house.  And we all ran off.

8    **Q.**    So did you ever go in the house that day?

9    **A.**    No.

10   **Q.**    So after the guy came out of the house and saw you, where

11   did you go?

12   **A.**    We came back to -- to Baltimore.

13   **Q.**    Mr. Hankins, did there come a time when you learned about

14   an incident involving a bus?

15   **A.**    Um --

16   **Q.**    Well, first, did you learn about this incident?

17   **A.**    Yes.

18   **Q.**    And who did you hear about it from?

19   **A.**    S-Dot.

20   **Q.**    And what did S-Dot tell you about what happened?

21   **A.**    Basically, he was, like, trying to describe how gangsta

22   and crazy Gutta is.  So he was, like, Shit, well, Gutta, man,

23   he will do anything.  Like, he got on the bus and made

24   everybody get off the bus and put a gun in the dude' face

25   because the guy was throwing up gang signs or doing something

1    gang-related and that he asked the dude, What's mobbin'?

2    Apparently.

3    **Q.**   And that was according to what S-Dot told you?

4    **A.**   Yes.

5    **Q.**   Mr. Hankins, during your time hanging out in the area of

6    Windsor Mill and Forest Park, did you become familiar with a

7    person who went by the name of Bangout?

8    **A.**   Yes.

9    **Q.**   How did you know Bangout?

10   **A.**   Through Gutta.

11   **Q.**   And was Bangout a member of the mobsters?

12   **A.**   Yes.

13   **Q.**   How did you know?

14   **A.**   Basically, 'cause I was told he was.

15   **Q.**   Who told you?

16   **A.**   Gutta.

17   **Q.**   Do you know what happened to Bangout?

18   **A.**   He was murdered.

19   **Q.**   I'm going to show you Government's Exhibit IND-27.

20        Do you recognize this person?

21   **A.**   Yes.

22   **Q.**   Who is this?

23   **A.**   Bangout.

24   **Q.**   Now, was there a time when you learned about the

25   circumstances or learned something about Bangout's murder?

1    **A.**    Yes.

2    **Q.**    From whom?

3    **A.**    Dominick Wedlock.

4    **Q.**    And how do you know Dominick Wedlock?

5    **A.**    Um, we met in the halfway house.  I later found out that

6    Gutta said that he was his brother, and then he later married

7    my cousin.

8    **Q.**    And was Dominick Wedlock a member of the mobsters?

9    **A.**    Yes.

10    **Q.**    How do you know?

11    **A.**    Um, 'cause he told me.

12    **Q.**    And did Dominick Wedlock go by any nicknames that you knew

13    of?

14    **A.**    Rage.

15    **Q.**    I'm going to show you Government's Exhibit IND-94.

16         Do you recognize this person?

17    **A.**    Yes.

18    **Q.**    Who is this?

19    **A.**    It's Dominick Wedlock.

20    **Q.**    I'm going to show you Government's Exhibit IC-88, which is

21    an excerpt from an iCloud account belonging to Dante Bailey.

22         What are we looking at here?

23    **A.**    Gutta, Nick, and me.

24    **Q.**    And where was this photograph taken, if you can tell?

25    **A.**    On the side of the gas station where the check cashing

```
 1   spot was.
 2   Q.   Now, I believe you said that you learned about Bangout's
 3   death from Mr. Wedlock; is that right?
 4   A.   Yes.
 5   Q.   What did Mr. Wedlock tell you?
 6   A.   He said that Bangout thought that Gutta was going to send
 7   him to kill him, but he didn't.
 8   Q.   So let me just unpack some of those "hims."
 9        Mr. Wedlock told you that Bangout said that who was going
10   to send --
11   A.   He said that Bangout thought that Gutta was going to send
12   him to kill him.
13   Q.   And that "him" is Mr. Wedlock?
14   A.   Yes.
15   Q.   Why would Mr. Bailey -- why would Gutta -- did Gutta have
16   a problem with Bangout that you knew about?
17   A.   To my knowledge, it was some type of -- he had a -- a
18   grievance over --
19             MR. ENZINNA:  Objection; basis of knowledge.
20   BY MS. PERRY:
21   Q.   Did someone tell you about an issue between Gutta and
22   Bangout?
23   A.   Yes.
24   Q.   Who told you?
25   A.   Gutta.
```

1    **Q.**    What did Gutta tell you?

2    **A.**    That, you know, nigga was acting crazy over some bullshit.

3    He was -- he was mad about -- I witnessed the conversation with

4    him and Bangout on the phone.  Bangout was crying about him

5    leaving him down in either Georgia or South Carolina or

6    something.  He got locked up.  They was supposed to be

7    together.  But Gutta never sent him no money or something.

8    **Q.**    And in addition to that, did you learn about another issue

9    between Gutta and Bangout?

10   **A.**    Well, supposedly Bangout was makin' threats and saying he

11   will -- he will bring his cousins up there and shoot up the gas

12   station, something like that.

13   **Q.**    Do you know if Bangout had ever been sanctioned by the

14   mobsters?

15   **A.**    Yes.

16   **Q.**    How do you know?

17   **A.**    I pulled up right after they did it, and Nick was holding

18   his hand.  And I was joking with him.  I'm like, you know --

19   You know I like to fight.  Why you all not let me know?

20        And he was like, You can't do that 'cause it's mob

21   business.

22   **Q.**    And what did he tell you happened?

23   **A.**    He said that they -- they sanctioned Bangout.

24   **Q.**    And did he tell you who sanctioned Bangout?

25   **A.**    It was Easy, Nick, and Melvin.

1    **Q.**   I'm going to show you Government's Exhibit IND-58.

2         Do you recognize this person?

3    **A.**   Yes.

4    **Q.**   Who is this?

5    **A.**   Melvin.

6    **Q.**   And was Melvin a member of the mobsters?

7    **A.**   Yes.

8    **Q.**   How do you know?

9    **A.**   Just from being around him and him being up the gas

10   station.

11   **Q.**   And showing you Government's Exhibit IND-84.

12        Do you recognize this person?

13   **A.**   Yes.

14   **Q.**   Who is this?

15   **A.**   Easy.

16   **Q.**   And was he a member of the mobsters?

17   **A.**   Yes.

18   **Q.**   How do you know?

19   **A.**   He told me.

20   **Q.**   Mr. Hankins, did Mr. Wedlock ever tell you who actually

21   committed the murder?

22   **A.**   No.

23   **Q.**   Did Mr. Wedlock tell you about another murder that he knew

24   about?

25   **A.**   Yes.

1   **Q.**   What did he tell you?

2   **A.**   He said he was mad because Gutta didn't pay him after

3   they -- they killed whoever kidnapped Dot.

4   **Q.**   Let me unpack that.

5         Let me show you, first, Government's Exhibit IND-14.

6         Do you recognize this person?

7   **A.**   S-Dot.

8   **Q.**   And how do you know S-Dot?

9   **A.**   We got real close in, like, 2010, 2011.

10  **Q.**   And was S-Dot a member of the mobsters?

11  **A.**   No, not to my knowledge.

12  **Q.**   Did S-Dot hang out in the Windsor Mill-Forest Park area?

13  **A.**   Yes.

14  **Q.**   And so you said that Mr. Wedlock told you that he was

15  upset.

16        What was he upset about?

17  **A.**   Because supposedly S-Dot went to -- to Gutta and told him

18  that, you know what I mean, he had got kidnapped and robbed and

19  he needed to be dealt with.  And Gutta put Dominick Wedlock and

20  Easy on -- on it to take care of it.  And they found out who

21  did it, and supposedly they got -- they killed him.  But in the

22  process of 'em doing it, they was supposed to get paid for it

23  and they never got paid for it.

24  **Q.**   Who was supposed to pay them?

25  **A.**   Um, S-Dot was supposed to pay Gutta, and Gutta was

1   supposed to pay them.

2   **Q.**   Mr. Hankins, are you familiar with someone named

3   Bobby Shmurda?

4   **A.**   Yes.

5   **Q.**   And did you ever hear Mr. Bailey discussing an incident

6   with Bobby Shmurda?

7   **A.**   Yes.

8   **Q.**   Can you tell us what Gutta told you.

9   **A.**   He -- he -- we often had different vehicles, and he came

10  and got my vehicle and went down to Mondawmin Mall.  And when

11  they got to Mondawmin Mall, he -- he slapped Bobby Shmurda or

12  something and they took his chain.

13  **Q.**   Did he tell you why he did this?

14  **A.**   Supposedly one of the dudes was throwing up gang signs or

15  something.

16  **Q.**   So I want to play you a call that has come in as an

17  exhibit on Government's Exhibit Wire B.  This is Call B-74, and

18  the transcript is on Page 270 of your transcript binder.

19       And while I'm pulling up the call, I just want to ask you,

20  I believe you said that you were told that Gutta took his

21  chain.  What do you mean by that, "took his chain"?

22  **A.**   His -- his jewelry.

23       **MS. WHALEN:**  Can you give the page again, please.

24       **MS. PERRY:**  Page 270, I believe, of the wire call tab.

25       (Audio was played but not reported.)

1    **BY MS. PERRY:**

2    **Q.**   Mr. Hankins, did you recognize any of the voices?

3    **A.**   Just SP.

4    **Q.**   And we'll come back to SP in a minute.

5          But looking over here at the transcript, did you hear when

6    an individual on the call said [reading]:  I had seen Gutta and

7    that "N" word had about 50 chains around his neck?

8    **A.**   Yes.

9    **Q.**   And did you hear where Spence said they were going around

10   taking "N" words' chains?

11   **A.**   Yes.

12   **Q.**   I want to now play you one other call.  This is from

13   jail call -- Government's Exhibit JAIL-1.  This is J-31, and

14   the transcript is on Page 99 of the jail call tab.

15         I'm going to play it from the beginning to start.

16         (Audio was played but not reported.)

17   **BY MS. PERRY:**

18   **Q.**   Now, do you recognize that voice?

19   **A.**   Yes.

20   **Q.**   Whose voice is that?

21   **A.**   Nick.

22          **MS. PERRY:**  Now I'm going to jump ahead to about

23   5 minutes and 27 seconds into the call.

24         (Audio was played but not reported.)

25   **BY MS. PERRY:**

1    **Q.**   I'm going to pause it right there.

2          Mr. Hankins, do you recognize either of those voices?

3    **A.**   Yes.

4    **Q.**   Who do you recognize them to be?

5    **A.**   Nick and -- and Melvin.

6          **MS. PERRY:**  I'm going to jump ahead now to 22 minutes

7    and 41 seconds into the call.

8          (Audio was played but not reported.)

9          **MS. PERRY:**  I'm going to stop it there.

10   **BY MS. PERRY:**

11   **Q.**   Did you hear mention of Bobby Shmurda during that call?

12   **A.**   Yes.

13   **Q.**   And is that the individual you were talking about earlier

14   who had his chain taken?

15   **A.**   Yes.

16   **Q.**   Now, Mr. Hankins, I believe before the break, you told us

17   that you knew an individual named Dirt and that you at one

18   point took money from Dirt to take to the casino.

19          Do you remember that?

20   **A.**   Yes.

21   **Q.**   When did you first meet Dirt?

22   **A.**   I think that night that I met him with -- with Gutta, that

23   was the first time.

24   **Q.**   And who introduced you to him?

25   **A.**   Gutta.

1  **Q.**   And do you know if Dirt was a member of the mobsters?

2  **A.**   Yeah.  Gutta told me that he was, like, the one that

3  handled all the money.

4  **Q.**   And did you learn where Dirt operated?

5  **A.**   Kind of yes and no.  I know he -- he wasn't around

6  Windsor Mill area.  He was like a floater.  But I've seen him

7  leaving from meetin' with -- with Gutta in the Liberty Heights

8  area.

9  **Q.**   And did you ever have communication with Dirt?

10 **A.**   No.

11 **Q.**   Did you ever have a phone number for Dirt?

12 **A.**   Yes.

13 **Q.**   How did you get that phone number?

14 **A.**   Um, from him and Gutta.  If I ever couldn't get in contact

15 with Gutta, he told me to call Dirt.

16 **Q.**   I'm going to show you again what's CELL-19.  I'm going to

17 show you Page 19 of this exhibit.

18      And looking here at the top, who is this contact for?

19 **A.**   Dirt.

20 **Q.**   But, again, did you ever actually contact Dirt?

21 **A.**   No.

22 **Q.**   Do you know what kind of car Dirt drove?

23 **A.**   A S550.

24 **Q.**   How did you know?

25 **A.**   I seen him in it.

1  **Q.**  And what did you see him doing in it?

2  **A.**  Just drivin' his car, just being around.

3  **Q.**  I'm going to show you Government's Exhibit IC-109.

4       Can you tell us what we're looking at here.

5  **A.**  A black S550 with Dirt inside and SP at the window.  And

6  it look like Jack, but I can't tell.

7  **Q.**  And which one is SP?

8  **A.**  The chubbier one in the white T.

9  **Q.**  And you told us earlier that you believe the person on

10  that call was SP.  Is this the same SP you're talking about?

11  **A.**  Yes.

12  **Q.**  I'm going to come back to SP in a few minutes.

13       Now, you told us earlier that you -- when you met with

14  Gutta and Dirt, that you took money from Dirt.  How was that

15  money?  What --

16  **A.**  Cash.

17  **Q.**  And how much money was provided by Dirt, if you recall?

18  **A.**  I don't recall.

19  **Q.**  And do you know where that money came from?

20  **A.**  No.

21  **Q.**  Now, I'm going to show you Government's Exhibit IND-2.

22       Do you recognize this person?

23  **A.**  Yes.

24  **Q.**  Who is this?

25  **A.**  Bo.

1    **Q.**   And when did you first meet Bo?

2    **A.**   Like two thousand, like, eleven, I think.

3    **Q.**   How did you meet Bo?

4    **A.**   Through S-Dot.

5    **Q.**   And do you see Bo in the courtroom today?

6    **A.**   Yes.

7    **Q.**   Could you point to him and indicate what he's wearing.

8    **A.**   On the end in a white button-down.

9    **Q.**   And did you learn whether or not Bo was a member of the

10   mobsters?

11   **A.**   I don't believe he was.

12   **Q.**   Did you ever see Bo in the area?

13   **A.**   Yes.

14   **Q.**   Where would you see him?

15   **A.**   Normally at the gas station or maybe in the townhouses.

16   **Q.**   And who would be -- who would you see Bo with when you saw

17   him?

18   **A.**   Um, sometimes Gutta, sometimes just the other neighborhood

19   guys.

20   **Q.**   How many times did you hang out or talk to Bo?

21   **A.**   Um, I didn't hang out with him, per se, that much.

22        One night we went to a show off of Mulberry and Franklin,

23   like around Franklin.  That was like the only time we ever

24   went -- went out together.  But it was a lot of guys there, but

25   we wasn't directly interacting.

1    **Q.**   Do you know what kind of vehicle Bo drove?

2    **A.**   Normally Hondas.

3    **Q.**   How do you know?

4    **A.**   I seen him in 'em.

5    **Q.**   Where did you see him at?

6    **A.**   At the gas station.

7    **Q.**   And when you would see Bo at the gas station or in the

8    area, would you ever see him carrying anything?

9    **A.**   I only seen him with a gun like once.

10   **Q.**   And when did you see him with a gun?

11   **A.**   I believe he was either in the townhouses or the gas

12   station.  I don't quite remember.  I just know I saw him like

13   once.

14   **Q.**   Where was the gun when you saw him with it?

15   **A.**   In his dip.

16   **Q.**   Did you ever have a conversation with Gutta about Bo

17   related to drugs?

18   **A.**   Well, basically, he said -- yes, yes.

19   **Q.**   And what did Gutta tell you?

20   **A.**   He said that they took a loss.  He waitin' for Bo to get

21   back straight so that he could get right.  That was when I went

22   and got him the -- the drugs.

23   **Q.**   And, again, you say he -- that Gutta told you he took a

24   loss.  What does it mean to take a loss?

25   **A.**   Either that somebody robbed him or the police confiscated

1    some drugs.

2    **Q.**   And he told you that he was waiting for Bo to get back

3    straight?

4    **A.**   Yes.

5    **Q.**   What does that mean?

6    **A.**   To reup.

7            **MS. AMATO:**  Objection.

8            **THE COURT:**  Overruled.

9    **BY MS. PERRY:**

10   **Q.**   And did you know -- what was Gutta talking about?  What

11   kind of drugs?

12   **A.**   Heroin.

13   **Q.**   I'm going to show you Government's Exhibit IC-134.

14       (Video was played but not reported.)

15           **MS. PERRY:**  I'm going to pause it right there.

16   **BY MS. PERRY:**

17   **Q.**   First of all, can you tell us, do you recognize the voice?

18   **A.**   Yes.

19   **Q.**   Whose voice is that?

20   **A.**   Gutta.

21   **Q.**   And did you see the person who just pulled up?

22   **A.**   Yes.

23   **Q.**   Who was that?

24   **A.**   Bo.

25   **Q.**   And can you tell us where this video is.

1    **A.**   At the gas station, at the BP gas station.

2        (Video was played but not reported.)

3    **BY MS. PERRY:**

4    **Q.**   Mr. Hankins, did there come a time when you received a

5    phone call from someone else that you knew about Bo?

6    **A.**   Yes.  S-Dot called me, and he said he needed me to help Bo

7    get 80,000 back.

8    **Q.**   And when you -- when he said 80,000, do you know what he

9    was referring to?

10   **A.**   $80,000.

11   **Q.**   And what happened next?

12   **A.**   I just gave him a few ways that he can get the money back,

13   but I told him that I could help him if he wanted to.

14   **Q.**   Did S-Dot tell you what was going -- what the situation

15   was with Bo?

16   **A.**   He just said the police had taken 80,000 from Bo.

17   **Q.**   And did he tell you what Bo was trying to do?

18   **A.**   He was trying to get his money back.

19   **Q.**   And why did they call you?

20   **A.**   Because I had legitimate businesses that I could make --

21   you know, or ways to get -- I'm the -- I play with paper, you

22   know, white collar.  So I always have a way to legitimize

23   something or make something look like it was right even when it

24   wasn't.

25   **Q.**   And so on this occasion they called you to ask about how

1    to potentially get this $80,000 back?

2    **A.**    Well, S-Dot called me.  Bo didn't call me hisself.

3    **Q.**    But S-Dot told you that it was for Bo?

4    **A.**    Yes.

5    **Q.**    Did you know -- I believe you told us earlier that you

6    knew Bo to drive a Honda and I showed you the video.  Did you

7    recognize the car in that particular video?

8    **A.**    Yes.

9    **Q.**    What car was it?

10   **A.**    A black two -- a black two-door Honda coupe.

11   **Q.**    Now, did you -- you testified earlier, I believe, that you

12   dealt with cars.  Did you know Bo to deal with cars as well?

13   **A.**    Yes.

14   **Q.**    Can you tell us about that.

15   **A.**    I just knew he had a dealer's license where he can go buy

16   his own cars if he wanted to.

17   **Q.**    And do you know whether or not Bo sold cars?

18   **A.**    No.

19   **Q.**    No, you don't know?

20   **A.**    No, I don't know.

21   **Q.**    Now, we talked about SP a couple of times.  I'm going to

22   show you Government's Exhibit IND-81.

23       Who are we looking at here?

24   **A.**    SP.

25   **Q.**    And when did you first meet SP?

1   **A.**   Like 2011, somewhere in there.

2   **Q.**   And who -- how did you meet SP?

3   **A.**   S-Dot.

4   **Q.**   And do you know if SP was a member of the gang?

5   **A.**   I don't think he was.

6   **Q.**   Where did you see SP?

7   **A.**   Around the gas station, around the

8   Windsor Mill-Forest Park area.

9   **Q.**   And how frequently did you see him there?

10  **A.**   You know, a few times a week.

11  **Q.**   And when you saw him there, what did you see him doing?

12  **A.**   Just hangin' out for the most part.  I mean, he was a

13  little reserved.  So, you know, just kind of hangin' out, being

14  around.

15  **Q.**   Did you ever see SP with drugs?

16  **A.**   I didn't see him directly with drugs.  I heard

17  conversations, heard him over here.  He's gettin' ready to go

18  hit a sale or something like that.

19  **Q.**   And was that in the area of Windsor Mill and Forest Park?

20  **A.**   Yes.

21  **Q.**   Now, I want to show you Government's Exhibit IND-60.

22       Do you recognize this person?

23  **A.**   Yes.

24  **Q.**   Who is this?

25  **A.**   T-Roy.

1    **Q.**    Did you know him by any other nicknames?

2    **A.**    Droid.

3    **Q.**    And do you see T-Roy in the courtroom today?

4    **A.**    Yes.

5    **Q.**    Could you point to him and indicate what he's wearing.

6    **A.**    (Indicating.)

7           He got like a paisley, light-colored shirt on,

8    blue-colored shirt.

9    **Q.**    And where -- how did you come to meet T-Roy?

10   **A.**    Again, just by way of being in the area.

11   **Q.**    And when you were in the area, would you run into T-Roy?

12   **A.**    Yes; from time to time.

13   **Q.**    And what was T-Roy doing when you would see him in the

14   area?

15   **A.**    Just hangin' out.

16   **Q.**    And do you know how T-Roy made money?

17   **A.**    No, not directly.

18   **Q.**    Did you ever see T-Roy in the area with anyone else?

19   **A.**    Just all the guys.  I mean, he frequently -- everybody up

20   there, like, just mingled with everybody else.  You know what I

21   mean?  It was kind of, like, just a big neighborhood.  So

22   everybody kind of was cool with everybody.

23   **Q.**    And do you know if T-Roy supplied drugs?

24   **A.**    Not directly, no.

25   **Q.**    Did you ever see him with drugs?

```
 1   A.   No.

 2   Q.   I'm going to show you IND-19.

 3        Do you recognize this person?

 4   A.   Yes.

 5   Q.   Who is this?

 6   A.   Cream.

 7   Q.   And where did you meet Cream?

 8   A.   Again, just around the neighborhood, around the area.

 9   Q.   And where would you see him?

10   A.   Around the area.

11   Q.   And that would be the area of Windsor Mill and

12   Forest Park?

13   A.   Windsor Mill and Forest Park, yes.

14   Q.   Now I want to show you IND-32.

15        Do you recognize this person?

16   A.   Yes.

17   Q.   Who is this?

18   A.   Syd.

19   Q.   Let me actually go back to Cream for a second.

20        Do you see Cream in the courtroom?

21   A.   Yes.

22   Q.   And where is he?

23   A.   At the second table.

24   Q.   Okay.  So going back to IND-32, I believe -- tell us again

25   who this is.
```

1    **A.**    Syd.

2    **Q.**    And when did you first meet Syd?

3    **A.**    Probably around the same time.

4    **Q.**    And who introduced you to Syd?

5    **A.**    I think Jack introduced me to Syd.

6    **Q.**    And where would you see Syd?

7    **A.**    At the gas station or in the -- in the townhouses.

8    **Q.**    And when you saw Syd, what was he doing?

9    **A.**    Normally just grindin', trying to -- trying to hustle,

10   make sales.

11   **Q.**    And when you say "make sales," make sales of what?

12   **A.**    Drugs.

13   **Q.**    Did you ever actually see Syd with drugs?

14   **A.**    I seen him hit sales, yes.

15   **Q.**    And describe -- what do you mean by that?

16   **A.**    I seen him serve a fiend.

17   **Q.**    So you've seen him approach someone and hand them --

18   **A.**    Yes.

19   **Q.**    -- drugs?

20         Do you know what kind of drugs Syd sold?

21   **A.**    No, I couldn't see what it -- what exactly he had.  But

22   coke, heroin, that type of thing, I guess.

23   **Q.**    I'm going to show you Government's Exhibit IND-53.

24         Do you recognize this person?

25   **A.**    Yes.

1    **Q.**   Who is this?

2    **A.**   Bino.

3    **Q.**   When did you first meet Bino?

4    **A.**   I first met him in -- sometime after 2013.

5    **Q.**   And where did you meet him?

6    **A.**   Through Gutta.

7    **Q.**   And was Bino a member of the mobsters?

8    **A.**   Yes.

9    **Q.**   How do you know?

10   **A.**   I was told.

11   **Q.**   Now, I want to direct your attention to about April or May

12   of 2016.  Did you have a conversation with Bino?

13   **A.**   Yes.

14   **Q.**   Where was that -- where did that conversation take place?

15   **A.**   At Supermax.

16   **Q.**   And what did Bino tell you?

17   **A.**   He told me he was going to wait, wait out the whole thing

18   until -- so he could find out who was tellin' on him, and then

19   he was going to kill 'em.

20   **Q.**   And what's Supermax?

21   **A.**   The federal detention.

22   **Q.**   The federal facility here in Baltimore?

23   **A.**   Yes.

24   **Q.**   Is it also known as the Chesapeake Detention Facility or

25   CDF?

```
 1   A.   Yes, yes, that's the formal name.

 2          MS. PERRY:  Just a moment.

 3          Nothing further, Your Honor.  Thank you.

 4          THE COURT:  All right.  Thank you.

 5          I'll see if there are any questions.

 6          Mr. Enzinna.

 7          MR. ENZINNA:  Thank you, Your Honor.

 8                        CROSS-EXAMINATION

 9   BY MR. ENZINNA:

10   Q.   Good afternoon, Mr. Hankins.

11   A.   Good afternoon, sir.

12   Q.   You testified earlier that there were -- that you knew

13   many of the members of MMP.

14   A.   Yes.

15   Q.   And that you -- you knew they were members of MMP in

16   different ways, right, by tattoos, you mentioned?

17   A.   Yes.

18   Q.   And people told you?

19   A.   Yes.

20   Q.   And people made gang signs?

21   A.   Yes.

22   Q.   Did you know a gentleman named Jay Greer?

23   A.   Yes.

24   Q.   He was a member of MMP, wasn't he?

25   A.   Yes.
```

1   **Q.**   Now, were you a member of MMP?

2   **A.**   Never.

3   **Q.**   I'm going to show you an exhibit that you looked at

4   earlier.  This is IC-87.

5        You -- I believe you testified that was a picture of you

6   with Mr. Bailey in the car?

7   **A.**   Yes.

8   **Q.**   What are you doing with your left hand?

9   **A.**   Throwing up the mobster sign.

10  **Q.**   Okay.  All right.  You also testified earlier about a

11  bank fraud conviction.  You pled guilty in 2016 --

12  **A.**   Yes.

13  **Q.**   -- correct?

14       But you also pled guilty to a prior bank fraud, correct,

15  in 2012?

16  **A.**   Aiding and abetting, yes.

17  **Q.**   Aiding and abetting bank fraud?

18  **A.**   Yes.

19  **Q.**   Okay.  In fact, you were on supervised release following

20  your sentence in that case when you committed this second

21  bank fraud; right?

22  **A.**   Correct.

23  **Q.**   So those are two separate convictions?

24  **A.**   Yes.

25  **Q.**   And you also testified earlier that you were convicted, I

```
 1   think, of third-degree car theft?

 2   A.   Yes.

 3   Q.   That was a carjacking, wasn't it?

 4   A.   No.  It was actually a complete misunderstanding.  But it

 5   went down as a third-degree car theft because I just pleaded

 6   out.  The case was taking forever, and the witness wasn't

 7   comin' to court.  And I just said, The heck with it.  I'll just

 8   take the plea just to get it over with.

 9   Q.   Well -- this happened at a casino?

10   A.   Outside a casino.

11   Q.   Outside a casino?

12   A.   Yes.

13   Q.   And you met some people outside the casino --

14   A.   Correct.

15   Q.   -- who had talked about the money they'd won; correct?

16   A.   Correct.

17   Q.   And you followed them to their car?

18   A.   Yes.  We went to -- we went to the gas station.

19   Q.   And you used a gun to threaten one of them with his life;

20   correct?

21   A.   No, sir.

22   Q.   That's not true?

23   A.   No.

24   Q.   So if the police report says that, that's false?

25   A.   There was no weapon recovered, and there were no weapons
```

```
 1   at all.
 2   Q.  All right.  Now, have you ever been a cooperator before?
 3   A.  No.
 4   Q.  Never?
 5   A.  No.
 6   Q.  And by that, I mean -- I don't mean just testified in
 7   court, but have you ever given information to police about
 8   other criminal defendants?
 9   A.  No.
10   Q.  Okay.  Now, you have met on several occasions with the
11   prosecutors in this case, the AUSAs?
12   A.  That's correct.
13   Q.  And with the case agents?
14   A.  Yes.
15   Q.  Which agents have you met with?
16   A.  I'm not sure of their names.
17   Q.  Okay.  When was the last time you met with them?
18   A.  This morning.
19   Q.  This morning.
20       Did you meet with them during lunch?
21   A.  No.
22   Q.  And this morning, how long did you meet with them?
23   A.  Approximately an hour.
24   Q.  What did you talk about?
25   A.  Just went over what I was saying.
```

1   **Q.**   Okay.  All right.  You testified earlier -- oh, I'm sorry.

2   We talked about Mr. Greer a minute ago.

3        Was Mr. Greer also known as Champagne?

4   **A.**   Yes.

5   **Q.**   And you testified earlier that you saw Champagne put guns

6   in the trunk of a Crown Vic outside Mr. Bailey's house; is that

7   right?

8   **A.**   That's correct.

9   **Q.**   So that would have been Mr. Greer?

10  **A.**   Yes.

11  **Q.**   Okay.  All right.  You also testified earlier about

12  certain telephone numbers for Mr. Bailey that were in your

13  contacts --

14  **A.**   Yes.

15  **Q.**   -- correct?

16       And there were, I think, four of them that you testified

17  to, four different numbers.

18  **A.**   Yes.

19  **Q.**   Okay.  And three of them were -- well, they were in two

20  different phones; right?

21  **A.**   Yes.

22  **Q.**   And three of them were in one phone -- was that your

23  phone?

24  **A.**   Yes.

25  **Q.**   And then there was a second phone that had a different

1    one.

2    **A.**   That also was my phone.

3    **Q.**   That also was your phone as well?

4    **A.**   Yes.

5    **Q.**   But that had a different number.

6    **A.**   Yes.

7    **Q.**   And that number ended in 9975.

8    **A.**   I believe so.

9    **Q.**   And when you testified about that, you were asked if

10   you -- if that was Mr. Bailey's number.  And I think you said,

11   "To my knowledge."

12       What did you mean by that?

13   **A.**   It means that to -- to my understanding, the understanding

14   that I have as a person, that was correct.

15   **Q.**   Did you ever call him on that number?

16   **A.**   I believe I did.

17   **Q.**   Okay.  You also testified earlier that you sometimes had

18   to get ahold of him through Tiffany, his wife --

19   **A.**   Yes.

20   **Q.**   -- because he would get rid of his phone?

21   **A.**   Either get rid of 'em; they were cut off; he had frequent

22   times where he was locked up, so, of course, he might not have

23   that phone number anymore; might have got rid of the phone.

24   **Q.**   But there were times when he was not locked up when he

25   didn't have his phone with him.

1   **A.**    Correct.

2   **Q.**    All right.  Now, you said earlier that you saw -- you were

3   asked about whether you saw Mr. Bailey purchase drugs.

4   **A.**    Yes.

5   **Q.**    And you mentioned where you went to a barbershop and

6   waited, and he got into another car and came back.

7   **A.**    Yes.

8   **Q.**    And when he came back, you said he told you that he -- he

9   had arranged to purchase some drugs; correct?

10  **A.**    Yes.

11  **Q.**    So you never saw the drugs actually, did you?

12  **A.**    No, I didn't.

13  **Q.**    Okay.  And you also testified earlier about a situation --

14  and correct me if I'm misunderstanding this.

15       But what I understood is that you said he -- you got him a

16  total of 50 grams --

17  **A.**    Yes.

18  **Q.**    -- and you gave him 25 grams that he paid you for.

19  **A.**    After -- he paid me at the end.

20  **Q.**    Okay.

21  **A.**    He didn't pay me when I handed it to him.

22  **Q.**    Understand.

23  **A.**    He gave it to me -- I gave it to him on consignment.

24  **Q.**    Okay.  And then you also gave him the second 25 grams, but

25  he didn't pay you for that?

1    **A.**   Correct.

2    **Q.**   What's the street value of 50 grams of heroin -- was it

3    heroin?

4    **A.**   Yes.

5    **Q.**   What's the street value?

6    **A.**   It can -- it can range.

7    **Q.**   How much does a gram of heroin sell for?

8    **A.**   It can go from -- sell wholesale or sell --

9    **Q.**   On the street.

10   **A.**   I mean, $100.

11   **Q.**   Okay.  So 50 grams would be about $5,000?

12   **A.**   Yes.

13   **Q.**   And I think you said that Mr. Bailey came to you to get

14   that -- to get that heroin because he said he was dry; is that

15   right?

16   **A.**   Yes.

17   **Q.**   Which meant he had no other drugs at all?

18   **A.**   He couldn't find anything good.

19   **Q.**   Okay.

20   **A.**   It's always easy to find something else, but not having

21   quality.

22   **Q.**   All right.  Now, you testified earlier about laundering

23   money for Mr. Bailey.  And one of the ways you said you did

24   this was by taking cash from him and going to the casino and

25   gambling with it and giving him from your winnings the amount

 1   he gave you plus 50 percent?

 2   **A.**   Yes.

 3   **Q.**   Correct?

 4        Okay.  So let me make sure I understand this.  He would

 5   give you -- let's say he gave you a thousand dollars?

 6   **A.**   Uh-huh.

 7   **Q.**   You would take that thousand dollars, go to the casino,

 8   and play blackjack?

 9   **A.**   Yes.

10   **Q.**   And you said you -- you doubled or tripled your money?

11   **A.**   Yes.

12   **Q.**   Always?

13   **A.**   Yes.  Most of the time, yes.

14   **Q.**   What's your secret?

15   **A.**   I mean, if I told you that, it wouldn't be a secret

16   anymore.

17   **Q.**   True.  True.  Okay.

18        So you would win the money --

19   **A.**   Right.

20   **Q.**   -- and then you would -- let's say you won $5,000.

21   **A.**   Uh-huh.

22   **Q.**   And then you would pay Mr. Bailey $1500?

23   **A.**   Yes.

24   **Q.**   In cash?

25   **A.**   Yes.

1  **Q.**  How did that launder his money?  He gave you cash, and you

2  gave him back more cash?

3  **A.**  I mean, I'm flipping the money.  I wasn't -- I never used

4  the word "laundering."  You did.

5  **Q.**  Oh, I thought that that was -- that that was what you said

6  earlier.

7  **A.**  I just said I flipped his money.

8  **Q.**  So you didn't actually launder money for him?

9  **A.**  I mean, the terminology is on you.

10 **Q.**  Okay.

11 **A.**  I made the flip.

12 **Q.**  Okay.

13 **A.**  I gave him back more money than what he gave me.

14 **Q.**  I understand.  Okay.

15      Now, you also testified about a scam, an insurance scam,

16 where you would get FR-19s, proof of insurance forms?

17 **A.**  Correct.

18 **Q.**  And you would buy them cheap and sell them for more?

19 **A.**  Yes.

20 **Q.**  And what that is, it's a -- you would sell that to people

21 who couldn't get car insurance; correct?

22 **A.**  Not couldn't get car insurance; had a lapse of insurance.

23 **Q.**  I see.

24 **A.**  Yes.

25 **Q.**  Oh, I understand.  Okay.

1        And you would use Mr. Bailey's money to do that and give

2   him back some of the proceeds from that.

3   **A.**    Yes, I have used his money for that.

4   **Q.**    Okay.  Now, you've been cooperating in this case for some

5   time, haven't you?

6   **A.**    Yes.

7   **Q.**    You've been meeting with prosecutors and agents for some

8   time?

9   **A.**    Yes.

10  **Q.**    Several years?

11  **A.**    Now, yes.

12  **Q.**    And you've met with them multiple times.

13  **A.**    Yes.

14  **Q.**    And on each of those times, you've talked about all the

15  stuff you've talked about today; right?

16  **A.**    For the most part, yes.

17  **Q.**    You've talked about the casinos?

18  **A.**    Yes.

19  **Q.**    You talked about the car sales that you also flipped money

20  through?

21  **A.**    Yes.

22  **Q.**    You never mentioned the insurance scam, did you?

23  **A.**    No.  I did.

24  **Q.**    You did?  When?

25  **A.**    Some time ago.

1   **Q.**   Who was there?

2   **A.**   The agents and the prosecutor.

3   **Q.**   Did they write it down anywhere?

4   **A.**   I can't tell you what they wrote.  I -- I don't have --

5   I'm not privy to that information.

6   **Q.**   Okay.  So if it's not in the materials that we were given,

7   it's just a mistake?

8   **A.**   It's a mistake, correct.

9   **Q.**   Okay.  All right.  Now, you've also talked earlier about

10   James Edwards or Bangout; right?

11   **A.**   Yes.

12   **Q.**   And you mentioned an incident where he was sanctioned.

13   **A.**   Yes.

14   **Q.**   And by that you meant beat -- beaten?

15   **A.**   Yes.

16   **Q.**   Okay.  And you said that -- I believe you said that Easy,

17   Nick, and Melvin were involved?

18   **A.**   To my knowledge, yes.

19   **Q.**   Not Mr. Bailey?

20   **A.**   I don't remember.

21   **Q.**   Okay.  And what was he sanctioned for?

22   **A.**   I don't know the exacts of it.  That was their business.

23   But to my knowledge, it was kind of over discrepancies.

24   **Q.**   And --

25       **MR. ENZINNA:**  Your Honor, may I have the Court's

```
 1   indulgence?

 2   BY MR. ENZINNA:

 3   Q.   You knew Jay Greer as Slick; right?

 4   A.   Champagne.

 5   Q.   I'm sorry?

 6   A.   Champagne.

 7   Q.   Champagne?

 8   A.   Yes.

 9   Q.   Okay.  Did you know Nutty B?

10   A.   Yes.

11   Q.   Brian Johnson?

12   A.   I don't know his real name.

13   Q.   You don't know.  Okay.

14        You told police that Fish killed him; right?

15   A.   That's what I was told.

16   Q.   And he was shot prior to being killed; right?  There was a

17   previous shooting incident; right?

18   A.   I have no idea.

19   Q.   You don't?  You didn't tell police that when he was shot,

20   Dante Bailey was angry about it?

21   A.   No, sir, not to my knowledge.  I don't really recall.

22   It's . . .

23        MR. ENZINNA:  No further questions, Your Honor.

24        Thank you.

25        Thank you, Mr. Hankins.
```

1          **THE WITNESS:**  You're welcome.

2          **THE COURT:**  Thank you.

3          Mr. Sardelli.

4                      CROSS-EXAMINATION

5    **BY MR. SARDELLI:**

6    **Q.**   Good afternoon, sir.

7    **A.**   Good afternoon.

8    **Q.**   So focusing back on your testimony earlier today, I

9    believe you said at some point my client, Mr. Banks, and

10   Mr. Bailey gave you $12,000 to go to the casino.  And you were

11   going to flip it and bring back 18,000; am I correct?

12   **A.**   He didn't know exactly what he was giving me the money

13   for.  He just gave me the money to flip, yes.

14   **Q.**   But that was your intent, to take it to the casino?

15   **A.**   That was one of the ways, yes.

16   **Q.**   Play blackjack and then flip it and bring back 18,000;

17   correct?

18   **A.**   Yes.

19   **Q.**   All right.  And that was probably back in -- would you

20   estimate that was back in 2014?

21   **A.**   Somewhere along there.  Along this way, I was -- I was

22   locked up for a little while.  So it was one of those years

23   that I was out --

24   **Q.**   Okay.

25   **A.**   -- between '13 and '15.

1    **Q.**   In fact, you mentioned previously you met with agents

2    before in this case; correct?

3    **A.**   Yes.

4    **Q.**   Okay.  And you met with agents back on August 24th of

5    2016, and do you remember telling them that that would have

6    occurred on about December 18th of 2014?

7    **A.**   I don't remember exactly what I said, but if -- if that's

8    what I said, yes.

9    **Q.**   Okay.  And you were going to take that money, flip it

10   playing blackjack, and bring them back a profit, necessarily.

11   They would give you -- loan you the 12,000.  You would bring

12   them back a profit of 18,000; correct?

13   **A.**   I didn't tell -- again, I didn't tell 'em exactly how I

14   was doing it.  And the way I would break it down, in order to

15   guarantee that I hand them their money, because I'm not going

16   to play with them, 'cause then you be -- I'll put myself in a

17   war over money that wasn't mine.

18   **Q.**   Okay.

19   **A.**   So I would take an allotted amount to the casino.  If that

20   worked out, fine; if it didn't, I always had the FR-19

21   insurance stuff to fall back on.

22   **Q.**   Okay.  But your intent was to take the 12,000, hopefully

23   win, and then bring them back the 18,000; correct?

24   **A.**   Correct.

25   **Q.**   All right.  And you mentioned previously on cross that

```
 1   you're a good blackjack player.  You don't want to give away

 2   your secret but that you win money at blackjack?

 3   A.   Yes.

 4   Q.   All right.  In fact, in 2013, isn't it true that

 5   Maryland Live! Casino, that you lost money over the year in

 6   2013?

 7   A.   I mean, based on what they could calculate -- all they can

 8   see is what you put in, and they don't measure every time you

 9   cash out.  There's ways around that.  So per what they saw, it

10   may have said loss.

11   Q.   Did you have a player's card?

12   A.   Yes.

13   Q.   Okay.  Have you seen a copy -- let's move to 2014, the day

14   this -- or the year this approximately happened.  Are you aware

15   that you lost money, according to your player's club card, in

16   2014?

17   A.   That's what the prosecutor told me, yes.

18   Q.   Okay.  Have you seen a copy of your yearly gaming activity

19   from Maryland Live! Casino in 2014?  Were you shown a copy of

20   that?

21   A.   Yeah.  The prosecutor showed it to me.

22   Q.   Okay.  And isn't it true that you lost $25,000 in 2014,

23   according to your player's card?

24   A.   According to the player's card, yes.

25   Q.   Okay.  And, in fact, on about December 18th, 2014, when
```

1  you said you were flipping this 12,000 to 18,000, you actually

2  won that day.  You won $93 that day.  Are you aware of that?

3  **A.**   You said $93?

4  **Q.**   $93.

5  **A.**   If that's what it says.  That's only -- again, the way the

6  casino works --

7  **Q.**   I'm asking whether [sic] your player's card, sir.

8  **A.**   I can't attest to what they -- how they do it.

9  **Q.**   Okay.

10 **A.**   All I can attest to --

11 **Q.**   Would it refresh your recollection if I showed you a copy

12 of this?

13 **A.**   No.  It wouldn't even matter.

14 **Q.**   It wouldn't even matter?

15 **A.**   No.

16 **Q.**   Okay.  So you agree that in 2014, according to your

17 player's club card in Maryland Live! Casino, you lost $25,000

18 in 2014; correct?

19 **A.**   No.

20 **Q.**   You don't think that's accurate as your player's club

21 card?

22 **A.**   No.  Would you like me to explain?

23 **Q.**   Well, I'm asking you about your player's club card.  Is

24 that accurate or not?

25 **A.**   It -- on paper, possibly.

```
 1   Q.    Okay.  And, actually, on December 18th, the day you think

 2   you were going to flip the 12,000 to 18,000, you only made $93

 3   that day, according to your player's club card.

 4         THE COURT:  According to what you're telling him,

 5   that's what the player's club card says.

 6         MR. SARDELLI:  The player's club card, yes.

 7         THE WITNESS:  Okay.

 8   BY MR. SARDELLI:

 9   Q.    Do you agree with that?

10   A.    No.

11   Q.    So if this account says you made $93 that day, that

12   accounting from Maryland Live! Casino must be wrong and you

13   must be correct.

14   A.    Correct.

15         MR. SARDELLI:  No further questions, Your Honor.

16         THE COURT:  All right.  Mr. Trainor, did you wish to

17   ask any questions?

18         MR. TRAINOR:  No questions.

19         MS. AMATO:  I have a few, Your Honor.  Thank you.

20         THE COURT:  All right.

21                    CROSS-EXAMINATION

22   BY MS. AMATO:

23   Q.    Good afternoon, Mr. Hankins.

24   A.    Good afternoon.

25   Q.    My name is Elita Amato, and I represent Mr. Anderson, who
```

1    you've identified as Bo.

2    **A.**   Okay.

3    **Q.**   All right.  You were asked on direct examination whether

4    you knew that Mr. Anderson carried a gun.

5    **A.**   Yes.

6    **Q.**   Or whether you had ever seen him, anything like that with

7    a gun; correct?  Remember that?

8    **A.**   Yes.

9    **Q.**   All right.  And you told us that one time you believed

10   that you saw him with a gun.

11   **A.**   Correct.

12   **Q.**   All right.  Now, you weren't -- you didn't remember where

13   you saw him, correct, with a gun?

14   **A.**   Correct.

15   **Q.**   All right.  You said it was either one place or another

16   place; correct?

17   **A.**   Correct.

18   **Q.**   You don't know when that was?

19   **A.**   Correct.

20   **Q.**   And to be fair, you never really saw the gun, did you?

21   **A.**   No.  I saw the gun.

22   **Q.**   Oh, you did see it?

23   **A.**   Yes.

24   **Q.**   Oh, I see.  Okay.

25        And, again, you don't know when this was?

1   **A.**   It's been a long time.  I mean, we're talking about before

2   I was locked up.  And I don't know about your memory, but I got

3   six kids.  It's --

4   **Q.**   So, I mean, memories kind of get --

5   **A.**   Over time, yes.

6   **Q.**   -- right, blurred?

7   **A.**   Yes.

8   **Q.**   About what people do, who the person is?

9   **A.**   Not that blurred.

10   **Q.**   Oh, not that blurred.

11   **A.**   Just enough to forget minor details.

12   **Q.**   Okay.  All right.  And you were also asked about --

13   something about Gutta took a loss waiting for Bo to get back

14   straight, something like that; right?

15   **A.**   Yes.

16   **Q.**   Okay.  And that was a conversation -- or that was

17   information that you obtained from Gutta?

18   **A.**   Yes.

19   **Q.**   Okay.  From Mr. Bailey?

20   **A.**   Yes.

21   **Q.**   All right.  So you never spoke with Mr. Anderson about

22   that?

23   **A.**   Correct.

24   **Q.**   All right.  And so you don't have any knowledge --

25   personal knowledge as to Mr. Anderson, what he knew about it or

1    didn't know; correct?

2    **A.**   Correct.

3    **Q.**   All right.  You don't know what he may have been told or

4    not told?

5    **A.**   Correct.

6    **Q.**   All right.  And you also mentioned about a conversation

7    with a person named S-Dot.

8    **A.**   Yes.

9    **Q.**   Pertaining to a loss of money.

10   **A.**   Yes.

11   **Q.**   All right.  And that it was S-Dot that called you and said

12   something about Mr. Anderson had lost some money, correct -- or

13   money had been taken that belonged to him by police; correct?

14   **A.**   Yes.

15   **Q.**   It had been seized?

16   **A.**   Yes.

17   **Q.**   About $80,000?

18   **A.**   Yes.

19   **Q.**   All right.  And, again, you never spoke to Mr. Anderson

20   about that; correct?

21   **A.**   Correct.

22   **Q.**   All right.  But S-Dot called you, and he was asking for

23   some kind of help from you to get the money back; correct?

24   **A.**   Correct.

25   **Q.**   All right.  But ultimately, Mr. Anderson never needed your

```
 1   help for that, did he?

 2   A.    I have no idea.

 3   Q.    Okay.  Well, he never came to you and said, Help me out;

 4   right?

 5   A.    Right.

 6   Q.    Okay.  And so you never even know:  Did he get the money;

 7   he didn't get the money.  You have no idea?

 8   A.    I have no idea.

 9   Q.    All right.  You were asked just briefly about your casino

10   wins, and you had mentioned that the records from

11   Maryland Live! don't give the full picture of your win --

12   winnings; correct?

13   A.    That's correct.

14   Q.    Because Maryland Live! records only have information about

15   your winnings when you use your player's card; right?

16   A.    Correct.

17   Q.    Okay.  So when you're in there and you're not using your

18   player's card, you can be winning money and it's not -- there's

19   going to be no record of it?

20   A.    Exactly.

21   Q.    Okay.

22         MS. AMATO:  Court's indulgence.

23         That's all I have, Your Honor.

24         Thank you.

25         THE COURT:  All right.  Thank you.
```

```
 1              Mr. Hazlehurst?

 2         MR. HAZLEHURST:  No questions, Your Honor.

 3         Thank you.

 4         THE COURT:  Okay.  Mr. Davis?

 5         MR. DAVIS:  No questions, Your Honor.

 6         Thank you.

 7         THE COURT:  Any redirect?

 8         MS. PERRY:  Very briefly, Your Honor.

 9                     REDIRECT EXAMINATION

10   BY MS. PERRY:

11   Q.   Mr. Hankins, I believe you testified that you were not a

12   member of the mobsters; is that right?

13   A.   Correct.

14   Q.   And so do you know the ins and outs of the mobsters' rank

15   structure?

16   A.   No.

17   Q.   And do you know for sure who was in or who was out of the

18   mobsters?

19   A.   Only who I'm told about.

20   Q.   I want to talk just for a second about these casino

21   records.

22        You told us, I believe, on direct examination that you

23   gambled frequently.

24   A.   Yes.

25   Q.   Did you sometimes win money?
```

1    **A.**    Yes.

2    **Q.**    Did you sometimes lose money?

3    **A.**    Yes.

4    **Q.**    And do you remember how much money you won or lost on the

5    specific dates that were mentioned?

6    **A.**    No.

7    **Q.**    And do you remember what specific date you were provided

8    that $12,000?

9    **A.**    No.

10   **Q.**    And so is it possible that it wasn't December 18th of

11   2014?

12   **A.**    Yes.

13        **MS. PERRY:**  Nothing further.

14        Thank you.

15        **THE COURT:**  All right.  Thank you.  The witness is

16   excused.

17        (Witness excused.)

18        **THE COURT:**  Can I see counsel just briefly on the

19   schedule.

20        (Bench conference on the record:

21        **THE COURT:**  I just didn't know your next witness,

22   long, short, if we should break a little early.

23        **MS. HOFFMAN:**  Yes, we can break now.  Our next witness

24   will probably be about an hour, I think.

25        **THE COURT:**  Okay.  I was just trying to figure out --

1    you have a witness that will be about an hour?

2         **MS. HOFFMAN:**  Yeah.  I think it's fine to break now,

3    if you'd like to break early.

4         **MS. AMATO:**  Who is the witness?

5         **MR. HAZLEHURST:**  Is it Wilson?

6         **MS. HOFFMAN:**  Yes.

7         **MR. HAZLEHURST:**  Okay.

8         **MS. HOFFMAN:**  Wilson will be, I think, about an hour,

9    including cross.

10         **MR. HAZLEHURST:**  And, Your Honor, that does raise --

11   are you going to play the call from --

12         **MS. HOFFMAN:**  And there's also -- yes.  Thank you.

13         There's also a call that Mr. Hazlehurst moved to

14   exclude in his motion in limine that I don't think Your Honor

15   has fully addressed.  This is the shoulder strap call.

16         **MR. HAZLEHURST:**  Your Honor, I'm going to -- I think

17   we've sort of talked about that in regard to another issue, and

18   I think I know what the Court's ruling is going to be.

19         So I'm going to submit on the papers and argue -- that

20   actually has to be argued maybe another day, be incorporated as

21   to this issue.  I'd ask for a continuing objection about it.

22   But, again, I will submit.

23         The one thing I will note, Your Honor, that there

24   is -- the call basically is discussion of Mr. Davis supposedly

25   wearing or basically going around with a shoulder strap which

     1    has been interpreted to be a long gun.

     2              Immediately after that statement, there is -- the

     3    person who made the statement goes, No, no, no.  Basically, I'm

     4    kidding you.  He's not doing that.

     5              So there is sort of a retraction of that.

     6              So the only thing I'm asking is that the full

     7    recording be played under 106.

     8              **THE COURT:**  Yes.

     9              **MS. HOFFMAN:**  Yes.  That's in there, yes.  Yes.

    10              **MR. HAZLEHURST:**  Your Honor, I think that's fine.

    11              **THE COURT:**  Okay.  Well, I do think it's admissible,

    12    but certainly the second part should be played as well.

    13              We'll take the break now.

    14              **MR. HAZLEHURST:**  Thank you, Your Honor.)

    15         (Bench conference concluded.)

    16              **THE COURT:**  Now, ladies and gentlemen, this seems like

    17    a good opportunity for the mid-afternoon break.  We do have

    18    another witness that will be called immediately after that, so

    19    I'm going to start by excusing the jury.

    20         (Jury left the courtroom at 3:14 p.m.)

    21              **THE COURT:**  All right.  And we'll excuse the gallery.

    22              Okay.  We'll take our afternoon recess.

    23         (Recess taken.)

    24              **THE COURT:**  We're ready for the next witness.

    25              **MS. AMATO:**  Your Honor, I just wanted to say one

1    thing; and that is that the Government, I know, has a lot of

2    evidence.  But I would ask that in the future that they not

3    have guns and rifles laying around until the evidence has been

4    introduced.

5         I mean, because basically the evidence is right by the

6    jury.  And so the jury -- there had been a rifle and a gun that

7    were on the table sitting throughout this other witness, and it

8    had nothing to do with this witness.

9         So I would just ask that those things be -- the

10   Government be more careful about where they're putting these

11   things before they're introduced into evidence.

12        **MS. HOFFMAN:**  We are going to be introducing them

13   through this witness.  And, I mean, we certainly didn't

14   intentionally put irrelevant evidence up on the table.  But

15   because he's the very next witness, we sometimes have to get

16   the next evidence up on tap so we keep track of it.

17        **THE COURT:**  All right.  Let's get the jury.

18        And is there any reason that we need to get the

19   witness first?

20        **MS. HOFFMAN:**  No.

21        **THE COURT:**  Okay.

22     (Jury entered the courtroom at 3:37 p.m.)

23        **THE COURT:**  Does the Government have another witness?

24        **MS. HOFFMAN:**  The Government calls Philip Wilson.

25        **THE CLERK:**  Please raise your right hand.

```
 1            DETECTIVE PHILIP WILSON, GOVERNMENT'S WITNESS, SWORN.
 2            THE CLERK:  Please be seated.
 3            Please speak directly into the microphone.
 4            State and spell your full name for the record, please.
 5            THE WITNESS:  Yes.  My full name, Philip Wilson.  It's
 6    P-H-I-L-I-P; last name, Wilson, W-I-L-S-O-N.
 7            THE CLERK:  Thank you.
 8                         DIRECT EXAMINATION
 9    BY MS. HOFFMAN:
10    Q.    Good afternoon, Detective Wilson.
11    A.    Good afternoon.
12    Q.    With which law enforcement agency are you employed?
13    A.    Yes.  I'm currently employed at the Baltimore County
14    Police Department.
15    Q.    And can you tell us your unit and title.
16    A.    Yes.  My unit that I currently work is the -- it's called
17    the special enforcement team, which works out of the
18    vice/narcotics section in Baltimore County.
19    Q.    How long have you been with the Baltimore County Police
20    Department?
21    A.    August the 7th of this year will be my 12th year with the
22    department.
23    Q.    And as of April of 2016, what was your unit and title?
24    A.    My unit title at that time was the community action team
25    that works out of the Woodlawn District within
```

1    Baltimore County.

2    **Q.**   Do you have experience conducting drug-trafficking

3    investigations?

4    **A.**   Yes, ma'am.

5    **Q.**   And do you have experience making arrests for violations

6    of drug-trafficking laws?

7    **A.**   Yes, ma'am.

8    **Q.**   Do you have experience assisting with search warrants in

9    which narcotics have been seized?

10   **A.**   Yes, ma'am.

11   **Q.**   I want to direct your attention to April 26th of 2016 at

12   approximately 2:30 in the afternoon.  Did you make a traffic

13   stop at around that time?

14   **A.**   Yes, ma'am.

15   **Q.**   And can you tell us where you were and what you were doing

16   at the time of the traffic stop.

17   **A.**   Yes.  During the time of the traffic stop, I was

18   conducting stationary radar at the Security Boulevard corridor

19   area near Robert Myers Boulevard.

20           **MS. HOFFMAN:**  And I want to pull up

21   Government's Exhibit MAP-13.

22   **BY MS. HOFFMAN:**

23   **Q.**   Do you recognize this image?

24   **A.**   Yes, ma'am.  That's an actual photo of the

25   Security Boulevard corridor I was functioning stationary radar

1    at the time.

2    **Q.**   And do you see the little, red pin right here

3    (indicating)?

4    **A.**   Yes, ma'am.

5    **Q.**   And is that roughly where you were when you conducted the

6    traffic stop?

7    **A.**   That's correct.

8    **Q.**   Can you tell us what you observed.

9    **A.**   Yes, ma'am.  So at the time I was conducting the

10   stationary radar in that area.  I was -- I'm actually certified

11   in conducting radar stops.  I've been certified since 2010.

12         While I was conducting the radar on Security Boulevard, I

13   observed a white-in-color Hyundai sedan traveling at a high

14   rate of speed on Security Boulevard.

15         During the radar test, it showed that the vehicle was

16   traveling at 55 miles per hour in a 35-miles-an-hour zone.

17   **Q.**   And did you pull the vehicle over?

18   **A.**   Yes, ma'am.

19   **Q.**   Were you able to identify the occupants of the vehicle?

20   **A.**   Yes, ma'am.

21   **Q.**   And who did you identify?

22   **A.**   After the traffic stop was conducted on Security Boulevard

23   near Gwynn Oak Avenue, I approached the vehicle.  There was two

24   occupants in the vehicle at that time.

25         It was -- the driver was identified as Shakeen Davis by

1    his Maryland license that he provided to me.  And later on the

2    passenger was identified as -- I remember his first name is

3    Eddie.  I don't recall his last name at this time.  It should

4    be in the report.

5    **Q.**   Now, you mentioned that the driver was Shakeen Davis.  Do

6    you see Mr. Davis in the courtroom today?

7    **A.**   Yes, ma'am.

8    **Q.**   And can you point him out, for the record.

9    **A.**   Yes.  He's the defendant straight to -- directly in front

10   of me in that blue-and-white jacket.

11   **Q.**   Had you seen Shakeen Davis prior to that day that you

12   pulled him over?

13   **A.**   Yes.

14   **Q.**   And where had you seen him?

15   **A.**   I seen Shakeen, Mr. Davis, at a BP gas station, which

16   is -- from where the traffic stop that I conducted, it's maybe

17   less than a half a mile down the street.  It's directly located

18   on Forest Park Avenue and Windsor Mill, right at the

19   intersection.

20   **Q.**   And turning your attention back to

21   Government's Exhibit MAP-13 -- it may be a little blurry, but

22   do you see -- can you make out the intersection of

23   Windsor Mill --

24   **A.**   (Indicating.)

25   **Q.**   Oh, looks like you just pointed to it.

1          Is the BP gas station that you're referring to in that

2     area?

3     **A.**   Yes, that's correct.

4     **Q.**   Did you notice anything unusual when you approached the

5     vehicle?

6     **A.**   Yes, ma'am, through my training, knowledge, and

7     experience, I noticed a strong odor of marijuana, THC, coming

8     from inside the vehicle.

9     **Q.**   And what did you do then?

10    **A.**   I -- I first asked for the driver's license and the

11    identification card for the passenger.

12         As I walked back to my patrol vehicle to run the

13    individual's driver's license through our database, I requested

14    backup.

15    **Q.**   And did backup eventually come?

16    **A.**   Yes.

17    **Q.**   Did you run license checks on the occupants of the

18    vehicle?

19    **A.**   Correct.

20    **Q.**   And what did you find?

21         **MR. HAZLEHURST:**   Your Honor, may we approach?

22         **THE COURT:**   Yes.

23       (Bench conference on the record:

24         **MR. HAZLEHURST:**   Your Honor, it's my understanding

25    that the officer who ran Mr. Davis' license found that he had

```
 1    an outstanding arrest warrant.  And I don't know that
 2    basically -- but I think that that is certainly prejudicial.
 3    I'm not sure what probative value it has at this point.  So I
 4    would ask that the Government not go into that area.
 5          MS. HOFFMAN:  Sure.  I don't -- the only real
 6    relevance is he then placed Mr. Davis under arrest.  So I
 7    wanted to, I guess, ask him, you know:  Why did you -- because
 8    he immediately placed him under arrest upon finding the
 9    outstanding arrest warrant.  That's part of why he searched the
10    car, but I think I can skip past it.
11          THE COURT:  Somebody said they couldn't hear.  The
12    issue is that when the license was run, the officer found that
13    Mr. Davis had an open warrant.
14          Mr. Hazlehurst didn't want that to come in.
15          The Government's saying the reason for it is just
16    explaining why he was taken into custody, but you can perhaps
17    get around that.
18          MR. HAZLEHURST:  Your Honor, I would simply suggest,
19    Did there come a time that you arrested Mr. Davis, and we have
20    now in evidence that there was a smell of marijuana.  And that
21    could be --
22          THE COURT:  Now I can't hear you.
23          MR. HAZLEHURST:  I would suggest that maybe asking
24    him, Did there come a time when you placed Mr. Davis under
25    arrest, and I think that in view of the fact that marijuana was
```

1    smelled, it gives us a good --

2            THE COURT:  Marijuana; right.

3            MS. HOFFMAN:  I guess that's okay.  Yeah, okay.

4            THE COURT:  Okay.

5            MR. HAZLEHURST:  Thank you.)

6        (Bench conference concluded.)

7    BY MS. HOFFMAN:

8    Q.   Detective Wilson, was Mr. Davis ultimately placed under

9    arrest?

10   A.   During the traffic stop?

11   Q.   Yes.

12   A.   He was, but not --

13           THE COURT:  Just he was at some point placed under

14   arrest.

15           THE WITNESS:  At some point and during the traffic

16   stop, he was placed under arrest.

17   BY MS. HOFFMAN:

18   Q.   And did -- was a search of the vehicle conducted?

19   A.   Yes, ma'am.

20   Q.   And what, if anything, did you find inside the vehicle?

21   A.   During the -- after my backup arrived on-scene, the

22   passenger was asked to exit the vehicle.  A search of the

23   vehicle, in the center console I recovered a black-in-color

24   .22 model .40-caliber style Glock handgun.

25   Q.   And was there anything recovered from the trunk of the

```
 1   vehicle?
 2   A.   Yes, ma'am.
 3   Q.   What was recovered from the trunk?
 4   A.   My backup, who actually searched the trunk of the vehicle,
 5   recovered an AR-style, black-in-color rifle.
 6   Q.   I'm going to approach and show you
 7   Government's Exhibit F-17.
 8   A.   Okay.
 9   Q.   (Handing.)
10        Can you tell us what we're looking at there or what you're
11   looking at there.
12   A.   Yes, ma'am.  That's the black handgun I recovered from the
13   vehicle.
14   Q.   And are you able to -- well, first, let me pull up
15   Government's Exhibit F-17-A.
16        Do you recognize this image here?
17   A.   Yes, ma'am.
18   Q.   What is this an image of?
19   A.   That's the handgun that I recovered from the vehicle.
20   Q.   Are you able to read the serial number on the gun, by any
21   chance?  Maybe not on the photo, but on the actual gun?
22   A.   Yes, ma'am.
23   Q.   Can you read it for us.
24   A.   Yes.  It's HHC901.
25   Q.   Now, you mentioned that your fellow officer -- and what
```

1    was your backup officer's name?

2    **A.**    Officer Crump.

3    **Q.**    You mentioned that Officer Crump recovered an AR-style gun

4    from the trunk of the vehicle.

5         I'm going to approach and show you

6    Government's Exhibit F-16.

7         (Handing.)

8         Do you recognize that exhibit?

9    **A.**    Yes, ma'am.

10   **Q.**    And what is that?

11   **A.**    That's the AR-style, 15 rifle that was recovered from the

12   trunk of the vehicle.

13   **Q.**    I'm going to pull up Government's Exhibit F-16-A.

14        Sorry.  Let me try that one more time.

15        What are we looking at in this image?

16   **A.**    That's the same AR-style, 15 handgun -- I mean rifle that

17   was found in the trunk of the vehicle.

18   **Q.**    And I'm going to ask you to do the same thing, if you

19   don't mind.  Can you find and read the serial number on the

20   AR-15 in front of you.

21   **A.**    Yes, ma'am.  I'll read it off.  F071734.

22   **Q.**    Thank you.

23        Now, you mentioned that the AR-15 was recovered from the

24   trunk of the vehicle.  Was there anything else recovered from

25   the trunk of the vehicle?

1    **A.**    Yes, ma'am.  It was a black digital scale, small

2    digital scale; "isotol," which was in a small bottle, a white

3    bottle; and a black ski mask.

4    **Q.**    Now, I'm going to show you Government's Exhibit AP-5.

5        Do you recognize this image here?

6    **A.**    Yes, ma'am.

7    **Q.**    And what are we looking at here?

8    **A.**    Those are the items that were recovered, along with the

9    rifle in the trunk of the vehicle.

10   **Q.**    Why did you recover -- why did you seize the scale and the

11   inositol?

12   **A.**    Well, through my training, knowledge, and experience, I

13   know --

14           **MR. HAZLEHURST:**  Objection; foundation, Your Honor.

15   She simply asked the question as to whether he has training.

16   She hasn't established what that training is.

17           **THE COURT:**  I thought she did at the beginning.

18           But if you'd like to repeat.

19           **MS. HOFFMAN:**  Sure.

20   **BY MS. HOFFMAN:**

21   **Q.**    You've been employed by the Baltimore County Police

22   Department for 11 years; is that right?

23   **A.**    11 years, going on 12 years.

24   **Q.**    And do you have experience conducting drug-trafficking

25   investigations?

1    **A.**   Yes, ma'am.

2    **Q.**   And do you have experience making arrests for violations

3    of drug-trafficking laws?

4    **A.**   Yes, ma'am.

5    **Q.**   And do you have experience executing or assisting in the

6    execution of search warrants in which drugs have been seized?

7    **A.**   Yes, ma'am.

8    **Q.**   And through that experience, have you become familiar with

9    the way that drugs are packaged and sold?

10   **A.**   Yes, ma'am.

11   **Q.**   Have you become familiar with the way that drugs appear

12   and the way their quality can vary?

13   **A.**   Yes, ma'am.

14   **Q.**   And have you become familiar with street terminology for

15   drugs like heroin and cocaine?

16   **A.**   Yes.

17   **Q.**   Now I'd like to ask you:  Why did you seize the small

18   digital scale and the bottle of inositol?

19   **A.**   Well, through my training, knowledge, and experience, I

20   know drug distributors would often carry digital scales;

21   paraphernalia such as "isotol" to -- which as I know as cuttin'

22   agents for distribution of narcotics; and the digital scale is

23   to actually weigh the product, which is the actual narcotics,

24   for street-level drug sales.

25   **Q.**   Were any cell phones recovered from the vehicle?

1  **A.**   Yes, ma'am.

2  **Q.**   What was recovered?

3  **A.**   It was a total of three cell phones recovered from that

4  vehicle.

5  **Q.**   And I'm going to approach and show you

6  Government's Exhibit CELL-2.

7          **THE COURT:**  The agent can put them away.

8  **BY MS. HOFFMAN:**

9  **Q.**   Do you recognize Government's Exhibit CELL-2?

10  **A.**   It's not the actual complete of the phone, but it's -- it

11  has phone pieces inside of it, so . . .

12  **Q.**   Does it have components of one of the phones that you

13  recovered?

14  **A.**   Yes.

15  **Q.**   And are you able -- could you -- describe, if you could,

16  what the model of the phone is there.

17  **A.**   Yes.  It's Alcatel OneTouch cell phone, smartphone, white

18  in color.

19  **Q.**   Did you conduct a search of Shakeen Davis' person?

20  **A.**   Yes, ma'am.

21  **Q.**   And what, if anything, did you find on his person?

22  **A.**   During the search of Shakeen Davis, I actually found a

23  small, clear baggie containing marijuana, THC, inside of it.

24  **Q.**   Was Mr. Davis transported to the precinct for processing?

25  **A.**   Yes, he was.

1   **Q.**   And back at the precinct, was he advised of his

2   Miranda rights?

3   **A.**   Yes, he was.

4   **Q.**   And did he agree to answer questions?

5   **A.**   Yes, ma'am.

6   **Q.**   And what in substance did he tell you?

7   **A.**   Well, during the interview, Mr. Davis, he acknowledged

8   that the handgun and the patrol -- I mean the AR-15 rifle was

9   in the vehicle during the traffic stop.

10      He also advised me and Detective Sohar (ph) that the

11  passenger had no knowledge of the handgun and the AR-15 rifle

12  inside the vehicle.

13      Shakeen Davis proceeded to tell us that he came across a

14  bag while traveling on I-83 towards Baltimore City where he

15  said that he hit something in the roadway.  He then proceeded

16  to say that he stopped to see what did he hit.  Once he was

17  outside the vehicle, he recovered the bag -- the bag containing

18  the handgun and the rifle alongside the road.

19      When Mr. Davis was asked did he made any attempts to call

20  9-1-1 for police, he said, No.  He was going to sell the

21  handgun and the rifle for money.

22  **Q.**   And this is what Mr. Davis told you?

23  **A.**   That's correct.

24  **Q.**   The handgun and the AR rifle that were recovered from the

25  vehicle, did they appear to be damaged in any way?

1   **A.**    No, ma'am.

2   **Q.**    The cell phones that were recovered from the vehicle, were

3   those cell phones later transferred to the Bureau of Alcohol,

4   Tobacco, Firearms & Explosives so that a search warrant could

5   be conducted on them?

6   **A.**    Yes, ma'am.

7   **Q.**    And I'm going to pull up Government's Exhibit CELL-2-A,

8   which has been admitted as excerpts from a certified cell phone

9   extraction report for CELL-2, which you just identified as one

10  of the cell phones recovered from the vehicle that day.

11       And now before I ask you about this, I just want to be

12  clear:  Did you have any role in selecting these particular

13  excerpts?

14  **A.**    No, ma'am.

15  **Q.**    You just recovered the phone?

16  **A.**    That's correct.

17  **Q.**    All right.  I'd like to start by highlighting for you the

18  device number at the top.

19       Could you read the number here for us (indicating).

20  **A.**    Yes.  It's (240) 713-0332.

21  **Q.**    And then I'm going to ask you, can you read this contact

22  here.

23  **A.**    Yes.  Lilsid5200@yahoo.com.

24  **Q.**    And I'm going to highlight a few more contacts here.

25       Do you see the contact Tr on the left?

1  **A.**   Yes.

2  **Q.**   Could you read the phone number associated with that

3  contact.

4  **A.**   (443) 709-7780.

5  **Q.**   And then do you see the contacts below

6  troublem5200@iCloud.com and wolfmobb@iCloud.com?

7  **A.**   Yes, ma'am.

8  **Q.**   I'm going to highlight a few SMS messages for you.

9      Do you see down below there's a message sent from a

10  contact -- a contact Tay that says Shakeen?

11  **A.**   Yes, ma'am.

12  **Q.**   And the one just below that, do you see there's a

13  text message sent to the phone that says [reading]:  Goodnight,

14  Creams.  I love you more?

15  **A.**   Yes, ma'am.

16  **Q.**   And then do you see that there are a number of additional

17  texts down below sent to the phone in which the name Shakeen or

18  Creams are used?

19  **A.**   Yes, ma'am.

20  **Q.**   I'm going to ask you about some additional text messages.

21      Do you see that there's a text message here sent from a

22  contact saved as Fh?

23  **A.**   Yes, ma'am.

24  **Q.**   And would you mind reading that text for us.

25  **A.**   Yes.  [Reading]:  Wanted to grab two more.  Can you do

1    that for two bills.

2    **Q.**   And then do you see that there's a response from the phone

3    to Fh that says [reading]:  Yeah?

4    **A.**   Yes, ma'am.

5    **Q.**   And then can you read this third text message here from Fh

6    to the phone.

7    **A.**   Yes, ma'am.

8         [Reading]:  Awesome.  I'm a -- I'm a grab the bread.  Then

9    tell me where to go.

10   **Q.**   There's a few more text messages down below from Fh to the

11   phone.  Do you see these here (indicating)?

12   **A.**   Yes, ma'am.

13   **Q.**   Would you mind -- would you mind reading those four texts

14   there.

15   **A.**   Yes.  [Reading]:  You got the same stuff or new?

16        The next one [reading]:  You gonna text me an address?

17        [Reading]:  Allendale and Gwynn Falls?

18        [Reading]:  Yeah.

19   **Q.**   Okay.  And then could you read this text message from Fh

20   to the phone for us.

21   **A.**   Yes.  [Reading]:  Those boys were not the same and stepped

22   on pretty hard.  Just FYI.

23   **Q.**   And without asking you to interpret this particular

24   text message, can you tell us, based on your 11-some years

25   conducting drug-trafficking investigations, have you become

1    familiar with the term --

2            **MR. HAZLEHURST:**  Objection.  I'm not sure that's what

3    his testimony was, Your Honor.

4            **THE COURT:**  Sustained.

5    **BY MS. HOFFMAN:**

6    **Q.**   Based on your experience conducting drug-trafficking

7    investigations, have you become familiar with the term "boy" in

8    the context of drug trafficking?

9    **A.**   Yes, ma'am.

10   **Q.**   And what does "boy" refer to?

11   **A.**   I -- through my training, knowledge, and experience, I

12   know that "boy" is a street term used by -- by drug dealers

13   known to be heroin, described -- to call heroin.

14   **Q.**   And same question for the term "stepped on."  Have you

15   become familiar with the term "stepped on" based on your

16   experience conducting drug-trafficking investigations?

17   **A.**   Yes, ma'am.  That --

18   **Q.**   And what does "stepped on" refer to?

19   **A.**   That is also used -- is a street term.  Drug dealers would

20   often get the raw quality of heroin, and they will use cutting

21   agents, such as "isotol" and other cutting agents, to break

22   down the product so they can make a profit off of it.  They

23   would often use this and break it down for street-level drug

24   sales.

25   **Q.**   And now I just want to -- do you see the text message

 1   below from the phone to Fh that says [reading]:  Okay.  Thanks

 2   for lettin' me know.  I have something different, too.  I'll

 3   give you a piece.

 4   **A.**   Yes.

 5   **Q.**   Okay.  Do you see that there's a couple text messages

 6   exchanged with phone number (240) 702-8596 here?

 7   **A.**   Yes, ma'am.

 8   **Q.**   Would you mind reading those text messages for us.

 9   **A.**   Yes.  [Reading]:  Okay.  Thanks for lettin' me know.  I

10   have something different, too.  I'll give you a piece.

11        Next one [reading]:  I need four total divided into two

12   and two.  Bud.

13        Okay.

14   **Q.**   Do you see the text message here from the phone to a

15   contact described as Pete that says [reading]:  I got a bomb?

16   **A.**   Yes.

17   **Q.**   And then down below, do you see the text message here from

18   another -- a different phone number to the phone that says

19   [reading]:  I bet.  Oh, yeah, by the way, that last batch was

20   just a little short.  I'm not too pressed about it.  Just

21   thought to let you know?

22   **A.**   Yes.

23   **Q.**   And what does the phone text back in reply?

24   **A.**   [Reading]:  Okay.

25   **Q.**   Okay.  And then do you see the text message down below

1   from the same phone that says [reading]:  If ya can split it as

2   one, one, and point five, appreciate it, bro?

3   **A.**   Yes.

4   **Q.**   Do you see the text message from a different number here

5   on March 22nd of 2016 to the phone -- or, I'm sorry, from the

6   phone to this different number that says [reading]:  You still

7   needed green?

8   **A.**   Yes.

9   **Q.**   And then would you mind reading the text message from that

10   (301) 828-6230 number to the phone.

11   **A.**   Yes.  [Reading]:  Yeah, but I'll be coming down tomorrow

12   morning for boy, so can I grab it at the same time?  I'll def

13   want it if you can do it.

14   **Q.**   And down below do you see the text message from a

15   different number to the phone that says [reading]:  Good

16   morning, bruh.  You available today?  Also, ya got new stuff?

17   Stuff from the other day is kind of weak?

18   **A.**   Yes.

19   **Q.**   And do you see the reply from the phone to that number,

20   [reading]:  Yeah, and I'll get you something better?

21   **A.**   Yes.

22   **Q.**   And do you see this text message later on from that same

23   number to the phone that says [reading]:  Actually, if you

24   want, you can do three bags or all halves, whichever works best

25   for you?

WILSON - DIRECT

1    **A.**    Yes.

2    **Q.**    Down below, same date, different phone number -- or phone

3    number indicated as Ann to the phone, do you see this text that

4    says [reading]:  Yo, I'm 20 minute -- I'm 20 min out.  I need

5    two Gs?

6    **A.**    Yes.

7    **Q.**    A few days later do you see this text message from a

8    different number to the phone March 28th of 2016 that says

9    [reading]:  Cool.  You got new stuff?  The at stuff kinda

10   jelled up?

11   **A.**    Yes.

12   **Q.**    And then what does the phone respond to that phone number?

13   **A.**    [Reading]:  I have the same tan.

14   **Q.**    And then do you see the text from that same phone number

15   to the phone that says [reading]:  Okay.  Cool.  I'm in WVA

16   now, but I'll call you when I'm coming down?

17   **A.**    Yes.

18   **Q.**    Skipping to some text messages here from March 29th of

19   2016, do you see the text here from a number ending in 8783 to

20   the phone that says [reading]:  Afternoon, bruh.  You

21   available?  If so, what kind do you got?  I'm hoping it ain't

22   that yellow stuff.  It sucked?

23   **A.**    Yes.

24   **Q.**    And what does the phone send back to that phone number?

25   **A.**    [Reading]:  I have tan stuff.

1   **Q.**   And then do you see the response [reading]:  Strong stuff?

2   I just gotta get my shit together, and I'll be on my way.  I'll

3   hit ya up when I do?

4   **A.**   Yes.

5   **Q.**   Also, March 30th, 2016, different phone number, do you see

6   the text from the phone in question to this 8596 number or

7   number ending in 8596 that says [reading]:  Come to BP?

8   **A.**   Yes.

9   **Q.**   And I believe you testified earlier that you had sometimes

10  seen Shakeen Davis at a BP gas station at the intersection of

11  Windsor Mill and Forest Park?

12  **A.**   That's correct.

13  **Q.**   Do you see this text message from the next day,

14  March 31st, 2016, from a phone number ending in 6230 that says

15  [reading]:  Can you put it in one bag so I can clock it?

16  **A.**   Yes.

17  **Q.**   Skipping down below, now I want to highlight some

18  text messages from April 2nd of 2016.

19      Do you see the first text that I've just highlighted from

20  a number ending in 2985 that says [reading]:  Okay.  Anything

21  you want added to it?

22  **A.**   Yes.

23  **Q.**   And what does the phone text back?

24  **A.**   [Reading]:  AR-15 behind GMB.

25  **Q.**   And can you read the next two text messages for us.

1    **A.**    Yes.  [Reading]:  Okay.  AR-15 is in -- a gun.

2    **Q.**    Directing your attention to the next page and some

3    text messages from April 2nd of 2016, do you see the two

4    text messages sent from the number ending in 6230?

5        [Reading]:  Hey, you ever get new stuff?  And can I at

6    least buy 2.5?  I have cash.

7    **A.**    Yes.

8    **Q.**    And what does the phone text back to that number?

9    **A.**    [Reading]:  Yeah.

10   **Q.**    Page 9 of this document, do you see that there are a few

11   text messages from the phone -- well, I'm sorry.  There are two

12   messages from the phone to other numbers that say [reading]:

13   Got fire?

14   **A.**    Yes.

15   **Q.**    And then do you see the text messages exchanged with the

16   number ending in 8596 [reading]:  Need five.

17       And then [reading]:  Okay?

18   **A.**    Yes.

19   **Q.**    And then do you see there's a question here from a

20   different phone number [reading]:  Can you get any girl also?

21   **A.**    Yes.

22   **Q.**    Without asking you to interpret this particular

23   text message, based on your experience conducting

24   drug-trafficking investigations, have you become familiar with

25   the term "girl" in the context of drug trafficking?

1    **A.**    Yes, I have.

2    **Q.**    And what does "girl" refer to?

3    **A.**    "Girl" is a normal street term used to describe cocaine.

4    **Q.**    Do you see the text down here, April 6th of 2016, from the

5    phone to a number ending in 1370 that says [reading]:  No.  I'm

6    at BP?

7    **A.**    Yes.

8    **Q.**    And then [reading]:  Q rolling a blunt.  LOL?

9    **A.**    Yes.

10   **Q.**    Do you see this text message from April 9th of 2016 from a

11   number ending in 8783 that says [reading]:  Morning, bruh.  You

12   gonna be available later on today in the afternoon?  To be

13   honest with ya, I think that stuff from yesterday was like

14   "bottom of batch" stuff.  I think it was just cut stuff?

15   **A.**    Yes, ma'am.

16   **Q.**    And what does the phone text back to that phone number?

17   **A.**    [Reading]:  Okay.  I got brown for you.

18   **Q.**    Directing your attention to another text from the

19   6230 number to the phone on April 9th of 2016, do you see this

20   text that says [reading]:  Made it through detox.  Ended up in

21   the hospital, but I'm better now.  Good luck with everything,

22   and I'll send people your way if they are looking?

23   **A.**    Yes.

24   **Q.**    And do you see the text down here from a number ending in

25   8783 to the phone that says [reading]:  Just a friendly

1  reminder.  2.5 but separated in halves?

2  **A.**  Yes.

3  **Q.**  I'm not going to read all these text messages, but I am

4  going to scroll through.

5      Detective Wilson, did I have you read every single

6  text message in this exhibit?

7          **MR. HAZLEHURST:**  Objection.

8          **THE WITNESS:**  No.

9          **MR. HAZLEHURST:**  Relevance.

10          **THE COURT:**  Overruled.  The answer is just "no."

11  That's fine.

12  **BY MS. HOFFMAN:**

13  **Q.**  After Mr. Davis' arrest, Detective Wilson, did you have an

14  occasion to review Instagram evidence of potential relevance to

15  Mr. Davis?

16  **A.**  Yes.

17  **Q.**  And I'm going to show you Government's Exhibit SM-10,

18  which has previously come into evidence as excerpts from

19  certified business records of Shakeen Davis' Instagram account.

20      And would you mind, first of all, just reading the

21  registered e-mail address here (indicating).

22  **A.**  Yes.  It says [reading]:  Creams.dinero@iCloud.com.

23  **Q.**  Do you recognize the individual in this photo on Page 2?

24  **A.**  Yes.  That's Shakeen Davis.

25  **Q.**  And do you see that there's a comment by user

1   Creams Dinero here?

2   **A.**   Yes.

3   **Q.**   Could you read the highlighted text there.

4   **A.**   Yes.  It says [reading]:  Trapper of the year, and you

5   ain't got no money.  #5200fam, #GMB.

6   **Q.**   Do you recognize the individual on the left here?

7   **A.**   Yes, ma'am.  That's Shakeen Davis.

8   **Q.**   And -- sorry.  This is Page 5 of this exhibit.

9        And then do you see that at the bottom it says there's a

10  comment by user Creams Dinero?

11  **A.**   Yes.

12  **Q.**   And then turning to the next page of the exhibit, would

13  you mind reading the highlighted text there (indicating).

14  **A.**   Yes.  It says [reading]:  Thuggin' since a juvenile.

15  Shawty really thought [sic] me a lot.

16  **Q.**   I'm going to move to Page 14 of this document.

17        **MR. HAZLEHURST:**  Excuse me, Your Honor.  If the

18  Government could refer to the page number on the Instagram

19  business record because --

20        **MS. HOFFMAN:**  Sure.  Yes.  I apologize.

21  **BY MS. HOFFMAN:**

22  **Q.**   Directing your attention to Page 14, which is Page 34 of

23  the Instagram business record, do you recognize the individual

24  on the left here?

25  **A.**   Yes, ma'am.  That's Shakeen Davis.

1  **Q.**  And then I'm going to refer you to the next page of the

2  exhibit, which is the next page of the Instagram business

3  return, Page 35.

4  And would you mind reading the text of the comment by the

5  user Creams Dinero here (indicating).

6  **A.**  Yes.  It says [reading]:  We extra heavy.  Better believe

7  it.  #5200.

8  **Q.**  And then I'm going to move to Page 16 of the exhibit,

9  which is Page 36 of the Instagram business record.  And can you

10  read the word at the top here.

11  **A.**  Yes.  If I'm pronouncing it right, it says, "Omertà."

12  **Q.**  And then do you see that there's the beginning of a

13  comment by user Creams Dinero down here at the bottom

14  (indicating)?

15  **A.**  Yes.

16  **Q.**  And I'm going to refer you to the next page, Page 17 of

17  the exhibit, which is Page 37 of the Instagram business record,

18  the next page of the Instagram business record.

19  Can you read the text of that comment by user

20  Creams Dinero.

21  **A.**  Yes.  It says "code."

22  **Q.**  And do you recognize the person on the right in this

23  photo?

24  **A.**  Yes, ma'am.  That's Shakeen Davis.

25  **Q.**  I'm going to move now to Page 20 of the exhibit, which is

1    Page 40 of the Instagram business return -- business record.

2         Do you recognize that individual there?

3    **A.**    Yes, ma'am.

4    **Q.**    Who is that?

5    **A.**    I believe that's Dante Bailey.

6    **Q.**    And how are you familiar with him?

7    **A.**    This individual, seen him quite often at the BP gas

8    station I referred to about.

9    **Q.**    And then directing you to the next page of the exhibit,

10   which is also the next page of the Instagram business return,

11   Page 41 of the Instagram business return, can you read the

12   comment attached to that photo by user Creams Dinero

13   (indicating).

14   **A.**    Yes, it says [reading]:  The #fam.

15   **Q.**    Now I'm going to move down to Page 25 of this exhibit,

16   which is Page 45 of the Instagram business record.

17        Do you recognize the person on the left of this photo?

18   **A.**    Yes, ma'am.  That's Shakeen Davis.

19   **Q.**    And then do you see that down at the bottom, there's the

20   beginning of a comment by user Creams Dinero?

21   **A.**    Yes, ma'am.

22   **Q.**    And then I'm going to go to the next page of the exhibit,

23   which is also the next page of the Instagram business record,

24   Page 46 of the Instagram business record.

25        Can you read the text of that comment by user

1    Creams Dinero (indicating).

2    **A.**   Yes.  It says [reading]:  Young MOBB bosses swagged up.

3    Playin' with/that check.  #5200fam.  #GMB.

4    **Q.**   I'm going to move now to Page 28, which is Page 69 of the

5    Instagram business record.

6         Do you see that there's the beginning of a comment by user

7    Creams Dinero from April 18th right here (indicating)?

8    **A.**   Yes, ma'am.

9    **Q.**   And I'm going to go to the next page of the exhibit,

10   Page 29, which is also the next page of the Instagram business

11   record, Page 70.

12        Can you read the text of the comment beginning where I've

13   highlighted it (indicating).

14   **A.**   Yes, ma'am.  It says [reading]:  Get ya grams, #GGs, money

15   sign, #GiftOfGab.  #GoodGrams.  #GMB.  Guns, money, and blow.

16   **Q.**   And I am now going to direct your attention to -- do you

17   see there's another comment from user Creams Dinero here from

18   April 10th of 2016?

19   **A.**   Yes, ma'am.

20   **Q.**   And I just want to ask you to read just the highlighted

21   text there (indicating).

22   **A.**   Yes.  It says [reading]:  Beefin' with the city.  I gotta

23   choppa, so who want it?

24   **Q.**   Actually, can you read the hashtags right here.

25   **A.**   [Reading]:  #5200fam.  #Omertà code.

1  **Q.**   Now, Page 30 of the exhibit, which is Page 71 of this

2  Instagram return, do you see that there's another comment from

3  March 9th of 2016 by user Creams Dinero right here

4  (indicating)?

5  **A.**   Yes, ma'am.

6  **Q.**   Could you read the text of that comment.

7  **A.**   Yes.  It says [reading]:  Go against the mob, get

8  murdered.

9  **Q.**   Next page of the exhibit, page -- it's Page 31 of the

10 exhibit, but it's Page 75 of the Instagram business record.

11      Do you see that there is a message from author

12 Creams Dinero here?

13 **A.**   Yes, ma'am.

14 **Q.**   And can you read the text of that message.

15 **A.**   Yes.  The phone number [reading]:  (240) 713-0332.

16 **Q.**   And does that number ring a bell?

17 **A.**   Yes, ma'am.

18 **Q.**   How does it -- how is it familiar to you?

19 **A.**   This phone number was connected to the text messages

20 previous.

21 **Q.**   The -- are you referring to the excerpts from the

22 cell phone that we went through a few minutes ago?

23 **A.**   Correct.

24 **Q.**   Now I'm going to show you Page 32 of this document which

25 is Page 88 of the Instagram business record.

1      Do you see the text by author Creams Dinero [reading]:

2   What's mobbin'?

3   **A.**   Yes, ma'am.

4   **Q.**   And finally, I'm going to go to Page 35 of the exhibit,

5   which is Page 1456 of the Instagram business record.

6      Who are we looking at there?

7   **A.**   That's Shakeen Davis, ma'am.

8   **Q.**   And can you tell where he is in that photo?

9   **A.**   Yes.  That parking lot is actually the BP gas station,

10  photo in the background of the BP gas station.

11  **Q.**   And then directing you to the next page of the -- well, do

12  you see where it says "caption" down here at the bottom of the

13  page?

14  **A.**   Yes.

15  **Q.**   And then continuing to the next page, Page 36 of the

16  exhibit, which is Page 1457 of the Instagram business record,

17  can you read the text that I've highlighted right here

18  (indicating).

19  **A.**   Yes.  It says [reading]:  Can't sleep when you got murder

20  on your mind.

21  **Q.**   After the arrest of Mr. Davis, did you have occasion to

22  listen to any recorded jail calls of potential relevance to

23  this incident?

24  **A.**   Yes, ma'am.

25      **MS. HOFFMAN:**  And, Your Honor, do we need to approach

1    about this jail call?

2           **THE COURT:**  I thought it was the issue we already

3    discussed.

4           **MS. HOFFMAN:**  Okay.  Thank you.  I just wanted to

5    clarify.

6    **BY MS. HOFFMAN:**

7    **Q.**   All right.  Well, I'm going to play you Government's --

8    I'm going to play you a recording from

9    Government's Exhibit JAIL-1, which has previously been

10   introduced into evidence as a disc of recorded -- of jail

11   recordings, a disc of certified jail recordings.  And

12   specifically, I'm going to play you Call J-30, and the

13   transcript is on Page 98 of the jail call tab of the

14   transcripts binder.

15          And just to be clear, before I play this, did you have any

16   role in preparing this transcript?

17   **A.**   No, ma'am.

18   **Q.**   All right.  I am going to skip ahead to 1 minute and

19   29 seconds -- well, first, you said you didn't have any role in

20   preparing this transcript.  Are you relying on someone else's

21   identification of the participants in this call and what's in

22   the transcript here?

23   **A.**   Yes, ma'am.

24   **Q.**   Can you just read for the record who the participants are

25   and the date of the call (indicating).

1   **A.**   Yes.  It says [reading]:  Inmate, Williams Jones.

2   Inmate ID, 2739775.  Dialed number, (410) 762-9166,

3   Melvin Lashley.  The date, August 28th, 2015.  The time,

4   18:49 hours.

5   **Q.**   Thank you.

6        And I'm going to skip to 1 minute and 29 seconds.

7        (Audio was played but not reported.)

8   **BY MS. HOFFMAN:**

9   **Q.**   And I'm going to pause it there.

10       Do you recall reading the user name of the Instagram

11  excerpts we just went through as Creams Dinero?

12  **A.**   Yes, ma'am.

13  **Q.**   And I'm going to put Government's Exhibit F-16-A back up

14  on the screen.

15       Did the AR-15 that was recovered from Shakeen Davis'

16  vehicle have a shoulder strap?

17  **A.**   Yes, ma'am.

18          **MS. HOFFMAN:**  No further questions.

19          **THE COURT:**  All right.  Thank you.

20          Mr. Hazlehurst.

21          **MR. HAZLEHURST:**  Thank you, Your Honor.

22                         CROSS-EXAMINATION

23  **BY MR. HAZLEHURST:**

24  **Q.**   Good afternoon.

25  **A.**   Good afternoon, sir.

1    **Q.**   I'm Paul Hazlehurst.  I represent Shakeen Davis

2    (indicating).

3    **A.**   Okay.

4    **Q.**   Now, the Government started by asking you about something

5    that occurred on April 26th of 2016; correct?

6    **A.**   That's correct.

7    **Q.**   Okay.  And you are a Baltimore County police officer; is

8    that right?

9    **A.**   That's correct.

10   **Q.**   And you were a Baltimore County police officer then;

11   correct?

12   **A.**   Correct.

13   **Q.**   And the Government at one point referred to you during its

14   examination as detective, but you are not a detective; is that

15   correct?

16   **A.**   I'm currently a detective.

17   **Q.**   But you weren't on the day that this occurred, were you?

18   **A.**   No.

19   **Q.**   Okay.  So today you're dressed in a coat and tie, and

20   that's what you normally wear to work these days, I assume;

21   correct?

22   **A.**   No.  I'm actually a street detective, so I'm actually in

23   plainclothes a lot.

24   **Q.**   So not nice streets.  You're in places where you wouldn't

25   be wearing a coat and tie, I assume?

1    **A.**    Correct.

2    **Q.**    These are your Court clothes, if you will?

3    **A.**    That's correct.

4    **Q.**    All right.  But on that date in April of 2016, you were in

5    a police uniform; correct?

6    **A.**    Correct.

7    **Q.**    Okay.  And you said you were working stationary radar;

8    right?

9    **A.**    Correct.

10    **Q.**    And that means you were parked using a radar device;

11    correct?

12    **A.**    Correct.

13    **Q.**    All right.  You're the thing every driver fears coming

14    over the rise when you're going too fast; right?

15    **A.**    I wouldn't say fear, but . . .

16    **Q.**    Maybe I speak for myself.

17    **A.**    Okay.

18    **Q.**    And you're on Security Boulevard; correct?

19    **A.**    That's correct.

20    **Q.**    And you are wearing a uniform.  You're observing cars

21    approaching; correct?

22    **A.**    That's correct.

23    **Q.**    Using the radar device, you see a car approaching.  It's a

24    white Hyundai?

25    **A.**    That's correct.

1    **Q.**    35-mile-per-hour zone; right?

2    **A.**    That's correct.

3    **Q.**    And you see that Hyundai and it's going, based on your

4    radar device, going 55 miles per hour; correct?

5    **A.**    That's correct.

6    **Q.**    And at that point you step out in the road.  Are you

7    actually physically out of your car at that point?

8    **A.**    I'm actually in my car.

9    **Q.**    Okay.  Did you step out and stop the car?

10   **A.**    I stopped the car with my patrol vehicle, yes.

11   **Q.**    So the car passed you, and you followed the car, pulled it

12   over?

13   **A.**    That's correct.

14   **Q.**    And at that point the car didn't try to flee.  The person

15   who's driving the car didn't try and get away; correct?

16   **A.**    No.

17   **Q.**    Pulled over, saw your emergency lights, I assume?

18   **A.**    Yes.  Emergency equipment lights was functioning and

19   working.

20   **Q.**    You got out of your car, approached that vehicle?

21   **A.**    Yes.

22   **Q.**    Again, no attempt to flee at that point; correct?

23   **A.**    No, sir.

24   **Q.**    Okay.  And you obtained a driver's license for the person

25   you have ultimately identified as Shakeen Davis (indicating);

1   right?

2   **A.**   Yes.

3   **Q.**   And there came a point where you searched the car;

4   correct?

5   **A.**   Yes.

6   **Q.**   Okay.  And when you searched the car, you found a handgun

7   in the console of that car; correct?

8   **A.**   Yes.

9   **Q.**   Okay.  And you also said you found a -- or actually your

10  partner found, if I'm not mistaken, found a rifle; correct?

11  **A.**   That's correct.

12  **Q.**   Now, you've seen the rifle in court today; correct?

13  **A.**   Yes.

14  **Q.**   And that rifle is not the way that was found in the trunk,

15  was it?

16  **A.**   It was in a bag.

17  **Q.**   It was in a bag.  A zippered bag?

18  **A.**   It was some type of book bag.

19  **Q.**   That was -- basically, it wasn't open in the trunk;

20  correct?

21  **A.**   No.

22  **Q.**   Okay.  You also said you recovered some cell phones;

23  correct?

24  **A.**   That's correct.

25  **Q.**   Now, also, you wrote a report in this case; correct?

1    **A.**    That's correct.

2    **Q.**    You also wrote a statement of charges, because ultimately

3    Mr. Davis was charged in state court; correct?

4    **A.**    That's correct.

5    **Q.**    Now, when you write -- first of all, a statement of

6    charges, it is prepared under oath; that's correct?

7    **A.**    It's prepared by me; that's correct.

8    **Q.**    It's prepared under oath by you.

9    **A.**    That's the facts by me, yes.

10   **Q.**    Right.  And when you prepare a statement of

11   probable cause, it is under oath; correct?

12   **A.**    That's correct.

13   **Q.**    Okay.  And so you make sure that you're complete when you

14   make out that statement of charges?

15   **A.**    Correct.

16   **Q.**    You're accurate?

17   **A.**    Yes.  You have to be accurate.

18   **Q.**    And obviously if it's under oath, you've got to be

19   truthful; correct?

20   **A.**    Yes.

21   **Q.**    All right.  Now, you wouldn't differ in those standards

22   when you prepare a report, would you?

23   **A.**    No.  The facts, what I wrote in the statement of charges,

24   will also be in the original report.

25   **Q.**    Okay.  Now, I'm going to show you what has been marked as

```
 1   Defendant's Exhibit 7 for purposes of identification.
 2          MR. HAZLEHURST:  If I may approach, Your Honor.
 3   BY MR. HAZLEHURST:
 4   Q.   (Handing.)
 5        That is the statement of charges you prepared in this
 6   case; isn't that correct?
 7   A.   Yes.
 8   Q.   And when you prepared this, you weren't under any time
 9   pressure.  You had ample time to prepare it and put all the
10   facts that were necessary for that statement of charges;
11   correct?
12   A.   Yes.
13   Q.   Okay.  And, again, same goes for your report; correct?
14   A.   That's correct.
15   Q.   All right.
16          MR. HAZLEHURST:  Your Honor, I'm going to show, if I
17   may, and approach with what I have marked as Defendant's
18   Exhibit 8 for purposes of identification.
19          THE COURT:  All right.
20   BY MR. HAZLEHURST:
21   Q.   (Handing.)
22        That is the report you prepared; correct?
23   A.   That's correct.
24   Q.   Okay.  And when you prepared these reports, you did not
25   include that you found any cell phones, did you?
```

1    **A.**   Not in the statement of charges.

2    **Q.**   Not in the report either, did you?

3          **MS. HOFFMAN:**   Objection.  That's not true.

4          **THE WITNESS:**   It's actually in the report.

5    **BY MR. HAZLEHURST:**

6    **Q.**   It is in the report.  Where is it in the report, Officer?

7    **A.**   It's on Page 6 of the actual FBR report, the third

8    paragraph and below.

9    **Q.**   Page 6?

10   **A.**   Page 6.

11         (Counsel conferred.)

12   **BY MR. HAZLEHURST:**

13   **Q.**   And this was a draft report, the one I've given you?

14   **A.**   Yes.

15   **Q.**   All right.  Now, there is no mention of -- you said it was

16   "isotol"; correct?

17   **A.**   Yes.

18   **Q.**   And you recovered "isotol"?

19   **A.**   Yes.

20   **Q.**   And that is in the report?

21   **A.**   I don't believe it was in the report, no.

22   **Q.**   Okay.  Now, you recovered these two firearms.  And the day

23   you were working, this was not an investigation of Mr. Davis,

24   was it?

25   **A.**   Can you repeat the questions again, sir.

1    **Q.**   When you were working the radar site, that didn't start

2   out to be an investigation of Mr. Davis, did it?

3   **A.**   No.

4   **Q.**   So you were out there just working in traffic detail?

5   **A.**   That's correct.

6   **Q.**   Okay.  And you see Mr. Davis and, again, appears to be

7   speeding; you pull him over?

8   **A.**   That's correct.

9   **Q.**   And you find these firearms in the car; correct?

10   **A.**   That's correct.

11   **Q.**   And you had no evidence in regard to whether Mr. Davis had

12   ever used those firearms; correct?

13   **A.**   That's correct.

14   **Q.**   And you had no evidence regarding whether they had been

15   ever used in any particular offense; correct?

16   **A.**   That's correct.

17   **Q.**   And you took those firearms, and you submitted them for

18   examination; correct?

19   **A.**   That's correct.

20   **Q.**   And part of the reason you do that is, one, because you

21   have to make sure that those firearms are actually firearms;

22   right?

23   **A.**   Correct.

24   **Q.**   They have to be operable.  They have to be test-fired.

25   **A.**   That's correct.

1   **Q.**   But you're also doing that to make sure that they can be

2   examined to determine whether they are or were involved in any

3   other offense; correct?

4   **A.**   That's correct.

5   **Q.**   And to your knowledge, there was never any evidence that

6   they were involved in any other offense, were they?

7   **A.**   I don't have any paperwork saying that.

8   **Q.**   Now, you said that there was also a small amount of

9   marijuana that was seized; correct?

10   **A.**   Correct.

11   **Q.**   Personal-use marijuana?

12   **A.**   Yes.

13   **Q.**   Might explain that smell that you got when you approached

14   the car.

15   **A.**   That's correct.

16   **Q.**   Okay.  And wasn't any cash that was obtained, was there?

17   **A.**   No.

18   **Q.**   Now, you've been asked at length about some other

19   documents, and the first thing that you were asked to discuss

20   was a cell phone excerpt; correct?

21   **A.**   That's correct.

22   **Q.**   Now, that is marked as Government's Exhibit CELL-2-A.

23   **A.**   Correct.

24   **Q.**   And the Government asked you to go through that document

25   and comment upon that; correct?

1   **A.**   Correct.

2   **Q.**   Now, that document didn't have anything to do with your

3   arrest that day of Mr. Davis; right?

4   **A.**   It was actually his phone that was recovered from the

5   vehicle.

6   **Q.**   What I'm asking, that information that's contained in this

7   document didn't do anything to establish probable cause for

8   your arrest the day that you arrested Mr. Davis; correct?

9   **A.**   No.

10  **Q.**   Okay.  And you went through that document, and the

11  Government highlighted certain items on the first page.

12  **A.**   Correct.

13  **Q.**   I am not seeing this on the screen.  Is that it?  Aha.

14       Government asked you to note certain contacts on that

15  phone that are highlighted here, Little Syd, TroubleM,

16  Wolfmobb; correct?

17  **A.**   Correct.

18  **Q.**   And those are e-mail addresses, aren't they?

19  **A.**   Correct.

20  **Q.**   There was nothing on the phone related to any

21  communications with those addresses, was there?

22       **MS. HOFFMAN:**  Objection; basis of knowledge.

23       **THE COURT:**  You're asking about the entire phone?  I

24  mean, do you want to --

25       **MR. HAZLEHURST:**  Your Honor, in the excerpts, so I'll

1    refine the question.

2         **THE COURT:**  Okay.

3    **BY MR. HAZLEHURST:**

4    **Q.**   You went through the excerpts.  There were no

5    communications on that excerpt with any of those e-mail

6    addresses, were there?

7    **A.**   They were all phone numbers attached.

8    **Q.**   They're all phone numbers; right.

9         Now, you went through a series of text messages.  The

10   Government asked you to read several text messages; correct?

11   **A.**   That's correct.

12   **Q.**   Now, they were on various dates.  And, again, you're a

13   police officer.  You've got powers of investigation; correct?

14   **A.**   Correct.

15   **Q.**   The dates, any of the dates that the Government mentioned

16   to you and asked you to read, do you have knowledge of either

17   yourself or anyone else arresting Mr. Davis on any of those

18   dates?

19   **A.**   No.

20   **Q.**   No evidence that he was engaged in any sort of drug

21   trafficking on any of those dates?

22   **A.**   I wasn't there on the date when I [sic] had contacts with

23   Shakeen.

24   **Q.**   So you basically don't know anything about this document

25   (indicating) other than what you're reading today; correct?

1   **A.**   I know exactly what I read and it's drug contact, drug
2   talk.
3   **Q.**   Well, again, what I'm asking you is, based on your
4   knowledge of any investigation that's gone on in regard to
5   Mr. Davis, there is nothing that corresponds with any of those
6   messages where Mr. Davis was arrested, detained, or otherwise
7   found to be engaged in drug trafficking, is there?
8   **A.**   Based off of my contacts with Shakeen Davis on a traffic
9   stop, this wasn't a part of my investigation at the time --
10  **Q.**   And you're not --
11  **A.**   -- as far as arrest.
12  **Q.**   Pardon me for interrupting.
13      You're not aware of any other investigation by any agency,
14  by ATF, by Baltimore County, by Baltimore City, that
15  corresponds with any of these text messages where Mr. Davis was
16  alleged to be engaged in drug transactions; correct?
17  **A.**   Not at that point.
18  **Q.**   Now, you also were asked to go through an Instagram
19  record.
20  **A.**   Correct.
21  **Q.**   And read pieces of that Instagram record that were
22  highlighted by the Government; correct?
23  **A.**   Correct.
24  **Q.**   Now, again, this had no part in establishing
25  probable cause for your arrest of Shakeen Davis (indicating) on

1  that day in April 2016, did it?

2  **A.**   No.

3  **Q.**   You didn't have anything to do with preparing this

4  document, did you?

5  **A.**   No.

6  **Q.**   Other than trial preparation with the prosecutors, you'd

7  never seen this document before, had you?

8  **A.**   No.

9  **Q.**   And you were never engaged in any active investigation of

10  Mr. Davis that had any correlation to any of these particular

11  comments, did you?

12  **A.**   I had no investigations pertaining to him.

13  **Q.**   Now, the last thing you were asked to listen to was a

14  jail call, a recorded jail call; correct?

15  **A.**   Yes.

16  **Q.**   Okay.  And do you remember that call, sir?  Would you like

17  me to play it for you again?

18  **A.**   You can play it again.

19  **Q.**   Do you know what?  It may be easier said than done, but

20  we'll figure that out.

21          **THE COURT:**  Put up the page of the transcript.

22          **MR. HAZLEHURST:**  Your Honor, I think that that might

23  be the easier way to do it.

24          **MS. HOFFMAN:**  (Handing.)

25          **MR. HAZLEHURST:**  Thank you very much.  I appreciate

1    that.

2    **BY MR. HAZLEHURST:**

3    **Q.**   You look at what has been marked as

4    Government Exhibit J-30-T.  Has that shown up on your monitor?

5    **A.**   Yes, sir.

6    **Q.**   And that call began at 1:29 between two men who you never

7    encountered; correct?

8    **A.**   No.

9    **Q.**   You don't know William Jones?

10   **A.**   No.

11   **Q.**   And you don't know Melvin Lashley?

12   **A.**   No.

13   **Q.**   And as the Government pointed out, you're relying on

14   somebody else to establish the identity of these two men;

15   correct?

16   **A.**   Yes.

17   **Q.**   And that call, basically, is very -- at least what we have

18   here, is very short.  And it starts out [reading]:  That for

19   sho, that mob already know.

20        Do you have any clue what that means?

21   **A.**   Repeat the question.

22        **MR. HAZLEHURST:**  Strike it, Your Honor.

23   **BY MR. HAZLEHURST:**

24   **Q.**   And the next line, spoken by a Mr. Jones, is [reading]:

25   Where --

1          And I'll omit where the -- I'll omit that word.

2          [Reading]: -- my man Creams Dinero at, man?

3          Do you see that?

4     **A.**   Yes, I saw it.

5     **Q.**   And you get the response from Mr. Lashley [reading]:  He

6     ridin' around with that shoulder strap, though.  I don't know.

7          Correct?

8     **A.**   Yes.

9     **Q.**   Mr. Jones [reading]:  Oh, he's still ridin' around with

10    that --

11         Again, omit the word.

12         [Reading]: -- mop.  Laughter.  He gotta stop.

13         Do you see that?

14    **A.**   Yes.

15    **Q.**   And then Mr. Lashley says [reading]:  No, I'm --

16         I'll omit that word.

17         [Reading]: -- with you, bro.  Nah, nah, he ain't doing --

18         Omit that word.

19         [Reading]:  He chillin', yo.

20         Correct?

21    **A.**   Yes.

22    **Q.**   You get an assertion then you get an immediate retraction;

23    correct?

24    **A.**   Yes.

25    **Q.**   Now, again, you've testified about a lot today.  But your

1   knowledge of Mr. Davis after April 26th, 2016, basically came

2   in trial preparation, didn't it?

3   **A.**   Correct.

4   **Q.**   And the last time that you saw Shakeen Davis in the flesh,

5   before you walked into this courtroom today, was on April 26th,

6   2016, wasn't it?

7   **A.**   Correct.

8        **MR. HAZLEHURST:**  No further questions, Your Honor.

9        **THE COURT:**  All right.  Thank you.

10       Anybody else?

11       **MS. WHALEN:**  No questions.

12       **THE COURT:**  Any redirect?

13       **MS. HOFFMAN:**  No redirect, Your Honor.

14       **THE COURT:**  Okay.  Thank you very much, sir.

15       You're excused.

16       **THE WITNESS:**  Thank you.

17       (Witness excused.)

18       **THE COURT:**  I'll see counsel briefly.

19       (Bench conference on the record:

20       **THE COURT:**  Do you have a short witness, by any

21   chance?

22       **MS. HOFFMAN:**  We do actually have a short witness.

23   I'm not sure that he would finish by 5:00, though.  We would

24   probably go over a little bit.  He might be like 15, 20

25   minutes.

1          **THE COURT:**  Okay.

2          **MS. HOFFMAN:**  We can go either -- whatever Your Honor

3    prefers.

4          **THE COURT:**  Well, if you think we might get at least

5    the direct done.

6          **MS. PERRY:**  I think he may have had an issue with

7    tomorrow morning.

8          **MS. HOFFMAN:**  Oh, he did.  Well, then we'd better do

9    him now.

10          **THE COURT:**  All right.  We're going to try to move

11    quickly, then.  Okay.)

12        (Bench conference concluded.)

13          **THE COURT:**  The Government is calling one more witness

14    for today.

15          **MS. HOFFMAN:**  The Government calls Joe Cohan.

16          **THE CLERK:**  Please raise your right hand.

17          DETECTIVE JOSEPH COHAN, GOVERNMENT'S WITNESS, SWORN.

18          **THE CLERK:**  Please be seated.

19          **MS. HOFFMAN:**  And, Your Honor, permission to approach

20    and retrieve the exhibit?

21          **THE COURT:**  Sure.

22          **MS. HOFFMAN:**  Thanks.

23          **THE CLERK:**  Please speak directly into the microphone.

24          State and spell your full name for the record, please.

25          **THE WITNESS:**  Sure.  It's Detective Joseph Cohan,

```
 1   J-O-S-E-P-H, C-O-H-A-N.
 2               THE CLERK:  Thank you.
 3                        DIRECT EXAMINATION
 4   BY MS. HOFFMAN:
 5   Q.   Good afternoon, Detective Cohan.
 6        With which law enforcement agency are you employed?
 7   A.   Baltimore County Police.
 8   Q.   And can you tell us your unit and title.
 9   A.   I am in the intel unit, the gang enforcement team.
10   Q.   And how long have you been with the Baltimore County
11   Police Department?
12   A.   It was 16 years in December of 2018.
13   Q.   During your career in law enforcement, have you
14   participated in investigations into drug-trafficking
15   organizations?
16   A.   I have.
17   Q.   And have you assisted in the execution of search warrants
18   at the homes of suspected drug traffickers?
19   A.   I have.
20   Q.   Have you seized drugs and related drug paraphernalia and
21   paperwork?
22   A.   I have.
23   Q.   I want to direct your attention to July 31st of 2015.  Did
24   you assist with the execution of a search warrant on that day?
25   A.   I did.
```

1    **Q.**   Who was the subject of the search warrant?

2    **A.**   Dontray Johnson.

3    **Q.**   And what was the location of the search warrant?

4    **A.**   Number 4 Wyegate Court, Owings Mills, Maryland.

5    **Q.**   I'm going to show you Government's Exhibit MAP-12.

6         What are we looking at here?

7    **A.**   That's Number 4 Wyegate Court.

8    **Q.**   And I'm going to show you Government's Exhibit IND-53.

9         Who is that?

10   **A.**   Dontray Johnson.

11   **Q.**   Approximately what time was the search warrant executed,

12   if you recall?

13   **A.**   04:40 hours in the morning.

14   **Q.**   And who, if anyone, was located inside the residence?

15   **A.**   Dontray Johnson and his -- I believe it was his wife,

16   Toi Cutchember.

17   **Q.**   And were they detained?

18   **A.**   Yes, they were.

19   **Q.**   And were Miranda warnings given to them?

20   **A.**   They were.

21   **Q.**   Was a search of the house conducted?

22   **A.**   Yes.

23   **Q.**   And was there anything recovered from a kitchen cabinet in

24   the house?

25   **A.**   Yes, there was.

1    **Q.**   What was found in the kitchen cabinet?

2    **A.**   In the kitchen cabinet was a bag containing unused

3    gelcaps.

4    **Q.**   And you mentioned that you have experience conducting

5    drug-trafficking investigations and seizing drug-trafficking

6    paraphernalia.

7         Why did you seize the gelcaps?

8    **A.**   They are commonly used to contain/hold/package heroin,

9    crack cocaine, powder cocaine, CDS in general.

10   **Q.**   Was there any other drug paraphernalia located in the

11   kitchen?

12   **A.**   Yes.  There were scales.

13   **Q.**   What kind of scales?

14   **A.**   Like digital scales.

15   **Q.**   Did you assist with searching the rest of the residence?

16   **A.**   I did.

17   **Q.**   And what, if anything, did you recover from the residence?

18   **A.**   On the first floor going on the stairwell going up to the

19   second floor was a picture of many individuals.

20   **Q.**   And I'm actually going to stop you there, and I'm going to

21   show you Government's Exhibit GP-5-A.

22        Do you recognize this photo here?

23   **A.**   Yes, I do.

24   **Q.**   And what is it?

25   **A.**   That's the picture that we -- we seized from the stairwell

1   going up -- up to the second floor.

2   **Q.**   And I'm going to . . .

3       In the course of the search, was there a safe recovered

4   from the master bedroom?

5   **A.**   There was.

6   **Q.**   And what, if anything, was found in that safe?

7   **A.**   U.S. currency, a bag containing live ammunition.  It was

8   seventy .22-caliber rounds and a bag containing three other

9   bags of packaged CDS.  And those were baggies and capsules

10  individually packaged containing like an off-white, brownish

11  substance.

12  **Q.**   And based on your experience conducting drug-trafficking

13  investigations, what did you believe the brownish, off-white

14  powder substance to be?

15  **A.**   Heroin.

16  **Q.**   By the way, before searching the safe, did you ask

17  Mr. Johnson for the combination to open the safe?

18  **A.**   We did.

19  **Q.**   And did he ultimately provide you that combination?

20  **A.**   Ultimately, he did, yes.

21  **Q.**   I'm going to approach and show you

22  Government's Exhibit F-10.

23      (Handing.)

24      What are you looking at there?  You may need to open it.

25  I don't know.

1   **A.**   This is -- this is the bag of ammunition that we found.

2   **Q.**   And is that the bag containing, I believe you said, 70

3   rounds of .22-caliber ammunition?

4   **A.**   Correct.

5   **Q.**   And I'm going to show you Government's Exhibit F-10-A.

6          What are we looking at here?

7   **A.**   Same bag.

8   **Q.**   And I'm going to approach and show you

9   Government's Exhibit D-12.

10         (Handing.)

11         Can you tell us what Government's Exhibit D-12 is.

12  **A.**   Are they -- this is the -- this is the bag that was found

13  in the kitchen with the unused, empty gelcaps.  Yep.

14  **Q.**   I'm sorry.  I'm going to retract -- let's call that bag

15  D-12-A and then the one that you're about to identify D-12.

16  **A.**   Do you want me to open this up and take everything out?

17  Because I can recognize --

18  **Q.**   Oh, you don't have to take -- yeah.  Do you recognize it?

19  **A.**   -- through it that this is the CDS that we found in the

20  safe.

21  **Q.**   And did you submit that drug evidence to the

22  Baltimore County lab for testing?

23  **A.**   Yes.

24  **Q.**   And if you recall, do you recall what the approximate

25  weight of the CDS was?

1   **A.**   It was over 25 grams, in total.

2   **Q.**   In total.

3           **MS. HOFFMAN:**  I have no further questions.

4           **THE COURT:**  All right.  Thank you.

5           Any questions?

6           **MS. WHALEN:**  No, Your Honor.

7           Thank you.

8           **THE COURT:**  Okay.  All right.  Thank you, sir.

9           **THE WITNESS:**  Thank you, Your Honor.

10          **THE COURT:**  You're excused.

11      (Witness excused.)

12          **THE COURT:**  Retrieve the exhibits and we'll adjourn

13  for today until 10:00 tomorrow.

14          The ladies and gentlemen of the jury are excused.

15          Thank you very much.

16      (Jury excused at 4:56 p.m.)

17          **THE COURT:**  Any issues anybody wants to anticipate for

18  tomorrow?

19          **MS. WHALEN:**  Your Honor, we haven't been given any

20  information about what exhibits will be presented tomorrow, so

21  it will have to be in the morning, assuming we get that kind of

22  information about whether there's any additional challenges.

23          **THE COURT:**  Sure.  Sure.  Sure.  Okay.  I assume that

24  you will be getting that information.

25          **MS. HOFFMAN:**  Your Honor, I believe we did discuss

```
1    this a couple times previously.

2          We're not always able to get advanced notice of

3    exhibits.  Things are in flux sometimes up until the last

4    minute.  We've been doing our best to provide general

5    categories of exhibits and flag exhibits that we think may be

6    objected to and that sort of thing.

7          We will certainly continue to do our best to do that.

8          I don't think we have a list of exhibits for tomorrow

9    yet.  But we will, you know, attempt to do our best.

10         I don't . . .

11         THE COURT:  Can you tell me, is there any reason you

12   can't just find out who are the witnesses for tomorrow?

13         MS. HOFFMAN:  Oh, we've already provided the witnesses

14   for tomorrow, yes.  We have been providing witnesses, doing our

15   best to provide witnesses 48 hours in advance.

16         THE COURT:  Okay.

17         MS. HOFFMAN:  There will be, I think, wire calls,

18   Ms. Perry is telling me, that will be played tomorrow.  We

19   don't know the specific numbers now, but we can flag those for

20   the defense counsel when we figure those out.

21         THE COURT:  As soon as you figure it out, please let

22   them know.

23         All right.  I'll excuse the gallery.

24      (Pause.)

25         THE COURT:  All right.  We'll be in recess until
```

```
 1   tomorrow morning, 10 o'clock.

 2        (Court adjourned at 5 o'clock p.m.)

 3              INDEX - GOVERNMENT'S EVIDENCE

 4   WITNESS                DR         CR        RDR       RCR

 5   JAMES WAGSTER          29         32         --        --
     (Voir Dire)
 6   JAMES WAGSTER          35         51         58        --

 7   DERRAN HANKINS         63   122, 135, 139   144        --

 8   DET. PHILIP WILSON     149        180        --        --

 9   DET. JOSEPH COHAN      198        --         --        --

10

11

12

13

14        I, Douglas J. Zweizig, RDR, CRR, do hereby certify that

15   the foregoing is a correct transcript from the stenographic

16   record of proceedings in the above-entitled matter.

17                      _____
                                 /s/
18
                    Douglas J. Zweizig, RDR, CRR, FCRR
19                     Registered Diplomate Reporter
                        Certified Realtime Reporter
20                     Federal Official Court Reporter
                         DATE:  November 6, 2019
21

22

23

24

25
```

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
2                        NORTHERN DIVISION

3  UNITED STATES OF AMERICA,    )
          Plaintiff,            )
4                               )
          vs.                   ) CRIMINAL CASE NO. CCB-16-0267
5                               )
   DANTE BAILEY, et al.,        )
6         Defendants.           )
   _____)
7

8
                       Wednesday, April 3, 2019
9                          Courtroom 1A
                        Baltimore, Maryland
10

11        BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                    (AND A JURY)
12

13                           VOLUME X

14  For the Plaintiff:

15  Christina Hoffman, Esquire
    Lauren Perry, Esquire
16  Assistant United States Attorneys

17  For the Defendant Dante Bailey:

18  Paul Enzinna, Esquire
    Teresa Whalen, Esquire
19
   _____
20

21

22
                        Reported by:
23
                 Douglas J. Zweizig, RDR, CRR, FCRR
24                Federal Official Court Reporter
                  101 W. Lombard Street, 4th Floor
25                  Baltimore, Maryland  21201

2

1   For the Defendant Randy Banks:

2   Brian Sardelli, Esquire

3

    For the Defendant Corloyd Anderson:

4   Elita Amato, Esquire

5

6   For the Defendant Jamal Lockley:

7   Harry Trainor, Esquire

8

    For the Defendant Shakeen Davis:

9   Paul Hazlehurst, Esquire

10

11  For the Defendant Sydni Frazier:

12  Christopher Davis, Esquire

13

14  Also Present:

15  Special Agent Christian Aanonsen, ATF

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2        (10:14 a.m.)

 3             THE COURT:  Good morning, everyone.

 4             MS. HOFFMAN:  Good morning, Your Honor.

 5             MR. DAVIS:  Good morning, Your Honor.

 6             THE COURT:  Let's see.  If I could see counsel at the

 7   bench.

 8             MR. HAZLEHURST:  Your Honor, all the headsets, I

 9   think, were recharged overnight for the defendants.

10        (Bench conference on the record:

11             THE COURT:  Are we okay?

12        I wanted to let you know what -- I had told you before

13   about Alternate Juror No. 2.  His employer did send an

14   e-mail -- well, actually had him send an e-mail to Ms. Moyé in

15   which the employer says that it is a hardship for them not to

16   have this gentleman, at his address.

17        He is still quite firm with Ms. Moyé that he's getting

18   some of his work done, teleworking, other hours.  It's not a

19   hardship.  He does not wish to be excused from the jury.

20             MS. AMATO:  That's interesting.

21             THE COURT:  Unless -- I'm telling you.  I wanted this

22   to be on the record.  But I don't see any -- personally, I

23   don't see any need to do anything.  Obviously, if he changes

24   his mind, if he comes forward and says it is a hardship, that

25   would be something else to evaluate.
```

4

```
1              But right now he thinks he's doing okay.
2              On that, I'm going to be telling the jury perhaps
3    today what I know about the schedule so far next week is that
4    we will be a half day on Monday, stopping at 1:00.
5              Full day Tuesday.
6              Not sitting Wednesday.
7              Not sitting Friday.
8              I am still hopeful we'll be sitting Thursday, but I
9    don't know the answer yet.  That's depending on Judge Russell.
10   So do not schedule stuff for Thursday, because I hope we're
11   going to be in court.
12             MS. AMATO:  Okay.  All right.  The sooner you could
13   tell us, Your Honor, though, the better, only because I have a
14   CLE that I'm definitely going on Friday since we're not
15   sitting.  It's in Charlottesville.  It starts on Thursday.  So
16   I hadn't planned, obviously, to attend on Thursday.  But if
17   we're not sitting, then obviously I would need to know sooner.
18             THE COURT:  I'll see Judge Russell at the bench
19   meeting today.  I'll ask him if he has any updates.
20             MS. AMATO:  Thank you.  Appreciate it.
21             MR. HAZLEHURST:  Just wanted to alert the jurors,
22   tomorrow is Opening Day for the Orioles, so it's going to be a
23   parking mess, at the very least.
24             THE COURT:  Yes.  I think they would be okay for
25   parking, given that they come in pretty early.  But I will
```

1    certainly mention it at some point, and there may be traffic

2    jams for all of us.

3          **MR. HAZLEHURST:**  And the garages tend to limit the

4    people in the morning because they want to get people who are

5    paying the higher rate in the afternoon for the game, so they

6    will be -- there will be some parking problems even in the

7    morning.

8          **THE COURT:**  Do you know if they accept --

9          **MR. HAZLEHURST:**  Like the Arena Garage I know,

10   basically, they'll limit the -- they won't take all the people

11   who normally come in in the morning because they're going to

12   try to reserve spots for the higher payers in the afternoon.

13         **THE COURT:**  Interesting.

14         **MR. HAZLEHURST:**  A little parking piracy, if you will.

15         **THE COURT:**  Anything else?  You can all go back and

16   sit down unless there are any other issues or anything.

17         **MS. HOFFMAN:**  No.  For the record, we agree with

18   Your Honor's assessment about Alternate Juror No. 2.

19         **MS. AMATO:**  And the same as well.  I mean, if the

20   juror himself explains reservations, then that's different.

21         **THE COURT:**  Yes.  Okay.  All right.  Thank you.

22         **MS. HOFFMAN:**  Thank you.)

23      (Bench conference concluded.)

24         **THE COURT:**  All right.  Any issues before we bring in

25   the jury?

1          **MS. HOFFMAN:**  Your Honor, I did want to address the

2     exhibits notice issue again that we've discussed now a couple

3     times.

4          Last night Ms. Perry flagged for defense counsel some

5     of the specific wire calls and iCloud exhibits that she plans

6     to use today.  And Ms. Whalen stated that she believed that it

7     was a late disclosure and that she may need to ask the Court

8     for a recess.

9          And I wanted to put on the record again that it's not

10    our understanding that Your Honor required us to provide a

11    specific itemized list of every single exhibit that we're going

12    to be using with every single witness in this case.

13         And as we've explained several times, we're not able

14    to do that.  It's extremely onerous.  We don't know exactly

15    which wire calls and which exhibits we're going to be showing

16    each witness.

17         Moreover, we have consulted with supervisors in the

18    office, including the criminal chief.  And their instruction to

19    us is that we don't provide itemized lists of specific exhibits

20    that we use with -- that we're going to be using with each

21    individual witness.

22         There's nothing in the rules or the law that requires

23    that.  We're not aware of any precedent for that kind of

24    notice.  And, in fact, the Fourth Circuit has held that the

25    Government is not required to provide that kind of detailed

7

```
1     notice.
2            There is a Fourth Circuit case,
3     United States versus Anderson.
4            THE COURT:  Ms. Hoffman, I really -- I'm not sure
5     where you're going with this.  If Ms. Whalen was intending to
6     argue, which I have not heard her do, that there was some sort
7     of rule violation or something of that nature, then this would
8     be more relevant.
9            At the moment, I think what you're under is just a
10    direction from the Court, which I think has more priority than
11    the criminal supervisor in your office, to do your best.
12           I absolutely understand.  You've told me that you've
13    already identified and disclosed all the exhibits.  You've
14    given an exhibit list.  It's all been done in advance.  Believe
15    me, I understand that people are preparing witnesses, you know,
16    at the last minute.
17           All I have asked is, given the huge number of exhibits
18    and the number of calls, that you do your best to provide
19    that --
20           MS. HOFFMAN:  Thank you.  I appreciate that.
21           THE COURT:  -- to Ms. Whalen and everybody else.
22           Okay.  Let's get the jury.
23        (Jury entered the courtroom at 10:22 a.m.)
24           THE COURT:  Good morning.
25           JUROR:  Good morning.
```

**JA4054**

8

```
 1            JUROR:  Good morning.

 2            JUROR:  Good morning.

 3            THE COURT:  Before we have the Government call its

 4   first witness, just let me give you an update, ladies and

 5   gentlemen, on the schedule, a couple things.

 6            First of all, we are sitting tomorrow, Thursday.  As

 7   counsel have kindly reminded me, it is Opening Day.  First home

 8   game for the Orioles tomorrow, which just means that you might

 9   want to allow yourselves a little extra time to park in the

10   morning.

11            Not that the game starts that early, but there may be

12   some parking restrictions and issues and it's just a good idea

13   to allow a little extra time in the morning to find your

14   parking place.  And it may take a little longer to get out of

15   the city, depending on when things break up at the end of the

16   day.

17            Next week, next week is going to be a little bit

18   shorter than usual.  It's not completely all certain.

19            The problem is this courthouse has only one large

20   courtroom, and sometimes there are conflicting previously

21   scheduled events.  That's part of what's going on.

22            But, at any rate, for various reasons, next week,

23   Monday will be a half day.  It will be the morning.  But when

24   we adjourn around 1:00, that will be it for Monday.

25            Tuesday will be a normal, normal, full day.
```

```
 1              Wednesday, we will not be sitting because of a
 2    previously scheduled proceeding here.
 3              And Friday, for the same reason, we will not be
 4    sitting.
 5              I am not sure yet about next Thursday.  Again, there
 6    was a prior conflict.  I am trying to see if I can work that
 7    out with the other judge involved.  I don't know quite yet.  I
 8    am hoping maybe I'll know by tomorrow and be able to let you
 9    know; and if not, Monday.
10              So next week is a half day Monday, all day Tuesday,
11    not Wednesday, not Friday.  And I'm still a little up in the
12    air about Thursday.  I hope we'll be sitting on Thursday, but
13    now you know as much as I do.
14              So thank you.
15              All right.  Does the Government want to call a
16    witness?
17              MS. PERRY:  Yes, Your Honor, the Government calls
18    Officer Christopher Faller.
19              THE CLERK:  Please raise your right hand.
20              THE WITNESS:  Yes, ma'am.
21         POLICE OFFICER CHRISTOPHER FOWLER, GOVERNMENT'S WITNESS,
22    SWORN.
23              THE CLERK:  Please be seated.
24              THE WITNESS:  Thank you.
25              Good morning.
```

1              Good morning, Your Honor.

2          **THE CLERK:**  Please speak directly into the microphone.

3          State and spell your full name for the record, please.

4          **THE WITNESS:**  Detective Christopher Faller.

5     Christopher, common spelling, C-H-R-I-S-T-O-P-H-E-R.  And last

6     name is Faller, F as in Frank, A-L-L-E-R.

7          **THE CLERK:**  Thank you.

8          **THE WITNESS:**  Welcome.

9                        DIRECT EXAMINATION

10    **BY MS. PERRY:**

11    **Q.**  Good morning.

12    **A.**  Good morning, ma'am.

13    **Q.**  With which law enforcement agency are you employed?

14    **A.**  Baltimore City Police Department.

15    **Q.**  And how long have you been with the Baltimore City Police

16    Department?

17    **A.**  20 years 3 months ago, so since the year 1999.

18    **Q.**  And what is your current assignment with the Baltimore

19    Police Department?

20    **A.**  I am a task force officer with the Drug Enforcement

21    Administration.

22    **Q.**  Can you tell us what it means to be a task force officer.

23    **A.**  Yes, ma'am.  There are federal task forces which

24    essentially integrate officers from the Baltimore Police

25    Department into -- with federal agents, and we all work

1  together as a team.

2  **Q.**   And how long have you been a task force officer with the

3  DEA.

4  **A.**   Four months.

5  **Q.**   And were you a task force officer before that?

6  **A.**   I was.

7  **Q.**   With which agency?

8  **A.**   The Bureau of Alcohol, Tobacco & Firearms.

9  **Q.**   And how long were you a task force officer with the ATF?

10 **A.**   Nine years.

11 **Q.**   Detective, in your years in law enforcement, do you have

12 any training in making drug-related arrests?

13 **A.**   I do.

14 **Q.**   Can you briefly describe that training for us.

15 **A.**   Training in arrests and/or undercover work.  I have a

16 specialized training of over 310 hours of training in narcotics

17 enforcement, which also includes undercover work.

18 **Q.**   We'll get to the undercover work in a moment.  Do you have

19 any -- have you made drug-related arrests in your career?

20 **A.**   Absolutely.

21 **Q.**   Approximately how many?

22 **A.**   In excess of 1,000.

23 **Q.**   Now, you said that you have some training in undercover

24 work.  In your time with the ATF, did you work in an undercover

25 capacity?

1    **A.**    I did.

2    **Q.**    How long have you worked in an undercover capacity?

3    **A.**    Since the year 2003 or '4.

4    **Q.**    And I believe you said you had some training in doing

5    undercover work.  Can you describe that training for us.

6    **A.**    Yes.  From numerous agencies:  the New York City police

7    department, Maryland State Police, Florida State Police, the

8    Drug Enforcement Administration, the FBI, and the Bureau of

9    Alcohol, Tobacco & Firearms.

10   **Q.**    Approximately how many undercover operations have you

11   participated in?

12   **A.**    Hundreds.

13   **Q.**    And of those hundreds, how many were for drug-related

14   offenses?

15   **A.**    80 percent.

16   **Q.**    And can you describe just generally what it means to work

17   undercover in a drug-related investigation.

18   **A.**    It could mean anything as to just fraternize with people,

19   talk, listen.  And, of course, we also participate in purchases

20   of narcotics, firearms.

21   **Q.**    How do you typically dress when you're working an

22   undercover operation?

23   **A.**    Not like this.  T-shirt, jeans, hat.

24   **Q.**    Because you work undercover operations, do you have to

25   become familiar with certain language or terminology?

1    **A.**   Absolutely.

2    **Q.**   Now, in your capacity as an ATF task force officer, did

3    you assist in an investigation into drug activity and violence

4    in Northwest Baltimore in 2015 and 2016?

5    **A.**   Yes, ma'am, I did.

6    **Q.**   So I want to direct your attention, first, to May 2nd of

7    2016.

8          Were you working on that particular day?

9    **A.**   Yes, ma'am, I was.

10   **Q.**   And were you working in an undercover capacity on that

11   day?

12   **A.**   Yes, ma'am I was.

13   **Q.**   So I want to direct your attention to about midday.  Where

14   were you at that time?

15   **A.**   I was at the intersection of Forest Park Avenue and

16   Windsor Mill.

17   **Q.**   And what were you doing there?

18   **A.**   Driving.

19   **Q.**   Did there come a time when you went to a specific location

20   in that vicinity?

21   **A.**   Yes.

22   **Q.**   Where did you go?

23   **A.**   Subway.

24   **Q.**   Is that the Subway restaurant?

25   **A.**   It is.

1    **Q.**   And where is the Subway restaurant located?

2    **A.**   Located at that same intersection I just mentioned, which

3    was Forest Park at Windsor Mill.

4    **Q.**   I'm going to show you MAP-34.

5         Just a moment.  I seem to be having a technical

6    difficulty.  My apologies.

7         So here we are MAP-34.  Can you tell us what we're looking

8    at here.

9    **A.**   Yes.  It's a map of that same intersection, ma'am.

10   **Q.**   And can you, using MAP-34, tell us where the Subway

11   restaurant is located.

12   **A.**   Surely.  Now, if I point, it doesn't show up on the

13   screen, does it?

14   **Q.**   It should show up if you draw a circle or a line.

15   **A.**   Okay.  Sure.  (Indicating.)

16        I think I just made a little green dot; am I correct?

17   **Q.**   Yes.

18   **A.**   Okay.  That's the BP gas station, which would essentially

19   be right at that intersection.  And on the side of it is

20   several stores:  one of them being a convenience store, one of

21   them, I'm not recalling what it was; and one of them was, in

22   fact, a Subway restaurant.

23   **Q.**   So what happened once you got to the Subway restaurant?

24   **A.**   I noticed several individuals standing in front of it.

25   **Q.**   What happened next?

1    **A.**    Well, I knew from the investigation that we were working

2    that this area was kind of a, for lack of a better word,

3    stronghold of the gang that we were looking at for narcotics

4    activity.  So I just wanted to kind of survey the area, see if

5    I could maybe speak to, listen to, or fraternize with some of

6    the individuals that were in the area.

7    **Q.**    And so deciding that you would stay in the area for a

8    little while, where did you go?

9    **A.**    Into the Subway.

10   **Q.**    And what did you do?

11   **A.**    Eat.

12   **Q.**    What happened next?

13   **A.**    I got a sandwich, sat at one of the tables.  Two tables

14   away from me, those same three individuals that I saw in front

15   of the Subway had re-entered the store and were sitting tables

16   away from me.

17   **Q.**    And while those individuals were sitting there, could you

18   overhear what was going on?

19   **A.**    I could.

20   **Q.**    And what happened next?

21   **A.**    They were speaking of individuals that they knew and that

22   someone had been arrested recently and what they were going to

23   do about the fact that that person was locked up.

24   **Q.**    And did this pique your interest?

25   **A.**    Sure.

1   **Q.**   How come?

2   **A.**   Because I think I had the right people that I was looking

3   at.  They were going in and out of the store.  They were in the

4   area and they were speaking about criminal activity.

5   **Q.**   So what did you do next?

6   **A.**   I listened.

7   **Q.**   What happened after that?

8   **A.**   At that point I noticed that two of the individuals had

9   taken their cell phones, they plugged them into the wall of the

10  actual Subway restaurant.  The plug was located in the corner

11  near where the soda machines are.  So they were plugging them

12  in, I guess, to recharge.

13  **Q.**   And where did the individuals go after they plugged in

14  their cell phones?

15  **A.**   They left.

16  **Q.**   What did you do?

17  **A.**   Well, that really piqued my interest because I would never

18  do that.  Plugged their phones in and out.  They had no real

19  keen eye as to watch as to if anyone was going to take the

20  phones, look at the phones.  They left them there, walked out,

21  walked back in again to get something to drink.  But at no

22  point was there any "hope my phone is still there" thoughts.

23  **Q.**   So did you eventually go outside?

24  **A.**   I did.

25  **Q.**   And when you went outside, what did you do?

1   **A.**   I referred to the fact that where I grew up, you can't do

2   that because phones like that get stolen.

3   **Q.**   And who did you say that to?

4   **A.**   The group of males.

5   **Q.**   Did they respond in any way?

6   **A.**   They laughed.

7   **Q.**   And did there come a time when you were able to identify

8   one of the members of this group?

9   **A.**   I did.

10  **Q.**   And who was that?

11  **A.**   Mr. Sydni Frazier.

12  **Q.**   I'm going to show you Government's Exhibit IND-32.

13       Do you recognize this person?

14  **A.**   I do.

15  **Q.**   Who is that?

16  **A.**   Mr. Sydni Frazier.

17  **Q.**   And do you see Mr. Frazier in the courtroom today?

18  **A.**   I can't see that far, so . . .

19  **Q.**   When you approached the group and started this

20  conversation and they laughed, what happened next?

21  **A.**   They asked what I was doing in the area.

22  **Q.**   Did you respond?

23  **A.**   I did.

24  **Q.**   What did you say?

25  **A.**   That I was waiting for an individual.

1  **Q.**   What happened next?

2  **A.**   Mr. Frazier kind of emerged from the group of people and

3  asked a question of me.

4  **Q.**   What did he ask you?

5  **A.**   If I liked to party.

6  **Q.**   And based on your experience in doing undercover work,

7  what did you believe that to mean?

8  **A.**   If I used narcotics or I liked to buy narcotics.

9  **Q.**   Did you respond to Mr. Frazier?

10 **A.**   I did.

11 **Q.**   What did you say?

12 **A.**   I absolutely love to party.

13 **Q.**   What happened next?

14 **A.**   A negotiation took place.

15 **Q.**   What were you negotiating for?

16 **A.**   The price of crack cocaine.

17 **Q.**   Did you ask for a specific quantity?

18 **A.**   I did.

19 **Q.**   What did you ask for?

20 **A.**   An eight ball.

21 **Q.**   And did Mr. Frazier respond?

22 **A.**   He did.

23 **Q.**   What did he tell you?

24 **A.**   I can't give you the exact price; but if my memory

25 recalls, I believe it was $250.

1   **Q.**   How did you respond to this price?

2   **A.**   I laughed.

3   **Q.**   Why?

4   **A.**   It's high.

5   **Q.**   What happened next?

6   **A.**   We, again, negotiated.

7   **Q.**   And what did you negotiate for at this point?

8   **A.**   I think we got to a number of about $200, which is still

9   highway robbery, but I accepted it.

10  **Q.**   And after you sort of negotiated and agreed on a price,

11  what happened?

12  **A.**   Phone numbers were exchanged.

13  **Q.**   And so did -- who provided you a phone number?

14  **A.**   Mr. Frazier did.

15  **Q.**   And what did you do with that phone number?

16  **A.**   I put it into my own cell phone memory banks, contact

17  list.

18  **Q.**   And at that point had Mr. Frazier provided you with a

19  name?

20  **A.**   Not an actual birth name, but a nickname.

21  **Q.**   What did he provide his name as?

22  **A.**   The letter P, as in Paul, which is common, because most

23  people won't give their name.  They're going to give you a

24  nickname.

25  **Q.**   Now, after you saved the contact for Mr. Frazier in your

```
 1   phone, what did you do?
 2   A.    The following day, we began text messaging each other back
 3   and forth.
 4   Q.    And did you memorialize those text messages in any way?
 5   A.    I did.
 6   Q.    How so?
 7   A.    Screenshots, so I essentially took a picture of the
 8   message onto my phone.
 9   Q.    And as you sit here today, do you recall what the phone
10   number was that he provided you?
11   A.    I cannot recall that, ma'am.
12   Q.    But did you memorialize that in some way?
13   A.    Yes.
14   Q.    How did you memorialize that?
15   A.    It was written within a report.
16   Q.    And would seeing the report refresh your recollection as
17   to what that number was?
18   A.    Absolutely.  And I apologize.
19         MS. PERRY:  Your Honor, permission to approach the
20   witness?
21         THE COURT:  Sure.
22   BY MS. PERRY:
23   Q.    (Handing.)
24         Detective, can you take a look at your report and let us
25   know if it refreshes your recollection as to what that phone
```

1    number was.

2    **A.**    Yes, ma'am it does.

3    **Q.**    What was the phone number?

4    **A.**    (443) 699-8181.

5    **Q.**    Now, I want to show you Government's Exhibit CELL-17.

6          Do you recognize what we're looking at here on the screen?

7    **A.**    Yes, ma'am, I do.

8    **Q.**    And can you tell us what we're looking at.

9    **A.**    This is the exchange of messages that I had just spoke

10   about between myself and Mr. Frazier.

11   **Q.**    And looking here, we see some green messages on the right

12   and some gray messages on the left.  Who are the green

13   messages?

14   **A.**    I'm green.

15   **Q.**    And who are the gray messages?

16   **A.**    Mr. Frazier.

17   **Q.**    Looking at the first -- first of all, can you tell us what

18   date these messages were exchanged.

19   **A.**    It commenced on Tuesday, May 3rd, the year -- I can't tell

20   the year.  I'm not sure.

21   **Q.**    And was that the day after you had the interaction at the

22   Subway?

23   **A.**    May 2nd is when we had the interaction.  May 3rd is when

24   the messages commenced; correct.

25   **Q.**    And looking up here at the first message, what did you ask

1    Mr. Frazier?

2    **A.**   Would you like me to read what it says on there?

3    **Q.**   Yes, please.

4    **A.**   Of course.

5         [Reading]:  Yo, I'm going to come through on Friday.  Can

6    you do one-quarter for a good price?  Smiley, smiley.

7    **Q.**   And you asked for a quarter for a good price.  What did

8    you mean by "a quarter"?

9    **A.**   I was referring to a quarter -- quarter of ounce -- excuse

10   me, quarter ounce of crack cocaine.

11   **Q.**   And was there a response?

12   **A.**   Yes.

13   **Q.**   What was the response?

14   **A.**   [Reading]:  Yeah.

15   **Q.**   Did you respond to that?

16   **A.**   I did.

17   **Q.**   What did you say?

18   **A.**   [Reading]:  Cool.  I'll call you on Thursday.

19   **Q.**   And was there a response to that message?

20   **A.**   There was.

21   **Q.**   What was that response?

22   **A.**   [Reading]:  You not police, are you?

23   **Q.**   Now, in your experience as an undercover detective, is

24   it -- have you -- have people asked you before about being

25   police?

1   **A.**   Always.

2   **Q.**   And what is your understanding of what that question is

3   about?

4   **A.**   It alleviates, I guess, a guilty conscience or maybe

5   thinking that if they were to ask me if I'm the police, that I

6   am compelled to tell them so.

7   **Q.**   Did you respond to the question?

8   **A.**   I did.

9   **Q.**   What did you say?

10  **A.**   Verbatim [reading]:  Just got done with one and six from

11  Rikers.  I hope not.

12  **Q.**   And what is Rikers?

13  **A.**   Rikers Island is a prison in New York City.

14  **Q.**   Now, turning down to May 4th, do we see additional

15  text messages between you and Mr. Frazier?

16  **A.**   Yes, ma'am.

17  **Q.**   And what did you message on May 4th?

18  **A.**   [Reading]:  I will be in the city at, like, 12:00.  You

19  cool with that?

20        Meaning -- and then I subsequently followed up with "on

21  Friday."

22  **Q.**   Now, flipping to the second page and starting sort of in

23  the middle, did you send some additional texts on that

24  particular day?

25  **A.**   Yes, ma'am.

1    **Q.**   What were those texts?

2    **A.**   Would you like me to read them again?

3    **Q.**   Yes.

4    **A.**   Okay.  Excuse my language.

5         [Reading]:  I have a female that fucks with the boy I can

6    turn you onto.  So give me some numbers on that, too.  If you

7    can't come through for me, let me know.  I don't want to get

8    fucked over the -- over here.

9         Sorry.

10   **Q.**   Now, the first message you read says [Reading]:  I have a

11   female that fucks with the boy I can turn you onto.

12   **A.**   Correct.

13   **Q.**   What were you referring to?

14   **A.**   A female friend.  And when I refer to the word "boy," I am

15   referring to heroin.

16   **Q.**   And then looking at Thursday, May 5th -- and just to be

17   clear, what year are we talking about here?  Does your report

18   refresh your recollection as to what year we're talking about?

19   **A.**   May I, please?

20   **Q.**   Yes.

21   **A.**   2016.

22   **Q.**   Okay.  So turning to May 5th of 2016, did you send an

23   additional text message?

24   **A.**   Yes; at 12:31.

25   **Q.**   And what was that message?

1   **A.**   [Reading]:  Kinda thought this was bullshit.  Thanks, man.

2   **Q.**   Now, I want to turn to Page 3 of this exhibit, which is --

3   again, it appears at the top, the date.

4       Can you tell us what date that was.

5   **A.**   Thursday, May 6th, again, the year 2016.

6   **Q.**   And we see a message over here in gray on the left.  What

7   is that message?

8   **A.**   [Reading]:  WYA.

9   **Q.**   And what is your understanding of what "WYA" means?

10  **A.**   Where you at?

11  **Q.**   How did you respond to that?

12  **A.**   [Reading]:  Who's this?

13  **Q.**   Why did you respond, "Who's this?"

14  **A.**   Because this was a phone number that I did not have stored

15  in my phone.

16  **Q.**   And was there a response to, "Who's this?"

17  **A.**   Yes, ma'am.

18  **Q.**   What was that response?

19  **A.**   P from BP.

20  **Q.**   And so this was a message that came from a different phone

21  number than the one you've told us about?

22  **A.**   You are correct.

23  **Q.**   And what was that phone number?

24  **A.**   May I refer?

25  **Q.**   Yes.

1   A.   Thank you.

2        443 -- I'm sorry -- 640-8950.

3   Q.   And can you just read the exchange you had with P from BP

4   on May 5th of 2016.

5   A.   Of course.

6        [Reading]:  Man, I called your other phone -- your other

7   gone.

8        I presume I spelled -- I meant to mean "phone," and that's

9   what I followed up with.

10       [Reading]:  It was dead.  What's up?

11       [Reading]:  I'm coming through tomorrow.  I got somewhere

12  to be downtown.  So I can meet you at like 12.  What's the

13  numbers?  Question mark three times.

14       [Reading]:  We already discussed that.

15       And I can only read half that message on the bottom.

16  Q.   Now, you said that you texted, "What's the numbers?"  What

17  were you asking?

18  A.   The price.

19  Q.   And the response was what?

20  A.   We had already discussed the numbers.

21  Q.   Okay.  Turning to Page 4, can you read the full text of

22  that message that was cut off.

23  A.   Yes, ma'am.

24       [Reading]:  Yeah.  I told you I wanted a bit more, but

25  that's cool.  I'll meet you at 12, and I can't wait.  I have to

 1   meet someone 15 minutes later, so I can't wait.

 2   **Q.**   Was there a response?

 3   **A.**   [Reading]:  Okay.

 4   **Q.**   Did you follow up?

 5   **A.**   [Reading]:  You said MLK.  We can do the casino if you

 6   want.

 7   **Q.**   And what was the response to that?

 8   **A.**   [Reading]:  Naw, I never go where you want me.  I a let

 9   you know whenever you ready.

10   **Q.**   And so what is going on at this point?

11   **A.**   Typically, those involved in the trafficking of narcotics

12   like to feel comfortable with the location for their own

13   safety, so they're going to attempt to direct the buyer --

14   being me in this situation -- to a place where they feel most

15   safe and secure.

16        So I was attempting to lure Mr. Frazier to a location.

17   Mr. Frazier was not accepting that and was going to set the

18   location himself.

19   **Q.**   So what were the next exchanges?

20   **A.**   [Reading]:  I'm not drivin' all over the place.  I will

21   call you tomorrow when I'm 30 minutes away.

22   **Q.**   Is there a response?

23   **A.**   [Reading]:  K.

24   **Q.**   And did you follow up to that?

25   **A.**   [Reading]:  This phone or your other one?

1    **Q.**   And was there a response?

2    **A.**   [Reading]:  Either one.

3    **Q.**   Turning to Page 5, can you read through the messages here

4    for us.

5    **A.**   Starting with the top, ma'am?

6    **Q.**   Yes, please.

7    **A.**   Okay.  [Reading]:  All good?

8          Response [reading]:  Yes.

9          Myself [reading]:  Okay.  I should be there in bout an

10   hour.  Rain in awful.  Where at?

11         [Reading]:  I have to put it into GPS.

12         [Reading]:  Question mark four times.

13         [Reading]:  Man, I need something here.  I have none idea

14   what to put in.

15   **Q.**   Is there a response?

16   **A.**   Yes, ma'am, there was.

17         [Reading]:  945 Bennett Place.

18   **Q.**   Did you respond to that?

19   **A.**   [Reading]:  When?  'Cause I'm close.

20   **Q.**   Was there a response to that?

21   **A.**   [Reading]:  20.

22   **Q.**   And a response to that?

23   **A.**   [reading]:  I'll be there at 1.  I wasn't that close.

24   **Q.**   Now turning to the next page, did you ask Mr. Frazier if

25   he was good?

1    **A.**    Yes.

2    **Q.**    And did he respond?

3    **A.**    [Reading]:  Yeah.  Wua.

4    **Q.**    And how did you respond to that?

5    **A.**    [Reading]:  Edmondson Avenue 7-Eleven, 2 minutes from

6    Bennett Place.

7    **Q.**    And what -- were you providing him your location at that

8    particular point?

9    **A.**    Yes, ma'am, I was.

10   **Q.**    And how did he respond to that?

11   **A.**    On -- after I had given my own location?

12   **Q.**    Yes.

13   **A.**    He then stated [reading]:  Lord Baltimore Hotel.

14   **Q.**    Now, I want to flip back up to the previous slide, and you

15   asked, "All good?" at one point.  What did you mean by "all

16   good"?

17   **A.**    I was just referring and asking Mr. Frazier if he was

18   prepared and -- to make the transaction.

19   **Q.**    Now, I believe we were on Page 6, and you said that he

20   responded "Lord Baltimore Hotel"?

21   **A.**    Correct.

22   **Q.**    And what did you do when you got this message?

23   **A.**    I responded.

24   **Q.**    And what did you say?

25   **A.**    [Reading]:  Headed there now.  Two blocks away.

1   **Q.**   Were there any exchanges with Mr. Frazier's phone after

2   that?

3   **A.**   Just phone calls back and forth.

4   **Q.**   So what happened after this last exchange?

5   **A.**   Text messaging.

6   **Q.**   After this last text message exchange.

7   **A.**   An argument ensued.

8   **Q.**   And how did you have that argument?

9   **A.**   How did we have that argument?

10  **Q.**   Yes.

11  **A.**   I don't understand.

12  **Q.**   Was that over a voice call?

13  **A.**   Yes, ma'am.

14  **Q.**   And where were you at this particular time?

15  **A.**   In a vehicle.

16  **Q.**   And where -- at what location?

17  **A.**   Not far from the Lord Baltimore Hotel.

18  **Q.**   And can you tell us about the voice message -- the voice

19  exchange that you had with Mr. Frazier.

20  **A.**   Mr. Frazier continued to change the location, which

21  obviously made me a little bit nervous.  Different room numbers

22  where we were going to meet.  "Where are you at?"

23       So the argument got very heated whereas he pretty much

24  told me to disregard, and I told him the same.

25  **Q.**   So at that point did you ever meet up with Mr. Frazier?

1    **A.**   I did not.

2    **Q.**   And did you ever actually make a purchase from him?

3    **A.**   No, ma'am, I did not.

4    **Q.**   Now, I want to change gears a little bit and turn your

5    attention to August of 2016.

6         Were you again assisting in the investigation we discussed

7    earlier?

8    **A.**   I was.

9    **Q.**   And at that time what, just generally, was happening with

10   the investigation overall?

11   **A.**   We were monitoring phone lines, and we were also

12   conducting surveillance.

13   **Q.**   And when you say you were monitoring phone lines, was

14   there a wiretap investigation happening at that time?

15   **A.**   Yes, ma'am, there was.

16   **Q.**   And who was the target of that wiretap investigation, if

17   you know?

18   **A.**   Mr. Lockley.

19   **Q.**   I'm going to show you Government's Exhibit IND-60.

20        Do you recognize this person?

21   **A.**   I do.

22   **Q.**   Who is that?

23   **A.**   Mr. Lockley.

24   **Q.**   Now, I want to direct your attention specifically to

25   August 11th of 2016 at about 11:00 a.m.

---

1          Were you working on that date and time?

2     **A.**    Yes, ma'am.

3     **Q.**    And where were you located at about 11 o'clock that day?

4     **A.**    I was near the intersection of Longwood Avenue and

5     Gwynns Falls Parkway.

6     **Q.**    Now, I want to show you Government's Exhibit MAP-37.

7          Do you recognize this?

8     **A.**    I do.

9     **Q.**    What are we looking at here?

10    **A.**    It is a map of the location I just gave.

11    **Q.**    And what were you doing at Longwood near Gwynns Falls?

12    **A.**    Conducting surveillance.

13    **Q.**    And what was the target of your surveillance?  Who were

14    you conducting surveillance -- what were you conducting

15    surveillance on?

16    **A.**    Mr. Lockley and an unknown male.

17    **Q.**    And let me just back up a quick second.

18         You indicated that you were conducting surveillance in the

19    area that's up here on MAP-37.

20         Where is the BP gas station in relation to what we're

21    looking at?

22    **A.**    So if you were looking at the screen like I am, it's to

23    the left by about a mile or so.  It's not in the screen itself.

24    **Q.**    So about a mile to the left off the screen?

25    **A.**    Correct.

1  **Q.**   So you said that you were conducting surveillance in the

2  area of an individual.  Did you actually see an individual in

3  the area when you were there?

4  **A.**   Yes, I did.

5  **Q.**   And what did that individual look like?

6  **A.**   He was a black male.  He was dressed in a white tank top,

7  and he had green shorts on.

8  **Q.**   And about 11 o'clock, what happened?

9  **A.**   Several phone calls were intercepted between that male and

10  Mr. Lockley.

11  **Q.**   And while you were at the location surveilling, were you

12  in contact with other members of ATF and other members of the

13  team?

14  **A.**   Absolutely.

15  **Q.**   And were they giving you updates about what was going on?

16  **A.**   Yes, ma'am, they were.

17  **Q.**   Was there a particular reason that you were surveilling

18  this individual you described?

19  **A.**   Yes.  We were suspicious to the fact from the phone calls

20  that he was involved in narcotics activity.

21  **Q.**   And so did you believe that he may have been intercepted

22  over the wiretap at some point?

23  **A.**   Yes, he was.

24  **Q.**   What makes you say, "Yes, he was"?

25  **A.**   His voice was heard during the interceptions speaking to

1    Mr. Lockley.

2    **Q.**   Now, you said that while you were there around 11 o'clock,

3    you were informed -- I believe you said you were informed that

4    a call had come over the wiretap line.

5    **A.**   Yes, ma'am.

6    **Q.**   At the time that you were sitting there, did you actually

7    hear the call?

8    **A.**   I did not.

9    **Q.**   Were you provided information about what was contained in

10   the call?

11   **A.**   Yes, ma'am, I was.

12   **Q.**   And have you since listened to that call?

13   **A.**   I have.

14   **Q.**   So I want to show you what's or play you what's in

15   evidence as Government's Exhibit Wire 3.  This is

16   Call TT-3-6158, and the transcript is on Page 211 of the wire

17   call tab.

18       Now, looking, first, over here to the right side of the

19   screen to the transcript, can you tell us the date of this

20   call.

21   **A.**   Yes, ma'am.  August 11th of the year 2016.

22   **Q.**   And what time was the call?

23   **A.**   Approximately 12:59 p.m.

24   **Q.**   And can you tell us who the participants of the call were.

25   **A.**   Mr. Jamal Lockley and the unknown male, the one I had

1    described earlier.

2         **MS. PERRY:**  I'm going to play the call at this point.

3         (Audio was played but not reported.)

4    **BY MS. PERRY:**

5    **Q.**   Now, Detective, at about this time, what happened?

6    **A.**   When that phone call was received, we were still on

7    surveillance.  And we observed Mr. Lockley in the area drive up

8    in the Lexus.

9    **Q.**   Can you describe what the Lexus looked like.

10   **A.**   It was dark-colored.

11   **Q.**   And what happened when Mr. Lockley arrived in the Lexus?

12   **A.**   The male that I had earlier described met with Mr. Lockley

13   in that Lexus.

14   **Q.**   What happened next?

15   **A.**   I believe the male then left the side of the Lexus and

16   entered a vehicle that was in the block.

17   **Q.**   And where did the Lexus go at that point?

18   **A.**   The Lexus left the area.

19   **Q.**   And then what happened to the other individual you were

20   surveilling?

21   **A.**   He proceeded south on Longwood Avenue.  And then he

22   proceeded, I believe it would be a westbound direction on

23   Elgin Avenue out of the area.

24   **Q.**   Did you later learn that additional calls had come over

25   the wiretap around this time?

```
1   A.    Yes, ma'am.

2   Q.    So I want to play again from Wire 3.  This is TT-3-6171,

3   and the transcript is on Page 213.

4            THE COURT:  Which page?  I'm sorry.

5            MS. PERRY:  I believe it is on Page 213, 213 of the

6   wire call tab.

7            THE COURT:  Thank you.

8   BY MS. PERRY:

9   Q.    So, again, can you tell us the date that we're looking at

10  here.

11  A.    August 11th of the year 2016.

12  Q.    And what is the time -- start time of the call?

13  A.    At approximately 2:36 p.m.

14  Q.    And the participants of the call?

15  A.    Mr. Lockley and an unknown male.

16  Q.    I'm going to play the call.

17        (Audio was played but not reported.)

18  BY MS. PERRY:

19  Q.    And, Detective, remind us, where were you at this time?

20  Where were you located?

21  A.    Still in the area of Longwood and Gwynns Falls Parkway.

22  Q.    And how close is Elgin to where you were?

23  A.    Two blocks.

24  Q.    So I'm now going to play you TT-3-6172.  It's on Page 216

25  of the transcript binder.
```

1          And, again, starting over here on the right, what is the

2    date of this call?

3    **A.**    August 11th of the year 2016.

4    **Q.**    And the time?

5    **A.**    Approximately 2:36 p.m.

6    **Q.**    And the participants?

7    **A.**    Mr. Lockley and an unknown male.

8    **Q.**    And when is this call in relation to the call --

9    **A.**    Oh, excuse me.  An unknown.  Excuse me.  I apologize.

10   **Q.**    And when is this call in relation to the call we just

11   listened to?

12   **A.**    Immediately afterwards.

13          **MS. PERRY:**  I'm going to play the call.

14       (Audio was played but not reported.)

15   **BY MS. PERRY:**

16   **Q.**    And now turning your attention -- I'm going to play you

17   one more call.  This is TT-3-6173, and the transcript is on

18   Page 218.

19          Again, starting over here at the transcript, can you tell

20   us the date and time.

21   **A.**    August 11th of the year 2016 at approximately 2:45 p.m.

22   **Q.**    And the participants?

23   **A.**    Mr. Lockley and an unidentified -- well, a

24   later-to-be-identified female.

25   **Q.**    And, again, when is this call in relation to the one we

1   just listened to?

2   **A.**   A few moments later.

3           **MS. PERRY:**  I'll play the call.

4       (Audio was played but not reported.)

5   **BY MS. PERRY:**

6   **Q.**   Now, Detective, at about this time, at about 2:45 p.m. on

7   August 11th, what, if anything, did you observe?

8   **A.**   Well, I was notified by those monitoring the phone lines

9   that an individual had called Mr. Lockley and was attempting to

10  purchase narcotics.

11  **Q.**   And let me actually pull that transcript up one more time.

12  This is TT-3-6173.

13      And can you, looking here at the top, tell us the number

14  that called.

15  **A.**   Yes.  It's (717) 331-0144.

16  **Q.**   And were you provided with this number when you were

17  communicating with the rest of your team?

18  **A.**   Yes.  The person monitoring the phone informed me that

19  that was the number that was calling.

20  **Q.**   And what can you tell us about the extension, the 717

21  extension?

22  **A.**   It just alerted me to the fact that the individual may be,

23  in fact, from Pennsylvania because of the area code.

24  **Q.**   And so what happened -- what, if anything, did you observe

25  when you were at that location at about that time?

1   **A.**    A vehicle came into the area bearing Pennsylvania license

2   plates.

3   **Q.**    And what happened once that vehicle arrived in the area?

4   **A.**    It proceeded to Longwood and then proceeded to

5   Elgin Avenue just as it was directed to by Mr. Lockley.

6   **Q.**    What happened next?

7   **A.**    I left my location of surveillance and began to follow

8   that vehicle.

9   **Q.**    Did you ever see anyone approach the vehicle?

10  **A.**    I did.

11  **Q.**    Who did you see approach the vehicle?

12  **A.**    The male with the white tank top and the green shorts.

13  **Q.**    And was it after you saw that person approach the vehicle

14  that you followed the vehicle?

15  **A.**    Yeah.

16  **Q.**    Now, when you were following the vehicle, did you stop and

17  talk to anyone first?

18  **A.**    I did.

19  **Q.**    Can you tell us about that.

20  **A.**    I had an interaction with the male with the white tank top

21  and green shorts.

22  **Q.**    Can you tell us about that interaction.  What did you say?

23  **A.**    I was just asking him if I was in the right area to

24  purchase narcotics.

25  **Q.**    Did he respond?

```
 1   A.   Yeah.  He didn't like me very much.

 2   Q.   What happened next?

 3   A.   Told me to go on my way.

 4   Q.   And what did you do?

 5   A.   I did.

 6   Q.   And where did you go?

 7   A.   Followed.

 8   Q.   Who were you following?

 9   A.   The vehicle we just spoke of.

10   Q.   With the Pennsylvania plates?

11   A.   Correct.

12   Q.   Where did you follow that vehicle to?

13   A.   We eventually stopped at the intersection of Windsor Mill

14   and Forest Park.

15   Q.   Is that near the BP gas station?

16   A.   It's directly across the street from it.

17   Q.   And when you stopped the car, did you approach it?

18   A.   I did not stop the car.  I stopped my vehicle, and they

19   stopped at a red light.

20   Q.   And did there come a time when you approached the car?

21   A.   Yes.

22   Q.   What, if anything, did you observe when you approached the

23   car?

24   A.   Immediately when I walked up to the vehicle, one of the

25   occupants had a needle in his arm.
```

1   **Q.**   How many occupants were there in the vehicle?

2   **A.**   I believe there was three.

3   **Q.**   Did you engage the occupants of the vehicle in a

4   conversation?

5   **A.**   I did.

6   **Q.**   And what, if anything, happened?

7   **A.**   I alerted them to the fact that I was law enforcement and

8   that we had suspicion as to what they were doing and asked them

9   to relinquish what they had just purchased.

10  **Q.**   And did you recover anything at that point?

11  **A.**   Yes, ma'am, I did.

12  **Q.**   What did you recover?

13  **A.**   A plastic bag containing a brown substance.

14  **Q.**   And what, based on your training and experience, did you

15  believe that substance to be?

16  **A.**   Suspected heroin.

17  **Q.**   And where did you recover it from?

18  **A.**   From the driver.

19  **Q.**   Do you know where he took it from?

20  **A.**   Somewhere on his person.  I can't tell you exactly where.

21  I'm sorry.

22  **Q.**   Now, I want to show you Government's Exhibit D-20.

23       (Handing.)

24       Do you recognize this?

25  **A.**   I do.

1    **Q.**   What is it?

2    **A.**   It's a submission of the narcotics I had just mentioned.

3    **Q.**   And is it the narcotics you recovered from the driver of

4    the vehicle?

5    **A.**   Correct.

6    **Q.**   And was that ultimately submitted to the Baltimore Police

7    lab for testing?

8    **A.**   It was.

9    **Q.**   Now, Detective, did you later learn that additional calls

10   had come over the wiretap around this time?

11   **A.**   Yes.

12   **Q.**   So I want to show you, again, from

13   Government's Exhibit Wire 3, this is TT-3-6175, and the

14   transcript is on Page 220.

15        Starting again over here on the right, who is this call --

16   what phone number was this call from?

17   **A.**   It's the same 717 number that I had just mentioned earlier

18   that had spoken with Mr. Lockley.

19   **Q.**   And what was the date and time of the call?

20   **A.**   The 11th of August, the year 2016, at approximately

21   3:04 p.m.

22   **Q.**   And who was the other participant in the call?

23   **A.**   It was Mr. Lockley and the female.

24   **Q.**   I'm going to play this call.

25        (Audio was played but not reported.)

1    **BY MS. PERRY:**

2    **Q.**   Detective, what were you driving that day?

3    **A.**   What was I driving?

4    **Q.**   Yes.

5    **A.**   A black truck.

6    **Q.**   Now, I want to play for you TT-3-6178.

7         And, again, looking over here at the transcript, what was

8    the date and time of this call?

9    **A.**   The 11th of August, the year 2016, at approximately

10   3:08 p.m.

11   **Q.**   And when is this call in relation to the one we just

12   listened to?

13   **A.**   I'm sorry?

14   **Q.**   When is this call in relation to the call we just

15   listened --

16   **A.**   When is it?

17   **Q.**   Yes.

18   **A.**   Oh, moments later.

19   **Q.**   And who were the participants in this call?

20   **A.**   Mr. Lockley and the male with the white tank top.

21   **Q.**   I'm going to play this call.

22        (Audio was played but not reported.)

23   **BY MS. PERRY:**

24   **Q.**   Detective, did you hear the part in the call where the

25   caller said [reading]:  He like, any blow out here?

1    **A.**   Yes.

2    **Q.**   Are you familiar with the term "blow"?

3    **A.**   I am.

4    **Q.**   What is "blow"?

5    **A.**   It can be referred to as a controlled, dangerous

6    substance.

7    **Q.**   Detective, at this point did you continue your

8    surveillance?

9    **A.**   I did not.

10   **Q.**   Why not?

11   **A.**   I was blown.

12   **Q.**   So I want to direct your attention to a few days later, to

13   August 15th of 2016, at about 1:30 p.m.

14        Where were you at that date and time?

15   **A.**   I was again working surveillance in the area of the

16   northwest part of Baltimore.  Excuse me.

17   **Q.**   And what investigation were you conducting surveillance

18   with respect to?

19   **A.**   The same wiretap that we've been speaking of.

20   **Q.**   And did there come a time on that day when you learned

21   that a call had come over the tapped line?

22   **A.**   Yes.

23   **Q.**   And have you since listened to that call?

24   **A.**   I have.

25   **Q.**   So I'm going to play you Government's Exhibit from Wire 3,

45

PALMER - DIRECT

```
 1    this is TT-3-7331, and the transcript is on Page 233.
 2         So, again, starting over here at the right, what is the
 3    date and time?
 4    A.   The date is August 15th in the year 2016.
 5    Q.   And what's the time?
 6    A.   Approximately 1:35 p.m.
 7    Q.   And who were the participants in the call?
 8    A.   Mr. Lockley and an unknown person.
 9    Q.   I'm going to play this call.
10         (Audio was played but not reported.)
11    BY MS. PERRY:
12    Q.   Did you hear when the caller said, "We're trying to get
13    girl"?
14    A.   Yes, ma'am.
15    Q.   And based on your training and your experience in
16    undercover narcotics work, do you know what "girl" refers to?
17    A.   Yes, ma'am.  It's commonly used as a nickname for cocaine.
18    Q.   Now, around this time, what did you do?
19    A.   Well, we were in the area, so we began to conduct
20    surveillance in that area.
21    Q.   And did you ultimately learn about other calls that came
22    over the wire?
23    A.   Yes, ma'am.
24    Q.   So I'm going to play you Call TT-3-7363.  It's on
25    Page 235.
```

PARKER - DIRECT

```
 1        And looking over at the transcript, can you tell us the
 2   date and time.
 3   A.   August 15th, the year 2016, at approximately 2:47 p.m.
 4   Q.   And who were the participants?
 5   A.   Mr. Lockley and an unknown individual.
 6   Q.   So I'm going to play this call.
 7        (Audio was played but not reported.)
 8   BY MS. PERRY:
 9   Q.   Now, Detective, did you hear when the caller said, "I'm
10   turning right onto Chelsea"?
11   A.   Yes, ma'am.
12   Q.   And did you -- what did you understand that to mean?
13   A.   Chelsea Terrace, which is a block in Northwest Baltimore.
14   Q.   And then did you hear where the caller was asked,
15   "No boy?"
16   A.   Yes.
17   Q.   Are you familiar in your experience in undercover work and
18   narcotics work with the term "boy"?
19   A.   Yes, ma'am.  It refers to heroin.
20   Q.   At this point what did you do?
21   A.   We conducted surveillance in the area.
22   Q.   And what area is that?
23   A.   I'm sorry?
24   Q.   What area did you go to at that point?
25   A.   The area of Chelsea Terrace.
```

1  **Q.**   I'm going to show you MAP-38.

2       Can you tell us what we're looking at here.

3  **A.**   Yes.

4  **Q.**   What is this area?

5  **A.**   That's a map of Chelsea Terrace between Clifton Avenue and

6  Windsor Mill Road.

7  **Q.**   And where did you go at about that time?

8       Or what area were you surveilling?

9  **A.**   That area, whereas, the large red bubble on top is the

10  intersection of Windsor Mill Road at Chelsea Terrace.  If you

11  follow all the way down Chelsea Terrace to the bottom, that

12  would be Clifton Avenue.  That was the target location that we

13  were surveilling at that point.

14  **Q.**   Now, I want to play you another call.  This is TT-3-7376,

15  and the transcript is on Page 237.

16       And, again, what is the date and time of this call?

17  **A.**   The 15th of August, the year 2016, and the time is

18  approximately 2:58 p.m.

19  **Q.**   And who were the participants in this call?

20  **A.**   Mr. Lockley and Mr. Jacob Bowling.

21  **Q.**   And in the course of your investigation, did you become

22  familiar with Jacob Bowling?

23  **A.**   Yes, ma'am, I did.

24  **Q.**   I'm going to turn back to Mr. Bowling in a second.  But,

25  first, I'm going to play this call.

1   **A.**   Sure.

2         (Audio was played but not reported.)

3   **BY MS. PERRY:**

4   **Q.**   Now, did you hear when Mr. Lockley said, "They on Chelsea

5   on the right"?

6   **A.**   Yes.

7   **Q.**   And at that point what, if anything, did you observe?

8   **A.**   At that point what did I observe?

9   **Q.**   Yes.

10  **A.**   A small vehicle occupied by two females.

11  **Q.**   And where was that vehicle?

12  **A.**   It was parked on Chelsea Terrace.

13  **Q.**   Now, I'm going to show you Government's Exhibit IND-12.

14        Who are we looking at here?

15  **A.**   Mr. Bowling.

16  **Q.**   Now, I'm going to play you one more call.  This is

17  TT-3-7382, and the transcript is on Page 239.

18        And, again, what is the date and time of this call?

19  **A.**   The date is August 15th, year 2016, and the time is

20  approximately 3:12 p.m.

21  **Q.**   And who were the participants in the call?

22  **A.**   Mr. Lockley and Mr. Bowling again.

23  **Q.**   I'm playing this call.

24        (Audio was played but not reported.)

25  **BY MS. PERRY:**

1    **Q.**   Did you hear in the call where Mr. Bailey said, "I'm

2    behind you"?

3    **A.**   Yes.

4    **Q.**   Now, what happened, if anything happened at that time,

5    while you were observing that area?

6    **A.**   Like I had said earlier, the vehicle with the two female

7    occupants arrived.  Then the Lexus that we had mentioned

8    earlier arrived as well, being driven by Mr. Lockley.

9    **Q.**   And, again, can you describe what that Lexus looked like.

10   **A.**   It was, again, dark-colored.

11   **Q.**   And what happened when the Lexus arrived?

12   **A.**   One of the occupants of the small vehicle exited the car

13   and walked to Mr. Lockley.

14   **Q.**   What happened next?

15   **A.**   There was an exchange, maybe a hug, high five.  I'm not

16   really sure what it was.  But then she walked back to her

17   vehicle.

18   **Q.**   What happened after that?

19   **A.**   Mr. Bowling arrived.

20   **Q.**   And when Mr. Bowling arrived, what happened?

21   **A.**   Mr. Bowling walked to the Lexus, and then he subsequently

22   walked to the car being occupied by the two females.

23   **Q.**   What happened after that?

24   **A.**   Mr. Bowling then re-approached Mr. Lockley in the Lexus.

25   **Q.**   And what happened to the other vehicle?

1    **A.**   That vehicle left the area.

2    **Q.**   What did you do?

3    **A.**   I followed that vehicle for a very short duration and

4    left.

5    **Q.**   Did you continue your surveillance after that?

6    **A.**   No, ma'am, I did not.

7    **Q.**   Now, I want to jump ahead -- actually, let me ask you one

8    more question about that.

9          What did you believe happened during the exchange you just

10   described?

11   **A.**   I'm sorry.  One more time.

12   **Q.**   You just . . .

13         I believe you just described an interaction, you said,

14   between the Lexus that you observed pull up and Mr. Bowling, as

15   well as the occupants of another vehicle.

16         What did you believe happened?

17              **MR. TRAINOR:**  Objection.

18              **THE COURT:**  Overruled.

19              **THE WITNESS:**  May I answer?

20              **THE COURT:**  Yes.

21   **BY MS. PERRY:**

22   **Q.**   Yes.

23   **A.**   Thank you.

24         It was apparent to me that the two females were in the

25   area to purchase narcotics.  Mr. Lockley had called Mr. Bowling

```
 1    to inform him that there was, in fact, what they call a sale in
 2    the block.  Mr. Bowling was instructed to make that transaction
 3    with those individuals.
 4         Mr. Lockley, almost acting in what would be considered a
 5    supervisory position, arrived before Mr. Bowling did.  Then
 6    Mr. Bowling arrived and kind of had to justify his tardiness in
 7    the -- with the sale.
 8         And Mr. Lockley clearly declares that this is why they're
 9    losing money, because of people that are being lazy and aren't
10    showing up on time.
11    Q.   And when Mr. Bowling approached -- ultimately approached
12    that other vehicle in the area, what do you believe happened
13    then?
14    A.   A narcotics transaction.
15    Q.   And what made you believe that?
16    A.   Because that was what was declared that they were there
17    for.
18    Q.   So now I do want to jump ahead and direct your attention
19    to September 27th of 2016.
20         Were you working on that particular day?
21    A.   Yes, ma'am, I was.
22    Q.   And on that day, did you assist in the execution of a
23    search warrant?
24    A.   I did.
25    Q.   What was the location of the search warrant?
```

```
1    A.    2525 Eutaw Place.

2    Q.    Was there an apartment number?

3    A.    503.

4    Q.    And is that location in Baltimore?

5    A.    Yes, ma'am, it is.

6    Q.    Approximately what time did you arrive at 2525 Eutaw Place

7    that day?

8    A.    We probably arrived at 5:30, but execution of the warrant

9    took place at approximately 6:00 a.m.

10   Q.    And what was your role in the execution of the

11   search warrant that day?

12   A.    I was support.

13   Q.    And did there come a time when you entered the residence?

14   A.    Yes, ma'am.

15   Q.    Was anyone inside the residence when you entered?

16   A.    Yes.  There were two occupants.

17   Q.    Who were those occupants?

18   A.    Mr. Lashley and I'm not real sure about the name of the

19   female.  If you could show me the report, I may be able to

20   remember.

21   Q.    Sure.  I can . . .

22             MS. PERRY:  Permission to approach?

23             THE COURT:  Yes.

24   BY MS. PERRY:

25   Q.    (Handing.)
```

```
 1          Take a look at that and let us know if it refreshes your
 2   recollection.
 3   A.   It does.
 4   Q.   And who were the occupants on that particular day?
 5   A.   Mr. Melvin Lashley and Ms. Tamika Webb.
 6   Q.   I'm going to show you Government's Exhibit IND-58.
 7        Do you recognize this person?
 8   A.   Yes, ma'am.
 9   Q.   Who is that?
10   A.   Mr. Lashley.
11   Q.   Now, ultimately, was the residence searched?
12   A.   Yes.
13   Q.   Was anything recovered?
14   A.   Not that I know of.
15   Q.   Nothing was recovered from inside of the residence?
16   A.   Yes, from within the residence; but from his person, I do
17   not believe so.
18   Q.   Okay.  So what was recovered from inside the residence?
19   A.   There were numerous items of evidentiary -- may I refer to
20   the notes, please?
21   Q.   If you need it to refresh your recollection.
22   A.   I know that two firearms were recovered from the
23   residence, a cell phone, several items of clothing, and two
24   firearms were recovered -- did I already say two firearms?  I'm
25   sorry if I did.
```

```
 1        Narcotics, which we believed to be heroin, was recovered
 2   as well.
 3   Q.   So let me start, first of all, by showing you -- first of
 4   all, were photos taken of the items recovered in the residence?
 5   A.   Yes, ma'am.
 6   Q.   So I'll start by showing you Government's Exhibit SW-8-A.
 7        What are we looking at here?
 8   A.   The apartment.
 9   Q.   And turning to SW-8-B.
10        Can you tell us what we're looking at here.
11   A.   Yes.  It looks to be a windowsill, and there's narcotics.
12   If you were to look in the top left corner, there's a small,
13   black item -- object.  I can't tell you what that is, next to
14   two candlesticks -- candle posts.  And there's narcotics right
15   behind that laying near the Venetian blind.
16   Q.   And did you -- what do you believe those narcotics to be
17   based on your training and experience?
18   A.   Heroin.
19   Q.   Showing you SW-8-C, what are we looking at here?
20   A.   A telephone and a baseball hat.
21   Q.   Turning to SW-8-D, what are we looking at here?
22   A.   It's the same baseball hat, and inside of the hat is a
23   small plastic bag.
24   Q.   And did you recover anything from inside of the hat?
25   A.   Yes.  That small plastic bag was, in fact, recovered,
```

 1   which contained a brown substance.

 2   **Q.**   And what did you believe that substance to be, based on

 3   your training and experience?

 4   **A.**   That as well to be suspected heroin.

 5   **Q.**   Showing you SW-8-E.

 6        What are we looking at here?

 7   **A.**   That is a bed frame.  And underneath it, in the middle of

 8   the picture, you can see a small, black firearm.

 9   **Q.**   And was that recovered on that particular day?

10   **A.**   Yes, ma'am, it was.

11   **Q.**   Turning to SW-8-F.

12        What are we looking at here?

13   **A.**   That's, in fact, that firearm that was under the bed.

14   **Q.**   Turning to SW-8-G.

15        And what are we looking at here?

16   **A.**   That's an additional firearm.

17   **Q.**   And did you learn who this particular firearm, the one in

18   SW-8-G, belonged to?

19   **A.**   Yes, ma'am.

20   **Q.**   And who did that firearm belong to?

21   **A.**   Ms. Tamika Webb.

22   **Q.**   And did you learn whether or not this particular firearm

23   was lawfully owned?

24   **A.**   It was lawfully owned by Ms. Webb; whereas, she worked

25   security.

1   **Q.**   And what about the other firearm that we saw?

2   **A.**   No, ma'am.  That was not lawfully owned by anyone there.

3   **Q.**   Now, I want to approach and show you

4   Government's Exhibit F-20.

5        (Handing.)

6        Can you tell us what Government's Exhibit F-20 is.

7   **A.**   That is, in fact, that firearm we just saw pictures of.

8   **Q.**   And is that the firearm that you recovered on

9   September 27th of 2016?

10  **A.**   Yes, ma'am, it was.

11  **Q.**   Now, I want to go back to talk about the drugs that we saw

12  in the photographs.

13       Can you tell us what the quantity of drugs or approximate

14  quantity of the drugs we saw in the photographs was.

15  **A.**   The picture near the windowsill, I think it was an

16  approximate weight of 15 grams.  And the plastic bag that was

17  contained within the brim of the hat was approximately 5 grams.

18  **Q.**   And based on your experience and your training, what can

19  you say about that particular quantity?

20  **A.**   It's a quantity that shows a clear intent to distribute

21  that same, to use it to distribute on the street, not for

22  personal use.

23       **MS. PERRY:**  Court's indulgence.

24       Nothing further, Your Honor.  Thank you.

25       **THE COURT:**  Cross-examination.

```
 1              Mr. Trainor.
 2         MR. TRAINOR:  Thank you.
 3                    CROSS-EXAMINATION
 4    BY MR. TRAINOR:
 5    Q.   Good morning, Officer Faller.  How are you?
 6    A.   Good morning, sir.  How are you?
 7    Q.   Good.
 8         Now -- so basically, you were undercover doing
 9    surveillance in August of 2016; correct?
10    A.   Yes.
11    Q.   And you told us about some observations you made, I
12    believe, between August 11th and, say, August 16th of 2016?
13    A.   Correct.
14    Q.   All right.  And you described seeing a young man in green
15    shorts and a white tank top?
16    A.   Yes, sir.
17    Q.   And that was in an area approximately a mile or so from
18    the 5200 block of Windsor Mill Road?
19    A.   I can't tell you exactly how far away it was, but I would
20    presume it's about a mile.
21    Q.   All right.  And according to your observations, you saw
22    this person in green shorts and a white tank top making contact
23    with people who came in and out of the area; is that right?
24    A.   Yes, sir.
25    Q.   And you assumed or you -- based on your training and
```

```
 1    experience, that that might be drug transactions going on.
 2    A.   Yes, sir.
 3    Q.   All right.  And is that the person you approached and
 4    asked if you could get drugs in that area?
 5    A.   You're correct.
 6    Q.   And he's the one who sent you on your way; am I right?
 7    A.   He, in fact, did, yes.
 8    Q.   What was his name?
 9    A.   I cannot tell you that.
10    Q.   You don't know his identity at all?
11    A.   No, sir, I do not.
12    Q.   All right.  And you didn't arrest him?
13    A.   No, sir, I did not.
14    Q.   All right.  Now, the observations you made between
15    August 11th and August 16th of 2016, did you take photographs
16    of what you were seeing?
17    A.   No, sir, I did not.
18    Q.   All right.  And as I understand it, you were not listening
19    to any phone calls in realtime, were you?
20    A.   I myself was not, no, sir.
21    Q.   All right.  You were just eyeballing or visual -- looking,
22    surveilling, if you will, the area?
23    A.   Yes, sir.
24    Q.   All right.  You didn't make any arrests?
25    A.   No, sir.
```

1    **Q.**   And other than that time that you approached the person

2    who had a needle in his arm or her arm, you didn't seize any

3    drugs that you described?

4    **A.**   No, sir, I did not.

5    **Q.**   And so there was no seizure of drugs other than what was

6    taken from the person who was stopped with the needle in their

7    arm?

8    **A.**   You're correct.

9    **Q.**   And you didn't seize any money or guns or anything like

10   that, did you?

11   **A.**   No, sir, I did not.

12   **Q.**   All right.  And you can't tell us who this green -- person

13   in green shorts and a white tank top was?

14   **A.**   No, sir, I cannot.

15   **Q.**   Did you speak with Mr. Lockley?

16   **A.**   No, sir.

17   **Q.**   All right.  So have you ever spoken with Mr. Lockley?

18   **A.**   I have not.

19   **Q.**   All right.  So you had no basis other than listening to

20   these recordings prior to your testimony to identify his voice.

21   **A.**   No, sir.

22          **MR. TRAINOR:**  All right.  Thank you.

23          **THE WITNESS:**  You're welcome.

24          **THE COURT:**  Thank you, Mr. Trainor.

25          Anybody else?

PALMER - CROSS

```
 1          MR. DAVIS:  Briefly.

 2                       CROSS-EXAMINATION

 3   BY MR. DAVIS:

 4   Q.    Detective, you testified that the BP area was targeted,

 5   and that's why you went in to look around; correct?

 6   A.    I don't remember using the word "targeted," but I may

 7   have, yes.

 8   Q.    Well, I'm probably paraphrasing, but that's --

 9   A.    That's okay.

10   Q.    -- essentially, that's what -- I mean, it was part of

11   the -- it was being investigated?

12   A.    It was part of the investigation; you are correct, sir.

13   Q.    And were there certain individuals that were targeted

14   prior to you going -- actually physically going into the area

15   and talking to people?

16   A.    I'm sorry.  I don't really understand your question.  I

17   apologize.

18   Q.    Did you view photographs?  Were there particular people of

19   interest before you went into the area?  Or were you just going

20   in cold to see who was in there?

21   A.    No, sir.  The first part, whereas, you said that we knew

22   there were individuals in there; you are correct.

23   Q.    So you viewed photographs of the individuals before you

24   went in?

25   A.    I have viewed photographs; you are correct.
```

1   **Q.**   And you did not view a photograph of Sydni Frazier before

2   you went in that day on May 2nd of 2016; correct?

3   **A.**   I cannot specifically said [sic] if I saw Mr. Frazier in

4   those photographs, no, sir.

5   **Q.**   And, actually, on that day, you didn't know the name

6   "Sydni Frazier"; correct?

7   **A.**   I did not know who Mr. Frazier was, no, sir.

8   **Q.**   And you did not know the name "Sydni Frazier" for some

9   time after that incident; correct?

10   **A.**   I'm sorry.  For some time after that incident?

11   **Q.**   Yes.  After May 2nd, 2016, when you went in and saw people

12   in the Subway shop, there was some time passed before you put

13   the name "Sydni Frazier" into the picture.

14   **A.**   I had not -- I had no interaction or anything further with

15   him after that date.

16   **Q.**   But you didn't even know his name after that date.  It

17   just didn't -- it wasn't -- it wasn't important.

18   **A.**   Well, I already knew his name after that date.

19   **Q.**   After that day on May 2nd of two thousand --

20   **A.**   On May 2nd, now the identity is learned, so now I know his

21   name; correct.

22   **Q.**   After May 2nd, I mean, like, literally on May 2nd, you

23   learned his name?

24   **A.**   We immediately -- I was shown pictures; yes, sir.

25   **Q.**   When you came out of the area --

PALMER - CROSS

1    **A.**   Yes.

2    **Q.**   -- on May 2nd?

3          Now, the text messages that were going back and forth,

4    that was about a partying quantity of cocaine base.  That's

5    what you were looking for; correct?

6    **A.**   I was looking to purchase; you are correct, yes, sir.

7    **Q.**   User amount of cocaine base.

8    **A.**   No, sir.

9    **Q.**   Well, partying, I mean, that's what the term implies,

10   doesn't it?  That people use it to party?

11   **A.**   Well, there's also the fact that someone has to throw the

12   party, so that could be me.

13   **Q.**   It was still a partying quantity.

14   **A.**   But it's a quantity that can be used for further

15   distribution, clearly.

16   **Q.**   Now, you never actually bought anything from the

17   individual, the photograph that you identified as

18   Sydni Frazier.  You never actually bought anything from him,

19   did you?

20   **A.**   No, sir.

21   **Q.**   And the guys, when you were in the Subway and you came

22   out, they kind of laughed at you initially; correct?

23   **A.**   They did.

24   **Q.**   The text messages were coming from two different phones;

25   correct?

1    **A.**   Yes, sir.

2    **Q.**   Now, when someone sends a text message, you don't know

3    who's actually texting.  You can't see them; right?

4    **A.**   Correct.

5    **Q.**   And when someone sends you a text message, you can't hear

6    them either; correct?

7    **A.**   Yes.

8    **Q.**   Now, did you run the numbers on the phones?

9    **A.**   I, myself, did not.

10   **Q.**   Did you try to identify the person on the other end of the

11   phone through the phones themselves?

12   **A.**   I'm sorry.  I don't really understand your question.

13   **Q.**   Well, did you use the phone numbers to try to identify

14   anyone?

15   **A.**   Well, the problem with that lies in that most people that

16   are involved in illicit activities don't use their real name.

17   **Q.**   And based on your experience in narcotics investigations

18   and just investigations in general, would it be fair to say

19   that a lot of guys, they switch these cell phones around like

20   we change our socks?

21   **A.**   Switch them?  I'm not sure I understand.

22   **Q.**   Pass them back and forth.  Not pay the bill.  Get another

23   one a week later.

24   **A.**   Well, in my experience with this type of organization, one

25   phone number is kept very concrete because you don't want to

1  lose your customer base, so losing a phone number would be very

2  detrimental to the sales for that organization; so not often,

3  no.

4  **Q.**   When you say "this organization," what are you referring

5  to?

6  **A.**   The MMP.

7  **Q.**   Okay.  Is Sydni Frazier MMP?

8  **A.**   I cannot tell you definitively.

9  **Q.**   But you used the word "this organization" when you

10 referenced telephone numbers that we were talking about in

11 reference to him.

12 **A.**   Yes, sir.

13 **Q.**   Now, you've been an undercover officer for a number of

14 years, haven't you?

15 **A.**   I have.

16 **Q.**   That requires a certain degree of acting capability, does

17 it not?

18 **A.**   Sir, it does.

19 **Q.**   It requires a certain ability to deceive people to

20 accomplish your goal; correct?

21 **A.**   Correct.

22 **Q.**   And you've been doing it for how many years now?

23 **A.**   Probably in excess of 16.

24 **Q.**   But the bottom line is you never bought anything from

25 Sydni Frazier; correct?

```
 1    A.    You are correct.
 2               MR. DAVIS:  Thank you.
 3               THE WITNESS:  You're welcome.
 4               THE COURT:  Anybody else?
 5         (No response.)
 6               THE COURT:  Any redirect?
 7               MS. PERRY:  No, Your Honor.  Thank you.
 8               THE COURT:  Okay.  Thank you, sir.  You are excused.
 9               THE WITNESS:  Thank you, Your Honor.
10               Thank you.
11         (Witness excused.)
12               THE COURT:  All right.  We'll take the mid-morning
13    recess.
14               The jury is excused.
15         (Jury left the courtroom at 11:35 a.m.)
16               THE COURT:  All right.  And the gallery is excused.
17         (Pause.)
18               THE COURT:  That would be the entire gallery.
19               All right.  And we'll take our mid-morning recess.
20         (Recess taken.)
21               THE COURT:  All right.  Ready for the jury?
22               MS. HOFFMAN:  Yes.
23         (Jury entered the courtroom at 11:56 a.m.)
24               THE COURT:  Does the Government have another witness?
25               MS. HOFFMAN:  The Government calls Victor Villafane.
```

```
 1              THE CLERK:  Please raise your right hand.
 2          DETECTIVE VICTOR VILLAFANE, GOVERNMENT'S WITNESS, SWORN.
 3              THE CLERK:  Please be seated.
 4          Please speak directly into the microphone.
 5          State and spell your full name for the record, please.
 6              THE WITNESS:  Victor Villafane, V-I-C-T-O-R,
 7     V-I-L-L-A-F-A-N-E.
 8              THE CLERK:  Thank you.
 9                      DIRECT EXAMINATION
10     BY MS. HOFFMAN:
11     Q.   Good morning, Detective Villafane.
12     A.   Good morning.
13     Q.   With which law enforcement agency are you employed?
14     A.   Baltimore Police Department.
15     Q.   Can you tell us your unit and title.
16     A.   I am a detective in the Southwest District.
17     Q.   And how long have you been with the Baltimore Police
18     Department?
19     A.   Over seven years.
20     Q.   As of early 2016, what unit were you in?
21     A.   I was in the drug unit in the Southwest.
22     Q.   Are you familiar with a BP gas station at the intersection
23     of Windsor Mill Road and Forest Park Avenue in the
24     Southwest District?
25     A.   Yes.
```

1    **Q.**   Have you done enforcement in that area?

2    **A.**   Yes.

3    **Q.**   Have you responded to calls for service at that location?

4    **A.**   Yes.

5    **Q.**   And have you made arrests in that area?

6    **A.**   Yes.

7    **Q.**   Can you tell us what kind of neighborhood it is.

8    **A.**   For the most part, there's a lot of apartments.  It's

9    quiet, but in that exact area of the gas station, it's a --

10   it's a drug hub.

11   **Q.**   And have you conducted surveillance there at the gas

12   station?

13   **A.**   Yes.

14   **Q.**   Have you observed drug transactions there?

15   **A.**   Yes.

16   **Q.**   Can you describe what you would see at that location.

17   **A.**   It would be more of a drive-through --

18          **MS. WHALEN:**  Objection, Your Honor.  Can we have some

19   time, date, some other information.

20          **THE COURT:**  Sure.

21   BY MS. HOFFMAN:

22   **Q.**   Sticking with the 2015-2016 time period.

23          **THE COURT:**  That's two years.  Can we narrow it

24   slightly more.

25          **MS. HOFFMAN:**  Sure.

1    **BY MS. HOFFMAN:**

2    **Q.**    Early 2016.

3    **A.**    Yes.  It will be of a -- more of a drive-through.

4    Vehicles will pull into the gas station as if they were pumping

5    gas.  Either the driver will get out of the car and enter the

6    gas station.  Or that's where the transaction will occur.  Or

7    the actual drug dealer will come up to the window of the car

8    and sell the drug; then the vehicle will drive away.

9    **Q.**    And did you ever see cars pull into that location with

10   out-of-state plates?

11   **A.**    Yes.

12   **Q.**    What plates would you see?

13   **A.**    Most commonly it was Virginia, West Virginia, and

14   Pennsylvania.

15   **Q.**    I want to direct your attention to January 26th of 2016 at

16   approximately 6:30 in the evening.

17         Were you working and on duty?

18   **A.**    Yes.

19   **Q.**    And what were you doing?

20   **A.**    I was -- we were conducting proactive enforcement that

21   day.

22   **Q.**    And where were you conducting proactive enforcement?

23   **A.**    At the area of Forest Park and Windsor Mill.

24   **Q.**    Did you go to a particular location?

25   **A.**    Yes.

69

1   **Q.**   Where did you go?

2   **A.**   We initially went to the -- an apartment building located

3   on North Forest Park.

4   **Q.**   And let me pull up Government's Exhibit MAP-34.

5        And, first, can you tell me:  Was there an individual who

6   you were looking for in particular?

7   **A.**   Yes.

8   **Q.**   Who was that?

9   **A.**   Jacob Bowling.

10  **Q.**   And you said you went, first, to an apartment complex on

11  North Forest Park Avenue.  Are you able to show us where you

12  went first?

13  **A.**   Yes.

14  **Q.**   Can you point it out.  You should be able to touch the

15  screen, and it will actually show up on the screen.

16  **A.**   (Witness complies.)

17  **Q.**   And did you find Mr. Bowling there?

18  **A.**   No.

19  **Q.**   And where did you go next?

20  **A.**   We proceeded to go to the gas station located at

21  Forest Park and Windsor Mill.

22  **Q.**   And let me show you Government's Exhibit IND-12.

23        Who is that?

24  **A.**   That's Jacob Bowling.

25  **Q.**   So that's the person you were looking for that day?

1    **A.**    Yes.

2    **Q.**    And you said you went to the gas station.  And let me show

3    you Government's Exhibit MAP-23.

4         Do you recognize this location?

5    **A.**    Yes.

6    **Q.**    What are we looking at here?

7    **A.**    That's the gas station located at North Forest Park and

8    Windsor Mill.

9    **Q.**    And why -- can you just tell us, generally speaking, why

10   were you looking for Jacob Bowling?

11   **A.**    'Cause we had intelligence that he had a large amount of

12   narcotics on him.

13   **Q.**    So when you went to the gas station, what did you observe?

14   **A.**    As I was pulling into the gas station, I was looking at

15   the -- at the glass door inside the small vestibule.  I

16   observed several individuals in there.  I focused my attention

17   on one.

18        As I was driving towards the front door of the gas

19   station, I observed this individual retrieve the -- a handgun

20   from his waistband and attempted to put it in the coin slot on

21   the vestibule towards the back of the gas station attendant.

22        As I keep driving forward, I seen him grab the handgun

23   again, then put it on the turnstile, which is the little turn

24   (indicating).  He placed it in there and turned it and stood in

25   front of it, his back towards it.

71

VILLAFANE - DIRECT

```
 1   Q.   And the coin slot and the turnstile that you described,
 2   are those in between the store and where the clerk sits?
 3   A.   Yes.  That separates the vestibule and the actual store
 4   clerk.
 5   Q.   And did you have a clear view through the glass doors as
 6   you were approaching?
 7   A.   Yes.
 8   Q.   Were you able to actually see that it was a gun?
 9   A.   Yes.
10   Q.   Were you later able to identify that individual?
11   A.   Yes.
12   Q.   And who was it?  What was his name?
13   A.   Mr. Walker.
14   Q.   I'm going to show you Government's Exhibit IND-92.
15        Who's that?
16   A.   That's Mr. Walker.
17   Q.   So when you entered the store -- well, did you enter the
18   store?
19   A.   Yes.
20   Q.   And what did you do when you entered?
21   A.   I immediately placed Mr. Walker under arrest.
22   Q.   And did you attempt to recover the weapon?
23   A.   Yes.
24   Q.   Tell us what you did.
25   A.   Then I -- as I was placing Mr. Walker under arrest, I
```

1  observed the gas station clerk, Mr. Mensa (ph), he reached into

2  the coin style; grabbed the revolver, the silver revolver; and

3  placed it under the table.

4  **Q.**   Did you give him an instruction?

5  **A.**   Yes.  I gave him instructions to open the door and give me

6  access to the back of the gas station.  He hesitated at first,

7  but then he complied.

8  **Q.**   And were you able to recover the weapon?

9  **A.**   Yes, I did.

10  **Q.**   And where did you recover it?

11  **A.**   It was behind the counter exactly where I observed him

12  place it.

13  **Q.**   And what kind of weapon was it?

14  **A.**   It was a Taurus .357 Magnum revolver.

15  **Q.**   I'm going to approach and show you

16  Government's Exhibit F-15.

17       (Handing.)

18       Can you tell us what that is.

19  **A.**   Yes.  This is a Taurus .357 Magnum revolver that I

20  recovered from behind the counter.

21  **Q.**   And I'm going to show you Government's Exhibit F-15-A.

22       And what are we looking at here?

23  **A.**   That's a photograph of the same revolver that is right in

24  front of me that was recovered from the gas station.

25  **Q.**   And was it loaded?

1   **A.**   Yes.

2   **Q.**   What did you do next?

3   **A.**   After I recovered the revolver, I placed Mr. Mensa (ph)

4   under arrest.  As well, I called for backup units.  We had

5   units on standby in the area.

6        The units finally showed up, and we were able to place the

7   rest of the individuals that were in that vestibule in

8   handcuffs.

9   **Q.**   And how many other individuals were in the vestibule area

10  with Mr. Walker?

11  **A.**   Three other.

12  **Q.**   And were you able to identify the people who were with

13  Mr. Walker?

14  **A.**   Yes.

15  **Q.**   And who were they?

16  **A.**   Mr. Blackwell, Mr. Stewart, and Mr. Talley.

17  **Q.**   I'm going to show you Government's Exhibit IND-10.

18       Who's that?

19  **A.**   That's Mr. Blackwell.

20  **Q.**   And I'm going to show you Government's Exhibit IND-87.

21       Who's this?

22  **A.**   That's Mr. Talley.

23  **Q.**   And, finally, Government's Exhibit IND-85 -- oops.  I'm

24  sorry.  That's not right.  Apologies.

25       IND-86.  I apologize.

```
 1          Who are we looking at there?
 2    A.    Mr. Stewart.
 3    Q.    Now, you mentioned that Mr. Blackwell, Mr. Talley, and
 4    Mr. Stewart were also placed in handcuffs?
 5    A.    Yes.
 6    Q.    And were they ultimately searched?
 7    A.    Yes.
 8    Q.    And can you tell us, starting with Mr. Blackwell -- I'll
 9    pull up IND-10.
10          Can you tell us what was recovered from Mr. Blackwell.
11    A.    From Mr. Blackwell, we recovered a clear bag containing
12    nine clear plastics containing rock substance, suspected
13    heroin, and two pink Ziplocs containing suspected marijuana.
14    Q.    And did you recover any currency from him?
15    A.    Yes.
16    Q.    I'm going to approach and show you
17    Government's Exhibit D-13-C.
18          (Handing.)
19          Can you tell us what we're looking at there or what you're
20    looking at there.
21    A.    We're looking at the suspected heroin and marijuana that
22    was recovered.
23    Q.    I'm going to pull up Government's Exhibit AP-4-D.
24          And what are we looking at here?
25    A.    That's a photograph of the suspected heroin and marijuana
```

1    that was recovered.

2    **Q.**    Pulling back up Government's Exhibit IND-87, who you

3    identified as Mr. Talley, what, if anything, was recovered from

4    Mr. Talley?

5    **A.**    There was a revolver recovered from Mr. Talley.

6    **Q.**    And I'm going to approach and show you -- well, first, let

7    me pull up Government's Exhibit AP-4-A.

8        And can you tell us what we're looking at here.

9    **A.**    Yeah.  That's the photograph of Mr. Talley.

10   **Q.**    And are you able to see what's in his inside jacket pocket

11   there?

12   **A.**    Yes; the revolver.

13   **Q.**    And I'm showing you Government's Exhibit AP-4-B.

14       And what are we looking at here?

15   **A.**    That's a close-up photograph of the pocket and the

16   revolver.

17   **Q.**    I'm going to approach and show you

18   Government's Exhibit F-13.

19       (Handing.)

20       Can you tell us what you're looking at there.

21   **A.**    This is the revolver that was recovered from Mr. Talley.

22   **Q.**    And I'm going to pull up Government's Exhibit F-13-A.

23       And what are we looking at there?

24   **A.**    That's the photograph of this revolver.

25   **Q.**    Finally, pulling back up Government's Exhibit IND-86, who

1  you identified as Mr. Stewart, what, if anything, was recovered

2  from Mr. Stewart?

3  **A.**   There was a SIG SAUER handgun, .45 caliber, that was

4  recovered from him.

5  **Q.**   And were there any narcotic -- or suspected narcotics

6  recovered from him?

7  **A.**   Yes.

8  **Q.**   And do you recall -- do you recall what was recovered?

9  **A.**   It was nine green Ziplocs, I believe, containing rock

10  substance, suspected cocaine.

11  **Q.**   I'm going to approach and show you

12  Government's Exhibit F-14.

13       (Handing.)

14       What are you looking at there?

15  **A.**   This is the SIG SAUER that was recovered from Mr. Stewart.

16  **Q.**   And I'm going to pull up Government's Exhibit F-14-A.

17       What are we looking at here?

18  **A.**   That's a photograph of the -- this handgun that is in

19  front of me right now.

20  **Q.**   And I'm going to approach and show you Government's

21  Exhibit D-13-B.

22       (Handing.)

23       Can you tell us what you have in front of you there.

24  **A.**   This is the suspected cocaine that was recovered from

25  Mr. Talley.

1    **Q.**    I'm going to pull up Government's Exhibit AP-4-C.

2          What are we looking at here?

3    **A.**    That's a photograph of the suspected cocaine that was

4    recovered from Mr. Talley -- from Mr. Stewart.

5    **Q.**    After Mr. Walker was placed under arrest, was there an

6    additional search of his person conducted?

7    **A.**    Yes.

8    **Q.**    And what, if anything, was recovered from Mr. Walker?

9    **A.**    It was a clear bag containing suspected heroin.

10   **Q.**    And I'm going to approach and show you

11   Government's Exhibit D-13-D.

12         (Handing.)

13         Can you tell us what you have in front of you there.

14   **A.**    This is the suspected heroin that was recovered from

15   Mr. Walker.

16   **Q.**    I'm going to pull up Government's Exhibit AP-4-E.

17         And what are we looking at here?

18   **A.**    That is a photograph of the suspected heroin that was

19   recovered from Mr. Walker.

20   **Q.**    Did you recover any drug-trafficking paraphernalia from

21   the store?

22   **A.**    Yes.  I recovered packaging material and a digital scale.

23   **Q.**    And I'm going to show you Government's Exhibit AP-4-G --

24   no.  I'm sorry.

25         AP-4-F.

1        And what are we looking at here?

2    **A.**   That's a photograph of the digital scale that was

3    recovered from the store.

4    **Q.**   And, finally, I'm going to show you

5    Government's Exhibit AP-4-G.

6        What are we looking at here?

7    **A.**   That's an overview photograph of the currency, the drugs,

8    and the handguns that were recovered on this date.

9    **Q.**   Detective Villafane, were you able to review footage of

10   the incident on the surveillance camera system at the BP gas

11   station?

12   **A.**   Yes.

13   **Q.**   And I want to approach and show you

14   Government's Exhibit SF-8.

15       (Handing.)

16       Have you had a chance to review the footage on that disc

17   before coming in here today?

18   **A.**   Yes.

19   **Q.**   And is it a fair and accurate compilation of clips from

20   the surveillance footage as you saw it on the cameras at the BP

21   gas station?

22   **A.**   Yes.

23   **Q.**   I'm going to play some clips of the footage for you,

24   starting with Government's Exhibit SF-8-A.

25       (Video played.)

```
1   BY MS. HOFFMAN:

2   Q.   And can I direct your attention to the date and timestamp

3   in the bottom right.  Do you mind -- I guess it's in two

4   places.  But would you mind reading that date and timestamp for

5   us.

6   A.   Yes.  It's January 26th, 2016, at 18:13 hours.

7   Q.   And I believe you said you arrived at the gas station

8   somewhere around 6:30; is that right?

9   A.   Yes.

10  Q.   So is this before you arrived at the BP gas station?

11  A.   Yes.

12  Q.   I'm going to continue playing.  But, first, are you able

13  to identify the individuals in this -- on the left screen?

14  A.   Yes.

15  Q.   And who are they?

16       If I continue playing, maybe that will help.

17  A.   This right here, next to the ATM, is Mr. Stewart

18  (indicating).

19       This is Mr. Walker dancing (indicating).

20       The one that is walking out is Mr. Blackwell (indicating).

21       And this is Mr. Talley (indicating).

22  Q.   Thank you.

23       At a certain point did someone else who you recognized

24  come into the store?

25  A.   Yes.
```

1    **Q.**   Do you see the gentleman approaching with what looks like

2    maybe a red-colored hoodie who's just walking in now?

3    **A.**   Yes.

4    **Q.**   Who is that person?

5    **A.**   That's Mr. Jacob Bowling.

6    **Q.**   And is that the person who you were looking for that day?

7    **A.**   Yes.

8    **Q.**   Does he appear to be interacting with the other

9    individuals in the store?

10   **A.**   Yes.

11   **Q.**   I'm going to play you another clip, and this is going to

12   be Government's Exhibit SF-8-B.

13       (Video played.)

14   **BY MS. HOFFMAN:**

15   **Q.**   And do you see the date and timestamp here?  It says

16   January 26th, 2016, at 18:22-and-some-odd seconds?

17   **A.**   Yes.

18   **Q.**   And is this, again, before you arrived at the BP gas

19   station?

20   **A.**   Yes.

21   **Q.**   Can you identify the people in this video.

22   **A.**   Yes.  We have Mr. Bowling, Mr. Walker, Mr. Stewart,

23   Mr. Talley, and Mr. Blackwell.

24   **Q.**   Do you see that there's a gentleman approaching in the

25   right screen from a pickup truck?

1    **A.**    Yes.

2    **Q.**    And I just want to direct your attention to him.

3         Can you tell us for the record what you just saw happen.

4    **A.**    That's a hand-to-hand CDS transaction.

5    **Q.**    And did you see who it was who the gentleman from the

6    pickup truck had that transaction with?

7    **A.**    Yes.

8    **Q.**    Who was that?

9    **A.**    Mr. Walker.

10   **Q.**    Okay.  I'm going to show you another clip.  This one's

11   Government's Exhibit SF-8-C.

12        (Video played.)

13   **BY MS. HOFFMAN:**

14   **Q.**    And do you see how the timestamp here says January 26th,

15   2016, 18:29-and-some-odd seconds?

16   **A.**    Yes.

17   **Q.**    Is that just shortly before you arrived at the BP?

18   **A.**    Yes.

19   **Q.**    And you see that there's a gentleman approaching entering

20   the store right now in tan clothing?

21   **A.**    Yes.

22   **Q.**    And I want to direct your attention on him.

23        And can you tell us for the record what you just saw

24   happen.

25   **A.**    The individual with the tan is retrieving the money while

1    Mr. Blackwell over here (indicating) retrieved the suspected

2    narcotics off of his front waistband area.

3    **Q.**    And, finally, I'm going to show you one more clip.  This

4    one's Government's Exhibit SF-8 -- SF-8-D.

5         (Video played.)

6    **BY MS. HOFFMAN:**

7    **Q.**    And do you see how -- I just paused it for a second -- the

8    timestamp here says 18:35 and 26 seconds?

9    **A.**    Yes.

10   **Q.**    Is this about the time that you arrived at the BP?

11   **A.**    Yes.

12        (Video played.)

13           **THE WITNESS:**  You can actually see my vehicle here

14   pulling in (indicating).

15   **BY MS. HOFFMAN:**

16   **Q.**    And feel free to explain what you were able to see as this

17   was occurring.

18   **A.**    Well, right now Mr. Walker right there (indicating) tried

19   to put the gun in the coin style.  Then he placed it on the

20   turnstile, and that's when the gas station attendant turned it

21   and placed it under the cabinet.

22        At that point I placed Mr. Walker under arrest.  I passed

23   him on to my partner, and I proceeded to tell the gas station

24   attendant to come around and open the door for me so I can

25   retrieve the gun.

```
 1          MS. HOFFMAN:  Thank you very much.

 2          I have no further questions.

 3          THE COURT:  Thank you.

 4          Let me see if there are any questions.

 5          MS. WHALEN:  No questions.

 6          THE COURT:  Okay.

 7          MR. HAZLEHURST:  None on behalf of Mr. Davis.

 8          THE COURT:  Thank you very much, sir.

 9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  You are excused.

11      (Witness excused.)

12          THE COURT:  Government have another witness?

13          MS. PERRY:  Yes, Your Honor.  The Government calls

14  Robert Pulliam.

15          THE CLERK:  Please raise your right hand.

16         SPECIAL AGENT ROBERT PULLIAM, GOVERNMENT'S WITNESS,

17  SWORN.

18          THE CLERK:  Please be seated.

19          THE WITNESS:  Thank you.

20          THE CLERK:  Please speak directly into the microphone.

21          State and spell your full name for the record, please.

22          THE WITNESS:  Yes, ma'am.  Robert Pulliam,

23  P-U-L-L-I-A-M.

24          THE CLERK:  Thank you.

25
```

```
 1                      DIRECT EXAMINATION
 2   BY MS. PERRY:
 3   Q.   Good afternoon.
 4   A.   Good afternoon.
 5   Q.   Where are you currently employed?
 6   A.   I'm employed with NASA.
 7   Q.   And what is your title with NASA?
 8   A.   I am a Special Agent.
 9   Q.   And how long have you been a Special Agent with NASA?
10   A.   A little over two years.
11   Q.   And what are your duties and responsibilities as a
12   Special Agent with NASA?
13   A.   I'm a criminal investigator, and I also manage the
14   New York network's security requirements.
15   Q.   Before joining NASA, where did you work?
16   A.   Baltimore City Police Department.
17   Q.   And how long were you at the Baltimore City Police
18   Department?
19   A.   Eight years.
20   Q.   And back in July of 2015, where were you working?
21   A.   I was working the Special Enforcement Section, Squad 4,
22   under Sergeant Mike Smith.
23   Q.   Now, I want to direct your attention to July 31st of 2015.
24   Were you working on that particular day?
25   A.   Yes, ma'am.
```

1   **Q.**   And what were you doing on that day?

2   **A.**   I was with a raid team at 19 South Tremont,

3   Baltimore City, Maryland.

4   **Q.**   And were you assisting with the execution of a

5   search warrant at that location?

6   **A.**   Yes, ma'am.

7   **Q.**   Approximately what time did you arrive at 19 South Tremont

8   that day?

9   **A.**   It was early in the morning.

10  **Q.**   And what was your role in the execution of the

11  search warrant on that day?

12  **A.**   I was taking notes, writing down all the evidence as

13  collected.  I was managing the raid packet.

14  **Q.**   Now, did there come a time when you entered the residence

15  on that day?

16  **A.**   Yes.

17  **Q.**   And who, if anyone, did you observe inside the residence?

18  **A.**   I'd have to refer to the notes, but I know one of the

19  individuals was William Jones.

20  **Q.**   And would it refresh your recollection to see your report?

21  **A.**   Yes, please.

22  **Q.**   (Handing.)

23       Can you take a look at that and let us know if it

24  refreshes your recollection.

25  **A.**   Yes.

```
 1    Q.   So who did you encounter inside of the residence that day?
 2    A.   William Jones, Monica Jones, and an Ashley --
 3    Ashley David.
 4    Q.   And who was the target of the investigation on that
 5    particular day?
 6    A.   For that house, it was William Jones.
 7    Q.   I'm going to show you Government's Exhibit IND-55.
 8         Do you recognize this person?
 9    A.   Yes, ma'am.
10    Q.   Who is that?
11    A.   William Jones.
12    Q.   Now, did you ultimately assist in and conduct a search of
13    that particular location?
14    A.   Yes, ma'am.
15    Q.   And what, if anything, was recovered from inside the
16    location?
17    A.   We collected narcotics, mail, pictures.  I'd have to refer
18    to the notes for the other items, but those are the ones that
19    stand out in my memory.
20    Q.   Was there also paperwork recovered?
21    A.   Yes, ma'am.
22    Q.   And what about money?
23    A.   Yes, ma'am.
24    Q.   You mentioned that there were narcotics recovered.  What
25    specifically was recovered?
```

1  **A.**   Can I refer to the notes?

2  **Q.**   If it would refresh your recollection.

3  **A.**   It was 36 green Zips with white rock, suspected cocaine.

4  **Q.**   Now, I want to start by showing you

5  Government's Exhibit D-11.

6       (Handing.)

7           Do you recognize this?

8  **A.**   Yes, ma'am.

9  **Q.**   What is it?

10 **A.**   This is the evidence collected from 19 South Tremont from

11 the execution of the search-and-seizure warrant.

12 **Q.**   And when you say "the evidence collected," what

13 specifically is contained in Government's Exhibit D-11?

14 **A.**   We have the narcotics.  There should be -- overall, there

15 should have been the narcotics, the cash, pictures, letters,

16 and mail.

17 **Q.**   And is what's contained in Government's Exhibit D-11 just

18 the narcotics you described earlier?  If you could take a look.

19 **A.**   Yes, ma'am, this is the narcotics.

20 **Q.**   And were these narcotics submitted -- ultimately submitted

21 to the Baltimore laboratory for testing?

22 **A.**   Yes, ma'am.

23 **Q.**   Now, I believe you mentioned that there were photographs

24 recovered from the location; is that right?

25 **A.**   Correct.

1    **Q.**   So I want to show you Government's Exhibit GP-8.

2         Can you tell us what we're looking at here.

3    **A.**   Yes, ma'am.  It's a picture collected from

4    19 South Tremont during the search warrant.

5    **Q.**   And can you just read for us what's on the back of the

6    jacket at the center of the photograph.

7    **A.**   Yes, ma'am.  [Reading]:  Murdaland Mafia, The City Is

8    Ours.

9    **Q.**   I'm going to show you Government's Exhibit GP-9.

10        Do you recognize this?

11   **A.**   Yes, ma'am.  It's another one of the photos collected from

12   the search warrant.

13   **Q.**   And Government's Exhibit GP-10.

14        Do you recognize Government's Exhibit GP-10?

15   **A.**   Yes, ma'am.  It's, again, one of the photos collected from

16   the search warrant residence.

17   **Q.**   You also mentioned that there was some paperwork recovered

18   from the residence.  I'm going to show you

19   Government's Exhibit GP-7-A.

20        Do you recognize Government's Exhibit GP-7-A?

21   **A.**   Yes, ma'am.

22   **Q.**   What is it?

23   **A.**   It's a letter recovered from the residence during the

24   search warrant.

25   **Q.**   And I'll specifically direct your attention to the first

1    line.  Can you tell us what that says (indicating).

2    **A.**    Yes, ma'am.  [Reading]:  Mafia, My All Family I Am.

3    **Q.**    And then the second line (indicating).

4    **A.**    [Reading]:  MMP, a/k/a LaEMM -- LaEMM, a/k/a . . .

5         Can I read it off the notes?

6    **Q.**    Actually, let me see if I can --

7    **A.**    It's a little blurry on the screen.

8    **Q.**    -- zoom in if that makes it easier.

9    **A.**    Okay.  Thank you.  There we go.

10   **Q.**    Are you able to see that better?

11   **A.**    Yes, ma'am.

12        [Reading]:  MMP, a/k/a LaEMM, a/k/a Sure Thing, a/k/a 667.

13   **Q.**    And can you read the next line for us.

14   **A.**    [Reading]:  Ms. -- M's, my blood is my honor.  My honor is

15   my blood.  If I ever -- if I eva I dishonor, take my blood.

16   **Q.**    And, finally, the next line that's in the zoomed-in

17   portion.

18   **A.**    [Reading]:  Omera [sic] is the code of silence.  If you --

19   if eva you dishonor it, I shall command you and you shall take

20   your own life.

21   **Q.**    Now, turning to the second page of Government's

22   Exhibit GP-7-A, I'm going to first just zoom in here on the

23   very top.

24        Can you tell us what that first word is.

25   **A.**    Here -- I'm sorry.  Here -- [reading]:  Heartbeat.

1          Sorry.  Heartbeat.  I was trying to decipher the writing.

2   **Q.**   And then there's one other line here I'm going to ask you.

3          Can you tell us what the highlighted portion says.

4   **A.**   [Reading]:  It was meant for us to meet and be introduced

5   as LaEMM, LaEMM.

6   **Q.**   And then, finally, looking down here at the bottom right

7   of the second page, can you tell us what it says here.

8   **A.**   [Reading]:  5200, LaEMM, La Costra Nostra.  Lamerta [sic]

9   Costa, Underboss, Bang -- Bangout.

10  **Q.**   Thank you.

11         **MS. PERRY:**  Nothing further, Your Honor.

12         Thank you.

13         **THE COURT:**  All right.  Thank you.

14         Any questions?

15         Ms. Whalen.

16                        CROSS-EXAMINATION

17  **BY MS. WHALEN:**

18  **Q.**   Officer, do you know where Tremont Street is in relation

19  to Collins Avenue?

20  **A.**   South Tremont runs off Frederick Avenue in Baltimore City

21  Southwest District.

22  **Q.**   And Frederick Avenue, is that Route 144?

23  **A.**   I'm not sure of the actual route number, ma'am.

24  **Q.**   Okay.  Fairly close, maybe a few blocks from

25  Collins Avenue, if you know?

1    **A.**   I would have to have a map in front of me.  Not off the

2    top of my head.  Sorry.

3              **MS. WHALEN:**  Okay.  Thank you, sir.

4              That's all I have, Your Honor.

5              **THE COURT:**  Thank you.

6              Anyone else?

7         (No response.)

8              **THE COURT:**  Any redirect?

9              **MS. PERRY:**  No, Your Honor.

10             **THE COURT:**  Thank you very much, sir.

11             You are excused.

12             **THE WITNESS:**  Thank you, Your Honor.

13        (Witness excused.)

14             **THE COURT:**  Another witness?

15             **MS. HOFFMAN:**  The Government calls Dawn Copper.

16             **THE CLERK:**  Please raise your right hand.

17        LIEUTENANT DAWN COPPER, GOVERNMENT'S WITNESS, SWORN.

18             **THE CLERK:**  Please be seated.

19             Please speak directly into the microphone.

20             State and spell your full name for the record, please.

21             **THE WITNESS:**  Lieutenant Dawn Copper, D-A-W-N,

22    C-O-P-P-E-R.

23             **THE CLERK:**  If you could just move a little closer,

24    please.

25             Thank you.

```
 1                        DIRECT EXAMINATION
 2   BY MS. HOFFMAN:
 3   Q.    Good afternoon, Lieutenant Copper.  Where do you work?
 4   A.    Baltimore County Department of Corrections.
 5   Q.    And can you tell us your title.
 6   A.    Lieutenant.
 7   Q.    And you said Baltimore County Department of Corrections.
 8         Do you work at a particular facility?
 9   A.    It's only one.  It's 720 Bosley Avenue.
10   Q.    And where in Baltimore County is that?
11   A.    Towson, Maryland.
12   Q.    What are your duties and responsibilities as a lieutenant
13   for the Baltimore County Department of Corrections?
14   A.    Just manage the facility, make sure staff are doing what
15   they're supposed to do; and any incidences that occur, I tell
16   people what they need to do.
17   Q.    Back in April of 2016, what was your unit and title then?
18   A.    Sergeant Copper.
19   Q.    And I want to direct your attention to April 8th of 2016.
20   What was your responsibility on that day?
21   A.    That day I was the -- it's called Zone 5, which is how we
22   break the building down.  Mainly it was restrictive housing.
23   As the supervisor for that floor, I relieved a third-tour
24   supervisor who had sent an inmate to lockup, which is
25   restrictive housing.  And I had to collect his property and go
```

1    through it and separate what they could have in restrictive

2    housing, what they can't, and then I document it.  But as I

3    search it, I make sure that there's no contraband that's in

4    there.

5    **Q.**    And can you explain what restrictive housing and lockup

6    are.

7    **A.**    Yes.  That is if an inmate does an incident that's against

8    the policies, they'll receive an incident report.  If it's

9    warranted to go to lockup, say, fighting or trying to get staff

10   to bring in contraband, it sends them to restrictive housing.

11   **Q.**    And what property -- I'm sorry.

12        Whose property did you receive on that day?

13   **A.**    Inmate Simms, I think it was.

14   **Q.**    And I'm going to show you Government's Exhibit IND-78.

15        Do you recognize that individual?

16   **A.**    Vaguely.

17   **Q.**    Do you know who it is?

18   **A.**    Is that -- I think that's Simms.

19   **Q.**    Why -- and can you explain, why did you receive Mr. Simms'

20   property?

21   **A.**    He had received an incident report for trying to get staff

22   to bring in contraband.

23   **Q.**    And did you sort and inventory Mr. Simms' property when

24   you received it?

25   **A.**    Yes, I did.

1 **Q.** Can you describe, generally speaking, what it was, what it

2 included.

3 **A.** You separate, like, sheets and towels and blankets,

4 underclothes, and then any court paperwork, pictures,

5 commissary, books that they have.

6 **Q.** And I'm going to -- was there anything in his property

7 that stood out to you?

8 **A.** He had a composition book that I noticed that there was

9 some -- some writings in it that seemed gang-related, so I

10 removed it.

11 **Q.** I'm going to approach and show you

12 Government's Exhibit GP-11.

13     (Handing.)

14     Do you recognize that exhibit?

15 **A.** Yes.

16 **Q.** What is it?

17 **A.** It's a composition book that the inmates get and --

18 **Q.** And is it the composition book that you recovered or that

19 you inventoried on that day?

20 **A.** Yes.

21 **Q.** And I'm going to now pull up -- have you had a chance to

22 review the composition book before coming in here today?

23 **A.** It's been a long time.

24 **Q.** I'm going to pull up Government's Exhibit GP-11-A.

25     And do you recognize this document?

1   **A.**   Yes.

2   **Q.**   Is it one of the pages from the composition book?  You

3   should feel free to open up the composition book.

4   **A.**   Even though it's sealed?

5   **Q.**   You can rip it open.

6   **A.**   Oh.  (Witness complies.)

7        Yes.

8   **Q.**   So the page that's up here on the screen, is this a copy

9   of what you have in front of you?

10  **A.**   Yes, ma'am.

11  **Q.**   And I'd like to direct your attention to a few places in

12  this exhibit.

13       First, if I could, I'm going to highlight -- do you see

14  where it says [reading]:  Number 4, Boss of Finance.

15       Down here (indicating)?

16  **A.**   Uh-huh.

17  **Q.**   Would you mind reading that part for us.

18  **A.**   [Reading]:  As the overseer of the economic system of the

19  mafia, he represents the pockets of the godfather, which is the

20  mafia's banking system.

21  **Q.**   And I'm going to go to the next page.

22       And does this handwriting here appear to be the same or

23  different as the handwriting on the first page?

24  **A.**   It appears to be the same.

25  **Q.**   I'm sorry.  If I could direct your attention to the

1    screen -- you should be able to see it on the screen in front

2    of you.  And going from this page to this page, does it appear

3    to be the same or different handwriting?

4    **A.**    I guess different 'cause it's smaller.  A little bit

5    more -- print's different.

6    **Q.**    And then I'm going to go down to the third page.

7         And do you see where it says "answers" at the top of the

8    screen here (indicating)?

9    **A.**    Yes.

10   **Q.**    Would you mind reading this highlighted section for us.

11   And if you could read it -- are you able to see it on the

12   screen in front of you?

13   **A.**    It's blurry, but I can read it off of here.

14   **Q.**    Okay.  I might be able to zoom in for you.

15        Is that better?

16   **A.**    Oh, yes.

17   **Q.**    Yeah.

18   **A.**    [Reading]:  The science behind being 25 percent Piru,

19   75 percent MOB is a representation of our roots, which is Piru,

20   and our bloodline, which is mafia, EMM, dollar sign, come

21   before all.  M1 P2, I will murder you for Piru.

22   **Q.**    And I'd like to direct your attention to another section

23   here.

24        **MS. HOFFMAN:**  And, Your Honor, for efficiency's sake,

25   would it be all right if I read this part into the record?

1       **THE COURT:**  Yes.  Go ahead, and the witness can follow

2  along and make sure you read it right.

3       **MS. HOFFMAN:**  Thank you.

4  BY MS. HOFFMAN:

5  **Q.**  [Reading]:  MMP was started 3/2/09, but our birth date is

6  celebrated on 9/20 of every year because it is a representation

7  of our forefather Bad Guy's birth.  Bad Guy wanted to separate

8  the real brothers from the fake when Chu, The Don of Treetop,

9  told the feds on his brothers.  Bad Guy was a OOOG of TTP.  He

10  chose a OG by the name of Werewolf as well as a few others who

11  eventually got kicked out of the mob by Werewolf.

12       [Reading]:  In 2010, Bad Guy and Wolf finally reunited in

13  USP Lee County and the structure of the mob was put into

14  effect.  Wolf had recently went to war with the Mexican mafia,

15  solidifying Murdaland Mafia as a problem.  This happened in

16  FCI McKean -- McKean 2009.  Bad Guy and Wolf made history

17  together for the mob by smashing the New York and New Jersey

18  blood sets in USP Lee, sending a message to the Bloods on the

19  East Coast that we, Murdaland Mafia, run Murdaland -- run

20  Murdaland.

21       [Reading]:  In 2011, January, Wolf was released from

22  USP Big Sandy back into society.  What he saw was a mockery of

23  Piru and everything it stood for.  His first move was to

24  implement . . .

25       And did I read that correctly, Lieutenant Copper?

1   **A.**   Yes.

2   **Q.**   I'm going to go to the next page.

3        And I want to direct your attention to the top here

4   (indicating).

5        And I'm going to continue reading, and then I'll ask you

6   if I got it right.

7        [Reading]:  The RU-print.  He got the mob together and

8   gave them the Krimson Pinnacle, the first book of instructions.

9   His next move was confronting other leaders of the Piru nation.

10  At the time it was Moon and Mike Leroy.  Moon represented BTTP,

11  and Mike Leroy represented 400 TTP.  Moon got his flag

12  snatched, and Mike Leroy got beat up.  A few people got hurt,

13  but Wolf didn't want to continue to hurt Piru.  So he flew to

14  Cali in 2012.  By this time, mobsters had taken over Greenmount

15  and Ilchester, 27th and Boone, Lauretta and Warwick, and a part

16  of North and Pulaski.  Killa had Ilchester.  Gambino had 27th.

17  NizBone had Warwick.  Pimp had Pulaski.  LAGO and the 5-Deuce

18  have always belonged to the mob.

19        Did I read that right, Lieutenant Copper?

20  **A.**   Yes.

21  **Q.**   All right.  I'm going to go down to the next page.

22        And I'm going to direct your attention to a paragraph

23  here.  And, again, I'm going to continue reading and then ask

24  you if I got it right.

25        [Reading]:  Also in 2013, Gangsta was named matriarch of

1    the family, and the females all went under her.  They

2    terrorized the city, earning lightning bolts.  But they were

3    dismantled because the matriarch allowed one of the sisters to

4    snitch on the GF and attempt to bury him under the jail for

5    three choppers that were found in her house.

6          Did I get that right?

7    **A.**    Yes.

8    **Q.**    And do you see here where it says [reading]:  Gambino

9    became the boss of the East?

10   **A.**    Yes.

11   **Q.**    And do you see this paragraph here where it says

12   [reading]:  Black Blood is a reflect of the mob.  It represents

13   the last two letters of the mob.  It just gets others to do

14   what the mob needs done.  The world is a mob zone.  Everything

15   is mob -- or everything mob through our eyes.

16         Do you see that?

17   **A.**    Yes.

18   **Q.**    I'll go down to the next page.  Zoom in on this part here.

19         Do you see where it says [reading]:  There are mobsters

20   outside of MD.  In ATL through Baby Wolf (a/k/a Sumlar) and in

21   DC through M-Easy?

22   **A.**    Yes.

23   **Q.**    And then below that do you see there's a little star?  And

24   it says [reading]:  How is he a prospect if you don't want him

25   in the life he's destined to die?

| | |
|---|---|
| 1 | **A.**    Yes. |
| 2 | **Q.**    And then do you see down below where it says [reading]: |
| 3 | All tattoos are earned? |
| 4 | **A.**    Yes. |
| 5 | **Q.**    And, actually, would you mind reading the part below that |
| 6 | where it says [reading]:  All tattoos are earned. |
| 7 | **A.**    Yes. |
| 8 |     [Reading]: |
| 9 |     M is taking the mafia oath. |
| 10 |     Lightning bolt sign is killing for the mob. |
| 11 |     Pink rose is mafia wife. |
| 12 |     Badge of honor is made man. |
| 13 |     Wolf imprint is the direct descendent of Werewolf, who has |
| 14 | killed. |
| 15 |     Mafia shield is a capo of the MOBB. |
| 16 | **Q.**    Thank you. |
| 17 |     And I'm not going to have you read all of this, but I will |
| 18 | scroll through. |
| 19 |     And I want to zoom in on the section here in the middle. |
| 20 |     Do you see where it says "roundtable"? |
| 21 | **A.**    Yes. |
| 22 | **Q.**    And would you mind reading that part for us. |
| 23 | **A.**    [Reading]:  Boss controls and oversees an entire |
| 24 | territory; never . . . |
| 25 |     I can't see the last part. |

1    **Q.**   That's okay.

2    **A.**   I think that says.

3         [Reading]:

4         Underboss enforces laws of the boss without being seer.

5         Capo controls entire territory with his force.

6         Lieutenant enforces laws of the capo.

7         Soldiers put in footwork for roundtable.

8    **Q.**   And, again, I'm not going to have you read everything, but

9    would you mind reading this part for us here.

10   **A.**   [Reading]:

11        Godfather Don, most powerful, omnipotent.

12        Boss of all bosses, force of Giza, voice of Don.

13        Boss of finance, economic system, pockets of Don.

14   **Q.**   And I'm going to scroll down.

15        Now, I want to zoom in on this part here (indicating).

16        Do you see where it says "future release"?

17   **A.**   Yes.

18   **Q.**   Can you read that part.

19   **A.**   [Reading]:  Frenemies 2, still can't trust nobody,

20   the mafia.

21   **Q.**   And then do you see on the -- I think this is the last

22   page -- that there's a reiteration of what you read before

23   under the section that said "roundtable"?

24   **A.**   Yes.

25   **Q.**   Lieutenant Copper, aside from assisting with this search

COPPER-CROSS

```
 1   and inventory, did you have any other involvement in this
 2   investigation?
 3   A.    No.
 4         MS. HOFFMAN:   Thank you very much.
 5         No further questions.
 6         THE WITNESS:   Thank you.
 7         THE COURT:   Thank you.
 8         Does anybody have any questions?
 9         MS. WHALEN:   Just a couple, Your Honor.
10         THE COURT:   Sure.
11                         CROSS-EXAMINATION
12   BY MS. WHALEN:
13   Q.    Lieutenant, you've seen lots of inmates come and go at
14   Baltimore County Detention Center; right?
15   A.    That is correct.
16   Q.    And really, your job was not to deal with Mr. Simms on
17   that day.  It was to deal with his property; is that correct?
18   A.    Correct.
19   Q.    And he had been sanctioned or disciplined, I think, would
20   be a better term, for trying to get some of the guards to
21   actually bring in narcotics for him; right?
22   A.    That is correct.
23   Q.    Okay.  And so you took his property, and you saw these --
24   the composition book.  And you held on to it; right?
25   A.    Yes.
```

1   **Q.**   Now, that composition book, it's just a black-and-white,
2   like a school book; right?
3   **A.**   Yes, ma'am.
4   **Q.**   And are they passed out to each inmate when they come to
5   the facility?
6   **A.**   No.
7   **Q.**   Okay.  They -- are they purchased?
8   **A.**   Purchased on commissary.
9   **Q.**   In the commissary.  Okay.
10          And could I take a look --
11          **MS. WHALEN:**  Could I approach, Your Honor?
12          **THE COURT:**  Of course.
13  **BY MS. WHALEN:**
14  **Q.**   I'll just take a quick look.
15  **A.**   (Handing.)
16  **Q.**   (Reviews exhibit.)
17          Now, were there other items of Mr. Simms at the -- I mean
18  in his cell when you had to move things and gather things?
19  **A.**   I'm pretty sure he had commissary and pictures and things
20  like that.
21  **Q.**   Okay.  But --
22  **A.**   I can't recall.
23  **Q.**   You don't know what it was right now.  Sure.
24          And just like you said, you know, that picture looked
25  vaguely familiar, that's because you see so many different

1    people; right?

2    **A.**    Yes, ma'am.

3    **Q.**    You're assuming because they put a picture up there that

4    it really is Mr. Simms?

5    **A.**    Yes, ma'am.

6    **Q.**    Do you recall -- and I'm not -- I apologize.  I'm not

7    exactly sure which page.  But within that composition book, I'm

8    just going to show you one other page -- no, I'm not.  Let's

9    see.

10           **THE COURT:**  Ms. Moyé is switching it, I believe.

11           **MS. WHALEN:**  Oh, thank you.

12   **BY MS. WHALEN:**

13   **Q.**    At the very top of the page, it said "12 Steps."

14   **A.**    Yes.

15   **Q.**    And then there were [reading]:  Create your mission on why

16   your business exists.

17           Is that correct?

18   **A.**    Yes.

19   **Q.**    That's right on there too.

20           And do you know whose handwriting this is?

21   **A.**    No, ma'am.

22   **Q.**    [Reading]:  Define your vision of what you want your

23   business will become.

24           Is that correct, on number 2?

25   **A.**    Looks correct, yes.

1  **Q.**   And then more [reading]:  Define the market for your

2  business.

3        Number 3; is that right?

4  **A.**   Yes.

5  **Q.**   And it just keeps going down to 12 -- pardon me, 11 steps

6  on that page.  The 11th one [reading]:  Gather all info to

7  define the company.

8  **A.**   Yes.

9  **Q.**   And then finally, number 12 [reading]:  Include marketing

10  materials, contacts, and employee responsibility -- excuse me,

11  résumé and responsibility.

12        Is that correct?

13  **A.**   Can you pull it down.  I can't see it.

14  **Q.**   Oh, you're right.  Okay.

15        [Reading]:  Include marketing materials, contracts, and

16  employee résumés and responsibility; correct?

17  **A.**   Yes.

18  **Q.**   Do you know what these 12 steps are?

19  **A.**   No.

20              **MS. WHALEN:**  Thank you very much, Lieutenant.

21              **THE CLERK:**  Ms. Whalen, are you marking that?

22              **MS. WHALEN:**  It's already within 11 --

23              **THE CLERK:**  Okay.

24              **MS. WHALEN:**  -- Government's exhibit.

25              **THE CLERK:**  Okay.

```
 1          THE COURT:  Anyone else?
 2      (No response.)
 3          THE COURT:  Any redirect?
 4          MS. HOFFMAN:  Oh, I'm sorry.  No redirect.
 5          THE COURT:  Thank you very much, Lieutenant.
 6          You are excused.
 7      (Witness excused.)
 8          THE COURT:  Can I see counsel briefly on the schedule.
 9      (Bench conference on the record:
10          THE COURT:  I'm just assuming this is a good time for
11   the lunch recess.  Will you have somebody else?
12          MS. HOFFMAN:  We do, yes.
13          THE COURT:  Just planning on the recess, lunch recess,
14   and there will be other witnesses.
15          MS. HOFFMAN:  Yes.  We have two, potentially three.
16   We are moving a little faster than we had expected, but we have
17   a definite two and hopefully a third lined up for the
18   afternoon.
19          THE COURT:  Okay.  The more you can fill up, the
20   better.  Just let counsel know who you're thinking about.
21          MS. HOFFMAN:  They know.
22          THE COURT:  And thank you very much.  Okay.
23          MS. WHALEN:   Thank you.)
24      (Bench conference concluded.)
25          THE COURT:  All right.  Ladies and gentlemen, we're
```

```
1   going to take the lunch recess, and there will be some more

2   witnesses after that.

3           So we'll excuse the jury until 2 o'clock.

4           Thank you very much.

5       (Jury left the courtroom at 12:53 p.m.)

6       THE COURT:  All right.  We'll excuse the gallery.

7           And we'll take the lunch recess until 2 o'clock.

8       (Luncheon recess taken.)

9       THE COURT:  Okay.  I apologize.  I was at the bench

10  meeting today, and it ran longer than I was expecting it to.

11  And unfortunately, Judge Russell was not at the bench meeting.

12  I will try to communicate with him later, so I still don't have

13  an answer about Thursday.

14          Are we ready for the jury?

15      MS. HOFFMAN:  Yes.

16      THE COURT:  Okay.

17      (Jury entered the courtroom at 2:21 p.m.)

18      THE COURT:  All right.  Does the Government have

19  another witness?

20      MS. PERRY:  Yes, Your Honor.  At this time the

21  Government calls Detective Dave Pietryak.

22      THE CLERK:  Please raise your right hand.

23      DETECTIVE DAVID PIETRYAK, GOVERNMENT'S WITNESS, SWORN.

24      THE CLERK:  Please be seated.

25          Please speak directly into the microphone.
```

```
 1                  State and spell your full name for the record, please.
 2              THE WITNESS:  My name is David Pietryak,
 3     P-I-E-T-R-Y-A-K.
 4              THE CLERK:  D-A-V-I-D?
 5              THE WITNESS:  Yes, ma'am.
 6                      DIRECT EXAMINATION
 7     BY MS. PERRY:
 8     Q.   Good afternoon.
 9     A.   Good afternoon.
10     Q.   With which law enforcement agency do you work?
11     A.   Baltimore Police Department.
12     Q.   And how long have you been with the Baltimore Police
13     Department?
14     A.   13 years.
15     Q.   And what is your current assignment with the Baltimore
16     Police Department?
17     A.   I am a task force officer with the drug administration.
18     Q.   How long have you been a task force officer with DEA?
19     A.   Five months.
20     Q.   And where were you before that?
21     A.   I was a task force officer for the ATF.
22     Q.   How long were you a task force officer with the ATF?
23     A.   One year.
24     Q.   And in your approximately 13 years in law enforcement, do
25     you have any training in making drug-related arrests?
```

1    **A.**   Yes, ma'am, I do.

2    **Q.**   Can you describe that training.

3    **A.**   The standard 40 hours that we each get in the academy,

4    supplemented by yearly roll call training, which would equal up

5    to be almost a hundred hours.

6    **Q.**   And approximately how many drug-related arrests or

7    investigations have you been involved in over the course of

8    your career?

9    **A.**   Thousands.

10   **Q.**   Now, I want to direct your attention to the summer of

11   2015.  Were you involved in a multi-jurisdictional

12   investigation?

13   **A.**   Yes, ma'am, I was.

14   **Q.**   What was the nature of that investigation?

15   **A.**   It was a narcotics investigation with Baltimore Police

16   Department, Baltimore County, and Homeland Security.

17   **Q.**   And who were the primary targets of that investigation?

18   **A.**   Adrian Spence and a Kenneth Dixon.

19   **Q.**   I want to show you Government's Exhibit IND-81.

20         Do you recognize this person?

21   **A.**   That's Adrian Jamal Spence.

22   **Q.**   And did you learn if Mr. Spence went by any other names?

23   **A.**   Yes, ma'am.  He went by AJ.

24   **Q.**   During the course of your investigation into Mr. Spence,

25   were you involved in a wiretap?

PIETRZAK - DIRECT

1   **A.**   Yes, ma'am.

2   **Q.**   Can you tell the members of the jury just generally the

3   nature of the wiretap investigation and who some of the targets

4   were.

5   **A.**   The wiretap encompassed Spence and Dixon and individuals

6   that would come in and purchase narcotics from them.

7   **Q.**   When, approximately, were those wiretaps conducted?

8   **A.**   June through August of 2015.

9   **Q.**   And were you a monitor on that wiretap investigation?

10  **A.**   I was one of the affiants and monitors, yes, ma'am.

11  **Q.**   What does it mean to be a monitor?

12  **A.**   You listen to the calls.

13  **Q.**   In addition to -- in addition to monitoring calls over the

14  tapped lines, did you use any other investigative techniques to

15  assist with that investigation?

16  **A.**   Yes, ma'am.  Prior to we did undercover and CI buys.  And

17  then during we did surveillances and search warrants.

18  **Q.**   And when you say "CI buys," what do you mean by that?

19  **A.**   Utilizing informants to purchase narcotics.

20  **Q.**   Now, before I turn to the surveillance and the

21  search warrants, I want to discuss some specific wire calls.

22       You mentioned that the -- did you tell us whose phones

23  were being wiretapped over the course of the investigation?

24  **A.**   Spence and Dixon.

25  **Q.**   And did you have any personal contact with Mr. Spence over

1    the course of your investigation?

2    **A.**   At the time of his arrest.

3    **Q.**   And what about an individual named Kameron Wilson; did you

4    become familiar with an individual by the name of

5    Kameron Wilson?

6    **A.**   At the time of his arrest also, yes, ma'am.

7    **Q.**   First, I'm going to show you Government's Exhibit IND-96.

8         Do you recognize this person?

9    **A.**   That's Kameron Wilson.

10   **Q.**   And I believe you said that you had some personal contact

11   with Mr. Wilson.

12   **A.**   When he was arrested, yes, ma'am.

13   **Q.**   And did you come to recognize Mr. Spence and Mr. Wilson's

14   voices?

15   **A.**   Yes, ma'am.

16   **Q.**   Have you had the opportunity to review some of the calls

17   captured in June and July of 2015 before coming to court today?

18   **A.**   I have.

19   **Q.**   And were you able to identify who was speaking on some of

20   those calls?

21   **A.**   Yes, ma'am.

22   **Q.**   So I first want to start by playing what has come into

23   evidence as Government's Exhibit Wire D.  This is called D-20,

24   and the call is on Page 324 of the transcript binder.

25        Now, looking, first, over here at the right side of the

1    screen, can you tell us the date and start time of this

2    particular call.

3    **A.**    That would be June 12th, 2015, at 2:08 p.m.

4    **Q.**    And can you tell me the participants in this particular

5    call.

6    **A.**    Spence and Kameron Wilson.

7    **Q.**    I'm going to play this call.

8          (Audio was played but not reported.)

9    **BY MS. PERRY:**

10   **Q.**    Did you recognize the participants in that call?

11   **A.**    Yes, ma'am.

12   **Q.**    Who did you recognize them to be?

13   **A.**    Adrian Spence and Kameron Wilson.

14   **Q.**    And did you hear when Mr. Spence said, "Just bring a

15   50-piece"?

16   **A.**    I did.

17   **Q.**    Now, you mentioned that over the course of your

18   investigation, you did some undercover buys and CI buys.

19   **A.**    Yes, ma'am.

20   **Q.**    Were -- when you would do undercover buys and CI buys,

21   what were you purchasing during those buys?

22   **A.**    Gram quantities.

23   **Q.**    Did you always purchase in gram quantities?

24   **A.**    Yes, ma'am.

25   **Q.**    And so based on your training and experience and your

1    experience in this particular investigation, do you have --

2    what is a piece?  What does "50-piece" mean?

3    **A.**    It would be equivalent to 1 gram.

4    **Q.**    And during the course of your investigation, what kinds of

5    drugs were you purchasing during those CI buy and

6    controlled buys?

7    **A.**    Heroin.

8    **Q.**    And so is it your understanding -- what is your

9    understanding of what a piece would be, a gram of what?

10   **A.**    Equivalent to 1 gram of heroin.

11   **Q.**    So I now want to play you Government's -- this is

12   Call D-140, also from Wire D.  It's on Page 325 of the

13   transcript binder.

14        And, again, directing your attention to the right side of

15   the screen, can you tell us the date and time of this call.

16   **A.**    It is June 16th at 6:40 p.m.

17   **Q.**    And who were the participants in the call?

18   **A.**    Spence and Wilson.

19        (Audio was played but not reported.)

20   **BY MS. PERRY:**

21   **Q.**    I'm now going to play Call D-146, which is on Page 326 of

22   the transcript binder.

23        And, again, starting over on the right, can you tell us

24   the date and time of this call.

25   **A.**    It's also June 16th, and it's at 7:02 p.m.

1    **Q.**   And when is this call in relation to the one we just

2    listened to?

3    **A.**   Subsequently, afterwards.

4    **Q.**   On the same day?

5    **A.**   Yes, ma'am.

6    **Q.**   So playing this call.

7        (Audio was played but not reported.)

8    **BY MS. PERRY:**

9    **Q.**   And, finally, playing you what's also on Wire D, this is

10   D-153 on Page 327 of the transcript binder.

11       And, again, starting on the right side, can you tell us

12   the date and time of this call.

13   **A.**   That is also June 16th at 7:16 p.m.

14   **Q.**   And who were the participants?

15   **A.**   Spence and Wilson.

16       (Audio was played but not reported.)

17   **BY MS. PERRY:**

18   **Q.**   And did you hear where Spence said, "Just bring me a

19   20-piece, yo"?

20   **A.**   Yes, ma'am.

21   **Q.**   Now, after hearing these calls, did you ask teams to

22   surveil a particular location on that day?

23   **A.**   I did.

24   **Q.**   And, again, that was on June 16th of 2015?

25   **A.**   Correct.

1   **Q.**   What location?

2   **A.**   We identified a location of 532 Coventry.

3   **Q.**   And were teams sent out to actually conduct surveillance

4   in that area?

5   **A.**   Yes, ma'am.

6   **Q.**   And were photos taken during the surveillance?

7   **A.**   They were.

8   **Q.**   So I'm going to show you Government's Exhibit SW-1-A.

9        Can you tell us what we're looking at here.

10  **A.**   That's Adrian Spence.

11  **Q.**   And do you recognize anything about the location?

12  **A.**   He's walking away from 532 Coventry.

13  **Q.**   Showing you SW-2-B.  Sorry.

14       This is SW-2 -- SW-1-B.

15       What are we looking at here?

16  **A.**   That's Spence again approaching his vehicle.

17  **Q.**   And you said "his vehicle."  How do you know that to be

18  his vehicle?

19  **A.**   We had a GPS on it.  We had done surveillance on it

20  multiple times.  We knew his vehicle.

21  **Q.**   Showing you SW-1-C.

22       Who are we looking at here?

23  **A.**   Adrian Spence.

24  **Q.**   SW-1-D.

25       Who are we looking at here?

1   **A.**   That's Kameron Wilson meeting Spence.

2   **Q.**   So is this photograph taken after the one that we just

3   saw?

4   **A.**   Correct.

5   **Q.**   And SW-1-E.

6   **A.**   That's Wilson at Spence's vehicle speaking to him through

7   the window.

8   **Q.**   SW-1-F.

9   **A.**   And then it's Spence leaving the area.

10  **Q.**   And, again, this was the area near Coventry Lane?

11  **A.**   Yes, ma'am.

12  **Q.**   And how did you identify that particular location?

13  **A.**   Based off of the GPS that had been on Spence's vehicle.

14  **Q.**   Now, after this day, did you continue to review calls made

15  over the wiretap lines?

16  **A.**   We did.

17  **Q.**   So now I'm going to play what's on Wire D.  This is D-179

18  on Page 328 of the transcript binder.

19       Can you tell us the date and time of this particular call.

20  **A.**   That is June 17th at 3:02 p.m.

21  **Q.**   And who were the participants in this call?

22  **A.**   Spence and Wilson.

23       (Audio was played but not reported.)

24  **BY MS. PERRY:**

25  **Q.**   And now turning to Call D-367, which is on Page 334.

1          What's the date and time of this particular call?

2    **A.**    That's June 25th at 12:49.

3    **Q.**    And who were the participants?

4    **A.**    Spence and Wilson.

5          (Audio was played but not reported.)

6    **BY MS. PERRY:**

7    **Q.**    Now, Detective, over the course of your investigation, did

8    you also capture calls between Spence and other individuals who

9    were relevant to your investigation?

10   **A.**    Yes, ma'am.

11   **Q.**    So I want to play a call from -- this is from

12   Government's Exhibit Wire B.  This is B-2478.  It's on Page 311

13   of the transcript binder.

14         And what is the date and time of this call?

15   **A.**    That would be July 6th at 8:00 p.m.

16   **Q.**    And who were the participants in the call?

17   **A.**    An Ayre Graham and Spence.

18   **Q.**    I'm going to play this call, but I'm going to start it at

19   about 3 minutes and 47 seconds into the call.

20         **THE COURT:**  I'm sorry.  What page?

21         **MS. PERRY:**  It is on Page 311 of the transcript -- 310

22   of the transcript binder.

23         **THE COURT:**  310.  Okay.

24         (Audio was played but not reported.)

25   **BY MS. PERRY:**

 1   **Q.**   I'm going to stop it there.

 2       Did you hear when Spence said, "Asking about serving up my

 3   sales"?

 4   **A.**   Yes, ma'am.

 5   **Q.**   What's a "sale," based on your training and experience?

 6   **A.**   A transaction for currency and narcotics.

 7   **Q.**   I'm now going to play, again, from Wire B.  This is

 8   Call B-3427.  It's on Page 314 of the transcript binder.

 9       And what is the date and time of this particular call?

10   **A.**   July 17th, and it's going to be at 9:34 p.m.

11   **Q.**   I'm going to play this call.

12       (Audio was played but not reported.)

13   **BY MS. PERRY:**

14   **Q.**   Did you hear where Spence said, "I'm going to be like six

15   hours mixing the whole brick tomorrow"?

16   **A.**   Yes, ma'am.

17   **Q.**   And based on your training and experience and your

18   experience in this investigation, do you know what the term --

19   have you become familiar with the term "brick"?

20   **A.**   Yes, ma'am.

21   **Q.**   What is a brick?

22   **A.**   It would be 1 kilogram.

23   **Q.**   Turning now to what is in evidence as

24   Government's Exhibit Wire G, this is Call G-8, which is on

25   Page 367 of the transcript binder.

1          What is the date and time of this call?

2     **A.**    July 18th at 1:54 p.m.

3     **Q.**    And who were the participants in this call?

4     **A.**    Spence and Wilson.

5          (Audio was played but not reported.)

6     **BY MS. PERRY:**

7     **Q.**    Detective, did the wiretap investigation over Line G also

8     capture text messages?

9     **A.**    It did.

10    **Q.**    So I want to show you Government's Exhibit -- this is

11    G-37.

12         What are we looking at here?

13    **A.**    That's a text message from Spence to Wilson.

14    **Q.**    And what is the text of the message?

15    **A.**    It reads [reading]:  Lock up 200 for the a.m.

16    **Q.**    And what was the date of this particular message?

17    **A.**    That is July 18th at 9:33 p.m.

18    **Q.**    Now, I want to direct your attention to approximately two

19    days later, on July 20th of 2015.

20         Were you working on that particular day?

21    **A.**    Yes, ma'am.

22    **Q.**    And did you assist in the execution of a search warrant on

23    that day?

24    **A.**    I did.

25    **Q.**    What location was that search warrant executed at?

1    **A.**    532 Coventry, the residence of Kameron Wilson.

2    **Q.**    And is that the location that we discussed earlier when we

3    were talking about surveillance?

4    **A.**    Correct.

5    **Q.**    And what did you believe this location to be?

6    **A.**    The stash house used by Adrian Spence.

7    **Q.**    And what is a stash house?

8    **A.**    A secretive location used to hide illegal items from

9    police.

10   **Q.**    What time -- did there come a time that you went to

11   Coventry Lane on the morning of July 20th of 2015?

12   **A.**    Yes, ma'am; at approximately 5:00 a.m.

13   **Q.**    And did you ultimately enter that location?

14   **A.**    I did.

15   **Q.**    When you entered, who was inside the residence?

16   **A.**    Wilson and his mother.

17   **Q.**    And did you have a specific role in the execution of the

18   warrant?

19   **A.**    I was the scribe and also the affiant of the warrant.

20   **Q.**    And so did you assist with looking around the location on

21   that particular day?

22   **A.**    Yes, ma'am.

23   **Q.**    Was anything recovered from the home?

24   **A.**    There was narcotics, narcotics paraphernalia, and

25   packaging.

1    **Q.**   Can you describe the narcotics that were recovered and

2    where they were recovered from.

3    **A.**   Approximately 600 grams of heroin that was recovered from

4    inside of a futon in Wilson's bedroom.

5    **Q.**   Were photos taken of the location and the items recovered?

6    **A.**   There were.

7    **Q.**   So I want to show you Government's Exhibit SW-1-G.

8          What are we looking at here?

9    **A.**   That's the exterior of 532 Coventry.

10   **Q.**   And looking at Government's Exhibit SW-1-G, where were the

11   photographs that we saw earlier?

12   **A.**   They'd be -- if you're facing the building like this

13   photograph is showing, it's down to the right.

14   **Q.**   Turning now to SW-1-H, what are we looking at here?

15   **A.**   That's the door of Apartment 4.

16   **Q.**   And is that the apartment that was searched on that day?

17   **A.**   Correct.

18   **Q.**   So now turning to SW-2-A, what are we looking at here?

19   **A.**   It's a black book bag that contained U.S. currency.

20   **Q.**   And do you recall approximately how much currency was

21   recovered?

22   **A.**   I believe it was around $400.

23   **Q.**   Turning to SW-2-B, what are we looking at here?

24   **A.**   A small amount of heroin that was recovered from inside

25   the book bag.

1 **Q.** SW-2-C.

2 What are we looking at here?

3 **A.** That is packaging material and cutting agent.

4 **Q.** When you say -- you said that this is cutting agent. What

5 specifically are you referring to?

6 **A.** The inositol powder.

7 **Q.** And based on your experience and your investigation in

8 this case, what do you believe that powder to be used for?

9 **A.** It was used to mix with heroin to make a smaller amount of

10 heroin into a larger amount.

11 **Q.** Turning to SW-2-D.

12 Now, what are we looking at here?

13 **A.** That is a hydraulic jack, known as a kilo press.

14 **Q.** And based on your training and experience, can you explain

15 what this device does.

16 **A.** You take heroin and you take a cutting agent and you mix

17 them together. You put them in the press and press them, for

18 lack of better terms, to make it appear to be off of a uncut

19 kilo of heroin.

20 **Q.** Turning to SW-2-E, what are we looking at here?

21 **A.** A small amount of marijuana -- or, excuse me, heroin

22 recovered from the floor.

23 **Q.** SW-2-F.

24 Now, what are we looking at here?

25 **A.** That is packaging material.

1   **Q.**   SW-2-G, what are we looking at here?

2   **A.**   More packaging material.

3   **Q.**   And, finally, SW-2-I.

4        What are we looking at here?

5   **A.**   That is the larger quantity, the approximately 600 grams

6   of mari -- marijuana -- excuse me, heroin.

7   **Q.**   And, again, where was this recovered from?

8   **A.**   Inside of a futon in Wilson's bed.

9   **Q.**   And is that sort of what we're seeing in this particular

10   photograph?

11   **A.**   Yes, ma'am.  It was inside the padding.

12   **Q.**   Now, you mentioned that these items were recovered.  I do

13   want to show you at this point Government's Exhibit D-8.  And

14   I'm going to ask the agent to help me carry it up to you.

15        Do you recognize Government's Exhibit D-8?

16   **A.**   It is the evidence recovered from Coventry, later

17   submitted to the Baltimore evidence control unit.

18   **Q.**   And if you could just pull out the items in

19   Government's Exhibit D-8 and let us know what the items are.

20   **A.**   That's the approximately 600 grams of heroin (indicating).

21        The cutting agent (indicating).

22        Digital scale (indicating).

23        A hydraulic press (indicating).

24        Packaging material (indicating).

25        And smaller amounts of mari -- of heroin.

1   **Q.**   And the drugs that you described or the narcotics you

2   described, were those ultimately submitted to the

3   Baltimore Police laboratory for testing?

4   **A.**   Yes.

5   **Q.**   And based on your training and experience, what can you

6   tell us about the quantity of drugs -- what, if anything, can

7   you tell us about the quantity of drugs that were recovered?

8   **A.**   The 600 grams could have been broken down to at least

9   6,000 units and then sold for a profit of in the area of

10  $60,000.

11  **Q.**   Now, were any calls made or intercepted over the wiretap

12  lines after the execution of this search warrant?

13  **A.**   Yes, ma'am.

14  **Q.**   And did you review some of those calls before coming to

15  court today?

16  **A.**   I did.

17  **Q.**   So I want to play for you Government's Exhibit -- from

18  Wire G, this is Call G-74, and I believe it's on Page 371 of

19  the transcript binder.

20       Starting over here on the right, can you tell us the date

21  of this call.

22  **A.**   That's July 20th, 2015, at 1:12 in the afternoon.

23  **Q.**   And remind us, what day was the search warrant executed?

24  **A.**   It was the 19th.

25  **Q.**   Was it on the -- was this call actually from the same day?

1    **A.**    I believe so, yes.

2    **Q.**    Okay.  And who are the participants in this particular

3    call?

4    **A.**    Spence and an unknown male.

5         (Audio was played but not reported.)

6    **BY MS. PERRY:**

7    **Q.**    Turning now again on Wire G, this is G-134 on Page 376 of

8    the transcript binder.

9         Can you tell us the date and time of this call.

10   **A.**    That's July 21st at 1:51 in the afternoon.

11   **Q.**    And who were the participants in this call?

12   **A.**    Spence and Wilson.

13   **Q.**    I'm going to play this call, but I'm going to start about

14   a minute and 15 seconds into the call.

15        (Audio was played but not reported.)

16   **BY MS. PERRY:**

17   **Q.**    Did you hear where Mr. Wilson said -- where Spence said,

18   "What was left?" and Mr. Wilson responded, "Six"?

19   **A.**    I did.

20   **Q.**    And could you remind us, what was the quantity of heroin

21   recovered from the location?

22   **A.**    Just over 600 grams.

23   **Q.**    Now, I want to jump ahead about ten days to July 31st of

24   2015.

25        Were you working on that particular date?

1   **A.**   I was.

2   **Q.**   And did you assist in the execution of a search warrant on

3   that particular day?

4   **A.**   I did.

5   **Q.**   What was the location of that warrant?

6   **A.**   338 Marydell.

7   **Q.**   And who was the target of that particular warrant?

8   **A.**   Adrian Spence.

9   **Q.**   What time did you arrive at that location on July 31st?

10  **A.**   Again, approximately 5:00 a.m.

11  **Q.**   And what happened when you arrived?

12  **A.**   The Baltimore City SWAT team had made entry, and we

13  entered the dwelling.

14  **Q.**   And when you entered the house, who, if anyone, was

15  inside?

16  **A.**   Spence and his, I believe, grandmother.

17  **Q.**   Was the home searched?

18  **A.**   It was.

19  **Q.**   And what, if anything, was recovered?

20  **A.**   A firearm was recovered, a multitude of cell phones, and a

21  large amount of currency.

22  **Q.**   Approximately how much currency was recovered?

23  **A.**   Over twenty or twenty-five thousand dollars.

24  **Q.**   Now, were photos taken of the house and the items

25  recovered?

1   **A.**   They were.

2   **Q.**   I'm going to start by showing you

3   Government's Exhibit SW-4-A.

4         Do you recognize what we're looking at here?

5   **A.**   That's the front of the location, 338 Marydell.

6   **Q.**   And turning to SW-4-B, what are we looking at here?

7   **A.**   U.S. currency.

8   **Q.**   And was all of the U.S. currency found in a single

9   location?

10  **A.**   It was not.  Some was found on Spence's person, some was

11  found on a table, and some was found in a shoebox.

12  **Q.**   So turning to SW-4-C.

13        Now, what are we looking at here?

14  **A.**   The shoebox full of money.

15  **Q.**   SW-4-D.

16        What are we looking at here?

17  **A.**   A cellular telephone.

18  **Q.**   SW-4-E?

19  **A.**   More cellular phones.

20  **Q.**   SW-4-F?

21  **A.**   More phones.

22  **Q.**   SW-4-G?

23  **A.**   Again, more phones.

24  **Q.**   SW-4-H?

25  **A.**   That's the firearm that was recovered.

PIETRZAK - DIRECT

1   **Q.**   And where was the firearm recovered, if you recall?

2   **A.**   Under Spence's grandmother's bed.

3   **Q.**   SW-4 -- I think that is the last photo.

4        Now, I want to approach and show you what's been marked as

5   Government's Exhibit F-9.

6        (Handing.)

7        Do you recognize this?

8   **A.**   Yes, ma'am.

9   **Q.**   What is it?

10  **A.**   This is the firearm that was recovered from Spence's

11  house.

12  **Q.**   And showing you Government's Exhibit F-9-A.

13       What are we looking at here?

14  **A.**   That's the same firearm with the property tag from the

15  Baltimore Police evidence unit.

16  **Q.**   Now, I want to show you what's been marked as

17  Government's Exhibit CELL-12.

18       (Handing.)

19       Do you recognize CELL-12?

20  **A.**   I do.

21  **Q.**   What is CELL-12?

22  **A.**   It's a cellular phone taken from the residence of Spence.

23  **Q.**   And is that just one of the phones that was recovered?

24  **A.**   One of very many.

25  **Q.**   Now, I want to show you Government -- actually, what did

1  you do with CELL-12?  Was it turned over to other agents?  And

2  was a search warrant ultimately written for CELL-12?

3  **A.**   Yes, ma'am.

4  **Q.**   Now, I want to show you what's come into evidence as

5  Government's Exhibit CELL-12-A, an excerpt from the phone.

6       Now, did you have any -- did you help create this

7  particular exhibit?

8  **A.**   I did not.

9  **Q.**   And is this just an excerpt or is it your understanding

10  that this is just an excerpt of what was contained on CELL-12?

11  **A.**   That's my understanding, yes.

12  **Q.**   And did you have any role in deciding which portions of

13  this to excerpt?

14  **A.**   No, ma'am.

15  **Q.**   So I want to look at CELL-12-A.  And starting at the top,

16  can you tell us the phone number for this particular phone.

17  **A.**   It's (410) 746-1240.

18  **Q.**   And looking here at the very top, can you just read us

19  this first portion that's highlighted (indicating).

20  **A.**   [Reading]:  AJ, it's Bryan.

21  **Q.**   And is this a message that was sent to the phone?

22  **A.**   Yes.

23  **Q.**   And can you remind us, what were the nicknames you knew

24  for Mr. Spence?

25  **A.**   AJ.

1    **Q.**   And turning to the next one, can you just read the very

2    beginning of this message to the phone.

3    **A.**   [Reading]:  Please, AJ, you're the only guy.

4    **Q.**   And then down here, can you read those messages for us.

5    **A.**   It says -- the first one says [reading]:  Spence you got

6    $15?

7         And then the second one says [reading]:  No.  I'm at the

8    shop gettin' my hair done.

9    **Q.**   And is the first message a message sent to the phone and

10   the second message a message that was sent from the phone?

11   **A.**   Correct.

12   **Q.**   I want to go through a few of these, starting here at the

13   bottom.

14        Can you tell us the date of these messages.

15   **A.**   12/20 and 12/21 of 2010.

16   **Q.**   And can you read the messages for us.

17   **A.**   The first one reads [reading]:  Hey, are you good?  And

18   how is the quality?  Be honest 'cause the last shit was

19   garbage.

20        And the second one reads [reading]:  Got the good stuff,

21   and I got a tester.

22   **Q.**   And can you read these three messages down below.

23   **A.**   The first one reads [reading]:  Dun, dun, you got any soft

24   or hard?

25        [Reading]:  Yeah, I got the hard.

1           [Reading]:  Seven for three?

2     **Q.**   And turning to the next page, can you read these messages

3     here at the top.

4     **A.**   The first one says [reading]:  Yeah.

5           And the second one is [reading]:  K.  If you still got

6     that tan, I need a few -- a few of them, too.

7           And then the last one reads [reading]:  The tan on hold,

8     dun.

9     **Q.**   I want to skip down a little bit and highlight this

10    portion here (indicating).

11          Do you see a message from the phone here up at the top?

12    **A.**   I do.

13    **Q.**   And what was the message from the phone?

14    **A.**   It says [reading]:  Yo, I want my money or my dope or I'm

15    gonna kill you today.

16    **Q.**   And was there a response?

17    **A.**   There is.

18    **Q.**   And what does the response say?

19    **A.**   It reads [reading]:  I'm sorry, dude.  I'm sick.  I'll get

20    your money.  That's the last thing I wanted to do to you.

21    Please believe me.

22    **Q.**   And is there a response to that?

23    **A.**   There is.

24    **Q.**   What's that say?

25    **A.**   It reads [reading]:  I don't give a fuck how sick you

1    were.  I want my fucking money.  I'm not going to wait either

2    or people going to die.

3    **Q.**   Is there a response?

4    **A.**   [Reading]:  Dude, I'm sorry.

5    **Q.**   And then does the phone send a response to that?

6    **A.**   It does.  [Reading]:  Yo, bring me my money and stop

7    texting my phone.

8    **Q.**   And is there a response to that?

9    **A.**   Response back is [reading]:  I'll bring it down as soon as

10   I get it.  I'm sorry, buddy.

11   **Q.**   And then is there an outgoing message from the phone?

12   **A.**   There is [reading]:  You're going to be more than sorry.

13   **Q.**   And is there a response to that?

14   **A.**   [Reading]:  Okay.  I'll bring it as soon as I get it.

15   **Q.**   And then is there a message from the phone to a different

16   number?

17   **A.**   There is.

18   **Q.**   And what's that message say?

19   **A.**   [Reading]:  Yo, I'll give you some money or some girl.  I

20   just need his address and his parents' address.  I'm going to

21   make an example out of this motherfucker.

22   **Q.**   Now, Detective, based on your training and experience in

23   this investigation and other investigations, do you know what

24   the term "girl" means?

25   **A.**   "Girl" would be cocaine.

1    **Q.**   So turning now to the next page, do you see some text

2    messages here in the center of the page?

3    **A.**   I do.

4    **Q.**   Can you read those for us.

5    **A.**   [Reading]:  Do you have half a G?

6          The second one reads [reading]:  Did you good.

7          Third one would be [reading]:  I need a ball.

8          The fourth one is [reading]:  Okay.

9          The fifth one would be [reading]:  You got half a G.

10         And the final one is [reading]:  Yup.

11   **Q.**   And then down here at the bottom, is there a message to

12   the phone?

13   **A.**   [Reading]:  If I get three, could you do any deals?

14   **Q.**   Is there another message to the phone?

15   **A.**   There is.  [Reading]:  Like, could you do three for 340?

16   That's all I have.  Otherwise, I'm not sure what we're gettin'.

17         And then [reading]:  Yeah, man.

18   **Q.**   And is "yeah, man" a response?

19   **A.**   Yes.

20   **Q.**   Just a few more.

21         Turning over to Page 4.

22         Do you see three messages in a row to the phone?

23   **A.**   I do.

24   **Q.**   Can you read those messages for us.

25   **A.**   [Reading]:  Yo, man, I don't want to be a bitch or

1  anything, but those bags you gave me were mad short, like only

2  4s and that's pushin' it.  Like, my dude really liked that

3  shit, but he really puts on me 'cause he didn't weigh -- like,

4  I don't what you can do but was at least short altogether.  I

5  don't know.  But this dude is really mad at you.  I'm kinda

6  scared -- excuse me, mad at me.  I'm kinda scared [sic].

7  **Q.**   And is there a response from the phone?

8  **A.**   The response is [reading]:  I made them all .4 so I could

9  make my money.  And nobody wasn't trying to pay 130 a gram, so

10 I bagged up all .4 so I could make out.

11 **Q.**   Turning to Page 5, is there a message to the phone up here

12 at the top.

13 **A.**   [Reading]:  Hey, man, I'm sorry I couldn't make it down

14 there yesterday.  Anne overdosed and died yesterday.  Give me a

15 call.

16 **Q.**   And then here in the middle of the page, are there two

17 messages from the phone?

18 **A.**   There is.  [Reading]:  Yo, just come tomorrow.  It's cops

19 everywhere up here.  Bitch, if I don't get my money, I'm gonna

20 kill you.

21 **Q.**   Turning to the next page, can you read this exchange up

22 here at the top for us (indicating).

23 **A.**   [Reading]:  The bags were fire, but the chunk wasn't very

24 good.  Just want you to know.  I'm an honest man.

25 **Q.**   Is there a response from the phone?

1    **A.**    There is.  [Reading]:  All right.  That's cool.  The chunk

2    shit is gone anyway.

3    **Q.**    And is there a response?

4    **A.**    And the response back is [reading]:  Are you gonna have

5    the light-tan stuff in the bags tomorrow?  If so, I'll need at

6    least another G and a half or two if everything goes well.

7        And the response back is [reading]:  Yeah, man.

8    **Q.**    Now, I want to turn down here to the very bottom.  Is

9    there a message to the phone down here?

10   **A.**    There is.  There's an incoming message that reads

11   [reading]:  Hey, I got that 380 and 50 shells.  I want three

12   and a half grams, if that's cool.

13   **Q.**    Is there a response?

14   **A.**    The response is [reading]:  Yeah.

15   **Q.**    And then turning to the next page, is there an outgoing

16   message from the phone?

17   **A.**    [Reading]:  Yo, you got the shells or the actual thing?

18   **Q.**    And is there a response?

19   **A.**    [Reading]:  I got both the thing and the ammo.  It's black

20   with wood handgrips, seven-shot clip, semi-auto, and enough

21   ammo to fill the clip seven times.

22   **Q.**    And is there a response from the phone?

23   **A.**    It reads [reading]:  Okay.

24   **Q.**    Now, I want to ask you about one final wire call.  Before

25   coming to court, did you review a call from July 1st of 2015?

1    **A.**    Yes, ma'am.

2    **Q.**    So I want to play you what is on Wire B.  This is B-1867,

3    and I believe it's on Page 292 of the transcript binder.

4          And what is the date and time of this call?

5    **A.**    That's July 1st, 2015, at 5:48 p.m.

6    **Q.**    And do you know at least one of the participants in this

7    call?

8    **A.**    Adrian Spence.

9          (Audio was played but not reported.)

10   **BY MS. PERRY:**

11   **Q.**    And did you hear when Mr. Spence said, "All right.  I got

12   a gun on"?

13   **A.**    I did.

14         **MS. PERRY:**  I have no further questions for the

15   witness.

16         **THE COURT:**  All right.  Thank you.

17         I'll see if there are any questions.

18         **MS. WHALEN:**  No questions.

19         **MR. HAZLEHURST:**  Nothing on behalf of Mr. Davis,

20   Your Honor.

21         **THE COURT:**  All right.  Thank you, sir.

22         **THE WITNESS:**  Thank you, Your Honor.

23         **THE COURT:**  You are excused.

24         **THE WITNESS:**  Thank you very much.

25         (Witness excused.)

1    **THE COURT:**  Government, have another witness?

2    **MS. PERRY:**  Yes, Your Honor.  At this time the

3  Government calls Special Agent Lindsay Erbe.

4    **THE CLERK:**  Please raise your right hand.

5    SPECIAL AGENT LINDSAY ERBE, GOVERNMENT'S WITNESS, SWORN.

6    **THE CLERK:**  Please be seated.

7    Please speak directly into the microphone.

8    State and spell your full name for the record, please.

9    **THE WITNESS:**  Lindsay Erbe, L-I-N-D-S-A-Y, E-R-B-E.

10    **THE CLERK:**  Thank you.

11    DIRECT EXAMINATION

12  **BY MS. PERRY:**

13  **Q.**  Good afternoon.

14  **A.**  Good afternoon.

15  **Q.**  With which law enforcement agency do you work?

16  **A.**  I work for the Bureau of Alcohol, Tobacco & Firearms.

17  **Q.**  What is your title there?

18  **A.**  I'm a Special Agent.

19  **Q.**  How long have you been a Special Agent with the ATF?

20  **A.**  Since July of 2014.

21  **Q.**  And what did you do before joining the ATF?

22  **A.**  For approximately 11 years, I was a police officer with

23  the United States Capitol Police in Washington, D.C.

24  **Q.**  Now, I want to direct your attention to September 27th of

25  2016.

138

BRBB - DIRECT

1      Did you assist with the execution of a search warrant on

2  that particular day?

3  **A.**   Yes, I did.

4  **Q.**   What was the location?

5  **A.**   1868 Oxford Square Road, Bel Air, Maryland.

6  **Q.**   And about what time was the warrant executed on that day?

7  **A.**   Around 6:00 a.m.

8  **Q.**   What was your role on that -- during the execution of the

9  warrant?

10 **A.**   I was part of the entry team, and then I was the

11 photographer for the search portion.

12 **Q.**   And what does it mean to be the photographer for the

13 search portion?

14 **A.**   We take pre photos of the location, photographs of any

15 evidence found in the location, and then photographs post,

16 after the search has been completed.

17 **Q.**   You said that you were on the entry team.  And when you

18 first entered the location, who, if anyone, did you find

19 inside?

20 **A.**   There were multiple people there, Jamal Lockley and family

21 and relatives of his.

22 **Q.**   Now, I'm going to show you Government's Exhibit IND-60.

23     Do you recognize this person?

24 **A.**   Yes, ma'am.  That's Jamal Lockley.

25 **Q.**   And upon entry, was Mr. Lockley placed under arrest?

1    **A.**   Yes, ma'am.

2    **Q.**   And was the residence searched?

3    **A.**   Yes, ma'am.

4    **Q.**   What, if anything, was recovered?

5    **A.**   U.S. currency, documents in Mr. Lockley's name, multiple

6    cell phones.

7    **Q.**   You said there was U.S. currency recovered.  Do you recall

8    how much U.S. currency?

9    **A.**   $1,532.

10   **Q.**   And I believe you said that you were the photographer, so

11   were photos taken of the items that were recovered and of the

12   location?

13   **A.**   Yes, ma'am.

14   **Q.**   So I want to start by showing you

15   Government's Exhibit SW-8-A.  Just a moment.

16        I'm going to show you Government's Exhibit SW-9-A.

17        Do you recognize -- I know this is kind of sideways.

18        Do you recognize this location?

19   **A.**   Yes, ma'am.  That's the location that we went to,

20   1868 Oxford Square.

21   **Q.**   Turning to SW-9-B.

22        What are we looking at here?

23   **A.**   That's a pair of pants.  They were found in the dining

24   room with U.S. currency in one pocket and a ID card in the

25   other pocket.

1   **Q.**   And turning to SW-9-C.

2        What are we looking at here?

3   **A.**   That's a picture of the ID card that's in the other pocket

4   of the pants.

5   **Q.**   And whose identification was it?

6   **A.**   It was Mr. Lockley's.

7   **Q.**   Turning to SW-9-D.

8        What are we looking at here?

9   **A.**   That is the ID card and the money taken out of the pants

10  pockets.

11  **Q.**   Turning to SW-9-E.

12       What are we looking at here?

13  **A.**   That's a cellular phone that was found in the master

14  bedroom in the dresser.

15  **Q.**   Now, in addition to this cellular phone that we're looking

16  at in SW-9-E, were there other phones recovered at the

17  location?

18  **A.**   Yes, ma'am.

19  **Q.**   At this point I want to show you

20  Government's Exhibit CELL-11.

21       (Handing.)

22       Do you recognize Government's Exhibit CELL-11?

23  **A.**   Yes, ma'am.  This is the cell phone that was found in the

24  bedroom, master bedroom dresser.

25  **Q.**   And was this cell phone provided to other ATF agents so

1  that a search warrant and a search of the phone could be

2  conducted?

3  **A.**   Yes, ma'am.

4  **Q.**   I'm going to show you Government's Exhibit CELL-11-A which

5  has come into evidence as an excerpt from this particular

6  phone.

7       Have you seen CELL-11 -- hold on a moment.

8       Have you had an opportunity to look at CELL-11-A before

9  coming to court today?

10 **A.**   Yes, ma'am.

11 **Q.**   And is it your understanding that's an excerpt of the

12 records contained on the phone in front of you?

13 **A.**   Yes, ma'am.

14 **Q.**   And did you have anything to do with putting together this

15 particular excerpt?

16 **A.**   No, I did not.

17 **Q.**   And did you have any role in choosing which excerpts would

18 be in here?

19 **A.**   No, I did not.

20 **Q.**   So I want to start at the top.

21      Can you tell us the phone number for this particular phone

22 (indicating).

23 **A.**   (443) 709-7780.

24 **Q.**   And do you see this very first contact listed

25 (indicating)?

1    **A.**   Yes, ma'am.

2    **Q.**   What is the name?

3    **A.**   Cream.

4    **Q.**   And what is the phone number?

5    **A.**   (240) 713-0332.

6    **Q.**   And do you see this contact here (indicating)?

7    **A.**   Yes, ma'am.

8    **Q.**   Can you tell us the name.

9    **A.**   Jb.

10   **Q.**   And the phone number?

11   **A.**   (443) 640-8950.

12   **Q.**   Now, looking here at the first message -- actually, let me

13   move down to the second message here.

14        Do you see a message sent to the phone?

15   **A.**   The -- yes.  The first one?

16   **Q.**   The first one, yes.

17   **A.**   Yes, ma'am.

18   **Q.**   And what was the message sent to the phone?  What did that

19   read?

20   **A.**   [Reading]:  Who this.

21   **Q.**   And was there a response from the phone?

22   **A.**   Yes, ma'am.

23   **Q.**   What was the response?

24   **A.**   [Reading]:  T-Roy, I got that bomb back.

25   **Q.**   And looking down here, is there a message to the phone

 1   that says [reading]:  Is this T-Roy?

 2   **A.**   Yes, ma'am.

 3   **Q.**   And what is the response?

 4   **A.**   [Reading]:  Who's this?

 5   **Q.**   And then is there a message that says [reading]:  This is

 6   T-Roy; right?

 7   **A.**   Yes.

 8   **Q.**   And is there a response?

 9   **A.**   It says [reading]:  You sound different.

10   **Q.**   I'm going to turn to the next page, Page 2.

11        Is there a message from the phone that says [reading]:  My

12   number T-Roy?

13   **A.**   Yes, ma'am.

14   **Q.**   And then do we see a message here sent to the phone that

15   says [reading]:  Droid.

16        And a response that says [reading]:  Yo yo?

17   **A.**   Yes, ma'am.

18   **Q.**   And, finally, looking down here, what's this first message

19   to the phone?

20   **A.**   [Reading]:  Who this?

21   **Q.**   And is there a response?

22   **A.**   [Reading]:  T-Roy.

23   **Q.**   And is there a response to that?

24   **A.**   [Reading]:  T-Roy?

25        With a question mark.

1    **Q.**    And then are there two responses from the phone?

2    **A.**    Yes, ma'am.

3    **Q.**    And what do they say?

4    **A.**    [Reading]:  Forest Park BP.

5    **Q.**    I'm going to flip down a couple of pages to Page 4, and

6    look here at the -- this section I've highlighted.

7         Can you tell us the date of these particular messages.

8    **A.**    March 16th, 2016.

9    **Q.**    And what do the messages say?

10   **A.**    The first one says [reading]:  Yo, I came through like

11   around 5:30 today.

12        And the second one says [reading]:  It was post to be a

13   whole pizza.  But when I put it on the clock, it was only 52.

14   **Q.**    I'll turn down a couple more pages.  And looking at these

15   messages I have highlighted, first, can you tell us the date

16   that these messages are from.

17   **A.**    March 22nd, 2016.

18   **Q.**    And can you read them -- first message to the phone.

19   **A.**    [Reading]:  Dude, will I be seeing the new boys?

20   **Q.**    And the response says, "No."

21        And then is there a response to the phone?

22   **A.**    Yes.  There are two responses.

23        The first is [reading]:  Good.

24        The second is [reading]:  They are some wild ones.  They

25   saw me a block away and were hooting and hollering, showing off

1    to the girls hanging around.  Not cool.  You know what I mean?

2    **Q.**   And is there a response from the phone?

3    **A.**   Yes.  [Reading]:  Where at?

4    **Q.**   And then there's a response to the phone?

5    **A.**   Yes.  [Reading]:  Same place I am right now.  First park L

6    on right, C street.

7    **Q.**   I'm going to turn ahead a few pages.

8         And look down here at the bottom.

9         Can you tell us the date of these particular messages.

10   **A.**   April 7th, 2016.

11   **Q.**   And is there a message to the phone?

12   **A.**   Yes, ma'am.  It says [reading]:  I need 6 and 50, and I

13   have 200 extra for you.

14   **Q.**   And is there a response from the phone?

15   **A.**   Yes.  And it's [reading]:  K.

16   **Q.**   Turning to Page 10.

17        What date are we looking at here?

18   **A.**   April 8th, 2016.

19   **Q.**   And is there a message to the phone?

20   **A.**   Yes.  It says [reading]:  Yo, I need 2 whole ones and a 50

21   of girl.

22   **Q.**   And is there a response?

23   **A.**   Yes.  [Reading]:  K.

24   **Q.**   Looking just below that, what date are we looking at here?

25   **A.**   April 9th, 2016.

1    **Q.**   And is there a message to the phone?

2    **A.**   [Reading]:  You got that fire back yet?

3    **Q.**   Is there a response?

4    **A.**   [Reading]:  Yeah.

5    **Q.**   The response to that?

6    **A.**   [Reading]:  You sure.  That brown stuff I got last time

7    was no good at all.  I'm on my way.  Be there in an hour.

8    **Q.**   I'm sorry.  Was there a response?

9    **A.**   Yes.  It was [reading]:  K.

10   **Q.**   Turning to the next page, and I want to focus down here.

11        What is the date of these messages?

12   **A.**   April 13th, 2016.

13   **Q.**   And the first message, is that a message to the phone?

14   And is it a picture message?

15   **A.**   Yes, ma'am.

16   **Q.**   Is there a response?

17   **A.**   Yes.  And it's [reading]:  What's that?

18   **Q.**   And is there a response to the phone?

19   **A.**   Yes.  [Reading]:  Air rifle with a silencer and shit.

20   It's bad, man.  I'm sick and will let it go real cheap, like

21   1g.

22   **Q.**   And is there another message to the phone?

23   **A.**   [Reading]:  Would you take it, man?

24        Question mark.

25   **Q.**   And is there a response?

1    **A.**    Yeah.   [Reading]:   What's a air?

2    **Q.**    And continuing with that same -- turning down one page, is

3    there a continuation of the messages with the same number?

4    **A.**    Yes, ma'am.

5    **Q.**    And is there a message to the phone?

6    **A.**    [Reading]:   So what's up?

7    **Q.**    And is there a response?

8    **A.**    [Reading]:   It's a BB gun.

9    **Q.**    And are there three incoming messages?

10   **A.**    Yes.

11   **Q.**    What are those?

12   **A.**    [Reading]:

13        Yes, but it -- it shot 45-cal slugs.

14        It's way far from just a BB gun.

15        It's a 45-cal.

16   **Q.**    And looking at this next group of messages, are those

17   three messages to the phone?

18   **A.**    Yes.

19   **Q.**    And can you tell us what those messages say.

20   **A.**    [Reading]:   Almost there, my nigg.   Need 2 whole ones.

21   Yo, my nigg, just got that a couple min ago.   Supposed to be 2

22   whole ones, but I think it's only one and a half.   You got me

23   on a half next time I come up with my nigg.   It will be

24   tomorrow or the next, my nigg.

25   **Q.**    And then is there ultimately a response to that same

1    number on the next page?

2    **A.**    Yes.

3    **Q.**    And what's that response?

4    **A.**    [Reading]:  Got you, yo.

5    **Q.**    Turning now to the middle of this particular page, can you

6    tell us the date of these messages.

7    **A.**    April 14th, 2016.

8    **Q.**    And is the first one a message to the phone?

9    **A.**    Yes.

10    **Q.**    And what's it say?

11    **A.**    [Reading]:  This dark stuff is not good.  Don't even feel

12    it at all.  Let me know when it's right again.

13    **Q.**    Is there a response?

14    **A.**    [Reading]:  Who you get it from?

15    **Q.**    And is there a response to that?

16    **A.**    [Reading]:  Same dude it usually is.

17    **Q.**    Turning to Page 14 and looking up at the top, what is the

18    date of these messages?

19    **A.**    April 18th, 2016.

20    **Q.**    And is the first one an incoming message?

21    **A.**    Yes.

22    **Q.**    And what's it say?

23    **A.**    [Reading]:  Yo that light shit is terrible.  My shooter

24    not fucking with it.  I hope you don't have no more of that

25    shit, g.

1   **Q.**   And is there a response from the phone?

2   **A.**   Yes.  The response is [reading]:  Naw, somebody else said

3   that I got Diff.

4   **Q.**   Continuing on to the next page and looking down here at

5   the bottom, what date are we looking at now?

6   **A.**   May 4th, 2016.

7   **Q.**   And is the first message a message to the phone?

8   **A.**   Yes.

9   **Q.**   And what's it say?

10  **A.**   [Reading]:  Should it be the same as it was the other day?

11  Shit was fire.

12  **Q.**   The response?

13  **A.**   [Reading]:  Bring it back tomorrow.

14  **Q.**   Is there a response to that?

15  **A.**   [Reading]:  He was so fucked up the car was drifting down

16  the street.

17  **Q.**   And looking up here in the middle of the page, can you

18  just tell us what that message is.

19  **A.**   It's an e-mail address.

20  **Q.**   And what's that address?

21  **A.**   I'll just spell it.  Is that --

22  **Q.**   Sure.

23  **A.**   Wolfmobb@iCloud.com.

24  **Q.**   I'm going to turn to the next page and look up at the top.

25  Can you tell us what date we're looking at here.

1   **A.**   May 9th, 2016.

2   **Q.**   And is the first message a message to the phone?

3   **A.**   Yes.

4   **Q.**   And what's that message?

5   **A.**   [Reading]:  Yo, y'all got anything else yet besides that

6   yellow, gooey shit I got this morning?  'Cause that shit was

7   junk.

8   **Q.**   And what was the response?

9   **A.**   [Reading]:  Yeah.  How -- how you do it?

10  **Q.**   Is there a response to that?

11  **A.**   [Reading]:  I shot it.  So y'all have -- so y'all do have

12  something different now, then?  What's it look like?  'Cause I

13  really don't want that yellow shit again.

14  **Q.**   And is there a response from the phone?

15  **A.**   [Reading]:  Give me one min.

16  **Q.**   I'm going to jump ahead a couple of pages and direct your

17  attention to the top portion of the page.  What date are we

18  looking at here?

19  **A.**   May 19th, 2016.

20  **Q.**   Is there a message to the phone?

21  **A.**   Yes.

22  **Q.**   And what's that message?

23  **A.**   [Reading]:  Yo, need 3 whole ones, my nigg, and I'm like

24  7 minutes away.

25  **Q.**   Is there a response?

1   **A.**   [Reading]:  All right.

2   **Q.**   Turning to the next page and focusing your attention here

3   at the bottom, can you tell us what date we're looking at here.

4   **A.**   May 23rd, 2016.

5   **Q.**   And is the first message a message from the phone?

6   **A.**   Yes.

7   **Q.**   And what's that message?

8   **A.**   [Reading]:  You got the girl?

9   **Q.**   And is there a response?

10   **A.**   [Reading]:  Yeah.

11   **Q.**   Is there a response to that?

12   **A.**   [Reading]:  Need a point 5.

13   **Q.**   I'm going to skip ahead to the next page and direct your

14   attention up here to the top.

15        Can you tell us what date these messages are on.

16   **A.**   May 26th, 2016.

17   **Q.**   And is the first message that I've highlighted, that's

18   highlighted a message to the phone?

19   **A.**   Yes.

20   **Q.**   And what's it say?

21   **A.**   [Reading]:  Can you do 1 and a half pizza for 135?

22   **Q.**   And is there a response?

23   **A.**   [Reading]:  140.

24   **Q.**   Now, I want you to look down here at this next highlighted

25   portion.

1       Are these messages from -- outgoing from the phone?

2 **A.**   Yes.

3 **Q.**   And are they to different numbers?

4 **A.**   Yes.

5 **Q.**   And can you tell us what the messages say.

6 **A.**   Got -- the first three say [Reading]:  Got something new.

7       And the fourth one says [Reading]:  Got something real

8 good.

9       Oh, I'm sorry.

10       The first two say [reading]:  Got something new.

11       The third one says [reading]:  Got something good.

12       The fourth one says [reading]:  Got something real good.

13 **Q.**   Skipping ahead a little bit, and I want to focus your

14 attention here toward the bottom of the page.

15       Are we again seeing a string of outgoing messages from the

16 phone?

17 **A.**   Yes.

18 **Q.**   And what is the date of all of these messages?

19 **A.**   June 2nd, 2016.

20 **Q.**   And do the messages appear to be close in time?

21 **A.**   Yes.

22 **Q.**   And what are the messages?

23 **A.**   [Reading]:

24       Yo, fire.

25       Yo, fire.

 1          Yo, fire.

 2          Fire back.

 3          Yo, fire back, holla at me.

 4          Fire.

 5          Yo, fire.

 6          Fire back.

 7          Fire.

 8          Fire back.

 9  **Q.**   And do those messages appear to be to different phone

10  numbers?

11  **A.**   Yes.

12  **Q.**   So skipping ahead again to Page 26.

13          And looking here at the top of the page, first of all,

14  what date are these messages on?

15  **A.**   June 3rd, 2016.

16  **Q.**   And can you walk us through these highlighted messages.

17  **A.**   Sure.  The first says [reading]:  You still got that --

18  you still got fire shit that you texted me yesterday saying you

19  had?

20          The response is [reading]:  Yes.

21          [Reading]:  Ite, how do you know it's some fire?  What's

22  it look like?

23          [Reading]:  Yo, it's fire.

24          [Reading]:  People did it and told you it's fire?  Just

25  really trying -- just really not trying to drive all the way

1    down there and waste bread on shit if it's not good, know what

2    I mean, 'cause that's what's been happening, like, every time I

3    come down nowadays.

4         [Reading]:  Money back if you don't like.

5         [Reading]:  Can I try it first?  Please, 'cause I don't

6    want to buy it, then not like it, not be able to get all my

7    bread back and all that shit and have to deal with all that.

8    If I can try it first to make sure I like it, then I want to

9    get 3 wholes, but I want to try it first to make sure I like it

10   and shit before I spend all that bread, know what I mean?

11        [Reading]:  Yeah.

12   **Q.**   Turning to the next page.

13        Can you tell us the date of these two messages.

14   **A.**   June 5th, 2016.

15   **Q.**   And is the first message a message to the phone?

16   **A.**   Yes.

17   **Q.**   And what does that message say?

18   **A.**   [Reading]:  Hey, I just got home and weighed that.  It was

19   only 1.4.  I just thought I'd say something because I never

20   have had a problem before.  They all are usually dead on.

21   **Q.**   And is there a response from the phone?

22   **A.**   [Reading]:  Thanks for telling me.

23   **Q.**   And the message below that, what is the date of that

24   message?

25   **A.**   June 6th, 2016.

1    **Q.**   And can you read -- is that a message from -- to the

2    phone?

3    **A.**   Yes.

4    **Q.**   Can you read that message.

5    **A.**   [Reading]:  Oh, okay.  I just rode pass you.  Jakey,

6    Melvin, and all you can't respond.  It's cool, yo.  You could

7    have just said stop hittin' ya phone.  I can take that betta

8    than feel like I'm chasing.  Say something shit.

9    **Q.**   I'm going to jump ahead a couple more pages and direct

10   your attention to the bottom section here.  Can you tell us the

11   date of these messages.

12   **A.**   June 12th, 2016.

13   **Q.**   And is the first message a message to the phone?

14   **A.**   Yes.

15   **Q.**   And what's it say?

16   **A.**   [Reading]:  You still got that yellowish-tannish rock shit

17   that kinda looked like rock candy?  LOL.

18   **Q.**   Is there a response?

19   **A.**   [Reading]:  Yeah.  You don't like?

20   **Q.**   And is there a response to that?

21   **A.**   [Reading]:  Na.  I do like it.  That's what I'm trying to

22   get.  LOL.  Can I get that, please.

23   **Q.**   And on the next page, what are the date of the messages

24   here at the bottom?

25   **A.**   June 17th, 2016.

1   **Q.**   And can you walk us through these messages.

2   **A.**   [Reading]:

3        Yo, same brown stuff.

4        Good stuff.  You didn't like the brown.

5        Nah, not really.

6        What color now?

7        Gray.

8        It's good.

9   **Q.**   Skipping ahead a few pages here, can you tell us what date

10  we're looking at here in the middle of the page.

11  **A.**   June 21st, 2016.

12  **Q.**   And is there a message to the phone?

13  **A.**   Yes.

14  **Q.**   And what's that say?

15  **A.**   [Reading]:  Yo, you still have that gold?

16  **Q.**   And do you see that the response is, "Yeah"?

17       Is there a response to that?

18  **A.**   [Reading]:  I need 3 half -- 3 half of a -- 3 half of

19  gold.  Can you do that.

20  **Q.**   And what's the response?

21  **A.**   [Reading]:  Yeah.

22  **Q.**   I'm going to jump ahead a couple of pages here.

23       And looking here in the middle of the page, is the first

24  message a message from the phone?

25  **A.**   Yes.

1   **Q.**   And what's it say?

2   **A.**   [Reading]:  Order up a 40-piece.

3   **Q.**   And is there a response?

4   **A.**   [Reading]:  Ready.

5   **Q.**   And is there a response from the phone to that?

6   **A.**   [Reading]:  Yeah.

7   **Q.**   And turning to the next page, can you tell us the date of

8   this particular exchange.

9   **A.**   July 11th, 2016.

10  **Q.**   And is the first message a message to the phone?

11  **A.**   Yes.

12  **Q.**   And what's it say?

13  **A.**   [Reading]:  He left some 45s and 9-millimeter with coat

14  clip here.  Come in -- come and get it, please.

15  **Q.**   Is there a response?

16  **A.**   [Reading]:  All right.

17  **Q.**   Is there another incoming messages?

18  **A.**   Yes.  [Reading]:  Did you understand?

19  **Q.**   And is there a response?

20  **A.**   [Reading]:  Shells.

21  **Q.**   And is there a response to that?

22  **A.**   [Reading]:  Yes.  When are you coming by?

23  **Q.**   Now, I want to jump ahead a few more pages.

24       And do you see this exchange down here or these exchanges

25  down here at the bottom of the page?

1    **A.**   Yes.

2    **Q.**   What are the dates for these exchanges?

3    **A.**   The first is July 28th, 2016, and the responses are on

4    July 29th, 2016.

5    **Q.**   Can you just tell us what phone number is communicating

6    with the phone.

7    **A.**   (667) 228-4194.

8    **Q.**   And I'm going to turn to the next page.

9         Can you tell us the date that we're looking at here.

10   **A.**   August 7th, 2016.

11   **Q.**   And are these two messages to the phone?

12   **A.**   Yes.

13   **Q.**   And what do they say?

14   **A.**   [Reading]:  180 ggs and 2600.

15        Then the second says [Reading]:  3600 fool.

16   **Q.**   And flipping over to the next page, is this an exchange

17   with the same number?

18   **A.**   Yes.

19   **Q.**   And what's the -- is the first message outgoing?

20   **A.**   Yes.

21   **Q.**   What's it say?

22   **A.**   [Reading]:  Yo yo.

23   **Q.**   And what's the response?

24   **A.**   [Reading]:  131 ggs and 1500 papers.

25   **Q.**   I'll flip ahead a couple more pages.

```
 1            THE COURT:  I think we're going to need a break soon,
 2    Ms. Perry.
 3            MS. PERRY:  Yes, Your Honor.
 4            THE COURT:  Are you getting close?
 5            MS. PERRY:  We can certainly stop now.  I have a
 6    little bit more to go.
 7            THE COURT:  Let's take the recess.
 8            The jury will be excused first.
 9         (Jury left the courtroom at 3:36 p.m.)
10            THE COURT:  All right.  And the witness can step down.
11            Thank you.  Come back after the break.
12            Ms. Perry, this is getting awfully repetitive.  If
13    there's anything that's not necessary, please think about it
14    over the break.
15            The gallery is excused.
16            All right.  We'll take our recess.
17         (Recess taken.)
18            THE COURT:  Okay.  Ms. Hoffman?
19            MS. HOFFMAN:  Yes, we are in a bit of a scheduling
20    conundrum, and I apologize greatly.  But we are -- we believe
21    that Ms. Erbe is the last witness that we have for today.  We
22    tried two of the witnesses who are slated for tomorrow.  We
23    can't get them here in time.
24            The only thing we could think to do was scramble and
25    have the other case agent testify regarding the search warrant
```

1    at Mr. Bailey's residence.  But we didn't notice him about

2    that, so the defense hasn't had an opportunity to review those

3    documents.  They wouldn't want to cross him today,

4    understandably.  And if he carries into tomorrow, I fear that

5    we would not get through everyone tomorrow.

6            So long story short, I think Ms. Perry has about

7    another ten minutes to go.  And then I'm sure Mr. Trainor will

8    have some cross, and it looks like we're going to end early

9    today.  I apologize.  We didn't think we'd get through six

10   witnesses that quickly.

11          **THE COURT:**  I'm sure everybody's devastated to learn

12   that we might have to stop a little bit early today.

13          **MR. DAVIS:**  We'll have to hear more taped calls.

14          **THE COURT:**  Thank you, Ms. Hoffman.  I appreciate that

15   you did make an effort.  Obviously, I prefer to use the entire

16   day, but that's fine.  It sounds like it makes the most sense

17   to just stop at the end of this.

18          **MS. HOFFMAN:**  Thank you.

19          **THE COURT:**  All right.  We'll get the jury and the

20   witness.

21       (Jury entered the courtroom at 4:02 p.m.)

22          **THE CLERK:**  Special Agent, you're still under oath.

23          **THE WITNESS:**  Yes, ma'am.

24          **THE COURT:**  All right.  If you want to continue,

25   Ms. Perry.

```
1              MS. PERRY:  Thank you.
2    BY MS. PERRY:
3    Q.   And, Special Agent Erbe, I have just a couple more
4    messages to go through with you.
5         We were, I believe, on Page 44 of
6    Government's Exhibit CELL-11-A, and I want to direct your
7    attention down here to the bottom.
8         Can you tell us the date of these particular messages.
9    A.   August 19th, 2016.
10   Q.   And are these three messages messages to this particular
11   phone?
12   A.   Yes.
13   Q.   And can you read them for us.
14   A.   [Reading]:  Hey, brother, big bro just called.  He said we
15   can all have the meeting tonight at around 7 o'clock.  He wants
16   to call the studio on speakerphone and holla at us g.  I told
17   him, Yeah, I'm okay with that.  Is you good with meeting up at
18   7 o'clock?  If you can respond back to let me know.
19   Q.   And is that continued over onto the next page?
20   A.   Yes.
21   Q.   And is the first message another message to the phone?
22   A.   Yes.
23   Q.   What's it say?
24   A.   Can you make that a little bit bigger.  I can't read the
25   second word there.
```

1    **Q.**   Is that better?

2    **A.**   [Reading]:  What's mobbing, g?  We at the studio now, bro.

3    How much longer you going to be?

4    **Q.**   Is there a response from the phone?

5    **A.**   [Reading]:  In traffic, bro.

6    **Q.**   And is there a response to the phone?

7    **A.**   [Reading]:  Okay.  We waiting.

8    **Q.**   And then a response from the phone after that?

9    **A.**   [Reading]:  7 min.

10   **Q.**   Okay.  I just want to point your attention to this

11   particular message.

12        Can you tell us the date of that message.

13   **A.**   August 21st, 2016.

14   **Q.**   And is that an outgoing message?

15   **A.**   Yes.

16   **Q.**   And what's it say?

17   **A.**   [Reading]:  Fire back.

18   **Q.**   And is there, in fact, a long string of messages that say

19   "fire back" --

20   **A.**   Yes, ma'am.

21   **Q.**   -- to different cell phones -- to different numbers on

22   that same date?

23   **A.**   Yes, ma'am.

24   **Q.**   I'm going to flip ahead a couple of pages and ask you

25   about this particular string of messages.

1          First of all, what's the date?

2    **A.**   August 25th, 2016.

3    **Q.**   And can you walk us through these messages.

4    **A.**   First is [Reading]:

5          Count dummy.

6          All right.  I'm ready text you.

7          At least 4,000.

8          Small head said 20, almost 30 today, not count yesterday.

9          We should have at least 5, 6 thousand.

10         5 or 6.

11         82 ggs and 25 paper.

12         Not the right count, baby -- baby boy.

13         Call me ASAP 'cause that count not right.

14         I went in the other day with 1050.  Every play you sent to

15   me wanted halfs.  You can call and ask them.  I just added what

16   I got with the 650 small head said he had.

17         I got 15 for dot and 16 for Jim.  Would have had more, but

18   I gave Kia 100, you 40, and I spent 40.

19   **Q.**   And flipping to the next page, can you just read these

20   messages for us.

21   **A.**   [Reading]:

22         What's good?

23         Still need 3 wholes.

24         Where you at?

25         Just pulled off Chelsea.  It was getting hot.

1    **Q.**   I'm going to flip ahead a few pages.

2         And looking at the messages in the middle of the page, can

3    you tell us the date of these messages.

4    **A.**   September 16th, 2016.

5    **Q.**   And is this about 11 days before the search warrant was

6    executed?

7    **A.**   Yes, ma'am.

8    **Q.**   And can you walk us through these messages.

9    **A.**   [Reading]:

10        I got 900.

11        2 and a half.

12        4 gg.

13        Lil head got none.

14        Altogether we should have like 13.

15        I had 10 and small head -- had -- and small had 2 and a

16   half.

17        I got 943.  My bad.

18   **Q.**   And, finally, I want to turn to the next page.  And can

19   you tell us the date of these messages at the top.

20   **A.**   September 19th, 2016.

21   **Q.**   And is the first message a message to the phone?

22   **A.**   Yes.

23   **Q.**   And what's it say?

24   **A.**   [Reading]:  You got soft, babe?

25   **Q.**   And what's the response?

1   **A.**   [Reading]:  Girl.

2   **Q.**   And what's the response to that?

3   **A.**   [Reading]:  Yeah, but not hard, babe.

4   **Q.**   And what's the response from the phone to that?

5   **A.**   [Reading]:  Oz.

6   **Q.**   And what's the response to that?

7   **A.**   [Reading]:  Do you, baby?

8   **Q.**   And then the phone respond?

9   **A.**   [Reading]:  Yeah.

10  **Q.**   And then can you read the next three messages after that.

11  **A.**   [Reading]:

12       Okay.  I need a dub of soft and a dub of hard and two and

13  a half boys.

14       Soft only come in ounce, baby.

15       Okay.  Then I need two separate dubs of hard, one for me

16  and one for someone else, and then 2 and a half boys.

17  **Q.**   Okay.  So now I'm going to flip ahead.  Do you see here

18  where the section says "Selected Notes"?

19  **A.**   Yes, ma'am.

20  **Q.**   And can you read us this note here at the bottom

21  (indicating).

22  **A.**   [Reading]:  Forest Heights niggas puttin' grams on your

23  block.  21 hits.  10 brooms.  10 [sic] mops.

24  **Q.**   And turning to the next page, can you read us the first

25  two lines here (indicating).

1    **A.**   [Reading]:  I can teach you how to move a brick.  I can

2    teach a killa how to shoot a stick.

3    **Q.**   And then, finally, can you read this first line here

4    (indicating).

5    **A.**   [Reading]:  I be trappin' like a motherfucker.  Free my

6    bro Spittle, Jock Roc, Smalls, and Gutta.

7    **Q.**   Now, Agent Erbe, have you read every text message that's

8    included in this excerpt?

9    **A.**   No.

10   **Q.**   And did you review -- but did you review them before

11   coming to court today?

12   **A.**   Yes.

13   **Q.**   And are there similar text messages contained within

14   CELL-11-A?

15   **A.**   Yes.

16   **Q.**   And, again, did you have anything to do with selecting the

17   excerpts for CELL-11-A?

18   **A.**   No, I did not.

19            **MS. PERRY:**  I have no more questions for the witness.

20            **THE COURT:**  All right.  Thank you.

21            Mr. Trainor.

22            **MR. TRAINOR:**  Thank you, Your Honor.

23                             CROSS-EXAMINATION

24   **BY MR. TRAINOR:**

25   **Q.**   Good afternoon, Agent Erbe.

1   **A.**   Good afternoon.

2   **Q.**   So you were on the search team that executed a

3   search warrant at 1868 Oxford Square Road on -- in the early

4   morning hours of July 27th, 2016; correct?

5   **A.**   No.  It was in September, sir.

6   **Q.**   Excuse me.  I can't read my own handwriting.

7        September 27th, 2016; correct?

8   **A.**   Yes, sir.

9   **Q.**   And you were part of the entry team that are the first

10  people to go through the front door; correct?

11  **A.**   Yes, sir.

12  **Q.**   And you went in early in the morning.  Basically, it's

13  done that way to make sure people are still there; they haven't

14  gotten up and left the house.

15  **A.**   Yes, sir.

16  **Q.**   All right.  And you often try to catch people asleep when

17  you go in so nothing could be moved.

18  **A.**   It's also for safety, sir.

19  **Q.**   For safety.

20       But, also, to make sure that nothing is -- you take the

21  least possibility that something will be disturbed in the

22  house?

23  **A.**   Yes, sir.

24  **Q.**   All right.  So when you went in, then your role became to

25  be the photographer?

**A.**   Yes, sir.

**Q.**   All right.  So you photographed every room in the house?

**A.**   Yes, sir.

**Q.**   And you photographed everything that was seized in the house; correct?

**A.**   Yes, sir.

**Q.**   You photographed it where it was seized, and you were -- you were in a position to observe how the search took place; correct?

**A.**   Yes, sir.

**Q.**   And it was thorough and complete?

**A.**   Yes, sir.

**Q.**   Really, the house from top to bottom?

**A.**   Yes, sir.

**Q.**   And what you found was approximately $1500 in a pair of man's pants with Jamal Lockley's identification in the pocket as well --

**A.**   Yes, sir.

**Q.**   -- right?

     You found some documents, like ownership documents on the house or bills, that sort of thing, that ties people to that address --

**A.**   Yes, sir.

**Q.**   -- correct?

     And you found multiple cell phones, approximately four; am

1    I right?

2    **A.**    I believe so.

3    **Q.**    All right.  And in the house, apparently Mr. Lockley lived

4    there?

5    **A.**    Yes, sir.

6    **Q.**    Along with other people --

7    **A.**    Yes, sir.

8    **Q.**    -- correct?

9        So the cell phone, Cell Number 11, I think you -- you read

10   from certain excerpts, I think, on Exhibit CELL-11-A?

11   **A.**    Yes, sir.

12   **Q.**    And you had -- you had no role in preparing that exhibit,

13   did you?

14   **A.**    No, sir.

15   **Q.**    And, in fact, Cell Number 11 is supposedly the cell phone

16   from which that summary CELL-11-A was made?

17   **A.**    Yes, sir.

18   **Q.**    Did you ever go through Cell Phone Number 11 and look at

19   the messages in that phone?

20   **A.**    No, sir.

21   **Q.**    So the only thing you really know about those excerpts is

22   what was written on the paper; you just read it?

23   **A.**    Yes, sir.

24   **Q.**    All right.  I understand.

25       Now, you have no knowledge of who sent those messages that

1   are summarized, do you?

2   **A.**   No, sir.

3   **Q.**   And you have no knowledge of who received them or the

4   facts surrounding them, do you?

5   **A.**   No, sir.

6   **Q.**   All right.  Now, the last things you read when Ms. Perry

7   asked you to read those words about teach you how to shoot a

8   stick or something like that, those are rap lyrics, aren't

9   they?

10  **A.**   I'm not sure, sir.  I just read what the note said.

11  **Q.**   Yeah.  So they handed you an exhibit, and you just read

12  it?

13  **A.**   That's correct, sir.

14  **Q.**   And you don't know anything about how that -- you had no

15  role or personal knowledge about how that information was

16  transferred to the exhibit; right?

17  **A.**   No, sir.

18          **MR. TRAINOR:**  Thank you.

19          **THE COURT:**  Thank you, Mr. Trainor.

20          Mr. Hazlehurst.

21          **MR. HAZLEHURST:**  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23  **BY MR. HAZLEHURST:**

24  **Q.**   Good afternoon, Agent.

25  **A.**   Hi.  How are you?

1  **Q.**  My name is Paul Hazlehurst.  I represent Shakeen Davis.

2      Now, you were asked at great length many questions about

3  Government's Exhibit CELL-11-A; correct?

4  **A.**  Yes, sir.

5  **Q.**  Okay.  And we've already established, I believe, that you

6  didn't prepare that exhibit, did you?

7  **A.**  No, I did not.

8  **Q.**  But today is not the first day that you've seen this

9  exhibit, is it?

10  **A.**  The printout or the phone itself, sir?

11  **Q.**  The printout.

12  **A.**  I saw it this morning, sir.

13  **Q.**  You saw it.

14      And you had a chance to review it before you came in here

15  to testify, didn't you?

16  **A.**  Yes, I did.

17  **Q.**  And you did review it, didn't you?

18  **A.**  Yes, I did.

19  **Q.**  And I assume you reviewed it at length because you knew

20  you were going to have to answer questions about it; correct?

21  **A.**  Yes, sir.

22  **Q.**  And it is a fairly lengthy document.  It's 55 pages;

23  correct?

24  **A.**  Yes, sir.

25  **Q.**  Okay.  And it covers, in terms of time, a fairly

```
 1   significant period, from March 24th of 2016 to September 24th
 2   of 2016; correct?
 3   A.   I'd have to look again at the date, sir.  I can't remember
 4   off the top of my head.
 5   Q.   So I'm going to show you what is the first page of -- tell
 6   me when you can see that on your screen.
 7   A.   I can see it, sir.
 8   Q.   And you see the top of the page; correct?
 9   A.   Yes, sir.
10   Q.   And the first line which would be numbered 5850; is that
11   correct?
12   A.   Yes, sir.
13   Q.   And the date and time for that is March 24th, 2016;
14   correct?
15   A.   Yes, sir.
16   Q.   Okay.  Now, I'm going to show you what is Page 54 of this
17   exhibit.  And tell me when you can see that on your screen.
18   A.   I can see it, sir.
19   Q.   And there is one line, number 117, that is above the
20   selected notes; correct?
21   A.   I can't see that.
22   Q.   There we go.
23   A.   Yes, sir.
24   Q.   It's a little magic act.
25        And the date and time for that call or that text is
```

 1  September 24th, 2016; correct?

 2  **A.**   Yes, sir.

 3  **Q.**   So it's fair to say that the period of time that this

 4  excerpt covers is at least from March 24th, 2016, to

 5  September 24th, 2016; correct?

 6  **A.**   Yes, sir.

 7  **Q.**   Now, the first question you were asked about this exhibit

 8  is the phone number that these text messages came from;

 9  correct?

10  **A.**   I was asked to read what the -- the highlighted at the

11  top, the numbers and the names, sir.

12  **Q.**   And I'm going to again show you the first page of the

13  exhibit.

14       And, again, you were asked, at least at some point, to

15  identify the phone number that this telephone, this cell phone

16  was associated with; correct?

17  **A.**   At the top there, sir?  Yes.

18  **Q.**   Yes.

19  **A.**   (443) 709-7780.

20  **Q.**   Exactly.

21       Now, you were then asked to look at the selected contacts

22  for the phone; correct?

23  **A.**   Yes, sir.

24  **Q.**   And the first one that you were asked about has the name

25  Cream; correct?

1   **A.**   Yes, sir.

2   **Q.**   Category, mobile.  And then the value or telephone number

3   would be (240) 713-0332; correct?

4   **A.**   Yes, sir.

5   **Q.**   And, again, you reviewed this entire exhibit, didn't you?

6   **A.**   Yes.  I read the exhibit, sir.

7   **Q.**   And there is no text, either sent from that number or

8   received from the (443) 709-7780 number that is reflected in

9   this excerpt, is there?

10  **A.**   I don't know, sir.

11  **Q.**   Okay.  You reviewed the document.

12  **A.**   I did, sir.  There's a lot of phone numbers on there, so I

13  could flip through each page and look for you, but I don't know

14  off the top of my head.

15  **Q.**   Agent, I'm not sure any other way if you haven't reviewed

16  it that I can get to the point that I'm trying to get to, that

17  there is no text from that number or sent by that number.

18          **MR. HAZLEHURST:**  So I'm going to -- if I may,

19  Your Honor, if I may approach?

20          **THE COURT:**  Talk to counsel.

21      (Counsel conferred.)

22          **MR. HAZLEHURST:**  Your Honor, I believe that the

23  Government is willing to stipulate that there is no

24  text message that either was received by the phone in question

25  here or sent -- or basically sent to the number associated with

```
 1   the name Cream, (240) 713-0332 that is reflected in this

 2   excerpt.

 3           THE COURT:  Okay.  Thank you.

 4           MR. HAZLEHURST:  And I would have no further

 5   questions, Your Honor.

 6           THE COURT:  All right.

 7           MR. HAZLEHURST:  Thank you.

 8           THE COURT:  Anyone else?

 9      (No response.)

10           THE COURT:  Okay.  Any redirect?

11           MS. PERRY:  No, Your Honor.  Thank you.

12           THE COURT:  Okay.  Thank you very much.

13           THE WITNESS:  Thank you.

14           THE COURT:  You're excused.

15      (Witness excused.)

16           THE COURT:  So, ladies and gentlemen, we have

17   apparently moved a little faster than anticipated today.  And

18   so we've run out of witnesses, is the bottom line at the

19   moment.  So I'm going to be excusing you a little bit early.

20           I do expect we'll have a full day tomorrow.

21           So if you would, please, leave your notes here.  Keep

22   an open mind.  Don't talk about the case.  And you're excused

23   for today.  We'll see you at 10 o'clock tomorrow, and then

24   you're not sitting on Friday.

25           We'll see you at 10 o'clock tomorrow.
```

```
 1              Thank you very much.
 2         (Jury excused at 4:20 p.m.)
 3         THE COURT:  All right.  Any issues anybody wants to
 4    anticipate for tomorrow?
 5         MS. HOFFMAN:  I can't think of any.
 6         THE COURT:  All right.  We'll adjourn and I'll see you
 7    at 10 o'clock.
 8              The gallery is excused first.
 9         MS. AMATO:  Your Honor, one thing.  I just wanted to
10    determine whether tomorrow Your Honor might have a chance to
11    speak with Judge Russell, I guess, to determine if there is any
12    word.  I know.  I know.  I'll do my best.
13         THE COURT:  I don't know.  I don't know if he's in the
14    office today or not.  I will e-mail him.  Sorry.
15         MS. AMATO:  I appreciate it.
16         THE COURT:  I just don't know.  I'm still hopeful that
17    we'll have Thursday.
18              Okay.  We'll adjourn until tomorrow at 10:00.
19         (Court adjourned at 4:22 p.m.)
20
21
22
23
24
25
```

```
 1              INDEX - GOVERNMENT'S EVIDENCE

 2   WITNESS                     DR       CR      RDR      RCR

 3   P.O. CHRISTOPHER FALLER     10       57,60   --       --

 4   DET VICTOR VILLAFANE        66       --      --       --

 5   SA ROBERT PULLIAM           84       90      --       --

 6   LT. DAWN COPPER             92       102     --       --

 7   DET. DAVID PIETRYAK         108      --      --       --

 8   SA LINDSAY ERBE             137      166, 170 --      --

 9

10

11        I, Douglas J. Zweizig, RDR, CRR, do hereby certify that

12   the foregoing is a correct transcript from the stenographic

13   record of proceedings in the above-entitled matter.

14
                    _____/s/_____
15
                    Douglas J. Zweizig, RDR, CRR, FCRR
16                    Registered Diplomate Reporter
                       Certified Realtime Reporter
17                    Federal Official Court Reporter
                       DATE:  November 13, 2019
18

19

20

21

22

23

24

25
```

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                         NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
          Plaintiff,              )
 4                                )
          vs.                     )  CRIMINAL CASE NO. CCB-16-0267
 5                                )
     DANTE BAILEY, et al.,        )
 6        Defendants.             )
     _____)
 7

 8
                         Thursday, April 4, 2019
 9                         Courtroom 1A
                          Baltimore, Maryland
10

11         BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                    (AND A JURY)
12

13                           VOLUME XI

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Assistant United States Attorneys

17   For the Defendant Dante Bailey:

18   Paul Enzinna, Esquire
     Teresa Whalen, Esquire
19
     _____
20

21

22
                           Reported by:
23
                    Douglas J. Zweizig, RDR, CRR, FCRR
24                   Federal Official Court Reporter
                     101 W. Lombard Street, 4th Floor
25                      Baltimore, Maryland  21201
```

 1    For the Defendant Randy Banks:

 2    Brian Sardelli, Esquire

 3

      For the Defendant Corloyd Anderson:
 4
      Elita Amato, Esquire
 5

 6    For the Defendant Jamal Lockley:

 7    Harry Trainor, Esquire

 8
      For the Defendant Shakeen Davis:
 9
      Paul Hazlehurst, Esquire
10

11    For the Defendant Sydni Frazier:

12    Christopher Davis, Esquire

13

14    Also Present:

15    Special Agent Christian Aanonsen, ATF

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2        (10:39 a.m.)

 3             THE COURT:  All right.  Good morning, everyone.

 4             MS. HOFFMAN:  Good morning.

 5             THE COURT:  Any issues before we bring in the jury?

 6             MR. SARDELLI:  Your Honor, I did have one issue,

 7   Your Honor.

 8             THE COURT:  All right.

 9             MR. SARDELLI:  I believe one of the cooperators,

10   Mr. Ferguson, may be testifying today, Your Honor.  And I'm

11   concerned about some of the statements may be impermissible

12   hearsay and lack of basis of knowledge.

13             For example, I reviewed ATF Report Number 95, and

14   there may be evidence about a hit being put out, allegedly, by

15   my client.  And I think his basis of knowledge will be what his

16   cousin told him or based on hearsay from his cousin.

17             And I think he's a BGF member, and I'm not sure if the

18   cousin's associated or has anything to do with the gang or if

19   it's a statement in furtherance of a co-conspiracy or a

20   conspiracy or how it would come in, Your Honor.

21             And, also, on Page 95 there appears to be -- of the --

22   I'm sorry.

23             The statement from the cousin is from Page 18 of the

24   grand jury transcript.  I'm mistaken.

25             THE COURT:  All right.
```

1      **MR. SARDELLI:**  The other one, Your Honor -- I think

2  there's going to be numerous examples of this -- is there's

3  pages -- Paragraph 23 from ATF Report Number 95 where there's

4  some hearsay about my client being a triggerman or a guy named

5  Lance being my client's triggerman.  And that's coming from a

6  Muslim named Jawaun who was not a gang member, quote/unquote,

7  from the ATF report.

8      So I'm concerned about -- those are just two examples.

9  I'm concerned about a lot of hearsay coming in through this

10  witness that has either no basis of knowledge or is

11  impermissible hearsay, Your Honor.

12      And what I'm worried about is -- through the trial so

13  far, I'm worried about it coming out and then there being an

14  objection; and we can't repair the issue if it's not a proper

15  exception to the Hearsay Rule, if it's a proper basis of

16  knowledge.

17      So I would like to talk about that now.  And, also, if

18  during the examination they can also lay the foundation first

19  and the basis of the knowledge first before they ask the

20  ultimate question, it would be helpful for me to be able to

21  object in a timely fashion, Your Honor.

22      **THE COURT:**  All right.  Thank you.

23      Are we anticipating this witness shortly?

24      **MS. HOFFMAN:**  No.  He's the fifth witness today.

25      The first four, though, may be relatively short.

1          And I can address -- I think I can address those

2     things now, if you'd like, or we could wait.

3          **THE COURT:**  Sure.  I see Mr. Trainor.

4          Mr. Trainor, is it the same witness that you have

5     issues with, or is this a different issue?

6          **MR. TRAINOR:**  A different one.

7          **THE COURT:**  Different one.  All right.

8          Then go ahead and respond as to Mr. Ferguson.

9          **MS. HOFFMAN:**  Sure.  Well, actually, Mr. Sardelli,

10    what was the paragraph of the second objection that you have?

11         **MR. SARDELLI:**  Your Honor, the one was Page 18 of the

12    grand jury transcript involving the cousin.

13         **THE COURT:**  Right.

14         **MR. SARDELLI:**  I think the other one -- these are just

15    two examples.  I think there may be more -- is Page 95 --

16    excuse me, ATF Report Number 95, Paragraph 23.

17         **MS. HOFFMAN:**  So, yeah, Paragraph 23, I think, does

18    deal with hearsay, and I was not planning to elicit that.

19         **THE COURT:**  Okay.

20         **MS. HOFFMAN:**  The hit, though, I am planning to

21    elicit.  And he does in the grand jury say that he heard about

22    it, I think, initially through his cousin.

23         He did also hear about it from a member of the Bloods,

24    from Antonio Walker-Bey, also known as Tone.

25         And so I did plan to elicit it that way.

1   It's also relevant to -- I also plan to elicit it in

2   the context of explaining why he took certain actions.  So he

3   will acknowledge that he actually got involved in retaliatory

4   violence himself and that he was scared and that he knew that

5   he had this hit on his life, and that was part of the reason

6   for attempting to retaliate.  And so I think it's also

7   admissible because it goes to his state of mind and motive in

8   getting involved in the retaliatory violence.

9   So I do think that that -- the hit on his life is

10  admissible.  But Mr. Sardelli is right that there's a lot of

11  hearsay that he talks about in all the reports and in the

12  grand jury that I don't intend to elicit.

13  **THE COURT:**  Okay.  Well, let's come back to the one

14  issue about the alleged hit which you're saying also comes in

15  from a conversation with Antonio Walker-Bey.

16  I'm understanding that the other things that appeared

17  to be clear hearsay you're not planning to elicit.  If you

18  can -- if you appear to be getting close to that kind of issue,

19  to the extent, as he suggests, that you sort of -- we try to

20  figure out where it's going to come from, where the information

21  is going to come from in time for Mr. Sardelli to object.  That

22  sounds like the best we can do.

23  **MS. HOFFMAN:**  Sure.  Of course.

24  **MR. SARDELLI:**  Your Honor, this brings up another

25  issue.  This also appears to be -- I think there's an

1   allegation that a family member of my client was killed.  And a

2   lot of this is in retaliation or in response to that.

3          And, again, I don't know if there's any evidence that

4   that's really in furtherance of the conspiracy or is a personal

5   grudge type of thing based on the death of a family member.

6   And I think that they haven't -- as far as I've seen or

7   reviewed this, I'm still lacking -- I know she's saying it's

8   coming through this other person and not the cousin, as well as

9   the cousin, but I'm also not clear as to how this is in

10  furtherance of the conspiracy and how this isn't a hearsay

11  statement, therefore.

12         **THE COURT:**  Okay.  Well, we'll have to talk about that

13  a little bit further before Mr. Ferguson testifies to it.

14  Maybe someone can get me a copy of the grand jury testimony,

15  maybe.

16         Mr. Trainor.

17         **MR. TRAINOR:**  Thank you, Your Honor.

18         Your Honor, it's my understanding that the Government

19  may call Brandon Robinson and his sister, Shannon Robinson,

20  today.

21         And as I understand it from the discovery,

22  Brandon Robinson would testify that he was given a number for

23  somebody known as T-Roy and that he called that phone number

24  that he was given and arranged to purchase a small quantity of

25  drugs and then took it back to wherever he was from, which may

 1   be Western Maryland, I think.

 2           And he gave his sister some of the drugs, and she

 3   later had to go to the hospital with what they would

 4   characterize as an overdose.

 5           It's that part that we argue is not relevant to the

 6   charges here and any -- that it would be outweighed by any

 7   prejudicial impact.

 8           I don't know that the Government would be prepared to

 9   put on medical testimony that specifically shows that

10   Shannon Robinson overdosed from what her brother gave her.  I

11   understand she was a heroin user before that.

12           But -- so we would be objecting to anything regarding

13   a secondhand overdose as not relevant and outweighed by the

14   prejudicial impact.

15           **THE COURT:**  Okay.  Thank you.

16           **MR. TRAINOR:**  And, also, I've been asked to raise an

17   issue with the Court.

18           My client has seen that it seems to be the practice of

19   the Government when they play wiretap calls to put the

20   transcript up with his name on it for the witness before the

21   witness has laid a foundation that he or she recognizes the

22   voice, and so we're objecting to that practice as really a

23   leading of the witness.  And it seems to go on and on.

24           The same -- my client brought to my attention that

25   when the Government shows maps with these targeted areas, that

1    the maps are already marked with certain locations.  And we're

2    objecting that that is leading, and we're asking that that

3    practice be stopped as well.

4              **THE COURT:**  Okay.  Thank you.

5              As to the Robinsons?

6              **MS. HOFFMAN:**  Yes.  So they are our first two

7    witnesses today.  And the way that the Government identified

8    Brandon and Shannon Robinson was that ATF did a wiretap on

9    Jamal Lockley, a/k/a T-Roy's cell phone in the summer of 2015.

10   They intercepted a call shortly after this overdose happened in

11   which Brandon Robinson informed T-Roy, Hey, you got to be

12   careful.  That shit was really strong.  My friend had to go in

13   an ambulance.

14             And Brandon Robinson will testify that before buying

15   the heroin -- or when he bought the heroin from T-Roy that day,

16   T-Roy asked him to tell -- to report back to him about the

17   quality of the heroin and that that was unusual; that he hadn't

18   asked that in the past; and that he did think that the heroin

19   was particularly potent that day.

20             He then shared some with his sister.  And his sister

21   will testify that she injected that heroin, and then it was a

22   nonfatal overdose.  She actually did not end up going to the

23   hospital.  She regained consciousness after the ambulance

24   arrived and didn't go to the hospital.  But we think it's

25   absolutely relevant, given the nature of the intercepted

```
 1    wiretap conversation which will be played for the jury.
 2           And I should mention there have already been
 3    references to overdoses that have come up in text messages from
 4    various defendants' cell phones, and we do think that that's
 5    relevant.  It's certainly proof of the type of drug that they
 6    were distributing and the potency of it and their knowledge of
 7    what they were distributing.
 8           As to the second issue, the transcripts, Ms. Perry
 9    was, I believe, very careful with Agent Aanonsen when he first
10    testified to lay the foundation for the voice recognition in
11    all of the wire transcripts.
12           So she went through every single -- every single
13    person who's identified in those wire call transcripts and
14    asked Agent Aanonsen:  How were you able to identify that
15    person's voice?
16           And he explained at great length how he was able to
17    identify each participant's voice, and so we believe that
18    foundation has been laid.
19           Now, it's certainly true that we have played calls
20    through witnesses who are not able to recognize the
21    participants' voices, and I think we've tried to make that
22    clear that they're simply relying on a transcript that was
23    prepared by someone else and someone else's voice
24    identification.
25           But in a complicated case like this, we think it's
```

```
 1  important that the jury be able to refer to those transcripts
 2  and that we not have to play every single call through the
 3  agent and go through in painstaking detail how he identified
 4  the voice with respect to each individual transcript.
 5         THE COURT:  All right.  Well, on the last two issues,
 6  I agree.  That's my recollection as well, that these were, in
 7  terms of the voice recognition or how people could be
 8  recognized as speaking on the recordings, that that was covered
 9  in an earlier part of the case.
10         And as to the map, it's simply a matter of efficiency.
11         Obviously, if any defendant or defense counsel has a
12  challenge to the accuracy of the identification of the voices
13  or a challenge to the accuracy of a red pin dot that may
14  already be on the map, you're more than welcome to bring that
15  up.
16         But I don't think we need to have a new map every time
17  with every witness sort of drawing new things on it as to
18  issues which really don't seem to be in much dispute.
19         In terms of the testimony of the Robinsons, as it's
20  been explained by the Government, the reporting back to
21  Mr. Lockley was in response to a request from him about the
22  quality of the drugs.
23         Certainly the issue of potency and strength is one
24  that's relevant to discussion of the narcotics distribution
25  business.  And, again, given the proffer of what the wire call
```

```
 1    said, I find it very hard to see why the testimony should be
 2    excluded.
 3            It certainly can be questioned.  I don't know whether
 4    there was -- she may have ingested some other substances.  But
 5    I believe it's going to be her personal experience, sounds
 6    like, as a drug user and sort of an immediate reaction to what
 7    she ingested, which I think she's qualified to testify to.
 8            All right.  Can we bring in the jury.
 9            Did you find a copy of the grand jury transcript?
10        MS. HOFFMAN:  I can give you my copy if there's any
11    chance I could get it back before he testifies.
12        THE COURT:  Oh, of course.
13        MS. HOFFMAN:  The grand jury transcript, though, does
14    not mention the other source of the information about the hit.
15    It just mentions the cousin.
16        THE COURT:  Okay.  Is there anywhere else -- let's
17    see.
18            So this is just Page 18, basically.  I'll take a look
19    at it.
20            Is there anywhere else that mentions Mr. Walker-Bey?
21        MS. HOFFMAN:  Not in the grand jury.  And actually, I
22    don't think it's in the report, either.  It's just what he's
23    told us.
24        (Jury entered the courtroom at 10:53 a.m.)
25        THE COURT:  Welcome back, ladies and gentlemen.
```

```
 1    Sorry.  We had some issues to work out.
 2            But I think the Government's ready to call a witness.
 3            MS. HOFFMAN:  The Government calls Brandon Robinson.
 4            THE CLERK:  Please raise your right hand.
 5        BRANDON ROBINSON, GOVERNMENT'S WITNESS, SWORN.
 6            THE CLERK:  Please be seated.
 7            Please speak directly into the microphone.
 8            State and spell your full name for the record, please.
 9            THE WITNESS:  Brandon Robinson, B-R-A-N-D-O-N,
10    R-O-B-I-N-S-O-N.
11            THE CLERK:  Thank you.
12                        DIRECT EXAMINATION
13    BY MS. HOFFMAN:
14    Q.   Good morning, Mr. Robinson.
15    A.   Hi.
16    Q.   How old are you?
17    A.   27.
18    Q.   And where are you from?
19    A.   Eastern Maryland.
20            THE CLERK:  You need to slide up just a little bit.
21            THE WITNESS:  Eastern Maryland.
22            THE CLERK:  Thank you.
23    BY MS. HOFFMAN:
24    Q.   Do you have a history of drug use?
25    A.   Yes.
```

1    **Q.**   And what drug specifically?

2    **A.**   Heroin.

3    **Q.**   At some point in time did you become addicted to heroin?

4    **A.**   Yes.

5    **Q.**   And about how long ago what that?

6    **A.**   About seven years ago.

7    **Q.**   Where would you go to purchase heroin starting --

8    directing your attention to the 2014 and 2015 time period,

9    where would you go to purchase heroin?

10   **A.**   The city of Baltimore.

11   **Q.**   And where in Baltimore would you go?

12   **A.**   Security Boulevard.  That's all I know.

13   **Q.**   Were there any other landmarks that stick out in your

14   mind?

15   **A.**   The BP station.

16   **Q.**   And is that BP gas station close to a highway?

17   **A.**   Yes.

18   **Q.**   What highway is it close to?

19   **A.**   70.

20   **Q.**   I'm going to pull up Government's Exhibit MAP-23, and it

21   should show up on the screen right in front of you.

22        Do you see that image there?

23   **A.**   Yes.

24   **Q.**   Do you recognize that location?

25   **A.**   Yes, I do.

1   **Q.**   Is that the BP that you're referring to?

2   **A.**   Yes, it is.

3   **Q.**   Did you have a heroin connection in that area?

4   **A.**   I did.

5   **Q.**   And what did you know him by?  What name did you know him

6   by?

7   **A.**   T-Roy.

8   **Q.**   How did you get connected with T-Roy?

9   **A.**   Through a friend.

10  **Q.**   And when did you first begin purchasing heroin from T-Roy?

11  **A.**   I believe it was 2014, 2015, around that time.

12  **Q.**   How would you contact T-Roy?

13  **A.**   Via phone.

14  **Q.**   And did you have his number programmed in your phone?

15  **A.**   Did I have the what?  I'm sorry?

16  **Q.**   Did you have his phone number programmed in your phone?

17  **A.**   Yes.

18  **Q.**   When you would call T-Roy, how would the conversation

19  usually go?

20  **A.**   It would be a very short conversation.  I would call.  He

21  would pick up, and he would say, "Come."

22  **Q.**   Would you ever ask him a question?

23  **A.**   Hardly.

24  **Q.**   And when you said he would say, "Come," would he direct

25  you where to go?

```
 1   A.   Yes.

 2   Q.   And what were some of the locations that he would direct

 3   you to go to?

 4   A.   I don't have any specific ones in my memory except they

 5   were all just generally around the BP station.

 6   Q.   When you would go to the location that T-Roy directed you

 7   to, was it T-Roy who would actually give you the heroin?

 8   A.   No.

 9   Q.   And who would deliver the heroin?

10   A.   Somebody.  I didn't know their name.

11   Q.   And how did you know that it wasn't T-Roy?

12   A.   Um, that's a good question.

13   Q.   But was there something that indicated to you that it

14   wasn't T-Roy?  Was there a different voice, for instance?

15   A.   Well, yes.  Yeah, that would be the only thing that I'd --

16   but I wasn't trying to figure out who he was.  But you're

17   right, yes.  It would be a different voice.

18   Q.   And you said someone else would deliver the heroin.  You

19   believed it was someone else.  Was there -- were there -- was

20   there one person or were there people who would regularly

21   deliver heroin when you contacted T-Roy?

22   A.   Yes.

23   Q.   And would they meet you at the --

24   A.   Sorry about that.

25   Q.   No.  Take your time.
```

1    Would they meet you at the locations where T-Roy directed

2  you?

3  **A.**   Yes.

4  **Q.**   And would they give you the amount of heroin that you had

5  ordered from T-Roy?

6  **A.**   Yes.

7  **Q.**   And was it your understanding that they -- based on that,

8  was it your understanding that they were sent by T-Roy?

9  **A.**   Yes.

10       **MR. TRAINOR:**   Objection to the leading.

11       **THE COURT:**   Sustained.

12  **BY MS. HOFFMAN:**

13  **Q.**   You mentioned that you began purchasing heroin through

14  T-Roy in, you think it was, 2014 or 2015.

15       About how long did you purchase heroin from him in terms

16  of years?

17  **A.**   I believe it was a little less than a year.

18  **Q.**   And during that period, how often would you buy heroin

19  through T-Roy?

20  **A.**   Usually daily or every other day.

21  **Q.**   And how much would you typically buy at a time?

22  **A.**   Half gram.

23  **Q.**   How much would you pay for half a gram of heroin?

24  **A.**   $50.

25  **Q.**   And how was the heroin usually packaged?

```
 1    A.    In a bag.
 2    Q.    Did you ever bring anyone else with you to purchase
 3    heroin?
 4    A.    On one occasion I brought my sister.
 5    Q.    And what's your sister's name?
 6    A.    Shannon.
 7    Q.    I want to ask you about a day in the summer of 2016,
 8    specifically July 26th of 2016.
 9          Did you share heroin with your sister, Shannon, on that
10    day?
11    A.    Yes.
12    Q.    And can you tell us what happened.
13              MR. TRAINOR:  Objection.
14              THE WITNESS:  She overdosed.
15              THE COURT:  Same objection.  Overruled.
16    BY MS. HOFFMAN:
17    Q.    You can answer, Mr. Robinson.  What happened?
18    A.    She overdosed.
19    Q.    And had you purchased the heroin through T-Roy that day?
20    A.    Yes.
21    Q.    Excuse me.
22          You said your sister overdosed.  Can you give us some more
23    detail.  Can you explain what you observed.
24    A.    It was about three or four minutes after she had done it,
25    she had left the room.  And then I had went to go get a drink
```

```
 1    of water or something, and I saw her laying down.

 2        And it was at that time that I panicked, and somebody in

 3    my house got involved and called 9-1-1.  And --

 4    Q.   Was your sister unconscious?

 5    A.   She was unconscious, yes.

 6    Q.   What happened when you called -- when 9-1-1 was called?

 7    A.   They came.  And she had woken up by that time, and then we

 8    just told 'em some story, like -- I don't know.

 9    Q.   What story did you tell them?

10    A.   I believe she told 'em that she had taken some sort of

11    pill and got dizzy or something and had been on some --

12    Q.   Was that true?

13    A.   -- medication.

14        No, it was not true.

15    Q.   Had you seen her take the heroin that day?

16    A.   Yes.

17    Q.   And how did she take it?

18    A.   Injection.

19    Q.   Did she go in the ambulance to the hospital?

20    A.   She did not.

21    Q.   And why not?

22    A.   Because she was okay.  She didn't see any purpose in it.

23    Q.   Was there anything unusual about the transaction with

24    T-Roy that day?

25    A.   On that day I was asked to tell him how -- the quality of
```

1    it --

2    **Q.**    You said that --

3    **A.**    -- which was unusual.

4    **Q.**    -- T-Roy asked you to report on the quality of the heroin?

5    **A.**    Yes.

6    **Q.**    And how was the quality of heroin that day, based on --

7    based on your experience with heroin?

8    **A.**    I don't remember, like, specifically thinking it was,

9    like, that great.  I just -- I just remember the incident that

10   happened, you know.  And I did call back just to warn, you

11   know, like, "Hey, this is really strong."

12   **Q.**    You mentioned that you called back to warn that it was

13   strong.  And I'm going to play a call from

14   Government's Exhibit Wire 3, which has come into evidence as a

15   CD of wire calls intercepted over a phone number,

16   (443) 709-7780, belonging to Jamal Lockley, a/k/a T-Roy.

17         And I'm going to play a call, TT-3-3354.

18         And in the transcript binders, this is on Page 110 of the

19   wire call tab.

20         Mr. Robinson, can you see on the screen in front of you

21   the transcript there?

22   **A.**    Yes.

23   **Q.**    And would you mind reading the date of this call for us.

24   **A.**    7/26/2016.

25   **Q.**    I'll play the call.

```
 1              (Audio was played but not reported.)

 2      BY MS. HOFFMAN:

 3      Q.   Do you recognize the participants in that call?

 4      A.   Yes.

 5      Q.   And who is it?

 6      A.   I believe it was T-Roy.

 7      Q.   And is that also you?

 8      A.   Yes.

 9      Q.   Did you make this call the same day that your sister

10      overdosed?

11      A.   Yes.

12      Q.   And did there come a time when you stopped buying heroin

13      from T-Roy?

14      A.   Yes.

15      Q.   And why was that?

16      A.   Because I wanted to get sober.

17      Q.   Was there a particular incident that precipitated your no

18      longer buying heroin from T-Roy?

19      A.   Yes.

20      Q.   Can you tell us what happened.

21      A.   Yeah.  I had shorted somebody and drove off, but that was

22      a long time ago.

23      Q.   When you say "shorted," what does it mean to short

24      somebody?

25      A.   To not give them the full amount of money that they were
```

1   expecting.

2   **Q.**   On that day, had you called T-Roy like you normally did?

3   **A.**   Uh-huh.

4   **Q.**   And had you asked for your normal amount?

5   **A.**   Yes.

6   **Q.**   Was that a half gram?

7   **A.**   Uh-huh.

8   **Q.**   And I believe you testified that you paid $50 for half a

9   gram?

10  **A.**   Yes.

11  **Q.**   And can you tell us exactly what happened when -- when the

12  heroin was delivered to you.

13  **A.**   My memory isn't -- of that day wasn't that great because I

14  was under the influence of a lot of different things.

15  **Q.**   So you said that you shorted -- you shorted someone money.

16  Was the person you shorted money to the runner who arrived to

17  deliver you heroin?

18  **A.**   I believe it was, yes.

19  **Q.**   And then you said you sped away?

20  **A.**   Yes.

21  **Q.**   And after that, you said you never purchased heroin from

22  T-Roy again?

23  **A.**   No, I didn't.

24  **Q.**   I just want to go back briefly.

25       You said you believed you started purchasing heroin from

1    T-Roy in 2014 or 2015; is that right?

2    **A.**   Yes.  It was probably around 2015.  Because I looked up

3    the date, and it said 2016 when that call was.  So it was

4    probably around 2015.

5    **Q.**   Okay.  Do you know when -- do you recall when in 2015?

6    **A.**   No.

7    **Q.**   Okay.  When you would call T-Roy to order heroin, was it

8    the same voice that you would hear on the other end?

9    **A.**   I believe it was.

10          **MS. HOFFMAN:**  Thank you, Mr. Robinson.

11          I don't have any further questions for you.

12          **THE WITNESS:**  Thank you.

13          **THE COURT:**  All right.  Thank you.

14          Any questions?

15          **MS. WHALEN:**  No questions.

16          **THE COURT:**  All right.  Mr. Trainor.

17                         CROSS-EXAMINATION

18   **BY MR. TRAINOR:**

19   **Q.**   Good morning, Mr. Robinson.

20   **A.**   Good morning.

21   **Q.**   As I understand it, a friend of yours gave you a phone

22   number and told you you could get heroin if you called this

23   number, and the friend was the person who said that the number

24   was for T-Roy; correct?

25   **A.**   Yes.

1  **Q.**   Now, you would call that number and from time to time buy

2  a half a gram of heroin; correct?

3  **A.**   Yes.

4  **Q.**   But you'd never actually met this person who your friend

5  identified as T-Roy, did you?

6  **A.**   No.

7  **Q.**   All right.  You mentioned that in one incident when you

8  shorted someone, that you were under the influence of a lot of

9  different things besides heroin; correct?

10  **A.**   Yes.

11  **Q.**   What were those different things?

12  **A.**   Xanax.

13  **Q.**   What else?

14  **A.**   It might have been Xan -- it was two different types of

15  benzos, Xanax maybe and Klonopin.

16  **Q.**   Klonopin?  Are those prescription drugs or --

17  **A.**   Yes.

18  **Q.**   And did you have a prescription for those things?

19  **A.**   No.

20  **Q.**   And who did you get those from?

21  **A.**   A friend.

22  **Q.**   All right.  So you would take Xanax, Klonopin, and

23  supplement it with heroin; correct?

24  **A.**   Yes.

25  **Q.**   And at that point in your life, you were shooting drugs,

```
1    right, with a hypodermic needle (indicating)?
2    A.   Yes.
3    Q.   And your sister was also doing the same thing; correct?
4    A.   Yes.
5    Q.   And she would take pills like Klonopin and Xanax as well.
6    A.   Not those, but the heroin, yes.
7    Q.   Percocets?
8    A.   Yes.  Yeah.
9    Q.   Yeah.  And, in fact, that time when you said she took some
10   heroin and fell asleep, you don't know whether or not she had
11   also been taking Percocets that day, do you?
12   A.   I don't.
13   Q.   Yeah.  And, in fact, when you -- you called the ambulance
14   and they came to, I assume, your home?
15   A.   Yes.
16   Q.   Your sister told the ambulance personnel that, in fact,
17   she had been taking Percocets, and that is what caused her to
18   go to sleep; correct?
19   A.   Yes.
20   Q.   All right.  Now, when you would call this number and meet
21   some -- you say the calls were very short, just a few words,
22   like, "Come"; right?
23   A.   Yes.
24   Q.   You would go to an area in Northwest Baltimore that was
25   not actually at the BP station; correct?
```

1   **A.**   Yes.

2   **Q.**   In fact, there was -- do you recall the Chelsea Square

3   Apartments?

4   **A.**   Maybe, yeah.

5   **Q.**   Maybe, but you're not sure?

6   **A.**   I'm not sure.

7   **Q.**   So you're really not sure exactly where you went to buy

8   drugs in Northwest Baltimore?

9   **A.**   At the time I did.  I -- I learned the locations and --

10  yeah.

11  **Q.**   But you don't remember now?

12  **A.**   I don't anymore, no.

13          **MR. TRAINOR:**  All right.  I don't have any further

14  questions.

15          Thank you.

16          **THE COURT:**  Thank you, Mr. Trainor.

17          Any redirect?

18          **MS. HOFFMAN:**  No redirect.  Thank you.

19          **THE COURT:**  Okay.  Thank you, sir.  You are excused.

20          **THE WITNESS:**  Okay.

21      (Witness excused.)

22          **THE COURT:**  Is the Government calling another witness?

23          **MS. PERRY:**  Yes, Your Honor.  The Government calls

24  Shannon Robinson.

25          **THE CLERK:**  Please raise your right hand.

```
 1            SHANNON ROBINSON, GOVERNMENT'S WITNESS, SWORN.
 2            THE CLERK:  Please be seated.
 3            Please speak directly into the microphone.
 4            State and spell your full name for the record, please.
 5            THE WITNESS:  Okay.  S -- or Shannon Robinson,
 6    S-H-A-N-N-O-N, R-O-B-I-N-S-O-N.
 7            THE CLERK:  Thank you.
 8                         DIRECT EXAMINATION
 9    BY MS. PERRY:
10    Q.   Good morning.
11    A.   Good morning.
12    Q.   How old are you?
13    A.   28.
14    Q.   And directing your attention back to the summer of 2016,
15    who were you living with around then?
16    A.   My family, parents, my brother.
17    Q.   And you said your brother.  Who's your brother?
18    A.   Brandon Robinson.
19    Q.   And back in the summer of 2016, were you using drugs?
20    A.   Yeah.
21    Q.   What kind?
22    A.   Heroin.
23    Q.   How often were you using heroin?
24    A.   Not -- it was just kind of recreational for me, not too
25    much.
```

1    **Q.**    And where did you get the heroin you used from?

2    **A.**    My brother got it.

3    **Q.**    Did you always get it from your brother?

4    **A.**    Uh-huh.

5    **Q.**    Now, around that time, did your brother, Brandon, have a

6    substance abuse problem?

7    **A.**    Yeah.

8    **Q.**    Ms. Robinson, were you ever with your brother when he

9    obtained heroin?

10   **A.**    I did go a couple times with him.

11   **Q.**    And when you would go with him, where would you go, if you

12   recall?

13   **A.**    Baltimore.

14   **Q.**    And do you recall any specific areas of Baltimore that you

15   would go to?

16   **A.**    Just a gas station, the BP gas station.

17   **Q.**    And when you were with your brother on those few

18   occasions, did you ever see who handed him the drugs?

19   **A.**    No.  I didn't look at their faces.

20   **Q.**    So I want to direct your attention specifically to

21   July 26th of 2016.  Do you remember that day?

22   **A.**    Yeah.

23   **Q.**    What were you doing on that day?

24   **A.**    Well, I woke up and I was kind of having a couple beers.

25   And then my brother came home and he had "boughten" the heroin,

1    so we did it.

2    **Q.**    Around what time did you do heroin that day, if you

3    recall?

4    **A.**    I think it was like midday.

5    **Q.**    And you said that your brother came back with heroin.  Did

6    he provide you with some of it?

7    **A.**    Yes.

8    **Q.**    And what did you do with it?

9    **A.**    We injected it.

10   **Q.**    Tell us what happened after you injected the heroin.

11   **A.**    Um, I don't remember what happened right after.  I just

12   woke up on the floor in the kitchen.

13   **Q.**    So where were you when you did the heroin?

14   **A.**    My brother's room.

15   **Q.**    And what's the next thing you remember?

16   **A.**    I -- I just remember, like, opening my eyes.  And my

17   brother was over, like, looking at me.  And he had said that I

18   was unresponsive and that he had called the ambulance and that

19   I guess I basically had OD'd.

20   **Q.**    Do you recall -- do you know how long you were

21   unconscious?

22   **A.**    I don't know.

23   **Q.**    And when you woke up, were you in any pain?

24   **A.**    Um, it was -- I was uncomfortable.  I could tell that

25   something was wrong.  But not until like a couple -- like a

```
 1   day -- like the next day, I had incredibly bad pain in -- like,
 2   right here (indicating).
 3   Q.   And you're --
 4   A.   My ribs.
 5   Q.   Your abdomen?
 6   A.   Uh-huh.
 7   Q.   And did you have any marks on your abdomen?
 8   A.   Yeah.  I had a big, black bruise.
 9   Q.   And do you know what that was from?
10   A.   I guess my brother had to give me, you know --
11            MR. TRAINOR:  Objection.
12            THE WITNESS:  -- the compressions.
13   BY MS. PERRY:
14   Q.   Let me stop you right there.
15            THE COURT:  Sustained.  Sustained.
16   BY MS. PERRY:
17   Q.   Now, did -- once you became -- when you woke up as you
18   described it, what happened next?  Did there come a time when
19   anyone else arrived?
20   A.   Yeah.
21   Q.   Who arrived?
22   A.   The ambulance.
23   Q.   And what happened when the ambulance got there?
24   A.   I basically just tried to get them to leave.  They asked
25   me if I was okay.  They didn't give -- like, that was it.  They
```

1  just came, kind of crowded around me.  I told them that I was

2  going to be fine, and they left.

3       I did not, like, tell them that I had taken the heroin.  I

4  had said that I had taken pills instead, 'cause I was afraid to

5  tell them.

6  **Q.**   Why did you tell them you had taken pills?

7  **A.**   I didn't want to tell them that I did that.  I didn't want

8  to, you know -- I didn't want to talk about it.

9  **Q.**   And had you taken pills that day?

10 **A.**   No; just the heroin.

11 **Q.**   Now, Ms. Robinson, I want to show you

12 Government's Exhibit MISC-2.  These are records from the

13 response.

14      Can you see the screen next to you?

15 **A.**   Yeah.

16 **Q.**   And can you see the portion I'm zooming in on?

17 **A.**   Yes.

18 **Q.**   Whose name is that?

19 **A.**   That's my name.

20 **Q.**   And can you see the date here at the top?

21 **A.**   I can.

22 **Q.**   Can you just read that date for us.

23 **A.**   7/26/2016.

24 **Q.**   Now, I want to turn to the next page and just zoom in

25 here.

1        And do you see the part here that I've highlighted that

2   says that patient wanted to refuse transport to the hospital?

3   **A.**   Yes.

4   **Q.**   Did you, in fact, refuse to go to the hospital on that

5   day?

6   **A.**   I did.

7   **Q.**   Now, Ms. Robinson, you said that you occasionally used

8   heroin before this particular day.

9   **A.**   Uh-huh.

10  **Q.**   Was your reaction this day different than typical?

11  **A.**   Yeah.

12  **Q.**   How so?

13  **A.**   I -- I passed out.  I had never done that before and,

14  like, completely lost the track of time when I was passed out.

15  I had no idea that I had.  I don't remember going upstairs.  It

16  was just weird.

17            **MS. PERRY:**  Court's indulgence.

18            Nothing further.  Thank you.

19            **THE COURT:**  Thank you.

20            Mr. Trainor.

21            **MR. TRAINOR:**  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23  **BY MR. TRAINOR:**

24  **Q.**   Good morning, Ms. Robinson.

25  **A.**   Good morning.

1    **Q.**   Forgive me if I ask a few questions.  I couldn't hear

2    everything you said over there.

3         On July 26th, 2016, your brother, Brandon, brought you

4    some drugs; is that right?

5    **A.**   Yes.

6    **Q.**   And you didn't go with him to get drugs --

7    **A.**   Not that day, no.

8    **Q.**   -- that day?

9         But it wasn't that unusual for Brandon to bring drugs to

10   you; correct?

11   **A.**   Yeah.  I -- like, are you -- as in asking if he's the one

12   that I'd usually gotten drugs from?  Yeah.

13   **Q.**   Is he the one you -- well, that's what I'm asking.

14   **A.**   Yeah, yeah.  Sorry.  I was just trying to clarify.

15   **Q.**   And it wasn't -- you wouldn't just get heroin from him,

16   you'd get Percocets as well?

17   **A.**   No, no, unh-unh.

18   **Q.**   You never did Percocets?

19   **A.**   No, no, no.  I had -- the reason why the Percocet was

20   brought up, I did not want to tell the ambulance that I had

21   injected the heroin, so I said Percocet.

22   **Q.**   Did you sometimes do Percocets and other pills?

23   **A.**   Not -- not regularly, no.

24   **Q.**   All right.  Well, what -- I think I heard you say that on

25   July 26th of 2016 when the ambulance came, you told the

```
 1   ambulance attendants that you had been taking pills.
 2   A.   Yes.
 3   Q.   And that when you were asked, "Had you been taking pills
 4   that day?" you said, "I don't think so."  So you're not
 5   positive whether you were taking pills as well that day?
 6   A.   I'm positive I was not taking pills.
 7   Q.   You are positive?
 8   A.   I'm positive, yes.
 9   Q.   All right.  And how long had you been actually injecting
10   drugs when you lost consciousness?
11   A.   I'd say on and off, I -- I don't really -- how long?  A
12   couple months, maybe, but not like all -- I wasn't doing it
13   every day.  Just in the span that I had ever tried heroin,
14   then, yes.
15   Q.   You weren't doing it every day?
16   A.   No.
17   Q.   You say you were doing it recreationally; is that right?
18   A.   (Nods head.)
19   Q.   And were you aware that your brother, Brandon, was -- had
20   a fairly bad heroin habit?
21   A.   I was aware, yes.
22   Q.   And were you aware that he was doing other drugs as well,
23   such as Klonopin and Xanax --
24   A.   Yes.
25   Q.   -- and pills that he was getting from someone else, like a
```

1   friend of his?

2   **A.**   Yeah.

3   **Q.**   So he got drugs from more than one source?

4   **A.**   Yes.

5   **Q.**   All right.  And you don't know for sure what source he got

6   the drugs from that he gave you to inject, do you?

7   **A.**   No, I couldn't say.

8          **MR. TRAINOR:**  Thank you.  No further questions.

9          **THE COURT:**  Any redirect?

10         **MS. PERRY:**  No, Your Honor.

11         Thank you.

12         **THE COURT:**  Okay.  Thank you very much, Ms. Robinson.

13         You can be excused.

14      (Witness excused.)

15         **THE COURT:**  Does the Government have another witness?

16         **MS. HOFFMAN:**  The Government calls Troy Dannenfelser.

17         **THE CLERK:**  Please raise your right hand.

18      SPECIAL AGENT TROY DANNENFELSER, GOVERNMENT'S WITNESS,

19   SWORN.

20         **THE CLERK:**  Please speak directly into the microphone.

21         State and spell your full name for the record, please.

22         **THE WITNESS:**  Sure.  My name is Troy Dannenfelser.

23   Last name is D-A-N-N-E-N-F-E-L-S-E-R.

24         **THE CLERK:**  Troy, T-R-O-Y?

25         **THE WITNESS:**  Yes, ma'am.

36

```
 1              THE CLERK:  Thank you.

 2              THE WITNESS:  Thank you.

 3                        DIRECT EXAMINATION

 4   BY MS. HOFFMAN:

 5   Q.   Good morning, Agent Dannenfelser.

 6   A.   Good morning.

 7   Q.   Where do you work?

 8   A.   For the Bureau of Alcohol, Tobacco, Firearms & Explosives.

 9   Q.   And what's your title?

10   A.   I'm a supervisory Special Agent.

11   Q.   How long have you worked for ATF?

12   A.   16 years.

13   Q.   As part of your duties as a Special Agent for the ATF,

14   were you asked to assist with a -- the execution of a

15   search warrant in the fall of 2016?

16   A.   I was.

17   Q.   And I want to direct your attention to September 27th of

18   2016 in particular.

19   A.   Okay.

20   Q.   Was that the day the search warrant was executed?

21   A.   It was.

22   Q.   And where was the search warrant executed?

23   A.   At 32 Stockmill Road, Apartment E.

24   Q.   Who was the subject of the search warrant?

25   A.   Mr. Deleon.
```

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

**JA4260**

1  **Q.**  And did he have any nicknames?

2  **A.**  Murda.

3  **Q.**  I'm going to show you Government's Exhibit IND-20.

4  Who is that?

5  **A.**  That's Mr. Deleon, the sus -- the target of that

6  search warrant.

7  **Q.**  Approximately what time did you execute the

8  search warrant, if you recall?

9  **A.**  It would have been 6:00 a.m.

10 **Q.**  And were you -- who, if anyone, was located in the house?

11 **A.**  Mr. Deleon, a female, and a small child.

12 **Q.**  What was your role in this search warrant?

13 **A.**  I was the team leader for this search warrant.

14 **Q.**  And what does that mean exactly?

15 **A.**  I was responsible for the oversight for the collection of

16 evidence, processing, Mirandizing occupants of the residence,

17 and any interviews that were to be conducted.

18 **Q.**  And did you recover items of evidence from the residence?

19 **A.**  We did.

20 **Q.**  Can you give me an overview of what you recovered.

21 **A.**  Cell phones, currency, a quantity of marijuana, packaging

22 material for distribution, some photographs, and a large banner

23 or flag for the gang.

24 **Q.**  And do you recall the approximate quantity of marijuana

25 that was recovered?  And if -- actually, Agent Dannenfelser, if

1   that's your -- did you record what happened that day in a

2   report?

3   A.   I did.

4   Q.   And would it refresh your recollection to refer to your

5   report?

6   A.   Yes, please.

7   Q.   Go ahead and then let me know if that refreshes your

8   recollection.

9   A.   Okay.  We don't have the weight on at the time because

10  that would have been done at Baltimore City evidence for the

11  laboratory.  But it was a large bag that was in a safe in the

12  bedroom, as well as some smaller bags on top of the safe

13  containing marijuana and bags in a void space under a steering

14  wheel of a vehicle that was outside of the residence.

15  Q.   Were there photographs taken of the -- and if you could

16  put the report aside just to --

17  A.   (Witness complies.)

18  Q.   Were there photographs taken during the search warrant?

19  A.   Yes.

20  Q.   I'm going to show you some photographs, starting with

21  Government's Exhibit SW-7-F.

22       What are we looking at here?

23  A.   So on the right side of that picture is the safe that was

24  in the closet in the master bedroom.  The Ziploc baggie inside

25  the safe is the larger quantity of marijuana I referred to just

DANNENFELSER - DIRECT

 1   now.

 2        Above it you'll see sandwich baggies, and there's some

 3   more in the left side also on the top shelf.

 4   **Q.**   And I'm going to approach and show you

 5   Government's Exhibit D-22.

 6   **A.**   Okay.

 7   **Q.**   (Handing.)

 8        Can you tell us what you're looking at there.

 9   **A.**   This is the marijuana that you see in that photograph

10   there (indicating).

11   **Q.**   I'm going to show you Government's Exhibit SW-7-G.

12   **A.**   Okay.

13   **Q.**   What are we looking at here?

14   **A.**   That was the currency also mentioned that was beneath the

15   marijuana in that safe in that closet.

16   **Q.**   And SW-7-H.

17        What are we looking at here?

18   **A.**   Same closet.  To the left of the safe, more currency that

19   was on the shelf that was also seized and reported.

20   **Q.**   And SW-7-I.

21        What are we looking at here?

22   **A.**   Again, you can barely -- the safe is to the right of that

23   screen and then more of the sandwich bags and packaging

24   material.

25   **Q.**   I'm going to show you Government's Exhibit -- well, you

1   mentioned that you recovered cell phones during the

2   search warrant?

3   **A.**   We did.

4   **Q.**   I'm going to show you Government's Exhibit SW-7-L.

5   **A.**   Okay.

6   **Q.**   And what are we looking at here?

7   **A.**   There's a -- this plastic drawer also in the bedroom,

8   there's a cell phone in that bottom drawer, which is what we're

9   depicting in that photograph.

10   **Q.**   And I'll show you SW-7-M.

11         What are we looking at here?

12   **A.**   A close-up picture, bottom of that photograph is the

13   LG cell phone that we recovered and reported on.

14   **Q.**   And I'm going to approach and show you

15   Government's Exhibit CELL-4.

16   **A.**   Okay.

17   **Q.**   (Handing.)

18         What are you looking at there?

19   **A.**   This is the cell phone that's depicted in that photograph.

20   **Q.**   And I believe you testified earlier that you recovered

21   multiple cell phones.

22   **A.**   Yes.

23   **Q.**   I'm going to show you Government's Exhibit SW-7-N.

24         What are we looking at here?

25   **A.**   Sure.  This is also the gang banner that I referred to

```
 1   that was also seized during the search warrant.

 2   Q.   And, for the record, would you mind reading what the

 3   banner says.

 4   A.   Across the top it says "Mookie, MIP."

 5        And then at the bottom "MMP."

 6   Q.   And I'm going to approach and show you

 7   Government's Exhibit SW-7-Z.

 8        And I'm also going to show you SW-7-AA.

 9   A.   Okay.

10   Q.   (Handing.)

11        And can you tell us what you're looking at, first, in

12   Government's Exhibit SW-7-Z.

13   A.   SW-7-Z is this banner that you see in the photograph.  I

14   can open it up if you'd like to see it, but it's quite large.

15        (Displaying banner to jury.)

16   BY MS. HOFFMAN:

17   Q.   Thank you.

18   A.   You're welcome.

19   Q.   And when you're ready, could you tell us what is in

20   SW-7-AA.

21   A.   That's a mass card for Mr. Maurice Braham (indicating).

22   Q.   Now, you mentioned that you recovered

23   Government's Exhibit CELL-4, the cell phone you just referred

24   to.

25        Was that cell phone turned over to another law enforcement
```

1   officer for a search warrant to be executed on it?

2   **A.**   It was.

3   **Q.**   Did you search any vehicles at the residence?

4   **A.**   We did; two vehicles.

5   **Q.**   And I'm going to show you Government's Exhibit SW-7-O.

6       What are we looking at there?

7   **A.**   This is one of the vehicles that we searched.  It's a

8   black BMW.

9   **Q.**   Did you recover any items of evidence from the BMW?

10  **A.**   We did.

11  **Q.**   Can you give us an overview of what you found.

12  **A.**   May I refer to my report for that one?

13  **Q.**   Sure.  Would it refresh your recollection?

14  **A.**   It would.  Thank you.

15      So as I previously mentioned, that was the three smaller

16  bags of marijuana under a void space in the steering wheel, a

17  stun gun, and miscellaneous letters and then this flier

18  (indicating).

19  **Q.**   I'm going to show you Government's Exhibit SW-7-P.

20      What are we looking at here?

21  **A.**   This is the steering wheel area, and you might be able to

22  make out in the photograph the plastic baggie that's sticking

23  out from beneath the steering column.

24  **Q.**   And SW-7-Q.

25      What are we looking at there?

DANNENFELSER - DIRECT

```
 1   A.   Same photo, closer up of the baggie.

 2   Q.   SW-7-R.

 3   A.   That is the baggie once it had been removed from the

 4   steering column.

 5   Q.   SW-7-V?

 6   A.   The stun gun.

 7   Q.   SW-7-W?

 8   A.   The driver -- the vehicle registration for that vehicle to

 9   Mr. Deleon, who was the target of that location.

10   Q.   I'm going to show you SW-7-S.

11        What are we looking at here?

12   A.   That's where we found more of the documents as mentioned

13   in the report.

14   Q.   And I'm going to show you SW-7-T.

15        What are we looking at there?

16   A.   This was mail that we found inside of the vehicle as well.

17   Q.   And can you read the address on there.

18   A.   The ship-to address was 3130 Howard Park Avenue,

19   Baltimore, Maryland 21207.

20   Q.   And what's the name above that?

21   A.   Looks like "Devon Dentist" is what they have written

22   there.

23   Q.   And I'd like to show you Government's Exhibit MISC-11.

24        MR. SARDELLI:  Your Honor, may we approach?

25        THE COURT:  Sure.
```

1          (Bench conference on the record:

2          **MR. SARDELLI:**  The Government told me they'd give me a

3    heads-up before this came in.  I think it was newly identified

4    as an exhibit, Your Honor, so I would object as a late

5    disclosure.

6          Also, I'm not sure what relevance it has in the case.

7    It's a prison letter from Devon Dent, I believe.

8          **MS. HOFFMAN:**  So we did not notice it as an exhibit.

9    That is my fault.  It was turned over in discovery a long time

10   ago.

11         But it corresponds to the -- it basically is the

12   inside of the photo that we just saw, the mail.  And the reason

13   that it's relevant is that the sender is Devon Dent, and he

14   actually spells out his name and his SID number and where he

15   is.

16         And he requests that Ayinde Deleon, who he's writing

17   to, help smuggle drugs in to him, into the jail for him.  He

18   uses coded language and explains how to package the -- what he

19   refers to as strippers, which he's referring to as Suboxone

20   strips.

21         And there are some corresponding jail calls in which

22   they discuss the smuggling of drugs into jail.

23         These are co-conspirators.  They are indicted

24   co-conspirators.  And it is part of the theory of our case that

25   the conspiracy continued when members of the gang went to jail

```
 1    and that members on the street, it was an obligation of theirs

 2    to help members of the gang who were incarcerated by, among

 3    other ways, smuggling drugs into the jail for them.

 4            And so we believe that this -- this letter and the

 5    corresponding calls help prove that method and means of the

 6    racketeering conspiracy.

 7            MR. SARDELLI:  I would argue --

 8            THE COURT:  Is there anything specifically relating,

 9    just curious, to your client.

10            MR. SARDELLI:  I don't believe so, Your Honor, but

11    they're going to be trying to tie in Devon Dent through the

12    cooperator.  I anticipate he will come up through the

13    cooperating witness who's going to be coming up, Your Honor.

14            So my guess is that they're wanting to highlight

15    Devon Dent now because he's going to come up with a later

16    cooperating witness.  I believe he will be testified about with

17    the cooperating witness.

18            And so I don't -- I'm not sure how this is relevant to

19    anybody that's on trial now, Your Honor.  And I'm also not sure

20    they've established that it's in furtherance of the conspiracy

21    after a member is out of the conspiracy.  This seems like he

22    wants drugs to use drugs.

23            So I'm not sure how this is in furtherance of the

24    conspiracy related to MMP.  I'm not sure they established that.

25            THE COURT:  Okay.  Well, I think it was,
```

```
 1    unfortunately, not on the exhibit list, is what I'm hearing.
 2    So I'm going to have to look at it in the context of whether
 3    some additional time is necessary to respond to it, whether it
 4    should not be admitted because it wasn't on the exhibit list.
 5    I don't know.
 6         But I think that we can reserve -- if, after further
 7    conversation, I decide that it's admissible, can we all just
 8    agree that it was just included in this envelope and, rather
 9    than re-calling the witness to say that or -- or we could have
10    him identify it but not publish it and leave for another day
11    the question of whether it's admissible.
12         MR. SARDELLI:  I believe he's a local witness,
13    Your Honor, so it shouldn't be an issue if you had to re-call
14    him --
15         THE COURT:  No.  But it's silly to call him back just
16    for --
17         MR. SARDELLI:  And I don't -- no offense, but I'm not
18    even sure this is really a key element anyways.  I'm bringing
19    it up because I think it's going to hurt, possibly hurt my guy
20    with another witness.  But obviously, this is probably overkill
21    by the Government.  I'm not sure this is even necessary at this
22    point.
23         THE COURT:  All right.  Have him identify it, don't
24    publish it yet, and let me look at it.
25         MS. HOFFMAN:  Sure.  And I do --
```

1          **THE COURT:**  Obviously, Mr. -- there's plenty of

2    evidence about Mr. Dent that is likely to be admissible, but --

3          **MS. HOFFMAN:**  Yes, and he will come up later today.

4          I did want to play some jail calls that are tied to

5    this.  Should we just skip that?

6          We did disclose it last night, and I apologize that it

7    wasn't on our exhibit list.  I do think that Mr. Sardelli has

8    had a chance to review it and note his objection, so I guess we

9    would ask --

10          **THE COURT:**  I'm not letting it in this minute.  I'm

11   not excluding it, but I need time to look at it.  I need time

12   to hear about it.  You can have the choice.  You can reserve

13   and you can -- if you prefer to re-call the witness, you can do

14   that.  Otherwise, you can have it the same, marked for

15   identification without showing it to the jury.

16          **MR. SARDELLI:**  Thank you, ma'am.

17          **MS. HOFFMAN:**  Thank you.)

18        (Bench conference concluded.)

19   **BY MS. HOFFMAN:**

20   **Q.**   Agent Dannenfelser, I'm going to approach and show you

21   what's been marked for identification only as

22   Government's Exhibit MISC-11.

23   **A.**   Okay.

24   **Q.**   (Handing.)

25        And without reading from it, can you just give us a

```
1    general description of what this is or where it came from.
2              THE COURT:  Where it came from.
3    BY MS. HOFFMAN:
4    Q.   Where it came from.
5    A.   Sure.  This was also recovered during this overall
6    search warrant operation.
7    Q.   And where was it recovered?
8    A.   This would have been in the vehicle.
9    Q.   And where in the vehicle?
10   A.   In this envelope that is on the screen now.
11   Q.   You mentioned that Government's Exhibit CELL-4 was
12   submitted for a search warrant to be conducted.  And I want to
13   show you Government's Exhibit CELL-4-A, which has been
14   identified as excerpts from the certified extraction report for
15   Government's Exhibit CELL-4.
16   A.   Okay.
17   Q.   And just to be clear, did you have any role in putting
18   together these excerpts?
19   A.   I did not.
20   Q.   You just recovered the phone?
21   A.   I did.
22   Q.   I'm going to direct your attention to the selected
23   contacts at the top.
24        Would you mind just reading that list of contacts.
25   A.   Sure.  The contacts as stored by the user in this phone
```

```
 1   were Bitch Teck, Mookie, Pee Wee, Sand, Sheisty, Teck Bitch,

 2   and Tone.

 3   Q.   And this document is only ten pages long, just in case

 4   anyone's worried.

 5        But I am going to direct your attention to a few

 6   text messages.

 7        Here on the first page, do you see that there are a few

 8   references here to Murda?

 9   A.   Yes.

10   Q.   And then do you see the reference in number 568 to

11   Marc Deleon?

12   A.   Yes.

13   Q.   Turning to the next page, do you see that there's a text,

14   a series of text messages with a contact saved as Phil right

15   here?

16   A.   Yes.

17   Q.   And could you just read those text messages.

18   A.   So Phil sends to this cell phone message [reading]:  What

19   you got?

20        The response is [reading]:  Dream.

21        And then Phil asks [reading]:  Can I get 2 ounces.

22   Q.   Next page, do you see this text message here from a number

23   ending in 1171?

24   A.   I do.

25   Q.   And could you read that text message.
```

1   **A.**   So that person sent a message to this phone that says

2   [reading]:  Quick call Mookie or ty nd.  Tell them a nigga

3   lurking in the alley by the gas station masked up.

4   **Q.**   And do you see that there are some text messages, two

5   text messages here to Sand?

6   **A.**   Yes.

7   **Q.**   And can you read those text messages for us.

8   **A.**   So from this phone, a message was sent [reading]:  Dummy,

9   this is m.  Call me ASAP.

10       And then follows up with [reading]:  Bring that red belt

11   out, bitch.

12   **Q.**   And then directing your attention here to the

13   text messages exchanged with Bitch Teck, would you mind reading

14   those text messages.

15   **A.**   So that individual, Teck, says [reading]:  Hey, Teck said,

16   What's Dirt' number?

17       And then this -- from this phone, the reply was [reading]:

18   Sand and that number, (443) 613-8760.

19   **Q.**   And going to the next page, do you see the text messages

20   exchanged here with a number ending in 8801?

21   **A.**   Yes.

22   **Q.**   Would you mind reading those text messages.

23   **A.**   So 8801, that number sends a message that says [reading]:

24   This Tiffany.  You got Tone number?

25       Our phone says [reading]:  Hold tight.

1          The sender then says [reading]:  Why you say that?

2          This phone replies [reading]:  I gotta find him.

3          The sender says [reading]:  He at work with Gutta.  Trying

4   to see what went on.

5   **Q.**   And I'm going to scroll down to Page 6.  And do you see

6   the text messages here with the contact Mookie?

7   **A.**   I do.

8   **Q.**   Can you read those text messages.

9   **A.**   So Mookie sends a message [reading]:  WYA, where you at?

10          This phone replies back [reading]:  Up top.

11          And then says [reading]:  Here I come.

12   **Q.**   And would you mind reading the phone number for Mookie.

13   **A.**   Sure.  It's listed as (443) 804-0086.

14   **Q.**   And then I just want to direct your attention here to

15   these two messages exchanged with contact Kane.  Would you mind

16   reading those.

17   **A.**   Sure.  So the individual Kane sends a message [reading]:

18   My bad everything straight.  I'ma need 20 more girls, please.

19          From this phone, the message reply is [reading]:  You

20   rolling, ain't you?  Give me a while.

21   **Q.**   Going to Page 9, do you see that there are text messages

22   exchanged with a contact saved as Pee Wee?

23   **A.**   Yes.

24   **Q.**   And would you mind reading those text messages.

25   **A.**   So this phone, what we see here, he writes [reading]:  Hit

1    me if Sand get back and see if anybody needs some grass before

2    I dip.

3         Follows up with [reading]:  All righty.  Tell him come up

4    the Windsor real quick.

5         Then Pee Wee writes back [reading]:  Who, Sand or

6    Big Dummy?

7         This phone writes back [reading]:  Sand.

8         Pee Wee responds [reading]:  Rd.

9         This phone [reading]:  Tone say he not down there?

10        Pee Wee responds [reading]:  I ain't say he was.  I'ma

11   tell them, though.

12        This phone we have [reading]:  If he not there now, just

13   tell him hit me when he get 'round 'cause I'm ready to dip.

14   Heartbeat.

15        And then [reading]:  Be safe.

16        Pee Wee replies back [reading]:  Rd 2 times.

17        From this phone [reading]:  Last thing, you gonna run

18   these 7 joints through tonight for me.

19             **MS. HOFFMAN:**  Thank you, Agent Dannenfelser.  I don't

20   have any more questions for you.

21             **THE WITNESS:**  Thank you, ma'am.

22             **MS. WHALEN:**  No questions, Your Honor.

23             **THE COURT:**  Anyone have any questions?

24        (No response.)

25             **THE COURT:**  Okay.  It appears that you're finished for

1    now.

2              **THE WITNESS:**  Thank you, ma'am.

3              **THE COURT:**  Thank you.  You're excused.

4         (Witness excused.)

5              **THE COURT:**  And does the Government have another short

6    witness or someone we could appropriately get started on?

7              **MS. PERRY:**  Yes, Your Honor, the Government calls

8    Michael Pratt.

9              **THE CLERK:**  Please raise your right hand.

10         MICHAEL PRATT, GOVERNMENT'S WITNESS, SWORN.

11             **THE CLERK:**  Please be seated.

12             Please speak directly into the microphone.

13             State and spell your full name for the record, please.

14             **THE WITNESS:**  Michael Pratt, P-R-A-T-T.

15             **THE CLERK:**  M-I-C-H-A-E-L?

16             **THE WITNESS:**  Yes.

17             **THE CLERK:**  Thank you.

18                          DIRECT EXAMINATION

19   **BY MS. PERRY:**

20   **Q.**   Good morning.

21   **A.**   Good morning.

22   **Q.**   Where are you currently working?

23   **A.**   I'm currently working here at the Federal Courthouse.

24   **Q.**   And what are you doing here at the Federal Courthouse?

25   **A.**   I am a court security officer.

1    **Q.**   Where were you employed before you became a court security

2    officer?

3    **A.**   I was employed with the Baltimore City Police Department

4    for 32 years.

5    **Q.**   And were you with the Baltimore City Police Department

6    around 2016?

7    **A.**   Yes, I was.

8    **Q.**   And what was your assignment with the Baltimore City

9    Police Department in 2016?

10   **A.**   I was assigned with the Alcohol, Tobacco, Firearms &

11   Explosives task force unit.

12   **Q.**   How long were you a task force officer with the ATF?

13   **A.**   For 12 years.

14   **Q.**   Now, I want to direct your attention to September 27th of

15   2016.  Did you assist with the execution of a search warrant on

16   that day?

17   **A.**   Yes, I did.

18   **Q.**   What was the -- where was the search warrant executed?

19   **A.**   225 South Herring Court in Baltimore City, state of

20   Maryland.

21   **Q.**   And who was the subject of that search warrant?

22   **A.**   Dwight Jenkins, a/k/a Huggie.

23   **Q.**   I'm going to show you Government's Exhibit IND-50.

24        Do you recognize the person on the screen?

25   **A.**   Dwight Jenkins.

1  **Q.**   Approximately what time was the search warrant executed on

2  September 27th?

3  **A.**   6:02 a.m.

4  **Q.**   And when you entered the residence, who was inside?

5  **A.**   Mr. Jenkins; his girlfriend, Ms. Sierra Manuel; and two

6  children.

7  **Q.**   Was the residence searched?

8  **A.**   Yes, it was.

9  **Q.**   Were any other locations searched during this time?

10  **A.**   Yes; his vehicle.

11  **Q.**   And what, if anything, was recovered from inside the

12  residence?

13  **A.**   There was a small amount of cocaine, bulletproof vest,

14  ammunition, bullets, packaging material, drug paraphernalia, an

15  iPhone, and a Maryland driver's license and photos.

16  **Q.**   Now, you said an iPhone.  Are you sure it was an iPhone

17  that was recovered?

18  **A.**   Let me see.

19       I'm sorry.  It was a white smartphone.

20  **Q.**   Were photos taken of the residence and the items

21  recovered?

22  **A.**   Yes, they were.

23  **Q.**   I'm going to show you Government's Exhibit SW-13-A.

24       Who are we looking at here?

25  **A.**   Mr. Jenkins.

1   **Q.**   And turning to SW-13-B, what are we looking at here?

2   **A.**   You're looking at the -- that's cocaine in a black plastic

3   wrapping.

4   **Q.**   Turning to SW-13-C, what are we looking at here?

5   **A.**   That's a black -- I would say a sports bag.

6   **Q.**   And was that sports bag searched during the course of the

7   search warrant?

8   **A.**   Yes, it was.

9   **Q.**   So turning to SW-13-D, what are we looking at here?

10  **A.**   That's the items that were in the black bag.  You have a

11  empty gun case.  You have a bulletproof vest, and you have

12  several containers of ammunition.

13  **Q.**   Turning to SW-13-E.

14      Now, what are we looking at here?

15  **A.**   Those items were recovered from Mr. Jenkins' jean front

16  pocket.  I recovered that Maryland driver's license in

17  Mr. Jenkins' name and the smartphone with the cracked screen.

18  **Q.**   Turning to SW-13-F.

19      What are we looking at here?

20  **A.**   We have a digital scale and some packaging material.

21  **Q.**   And SW-13-G.

22      What are we looking at here?

23  **A.**   We have a safe with some packaging materials and some

24  envelopes.

25  **Q.**   SW-13-H.

```
 1    A.    A safe with some photographs and documents.

 2    Q.    And finally -- and, sorry, and finally, SW-13-I.

 3          And what is this?

 4    A.    That's Mr. Jenkins' vehicle parked outside on the parking

 5    lot.

 6    Q.    Now, I want to show you, first, what we've marked as

 7    Government's Exhibit F-32.

 8          (Handing.)

 9          Do you recognize this exhibit?

10    A.    Those -- this is the ammunition that was recovered from

11    225 South Herring Court during the search warrant.

12    Q.    And now showing you Government's Exhibit CELL-9.

13          (Handing.)

14    A.    This is the smartphone that was recovered from

15    Mr. Jenkins' front pants pocket.

16    Q.    And was this cell phone provided to other ATF agents so

17    that a search warrant and a search of the phone could be

18    conducted?

19    A.    Yes, it was.

20    Q.    So I want to show you Government's Exhibit CELL-9-A, which

21    has come into evidence as an extract from a phone.  And just to

22    be clear, did you have any role in creating the excerpt that's

23    in front of you?

24    A.    No, I did not.

25    Q.    But have you had a chance to look at it before coming to
```

1    court?

2    **A.**   Yes.

3    **Q.**   So looking at CELL-9-A, can you just tell us up here what

4    the phone number for CELL-9-A is -- for CELL-9 is.

5    **A.**   (443) 301-8819.

6    **Q.**   And can you just tell us the e-mail addresses that were --

7    that are listed here.

8    **A.**   Dwight.jenkins.73@facebook.com.  Also dwightwo@gmail.com.

9    **Q.**   And do you see the three contacts listed here?

10   **A.**   Yes, I do.

11   **Q.**   Can you just tell us the names and the phone numbers

12   associated with these contacts.

13   **A.**   The first one is Cid 5200; the number, (443) 640-8950.

14          Second one, Cream, (667) 228-4194.

15          Third one, Trouble5200, (443) 600-0131.

16   **Q.**   Thank you.

17          **MS. PERRY:**  Nothing further.

18          **THE COURT:**  Thank you.

19          Any questions?

20          **MR. HAZLEHURST:**  Your Honor, if I may.

21          **THE COURT:**  Mr. Hazlehurst, sure.

22                     CROSS-EXAMINATION

23   **BY MR. HAZLEHURST:**

24   **Q.**   Good morning, sir.

25   **A.**   Good morning.

1   **Q.**   My name's Paul Hazlehurst.  I represent Shakeen Davis.

2        Again, you've testified in response to the Government

3   counsel's questions that you helped execute a search warrant;

4   correct?

5   **A.**   That's correct.

6   **Q.**   And as part of executing that search warrant, you

7   recovered certain items?

8   **A.**   Yes, sir.

9   **Q.**   And one of those items was a cell phone?

10  **A.**   Yes, sir.

11  **Q.**   And as you've testified, you turned over that cell phone

12  to another agency to examine that cell phone; correct?

13  **A.**   The ATF.  It was not turned over to another agency.  I was

14  detailed working with ATF, and I turned it over to --

15  **Q.**   To one of your compatriots in ATF?

16  **A.**   That's correct.

17  **Q.**   To execute a search warrant on that cell phone; correct?

18  **A.**   I did not, but someone did, yes.

19  **Q.**   In ATF?

20  **A.**   I believe so, yes.

21  **Q.**   Right.

22        And the result of that examination was contained in an

23  exhibit that was identified as CELL-9-A; correct?

24  **A.**   If it was the item that was just shown to me, yes.

25  **Q.**   That piece of paper -- it changes every time.  There we

 1   go.

 2       The item you were just shown, is that the item that you

 3   were just shown, sir?

 4   **A.**   Yes.

 5   **Q.**   And you were asked questions in particular identifying the

 6   number that applied to that phone, which was (443) 301-8819;

 7   correct?

 8   **A.**   Yes.

 9   **Q.**   Okay.  And you were also asked questions in regard to

10   selected contacts; is that correct?

11   **A.**   Yes, sir.

12   **Q.**   Now, again, you didn't have any hand in preparing this

13   particular exhibit, did you?

14   **A.**   No, sir.

15   **Q.**   And you didn't do the examination of that cell phone;

16   correct?

17   **A.**   No, sir.

18   **Q.**   But that cell phone was turned over by you to someone else

19   in ATF to examine that cell phone and determine if there was

20   any pertinent information on that cell phone; correct?

21   **A.**   Correct.

22   **Q.**   And, again, you were asked to identify particularly these

23   selected contacts.  And one of those contacts -- and I'm

24   pointing to it now -- was for Cream; correct?

25   **A.**   Correct.

```
 1   Q.   The number is (667) 228-4194; correct?
 2   A.   Correct.
 3   Q.   And, again, to your knowledge, that cell phone was
 4   examined thoroughly?
 5   A.   I have no idea.  It was -- it was turned over.  A
 6   search warrant was written for it.  And the items that is shown
 7   is what appears.
 8   Q.   You would expect, though, that if you turn it over to
 9   someone else in the ATF, they would do a thorough examination
10   of that cell phone; correct?
11   A.   Sure.  Yes.
12   Q.   Certainly.  And if there were any pertinent evidence that
13   would be contained in this excerpt; correct?
14   A.   Yes.
15   Q.   And there is no record of any calls or texts to that
16   particular number, (667) 228-4194, is there?
17   A.   Not that I see here.  Yes.
18   Q.   And to your knowledge, no texts or calls; correct?
19   A.   Not that I have any knowledge.
20           MR. HAZLEHURST:  No further questions, Your Honor.
21           THE COURT:  Anyone else?
22           MR. DAVIS:  No questions.
23           THE COURT:  Any redirect?
24           MS. PERRY:  No, Your Honor.  Thank you.
25           THE COURT:  Okay.  Thank you very much, sir.  You are
```

```
 1   excused.

 2         (Witness excused.)

 3         THE COURT:  All right.  And I think this might be a

 4   good time for the mid-morning recess.

 5         So I will be excusing the jury at this point.

 6         (Jury left the courtroom at 12:02 p.m.)

 7         THE COURT:  Okay.  Perhaps we could talk a little more

 8   about Mr. Ferguson.

 9         MS. HOFFMAN:  Sure.

10         THE COURT:  And I've looked at the grand jury.  Let me

11   be sure I understand exactly, Mr. Sardelli, what you're

12   objecting to.  Is it the -- there's an indication in -- sort of

13   starts at Page 17 and goes into Page 18 where he claims that

14   your client put a hit on him for $10,000, and he knew about

15   that through his cousin.  Is that --

16         MR. SARDELLI:  Yes, Your Honor.  I would have a couple

17   different objections to that.

18         One, it appears to be hearsay.  I know they're saying

19   there's another source now, but that source would appear to be

20   someone that's not part of the gang or whatever it is.  So I'm

21   not sure how that would be a statement in furtherance of the

22   conspiracy or some other type of hearsay exception, Your Honor.

23         Also, this all has to do -- and they put the banner up

24   there recently about Mookie and his funeral, and I don't think

25   there's any evidence that this is part of a conspiracy at all.
```

1      It seems equally likely to me that this was about an

2  individual grudge or vendetta about someone that killed

3  someone's cousin.

4      And, also, there's other evidence in there about

5  dealing directly with my client, and I don't think there's any

6  evidence that that was done on behalf of the MMP or somewhere

7  [sic] else.

8      So my objection is hearsay, and I'm having a hard time

9  understanding how it's in furtherance of the conspiracy and not

10 either a personal grudge or an individual deal that he had.

11     **THE COURT:**  Well, and let me hear from the Government,

12 because I don't want to get the two things confused here.

13     This grand jury testimony also talks about Mr. Braham,

14 Mookie, who's killed.  And we've already heard, I think seen

15 photographs.  This is the funeral in May of 2016.  According to

16 the evidence, Mr. Bailey was there.  There was the banner that

17 we've just heard about again that was found in a

18 co-conspirator's house.

19     And there is some indication that your client was not

20 happy about that.  That's a little bit different to me, or

21 perhaps that's what I need to hear about the hit, allegedly.

22     So let me hear from the Government, first, and then

23 you can respond.

24     How does this all fit together?  What are you

25 offering?

1        **MS. HOFFMAN:**  Sure.  And I think we've heard a bit

2   about it from William Banks.

3        There was this -- there were a couple of murders in

4   April of 2016 that sparked a violent feud between MMP and a

5   rival gang.

6        **THE COURT:**  Right.

7        **MS. HOFFMAN:**  And the witness who will be testifying

8   this afternoon, Mr. Ferguson, is a member of that rival gang,

9   and so he will testify about that violent feud.

10       As Your Honor pointed out, there has been evidence, I

11  think through multiple witnesses now, that Mookie was a member

12  of MMP and that his killing sparked retaliatory violence.

13       Mr. Banks, of course, testified about the murder of

14  Anthony Hornes; or he didn't know the person's name, but the

15  murder that happened right after Mookie's death on

16  Haddon Avenue.  He testified that he was driving in a car with

17  Gutta and T-Roy when Gutta shot somebody in retaliation for

18  Mookie's murder.

19       And so it's certainly all part of the racketeering

20  conspiracy.

21       The -- yes, and my co-counsel is pointing out that

22  Mr. Banks also testified that after Mookie's death, members of

23  the gang got together and actually formed plans and go and

24  retaliate.

25       The hit -- so Mr. Ferguson was a member of the rival

1    gang.  He will testify that he was suspected of having

2    something to do with Mookie's death and that as a result -- as

3    a direct result of that, he learned that he had money on his

4    head; that Antonio Walker-Bey -- he learned it from multiple

5    sources, but he did also learn it from Antonio Walker-Bey,

6    Tone, who told him, you know, We think you got something to do

7    with that, and you've got money on your head from Dirt

8    (indicating).

9           And so we do think that, of course, that's relevant,

10   admissible evidence and that it's part and parcel of the

11   racketeering conspiracy here to retaliate against someone who's

12   suspected of killing a fellow gang member.

13          And we don't think that it's -- I didn't intend to

14   elicit the statement by the cousin.  But I did intend to elicit

15   what he had heard from Tone, who has been established to be a

16   member of the Bloods and an affiliate of the defendants.

17          **THE COURT:**  Okay.  So assuming we keep out the cousin,

18   Mr. Sardelli, what's . . .

19          **MR. SARDELLI:**  Well, again, Your Honor, I guess I was

20   making two objections.  You are correct, Your Honor.  I was

21   making it whether it's in furtherance of the conspiracy and

22   other -- you know, the hearsay issues as well, Your Honor.  I

23   guess they're technically connected, Your Honor.

24          But, again, I don't -- I think the witness would have

25   to establish how it's in furtherance of the conspiracy, because

```
 1    if there is a murder and it's a family issue, Your Honor, I
 2    don't see this as being in furtherance of the conspiracy,
 3    Your Honor, because I think the allegation will be that this
 4    has to do with the fact that he's related, allegedly, to my
 5    client.  They're cousins, allegedly.  I think if that's the
 6    issue, Your Honor, then that's not in furtherance of the
 7    conspiracy.
 8          And I guess the main thing I would ask for is,
 9    obviously, I'm asking it to be excluded, first of all, but also
10    that when they're on direct examination that we don't put the
11    cart before the horse; that they lay the foundation and how he
12    knows and everything first before the answer comes out and then
13    we object.  But -- if it's objectionable at that point, it's
14    too late.
15          So I guess my argument is two points:  one to keep it
16    out; and, two, if we're going to see how it goes, making sure
17    that they're laying a foundation about if it is a hearsay
18    statement, to clearly identify:  Is it a statement of a
19    party-opponent?  Is it a statement in furtherance of a
20    conspiracy?  Or is it some third, impermissible form, because I
21    did flag that issue from the grand jury transcript, Your Honor,
22    relating to the cousin.
23          THE COURT:  Sure.  And I appreciate that.  And
24    certainly I think you're right about the cousin.  And I
25    wouldn't expect that to come in.
```

1        I do think that the issue of retaliation for Mookie's

2    murder is clearly part of the case as alleged, and that as long

3    as it's coming in from a person such as Tone, who I believe the

4    jury could legitimately find is part of the alleged conspiracy,

5    that's a different issue.

6        I don't think this is purely family.  I think there's

7    plenty of evidence in the case already that establishes it's

8    more than a family matter.

9        **MR. SARDELLI:**  Sure.  I would respectfully disagree

10   with that, but definitely we need to see what the witness

11   actually says is his basis of knowledge as well, Your Honor,

12   before they get to the statements.

13       **THE COURT:**  Okay.  All right.  Is Mr. Ferguson the

14   next witness?

15       **MS. HOFFMAN:**  He is, Your Honor.

16       **THE COURT:**  Okay.  All right.  We'll excuse the

17   gallery.

18       (Pause.)

19       **THE COURT:**  All right.  We'll take a short break.

20       (Recess taken.)

21       **THE COURT:**  All right.  A quick scheduling question,

22   thinking about next week, Monday.  Since we only have a half

23   day, would people be able to start at 9:30?

24       **MS. HOFFMAN:**  Yes.

25       **THE COURT:**  All right.  I will mention that to the

1    jury.

2          And I do not know about Thursday.  I don't think I'll

3    know until probably Monday or Tuesday.

4          Okay.  You can get the jury.

5       (Jury entered the courtroom at 12:30 p.m.)

6          **THE CLERK:**  Please stand, sir.

7          **THE COURT:**  The Government is calling another witness.

8          **MS. HOFFMAN:**  Mr. Ferguson, if you could take a step

9    back.  You're just leaning into the mic a little bit.

10          **THE CLERK:**  Please raise your right hand.

11       DEVIN FERGUSON, GOVERNMENT'S WITNESS, SWORN.

12          **THE CLERK:**  Please be seated.

13          Please speak directly into the microphone.

14          State and spell your full name for the record, please.

15          **THE WITNESS:**  Devin Ferguson, D-E-V-I-N,

16    F-E-R-G-U-S-O-N.

17          **THE CLERK:**  Thank you.

18                     DIRECT EXAMINATION

19    **BY MS. HOFFMAN:**

20    **Q.**   Good afternoon, Mr. Ferguson.

21    **A.**   Good afternoon.

22    **Q.**   Do you go by any other names on the street?

23    **A.**   Chynaman.

24    **Q.**   Are you currently incarcerated?

25    **A.**   Yes.

 1   **Q.**   And what offense were you convicted of?

 2   **A.**   Robbery with a deadly weapon.

 3   **Q.**   I'm sorry.  What did you say?

 4   **A.**   You said offense right now?

 5   **Q.**   What offense were you convicted of?

 6   **A.**   Possession of a firearm while being a convicted felon.

 7   **Q.**   And when were you arrested for that offense?

 8   **A.**   August 2nd, 2016.

 9   **Q.**   After your arrest, did you decide to cooperate with the

10   Government?

11   **A.**   Yes.

12   **Q.**   And did you testify before a federal grand jury?

13   **A.**   Yes.

14   **Q.**   Was that in August of 2016?

15   **A.**   Yes.

16   **Q.**   Did you ultimately plead guilty to being a felon in

17   possession of a firearm?

18   **A.**   Yes.

19   **Q.**   And did you plead guilty pursuant to a cooperation

20   agreement with the Government?

21   **A.**   Yes.

22   **Q.**   Have you been sentenced yet?

23   **A.**   No.

24   **Q.**   What's your understanding of your agreement with the

25   Government?

1    **A.**    A reduced sentence and a relocation.

2    **Q.**    And what are you required to do under the plea agreement?

3    **A.**    Tell the truth.

4    **Q.**    Did your arrest in August of 2016 result in you violating

5    your probation with respect to --

6            **MR. SARDELLI:**  Objection; leading.

7            **THE COURT:**  Sustained.

8    **BY MS. HOFFMAN:**

9    **Q.**    Can you tell us, do you have pending state violation of

10   probation charges?

11   **A.**    Yes.

12   **Q.**    And are you hoping that as a result of your plea, that

13   those will be resolved favorably as well?

14   **A.**    Yes.

15   **Q.**    You mentioned that you're also hoping for relocation; is

16   that what you said?

17   **A.**    Yes, that's --

18           **MR. SARDELLI:**  Objection; leading.

19           **THE COURT:**  Overruled.

20   **BY MS. HOFFMAN:**

21   **Q.**    And why are you hoping for help with relocation?

22   **A.**    My life in danger.

23           **THE COURT:**  All right.  Wait a minute.  Wait a minute.

24   Wait a minute.

25           Do you want to approach the bench?  Or can we just

1    move on for now.

2    **BY MS. HOFFMAN:**

3    **Q.**   What are you required to do under the terms of your plea

4    agreement?

5    **A.**   Tell the truth.

6    **Q.**   And what happens if you don't tell the truth?

7    **A.**   I can be charged with perjury, and everything will be

8    taken away from me.

9    **Q.**   Have you been promised a specific sentence?

10   **A.**   No.

11   **Q.**   And what's your understanding of what will happen if you

12   tell the truth today?

13   **A.**   That I can possibly get a reduced sentence and get

14   everything that I was supposed to get.

15   **Q.**   Who ultimately decides your sentence?

16   **A.**   The judge.

17   **Q.**   Have you been convicted of other crimes, Mr. Ferguson?

18   **A.**   Yes.

19   **Q.**   Can you tell us what crimes and at what ages.

20   **A.**   17, robbery with a deadly weapon.  And 19, unauthorized

21   use of a vehicle.

22   **Q.**   Are those the convictions that caused you to violate your

23   probation?

24   **A.**   Yes.

25   **Q.**   How old are you now?

1   **A.**   26.

2   **Q.**   And where are you from?

3   **A.**   Baltimore, Maryland.

4   **Q.**   Where in Baltimore are you from?

5   **A.**   Northwest Baltimore, Liberty Heights and Gwynn Oak.

6   **Q.**   Have you lived in that neighborhood your whole life?

7   **A.**   Yes.

8   **Q.**   At a certain point, did you join a gang?

9   **A.**   Yes.

10  **Q.**   And what gang did you join?

11  **A.**   Black Guerilla Family.

12  **Q.**   Was your gang involved in selling illegal drugs?

13  **A.**   Yes.

14  **Q.**   And where did your gang operate?  Where did they sell

15  drugs?

16  **A.**   Liberty Heights and Howard Park and Liberty Heights and

17  Garrison.

18  **Q.**   Now, I want to show you Government's Exhibit MAP-39.

19      And do you see the red pin -- you should be able to see it

20  on the screen in front of you.  Do you see the red pin located

21  at Liberty Heights and Garrison?

22  **A.**   Yeah, I see it.  Yes, I see it.

23  **Q.**   And how far is that or where is that in relation to

24  Liberty Heights and Gwynn Oak?

25  **A.**   About three blocks up the street.

 1   **Q.**   Can you tell me who were some of the other members of your

 2   drug organization.

 3          **MR. SARDELLI:**  Objection, Your Honor.  They haven't

 4   established a basis of knowledge, Your Honor.

 5          **THE COURT:**  I don't think we've talked about his drug

 6   organization yet.

 7   **BY MS. HOFFMAN:**

 8   **Q.**   Well, I believe you testified that your gang was involved

 9   in selling drugs?

10   **A.**   Yes.

11   **Q.**   And can you tell us the -- some of the other people who

12   were involved in selling drugs with you.

13   **A.**   Da-Rod, Ro-Ro, Dorian, and Supreme.

14   **Q.**   Was there a rival gang that sold drugs in the area?

15   **A.**   Yes.

16   **Q.**   And what gang was that?

17   **A.**   Mobbin' Bloods.

18   **Q.**   You say Mobbin' Bloods?

19   **A.**   Yeah.

20   **Q.**   Is that what you knew them as?

21   **A.**   Yeah.

22   **Q.**   And what areas did the Mobbin' Bloods -- if I refer to

23   them as the mob, will you know what I'm talking about?

24   **A.**   Yes.

25   **Q.**   What area did the mob claim as its territory?

1    **A.**    Liberty Heights and Gwynn Oak.

2    **Q.**    What was the relationship like between your gang, BGF, and

3    the mob in the Liberty Heights Gwynn Oak area?

4    **A.**    We ain't get along.

5    **Q.**    Did you learn a lot about the mob over the years?

6    **A.**    Yes.

7    **Q.**    Did you have -- did you know people who were in the mob?

8    **A.**    Yes.

9    **Q.**    Did you have any family members who were in the mob?

10   **A.**    No.

11   **Q.**    Did you have any family members who were Bloods?

12   **A.**    Yes.

13   **Q.**    Who was that?

14   **A.**    My brother.

15   **Q.**    Did you learn about the mob from him?

16   **A.**    Yes.

17   **Q.**    Did you know other people who were in the mob?

18   **A.**    Yes.

19   **Q.**    And can you tell us who.

20   **A.**    Tech.

21        **MR. SARDELLI:**  Objection, Your Honor.  I don't think

22   she's still established a basis of knowledge yet, Your Honor.

23        **THE COURT:**  Overruled.  He can explain who and explain

24   as to each person.

25        **MS. HOFFMAN:**  I'm sorry.  I didn't hear, Your Honor.

```
 1              THE COURT:  We need to explain how as to the people.
 2              MS. HOFFMAN:  Sure.
 3   BY MS. HOFFMAN:
 4   Q.   Did you -- did you know on a personal level some people
 5   who were in the mob?
 6   A.   Yes.
 7   Q.   And how did you know -- without telling me who they are,
 8   how did you know them?
 9   A.   I went to school with some of 'em.
10   Q.   And did you have -- did you grow up in foster care?
11   A.   Yes.
12   Q.   Did you have -- did you know one of them through foster
13   care?
14   A.   Yes.
15   Q.   Can you tell us who you knew in the mob.
16   A.   Tone, Antonio Walker-Bey.
17   Q.   Now, I'm going to show you Government's Exhibit IND-93.
18        Who is that?
19   A.   That's Tone.
20   Q.   And can you remind us again how you knew Tone.
21   A.   I knew him.  I grew up with him, went to school with him.
22   And plus we was in the same foster mom.
23   Q.   Was there another member of the mob who you went to school
24   with?
25   A.   Yeah.  Tech.
```

```
1    Q.    I'm going to show you Government's Exhibit IND-21.

2          Who is that?

3    A.    That's Tech.

4    Q.    Did you learn about the mob from Tone and Tech as well?

5    A.    Yes.

6    Q.    Did you learn who the leaders of the mob in the

7    Gwynn Oak-Liberty Heights area were?

8    A.    Yes.

9    Q.    And who were they?

10   A.    Dirt.

11   Q.    I'm going to show you Government's Exhibit IND-7.

12         Who's that?

13   A.    That's Dirt.

14   Q.    And do you see him in the courtroom today?

15   A.    Right there.

16   Q.    Can you point out an article of clothing he's wearing.

17   A.    Right there (indicating).

18   Q.    Was there another leader of the mob in the

19   Gwynn Oak-Liberty Heights area?

20   A.    Yes.

21   Q.    Who was that?

22   A.    Murda.

23   Q.    I'm going to show you Government's Exhibit IND-20.

24         Who is that?

25   A.    That's Murda.
```

1  **Q.**   Did you have interactions with Dirt on the street?

2  **A.**   Yes.

3  **Q.**   And did you observe his interactions with other members of

4  the mob?

5  **A.**   Yes.

6  **Q.**   And based on what you observed, what was Dirt's role in

7  the mob?

8  **A.**   He was the leader as far as collectin' money and makin'

9  sure everybody do their part.

10 **Q.**   Did members of the mob sell drugs in the Gwynn Oak and

11 Liberty Heights area?

12 **A.**   Yes.

13 **Q.**   And based on your observations of Dirt interacting with

14 other members of the mob, what was Dirt's role in the drug

15 organization?

16 **A.**   He was the one to get all the money and pass out the drugs

17 and call the shots.

18 **Q.**   What territory did Dirt control in terms of the drug

19 operation?

20 **A.**   Liberty Heights and Gwynn Oak, Liberty Height -- Gwynn Oak

21 and Rogers.

22 **Q.**   And I want to ask you some questions about Dirt's drug

23 operation.

24       Did you see Dirt sell drugs himself, personally?

25 **A.**   No.

1    **Q.**    What did you see?

2    **A.**    I just see people that sell for him and him collect money.

3    **Q.**    And how did you know that there were people who sold drugs

4    for Dirt?

5    **A.**    Because I was friends with him.

6    **Q.**    Can you tell us some other members of the mob in the

7    Gwynn Oak-Liberty Heights area, or can you just tell us some

8    members of the mob in the Gwynn Oak-Liberty Heights area who

9    sold drugs for Dirt.

10   **A.**    You had Tone, Tech, Delante, Conehead.

11   **Q.**    You mentioned Delante.  And I'm going to show you

12   Government's Exhibit IND-59.

13        Who's that?

14   **A.**    That's Delante.

15   **Q.**    And how did you know that he sold drugs for Dirt?

16   **A.**    'Cause I know him personally and we talked.

17   **Q.**    And what did he tell you?

18   **A.**    That he ain't want to sell drugs for him.

19   **Q.**    He didn't want to sell drugs for him?

20   **A.**    He had a problem with it.

21   **Q.**    I'm going to show you Government's Exhibit IND-83.

22        Who's that?

23   **A.**    That's Conehead.

24   **Q.**    And was he a member of the mob?

25   **A.**    Yes.

1    **Q.**    And did he sell drugs in that area?

2    **A.**    Yes.

3    **Q.**    I'm going to pull back up Government's Exhibit IND-21.

4          You mentioned that this is Tech.  Did he sell drugs in the

5    Liberty Heights Gwynn Oak area?

6    **A.**    Yes.

7    **Q.**    Did you see him engage in drug transactions?

8    **A.**    Yes.

9    **Q.**    And what drugs did you see him sell?

10   **A.**    Crack, cocaine, and marijuana and pills.

11   **Q.**    And did he sell drugs for Dirt?

12   **A.**    Yes.

13   **Q.**    Did you ever see Tech with guns?

14   **A.**    Yes.

15   **Q.**    Based on your observations of him and his interactions

16   with others in the mob, what was Tech's role in the mob?

17   **A.**    He was like a hitman, enforcer.

18   **Q.**    I'm going to pull back up Government's Exhibit IND-93, who

19   you identified as Tone.

20          And was Tone part of the mob?

21   **A.**    Yes, he was.

22   **Q.**    And did he sell drugs in the Gwynn Oak-Liberty Heights

23   area?

24   **A.**    Yes.

25   **Q.**    Did he sell drugs for Dirt?

1    **A.**    Yes.

2    **Q.**    Did you ever see Tone with guns?

3    **A.**    Yes.

4         **MR. SARDELLI:**  Objection; leading.

5         **THE COURT:**  Can we come up to the bench again for a

6    minute.

7         (Bench conference on the record:

8         **THE COURT:**  I think we need to establish more of the

9    basis of knowledge.  You're sort of asking the questions, but I

10   don't know yet how much he talked with Tone.

11        These are rival gangs, so they're not --

12        **MS. HOFFMAN:**  Right.  He did mention that he grew up

13   in the same foster care family as Tone --

14        **THE COURT:**  Yes.

15        **MS. HOFFMAN:**  -- and went to school with him.  I can

16   ask him more questions about whether he had -- whether he hung

17   out in Liberty Heights and Gwynn Oak and whether he observed

18   them, sure.

19        **THE COURT:**  Yes; because, I mean, that certainly

20   establishes the basis of why they might talk to each other,

21   because they grew up, but presumably we're talking about a time

22   period that is later than when they were in foster care

23   together.

24        **MR. SARDELLI:**  And I would note that Tech and Tone are

25   BGF, not MMP, number one.

1          And, number two, I would have a --

2          **THE COURT:**  No.  They're -- I don't think that's the

3  evidence so far, is it?

4          **MS. HOFFMAN:**  I think he knows them as Bloods.  There

5  has been testimony that Tech at one point joined BGF but was

6  still affiliated with the Bloods.

7          **THE COURT:**  Tech is Devon Dent, isn't he, a named

8  co-conspirator?

9          **MS. HOFFMAN:**  Yes.

10          **MR. SARDELLI:**  Yes, Your Honor.  But as to this

11  witness, I don't think he's established that they're BGF or MMP

12  or whatever they are, so I don't know if he's established what

13  they are.

14          **THE COURT:**  I think this witness has testified that

15  they are Mob Bloods.

16          **MR. SARDELLI:**  And I would also ask for a running

17  objection as to the leading, Your Honor.

18          **THE COURT:**  Okay.  Yes.  Try not to lead.  And let's

19  establish the basis of knowledge a little more.

20          **MR. SARDELLI:**  Thank you, Your Honor.)

21      (Bench conference concluded.)

22  **BY MS. HOFFMAN:**

23  **Q.**   Mr. Ferguson, you testified that you grew up in the

24  Liberty Heights Gwynn Oak area.

25          Did you spend time there?

```
 1   A.   Yes.
 2   Q.   And did you observe -- did you have --
 3             THE COURT:  What years are we talking about now?
 4   BY MS. HOFFMAN:
 5   Q.   What years did you spend time in Gwynn Oak and
 6   Liberty Heights?
 7   A.   My whole life.
 8   Q.   Did you have occasion to observe Tone in that area over
 9   the years?
10   A.   Yes.
11   Q.   Did you have personal interactions with him?
12   A.   Yes.
13   Q.   And you testified that you're a member of a rival gang.
14   What were the nature of your interactions with him?
15   A.   We was friends.  We just used to talk when we see each
16   other.
17   Q.   And why were you friends despite being members of
18   different gangs?
19   A.   Because we grew up together before we was gang members.
20   Q.   How did you know that Tone was a member of the mob?
21   A.   Because my brother.
22   Q.   And is this the brother who's a member of the Bloods?
23   A.   Yes.
24             MR. SARDELLI:  Objection, Your Honor.  That sounds
25   like it calls for hearsay.
```

FERGUSON - DIRECT

1          **THE COURT:**  What are we talking about when we say "the

2   Bloods"?

3   **BY MS. HOFFMAN:**

4   **Q.**   You mentioned -- you testified that your brother was a

5   member of the Bloods.  What part of the Bloods was he a member

6   of?

7   **A.**   They was Bounty Hunters before they was Mobbin' Bloods.

8   **Q.**   Okay.  Was your brother a member of Bounty Hunters?

9          **MR. SARDELLI:**  Objection; leading.

10         **THE COURT:**  Overruled.

11  **BY MS. HOFFMAN:**

12  **Q.**   How else did you know that Tone was in the mob?  Were

13  there other ways?

14  **A.**   Yeah.  He hang with them.  They all hang together and take

15  pictures and throw the gang signs up.

16  **Q.**   Did you ever see Tone with guns?

17  **A.**   Yes.

18  **Q.**   And can you explain.

19  **A.**   He keep 'em in his car, in his door.

20  **Q.**   And what type of cars did he drive?

21  **A.**   He had a red Crossfire, a burgundy Altima, and a black

22  one.

23  **Q.**   You testified about -- I want to go back to Tech for a

24  minute.

25         You testified that he was part of the mob.  Did he ever

1   join a different gang?

2   **A.**   Yes; BGF.

3   **Q.**   Can you explain that.

4   **A.**   When he -- when he got locked up, he met somebody and they

5   made him Black Guerilla Family when he was incarcerated.

6   **Q.**   Was he -- did he remain affiliated with the Bloods after

7   that?

8   **A.**   Yes.

9   **Q.**   I want to show you Government's Exhibit IND-63.

10       Do you recognize that person?

11  **A.**   Yes.

12  **Q.**   Who is that?

13  **A.**   That's Sheisty.

14  **Q.**   And how do you know Sheisty?

15  **A.**   Because he grew up with my family.

16  **Q.**   And did you have personal interactions with him?

17  **A.**   At times, yes.

18  **Q.**   Did you learn whether or not he was affiliated with a

19  gang?

20  **A.**   Yes, he was.

21  **Q.**   And how did you learn that?

22  **A.**   Because he was under Murda.

23  **Q.**   You said under Murda.  What gang was he in?

24  **A.**   He was a Mobbin' Blood.

25  **Q.**   Did you see him with Murda?

```
 1   A.    Yes.
 2         MR. SARDELLI:  I'd still object, Your Honor.  They're
 3   not establishing the basis of knowledge or how he's learning
 4   this.
 5         THE COURT:  Overruled.
 6   BY MS. HOFFMAN:
 7   Q.    I'm going to show you Government's Exhibit IND-13.
 8         Do you recognize this person?
 9   A.    Yeah.
10   Q.    Who is that?
11   A.    That's Mookie.
12   Q.    And how did you know Mookie?
13   A.    I grew up around the area, known him for a while.
14   Q.    Did you see him on the street?
15   A.    Yes.
16   Q.    Did you learn whether or not he was affiliated with a
17   gang?
18   A.    Yes.
19   Q.    How did you learn that?
20   A.    Because he always throw the gang signs up, and he hang
21   with them.
22   Q.    And what gang was he a member of?
23   A.    Mobbin' Bloods.
24   Q.    And who would you see him with specifically?
25   A.    Tech and Tone.
```

*FERGUSON - DIRECT*

1   **Q.**   Anybody else?

2   **A.**   Dirt.

3   **Q.**   Did you ever see Mookie sell drugs?

4   **A.**   Yes.

5   **Q.**   And where did he sell drugs?

6   **A.**   On Liberty Heights and Gwynn Oak.

7   **Q.**   And did you see him interact with other members of the

8   mob?

9   **A.**   Yes.

10  **Q.**   Based on your observations of him interacting with other

11  members of the mob, what was your understanding of his role in

12  the gang?

13  **A.**   He was just another enforcer.

14  **Q.**   I'm going to show you Government's Exhibit IND-44.

15       Actually, just backing up a step.

16       What do you mean by "enforcer"?  In what way was Mookie an

17  enforcer?

18  **A.**   As far as like also collecting drugs for his cousin and,

19  you know, making sure everything -- all the operation is moving

20  smoothly.

21  **Q.**   Do you recognize the person in

22  Government's Exhibit IND-44?

23  **A.**   Yes.

24  **Q.**   Who is that?

25  **A.**   That's Eastside.

1    **Q.**   And did you have personal interactions with Eastside?

2    **A.**   Yes.

3    **Q.**   And did you learn whether or not he was a member of a

4    gang?

5    **A.**   Yes.

6    **Q.**   And how did you learn that?

7    **A.**   'Cause he hang with them.

8    **Q.**   Who's them?

9    **A.**   The Mobbin' Bloods, Tech and Dirt and Tone and all them.

10   **Q.**   And was he a member of the mob?

11   **A.**   Yes.

12   **Q.**   Did you see him sell drugs?

13   **A.**   Yes.

14   **Q.**   Where did he sell drugs?

15   **A.**   Liberty Heights and Gwynn Oak.

16   **Q.**   I want to show you a few photos and ask you if you

17   recognize -- recognize the people in the photos.

18        I'm going to show you, first, Government's Exhibit SM-23.

19        Do you recognize any of the people in this photo?

20   **A.**   Yes.

21   **Q.**   And can you tell us who you recognize.  You should be able

22   to touch the screen in front of you there to point to people.

23   **A.**   That's Dirt (indicating).

24        That's Mookie (indicating).

25        That's Murk (ph) (indicating).

1          That's Tone' father (indicating).

2          That's Tone (indicating).

3   **Q.**   Do you recognize the location of this picture?

4   **A.**   That's on Gwynn Oak.

5   **Q.**   I'm going to show you Government's Exhibit SM-25.

6          Do you recognize any of the people in this photo?

7   **A.**   Yes.

8   **Q.**   Can you tell us who.

9   **A.**   That's Dirt (indicating).

10          That's Tone' father (indicating).

11          That's KO (indicating).

12          That's Mookie (indicating).

13          And that's Twan (indicating).

14   **Q.**   And do you see what Dirt is doing with his hands in this

15   picture?

16   **A.**   He throwing up gang signs.

17   **Q.**   And what specifically is he doing with his hands?

18   **A.**   Throwing up MMP.

19   **Q.**   And did you know that to be a sign of the mob?

20   **A.**   Yes.  That's they gang sign.

21   **Q.**   I'm going to show you Government's Exhibit SM-26.

22          Do you recognize the people in this photo?

23   **A.**   Yes.

24   **Q.**   Can you tell us who you recognize.

25   **A.**   Dirt (indicating).

```
 1              Tech (indicating).

 2              And Mookie (indicating).

 3    Q.   I'm going to show you Government's Exhibit SM-28.

 4         Do you recognize the people in this photo?

 5    A.   Yes.

 6    Q.   Who are they?

 7    A.   That's Gutta (indicating) and Dirt (indicating).

 8    Q.   And did you ever have any personal interactions with Gutta

 9    on the street?

10    A.   No.

11    Q.   How did you know who he was?

12    A.   Because everybody know who he is, and everybody speak of

13    him.

14    Q.   Did you ever learn about him from members of the mob?

15    A.   Yes.

16    Q.   And what did you learn about his -- did you learn about

17    his role in the gang from other members of the mob?

18    A.   Yes.

19    Q.   What did you learn?

20              THE COURT:  Could we be more specific -- time, people.

21    BY MS. HOFFMAN:

22    Q.   Directing your attention to the years 2011 to when you got

23    arrested, did you learn about Gutta's role in the gang during

24    that time frame?

25    A.   Yes.
```

```
1    Q.   And what did you learn his role was?

2              MS. WHALEN:  Objection.

3              THE COURT:  Sustained.

4              We've now got a number-of-year period; and during that

5    time, he learned.  I don't know how.  I don't know when, from

6    whom.

7    BY MS. HOFFMAN:

8    Q.   When did you learn --

9              MS. HOFFMAN:  Sure.

10   BY MS. HOFFMAN:

11   Q.   How did you learn about Gutta's role in the gang?

12   A.   From his fellow gang members.

13   Q.   Did you say from his fellow gang members?

14   A.   Yes.

15   Q.   And so let me just be a little bit more specific now and

16   talk about the year before you got locked up in this case, so

17   2015 into 2016.

18        Did you learn during that time what Gutta's role in the

19   gang was?

20   A.   No.  I was incarcerated from '15 to the beginning of '16.

21   Q.   When did you learn about Gutta's role in the gang?

22   A.   Once I was home.

23   Q.   And when was that?

24   A.   After Carlos got killed.

25   Q.   Okay.  And what did you learn was his role in the gang
```

FERGUSON - DIRECT

```
 1   then?
 2             MS. WHALEN:  Objection.
 3             THE WITNESS:  He's the leader of everybody --
 4             THE COURT:  I'm sorry.  Wait a second.
 5             The same --
 6             MS. WHALEN:  I still object, yes.
 7   BY MS. HOFFMAN:
 8   Q.    All right.  I'm going to show you
 9   Government's Exhibit SM-39.
10        Can you tell us if you recognize any of the people in this
11   photo.
12   A.    Yeah.  That's Murda, Mook, and Tone.
13   Q.    And I'm going to show you Government's Exhibit SM-17,
14   Page 9.
15        Do you recognize the people -- and this is Page 87 of the
16   business record.  Do you recognize the people in this photo?
17   A.    Yes.
18   Q.    And who are they?
19   A.    That's Gutta, Sheisty, and Murda.
20   Q.    And I'm going to show you Page 11 of this same document,
21   which is Page 97 of the business record.
22        Do you recognize who's in this photo?
23   A.    Yeah.  Mookie, Sheisty, and Murda.
24   Q.    I want to ask you some more questions about the drug
25   operation at Liberty Heights and Gwynn Oak.
```

1    Did you hang out -- how much did you hang out in that

2    area?

3    **A.**   Every day.

4    **Q.**   And can -- what is that area like?  Can you describe it in

5    terms of buildings.

6    **A.**   A bunch of stores.

7    **Q.**   What stores are there?

8    **A.**   Food stores, a bar, a gas station.

9    **Q.**   What are the names of the stores?

10   **A.**   4 Gs, Big T's, New York Fried Chicken.

11   **Q.**   I'm going to show you Government's Exhibit MAP-30.

12       Do you recognize this image?

13   **A.**   Yes.  That's Liberty Heights and Gwynn Oak.

14   **Q.**   And is this the 4 Gs and the fried chicken stores you were

15   referring to?

16   **A.**   Yes.

17   **Q.**   Now, I'm going to show you Government's Exhibit MAP-31.

18       What are we looking at here?

19   **A.**   That's still the intersection of Liberty Heights and

20   Gwynn Oak.

21   **Q.**   Did you observe members of the mob conduct drug

22   transactions?

23   **A.**   Yes.

24   **Q.**   And where would you see them conduct drug transactions?

25   **A.**   Right there by the 4 Gs.

1    **Q.**    Anywhere else?

2    **A.**    The gas station.

3    **Q.**    Did you ever talk to members of the mob about their drug

4    business?

5    **A.**    Yes.

6    **Q.**    What kinds of drugs did the members of the mob sell in

7    that Liberty Heights-Gwynn Oak area?

8              **MS. WHALEN:**  Objection.

9              **THE COURT:**  Sustained.

10             You need to be a little more specific.

11   **BY MS. HOFFMAN:**

12   **Q.**    I want to ask you about the members of the mob who you've

13   identified, Tech, Tone, Dirt, and Murda.  Can you tell us, did

14   you ever have conversations with any of them about their drug

15   business?

16   **A.**    Yes.

17   **Q.**    And can you explain, can you tell us what you learned.

18   **A.**    Yeah, that they sell cocaine, heroin, and marijuana.

19   **Q.**    Did you ever see transactions with your own eyes?

20   **A.**    Yes.

21   **Q.**    And based on your own observations of the people who

22   you've identified as the members of the mob in that area, was

23   there one drug that was sold more than others?

24   **A.**    Yeah.  Crack was sold most -- more than anything.

25   **Q.**    Did you say crack?

FERGUSON - DIRECT

1    **A.**    Yeah.  Crack cocaine.

2    **Q.**    Without telling me who, can you just tell me, did you

3    learn who supplied drugs to the mob in that area?

4          **MR. SARDELLI:**  Objection, Your Honor; lack of

5    foundation.

6          **THE COURT:**  I don't know yet.

7          Did you learn?  And then we'll find out how without

8    saying any names.

9    **BY MS. HOFFMAN:**

10   **Q.**    Without telling me any names, can you tell me, did you

11   learn who supplied drugs in that area --

12   **A.**    Yes.

13   **Q.**    -- to the members of the mob?

14         And how did you learn that?

15   **A.**    Because me and my friends bought some from him.

16   **Q.**    Your friends bought some drugs from members of the mob?

17   **A.**    Yes.

18   **Q.**    Can you explain.

19   **A.**    When we want to buy something, we go to that person that's

20   selling it because he sell all the drugs around there.

21   **Q.**    Okay.  And who is that person who you would go to?

22   **A.**    Dirt (indicating).

23   **Q.**    Were there occasions when you bought drugs from Dirt?

24   **A.**    I never bought them personally from him.

25   **Q.**    How did it happen?  Can you explain.

```
 1   A.   From my friend Ro-Ro.

 2   Q.   And how did that transaction come about?

 3   A.   He would go to him and buy it.

 4   Q.   And how were you involved in the transaction?

 5   A.   I put my money into it.

 6   Q.   So you put your money into it, and then Ro-Ro bought drugs

 7   from Dirt?

 8   A.   Uh-huh.

 9   Q.   And what did Ro-Ro buy?

10   A.   Crack.

11   Q.   Did the mob -- did you learn about any stash houses that

12   were used by the mob in that area?

13   A.   Yes.

14   Q.   And how did you learn about the locations of stash houses?

15   A.   Because I'm from around there, and I see it.

16   Q.   When you say you've seen it, what would you see?

17   A.   I would see the Bloods be there and I see the addicts

18   going in and out from right there.

19   Q.   And can you tell us what locations you observed members of

20   the mob and addicts going in and out from.

21   A.   You had one on Norwood and Howard Park, Gwynn Oak and

22   Rogers, and Liberty Heights -- well, Haddon and Gwynn Oak.

23   Q.   And who of the members of the mob would you see at those

24   locations?

25   A.   You would see Tone, Tech, KO, Mookie.
```

1   **Q.**   Now, you testified that you observed --

2          **THE COURT:**  I don't mean to interrupt you, but just

3   let me know when you're at a good breaking point.

4          **MS. HOFFMAN:**  Sure.  This is fine.

5          **THE COURT:**  Okay.  All right.  Ladies and gentlemen,

6   we're going to take the lunch recess.  And you are excused for

7   lunch.  We'll see you at 2 o'clock.

8       (Jury left the courtroom at 1 o'clock p.m.)

9          **THE COURT:**  All right.  Thank you.  And we'll excuse

10  the witness.

11         Other than, in general, the need to be specific about

12  times and places and conversations, any other issues anybody

13  anticipates for this afternoon?

14      (No response.)

15         **THE COURT:**  Okay.  All right.  Then I'm going to

16  excuse the gallery.

17         Okay.  We'll take the recess until 2:00.

18      (Luncheon recess taken.)

19         **THE COURT:**  All right.  Ready for the jury and the

20  witness?

21         **MS. HOFFMAN:**  Yes.

22      (Jury entered the courtroom at 2:08 p.m.)

23         **THE COURT:**  All right.  If you'd like to continue,

24  Ms. Hoffman.

25         **THE CLERK:**  Mr. Ferguson, you're still under oath.

```
 1          THE WITNESS:  Okay.
 2   BY MS. HOFFMAN:
 3   Q.   Good afternoon, Mr. Ferguson.
 4   A.   Good afternoon.
 5   Q.   When we left off, we were talking about drug sales in the
 6   area of Gwynn Oak and Liberty Heights.
 7        Can you tell us, did you see with your own eyes drug sales
 8   that happened at that location?
 9   A.   Yes.
10   Q.   And can you tell us who the members of the mob were who
11   you actually saw make drug transactions in that area.
12   A.   Tone, Tech, Mookie, and Delante and the rest of 'em.
13   Q.   When you observed drug transactions take place at
14   Liberty Heights and Gwynn Oak, how much -- what in terms of
15   quantity -- sticking with crack cocaine, in terms of quantity,
16   how much would typically be sold in any given transaction?
17   A.   I'm going to say $10 and up.
18   Q.   $10 and up?
19   A.   Yeah.
20   Q.   And what do you mean by -- how much in terms of quantity,
21   like weight, would be sold for $10 of crack cocaine?
22   A.   Can you repeat your question.
23   Q.   Sure.  A $10 sale of crack cocaine, how much crack cocaine
24   would that be?
25   A.   I'm not sure.
```

1    **Q.**   What's the -- in terms of drug transactions that you saw,

2   what's the most that you might see in a given transaction?

3           **MS. WHALEN:**  Objection.

4           **THE COURT:**  Sustained.

5   **BY MS. HOFFMAN:**

6    **Q.**   I want to ask you specifically about Tech.

7           Can you tell us about drug transactions that you saw him

8   involved in.

9    **A.**   He made -- he made hand-to-hand sales, so it varies from

10   the customer.

11   **Q.**   And can you tell us, based on what you observed of Tech in

12   that area, how much would he typically sell in any given

13   transaction?

14           **MS. WHALEN:**  Objection.

15           **THE COURT:**  Overruled.

16           Based on what he saw personally.

17   **BY MS. HOFFMAN:**

18   **Q.**   I'm sorry.  You can answer, Mr. Ferguson.

19           Based on what you saw personally of Tech, do you know --

20   if you know -- how much would he typically sell in a given

21   transaction of crack?

22   **A.**   I'm not sure.

23   **Q.**   What was the volume of -- you mentioned Tech, Tone,

24   Mookie, and Delante as making sales in that area.

25           What was the -- sticking with those four individuals, what

1  was the volume of sales like in that area?

2  **A.**   It was like $10 and up, like, so it would be within a

3  whole, I'm going to say close to a half a kilo or something

4  between all of 'em.

5  **Q.**   I was actually -- and I apologize.  The question was

6  poorly worded.

7       How much customer traffic was there in that area, in

8  Gwynn Oak and Liberty Heights?

9  **A.**   It goes on all day.

10 **Q.**   Goes on all day.  And how frequently would you see

11 transactions there?

12 **A.**   Every two minutes.

13 **Q.**   And was it -- would people -- what was the traffic like?

14 Was it foot traffic?  Car traffic?  What would you see?

15 **A.**   Both.

16 **Q.**   And based on what you -- I think you mentioned this a

17 minute ago.  But based on your own personal observations of

18 drug sales, hand-to-hand transactions involving Tech and Tone

19 and Delante and Mookie at that location, how much would you

20 estimate they sold of crack cocaine on a daily basis?

21          **MS. WHALEN:**  Objection.

22          **MR. SARDELLI:**  Objection.

23          **THE COURT:**  I think we'll have to break it down.  He's

24 already said he wasn't sure as to Tech.

25 **BY MS. HOFFMAN:**

1   **Q.**   Okay.  That's okay.  I can move along.

2        Mr. Ferguson, who was -- who was able to sell at the

3   Liberty Heights and Gwynn Oak location?  Who was able to sell

4   drugs there?

5   **A.**   The people that worked for Dirt.

6   **Q.**   Did you ever attempt to sell drugs in that area?

7   **A.**   Yes.

8   **Q.**   And what happened?

9   **A.**   I got into an altercation with them.

10  **Q.**   I'm sorry.  I didn't hear what you said.

11  **A.**   I got into an altercation with the Blood.

12  **Q.**   And did you have an interaction with Dirt?

13  **A.**   Yes; one time.

14  **Q.**   And can you tell us what happened.

15  **A.**   He told me if I'm not sellin' for him or giving him

16  10 percent, then I can't sell right there.

17  **Q.**   And you said "10 percent."  What do you mean by that?

18  **A.**   A percentage of the money I make.

19  **Q.**   So Dirt told you that if you weren't selling for him, you

20  couldn't sell there anymore?

21  **A.**   Yes.

22  **Q.**   And he asked you to pay 10 percent of what you were

23  making?

24  **A.**   He asked everybody 10 --

25        **MS. WHALEN:**  Objection; leading.

 1          **THE COURT:**  He had already testified to it.

 2   Overruled.

 3   **BY MS. HOFFMAN:**

 4   **Q.**   And what did you say?

 5   **A.**   I told him, "No."

 6   **Q.**   So what happened?

 7   **A.**   I just went back on Howard Park where I usually sell drugs

 8   at.

 9   **Q.**   Is that a different location?

10   **A.**   It's up the street.

11   **Q.**   Did you know of anyone else who -- did you know of anyone

12   else in the gang who paid a tax to Dirt?

13   **A.**   Delante and the younger ones under him.

14   **Q.**   And how did you know about Delante paying a tax?

15   **A.**   'Cause Delante talked to me about it.

16   **Q.**   Do you know where Dirt -- do you know where Dirt resided?

17   **A.**   He had different places.

18   **Q.**   And did you know where -- which -- where those places

19   were?

20   **A.**   Yes.

21          **MR. SARDELLI:**  Objection; leading and lack of

22   foundation, Your Honor.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  Gwynn Oak and Rogers.  And he had

25   North Avenue and Erdman Avenue.

1    **BY MS. HOFFMAN:**

2    **Q.**    And how did you know that?

3    **A.**    Because I know he lived on Gwynn Oak and Rogers because

4    that's where I'm from.  So I knew his house.  But I knew the

5    other two by other people telling me.

6    **Q.**    Did you ever see Dirt with guns?

7    **A.**    Yes.

8    **Q.**    About how many times?

9    **A.**    Twice.

10   **Q.**    About twice.

11        Did you know what kind of car or cars Dirt drove?

12   **A.**    I just know of one.

13   **Q.**    And what car did you know Dirt to drive?

14   **A.**    It was a Benz.

15   **Q.**    A Benz.  What color was the Benz?

16   **A.**    Black.

17        **THE COURT:**  And did we establish how he knows that?

18   **BY MS. HOFFMAN:**

19   **Q.**    How did you know that Dirt drove a black Benz?

20   **A.**    He was always in it.

21   **Q.**    Did you see him in it?

22   **A.**    Yes.

23   **Q.**    You mentioned earlier that members of your drug business

24   sold drugs at Liberty Heights and Garrison.

25        Was there a BGF leader in that area?

1   **A.**   Yes.

2   **Q.**   Who was that?

3   **A.**   His name was Fish.

4   **Q.**   I'm going to show you Government's Exhibit IND-56.

5        Who is that?

6   **A.**   That's Fish.

7   **Q.**   Did you know him personally?

8   **A.**   Yes.

9   **Q.**   Did he have a rank in BGF?

10  **A.**   Yes.

11  **Q.**   What was his rank?

12  **A.**   He was a bushman.

13  **Q.**   Did you say bushman?

14       What does it mean to be a bushman?

15  **A.**   It's one of the highest ranks of BGF.

16  **Q.**   Have you ever heard of something called Black Blood?

17  **A.**   Yes.

18  **Q.**   What was Black Blood?

19  **A.**   It was BGF and Bloods comin' together.

20  **Q.**   And who did you learn about it from?

21  **A.**   Fish.

22  **Q.**   What did Fish tell you about Black Blood?

23  **A.**   That they was trying to come together to make music and

24  make more money.

25  **Q.**   And how did they want to make more money?

1   **A.**   Drugs.

2   **Q.**   Did you know of other BGF members who were part of

3   Black Blood?

4   **A.**   Yes.

5   **Q.**   Who else?

6   **A.**   Crazy.

7   **Q.**   I'm going to show you Government's Exhibit IND-90.

8        Who is that?

9   **A.**   That's Crazy.

10  **Q.**   Did you know Crazy personally?

11  **A.**   Yeah.

12  **Q.**   And you said he was a member of Black Blood?

13  **A.**   Yes.

14  **Q.**   Was he a member of BGF?

15  **A.**   Yes.

16  **Q.**   What happened to Black Blood?  Is it still around?

17  **A.**   No.

18  **Q.**   Can you tell us what happened.

19  **A.**   After Fish died, then we went our separate ways.

20  **Q.**   Are you familiar with someone from that area, from

21  Gwynn Oak and Liberty Heights, who went by the name Freak?

22  **A.**   Yes.

23  **Q.**   And who was Freak?  Was he affiliated with a gang?

24  **A.**   He was friends of 'em.

25       **THE COURT:**  I'm sorry.  He was what?

1    **BY MS. HOFFMAN:**

2    **Q.**   Could you repeat that, Mr. Ferguson.

3    **A.**   He was friends of the people that was in the gang.

4    **Q.**   And which gang is that that you're referring to?

5    **A.**   The mob Bloods.

6    **Q.**   Freak was a friend of the mob, of the mob?

7    **A.**   Yes.

8    **Q.**   And I want to direct your attention to 2012 or

9    thereabouts.  Was there a time around then when you witnessed

10   Freak get shot?

11   **A.**   Yes.

12   **Q.**   Can you tell us what you saw.

13   **A.**   I was standing in front of the Chinese store, and Tech

14   chased him into the store, shootin' him.

15   **Q.**   Tech chased Freak into a store, shooting him?

16   **A.**   Yes.

17   **Q.**   And which store did he chase him into?

18   **A.**   Pizza store.

19   **Q.**   Did you say the pizza store?

20   **A.**   Yes.

21   **Q.**   Did you see -- did Tech hit Freak?

22   **A.**   In his stomach.

23   **Q.**   And did you witness this with your own eyes?

24   **A.**   Yes.

25   **Q.**   Was it dark out or light out?

1    **A.**    It was light.

2    **Q.**    Did you learn why Tech shot Freak?

3    **A.**    No, I'm not sure.

4         **MR. SARDELLI:**  Objection; calls for speculation.

5         **THE COURT:**  Well, we have to get the basis of

6    knowledge before we get an answer.

7    **BY MS. HOFFMAN:**

8    **Q.**    I want to actually shift gears, Mr. Ferguson, and ask you

9    about some events in the spring of 2016.

10        Did you know somebody named Carlos or Los?

11   **A.**    Yes.

12   **Q.**    Who was Los?

13   **A.**    My friend.

14   **Q.**    And was he part of -- was he a member of BGF?

15   **A.**    No.

16   **Q.**    Was he -- how did you know him?

17   **A.**    We grew up together.

18   **Q.**    Did he sell drugs in that area?

19   **A.**    No.

20   **Q.**    How did you come to be -- how did you come to be friends

21   with him?

22   **A.**    We went to school together as kids, and we was in the

23   neighborhood.

24   **Q.**    I want to direct your attention to April 26th of 2016.

25        On that day did you learn that Los had been killed?

1    **A.**    Yes.

2    **Q.**    And I want to show you, actually,

3    Government's Exhibit IND-97.

4         Who is that?

5    **A.**    That's Carlos.

6    **Q.**    And where was Carlos killed?

7    **A.**    On Liberty Heights and Woodbine.

8    **Q.**    What happened as a result of Los's murder?

9    **A.**    I will tell you --

10        **MR. SARDELLI:**  Objection.  There's no foundation for

11   where she's going.

12        **THE COURT:**  That's a pretty broad question,

13   Ms. Hoffman.  I'll sustain that.

14   **BY MS. HOFFMAN:**

15   **Q.**    Did Los's murder -- how did Los's murder affect the

16   members of your gang and your drug crew?

17   **A.**    It started a beef between the Bloods.

18   **Q.**    It started a beef between your drug crew and the Bloods?

19   **A.**    Yes.

20   **Q.**    And why was that?

21   **A.**    Because Carlos was our friend and one of 'em killed him.

22   **Q.**    Did Los's murder spark violence between --

23        **MR. SARDELLI:**  Objection; leading.

24        **THE COURT:**  Sustained.

25        You can rephrase that.

1   BY MS. HOFFMAN:

2   **Q.**   Can you tell us what happened as a result of the beef

3   between your crew and the mob.

4   **A.**   We started retaliatin' against each other.

5   **Q.**   Was there direct retaliation for Los's murder?

6   **A.**   Yes.

7   **Q.**   Who was killed after that?

8   **A.**   Mookie.

9   **Q.**   And I want to pull up Government's Exhibit IND-13.

10      And I believe you identified this person as Mookie; is

11  that right?

12  **A.**   Yes.

13  **Q.**   When was Mookie killed in relation to when Los was killed?

14  **A.**   Two days after.

15  **Q.**   And where was Mookie killed?

16  **A.**   He was killed on Gwynn Oak in front of the Big T's.

17  **Q.**   Were members of -- well, what happened as a result of the

18  killing of Mookie?

19  **A.**   Back-and-forth violence.

20  **Q.**   Did you attend a candlelight vigil for Los?

21  **A.**   Yes.

22  **Q.**   And was that before or after Mookie got killed?

23  **A.**   It was like 10 minutes after or 20 minutes after.

24  **Q.**   And where was the candlelight vigil?

25  **A.**   On Liberty Heights and Woodbine.

1            **THE COURT:**  I can't hear.

2    **BY MS. HOFFMAN:**

3    **Q.**   Can you repeat that.

4    **A.**   Liberty Heights and Woodbine.

5    **Q.**   Did you say Liberty Heights and Woodbine?

6    **A.**   Yes.

7    **Q.**   I'm going to show you Government's Exhibit MAP-33.

8         Can you tell us what we're looking at here.

9    **A.**   That's the corner of Liberty Heights and Woodbine.

10   **Q.**   Is this where the candlelight vigil was?

11   **A.**   Yes.

12   **Q.**   Can you indicate where on this image the candlelight vigil

13   was.

14   **A.**   Right here (indicating).

15   **Q.**   Was there a confrontation that happened at the candlelight

16   vigil for Los?

17   **A.**   Yes.

18   **Q.**   And can you tell us what happened.

19   **A.**   Dirt and his comrades came, and Dirt walked up and asked

20   us who killed him.

21   **Q.**   Who killed who?

22   **A.**   Who killed his cousin Mookie.

23   **Q.**   And can you explain the story of what happened.

24   **A.**   And he was asking each -- us each individually who killed

25   him.  Nobody was saying nothin'.  So he got mad and he said he

```
 1   going to kill every last one of us by the summer -- by the end
 2   of the summer.
 3   Q.   And you spoke a little fast there.  Can you repeat one
 4   more time what Dirt said.
 5   A.   That he going to kill each and every last one of us by the
 6   end of the summer.
 7   Q.   Was Dirt holding anything when he said this?
 8   A.   A gun in his hand.
 9        MR. SARDELLI:  Objection; leading.
10        THE COURT:  Overruled.
11   BY MS. HOFFMAN:
12   Q.   I'm sorry.  You can answer, Mr. Ferguson.  Was Dirt --
13   A.   Yeah.  He had a gun in his hand.
14   Q.   And what happened next?
15   A.   A car pulled up and they rolled the window down, and there
16   was a gun in the backseat sittin' on the chair.
17   Q.   And you spoke a little fast there again.
18        You said a car pulled up, and were you able to see inside
19   the car?
20   A.   Yes.  It was a machine gun sittin' on the backseat.
21   Q.   In the backseat of the car?
22   A.   Yes.
23   Q.   You said Dirt and -- I don't know if you told us.  Who was
24   Dirt with when he confronted you?
25   A.   He was with a guy named Five and his nephew, Little Mike.
```

1   **Q.**   Were there other members of the mob there, too?

2   **A.**   Yeah.  They was standin' across the street.

3   **Q.**   Okay.  So you -- you indicated where on this map you were

4   standing.  Did Dirt come to your side of the street?

5   **A.**   Yes, I was standin' here (indicating).  Dirt was standin'

6   right there (indicating).

7   **Q.**   And then there were other members of the mob who remained

8   on the other side of the street?

9   **A.**   Yes.

10  **Q.**   After Mookie was killed, did you learn that members of the

11  mob suspected you of killing Mookie?

12  **A.**   Yes.

13       **MR. SARDELLI:**  Objection.  What's the basis of

14  knowledge?

15       **THE COURT:**  Okay.  Yes, we have to establish -- I

16  assume this is what we talked about before, so if you could go

17  to how he knew that.

18       **MS. HOFFMAN:**  Sure.

19  **BY MS. HOFFMAN:**

20  **Q.**   In the aftermath of -- well, you mentioned -- you just

21  testified that Dirt confronted you at the candlelight vigil.

22  Did he speak directly to you?

23  **A.**   He was speaking to us as a whole.

24  **Q.**   Did he say anything to you specifically?

25  **A.**   Yeah, he asked me did I know who killed Mookie and who

1   came around the area in the -- in the van and did that.

2   **Q.**   And what did you say?

3   **A.**   I told him, "I don't know."

4   **Q.**   And based on that interaction, did you -- did you believe

5   that you were suspected of killing Mookie?

6   **A.**   Not at that moment.

7   **Q.**   Did you learn -- did you have conversations with members

8   of the mob after that happened?

9   **A.**   Yes.

10  **Q.**   Did you have a conversation with Tone after Mookie was

11  killed?

12          **MR. SARDELLI:**  Objection; leading.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  Yes.  He called my phone.

15  **BY MS. HOFFMAN:**

16  **Q.**   And what did Tone tell you when he called your phone?

17  **A.**   He asked me did I kill Mookie and that I got a ransom on

18  me.

19  **Q.**   And what does it mean to have a ransom on you?

20  **A.**   Um, money for the -- to kill me.

21  **Q.**   And so what does it mean, money to kill you?  What -- if

22  someone kills you, they get money?

23  **A.**   Yeah, they get paid for it.

24  **Q.**   Was there other retaliatory violence that happened after

25  Mookie got killed?

1   **A.**   Yes.

2   **Q.**   Can you tell us what happened after Mookie got killed.

3   **A.**   Yeah.  Somebody was killed on Haddon and Woodbine after

4   the candlelight.

5   **Q.**   And do you know who that was?

6   **A.**   No.

7   **Q.**   Were there members of your drug crew who had violence

8   directed at them?

9   **A.**   Yes.

10   **Q.**   Can you tell us about that.

11   **A.**   My friend Evot (ph) was shot in his back and his hand in

12   front of the store.

13   **Q.**   And was anyone else in your organization targeted for

14   violence?

15   **A.**   Yes.  Dorian --

16           **MS. WHALEN:**  Objection.

17           **THE COURT:**  Sustained.

18   **BY MS. HOFFMAN:**

19   **Q.**   Who were the other members of your crew?  Who did you

20   consider to be part of your crew?

21   **A.**   Dorian, Ro-Ro, Da-Rod, and Tay and Supreme.

22   **Q.**   And did you hang out with them frequently?

23   **A.**   Yeah.

24   **Q.**   And did you, based -- just going based on your own

25   personal observations, were there any other -- did you see with

1  your own eyes any other retaliatory acts after that?

2          **MS. WHALEN:**  Objection.

3          **THE COURT:**  Do you want to come up to the bench.

4       (Bench conference on the record:

5          **THE COURT:**  How he knows it's retaliation, what do you

6  expect him to say?

7          **MS. HOFFMAN:**  Sure.  So a couple of them -- he said

8  that a couple of his friends, Dorian and Ro-Ro, had their

9  houses shot up.  I believe he knows that based on his own

10 personal observations.

11         **THE COURT:**  Was he there when the house was shot up?

12 Is he going to be able to say, "I saw X shoot my friend Ro-Ro"?

13         **MS. HOFFMAN:**  No, he would not identify anybody who

14 actually pulled the trigger.  He would, I think, just say that

15 they had their houses shot up after this.

16         **THE COURT:**  Okay.  I'm sustaining the objection.  I

17 don't see any reason to get into this.  There's very little

18 relevance, and it's more likely to cause prejudice than

19 anything else.  It's not directed at anybody specific, so let's

20 just move on.)

21      (Bench conference concluded.)

22 **BY MS. HOFFMAN:**

23 **Q.**  Mr. Ferguson, did there come a time when you got involved

24 in retaliatory violence?

25 **A.**   Yes.

1   **Q.**  And can you tell us what you did.

2   **A.**  I shot one of the victims -- I mean one of the Blood

3  members.

4   **Q.**  And when was that?

5   **A.**  The day I got arrested.

6   **Q.**  It was the day that you got arrested in this case?

7   **A.**  Yes.

8   **Q.**  So is that August 2nd of 2016?

9   **A.**  Yes.

10  **Q.**  And can you tell us what happened that day.

11  **A.**  I followed the dude to a house and jumped out the car and

12  shot at him.

13  **Q.**  Were you with other people at the time?

14  **A.**  I was with a friend.

15  **Q.**  And who was the friend?

16  **A.**  Dorian.

17  **Q.**  Was the person actually hit?

18  **A.**  He was grazed in his face.

19  **Q.**  And who were you shooting at?

20  **A.**  Harold.

21  **Q.**  Who's Harold?

22  **A.**  His name KO.

23  **Q.**  Is that -- KO is his street name?

24  **A.**  Yeah, his street name.

25  **Q.**  Was he a member of the mob?

1   **A.**   Yes.

2   **Q.**   Why did you shoot at KO?

3   **A.**   Because I felt like the odds was against me once I had the

4   ransom on my head.  And I was in fear for my life, so -- I was

5   just scared.

6   **Q.**   You mentioned that you were arrested on August 2nd of

7   2016.  Have you been incarcerated since then?

8   **A.**   Yes.

9   **Q.**   Was there a period when you were not incarcerated?

10  **A.**   Yes.

11  **Q.**   And when was that?

12  **A.**   January 10th, 2017.

13  **Q.**   Can you explain what happened.

14  **A.**   I was shot five times.

15  **Q.**   Well, what happened -- were you released at a certain

16  point?

17  **A.**   Yes.  The State released me by mistake.

18  **Q.**   You say by mistake?

19  **A.**   Yes.

20  **Q.**   And that was in January of 2017?

21  **A.**   Yes.

22  **Q.**   And where did you go when you were released?

23  **A.**   My sister' house.

24  **Q.**   And how long were you out for?

25  **A.**   About 12 days.

1    **Q.**   And what happened on the 12th day?

2    **A.**   I got shot five times.

3    **Q.**   Can you tell us what happened.

4    **A.**   I was sittin' on my couch, and somebody came to the window

5    and shot me through the window.

6    **Q.**   Was it dark out at the time?

7    **A.**   Yes.  It was 2:20-something in the morning.

8    **Q.**   Were you able to see who shot you?

9    **A.**   No.

10   **Q.**   Were you taken to the hospital?

11   **A.**   Yes.

12   **Q.**   And what happened after -- where did you go after the

13   hospital?

14   **A.**   I went to the pen hospital, which is the city jail,

15   infirmary.

16   **Q.**   Were you -- did you stay in the city jail?

17   **A.**   I stayed for a couple months.

18   **Q.**   And then what happened?

19   **A.**   I went to Chesapeake.

20   **Q.**   And where did you go after that?

21   **A.**   Warsaw, Virginia.

22   **Q.**   After you were shot, did you receive any payments from the

23   ATF?

24   **A.**   Yes.

25   **Q.**   And do you know -- do you know about how much money the

1  ATF has spent on your behalf?

2  **A.**  About 8500.

3  **Q.**  Were those payments all made directly to you?

4  **A.**  No.

5  **Q.**  Can you explain.

6  **A.**  It was towards my girlfriend being relocated 'cause she

7  was in danger of her life; my sister, security cameras in and

8  around -- around the side of her house; and my medical expenses

9  and phone calls.

10  **Q.**  Were some payments made directly to you?

11  **A.**  Yes.

12  **Q.**  And how were those payments made?

13  **A.**  Commissary account.

14  **Q.**  They were put on your commissary account?

15  **A.**  Yes.

16  **Q.**  And what was your understanding of what that money was

17  for?

18  **A.**  It was for my medical bills from being shot and for --

19  make calls to my lawyer and to my family.

20  **Q.**  Mr. Ferguson, are you still fearful for your life today?

21       **MS. WHALEN:**  Objection.

22       **THE WITNESS:**  Yes.

23       **THE COURT:**  Overruled.

24       **MS. HOFFMAN:**  Thank you, Mr. Ferguson.

25       I have no further questions.

```
 1                      CROSS-EXAMINATION
 2   BY MS. WHALEN:
 3   Q.   Good afternoon, Mr. Ferguson.
 4   A.   Good afternoon.
 5   Q.   Let's start with you were arrested on August 2nd of 2016;
 6   correct?
 7   A.   Yes.
 8   Q.   And that's the case that you are currently waiting to be
 9   sentenced by a judge after you perform your cooperation duties;
10   right?
11   A.   Yes.
12   Q.   Okay.  And in that case, you pled guilty to being a felon
13   in possession of a firearm; right?
14   A.   Yes.
15   Q.   Okay.  And that is the case for which you hope you're
16   going to get a reduced sentence because you've come in here and
17   testified and cooperated with the Government; right?
18   A.   Yes.
19   Q.   Now, you just told us that on that day, you followed a guy
20   and chased him down and shot him; right?
21   A.   Yes, I did.
22   Q.   And you did that, you said, on the same day that you were
23   arrested with a handgun; right?
24   A.   Yes.
25   Q.   And you remember going in to speak with these individuals
```

1   from the federal government and telling them what you know

2   about everything; right?

3   **A.**   Yes.

4   **Q.**   And you met with them several times; right?

5   **A.**   Yes, I have.

6   **Q.**   And do you recall, sir, that you told them that it was

7   someone else that shot Mr. Ushry, or KO; right?

8   **A.**   I don't recall.

9   **Q.**   Well, do you remember meeting with the agents --

10          **MS. WHALEN:**   If the Court would indulge me.

11  **BY MS. WHALEN:**

12  **Q.**   -- and saying that an hour or two before you got arrested,

13  Shropshire, who was your friend; right?

14  **A.**   Yes.

15  **Q.**   What's Shropshire's full name, please?

16  **A.**   Dorian Shropshire.

17  **Q.**   Dorian.  Okay.  And Dorian was with you in the car; right?

18  **A.**   Yes.

19  **Q.**   And Dorian had a gun too; right?

20  **A.**   Yes.

21  **Q.**   And then your other friend was in the car with a gun as

22  well; right?

23  **A.**   No.  I had two guns.  Dorian had one.

24  **Q.**   You had two.  Were there just two of you in the car or

25  three?

1   **A.**   There was three of us.

2   **Q.**   Okay.  But two of the guns were yours?

3   **A.**   Yes.

4   **Q.**   Okay.  And do you remember saying -- and let me just tell

5   you the date sir, March 1st, 2017, that Shropshire, an hour or

6   two before you got arrested, tried to kill Harold Ushry or

7   Ushry.

8        Do you remember that?

9   **A.**   No, I didn't say that.

10  **Q.**   You did not say that?

11  **A.**   I said we both tried to kill him.

12  **Q.**   Okay.  When was the last time that you met with the

13  prosecutors and the agent in this case?

14  **A.**   March 4th.

15  **Q.**   March 4th of this year?

16  **A.**   Yes.

17  **Q.**   Okay.  And you discussed the testimony that you're giving

18  here today with the agents?

19  **A.**   Yes, ma'am.

20  **Q.**   All right.  And they said to you, We're going to ask you

21  this question, for instance:  Did you plead guilty to being a

22  felon in possession of a firearm; right?

23  **A.**   Yes.

24  **Q.**   And they said, We're going to ask you, Who is the person

25  that sentences you; right?

1   **A.**   Yes.

2   **Q.**   Okay.  So you knew those questions were coming; right?

3   **A.**   Yes.

4   **Q.**   And they said, We're going to ask you, What do you -- what

5   is your understanding of what will happen once you cooperate?

6        Remember a question like that?

7   **A.**   Yes, I remember.

8   **Q.**   Okay.  And at that time you discussed what your answer

9   would be; right?

10  **A.**   Yes.

11  **Q.**   Okay.  And your answer to the ladies and gentlemen was

12  that you hoped to get a reduced sentence; right?

13  **A.**   Yes.

14  **Q.**   In fact, you hope to walk out of prison after you perform

15  your duties as a cooperator; right?

16  **A.**   Nothin' was promised, so I'm not sure.

17  **Q.**   Nothing specific was promised, but your hope is:  I'm out

18  of here when I'm done; right?

19  **A.**   Hopefully.

20  **Q.**   Now, you told us about, I believe, an incident -- well,

21  you knew Tech and you knew Tone; right?

22  **A.**   Yes.

23  **Q.**   Okay.  And do you recall back in 2012 being shot in the

24  leg?

25  **A.**   Yes, I do.

1    **Q.**   All right.  And you told us a little bit about that,

2    right, that --

3              **MS. HOFFMAN:**  Objection.

4         (Counsel conferred.)

5              **MS. WHALEN:**  I'm sorry, I don't know -- the objection.

6              **THE COURT:**  Do we need to approach the bench?

7              **MS. HOFFMAN:**  Sure.

8         (Bench conference on the record:

9              **MS. HOFFMAN:**  He didn't testify about -- I think

10   Ms. Whalen said, You told -- do you remember being shot in the

11   leg?  You told us a little bit about that.

12              He hasn't testified about that.

13              **MS. WHALEN:**  Okay.  I'll rephrase.

14              **THE COURT:**  Okay.)

15         (Bench conference concluded.)

16              **MS. WHALEN:**  Thank you, Your Honor.

17   **BY MS. WHALEN:**

18   **Q.**   Let me rephrase that.

19        You were shot back in 2012; right?

20   **A.**   Yes.

21   **Q.**   And you have told the Government that it was Tech and Tone

22   who shot at you; is that correct?

23   **A.**   Yes.

24   **Q.**   Okay.  Was it both of them?

25   **A.**   Yes.

**Q.**   And were you in a car with another individual?

**A.**   Yes.

**Q.**   Was that Dorian?

**A.**   No.

**Q.**   Who were you with?

**A.**   Supreme.  I was in the car with four other people.

**Q.**   Four other people?

**A.**   Yeah.

**Q.**   Okay.  And you're clear now that this was Tech and Tone
that did this shooting; right?

**A.**   Yes.

**Q.**   But when you went in and talked to the detectives, you
told them that it was not Tech or Tone that shot you; correct?

**A.**   I didn't tell 'em who it was.

**Q.**   Did you give them names at all?

**A.**   No.

**Q.**   In fact, you told them, I have no idea who shot me; right?

**A.**   Yes.

**Q.**   Okay.  And you actually gave them a little bit of a
description but claimed that you really couldn't see the face;
correct?

**A.**   Yes.

**Q.**   You lied to 'em; right?

**A.**   Yes, I did.

**Q.**   And then there was another time when you went and

 1   discussed with the same detective, Detective Howard, that --

 2   the incident of you being shot; right?

 3   **A.**   Yes.

 4   **Q.**   And at that time you told him that it was Sheldon Jacobs

 5   and Rashard Pierce that shot you.

 6        Do you recall that?

 7   **A.**   No.

 8   **Q.**   You don't recall telling Detective Howard at all that it

 9   was Sheldon and Jacobs and Mr. Pierce that shot you?

10   **A.**   No.

11   **Q.**   Let me be real specific.  June 14th, 2012,

12   Detective Howard, do you recall having a meeting with him?

13   **A.**   I never told him that they shot me.

14   **Q.**   You never said that?

15   **A.**   No.

16   **Q.**   Okay.  Well, do you remember indicating to, again, the

17   federal government, first, that you did not tell

18   Detective Howard -- consistent with what you're saying now, you

19   didn't tell Detective Howard that it was Mr. Jacobs that shot

20   you.  Do you remember saying that to the federal government?

21   **A.**   Can you repeat that.

22   **Q.**   Sure.

23        In one of the proffer sessions, do you remember indicating

24   that you never told Detective Howard that Sheldon Jacobs shot

25   you?

**A.**    Right.

**Q.**    Okay.  And then do you remember at that very same meeting,
you indicated that your friend had told the detective that it
was Jacobs and Pierce that shot you?

     Do you remember that?

**A.**    Yes, I remember that.

**Q.**    And do you remember, then, also saying, I just went along
with it and told the detective that it was Jacobs and Pierce?

**A.**    No, I never said that.

**Q.**    Again, let me ask you, sir -- I believe, again, it would
be the -- March 1st, 2017, do you recall telling prosecutors
and federal agents that Detective Howard confronted you with
the information that it was Jacobs and Pierce that shot you and
you went along with what your friend had said?

**A.**    No.

**Q.**    You did not say that?

**A.**    No.

**Q.**    Now, Sheldon Jacobs was actually arrested for the shooting
of you, wasn't he?

**A.**    Yes.

**Q.**    And he -- he went to jail, didn't he?

**A.**    Yes.

**Q.**    And he went -- was actually put on trial; right?

**A.**    Yes.

**Q.**    And you were brought into court, and you stood and took

1    the oath before a jury that you would tell the truth; right?

2    **A.**   Yes.

3    **Q.**   And at that trial, even though you knew, as you tell us

4    now, that Tech and Tone were the ones that shot you, you told a

5    jury you didn't know who shot you; right?

6    **A.**   Yes.

7    **Q.**   You said you didn't see his face; right?

8    **A.**   Right.

9    **Q.**   And that was a lie.

10   **A.**   (No response.)

11   **Q.**   Was it a lie, sir?

12   **A.**   Yes, I did lie.

13   **Q.**   And that wasn't this courtroom, but it was a courtroom for

14   the state of Maryland; right?

15   **A.**   Yes.

16   **Q.**   Now, I mentioned meetings or proffer sessions with

17   prosecutors and agents.

18        You know the term "proffer session," do you?

19   **A.**   Yes.

20   **Q.**   Okay.  And that's where you and your attorney, generally,

21   go in and sit down and talk with a federal agent and the

22   prosecutors in the case; right?

23   **A.**   Yes.

24   **Q.**   All right.  And you are told -- in fact, you signed an

25   agreement that says basically they're not going to use your

```
 1   statements against you; right?

 2   A.   Yes.

 3   Q.   So you knew you could tell them whatever and you weren't

 4   going to have any repercussions; right?

 5   A.   Yes.

 6   Q.   And so you did tell them things; right?

 7   A.   Yes.

 8   Q.   And do you recall that -- now, let me take -- ask it this

 9   way:  You don't expect to be prosecuted for perjuring before a

10   jury in the state of Maryland, do you?

11   A.   Can you repeat that.

12   Q.   You don't expect to be prosecuted for perjuring yourself

13   in a courtroom in the state of Maryland, do you, sir?

14   A.   No.

15   Q.   Okay.  And you actually went out and found Mr. Pierce, did

16   you not?

17   A.   I'm not understanding what you saying.

18   Q.   Well, you went out and shot Mr. Pierce in the leg because

19   Mr. Pierce, you believed, had given a gun to Tech or Tone

20   before you were shot; right?

21   A.   Yes.

22   Q.   All right.  You chased him down like you did Mr. Ushry;

23   right?

24   A.   I ain't chase him down.

25   Q.   How did you do it?
```

1   **A.**   I jumped out the car.  He was standin' right there.

2   **Q.**   And you shot him in the leg?

3   **A.**   Yeah; in his hand.

4   **Q.**   In his hand, too?

5   **A.**   Yes.

6   **Q.**   Was it one shot?

7   **A.**   I shot him in his leg and his hand.

8   **Q.**   All right.  Two shots?

9   **A.**   It was one shot, but it went through his hand and hit his

10  leg.

11  **Q.**   And he survived?

12  **A.**   Yes.

13  **Q.**   And did you tell him why you were shootin' him?

14  **A.**   No.

15  **Q.**   You don't expect to be prosecuted by the

16  federal government for shooting Mr. Pierce, do you?

17  **A.**   No.

18  **Q.**   And you don't expect to be further prosecuted for the

19  murder of Mr. Ushry -- excuse me, for the shooting of

20  Mr. Ushry, do you?

21  **A.**   No.

22  **Q.**   And all of that is because you cooperated with the

23  Government; right?

24  **A.**   Yes.

25          **MS. WHALEN:**  Would the Court indulge me.  I have one

```
 1    note here that I need to read.
 2            THE COURT:  Okay.
 3    BY MS. WHALEN:
 4    Q.   Now, when things happen out on the street, especially like
 5    a shooting or a murder, word starts to travel, does it not?
 6    A.   Yes, it do.
 7    Q.   And rumors start flying; right?
 8    A.   Yes, they do.
 9    Q.   People start gossiping about what they hear; correct?
10    A.   Right.
11    Q.   And maybe sometimes about what they see; correct?
12    A.   Right.
13    Q.   And sometimes the facts are not really accurate; right?
14    A.   Right.
15    Q.   And you might learn that right away that it's not
16    accurate; correct?
17    A.   Correct.
18    Q.   Or you might learn it years later; is that correct?
19    A.   Right.
20    Q.   And you may never hear the whole truth or the full truth
21    at all; right?
22    A.   Right.
23    Q.   Okay.  But it's a buzz.  Like, it goes out real quickly;
24    right?
25    A.   Yes.
```

FERGUSON - CROSS

1    **Q.**   And sort of the circumstances of the shooting or the

2    murder get passed around from person to person; correct?

3    **A.**   Say that again.

4    **Q.**   The circumstances, like how it happened, gets passed

5    around from person to person; correct?

6    **A.**   Yeah, that's right.

7            **MS. HOFFMAN:**  I'm going to object; vagueness.

8            **THE COURT:**  Do you have a specific --

9            **MS. WHALEN:**  This is just in general, Your Honor, what

10   happens on the street.

11           **THE COURT:**  I think I'll sustain the objection, then.

12   **BY MS. WHALEN:**

13   **Q.**   Now, for instance, the Mookie murder, that word traveled

14   very fast; correct?

15   **A.**   Yes.

16   **Q.**   And people gathered nearby where he was killed; correct?

17   **A.**   Yes.

18   **Q.**   And you and your girl and your kids, you went down there

19   as well; right?

20   **A.**   No, I didn't go to the -- I went to the candlelight.

21   **Q.**   You went to the candlelight.  I see.

22   **A.**   Yes.

23   **Q.**   Which candlelight are we talking about now?

24   **A.**   Of Carlos.

25   **Q.**   And that was how far away from where Mookie was killed?

```
 1   A.   Not far.  About two minutes, three minutes away.

 2   Q.   Two to three minutes by car or by walking?

 3   A.   By foot.

 4   Q.   Now, you know a person by the name of Trouble; right?

 5   A.   I don't know him personally, but I know of him.

 6   Q.   Do you know his real name as William Banks?

 7   A.   No.

 8   Q.   Okay.  And you know he was --

 9            MS. HOFFMAN:  Objection; hearsay.

10            THE COURT:  I'm sorry?

11            MS. HOFFMAN:  Hearsay.

12            THE COURT:  Well, I guess I don't know yet.

13   BY MS. WHALEN:

14   Q.   You know that he had a deal where he kept guns in the back

15   of the BP gas station; right?

16            MS. HOFFMAN:  Objection; hearsay.

17            THE COURT:  Do you want to come up to the bench.

18        (Bench conference on the record:

19            THE COURT:  This is the same thing.  How does he know?

20            MS. WHALEN:  His proffer doesn't specify that it's not

21   personal knowledge.  He just simply says he had a deal.  So I'm

22   exploring what he said.  I can't go any farther than what I

23   know from the Government.

24            MS. HOFFMAN:  He did, however -- I don't recall if

25   it's in the grand jury or in one of the proffers, but he also
```

1  just testified to the same thing.  He didn't know Trouble

2  personally.  He never interacted with him personally.

3          And so I think every -- my sense is that everything he

4  knew about Trouble was just word on the street through the

5  grapevine, so I don't think that it's permissible to ask him

6  about what he knew from the streets.

7          **MS. WHALEN:**  Well, I can, then, clear it up by simply

8  asking:  Do you have knowledge that he had this deal with the

9  gas station?

10          **MS. HOFFMAN:**  It gets prejudicial to ask --

11          **THE COURT:**  I guess I'm trying to do the same thing

12  that we had an issue with with Ms. Hoffman.  I'm trying to find

13  out, first, what would be the basis of his knowledge so we can

14  figure out if it's anything admissible or if it's just the

15  rumors on the street.  So I don't know if you want to go in --

16  say he didn't know him personally; did -- you can try to

17  explore if he had conversations.

18          **MS. WHALEN:**  Okay.  All right.  Thank you.

19          **THE COURT:**  I don't know, but we're just not quite

20  there yet without a basis for the knowledge.)

21      (Bench conference concluded.)

22  **BY MS. WHALEN:**

23  **Q.**   You indicated you didn't really personally know Trouble,

24  but you know who he is; right?

25  **A.**    Yes.

PERGUSON - CROSS

```
 1   Q.   And have you had conversations with him about the gas
 2   station, the BP gas station?
 3   A.   No.
 4   Q.   Have you had conversations with other members of the mob,
 5   as you called it, about Trouble and the BP gas station?
 6   A.   No.
 7   Q.   The individuals that you told us before that were telling
 8   you business of the mob, did you have conversations with them
 9   about Trouble and the gas station?
10   A.   I'm not sure who you speakin' on.
11   Q.   Well, you told us in direct about guys you grew up with --
12   A.   Right.
13   Q.   -- okay, that you know are members of the Bloods:  Tech,
14   Tone.  Those people, let's focus on them.
15        Did you have conversations with them about Trouble and the
16   gas station?
17   A.   No.
18             MS. WHALEN:  Thank you, Your Honor.
19             I think that's all I have.
20             THE COURT:  Okay.  All right.  Thank you.
21             Mr. Sardelli.
22                       CROSS-EXAMINATION
23   BY MR. SARDELLI:
24   Q.   Good afternoon, sir.
25   A.   Good afternoon.
```

1   **Q.**   You stated on direct examination that you're a BGF member;

2   am I correct?

3   **A.**   Yes.

4   **Q.**   And you said that you pled previously to being a felon in

5   possession of a firearm; am I correct?

6   **A.**   Yes.

7   **Q.**   And you don't anticipate being charged with RICO or RICO

8   conspiracy or any other drug crimes, do you?

9   **A.**   No.

10  **Q.**   And that's because of your cooperation agreement; am I

11  correct?

12  **A.**   You're correct.

13  **Q.**   Now, you testified that you never actually bought drugs

14  from my client, Randy Banks, am I correct, personally?

15  **A.**   Yeah.  Yes.

16  **Q.**   And you also testified that you met with the Government,

17  the prosecutors, the agents on numerous occasions; am I

18  correct?

19  **A.**   Yes.

20  **Q.**   Does that include just before the grand jury, did you meet

21  with them?

22  **A.**   Can you repeat that.

23  **Q.**   You testified at the grand jury in this case.

24  **A.**   Right.

25  **Q.**   All right.  Just before you went to the grand jury, did

```
 1   you talk to the prosecutors and the agents before you went into
 2   the grand jury?
 3   A.   Yes, I did.
 4   Q.   Now, you mentioned before on direct examination some
 5   houses that you said are linked to my client Randy Banks;
 6   right?
 7   A.   Yes.
 8   Q.   What are the addresses of those houses, the actual
 9   addresses?
10   A.   I'm not sure.
11   Q.   Well, you're from that neighborhood; right?
12   A.   Yes; but I don't know the addresses.
13   Q.   You mentioned three houses; right?
14   A.   Yes.
15   Q.   Can you give me one of the addresses?
16   A.   I'm not sure.
17   Q.   Are you aware that none of those houses were seized?
18   A.   One of 'em was.
19   Q.   By who?
20   A.   I guess the police.  I'm not sure exactly who seized it.
21   Q.   Okay.
22   A.   But one of 'em was raided.
23   Q.   And do you have the address of that house?
24   A.   No.
25   Q.   And you grew up in that neighborhood; correct?
```

| 1 | **A.** Yes, sir. |
| 2 | **Q.** Now, you mentioned a black Benz that you said is linked to |
| 3 | my client; correct? |
| 4 | **A.** Yes. |
| 5 | **Q.** Are you aware that that's not registered to him? |
| 6 | **MS. HOFFMAN:** Objection. |
| 7 | **THE COURT:** Sustained. |
| 8 | BY MR. SARDELLI: |
| 9 | **Q.** Are you aware of a business called Mighty Mouse Towing? |
| 10 | **A.** Can you repeat that. |
| 11 | **Q.** Are you aware of a business called Mighty Mouse Towing? |
| 12 | **A.** No. |
| 13 | **Q.** Are you aware of a person named Bernard Bell? |
| 14 | **A.** No. |
| 15 | **Q.** Are you aware that's Randy Banks' uncle? |
| 16 | **MS. HOFFMAN:** Objection. |
| 17 | **THE COURT:** Sustained. He doesn't know him. |
| 18 | BY MR. SARDELLI: |
| 19 | **Q.** Are you aware of a rap company called TCGMG? |
| 20 | **A.** No. |
| 21 | **Q.** But you spent a lot of time in this area; correct? |
| 22 | **A.** Right. |
| 23 | **Q.** You never heard of TCGMG? |
| 24 | **A.** No. |
| 25 | **Q.** Do you know a LaVon Henson? |

1    **A.**   Can you repeat the name.

2    **Q.**   LaVon Henson.

3    **A.**   No, not by name.

4    **Q.**   You don't know that that's Randy's mom?

5    **A.**   No.  I don't know his mom.

6             **MS. HOFFMAN:**  Objection.

7             **THE COURT:**  If he doesn't know him, he doesn't know

8    her, I gather.  But --

9    **BY MR. SARDELLI:**

10   **Q.**   Now, you spent a lot of time from 2012 to 2018 in jail or

11   in confinement; correct?

12   **A.**   Correct.

13   **Q.**   In fact, you spent more time in jail than you did probably

14   on the street; correct?

15   **A.**   Correct.

16   **Q.**   Walk us through -- let's go backwards.  From today, when

17   were you confined today?  From today back to 2016, have you

18   been in jail?

19   **A.**   Yes; August 2nd.

20   **Q.**   Okay.  And in 2016, how long were you actually on the

21   street for?

22   **A.**   Five and a half months.

23   **Q.**   Of all of 2016, you were out for five and a half months?

24   **A.**   Yes.

25   **Q.**   How about for 2015?

1   **A.**   I was incarcerated the whole of '15.

2   **Q.**   All of '15?

3   **A.**   Yes.

4   **Q.**   How about 2014?

5   **A.**   Besides 20 days.

6   **Q.**   Besides 20 days?

7   **A.**   Besides 20 days of 2015, the beginning.

8   **Q.**   How about 2014?

9   **A.**   I was in prison all the way until December 5th.

10  **Q.**   Okay.  So most of the year?

11  **A.**   Yes.

12  **Q.**   How about 2013?

13  **A.**   In prison.

14  **Q.**   How about 2012?

15  **A.**   Half of prison and half on the street.

16  **Q.**   Okay.  So you would say at least three-quarters of the

17  time or more you were in jail during that period?

18  **A.**   Yes.

19  **Q.**   Now, do you remember your plea agreement?

20  **A.**   Yes, I do.

21  **Q.**   When you pled guilty in the case you've already talked

22  about, the felon in possession case; correct?

23  **A.**   Say that again.

24  **Q.**   The felon in possession, the felon in possession of a

25  firearm, you pled guilty in that case; correct?

1  **A.**    Yes, I did.

2  **Q.**    And as part of that case, there was a plea agreement;

3  correct?

4  **A.**    Right.

5  **Q.**    You reviewed it.  You signed it; am I correct?

6  **A.**    Yes.

7  **Q.**    There is a factual basis in that case, correct, that has

8  the facts of the case; right?

9  **A.**    Yes.

10  **Q.**    And there's no mention of Randy Banks anywhere in those

11  facts, is there?

12  **A.**    No.

13  **Q.**    Do you remember writing a letter to Ms. Hoffman?

14  **A.**    No.

15  **Q.**    Would it refresh my [sic] recollection if I showed you a

16  copy of the letter?

17  **A.**    Yes.

18        **MR. SARDELLI:**  Your Honor, may I approach?

19  **BY MR. SARDELLI:**

20  **Q.**    (Handing.)

21      Can you go ahead and read that to yourself.

22  **A.**    (Reviews document.)

23      Yeah, I remember this.

24  **Q.**    Does that refresh your recollection?

25  **A.**    Yes.

1   **Q.**   It says September 26th, but it doesn't say a date [sic].

2   What year was that?

3   **A.**   2017.

4   **Q.**   And you wrote that letter to Ms. Hoffman offering

5   information and your help in the case; correct?

6   **A.**   Correct.

7   **Q.**   You proactively reached out to her; am I right?

8   **A.**   Right.

9   **Q.**   And there's no mention of Randy Banks in this letter, is

10  there?

11  **A.**   I didn't read the whole thing.

12  **Q.**   Well, can I bring it back and you can refresh your

13  recollection?

14  **A.**   Yes.

15        **MR. SARDELLI:**   May I approach, Your Honor?

16  **BY MR. SARDELLI:**

17  **Q.**   (Handing.)

18        Go ahead and read that again.

19  **A.**   (Reviews document.)

20  **Q.**   Does that refresh your recollection, sir?

21  **A.**   Yes.

22  **Q.**   Is there any mention of Randy Banks in this letter?

23  **A.**   No.

24  **Q.**   And what was the date of that, sir?  What year was that?

25  **A.**   2017.

1  **Q.**  Now, you said on direct testimony, I believe the quote

2  was, Everything I was supposed to get.

3      That was in relation to your cooperation; correct?

4  **A.**  Can you repeat that again.

5  **Q.**  I believe your statement was you said everything I was

6  supposed to get when you were asked about your cooperation; am

7  I correct?

8  **A.**  Yes.

9  **Q.**  And that's in relation to your cooperation, about what you

10  expect; correct?

11  **A.**  Yes.

12  **Q.**  And you called the group that you testify about, to be

13  correct and accurate, quote/unquote, the Mobbin' Bloods; right?

14  **A.**  Can you repeat that again.

15  **Q.**  You called the group you testified to on direct,

16  quote/unquote, the group the Mobbin' Bloods; am I correct?

17  **A.**  Yes; but they have different names they go by.

18  **Q.**  That's not what I asked you, sir.  I asked you what you

19  called them.

20  **A.**  I called 'em Mobbin' Bloods.

21  **Q.**  Did I also hear you say that you dealt drugs; correct?

22  **A.**  Yes.

23  **Q.**  But you also said you're not sure how much a $10 sale is

24  worth of crack; am I correct?

25  **A.**  No, I'm -- I didn't say that.  I didn't know how much it

1    was as far as like gram-wise or how much it was percentage like

2    that.

3    **Q.**    Do you remember being asked on direct about how much a $10

4    sale is, how much crack there is?  Correct?

5    **A.**    Right.

6    **Q.**    You were asked that question; right?

7    **A.**    Right.

8    **Q.**    And didn't you answer you're not sure how much a $10 sale

9    is, quote/unquote?

10   **A.**    Yes, I said that.

11   **Q.**    And besides hoping to get leniency in these cases, you

12   also mentioned that you were paid by the ATF $8,500; am I

13   correct?

14   **A.**    I --

15   **Q.**    You or family members?

16   **A.**    Yes, I said that.

17              **MR. SARDELLI:**  No further questions, Your Honor.

18              **THE COURT:**  All right.  Anybody else?

19              **MR. TRAINOR:**  No questions.

20              **MR. HAZLEHURST:**  Nothing on behalf of Mr. Davis,

21   Your Honor.

22              **THE COURT:**  Any redirect?

23              **MS. HOFFMAN:**  Just briefly.

24

25

```
 1                        REDIRECT EXAMINATION
 2   BY MS. HOFFMAN:
 3   Q.   Mr. Ferguson, Ms. Whalen asked you about a shooting that
 4   happened back in 2012 when you were shot.
 5        Did you ever tell detectives who shot you back in 2012?
 6   A.   No.
 7   Q.   And why not?
 8   A.   Because I was in fear for my life and I wanted to take
 9   matters in my own hands.
10   Q.   Were you called upon to testify at the trial of
11   Shelton Jacobs.
12   A.   Yes, I was.
13   Q.   And what did you say at the trial?
14   A.   I told 'em I didn't know who shot me.
15   Q.   And was Shelton Jacobs found guilty or acquitted?
16   A.   Acquitted.
17   Q.   Do you know who shot you in 2012?
18   A.   Yes, I do.
19   Q.   Who was it?
20   A.   Tone and Tech.
21   Q.   Mr. Sardelli asked you about a letter that you sent to me
22   in September of 2017.
23        I believe you testified on direct that you testified in
24   the federal grand jury in this case in August of 2016; is that
25   right?
```

DELGADO - DIRECT

1    **A.**   Yes, that's correct.

2    **Q.**   And did you testify about Dirt in the grand jury?

3    **A.**   Yes, I did.

4            **MS. HOFFMAN:**   Thank you, Mr. Ferguson.

5            No further questions.

6            **THE COURT:**   Anything else?

7        (No response.)

8            **THE COURT:**   Thank you very much.   The witness is

9    excused.

10       (Witness excused.)

11           **THE COURT:**   Does the Government have another witness?

12           **MS. HOFFMAN:**   The Government calls Luis Delgado.

13           **THE CLERK:**   Please raise your right hand.

14         DETECTIVE LUIS DELGADO, GOVERNMENT'S WITNESS, SWORN.

15           **THE CLERK:**   Please be seated.

16           Please speak directly into the microphone.

17           State and spell your full name for the record, please.

18           **THE WITNESS:**   Detective Luis Delgado.   Last name,

19    Delgado, D-E-L-G-A-D-O.

20           **THE CLERK:**   Please spell your first name.

21           **THE WITNESS:**   Luis, L-U-I-S.

22                            DIRECT EXAMINATION

23    **BY MS. HOFFMAN:**

24    **Q.**   Good afternoon, Detective Delgado.

25    **A.**   Good afternoon.

DELGADO - DIRECT

```
 1  Q.  Where are you employed?

 2  A.  I work for the Baltimore City Police Department.

 3  Q.  What unit and title?  What's your unit and title?

 4  A.  I work for the Arson and Explosives Unit.

 5  Q.  Are you a detective?

 6  A.  Yes, I am.

 7  Q.  Have you previously been in other units?

 8  A.  Yes, I have.

 9  Q.  What other units?

10  A.  I worked for the Baltimore City Homicide Unit.

11  Q.  And what years were you with Homicide?

12  A.  From 2010 to 2017.

13  Q.  How long have you worked for the BPD?

14  A.  12 years.

15  Q.  Approximately how many homicides have you investigated

16  with BPD?

17  A.  Approximately like 50.

18  Q.  Is that as lead detective?

19  A.  Yes.

20  Q.  Have you assisted in other homicide investigations?

21  A.  Yes, I have.

22  Q.  I want to direct your attention to April 28th of 2016.

23      Were you the lead detective on a homicide that occurred on

24  that day?

25  A.  Yes, I was.
```

1    **Q.**   Who was the victim?

2    **A.**   Anthony Hornes.

3    **Q.**   I'm going to show you Government's Exhibit IND-48.

4         Who is that?

5    **A.**   The victim, Anthony Hornes.

6    **Q.**   Approximately what time did the 9-1-1 calls come in on

7    April 28th of 2016?

8    **A.**   Around 9:55 p.m.

9    **Q.**   And where was the crime scene?

10   **A.**   4700 block of Haddon.

11   **Q.**   I'm going to show you Government's Exhibit MAP-14.

12        Do you recognize this image here?

13   **A.**   I do.

14   **Q.**   And are you able to indicate, first of all, on this map

15   where the intersection of Gwynn Oak and Liberty Heights is?

16   **A.**   Yes.

17   **Q.**   Can you point to it on the screen.  It should come up.

18   You can actually draw a circle.  It might be a little easier to

19   see.

20   **A.**   (Witness complies.)

21   **Q.**   Thanks.

22        And then could you point to the approximate location of

23   the crime scene.

24   **A.**   (Indicating.)

25   **Q.**   Did you respond to the crime scene?

1   **A.**   Yes, I did.

2   **Q.**   Approximately what time did you arrive?

3   **A.**   10:42 p.m.

4   **Q.**   Was the victim there when you arrived?

5   **A.**   No, he was not.

6   **Q.**   Where was the victim?

7   **A.**   He was transported to the hospital.

8   **Q.**   Was any evidence recovered from the crime scene?

9   **A.**   Yes.

10  **Q.**   Can you tell us what evidence was recovered.

11  **A.**   A pair of boots.  There was a vest, a sweater, cell phone,

12  $4, and one shell casing, 9-millimeter.

13  **Q.**   Were photographs taken of the crime scene?

14  **A.**   Yes.

15  **Q.**   I'm going to show you some photographs, starting with

16  Government's Exhibit CS-6-1.

17       What are we looking at here?

18  **A.**   Looking at the crime scene.

19  **Q.**   And I'm going to show you Government's Exhibit CS-6-2.

20       What are we looking at here?

21  **A.**   The crime scene.

22  **Q.**   CS-6-3.

23  **A.**   Different angle from the crime scene.

24  **Q.**   And CS-6-4, what are we looking at here?

25  **A.**   That's Marker No. 1.  That's the 9-millimeter casing.

1   **Q.**   Was that the only casing recovered?

2   **A.**   Yes.

3   **Q.**   I'm going to show you CS-6-5.

4        Can you tell us what we're looking at here.

5   **A.**   Different angle of the crime scene.

6   **Q.**   CS-6-7.

7   **A.**   That is the hat at the crime scene.

8   **Q.**   CS-6-8.  What are we looking at here?

9   **A.**   That is the jacket at the crime scene.

10  **Q.**   And CS-6-9.

11  **A.**   That is the shoes at the crime scene and the wallet and

12  the sweater.

13  **Q.**   Did you canvass the area for surveillance cameras?

14  **A.**   Yes, we did.

15  **Q.**   Are there any surveillance cameras in the 4700 block of

16  Haddon?

17  **A.**   Nope.

18  **Q.**   Did you conduct an area canvass for witnesses?

19  **A.**   Yes, we did.

20  **Q.**   Did you identify any eyewitnesses at the scene?

21  **A.**   No, we did not.

22  **Q.**   Did you make a request for 9-1-1 calls related to the

23  murder?

24  **A.**   Yes, I did.

25  **Q.**   And have you had a chance to listen to some of those 9-1-1

1    calls before coming in here today?

2    **A.**   Yes, I did.

3    **Q.**   And I'm going to approach and show you

4    Government's Exhibit CAD-3.

5            **MS. HOFFMAN:**   Court's indulgence.

6    **BY MS. HOFFMAN:**

7    **Q.**   (Handing.)

8            Is that a disc of 9-1-1 calls related to this case?

9    **A.**   Yes.

10   **Q.**   And I'm going to play for you a few of them.

11           I'm going to start with Government's Exhibit CAD-3-A,

12   which I believe is on Page 11 of the 9-1-1 call tab.

13           And before I play it, would you mind reading the date and

14   timestamp of the call.

15   **A.**   April 28th, 2016, 9:55:31 seconds p.m.

16           (Audio was played but not reported.)

17   **BY MS. HOFFMAN:**

18   **Q.**   I'm going to play another call for you, CAD-3-B, and this

19   one's on Page 12.

20           And would you mind reading the date and timestamp of this

21   call.

22   **A.**   April 28th, 2016, at 9:57 p.m.

23           (Audio was played but not reported.)

24   **BY MS. HOFFMAN:**

25   **Q.**   And I just have one more call for you.  This one is

1  Government's Exhibit CAD-3-C on Page 15 of the transcript
2  binders.
3      Would you mind reading the date and time of this call.
4  **A.**  April 28th, 2016, at 9:57 with 25 seconds p.m.
5      (Audio was played but not reported.)
6  **BY MS. HOFFMAN:**
7  **Q.**  Detective Delgado, did you hear that the caller there said
8  he heard one gunshot -- or heard a gunshot?
9  **A.**  Correct.
10 **Q.**  And in the call previous to that, did you hear the caller
11 say he heard one shot?
12 **A.**  Yep.
13 **Q.**  Did you attend the autopsy of the victim?
14 **A.**  I did.
15 **Q.**  And what was the cause of death?
16 **A.**  It was ruled a homicide by shooting.
17 **Q.**  And where was the victim shot?
18 **A.**  He was shot on the right cheek and exited through the
19 rear, the back left side of the head (indicating).
20 **Q.**  Were there any other murders in the area at the -- around
21 the same time as the Anthony Hornes murder?
22 **A.**  Yes.
23 **Q.**  And can you tell us, were there murders close in time?
24 **A.**  Yes; an hour before.
25 **Q.**  And who was murdered before?

1   **A.**   Maurice Braham.

2   **Q.**   And did you investigate whether there was any connection

3   between the Maurice Braham murder --

4   **A.**   I did --

5          **MR. SARDELLI:**   Lack of foundation, Your Honor.

6          **MS. HOFFMAN:**   I simply meant to ask him whether he

7   investigated it.

8          **THE COURT:**   Okay.   And the answer is "yes," but that's

9   it?

10          **MS. HOFFMAN:**   That's it.

11   **BY MS. HOFFMAN:**

12   **Q.**   Did you develop any actual suspects?

13   **A.**   I did not.

14   **Q.**   And other than responding to investigate this homicide,

15   did you have any role in the broader investigation?

16   **A.**   I did not.

17          **MS. HOFFMAN:**   Thank you, Detective Delgado.

18          I don't have any further questions.

19          **THE COURT:**   Thank you.

20                      CROSS-EXAMINATION

21   **BY MR. ENZINNA:**

22   **Q.**   Good afternoon, Detective.

23   **A.**   Good afternoon.

24   **Q.**   You said the murder took place on Haddon Avenue; correct?

25   **A.**   That's correct.

1    **Q.**   Let me see if I can focus this better.

2         How far away is that from the corner of Woodbine and

3    Liberty Heights?

4    **A.**   I couldn't tell you, sir.

5    **Q.**   Couldn't tell?

6    **A.**   Unh-unh.

7    **Q.**   Okay.  All right.  Did you learn at one point during the

8    investigation -- Maurice Braham, who you said was murdered an

9    hour before Mr. Horn [sic]?

10   **A.**   Braham.

11   **Q.**   Braham, yeah.  You said he was murdered an hour before

12   Mr. Horn [sic]?

13   **A.**   I believe so.

14   **Q.**   And did you learn during the investigation that the two of

15   them were friends?

16        **MS. HOFFMAN:**  Objection.

17        **THE COURT:**  Do you want to come up to the bench.

18        (Bench conference on the record:

19        **MS. HOFFMAN:**  Your Honor, last night Mr. Enzinna noted

20   that there were some redactions in the homicide file.  I

21   explained to him that they were hearsay intel memos, that we

22   objected to their admission, but I gave them to him anyways.

23        I did tell him that we believed they were not

24   admissible, and he has just asked a question based on blatant

25   hearsay from an intel memo which is completely inaccurate and

```
 1   has -- there's no basis of evidence to believe that the victim
 2   was friends with Braham at all.
 3           THE COURT:  Do you have any other foundation?
 4           MR. ENZINNA:  The foundation -- what I have is I have
 5   this memo that says that they were allegedly friends.
 6           THE COURT:  What's the source in the memo?
 7           MR. ENZINNA:  It's in this file.
 8           MS. HOFFMAN:  It's an e-mail from a LaTanya Lewis to
 9   somebody else.  It's clearly --
10           THE COURT:  I'm sustaining.
11           MR. ENZINNA:  That's not what it says.
12           THE COURT:  Show me.  Show me what it says.
13           MR. ENZINNA:  LaTanya Lewis, I don't know who
14   LaTanya Lewis is.
15           MS. HOFFMAN:  Right.  And he didn't author this
16   e-mail.  He is -- I mean, it's clearly double or triple
17   hearsay.
18           I object to any further questions about the contents
19   of any of these intel memos.
20           THE COURT:  Sustained.)
21       (Bench conference concluded.)
22           THE COURT:  The jury will just disregard the last
23   question.  We'll move on.
24   BY MR. ENZINNA:
25   Q.   Detective, you said that you didn't develop any suspects;
```

```
 1   is that correct?
 2   A.   That's correct.
 3          MR. ENZINNA:  I have nothing further.  Thank you.
 4          THE COURT:  Anybody else?
 5          Mr. Trainor.
 6                    CROSS-EXAMINATION
 7   BY MR. TRAINOR:
 8   Q.   Good afternoon, Detective Delgado.
 9        So as the lead detective on this homicide on April 28th,
10   2016, did you have a team of other detectives working with you?
11   A.   Detective Kershaw went out with me.
12   Q.   All right.  And did the two of you organize a neighborhood
13   canvass?
14   A.   Along with patrol.
15   Q.   And you went door to door and asked everyone what they
16   saw, what they heard?
17   A.   Correct.
18   Q.   All right.  And that was done that very night; correct?
19   A.   That night; correct.
20   Q.   All right.  And you weren't able to develop any
21   information regarding a description of the shooter or how he or
22   she came to -- through the neighborhood?
23   A.   No.
24   Q.   All right.  You testified on direct that there were no
25   surveillance cameras in the 4700 block of Haddon Avenue.
```

1   **A.**   I believe so, yes, sir.

2   **Q.**   But there are surveillance cameras around the

3   neighborhood, aren't there?

4   **A.**   Not that I recall.

5   **Q.**   How about up around Liberty Heights and Gwynn Oak?

6   **A.**   I don't recall.

7   **Q.**   You don't recall?

8   **A.**   That's correct.

9   **Q.**   Did you look for them?

10  **A.**   Two years ago, I believe so.

11  **Q.**   Pardon me?

12  **A.**   I believe so.

13  **Q.**   You believe so?

14  **A.**   Yeah.

15  **Q.**   Are you sure of that?

16  **A.**   I think so, sir.

17          **MR. TRAINOR:**  All right.  That's all I have.

18          **THE COURT:**  Thank you.

19          Anyone else?

20       (No response.)

21          **THE COURT:**  Any redirect?

22          **MS. HOFFMAN:**  No redirect, Your Honor.

23          But could we approach on scheduling?

24          **THE COURT:**  Sure.  In the meantime, we'll excuse the

25  witness.  Thank you very much.

```
1          (Witness excused.)

2          (Bench conference on the record:

3              THE COURT:  Yes?

4              MS. HOFFMAN:  So we have again moved faster today than

5   we expected, and what we'd like to do next is call one of the

6   case agents to play some jail calls that are sort of related to

7   this murder.

8              Again, we did not notice the agent for today, and so

9   we're hoping we can take the break now and let defense counsel

10  know which calls we intend to play and then put him on to play

11  the calls when we get back.

12             THE COURT:  Okay.

13             MR. HAZLEHURST:  I'm sorry?

14             THE COURT:  They're moving faster.  In an effort not

15  to run out of witnesses, they're going to call an agent to play

16  some of the jail calls.  We will take a break now, and they can

17  tell you what jail calls they are planning to play.

18             MS. HOFFMAN:  Related to the murder.

19             THE COURT:  Related to the murder; right.

20             MR. HAZLEHURST:  Thank you.

21             MS. HOFFMAN:  Yes.

22             THE COURT:  Okay.  Thank you.)

23         (Bench conference concluded.)

24             THE COURT:  All right.  If I could see Ms. Moyé for

25  just one second.
```

```
1              All right.  We're going to take the mid-afternoon
2    recess.
3              I'll start by excusing the jury.
4         (Jury left the courtroom at 3:25 p.m.)
5              THE COURT:  All right.  And we'll excuse the gallery.
6              Is the Government expecting to pretty much fill the
7    rest of the afternoon?
8              MS. HOFFMAN:  We're not sure.  It may not fill the
9    rest of the afternoon.
10             We will do our best.
11             We expected a lengthier cross of Mr. Ferguson.
12             THE COURT:  Okay.  All right.  Well, just see what you
13   can do.  We'll see how long the jail calls take.  That's fine.
14             All right.  We'll take a recess.
15        (Recess taken.)
16             THE COURT:  All right.  Any issues?
17             MS. HOFFMAN:  There is, Your Honor.
18             One of the calls that we would like to play is
19   Call J-51, which Defendant Dante Bailey moved to preclude prior
20   to trial, and this is the call from Devon Dent to
21   Ayinde Deleon.  It's an April 23rd, 2016 --
22             THE COURT:  I'm sorry.  What page is it?
23             MS. HOFFMAN:  J-51 is on Page 166 of the jail call tab
24   of the transcript binder.
25             And the relevant portion is also included in the
```

```
 1   defendant's -- well, it's included in the Government's response
 2   to the defendant's motion to preclude, which is ECF-1045.  The
 3   defendant's motion to preclude is ECF-1043.  And so I wanted to
 4   give -- I mean, it's their motion, so I don't want to speak
 5   first.
 6           I wanted to give them an opportunity to argue the
 7   motion perhaps before we play the call.
 8           THE COURT:  Okay.  So this is a call, jail call,
 9   Mr. Dent, Mr. Deleon.
10           Ms. Whalen.
11           MS. WHALEN:  Yes.  Thank you, Your Honor.  I have not
12   looked at the specific arguments that we made in a long time in
13   the motion to preclude.
14           But as memory serves me, this call, we were arguing
15   that it was not a call in furtherance of the conspiracy.  It's
16   a retelling of events, simply sort of like the good old days
17   when we were, you know -- for instance, Mr. Dent saying, When
18   we used to ride around, the police couldn't touch us.
19           I don't see that as being in furtherance of any of the
20   business of the organization, and so for that reason we'd ask
21   you to preclude it.
22           THE COURT:  Okay.
23           MS. HOFFMAN:  Yes, Your Honor.  And we do believe it's
24   in furtherance of the conspiracy.  It is certainly within the
25   dates of the conspiracy.  It's one co-conspirator to another,
```

1   Devon Dent, Tech, to Ayinde Deleon, Murda, and they're talking

2   about a number of other members of the gang and criminal

3   activities that they participated in together.

4          I think as I understand the defendant's argument,

5   they're not disputing that these are co-conspirators, but

6   they're arguing that it's more like idle conversation and not

7   in furtherance.

8          And we do think that the "idle conversation" exception

9   has been narrowly construed.  There are a number of

10  Fourth Circuit cases indicating that retrospective statements

11  can be co-conspirator statements in furtherance of the

12  conspiracy, for instance, if they're about the status of the

13  conspiracy, the status of its members; or if they provide

14  reassurance, serve to maintain trust and cohesiveness among

15  members, that that is also in furtherance of the conspiracy.

16         And I think that that is exactly what this is.  I

17  think that although they are reminiscing, it's a

18  conversation -- I think that they are maintaining trust and

19  cohesiveness by talking about criminal activities that the

20  members of the gang engaged in together and that that, under

21  the cases that we cited in our motion, should be admitted.

22         **THE COURT:**  And what's the particular relevance of it?

23  What is there specifically in here?

24         **MS. HOFFMAN:**  So the reference to -- there's certainly

25  reference to several members of the gang.  And so it's

```
 1    Sheisty -- Sheisty, who has been identified as a member of the

 2    mob; Gutta, of course; Trouble; reference to Nizzy and Bangout

 3    and all of them together pulling up on the block.  It's

 4    basically a reference to -- what it sounds like is armed

 5    robbery, basically, telling everybody to get down on the ground

 6    and, you know, saying, you know --

 7            THE COURT:  Yes, but it doesn't relate to any

 8    specific --

 9            MS. HOFFMAN:  It does not; however, it is one of the

10    methods -- you know, one of the racketeering activities that

11    we've alleged that the defendants participated in is robbery,

12    and so this is evidence of one of those racketeering

13    activities.

14            THE COURT:  Well, pretty general in terms of that.  It

15    says -- talking about putting people in their place.

16            MS. HOFFMAN:  It is general.  Although I think it is

17    clear that under the law for racketeering conspiracy, we're not

18    required to prove specific instances of robbery, although we

19    certainly have done that as well.  But I think we are required

20    to prove general types of criminal activity.  And this is a

21    call that goes directly to the proof of robbery committed by

22    members of the gang.  And especially when it's connected to a

23    lot of specific names of defendants here and other

24    co-conspirators who have been discussed and witnesses who have

25    testified, I think it is relevant and in furtherance.
```

1            **THE COURT:**  Okay.  Well, I think to say it's in

2    furtherance is a stretch.  Even if it is, I think that it's not

3    specifically relevant to anything very much.

4            There's certainly not going to be any news in terms of

5    the names of the people that are involved together.  There's

6    plenty of other evidence of that, and I think it's sort of just

7    general possibly prejudicial conversation not tied to anything

8    specific in the indictment.

9            So I'm going to exclude that particular call.

10           Anything else?

11       (No response.)

12           **THE COURT:**  Okay.  We can get the jury.

13           And the jury is okay with a 9:30 start on Monday.

14       (Jury entered the courtroom at 3:52 p.m.)

15           **THE COURT:**  Okay.  All right, ladies and gentlemen,

16   before the Government calls another witness, just briefly on

17   the schedule.

18           As you know, we're meeting a half day on Monday.  I

19   understand that coming at 9:30 on Monday would be okay for you,

20   so we'll have a half day on Monday.

21           We have a full day on Tuesday.

22           We are not sitting Wednesday.

23           We are not sitting Friday.

24           And unfortunately, I still don't know for sure yet

25   about Thursday.  If you can keep on hold Thursday.

| | |
|---|---|
| 1 | But we will not sit Wednesday. |
| 2 | We will not sit Friday. |
| 3 | We will sit Monday morning and Tuesday all day. |
| 4 | Okay.  All right.  Government. |
| 5 | **MS. PERRY:**  Your Honor, at this time the Government |
| 6 | would call Special Agent Tim Moore. |
| 7 | **THE COURT:**  All right. |
| 8 | **THE CLERK:**  Raise your right hand. |
| 9 | SPECIAL AGENT TIMOTHY MOORE, GOVERNMENT'S WITNESS, |
| 10 | SWORN. |
| 11 | **THE CLERK:**  Please be seated. |
| 12 | Please speak directly into the microphone. |
| 13 | State and spell your full name for the record, please. |
| 14 | **THE WITNESS:**  Certainly.  It's Timothy Moore, |
| 15 | M-O-O-R-E. |
| 16 | **THE CLERK:**  Thank you.  Timothy, T-I-M-O-T-H-Y? |
| 17 | **THE WITNESS:**  Yes, ma'am. |
| 18 | **THE CLERK:**  Thank you. |
| 19 | DIRECT EXAMINATION |
| 20 | **BY MS. PERRY:** |
| 21 | **Q.**   Good afternoon. |
| 22 | **A.**   Good afternoon. |
| 23 | **Q.**   Where do you work? |
| 24 | **A.**   I work for the ATF here in Baltimore. |
| 25 | **Q.**   And what is your title with the ATF? |

1  **A.**   I'm a Special Agent.

2  **Q.**   How long have you been a Special Agent with the ATF?

3  **A.**   Slightly over 12 years at this point.

4  **Q.**   And in your capacity as an ATF Special Agent, were you

5  involved in an investigation into a gang operating in

6  Northwest Baltimore?

7  **A.**   I sure was.

8  **Q.**   What was your role in that investigation?

9  **A.**   I was one of the case agents.

10 **Q.**   And what does it mean to be a case agent?

11 **A.**   We're the primary investigators.  We sort of direct the

12 rest of our group as to what we're going to do and how we're

13 going to do it.

14 **Q.**   Now, I want to approach and show you what's already come

15 into evidence as Government's Exhibit JAIL-1 (handing).

16        Do you recognize this?

17 **A.**   Sure do.

18 **Q.**   What is it?

19 **A.**   That is a disc that contains 80 or 81 jail calls.

20 **Q.**   And have you reviewed all of the calls on JAIL-1 before

21 coming to court today?

22 **A.**   Unfortunately, I have listened to every one of them.

23 **Q.**   And were transcripts prepared for all of the calls on

24 JAIL-1?

25 **A.**   Yes, ma'am.

1    Q.    What kind of information -- first, let me ask you, did you

2    prepare or review all of the transcripts for the calls

3    contained on JAIL-1?

4    A.    I did not prepare, but I reviewed and edited most, if

5    not -- well, I reviewed every one and edited many of them.

6    Q.    What kind of information, generally speaking, is included

7    in the transcripts?

8    A.    You'll have the number calling out and the inmate ID for

9    that number calling out, along with the actual inmate ID, the

10   person that's associated with it.  You'll have the date, the

11   time, and then you'll have below is the transcript or the

12   speakers.

13   Q.    Now, how is the inmate -- how do you know what the inmate

14   ID or the inmate calling is?

15   A.    The jail keeps a record of inmate ID numbers that are

16   associated with each inmate.

17   Q.    And so is that information contained in the certified

18   records?

19   A.    Yes, it is.

20   Q.    And what about the number that is dialed; how is that

21   information kept?

22   A.    Same.  It's contained by the jail.  And then when

23   requested, it's part of the certified records.

24   Q.    The same with the date and time?

25   A.    Yes.

1    **Q.**   Is that information contained in the certified records?

2    **A.**   Correct.

3    **Q.**   Now, generally speaking, did you attempt or identify the

4    individuals speaking on these particular calls?

5    **A.**   Yes, ma'am.

6    **Q.**   And generally speaking, can you explain how you were able

7    to identify the people speaking on the calls.

8    **A.**   Any number of means.  Some we've been in the same room

9    with them.  Some we've listened to.  They self-identify in the

10   calls.  Through review of subscriber records, people will

11   typically sometimes put the cell phones in their own names or

12   their house phones in their names.

13       Other people self-ID when they first make a call.  Many of

14   the jails ask you to state your name.  Some people use their

15   correct names.  Other times in the middle of calls or in calls

16   with other people, they will self-identify or identify using a

17   nickname that we are aware of.

18   **Q.**   And were there times where you were unable to identify the

19   speakers in calls?

20   **A.**   Yes.

21   **Q.**   And how did you denote that in the transcripts?

22   **A.**   It would -- if it's male, it would be "unknown male"; or

23   if it's female, it would be "unknown female."

24   **Q.**   And are there occasions -- were there occasions where

25   nicknames were contained in the transcripts?

1   **A.**   Yes.

2   **Q.**   And where did that come from?

3   **A.**   It came from the context of the call.

4   **Q.**   Now, I want to -- let me ask you one more question about

5   the jail calls generally.

6        Were there times -- did you always rely on the inmate name

7   and the inmate identification to determine who was speaking in

8   the calls?

9   **A.**   No.

10   **Q.**   Why not?

11   **A.**   Frequently inmates will either run out of minutes or calls

12   on their own ID number, so they'll use somebody else's.  Or

13   they'll use somebody else's to specific -- purposely not to

14   have those calls recorded under their name.

15   **Q.**   And so are the names identified in the transcripts all

16   based on -- just generally speaking, based on your review of

17   all of the -- all of the items and all of the materials and all

18   of the information you had and based on voice identification?

19   **A.**   Yes, ma'am, they are.

20   **Q.**   So I want to talk about just a few specific individuals

21   today.

22        Did you become familiar with an individual by the name of

23   Devon Dent over the course of your investigation?

24   **A.**   Yes.

25   **Q.**   And did you become familiar with his voice?

1    **A.**    Yes.

2    **Q.**    How did you become familiar with his voice?

3    **A.**    We were in the same room as him.

4    **Q.**    And did you become familiar over the course of your

5    investigation with an individual by the name of Ayinde Deleon?

6    **A.**    Yes.

7    **Q.**    And did you become familiar with Mr. Deleon's voice?

8    **A.**    I did.

9    **Q.**    How did you become familiar with his voice?

10   **A.**    Same thing, we were in the same room together.

11   **Q.**    And what about an individual named Darius Stepney, did you

12   come across Mr. Stepney during the course of your

13   investigation?

14   **A.**    We did.

15   **Q.**    And did you become familiar with his voice?

16   **A.**    I did.

17   **Q.**    How did you become familiar with his voice?

18   **A.**    He actually identifies himself via nickname in a number of

19   calls and we know that the nickname he uses, Cone or Conehead,

20   is only his nickname.  Nobody else goes by that that we know

21   of.

22   **Q.**    So I want to direct your attention to a few specific

23   calls.  I'm going to start with Call J-48.  J-48 is on Page 155

24   of the jail call tab of the transcript binders.

25        Now, Agent Moore, if you could look over here on the right

1  side of the screen, can you tell us the date and time of this

2  particular call.

3  **A.**   Right now there's nothing on my screen.

4  **Q.**   Oh, my apologies.

5       Let's try that again.

6  **A.**   There you go.  April 22nd, 2016, at approximately 10:49 in

7  the morning.

8  **Q.**   And were you able to identify the speakers in this

9  particular call?

10 **A.**   Yes.

11 **Q.**   Who did you identify them to be?

12 **A.**   Mr. Deleon and Mr. Dent.

13 **Q.**   And did you identify them based on the manner and means we

14 just described?

15 **A.**   Yes, ma'am.

16 **Q.**   So I'm going to play this call starting at 3 minutes and

17 28 seconds into the call.

18      (Audio was played but not reported.)

19         **MS. PERRY:**   I'm going to jump ahead to about

20 10:44 into the call.

21      (Audio was played but not reported.)

22 **BY MS. PERRY:**

23 **Q.**   I'm going to pause it here and turn to the next call.

24 This is J-49.

25      And looking here, first, on the right-hand side of the

1   screen, can you tell us the date and time of this call.

2   **A.**   Yep.  It's April 22nd, 2016, at 2:05.

3   **Q.**   And did -- were you able to identify the speakers in this

4   call?

5   **A.**   Just one of them.

6   **Q.**   And who was that?

7   **A.**   That's Darius Stepney.

8   **Q.**   I'm going to play the call starting at a minute and

9   48 seconds into the call.

10      (Audio was played but not reported.)

11  **BY MS. PERRY:**

12  **Q.**   I'm going to stop it there.

13      Did you hear a reference to Gutta?

14  **A.**   Yes, ma'am.

15  **Q.**   And did you identify someone over the course of your

16  investigation who went by the name Gutta?

17  **A.**   Yes, ma'am.  That's Mr. Bailey.

18  **Q.**   And you mentioned that you identified the person in this

19  call as Darius Stepney.  Did he go by a nickname?

20  **A.**   Yes.  He went by Cone or Conehead.

21  **Q.**   And did you hear that a phone number was provided in the

22  course of this call?

23  **A.**   Yes, ma'am.

24  **Q.**   So I'm going to turn now to J-50.

25      **THE COURT:**  Next page, 163?

1              MS. PERRY:  Yes, 163.

2    BY MS. PERRY:

3    Q.   And what is the date and time of this particular call?

4    A.   It's, again, April 22nd, 2016.  This time it's 10:11 in

5    the evening.

6    Q.   And were you able to identify any of the speakers in this

7    call?

8    A.   Just one, same thing.  It's Darius Stepney again.  Well,

9    two.  I'm sorry.  Further down, it's Mr. Bailey.

10   Q.   I'm going to play this call starting at two minutes and

11   one second into the call.

12        (Audio was played but not reported.)

13   BY MS. PERRY:

14   Q.   Now, I'm going to pause it there.

15        Did you hear where another voice came over the line?

16   A.   Yes, ma'am.

17   Q.   And did you recognize that voice?

18   A.   Yes.

19   Q.   Who did you recognize that to be?

20   A.   That's Mr. Bailey.

21   Q.   And how did you recognize Mr. Bailey's voice?

22   A.   I've been in the same room as Mr. Bailey before.

23   Q.   And did you -- when is this call -- let me pull back up

24   the first page of this transcript.

25        But when is this call in relation to the one we listened

1    to just before it?

2    **A.**    Same date, a little bit later in the day.

3    **Q.**    And the number that was provided in J-49 that we just

4    listened to, that (802) 839-8109 number, did that phone number

5    have some significance in your investigation?

6    **A.**    Yes.

7    **Q.**    Can you explain.

8    **A.**    It ended up being one of the -- one of Mr. Bailey's

9    numbers that we later recovered.

10    **Q.**    So I'm going to stick with J-50 for a moment and jump

11    ahead to 11 minutes into the call.

12        (Audio was played but not reported.)

13    **BY MS. PERRY:**

14    **Q.**    I'm going to pause it here.

15        Did you hear a reference to Dirt?

16    **A.**    Yes.

17    **Q.**    And did you identify someone who went by the name of Dirt

18    over the course of your investigation?

19    **A.**    Yes, we did.

20    **Q.**    Who was that?

21    **A.**    That's Mr. Banks.

22    **Q.**    Now, I want to jump ahead to J-53, which is on Page 171 of

23    the transcript binder.

24        And, again, starting over here at the right, can you tell

25    us the date and time of this particular call.

1   **A.**   Yep.  It's April 27th, 2016, at 11:26 in the morning.

2   **Q.**   And can you tell us, what was going on in the

3   investigation on April 27th of 2016?

4   **A.**   So the day before, on April 26th, 2016, Carlos Younger was

5   murdered around the Gwynn Oak and Liberty area, and then

6   April 27th would be the following day.

7   **Q.**   And did anything significant happen in the course of your

8   investigation the next day, on April 28th of 2016?

9   **A.**   Yes.  Two more people got killed in the same area.

10  **Q.**   Were you able to identify any of the speakers in

11  Call J-53?

12  **A.**   Yeah.  It's going to be Devon Dent and Ayinde Deleon.

13  **Q.**   I'm going to play this call from the beginning.

14      (Audio was played but not reported.)

15  **BY MS. PERRY:**

16  **Q.**   I'm going to stop it there and go back up to the first

17  page of the transcript.

18      Do you hear where Mr. Deleon said [reading]:  A whole

19  bunch of wild shit happened?

20  **A.**   Yes, ma'am.

21  **Q.**   And, again, who's Dirt?

22  **A.**   That's going to be Mr. Banks.

23  **Q.**   Now, I want to turn to the next call.  This is J-54, and

24  the transcript is on Page 173.

25      Again, starting over at the right, can you tell us the

1   date and time of this call.

2   **A.**   That's going to be April 29th, 2016, at about 3 -- 3:53 in

3   the afternoon.

4   **Q.**   And were you able to identify any of the individuals

5   speaking in this call?

6   **A.**   One is going to be Devon Dent, again, and the other is an

7   unknown female who just goes by Missy.

8   **Q.**   And, again, April 29th, is that the day after the two

9   murders that you described earlier?

10  **A.**   Yes, ma'am.

11  **Q.**   I'm going to play this call.

12      (Audio was played but not reported.)

13  **BY MS. PERRY:**

14  **Q.**   I'm going to stop it there and move back up a few pages in

15  the transcript.

16      Did you hear references to Yin?

17  **A.**   Yes, ma'am.

18  **Q.**   And did someone by the name of Yin come up in your

19  investigation?

20  **A.**   That's Mr. Deleon.

21  **Q.**   And were there -- did you also hear references to Murda?

22  **A.**   Yes.

23  **Q.**   And did Murda come up in your investigation?

24  **A.**   Same person, Mr. Deleon.

25  **Q.**   Did you hear the part in the call where Mr. Dent said

1    [reading]:  What "N" words we be doing, yo?

2    **A.**   Yes.

3    **Q.**   And Mr. Deleon said [reading]:  Big Homie was up there.

4    Nephew was up there.  But I don't know.

5    **A.**   Yes.

6    **Q.**   I'm going to turn to the next call.  This is J-55.

7         And what is the date and time of this call?

8    **A.**   Same date, April 29th, 2016, at about 5:28 in the evening.

9    **Q.**   So is this shortly after the call we just listened to?

10   **A.**   Yes, ma'am.

11   **Q.**   I'm going to play -- I'm going to start about 20 seconds

12   in.

13        (Audio was played but not reported.)

14   **BY MS. PERRY:**

15   **Q.**   I'm going to stop it here.

16        Did you hear a reference to Tech?

17   **A.**   Yes, ma'am.

18   **Q.**   And did an individual who went by the name of Tech come up

19   in your investigation?

20   **A.**   Yes, ma'am.  That's Mr. Dent.

21   **Q.**   Now, I'm going to turn now to J-56.

22        And can you tell us the date and time of this call.

23   **A.**   Sure can.  Same date, April 29th, 2016, approximately

24   10:02 in the evening.

25   **Q.**   And were you able to identify anyone in this particular

1    call?

2    **A.**    It's Mr. Stepney again, Darius Stepney.

3    **Q.**    And, again, what was the nickname Mr. Stepney went by?

4    **A.**    Cone or Conehead.

5    **Q.**    So I'm going to play this call starting at about 1 minute

6    and 30 seconds in.

7          (Audio was played but not reported.)

8    **BY MS. PERRY:**

9    **Q.**    I'm going to pause it here and go back up a page.

10         Agent Moore, did you hear when Mr. Stepney said [reading]:

11   Where Gutta and them at, yo?

12   **A.**    Yes, ma'am.

13   **Q.**    Did you hear the response [reading]:  I ain't gonna lie.

14   Something already happened about that?

15   **A.**    Yes.

16   **Q.**    And then did you hear when there was -- when the other

17   person said [reading]:  It's the 4700 block of Haddon,

18   34-year-old Anthony Hornes was pronounced deceased?

19   **A.**    Yes, ma'am.

20   **Q.**    I'm going to stop the call there.

21         **MS. PERRY:**  And I have no further questions for the

22   witness at this time.

23         **THE COURT:**  All right.  We'll see if there's any --

24         **MS. WHALEN:**  May we briefly approach the bench?

25         **THE COURT:**  Sure.

```
 1          (Bench conference on the record:

 2          MS. WHALEN:  Your Honor, Agent Moore was the person

 3   who recorded Mr. Ferguson's responses at a proffer session.  I

 4   could call him, I guess, in my case.  But what I was proposing

 5   to do was just ask him the two inconsistent statements that

 6   were denied by Mr. Ferguson; and that is, if the Government --

 7   let's see.  Here, he simply went along with what his friend had

 8   said.

 9          MS. HOFFMAN:  I'm not sure -- do you mind just

10   flipping the page to see which witness -- which agent it is?

11          Okay.  I wasn't sure if it was him.

12          MS. WHALEN:  And the second one was where he said

13   that -- where is it?  Is this the right one?

14          That Shropshire, yes, Shropshire was the one who

15   actually --

16          MS. HOFFMAN:  And that's the same proffer?

17          MS. WHALEN:  Yes.  122.

18          MS. HOFFMAN:  Yes.

19          THE COURT:  Yes, it makes sense to do it now.

20          MS. PERRY:  Your Honor, do you mind, since

21   Mr. Ferguson was Ms. Hoffman's witness, she handles the -- I

22   can handle it.  It's fine.

23          THE COURT:  If it takes handling, you all can consult.

24          MS. PERRY:  Thanks.)

25          (Bench conference concluded.)
```

MOORE - CROSS

```
 1                          CROSS-EXAMINATION

 2   BY MS. WHALEN:

 3   Q.   Agent Moore, I'm going to jump to a different topic than

 4   what you were just testifying about.

 5   A.   Of course.

 6   Q.   And you were involved in a proffer session with

 7   Mr. Ferguson, Devin Ferguson?

 8   A.   Yes; a number of them.

 9   Q.   A number of them.  All right.

10   A.   Yes, ma'am.

11   Q.   I want to direct your attention -- and I know you probably

12   don't have your notes, so I'm going to hand them to you if you

13   need them.

14   A.   Sure.

15   Q.   March 1st of 2017, do you recall being involved in a

16   proffer session on that date with Devin Ferguson, Ms. Perry,

17   Ms. Hoffman, and a police detective and an attorney for

18   Mr. Ferguson, Joe Balter?

19   A.   Vaguely, yes.

20   Q.   Okay.  Did you record -- by that I mean did you write down

21   statements that were made?

22   A.   I take my own notes of -- not verbatim, not, you know,

23   quotes of what was said, but my own notes.

24   Q.   All right.  You attempt, though, to record the information

25   from Mr. Ferguson that you feel is pertinent or important to
```

```
1    the investigation?
2    A.   Yes, ma'am.
3    Q.   All right.  And do you recall -- and like I said, I'm not
4    going to try to trick you.  I'll give you your notes.  But do
5    you recall that you were talking or Mr. Ferguson was talking
6    about an incident in which he had been shot -- and I believe it
7    was by Tech and Tone, he said?
8    A.   Yes, I do.
9    Q.   All right.  And do you recall that he indicated to you all
10   that a Detective Howard confronted him with the information
11   that Shelton Jacobs and Ro-Ro, or Rashard Pierce, were actually
12   the shooters?
13   A.   I remember the substance of that conversation being that
14   Detective Howard and Detective Ferguson [sic] had differing
15   opinions on what had happened.
16   Q.   You mean Mr. Ferguson?
17   A.   Mr. Ferguson.  I'm sorry.  Yeah.
18   Q.   Sure.  And do you remember that Mr. Ferguson indicated
19   that when he was confronted with the information that
20   Shelton Jacobs and Ro-Ro, who is Rashard Pierce, did the
21   shooting, he simply went along with what his friend had said?
22   A.   Are you quoting my --
23             MS. WHALEN:  May I approach?
24             THE COURT:  Yes.
25             THE WITNESS:  Thank you, ma'am.
```

1   BY MS. WHALEN:

2   **Q.**   I'm going to direct you to a point -- no numbers.

3   **A.**   That's okay.

4   **Q.**   The third dot or point there (handing).

5   **A.**   Sure.

6        Yes, ma'am.

7   **Q.**   All right.  And is that, to the best of your recollection,

8   what Mr. Ferguson told you about the incident?

9   **A.**   That's correct.

10  **Q.**   All right.  And do you recall talking -- perhaps I'd

11  better get back here -- talking also with Mr. Ferguson about

12  the day in which he was arrested, April -- excuse me,

13  August 2nd of 2016?

14  **A.**   Yes.

15  **Q.**   And that would be a felon in possession charge?

16  **A.**   Yes, ma'am.

17  **Q.**   Okay.  And on that day, do you recall him talking about a

18  shooting that happened prior to the car being stopped and he

19  being arrested?

20  **A.**   Yes.

21  **Q.**   All right.  And do you recall Mr. Ferguson said there was

22  a separate shooting that Shropshire perpetrated an hour or two

23  before Ferguson, et al., got arrested?

24  **A.**   Yes.

25  **Q.**   And Mr. Ferguson believed Shropshire was trying to kill

1  Harold Ushry?

2       Do you recall that?

3  **A.**   Yeah.  It's "Ushry."  Harold Ushry, yes.

4  **Q.**   Ushry.  All right.  Thank you.

5            **MS. WHALEN:**  That's all I have.

6            Thank you, sir.

7            **THE WITNESS:**  Sure.

8            **THE COURT:**  Anybody else?

9       (No response.)

10           **THE COURT:**  Any redirect on that point?

11           **MS. PERRY:**  No, Your Honor.  Thank you.

12           **THE COURT:**  All right.  Thank you very much, sir.

13           **THE WITNESS:**  Thank you, ma'am.

14           **THE COURT:**  You're excused.

15      (Witness excused.)

16           **THE COURT:**  I assume this is a good time to conclude

17  for the day.

18           All right.  So, ladies and gentlemen, we are not

19  sitting tomorrow, and we will be starting up for our morning

20  session on Monday at 9:30.

21           So usual instructions:  Please leave your notes here.

22  Don't talk about the case.  Don't do any research.  Keep an

23  open mind.  And we'll see you Monday at 9:30.

24           Thank you very much.

25      (Jury excused at 4:52 p.m.)

 1            **THE COURT:**  All right.  Any issues anybody wants to

 2    anticipate for Monday?

 3            **MS. AMATO:**  Not until we know the witnesses,

 4    Your Honor.

 5            **THE COURT:**  All right.  In that case we will excuse

 6    the gallery.

 7            Okay.  And maybe either Monday or at least Tuesday, we

 8    might discuss the schedule more generally and what predictions

 9    are for how much sooner we might finish than you thought we

10    were going to.

11            **MS. HOFFMAN:**  Sure.  We can tell the defense counsel

12    who our anticipated witnesses will be for Monday.  It

13    depends -- so we are just sitting -- is it 9:30?

14            **THE COURT:**  9:30 to 1:00.

15            **MS. HOFFMAN:**  To 1:00?

16            **THE COURT:**  Yes.

17            **MS. HOFFMAN:**  So we're going to continue with the

18    Anthony Hornes murder.  So it will be Agent Wilde again on the

19    cell sites; Donna Vincenti, who's the Medical Examiner.  I

20    apologize; we hadn't intended to call Agent Moore twice.  But

21    it will be Agent Moore again to testify about some additional

22    things relating to that murder, as well as the search warrant

23    on Dante Bailey's residence at 7607 Reserve Circle on May 17th

24    of 2016 and a related -- or prior to that, the seizure of

25    firearms from the Continental Arms firing range where

```
1    Dante Bailey illegally possessed firearms on May 3rd.

2            And then if we get there -- and we're not sure we

3    will -- but we will move into Detective Niedermeier on the

4    Ricardo Johnson murder.

5            THE COURT:  Okay.

6            MS. HOFFMAN:  And I know Your Honor doesn't know yet,

7    but do we anticipate that we'll know by the end of this week

8    whether we'll be sitting Thursday of next week?

9            THE COURT:  Unfortunately, we don't.  You know, if

10   it's too much trouble for everyone, then you've just got to let

11   me know.

12           I don't think Judge Russell is going to be able to

13   tell me -- his JA's been out.  There's still a lot of

14   defendants left.  It's a juggling.  So I don't anticipate it

15   being until early next week, but that's really all I can say.

16           MS. HOFFMAN:  Okay.  Thank you.

17           THE COURT:  Thank you, all.  I'll see you Monday at

18   9:30.

19           (Court adjourned at 4:57 p.m.)

20

21

22

23

24

25
```

```
 1                  INDEX - GOVERNMENT'S EVIDENCE

 2     WITNESS                      DR         CR      RDR      RCR

 3     BRANDON ROBINSON             13         23      --       --

 4     SHANNON ROBINSON             27         32      --       --

 5     SA TROY DANNENFELSER         36         --      --       --

 6     MICHAEL PRATT                53         58      --       --

 7     DEVIN FERGUSON               68       119, 134  144

 8     DET. LUIS DELGADO           145       152, 155  --       --

 9     SA TIMOTHY MOORE            164         178     --       --

10

11          I, Douglas J. Zweizig, RDR, CRR, do hereby certify that

12     the foregoing is a correct transcript from the stenographic

13     record of proceedings in the above-entitled matter.

14
                           _____/s/_____
15
                    Douglas J. Zweizig, RDR, CRR, FCRR
16                     Registered Diplomate Reporter
                       Certified Realtime Reporter
17                    Federal Official Court Reporter
                        DATE:  November 13, 2019
18

19

20

21

22

23

24

25
```