# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE FOURTH CIRCUIT

---

### UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

### RANDY BANKS,

*Defendant - Appellant,*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE**

---

**JOINT APPENDIX - VOLUME XII OF XXII
(Pages 5536 - 6129)**

---

Gerald T. Zerkin
ATTORNEY AT LAW
P. O. Box 5665
Richmond, VA 23220
804-921-4885
*Counsel for Appellant*
  *Randy Banks*

Allen H. Orenberg
THE ORENBERG
LAW FIRM, PC
12505 Park Potomac Avenue
6th Floor
Potomac, MD 20854
301-984-8005
*Counsel for Appellant*
  *Jamal Lockley*

Adam B. Schwartz
SHEARMAN &
STERLING LLP
401 9th Street, NW
Suite 800
Washington, DC 20008
202-508-8009
*Counsel for Appellant*
  *Dante Bailey*

Stuart A. Berman
LERCH, EARLY &
BREWER, CHARTERED
7600 Wisconsin Avenue
Suite 700
Bethesda, MD 20814
301-657-0729
*Counsel for Appellant*
  *Shakeen Davis*

Carmen D. Hernandez
ATTORNEY AT LAW
7166 Mink Hollow Road
Highland, MD 20777
240-472-3391
*Counsel for Appellant*
  *Corloyd Anderson*

Counsel for Appellee on Inside Cover

Brandon K. Moore
Assistant United States Attorney
United States Attorney's Office for the District of Maryland
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
410-209-4826

*Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME XII OF XXII

JA Page

Order (Denying certain Motions (Shakeen Davis))
Entered April 18, 2019 [ECF1140] ............................................................... 5536

Transcript of Jury Trial Vol. XVIII
Before the Honorable Catherine C. Blake
On April 22, 2019 [ECF1374]....................................................................... 5537

    MICHAEL McGEE
        Direct Examination by Ms. Whalen................................................. 5568
        Cross Examination by Ms. Hoffman................................................. 5573

    SA TIMOTHY MOORE
        Direct Examination by Ms. Whalen................................................. 5575
        Cross Examination by Ms. Amato ................................................... 5583
        Cross Examination by Ms. Hoffman................................................. 5586

    BOBBY LEE DAVIS
        Direct Examination by Ms. Amato................................................... 5592
        Cross Examination by Ms. Perry..................................................... 5599
        Redirect Examination by Ms. Amato ............................................... 5602

    JOYCE STAPLES
        Direct Examination by Ms. Whalen................................................. 5612
        Cross Examination by Ms. Hoffman................................................. 5614

    MICHAEL McGEE
        Direct Examination by Ms. Whalen................................................. 5616
        Cross Examination by Ms. Hoffman .................................................5618

Transcript of Jury Trial Vol. XIX
Before the Honorable Catherine C. Blake
On April 24, 2019 [ECF1376]....................................................................... 5670

Transcript of Jury Trial Vol. XX
Before the Honorable Catherine C. Blake
    On April 25, 2019 [ECF1377] ...................................................................... 5870

Transcript of Jury Trial Vol. XXI
Before the Honorable Catherine C. Blake
    On April 29, 2019 [ECF1378] ...................................................................... 5961

Transcript of Jury Trial Vol. XXII
Before the Honorable Catherine C. Blake
    On April 30, 2019 [ECF1379] ...................................................................... 6107

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. CCB-16-0267 |
| | * | |
| SHAKEEN DAVIS | * | |
| | ******* | |

## **ORDER**

Counsel for Shakeen Davis recently requested, on behalf of his client, formal rulings on a number of pretrial motions filed by prior counsel.  Upon review of these motions, it appears that most if not all have been ruled on in the course of trial; many are boilerplate discovery motions. For the record, the motion to adopt (ECF No. 746), is Granted only to the extent relevant to Mr. Davis.  The motions to sever (ECF No. 385), to dismiss (ECF No. 689), and for bill of particulars (ECF No. 694) are Denied.  The other evidentiary motions (ECF Nos. 386, 388, 389, 390, 391, and 690) are Denied as moot; ECF No. 387 is a notice rather than a motion and does not require a ruling.

So Ordered this _____ day of April, 2019.

_____
/s/

Catherine C. Blake
United States District Judge

1

**JA5536**

1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
            Plaintiff,            )
 4                               )
            vs.                   ) CRIMINAL CASE NO. CCB-16-0267
 5                               )
     DANTE BAILEY, et al.,        )
 6          Defendants.           )
     _____ )
 7

 8

                          Monday, April 22, 2019
 9                          Courtroom 1A
                          Baltimore, Maryland
10

11         BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                     (AND A JURY)
12

13                          VOLUME XVIII

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Assistant United States Attorneys

17   For the Defendant Dante Bailey:

18   Paul Enzinna, Esquire
     Teresa Whalen, Esquire
19
     _____
20

21

22
                          Reported by:
23
                   Douglas J. Zweizig, RDR, CRR, FCRR
24                 Federal Official Court Reporter
                   101 W. Lombard Street, 4th Floor
25                  Baltimore, Maryland  21201
</pre>

```
 1    For the Defendant Randy Banks:

 2    Brian Sardelli, Esquire

 3
      For the Defendant Corloyd Anderson:
 4
      Elita Amato, Esquire
 5

 6    For the Defendant Jamal Lockley:

 7    Harry Trainor, Esquire

 8
      For the Defendant Shakeen Davis:
 9
      Paul Hazlehurst, Esquire
10

11    Also Present:

12    Special Agent Christian Aanonsen, ATF
      Stuart Simms, Esquire,
13    Counsel for Davon Temple

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         P R O C E E D I N G S

 2          (10:17 a.m.)

 3              THE COURT:  Good morning, everyone.

 4              All right.  So we met in chambers and discussed some

 5     things briefly.

 6              I know there are various issues.

 7              We also want to have an opportunity for defense

 8     counsel to put any motions on the record.

 9              Let me just address one issue -- well, I guess, let's

10     see.

11              Ms. Whalen -- I see Ms. Whalen is not back yet.  She's

12     still talking to the witness, so I will wait on that question.

13              Are we comfortable from Mr. Bailey's point of view

14     with going ahead with motions?  Are you going to be arguing

15     them?

16              MR. ENZINNA:  Yes, Your Honor.  We're fine.

17              THE COURT:  Is that all right, Mr. Bailey?

18              DEFENDANT BAILEY:  Yes.

19              THE COURT:  All right.  Then I think that's the main

20     thing we wanted to do before the jury is here.

21              So I will start with counsel for Mr. Bailey.  Do you

22     have any motions that you want to make?

23              Oh, I'm sorry.  We're at the close of the Government's

24     case except for the demonstrative exhibit.

25              You want to just make mention of that?
```

```
 1           MS. HOFFMAN:   That's right.  We had some discussion

 2   about this in chambers and last week.  We have a demonstrative

 3   exhibit that was shown for identification only to

 4   Agent Aanonsen last week.

 5           We have reorganized the photos in the chart so that

 6   they are in alphabetical order, aside from the defendants, who

 7   appear at the top.

 8           And we would like to put DEM-5 into evidence.  I don't

 9   know whether we need to re-call Agent Aanonsen or simply move

10   them into evidence and put them up on the screen.

11           And then I think we are prepared to rest our case.

12           THE COURT:   Okay.  Does anyone -- you want to maintain

13   any objection to Demonstrative No. 5?  Any specific objections?

14   I think everybody's had a chance to look at it.

15           MR. SARDELLI:   Yes, Your Honor.  I understand we

16   talked about this in chambers earlier this morning, Your Honor.

17   But we would prefer -- we would argue for separate -- actual

18   separate photos, Your Honor.

19           I know that's going to be more cumbersome, Your Honor.

20   But I think this still does give the impermissible notion that

21   somehow the conspiracy already exists and it's already been

22   proven, Your Honor, so we would again request individual photos

23   with the names on it.

24           I know it's going to require multiple photos,

25   Your Honor.  But I think in an abundance of caution, I'm just
```

1   worried that looking at them, they're going to think the

2   conspiracy already exists.

3          Thank you, Your Honor.

4          **THE COURT:**  Okay.  And I'm going to assume everybody

5   joins in that.

6          **MR. HAZLEHURST:**  Your Honor, in lieu -- either -- on

7   behalf of Mr. Davis, either individual photos -- at the very

8   least, Your Honor, I would ask that on behalf of Mr. Davis,

9   that the exhibit just show everybody in alphabetical order,

10  that it not elevate those defendants who are actually present

11  in the courtroom.

12         I think the jury is sophisticated enough to understand

13  that these were all -- this is the universe of people who were

14  allegedly involved in the case.

15         **THE COURT:**  Okay.  I'm going to overrule the

16  objection.  I've seen the exhibit.  And I think it's perfectly

17  reasonable to have the five individuals that are actually on

18  trial in a separate row; and then after that, everybody is

19  alphabetical.

20         I don't see anything prejudicial in any way.  It's

21  nothing that hasn't come into evidence, and it's much easier

22  for the jury to have that sort of chart -- indeed, they

23  requested it -- rather than to go through individual

24  photographs.

25         So when the jury comes back in, we will have the

```
 1   Government just offer it.  They can put it on the screen.  It
 2   will be admitted.  And they'll rest their case.
 3           So I think we are sufficiently at the end of the
 4   Government's case with that one more exhibit, right, that I can
 5   turn to counsel.
 6           I see Ms. Whalen is now here as well.
 7           Let me preliminarily -- Ms. Whalen, I'm aware that you
 8   have been, I believe, interviewing a potential alibi witness.
 9           MS. WHALEN:  Your Honor, I can tell you that I've been
10   waiting to do so.  I did get to see him for about two minutes.
11           THE COURT:  Okay.
12           MS. WHALEN:  And I did ask him whether he wished to
13   have counsel or to at least consult with counsel.
14           THE COURT:  Yes.
15           MS. WHALEN:  And he does wish to do that.
16           THE COURT:  He does?
17           MS. WHALEN:  Yes.
18           THE COURT:  Thank you for making that inquiry.
19           I'm going to ask Ms. Moyé to send an e-mail to
20   Maureen Essex.  I did speak with Ms. Essex indicating that
21   there might be such a request for counsel, hopefully somebody
22   we can have available today to speak with Mr. Temple.
23           So if you could send Ms. Essex -- just say,
24   "Mr. Temple would like counsel."
25           THE CLERK:  Okay.
```

1        **THE COURT:**  Okay.  Then I will in a moment turn to

2  either Mr. Enzinna or Ms. Whalen.

3        Do you wish to make any motion on behalf of

4  Mr. Bailey?

5        **MS. WHALEN:**  We do, Your Honor.

6        Two areas.  We'd make the motion, Your Honor,

7  regarding all counts.

8        However, just two areas to really highlight in

9  argument.

10        The first is the aiding and abetting theory that the

11  Government has.  I understand that did come up at the charge

12  conversation about the jury instructions.

13        My understanding of the Government's theory is that

14  Mr. Edwards -- at least as to aiding and abetting in the

15  James Edwards murder.

16        **THE COURT:**  Right.

17        **MS. WHALEN:**  Mr. Edwards is -- was killed.  The

18  Government's theory is that Dante Bailey, because he was a

19  leader, must have been involved in it and/or ordered or the

20  like.

21        I think the evidence on that count, however, is just

22  this:  Mr. Hankins said that Mr. Wedlock -- so a statement in

23  furtherance of the conspiracy.  Mr. Wedlock said that he

24  thought Dante Bailey was going to send him to kill Bangout, so

25  that was one piece of evidence by a co-conspirator.

1            The second was that Mr. Banks indicated that about six

2     to seven months later, I believe it was, that my client

3     admitted to -- I think his words were he said he did it.

4            And then Jay Greer, again, said that about a year

5     later, while he was in prison with my client, that he

6     acknowledged that murder.

7            And then the only other piece of evidence I think that

8     came in about the Edwards murder other than the weapon, which

9     I'll mention in a moment, is that Mal or Lil Mal told

10    Mr. Lashley that he dropped Mr. Edwards off to Gutta.

11           All of those, I would suggest, only point -- oh, and

12    then Mr. Banks says that on February 8th, there was

13    a .40-caliber weapon that my client used at the gas station.

14    And there has been testimony that the .40-caliber

15    cartridge casing from that scene matched the cartridge casing

16    that was at the scene of the Edwards murder.

17           So -- and that, again, relies upon Mr. Banks, the

18    relevance of that, I think, and in any way making the

19    cartridge casings important are -- relies upon Mr. Banks'

20    statements as well.

21           The Government's theory has been always that the

22    killing was done by Mr. Bailey and no one else.  And I don't

23    think there's any evidence to support that the killing was done

24    by anyone other than Mr. Bailey.  So I think their theory of

25    aiding and abetting should not be put before the jury.

1              And then, secondly, the quality of the evidence, if

2      you will, I think we are asking Your Honor to take a look at

3      the quality of the evidence on that particular count.

4              It relies solely on co-conspirator statements in

5      furtherance of the conspiracy or solely on statements made by

6      cooperators in this particular case who have admitted to lying

7      in the past, who have admitted to lying to the Government in

8      the past.  And that level, without anything more, any direct

9      evidence, I would suggest the Government hasn't met its burden

10     at this stage.

11             **THE COURT:**  So, to be clear, are you arguing both that

12     there -- essentially, the aiding and abetting theory is not

13     supported and should not be instructed?  But also that there is

14     insufficient evidence --

15             **MS. WHALEN:**  Yes.

16             **THE COURT:**  -- to proceed in general, even on a theory

17     that Mr. Bailey directly caused this?

18             **MS. WHALEN:**  Yes, Your Honor, that is what I'm

19     articulating or trying to articulate.

20             **THE COURT:**  Okay.

21             **MS. WHALEN:**  Thank you.

22             **THE COURT:**  All right.  Mr. Sardelli.

23             **MR. SARDELLI:**  Your Honor, we would also make a motion

24     as to all counts as well, Your Honor, but I'm going to go ahead

25     and focus on some specifics as well, Your Honor.

```
 1              First of all, I think, as the Court is aware, my
 2    client's not charged with individual offenses.  He's charged
 3    with the two conspiracy offenses, the RICO and the drug
 4    conspiracy, Your Honor.
 5              So specifically as to all counts, we would focus on
 6    the agreement.  I don't believe there's any direct evidence of
 7    an actual agreement, a phone call, or a cooperator who
 8    specifically say [sic] that he agreed to anything or anything
 9    in my client's voice or anything else, Your Honor.
10              I'm also using -- the verdict form, obviously, came up
11    this morning in chambers.  And based on them tying in to the
12    Rule 29 motion, because I have severe concerns based on the
13    verdict form that there's no evidence at all linking my client
14    to any of these homicides or any of these homicides were
15    reasonably foreseeable.
16              They've got first-degree murder on there.  As for all
17    these individual predicate RICO offenses -- except for drug
18    trafficking.  I understand there is evidence of drug
19    trafficking.
20              But first-degree murder, second-degree murder,
21    attempted murder, conspiracy to commit murder, extortion,
22    robbery -- the Government did not present the robbery
23    allegation that they had thought about presenting before,
24    Your Honor.
25              Money laundering, witness tampering, witness
```

1    retaliation.

2            Clearly there is evidence -- we disagree with it --

3    but clearly there is evidence about drug trafficking.  But for

4    all those predicate offenses, which I'm very concerned about

5    based on the proposed verdict form, besides the drug

6    trafficking, Your Honor, specifically -- the evidence as I

7    remember it in this case specifically dealt with alleged

8    cocaine, either crack or powder, trafficking as well.

9            So for the RICO offenses, I'm concerned.  Again, I

10   would ask for a Rule 29 motion on anything that there is not

11   evidence of being reasonably foreseeable, whether it's

12   first-degree murder, robbery, or any of the other ones,

13   Your Honor.

14           I think the only thing that came into evidence with my

15   client is the drug trafficking, Your Honor.

16           And, second, going back to the Part 2 of it, which is

17   the conspiracy to distribute drugs in this case, the other

18   conspiracy count, Your Honor, I believe most of the evidence --

19   all the evidence I remember was either powder or crack cocaine.

20   Either the cooperating witnesses or other people talking about

21   drug trafficking of my client, it was cocaine.

22           I don't believe there's any evidence of heroin,

23   Fentanyl, marijuana, anything else being reasonably foreseeable

24   to my client as well, Your Honor.

25           So basically, to summarize it, even for the RICO, the

```
 1    only predicate offenses the Government has proved from my
 2    memory of the case, Your Honor, would be cocaine trafficking,
 3    either powder or crack.
 4         And with the drug trafficking as well, the conspiracy
 5    to distribute the drugs, Your Honor, that would be the same
 6    thing.  I don't remember any evidence of anything like heroin,
 7    Fentanyl, marijuana, or anything else being reasonably
 8    foreseeable to my client.
 9         So I think my client's Rule 29 motion and then the
10    verdict form has to be focused on the cocaine trafficking,
11    which we disagree with, but we acknowledge there has been some
12    evidence on that, Your Honor.
13         THE COURT:  Okay.
14         MR. SARDELLI:  So that's where I focus my motion in
15    this case, Your Honor.
16         THE COURT:  All right.
17         MR. SARDELLI:  Thank you.
18         THE COURT:  Thank you.
19         Mr. Trainor.
20         MR. TRAINOR:  Thank you, Your Honor.
21         On behalf of Mr. Lockley, I would move for judgment of
22    acquittal as to the counts in which he is charged, which I
23    believe are Counts 1, 2, and 10, on the grounds that the
24    evidence is insufficient to go forward at this point on each of
25    the elements of each count.
```

1          Specifically, as to Count 1, the RICO conspiracy, the

2   evidence so far has shown that Mr. Lockley was not a member of

3   the MMP gang.

4          And it's our position that he is -- the evidence is

5   insufficient at this point to go forward, particularly on the

6   element that he would have knowingly conspired with one or more

7   persons to conduct or participate in the affairs of the MMP

8   enterprise.

9          It's our position that the Government has not

10  established that sufficiently.

11         Also, as to any racketeering act other than drug

12  trafficking, there is very little or no evidence to support the

13  other racketeering acts that are alleged.

14         As to Count 2, the drug-trafficking conspiracy, it's

15  our position that the Government may have proven a series of

16  smaller drug conspiracies, but not the single, all-inclusive

17  conspiracy alleged in the indictment from 2011 until the date

18  of the second superseding indictment.

19         And that's it.  Thank you.

20         **THE COURT:**  Okay.  Thank you.

21         Ms. Amato.

22         **MS. AMATO:**  As to Mr. Anderson, I move for judgment of

23  acquittal as to all counts.

24         The evidence does not support the charges.

25         As to Count 1, the RICO, I would submit that the

1    evidence does not support that Mr. Anderson was a member of

2    MMP.  We heard from four cooperators.  Two said that he was not

3    a member.

4         One, Mr. Greer, thought he was a member only because

5    Greer said that the individual had gold implants in his mouth.

6    Clearly, we've heard from many witnesses.  We've seen

7    photographs.  Clearly, he's confusing Mr. Anderson with someone

8    else, because Mr. Anderson does not have and wear gold implants

9    in his -- the front of his teeth.

10        The only other witness the Government claimed that --

11   claimed Mr. Anderson was in MMP was William Banks.  But

12   clearly, his testimony is contradicted by the other witnesses.

13        In terms of the acts in furtherance of the

14   racketeering, the only one I believe that there was evidence

15   relating to was the drug conspiracy.  I don't believe there was

16   evidence as to the other charges or the other overt acts and

17   assertions and allegations that the Government provided, at

18   least in their verdict form.

19        In terms of the -- Mr. Anderson's connection as well

20   to the conspiracy-at-large, the -- there are evidence -- there

21   is evidence the Government did provide calls between

22   Mr. Anderson and Mr. Lockley if, as, of course, the Court has

23   to consider the evidence in light of the Government, that those

24   calls pertained to drug trafficking.

25        As we just heard, Mr. Lockley was certainly not a

1  member of MMP.  If anything, the testimony was that he was a

2  5200 boy, someone that lived in the neighborhood.  And so if

3  anything, I would submit that there was a different conspiracy

4  that Mr. Anderson was involved with.

5         Also, in terms of the statement that Mr. Anderson

6  gave, the statement was that he sold heroin on one occasion,

7  which would support a buyer-seller activity, not a conspiracy.

8         So that is what I would argue.

9         Thank you.

10  **THE COURT:**  Okay.

11         Mr. Hazlehurst.

12  **MR. HAZLEHURST:**  Thank you, Your Honor.

13         Your Honor, on behalf of Mr. Davis, I am moving for

14  judgment of acquittal on the six counts in which he's charged

15  in the indictment under Rule 29 of the Federal Rules of

16  Criminal Procedure.

17         Your Honor, in regard to the first count, racketeering

18  conspiracy, I believe that the evidence -- quite frankly, when

19  we start at the beginning, the Government has failed to

20  establish that he ever joined the conspiracy.

21         There certainly has never been any evidence that he

22  was initiated in any way.  There was discussion by cooperating

23  witnesses of initiation procedures, but no evidence that he

24  ever joined or pledged to join any conspiracy.

25         There has also been conflicting evidence in regard to

1    any affiliation he may have in regard to what we have come to

2    term MMP.  He has been described as being MMP without any

3    supporting evidence as to what would make that characterization

4    stick, if you will.

5            He's been described as being part of something called

6    5200, which is not something that's charged in the indictment.

7    And there's been sort of switching back and forth.

8            And each of these alleged organizations, in many

9    respects, have been very amorphous.  We don't know what defines

10   them.

11           And, again, there has been nothing that is established

12   that Mr. Davis has been or ever was a part of the conspiracy,

13   much less that he approved of or knew of any of the overt acts

14   that were allegedly committed or that he committed any of the

15   overt acts that are alleged against him.

16           Your Honor, in regard to the second count, the

17   conspiracy to distribute controlled, dangerous substances,

18   again, I think -- I would echo some of the comments of prior

19   counsel, that there have been multiple connections, if you

20   will, that have been alleged.

21           There have been a lot of people that have been

22   mentioned in this case, and there's really never been any

23   discernible organization that's been set forth by the

24   Government that has a top-down or a bottom-up, essentially,

25   structure to it.

1           There have been allegations that Mr. Davis was

2   purchasing drugs from certain sources; but, again, they're

3   different sources.

4           And, again, it is not something that is consistent

5   with the allegation that there was a conspiracy consisting of

6   the people who have been mentioned in the indictment that

7   Mr. Davis ever joined.

8           Your Honor, there was also at least one piece of

9   evidence that was testified to by one of the cooperating

10  witnesses that Mr. Davis worked alone.  He worked by himself.

11          And, again, because of these different potential

12  sources, it doesn't support the conspiracy that the Government

13  has alleged.

14          Your Honor, as to Count 3, which is the felon in

15  possession charge, which count -- or Count 16, I'm sorry,

16  Your Honor, the third count in which he's charged, which is

17  April 26th, 2016, I'm going to submit as to that.

18          The fourth count in which he's charged is Count 30,

19  which is a February 24th, 2017 felon in possession charge.  I

20  also will submit in regard to that.

21          The fifth count, which is possession with the intent

22  to distribute crack, that's Count 31, was alleged to have

23  occurred on February 24th, 2017.

24          Your Honor, in that regard, one, I don't believe there

25  has been any evidence as to that particular date that Mr. Davis

1    was engaged in trafficking any sort of drugs.

2         There has been evidence that he was found to be in

3    possession of drugs; but if the Court will recall, when the

4    chemist was called to testify, only one bag of the four bags

5    that Mr. Davis was alleged to have possessed was actually

6    tested.

7         There has not been any observation, I believe, in

8    any -- from any witness in this case of Mr. Davis selling drugs

9    at any time, much less on that date.

10        Your Honor, I also would -- quite frankly, he's

11   charged with possession with intent to distribute cocaine base,

12   and I don't believe that the testimony of the chemist in this

13   regard was that it was cocaine base.  Simply that it was

14   tested -- the one bag that was tested was powder cocaine.

15        Because there is insufficient evidence in regard to

16   drug trafficking, Your Honor, I believe that the 32nd count,

17   the sixth count in which Mr. Davis is charged, which is

18   basically possession of a firearm in furtherance of a

19   drug-trafficking offense, is not supported.

20        **THE COURT:**  Okay.

21        **MR. HAZLEHURST:**  Thank you.

22        **THE COURT:**  Thank you, Mr. Hazlehurst.

23        I'll be happy to hear from the Government.

24        **MS. HOFFMAN:**  Thank you.

25        I will start with Mr. Bailey.

1          Well, first, I'll start with the legal standard,

2    which, of course, is that the evidence should be considered in

3    the light most favorable to the Government.  And the Court

4    should determine whether the Government has made out a

5    prima facie case.

6          Starting with Mr. Bailey, he has focused in on

7    Count 3, and specifically the aiding and abetting instruction.

8          We did charge aiding and abetting in the indictment.

9    Certainly, the direct evidence in this case, the evidence in

10   the form of testimony from cooperators, has been that Bailey

11   himself pulled the trigger and killed Bangout himself.

12         But there has also been quite a lot of circumstantial

13   evidence tying Bailey to that crime.  For instance, there was

14   evidence that he used, of course, the same gun, the murder

15   weapon, to shoot at people at the BP gas station just three

16   nights earlier.

17         There's been evidence about phone records showing that

18   he made phone calls to Nizzy and Nick on that night.

19         There's been evidence that Nizzy and Nick were with

20   him when he committed the murder.

21         There's been evidence that he took a screenshot of a

22   Baltimore Twitter post about the murder in the early -- in the

23   morning hours before the victim's name had been made public.

24         So there's been a lot of -- and this is just some of

25   the circumstantial evidence tying Mr. Bailey to that murder.

And we do believe that that supports an instruction of aiding
and abetting as well and that the jury could reasonably find
that even if Mr. Bailey didn't himself pull the trigger, that
he ordered it or that he aided and abetted that murder.

So we do believe that that instruction is appropriate
and certainly that there's sufficient evidence to support
Count 3 and the murder of Bangout as well as the other counts.

It's difficult to summarize five weeks of evidence in
just a few minutes, and I won't attempt to do that.

But the evidence is much more than just the cooperator
testimony.  The cooperator testimony is fairly consistent.  We
have William Banks saying that Bailey confessed to the murder.

We have Jay Greer saying Bailey confessed to the
murder and gave specific details which matched up with crime
scene photos that Mr. Greer had no way of knowing about.

And other ballistic evidence and phone evidence that
I've mentioned.

And I'll try to make this brief.

Moving on to Randy Banks, he argues that there's no
direct evidence of a conspiratorial agreement.  Of course, we
don't need to have direct evidence of an agreement, and
frequently there's not direct evidence of an agreement.

But we do have a wealth of cooperator testimony that
Randy Banks, Dirt, was in the gang, that he was a member of
MMP, and testimony -- just to give one example, Mr. Greer

1    testified about going to Randy Banks' trap house with Gutta and

2    mixing up crack cocaine with him.  So there's certainly

3    evidence to support that he was part of the conspiracy.

4          With respect to the other racketeering activities that

5    are listed in the verdict sheet, I think there has been plenty

6    of evidence as to those racketeering activities as well for the

7    jury to infer that those racketeering activities were

8    foreseeable to Mr. Banks.

9          For example, with respect to murder, there has been

10   evidence that Mr. Banks was present when -- at the scene of the

11   Mirage nightclub when William Banks attempted to murder

12   Samartine Hill, a/k/a Snook.  We saw him in the video footage.

13         We saw excerpts from a screenplay that Mr. Bailey had

14   authored sometime later that matched up with the facts of that

15   shooting and described -- indicated that Dirt had prior

16   knowledge of what was about to happen at the Mirage nightclub.

17         We also, of course, had testimony from Devin Ferguson

18   that Randy Banks threatened him with murder.  And so we believe

19   that murder -- there's certainly enough evidence for the jury

20   to conclude that murder was a foreseeable racketeering activity

21   to Mr. Banks.

22         And there's been evidence of his involvement, at least

23   circumstantial evidence of his involvement in the Eastside

24   murder.

25         With respect to the specific drugs at issue, of

course, there's been evidence that he was primarily a supplier
of cocaine and crack cocaine.  But it was, I think, certainly
reasonably foreseeable to him, based on the evidence, that
heroin and other drugs were sold at these drug shops as well.

Moving on to Jamal Lockley, it has never been our
contention, and we said in opening statement that Mr. Lockley
was not an actual member of MMP.  Of course, the law does not
require that he be an actual member of MMP in order to be
guilty of a RICO conspiracy.

And there are abundant wire calls putting him in this
conspiracy, talking with other MMP members, including
Adrian Jamal Spence, Spittle, and Corloyd Anderson, Bo, about
the trafficking of narcotics in MMP's territories.

There's a jail call from Bailey in which Mr. Bailey
tells Mr. Lockley that Trouble is cooperating against the gang
and to send him to M-Easy.

So we have evidence that he was involved in a
conspiracy to murder a witness against the gang.

And then there's also been evidence that he was
involved in the murder of Anthony Hornes, which was a
retaliatory murder, a murder committed in retaliation or
attempted retaliation for the murder of Mookie, an MMP member.

And so there's a wealth of evidence that he was part
of this conspiracy, that he sought by his actions to make it
succeed, both through drug trafficking, but also through

1   murder, through murder as well.

2          As to Mr. Anderson, Ms. Amato argues the evidence

3   doesn't support that he was a member of MMP.  We had two

4   cooperating witnesses testify that he was a member of MMP; in

5   fact, that he was a high-ranking member.

6          There are also references to him under other names:

7   Fat Tony and Jim, which we heard were sometimes used as

8   nicknames for Bo.  There are references to him in the gang

9   paperwork where he's referred to as a high-ranking member.

10         In terms of the other racketeering activities listed

11  in the indictment, we do think that there has been sufficient

12  evidence for the jury to conclude that murder was foreseeable

13  to Corloyd Anderson.

14         First of all, there was testimony by William Banks

15  that Corloyd Anderson provided the gun that Gambino,

16  Dontray Johnson, used to kill Antoine Ellis, a/k/a Poopy, and

17  that he disposed of it afterwards.

18         There was also -- we saw a -- just a few days after

19  the attempted murder of Samartine Hill or Snook at the Mirage

20  nightclub, we saw video footage of a meeting between Gutta;

21  William Banks, Trouble; and Corloyd Anderson in which Trouble

22  was wearing a Murdaland Mafia jacket.

23         And we've, of course, heard a number of wire calls in

24  which Mr. Anderson is -- a number of wire calls and jail calls

25  in which he's mentioned in the context of the gang or in which

1   he directly participates in supplying drugs to Jamal Lockley.

2           Moving on to Shakeen Davis, Mr. Hazlehurst argues that

3   there's no evidence that he was initiated into the gang.

4           I think there has been abundant evidence that

5   Mr. Davis was a member of the gang, both in the form of

6   cooperator testimony but also social media evidence, in which

7   Mr. Davis is making the M for MMP and writes comments such as

8   "Murdaland Mafia, the world is ours."  That's certainly enough

9   evidence for the jury to infer that he was identifying himself

10  as a member of the gang.

11          And I don't think there's any -- there's been any

12  evidence in this case that there's an inconsistency between

13  being a member of MMP and also being a 5200 boy, which was one

14  of MMP's territories.

15          There has been evidence that Mr. Davis was responsible

16  for an attempted murder on May 30th of 2015.  This is a murder

17  that there was cooperator testimony from both William Banks and

18  Malcolm Lashley that Shakeen Davis committed that murder

19  because he was defending a fellow gang member, Nutty B, who had

20  been robbed.  And he went to his car -- he went and got an

21  AR-15 from his car and shot at the people who had attempted to

22  rob Nutty B, so that's a retaliatory attempted murder.

23          And there was other evidence of that murder as well in

24  the form of a jail call in which he says he had to change the

25  color of his car because he did some dumb shit out of the car.

1          There -- I apologize.  I lost my train of thought.

2          Moving on to, I think, Count 16 and Count 30,

3     Mr. Hazlehurst said he would submit.

4          Counts 31 and 32, this is the arrest of Shakeen Davis

5     on February 24th of 2017.  There was testimony that recovered

6     from his person was a distribution quantity of crack cocaine.

7          My recollection is that the chemist testified that it

8     was cocaine base.  So I don't think it's accurate that it was

9     powder -- that it tested for powder cocaine.  Certainly the lab

10    report shows it was crack cocaine.  I believe that's what the

11    chemist testified to.

12         Moreover, we put in evidence the text messages from

13    Mr. Davis's cell phone which was seized on the same day which

14    was replete with text messages about distributing heroin and

15    crack cocaine, including in the days leading up to his arrest.

16    I think even on the day of his arrest there were text messages

17    with drug customers.

18         So that's certainly enough evidence to support the

19    possession with intent to distribute count as well as the

20    924(c) count.  He had a gun in his waistband and distribution

21    quantities of drugs on his person, and there's, I think, ample

22    Fourth Circuit case law holding that the jury can infer from

23    that that the gun -- he had the gun to protect his drugs and

24    his drug proceeds.

25         And I'm sure I've missed things.  I'm happy to answer

1   specific questions Your Honor may have.

2            **THE COURT:**  Okay.  Thank you.

3            I appreciate the arguments.

4            As pointed out, of course, at this stage of the case,

5   under Rule 29, I need to look at the evidence in the light most

6   favorable to the Government, and I am going to -- I will

7   reserve on the aiding and abetting question as to Count 3 for

8   Mr. Edwards.

9            I am otherwise denying the motions.

10           First of all, I think there is ample evidence of the

11  existence of the RICO conspiracy that's charged.  And as to all

12  the defendants, there's -- again, looking at it in the light

13  most favorable to the Government -- ample evidence that the

14  individual defendant either was a member of MMP or was

15  associated in some way.

16           Of course, the law does not require that the

17  individual defendant be a member of the enterprise.  They have

18  to be associated with, employed by.  There's other language

19  that is sufficient.

20           As to the individual predicate acts, I think there is

21  substantial evidence as to a number of them for a number of

22  defendants.

23           I don't see -- we can discuss this further in the

24  context of the verdict sheets and perhaps the jury

25  instructions.  But I don't see an argument about the

1    possibility that one or more of the charged predicate acts was

2    not foreseeable to a particular defendant as a basis for

3    granting a motion as to that count.  It's a somewhat different

4    argument.

5            And I think as to all the defendants, there is, at a

6    minimum, sufficient evidence to go to the jury of two predicate

7    acts of drug trafficking being reasonably foreseeable.  I'm

8    just not going to go through it at this point as to each

9    individual defendant.  There's evidence to support more than

10   those predicate acts, but at least the drug trafficking,

11   there's no basis to take those counts away from the jury.

12           And, again, I think this motion is not necessarily the

13   way to address the question about what should be on the verdict

14   sheet.  We can come back to that.

15           And I understand that there is an argument about its

16   being a multiple conspiracy, not the one charged in the

17   indictment.  Again, crediting the Government's evidence, I

18   think there is a -- one overall conspiracy.

19           People have different roles.  There may be different

20   ways in which someone is allowed to sell in the particular

21   territory.  Being a member of the -- being a 5200 boy is one of

22   those.

23           There is evidence that if you were not either a

24   5200 boy or a member of MMP, then you would not necessarily be

25   allowed to deal drugs in that particular area.

1              So those are all things for the jury to consider.

2              And as to Mr. Shakeen Davis, I think under

3    Fourth Circuit case law, the evidence of his drug dealing right

4    up to the point of his arrest and being in possession of a gun

5    at the time along with drugs is sufficient to take all of the

6    counts, including the 924(c), to the jury.

7              So the motions are denied.

8              Do we have -- I assume the jury is there patiently

9    waiting, and we need to put in the Government's one exhibit.

10             Do we then have at least some evidence, Ms. Amato, you

11   would be prepared to present?

12        **MS. AMATO:**  Your Honor, I'm checking to see.  I

13   believe my witness may be on his way this morning, but I do

14   have stipulations possibly -- I have two.  I may have a third.

15        **THE COURT:**  Okay.

16        **MS. HOFFMAN:**  Yeah, we have two --

17        **THE COURT:**  Why don't we take a short -- all right,

18   Mr. Trainor?

19        **MR. TRAINOR:**  Your Honor, if I may correct something I

20   said in chambers, I previously notified the Government that we

21   may call Kameron Wilson.

22        **THE COURT:**  Yes.

23        **MR. TRAINOR:**  I said in chambers that I didn't think

24   we'd be calling any witnesses.  I received some new information

25   that I have to follow up on.  Mr. Wilson may be available, and

```
 1     I'd like to check on that right now or the next break.
 2             THE COURT:  Okay.  Why don't we take a short break.
 3     Ms. Moyé can thank the jury for holding on patiently, and then
 4     we'll go ahead with as much evidence as we can.
 5             And in the meantime, I'll check and see whether
 6     Ms. Essex has been able to find counsel for Mr. Temple.
 7             All right.  Let's take a recess.
 8         (Recess taken.)
 9             THE COURT:  All right.  So I think where we are on the
10     schedule is we will bring the jury in; we'll allow the
11     Government to introduce DEM-5 and officially rest in front of
12     the jury.
13             Nobody is waiving their Rule 29 motions.  We don't
14     need to do that again.  You've put it on the record.  But
15     that's all preserved.
16             And then I understand Ms. Amato has some evidence
17     ready to present?
18             MS. AMATO:  I do -- oh, I guess I thought that
19     Mr. Bailey was going -- his witnesses were going first.
20             THE COURT:  I don't know that they're ready.
21             MS. AMATO:  Oh, okay.
22             MS. WHALEN:  We are ready on two, possibly three
23     witnesses.  We are not ready on Mr. Temple.
24             THE COURT:  Okay.  The ones that you are ready on are?
25             MS. WHALEN:  Joyce Staples, and I think the Government
```

```
 1    has an issue with an exhibit on that.

 2            THE COURT:  Right.

 3            MS. WHALEN:  And Special Agent Moore and then

 4    Mike McGee, who's an investigator.

 5            THE COURT:  So what I would like to do is to go ahead

 6    with evidence where there is no issue, which may include

 7    Mr. McGee and Ms. Amato's witnesses.

 8            And I don't know if the issue as to Ms. Staples is

 9    limited to the one exhibit.

10            MS. WHALEN:  It is, Your Honor, the

11    Black Blood Brotherhood exhibit.

12            MS. HOFFMAN:  Well -- and Ms. Whalen wasn't there in

13    chambers this morning, and so it's not her fault.  But that's

14    not quite right.

15            I mean, we do -- so Joyce Staples, of course, as we

16    mentioned in chambers, is Dante Bailey's mother.

17            THE COURT:  And I'm just going to stop.  This is

18    exactly what I thought, that it's going to take a little while

19    to figure out Ms. Staples, where we have some other evidence

20    and that poor jury is just sitting there.  So let's get on and

21    off as many people as we can.

22            Is Special Agent Moore going to be available, ready to

23    go?

24            MS. HOFFMAN:  He's available whenever the defense is

25    ready.
```

1          **THE COURT:**  Okay.  All right.  Maybe we'll start with

2    him.

3          (Jury entered the courtroom at 11:26 a.m.)

4          **THE COURT:**  Welcome back, ladies and gentlemen.

5          I hope you had a lovely weekend and are not bothered

6    by the pollen as much as I am.  It was quite a good weekend

7    from that point of view.

8          I apologize and appreciate your patience.  There are

9    just -- we have been working.  There are various issues that

10   come up towards the end of any case.

11         But I do believe the Government has just one more

12   exhibit.

13         **MS. HOFFMAN:**  The Government moves into evidence what

14   has previously been marked for identification as

15   Government's Exhibit DEM-5.

16         And I'm going to put it up on the screen.

17         **THE COURT:**  And this will be responsive to one of the

18   jurors' questions.

19         **MS. HOFFMAN:**  Yes, that's right.

20         Do we have the lectern?

21         **THE CLERK:**  Yes.

22         **MS. HOFFMAN:**  Oh, it's just not coming up on the

23   screen here.  So I can't -- let's see.

24         Page 1 of Government's Exhibit DEM-5.

25         **THE COURT:**  And I suppose you can probably see it.

1    But there are photographs of various people with names and what

2    were alleged, according to the evidence, to be nicknames.

3              **MS. HOFFMAN:**  And then Page 2 of

4    Government's Exhibit DEM-5.

5              **THE COURT:**  And the Government rests?

6              **MS. HOFFMAN:**  The Government rests.

7              **THE COURT:**  All right.  Let me turn to this side of

8    the room.

9              I believe that one or more defendants would like to

10   call . . .

11             **MS. WHALEN:**  Yes, Your Honor, I would call

12   Michael McGee.  And if I could just . . .

13             MICHAEL McGEE, DEFENDANT BAILEY'S WITNESS, SWORN.

14             **THE CLERK:**  Please be seated.

15             Please speak directly into the microphone.

16             State and spell your full name for the record, please.

17             **THE WITNESS:**  Michael McGee, M-I-C-H-A-E-L, M-c-G-E-E.

18             **THE CLERK:**  Thank you.

19                           DIRECT EXAMINATION

20   **BY MS. WHALEN:**

21   **Q.**   Good morning, sir.

22        Could you tell the ladies and gentlemen what type of work

23   you do.

24   **A.**   I'm a self-employed private investigator.

25   **Q.**   And in your background, were you also a police officer?

1    **A.**   I was.

2    **Q.**   And for what agency?

3    **A.**   Baltimore City.

4    **Q.**   And for how long a period of time?

5    **A.**   Ten years.

6    **Q.**   In your capacity as an investigator, did you watch,

7    actually, a YouTube video called Straight Outta Compton?

8    **A.**   I did.

9         **MS. HOFFMAN:**   Objection.

10        **THE COURT:**   All right.  Do you want to come up to the

11   bench.

12        (Bench conference on the record:

13        **MS. HOFFMAN:**   Your Honor, I'm kind of operating on the

14   fly here, but I don't know what Mr. McGee is going to be

15   testifying about.  And I don't have -- I have not been provided

16   with any exhibits that are going to be used through him.  I

17   don't know what this video is.  It seems to me it is

18   potentially hearsay.  I haven't seen it, and so it's hard for

19   me to know.

20        But I would like a proffer of what exhibits Ms. Whalen

21   intends to introduce through him.

22        **MS. WHALEN:**   There's no exhibit with regard to this

23   testimony.  No exhibit with regard to this testimony.  The only

24   other exhibits are the ones that I've provided you, the Amazon

25   search for urban fiction and the search for Library of Congress

1    for urban fiction.

2            **MS. HOFFMAN:**  So he would just be testifying that he

3    ran a search on the computer and that this is what came up?

4            **MS. WHALEN:**  Yes.

5            **THE COURT:**  And what's the testimony about

6    Straight Outta Compton?

7            **MS. WHALEN:**  Straight Outta Compton, Your Honor, is a

8    video, and I'm going to ask him if there is a bus scene on the

9    video.  And this relates to testimony by one of the cooperators

10   that my client went onto a bus with a gun.

11           And I'm going to ask him to describe the scene.  And

12   it is pretty much exactly as the cooperator testified to.

13           **MS. HOFFMAN:**  I just -- I mean --

14           **THE COURT:**  Do we have the YouTube video?

15           **MS. WHALEN:**  We do not have -- I didn't provide it --

16   we actually had some problems, actually, with creating it in

17   time to give it to the Government.  That's why I'm not going to

18   play the video.

19           **MS. HOFFMAN:**  And, Your Honor, we haven't seen the

20   video, so we don't know what the scene entails.

21           But I also think -- I mean, if the idea is that

22   Derran Hankins, who testified about an incident with a bus, was

23   lying about what happened, he should have been crossed on this.

24   And I don't really see -- without having had a chance to view

25   it -- Ms. Perry, I'm sorry.  Did you want to add something?

1          **MS. WHALEN:**  That's what rebuttal is for, Your Honor.

2     If they review it and find that that's not accurate, then they

3     can put an agent up.

4          **THE COURT:**  Okay.  We are now in the defense part of

5     the case, and obviously the defense has certain obligations to

6     provide its case-in-chief evidence and exhibits in advance.

7          Is this the first time you're telling them that

8     Straight Outta -- there's going to be testimony that's on a

9     YouTube video, Straight Outta Compton?

10          **MS. WHALEN:**  I think it is, Your Honor.

11          **THE COURT:**  Why don't we go ahead with the other parts

12     of Mr. McGee's testimony, and we will try to see if this can be

13     worked out.  Give the Government a chance to look at this

14     YouTube video and have a better understanding of what the

15     testimony would be.

16          **MS. WHALEN:**  Okay.

17          **THE COURT:**  But go ahead with the other parts.)

18          (Bench conference concluded.)

19     **BY MS. WHALEN:**

20     **Q.**   Mr. McGee, we're going to move away from the video for the

21     time being.

22     **A.**   Okay.

23     **Q.**   Did you -- have you heard of the genre urban fiction?

24     **A.**   Yes, I have.

25     **Q.**   And were you able to look at an Amazon search for urban

1  fiction?

2  **A.**   Yes, I was.

3  **Q.**   And let me just show you what has been marked as

4  Exhibit 14 (handing).

5       Does this appear to be the Amazon search for urban

6  fiction?

7  **A.**   Yes.

8  **Q.**   Now, you haven't read these books, have you, sir?

9  **A.**   No, I have not.

10  **Q.**   Let me show you the first page.

11       Well, I have to bring it down a little bit.

12       Do you see at the top -- I don't have a monitor, so I

13  apologize.  I'm trying to look from afar.

14       African-American urban fiction (indicating)?

15  **A.**   Yes.

16  **Q.**   All right.  And several different pages of books that come

17  up; is that correct?

18  **A.**   Yes.

19  **Q.**   And if you look at the bottom of -- this is Page 4 of this

20  exhibit -- do you see where it says like 1, Page 1, 2, 3, and

21  then up to 100?

22  **A.**   Yes.

23  **Q.**   Now, did you also take a look at the Library of Congress

24  and search for the same genre, urban fiction?

25  **A.**   Yes.

1    **Q.**    Showing you what's been marked as Exhibit 15.

2         Do you see at the top left Library of Congress?

3    **A.**    I do.

4    **Q.**    And, again, Results 26 to 50 of 146 (indicating)?

5    **A.**    Yes.

6    **Q.**    And this exhibit, though, and what you actually come up

7    with, it doesn't give you the pictures of the cover; is that

8    correct?

9    **A.**    That's correct.

10   **Q.**    And showing you what's marked as Page 2 -- again, just a

11   snapshot of the Library of Congress search?

12   **A.**    Yes.

13        **MS. WHALEN:**  Thank you, sir.  That's all I have at

14   this time.

15        **THE COURT:**  Any cross-examination as to these parts of

16   Mr. McGee's testimony?

17                          CROSS-EXAMINATION

18   **BY MS. HOFFMAN:**

19   **Q.**    Mr. McGee, do you have -- are you deeply familiar with

20   African-American urban fiction?

21   **A.**    In the course of my work, to that extent.

22   **Q.**    To the extent of looking at these searches that have been

23   conducted?

24   **A.**    Well, I've been doing this as a private investigator for

25   eight years.  I was previously a city cop for ten, so the

1   extent of my work in Baltimore City.

2   **Q.**   Have you read the books that were listed in the search

3   there?

4   **A.**   No, I haven't.

5         **MS. HOFFMAN:**  I have no further questions.

6         **MS. WHALEN:**  Nothing further.  Nothing further.

7         **THE COURT:**  All right.  Subject to possible re-call on

8   the other issue, you are excused for now.

9         Thank you, sir.

10        **THE WITNESS:**  Okay.

11     (Witness excused.)

12        **MS. WHALEN:**  Special Agent Aanonsen -- no.  Excuse me.

13   Special Agent Moore.  I apologize.

14        **MS. HOFFMAN:**  Your Honor, may we approach?

15        **THE COURT:**  All right.

16     (Bench conference on the record:

17        **MS. HOFFMAN:**  I believe Ms. Staples is in the

18   courtroom.

19        **MS. WHALEN:**  She's right.

20        **THE COURT:**  Okay.

21        **MS. WHALEN:**  I'll just go ask her to leave.

22        **MS. HOFFMAN:**  I didn't see -- has she been in the

23   courtroom for --

24        **MS. WHALEN:**  I didn't think she was in here.

25        **THE COURT:**  Ask your co-counsel.)

```
 1           (Bench conference concluded.)

 2               THE CLERK:  Agent Moore, you're still under oath.

 3               THE WITNESS:  Yes, ma'am.

 4           SPECIAL AGENT TIMOTHY MOORE, DEFENDANT BAILEY'S WITNESS,

 5   PREVIOUSLY SWORN.

 6                       DIRECT EXAMINATION

 7   BY MS. WHALEN:

 8   Q.   Good morning.

 9   A.   Good morning.

10   Q.   Just a few questions.

11        When investigating this case, do you recall that there was

12   posted on social media a book that was called The BG Kode and

13   it had a picture of Dante Bailey?

14   A.   I believe so, yes.

15   Q.   Okay.  Did you endeavor or attempt to get that book or

16   order that book?

17   A.   No, I did not.

18   Q.   All right.  I'm going to show you just what's marked for

19   identification at this point 15?

20               THE CLERK:  16.

21               MS. WHALEN:  16.  Thank you.

22   BY MS. WHALEN:

23   Q.   Just take a look, if you would.

24        (Handing.)

25        Okay.  You've never read it?
```

1   **A.**   No, I have not.

2   **Q.**   And it doesn't appear to have the same front or cover as

3   the social media post that was moved into evidence in the case.

4   **A.**   I haven't seen that one, but that's -- I've seen that book

5   before, so . . .

6   **Q.**   All right.  Let me just put it on the monitor for now.

7          And did you see at the top "Entertainment Presents"?

8   **A.**   Yes.

9   **Q.**   And on the back there is some writing, and I took it away

10  from you a little quickly, but you didn't read that; right?

11  **A.**   No.

12  **Q.**   All right.  I'm going to show it to you in a different

13  format.

14          **MS. WHALEN:**  This will be Exhibit 17?

15          **THE CLERK:**  Yes.

16  **BY MS. WHALEN:**

17  **Q.**   All right.  Just a photograph of the book?

18  **A.**   Uh-huh.

19  **Q.**   I will take a look at the back.  It will be Page 2 of

20  Exhibit 17.

21          Now, down at the bottom, do you see [reading]:  To order,

22  contact asiaanthony11@yahoo.com?

23  **A.**   Yep.

24  **Q.**   All right.  Can you read the back of this book for us.

25          Do you want me to get it closer?

1    **A.**    Yeah, you may have to zoom in just a little bit, please.

2    **Q.**    Sure.

3    **A.**    Starting at the top?

4    **Q.**    Yes, please.

5    **A.**    [Reading]:  How do you play the game when you are the only

6    one playing by rules?  But what if the rules don't even really

7    exist?  When the odds are stacked against you, how do you rise

8    above it all?

9         [Reading]:  Meet Shy, a young boy turned into a man early

10   on -- I can't make out that -- when something struck in the

11   form of poverty or something appeared in the form of

12   responsibility --

13   **Q.**    Agent --

14        **THE COURT:**  Do you want to give him the back of the --

15        **MS. WHALEN:**  I was going to say --

16        **THE WITNESS:**  Yeah.  It may be easier to read the

17   screen.  It's a little --

18   **BY MS. WHALEN:**

19   **Q.**    I'll show you 17 for identification (handing).

20   **A.**    Thank you.

21        **MS. HOFFMAN:**  Your Honor, I just want to be clear.  I

22   believe the book is just for identification.  We would object

23   to the book coming into evidence as opposed to

24   Government's Exhibit 17.

25        **THE COURT:**  Defense Exhibit 17, but yes.  I think the

1    book is only identification.

2         **MS. WHALEN:**  That's correct, Your Honor.

3         **THE COURT:**  Fine.

4         **THE WITNESS:**  All right.  I'll pick up with the second

5    paragraph.

6         [Reading]:  Meet Shy, a young boy turned into a man

7    early on, when tribulation struck in the form of poverty.

8    Where trial appeared in the form of responsibility, turning a

9    little brother into a son.  That little brother morphing into a

10   killer, thus becoming his name.  The two together, bonded in

11   the -- bonded at the hip while forced to embrace the frigidness

12   of what comes with the street life of a treacherous city.  Will

13   they survive?  Or will they succumb to the wickedness of

14   Murdaland Mafia?

15        And then [reading]:  Baltimore City.  A place where

16   loyalty is a camouflage, used only to manipulate.  A place

17   where love is a backbone, when is -- when it is genuine and can

18   keep everything together.  What does this hideous city have in

19   store for Shy and Killa?  Or can their collective energies be

20   used?

21   **BY MS. WHALEN:**

22   **Q.**   All right.  Now I'm going to show you what is

23   Government's Exhibit GP-13-A, and this is -- I believe it's

24   Page 3 of the exhibit.

25        Do you see at the top -- can you read [reading]:  How do

1    you play a game (indicating)?

2    **A.**    Yes.

3    **Q.**    Are you able to read it, or is it easier if I just give it

4    to you?

5    **A.**    Probably is easier.  The screen is a little fuzzy.

6    **Q.**    (Handing.)

7    **A.**    Thank you.  Sorry.

8          Do you want me to just start right at the top?

9    **Q.**    Would you read it, yes.

10   **A.**    Sure.

11         [Reading]:  How do you a play a game when you're the only

12   one playing by the rules?

13               **THE COURT:**  A little more slowly.

14               **THE WITNESS:**  I'm sorry.

15         [Reading]:  How do you play a game when you are the

16   only one playing by rules that don't even really exist?  But

17   even when the odds are stacked against you, you still rise

18   above it all.

19         [Reading]:  Meet Shy, a young boy turned into a man

20   early on when tribulation struck in the form of poverty.  Where

21   trial appeared in the form of responsibility, turning a little

22   brother into a son.  That little brother morphing into a

23   killer, this -- that became his name.  Then together -- them

24   together, bonded by the hip, were forced to embrace the

25   frigidness of what comes with the street life of a treacherous

1   city.  Will they survive or will they succumb to the treachery?

2          [Reading]:  Baltimore City.  A place where loyalty is

3   a camouflage only used to manipulate.  Where love is the

4   backbone that, when it is genuine, can keep everything

5   together.  Will this hideous city break Shy?  Will it destroy

6   Killa?  Or will their collective energy, Killa as the shooter,

7   backing Shy's own personal gun game, push Shy to be the next

8   B'more Bad Guy?

9          [Reading]:  Take a walk with them through it all --

10  the envy, the hate, and the deceit.  Feel the love between a

11  family built, but recognize that the loyalty is what mattered

12  the most, because it was forever to notice the fight to the

13  top.  And when all else fails -- there's something I can't

14  read -- and then My All Family I Am.

15         And it's a little, small writing.

16         And then [reading]:  Take a look if you have the

17  heart.  But if you fear death . . .

18         Something's crossed out, and it says [reading]:

19  Welcome to Murdaland.  Meet the mafia.

20  **BY MS. WHALEN:**

21  **Q.**   Okay.  Thank you.

22         And do you recall that that was found in Dante Bailey's

23  jail cell?

24  **A.**   Yes.

25  **Q.**   Now, I'm going to show you -- this will be Exhibit 17 --

```
1              THE CLERK:  18.

2              MS. WHALEN:  Oh, gosh.  18.  Thank you.

3              THE CLERK:  You're welcome.

4    BY MS. WHALEN:

5    Q.   And you all obtained, of course, Dante the Great One

6    Facebook records; right?

7    A.   Yes.

8    Q.   All right.  I'm going to show you what's Page 342.

9         All right.  Can you read that?

10   A.   Yep.

11   Q.   Okay.  And do you see the comment down here, 4/17/2013?

12   A.   Yes.

13   Q.   And if you'd read that for us.

14   A.   It says [reading]:  EMMS, with an exclamation point, and

15   what it do, baby?

16   Q.   And then below it.

17   A.   Oh, everything good.  The book is out.

18   Q.   Now, let me turn your attention to Dominick Wedlock.  He

19   was an individual charged in this case; is that correct?

20   A.   Yes.

21   Q.   All right.  And he is someone who has a conviction for

22   false statement to police; is that right?

23   A.   That's correct.

24   Q.   Now, there came a point in February of 2017, I believe,

25   when you and others were able to meet with Jamal Smith.
```

1            Do you recall that?

2      **A.**    Yes.

3      **Q.**    And you asked or talked about the Edwards murder; is that

4      correct?

5      **A.**    Yes.

6      **Q.**    Among other things; right?

7      **A.**    Yes.

8      **Q.**    Okay.  And Mr. Smith said he was with Bangout a day or two

9      before Edwards was killed.

10            Do you remember that?

11     **A.**    That's what he told us, yes.

12     **Q.**    And do you remember that Mr. Smith recalled that Edwards

13     had called him on the day of his murder?

14     **A.**    I believe so, yes.

15     **Q.**    And do you remember Mr. Smith said that he stayed at

16     Edwards' house a few days before Edwards' murder?

17     **A.**    That's what he told us, yes.

18     **Q.**    And also that he'd been in the studio on 28th Street with

19     Edwards on occasion.

20            Do you recall that?

21     **A.**    Yes.

22     **Q.**    And in the days leading up to his murder?

23     **A.**    Correct.

24     **Q.**    And do you recall, finally, that Mr. Smith told you that

25     Mr. Edwards -- well, he learned of Mr. Edwards' death through

1    E-Money?

2    **A.**   Yes.  That's what he told us that day.

3    **Q.**   All right.  He did not say that he dropped Mr. Edwards off

4    around the way and last saw him getting into a car with a girl.

5    **A.**   He did not tell us that, no.

6    **Q.**   And he did not say that he dropped Mr. Edwards off to

7    Gutta somewhere in the area of Frederick Road; right?

8    **A.**   He didn't tell us that, no.

9              **MS. WHALEN:**  Thank you very much, Special Agent.

10             **THE COURT:**  Anyone else have questions for

11   Special Agent Moore?

12             **MS. AMATO:**  I do.

13             **THE COURT:**  Ms. Amato.

14                        CROSS-EXAMINATION

15   **BY MS. AMATO:**

16   **Q.**   Good morning.

17   **A.**   Good morning, ma'am.

18   **Q.**   Agent Moore, you remember, of course, meeting with

19   Mr. William Banks and interviewing Mr. William Banks on a

20   couple of occasions?

21   **A.**   Yes, ma'am.

22   **Q.**   All right.  And on September 12th of 2016, when you met

23   with Mr. Banks, Mr. Banks was asked about Mr. Anderson;

24   correct?

25   **A.**   Among probably many other people, yes.

1    **Q.**   Okay.  Right.  Among many other people.

2         And at that time Mr. Banks had stated that he believed

3    that Anderson had a stash house on Bowers and Norwood; correct?

4    **A.**   I'd have to see the report.

5    **Q.**   Certainly.  Okay.  And I'll just mark this as -- for

6    identification as defense exhibit -- well, I'll mark it as

7    defense exhibit?

8              **THE CLERK:**  14.

9              **MS. AMATO:**  14.  Okay.

10        (Counsel conferred.)

11   **BY MS. AMATO:**

12   **Q.**   (Handing.)

13        All right.  I'd like to show you what I've marked as

14   Defense Exhibit No. 14.  And, first of all, if you can just

15   take a look at this report, see if you recognize it.

16   **A.**   Sure.

17   **Q.**   Is that a report that you prepared?

18   **A.**   Yes, ma'am.

19   **Q.**   Okay.  In fact, it has your name on it, correct --

20   **A.**   Correct.

21   **Q.**   -- as having been prepared by you?

22   **A.**   Uh-huh.

23   **Q.**   All right.  And I'll show you specifically -- all right.

24   The location (indicating).

25   **A.**   Sure.  I wrote that [reading]:  Banks stated that Anderson

1    lived out in Owings Mills and had a business on Wabash Avenue.

2    Furthermore, he believed Anderson had a stash house on Bowers

3    and Norwood.

4    **Q.**   And, of course, preparing the reports is done regularly;

5    correct?

6    **A.**   Correct.

7    **Q.**   And it's important to prepare reports accurately; correct?

8    **A.**   Correct.

9    **Q.**   As -- in terms of what a witness says to you, you then

10   want to make sure that you have a record of what that witness

11   said to you so that later down the road, if there's any

12   questions, you can refer to your report; correct?

13   **A.**   Correct.

14   **Q.**   All right.  And at no time, then, when Mr. Banks had

15   spoken to you and had given you the address of Bowers and

16   Norwood did he say anything about that pertaining to the

17   Gwynn Oak group?

18   **A.**   Say that again.

19   **Q.**   Okay.  So when he provided you the address of Bowers and

20   Norwood, it was specific as to where he believed the Anderson

21   stash house was; correct?

22   **A.**   No.  I -- that report is actually my -- I made the mistake

23   in that report.  That's an incorrect statement attribute -- the

24   one you just had me read.  The portion about the Bowers and

25   Norwood was not attributable to Mr. Anderson.  That was for

1   Mr. Banks.  And I just -- I wrote the wrong name in the report.

2   **Q.**   Okay.  So you're saying that this report that you prepared

3   pertaining to the September 12th, 2016 interview with Mr. Banks

4   has incorrect information it?

5   **A.**   Yes.  I made a mistake.

6   **Q.**   I see.

7        And did you ever correct the report?

8   **A.**   No, I did not.

9   **Q.**   Okay.  So you've never actually came -- went back to the

10  report to correct it in any form or fashion?

11  **A.**   The -- what you're telling me right now is the first time

12  I've noticed that mistake.

13       **MS. AMATO:**   Okay.  All right.  I have no further

14  questions, Your Honor.

15       **THE COURT:**   Okay.  Any other questions for

16  Special Agent Moore?

17       (No response.)

18       **THE COURT:**   Does the Government have any questions?

19       **MS. HOFFMAN:**   I do.

20                      CROSS-EXAMINATION

21  BY MS. HOFFMAN:

22  **Q.**   Agent Moore, Ms. Whalen showed you this book, The BG Kode.

23       Do you remember that?

24  **A.**   Yes.

25  **Q.**   And do you see how "Kode" is spelled with a K instead of a

```
 1   C?

 2   A.   Yes.

 3   Q.   Are you familiar with the Bloods gang?

 4   A.   Yes, I am.

 5   Q.   Are you familiar with rivalry between the Bloods gang and

 6   the Crips gang?

 7   A.   I am.

 8   Q.   And do you know whether members of the Bloods gang like to

 9   use the letter C?

10   A.   They don't.  And, in fact, they will replace it with other

11   letters.

12   Q.   Ms. Whalen also asked you a question about -- there's a

13   reference to Asia Anthony on the back of the book here.

14   A.   Yes.

15   Q.   Are you familiar with an Asia Anthony?

16   A.   I am.

17   Q.   Did she come up in the course of your investigation?

18   A.   She did.

19   Q.   Did she have a relationship with Mr. Bailey?

20   A.   She did.

21   Q.   Was she a girlfriend of his at one point?

22   A.   We believe so, yes.

23   Q.   Are you aware of a search warrant that was executed on a

24   residence shared by the two of them?

25        MS. WHALEN:  Objection, Your Honor.
```

1           THE COURT:  Come up to the bench.

2       (Bench conference on the record:

3           MS. WHALEN:  I don't see any relevance to a

4   search warrant at Asia Anthony's house.

5           THE COURT:  Where is that going?

6           MS. HOFFMAN:  I think she has been presented as

7   someone who's simply helping him with his artistic endeavors.

8   There was a search warrant executed on a shared residence

9   belonging to them in which numerous guns were recovered.  I

10  think she -- there is evidence that she's actually part of the

11  conspiracy or was part of the conspiracy.

12          THE COURT:  But none of that has come in so far?

13          MS. WHALEN:  No.

14          MS. HOFFMAN:  No.

15          THE COURT:  I think you are fine up to the "she's a

16  girlfriend/there's a relationship" part.

17          MS. HOFFMAN:  Okay.

18          THE COURT:  But you should not go into the

19  search warrant.

20          MS. HOFFMAN:  Okay.

21          MS. WHALEN:  Thank you.)

22      (Bench conference concluded.)

23          THE COURT:  You're going to move on.

24  BY MS. HOFFMAN:

25  Q.  Agent Moore, during the course of this investigation, you

1  recovered quite a lot of writings by Dante Bailey; is that

2  right?

3  **A.**   That's correct.

4  **Q.**   And not all of them were gang-related?

5  **A.**   No.

6  **Q.**   Were some of them gang-related?

7  **A.**   Yes.

8  **Q.**   Sometimes Dante Bailey wrote letters to his mom?

9  **A.**   Correct.

10  **Q.**   Sometimes he exercised creative expression?

11  **A.**   Yes.

12  **Q.**   Are you aware that sometimes fiction draws from real life?

13  **A.**   Yes.

14  **Q.**   Are you familiar with the phrase "art imitates life"?

15  **A.**   Yes, ma'am.

16  **Q.**   You were asked about a February 2017 meeting with

17  Jamal Smith.

18      Do you remember that?

19  **A.**   Yes.

20  **Q.**   Now, when you met with Mr. Smith, he had been arrested

21  already in the case; is that right?

22  **A.**   That's correct.

23  **Q.**   And you were asked about what he told you about Bangout.

24      Do you recall that?

25  **A.**   Yes.

1  **Q.**  And is it ever your experience as an investigator that

2  subjects of the investigation, when arrested, will not be

3  completely forthcoming?

4  **A.**  That's correct, yes.

5  **Q.**  And was it your belief in this case that --

6       **THE COURT:**  Could you all come up to the bench.

7     (Bench conference on the record:

8       **THE COURT:**  It sounds like you are about to elicit his

9  opinion of Mr. Smith's truthfulness, and that's not an

10 appropriate question.

11      So, yes, I think limited to the facts of what he did

12 or did not say.

13      **MS. HOFFMAN:**  You're right.  I apologize.

14      **THE COURT:**  That's it.

15      **MS. HOFFMAN:**  Okay.

16      **THE COURT:**  Okay.)

17    (Bench conference concluded.)

18 **BY MS. HOFFMAN:**

19 **Q.**  Agent Moore, you testified that you typically write

20 reports of your proffer sessions; is that right?

21 **A.**  Yes.

22 **Q.**  And sometimes those proffer sessions are quite lengthy; is

23 that right?

24 **A.**  Correct.

25 **Q.**  Sometimes hours long?

1   **A.**   Yes.

2   **Q.**   And they're not recorded?

3   **A.**   No.

4   **Q.**   And you write down what you remember to the best of your

5   ability; is that right?

6   **A.**   Correct.

7   **Q.**   Is it sometimes possible that you make mistakes?

8   **A.**   Yes.

9        **MS. HOFFMAN:**   Thank you.

10        I have no further questions.

11        **THE COURT:**   Anything else?

12        **MS. WHALEN:**   Court's indulgence.

13        **THE COURT:**   Yes.

14        **MS. WHALEN:**   Thank you.

15        No further questions.

16        **THE COURT:**   Okay.  Thank you, sir.  You are excused.

17        (Witness excused.)

18        **THE COURT:**   We're not necessarily going in perfect

19   order.

20        But I believe, Ms. Amato, you might --

21        **MS. AMATO:**   I have a witness, yes, Your Honor.

22        **THE COURT:**   You have a witness.  All right.

23        **MS. AMATO:**   Your Honor, if I can just go and bring the

24   witness in.

25        **THE COURT:**   Sure.

```
 1              MS. AMATO:  Thank you.

 2              THE COURT:  You may.

 3              You're calling?

 4              MS. AMATO:  Calling Mr. Bobby Lee Davis.

 5              If you can take a seat here.

 6              THE CLERK:  Please raise your right hand.

 7          BOBBY LEE DAVIS, DEFENDANT ANDERSON'S WITNESS, SWORN.

 8              THE CLERK:  Please be seated.

 9              Please speak directly into the microphone.

10              State and spell your full name for the record, please.

11              THE WITNESS:  My name is Bobby Lee Davis, B-O-B-B-Y,

12    L-E-E, D-A-V-I-S.

13              THE CLERK:  Thank you.

14                        DIRECT EXAMINATION

15    BY MS. AMATO:

16    Q.   Good afternoon, Mr. Davis.

17    A.   Hi.

18    Q.   Mr. Davis, are you originally from the Maryland area?

19    A.   I was born in North Carolina.  I moved here when I was 12.

20    Been here since.

21    Q.   All right.  And are you currently working?

22    A.   I'm retired.

23    Q.   What are you retired from?

24    A.   Bethlehem Steel.  Worked there for 36 years.

25    Q.   And what did you do for them?
```

1    **A.**   I was a first-class welder.

2    **Q.**   All right.  Mr. Davis, I am going to show you what's

3    already been marked as Defense Exhibit 13.

4            **MS. AMATO:**  I'm using the HDMI.  Is it on?

5            Okay.  Is it on?  I'm not sure.

6            **THE CLERK:**  Yes.

7            **MS. AMATO:**  Okay.  Okay.  Thank you.

8    **BY MS. AMATO:**

9    **Q.**   All right.  Mr. Davis, I'd like you to take a look and

10   see -- look at Defense Exhibit No. 13.  Do you recognize who is

11   in this video?

12   **A.**   Yes.

13   **Q.**   Okay.  Who is this?

14   **A.**   Corloyd.

15   **Q.**   Sorry?

16   **A.**   Corloyd.

17   **Q.**   Okay.

18       (Video played.)

19           **MS. WHALEN:**  The sound isn't on, but that's okay.

20   **BY MS. AMATO:**

21   **Q.**   And can you identify who this is.

22   **A.**   That's me.

23   **Q.**   Okay.  And do you see a third person in the back?

24       Whoops.  I'm having -- did you see the third person?  I'll

25   go back.

1   **A.**   Take it back, please.

2   **Q.**   Certainly.

3   **A.**   That's Sylvester.

4   **Q.**   Okay.  All right.  So can you tell us where you were.

5   **A.**   We were in Vegas, bowling trip.

6   **Q.**   A bowling trip.

7   **A.**   Yes.

8   **Q.**   Okay.

9   **A.**   True Amateur.

10  **Q.**   What was it called?

11  **A.**   True Amateur.

12  **Q.**   True Amateur?

13  **A.**   Yes.

14  **Q.**   All right.  So how -- let me just take this out -- so who

15  was with you on this bowling trip?

16  **A.**   It was ten of us.  It was a group.  We go there every

17  year.  We been going there now for about 15 years.

18  **Q.**   Okay.  So when you say there were ten of you, so it was

19  yourself; it was Mr. Corloyd Anderson; it was Mr. -- it was

20  Sylvester and then other individuals?

21  **A.**   Yes.

22  **Q.**   Okay.  And how does one become a part of this group?

23  **A.**   We -- we recruit -- or I recruit bowlers and, you know,

24  see if they want to go to Vegas and bowl.  It's like -- it used

25  to be $50,000.  Now it's only $20,000.  We had a friend

1   recently to win it, so, you know . . .

2   **Q.**   So when you say $50,000, you mean the pot of winnings?

3   **A.**   Yeah, yeah.  You could have won $50,000, yes.

4   **Q.**   And when you went on this trip, do you remember this

5   specific trip, how long ago that was?

6   **A.**   It was about five years, I think, about five years,

7   something like that.  It's a long time.

8   **Q.**   And what time of year was the bowling tournament?

9   **A.**   February.  It's always in February.

10  **Q.**   Always in February?

11  **A.**   Uh-huh.

12  **Q.**   Okay.  And so on this particular trip, when there are ten

13  of you, did you all share rooms together?  What was the setup

14  usually with your --

15  **A.**   It was two to a room.

16  **Q.**   Okay.  And where did you all stay?

17  **A.**   We stayed at The Orleans.

18  **Q.**   Okay.  And why did you stay -- why did you all stay at the

19  Orleans?

20  **A.**   Because we had comps there.  We stayed like eight days.

21  At the end we would only end up paying like $150.  And some of

22  us would only end up paying $69 because of comps.

23  **Q.**   For the whole trip?

24  **A.**   Yes.

25  **Q.**   The whole hotel?

1   **A.**   Yes.

2   **Q.**   Okay.  All right.  Now -- and you said you would recruit.

3   What -- how were you in a position to recruit people?  Did you

4   do something else?

5   **A.**   Oh, because I -- I ran a pro shop.

6   **Q.**   A pro --

7   **A.**   Pro shop, yes.

8   **Q.**   Pro shop.

9   **A.**   Sold bowling balls.  Initially, you know, I was a ball

10   driller up to -- I did that for 17 years until recently I --

11   **Q.**   Let me just stop you here.

12         You say a pro shop.  What is that?  What is a pro shop?

13   **A.**   Sell bowling balls, shoes, attire, shirts, jackets, stuff

14   like that.

15   **Q.**   All pertaining to bowling?

16   **A.**   Yes.

17   **Q.**   And was that connected to any bowling alley?

18   **A.**   Yes.  Woodlawn, AMF Woodlawn.  I was located in there.

19   **Q.**   All right.  How did you meet Mr. Anderson?

20   **A.**   I met him in the bowling -- in the bowling center.  He

21   came in to -- to buy a ball and I knew his cousin, you know,

22   so -- and then he -- the cousin introduced me to him, and we

23   became very good friends.

24   **Q.**   Okay.  And how long have you known Mr. Anderson through

25   your bowling?

1    **A.**    Been over 15 years.

2    **Q.**    And -- now, in this vehicle we see you in a rather nice,

3    expensive vehicle.

4        Can you tell me about the story behind this vehicle.

5    **A.**    The story behind the vehicle was the gentleman sitting in

6    the back --

7    **Q.**    Sylvester?

8    **A.**    Yeah, Sylvester, he came into the pro shop, you know, one

9    day.  And then, you know, Corloyd and a couple of other, you

10   know, the people that, you know, bowled was in there.  And they

11   said, man, you know, said we should, you know, get some car --

12   because the year before that, the guy that won --

13   **Q.**    Let me ask you this:  Whose idea was it to rent a Bentley

14   when you went out to Vegas?

15   **A.**    Oh, Sylvester's.

16   **Q.**    Okay.  And Sylvester is the one that we identified in the

17   back of the vehicle?

18   **A.**    Yes.

19   **Q.**    Okay.  All right.  Was this a usual thing when you all

20   went out to Vegas, that you would rent Bentleys?

21   **A.**    No, no.  We generally dealt with Payless or the car rental

22   place inside the hotel.

23   **Q.**    And so was this, then, just a one-time --

24   **A.**    That was a one-time thing, yes.

25   **Q.**    Okay.  All right.  Now, in the video, also, we see

1    Mr. Anderson with what appears to be something around his neck.

2    **A.**   What you talking about, the fake chain?

3    **Q.**   The fake chain?

4    **A.**   Yeah.  It wasn't real.

5    **Q.**   It wasn't real.  Okay.

6    **A.**   No.

7    **Q.**   Did you ever touch it?  Did you ever hold it?

8    **A.**   Yes, I touched it in the pro shop because, you know . . .

9    **Q.**   What did the touch feel like?

10   **A.**   It wasn't real; I can tell you that.

11   **Q.**   Okay.  All right.  Now, let me ask you this:  When was the

12   last time that you actually saw Mr. Anderson?

13   **A.**   It's right before he got locked up.  I saw him outside of

14   his business on Wabash.

15   **Q.**   And -- all right.

16       Now, did you all win when you went out on that -- on this

17   particular trip?

18   **A.**   Oh, yeah.  Quite a few of us, you know, won money.  Like I

19   said, we had one that, you know, won the tournament itself.

20   **Q.**   I'm sorry.  Say that again.

21   **A.**   We had one bowler in the group that won the tournament,

22   yes.

23   **Q.**   Okay.  Excellent.

24   **A.**   Yes.

25   **Q.**   Now, before today, have we ever met in person?

1    **A.**    No.

2    **Q.**    How many times over the telephone did we speak about this

3    case?

4    **A.**    About once.

5              **MS. AMATO:**  All right.  I have no further questions at

6    this point.

7              **THE COURT:**  Thank you very much.

8              Any questions?

9              **MS. PERRY:**  Briefly, Your Honor.  Thank you.

10                          CROSS-EXAMINATION

11   **BY MS. PERRY:**

12   **Q.**    Good afternoon, Mr. Davis.

13   **A.**    Good afternoon.  How are you doing?

14   **Q.**    I'm all right.

15   **A.**    Good.

16   **Q.**    You told us that you've known Corloyd for a number of

17   years.  You became very good friends; right?

18   **A.**    Yes.

19   **Q.**    And you know he goes by Bo; right?

20   **A.**    Yes.

21   **Q.**    And you know him from the bowling alley; right?

22   **A.**    Yes.

23   **Q.**    That's where you would hang out with him?

24   **A.**    Yes.  He was in -- he was in my league.  I had a league.

25   I had the biggest league out there at Woodlawn at one time.

```
 1    And after -- you know, after the league, you know, we used to
 2    have drinks and stuff like that.
 3    Q.   But you don't know what he did when he wasn't at the
 4    bowling alley; right?
 5    A.   No.
 6    Q.   You weren't around him on a daily basis?
 7    A.   No, I wasn't.
 8    Q.   You don't know how he made his money; right?
 9    A.   I know that he had a car wash business, you know,
10    detailing.  You know, you could go there and, you know, get an
11    oil change, stuff like that.  I knew that.
12    Q.   Did you get your oil changed there?
13    A.   Say what?
14    Q.   Did you get your oil changed there?
15    A.   No.  I change my own.
16    Q.   Did you get your car washed there?
17    A.   I wash my own car -- truck.  I have a truck.
18    Q.   So you knew Mr. Anderson to have a car wash, but you
19    didn't actually ever go there; right?
20    A.   Yeah.  I went there one time they had open house.  He had
21    open house.  He had -- he had two, so I went there for the open
22    house for the one on Wabash.
23    Q.   A car wash is a cash business; right?
24    A.   Huh?
25    Q.   A car wash is a cash business?
```

```
 1   A.    Yes.
 2              MS. AMATO:   Objection; speculation, lack of knowledge.
 3              THE COURT:   Sustained.  Sustained.
 4   BY MS. PERRY:
 5   Q.    Mr. Davis, you went to -- you said you went to Vegas with
 6   Bo and a number of other people and that this was about five
 7   years ago.  That was with the video we saw with the Bentley; is
 8   that right?
 9   A.    Yeah, I think that was about five years ago.
10   Q.    And you each paid your own way to fly out there?
11   A.    Yes.
12   Q.    And you each paid your own -- you said you split rooms,
13   but you all paid for your own rooms?
14   A.    Yes.
15   Q.    You all paid your own portion of the rooms?
16   A.    Yes.
17   Q.    And then someone rented a Bentley while you were there?
18   A.    Yes.
19   Q.    And you guys went out while you were there, paid for that?
20   A.    Yes, we did go out on the town, yes.
21   Q.    And you said you've -- I believe I already asked you this,
22   but you said you've known Bo for a number of years, about 15
23   years?
24   A.    Yes.
25              MS. PERRY:   Court's indulgence.
```

1          Thanks.

2          I have no further questions.

3          **THE COURT:**  Anything else?

4          **MS. AMATO:**  Very briefly.

5                      REDIRECT EXAMINATION

6  **BY MS. AMATO:**

7  **Q.**  So, again, you said you all stayed at The Orleans Hotel;

8  is that correct?

9  **A.**  Yes.  That's where we stay at.  We stay -- we've stayed

10 there for the last, I'm going to say about the last ten years

11 or nine years.

12 **Q.**  And how much was the full amount of the hotel because of

13 the comps for the whole trip?

14 **A.**  Oh, you mean what -- what would it have cost us?

15 **Q.**  No, no, no.  What did you all pay because of the comps and

16 everything else?  What did you end up paying for the hotel?

17 **A.**  Oh, me, myself, I shared the room with Sly.  We ended up

18 paying like, you know, 60, 69 dollars, because we had comps.

19 He had comps.  I had comps.

20 **Q.**  Okay.  And --

21 **A.**  And that's the way we did it.  We shared.

22 **Q.**  Is that why everybody else also selected that hotel to

23 stay at, for the comps?

24 **A.**  Yeah; because we all played there.  Because the tournament

25 was actually there inside the hotel.  So we, you know, didn't

1  have to leave the hotel for, you know, too many things.

2  **Q.**   All right.  And then the Bentley, did the whole group, the

3  whole ten of you pay in to rent the Bentley?

4  **A.**   No.  It was just four of us.

5  **Q.**   Four of you?

6  **A.**   Yes.

7          **MS. AMATO:**  Okay.  All right.

8          Thank you.

9          **THE COURT:**  All right.  Thank you very much,

10  Mr. Davis.

11          You are excused.  Thank you.

12          **THE WITNESS:**  Oh, thank you.

13      (Witness excused.)

14          **MS. AMATO:**  Your Honor, I also have some stipulations.

15          And I will be using the -- no longer the HDMI at this

16  point.

17          All right.  So the first stipulation, which will be

18  Defense Exhibit --

19          **THE CLERK:**  15.

20          **MS. AMATO:**  -- 15, and I will read this to the jury.

21          [Reading]:  It is agreed and stipulated by the parties

22  that the certified records of regularly conducted business

23  activity of Maryland Live! Casino report -- Casino reports

24  Corloyd Anderson won $8,100 on September 25th of 2016.  The

25  records also report Mr. Anderson won $70,000 on December 13th

1  of 2013 and that he won 1,420, which is transaction 1715, and

2  1,420, transaction 1716, on August 30th, 2013.

3       Another stipulation which will be Defense Exhibit 16

4  [reading]:  It is agreed and stipulated by the parties that on

5  September 27th, 2016, law enforcement executed a search warrant

6  at We Cater to You Motors.  The attached photographs were taken

7  by law enforcement during the search of the business.

8       And I will present the photographs.

9       (Photographs displayed.)

10       One more stipulation.

11       **THE COURT:**  All right.

12       **MS. AMATO:**  Defense --

13       **THE COURT:**  And were those -- the photographs were

14  part of 16 or --

15       **MS. AMATO:**  Yes, they were all part of 16.  Correct.

16       And then as part of 17 -- I'll read 17, but there are

17  many documents that are part of 17.  I won't go through all of

18  them at this point.

19       **THE COURT:**  Okay.

20       **MS. AMATO:**  But they will obviously be in evidence as

21  part of the stipulation.

22       **THE COURT:**  All right.

23       **MS. AMATO:**  So Defense Exhibit 17, the stipulation

24  [reading]:  It is agreed and stipulated by the parties that on

25  September 27th, 2016, law enforcement executed a search warrant

1  at We Cater to You Motors.  The attached documents are true

2  copies of documents seized from the business.

3       And, again, I will not go through all of them, but I

4  will just show a sampling.

5       (Displaying documents.)

6       **MS. AMATO:**  Thank you, Your Honor.

7       **THE COURT:**  Okay.  All right.  Thank you.

8       Can I see counsel at the bench for just a minute on

9  the schedule.

10     (Bench conference on the record:

11     **THE COURT:**  I'm just checking if there's any other

12 witness available at this time as to whom there's not an issue.

13     We have Mrs. Staples that we need to talk about and

14 the rest of Mr. McGee and Mr. Temple.

15     And I know, Mr. Hazlehurst, your witness is --

16     **MR. HAZLEHURST:**  It should be ten minutes, if that,

17 tomorrow morning.

18     **THE COURT:**  Tomorrow morning.

19     Anything else at this point?  I'll take a recess and

20 perhaps we can talk about Ms. Staples.)

21     (Bench conference concluded.)

22     **THE COURT:**  All right.  Ladies and gentlemen, I need

23 to talk with counsel for a few moments.  We're going to take a

24 recess.

25     Thank you very much.

1          (Jury left the courtroom at 12:20 p.m.)

2          **THE COURT:**  All right.  If we can see where we are on

3     Ms. Staples.

4          There's a number of exhibits.  I don't know if there

5     are objections to more than one.

6          **MS. WHALEN:**  There's just one exhibit, Your Honor, and

7     I can pass it up to you, if you'd like.  It's called

8     Black Blood Brotherhood.

9          **THE COURT:**  Oh, you're not offering any other exhibits

10    through Ms. Staples?

11         **MS. WHALEN:**  No.

12         **THE COURT:**  Okay.

13         **MS. WHALEN:**  Would you like a copy?

14         **THE COURT:**  Sure.  You can pass it up and give me a

15    proffer of what would make it admissible.

16         **MS. WHALEN:**  (Handing.)

17         The proffer of the testimony is that she typed up this

18    exhibit on her computer and that she then sent the exhibit out

19    to various locations, and that was at the request of her son.

20         And those various locations include law enforcement

21    agencies.

22         The exhibit itself I think directly contradicts

23    testimony in the case that this entity was designed and created

24    as kind of a hitman entity.

25         And I think the exhibit indicates that instead of

1   that, it was designed as an entity that would help young

2   people, number one, and would help young African-Americans stop

3   killing each other.  That's sort of the content.

4        I wasn't there, but I think that there was an

5   objection based on hearsay for the exhibit itself.

6        **THE COURT:**  Right.  I think that was the objection.

7        Ms. Hoffman.

8        **MS. HOFFMAN:**  Yes.  And I think the entirety of what

9   Ms. Whalen has just proffered that Ms. Staples would say is, in

10  fact, hearsay.

11       Evidently, according to Ms. Staples, she -- she typed

12  up this document on Dante Bailey's behalf.  It's signed by him,

13  Almighty, Dante Bailey.

14       It, of course, characterizes the

15  Black Blood Brotherhood in a completely different light than

16  what the evidence in this case has showed.  And it appears to

17  be nothing more than a false exculpatory statement that he had

18  his mom type up for him and send to law enforcement officers on

19  his behalf.

20       I'm not aware of any hearsay exception that this would

21  fit into.  Certainly if Mr. Bailey wants to testify about what

22  he believed the Black Blood Brotherhood was and what its

23  purpose was, he has every right to do that.

24       But I don't think he can use his mother as a vehicle

25  to put in his own characterizations of what this organization

 1    was.

 2              **THE COURT:**  Ms. Whalen.

 3              **MS. WHALEN:**  Your Honor, I think she can testify --

 4    regardless of whether the exhibit comes in, she can testify of

 5    the fact of typing up Black Blood Brotherhood and sending it

 6    out to law enforcement agencies.

 7              I have been mulling over any exception to the Hearsay

 8    Rule, and I am candidly saying that I don't see one right now.

 9    But I do think the fact of her actions and those specific

10    actions I think are admissible.

11              **THE COURT:**  I guess the problem comes how -- with the

12    jury not knowing what's in the document, how is it relevant

13    that it was sent to law enforcement?

14              **MS. WHALEN:**  Because my client would not be sending to

15    law enforcement something that says:  Black Blood Brotherhood

16    is a hit squad.

17              And so I think the fact of her typing it up at his

18    behest and sending it to Black Blood Brotherhood -- excuse me,

19    sending it to law enforcement, the inference is that it was not

20    something that was in any way as the Government has portrayed

21    this group.

22              **THE COURT:**  Okay.

23              **MS. HOFFMAN:**  And, I mean, I think actually what

24    Ms. Whalen -- the point that she just made is the point that I

25    was going to make.  Of course, Mr. Bailey would not

```
 1   characterize the Black Blood Brotherhood as a hit squad when

 2   sending this to law enforcement.  It is a false exculpatory to

 3   law enforcement.

 4        And whether the exhibit itself comes into evidence or

 5   not, Ms. Staples' testimony about how it was portrayed to

 6   law enforcement on behalf of her son is still hearsay.

 7        THE COURT:  Well, I'm gathering that she's not going

 8   to testify about the content of the document, simply that she

 9   sent a document labeled "Black Blood Brotherhood" which

10   Mr. Bailey had prepared.

11        MS. WHALEN:  That she typed it up.  He had prepared

12   it, she typed it up and sent it out at his behest.

13        THE COURT:  Okay.

14        MS. WHALEN:  And the date I would be bringing up, too.

15        THE COURT:  I mean, it's some circumstantial evidence.

16        MS. HOFFMAN:  I really don't understand the relevance.

17   I mean, if the content is not coming in, then what's the

18   relevance of her sending something about

19   Black Blood Brotherhood to law enforcement?  And, I mean, the

20   very fact that she's sending something to law enforcement that

21   her son has told her to write at his behest I think makes it --

22   makes it -- I mean, it's essentially still putting in a false

23   exculpatory of her son through her.

24        And I don't see why -- I mean, the fact that it was

25   sent to law enforcement makes it even less likely to be
```

```
 1    truthful.  He's trying to characterize it in a different way.
 2            THE COURT:  Which would seem to be a matter of
 3    argument.
 4            I think it's somewhat limited relevance.  But as long
 5    as she's -- you're not offering the contents of the document
 6    and she doesn't offer testimony about what's in it or why he
 7    wanted it sent anywhere, it's --
 8            MS. WHALEN:  I won't elicit that.
 9            THE COURT:  It's very limited.
10            MS. WHALEN:  Yes.
11            MS. HOFFMAN:  And I guess I would also, as I pointed
12    out in chambers this morning, Ms. Staples has lived -- we
13    believe she's lived in Georgia since somewhere around the year
14    2000.  We don't believe she has any personal knowledge about
15    the facts of this case.
16            And so we would object to any -- any questioning of
17    her about anything that she was told by Dante Bailey or any of
18    the co-conspirators in the case.  That would be hearsay, and she
19    would object to any of that coming in.
20            THE COURT:  I'm understanding that that's not the
21    point of the testimony?
22            MS. WHALEN:  No.
23            THE COURT:  But if you hear anything like that, you
24    can certainly object.
25            All right.  That will resolve Ms. Staples.
```

1          Let's see.  As far as Mr. McGee, I think what we just

2    have to do is perhaps over the recess -- I don't know.  Do you

3    have access to this YouTube that you can --

4          **MS. WHALEN:**  I think it's been sent via e-mail.

5          **MS. HOFFMAN:**  Mr. Enzinna sent me a link, and we can

6    watch it over the lunch break.

7          **THE COURT:**  Okay.  Okay.  All right.  Well, if you

8    want to get Ms. Staples on and off.

9          **MS. WHALEN:**  I'm sorry?

10         **THE COURT:**  I'm sorry.  I guess I'm thinking out loud

11   here, but we could go ahead and bring the jury back long enough

12   to get Ms. Staples' testimony in --

13         **MS. WHALEN:**  Sure.

14         **THE COURT:**  -- and then take an early recess.  And

15   we'll try to see where things stand with Mr. Temple, and you

16   can watch the video over lunch.

17         Any other evidence or testimony expected at this

18   moment?  Obviously, we have to put advice of rights on the

19   record, but anything else at this time?

20         **MS. WHALEN:**  No.

21         **THE COURT:**  No.  Okay.

22         All right.  Let's bring the jury back in.

23      (Jury entered the courtroom at 12:31 p.m.)

24         **THE COURT:**  All right.  Ms. Whalen.

25         **MS. WHALEN:**  Thank you, Your Honor.

```
 1              Joyce Staples, please.
 2          THE CLERK:  Please raise your right hand.
 3        JOYCE STAPLES, DEFENDANT BAILEY'S WITNESS, SWORN.
 4          THE CLERK:  Please be seated.
 5          Please speak directly into the microphone.
 6          State and spell your full name for the record, please.
 7          THE WITNESS:  Joyce Staples, J-O-Y-C-E, S-T-A-P-L-E-S.
 8          THE CLERK:  Thank you.
 9                      DIRECT EXAMINATION
10   BY MS. WHALEN:
11   Q.   Good afternoon, Ms. Staples.
12        Where do you currently live?
13   A.   In Lawrenceville, Georgia.
14   Q.   And for how long have you lived in Georgia?
15   A.   Since 1998 -- '97.
16   Q.   '97.  And are you the mother of Dante Bailey?
17   A.   Yes, I am.
18   Q.   Could you tell us, did you originally live in the
19   Baltimore City area?
20   A.   Yes, I did.
21   Q.   Was that in the Forest Park-Gwynn Oak area?
22   A.   Yes.
23   Q.   All right.  And at that time did Dante live with you as
24   well?
25   A.   Yes, he did.
```

1   **Q.**   And are there other children that you have?

2   **A.**   Yes, I do.

3   **Q.**   Can you tell us who.

4   **A.**   His name is Malik.

5   **Q.**   All right.

6   **A.**   And right now he's at Louisville College.

7   **Q.**   Does he play football?

8   **A.**   Yes, he does.

9   **Q.**   All right.  Now, I'm going to direct your attention to

10  2015.  Do you recall sort of the riots in the city after the

11  incident with Freddie Gray?

12  **A.**   Yes.

13  **Q.**   And sometime after that, did you type up a document that

14  was entitled "Black Blood Brotherhood"?

15  **A.**   Yes, I did.

16  **Q.**   And was that at the request of your son Dante?

17  **A.**   Yes, it was.

18  **Q.**   And did you then print out what you typed up?

19  **A.**   Yes, I did.

20  **Q.**   And did you send that to various locations?

21  **A.**   Yes, I did.

22  **Q.**   Again, was that at the request of your son?

23  **A.**   Yes, it was.

24  **Q.**   And did you send it to law enforcement agencies?

25  **A.**   Yes, I did.

1  **Q.**   Do you have a specific recall right now which agencies you

2  sent it to?

3  **A.**   Just offhand, I know it was a lot of the police stations

4  in the Park Heights area.  It was different organizations,

5  churches.  It was quite a few organizations.  It was about 50

6  copies.

7  **Q.**   Okay.  And do you remember if "Safe Streets" was one of

8  the organizations?

9  **A.**   Yes.

10 **Q.**   Okay.

11         **MS. WHALEN:**  Thank you very much, Ms. Staples.

12         **THE WITNESS:**  Okay.

13         **THE COURT:**  Any questions?

14         **MS. HOFFMAN:**  Just a couple.

15                     CROSS-EXAMINATION

16 **BY MS. HOFFMAN:**

17 **Q.**   Good afternoon, Ms. Staples.

18 **A.**   Good afternoon.

19 **Q.**   Dante Bailey is your son?

20 **A.**   Yes, he is.

21 **Q.**   You care about him a great deal?

22 **A.**   I love him.

23 **Q.**   And I'm sure you don't want anything bad to happen to him.

24 **A.**   That's correct.

25 **Q.**   And you'd do just about anything to help him out if he

STAPLES - CROSS

```
 1    were in trouble?
 2    A.    Yeah.
 3              MS. HOFFMAN:  I have no further questions.  Thank you.
 4              THE COURT:  Okay.  Anything else?
 5              MS. WHALEN:  No questions.  Thank you.
 6              THE COURT:  Thank you very much.  Thank you very much,
 7    Ms. Staples.  You're excused.
 8         (Witness excused.)
 9              THE COURT:  All right.  Thank you.
10              All right.  Ladies and gentlemen, we have some
11    additional issues to discuss, and we may have some additional
12    testimony for you this afternoon.
13              But I'm going to give you a little bit long lunch hour
14    today.  We're going to ask counsel to stick around, but I'm
15    going to excuse you until 2 o'clock for your lunch recess
16    today.
17              Thank you very much.
18         (Jury left the courtroom at 12:36 p.m.)
19              THE COURT:  And, counsel, I'm going to suggest that
20    perhaps you all could come to chambers at about quarter of
21    2:00.  We'll sort of try to see where things stand in regard to
22    both the video, Mr. McGee, and the question of Mr. Temple.
23              Anything else that would be helpful to talk about
24    right now?
25              MS. HOFFMAN:  I don't think so.  Just -- and maybe it
```

1  will be mooted by what happens with Mr. Temple; but if he does

2  elect to testify, of course, we would like to argue our motion

3  on the record.

4        **THE COURT:**  Sure.  Okay.

5        All right.  I'll see you at quarter of 2:00 in

6  chambers.

7        Thank you.

8        You're excused.

9        I'm sorry.  The gallery is excused.

10        All right.  And the rest of us.

11     (Luncheon recess taken.)

12        **THE COURT:**  All right.  Welcome back.

13        I think we're ready to bring the jury in and re-call

14  Mr. McGee?

15        **MS. WHALEN:**  Yes.

16        **THE COURT:**  Okay.

17     (Jury entered the courtroom at 2:09 p.m.)

18      MICHAEL McGEE, DEFENDANT BAILEY'S WITNESS, PREVIOUSLY

19  SWORN.

20        **THE CLERK:**  Mr. McGee, you're still under oath.

21        **THE WITNESS:**  Yes, ma'am.

22                      DIRECT EXAMINATION

23  **BY MS. WHALEN:**

24  **Q.**   Good afternoon, Mr. McGee.

25  **A.**   Good afternoon.

 1   **Q.**   We were talking a little bit about a movie called

 2   Straight Outta Compton.

 3         Do you recall that?

 4   **A.**   Yes.

 5   **Q.**   And is there a scene in that movie which shows or depicts

 6   a bus?

 7   **A.**   Yes, there is.

 8   **Q.**   Now, to your knowledge, is that just a general movie that

 9   was put out there for anyone to see?

10   **A.**   Yes.

11   **Q.**   And then did you also determine whether it was on YouTube?

12   **A.**   Yes.

13   **Q.**   And did you watch the scene with the bus?

14   **A.**   Yes, I did.

15   **Q.**   Could you describe it for us.

16   **A.**   Yes.   There are some kids on the bus, on the driver's side

17   of the bus, that are hanging out the window making signs with

18   their hands to a car that's driving alongside of the bus.   And

19   at one point, the car cuts in front of the bus, forcing the bus

20   to stop.

21         The passenger in the car gets out and forces his way onto

22   the bus and walks down the aisle and begins chastising, yelling

23   at the kids, telling them what they're doing is wrong with the

24   signs.

25   **Q.**   And does he also have a weapon?

1   **A.**   He does.  He has a gun.

2   **Q.**   All right.  And is he making any threatening gestures?

3   **A.**   Yes, he is.  He -- to the kid that he appeared to

4   recognize as being the main one making the hand signs out the

5   window, he threatened the kid with -- to not make the signs

6   anymore and told him to stay in books and school and things

7   like that.

8   **Q.**   And just to make it clear, the person depicted in that

9   movie was not Dante Bailey; right?

10  **A.**   No, it was not.

11  **Q.**   All right.  And do you know whether it was an actor or

12  not?

13  **A.**   The person in the movie?

14  **Q.**   Yes.

15  **A.**   I don't know who the actor was.

16  **Q.**   Okay.

17  **A.**   But it was an actor.  It was . . .

18          **MS. WHALEN:**  Thank you, then.

19          That's all the questions, Your Honor.

20          **THE COURT:**  Thank you.  Any cross?

21                  CROSS-EXAMINATION

22  **BY MS. HOFFMAN:**

23  **Q.**   Just briefly, Mr. McGee.  You said you were a BPD

24  detective for about ten years?

25  **A.**   A police officer.  Yes.

 1   **Q.**   Police officer.

 2        And you've investigated crimes in Baltimore City; is that

 3   right?

 4   **A.**   Yes.

 5   **Q.**   And you know that some things that happen in movies and TV

 6   also happen in real life; is that fair?

 7   **A.**   It's possible, yes.

 8   **Q.**   People are threatened in movies, and sometimes people are

 9   threatened in real life?

10   **A.**   Yes.

11   **Q.**   People are murdered in movies, and sometimes people are

12   murdered in real life?

13   **A.**   Yes.

14   **Q.**   And people are gang members in movies, and sometimes

15   people are gang members in real life?

16   **A.**   That's possible, yes.

17   **Q.**   And the Bloods-Crips rivalry, that's a real thing; right?

18   That's not just fiction?

19   **A.**   I believe it is, yes.

20   **Q.**   And the Bloods is a gang that originated in -- around

21   Piru Street in Compton, California; is that right?

22   **A.**   Yes.

23   **Q.**   And, in fact, the movie that you were just asked about,

24   Straight Outta Compton, isn't that movie based on real-life

25   events?

1    **A.**   Well, I believe it's -- I don't know about real life, but

2    I believe it's based on the perspective of people that have

3    lived in Compton.

4         **MS. HOFFMAN:**  I have no further questions.

5         **THE COURT:**  Anything else?

6         **MS. WHALEN:**  Nothing further.

7         **THE COURT:**  Thank you very much, sir.  You're excused.

8    (Witness excused.)

9         **THE COURT:**  If I can see counsel at the bench for a

10   minute.

11        (Bench conference on the record:

12        **THE COURT:**  Again, until we resolve the issue of

13   Mr. Temple, there's no evidence to call at the moment, I think

14   that's still the case; right?

15             I'm going to excuse the jury.

16        **MR. HAZLEHURST:**  We may have a stipulation.  But I

17   haven't gotten it signed yet, so . . .

18        **THE COURT:**  Okay.  All right.  I'm going to send the

19   jury out.)

20        (Bench conference concluded.)

21        **THE COURT:**  Sorry, ladies and gentlemen.

22             Okay.  I have some more things to discuss with

23   counsel.  There may or may not be another stipulation or

24   witness for you, but there are some other things we need to

25   talk about.

1              I apologize and thank you again for your patience, but

2      we're going to excuse you.

3              And we'll keep everybody else here.

4              Thank you very much.

5          (Jury left the courtroom at 2:14 p.m.)

6          **THE COURT:**  Okay.  There remains a question of whether

7      any of the individual defendants would choose to testify.

8              At this point, since we are at the close of the -- or

9      almost at the close of the evidence, I need to get everybody's

10     choice on the record.

11             And I'll start with counsel for Mr. Bailey, advising

12     Mr. Bailey.

13         **MS. WHALEN:**  Your Honor, could I sit or do you want my

14     client to stand?

15         **THE COURT:**  You can sit.

16         **MS. WHALEN:**  Mr. Bailey, you have an absolute right

17     to --

18         **THE COURT:**  Just speak into the mic.  I'm sorry.

19         **MS. WHALEN:**  You have an absolute right to remain

20     silent throughout the trial, and that means that you do not

21     have to testify in your own defense.

22             And you can waive that and testify if you so choose to

23     do so.

24             If you testify in this case, the Government would

25     cross-examine you, of course.  And in that cross-examination,

```
1    they would be entitled -- within the bounds of the court and
2    the rules that we have, they would be entitled to ask you
3    questions about any prior convictions that you have, including
4    felonies and any misdemeanors.  And that would include the
5    prior conviction which is the subject of the felon in
6    possession count that you currently are facing.
7              Have you and I discussed this right before?
8              DEFENDANT BAILEY:  Yeah.
9              MS. WHALEN:  To testify or not to testify?
10             DEFENDANT BAILEY:  Yeah.
11             MS. WHALEN:  And have you also discussed it with
12   Mr. Enzinna as well?
13             DEFENDANT BAILEY:  No.
14             MS. WHALEN:  Okay.  In terms of discussing this right,
15   have we done so on more than one occasion?
16             DEFENDANT BAILEY:  No.
17             MS. WHALEN:  All right.  Do you have questions that
18   you want to ask Mr. Enzinna and I that are related to this
19   issue?
20             DEFENDANT BAILEY:  Yeah.
21             MS. WHALEN:  I would ask for the Court's indulgence so
22   that we can be satisfied.
23             THE COURT:  Okay.  Let me just add as well, the
24   cross-examination regarding prior crimes, of course, generally
25   that would apply to felonies, and I believe you mentioned
```

1   misdemeanors.  Of course, if they do bear on truthfulness,

2   those would also most likely be subject for cross-examination.

3          I just wanted to say that if -- as you indicated,

4   Mr. Bailey has the absolute right to choose to testify or not

5   to testify.  If his choice is not to testify, then I would

6   also, as I have already done, instruct the jury that a decision

7   not to testify -- and this applies to everyone -- a decision

8   not to testify may not be held against them by the jury.  They

9   simply may not consider it in any way because it's absolutely

10  the person's right not to testify.

11         So I just wanted to be clear that that instruction

12  would be given as well as opposed to, of course, if you do

13  testify.  Then, as Ms. Whalen said, you're subject to

14  cross-examination.  And your testimony is considered like any

15  other witness that would come in.

16         Do you understand that, sir?

17         **DEFENDANT BAILEY:**  Not clearly.

18         **THE COURT:**  Not clear?  All right.  Well, why don't

19  you talk to Ms. Whalen for a bit there.

20         Maybe we can put the husher on.

21      (The defendant conferred with counsel.)

22         **MS. WHALEN:**  Thank you, Your Honor.

23         **THE COURT:**  All right.

24         **MS. WHALEN:**  Mr. Bailey, do you wish to testify or do

25  you wish to remain silent?

```
 1          DEFENDANT BAILEY:  Remain silent.
 2          THE COURT:  All right, sir.  You've had an opportunity
 3   to speak more with counsel, and it is your choice not to
 4   testify; is that correct?
 5          DEFENDANT BAILEY:  Yes, Your Honor.
 6          THE COURT:  All right.  Thank you, sir.
 7          Let me move -- Mr. Sardelli, would you like to advise
 8   Mr. Banks.
 9          MR. SARDELLI:  Mr. Banks, we've talked previously
10   about your right to testify; am I correct?
11          DEFENDANT BANKS:  Yes.
12          MR. SARDELLI:  And on previous occasions, I've
13   recommended or advised you to not testify in this case; is that
14   correct?
15          DEFENDANT BANKS:  Yes.
16          MR. SARDELLI:  And you heard what the judge said
17   previously and what Ms. Whalen said previously as well about
18   your right to testify and some of the risks associated with
19   testifying; am I correct?
20          DEFENDANT BANKS:  Yes.
21          MR. SARDELLI:  That includes possibly being crossed on
22   your criminal history or being crossed on incidents like --
23   such as the burglary we discussed that did not come into
24   evidence.  There's a chance if you testify, that we could open
25   the door to some of those things that we kept out.
```

 1              **DEFENDANT BANKS:**  Yes.

 2         **MR. SARDELLI:**  Now, based on all of this, I've advised

 3    you not to testify.  But is it your wish to not testify in this

 4    case?

 5              **DEFENDANT BANKS:**  Yes.

 6         **THE COURT:**  Okay.  And just to be clear, Mr. Banks, it

 7    is certainly correct that it is Mr. Sardelli's job to give you

 8    his best advice.  But, ultimately, the choice is up to you.

 9         So your choice is not to testify in this case; is that

10    correct?

11              **DEFENDANT BANKS:**  Correct.

12         **THE COURT:**  Okay.  Thank you, sir.

13         Mr. Trainor.

14         **MR. TRAINOR:**  Mr. Lockley, you have the absolute right

15    to remain silent and not testify or elect to testify from the

16    witness stand in this courtroom before the jury.

17         If you elect to testify, you can be cross-examined.

18    And the jury will be made aware of prior felony convictions,

19    including any prior drug felony convictions as well as certain

20    misdemeanors that bear on truthfulness.

21         If you elect to remain silent, the jury could not hold

22    that against you in any way.  And they would be instructed by

23    the Court that your silence can't even be considered; it should

24    not even be discussed.

25         Have you had enough time to consider whether or not

1    you want to testify in this case?

2              **DEFENDANT LOCKLEY:**  Yes.

3              **MR. TRAINOR:**  Do you plan to testify or elect to

4    remain silent?

5              **DEFENDANT LOCKLEY:**  Remain silent.

6              **THE COURT:**  All right, sir.  So just to be clear, it

7    is your choice, after speaking with your attorney, not to

8    testify in this case; is that right?

9              **DEFENDANT LOCKLEY:**  Yes, ma'am.

10             **THE COURT:**  All right.  Thank you.

11             **MS. AMATO:**   Thank you.

12             Mr. Anderson, as you know, you have a right to choose

13   whether you would like to testify or not testify on your own

14   behalf in this case.

15             We have discussed this on several occasions.  And it's

16   my understanding, based on our discussions, that you have

17   chosen to not testify.

18             But I just want to reiterate again to you that it is

19   your right to choose and that you do know that if you were to

20   testify, certainly the Government could cross-examine you,

21   questions relating to not only the offense in question, but

22   also to your prior convictions.

23             Do you understand all of that?

24             **DEFENDANT ANDERSON:**  Yes.

25             **MS. AMATO:**  Okay.  And what is your decision at this

1      point?

2              **DEFENDANT ANDERSON:**  Remain silent.

3              **THE COURT:**  All right.  And, again, sir, after talking

4      with counsel, it is your choice not to testify in this case; is

5      that right?

6              **DEFENDANT ANDERSON:**  Yes, ma'am.

7              **THE COURT:**  Okay.  All right.  Thank you.

8              Mr. Hazlehurst.

9              **MR. HAZLEHURST:**  Thank you, Your Honor.

10             Mr. Davis, hearing what all other counsel have advised

11     their clients, you understand that you have an absolute right

12     to testify in this case if you so choose.

13             Do you understand that?

14             **DEFENDANT DAVIS:**  Yes, I understand.

15             **MR. HAZLEHURST:**  And it's a Constitutional right.  In

16     other words, it cannot be taken away from you.

17             Do you understand that?

18             **DEFENDANT DAVIS:**  Yes.

19             **MR. HAZLEHURST:**  And we have discussed the matter on

20     several occasions; correct?

21             **DEFENDANT DAVIS:**  Yes.

22             **MR. HAZLEHURST:**  And you understand that if you did

23     choose to testify, you would be subject to cross-examination.

24     And that cross-examination could potentially not be limited by

25     what you were asked on direct examination; it could go beyond

1    that.

2         Do you understand that?

3         **DEFENDANT DAVIS:**  Yes.

4         **MR. HAZLEHURST:**  And you only have the one prior

5    felony conviction, so I don't believe there are any other

6    convictions that could be brought up on your record as

7    impeachment; but, again, that could be inquired into, that one

8    conviction, on cross-examination.

9         Do you understand that?

10        **DEFENDANT DAVIS:**  Yes, I understand.

11        **MR. HAZLEHURST:**  And having been advised of that right

12   and what potentially could occur, it's my understanding that

13   you choose not to testify in this case; is that correct?

14        **DEFENDANT DAVIS:**  Yes.

15        **THE COURT:**  All right.  Again, thank you.

16        So, Mr. Davis, having had a chance to talk to counsel

17   and consider it, it is your choice not to testify in this case;

18   is that correct?

19        **DEFENDANT DAVIS:**  Yes, Your Honor.

20        **THE COURT:**  Okay.  Thank you.

21        All right.  If I could --

22        **MR. HAZLEHURST:**  Your Honor, I have typed up the

23   stipulation.  Unfortunately, I'm not sure I do have the

24   technological capability to get it signed on my tablet.  But we

25   could print it, have it signed, potentially put that to the

```
 1    jury before they leave.

 2              THE COURT:  Okay.  That would be good.

 3              THE CLERK:  He can e-mail it to me.

 4              THE COURT:  Can you e-mail it to Ms. Moyé.

 5              MR. HAZLEHURST:  I will, Your Honor.

 6              THE COURT:  All right.  While you're doing that, if I

 7    might consult briefly up here at the bench with Mr. Simms.

 8         (Sealed ex parte bench conference on the record under

 9    separate cover.)

10              THE COURT:  I'll just report that we do have counsel

11    representing Mr. Temple, that is, Mr. Simms.  He has advised me

12    that he needs some additional time to speak with his client on

13    this question of testimony.

14              So we'll go ahead and take some additional time.

15              Let's see.  So there's the stipulation.

16              Oh, not sent yet?

17              MR. HAZLEHURST:  Not sent yet.

18              THE COURT:  Working on that.  Okay.

19              MR. ENZINNA:  Your Honor --

20              THE COURT:  Yes.

21              MR. ENZINNA:  -- this morning in chambers, I raised an

22    issue about instructions.  And you asked me to submit something

23    in writing.

24              Would you like me to e-mail that to Ms. Moyé?

25              THE COURT:  You could e-mail that to the chambers
```

 1    e-mail box or to Ms. Moyé.

 2         **MR. ENZINNA:**  Okay.  And I'll copy all counsel on it.

 3         **THE COURT:**  Okay.

 4       (Pause.)

 5         **THE COURT:**  I guess actually while we're waiting and

 6    since we do not know yet what Mr. Temple's choice would be, if

 7    you want to argue the motion on the alibi defense, we could do

 8    that.

 9         **MS. HOFFMAN:**  Thank you, Your Honor.

10         So I wanted, first, to start by just correcting some

11    factual misstatements in the defendant's response to our motion

12    to exclude, which was ECF-1145.

13         Ms. Whalen stated in her brief that she wasn't on

14    notice that her client, Dante Bailey, was with Nizzy on the

15    night of the Bangout murder until Jencks was turned over a week

16    before trial or until the first day of trial when the

17    Government provided a disc of exhibits, including DEM-7.

18         And that is false.  That is not correct.

19         First of all, the Government turned over

20    Dante Bailey's phone records as well as the extraction report

21    for Dominick Wedlock's cell phone in spring of 2017, so that

22    was over two years ago or roughly two years ago.

23         And Wedlock's phone shows the phone number, the

24    (667) 207-4928 phone number saved as Bruh Nizz.  There was no

25    cooperator testimony about that phone number whatsoever.  It's

1  simply what Wedlock's phone extraction shows as being the phone

2  number of Bruh Nizz.

3          And then Bailey's phone records show multiple phone

4  calls to Bruh Nizz, that phone number, on the night of

5  Bangout's murder.

6          This was provided over two years ago in

7  Government's Exhibit DEM-7, which was provided on a disc the

8  week before trial started.  It is just a summary of the

9  information that was included in the discovery years ago.

10         More importantly, though, Dante Bailey has known where

11 he was on the night of the murder since the night of the

12 murder.

13         Ms. Whalen appears to be suggesting in her brief that

14 she couldn't learn where her client was at the time of the

15 murder until she heard all the cooperator testimony and saw all

16 the Government's evidence.  And that's just not the case.

17         That's tantamount to arguing that the defendant has

18 the right to fabricate an 11th-hour alibi tailored to the

19 Government's evidence, and that's exactly what Rule 12.1 is

20 intended to avoid.

21         Dante Bailey didn't learn where he was on the night of

22 Bangout's murder from Nizzy.  He didn't learn it from the phone

23 records.  He knew where he was all along.

24         And it's, we think really, frankly, preposterous to

25 claim that he has the right to wait until the Government rests

```
 1    its case so that he can figure out what his alibi defense will

 2    be.  That's precisely what Rule 12.1 bars.

 3            Ms. Whalen claims the Government was on notice that

 4    Dante Bailey was with Davon Temple at the time of the Bangout

 5    murder and had the opportunity to investigate Temple, and I

 6    think that's another red herring.

 7            The problem is not that we weren't on notice that

 8    Dante Bailey was with Davon Temple on the night of the Bangout

 9    murder.  Of course, we knew that.  Of course, we've

10    investigated Temple.  That's not the problem.

11            The problem is that Dante Bailey didn't tell us where

12    he claims to have been at the time of the murder until two

13    business days ago, five weeks into trial, after we'd finished

14    our case.

15            And the location where Bailey claims to have been is

16    the alibi defense.  That's what Rule 12.1 requires notice of.

17    It doesn't require the defendant to tell us exactly what every

18    witness on his behalf is going to say.  It requires him to tell

19    us where he claims he was at the time of the murder.

20            We haven't had an adequate opportunity to investigate

21    the defendant's alibi defense that he was at

22    2409 Loyola Northway at the time of the murder.

23            We have not been able to interview people at that

24    location.  We have not been able to talk to cooperators about

25    that location.  We have not been able to review Nizzy's
```

1   jail calls the week that <u>Jencks</u> was turned over or interview

2   people incarcerated with Nizzy, who -- which might have yielded

3   evidence of recent fabrication.

4           There are a number of investigative steps that we

5   would have taken that we cannot take because this information

6   was provided to us after we had finished our entire case, two

7   business days ago, right before Easter weekend.

8           There's another reason why Davon Temple should be

9   precluded from testifying, actually, totally apart from

10  Rule 12.1, and that's because the rule -- we believe the rule

11  of sequestration has been violated.

12          The parties invoked the witness sequestration rule at

13  the start of trial and that rule states [reading]:  No person

14  may directly or indirectly advise a witness other than a party

15  or expert witness of what the testimony of another witness has

16  been.

17          And we believe that's exactly what happened here, that

18  Dante Bailey waited until the completion of the Government's

19  case so that he and his lawyers and investigators could tell

20  Davon Temple what the witnesses had testified to and allow him

21  to tailor his alibi defense to the facts in evidence, including

22  the GPS in evidence.

23          It's hard to imagine a more flagrant and, we believe,

24  willful violation of Rule 12.1.

25          I think if we care anything about the adversarial

1    system as a truth-finding process, then this can't be

2    permitted.

3         The Supreme Court held in Williams v. Florida

4    [reading]:  It's too easy to fabricate a last-minute alibi.

5    There's too grave a danger that the jury will be swayed by

6    perjured testimony.  If this kind of tactic wins the day, if

7    the jury is allowed to hear this last-minute alibi defense with

8    no chance for us to investigate it, then I think the justice

9    system has failed.  It's not just the Government that loses

10   out.  It's everyone.

11        Ms. Whalen, I think, also is wrong that the

12   Sixth Amendment bars preclusion of an 11th-hour alibi.  The

13   Supreme Court held in Taylor versus Illinois that the

14   Sixth Amendment does not create an absolute bar to the

15   preclusion of testimony by a surprise witness.

16        And I do want to read -- there's a lot of helpful

17   language in that decision, but I want to read one part of it

18   that is really right on point.

19        The Supreme Court says in that case, quote, It is

20   elementary, of course, that a trial court may not ignore the

21   fundamental character of the defendant's right to offer the

22   testimony of witnesses in his favor.  But the mere invocation

23   of that right cannot automatically and invariably outweigh

24   countervailing public interests.  The integrity of the

25   adversary process, which depends both on the presentation of

1    reliable evidence and the rejection of unreliable evidence, the

2    interest in the fair and efficient administration of justice,

3    and the potential prejudice to the truth-determining function

4    of the trial process must also weigh in the balance.

5         A trial judge may certainly insist on an explanation

6    for a party's failure to comply with a request to identify his

7    or her witness in advance of trial.  If that explanation

8    reveals that the omission was willful and motivated by a desire

9    to obtain a tactical advantage that would minimize the

10   effectiveness of cross-examination and the ability to adduce

11   rebuttal evidence, it would be entirely consistent with the

12   purposes of the compulsory process clause simply to exclude the

13   witness's testimony, unquote.

14        We understand, of course, that Mr. Temple has been

15   brought here by the marshals from Hagerstown.  We understand

16   that the jury's ready to go.

17        But if the Court -- we are moving to exclude his

18   testimony.  And if the Court is going to permit Davon Temple to

19   testify, then we ask, as an alternative remedy, that when the

20   defense case is completed, that we have one to two days to

21   decide what rebuttal case we want to put on and further

22   investigate the alibi and prepare our closing arguments.

23        I think there absolutely has to be a remedy.  And

24   we've, as I mentioned in chambers, we have spent our Easter

25   weekend doing our best to investigate this 11th-hour alibi

```
 1   defense, in addition to new witnesses that were noticed on
 2   Friday of last week.
 3          So we are moving to exclude it, but we are moving, in
 4   the alternative, for that remedy of one to two days after the
 5   defense case rests, I suppose, to determine what, if any,
 6   rebuttal case we want to put on.
 7          THE COURT:  Okay.  Thank you.  Appreciate it,
 8   Ms. Hoffman.
 9          Ms. Whalen.
10          MS. WHALEN:  Your Honor, just a couple of points.
11          I think I tried to set out factually where the defense
12   was in this scenario, and it's not a scenario that we certainly
13   wanted to be in.
14          But to suggest somehow that Mr. Bailey knew exactly
15   where he was and that this is an eleventh-hour tactic I think
16   just ignores the fact that perhaps people do not know where
17   they are.
18          And the question is not whether Mr. Bailey knew,
19   because that assumes he did, and we're talking years later --
20   later.  The question is when counsel learned of what the
21   witness could say.
22          To suggest that there is a violation of the rule of
23   sequestration, I am not even sure how to respond to that except
24   for to say I have certainly worked with this investigator for
25   several years now, and I have absolutely no doubt that he did
```

1    not, nor would he have been able to, explain what was going on

2    specifically in the courtroom with witnesses to attempt to tell

3    Mr. Temple what he should say or shouldn't say.

4           And so I reject that out of hand, that that did not

5    occur.

6           As Your Honor knows, I have had extremely limited

7    contact with Mr. Temple because he's been moved from place to

8    place, and my attempts to meet with him have been foiled except

9    for very few minutes this morning.

10          **THE COURT:**  What were the efforts to meet with

11   Mr. Temple prior to trial?  I am having some difficulty

12   understanding -- I mean, apparently Mr. Temple was identified

13   as a potential witness before trial having to do with the

14   events of February 12th.

15          I do think that it's a fairly significant, I mean,

16   evening.  It's not unreasonable to think that your client might

17   remember where he was but that, in any event, you were aware of

18   Mr. Temple, something to do with Mr. Temple possibly being a

19   witness before trial, yet did not disclose this information

20   until the last day.

21          **MS. WHALEN:**  The only time -- or the last day, being

22   last -- I guess it was last Thursday that I e-mailed the

23   Government the specifics.  There had been attempts to meet with

24   Mr. Temple by my investigator prior to that.  He did meet with

25   him on one occasion.

```
 1              But we did not have specific information from him.  It
 2   wasn't contrary information, but we didn't have specific
 3   information.
 4              We knew from the Government's case -- so, in other
 5   words, I did not have what I turned over, which is that he, in
 6   fact, was with my client at some point and that he was driving
 7   around.
 8              That location already, I would suggest, was known to
 9   the Government, because they had my client and his cell phone
10   in the area of where my client, according to Mr. Temple, was,
11   his home, which is up north of Druid Park near
12   Cold Spring Lane.
13              The cell phone was pinging off of that particular
14   area.
15              And then the --
16         THE COURT:  But I thought during the crucial period,
17   it didn't ping.  I mean, that's the whole point.
18         MS. WHALEN:  No.  But what -- that's true.
19              But then they have the GPS track marks in the area
20   where I believe that Mr. Temple would say they were driving
21   around.
22              So that kind of information -- of course, he doesn't
23   know what -- that there are GPS track points or anything, to my
24   knowledge.  But that was the specific information that we
25   learned from him, that they were driving around.  They went
```

```
 1   from the house, and they were driving around.

 2          The crucial time is somewhere between 12:00 and

 3   1 o'clock in the morning, and that's what we expect him to

 4   testify that my client actually dropped him off at some point

 5   and then he doesn't know where he went.

 6          THE COURT:  Maybe it would be helpful to get a little

 7   more specific proffer, then, of what exactly you think

 8   Mr. Temple's going to testify to about the timing.

 9          Can you tell me that?

10          MS. WHALEN:  I expect that he will testify that at

11   some point after he was working in that evening, he was with my

12   client.  They were doing video games.  I believe it was at a

13   location that he lived in, which is the address I gave the

14   Government, which is near that Cold Spring Lane address.

15          That at some point they went out and were driving

16   around.  I think he will say they were driving around looking

17   for marijuana.  They were in the West Lanvale area.

18          And from there Mr. Bailey dropped him off, and he

19   presumes that he went home.

20          THE COURT:  Driving around the West Lanvale area and

21   then Mr. Bailey --

22          MS. WHALEN:  Dropped him -- dropped Mr. Temple off.  I

23   believe he will say he dropped him off at his mother's house,

24   which I think is on Lauretta.  And then Mr. Bailey left from

25   there.  But I have not been able to firm up the -- which house
```

1    he dropped him off at.

2              **THE COURT:**  Okay.  Sounds a bit unclear.

3              **MS. HOFFMAN:**  So, yeah.  I mean, Your Honor, now we're

4    getting two new locations that we have not heard about until

5    this very moment, the West Lanvale area and mother's house on

6    Lauretta.

7              The location that we were given on Thursday was

8    2409 Loyola Northway.

9              This is -- I mean, this is exactly what Rule 12.1 is

10   supposed to avoid, is this ever-evolving alibi defense tailored

11   to the Government's evidence.

12             We have literally no -- I mean, this is the very first

13   time just now that we've heard about these two locations.  We

14   have no way to investigate those.  We have no way to adequately

15   cross-examine Mr. Temple about whether he was at these

16   locations for these purposes.

17             The alibi notice that we got on Thursday was very

18   specific.  It said that Mr. Temple dropped Bailey off at

19   2409 Loyola Northway at 1:00 a.m., which is precisely the time

20   when James Edwards was killed or he was -- the first 9-1-1 call

21   came in at 12:59 a.m.

22             So -- and now we're getting something a little bit

23   different.

24             And I think the lack of clarity only strengthens our

25   position here that this is what Rule 12.1 is intended to avoid

 1   and that this should be excluded.  There's too grave a risk of

 2   perjured testimony and the jury being swayed by it.

 3        **THE COURT:**  Okay.  Did we get the stipulation, by

 4   chance?

 5             **MR. HAZLEHURST:**  Yes, Your Honor.

 6             I need to get it signed by the Government.

 7        **THE COURT:**  Okay.  I'm going to propose that we bring

 8   the jury back in for the stipulation.

 9             I'll, once again, apologize to them, send them back

10   out.  We'll take a recess and still need to find out whether

11   this is going to be a live issue with Mr. Temple, but I'm going

12   to reflect on what counsel have argued.

13             Ah, well, let's see.  I see Mr. Simms.

14             Can you come up to the bench, Mr. Simms.

15        (Sealed ex parte bench conference on the record under

16   separate cover.)

17        **THE COURT:**  All right.  And I will ask Mr. Simms to

18   correct if I say anything differently from what he just told me

19   at the bench.

20             Mr. Simms was appointed by the Court to represent

21   Mr. Temple, who had requested counsel.

22             Mr. Simms has now had the opportunity to speak with

23   Mr. Temple for approximately an hour and a quarter about his

24   rights, about his current situation.

25             It is my understanding from Mr. Simms that if

```
 1    Mr. Temple were called to testify, he would assert his
 2    Fifth Amendment privilege.
 3            Is that correct, Mr. Simms?
 4            MR. SIMMS:  Yes.  Yes, Your Honor.
 5            THE COURT:  Yes.
 6            Anything further on this issue?
 7            MS. WHALEN:  No, Your Honor.
 8            THE COURT:  Okay.  Thank you very much, Mr. Simms.
 9    Appreciate your service to the Court.
10            We'll get the jury and do the stipulation.
11            Yes, Ms. Hoffman?
12            MS. HOFFMAN:  With that decided, if Your Honor would
13    like to try to fill up more time today and if the defense is
14    ready to rest, I think we would be able to get a rebuttal
15    witness here in an hour.  He would be brief, but it would take
16    him an hour to drive here.  Just wanted to throw it out there.
17            THE COURT:  Okay.  And who would that be?
18            MS. HOFFMAN:  That would be Shawn Potts, and he would
19    just be testifying to rebut -- in rebuttal to some of the
20    stipulations and evidence and testimony that was put in by
21    Ms. Amato about Corloyd Anderson's financial documents.
22            THE COURT:  And he would otherwise testify tomorrow
23    morning?  Because you're saying it would take an hour.
24            MS. HOFFMAN:  Yes.  He would be available tomorrow.  I
25    just was offering it as an option in case we want to fill the
```

 1    day today and take a recess tomorrow.

 2            **THE COURT:**  That is a good point.  I do not want to

 3    bring the jury in for five or ten minutes of testimony.

 4            All right.  We have the one stipulation.  We can take

 5    a recess.  I can ask the jury.

 6            Do you think he could be here in an hour?

 7            **MS. HOFFMAN:**  I think he could, yes.  And I think his

 8    direct would be 10, 10 to 15 minutes, quick.

 9            **THE COURT:**  Okay.  So in that case we'd get to a point

10    where we could not have the trial tomorrow.  I may talk to

11    counsel about instructions and so forth.  But then all the

12    evidence would be in, and we could do -- start instructions and

13    argument on Wednesday.

14            **MS. HOFFMAN:**  That's right, Your Honor.

15            **THE COURT:**  Okay.  Is that acceptable to everyone?

16        (No response.)

17            **THE COURT:**  All right.  Then we'll bring the jury in

18    briefly on the stipulation, get that on the record, and the

19    defense can rest.

20        (Jury entered the courtroom at 2:55 p.m.)

21            **THE COURT:**  All right.  Thank you very much, ladies

22    and gentlemen.

23            I know this has been a little bit on and off for you,

24    but I appreciate your patience.

25            Mr. Hazlehurst, I believe you have something you wish

```
 1    to present.

 2              MR. HAZLEHURST:  Yes, Your Honor.

 3              Your Honor, the parties have reached a stipulation in

 4    regard to Mr. Davis which I would like to read into the record,

 5    if I may.

 6              THE COURT:  Certainly.

 7              MR. HAZLEHURST:  [Reading]:  The parties agree and

 8    stipulate that Shakeen Davis has no tattoos on his body of any

 9    kind, and it has been signed by all parties.

10              And I would ask it be entered as an exhibit,

11    Your Honor.

12              THE COURT:  Thank you.  We'll admit that as an

13    exhibit.

14              MR. HAZLEHURST:  Your Honor, with that, Mr. Davis

15    rests his case.

16              THE COURT:  Mr. Davis rests.  All right.  Thank you.

17              Let me see if there is anything additional on behalf

18    of Mr. Bailey.

19              MR. ENZINNA:  Your Honor, on behalf of Mr. Bailey, the

20    defense rests.

21              THE COURT:  All right.  Thank you.

22              Mr. Sardelli?

23              MR. SARDELLI:  On behalf of Mr. Banks, the defense

24    rests, Your Honor.

25              THE COURT:  Mr. Trainor.
```

1          **MR. TRAINOR:**  Your Honor, on behalf of Mr. Lockley,

2  the defense rests.

3          Thank you.

4          **THE COURT:**  Thank you.

5          **MS. AMATO:**  And, Your Honor, on behalf of

6  Mr. Anderson, the defense rests.

7          **THE COURT:**  All right.  Thank you, all.

8          Ladies and gentlemen, the defense has rested.

9          It is my understanding that the Government seeks to

10 call one rebuttal witness.  The Government is in the process of

11 trying to obtain that witness so that they can testify today so

12 that the evidence will all be concluded today.

13         If things go as we hope, we would then not ask you to

14 come in tomorrow.  We will rather be able to deal with things

15 without making you wait on legal issues tomorrow and then be

16 ready to have instructions and argument on Wednesday.  That is

17 my plan.  That is my hope.  I'm crossing my fingers.

18         So, again, appreciating your patience, we're going to

19 take a further recess and see if there's going to be a rebuttal

20 witness a bit later in the afternoon.

21         Okay.  Thank you very much.  You're excused again.

22      (Jury left the courtroom at 2:58 p.m.)

23         **THE COURT:**  We'll excuse the gallery.

24         Why don't we say we'll resume at 4:00.  If it turns

25 out that your witness is here more quickly and we can get back

 1    in court before that, you'll let us know.

 2         **MS. HOFFMAN:**  We'll let you know, yes.

 3         **THE COURT:**  Okay.  Otherwise, we'll recess until

 4    4 o'clock.

 5         Thank you.

 6      (Recess taken.)

 7         **THE COURT:**  All right.  So I understand there is an

 8    objection to the rebuttal.  I've gotten the e-mail.

 9         Let me start with the casino records.  Could I see

10    what it was that was admitted and the stipulation.

11         **MS. AMATO:**  Yes.

12         **MS. HOFFMAN:**  I don't actually know -- I think

13    Ms. Amato has copies of the stipulation.

14         **MS. AMATO:**  Actually, the Court has all the

15    stipulations.

16         **THE COURT:**  I think Ms. Moyé is about to -- I'll need

17    both of them, the casino records and the business records.

18         **MS. AMATO:**  They're Exhibits 15, 16, and 17, I

19    believe.

20         **THE COURT:**  Okay.  Regarding the casino records, what

21    I have is just a stipulation, no actual documents.  It is

22    Defendant's Exhibit 15, and it indicates three dates on which

23    Mr. Anderson won certain sums of money.

24         What would -- are copies of those documents already in

25    evidence?

1        **MS. AMATO:**  I -- yes.  So the Government had

2   introduced as casino -- CAS-1, they introduced the W-2G forms

3   that Maryland Live! sent to the IRS as to the 70,000 win and

4   the two 1,420 wins.

5        So my only concern and why I wanted the stipulation

6   was because Officer Schmidt seemed to question the reliability

7   of those documents.

8        He made a statement about that two of the documents

9   had the exact same number for the same date, the same winning.

10  And so he seemed to think that -- it kind of put the suggestion

11  that these documents were actually fraudulently made.

12       And so to meet that and respond to that -- because, in

13  fact, Mr. Anderson had won that money and it's just the way the

14  casino prepares their W-2 sixes [sic], depending on, I guess,

15  which location a person is at.  Even if the wins are exactly

16  the same on the same day, they prepare more than one.

17       And so I wanted to at least be able to meet that and

18  to show the jury that, no, in fact, those documents were

19  legitimate because the Maryland Live! had actually recorded

20  that he had won for those three times, the December 13th and

21  then the August 30th.

22       Then as to the other one, the Government had put on a

23  witness who searched his residence.  And they introduced

24  photographs from the agent, $2,500 in cash that was found in a

25  pocket at Mr. Anderson's residence.

1          And so to meet that, in essence, and respond to that

2     evidence, then, therefore, there's the -- the stipulation that

3     the casino records reflect that, in fact, he had won, two days

4     prior to his arrest, $8,100.  So that's what that was.

5          But, again, I didn't introduce the casino records in

6     full, and I think the Government may have actually introduced

7     this.

8          I'm going through my notes.  I didn't realize, but

9     they had actually introduced some greater amount of casino

10    records than even these, Casino 2, which I think they may have

11    introduced.  I don't know.

12         **MS. HOFFMAN:**  It was listed as an exhibit, but it

13    hasn't -- Casino 2 has not been introduced.

14         **MS. AMATO:**  Okay.  So it's just Casino 1, which has

15    the 70,000 -- the W-2s for the 70,000, the two 1,420s.

16         **THE COURT:**  Correct.

17         **MS. HOFFMAN:**  Right.  So let me start with the casino

18    records.

19         So, of course, Mr. Schmidt testified that somewhere

20    over -- I can't remember if he said 70,000 or 80,000.  I think

21    maybe he said 80,000 in cash was seized from Corloyd Anderson

22    or for someone who said he had -- was moving the money on

23    behalf of Corloyd Anderson at BWI Airport.

24         And I think what Mr. Schmidt testified to was not

25    necessarily that the documents were fraudulent, but that he

1  couldn't be sure that that's where the money actually came

2  from.  Simply having, you know, W-2Gs from -- reflecting a

3  payout from a casino doesn't mean that the money in front of

4  you is from the casino.  And it doesn't give you the full

5  picture of earnings versus losses at the casino.

6       And so when Ms. Amato proposed the stipulation this

7  morning, what I said to her was, you know, We may call

8  Shawn Potts in rebuttal to testify about this because the full

9  casino records that we have show actually overall losses.  So

10  he's gambling, you know, close to $200,000 at the casino in one

11  year and losing some significant portion of that.

12       And so his claim that, oh, well these winnings are --

13  you know, this cash that was seized was legitimate because he

14  won it at the casino is, I think, belied by the overall picture

15  that the records present, that he's actually losing money at

16  the casino.

17       **THE COURT:**  I mean, that's a very different analysis.

18  You're talking about over a year or a few years, which is very

19  different from verifying reports that are already in evidence

20  as to the 70,000, the two 4,000 -- you know, 1,420 transactions

21  and also, regardless of his overall winning or losing, that he

22  won 8,000 in cash two days before the search.

23       **MS. HOFFMAN:**  I don't actually think it's a different

24  analysis.  I think it's a misleading picture to paint that

25  he's -- you know, he's this really successful gambler; he's

```
 1    winning money at the casinos; the cash that you're seeing is
 2    coming from the casinos.
 3              It doesn't explain -- and I think the jury needs to
 4    see the whole picture, and this is why I explained to
 5    Ms. Amato, Well, then we would want to call him to testify
 6    about this.
 7              I mean, we wouldn't have agreed to that stipulation if
 8    we had known that there was going to be this objection.  I do
 9    think the jury needs the whole picture because it doesn't
10    explain why he -- it doesn't explain where the cash comes from.
11              And if he's losing money overall at the casinos, then
12    it doesn't explain where all this cash is coming from.  There's
13    unexplained money being funneled through the casinos.
14         THE COURT:  Is there something that would show that he
15    did not take away $8,000 in cash on September 25th of 2016, for
16    example?
17         MS. HOFFMAN:  So I think that he did take that away in
18    cash on that day but that he may very well have lost the same
19    amount even on that same day.  I mean, it doesn't -- the
20    casinos --
21         THE COURT:  Do you have that?  Is that part of what --
22    Mr. Potts, is it? -- would --
23         MS. HOFFMAN:  The casinos are required -- my
24    understanding is that the casinos are required to give you this
25    W-2G form whenever there's a payout, and it's not net of
```

 1   losses.

 2        And so then the onus is on the actual gambler, the

 3   player, to prove to the IRS that -- if they don't want to pay

 4   taxes on that, they then have to prove to the IRS that their

 5   losses were equal or greater than their winnings in order to

 6   not have to pay taxes on that.

 7        So you get the W-2G whenever there's a payout even if

 8   you lost even more money than that on the same day.

 9        **MS. AMATO:**  Your Honor, first of all, the Government

10   did not answer the Court's question as to whether or not they

11   have any evidence that he lost that amount or greater on that

12   same day, number one.

13        And I don't believe that he did lose that amount.  I

14   think that was the last -- I'll just have to look through my

15   records.

16        But the other point is the Government with their

17   witness, Officer Schmidt, he also testified that the 70,000 --

18   and they can argue this at closing -- that he received was in

19   different amounts.  It was in 20s and -- I don't know.  He said

20   different amounts.

21        And so they can argue that, well -- I mean, they can

22   argue that even though he won the 70,000, it doesn't mean that

23   the 80,000 that came to the airport was the amount that he won.

24        **THE COURT:**  Of course.  Of course.

25        **MS. AMATO:**  And they can do that based on his argue --

1    saying that what he saw were these different denominations that

2    came in, et cetera.

3              I didn't get into all of the wins and the losses.  I

4    mean, there's many more wins.  I didn't get into all the wins

5    that he made each year --

6              **THE COURT:**  Right.

7              **MS. AMATO:**  -- of the $135,000 that he took home in

8    2013, of the -- you know, et cetera.

9              So I was very isolated, and I did it specifically to

10   respond to things that came up during the direct examination.

11             **THE COURT:**  Okay.  Unless you have a dispute about the

12   accuracy -- I mean, I'm not -- we're not going to wait so that

13   somebody from Maryland Live! can come in and certify to those

14   particular records.  I think this is a much narrower focus than

15   the overall wins and losses that you're proposing.

16             Again, three of them just confirm documents that I

17   believe the Government put in, and the other one is two days

18   before an arrest.  It may or may not be the $2,500 that was in

19   his pocket, but I think it's at least relevant for Mr. Anderson

20   to be able to put that in.

21             And I do not think that it opens the door to a

22   complete analysis of his wins and losses over the year.

23             **MS. HOFFMAN:**  And I understand Your Honor's ruling.

24   And that was not my intent to ask him a long series of

25   questions.

1          It would simply be:  Did you review the certified

2    records?

3          Which Ms. Amato is very familiar with which do show

4    that, for instance, he gambled $183,000 at Maryland Live! in

5    2013 and came away with 135,000.

6          I do think that's relevant.  I do think that's

7    important information for the jury to have, given the defense

8    that this cash that we're seeing is attributable solely to his

9    gambling winnings.

10        **THE COURT:**  Okay.  Well, you have your objection.  I

11   think that this evidence is much more narrow and focused than

12   that.

13         And so I don't think it's proper rebuttal testimony as

14   to the casino records.

15         Let me move on to the business records.  There's a

16   search warrant.  There are photographs.  And then there are a

17   collection of documents, customer service agreement and receipt

18   books.  I mean, I couldn't tell as they were coming in what

19   period they covered or what they added up to or anything like

20   that.

21         What would your witness say in regard to the business

22   records, Ms. Hoffman?

23         **MS. HOFFMAN:**  The witness would say that he tallied

24   them all up and that they reflected 10,000-some-odd dollars in

25   receipts for car washes.

1          And the witness would also testify -- and I had an

2     e-mail exchange with Ms. Amato about this last week.  She

3     proposed these particular stipulations.

4          And I said that -- I asked [reading]:  Would you enter

5     it as part of your case such that we could call a rebuttal

6     witness to testify about the documents if we decide it requires

7     rebuttal?

8          Ms. Amato said [reading]:  Yes.  I would enter it in

9     part of my case.

10         I said [reading]:  In that case, we are okay with the

11    stipulations.

12         And then we explained that we would call Shawn Potts

13    to testify about the tally of the receipts as well as the fact

14    that he looked at certified tax records for Mr. Anderson and

15    that he filed no taxes in the years 2011 to 2016, which

16    together with the casino records showing how much he was

17    gambling would, I think, be significant evidence for the jury

18    to hear.

19         **MS. AMATO:**  Your Honor, my client is not charged with

20    tax evasion.  That's certainly what all of this would show,

21    that he didn't pay taxes on the casino wins nor on his

22    earnings.

23         The jury can themselves look at the books, and they

24    can get a sense of what he was making.  I mean, there's -- he

25    was charging $10, $15.  It wasn't a very expensive car wash.

```
 1            So I don't believe that the Government needs to call a

 2    witness to give a tally of what the jury has.  They can look at

 3    the numbers.  They can add them up.  Or they can just get a

 4    sense themselves.

 5            THE COURT:  Well, on that, I mean, no.  The jury

 6    should not have to sit there and add up the receipts.

 7            The first part of what the Government proposes, if

 8    these records are in, then I think it's perfectly fair and

 9    helpful to the jury for someone to say, Well, I've added these

10    up.  And it covers this period of time, and it is this amount

11    of money.

12            I would not get into failure to file tax returns.  I

13    don't think we need to introduce that separate issue at this

14    point, but if you want someone to testify to what period of

15    time this covered and what it adds up to --

16            MS. HOFFMAN:  Your Honor, I mean, I think we made it

17    very clear to Ms. Amato that we would not have agreed to these

18    stipulations if not for the ability to call this rebuttal

19    witness to testify to exactly what we told her he would be

20    testifying to, including the tax records and the casino records

21    and the financial documents.

22            THE COURT:  Can I see your e-mail.

23            MS. HOFFMAN:  (Handing.)

24            THE COURT:  Did we get a response from Ms. Amato after

25    the April 19th e-mail?
```

1    **MS. HOFFMAN:**  I don't believe so.  I didn't find one.

2    And so obviously -- I had communicated that in that case, we

3    would enter the stipulations.  And then the casino stipulation

4    was proposed in person after that e-mail exchange.

5         And this morning I discussed it with Ms. Amato and

6    told her before I signed it I would then call Shawn Potts to

7    testify about this.

8         And I also think -- I mean, the fact that the tally of

9    receipts -- or the receipt books have put in, have been put

10   into evidence, also makes the casino records relevant in

11   rebuttal.

12        He's got only $10,000 of explained income in these

13   receipts, and yet he's gambling close to $200,000 at the

14   casino.  That's unexplained wealth.

15        And Ms. Amato is going to stand up in closing and say,

16   You saw that he was making this money from his car wash.

17        And I think we do need to be able to rebut that.

18        **THE COURT:**  Well, apparently she's going to be able to

19   stand up and say he made $10,000, which is not much.

20        But --

21        **MS. AMATO:**  No.  And, Your Honor, I mean, when this

22   morning I provided them with the casino stipulation, the only

23   thing that I was told -- and that was in regards to all of the

24   stipulations.  It wasn't specific to the stipulation -- the

25   casino, was that they were going to call this other witness.

1          She didn't get into all the explanation here she did

2     today as to what she intended to call that witness as in

3     regards to the casino.

4          So it was just -- I understand from the previous

5     e-mail, but -- in terms of the tax issue and then the business,

6     but there was no discussion about the casino records and how it

7     was going to be used today.

8          **THE COURT:**  But did you respond to -- on the business

9     records where they said that the witness would testify

10    regarding the tax returns, that there weren't any?

11         **MS. AMATO:**  I don't recall, Your Honor.  But, I mean,

12    I'm not disputing that -- I mean -- but I just don't think at

13    this point in this trial -- I mean, regardless of whatever

14    income he made, I mean, if he made income from casinos, he

15    didn't pay for it, if he made income from his business, he

16    didn't pay.

17         I mean, it's just -- it would give them a nice

18    tax-evasion case; that's for sure.

19         **THE COURT:**  What period of time do these records

20    cover?  And what's he going to say --

21         **MS. AMATO:**  And the business records only are 2016,

22    and they're only from --

23         **THE COURT:**  Oh, they're only 2016?

24         **MS. AMATO:**  Right.  They're only 2016.  And they only

25    cover from April, I believe -- Court's indulgence --

1          **MS. HOFFMAN:**  I just -- I mean, I don't think you can

2     put the toothpaste back in the tube like that.  I mean, we --

3          **MS. AMATO:**  They're from April the 14th through

4     September the 26th of 2016.  That's all these records from his

5     business cover.  That's the period.  That's all I put in.

6     That's all we -- you know, that's it.

7          **MS. HOFFMAN:**  I think, you know, we planned our case

8     in a particular way based on what we believed Ms. Amato was

9     agreeing to.

10         I do think that it's relevant.

11         I think that -- frankly, I think the casino records

12    are an important piece of it.  I mean, I think that all three

13    of those things combined is what indicates that there's

14    unexplained income here.

15         **THE COURT:**  But you didn't introduce this in your

16    case-in-chief.  You didn't make an unexplained wealth part of

17    your case-in-chief; right?  I mean --

18         **MS. HOFFMAN:**  We did with the cash seizure at the

19    airport.

20         And then Ms. Amato said in her defense case that, oh,

21    well here's certified casino records showing that he won money

22    that day.

23         **THE COURT:**  But didn't that also come in in the

24    Government's case, the W-2 equivalent?

25         **MS. HOFFMAN:**  Yeah.  Not the certified casino records;

 1    just the fact that Corloyd Anderson showed up at the

 2    BWI Airport with these W-2Gs.

 3            **MS. AMATO:**  And that's why --

 4            **THE COURT:**  Okay.  With the W-2Gs.  And what she's

 5    offering now are records that will support the accuracy of the

 6    W-2Gs.  I'm not revisiting the casino issue.  I think in

 7    terms -- I do have -- there does seem to have been notice,

 8    Ms. Amato, that in regard to this stipulation, they would want

 9    to get into testimony about the tax returns.

10            Now, it seems to me it's only one year.  But if you --

11            **MS. HOFFMAN:**  Well, Your Honor, the defendant was

12    incarcerated -- I mean --

13            **THE COURT:**  Well, that would be another reason he

14    wasn't filing tax returns.

15            **MS. HOFFMAN:**  Right.  In 2016.  I mean, I think that

16    the 2015 tax records would be -- well, I guess --

17            **THE COURT:**  These records -- there are various

18    periods -- and I don't recall what they are, so there are

19    various times when Mr. Anderson may have been incarcerated.

20    These particular records just relate to a certain amount of

21    time in 2016; right?

22            **MS. HOFFMAN:**  The -- is Your Honor referring to the

23    financial documents?

24            **THE COURT:**  The car wash records.  I'm on the business

25    records.

1          **MS. HOFFMAN:**  The car wash documents cover a period

2  just in 20 -- just in 2016.

3          **THE COURT:**  Okay.  Ms. Amato, are you willing to have

4  testimony that for 2016, your client did not file a tax return

5  for this business with an instruction that he's not -- you

6  know, failing to file tax returns is nothing that he is charged

7  with.  Or do you want to just stick with the casino records?

8          And then I guess we have the pictures, which is a

9  separate issue.  Is there going to be any specific rebuttal in

10  regard to the pictures?

11          **MS. HOFFMAN:**  Well, he would just testify that he was

12  there for the search warrant and that there were no cars in the

13  car bays.  There was maybe one or two cars in the entire lot,

14  but nothing being serviced or washed.

15          **THE COURT:**  Okay.  All right.

16          **MS. AMATO:**  I mean, the thing is, my client was locked

17  up in 20 -- as we all know, from September 27th to the present.

18  And so for his 2016, he would have been required to pay his

19  taxes in 2017; and he was locked up.

20          And so for as much as that's a reason or excuse as to

21  why he didn't, I mean, it's out there.  So I think it's just --

22  I don't know where the Government's going to go with that, but

23  I think it's prejudicial for them to bring in that he -- I

24  mean, it's --

25          **THE COURT:**  Would you like to withdraw the business

 1    records and just go with the photographs?

 2            **MS. AMATO:**  Court's indulgence.

 3         (The defendant conferred with counsel.)

 4            **MS. AMATO:**  All right, Your Honor, I have spoken with

 5    Mr. Anderson, and we will withdraw that particular -- the

 6    stipulation with the receipts, the records of the receipts.  I

 7    believe that was Exhibit --

 8            **THE COURT:**  That is Exhibit 17.

 9            **MS. AMATO:**  -- 17.  Okay.

10            **THE COURT:**  And so I will instruct the jury that those

11    have been withdrawn and they won't have them at the time and

12    they should just disregard them.

13            As to the -- we'll proceed with the casino records.  I

14    don't know if there's anything else that Mr. Potts was going to

15    testify to regarding the casino records, the specific --

16            **MS. HOFFMAN:**  I think Your Honor is referring to the

17    financial records.  The casino records are not coming in;

18    right?

19            **MS. AMATO:**  That's right.  I mean -- well, no.  What

20    are we -- my stipulation is --

21            **THE COURT:**  I'm trying to state something.  I'm sorry.

22            On the casino records, my ruling was that her

23    stipulation relating to the four total winnings at various

24    times offered in Defendant's Exhibit 15 did not open the door

25    to an analysis of his overall winnings and losings at the

```
1    casino.
2          I was simply asking, to avoid any surprise, was there
3    any other rebuttal testimony on the casino records that
4    Mr. Potts would be offered for or would you just not mention
5    the casino records?
6          MS. HOFFMAN:  I would like to be able to ask him
7    what -- whether the reporting requirements at casinos -- what a
8    W-2G is, what that means.
9          And he's a CPA.  He would explain -- he has some
10   knowledge about this.  He would explain that those winnings are
11   not profits.  They're just a reflection of the payout on a
12   given day and that then the onus is on the gambler to --
13         MS. AMATO:  I'm sorry.  That still goes to, again, the
14   issue of taxes and did he pay.
15         THE COURT:  Well, no, that's not -- there's not going
16   to be any testimony about whether he paid taxes on any casino
17   money, but the records are not W-2s; right?  The records are a
18   report of specific winnings on specific days.  What would he
19   say about that?
20         MS. HOFFMAN:  Nothing.  I think Your Honor ruled that
21   those are not coming in, and so we wouldn't ask --
22         THE COURT:  What's not coming in?
23         MS. HOFFMAN:  I'm sorry.  Maybe I'm completely
24   confused.  I thought Your Honor ruled that the casino records,
25   the certified casino records, would not be coming in through
```

 1    Mr. Potts because --

 2              **THE COURT:**  Right, not through -- no.  You are right.

 3    Right.  The stipulation's coming in, no additional casino

 4    records.

 5              Okay.  Now we understand.

 6              **MS. HOFFMAN:**  I think so.  He would just -- I would

 7    like to ask him, if Your Honor permits it, simply what a W-2G

 8    is.  What does that mean?  Is it profits or is it just

 9    winnings?

10              **THE COURT:**  That it's winnings on a particular day.

11              **MS. HOFFMAN:**  Yes.

12              **THE COURT:**  Okay.

13              **MS. AMATO:**  I guess the question is:  How would this

14    particular witness be in the right position to answer that

15    question?

16              **THE COURT:**  Is he an employee of

17    Maryland Live! Casino?

18              **MS. HOFFMAN:**  No, he's not.  He's a CPA who has some

19    knowledge about financial records.

20              **THE COURT:**  All right.  Then I will sustain the

21    objection.  We are talking about records of regularly conducted

22    business activity of Maryland Live! Casino.  This is in

23    response to the W-2, whatever they are, forms that were

24    introduced by the Government and in response to the fact that

25    Mr. Anderson had $2,500 in cash on September 25th of 2016.

1           So that's where the casino stuff stands.

2           **MS. AMATO:**  So, Your Honor, at this point I'd like to

3    know what the Government intends to bring the rebuttal witness

4    for.

5           **THE COURT:**  As I understand it, the photographs are

6    still in evidence.  And they would call him simply to testify

7    that at the time on the day he was there and these photographs

8    were taken, there was very little business going on.  A car or

9    two; right?

10          **MS. HOFFMAN:**  I think, Your Honor -- and I apologize,

11   but, I mean, given Your Honor's rulings that the casino records

12   aren't coming in -- the financial stipulation has now been

13   withdrawn, so he's not going to be testifying about a tally.

14          I mean, I think we've just had him drive here for

15   nothing.  I don't think there's any point in calling him if he

16   can't testify about the tax records, the casino records, or the

17   financial documents.

18          I do wish that we had known this before we signed the

19   stipulations and had them read to the jury.

20          **THE COURT:**  Yes, I agree.  I apologize.  I mean, I'm

21   not apologizing.  I'm sorry that there was not better

22   communication between counsel.

23          But at this point I'm bringing the jury back in simply

24   to tell them that the business records -- the records of --

25   documents, business records seized at We Cater to You Motors on

```
 1   September 27th have been withdrawn and should not be considered
 2   for any purpose.  And in light of that, the evidence is closed,
 3   done, nothing else.
 4          Okay.  All right.  Let's get the jury.
 5      (Jury entered the courtroom at 4:33 p.m.)
 6      THE COURT:  Okay, ladies and gentlemen.  I've been in
 7   conversations.
 8          Where we are now is the following.  There was a
 9   stipulation and a copy of certain documents introduced,
10   documents seized from a business called We Cater to You Motors.
11   That stipulation and those documents are being withdrawn.  They
12   are not evidence, may not be considered by you as evidence.
13   They have been withdrawn.
14          The other stipulations remain.
15          And with that, I believe that would conclude -- I
16   believe we have already -- the defense evidence.
17      MS. AMATO:  Yes, Your Honor.
18      THE COURT:  And my understanding in light of that, the
19   withdrawal, is that the Government will not be calling a
20   rebuttal witness; correct?
21      MS. HOFFMAN:  That's correct.
22      THE COURT:  Okay.  So the evidence is done.
23          Keep an open mind.  You haven't heard the
24   instructions.  You haven't heard the arguments.
25          As I did indicate before, I appreciate your patience.
```

```
 1    By waiting to see exactly what happened today, it means that we

 2    will not ask you to come in tomorrow.  We will spend the day

 3    tomorrow making sure that we have all these instructions and

 4    verdict sheets and so forth ready for you.

 5            So I do still expect you're getting the case, as I

 6    said, this week.  I think it will begin Wednesday that you will

 7    have instructions and argument.

 8            There are a number of folks involved.  There are a

 9    number of issues.  You've been here for a number of weeks.  So

10    it may take some time for all the instructions and argument to

11    be done.

12            I need to sort of go over that precisely with counsel,

13    but it would not surprise me if it carried over into Thursday

14    before you actually began to deliberate.

15            But you will have the case.

16            All right.  Anything else, counsel, that I should say

17    at this moment before I excuse the jury?

18        MS. WHALEN:  No, Your Honor.

19        MR. ENZINNA:  No, Your Honor.

20        MS. HOFFMAN:  No.

21        THE COURT:  Okay.  All right.  Same instructions.

22    Keep an open mind.  Leave your notes here.

23            Thank you very much.  Don't do any research.

24            Please come back at 10 o'clock on Wednesday.

25            Thank you.
```

1          (Jury excused at 4:35 p.m.)

2          **THE COURT:**  All right.  Counsel, you've given me

3     various instructions and so forth to look at.

4          I will try to put together an additional draft.

5          I'm going to propose that perhaps we meet in chambers

6     at 3 o'clock tomorrow, if that would work, to discuss the

7     issues that have been raised about the instructions and about

8     the verdict sheet.  And by that time, perhaps I'll have another

9     draft.

10         Any other issues?

11         **MS. HOFFMAN:**  Just that we noticed in going through

12    the instructions again, Instruction No. 55, I believe, which is

13    on Page 83, there's mistakenly included a fourth element of the

14    VICAR murder, which is that there was a conspiracy to commit

15    murder.

16         That was an error.  It was a copy-and-paste job for an

17    instruction for a conspiracy, and so I think that fourth

18    element should be removed.

19         **THE COURT:**  Sure.  And I'm sorry.  What page did you

20    say it was on?

21         **MS. HOFFMAN:**  I believe it was Page 83.  Did I get

22    that wrong?

23         **THE COURT:**  Or instruction number --

24         **MS. HOFFMAN:**  Instruction No. 55.

25         **THE COURT:**  Okay.  Fourth element.

 1            **MS. HOFFMAN:**  Or sorry -- yeah.  Ms. Perry has pointed

 2    out we don't need to remove it.  We need to change if from

 3    "conspired to commit" to "committed the alleged murder."  And

 4    that was my mistake copying and pasting from another

 5    instruction.

 6            **THE COURT:**  Okay.  "Committed" instead of "conspired."

 7            All right.  Anybody else?

 8        (No response.)

 9            **THE COURT:**  Okay.  Subject to anything else coming up

10    tomorrow, I'll see everybody in chambers at 3 o'clock --

11    lawyers, that is.

12            Okay.  I'm about to say the gallery is excused.  Is

13    there something else?

14            Ms. Moyé is keeping track of me.

15            And the gallery is excused.

16        (Pause.)

17            **THE COURT:**  All right.  Again, we're finished for

18    today.  And I'll see counsel at 3:00 in chambers and everybody

19    else 10 o'clock on Wednesday morning.

20            Thank you.

21        (Court adjourned at 4:39 p.m.)

22

23

24

25

INDEX - DEFENDANT BAILEY'S EVIDENCE

| WITNESS | DR | CR | RDR | RCR |
| --- | --- | --- | --- | --- |
| MICHAEL McGEE | 32 | 37 | -- | -- |
| SA TIMOTHY MOORE | 39 | 47, 50 | -- | -- |
| JOYCE STAPLES | 76 | 78 | -- | -- |
| MICHAEL McGEE | 80 | 82 | -- | -- |

INDEX - DEFENDANT ANDERSON'S EVIDENCE

| WITNESS | DR | CR | RDR | RCR |
| --- | --- | --- | --- | --- |
| BOBBY LEE DAVIS | 56 | 63, 66 | -- | -- |

I, Douglas J. Zweizig, RDR, CRR, do hereby certify that

the foregoing is a correct transcript from the stenographic

record of proceedings in the above-entitled matter.

_____/s/_____

Douglas J. Zweizig, RDR, CRR, FCRR
Registered Diplomate Reporter
Certified Realtime Reporter
Federal Official Court Reporter
DATE:  November 20, 2019

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
          Plaintiff,              )
 4                                )
          vs.                     ) CRIMINAL CASE NO. CCB-16-0267
 5                                )
     DANTE BAILEY, et al.,        )
 6        Defendants.             )
     _____ )
 7

 8

                      Wednesday, April 24, 2019
 9                        Courtroom 1A
                       Baltimore, Maryland
10

11         BEFORE:   THE HONORABLE CATHERINE C. BLAKE, JUDGE
                        (AND A JURY)
12

13                        VOLUME XIX

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Assistant United States Attorneys

17   For the Defendant Dante Bailey:

18   Paul Enzinna, Esquire
     Teresa Whalen, Esquire
19
     _____
20

21

22
                         Reported by:
23
                   Douglas J. Zweizig, RDR, CRR, FCRR
24                  Federal Official Court Reporter
                   101 W. Lombard Street, 4th Floor
25                     Baltimore, Maryland  21201
```

```
 1    For the Defendant Randy Banks:

 2    Brian Sardelli, Esquire

 3
      For the Defendant Corloyd Anderson:
 4
      Elita Amato, Esquire
 5

 6    For the Defendant Jamal Lockley:

 7    Harry Trainor, Esquire

 8
      For the Defendant Shakeen Davis:
 9
      Paul Hazlehurst, Esquire
10

11    Also Present:

12    Special Agent Christian Aanonsen, ATF

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2        (9:41 a.m.)

 3            THE COURT:  Good morning, everyone.

 4            All right.  First thing, I have -- somebody wants to

 5   come up and -- Mr. Trainor.

 6            MR. TRAINOR:  I'll be happy to come up.  I've been

 7   waiting for that.

 8            THE COURT:  This is a paper copy of what I believe to

 9   be pretty much the final set of instructions.

10            MS. HOFFMAN:  And, Your Honor, related to that, I have

11   the copies for you of the individual counts of the indictment.

12            THE COURT:  Oh, yes.  All right.  Thank you.

13            (Handing.)

14            Just the relevant ones; yes?  Yes.

15            MS. HOFFMAN:  That's right.  16.  Okay.

16            THE COURT:  All right.  A couple things.

17            There are a few changes from what we sent out last

18   night.  Mostly typographical.  And I discovered one where there

19   was a reference to Count 3 instead of 32, and I don't think

20   anything of substance.

21            I did change the -- I am leaving in the witness

22   retaliation.  Upon reading what everybody submitted, I changed.

23   So it is -- the instruction is now in two sentences instead of

24   three, as the Government suggested.

25            And I have, I believe, the final version of the
```

```
 1    instructions ready to put on the monitor and show the jury.

 2            I also looked at the requests regarding the schedule.

 3    It's admirable, Ms. Whalen, but I think extremely optimistic,

 4    starting with we never start on time.

 5            So, on the other hand, your alternative request, if

 6    you would like to have the argument on behalf of Mr. Bailey

 7    reserved, if that's the way this is going to go and we need to

 8    have a defense argument and Government rebuttal on Monday and

 9    you'd like that to be the one on behalf of Mr. Bailey, I would

10    be happy to accommodate that.  And I assume other counsel can

11    accommodate that as well.

12            Have you talked?

13            MS. WHALEN:  May we confer?

14            THE COURT:  Or was this a surprise to other counsel?

15            MS. WHALEN:  Well, I tried to make sure that everyone

16    knew.

17            MR. HAZLEHURST:  Your Honor, on behalf of Mr. Davis,

18    Mr. Davis does prefer to go last.  And I think that's in his

19    best interests.  So, again, I apologize for what may seem like

20    a lack of collegiality, but I do think that is his prerogative

21    and would be in his best interest.

22            THE COURT:  Well, it's not a prerogative, but I

23    understand what you're saying.

24            MR. SARDELLI:  And similarly, Your Honor, I mean, I've

25    made plans to go second in this case, Your Honor.  I would
```

```
 1    prefer to keep the second slot as well, Your Honor.  I
 2    planned -- I'm not going to give away my strategy or tactics,
 3    Your Honor, but I do think it's in Mr. Banks' best interest to
 4    maintain the second slot.  That's what I had planned for,
 5    Your Honor.
 6              MR. TRAINOR:  Mr. Lockley's position is that he'd like
 7    to go in the order in the indictment.
 8              MR. ENZINNA:  Your Honor, if the Government's going to
 9    do their rebuttal on Monday, I would prefer to close on Monday.
10              THE COURT:  Okay.  Well, we'll just see how it all
11    goes.
12              I'm going to start by instructing the jury, so why
13    don't we have them come in.
14              MR. ENZINNA:  Your Honor, one more thing.  Just to put
15    on the record, now that all the evidence is --
16              THE COURT:  I'm sorry.  I can't hear you.
17              MR. ENZINNA:  I'm sorry.
18              Now that the evidence is all done, I just want to
19    renew our Rule 29 motion.
20              THE COURT:  Sure.  Everybody's motion is renewed.
21              MR. ENZINNA:  Thank you.
22              THE COURT:  And everybody's motion is denied.
23              MR. SARDELLI:  And there's one more issue, Your Honor.
24    They have only had one copy of the PowerPoint that the
25    Government is going to present for closing, and I requested an
```

```
 1    additional copy of the PowerPoint just so I can have a copy.

 2            THE COURT:  I don't know if there is another copy.

 3            MS. HOFFMAN:  Unfortunately, we only have -- it's a

 4    lengthy PowerPoint.  It's all just exhibits and some text about

 5    the law, but it's about 200 slides.  We were only able to print

 6    out one color copy of everything.  But we have, I think, passed

 7    it out to the defense counsel to look through.

 8            I don't think there have been any objections to

 9    anything in it.

10            I did -- related to that, though, we haven't been

11    given anything from the defendants about their closings.  And

12    if they are going to use any sort of demonstratives,

13    PowerPoints, we would like to see those in advance.

14            THE COURT:  Got any PowerPoints?

15            MS. AMATO:  I don't have a PowerPoint.  I do have

16    demonstrative evidence.

17            THE COURT:  I would certainly think these should be --

18            MS. HOFFMAN:  Even exhibits, if they're going to be

19    put up on the screen, we'd like to see them in advance just to

20    make sure that it's what's come into evidence.

21            THE COURT:  Sure.  But in the meantime, let's get the

22    jury in.

23            DEFENDANT LOCKLEY:  Your Honor, I need to say

24    something.

25            THE COURT:  Not right now.
```

```
 1            (Pause.)

 2            THE COURT:  I gather we're still waiting for one

 3     juror; is that right?

 4            Ms. Moyé, we're still waiting?

 5            THE CLERK:  Yes.

 6            (Pause.)

 7       (Jury entered the courtroom at 9:59 a.m.)

 8            THE COURT:  All right.  Good morning, everyone.

 9            JUROR:  Good morning.

10            JUROR:  Good morning.

11            THE COURT:  Let me tell you where we are in terms of

12     scheduling.

13            As you know, the evidence is all in, so the next stage

14     is my instructions to you on the law and then arguments by

15     counsel.

16            One thing I had not anticipated or recalled that

17     affects the schedule slightly, we're here all day today.  I

18     only have the courtroom -- I can only have the courtroom for a

19     half a day tomorrow, the morning, because there is -- as I've

20     told you, this is our only kind of ceremonial courtroom.  And

21     there is an investiture in here Thursday afternoon at

22     4 o'clock, and they need time to move tables and put in chairs

23     and so forth.

24            So with that, it may be -- so we'll have all of today.

25     We'll have half of Thursday.  But then we'll be bringing you
```

1   back -- it will probably be Monday before it is actually

2   finished in terms of the argument, instructions, and you begin

3   to deliberate.

4           So I wanted to tell you that.

5           What we are going to do to begin with is I am going to

6   read you some fairly lengthy jury instructions.

7           I don't know if this will be helpful or not; but in

8   addition to your listening to them, I am going to have them up

9   on the screen as we go, sort of a page at a time.  For anyone

10  who prefers to follow along on the screen while I'm reading

11  them, you can do that.

12          You will also have several copies, as many as you

13  want, in the jury room when you deliberate.  So this is not the

14  only time that you can look at these instructions.

15          They are somewhat complicated, but I am confident you

16  have the ability to listen and make sense of them.  And, again,

17  as I said, you'll have written copies of them.  And I expect

18  that counsel may mention some of the arguments of law as well

19  as we're going through this.

20          The instructions are approximately in the 50-page

21  range.

22          The first 15-ish deal generally with things that might

23  apply in any criminal case, and then I move into discussion of

24  conspiracy and the other specific charges that I mentioned to

25  you way back at the beginning.  We did go through them briefly.

```
1              So that's just to give you an idea of what's coming

2    here.

3              I expect maybe about halfway through, I might just

4    take a pause and everybody can just stand up and stretch.  So

5    that's where we are.

6              And with that, let me go ahead and start and start

7    with thank you.  Thank you for your patience and attention

8    throughout this case.  I shall now instruct you as to the law

9    applicable to the case before you.

10             Please keep in mind that you will be provided a copy

11   of these instructions for your use during your deliberations.

12             Let me explain our respective roles, which are quite

13   different.  It is my duty as judge to instruct you as to the

14   law that applies to this case.  It is your duty to decide the

15   facts and, in deciding these facts, to comply with the rules of

16   law and apply them as I state them to you without regard to

17   what you think the law is or should be.

18             On these legal matters, you are required to follow the

19   law exactly as I give it to you.  If any attorney has stated or

20   states a legal principle different from any that I state to you

21   in my instructions, it is my instructions that you must follow.

22             You should not single out any instruction as alone

23   stating the law, but you should consider my instructions as a

24   whole when you retire to deliberate in the jury room.

25             None of you should be concerned about the wisdom of
```

1    any rule that I state.  Regardless of any opinion that you may

2    have as to what the law may be -- or ought to be -- it would

3    violate your sworn duty to base a verdict upon any other view

4    of the law than that which I give you.

5           Your duty is to pass upon and decide the factual

6    issues that are in the case.  You, the members of the jury, are

7    the sole and exclusive judges of the facts.  You pass upon the

8    weight of the evidence; you determine the credibility of the

9    witnesses; you resolve such conflicts as there may be in the

10   testimony; and you draw whatever reasonable inferences you

11   decide to draw from the facts as you have determined them.  If

12   any expression of mine or anything I may or may not have done

13   or said would seem to indicate any opinion relating to any

14   factual matters, I instruct you to disregard it.

15          You are to perform the duty of finding the facts

16   without bias or prejudice as to any party.  You are to perform

17   your final duty in an attitude of complete fairness and

18   impartiality.

19          This case is important to the Government, for the

20   enforcement of criminal laws is a matter of prime concern to

21   the community.  Equally, it is important to the defendants, who

22   are charged with serious crimes.  The fact that the prosecution

23   is brought in the name of the United States of America entitles

24   the Government to no greater consideration than that accorded

25   to any other party to a case in litigation.

1          By the same token, the Government is entitled to no

2     less consideration.  All parties, whether Government or

3     individuals, stand as equals at the bar of justice.

4          It would be improper for you to consider, in reaching

5     your decision as to whether the Government sustained its burden

6     of proof, any personal feelings you may have about the

7     defendants' race, religion, national or ethnic origin, sex, or

8     age.  All persons are entitled to the presumption of innocence,

9     and the Government has the burden of proof, as I will discuss

10    in a moment.

11         It would be equally improper for you to allow any

12    feelings you might have about the nature of the crimes charged

13    to interfere with your decision-making process.

14         Under your oath as jurors, it would be improper for

15    you to be swayed by sympathy.  You are to be guided solely by

16    the evidence in this case.  And the crucial question you must

17    ask yourselves, as you sift through the evidence, is:  Has the

18    Government proven the guilt of the defendants beyond a

19    reasonable doubt?  It is for you alone to decide whether the

20    Government has proven that the defendants are guilty of the

21    crimes charged solely on the basis of the evidence and subject

22    to the law as I instruct you.

23         If you let fear or prejudice or bias or sympathy

24    interfere with your thinking, there is a risk that you will not

25    arrive at a true and just verdict.

1          If you have a reasonable doubt as to the defendants'

2    guilt, you should not hesitate for any reason to find a verdict

3    of not guilty.

4          But, on the other hand, if you should find that the

5    Government has met its burden of proving the defendants' guilt

6    beyond a reasonable doubt, you should not hesitate because of

7    sympathy or any other reason to render a verdict of guilty.

8          The statements, objections, and arguments of counsel

9    are not evidence and should not be considered by you as

10   evidence.  The evidence in this case consists of the sworn

11   testimony of the witnesses, the exhibits received in evidence,

12   and any stipulations.

13         Exhibits that were marked for identification but not

14   received -- that means not admitted -- may not be considered by

15   you as evidence.  Only those exhibits received may be

16   considered as evidence.  And the admitted exhibits will be

17   available for your review.

18         You are to disregard any testimony when I have ordered

19   it to be stricken.  Only the witnesses' answers are evidence.

20   You are not to consider a question as evidence.

21         A stipulation is an agreement among the parties that a

22   certain fact is true.  You should regard such agreed facts as

23   true.

24         Anything you may have seen or heard outside the

25   courtroom, including any newspaper or media publicity of any

1   kind, is not evidence and must be entirely disregarded.  You

2   must limit the information you get about the case to what came

3   to you in the courtroom through the Rules of Evidence.

4         At times, a lawyer, on cross-examination, may have

5   incorporated into a question a statement that assumed certain

6   facts to be true and asked the witness if the statement was

7   true.

8         Now, that would apply to direct examination as well.

9   If the witness denies the truth of a statement, and if there is

10   no evidence in the record proving that the assumed fact is

11   true, then you may not consider the fact to be true simply

12   because it was contained in the lawyer's question.  In short,

13   questions are not evidence; answers are.

14         It is the duty of the attorney for each side of a case

15   to object when the other side offers testimony or other

16   evidence that the attorney believes is not properly admissible.

17   The attorneys also have the right and duty to ask me to make

18   rulings of law and to request conferences at the bench out of

19   the hearing of the jury.  All those questions of law must be

20   decided by me.  You should not show any prejudice against an

21   attorney or his or her client because the attorney objected to

22   the admissibility of evidence or asked for a conference out of

23   the hearing of the jury or asked the Court for a ruling on the

24   law.

25         The Government has presented exhibits in the form of

1    charts and summaries.  I decided to admit these charts and

2    summaries in place of, or in addition to, the underlying

3    documents that they represent in order to save time and avoid

4    unnecessary inconvenience.  The charts and summaries are no

5    better than the testimony or the documents upon which they are

6    based and are not themselves independent evidence.  So while

7    you are entitled to consider them, you are to give no greater

8    consideration to those charts or summaries than you would give

9    to the evidence upon which they are based.

10           It is for you to decide whether the charts, schedules,

11   or summaries correctly present the information contained in the

12   testimony and in the exhibits on which they were based.  You

13   are entitled to consider the charts, schedules, and summaries

14   if you find that they are of assistance to you in analyzing the

15   evidence and understanding the evidence.

16           Although the defendants have been indicted, you must

17   remember that an indictment is only an accusation to which the

18   defendant has pleaded not guilty.  The indictment itself is not

19   evidence.

20           As a result of the defendants' plea of not guilty, the

21   burden is on the prosecution to prove guilt beyond a reasonable

22   doubt.  This burden never shifts to the defendants for the

23   simple reason that the law never imposes upon a defendant in a

24   criminal case the burden or duty of calling any witness or

25   producing any evidence.

1      The law presumes the defendants to be innocent of the

2  charges against them.  I, therefore, instruct you the

3  defendants are presumed by you to be innocent throughout your

4  deliberations until such time, if ever, you as a jury are

5  satisfied that the Government has proven them guilty beyond a

6  reasonable doubt.

7      The defendants begin the trial here with a clean slate

8  and began it and it still applies.  This presumption of

9  innocence alone is sufficient to acquit a defendant unless you

10  as jurors are unanimously convinced beyond a reasonable doubt

11  of his guilt after a careful and impartial consideration of all

12  of the evidence in this case.  If the Government fails to

13  sustain its burden, you must find the defendants not guilty.

14      This presumption was with the defendants when the

15  trial began.  It remains with them even now as I speak to you,

16  and will continue with them into your deliberations unless and

17  until you are convinced that the Government has proven the

18  defendants' guilt beyond a reasonable doubt.

19      You are about to be asked to decide whether or not the

20  Government has proven beyond a reasonable doubt the guilt of

21  each defendant before you.  You are not being asked whether any

22  other person has been proven guilty.

23      Some of the other co-defendants were not on trial, and

24  you are not being asked to reach verdicts as to those other

25  co-defendants.  You are not to be concerned with the

1    co-defendants, nor are you to speculate about the reasons why

2    they are not part of this trial.

3         Any co-defendants' absence from this trial should not

4    affect or influence your verdict with respect to these

5    defendants now before you.

6         Your verdict should be based solely upon the evidence

7    or lack of evidence as to each defendant before you, in

8    accordance with my instructions, and without regard to whether

9    the guilt of other people has or has not been proven.

10        You may not draw any inference, favorable or

11   unfavorable, towards the Government or the defendants from the

12   fact that certain persons were not named as defendants in the

13   indictment.  The fact that these persons were not indicted must

14   play no part in your deliberations.  Therefore, you may not

15   consider it in any way in reaching your verdict as to the

16   defendants on trial.

17        Now, there are two types of evidence that you may

18   properly use in deciding whether a defendant is guilty or not

19   guilty.

20        One type of evidence is called direct evidence.

21   Direct evidence is where a witness testifies to what he saw,

22   heard, or observed.  In other words, when a witness testifies

23   about what is known to him of his own knowledge by virtue of

24   his own senses -- what he sees, feels, touches, or hears --

25   that is called direct evidence.

1          Circumstantial evidence is evidence that tends to

2    prove a disputed fact by proof of other facts.  Let me give you

3    a simple example of circumstantial evidence:

4          Assume that when you came into the courthouse this

5    morning, the sun was shining and it was a nice day.  Assume

6    that the courtroom blinds were drawn and you could not look

7    outside.

8          As you were sitting here, someone walked in with an

9    umbrella that was dripping wet.  Somebody else then walked in

10   with a raincoat that also was dripping wet.

11          Now, you cannot look outside of the courtroom.  You

12   cannot see whether or not it is raining.  So you have no direct

13   evidence of that fact.

14          But on the combination of facts that I have asked you

15   to assume, it would be reasonable and logical for you to

16   conclude that it had been raining.

17          That is all there is to circumstantial evidence.  You

18   infer on the basis of reason and experience and common sense

19   from an established fact the existence or the nonexistence of

20   some other fact.

21          Circumstantial evidence is of no less value than

22   direct evidence, for it is a general rule that the law makes no

23   distinction between direct and circumstantial evidence, but

24   simply requires that before convicting a defendant, the jury

25   must be satisfied of the defendant's guilt beyond a reasonable

1   doubt from all of the evidence in the case.

2        During the trial, you may have heard the attorneys use

3   the term "inference."  I've used it in these instructions.  And

4   in their arguments they may ask you to infer, on the basis of

5   your reason, experience, and common sense, from one or more

6   established facts, the existence of some other fact.

7        An inference is not a suspicion or a guess.  It's a

8   reasoned, logical decision to conclude that a disputed fact

9   exists on the basis of another fact that you know exists.

10        There are times when different inferences may be drawn

11   from facts, whether proved by direct or circumstantial

12   evidence.  The Government asks you to draw one set of

13   inferences, while the defense asks you to draw another.  It is

14   for you, and you alone, to decide what inferences you will

15   draw.

16        The process of drawing inferences from facts in

17   evidence is not a matter of guesswork or speculation.  An

18   inference is a deduction or conclusion that you, the jury, are

19   permitted to draw -- but are not required to draw -- from the

20   facts that have been established by either direct or

21   circumstantial evidence.  In drawing inferences, you should

22   exercise your common sense.

23        So while you are considering the evidence presented to

24   you, you are permitted to draw, from the facts that you find to

25   be proven, such reasonable inferences as would be justified in

1    light of your experience.

2            Here again, let me remind you that whether based upon

3    direct or circumstantial evidence, or upon the logical,

4    reasonable inferences drawn from such evidence, you must be

5    satisfied of the guilt of the defendant beyond a reasonable

6    doubt before you may convict him.

7            Now, because you, the jurors, are the sole judges of

8    the facts, you are also the sole judges of the credibility of

9    the witnesses.  And it is up to you to decide what weight, if

10   any, should be given to a witness's testimony.  You are not

11   required to believe any witness, even if his or her testimony

12   is uncontradicted.

13           In deciding whether or not to believe a witness, you

14   should carefully scrutinize all of the testimony of each

15   witness, the circumstances under which each witness testified,

16   and any other matter in evidence that may help you to decide

17   the truth and the importance of each witness's testimony.

18           You should consider a witness's demeanor and manner of

19   testifying on the stand.  Was the witness candid, frank, and

20   forthright?  Or did the witness seem as if he or she was hiding

21   something, being evasive or suspect in some way?

22           How did the way the witness testified on direct

23   examination compare with the way the witness testified on

24   cross-examination?

25           Was the witness consistent in his or her testimony, or

1    did he or she contradict himself or herself?

2         Did the witness appear to know what he or she was

3    talking about?  And did the witness strike you as someone who

4    was trying to report his or her knowledge accurately?

5         You should also consider whether a witness may have

6    been biased.  Does the witness have a relationship with the

7    Government or the defendant that may affect how he or she

8    testified?

9         Does the witness have some incentive, loyalty, or

10   motive that might cause him or her to shade the truth?  Or does

11   the witness have some bias, prejudice, or hostility that may

12   have caused the witness -- consciously or not -- to give you

13   something other than a completely accurate account of the facts

14   he or she testified to?

15        In evaluating credibility of the witnesses, you should

16   take into account any evidence that the witness who testified

17   may benefit in some way from the outcome of the case.  Such an

18   interest in the outcome creates a motive to testify falsely and

19   may sway the witness to testify in a way that advances his own

20   interests.

21        Therefore, if you find that any witness whose

22   testimony you are considering may have an interest in the

23   outcome of this trial, then you should bear that factor in mind

24   when evaluating the credibility of his or her testimony and

25   accept it with great care.

1          This is not to suggest that every witness who has an

2    interest in the outcome of the case will testify falsely.  It's

3    for you to decide to what extent, if at all, the witness's

4    interest has affected or colored his or her testimony.

5          Another consideration is the witness's opportunity to

6    observe the matters about which he or she has testified, as

7    well as the witness's ability to express him or herself.

8          Now, inconsistencies or discrepancies in the testimony

9    of a witness, or between the testimony of different witnesses,

10   may or may not cause you to discredit such testimony.

11         Two or more persons witnessing an incident or a

12   transaction may see or hear it differently.  An innocent

13   misrecollection, like a failure of recollection, is not an

14   uncommon experience.

15         In weighing the effect of a discrepancy, always ask

16   yourself whether it pertains to a matter of importance or an

17   unimportant detail, and whether the discrepancy results from an

18   innocent error or intentional falsehood.

19         You have heard the testimony of law enforcement

20   officials.  The fact that a witness may be employed by the

21   federal government or a state or local Government as a

22   law enforcement officer -- official does not mean that his or

23   her testimony is necessarily deserving of more or less

24   consideration or greater or lesser weight than that of an

25   ordinary witness.

1          It is your decision, after reviewing all the evidence,

2     whether to accept the testimony of a law enforcement witness

3     and to give that testimony whatever weight, if any, you find it

4     deserves.

5          After you have considered all the factors bearing on

6     the credibility of a witness that I've mentioned to you, you

7     may decide to accept all of the testimony of a particular

8     witness, none of the testimony of a particular witness, or part

9     of the testimony of a particular witness.

10         In other words, what you must try to do in deciding

11    credibility is size up a person in light of his or her

12    demeanor, the explanations given, and in light of all the other

13    evidence in the case, just as you would in any important matter

14    where you're trying to decide if a person is truthful,

15    straightforward, and accurate in his or her recollection.  In

16    deciding the question of credibility, remember that you should

17    use your common sense, your good judgment, and your experience.

18         You have heard testimony from Government witnesses who

19    pled guilty to charges arising out of the same facts as this

20    case.  You are instructed that you are to draw no conclusions

21    or inferences of any kind about the guilt of the defendants on

22    trial from the fact that any prosecution witness pled guilty to

23    similar charges.  That witness's decision to plead guilty was a

24    personal decision about his own guilt.  It may not be used in

25    any way as evidence against or unfavorable to the defendants on

1    trial here.

2          You have heard witnesses who testified that they were

3    actually involved in planning and carrying out the crimes

4    charged in the indictment.  These witnesses pled guilty after

5    entering into agreements with the Government to testify.

6          The Government is permitted to enter into this kind of

7    plea agreement.  There may be a great deal said about these

8    so-called accomplice witnesses in the arguments of counsel and

9    whether or not you should believe them.

10          The Government argues, may argue, as it is permitted

11    to do, that it must take the witnesses as it finds them.  It

12    argues that only people who themselves take part in criminal

13    activity have the knowledge required to show criminal behavior

14    by others.

15          For those very reasons, the law allows the use of

16    accomplice testimony.  Indeed, it is the law in federal courts

17    that the testimony of accomplices may be enough in itself for

18    conviction, if the jury finds that the testimony establishes

19    guilt beyond a reasonable doubt.

20          However, it is also the case that accomplice -- or

21    sometimes called cooperator -- testimony is of such nature that

22    it must be scrutinized with great care and viewed with

23    particular caution when you decide how much of that testimony

24    to believe.

25          I have given you some general considerations on

1    credibility.  I won't repeat those all here.  Nor will I repeat

2    or try to anticipate all of the arguments made on both sides.

3    However, let me say a few things that you may want to consider

4    during your deliberations on the subject of accomplices.

5            You should ask yourselves whether these so-called

6    accomplices or cooperators would benefit more by lying or by

7    telling the truth.  Was their testimony made up in any way

8    because they believed or hoped that they would somehow receive

9    favorable treatment by testifying falsely?  Or did they believe

10   that their interests would be best served by testifying

11   truthfully?

12           If you believe the witness was motivated by hopes of

13   personal gain, was the motivation one that would cause him to

14   lie, or was it one that would cause him to tell the truth?  Did

15   this motivation color his testimony?

16           You should bear in mind that a witness who has entered

17   into a plea agreement that requires the witness to testify has

18   an interest in the case different from any ordinary witness.  A

19   witness who realizes that he may be able to obtain his own

20   freedom or receive a lighter sentence by giving testimony

21   favorable to the prosecution has a motive to testify falsely.

22   Therefore, you must examine his testimony with caution and

23   weigh it with great care.

24           If, after scrutinizing his testimony, you decide to

25   accept it, you may give it whatever weight, if any, you find it

1    deserves.

2              In sum, you should look at all of the evidence in

3    deciding what credence and what weight, if any, you will want

4    to give to the testimony of accomplice witnesses.

5              You have heard evidence that a witness made a

6    statement on an earlier occasion that counsel may argue is

7    inconsistent with the witness's trial testimony.  Evidence of

8    the prior inconsistent statement was placed before you for the

9    limited purpose of helping you decide whether to believe the

10   trial testimony of the witness.  If you find that the witness

11   made an earlier statement that conflicts with his or her trial

12   testimony, you may consider that fact in deciding how much of

13   his or her trial testimony, if any, to believe.

14             In making this determination, you may consider whether

15   the witness purposely made a false statement or whether it was

16   an innocent mistake; whether the inconsistency concerns an

17   important fact or whether it had to do with a small detail;

18   whether the witness had an explanation for the inconsistency;

19   and whether that explanation appealed to your common sense.

20             It is exclusively your duty, based upon all of the

21   evidence and your own good judgment, to determine whether the

22   prior statement was inconsistent; and if so, how much, if any,

23   weight to be given to the inconsistent statement in determining

24   whether to believe all or part of the witness's testimony.

25             There has been evidence introduced at trial that the

1    Government called as a witness a person who was using drugs

2    when the events he observed took place or who is now using

3    drugs.  I instruct you that there is nothing improper about

4    calling such a witness to testify about events within his

5    personal knowledge.

6           On the other hand, his testimony must be examined with

7    greater scrutiny than the testimony of any other witness.  The

8    testimony of a witness who was using drugs at the time of the

9    events he is testifying about, or who is using drugs at the

10   time of his testimony, may be less believable because of the

11   effects the drugs may have on his ability to perceive or relate

12   the events in question.

13          If you decide to accept the testimony, after

14   considering it in light of all the evidence in the case, then

15   you may give it whatever weight, if any, you find it deserves.

16          The Government has offered evidence in the form of

17   recordings of telephone calls and conversations with the

18   defendants.  These recordings were made without the knowledge

19   of the defendants, but with court authorization, or with the

20   consent and agreement of one of the other parties to the

21   conversations.

22          The use of these procedures to gather evidence is

23   perfectly lawful, and the Government is entitled to use the

24   recordings in this case.

25          The Government also was permitted to hand out typed

1  documents which it prepared containing the Government's

2  interpretation of what appears on the recordings that have been

3  received as evidence.  These documents were given to you as an

4  aid or guide to assist you in listening to the recordings.

5  However, they are not, in and of themselves, evidence.

6  Therefore, when the recordings were played, I advised you to

7  listen very carefully to the recordings themselves.  You alone

8  should make your own interpretation of what appears on the

9  recordings based on what you heard.  If you think you heard

10 something differently from what appeared on the transcript,

11 then what you heard is controlling.

12        Let me say again, you, the jury, are the sole judges

13 of the facts.

14        The defendants did not testify in this case.  Under

15 our Constitution, a defendant has no obligation to testify or

16 to present any other evidence, because it is the prosecution's

17 burden to prove a defendant guilty beyond a reasonable doubt.

18 That burden remains with the prosecution throughout the entire

19 trial and never shifts to the defendant.  A defendant is never

20 required to prove that he is innocent.

21        You may not attach any significance to the fact that a

22 defendant did not testify.  No adverse inference against the

23 defendant may be drawn by you because he did not take the

24 witness stand.  You simply may not consider this against the

25 defendant in any way in your deliberations in the jury room.

1         There also has been evidence that one or more of the

2    defendants made certain statements in which the Government

3    claims they admitted certain facts charged in the indictment.

4    I instruct you that you are to give the statements such weight

5    as you feel they deserve in light of all the evidence.

6         You are cautioned that the evidence of one defendant's

7    statement to the authorities after his arrest about his own

8    conduct may not be considered or discussed by you in any way

9    with respect to any defendant on trial other than the defendant

10   who made the statement.

11        You are also instructed that there is no legal

12   requirement for the Government to use any specific

13   investigative techniques to prove its case.

14        Law enforcement techniques are not your concern.

15        Moreover, the law does not require the prosecution to

16   call as witnesses all persons who may have been present at any

17   time or place involved in the case or who may appear to have

18   some knowledge of the matters at issue in this trial.

19        Nor does the law require the prosecution to produce as

20   exhibits all papers and things that may have been mentioned in

21   the evidence.

22        You have also heard testimony in this case regarding

23   evidence seized by the Government during the execution of

24   search warrants.

25        You are instructed that it is the responsibility of

1   the Court, alone, to determine the validity and legality of

2   those search warrants and other searches.  And the Court has

3   determined that the searches in this case were valid and legal.

4   It's up to you to decide what significance, if any, the

5   evidence seized may have in this case.

6          You've also heard testimony from certain persons who

7   were qualified as expert witnesses.

8          An expert is allowed to express his or her opinion on

9   those matters about which he or she has special knowledge or

10  training.

11         Expert testimony is presented to you on the theory

12  that someone who is experienced in the field can assist you in

13  understanding the evidence or in reaching an independent

14  decision on the facts.

15         In weighing the expert's testimony, you may consider

16  the expert's qualifications, his or her opinions, his or her

17  reasons for testifying, as well as all the other considerations

18  that ordinarily apply when you are deciding whether or not to

19  believe a witness's testimony.

20         You may give the expert testimony whatever weight, if

21  any, you find it deserves in light of all the evidence in this

22  case.

23         You should not, however, accept the witness's

24  testimony merely because he or she is an expert.  Nor should

25  you substitute it for your own reason, judgment, and

 1   common sense.

 2        The determination of the facts in this case rests

 3   solely with you.

 4        We shall next consider the crimes with which the

 5   defendants are charged in the indictment.  And I shall discuss

 6   with you the rules of law that govern whether the crimes

 7   charged have been proven.  Each alleged crime is charged in

 8   what is called a count.

 9        The jury must consider each count against each

10   defendant separately, and the burden is always upon the

11   Government to prove each count beyond a reasonable doubt.

12        In reaching your verdict, bear in mind that guilt is

13   personal and individual.  Your verdict of guilty or not guilty

14   must be based solely upon the evidence about each defendant.

15        The case against each defendant, on each count, stands

16   or falls upon the proof or lack of proof against that defendant

17   alone, and your verdict as to any defendant on any count should

18   not control your decision as to any other defendant or any

19   other count.  No other considerations are proper.

20        While we're on the subject of the indictment, I should

21   draw your attention to the fact that the indictment charges

22   that specific acts occurred on or about certain dates.  The

23   proof need not establish with any certainty the exact date of

24   the specific act charged.  It is sufficient if the evidence in

25   this case establishes that an offense was committed on a date

1    reasonably near the date alleged in the indictment.  The law

2    only requires a substantial similarity between the date alleged

3    in the indictment and the date established by testimony or

4    exhibits.

5         The indictment alleges that the conspiracy, which

6    you'll hear about, began in or about 2011 and continued until

7    the date of the indictment, June 1st of 2017.

8         You need not find that the starting date of a

9    conspiracy coincides with the starting date alleged in the

10   indictment in order to render a guilty verdict.

11        Rather, you may find that the starting date of a

12   conspiracy began anytime in the time window alleged in the

13   indictment.

14        In order to sustain its burden of proof, the

15   Government must prove that the defendants acted knowingly.  A

16   person acts knowingly if he acts intentionally and voluntarily

17   and not because of ignorance, mistake, accident, or

18   carelessness.

19        Whether a defendant acted knowingly may be proven by a

20   defendant's conduct and by all of the facts and circumstances

21   surrounding the case.

22        In order to sustain its burden of proof, the

23   Government also must prove that the defendants acted willfully.

24   "Willfully" means to act with knowledge that one's conduct is

25   unlawful and with the intent to do something the law forbids;

1    that is to say, with the bad purpose to disobey or disregard

2    the law.

3            A defendant's conduct was not "willful" if it was due

4    to negligence, inadvertence, or mistake.

5            The Government also must prove beyond a reasonable

6    doubt that the defendants acted intentionally when they

7    committed the crimes charged in the indictment.

8            Before you can find that a defendant acted

9    intentionally, you must be satisfied beyond a reasonable doubt

10   that he or she acted deliberately and purposefully; that is, a

11   defendant's acts must have been the product of that defendant's

12   conscious objective rather than the product of a mistake or

13   accident.

14           Knowledge, willfulness, and intent involve the state

15   of a person's mind.  State of mind ordinarily may not be proved

16   directly, because there is no way of fathoming or scrutinizing

17   the operations of the human mind.  But you may infer the

18   defendant's state of mind from the surrounding

19   circumstances:  one's words, one's actions, and one's conduct,

20   as of the time of the occurrence of certain events.

21           You may consider it reasonable to draw the inference

22   and find that a person intends the natural and probable

23   consequences of acts knowingly done or knowingly omitted.  As I

24   have said, it's entirely up to you to decide what facts to find

25   from the evidence.

1          Willful intent or guilty knowledge may be inferred

2    from the secretive or irregular manner in which a transaction

3    is carried out.

4          Now, proof of motive is not a necessary element of the

5    crimes with which the defendants are charged.

6          Proof of motive does not establish guilt, nor does a

7    lack of proof of motive establish that a defendant is innocent.

8          If the guilt of a defendant is shown beyond a

9    reasonable doubt, it is immaterial what the motive for the

10    crime may be or when the -- whether any motive be shown, but

11    the presence or absence of motive is a circumstance that you

12    may consider as bearing on the intent of a defendant.

13          Now, in Counts 1 and 2, the defendants are accused of

14    having been members of a conspiracy to violate certain federal

15    laws.

16          All of the defendants are charged in Count 1 and 2.

17          I'm going to start by explaining to you the law on

18    conspiracy, and then I will come back to the specifics of

19    Count 1, which is an alleged RICO conspiracy, and Count 2, an

20    alleged drug conspiracy.

21          A conspiracy is a kind of criminal partnership -- a

22    combination or agreement of two or more persons to join

23    together to accomplish an unlawful purpose.

24          The crime of conspiracy to violate a federal law is an

25    independent offense.  It is separate and distinct from the

1    actual violation of any specific federal laws, which the law

2    refers to as "substantive crimes."

3           Indeed, you may find a defendant guilty of the crime

4    of conspiracy to commit an offense even though the substantive

5    crime that was the object of the conspiracy was not actually

6    committed.

7           In order to satisfy its burden of proof as to Counts 1

8    and 2, the Government must establish, for both counts, each of

9    the following two essential elements beyond a reasonable doubt:

10          First, that two or more persons entered the unlawful

11   agreement charged in the count;

12          And, second, that the defendant in question knowingly

13   and willfully joined the unlawful agreement charged by that

14   count.

15          The first element the Government must prove beyond a

16   reasonable doubt to establish the offense of conspiracy, as I

17   just said, is that two or more persons entered the unlawful

18   agreement charged in the indictment.

19          In order for the Government to satisfy this element,

20   you need not find that the alleged members of the conspiracy

21   met together and entered into any express or formal agreement.

22          Similarly, you need not find that the alleged

23   conspirators stated, in words or in writing, what the scheme

24   was, its object or purpose, or every precise detail of the

25   scheme or the means by which its object or purpose was to be

 1    accomplished.  What the Government must prove is that there was

 2    a mutual understanding, either spoken or unspoken, between two

 3    or more people to cooperate with each other to accomplish an

 4    unlawful act.

 5         You may, of course, find that the existence of an

 6    agreement to disobey or disregard the law has been established

 7    by direct proof.  However, since conspiracy is, by its very

 8    nature, characterized by secrecy, you may also infer its

 9    existence from the circumstances of this case and the conduct

10    of the parties involved.

11         In a very real sense, then, in the context of

12    conspiracy cases, actions often speak louder than words.  In

13    this regard, you may, in determining whether an agreement

14    existed here, consider the actions and statements of all of

15    those you find to be participants as proof that a common design

16    existed on the part of the persons charged to act together to

17    accomplish an unlawful act.

18         The second element the Government must prove beyond a

19    reasonable doubt to establish the offense of conspiracy is that

20    a defendant knowingly, willfully, and voluntarily became a

21    member of the conspiracy.

22         If you are satisfied that the conspiracy charged in

23    the indictment existed, then you must next ask yourselves who

24    the members of that conspiracy were.

25         In deciding whether a particular defendant was, in

 1   fact, a member of the conspiracy, you should consider whether

 2   that defendant knowingly and willfully joined the conspiracy.

 3   Did he or she participate in it with knowledge of its unlawful

 4   purpose and with the specific intention of furthering its

 5   business or objective as an associate or worker?

 6         In that regard, it has been said that in order for a

 7   defendant to be deemed a participant in a conspiracy, he must

 8   have had a stake in the venture or its outcome.

 9         You are instructed that while proof of a financial

10   interest in the outcome of a scheme is not essential, if you

11   find that a defendant had such an interest, then that is a

12   factor you may properly consider in determining whether or not

13   a defendant was a member of the conspiracy charged in the

14   indictment.

15         As I mentioned a moment ago, before a defendant can be

16   found to have been a conspirator, you must first find that he

17   or she knowingly joined in the unlawful agreement or plan.

18         The key question, therefore, is whether a defendant

19   joined the conspiracy with an awareness of at least some of the

20   basic aims and purposes of the unlawful agreement.

21         It is important for you to note that a defendant's

22   participation in the conspiracy must be established by

23   independent evidence of his own acts or statements, as well as

24   those of the other alleged co-conspirators, and the reasonable

25   inferences that may be drawn from them.

1    A defendant's knowledge is a matter of inference from

2  the facts proved.

3    In that connection, I instruct you that to become a

4  member of the conspiracy, a defendant need not have known the

5  identities of each and every other member, nor need he have

6  been apprised of all of her activities.

7    Moreover, a defendant need not have been fully

8  informed as to all of the details or the scope of the

9  conspiracy in order to justify an inference of knowledge on his

10  part.

11    Furthermore, a defendant need not have joined in all

12  of the conspiracy's unlawful objectives.

13    The extent of a defendant's participation has no

14  bearing on the issue of a defendant's guilt.  A conspirator's

15  liability is not measured by the extent or duration of his or

16  her participation.

17    Indeed, each member may perform separate and distinct

18  acts and may perform them at different times.

19    Some conspirators play major roles, while others play

20  minor parts in the scheme.

21    An equal role is not what the law requires.  In fact,

22  even a single act may be sufficient to draw a defendant within

23  the ambit of the conspiracy.

24    I want to caution you, however, that a defendant's

25  mere presence at the scene of the alleged crime does not, by

1    itself, make him or her a member of the conspiracy.

2            Similarly, mere association with one or more members

3    of the conspiracy does not automatically make a defendant a

4    member.

5            A person may know or be friendly with a criminal,

6    without being a criminal himself.

7            Mere similarity of conduct or the fact that they may

8    have assembled together and discussed common aims and interests

9    does not necessarily establish proof of the existence of a

10   conspiracy.

11           I also want to caution you that mere knowledge or

12   acquiescence, without participation in the unlawful plan, is

13   not sufficient.

14           Moreover, the fact that the acts of a defendant,

15   without knowledge, merely happen to further the purposes or

16   objectives of the conspiracy, does not make that defendant a

17   member.  More is required under the law.  What is necessary is

18   that a defendant must have participated with knowledge of at

19   least some of the purposes or objectives of the conspiracy and

20   with the intention of aiding in the accomplishment of those

21   unlawful ends.

22           In sum, a defendant, with an understanding of the

23   unlawful character of the conspiracy, must have intentionally

24   engaged, advised, or assisted in it for the purpose of

25   furthering the illegal undertaking.  He or she thereby becomes

1   a knowing and willing participant in the unlawful agreement --

2   that is to say, a conspirator.

3          You will recall that I have admitted into evidence

4   against the defendants the acts and statements of other persons

5   because the Government charges that these acts and statements

6   were committed by persons who were also confederates or

7   co-conspirators of the defendants on trial.

8          The reason for allowing this evidence to be received

9   against a defendant has to do with the nature of the crime of

10  conspiracy.  A conspiracy is often referred to as a partnership

11  in crime.  Thus, as in other types of partnerships, when people

12  enter into a conspiracy to accomplish an unlawful end, each and

13  every member becomes an agent for the other conspirators in

14  carrying out the conspiracy.

15         Accordingly, the reasonably foreseeable acts,

16  declarations, statements, and omissions of any member of the

17  conspiracy done in furtherance of the common purpose of the

18  conspiracy are deemed under law to be the acts of all of the

19  members, and all of the members are responsible for such acts,

20  declarations, statements, and omissions.

21         If you find beyond a reasonable doubt that a defendant

22  was a member of the conspiracy charged in the indictment, then

23  any reasonably foreseeable acts done or statements made in

24  furtherance of the conspiracy by persons also found by you to

25  have been members of that conspiracy may be considered against

1    that defendant.  This is so even if such acts were done and

2    statements were made in that defendant's absence and without

3    his knowledge.

4         However, before you may consider the statements or

5    acts of a co-conspirator in deciding the issue of a defendant's

6    guilt, you must first determine that the acts and statements

7    were made during the existence and in furtherance of the

8    unlawful scheme.

9         If the acts were done or the statements made by

10   someone whom you do not find to have been a member of the

11   conspiracy or if they were not done or said in furtherance of

12   the conspiracy, then they may be considered by you as evidence

13   only against the member who did or said them.

14        I will now turn to the specific counts in the

15   indictment.

16        Count 1 of the indictment charges the defendants with

17   conspiracy to violate the Racketeer Influenced and Corrupt

18   Organizations Act (RICO).

19        This means that the defendants have been charged with

20   conspiracy to conduct or participate in the affairs of an

21   enterprise through a pattern of racketeering activity.

22        The charging language in Count 1 of the indictment is

23   lengthy.  I am not going to read all of the formal charge to

24   you because of its length.  Instead, I shall point out that the

25   Government alleges that the defendants were members or

1    associates of an organization known as Murdaland Mafia Piru, or

2    MMP.

3              I shall now read the operative language of Count 1:

4              Beginning on a date unknown to the grand jury, but at

5    least prior to 2011, and continuing until on or about the date

6    of this indictment, in the District of Maryland and elsewhere,

7    the defendants, Dante Bailey, a/k/a Gutta, a/k/a Almighty,

8    a/k/a Wolf; Randy Banks, a/k/a Dirt; Jamal Lockley,

9    a/k/a T-Roy, a/k/a Droid; Corloyd Anderson, a/k/a Bo; and

10   Shakeen Davis, a/k/a Creams, each being a person employed by

11   and associated with MMP, an enterprise, which engaged in, and

12   the activities of which affected interstate and foreign

13   commerce, together with each other and with other persons known

14   and unknown to the grand jury, did knowingly, intentionally,

15   and unlawfully combine, conspire, confederate, and agree to

16   violate Section 1962(c) of Title 18, United States Code; that

17   is, to conduct and participate, directly and indirectly, in the

18   conduct of the enterprise's affairs through a pattern of

19   racketeering activity, as defined in Sections 1961(1) and (5)

20   of Title 18, United States Code, which pattern of racketeering

21   activity consisted of:

22             A, multiple acts involving murder, chargeable under

23   Maryland statute and common law.

24             Extortion, chargeable under Maryland statute and

25   common law.

1              Robbery, chargeable under Maryland statute and common

2    law.

3              That was A.

4              B, multiple offenses involving dealing in controlled

5    substances, in violation of -- and these are federal laws --

6    conspiracy to distribute and possess with intent to distribute

7    a controlled substance.

8              Distribution and possession with intent to distribute

9    a controlled substance.

10             And, C, multiple acts indictable under -- these are

11   also federal laws -- witness tampering and witness retaliation.

12             As I said, the defendants are charged with violating

13   Section 1962(d) of Title 18 of the United States Code.  That

14   section reads as follows:

15             It shall be unlawful for any person to conspire to

16   violate any of the provisions of Subsection (a), (b), or (c) of

17   this section.

18             And Subsection (c) that I just referred to provides as

19   follows:

20             It shall be unlawful for any person employed by or

21   associated with any enterprise engaged in, or the activities of

22   which affect, interstate or foreign commerce, to conduct or

23   participate, directly or indirectly, in the conduct of such

24   enterprise's affairs through a pattern of racketeering

25   activity.

1           Now, the word "racketeering" has certain implications

2   in our society.  Use of that term in this statute and in this

3   courtroom should not be regarded as having anything to do with

4   your determination of whether the guilt of these defendants has

5   been proven.  This term is only a word that was used by

6   Congress to describe the statute.

7           In order to prove that the defendants conspired to

8   violate the Racketeer Influenced and Corrupt Organizations Act

9   (RICO), the Government must established beyond a reasonable

10  doubt each of the following elements of the offense:

11          First, that there was an agreement among two or more

12  persons to participate in an enterprise that would affect

13  interstate commerce through a pattern of racketeering activity;

14          Second, that the defendant knowingly and willfully

15  became a member of that agreement;

16          And, third, that the defendant or another member of

17  the conspiracy agreed to commit two racketeering acts, as I

18  will define that term for you.

19          Again, the first element the Government must establish

20  beyond a reasonable doubt is that there was a conspiracy among

21  two or more persons to participate in an enterprise that would

22  affect interstate commerce through a pattern of racketeering

23  activity.

24          As I have already explained, a conspiracy is an

25  agreement among two or more persons to achieve an unlawful

1   object.  To show a conspiratorial agreement, the Government is

2   not required to prove that two or more people entered into a

3   solemn pact, but only that two or more persons explicitly or

4   implicitly came to an understanding to achieve the specified

5   unlawful object, whether or not they were successful.

6        In this case the unlawful act is the formation of an

7   enterprise whose activities would affect interstate commerce

8   through a pattern of racketeering activity.

9        Let me define these terms for you:

10       An enterprise, for the purposes of this case, includes

11  a group of people who have associated together for a common

12  purpose of engaging in a course of conduct over a period of

13  time.

14       This group of people, in addition to having a common

15  purpose, must have an ongoing organization, either formal or

16  informal, and it must have personnel who function as a

17  continuing unit.

18       This group of people does not have to be a legally

19  recognized entity, such as a partnership or corporation.  This

20  group may be organized for a legitimate and lawful purpose or

21  it may be organized for an unlawful purpose.

22       The Government has charged in this indictment that the

23  organization known as Murdaland Mafia Piru, including its

24  leadership, members, and associates, constitutes the

25  enterprise.

1          If you find that this was a group of people

2    characterized by, one, a common purpose; two, an ongoing formal

3    or informal organization; and, three, personnel who functioned

4    as a continuing unit, then you may find that an enterprise

5    existed.

6          If you find that this enterprise existed, you must

7    also determine whether this enterprise continued in an

8    essentially unchanged form during substantially the entire

9    period charged in the indictment.  This does not mean that

10   everyone involved has to be the same, but the core of the

11   enterprise has to be the same throughout.

12         "Interstate commerce" includes the movement of goods,

13   services, money, and individuals between states or between

14   states and the District of Columbia or a U.S. territory or

15   possession or between the United States and a foreign state or

16   nation.

17         As noted above, the Government must prove that the

18   enterprise engaged in interstate commerce or that its

19   activities affected interstate commerce in any way, no matter

20   how minimal.

21         It does not have to prove that the racketeering

22   activity affected interstate commerce, although proof that

23   racketeering acts did affect interstate commerce is sufficient

24   to satisfy this element.  It is not necessary to prove that the

25   acts of any particular defendant affected interstate commerce

1   as long as the acts of the enterprise had such effect.

2          And, finally, the Government is not required to prove

3   that any defendant knew he was affecting interstate commerce.

4          As with the enterprise element, it is not required

5   that the Government prove that the enterprise actually affected

6   interstate commerce as long as it proves beyond a reasonable

7   doubt that if the objective of the conspiracy had been

8   achieved, the enterprise would have affected interstate

9   commerce.

10         A "pattern of racketeering activity," that requires

11  the commission of two racketeering acts within ten years of

12  each other.  The indictment alleges that the following

13  racketeering acts were or were intended to be committed as part

14  of the conspiracy:

15         Again, A, that's multiple acts involving murder,

16  chargeable under specific sections of the Maryland statute and

17  common law.

18         Two, extortion, chargeable under Maryland statute or

19  common law.

20         Three, robbery, chargeable under Maryland statute or

21  common law.

22         Multiple offenses involving dealing in controlled

23  substances.  This is federal law, including conspiracy to

24  distribute and possess with intent to distribute a controlled

25  substance.

1          Distribution and possession with intent to distribute

2     a controlled substance.

3          And multiple acts indictable under other federal

4     laws:  witness tampering and witness retaliation.

5          To prove that the acts constituted a "pattern of

6     racketeering activity," the Government must prove that the acts

7     of racketeering are related to each other and that they pose a

8     threat of continued criminal activity.

9          It is not sufficient for the Government to prove only

10    that a member of the enterprise committed two of the

11    racketeering acts I have just described.  A series of

12    disconnected acts does not constitute a pattern, and a series

13    of disconnected crimes does not constitute a pattern of

14    racketeering activity, nor do they amount to or pose a threat

15    of continued racketeering activity.

16         To prove that the acts of racketeering are related,

17    the Government must prove that the acts had the same or similar

18    purposes, results, participants, victims, or methods of

19    commission, or that they are otherwise interrelated by

20    distinguishing characteristics and are not isolated events.

21         To prove that the racketeering acts pose a threat of

22    continued racketeering activity, the Government must establish

23    that the acts are part of a long-term association that exists

24    for criminal purposes.

25         The second element that the Government must prove

1    beyond a reasonable doubt is that the defendant knowingly and

2    willfully became a member of the conspiracy charged in the

3    indictment.

4         You were already instructed on membership in a

5    conspiracy.  You are also instructed that the RICO Act does not

6    criminalize mere association with an enterprise.  More is

7    required.

8         The Government must establish that the defendant

9    knowingly and intentionally agreed with another person to

10   conduct or participate in the affairs of the enterprise through

11   a pattern of racketeering activity; that is, a defendant must

12   have participated with knowledge of at least some of the

13   purposes or objectives of the RICO conspiracy and with the

14   intention of aiding in the accomplishment of those unlawful

15   ends.

16        The third element the Government must prove beyond a

17   reasonable doubt is that the defendant or another member of the

18   conspiracy agreed to commit two racketeering acts.

19        The focus of this element is on the defendant's

20   agreement to participate in the objective of the enterprise to

21   engage in a pattern of racketeering activity, not on the

22   defendant's agreement to commit the individual criminal acts.

23        So the Government must prove that the defendant

24   participated in some manner in the overall objective of the

25   conspiracy, and that the conspiracy involved, or would have

1    involved, the commission of two racketeering acts.

2         The Government is not required to prove either that

3    the defendant agreed to commit two racketeering acts himself or

4    that he actually committed two such acts, although you may

5    conclude that he agreed to participate in the conduct of the

6    enterprise from proof that he agreed to commit or actually

7    committed such acts.

8         For the purposes of this count, the indictment alleges

9    that the following racketeering acts were or were intended to

10   be committed as part of the conspiracy:

11        It's multiple acts involving murder under state law.

12        Extortion under state law.

13        Robbery under state law.

14        Multiple offenses involving conspiracy to distribute

15   controlled substances under federal law.

16        Distribution and possession with intent to distribute

17   controlled substances, in violation of federal law.

18        And multiple acts indictable under federal law,

19   relating to tampering with a witness, victim, or informant or

20   retaliating against witnesses, victims, or informants.

21        In order for the state offenses -- I'll start with the

22   state offenses -- of murder, extortion, or robbery to be

23   considered as racketeering acts, the Government must prove to

24   you beyond a reasonable doubt that the offenses were or were

25   intended to be committed as part of the conspiracy.

1          So I have to tell you what the elements of those

2    offenses are:

3          First-degree murder is the intentional killing of

4    another person with willfulness, deliberation, and

5    premeditation.

6          The elements of this offense are:

7          One, that the defendant caused the death of the

8    victim;

9          Two, that the killing was willful, deliberate, and

10   premeditated;

11         Three, that the killing was not justified;

12         And, four, that there were no mitigating

13   circumstances.

14         "Willful" means that the defendant actually intended

15   to kill the victim.

16         "Deliberate" means the defendant was conscious of the

17   intent to kill.

18         "Premeditated" means that the defendant thought about

19   the killing and that there was enough time before the killing,

20   though it may only have been brief, for the defendant to

21   consider the decision whether or not to kill and enough time to

22   weigh the reasons for and against the choice.  The premeditated

23   intent to kill must be formed before the killing.

24         Second-degree murder is the killing of another person

25   with either the intent to kill or the intent to inflict such

1  serious bodily harm that death would be the likely result.

2  Second-degree murder does not require premeditation or

3  deliberation.  The elements of this offense are:

4  One, that the defendant caused the death of the

5  victim;

6  And, two, that the defendant engaged in the deadly

7  conduct, either with the intent to kill or with the intent to

8  inflict such serious bodily harm that death would be the likely

9  result.

10  Attempted first-degree murder is a substantial step,

11  beyond mere preparation, toward the commission of murder in the

12  first degree.

13  The elements of this offense are:

14  One, the defendant took a substantial step, beyond

15  mere preparation, toward the commission of murder in the first

16  degree;

17  Two, the defendant had the apparent ability at that

18  time to commit the crime of murder in the first degree;

19  And that the defendant willfully and with

20  premeditation and deliberation intended to kill the victim.

21  Conspiracy to murder.

22  The elements of conspiracy to commit murder are:

23  That the defendant agreed with at least one other

24  person to commit the crime of murder;

25  And, two, that the defendant entered into the

1 agreement with the intent that the crime of murder be

2 committed.

3          Extortion.

4          The elements of extortion are as follows:

5          Number one, the defendant made a verbal threat;

6          Number two, the threat was to physically injure

7 another person;

8          And, three, the defendant made the threat with the

9 intent unlawfully to obtain money, property, labor, services,

10 or anything of value.

11          The threat may be direct or implied.

12          And, finally, on the state law offenses, robbery.

13          Robbery is the taking and carrying away of property

14 from someone else, or from someone's presence and control, by

15 force or threat of force with the intent to deprive the victim

16 of the property.

17          The elements of the offense are:

18          One, the defendant took the property from the victim

19 or the victim's presence and control;

20          Two, the defendant took the property by force or

21 threat of force;

22          And, three, the defendant intended to deprive the

23 victim of the property.

24          "Property" means anything of value.

25          "Deprive" means withhold property of another

1    permanently, for such a period as to appropriate a portion of

2    its value, with the purpose of restoring it, only upon payment

3    of a reward or other commission, or to dispose of the property

4    and use or deal with the property so as to make it unlikely

5    that the owner will recover it.

6          Before I go on to the federal offenses, I am a little

7    bit over halfway done.  Would anyone like to stand up, stretch?

8          Stand up and stretch, please, including Ms. Moyé may

9    stand up and stretch.

10         But not me.

11         Okay.  All right.  As with the state law offenses, in

12   order for the federal offenses of conspiracy to distribute

13   controlled substances, distribution and possession with intent

14   to distribute controlled substances, tampering with witnesses,

15   retaliating against witnesses to be considered -- for them to

16   be considered as racketeering acts, the Government must prove

17   to you beyond a reasonable doubt that the offenses were, or

18   were intended to be, committed as part of the conspiracy.

19         I will explain the elements of a conspiracy to

20   distribute controlled substances when I explain Count 2,

21   because that is Count 2 of the indictment.

22         I'll go on to the other ones.

23         The elements of the other offenses:

24         First of all, the elements of possession with the

25   intent to distribute a controlled substance are as follows:

1        One, that the defendant possessed a controlled

2    substance;

3        Two, the defendant knew he possessed a controlled

4    substance;

5        And, three, the defendant possessed the controlled

6    substance with the intent to distribute it.

7        The first element the Government must prove beyond a

8    reasonable doubt is that the defendant possessed a controlled

9    substance.  To establish this element, the Government must

10   prove that the material the defendant is charged with

11   possessing (or distributing) is, in fact, the charged drug.

12   The Government may prove this through either direct evidence or

13   through circumstantial evidence.

14       An example of direct evidence is the testimony of a

15   chemist who has done a chemical analysis of the material.

16       Circumstantial evidence would be evidence from which

17   you could infer that the material was the charged drug, such as

18   testimony concerning the names used by the defendant to refer

19   to the material or testimony about the material's appearance.

20       Whether the Government relies on direct or

21   circumstantial evidence to prove that the material at issue was

22   the charged drug, it must prove so beyond a reasonable doubt.

23       The legal concept of possession may differ from the

24   everyday usage of the term, so I will explain it in some

25   detail.

1          Actual possession is what most of us think of as

2   possession; that is, having physical custody or control of an

3   object.  For example, if you find that a defendant had drugs on

4   his person, you may find that he had possession of those drugs.

5          However, a person need not have actual physical

6   custody of an object in order to be in legal possession of it.

7          If an individual has the ability to exercise

8   substantial control over an object that he does not have in his

9   physical custody, then he is in possession of that item.

10          An example of this from everyday experience would be a

11   person's possession of items he keeps in the safe deposit box

12   of his bank.  Although the person does not have physical

13   custody of those items, he or she exercises substantial control

14   over them and so has what is known as constructive possession

15   of them.

16          The law also recognizes that possession may be sole or

17   joint.  If one person alone possesses something, that is sole

18   possession.

19          However, it is possible that more than one person may

20   have the power and intention to exercise control over the

21   drugs.  This is called joint possession.  If you find the

22   defendant had such power and intention, then he possessed the

23   drugs under this element even if he possessed the drugs jointly

24   with another person.

25          Now, possession of the drugs cannot be found solely on

1    the ground that a defendant was near or close to the drugs.

2    Nor can it be found simply because a defendant was present at a

3    scene where drugs were involved, or solely because a defendant

4    associated with a person who does control the drugs or the

5    property where they are found.

6          However, these factors may be considered by you, in

7    connection with all the other evidence, in making your decision

8    whether a defendant possessed drugs.

9          The second element the Government must prove beyond a

10   reasonable doubt is that the defendant knew he possessed drugs.

11   To establish this element, the Government must prove the

12   defendant knew that he possessed drugs and that his possession

13   was not due to carelessness, negligence, or mistake.

14         If you find the defendant did not know that he had

15   drugs in his possession or that he didn't know that what he

16   possessed was, in fact, drugs, then you must find the defendant

17   not guilty.

18         Although the Government must prove the defendant knew

19   he possessed drugs, the Government does not have to prove the

20   defendant knew the exact nature of the drugs in his possession.

21   It is enough that the Government proves the defendant knew he

22   possessed some kind of drugs.

23         The third element the Government must prove is that

24   the defendant possessed drugs with the intent to distribute

25   them.  To prove this third element, the Government must prove

1  beyond a reasonable doubt that the defendant had control over

2  the drugs with the state of mind or purpose to transfer them to

3  another person.

4       The same considerations that apply to your

5  determination whether the defendant knew he possessed drugs

6  apply to your decision concerning the defendant's intention to

7  distribute them.  Since you cannot read the defendant's mind,

8  you must make inferences from his behavior.

9       However, you may not convict the defendant unless

10  these inferences convince you beyond a reasonable doubt that

11  the defendant intended to distribute the drugs.

12       When I say you must find that the defendant intended

13  to distribute the drugs, this does not mean you must find that

14  the defendant intended personally to distribute or deliver the

15  drugs.  It's sufficient if you find the defendant intended to

16  cause or assist the distribution of the drugs.

17       Basically, what you are determining is whether the

18  drugs in the defendant's possession were for his personal use

19  or for the purpose of distribution.

20       Often it is possible to make this determination from

21  the quantity of drugs found in a defendant's possession.  For

22  example, it would be highly unlikely that a person with 50,000

23  doses of amphetamine possessed them all for personal

24  consumption.

25       Now, the possession of a large quantity of drugs does

1    not necessarily mean that the defendant intended to distribute

2    them.

3         On the other hand, a defendant may have intended to

4    distribute drugs, even if he did not possess large amounts of

5    them.  Other physical evidence, such as paraphernalia for the

6    packaging or processing of drugs, can show such an intent.

7         There might also be evidence of a plan to distribute.

8    You should make your decision whether a defendant intended to

9    distribute the drugs in his possession from all of the evidence

10   presented.

11        Now, the elements of distribution of a controlled

12   substance, in violation of the statute, are as follows:

13        Number one, the defendant distributed a controlled

14   substance;

15        And, two, that he distributed the controlled substance

16   knowingly.

17        The word "distribute" means to deliver a drug.

18        "Deliver" is defined as the actual, constructive, or

19   attempted transfer of a drug.  Simply stated, the words

20   "distribute" and "deliver" mean pass on or hand over to another

21   or cause to be passed on or handed over to another or try to

22   pass on or hand over to another drugs.

23        For example, if A tells or orders B to hand over the

24   drugs to C, then A has caused the drugs to be handed over and,

25   therefore, has distributed them.

1          Distribution does not require a sale.  Activities in

2    furtherance of the ultimate sale, such as vouching for the

3    quality of the drugs, negotiating for or receiving the price,

4    and supplying or delivering the drugs, may constitute

5    distribution.  In short, distribution requires a concrete

6    involvement in the transfer of the drugs.

7          Next, the elements of tampering with a witness, in

8    violation of 18 U.S.C., Section 1512, are as follows:

9          One, that the defendant knowingly used physical force

10   or the threat of physical force against the victim, or

11   attempted to do so;

12         And, two, that the defendant acted knowingly and with

13   the intent to hinder, delay, or prevent the communication to a

14   law enforcement officer or judge of the United States of

15   information relating to the commission or possible commission

16   of a federal offense or a violation of conditions of probation,

17   supervised release, parole, or release pending a federal

18   judicial proceeding.

19         Physical force simply means physical action against

20   another and includes confinement of a person against his or her

21   will.

22         If you find that the defendant acted with the intent

23   to hinder or prevent communication by the victim to a specific

24   law enforcement officer or group of officers, this element is

25   satisfied if that officer or one of the group of officers was a

1   federal law enforcement officer.

2        A federal law enforcement officer is an officer or

3   employee of the federal government who is authorized to act on

4   behalf of the federal government in the prevention, detection,

5   investigation, or prosecution of federal crimes (or a probation

6   or Pretrial Services officer.)

7        The Government is not required to prove that the

8   defendant knew the officer was a federal law enforcement

9   officer.

10       On the other hand, if you find that the defendant was

11  not acting with the intent to prevent communication to a

12  particular officer or group of officers, then this element is

13  satisfied only if the Government proves beyond a reasonable

14  doubt that there was a reasonable likelihood that had the

15  victim been able to communicate with law enforcement officers,

16  at least one relevant communication would have been made to a

17  federal law enforcement officer.

18       Next, the elements of retaliating.  The elements of

19  retaliating against a witness, in violation of 18 U.S.C.,

20  Section 1513, are as follows:

21       That the defendant knowingly engaged in conduct that

22  caused bodily injury to another person or threatened to do so;

23       And, two, that the defendant acted with the intent to

24  retaliate against the victim for testimony given in an official

25  proceeding or information given relating to the commission of a

1    federal offense to a law enforcement officer.

2            "Bodily injury" means a cut, abrasion, bruise, burn,

3    or disfigurement, physical pain, illness, or the impairment of

4    the function of a bodily member, organ, or mental facility.  It

5    includes any injury to the body, no matter how temporary.

6            In this regard, it is not necessary that the defendant

7    himself caused the bodily injury.  It is sufficient if you find

8    that the defendant knowingly participated in some activity

9    which had the consequence or effect of injuring the victim.

10   Nor is it necessary to prove that the victim actually was

11   injured.  It's sufficient if the defendant knowingly threatened

12   to cause bodily injury to the victim.

13           A threat is simply the expression of intention to do

14   harm.  A threat may be communicated by words as well as

15   gestures.

16           In order to find that the defendant threatened to

17   cause the victim bodily harm, you need not find that he

18   intended to carry out the threat.

19           A "law enforcement officer" means an officer or

20   employee of the federal government authorized to prevent,

21   investigate, or prosecute offenses or serving as a probation

22   officer.  In this regard, the Government must also prove that

23   the defendant knew the witness was cooperating with respect to

24   a federal offense.

25           In order to satisfy this element, it is not necessary

1   for the Government to prove the defendant knew he was breaking

2   any particular law.

3          To conclude, I have now described for you the elements

4   of the racketeering acts listed in the indictment.  The

5   Government must prove that two of these acts were, or were

6   intended to be, committed as part of the conspiracy, although

7   it need not prove that the defendant committed or agreed to

8   commit any of these acts personally, as long as the Government

9   proves that the defendant participated in some manner in the

10  overall objective of the conspiracy.

11         The jury's verdict must be unanimous as to which type

12  or types of predicate racketeering activity the defendant

13  agreed would be committed; for example, at least two acts of

14  murder or robbery or drug trafficking or conspiracy to commit

15  drug trafficking or any combination thereof.

16         Now, Count 2.

17         Count 2 of the indictment charges the defendants with

18  conspiracy to distribute and possess with intent to distribute

19  controlled, dangerous substances.

20         Count 2 charges the defendants as follows:

21         From at least in or about 2011, through the date of

22  this indictment, in the District of Maryland and elsewhere, the

23  defendants herein, Dante Bailey, a/k/a Gutta, a/k/a Almighty,

24  a/k/a Wolf; Randy Banks, a/k/a Dirt; Jamal Lockley,

25  a/k/a T-Roy, a/k/a Droid; Corloyd Anderson, a/k/a Bo; and

1    Shakeen Davis, a/k/a Creams, did knowingly and willfully

2    combine, conspire, confederate and agree with each other and

3    with others known and unknown to the grand jury to knowingly

4    and intentionally distribute and possess with intent to

5    distribute 1 kilogram or more of a mixture or substance

6    containing a detectable amount of heroin, a Schedule I

7    controlled substance; 280 grams or more of a mixture or

8    substance containing a detectable amount of cocaine base, a

9    Schedule II controlled substance; a mixture or substance

10   containing a detectable amount of Fentanyl, a Schedule II

11   controlled substance; a mixture or substance containing a

12   detectable amount of cocaine, a Schedule II controlled

13   substance; and a mixture or substance containing a

14   detectable amount of marijuana, a Schedule I controlled

15   substance; in violation of Section 841 and various subsections

16   of the U.S. Code.

17           Count 2 of the indictment is brought under Section 846

18   of Title 21 of the United States Code, which provides that "any

19   person who conspires to commit any offense defined in this

20   subchapter" has violated the criminal laws of the

21   United States.

22           You are instructed that a violation of

23   Section 841(a)(1) of Title 21 is an offense defined in this

24   subchapter.  And that section, 841(a)(1), provides:  "It shall

25   be unlawful for any person, knowingly or intentionally, to

1    distribute or possess with intent to distribute a controlled

2    substance."

3         Accordingly, you are instructed that it is a violation

4    of Section 846 of Title 21 of the United States Code for any

5    person to conspire to distribute or possess with intent to

6    distribute any controlled substance.

7         You are further instructed as a matter of law that

8    heroin, cocaine, cocaine base, Fentanyl, and marijuana are

9    "controlled substances," as that term is used in these

10   instructions, in the indictment, and in the statute I just read

11   to you.

12        You are further instructed that heroin and marijuana

13   are "Schedule I controlled substances," and that cocaine,

14   cocaine base, and Fentanyl are "Schedule II controlled

15   substances."

16        In order to satisfy its burden of proof for Count 2,

17   the Government must establish each of the following two

18   essential elements beyond a reasonable doubt:

19        First, that two or more persons entered into an

20   unlawful agreement to distribute and possess with the intent to

21   distribute controlled substances;

22        Second, that the defendant knowingly and willfully

23   became a member of the conspiracy.

24        I've previously explained the elements of a conspiracy

25   to you and the underlying crime of distribution and possession

1    with the intent to distribute controlled substances.

2          While a mere buyer-seller relationship is not

3    sufficient to support a narcotics conspiracy conviction, such

4    evidence is relevant to the issue of whether a conspiratorial

5    relationship exists.  Evidence of continuing relationships and

6    repeated transactions also can support the finding that there

7    was a conspiracy, especially when coupled with substantial

8    quantities of drugs.

9          If you find that the Government has proven any of the

10   defendants guilty of the conspiracy charged in Count 2 -- that

11   is, the alleged conspiracy existed and the defendant knowingly

12   and intentionally became a member of the conspiracy -- then

13   there is one more issue that you must decide.

14         I will be providing you with verdict forms -- you'll

15   see them in a little bit -- for each defendant, asking you to

16   fill in the type and amount of drugs that the defendant

17   possessed or distributed.  The burden is on the Government to

18   establish the type and amount of drugs beyond a reasonable

19   doubt.

20         Remember, you should address this issue and complete

21   this part of the form only if you find the defendant guilty of

22   the conspiracy charged in Count 2.

23         In determining what type and quantity of controlled

24   substance is attributable to a particular defendant, you should

25   consider the following factors.

1          First, a defendant is accountable for any type and

2    quantity of drugs which he personally distributed or possessed

3    with intent to distribute.

4          Second, a defendant is also accountable for any type

5    and quantity of drugs which he attempted to or planned to

6    distribute or possess with the intent to distribute.

7          Specifically, a defendant is accountable for those

8    drugs, even if those drugs were never actually obtained or

9    distributed, so long as an objective of the conspiracy was for

10   the defendant to distribute or possess with intent to

11   distribute such a type and quantity of drugs.

12         Third, a defendant is also accountable for any type

13   and quantity of drugs which another member of the conspiracy

14   distributed or possessed with intent to distribute as part of

15   the conspiracy, so long as it was reasonably foreseeable to the

16   defendant that such a type and quantity of drugs would be

17   involved in the conspiracy which he joined.

18         Fourth, a defendant is also accountable for any type

19   and quantity of drugs which another member of the conspiracy

20   attempted to or planned to distribute or possess with intent to

21   distribute, so long as it was reasonably foreseeable to the

22   defendant that such a type and quantity of drugs would be

23   involved in the conspiracy which he joined.

24         A defendant is accountable for those drugs even if

25   those drugs were never actually obtained or distributed by

1   other members of the conspiracy, so long as an objective of the

2   conspiracy was for the other members of the conspiracy to

3   distribute or possess with intent to distribute such a type and

4   quantity of drugs.

5           These last two rules apply even if the defendant did

6   not personally participate in the acts or plans of his

7   co-conspirators or even if the defendant did not have actual

8   knowledge of those acts or plans, so long as those acts or

9   plans were reasonably foreseeable to the defendant and were

10  committed by his co-conspirators in furtherance of the

11  conspiracy.

12          The reason for this is simply that a co-conspirator is

13  deemed to be the agent of all other members of a conspiracy.

14  Therefore, all of the co-conspirators bear criminal

15  responsibility for acts or plans that are undertaken to further

16  the goals of the conspiracy.

17          Your findings about the types and quantities of

18  controlled substances attributable to the defendant will be

19  noted on the verdict forms, as I said, which I will discuss

20  later.

21          Now, those are the two conspiracies, Counts 1 and 2.

22          There are also some additional what I'm calling --

23  what we call sometimes substantive crimes or counts.

24          Let me move to Count 3.

25          Count 3 of the indictment charges the

1    Defendant Dante Bailey with murder in aid of racketeering.

2    Unlike Count 1 or Count 2, Count 3 does not charge a

3    conspiracy.  This count applies to Dante Bailey only.  The

4    operative part of the indictment reads as follows:

5              On or about February 12th, 2015, in the

6    District of Maryland, the Defendant Dante Bailey, a/k/a Gutta,

7    a/k/a Almighty, a/k/a Wolf, for the purpose of maintaining and

8    increasing position in MMP, an enterprise engaged in

9    racketeering activity, feloniously, willfully, and with

10   deliberate premeditated malice, murdered James Edwards, by

11   using a firearm to shoot James Edwards, which crime constituted

12   murder under Maryland Code, specific sections and the common

13   law, also in violation of Section 1959(a)(1) of Title 18 of the

14   U.S. Code.

15             The defendant is charged with violating Section 1959

16   of Title 18 of the U.S. Code.  That section reads as follows:

17             Whoever, for the purpose of gaining entrance to or

18   maintaining or increasing position in an enterprise engaged in

19   racketeering activity, murders, kidnaps, maims, assaults with a

20   dangerous weapon, commits assault resulting in serious bodily

21   injury upon or threatens to commit a crime of violence against

22   any individual, in violation of the laws of any state or the

23   United States, or attempts or conspires to do so, is guilty of

24   a crime.

25             In order to prove that the Defendant Dante Bailey

1   committed murder in aid of racketeering, the Government must

2   establish beyond a reasonable doubt each one of the following

3   five elements of the offense:

4          First, that an enterprise affecting interstate

5   commerce existed;

6          Second, that the enterprise was engaged in

7   racketeering activity;

8          Third, that the defendant had (or was seeking) a

9   position in the enterprise;

10          Fourth, that the defendant committed the alleged

11   murder;

12          And, fifth, that the defendant's general purpose in

13   committing the murder was to maintain or increase his position

14   in the enterprise.

15          So the first element the Government must prove beyond

16   a reasonable doubt is that an enterprise existed, which was

17   engaged in or had an effect on interstate or foreign commerce.

18   The terms "enterprise" and "interstate commerce" have already

19   been defined for you.

20          The second element the Government must establish

21   beyond a reasonable doubt is that the enterprise was engaged in

22   racketeering activity.  I have already listed for you the

23   racketeering acts which the Government has alleged were engaged

24   in by the enterprise.

25          I'll charge you that "racketeering activity" includes

1    those offenses.

2         It is for you to determine whether the enterprise

3    engaged in those activities as charged.  You should give the

4    words "engaged in" their ordinary, everyday meaning.

5         For an enterprise to be engaged in racketeering

6    activity, it is enough to show that the enterprise committed or

7    was planning to commit some racketeering activity within a

8    period of time short enough under all the circumstances.  So it

9    is appropriate to say that the enterprise was engaged in

10   racketeering activity.

11        The third element the Government must establish beyond

12   a reasonable doubt is that the defendant had a position in the

13   enterprise.

14        To establish this element, the Government must prove

15   that the defendant was actively engaged in promoting the

16   illegal activities of the enterprise.  It is not enough to

17   prove that the defendant was doing business with the

18   enterprise; the Government must prove that the defendant was

19   actually a member of the enterprise.

20        The fourth element the Government must establish

21   beyond a reasonable doubt is that the defendant murdered, or

22   aided and abetted the murder, of the victim.  The elements of

23   murder under Maryland law have been explained to you

24   previously.

25        The fifth element the Government must establish beyond

1    a reasonable doubt is that the defendant's general purpose in

2    committing the murder was to maintain or increase his position

3    in the enterprise.

4          The Government is required to prove that the

5    defendant's general purpose was to maintain or increase his

6    position in the enterprise.  The Government is not required to

7    prove that it was the defendant's sole or principal motive.

8          In determining whether the defendant's purpose in

9    committing the murder was to maintain or increase his position

10   in the enterprise, you should give the words "maintain" and

11   "increase" their ordinary meanings.  You should consider all of

12   the facts and circumstances in making that determination.

13         For example, you may consider evidence that the crime,

14   if proved, was committed in order to maintain discipline within

15   the enterprise and served to maintain the defendant's position

16   in the enterprise.

17         If the defendant committed the crime because he knew

18   it was expected of him by reason of his membership in the

19   enterprise, or if he committed the crime because he thought it

20   would enhance his position or prestige within the enterprise,

21   or if he committed it because he thought it was necessary to

22   maintain the position he already held, this element would be

23   established.  These examples are only meant by way of

24   illustration.  They are not exhaustive.

25         As an alternate theory of liability, the Government

1  has alleged that the Defendant Dante Bailey committed the

2  offense charged in Count 3 under the aiding and abetting

3  statute.

4       Under the aiding and abetting statute, it is not

5  necessary for the Government to show that a defendant himself

6  physically committed the crime with which he is charged in

7  order for you to find that defendant guilty.

8       A person who aids or abets another to commit an

9  offense is just as guilty of that offense as if he or she

10  committed it himself.

11       Accordingly, you may find a defendant guilty of the

12  offense charged if you find beyond a reasonable doubt that the

13  Government has proved that another person actually committed

14  the offense with which the defendant is charged and that that

15  particular defendant aided or abetted that person in the

16  commission of the offense.

17       As you can see, the first requirement is that you find

18  that another person has committed the crime charged.

19  Obviously, no one can be convicted of aiding or abetting the

20  criminal acts of another if no crime was committed by the other

21  person in the first place.

22       But if you do find that a crime was committed, then

23  you must consider whether the particular defendant aided or

24  abetted the commission of the crime.

25       In order to aid or abet another to commit a crime, it

1    is necessary that a defendant willfully and knowingly

2    associated himself in some way with the crime and that he

3    willfully and knowingly sought by some act to help make the

4    crime succeed.

5            To establish that a person -- that a defendant

6    participated in the commission of the crime -- that is, that he

7    aided and abetted -- the Government must prove that he engaged

8    in some affirmative conduct or overt act for the specific

9    purpose of bringing about that crime.

10           Participation in a crime is willful if action is taken

11   voluntarily and intentionally, or in the case of a failure to

12   act, with the specific intent to fail to do something the law

13   requires to be done; that is to say, with a bad purpose either

14   to disobey or to disregard the law.

15           The mere presence of a defendant where a crime is

16   being committed, even coupled with knowledge by that defendant

17   that a crime is being committed, or the mere acquiescence by a

18   defendant in the criminal conduct of others, even with guilty

19   knowledge, is not sufficient to establish aiding and abetting.

20   An aider and abettor must have some interest in the criminal

21   venture.

22           To determine whether a defendant aided or abetted the

23   commission of the crime, ask yourself these questions:

24           Did he participate in the crime charged as something

25   he wished to bring about?

1          Did he associate himself with the criminal venture

2    knowingly and willfully?

3          Did he seek by his actions to make the criminal

4    venture succeed?

5          If he did, then that defendant is an aider and abettor

6    and, therefore, guilty of the offense.

7          If you determine the defendant did not aid and abet

8    the commission of an offense, then the defendant is not guilty

9    under this statute.

10          Now, there are a number of other counts.  You'll hear

11   they are not necessarily in numerical order.  They do not cover

12   all the numbers that you might expect to hear.  These are the

13   ones that apply to the individuals here.

14          Counts 16, 17, 24, and 30 charge the defendants

15   Shakeen Davis, Dante Bailey, Corloyd Anderson, and

16   Shakeen Davis, again, respectively, with being persons

17   convicted of a crime who possessed firearms and ammunition

18   shipped in interstate or foreign commerce.

19          Those counts which you will have in the jury room read

20   as follows:

21          Count 16 charges that on or about April 26th of 2016

22   in the District of Maryland, the Defendant Shakeen Davis,

23   having been convicted of a crime punishable by imprisonment for

24   a term exceeding one year, did knowingly possess in and

25   affecting interstate commerce the following firearms and

1  ammunitions -- and I'm reading these to you.  As I said, you'll

2  have them.  They're not up on the screen right now.

3          One, a Glock .40-caliber handgun with

4  Serial No. HHC901 and ammunition.

5          And, B -- or, two, an AR-15 rifle with

6  Serial No. F071734 and ammunition, in violation of

7  Section 922(g), Title 18, U.S. Code.

8          Count 17 is brought under the same statute.  It

9  charges that on or about May 3rd of 2016 in Maryland,

10  Dante Bailey, having been convicted of a crime punishable by

11  imprisonment for a term exceeding one year, did knowingly

12  possess in and affecting interstate commerce the following

13  firearms and ammunition.

14          It's a Ruger .22-caliber handgun with a specific

15  serial number, 36375990.

16          50 rounds of .22-caliber ammunition.

17          A Springfield .45 ACP caliber handgun with Serial

18  Number MG500105.

19          And 50 rounds of 9-millimeter-caliber ammunition.

20          Count 24, same statute, charges that on or about

21  September 27th of 2016 in Maryland, Corloyd Anderson, having

22  been convicted of a crime punishable by imprisonment for a term

23  exceeding one year, did knowingly possess, in and affecting

24  interstate commerce, a Glock 9-millimeter-caliber firearm with

25  Serial No. MNN356 and ammunition.

1          And Count 30, same statute, charges on or about

2    February 24th, 2017, in Maryland, Shakeen Davis, having been

3    convicted of a crime punishable by imprisonment for a term

4    exceeding one year, did knowingly possess, in and affecting

5    interstate commerce, a SIG SAUER .22-caliber firearm with

6    Serial No. T148576 and ammunition.

7          The relevant statute on this subject is Title 18,

8    United States Code, Section 922(g), which provides that it

9    shall be unlawful for any person who has been convicted in any

10   court of a crime punishable by imprisonment for a term

11   exceeding one year to possess, in or affecting commerce, any

12   firearm or ammunition.

13         In order to satisfy its burden of proof on those four

14   counts, the Government must establish each of the following

15   elements beyond a reasonable doubt:

16         First, that the defendant was convicted in any court

17   of a crime punishable by imprisonment for a term exceeding one

18   year as charged;

19         Second, that the defendant knowingly possessed the

20   firearm or ammunition, as charged;

21         And, third, that the possession charged was in or

22   affecting interstate or foreign commerce.

23         The first element the Government must prove beyond a

24   reasonable doubt is that prior to the date the defendant is

25   charged with possessing the firearm or ammunition, the

1  defendant had been convicted of a crime punishable by

2  imprisonment for a term exceeding one year and that the state

3  has not restored the defendant's civil rights following that

4  conviction.

5           To satisfy this first element, you need only find

6  beyond a reasonable doubt that the defendant was, in fact,

7  convicted of that crime and that the conviction was prior to

8  the possession of the weapon as charged in the indictment.

9           It is not necessary that the Government prove that the

10  defendant knew the crime was punishable by imprisonment for

11  more than one year, nor is it necessary for the defendant to

12  have been sentenced to imprisonment for more than one year.

13           I instruct you in this connection that the prior

14  conviction that is an element of the charge here is only to be

15  considered by you for the fact that it exists and for nothing

16  else.  You are not to consider it for any other purpose.  You

17  are not to speculate as to what it was for.  You may not

18  consider the prior conviction in deciding whether the

19  Government was in -- excuse me, whether the defendant was in

20  knowing possession of the gun or ammunition that is charged in

21  the indictment.

22           The second element the Government must prove beyond a

23  reasonable doubt is that on or about the date set forth in the

24  indictment, the defendant knowingly possessed a firearm or

25  ammunition.

1          A firearm is any weapon which will or is designed to

2    or may readily -- may be readily converted to expel a

3    projectile by the action of an explosive.

4          "Ammunition" is any ammunition or cartridge cases,

5    primers, bullets, or propellant powder designed for use in any

6    firearm.

7          "To possess" means to have something within a person's

8    control.  This does not necessarily mean that the defendant

9    must hold it physically; that is, have actual possession of it.

10   As long as the firearm or ammunition is within the defendant's

11   control, he possesses it.

12         If you find that the defendant either had actual

13   possession of the firearm or ammunition or he had the power and

14   intention to exercise control over it, even though it was not

15   in his physical possession, you may find the Government has

16   proven possession.

17         The law also recognizes -- as I said earlier with

18   regard to the drug charges -- that possession may be sole or

19   joint.  If one person alone possesses it, that is sole

20   possession.  However, it is possible that more than one person

21   may have the power and intention to exercise control over the

22   firearm or ammunition.  This is called joint possession.

23         If you find the defendant had such power and

24   intention, then he possessed the firearm or ammunition under

25   this element even if he possessed it jointly with another.

1   Proof of ownership of the firearm or ammunition is not

2   required.

3        To satisfy this element, you must also find that the

4   defendant knowingly possessed the firearm or ammunition.  This

5   means he possessed the firearm or ammunition purposely and

6   voluntarily and not by accident or mistake.

7        It also means that he knew the weapon was a firearm or

8   ammunition, as we commonly use the word.  However, the

9   Government is not required to prove that the defendant knew

10  that he was breaking the law.

11       The third element the Government must prove beyond a

12  reasonable doubt is that the firearm or ammunition the

13  defendant is charged with possessing was in or affecting

14  interstate or foreign commerce.

15       This means that the Government must prove that at some

16  point prior to the defendant's possession, the firearm or

17  ammunition had traveled in interstate commerce.  It is

18  sufficient for the Government to satisfy this element by

19  proving that at any time prior to the date charged in the

20  indictment, the firearm or ammunition crossed a state line or

21  the United States border.

22       It is not necessary that the Government prove that the

23  defendant himself carried it across a state line, nor must the

24  Government prove who carried it across or how it was

25  transported.  It is also not necessary for the Government to

```
 1   prove that the defendant knew that the firearm or ammunition

 2   had previously traveled in interstate commerce.

 3          Now, there is just one more set of separate counts

 4   that I'm going to read to you, Counts 10, 18, and 31.  They

 5   charge defendants Jamal Lockley, Dante Bailey, and

 6   Shakeen Davis (respectively) with the distribution and

 7   possession with intent to distribute a controlled substance.

 8          The indictment reads as follows:

 9          Count 10 is distribution of cocaine base.  It charges

10   that on or about March 10th of 2016 in the

11   District of Maryland, the Defendant Jamal Lockley knowingly,

12   intentionally, and unlawfully distributed a mixture or

13   substance containing a detectable amount of cocaine base, a

14   Schedule II controlled substance, in violation of federal law.

15          Count 18 charges possession with intent to distribute

16   heroin.  It charges that on or about May 17th of 2016 in the

17   District of Maryland, the Defendant Dante Bailey knowingly and

18   intentionally possessed with intent to distribute a mixture or

19   substance containing a detectable amount of heroin, a

20   Schedule I controlled substance, in violation of federal law.

21   I will check that with counsel later.

22          Okay.  Count 31, possession with intent to distribute

23   cocaine base.  As to this one, 31, on or about February 24th of

24   2017 in the District of Maryland, the Defendant Shakeen Davis

25   knowingly and intentionally possessed with intent to distribute
```

 1    a mixture or substance containing a detectable amount of

 2    cocaine base, which is a Schedule II controlled substance.

 3             In those charges, the defendants are charged with

 4    violating the Drug Abuse Prevention and Control Act.  That law

 5    makes it a crime for any person knowingly or intentionally to

 6    manufacture, distribute, or dispense or possess with intent to

 7    manufacture, distribute, or dispense a controlled substance.

 8             In order to prove this charge against the defendant,

 9    the Government must establish beyond a reasonable doubt each of

10    the following elements of the crime:

11             With respect to Counts 18 and 31 of the indictment,

12    charging possession with intent to distribute:

13             First, that the defendant possessed the narcotic drug

14    charged in the indictment;

15             Second, that the defendant knew he possessed narcotic

16    drugs;

17             And, third, that the defendant possessed narcotic

18    drugs with intent to distribute them.

19             With respect to Count 10 of the indictment, charging

20    distribution:

21             First, that the defendant distributed the narcotic

22    drug charged in the indictment;

23             And, second, that the defendant distributed the

24    narcotics knowingly.

25             And I've already instructed you, back in connection

1   with Counts 1 and 2 of the indictment, that heroin and cocaine,

2   as well as cocaine base, are narcotic drugs and controlled

3   substances.  And I've also instructed you in connection with

4   Counts 1 and 2 of the indictment on the meanings of

5   "distribute" and "possession," so I'm not going to repeat all

6   of that.

7          Finally, in Count 32, the Defendant Shakeen Davis is

8   charged with possession of a firearm in furtherance of a

9   drug-trafficking crime; specifically, conspiracy to distribute

10  controlled substances and possession with intent to distribute

11  controlled substances as charged in Counts 2 and 31.

12         The indictment reads as follows.  This is Count 32:

13         On or about February 24th, 2017, in the

14  District of Maryland, the Defendant Shakeen Davis did knowingly

15  possess a firearm in furtherance of a drug-trafficking crime,

16  to wit:

17         Conspiracy to distribute and possess with intent to

18  distribute controlled substances, in violation of Section 846

19  of Title 21, United States Code, as charged in Count 2 of this

20  indictment.

21         And possession with intent to distribute cocaine base,

22  in violation of Section 841 of Title 21, United States Code, as

23  charged in Count 31 of this indictment, both of which are --

24  I've already told you about.

25         Okay.  As to Count 32, the relevant statute on this

1    subject is Title 18, U.S. Code, Section 924(c).

2         It says:

3         Any person who, during and in relation to any crime of

4    violence or drug-trafficking crime, for which the person may be

5    prosecuted in a court of the United States, uses or carries a

6    firearm, or who, in furtherance of any such crime, possesses a

7    firearm, shall be guilty of a crime.

8         In order to satisfy its burden of proof as to

9    Count 32, the Government must establish each of the following

10   elements beyond a reasonable doubt:

11        First, that the defendant committed a drug-trafficking

12   crime for which he might be prosecuted in a court of the

13   United States;

14        And, second, that the defendant knowingly possessed a

15   firearm in furtherance of the drug-trafficking crime charged in

16   either Count 2 or Count 31 of the indictment.

17        The first element the Government must prove beyond a

18   reasonable doubt is that the defendant committed a

19   drug-trafficking crime for which he might be prosecuted in a

20   court of the United States.

21        The defendant is charged in Count 2 of the indictment

22   with committing the crime of conspiracy to distribute or

23   possess with intent to distribute controlled substances; and in

24   Count 31, with possession with intent to distribute

25   cocaine base.

1          I instruct you that the crimes charged in Count 2 and

2     Count 31 are drug trafficking crimes.

3          However, it is for you to determine whether the

4     Government has proved beyond a reasonable doubt that the

5     defendant committed the crime of conspiracy to distribute or

6     possess with intent to distribute controlled substances, as

7     charged in Count 2, or possession with intent to distribute

8     cocaine base, as charged in Count 31.

9          You need not find the defendant committed both of the

10    crimes charged in Counts 2 and 31, but you must find beyond a

11    reasonable doubt that the defendant committed at least one of

12    the crimes charged in Count 2 and Count 31 of the indictment.

13         If during your deliberations you determine that the

14    Government has failed to prove either Count 2 or Count 31

15    beyond a reasonable doubt, then you will proceed no further as

16    to Count 32.  Count 32 is to be considered only if you first

17    find the defendant guilty under either Count 2 or Count 31 as

18    charged.

19         And in reaching your verdict as to Count 32, you may

20    consider evidence of Count 2 and Count 31 only for the purpose

21    of determining whether this first element of Count 32 has been

22    satisfied.

23         The second element that the Government must prove

24    beyond a reasonable doubt is that the defendant knowingly

25    possessed a firearm in furtherance of the commission of a

1   drug-trafficking crime; that is, conspiracy to distribute or

2   possess with intent to distribute controlled substances as

3   charged in Count 2 or possession with intent to distribute

4   cocaine base as charged in Count 31.

5          A "firearm" is any weapon which will or is designed to

6   or may be readily converted to expel a projectile by the action

7   of an explosive.

8          I've already defined "knowing possession" for you.

9          "To possess a firearm in furtherance of the

10   drug-trafficking offense" simply means that the presence of a

11   firearm played some part in forwarding, promoting,

12   facilitating, or advancing the commission of the crimes alleged

13   in either Count 2 or Count 31 of the indictment; that is, that

14   the presence of the firearm was not merely coincidental to the

15   crimes alleged in Counts 2 or 31.

16          "Possessing a gun in furthering of a drug-trafficking

17   offense" includes, but is not limited to, having a firearm or

18   firearms available to assist or embolden or aid or protect the

19   defendant in committing the crimes alleged in Counts 2 or 31.

20          In determining whether the defendant possessed a

21   firearm in furtherance of the drug-trafficking crime charged in

22   either Count 2 or Count 31 of the indictment, you may consider

23   all of the facts received in evidence in the case, including,

24   but not limited to, the nature of the underlying drug

25   trafficking alleged, the proximity of the defendant to the

1  firearm in question, the proximity of drugs or drug proceeds to

2  the firearm in question, the type of firearm found, whether the

3  gun was legitimately owned or registered to the defendant,

4  whether the gun was loaded, and the usefulness of the firearm

5  in furthering the crime alleged; i.e., whether the firearm

6  provided a defense against the theft of drugs and/or reduced

7  the probability that such a theft might be attempted.  The

8  possession is in furtherance if the purpose of the firearm is

9  to protect or embolden the defendant.

10      The Government is not required to show that the

11  defendant actually displayed or fired any weapon.  The

12  Government is required, however, to prove beyond a reasonable

13  doubt that a firearm was in the defendant's control at the time

14  that the drug-trafficking crimes in Count 2 or 31 were

15  committed and that the possession of the gun was not merely

16  coincidental to the crimes alleged in Counts 2 or 31.

17      I am on my last paragraph.  I have finished the

18  Court's instructions on the specific crimes charged.

19      As you deliberate, I caution you that the question of

20  possible punishment of the defendants is of no concern to you

21  and should not in any sense enter into or influence your

22  deliberations.

23      The duty of imposing sentence, if the defendants are

24  convicted, rests exclusively upon the Court.

25      Similarly, the possible consequences of a not-guilty

 1   verdict are of no concern to you.  Your duty is to weigh the

 2   evidence in the case and determine whether or not each

 3   defendant has been proved guilty beyond a reasonable doubt,

 4   solely upon the evidence presented.

 5         Now, I have mentioned verdict forms.  I don't at this

 6   point have the verdict forms to put up on the monitor for you,

 7   although you may see them in the course, it's possible, of

 8   counsel's argument.

 9         I just want to tell you briefly, you will have a

10   verdict form, a separate one for each defendant, and it will

11   ask you a number of questions.

12         For example, on Count 1 as to Mr. Bailey, conspiracy

13   to participate in the affairs of a racketeering enterprise, it

14   will ask:  How do you find the Defendant Dante Bailey as to

15   Count 1 of the indictment, conspiracy to participate in the

16   affairs of a racketeering enterprise?

17         And there will be a place for you to enter either "not

18   guilty" or "guilty," depending on what you have found.

19         If you find him not guilty of that charge, Count 1,

20   the instructions will be to just move on to Count 2, which is

21   the drug conspiracy.

22         If you do find him guilty of Count 1, then you will be

23   asked to determine unanimously what type or types of

24   racketeering activity were reasonably foreseeable to him in

25   furtherance of the racketeering conspiracy.  You'll be asked to

1   check all that apply, and there's a list. It's just the same

2   list of those offenses that I read to you in the course of the

3   instructions.

4          There are further follow-up questions if you found the

5   defendant guilty of Count 1 and found that one or more of the

6   racketeering acts was a drug offense, conspiracy to distribute

7   and possess with the intent to distribute controlled substances

8   or distribution and possession with the intent to distribute

9   controlled substances.

10          As I told you in the course of the instructions, you

11   will be asked to determine unanimously what type or types of

12   drugs were reasonably foreseeable to that defendant as part of

13   that racketeering activity, and there's a list of types of

14   drugs: heroin, cocaine, cocaine base, fentanyl, marijuana.

15          If you find that heroin was a drug foreseeable as part

16   of the racketeering activity to a defendant that you found

17   guilty of Count 1, you'll be asked to determine unanimously the

18   quantity of heroin that was foreseeable as part of that

19   racketeering activity, the choice being a kilogram of heroin or

20   more or less than 1 kilo.

21          And, also, if you find as to a defendant that they're

22   guilty of Count 1 and that cocaine base, an offense involving

23   cocaine base, crack, that was one of the drugs foreseeable to

24   that defendant, you will be asked to determine unanimously the

25   quantity of cocaine base. And the choices there will be

1    280 grams or more, or less than 280 grams.

2            And, again, this Question 1 applies to all the

3    defendants.

4            Count 2, the conspiracy to distribute and possess with

5    intent to distribute controlled substances also is going to

6    apply to all the defendants.

7            You make your decision about them individually, of

8    course.  So you'll be asked:  How do you find as to Count 2?

9            And it's "not guilty" or "guilty."

10           If you find a particular defendant guilty of Count 2,

11   you will be asked those same questions about drugs, what type

12   of drugs were involved and the quantities of either heroin or

13   cocaine base that may have been -- that were unanimously, you

14   find, foreseeable.

15           After Counts 1 and 2, the separate counts differ

16   somewhat among the defendants, so there will be somewhat

17   separate questions.  For Mr. Bailey, it's Count 3, murder in

18   aid of racketeering; Count 17, possession of firearms by a

19   felon; Count 18, possession with intent to distribute heroin.

20           It's going to be in accordance with what I read to

21   you.

22           Now, as to Mr. Banks, it's the two conspiracy charges.

23           As to Mr. Lockley, it is the two conspiracy charges

24   and the one additional Count 10, distribution of cocaine base.

25           As to Mr. Anderson, it is the two conspiracy charges

 1 | and the Count 24, the unlawful possession of a firearm.

 2 |      And as to Mr. Shakeen Davis, it is the two conspiracy

 3 | charges as well as possession of firearms by a felon.  That's

 4 | Count 16 and 30.  And 31, possession with intent to distribute

 5 | cocaine base.  And 32, possession of a firearm in furtherance

 6 | of a drug-trafficking crime.

 7 |      You will have those verdict forms.  As I said, you may

 8 | see them during argument.  You will have them in the jury room.

 9 | And you will, of course, be asked to fill them out unanimously

10 | in accordance with your verdict.

11 |      I will have a very short amount to say to you at the

12 | very end, after everybody else has argued.  But, otherwise, I

13 | have completed my instructions.

14 |      Thank you very much for your patience.

15 |      I think we'll take a recess, starting with letting the

16 | jury out.

17 |     (Jury left the courtroom at 12:01 p.m.)

18 |     **THE COURT:**  And I would suggest that we take our

19 | recess; and then when we come back, before the jury comes back

20 | in, you can put on the record any objections, issues that came

21 | up about any objections you have about the instructions.

22 |      But why don't we go ahead and excuse the gallery.

23 |     (Pause.)

24 |     **THE COURT:**  We're in recess.

25 |     (Recess taken.)

1   **THE COURT:**  All right.  Before we bring the jury back

2   in, what objections to the jury instructions would anyone like

3   to put on the record?  If any, of course.

4   Ms. Whalen.

5   **MS. WHALEN:**  Your Honor, I would object to the failure

6   to provide a multiple conspiracy instruction.

7   I would also object to the aiding and abetting

8   instruction because the evidence, we believe, was not

9   generated.

10  And then the same for the retaliation of a witness

11  instruction, I would object to that one for the same reasons

12  and, also, that I think it's somewhat duplicative of the

13  tampering with a witness instruction.

14  **THE COURT:**  Okay.  Mr. Sardelli.

15  **MR. SARDELLI:**  Your Honor, I join what Ms. Whalen has

16  already said, Your Honor.  And I would also, specifically --

17  obviously, the Court knows we were really pushing for the

18  multiple conspiracy instruction, and I would note two reasons

19  why I think it's justified.

20  One, I'm showing you -- holding up one of the

21  Government exhibits here just to point out how geographically

22  diverse several of these areas are.

23  I think Windsor Mill, Forest Park, 5200 block of

24  Windsor Mill.  Area 2 is Gwynn Oak and Liberty Heights.  Area 3

25  is Lauretta and Warwick.  Area 4 is 27th and Boone.  I think

1  the geographical diversity, number one, justifies multiple

2  conspiracy instruction, Your Honor.

3          And number two -- I think there's -- and I'm still

4  confused sometimes about the multiple names and groups that

5  have come up:  MMP, BGF, 5200 boys, Black Bloods.  It goes on

6  and on, Your Honor.

7          I think the fact of the combination of the different

8  groups discussed in this case and the geographical diversity

9  justify a multiple conspiracy instruction, Your Honor.

10         Thank you.

11         **THE COURT:**  All right.  Thank you.

12         **MR. TRAINOR:**  Your Honor, Mr. Lockley joins in those

13  objections.

14         Thank you.

15         **THE COURT:**  Okay.  Ms. Amato.

16         **MS. AMATO:**  And the same for Mr. Anderson.

17         **THE COURT:**  Thank you.

18         **MR. HAZLEHURST:**  Your Honor, finally, on behalf of

19  Mr. Davis, we would also join in that objection and incorporate

20  the arguments of prior counsel.  As noted here I think,

21  Your Honor, that Mr. Davis specifically requested and drafted a

22  multiple conspiracy instruction that was sent to the Court on

23  April 19th.

24         **THE COURT:**  Okay.  All right.  Thank you.

25         I did obviously consider the issue.  I do not think

1    that the evidence as it comes in supports a multiple conspiracy

2    instruction.  There are a number of cases I would rely on,

3    including U.S. versus Bowens, B-O-W-E-N-S, 224 F.3d 302.

4    There's also U.S. versus Babb, B-A-B-B, 369 Fed Appendix 503.

5    It's from 2010.  Of course, it's unpublished, but it cites to

6    some published opinions.

7            U.S. versus Stockton, 349 F.3d 755, which is a 2003

8    case, interestingly, from the Park Heights neighborhood.

9            And then there's another unpublished one,

10   U.S. versus Ko, K-O.  It's 682 Fed Appendix 247.  That's as

11   recent as 217, which repeats the general principle that

12   multiple conspiracy instruction is not required unless the

13   proof at trial demonstrates the defendant was involved only in

14   a separate conspiracy unrelated to the overall conspiracy

15   charged in the indictment.

16           I simply don't believe that's the case here, given the

17   evidence about MMP and its control on the neighborhood.  The

18   fact that there may be somewhat scattered geographical areas,

19   still all within the same city, I don't think changes the

20   outcome.

21           And I also did give, obviously, the aiding and

22   abetting and the retaliating instructions, I think, based on

23   the written arguments of the Government that both those were

24   justified.  The aiding and abetting had been charged in the

25   indictment, of course.

1          The retaliation, while it may be somewhat duplicative,

2    it's also somewhat different.  And I think that its elements

3    could be satisfied by evidence if found credible in the case by

4    the jury, particularly as to the -- what could be perceived to

5    be threats against Mr. William Banks.

6          So did the Government have any objections?

7          **MS. HOFFMAN:**  No objections.

8          But I did want to raise the issue that Your Honor

9    raised while reading the instructions, which is that Count 18

10   charges both Dante Bailey and Tiffany Bailey --

11         **THE COURT:**  Yes.

12         **MS. HOFFMAN:**  -- with possession with intent to

13   distribute heroin.  We have no objection to the way Your Honor

14   read it without mentioning Tiffany Bailey.  I just wanted to

15   know whether we should provide a redacted copy of that.

16         **THE COURT:**  I assume.  I didn't read the name

17   "Tiffany Bailey" just because of our prior conversations where

18   we had agreed not to read all the other co-defendants' names.

19   So that was in the indictment, and I just didn't read it.  And

20   I did not just read the words "second superseding."

21         I think both -- there were two counts.  There was the

22   one with Tiffany Bailey's name, and there was also one of the

23   counts in the indictment mentioned the superseding indictment.

24   So my assumption would be -- and we have plenty of time -- but

25   before they go to the jury would be to redact "Tiffany Bailey"

1    and to redact "second superseding."

2              **MS. WHALEN:**  That's fine, Your Honor.

3              **THE COURT:**  That's all right?

4              Is that fine with everybody?

5              Okay.  Regarding the order of argument, we're

6    obviously going to start with the Government, which is -- the

7    opening argument is going to be under two hours, but it is

8    going to have to break slightly before 1:00.  So, I mean, I'm

9    not going to cut you in the middle of a sentence, but please

10   try to have in mind sort of about 5 of or so, try to come to a

11   breaking point and we'll finish it.

12             Regarding the order of argument, unless anything has

13   changed since this morning -- I apologize for speaking too

14   fast.  I assumed, erroneously, as it turns out, that the

15   proposal to have Mr. Bailey's counsel argue last was something

16   that had been discussed and agreed upon among other counsel.

17   Obviously, it had not.

18             And I think -- therefore, I think the order of

19   argument is going to proceed in the way that everything else

20   has proceeded in the case.  And I think other defense counsel

21   relied on the order of argument.  And it should be as it has

22   been, which is in the order that it is in the indictment.

23             So I expect that Mr. Bailey's counsel will argue after

24   the Government.  And we'll see how far we get in terms of today

25   and tomorrow, whether we can finish it all somehow or if it has

1    to carry over.

2           Anything else?

3       (No response.)

4       **THE COURT:**  No.  Okay.  We'll get the jury.

5           I should also say, although we can discuss this later,

6    I would certainly not think that the Government needs two hours

7    for rebuttal, particularly if it's taking two hours in its

8    opening.

9       **MS. HOFFMAN:**  Your Honor, my rebuttal may be --

10   there's going to be five, roughly five hours of defense

11   arguments.  I am not going to rehash anything that Ms. Perry

12   did in opening, but I do want to thoroughly respond to all of

13   the defense arguments.  And if that takes me to an hour and a

14   half to two hours, I would like the opportunity to do that.

15          I do think it's very important to rebut all the

16   arguments raised by Defendants.

17      **THE COURT:**  Yes, well . . .

18      (Jury entered the courtroom at 12:28 p.m.)

19      **THE COURT:**  All right.  Ladies and gentlemen, we're

20   going to begin with the closing arguments.  Of course, as you

21   know, that's not evidence.

22          The attorneys do have a chance, however, to argue to

23   you and summarize, interpret what they think the evidence has

24   shown.

25          The order -- what happens is the Government is allowed

 1    to go first.  They have the burden of proof.

 2          Defense counsel have the opportunity, no requirement,

 3    but they have the opportunity to argue to you.  And at the end

 4    the Government has the opportunity for rebuttal.  That is

 5    because the Government has the burden of proof.

 6          I expect that since there's just about a half hour

 7    left before 1 o'clock, that the Government will not necessarily

 8    finish its first argument to you.  But we'll get started.

 9    We'll take a break for the normal lunch hour, and then the

10    Government will continue.  And then we'll turn to defense

11    counsel.

12          So with that, Ms. Perry.

13          **MS. PERRY:**  Thank you.

14          Murdaland Mafia Piru, the name alone said a lot.

15          We had a team for money and a team for murder.

16          You get with us or you get run over.

17          My blood is my honor.  My honor is my blood.  If ever

18    I dishonor, take my blood.

19          Murdaland Mafia Piru terrorized Windsor Mill and

20    Forest Park and Gwynn Oak and Liberty Heights with their code

21    of silence, their prolific drug dealing, and their lust for

22    violence.

23          From 2011 to 2017, the defendants, these five

24    defendants, and countless others you've heard about over the

25    course of this trial banded together to make the rules, to set

1    the terms, to defend their turf, and to punish those they

2    deemed undeserving.

3            Many paid with their lives.  Some others got a little

4    luckier -- all under the MMP banner for the M tattoos, for the

5    lightning bolts, for the status, for the drugs, for the

6    bragging rights, for honor or code, or seemingly nothing at

7    all, all in furtherance of the gang.

8            As you have heard over the course of this trial, MMP

9    was not about rap music, about urban fiction, about record

10   sales, or book deals or car washes.  MMP was about two things.

11   It was about domination and it was about control.  And it was

12   about silencing witnesses and stopping rivals.

13           Over the course of this trial, you heard about a

14   coordinated effort, the hard work of many people over many

15   years, and the courage of people willing to come forward and

16   risk their lives to dismantle MMP.

17           It is time for these defendants to face the

18   consequences of their actions, and it is time for them to be

19   held accountable.

20           Before I jump into the charges, I just want to take a

21   moment and thank you for your time and your attention in this

22   case.

23           Over the last few weeks, we've called witness after

24   witness and put hundreds of exhibits in front of you.  And I

25   ask that you give me a little more of your time as I summarize

```
 1    why these defendants are guilty beyond a reasonable doubt on
 2    all counts.
 3           Now, as you probably recall from just a few moments
 4    ago, Dante Bailey, Randy Banks, Jamal Lockley,
 5    Corloyd Anderson, and Shakeen Davis are before you charged with
 6    several counts.
 7           Racketeering conspiracy, a drug-trafficking
 8    conspiracy, and individual counts, including murder in aid of
 9    racketeering, and counts of possession of drugs and guns.
10           And you just heard from Judge Blake what the
11    Government has to prove for you to find the defendants guilty.
12           And I want to talk about how the evidence that you saw
13    over the last five and a half weeks proves just that.
14           So we'll start with Count 1.
15           The Government has to prove that there was an
16    agreement between two or more people to participate in an
17    enterprise that would affect interstate commerce through a
18    pattern of racketeering activity.
19           We have to prove that each defendant knowingly and
20    willfully joined and that a member of the conspiracy, any
21    member of the conspiracy, agreed to commit at least two
22    racketeering acts.  And those racketeering acts are murder,
23    attempted murder, and conspiracy to commit murder, extortion,
24    robbery, drug distribution, witness tampering, and witness
25    retaliation.
```

1          And that's kind of a lot, so I'm going to try to break

2     it down.

3          We have to show that there was an agreement; that the

4     defendants joined the agreement; and that when they joined,

5     they knew some member would commit to racketeering acts.

6          We do not have to prove with respect to Count 1 that

7     any defendant committed any specific murder or that any

8     defendant ever dealt a single gram of drugs.

9          We just have to prove that by joining the racketeering

10    conspiracy, they agreed that at least two acts would be

11    committed.

12         It could be as simple as agreeing that drugs would be

13    sold by someone in the group on at least two occasions or

14    agreeing that rival drug dealers would be extorted, shot, or

15    killed if they encroached on the gang's turf.

16         However, even though we don't have to prove that any

17    specific defendant committed any act of violence or handled any

18    drugs, throughout the course of this trial, we have done just

19    that.

20         So keeping those things in mind, let's take a deeper

21    dive.

22         The first question you have to answer is:  Was there

23    an enterprise?

24         And the answer to that is an easy "yes."

25         Murdaland Mafia Piru.

1          As Judge Blake explained, an enterprise is just a

2     group of people with a common purpose, ongoing organization,

3     and members that function as a continuing unit.

4          Enterprises can be formal or informal, and street

5     gangs routinely meet this test.  MMP is no exception.

6          There can be no reasonable doubt that MMP existed.

7     From at least 2011, MMP was a group of people, a group of

8     Bloods, who joined together for the common purpose of enriching

9     themselves through drug trafficking and who used threats of

10    violence and actual violence to eliminate rivals and witnesses.

11         MMP embraced its turf and folded the 5200 boys into

12    their drug-trafficking organization to expand and grow.

13         You heard from any number of witnesses that MMP

14    existed.  You saw it and heard it from the defendants

15    themselves, in social media and wire calls and jail calls.

16         You heard from Judge Blake that an enterprise need not

17    be formal, but MMP was about as organized as it gets.

18         It was an offshoot of the greater Bloods gang,

19    sanctioned by the Piru leaders in California.  And at all

20    times, Dante Bailey, Gutta, was its leader.  He called the

21    shots, and he wrote it all down in his gang paperwork.

22         He explained that Treetop Piru was rocked by a federal

23    indictment and that brothers who would kill and die for one

24    another became adversaries; that they became snitches and rats;

25    and it caused separation.  And so in Murdaland, the mafia was

1    built.

2           Dante Bailey went to California.  He got the okay from

3    the Bloods leaders; and from then on, there can be no question

4    that MMP had a common purpose and functioned as a continuing

5    unit.

6           It had a formal oath.  You heard a witness testify

7    about the oath and recite it from the stand.

8           There was structure with a Don at the top and mobsters

9    at the bottom.

10          There were handshakes and gang signs.

11          There were rules and, with the rules, a way to earn

12   rewards and sanctions for violating the code.

13          MMP was not a fiction; it was an enterprise.

14          The second part of this element is that the enterprise

15   affected interstate commerce, and this is also pretty easy to

16   deal with.

17          As Judge Blake just instructed you, any effect on

18   interstate commerce qualifies, no matter how minimal.

19          And you heard testimony from Special Agent

20   David Collier of the ATF that members of MMP possessed and

21   carried and used guns that were manufactured out of state.

22          And you heard lots of testimony that the gang

23   trafficked in drugs, including selling drugs to customers who

24   traveled to MMP's territories from outside the state.  That is

25   more than enough to satisfy the element of interstate commerce.

1           So let's talk about the second element.

2           Did each of these defendants knowingly agree to

3    participate in the affairs of the enterprise?

4           And, again, "yes."

5           Remember, we do not have to prove that each defendant

6    formally joined the gang, nor have we attempted to.

7           We must only prove that each defendant became a member

8    of the agreement, became a member of the racketeering

9    conspiracy, that they each agreed to participate in the affairs

10   of the enterprise through a pattern of racketeering activity.

11          In other words, that they agreed to help the gang

12   achieve its goals through a pattern of crime; that they agreed

13   to take part in the criminal affairs of the gang.

14          And in this case, that means they worked with the gang

15   to make money, to sell drugs, or helped identify and retaliate

16   against witnesses or acted to protect the gang's territories or

17   helped to promote the gang and its affairs.  And each of these

18   defendants, undoubtedly, did those things.

19          Numerous witnesses testified that Gutta, Dirt, T-Roy,

20   Bo, and Creams were members and associates of MMP.

21          Witness after witness testified that these five

22   defendants were integral members of the conspiracy, that they

23   supplied drugs to other gang members, that they participated in

24   gang meetings, that they retaliated against witnesses, and that

25   they supplied guns.

1        The defendants not only became members of the

2   agreement; they were integral parts of it.

3        They comprised the teams for money and the teams for

4   murder.

5        But, again, you don't have to take the witnesses' word

6   for it.  That testimony is corroborated by the defendants

7   themselves, by their social media posts, their text messages,

8   their recorded phone calls.

9        Let's start with Dante Bailey, who went by Gutta or

10  Wolf, Almighty, Godfather, Don.  There can be no doubt that

11  Bailey agreed to participate in the affairs of the enterprise.

12       He is the undisputed leader of MMP.  He founded the

13  gang.

14       He made the rules, and he called the shots.

15       He initiated new members.  He gave people their M's.

16  And he elevated other mobsters up through the ranks.

17       He ordered sanctions.  He ordered hits.  He green-lit

18  murders, and he committed them himself.

19       I could go on and on about how you know that

20  Dante Bailey was a member of MMP, but I think the evidence

21  speaks for itself on this point.

22       Randy Banks, who went by Dirt or Sand.  There can be

23  no doubt that Randy Banks agreed to participate in the affairs

24  of the enterprise.

25       Mr. Sardelli asked you at the beginning of the trial

```
 1    to keep track of how many times Randy Banks was mentioned over

 2    the course of the trial.  And I hope you did that, because each

 3    and every witness came up here and told you that Randy Banks,

 4    Dirt, ran the Gwynn Oak-Liberty Heights drug shop.  He was a

 5    boss.  He was in charge of the second drug shop.  He was

 6    intimately involved in the drug operation and personally

 7    involved in the violence.

 8         And Randy Banks was a part of MMP from the beginning.

 9    He was placed in control of the West, and the gang flourished

10    in the West within the Gwynn Oak area under the tutelage of

11    Dirt.

12         Randy Banks, Sand, was the boss of finance, and he

13    participated in the gang's affairs.

14         When gang members like Dontray Johnson, Bino, needed

15    money for gang business, they went to Dirt.

16         You heard this call where Bino sends someone to the

17    boss of finance on his behalf for money.

18         You heard about Randy Banks being a supplier to other

19    members of the gang, about him demanding taxes from others to

20    sell in his turf, and about him looking to retaliate against

21    rival gang members, even threatening to kill rival gang

22    members.

23         Randy Banks certainly agreed to participate in the

24    affairs of the enterprise.

25         Jamal Lockley, Droid, T-Roy.  Mr. Lockley was not an
```

1  oath-taking member of MMP, but that in no way means that he was

2  not intimately involved in the affairs of the enterprise.  He

3  cannot escape culpability simply because he did not jump

4  through the formal hoops of becoming a member.

5       You heard from witness after witness that Mr. Lockley

6  was as involved in MMP's affairs as every other member.  He

7  bought drugs from and sold drugs to MMP members.  He worked

8  with MMP members on a daily basis.

9       He attended gang meetings, took orders from gang

10  leaders.  And when it was time to retaliate for a gang member's

11  murder, he hopped in the driver's seat.

12       Mr. Lockley need not be a card-carrying member of MMP

13  to be a part of the conspiracy.  Just ask Malcolm Lashley or

14  Jay Greer.

15       Make no mistake, Jamal Lockley was not an independent

16  player.  He was not just a 5200 boy who got caught up.  He

17  knowingly and intentionally associated himself with MMP.  He

18  benefited from MMP's violence, from MMP's protection of the

19  drug turf where he sold drugs on a daily basis, and he

20  participated in MMP's affairs.

21       You heard countless wiretaps, wiretaps where

22  Mr. Lockley sold to MMP members Jacob Bowling, Melvin Lashley,

23  Shakeen Davis.

24       He was supplied by two MMP bosses, Adrian Spence and

25  Corloyd Anderson.

1          When Dante Bailey called gang meetings, T-Roy was in

2     attendance.  Let's take a look at his phone.

3          Blizz, who you heard was a member of MMP, texted T-Roy

4     about a gang meeting.

5          T-Roy said he was on his way, and the meeting waited

6     for him.

7          And you know what happened at that meeting on

8     August 19th of 2016.  You heard it yourself.  Bailey got on the

9     phone, and there was a discussion of Trouble being a

10    confidential informant and what they were going to do about

11    it -- send him to M-Easy, the enforcer -- as well as an

12    apparently hilarious conversation about the murder of

13    Uncle Rick.

14         When Mookie was killed, who was right there in the

15    mix?  Jamal Lockley.

16         Failure to take an oath does not absolve someone from

17    being part of the racketeering conspiracy.  He doesn't get to

18    benefit from and sell for the enterprise but insulate himself

19    from culpability because he didn't raise his hand and take the

20    oath.

21         He, undoubtedly, participated in the gang's affairs.

22         Corloyd Anderson, Bo.

23         Mr. Anderson was not nearly as flashy or obvious about

24    his involvement with MMP, but he was just as integral a part of

25    that operation.

1          He was a boss.  Trouble told you that.

2          Greer also said he was someone at the top, that he had

3     MMP golds in his mouth.  Dante Bailey himself confirmed it.

4          And you heard about the main role that

5     Corloyd Anderson played in the gang:  drug supplier.

6          You heard from Trouble that he supplied heroin.

7          You heard from Jay Greer that he supplied heroin.

8          You heard from Malcolm Lashley that he tried to supply

9     him heroin, too.

10         You saw gang paperwork describing him as a drug

11    supplier, and you heard from Mr. Anderson himself over the wire

12    calls that he supplied drugs to other members of the gang.

13         You also heard that Bo supplied a gun, a Ruger .22,

14    that was used in the murder of Antoine Ellis.

15         Mr. Anderson was more careful.  He was cautious.  You

16    heard him over the wiretap telling Jamal Lockley to stop

17    talking dumb over the phone.

18         But Bo was clearly involved in the gang's affairs.  He

19    was a member of the enterprise.

20         And, finally, Shakeen Davis, Creams or Creams Dinero.

21         Unlike Mr. Anderson, Shakeen Davis was a proud,

22    flag-flying member of MMP.  Yes, he was a 5200 boy, but he was

23    also a member of MMP.  The witnesses all told you that.

24         And Creams himself told you that over and over and

25    over again:

```
1              Murdaland Mafia mob, the world is ours.

2              Murdaland Mafia, nothing more, nothing less.  The real

3    mob.

4              You heard about his drug sales.  You heard about his

5    love for firearms, about him hiding guns in MMP's territories.

6              You heard about him using an AR to defend MMP's turf,

7    to shoot at rivals in broad daylight at a busy intersection at

8    Windsor Mill and Forest Park.

9              Shakeen Davis was a member of the enterprise.

10             So that brings us to the third element, that any

11   member of the conspiracy agreed to commit at least two

12   racketeering acts.  And the racketeering acts are broken down

13   by type of act.

14             Over the course of this trial, you heard evidence

15   about a lot of these crimes; but remember, for the purposes of

16   Count 1, we don't need to prove that the defendants personally

17   agreed to commit any of these crimes; just that when they

18   joined the enterprise, they knew at least two crimes would be

19   committed by members of the conspiracy.

20             And some of these racketeering acts, you can

21   reasonably infer from MMP's rules alone.

22             MMP Rule Number 3:  Retaliation is a must.

23             You heard testimony and saw evidence that the rule

24   against snitching is one of the rules that's punishable by

25   death.
```

1           And you heard that whenever we are forced to strike,

2   our only option is to kill.

3           What this means is that it's impossible to join or be

4   associated with MMP without understanding that murder and

5   witness tampering and witness retaliation are part of the deal.

6   Just by joining this gang, by associating with MMP, these

7   things are foreseeable.

8           But let's start with murder, attempted murder and

9   conspiracy to commit murder.

10          As you'll likely recall, you heard evidence about a

11  number of murders and attempted murders perpetrated by gang

12  members in furtherance of the gang's goals.

13          These murders were committed by, sanctioned by, and

14  involved different members of the conspiracy, but they were all

15  done in the name of MMP.

16          October 15th, 2012, Samartine Hill, Snook, was shot

17  outside a crowded nightclub.  He was gunned down at point-blank

18  range by William Banks, Trouble, and somehow he survived.

19          Dante Bailey ordered the hit.  He ordered the hit

20  because Snook was rumored to be snitching.

21          You heard about this attempted murder from the shooter

22  himself, and you watched the video.

23          What happened that night is that members of the gang

24  filed in:  Tech, Dirt, Trouble, Gutta, Bangout, Mookie, Bino.

25  Gutta saw Snook in the crowd and turned to the newly released

1    MMP member, Trouble, and gave his order:  Snook is a rat.  Kill

2    him.

3         And Trouble told you he followed the order.  He went

4    to the car, got Gutta's gun, and returned and unloaded.

5         There is no doubt that Gutta knew what was about to

6    happen.

7         Let's watch the video.

8       (Video played.)

9       **MS. PERRY:**  You don't have to take Trouble's word for

10   it.  You can see what happened.  You can see it in the video.

11   The crowd scatters at the sound of gunshots.  Everyone is

12   blurry.  Everyone is moving except for Dante Bailey

13   (indicating), because it's not a surprise to him.  How could it

14   be?  It was on his orders.

15        Look at how everyone else in the crowd reacts and how

16   Bailey reacts.  He knew that Trouble was going to follow his

17   order.

18        And not only did Dante Bailey order it and watch it go

19   down; he then wrote about it.

20        Scene 32, Mirage nightclub, Nooks gets hit.

21        Mirage, Gutta and his entourage, Gutta and Dirt agree

22   to make it look like the Fourth of July.

23        Insert a scene where Spittle asks Nooks, and they say

24   he a rat and a bitch and a snake.

25        This is a screenplay.  Of course it's a screenplay.

 1   But that doesn't mean that what's in it is not true.  Of course

 2   it's true.  You saw it happen on video.

 3          Now, Ms. Whalen and the other defense attorneys spent

 4   a lot of time at the beginning of this case warning you about

 5   who to believe.  And apparently their answer is no one.

 6          They promised that Trouble would lie to you.  They

 7   said, Don't believe Trouble.  Don't believe Jay Greer or

 8   Malcolm Lashley or Derran Hankins or Jarrud Dixon or

 9   Devin Ferguson.  And, in fact, don't believe the defendants

10   themselves.  Don't believe the rap lyrics or the social media

11   or the gang writings.  Apparently everything everyone says is

12   fiction.

13          And as the judge explained, it is your obligation as

14   jurors to take a close look at all of the witnesses and their

15   testimony.  And I urge you to think critically about what they

16   told you.  And with respect to Trouble, to even approach it

17   skeptically.

18          If one thing is abundantly clear, it's that Trouble is

19   not someone who's earned unwavering trust.  And yet you saw him

20   testify.  You heard him tell you that he was a dead man

21   walking.  He told you that he believed that this was his last

22   chance to come clean about everything he did and everything he

23   saw and everything he knew.

24          He came in here and he told you the good, the bad, and

25   the incredibly ugly.

1          He did not shy away from his crimes.  He did not

2   hesitate to admit his past transgressions.

3          But most critically, what he told you is corroborated

4   by all of the other evidence.

5          Trouble didn't manufacture this video.  He didn't have

6   any idea that Dante Bailey was going to write this screenplay.

7   He didn't force Dante Bailey to flash gang signs.

8          Almost every single thing Trouble told you is

9   corroborated by other witnesses and in other ways.

10         And as you heard from Trouble and numerous others, you

11  don't become a capo in MMP, you don't become Dante Bailey's

12  right-hand man, his confidante, without putting in work.

13         It takes someone inside of the gang to break the

14  Omertà code, to shine a light on the dark place that MMP

15  created.

16         And I'm certainly not standing here asking you to like

17  Trouble or even to believe him because he testified as a

18  Government witness.  I'm standing here asking you to think

19  about whether or not his information is supported, whether or

20  not his information is corroborated by other evidence.

21         And I say the same to you about the other witnesses

22  you heard from:  Jay Greer, Malcolm Lashley, Derran Hankins,

23  Devin Ferguson.  Some of them have committed serious crimes.

24  They pled guilty in other cases, and they're testifying here

25  because they're hoping for leniency.

1          And their testimony didn't line up perfectly.  In

2    fact, that's one of the ways you know they weren't coached.

3    They didn't try to get their stories straight.  They each gave

4    you their own individual perspective.

5          They didn't have the same roles in the gang, the same

6    rank, the same close confidants.  They were not out on the

7    street at the same time.  But each and every one of them

8    testified about what they knew, and they are corroborated by

9    each other and by the other evidence.

10          And with respect to the attempted murder of Snook,

11    Trouble's word is corroborated by that video and by

12    Mr. Bailey's own words.

13          **THE COURT:**  Is this a good breaking point?

14          **MS. PERRY:**  I think so.

15          **THE COURT:**  Okay.  All right.  Thank you.

16          We're going to take the lunch recess.  I'll start by

17    excusing the jury.

18      (Jury left the courtroom at 12:57 p.m.)

19          **THE COURT:**  Okay.  We'll excuse the gallery.

20          Okay.  We'll take the recess until 2 o'clock.

21      (Luncheon recess taken.)

22          **THE COURT:**  Good afternoon.  Ready for the jury.

23      (Jury entered the courtroom at 2:06 p.m.)

24          **THE COURT:**  All right.  If you'd like to continue,

25    Ms. Perry.

1        **MS. PERRY:**  Thank you, Your Honor.

2            Before the break, we were discussing the specific

3    racketeering acts, specifically, murder, attempted murder, and

4    conspiracy.  And we had just discussed the murder or attempted

5    murder of Samartine Hill.

6            I want to turn now to November of 2012, Thanksgiving

7    Day.

8            On that day, on Thanksgiving Day of 2012,

9    Antoine Ellis, Poopy, lost his life for alleged violations of

10   MMP rules.

11           Trouble told you about that murder.  Yet again,

12   Dante Bailey ordered that hit.

13           Trouble -- sorry.

14           Bailey told Trouble to kill Poopy because he was,

15   quote, playing both sides, being disloyal to MMP, working with

16   BGF.

17           But before Trouble could commit the murder, Bino got

18   there.

19           Bino met Poopy at the gas station.  Poopy had been

20   hanging around the gang's territory doing gang business.

21           It was broad daylight, Thanksgiving Day.

22           Poopy went willingly with Bino, his friend and fellow

23   gang member.

24           Bino walked the victim over to the baseball field

25   where Bino unloaded.  He shot Poopy 13 times with

1    Corloyd Anderson's 9-millimeter Ruger, and then he fled.

2        You heard the frantic 9-1-1 calls describing the

3    shooter.

4        After the murder, Bailey told Trouble that it was

5    already taken care of, that Poopy had already been killed.

6        But there was still the murder weapon to deal with.

7        Trouble was standing right next to Corloyd Anderson,

8    Bo, when Bo told Mr. Bailey that he had gotten rid of it, that

9    he had ditched the gun.

10        This murder was a true MMP effort.

11        After the murder, Bino bragged, promoting the gang.

12    He posted on Facebook, "198 and risin'," a reference, as

13    Detective Diaz told you, to Baltimore's murder rate.

14        He said [reading]:  That man has work to do.  The city

15    has to be cleaned up.

16        He bragged about elevating his status and about being

17    paid for the hit, paid by the gang leader.

18        [Reading]:  I'm one of the loyalest young "N" words.

19    He gave me a couple hundred.

20        Mr. Bailey acknowledged that [reading]:  Oh, yeah.

21        Trouble told you about this murder and the aftermath.

22    And, again, he is corroborated by Bailey's and Bino's own

23    words, by the physical evidence, by the surveillance footage.

24    MMP, you get with us or you get run over.

25        In February of 2015, Dante Bailey decided to get his

1   own hands dirty.  Let's start with February 8th of 2015, at the

2   gang's headquarters, the BP gas station.

3            Trouble told you that he showed up at the BP that

4   night to meet with Bailey because he needed a place to stay.

5            When Trouble got there, Dominick Wedlock, Nick, was

6   already there.

7            Nick got into it with some guys.  You saw the

8   confrontation inside the gas station store on the video.

9            And, as was the MMP way, Nick wanted to send a

10  message.  So Nick walked over to Bailey's car, the dark Lexus

11  parked by the pump, and asked Bailey for a gun.

12           Mr. Bailey decided to take care of it himself.  He got

13  out of the car, out of the driver's seat, and started shooting.

14           No reasons asked for.  No reasons proffered.  You get

15  with us or you get run over.

16           By sheer luck, no one was hit, despite the abandoned

17  car and the bullet lodged in a neighbor's wall.

18           But no one was hit, so no need to get rid of the gun.

19           Bailey got back in the driver's seat.  And he and

20  Trouble pulled out of the station, headed back to Bailey's

21  place on Princely Way.

22           Again, you don't have to take Trouble's word for it.

23  It was captured on video.

24           Bailey was there that night, dressed in all

25  black:  black hat, black pants, black jacket, black shoes.

```
 1              Mr. Wedlock was there that night wearing a
 2    light-colored hat.
 3              And Trouble showed up wearing white shoes.
 4              You watch the video -- and before I play it again, I
 5    just want to remind you what you heard from Detective Carrai,
 6    that the timestamp is about an hour off.
 7         (Video played.)
 8         MS. PERRY:  You can see the confrontation and
 9    argument.
10              Nick approaches the driver's side of the car.
11              And the door opens and the driver gets out, starts
12    shooting.
13              I'm going to play it one more time.
14         (Video played.)
15         MS. PERRY:  Nick approaches the driver's side of the
16    car.  The door opens.
17              Notice how clearly you can see Nick in his
18    light-colored clothes.  Notice how that the shadow that emerges
19    from the driver's seat, you can't see any clothing distinctly;
20    but you can see that it's the driver's side of that car.
21              And you can see that the person -- you can't see
22    anything about the person's clothes.  That's because it's the
23    driver.  It's Dante Bailey, dressed in all black, no white hat,
24    no white shoes.
25              Dante Bailey and Trouble flee.
```

1          William Jones, Bill, slashes the tires of the car for

2     good measure.

3          And minutes later, Officer Carrai responds and

4     collects the shell casings, along with some expelled live

5     rounds.

6          Three days later, James Edwards, Bangout, becomes, as

7     Sydni Frazier put it, another lost cause for the mob.

8          In the weeks leading up to the murder, Bailey and

9     Bangout were not on good terms.

10          Trouble told you that Mr. Bailey and Bangout were

11     arrested together in Atlanta and that a dispute started.

12          Derran Hankins and Jay Greer also told you there was

13     an issue brewing between the two of them, that Bangout was

14     unhappy with how he was being treated after the Atlanta arrest

15     and was making threats against the higher-ups.

16          It was well known that Bailey and Bangout were on the

17     outs.

18          And on February 11th of 2015, members of MMP were at

19     the recording studio.  By 1 o'clock that morning, James Edwards

20     was dead, shot five times:  in the face, in the chest, in the

21     back.

22          And left to bleed out below Fatima Hamid's bay window

23     at 310 Collins Avenue.

24          Detective Kazmarek collected the five casings along

25     with seven live rounds.  There was no other relevant physical

1    evidence.

2           But you do not need video or DNA to know that

3    Dante Bailey killed James Edwards that night.  Bailey himself

4    admitted that he was the shooter.

5           Bailey told Trouble the night of their show that he,

6    Bailey, had murdered Bangout.

7           Bailey also told Jay Greer.  He told Jay Greer about

8    it -- about that murder, about that night in incredible detail.

9           Mr. Bailey told Jay Greer things that only the killer

10   could know.

11          Jay Greer told you that Bailey said he and Bangout had

12   a disagreement and Bailey decided he would get Bangout touched;

13   he would get him killed.

14          Bailey told Greer that he, Bailey, Nizzy, and Nick

15   went to get Bangout.

16          That Bailey said he shot Bangout in the face first.

17          That Bangout tried to run.  He tried to crawl up some

18   steps.

19          Bailey said Nizzy kicked him and that Bailey shot him

20   two more times.

21          Jay Greer told you that Bailey said that he knew

22   Bangout was dead when he drew a long sigh.

23          These details weren't urban fiction.  It is what

24   actually happened.

25          Jay Greer did not see the crime scene photos.  He

1    didn't talk to the Medical Examiner.  He talked to the killer,

2    Dante Bailey.

3            And Bailey told him exactly what happened, and Bailey

4    didn't need to see the photos.  He saw the real thing.

5            Shot in the face.  Tried to crawl up some steps.  Shot

6    two more times.

7            It is completely corroborated by the crime scene.

8            There is no way for Jay Greer to know these things

9    unless Bailey told him.

10           And what Jay Greer told you is also corroborated by

11   the other evidence.

12           You know that Dante Bailey was in touch with Bangout

13   that night.  They texted back and forth 18 times, and then

14   Bailey began to gather his team.

15           He called Nizzy and he called Nick.

16           And at that point all he needed was his victim.  So at

17   12:26 a.m., Nick called Mal.  Mal, who told Malcolm Lashley the

18   day after Bangout was killed that he dropped Bangout off that

19   night to Gutta near Frederick Road.

20           Now, expect that you might hear about how Mal didn't

21   tell law enforcement this.  But I want you to consider who Mal

22   is more likely to tell the truth to, his close friend

23   Malcolm Lashley the day after the murder or law enforcement

24   officers after he's been arrested years later.

25           But back to 12:26 when Nick calls Mal, where is

1  Dante Bailey then?  He's not at home.  He's not at the BP.

2  He's out near Druid Hill Park.

3      And then he's moving south, headed in the direction of

4  310 Collins Avenue, headed towards the murder scene, when

5  suddenly he falls off the grid.

6      He makes phone calls all night long until suddenly he

7  stops.

8      He's not calling Nizzy.  He's not calling Nick.  He

9  doesn't need to.  He's with them already.  And he's already

10  made his plan to meet Bangout around Frederick Road.

11      And it's then, once the plans are made and the stage

12  is set, that he falls off the grid.

13      The unexplainable gap between 12:32 a.m. and

14  1:28 a.m., a gap just long enough for Bailey to get to

15  Collins Avenue, murder Bangout, and get home.

16      GPS cannot tell you where Dante Bailey was that night

17  at 1:00 a.m.  Cell site data cannot tell you where Dante Bailey

18  was at 1:00 a.m.  But you know where Dante Bailey was at

19  1:00 a.m.  He was at 310 Collins Avenue, precisely where he

20  told Trouble he was, precisely where he told Jay Greer he was.

21      12:32 a.m., a 10-minute drive from the crime scene.

22  1:00 a.m., Bangout is dead, murdered by the exact same gun

23  Bailey fired at the BP.

24      As James Wagster told you, same firing-pin impression,

25  same breech face marks, same live rounds left at the scene,

1    same gun, same shooter, same path of flight back home to

2    Princely Way.

3            1:28 a.m., safely home, safe to make calls.

4            But by 1 -- by 11:20 a.m. the next morning, Bailey's

5    looking for confirmation of his handiwork.

6            A screenshot of this murder from his iCloud account.

7    This crime is not in MMP territory.  It is way over on

8    Irvington.

9            James Edwards' next of kin has not been informed.  It

10   has not been made public that Bangout, James Edwards, was

11   murdered.

12           There is absolutely no reason for Dante Bailey to have

13   taken any interest in this crime scene unless, of course, he

14   was involved; unless, of course, he already knew who the victim

15   was.

16           Now, I fully expect that defense counsel will come up

17   here and tell you that someone else killed Bangout and maybe

18   even try to suggest that it was Trouble.

19           And there was this suggestion over the course of the

20   trial that because Trouble had access to a .40-caliber gun,

21   that it was Trouble's gun that killed Bangout.  It wasn't.  It

22   couldn't have been.

23           James Wagster told you that the .40 caliber from the

24   Terrell Gale shooting and the .40 caliber that killed Bangout

25   have totally different firing pins.  They are not the same gun.

1           And Trouble was not on Irvington on the night of

2    Bangout's murder.  He was in Essex, just like he told you he

3    was, at 11:22 p.m. and 6:24 a.m.

4           In fact, Trouble did not even know that Bangout had

5    been murdered.  He tried to call Bangout at 5:16 p.m. the next

6    day.  You saw those phone records.

7           Bailey, on the other hand, never made one more call to

8    Bangout.  He texts him 18 times leading up to the murder.  18

9    times and then nothing.  No call.  No text.  Nothing.  Because

10   he knew that Bangout was not going to answer.

11          This is not a big conspiracy to pin things on

12   Dante Bailey.  Trouble, Jay Greer, Malcolm Lashley are

13   corroborated by the physical evidence.  They are supported by

14   common sense.

15          Dante Bailey murdered James Edwards.  He did it

16   because James Edwards dared to show disloyalty to MMP.  He

17   dared to question Bailey's authority.  And he paid dearly for

18   it.

19          But Dante Bailey was certainly not the only MMP member

20   who was willing to pull the trigger.

21          On May 30th of 2015, Malcolm Lashley, Spook, was

22   sitting out across from the BP gas station.

23          As you heard, he was out there regularly.  And on that

24   day, he saw Shakeen Davis, Creams, hanging out of the passenger

25   window of a car firing a machine gun at a passing vehicle.

1          You heard why it happened.  You heard from both

2    Malcolm Lashley and Trouble.  Someone had pulled a gun on

3    another MMP member, on Nutty B, and retaliation is a must.

4          So Creams grabbed the long gun that he kept in the

5    trunk of his car and attempted to do just that, retaliate.

6          He fired nine rounds at a moving vehicle at a busy

7    intersection in broad daylight.

8          Malcolm Lashley saw it.  Trouble heard about it the

9    next day -- I'm sorry, the same day.

10          You even heard Creams talking about it, about how he

11    changed the color of his car, just like Trouble told you he

12    did.

13          Trouble told you that Creams' car was burgundy; but

14    after the shooting, he had all the paint scraped off.

15          Creams told Sydni Frazier that very thing about two

16    days later.

17          (Audio was played but not reported.)

18          **MS. PERRY:**  Sydni Frazier asked him about his car.  He

19    asked him what color it was.

20          Creams said [reading]:  I did some dumb shit out of

21    there.  It's on the green tip now.

22          Long guns, AR-15s, you know that was Shakeen Davis's

23    weapon of choice.  Everyone knew.

24          His friends and fellow gang members joked about it.

25          (Audio was played but not reported.)

 1          **MS. PERRY:**  It's all over his cell phone.  The fact

 2    that Creams was the shooter on that day, that's corroborated by

 3    all the other evidence you heard in this case.

 4          Creams carried long guns, "mops," shoulder straps.  It

 5    was common knowledge.

 6          In fact, you saw the one Officer Wilson recovered from

 7    Shakeen Davis on April 26th of 2016.

 8          On that day, Shakeen Davis was riding around with a

 9    Glock and an AR in the trunk of his car, precisely where

10    Malcolm Lashley told you he kept them.

11          Shakeen Davis carried guns.  He was ready to use them

12    to enforce the gang's rules, to protect the turf, to protect

13    other members of MMP.  Clearly, murder and attempted murder

14    were foreseeable to Shakeen Davis.

15          That same summer, Lawrence Shird, John Wayne, became

16    yet another victim of the mob.  Again, you heard about this

17    shooting from an eyewitness, this time from Jay Greer.

18          He and numerous other members of MMP were at the BP

19    gas station that night, and Jay Greer told you exactly what

20    happened.

21          And yet again, Jay Greer is completely corroborated by

22    the other evidence.

23          You heard that MMP members -- you heard from MMP

24    members themselves about precisely what happened that night.

25          The very day of the shooting, Adrian Spence, Spittle,

 1   and Jarmal Harrid, J-Rock, laid it out in explicit detail.

 2        (Audio was played but not reported.)

 3        **MS. PERRY:**  Big man and them was really trying to fix

 4   him up.  Big man, Dante Bailey, was trying to fix him up,

 5   trying to fix up the man with the jeans, Lawrence Shird.

 6        Spence said Bailey was trying to fix him up.

 7   Jay Greer told you that same exact thing, that Bailey told Fish

 8   that he would put that together; that Bailey called a meeting

 9   with Shird; that while Lawrence Shird and Bailey were talking,

10   Spotty, the shooter, jumped out and started firing.

11        Lawrence Shird's people fired back, and three people

12   were shot.

13        And Jay Greer told you why Dante Bailey did it.  He

14   did it as part of the Black Blood Brotherhood, in furtherance

15   of the alliance between BGF and MMP.

16        But make no mistake, this attempted murder was for the

17   gang.  It happened on MMP's turf.  It happened at

18   Dante Bailey's direction.  It happened because Black Blood was

19   just another way to get -- to get others to do what the mob

20   needs done.

21        It was for status.  And after, Bailey bragged in front

22   of Jay Greer and everyone else, "I had that done."

23        September of 2015.  In September of 2015, Dante Bailey

24   was locked up at the Baltimore County Detention Center in

25   Towson.  And he decided he needed to enforce MMP dues.  He

 1    needed money for his lawyer and his bail.

 2          Trouble, Jay Greer, Malcolm Lashley, they all told you

 3    that Bailey started demanding money.  He started taxing people

 4    and collecting dues.  Everyone was talking about it.

 5          (Audio was played but not reported.)

 6          **MS. PERRY:**  Gutta out here sending threats, talkin'

 7    about people have to give up $150 every week.

 8          Bailey held meetings with his fellow gang members,

 9    Bino, Trouble, Bo, his team for money and his team for murder.

10          He ordered Trouble and Bino to enforce the dues, to go

11    collect.

12          Brian Johnson, Nutty B, refused.  And he paid for it

13    with his life.

14          On September 29th of 2015, Bino, Melvin Lashley, Fish,

15    and a number of others waited for Nutty B on MMP turf.  You saw

16    the video.  There can be no doubt that they knew what was

17    coming.

18          When Nutty B arrived, they immediately filed out --

19    filed out of the convenience store.

20          (Video played.)

21          **MS. PERRY:**  They confronted him.

22          Nutty B bucked authority.  He wouldn't pay.

23          They murdered him.  One shot to the chest.  And they

24    left him there to die.

25          You get with us or you get run over.

1              You did not need witnesses to tell you what happened

2        on that day; you saw it.

3              And while each and every witness told you why it

4        happened, you did not need to hear it from them.  You heard it

5        from Bailey and Bino themselves.

6              On the same day as the murder, Bino visited Bailey.

7          (Audio was played but not reported.)

8          **MS. PERRY:**  They asked him for money for yo, for

9        Bailey.

10             Nutty B said, No.

11             They said, Then where the girl, the cocaine?  Where

12       that at?

13             Nutty B said he didn't have any.

14             And that was that.

15             And so Bailey says, Good.  They're scared now because

16       of this.

17         (Audio was played but not reported.)

18         **MS. PERRY:**  He says [reading]:  Blow his head off.

19       Blow another head off.

20         (Audio was played but not reported.)

21         **MS. PERRY:**  You heard it.  Detective Moore heard it.

22       This isn't urban fiction.

23             The day that his fellow gang member is murdered,

24       Dante Bailey says to the shooter, Good for you.  Do it again.

25             He has a team for money (indicating) and a team for

1  murder (indicating).

2      Bino wasn't the only person who visited Dante Bailey

3  right after this murder.  Another boss, Bo, visited him that

4  same night, too.  Everyone plays their part.

5      And when you think about Nutty B's murder, remember

6  what you didn't hear.  There was no one out retaliating for

7  this murder.  No one called a meeting.  No one went out looking

8  for Bino, because the murder had a green light from the top.

9      Because when it doesn't, when the threat comes from an

10  outsider, retaliation is a must.

11      Unfortunately for Anthony Hornes, MMP's version of

12  justice requires no evidence.  It affords no judge or jury.

13      You heard from a number of witnesses that there was a

14  wave of violence in April of 2016; that Carlos Younger, Los, a

15  rival gang member and a friend of Devin Ferguson's, was killed.

16      A few days later, on April 28th of 2016,

17  Maurice Braham, Mookie, a member of MMP, was murdered outside

18  the Big T's in Gwynn Oak.

19      MMP would not stand for it.  They kicked into high

20  gear.

21      Devin Ferguson and Trouble told you about the

22  aftermath of Mookie's murder.

23      Ferguson and his other BGF members and friends held a

24  vigil for Los.

25      Randy Banks, Dirt, a close friend of Mookie's, stormed

1    the candlelight vigil, gun in hand.  And he demanded to know

2    who killed Mookie.  He promised that he was going to kill every

3    last one of them by the end of the summer.

4          And as Dirt made those threats, a car drove up to the

5    vigil with a machine gun sitting in the backseat, a very thinly

6    veiled threat.

7          Devin Ferguson was Dirt's prime suspect, and Dirt put

8    money on Ferguson's head.

9          The rest of MMP gathered at a bank near

10   Liberty Heights and Gwynn Oak.  Trouble told you about that

11   meeting.  Dirt showed up, along with T-Roy, Gutta, and Murda.

12         What may have started as a grieving session turned

13   quickly.  And it was not long before everybody decided to strap

14   up, to get guns, and to go out hunting.

15         Trouble, Bailey, and Jamal Lockley got into Lockley's

16   blue Lexus.  Bailey directed from the passenger seat while

17   Lockley drove.

18         Bailey suddenly said, Stop right here.

19         He jumped out, and he shot Anthony Hornes one time in

20   the head just for walking down the street.

21         Trouble told you he was right there when it happened,

22   feet away, and he told you what he saw.

23         And what Trouble told you is consistent with the

24   evidence.  As the Medical Examiner explained, one shot to the

25   head, close range.

1            The photos tell -- the phones, rather, tell the same

2    story.  Bailey, Lockley, Trouble, all right there on top of the

3    murder scene.

4            You may recall that a number of defense counsel asked

5    Special Agent Wilde if these cell sites were consistent with

6    them being at the candlelight vigil.

7            Let me be perfectly clear.  The candlelight vigil was

8    for Los, a rival gang member, not for Mookie.

9            Dirt was terrorizing the candlelight vigil, not

10   attending it.

11           Bailey and Lockley were in Gwynn Oak for retaliation,

12   not to show support for a fallen member of a rival gang.

13           And, again, Trouble and Devin Ferguson are

14   corroborated by MMP members themselves the very next day.

15        (Audio was played but not reported.)

16        **MS. PERRY:**  [Reading]:  They want some smoke out

17   there.  Where Gutta at?  I'm not gonna lie.  Something already

18   happened.

19        (Audio was played but not reported.)

20        **MS. PERRY:**  [Reading]:  I don't even know who that is,

21   but he was up there.

22           You get with us or you get run over.

23           And let me make one thing abundantly clear.  Every

24   single person who showed up at that bank that night knew what

25   was likely to happen.  Dirt, T-Roy, everyone, they went up

1    there for one purpose.

2           And Jamal Lockley made himself a part of this.  He

3    knew exactly what he was doing.  This murder was foreseeable.

4           And for Dirt, it wasn't even enough.  You heard from

5    Malcolm Lashley that in 2017, after his arrest and while he was

6    detained, Randy Banks was still trying to figure out who killed

7    Mookie, still looking to retaliate.

8           Another major MMP tenet:  the elimination of rivals.

9           On August 10th of 2016, Ricardo Johnson was kidnapped

10   outside his home.  He was thrown into a stolen van, bound, shot

11   26 times, and attempted to be set on fire, all in the name of

12   MMP.

13          Malcolm Lashley and perhaps, more significantly, the

14   physical evidence told you exactly what happened.

15          Ricardo Johnson was flashy.

16          Sydni Frazier told Malcolm Lashley and a number of

17   other MMP members, including Creams, that he wanted to get

18   Rick, to kidnap Rick, to rob Rick.

19          Two days later, Rick was dead.

20          And Syd was out in MMP territory with a large stash of

21   heroin, sharing it with other members of the enterprise.

22          Elimination of rivals, enrichment of the gang, money,

23   and murder.

24          And you know that's what happened to Rick.

25          You saw Syd on the dirt bike ditching the murder

 1    weapons, ballistic matches to the crime scene.

 2           Ditching the gloves, his DNA on the inside,

 3    Ricardo Johnson's on the outside.

 4           Ditching the phones, the phones he used to text about

 5    the murder; the phones he used to text Creams a few days before

 6    about getting three Jimmy Macks, three guns; the phones that

 7    put Sydni Frazier at the scene of the abduction and then the

 8    scene of the murder; and the phones he used to contact Creams

 9    that very night.

10           And you know this murder was in furtherance of the

11    gang.  First, it was to eliminate Rick, a rival, someone with

12    money and drugs.  And it was to enrich the gang.  Syd came

13    around and distributed those drugs to other members and

14    affiliates of MMP.

15           You heard from Trouble that Dante Bailey ordered

16    Rick's murder, that Bailey believed Rick was a rat,

17    cooperating.

18           And he wasn't the only one that thought that Rick was

19    a rat.

20           Dwight Jenkins, Huggie, and Jamal Lockley, they talked

21    about Rick being on some other shit.

22        (Audio was played but not reported.)

23        **MS. PERRY:**  He's going to get himself hurt.

24           Jenkins and Lockley promised to put 'em together.

25        (Audio was played but not reported.)

1  **MS. PERRY:** And after Uncle Rick had been kidnapped,

2  bound, and shot 26 times, left to die in the desolate area near

3  the train tracks, they laughed.

4  Bailey, Lockley, laughter.

5  (Audio was played but not reported.)

6  **MS. PERRY:** It's a joke to them. So commonplace, so

7  routine, so foreseeable that it's funny.

8  This brutal murder of a rumored snitch is a joke.

9  There can be no reasonable doubt that each and every

10  one of these defendants knew, when they agreed to be involved

11  in this enterprise, when they agreed to participate in the

12  affairs of MMP, that murder was likely, that shootings were

13  mandatory, and that violence was expected. It's in the rules.

14  It's in the code. It's in the gang's own name.

15  There can be no doubt that when you decide to join and

16  associate with this violent street gang, that murder and

17  attempted murder and conspiracy to commit murder are

18  foreseeable.

19  And, in fact, each and every one of these defendants

20  agreed to participate, be it as the provider of the gun, the

21  person to dispose of the weapon, the getaway driver, or the

22  shooter himself.

23  To be sure, members of the racketeering conspiracy had

24  different roles. But being on the team for money does not mean

25  that you were unaware of the team for murder, because the two

 1   sides scratched each other's backs.

 2         Being the supplier, the money man, meant you needed a

 3   drug turf and you needed someone to protect it.  They all

 4   benefited from the violence.

 5         Murder happened.  It happened in furtherance of the

 6   gang, and it was foreseeable to these defendants.

 7         I spent a lot of time talking about the team for

 8   murder.  I want to talk now about the team for money.

 9         Drug trafficking was MMP's bread and butter.  You

10   heard witness after witness explain that members and associates

11   of MMP sold drugs all day every day on the streets, in jail, to

12   their usual customers, to those just driving by.

13         It would be impossible to participate in this

14   enterprise, to be within a ten-block radius of MMP, and not

15   expect that drugs would be sold.

16         Anyone who joined the gang understood that drug

17   trafficking was part of the deal.

18         And the drugs at issue here are heroin, cocaine,

19   crack cocaine, fentanyl, and marijuana.  And you saw each and

20   every one of those drugs over the course of this trial, and you

21   heard testimony about each and every one of those drugs from

22   witnesses.

23         And once you find that it was foreseeable that members

24   of the conspiracy would distribute and conspire to distribute

25   heroin and crack cocaine, then you also have to decide how much

137

```
 1    heroin and crack cocaine was foreseeable to the defendants.
 2            The indictment alleges that the defendants conspired
 3    to distribute over 1 kilogram of heroin and over 280 grams of
 4    crack cocaine.
 5            And remember, you don't need to find that the
 6    defendants themselves, any of the defendants, personally dealt
 7    any grams of drugs.  Just that it was foreseeable to them when
 8    they joined the gang that others would do so and that others
 9    did so.
10            But, again, each of these defendants did, in fact,
11    sell extraordinary quantities of narcotics.
12            Dante Bailey, you know that he sold drugs.  Trouble
13    told you.  Jay Greer told you.  Derran Hankins, Malcolm Lashley
14    told you.
15            Back in 2012, Devon Dent, Tech, was stopped with
16    cocaine, crack cocaine, heroin, and marijuana that belonged to
17    Bailey.
18            You heard him say over a jail call that Bailey left
19    him there with the drugs when the police arrived.
20            Bailey was arrested selling heroin with
21    Altoneyo Edges, Chicken Box, in April of 2015.
22            On June 18th, he had marijuana in his parked car that
23    was seized by Sergeant Friend.
24            Detective Corbin recovered heroin and crack cocaine
25    from Tiffany Bailey's car in July of 2015.  And then
```

 1  Detective Fisher recovered marijuana in Bailey's house on

 2  Princely Way that very same day.

 3          Agent Moore recovered over 90 grams of heroin from

 4  Bailey's house on Reserve Circle in May of 2016.

 5          Bailey was in jail calls with Jay Greer talking about

 6  acquiring 200 grams of heroin for Jay Greer to sell on his

 7  behalf.

 8          You heard a jail call between Bailey and his wife

 9  discussing their heroin inventory and somewhat comically trying

10  to figure out the count.

11          You saw and heard about his O sheets.

12          Dante Bailey sold drugs in furtherance of the gang.

13          Randy Banks.  You know that Dirt sold drugs.  He ran

14  the shop at Gwynn Oak and Liberty Heights.  Almost every single

15  witness testified -- that testified told you that.

16          You heard about his stash house.  You saw pictures of

17  it.

18          Jay Greer told you about a time that he cooked half a

19  kilogram of crack with Dirt at that very house.  That's

20  500 grams of crack cocaine on a single occasion.

21          You heard about Randy Banks taxing people who wanted

22  to sell in his territory.  You heard about him supplying

23  Melvin Lashley back in 2010 or 2011.  And you heard the details

24  about his shop on Gwynn Oak back in May of 2016, about how he

25  was overseeing, directing the people to the back where they

1    bought crack cocaine, and you saw the dime bags that they were

2    later arrested with.

3         You heard about him trying to double his drug money

4    through Derran Hankins.  You heard how Randy Banks and

5    Dante Bailey gave Hankins somewhere around $12,000 to gamble at

6    casinos or run through a fraudulent auto business.

7         You heard about how lucrative the drug shops were,

8    about all the people selling crack and heroin under Dirt on a

9    daily basis.

10        There can be no question that by joining MMP,

11   Randy Banks knew that large quantities of drugs would be sold.

12        Jamal Lockley.  I could probably spend the next two

13   days talking about how we know Jamal Lockley sold drugs, but

14   you heard and saw the evidence.

15        You saw the excerpts from Lockley's phone, 55 pages of

16   drug text after drug text.

17        And we only went over a small portion of that exhibit.

18        You saw him sell drugs to Trouble and a CI on

19   March 10th of 2016.

20        You heard him over the wiretap discussing sales with

21   countless drug buyers.

22        You heard him purchasing drugs from members of MMP,

23   asking Adrian Spence for 40 grams of heroin; on another day,

24   asking Spence for 50 grams of heroin.

25        You heard about Special Agent Faller's surveillance in

```
 1    August of 2016, about how he stopped a buyer who had just
 2    purchased from Jamal Lockley with a bag of heroin and a needle
 3    still hanging out of his arm.
 4          You heard Lockley yell at a drug buyer.
 5        (Audio was played but not reported.)
 6        MS. PERRY:  You know that Jamal Lockley routinely
 7    supplied Brandon Robinson and that Brandon's sister Shannon
 8    could have died from the drugs Lockley sold.  And you know that
 9    to Jamal Lockley, that was just a sign that the product was
10    good.  The stronger, the better.
11          There can be no question that by agreeing to work with
12    MMP, by supplying and being supplied by MMP members, Lockley
13    knew that large quantities of drugs would be sold.
14          Corloyd Anderson, supplier.  Again, something you
15    heard from each and every witness.
16          Trouble told you that Bo was one of the main suppliers
17    of heroin to members of the gang.
18          Trouble told you that Bo supplied him with 25 or
19    30 grams of heroin one time.
20          He also told you that Bo supplied Eddie McCargo, Kane,
21    another MMP member and that Kane got arrested with 50 grams Bo
22    supplied.
23          Trouble told you that -- about Bo's stash house.
24          Jay Greer also told you that Bo was a heroin supplier
25    for the gang.
```

1          Malcolm Lashley told you that Bo was a supplier.  He

2     told you that Bo was trying to get him to sell drugs for Bo,

3     but that he didn't want to owe Bo, so he never took the drugs.

4          But most importantly, you heard from Bo himself.  You

5     heard wire calls about drug trafficking.  You heard calls

6     between Bo and Jamal Lockley discussing drug business.

7          Here discussing the supply with MMP member

8     Jacob Bowling about the shop needing drugs before 9:00 a.m.

9          (Audio was played but not reported.)

10         **MS. PERRY:**  Bowling is not talking about a rental

11    office.  You heard the testimony.  The only shop these guys

12    were running was a drug shop.

13         Mr. Anderson talking about wanting his drug money.

14         (Audio was played but not reported.)

15         **MS. PERRY:**  He's mad that he hasn't been paid for his

16    supply.

17         (Audio was played but not reported.)

18         **MS. PERRY:**  So Mr. Lockley agrees to get him another

19    five tomorrow.  Could be 5,000, 500.  We don't know.  But we

20    know Lockley owed Bo money for drugs because that's the only

21    thing Lockley was selling.  You heard it in call after call.

22         A few days later, Jamal Lockley tells Bo he's trying

23    to see what he can scrape up to get another two.

24         (Audio was played but not reported.)

25         **MS. PERRY:**  Mr. Anderson and Mr. Lockley talking about

```
 1   the count.

 2        (Audio was played but not reported.)

 3        MS. PERRY:  Talking about the count until Bo gets

 4   upset that Mr. Lockley's talking explicitly over the phone.

 5        You also heard and saw evidence of Corloyd Anderson's

 6   drug proceeds.  You heard about Charles Banks being stopped at

 7   the airport with two U.S. postal envelopes full of random

 8   denominations of cash.

 9        Charles Banks claimed he was going to Vegas but had a

10   ticket to Texas.

11        Derran Hankins was consulted and, ultimately,

12   Corloyd Anderson showed up with some casino receipts, receipts

13   that show winnings from months earlier.

14        That $80,000 in cash in U.S. postal envelopes, that

15   was not casino winnings.  Casinos don't give out random

16   denominations of cash.  They don't package winnings in

17   U.S. postal envelopes.  Those receipts were just a cover, just

18   like the auto shop, car wash photos you saw with no cars being

19   serviced.

20        Bo made his money selling drugs.

21        And, finally, Corloyd Anderson admitted to

22   Special Agent Aanonsen that he was a drug supplier.  You heard

23   the interview on the day of his arrest, and you saw it in his

24   own handwriting.  He admitted to selling 50 grams of heroin.

25        Why he picked that number, again, we don't know; but
```

1    what you can be sure of is that he sold heroin.

2         Just because Corloyd Anderson was more cautious does

3    not make him any less involved.  You heard what the witnesses

4    said, and you listened to the calls.

5         Did Mr. Anderson use the word "heroin"?  Of course

6    not.  That's not how it works.  Context matters.

7         And after each time Mr. Anderson and Mr. Lockley

8    discussed meeting, discussed the count or the supply, you heard

9    calls between Mr. Lockley and customers.  And lo and behold,

10   Mr. Lockley had drugs to sell.

11        Mr. Anderson sold drugs for MMP.

12        Like with Corloyd Anderson, countless witnesses told

13   you that Creams sold drug for the gang -- sold drugs for the

14   gang.  And yet again, you heard it from the defendant himself.

15   You heard him getting supplied by Jamal Lockley over the

16   wiretap.

17        (Audio was played but not reported.)

18        **MS. PERRY:**  The sister tip, Malcolm Lashley told you

19   that's cocaine.

20        You saw Mr. Davis's phones, the phone recovered in

21   April of 2016 talking about having brown for you, having dark

22   brown.  Searches about how to make heroin rock solid.  This is

23   a small excerpt from that larger excerpt, but this kind of text

24   is not an anomaly on that phone.

25        On the phone recovered from February of 2017, blast

 1    text about testers.  Blast text about having heroin and

 2    cocaine.  Again, over and over on Mr. Davis's phones.

 3            You look through some of those phones, and what they

 4    show is that Shakeen Davis was selling gram quantities of

 5    heroin and cocaine to numerous customers per day, day in and

 6    day out, over and over.

 7            Those transactions add up to hundreds and hundreds of

 8    grams.

 9            You saw his Instagram page.

10            And, finally, when he was arrested in February of

11    2017, he had about 25 grams of crack cocaine and a Glock on

12    him.

13            Each and every one of the defendants sold drugs.  All

14    of them knew that drugs were part of the conspiracy, a crucial

15    part of the conspiracy.

16            So let's talk about quantities.

17            Trouble, Jay Greer, Malcolm Lashley, Derran Hankins,

18    and numerous law enforcement witnesses described both

19    Windsor Mill-Forest Park and Gwynn Oak-Liberty Heights as

20    open-air drug markets.

21            Numerous members of the conspiracy were out selling

22    each and every day.

23            You heard wire call after wire call about the sale of

24    drugs.

25            Trouble told you that on a good day, he could sell

1    60 grams of heroin.  That's one person in one day.

2         You heard about a seizure of 600 grams of heroin from

3    an MMP stash house run by Spence.  One seizure, 600 grams.

4         You saw drugs from search warrants, from car stops,

5    from stopping drug buyers.  You heard hundreds of calls

6    discussing hundreds of grams of heroin and crack cocaine.  You

7    saw countless cell phone excerpts discussing the sale of grams

8    and grams of girl and boy, heroin and crack.

9         You heard from Brandon Robinson and Jarrud Dixon.

10   They bought gram quantities of heroin from MMP members, from

11   Spence, from Bailey, from Lockley almost every single day for

12   years.  That means those two customers alone bought hundreds of

13   grams of heroin from Lockley, Bailey, and Spence, two

14   customers.

15        MMP members and associates sold their drugs by the

16   gram.  They were out there 10 to 15 people at a time.

17        Over the six years of this conspiracy, that is many,

18   many kilograms of heroin and crack cocaine.  There can be no

19   doubt that over the course of this conspiracy, over 1 kilogram

20   of heroin and more than 280 grams of crack cocaine were sold.

21        A kilogram of heroin, 280 grams of crack cocaine, that

22   was a drop in the bucket for MMP.

23        Moving on to witness tampering and witness

24   retaliation.

25        As we've already discussed, the rule against snitching

1  is one of MMP's founding principles.  Violation is punishable

2  by death.

3      And over the course of this trial, you've seen

4  countless occasions when that rule was put into practice.

5      We've already discussed Uncle Rick and Snook, about

6  how they were targeted based on the mere allegations that they

7  were cooperating with law enforcement.

8      You saw references to it in social media posts, about

9  the five laws, never snitch.

10      You saw gang paperwork about it.

11      One of the seven laws of death, any cooperation with

12  law enforcement.

13      A level 1 violation, punishable by death, telling,

14  snitching.

15      You also heard recorded conversations about it.

16      (Audio was played but not reported.)

17      **MS. PERRY:**  Find out who's cooperating and turn it up.

18      (Audio was played but not reported.)

19      **MS. PERRY:**  Punish him because he, as you heard

20  earlier in that call, told on Bino, for real.

21      And in addition to hearing about it, you heard about

22  actual attempts to murder cooperators in this very case.

23      Generally speaking, witness tampering is

24  forward-looking.  It involves preventing or attempting to

25  prevent a witness from providing information to law enforcement

1    or interfering with a witness's testimony.

2         Witness retaliation is backward-looking.  It involves

3    retaliation or the threat of retaliation against a witness

4    after the fact.

5         Often the two go hand in hand.

6         You heard Trouble testify that he was a dead man

7    walking.  That wasn't an exaggeration.  He was a ranking member

8    of MMP, and he broke the rules.

9         You heard evidence that Bailey and Spence and

10   Jamal Lockley made plans to do something about it.

11        On August 19th of 2016, Bailey called a gang meeting

12   at the studio.  Blizz got it together.  During that meeting,

13   Bailey said that Trouble was no longer a part of the team.  He

14   had violated Rule 1.

15        (Audio was played but not reported.)

16        **MS. PERRY:**  It was in Spittle's paperwork he was

17   cooperating.

18        So Bailey decides to send Trouble to M-Easy, his

19   hitman.

20        (Audio was played but not reported.)

21        **MS. PERRY:**  Just tell yo, holla at yo.  Say no more.

22        The message is clear.  They are talking about a hit.

23        You even heard Blizz later in that conversation say he

24   didn't want anything to go down at the studio.  The violence

25   was okay; just couldn't happen there.

```
 1              You saw a similar situation with Jay Greer, Champagne.

 2    Champagne was a liability.  He knew too much.

 3              Dante Bailey explained in his own handwriting how he

 4    goes about deducing when someone is cooperating.

 5              And so he set up a drop location with a female inmate

 6    at the Northern Neck Regional Jail.

 7              And then he told her to send a hit letter.

 8              [Reading]:  I need you to send a letter to Hollywood

 9    and give him Jay Greer's address.  Tell Hollywood, Give this

10    address to Crazy, and tell Crazy to pop a bottle of champagne

11    for me.

12              Send a letter to Hollywood.  Give him Jay Greer's

13    address (indicating).  Tell him to tell Crazy to pop a bottle

14    of champagne for him.

15              And that's what happens.  On September 27th of 2017,

16    Tara Whyte sends a letter to Kevin Forrest.

17              Two days later, Kevin Forrest buys a

18    Springfield Armory pistol and gets in touch with Crazy Homie.

19              Luckily, ATF gets there first.  They intercept the

20    hit letter.  They recover that gun, and they relocate Greer.

21              But you heard about the effect it had on Jay Greer,

22    his attempt to take his own life.

23              When Bailey tried to have Trouble killed, he was

24    retaliating against Trouble for providing information, for

25    cooperating with law enforcement against Spence, another member
```

1  of the gang.

2       But he was also trying to prevent Trouble from taking

3  the witness stand.

4       And when Bailey tried to have Jay Greer popped based

5  on his deduction that Greer was providing information to

6  law enforcement, he was retaliating, but he was also trying to

7  prevent him from testifying at this very trial.

8       And let me touch on one thing I expect you'll hear

9  from defense counsel.  That letter was a hit letter, plain and

10 simple.  There is no other way to interpret it.  It is

11 Jay Greer's street name.  It is Jay Greer's address.  And it

12 was because Jay Greer was cooperating.

13      Jay Greer had been released from prison.  You heard he

14 had already pled guilty pursuant to a cooperation agreement,

15 but he had not yet been sentenced.  He was out on the street.

16      And to use Mr. Bailey's own words, that is a major red

17 flag to anyone.  And the circumstances are sitting right in

18 front of you.

19      And certainly, Hollywood knew it was a hit.  He took

20 steps to carry it out.

21      The threats and attempts to kill witnesses in this

22 case were both retaliatory and forward-looking.

23      MMP created, they embraced this code of silence.

24      It was obviously foreseeable that witness retaliation

25 was a part of MMP.

 1          You could see the fear in the witnesses' faces as they

 2    testified.  The rule could not have been clearer:  If you speak

 3    up, MMP is coming after you.

 4          Extortion and robbery, two other tools in MMP's

 5    arsenal, to target rival drug dealers and to promote the gang.

 6          Extortion, you heard, involves threatening someone

 7    with physical injury unless they give you money, property, or

 8    something else of value.

 9          Extortion was the way MMP operated.  You get with us

10    or you get run over.

11          And over the course of this trial, you've certainly

12    heard evidence of extortion.

13          You heard that Dante Bailey and Bino extorted members

14    of the gang in an attempt to collect dues for Bailey's bail.

15    Nutty B was a victim of that.  He paid with his life.

16          You heard Dante Bailey routinely order other people to

17    take charges for him.  Spotty with the marijuana in the

18    vehicle -- in his vehicle.

19          Chicken Box with the heroin in the sweater.

20          You heard the reprimand Jay Greer got for refusing to

21    lie about the guns in the trunk of the car at Princely Way.

22          And you heard about Randy Banks demanding taxes from

23    outside drug sellers.

24          You also heard evidence about robberies.  You heard

25    about the robbery of Ricardo Johnson, the plot to kidnap him,

 1    the driving around for hours before murdering him and dumping

 2    his body near the Light Rail tracks.

 3            You heard about the fruits of that robbery, the bagful

 4    of heroin used to enrich the gang.

 5            And you heard about the robbery of Bobby Shmurda.  You

 6    heard about it from Derran Hankins that Gutta snatched a chain

 7    from Bobby Shmurda's neck just to prove he could, to show his

 8    dominance and to promote MMP.

 9            And you know that happened because other gang members

10    were discussing it.

11        (Audio was played but not reported.)

12        **MS. PERRY:**  You heard jail calls between Nick and

13    Melvin Lashley where Melvin Lashley described how Bino beat

14    someone up because he stole a drug sale from Lockley.

15            You heard other jail calls where incarcerated members

16    demanded dues from people on the street, threatened to beat up

17    people who didn't pay out.

18            Robbery and extortion were tools in MMP's toolbox that

19    they used to further their power and their control.

20            Murder, extortion, robbery, drug trafficking, witness

21    tampering, and witness retaliation were all foreseeable to

22    these defendants.  And they are all guilty of Count 1.

23            Turning, at long last, to Count 2, the

24    drug-trafficking conspiracy.

25            So the elements of Count 2 are that, first, that two

1    or more persons entered into an unlawful agreement to

2    distribute and possess with intent to distribute controlled

3    substances.

4          And, second, that the defendant -- that each defendant

5    knowingly and willfully became a member of the conspiracy.

6          The key difference between Count 1 and Count 2 is that

7    for Count 2, you don't need to find that the defendants were

8    members of or working for MMP; only that they conspired with at

9    least one other person to distribute drugs.

10         And we've already touched on most of the key points

11   here.

12         Remember that a conspiracy is simply an agreement.  It

13   doesn't need to be written down; just an unspoken, mutual

14   understanding.

15         And the conspirators do not need to know each and

16   every other member of the conspiracy, nor do they need to know

17   all of the details of the conspiracy.

18         But we have already been through how you know that

19   each and every defendant was a member of the drug-trafficking

20   conspiracy.  The defendants worked together with other members

21   of the gang to routinely deal drugs at their two major drug

22   shops.

23         Each defendant personally conspired with other members

24   to distribute drugs.

25         Some were suppliers.  Others were middlemen.  And some

1    were street-level hitters, but they all played a role in the

2    conspiracy.

3           And as the judge just instructed you, in a drug

4    conspiracy, a defendant is responsible for the quantity of

5    drugs sold by other members of the conspiracy that were

6    reasonably foreseeable to them.

7           And we have already talked about how each defendant

8    knew that much greater quantities than 1 kilogram of heroin and

9    280 grams of crack cocaine were being sold.

10          The defendants are guilty of Count 2.

11          In Count 3, Dante Bailey is charged with the murder of

12   James Edwards, Bangout, in aid of racketeering.

13          As with Count 2, we have already discussed this murder

14   in detail, so now it's just a matter of applying the facts to

15   the law.

16          The elements for Count 3 are, first, that an

17   enterprise affecting interstate commerce existed.

18          That the enterprise was engaged in racketeering

19   activity.

20          That the defendant had a position in the enterprise.

21          That the defendant committed the alleged crime of

22   violence, here the murder.

23          And that the defendant's general purpose in committing

24   the murder was to maintain or increase his position in the

25   enterprise.

1    So we've already discussed the enterprise.  MMP

2  existed.

3    And you know that MMP was engaged in racketeering

4  activity.  We just talked about that as well.

5    And you know that Dante Bailey had a position in the

6  enterprise.  He was the leader.

7    And as we discussed, you know that Dante Bailey

8  committed that murder.

9    So all that's left to talk about is whether the

10  purpose was to maintain or increase his position in the

11  enterprise, and this is not as complicated as it might sound.

12    If you find that Dante Bailey murdered James Edwards

13  because he knew it was expected of him by reason of his

14  membership in the enterprise or because he believed that it

15  would enhance his position or prestige with the gang or just

16  because he thought it was necessary to maintain the position he

17  already held, then the element is satisfied.

18    Bailey murdered Bangout because he knew it was

19  expected of him.  He did it because he thought Bangout was

20  challenging his authority.  He did it because Bangout was

21  violating his rule:  Loyalty to the gang over everything.

22    This was not a personal vendetta or a crime of

23  passion.  It was about MMP.  It was about protecting MMP and

24  about cleaning house.

25    Bangout was -- again, to quote Sydni Frazier --

1      another lost cause for the mob.

2            Dante Bailey is guilty beyond a reasonable doubt of

3      murdering James Edwards in aid of racketeering.

4            Turning to Counts 10, 18, and 31, these charge

5      individual defendants with specific counts of distribution or

6      possession with intent to distribute controlled substances.

7            And Judge Blake instructed you on the elements, but

8      with respect -- but they're similar.  So with respect to the

9      distribution, the Government has to prove that the defendant

10     distributed the drugs charged and that he did so knowingly.

11           And for possession with intent to distribute, the

12     Government must prove that the defendant possessed the drugs

13     charged; that he did so knowingly; and that he intended to

14     distribute those drugs.

15           So Count 10 charges Jamal Lockley with distribution of

16     crack cocaine on March 10th of 2016.

17           March 10th of 2016, Trouble set up a controlled buy of

18     approximately 14 grams of crack cocaine.  You heard about this

19     buy from Trouble, and you saw it -- and you heard about it from

20     Special Agent Tim Moore.

21           But more importantly, you saw it.  You saw Lockley

22     approach the car where Trouble sat with another

23     confidential informant, and you heard Lockley discussing the

24     purchase.

25           You saw money exchanged.

1          You heard from Special Agent Tim Moore that ATF set up

2    this purchase; that Trouble and the CI were searched before

3    they went out; that a team followed them to make sure nothing

4    happened; and that they retrieved the drugs, that they got back

5    Government's Exhibit D-14 from the CI.

6          Those drugs were sent to the lab, and they tested

7    positive for cocaine base, for crack.

8          This was not Trouble going rogue.  It was not some

9    attempt to plant drugs on Jamal Lockley.  This was a routine

10   occurrence for Jamal Lockley, selling cocaine in the area to a

11   member of MMP.

12         He distributed crack cocaine on that day, and he's

13   guilty of Count 10.

14         Count 18 charges Dante Bailey with possession with

15   intent to distribute heroin.

16         On May 17th, 2016, ATF executed a search warrant at

17   Mr. Bailey's home at 7607 Reserve Circle.

18         You heard Special Agent Moore testify that he

19   recovered a brown paper bag containing over 90 grams of heroin.

20   It was in Dante Bailey's room, the master bedroom.

21         At the street values, you heard about over and over in

22   this trial, that heroin is worth $9,000.  It was sent to the

23   lab, and it was tested and it was heroin.

24         Those drugs were not for personal use.  They were

25   distribution quantities.  Dante Bailey knowingly possessed that

1     heroin with the intent to distribute it and is guilty of

2     Count 18.

3          Count 31 charges Shakeen Davis with possession with

4     intent to distribute cocaine base.

5          On February 24th of 2017, the U.S. Marshals Service

6     was out looking for Shakeen Davis, and they found him at the

7     Foot Locker at the Mondawmin Mall.

8          And when they found him, they recovered approximately

9     25 grams of crack cocaine.  It was packaged in four clear

10    plastic bags inside a child's sock.

11         These drugs were sent to the lab, and you heard they

12    tested positive for cocaine base.

13         They were on Shakeen Davis's person.  They were not

14    for personal use.

15         25 grams of crack cocaine is distribution quantity.

16         And you saw the cell phone that Shakeen Davis was

17    carrying around that day full of drug texts, communications

18    with customers.

19         Shakeen Davis possessed this crack with the intent to

20    distribute it, and he is guilty of Count 31.

21         Counts 16, 17, 24, and 30 charge individual defendants

22    with specific counts of unlawful possession of a firearm.

23         And for this you must find that the defendant was

24    convicted of a crime punishable by more than a year.

25         That he knowingly possessed the firearm.

1          And that the possession of the firearm was in or

2    affecting interstate or foreign commerce.

3          Count 16 specifically charges Shakeen Davis with

4    possession of two firearms that we've already talked about, a

5    Glock and an AR-15.

6          First, you know that Shakeen Davis was convicted of a

7    crime punishable by more than a year.  You saw a certified

8    record of his conviction.

9          And you heard Special Agent Dave Collier testify that

10   both of those guns traveled in interstate commerce before

11   coming to Maryland.

12         And you heard Officer Philip Wilson describe pulling

13   over Shakeen Davis on that day for speeding.

14         When he was pulled over, Shakeen Davis had the Glock

15   in the center console and the AR in the trunk.

16         And when questioned about the guns, Davis admitted he

17   knew the guns were in the car.

18         And then he made up a story about where he found them.

19   He said he ran into them on the highway.

20         Even in Baltimore, you don't find AR-15s laying around

21   on the highway.

22         But regardless, Shakeen Davis admitted that he knew

23   the guns were in his car.  He knowingly possessed them and is

24   guilty of Count 16.

25         Count 17 charges Dante Bailey with possession of two

1    firearms, a Ruger .22 and a Springfield .45.

2         You know that Dante Bailey was convicted of a crime

3    punishable by more than one year because you saw the

4    stipulation.

5         And, again, you heard Special Agent Dave Collier

6    testify that both of those guns traveled in interstate commerce

7    before coming to Maryland.

8         And you actually saw a video of Dante Bailey

9    possessing those guns.  He was captured possessing those guns

10   at the Continental Arms firing range on May 3rd of 2016, and

11   you actually saw video of him firing one.

12       (Video was played but not reported.)

13       **MS. PERRY:**  Just to be clear, the law makes no

14   exception for renting guns or for firing ranges.

15       In fact, the range itself asks a specific question

16   about this, a question Dante Bailey did not give a truthful

17   answer to.

18       He knowingly possessed these firearms and is guilty of

19   Count 17.

20       Count 24 charges Corloyd Anderson with possession of a

21   firearm, a Glock 9-millimeter.

22       You know that Corloyd Anderson was convicted of a

23   crime punishable by more than a year because you saw that

24   stipulation.  And, again, you heard Special Agent Dave Collier

25   testify that this gun traveled in interstate commerce before

1   coming to Maryland.

2        You know that Corloyd Anderson possessed this gun on

3   September 27th of 2016.  It was recovered under the mattress in

4   the master bedroom of his house.  Before ATF found that gun,

5   Corloyd Anderson admitted that the gun was there, admitted that

6   the gun was his, and then described exactly where it could be

7   found.

8        The gun did not belong to his wife or anyone else in

9   the house.  It was not accidentally left in some possibly

10  rented furniture.  It was Mr. Anderson's gun.  You don't need

11  DNA or fingerprints to know that.  He told you that.  And he

12  had control over it because he knew exactly where it was.

13       Mr. Anderson said it was his gun.  He wrote it down

14  and then he said it again in a recorded interview.  He

15  knowingly possessed this firearm and is guilty of Count 24.

16       Count 30 charges Shakeen Davis with possession of yet

17  another firearm, this time a SIG SAUER .22.

18       We've already been over that Shakeen Davis was

19  convicted of a crime punishable by more than a year, and

20  Special Agent Collier testified that this gun traveled in

21  interstate commerce before coming to Maryland.

22       You heard Officer Sadik describe the arrest of

23  Shakeen Davis at the Foot Locker in the Mondawmin Mall.  In

24  addition to the 25 -- approximately 25 grams of crack cocaine

25  we talked about, he had this SIG SAUER in his waistband.  It

1    was on his person in his waistband.  He knowingly possessed

2    this firearm and is guilty of Count 30.

3         The final count for you to consider is Count 32, which

4    charges Shakeen Davis with possessing that SIG SAUER we just

5    talked about in furtherance of a drug-trafficking crime, and

6    that means that we must prove that the defendant committed a

7    drug-trafficking crime and that he possessed that firearm in

8    furtherance of a drug-trafficking crime.

9         So we already talked about how you know that

10   Shakeen Davis committed a drug-trafficking crime.  We talked

11   about it with respect to Count 2, and most recently we talked

12   about it with respect to Count 31 when we discussed that

13   crack cocaine in his pocket during this same arrest.

14        And as we just went over, you know he possessed this

15   firearm, the SIG SAUER.

16        So the question with Count 32 is simply:  Did he

17   possess that firearm in furtherance of the drug-trafficking

18   crime?

19        And the answer is clearly "yes."

20        As you heard a little while ago, possessing a crime --

21   possessing a gun in furtherance of a drug-trafficking crime

22   means that you have the gun to assist, embolden, aid, or

23   protect you while committing that drug-trafficking crime.

24        And as you heard over the course of this trial, drug

25   trafficking is a dangerous business and firearms are tools of

1      that trade.

2           You can't run to the police if someone robs you of

3      your drugs or if a customer refuses to pay.

4           You have to handle it yourself.

5           Drug dealers carry guns to protect their drugs and

6      their drug proceeds.

7           Shakeen Davis carried guns to protect the gang and to

8      protect his drugs.  This gun was clearly no exception.

9           He walked into that mall with crack cocaine and the

10     gun.  Those go hand in hand.  The gun furthers the

11     drug-trafficking crime.  It is a warning to others and

12     protection if necessary.

13          Shakeen Davis is not a security guard.  He wasn't

14     going deer hunting.  He possessed that gun for one reason, to

15     assist in his drug trafficking, if necessary.  And so he's

16     guilty of Count 32.

17          Ladies and gentlemen, MMP was not fiction.  It was not

18     just rap.  It was not a story concocted by Trouble to pin

19     heinous crimes on everyone else.  It was a violent street gang.

20     It was six years of money and murder.  It was families torn

21     apart, neighborhoods terrorized, and lives lost.

22          And it took the courage of witnesses you heard from,

23     the hard work of law enforcement officers from every

24     jurisdiction in the area over many years to bring this gang to

25     justice.

 1            The Omertà code of silence has been broken.  And when

 2    you look at all of the exhibits, all of the testimony, all of

 3    the evidence, there can be only one reasonable and inescapable

 4    conclusion:  The defendants are guilty.  And I ask that you

 5    find them guilty on all counts.

 6            Thank you.

 7            **THE COURT:**  Thank you, Ms. Perry.

 8            Seems like a good opportunity for a recess before we

 9    hear from next counsel.

10            So I'll start by excusing the jury.

11    (Jury left the courtroom at 3:33 p.m.)

12            **THE COURT:**  All right.  We'll excuse the gallery.

13            All right.  We'll take the mid-afternoon recess.

14    (Recess taken.)

15            **THE COURT:**  All right.  Ready for the jury?

16            **MR. ENZINNA:**  Yes, Your Honor.

17            **THE COURT:**  Okay.

18    (Jury entered the courtroom at 3:53 p.m.)

19            **THE COURT:**  All right.  I believe we'll be hearing

20    from counsel for Mr. Bailey.

21            **MR. ENZINNA:**  Thank you, Your Honor.

22            Good afternoon, ladies and gentlemen.  It occurred to

23    me this morning that after talking at you for almost two months

24    now, this is my first opportunity to actually talk to you.

25            So I'll start by introducing myself.  My name is

 1    Paul Enzinna.  And along with Teresa Whalen, I've been

 2    appointed to represent Dante Bailey in this case.

 3              I want to start by thanking you and echoing what

 4    Ms. Perry said about your service in this case.

 5              One of the things that makes our country great is the

 6    rights we all enjoy and the lengths we go to to protect those

 7    rights.

 8              Now, one of the most important things we do is trial

 9    by jury.

10              The Government has accused Dante Bailey of very, very

11    serious crimes.  I mean, there are no more serious crimes than

12    murder.

13              They want to take away his freedom.

14              But before they can do that, our Constitution requires

15    that they come in here and convince you, a jury of Mr. Bailey's

16    peers, beyond a reasonable doubt that they have proved

17    everything they have to prove to prove the specific crimes

18    they've charged in the indictment.

19              The jury system is a great thing.  The problem is it

20    imposes costs.  And, unfortunately, most of those costs are

21    borne by people like yourselves.

22              This case has gone on for almost two months now.

23    There have been dozens of witnesses, hundreds of exhibits.

24    Some of the exhibits are disturbing and shocking and really

25    unpleasant.

1    Through it all, you've showed up.  You've paid

2  attention.  You've taken notes.  And we thank you for that.

3    But now comes the next part of your job, which is to

4  deliberate, and that's a great word.  I like to say it was

5  chosen very deliberately.

6    What it means is it means to decide, but not just to

7  decide, it means to decide after careful and thorough

8  consideration, taking into account the evidence and the

9  consequences.  And that's what you're going to be asked to do

10  in a little while.

11    We make a lot of decisions in our lives.  You've

12  probably made dozens of decisions already today.  And over the

13  course of your lives, you'll make millions of decisions.  Very

14  few of those decisions do you make after deliberation and do

15  you make on a beyond-a-reasonable-doubt standard.

16    Reasonable doubt is a high standard, and it's meant to

17  be a high standard.  It means:  Do you have a doubt supported

18  by reason?  Simple as that.

19    This is a very complicated case, too.  32 counts.

20  Like I said, dozens of witnesses, hundreds of exhibits.

21    Multiple defendants, and that's very important,

22  because as Ms. Perry told you, you're not here today and for

23  the last six weeks to render a verdict as to Dante Bailey and

24  Randy Banks and Jamal Lockley and Corloyd Anderson and

25  Shakeen Davis.  You're here to render a verdict as to

1  Dante Bailey, a separate verdict as to Randy Banks, a separate

2  verdict as to Jamal Lockley, a separate one as to

3  Corloyd Anderson, and a separate one as to Shakeen Davis.

4       And in each case, you have to look at the evidence, at

5  the specific charges, at what the Government is required to

6  prove, and at the specific evidence relating to that defendant

7  and decide whether the Government has met its burden to prove

8  its case.

9       Now, as I said, beyond a reasonable doubt is a very

10 high standard.  And Ms. Perry spoke to you and spoke to you at

11 quite a length about what the Government does not have to prove

12 in this case.

13      But I want to talk to you about what they do have to

14 prove.

15      Beyond a reasonable doubt does not mean probably.  It

16 does not mean more likely than not.  It does not mean

17 consistent with.  It doesn't mean the best we can do.

18      It means what it means.

19      As I said, you are here as a jury of Dante Bailey's

20 peers.

21      I want to talk a little bit about Dante Bailey and

22 about who he is.

23      You've seen -- you've heard evidence about him that

24 the Government has offered, and the Government has painted him

25 really as kind of a monster.

 1          But he's just a man.  He's a 40-year-old man, has

 2   several children.

 3          We talked about his aspirations, about his writing,

 4   his screenplays, his rap videos, and so on.

 5          And now I want to clear one thing up.  I don't want

 6   you to get the impression that by talking about Dante Bailey's

 7   writings, his screenplays, his books, that we are trying to

 8   give you the impression that what happened here is fiction and

 9   it didn't happen.  That's not the issue.

10          The issue is not, as Ms. Perry said, it's not that

11   writing about it doesn't make it fiction.  The issue is,

12   though, that writing about it doesn't mean you did it.

13          I may date myself with this but one of my favorite

14   movies is a movie called "Goodfellas."  It's almost 30 years

15   old.  I can't believe it.

16          But it's about a famous incident in New York in the

17   1950s, when a group of gangsters stole a huge amount of money.

18   I don't remember how much.  Probably doesn't seem like that

19   much today, 60 years later.  But they made a movie about it,

20   and it is a likely fictionalized version of true events.

21          But the people who wrote that movie and who made that

22   movie weren't there.  They didn't do it.  They wrote about

23   something that happened, but they didn't do it.  And that

24   didn't make it fictional, but it didn't make them involved in

25   it.

 1          Now, I want to draw your attention back to something

 2   Ms. Perry showed you.  There we go.

 3          Ah, success.

 4          This is one of the documents that was taken from

 5   Mr. Bailey's writings.  And she showed you -- it's highlighted

 6   in red here:  Retaliation is a must.

 7          And I want you to look at some of the other things,

 8   what this says.  It talks about families first.  Don't let your

 9   emotions overpower your intelligence.

10          And it says down here at the bottom, number 6:  Always

11   give back to the people in some form.

12          And 7:  Find God.  Pray for your family.

13          My point is that I'm not here to convince you that

14   Dante Bailey is a great man or even a good man.  I'm not here

15   to try and get you to like Dante Bailey.

16          What I'm here to do is to ask you to think very

17   carefully about what happened here, what's been proved here,

18   and what needs to be proved.

19          Now, there was a lot of talk about the

20   Black Blood Brotherhood.  Remember that?

21          And the Government has painted it as sort of a -- I

22   don't know if you're familiar with the movie "Strangers on a

23   Train," but where two people on a train agree to basically swap

24   murders because it will be harder for the police to figure out

25   who did it because nobody will have a motive.  And that's what

 1    the Government has painted it as here.

 2            But I want to go back to a couple things here.  Here's

 3    something that William Banks said about the

 4    Black Blood Brotherhood.

 5            [Reading]:  Gutta just put it to us all like we all

 6    black men in the same struggle.  And instead of beefing and

 7    killing each other, we need to come together to get something

 8    bigger done.

 9            Devin Ferguson testified that this is where these

10    different gangs came together to make music and to find a way

11    to work out their disagreements without killing each other.

12            And my point is that you can look at something like

13    that through different lenses.

14            The Government looks at Black Blood Brotherhood

15    through one lens, but maybe there's more to it than what the

16    Government suggests.

17            Now, I mentioned that what you need to do here is to

18    look at the specific charges in this case, and that's very

19    important because the Government has -- the Government has not

20    charged Mr. Bailey with the murder of Poopy Ellis or of

21    Nutty B.

22            What it's charged him with is conspiracy, a

23    racketeering conspiracy, which is a very specific crime.

24            So the question here is not:  Was Mr. Bailey involved

25    in those events?

1          The question is:  Was he -- did he conspire to operate

2     a racketeering enterprise that caused those things to happen?

3          And that's a different question.

4          Now, there are two kinds of charges here that the

5     judge told you.  There are conspiracy charges, Counts 1 and 2.

6     Conspiracy is an agreement, a criminal partnership where people

7     agree:  Hey, let's work together and let's commit a crime

8     together.

9          And the thing about conspiracy is the crime is the

10    agreement.  It's not the thing that you agree to do.  It's the

11    agreement.

12         But the flip side of that is that without an

13    agreement, there's no crime.

14         And think about it this way:

15         Imagine, if you would, a couple of farmers and they

16    grow different things.  They grow lettuce, they grow

17    strawberries, whatever they grow.

18         And there are a group of people who come out there

19    every weekend and fill up their pickup trucks with fruit, and

20    they take it into the city to the farmers market.  And they

21    park their trucks, and they sell it all to the people.  They're

22    all selling stuff.  They're all selling the same stuff.

23    They're all getting it from the same people.  Are they

24    conspiring?

25         Now, if they say, "Listen, let's do this together.

 1   And I'll drive the truck, and you run the cash register.  And

 2   at the end of the day, we'll take all the money and we'll split

 3   it up," that's an agreement.  That's a partnership.  That's a

 4   conspiracy.

 5           But if it's simply ten guys with pickup trucks doing

 6   the same thing in the same place, that's not a conspiracy.

 7           Now, there are also substantive charges here, as the

 8   judge told you.  Substantive charges are charges where the

 9   crime is not an agreement, but it's an actual deed.  And

10   Mr. Bailey is charged with three substantive crimes.

11           One is possession of a firearm by a felon.

12           One is possession with intent to distribute heroin.

13   Those are Counts 17 and 18.

14           And Count 3, which I'm going to return to later,

15   because in a lot of ways, Count 3 is really the key to this

16   case against Dante Bailey.  And I want you to pay specific --

17   special attention to that count, and we'll come back to that

18   later.

19           Now, I want to stay on the conspiracy charges first.

20           A RICO conspiracy is a special type of conspiracy, and

21   Ms. Perry pointed that out to you.  It's an agreement, but not

22   just an agreement.  It's an agreement to benefit an enterprise.

23   And what is an enterprise?  And, again, she defined it to you.

24   I should just use her slides.

25           But an enterprise is a thing.  It's a -- an

1    organization.  It has a structure.  It is a -- it is something

2    bigger than a bunch of guys.  And it has a common purpose.  It

3    has an ongoing organization.  It has relatively stable

4    membership.  And that's the key to both Count 1, which is the

5    RICO conspiracy, and Count 3, which is the substantive crime of

6    murder in furtherance of a RICO enterprise.

7           And the question here is:  What is the enterprise

8    here?

9           Now, we've heard a lot about MMP, but we've heard a

10   lot about a lot of things here.  We've heard about the

11   5200 boys, the GMB.  I forget what that means, something about

12   getting money.  BGM, maybe, boys getting money.  TC, Team Cash.

13   GMG, Gutta Music Group.  TCCMG Team Cash Gutta Music Group.

14   There were a lot of things going on here.

15          And there were dozens of people selling drugs at the

16   BP station.  I think somebody testified there were as many as

17   50 people out there selling drugs.  And who were all these

18   people?

19          Well, there was testimony that you had to be MMP to

20   sell there.

21          But then there was testimony, Oh, well, you could sell

22   there if you were a 5200 boy.

23          And, oh, well, you could sell there if you were from

24   the neighborhood.

25          And, oh, you could sell there if you were close to

1    somebody.

2            Basically, it sounded like you could sell there unless

3    somebody said you can't.

4            So the question is:  Is this an enterprise?  Or is it

5    just a lot of people selling drugs?

6            Now, there was talk about the enterprise and MMP and

7    who's a member and who's not a member.  And a lot of people

8    were asked:  Who was a member?  How did you know who was a

9    member?

10           And they said a lot of things.  They said, Oh, people

11   did the handshake.

12           But did you notice, everybody who testified about a

13   handshake, nobody could do it?

14           Tattoos.  Somebody just told me.

15           Now, and the thing -- there was also talk about the

16   gang signs.  And I'm tempting fate here going to the AV

17   equipment, but let me see if I can pull this off.

18           No, I can't.

19           You remember Derran Hankins.  Remember Derran Hankins

20   testified?  And I asked him about who's in MMP.

21           And he said, Well, I'm not.

22           And I said, Well, what about this picture?

23           Remember I showed him that picture of him and

24   Mr. Bailey in the car and he's making the sign with his hand?

25           So the fact that you make a sign doesn't, apparently,

1  mean you're a member of the gang.

2      I asked him -- I asked Jay Greer, Were you a member of

3  MMP?

4      He said, No.

5      I asked Hankins, Was Greer a member of MMP?

6      He said, Yes.

7      It's a pretty fluid concept.

8      Mr. Hankins was asked, Have you ever been in a gang

9  meeting?

10      He said, No.

11      He said [sic], Did you know if they occurred?

12      He said, Well, I assumed there were gang meetings.

13      And he was asked, Well, did Dante Bailey ever tell you

14  about meetings?

15      And he said, Well, he told me he had to meet with

16  everybody to make sure everything was good.

17      Now, is that an enterprise?  Is that organization?  Is

18  that structure?

19      There's been a lot of talk about Mr. Bailey's music,

20  and not just Mr. Bailey, but all of these guys appear to rap.

21  And you saw Mr. Greer talked about the mix tapes and Spinrilla

22  and the Black Blood Brotherhood mix tape.  And they were really

23  trying to get off the ground with this kind of music.

24      Like I said -- well, it may not be your cup of tea.

25  It may not be my cup of tea.  But it is -- it's one of the

1   fastest-growing genres in the world today, and they were really

2   trying to do this.

3           Now, I want to spend some time talking about the

4   specific racketeering acts.  And I'm going to focus on two

5   kinds of racketeering acts here.  One is the shootings; one is

6   the murders.

7           Now, there were other racketeering acts, in particular

8   drugs.  Now, Ms. Whalen got up in the opening -- and, you know,

9   we're not trying to hide the ball here.  Ms. Whalen got up in

10  the opening and told you:  Did Dante Bailey sell drugs?

11          Yeah, people sold drugs.  There was a lot of drugs

12  being sold.

13          But I want to talk about the shootings, and I want to

14  talk about the murders.

15          Let's start with Samartine Hill.

16          It's interesting because it's tempting to say there's

17  no question about what happened here.  There's a videotape of

18  the shooting.

19          But -- and we know from that videotape exactly who the

20  shooter was.  It was William Banks.

21          But then Ms. Perry showed you the tape and showed you

22  and said, The tape shows that Dante Bailey knew this was going

23  to happen because he was going to -- he was standing there

24  while everybody was running away.

25          Now, a couple of things:  One, Dante Bailey got out of

1    there.  Dante Bailey, you noticed, is a large man.  I don't

2    think -- there aren't a lot of videos of Dante running.

3          But he got out of there.  If you watch that videotape.

4          And the other question is this -- ask yourselves this:

5          If, as the Government says, these guys arrived at that

6    club, they stood in line and Bailey, as Ms. Perry said, turned

7    to Mr. Banks and said, "There's Snook.  He's a rat.  He needs

8    to be killed," where was Dante Bailey when the shooting went

9    down?  Remember that video?  He was how close, 3 feet away?

10         Now, if he had just told Banks, "Go kill that guy,"

11   would he then hustle up there next to the guy to be there when

12   the shooting goes down?

13         So the question really is -- about the Samartine Hill

14   shooting is not so much:  Who did it?

15         The question is:  Why?

16         Now, Mr. Banks testified about Bailey supposedly

17   telling him that Snook was a rat.  He's got to be taken care

18   of.  SP has money on him.  You know what's up, et cetera,

19   et cetera.

20         Like many things in this case, determining why this

21   happened turns on what you think of William Banks.

22         Now, I don't know if you've ever seen those things on

23   the Internet where they'll take a speech and they do what's

24   called a word cloud where they take all the words in a speech

25   and the more often a word gets used, the bigger it is.  And,

```
 1    you know, they'll take somebody and -- I can't think of an
 2    example right now, but I think you know what I'm talking about.
 3         If you took a word cloud of the Government's closing
 4    argument in this case, you know what would be the biggest word
 5    right in the middle?  "Trouble."  Because Trouble is the key to
 6    the Government's case here.
 7         Now, I want to talk a little bit about Mr. Banks or
 8    Trouble and about all the cooperators.
 9         Like I said, there were dozens of witnesses in this
10    case.  There were forensic people.  There were chemists.  There
11    were drug -- I'm sorry, firearms experts.  There were police
12    officers.  There were ATF agents, FBI agents, cell phone
13    experts.
14         But in that closing argument, what did you hear?  You
15    heard about Banks.  You heard about Greer.  You heard about
16    Lashley.  You heard about Ferguson.  These are the cooperators.
17         And now you heard, the judge talked about cooperating
18    witnesses in the instructions and about how, you know, that's
19    how the Government proves cases many times.  They get somebody
20    to cooperate.
21         And -- but as the judge said, you have to be careful
22    with that kind of testimony, because these people have a
23    motive, a motive to tilt the truth, a motive to lie.
24         All these guys were testifying because they don't want
25    to go to jail.
```

 1          Greer testified.  He's been sentenced to ten years.

 2   He's hoping to get time served for testifying in this case.

 3          Mr. Banks said the same thing when he made his deal

 4   with the State.  Remember that?  He told the prosecutor in the

 5   State, I got you the arrest you wanted, and there will be

 6   plenty more to come.  He guaranteed that his cooperation would

 7   result in convictions.

 8          He said, I'll do whatever -- whatever you want to stay

 9   out of jail.

10          Now, Mr. Banks -- as the Government said, Mr. Banks is

11   accused of serious crimes here.  He pled guilty to two

12   attempted murders, one of a 2-year-old girl.  He's facing life

13   in prison.

14          That's -- those are what we call bad facts.  And he's

15   facing a very stiff sentence, so he's in here fighting for his

16   life.

17          And he knows, as does Jay Greer and Derran Hankins and

18   everybody else, that -- who's going to decide whether or not he

19   gets credit, whether or not he gets leniency?

20          Two people:  One is the judge, because the judge

21   sentences; right?

22          But before it gets to the judge, it goes through the

23   prosecutors.  The prosecutors tell the judge, This guy helped

24   us.  This guy cooperated.  You should give him a break.

25          And the prosecutors determine on their own whether or

 1    not you cooperated and whether or not you helped.

 2         Now, don't get me wrong; I'm not saying that the

 3    prosecutors are encouraging people to make things up or trying

 4    to coach people or anything like that.  These are honorable

 5    prosecutors.

 6         But put yourself in the place of Mr. Banks or

 7    Mr. Greer.  You're sitting up here, and you know that whether

 8    or not you spend the next ten years or the rest of your life in

 9    jail depends on helping them prove their case.

10         And now you, as a cooperator, what do you know?  You

11    know what their case is; right?  Because you've been indicted

12    in this case, too.  Before you cooperated, you got the

13    indictment.

14         And the indictment lays it all out.  Here's what we

15    say happened.  We say -- we, the Government, says Dante Bailey

16    killed James Edwards, so they know that their meal ticket is to

17    help prove that.

18         They also know -- you've heard a little bit, I think,

19    in this case about what's called discovery.  And when an

20    individual is charged with a crime, the Government gives you

21    what's called discovery, and all these exhibits and pictures

22    and things that -- we got that months and even years ago,

23    because we are entitled to see that so that we can prepare a

24    defense.

25         And the cooperators got that, too.

```
 1            Now, Ms. Perry talked about how Mr. Greer was able to
 2   talk about things with regard to the James Edwards killing that
 3   he could only know if the killer told him.  About how he
 4   climbed up the stairs and about how somebody kicked him and
 5   about how he sighed and that sigh meant he was dead.
 6            Now, that's not information that he could only know if
 7   the killer told him.  That's information that he could see in
 8   the indictment, in the discovery.
 9            It's not -- and, furthermore, none of that is
10   corroborated.  There's no proof that any of that actually
11   happened; right?
12            So, anyway, let me talk some more about Mr. Banks.
13   What do we know about Mr. Banks?  We know a couple of things.
14            We know one is he's done some very bad things.
15            We know, two, he's facing life in prison.
16            We know, three, he has told people, I will do whatever
17   I have to do to stay out of jail.
18            And we also know that he's a liar.  He lies about
19   everything.
20            He lied about the Samartine Hill shooting; right?  He
21   did that.  But he stuck to his story for how long that it
22   wasn't him; it was his supposed friend, Bangout, James Edwards,
23   who did it?  That's what he told the police until the police
24   showed him the video and said, That's you.
25            Then he said, Oh, well, now it's time for me to come
```

1    clean.  And he came clean; right?

2         He lied about the Gale shooting.  Remember

3    Terrell Gale, the road-rage incident when he shot at the guy

4    and he shot at the man's 2-year-old daughter?  He lied about

5    that too; right?

6         Remember he told the police that someone in a car had

7    driven by and shot at him (indicating)?

8         He lied about the Anthony Hornes murder.  Remember he

9    was working as a confidential informant at the time.  And he

10   came in here and told you that he got in the car with my

11   client, Mr. Bailey, and drove around until they found somebody

12   and shot him.

13        But when he texted his handler, Agent Hood, what did

14   he say?

15        He said, Bailey and Lockley are driving around in a

16   car.

17        He didn't say, I did it.

18        He didn't say, I was there.

19        And after the shooting happened, Hood asked him,

20   You've got to tell us.  Do you know anything?

21        He didn't say, Yeah, I saw this happen.

22        He didn't say that.  He's a liar.

23        Okay.  Let me talk a little bit about John Wayne.

24   Remember Lawrence Shird, the man who was shot.  And, again, we

25   know what happened there.  Again, the question is:  How did it

 1    happen and why did it happen?

 2              And that turns on Jay Greer; right?

 3              Jay Greer said that he heard Bailey and Fish talking

 4    about this and that Bailey set him up to lure him to the gas

 5    station so that Fish could shoot him.  And he said, This is one

 6    of those traded murders from the Black Blood Brotherhood;

 7    right?

 8              But let's think about that for a minute.

 9              First of all, supposedly the idea behind the

10    Black Blood Brotherhood was that if BGF has a problem and wants

11    somebody killed, let's have MMP do the killing, 'cause that

12    will make it hard for the police to figure out who do it and

13    vice versa.  If MMP wants somebody killed, let's [sic] BGF do

14    it.

15              But here, the issue with Lawrence Shird was an issue

16    between him and this guy Monkey Dog; right?

17              Remember Monkey Dog was seeing John Wayne's baby

18    mother.  And Fish said -- when this all was over, Fish said, I

19    got Monkey Dog's problem taken care of.

20              So this wasn't a traded murder at all; right?  BGF did

21    the shooting.

22              And Mr. Greer said, Well, I knew that Bailey was

23    setting him up because he deliberately lured him to the gas

24    station.

25              Now, ask yourselves this:  BGF comes to Mr. Bailey and

1    says, Hey, we want to kill a guy.  Can you help us kill him?

2    Can you set him up?

3            And Bailey said, Sure, that's a great idea.  Under our

4    Black Blood Brotherhood murder-trading scheme, that's a

5    terrific idea.  I'll lure him someplace so you can shoot him.

6            I know.  I'll lure him to the gas station where I

7    sell -- where all my people sell their drugs.  Let's -- let's

8    have a murder take place there so the police can come in and

9    shut it down and we go out of business.

10           And let's do it there where there are, as we know,

11   surveillance cameras going 24/7.  Does that make any sense?

12           And I also want to just point out one thing about

13   Mr. Greer.

14           Remember what Mr. Greer said, that he went to jail; he

15   chose to go to jail 'cause he was so afraid, because he was

16   afraid for his life?  Remember the letter he wrote to the

17   judge?  What did the letter say?

18           Did it say, Judge, I want to go to jail because I'm

19   afraid for my life?

20           No, it didn't say that.  Didn't say that at all.

21           It said, Judge, I want to go to jail so I can start

22   serving my sentence and get it done with.

23           And we asked him -- I asked him, Well, you know, why

24   didn't you mention that to the judge?

25           Well, I assumed the judge knew that.

1          Let's talk about Nutty B, Brian Johnson.

2          Greer says that Bailey told him, Greer, that Bailey

3   ordered Bino, Dontray Johnson, and Banks, Mr. Banks,

4   William Banks, to kill anyone who didn't pay dues.

5          Mr. Banks sat on that stand.  Did he -- did he

6   corroborate that?  Did he say, Bailey told me that?

7          And ask yourselves this:  Who was there when Nutty B

8   got killed?  Remember -- and there, you know, there's a

9   videotape of the murder.  We saw the videotape.

10         It was Bino, Gambino, Dontray Johnson, the MMP member,

11  and Fish.

12         Remember Fish?  Fish is from BGF.  BGF is a rival

13  gang.

14         Why is Fish collecting dues for MMP?

15         And remember that Greer told the grand jury -- before

16  he came in here, he testified before the grand jury.  And he

17  told them that Fish ordered Bino to kill Nutty B.

18         Ricardo Johnson, remember he was kidnapped and killed

19  in the van?

20         Greer said Mr. Bailey wanted Johnson killed because he

21  was cooperating.

22         But the Government's theory today was Lashley told you

23  exactly what happened.  They wanted to eliminate a rival who

24  was selling drugs.  So Greer is so eager to help, to score

25  points for his leniency, that he's coming in here and espousing

```
 1    a theory that the Government doesn't even espouse with respect
 2    to this murder.
 3              And in his grand jury testimony, again, he didn't
 4    mention that.
 5              He said, Oh, well, that was a minor detail.
 6              Remember Melvin Lashley testified, and he said Bailey
 7    did not order the killing.  Frazier wanted to kidnap Johnson
 8    and take his drugs.
 9              Anthony Hornes; remember Anthony Hornes?  Appeared to
10    be a wrong man in the wrong place at the wrong time.
11              But you remember what happened -- and I'm going to use
12    a map to talk a little bit about this.
13              You remember there was a murder.  Carlos, Los, was
14    killed on one night, and the next night Mookie was killed.
15              And at the same time there was a vigil being held for
16    Carlos; right?
17              And all of this is happening -- I hope I can find it
18    now.  It's all happening in a place about two blocks wide.
19    Remember that?  I mean, these are -- these are places that are,
20    like, minutes from each other, walking from each other.
21              And remember when Mookie was killed, Mookie was killed
22    and within minutes the word was out that this had happened and
23    MMP guys came from all over.
24              The Government said, Well, don't let them tell you
25    that the MMP guys came to attend the candlelight vigil.  They
```

1    didn't come to attend the candlelight vigil.  They came because

2    their guy Mookie had been killed a block away from the

3    candlelight vigil.  So everybody is there.

4         And Agent Wilde got up on the stand and said, See

5    that?  Their cell phones were there.

6         Of course their cell phones were there, because that's

7    where they were.  That's where everybody was.

8         And look how quickly it happened.  Within minutes,

9    they had heard Mookie's been shot, and they ran out there.

10        Now, again, I already talked about what happened

11   with -- oh, I wanted to mention Devin Ferguson.  Remember

12   Devin Ferguson testified about this, and he talked about the

13   retaliatory violence that was going on that night.  And it just

14   kind of escalated and spiraled out of control.

15        Who's the one person he didn't mention?  He didn't

16   mention Dante Bailey.

17        And the Government talked about the car that pulled up

18   and the window rolled down and the machine gun in the back.

19   Who was driving that car?  Who was in that car?

20        And I already told you about Mr. Banks working as a CI

21   and the dishonest texts he was sending to his handler at the

22   time about what was supposedly happening.

23        So, again, that's another case where we know what

24   happened.  We know Anthony Hornes was killed.

25        What's the evidence as far as who killed him?  It's

1    Mr. Banks.

2           Now I want to talk about what I said earlier is

3    really, for Mr. Bailey, at least, sort of the heart of the

4    case, and that's the James Edwards murder.

5           This is a case -- this is a substantive crime.  So the

6    Government's not saying, Convict Mr. Bailey because he agreed

7    that somebody would kill James Edwards.

8           It is saying, Convict Mr. Bailey because we have

9    proven beyond a reasonable doubt that he pulled the trigger,

10   that he killed James Edwards.

11          Now, ask yourselves:  Has the Government proven that?

12          Let's look at the evidence.

13          First of all, what's the theory for why Bailey would

14   want to kill Mr. Edwards?  I heard several.

15          One is that Edwards was upset that Bailey wasn't

16   treating him right and was making threats.  There was an issue

17   about a missing gun.

18          There was an issue about Atlanta.

19          There was an issue about Edwards was trying to get SP

20   robbed.

21          I mean, we don't even have a coherent motive for why

22   this would have happened.

23          And now let's look at the testimony here, Lil Mal.

24   Remember Lil Mal?  Lashley said that Lil Mal told him -- well,

25   we didn't hear from Lil Mal.  We heard from people who said

 1   Lil Mal told them that he dropped off Edwards on Frederick Road

 2   to Gutta.

 3          Whereas, Mr. Banks said he dropped him off at the BP

 4   to a car with a girl in it.

 5          Now, we also know -- well, we also know where

 6   Mr. Bailey was that night; right?  By virtue of his cell phone

 7   and his GPS.

 8          Now -- I'll come back to that in a minute.  Let me --

 9   let me talk about something else first.

10          Another piece of the Government's evidence is this:

11   This is a screenshot of the Baltimore Police Twitter feed about

12   the Edwards murder, and the Government said -- and I wrote it

13   down:  There was no reason for Mr. Bailey to take interest in

14   this incident unless he had been involved.

15          And the Government said:  He was seeking confirmation

16   of his handiwork.

17          Now, I put it to you that that's exactly backwards.

18   If Mr. Bailey did kill James Edwards and if he was involved in

19   it, what confirmation does he need?  He was there.  Why take a

20   screenshot of his Twitter feed?

21          I mean, what explains this?  What explains this?

22          Now, remember the Twitter feed -- the Twitter feed was

23   downloaded what time?  Here it is, 11:20 a.m.

24          And remember, when was James Edwards killed?  Shortly

25   before 1:00 a.m.  So this is 10 and a half hours later.

1          Now, we saw what happened when Mookie got killed, how

2     the rumors fly, how everybody knows what's happening right

3     away.

4          And don't you think that rumors were flying about

5     Edwards being killed and that Bailey went on the Twitter feed

6     to see if there'd been anybody killed?

7          There's also the ballistics evidence.  And I was

8     struck by the fact that -- well, you remember that the firearms

9     examiner said that the bullets -- remember the bullets

10    were .40-calibers.  And the bullets used to kill Edwards, the

11    firearms examiner said, were shot from the same gun as the gun

12    that was used a couple of nights before at the BP shooting

13    which the Government says was done by Dante Bailey.

14          Now, that depends on a number of logical leaps.

15          One is that Bailey did the shooting on the 8th.

16          Two is that that means that Bailey necessarily had the

17    gun on the 12th and not someone else.

18          It also means that the firearms examiners were right.

19          And remember, the firearms examiner never had the gun

20    itself.  All they had were the shells.

21          They also had the live rounds.  But remember what

22    Ms. Perry argued earlier today.  She said it was the same live

23    rounds.

24          Now, of course, they were the same live rounds because

25    they were live rounds.  They hadn't been fired.  So the live

1    rounds at the BP station and the live rounds at the Edwards

2    murder were both -- were all .40-caliber rounds.  They didn't

3    have firearms tool marks on them.  So, of course, they were the

4    same.  That proves nothing.

5         And, again, with respect to the firearms examiner,

6    remember what Mr. Wagster said when he was asked:  There was

7    a .40-caliber weapon used in the Terrell Gale shooting; right?

8    Did you compare those two guns?

9         And he said, No, I didn't.

10        Now, of course, he said, The reason I didn't was

11   because they had different firing pin shapes.

12        But how do you determine the firing pin shape for a

13   firearm?

14        The way they determine it is by looking at it.  It's a

15   judgment call.

16        So the notion that these guns were necessarily -- that

17   these shells were necessarily fired from the same gun just

18   doesn't wash.

19        And let me turn now to the cell phone evidence and the

20   GPS evidence.  We talked a lot about that.

21        And, again, I'm going to use the map.

22        You remember at 12:23, Mr. Bailey's phone pings off a

23   cell phone tower up here, a little bit north of

24   Druid Hill Park; right?

25        And then Collins Avenue is down here (indicating).

 1    That's where the murder took place.

 2             And at 12:23, we then have a series of pings that go

 3    in this direction (indicating) and start moving across the

 4    city; right?

 5             And remember Mr. Bailey was here at 12:23 and an hour

 6    and 5 minutes later, he was up here in Pikesville at home

 7    (indicating).  So he came up here; right?

 8             And the Government now says, Well, we had our agent go

 9    out and drive it, and he determined that it's 18 minutes from

10    here (indicating) to here (indicating).

11             So if Mr. Bailey was here at 12:23, he could have made

12    it here (indicating) by 12:40, in time to shoot Edwards; right?

13             And then the Government says, Well, plus we have these

14    other pings going down here that show him moving in that

15    direction (indicating).

16             It's interesting, though, where those pings stop.

17    They stop here (indicating).

18             Now -- or roughly here (indicating) -- or, actually, I

19    think it's actually right here on Franklin Street (indicating).

20             And what that shows is that Mr. Bailey was moving

21    south.  I think he may have been moving a little bit west too,

22    in fairness.

23             But the interesting question would have been:  Does he

24    go straight across here to 695 and home (indicating)?  Or does

25    he come over here and go down Collins Avenue (indicating)?  We

1    don't know 'cause the pings stopped.

2         And the Government says he falls off the map.

3         Now -- oh, I'm sorry.  Those weren't cell phone pings,

4    the 12:25 to 12:32.  Those were GPS pings because, remember,

5    Mr. Bailey is wearing an ankle monitor.  So he knows that he's

6    being monitored by GPS where he is at any given time.

7         So -- and you remember also that -- remember what

8    Agent Moore testified about the records and they had that

9    little notation on them:  Strap -- strap tamper detected.

10        So if somebody tried to tamper with that, they could

11   detect it.  And there was no indication that that had been

12   tampered with.

13        So Mr. Bailey is up north of Druid Hill Park at 12:23.

14   And the Government says he then drove down to Collins Avenue to

15   shoot Mr. Edwards and then zipped home.

16        Now, if you were wearing an ankle monitor and you knew

17   that someone was keeping track of where you were at all times,

18   would you do that?

19        And, finally -- oh, and remember -- remember

20   Agent Wilde testified, remember one of the last questions I

21   asked Agent Wilde was -- I said, In fact, what you're saying

22   here is that it was possible for Mr. Bailey to go down to

23   Collins Avenue, shoot Edwards, and get home by the time the

24   next cell phone pinged?

25        And he said, Yeah, that's right.  It was possible.

1    Remember I talked about reasonable doubt?  "Possible"

2  doesn't cut it.

3    Now, in fairness, the Government has some additional

4  evidence, and that is the supposed confessions, that Mr. Bailey

5  supposedly confessed to both William Banks and Jay Greer that

6  he killed Edwards.

7    Now, Mr. Banks says that Bailey told him this at a

8  pool party at a club called Paparazzi several months after the

9  killing and that he didn't tell him any details.

10    Greer says -- remember what Greer said?  He said,

11  People get confessional when they get locked up.

12    Remember, they were in prison and they got locked up.

13    But remember what happened here?  Remember Jay Greer?

14  Jay Greer was this little guy who worked at the audio recording

15  studio that Bailey liked the way he engineered the records and

16  let him come live with him.

17    And there was testimony and evidence of time after

18  time when Greer was -- remember he got beaten up for eating a

19  hot dog?  He got beaten up for losing a key?  Remember that he

20  said that Bailey told him, "I want you to go shoot somebody,"

21  and Greer didn't do it?  Came back and said, "I couldn't find

22  the guy."

23    And what did Bailey say?  You're not one of us.

24  You're not -- you're scared.  I don't trust you.  Remember

25  Bailey told him, I don't trust you?

1          Remember after the search warrant when Bailey said,

2     "You should have protected me," on that phone call?  He said,

3     "You got to stand up for me," and he didn't do it.

4          And Greer says that two weeks later in prison, Bailey

5     said to him, Oh, yeah, by the way, I shot Edwards.

6          And I talked already about the, quote/unquote, details

7     that he supposedly learned.  And there's supposedly no way that

8     he could know those details unless Bailey had told him when, in

9     fact, we don't know if those details are, in fact, accurate;

10    and, B, Greer claimed that Bailey confessed to him only after

11    he was charged in this case and learned the facts of this case.

12         But I want to focus for a minute on one important

13    piece in the case.

14         When you go to consider Count 3, you will see that

15    Mr. Bailey is charged with violating the RICO statute.  But

16    he's also charged under 18 U.S. Code, Section 2, which is the

17    aiding and abetting statute.

18         And aiding and abetting is a theory which says that

19    you can be liable for a crime even if you don't actually commit

20    it, but if you aid and abet the commission of it.

21         Now, the judge instructed you about aiding and

22    abetting.

23         What's the first thing -- what are the two key things

24    about aiding and abetting?  One, there has to be proof that

25    someone committed the crime.

     1          And, two, there has to be proof that you, the

     2     defendant, willfully and knowingly commit -- participated in

     3     it, that you committed some affirmative act to bring it about.

     4          Now, aiding and abetting is not some sort of catchall

     5     standard to say, Look, we know the guy's dead.  We think Bailey

     6     wanted him dead, so Bailey probably helped the guy.  That's not

     7     what aiding and abetting is.  There has to be proof that

     8     somebody killed him and that Bailey affirmatively helped that

     9     someone do it.

    10          What is the evidence that any -- the Government's all

    11     in on Dante Bailey as far as killing James Edwards.  Their

    12     theory is that Dante Bailey left Druid Hill Park, drove down

    13     there -- even though we don't have him anyplace within three

    14     miles of Collins Avenue -- drove down there, shot Edwards, and

    15     then went home.

    16          Their theory isn't, Oh, Dante Bailey gave somebody a

    17     gun to go kill Edwards or Dante Bailey gave somebody a ride.

    18          That's not the theory here.

    19          So aiding and abetting, I mean, if, in fact, the

    20     Government really believes that Dante Bailey didn't kill

    21     Edwards, who did they think did kill him?  And where is that

    22     person?

    23          Now, there is no denying that a lot of very bad things

    24     happened here.  There is -- you saw the autopsy photographs,

    25     drugs being sold.  A lot of very bad things happened here.

1          But the question is not:  Did a lot of bad stuff

2    happen and was Mr. Bailey possibly or probably involved or is

3    it consistent with his involvement?

4          The question is:  The Government says Mr. Bailey

5    committed very specific crimes.  And the question is:  Has the

6    Government met its burden beyond a reasonable doubt of putting

7    facts in front of you to show that that is what happened; that

8    there was an enterprise; that there was a structure; that there

9    was a -- an ongoing form to this thing; that there was an

10   agreement among the conspirators who sold this -- who sold

11   drugs at the gas station?

12         One interesting thing is, ask yourselves this:

13   Where's the evidence that at the end of the day, all these

14   supposed foot soldiers for the MMP came back to the clubhouse

15   and said, Here's our money; let's divide it up?

16         Or were they just selling the drugs for themselves?

17         The Edwards murder, again, like I said, I think that

18   that is really key to this case, because that's the one place

19   where the Government says, Dante Bailey did this.  He committed

20   this heinous crime, and here's the evidence we've got, ladies

21   and gentlemen.  And we know it doesn't put him anywhere within

22   three miles.

23         We know -- one other thing, too.  I'm sorry.  I forgot

24   to mention this, but remember this about the telephone calls?

25   18 text messages between Dante Bailey and James Edwards between

1    10:05 and 11:22 (indicating); right?  And then they stop.

2          And the Government says, Aha, they stopped.  Why did

3    they stop at 11:22?  If Bailey had made plans to rendezvous

4    with Edwards and shoot him, why don't they continue?

5          Why don't they continue and say, I'm on my way now.

6          Why don't they continue and say, I'll meet you here?

7          What happened to that?

8          And remember, also, I asked Agent Wilde, the last

9    phone -- the last phone call that Edwards received, 15 minutes

10   before he was killed, I asked him, Whose phone is that?

11         He said, I don't know.

12         I said, Did anybody look into that?

13         No.

14         So, anyway, it is true that James Edwards is dead.

15   Someone killed James Edwards.

16         But, ladies and gentlemen, the question is:  Has the

17   Government proved to you beyond a reasonable doubt that

18   Dante Bailey pulled the trigger?  And I submit to you that they

19   haven't.

20         Thank you very much.

21         **THE COURT:**  Thank you, Mr. Enzinna.

22         Could I see counsel at the bench for a moment.

23      (Bench conference on the record:

24         **THE COURT:**  You're next.  I'm assuming that --

25         **MR. SARDELLI:**  I would prefer tomorrow morning,

```
 1    Your Honor.
 2            THE COURT:  Yes.  I'm going to ask the jury if they
 3    can make it at 9:00.
 4            MR. SARDELLI:  Yes, ma'am.
 5            THE COURT:  Okay.
 6            MR. HAZLEHURST:  Just for my own mental health, should
 7    I plan to --
 8            THE COURT:  Why don't we talk after I send the jury
 9    home.
10            MR. HAZLEHURST:  Thank you.)
11        (Bench conference concluded.)
12            THE COURT:  All right.  Ladies and gentlemen, we will
13    hear from additional counsel.  But it's already quarter of
14    5:00, and I think someone may need a little more than
15    15 minutes to talk to you.
16            I am going to ask -- and if you need to go back and
17    talk about it -- actually, I'll ask you maybe to go back and
18    talk about it just briefly and let Ms. Moyé know whether you
19    could all come at 9:00 tomorrow.  We do only have a half day
20    tomorrow.  And if it's possible to start at 9:00, that would be
21    helpful.  If not, then 9:30.
22            Other than that, please continue to keep an open mind.
23    Don't talk about the case.  It is not over yet.
24            I'm going to ask you to go back in the jury room.  And
25    just let Ms. Moyé know, and she can come back out and tell me.
```

```
 1              And other than that, we will excuse you for the

 2    evening.

 3              Thank you very much.

 4              Ms. Moyé will let me know whether it's 9:00 or 9:30.

 5         (Jury excused at 4:45 p.m.)

 6              THE COURT:  So, Mr. Hazlehurst, let's see.

 7              MR. HAZLEHURST:  Yes, Your Honor.

 8              THE COURT:  We have at least three counsel before you

 9    who have told me they will be between 45 minutes and an hour.

10              So I think it's unlikely that we would be able to get

11    to not only you but also the Government's rebuttal.  In fact,

12    it is, I would say, virtually impossible since we only have a

13    half a day.

14              So unless somebody has something that they want to

15    tell me that they haven't already or some different argument, I

16    think we had agreed that we would have at least one defense

17    argument wait.

18              I don't -- I'm not sure we would get to you anyway;

19    but even if we could, if we are not going to get to the

20    Government's rebuttal, we should wait until Monday morning.

21              MR. HAZLEHURST:  I understand, Your Honor.  And,

22    again, and I apologize.  This is a vanity request, but it is

23    for my own mental health.  I just want to make sure that I can

24    rely on the idea that I will be on Monday and not tomorrow,

25    so . . .
```

 1           **THE COURT:**  Government?

 2           **MS. HOFFMAN:**  We're certainly fine with that, I think,

 3   I mean, for my mental health, too.  If it's unlikely, we're

 4   fine with just saying we'll do Paul's and my closing on Monday.

 5           **MR. HAZLEHURST:**  Thank you, Your Honor.

 6           **THE CLERK:**  9 o'clock.

 7           **THE COURT:**  And 9 o'clock is fine with the jury.

 8           So that's good.  All right.  You're going to step back

 9   in and tell them.

10           Okay.  All right.  9 o'clock.

11           All right.  We can excuse the gallery.

12           All right.  Any other -- any issues?  Anything anybody

13   wants to anticipate for tomorrow?

14       (No response.)

15           **THE COURT:**  No?

16           All right.  Thank you, all.  We will adjourn, and I'll

17   see you tomorrow morning at 9:00.

18       (Court adjourned at 4:49 p.m.)

19   I, Douglas J. Zweizig, RDR, CRR, do hereby certify that

20   the foregoing is a correct transcript from the stenographic

21   record of proceedings in the above-entitled matter.

22                    _____/s/_____

23                    Douglas J. Zweizig, RDR, CRR, FCRR
                          Registered Diplomate Reporter
24                       Certified Realtime Reporter
                       Federal Official Court Reporter
25                          DATE:  November 21, 2019

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
          Plaintiff,              )
 4                                )
          vs.                     ) CRIMINAL CASE NO. CCB-16-0267
 5                                )
     DANTE BAILEY, et al.,        )
 6        Defendants.             )
     _____ )
 7

 8

                     Thursday, April 25, 2019
 9                      Courtroom 1A
                     Baltimore, Maryland
10

11        BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                    (AND A JURY)
12

13                        VOLUME XX

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Assistant United States Attorneys

17   For the Defendant Dante Bailey:

18   Paul Enzinna, Esquire
     Teresa Whalen, Esquire
19
     _____
20

21

22
                        Reported by:
23
                Douglas J. Zweizig, RDR, CRR, FCRR
24             Federal Official Court Reporter
               101 W. Lombard Street, 4th Floor
25               Baltimore, Maryland  21201
```

1   <u>For the Defendant Randy Banks</u>:

2   Brian Sardelli, Esquire

3

    <u>For the Defendant Corloyd Anderson</u>:

4

    Elita Amato, Esquire

5

6   <u>For the Defendant Jamal Lockley</u>:

7   Harry Trainor, Esquire

8

    <u>For the Defendant Shakeen Davis</u>:

9

    Paul Hazlehurst, Esquire

10

11  <u>Also Present</u>:

12  Special Agent Christian Aanonsen, ATF

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S

 2         (9:04 a.m.)

 3             THE COURT:  Good morning, everyone.

 4             Before we start, I thought I would just mention,

 5    probably everybody is familiar with this -- oh, thank you.

 6             A new, revised -- the Count 10 is taking out the

 7    superseding indictment?

 8             MS. PERRY:  Yes.  And the top stack is actually a cut

 9    and paste from Word, so I actually just took those words out so

10    they read very cleanly.

11             The second stack, I actually blacked them out as

12    redactions.

13             I defer to Your Honor on which you prefer to send back

14    to the jury.

15             THE COURT:  Okay.  I'll take a look at them.  Thank

16    you.

17             I was just going to mention, just in case -- I think

18    everybody knows, but we're in the Fourth Circuit here.  So I'm

19    not expecting to hear any definitions of "beyond a reasonable

20    doubt."

21             I don't mean that you can't say, as Mr. Enzinna did,

22    which is perfectly fine, that it's a high standard; that it's a

23    doubt based on reason; obviously, these are very serious

24    matters, that sort of thing.

25             But I just wanted to be sure everybody knows we don't
```

```
1   get into percentages.  We don't get into moral certainty.  We
2   don't get into comparing it to some specific decision that
3   jurors have to make in the course of their own affairs.  Can't
4   do it.
5         Can't define "reasonable doubt" unless under some
6   circumstances the jurors ask for it in the course of
7   deliberations.  So that's number one.
8         And, number two, it is also -- again, I think
9   everybody knows, but punishment of anybody's individual client
10  is not something the jurors are allowed to consider.
11        So I don't expect to hear that, "The Government's
12  asking you to put my client in jail for the rest of his life"
13  or anything like that.
14        Obviously, the jury is very well aware these are
15  serious offenses.  Obviously, the sentences that the
16  cooperators are facing is fair game because that's an
17  incentive.
18        But no specific appeal based on the punishment of
19  anybody's individual client.
20        And I'm not suggesting anybody was planning to do
21  that, but I also wanted to avoid any possibility of an
22  interruption during closing.
23        Okay.  We're ready for the jury.
24        I see you are all organized there at the podium,
25  Mr. Sardelli.
```

 1          **MR. SARDELLI:**  How are you doing, Your Honor?

 2          (Jury entered the courtroom at 9:07 a.m.)

 3          **THE COURT:**  All right.  Welcome back, ladies and

 4   gentlemen.

 5          I think we're ready to continue.

 6          We'll be hearing from Mr. Sardelli.

 7          **MR. SARDELLI:**  Thank you, Your Honor.

 8          **THE CLERK:**  Mr. Sardelli (indicating).

 9          **THE COURT:**  With the mic.

10          **THE CLERK:**  You just have to turn it on.

11          **MR. SARDELLI:**  Good morning.

12          **JUROR:**  Good morning.

13          **MR. SARDELLI:**  It's been a while since opening

14   statements, so I'll go ahead and reintroduce myself again.  I'm

15   Brian Sardelli.  I'm a court-appointed attorney for

16   Mr. Randy Banks.

17          Now, I'm only here for Randy Banks, and so I'm not

18   going to try to repeat things that have been said already.  I'm

19   going to try to focus what I say about Randy Banks.

20          And you remember back to the opening statements, and

21   the Government was correct; I did want you to pay very close

22   attention, to take notes, because much of this case does not

23   have anything to do with Randy Banks.

24          The facts and the evidence in this case are very

25   important to you, because my client is only charged with two

 1  things.  Remember this:  He's not charged with a substantive or

 2  individual crime.  He's charged with the two conspiracies, the

 3  RICO conspiracy and the drug conspiracy.

 4       And in order for you to convict him of those two

 5  conspiracies, there has to be an agreement.

 6       The problem in this case is the facts and the evidence

 7  have shown no agreement, not one call, not one text, not one

 8  piece of social media, not an e-mail, not anything.

 9       I challenge you, when you go back for your

10  deliberations, to find something, a call, text, an e-mail,

11  something from Randy Banks that you find appropriate that

12  showed that he ever agreed to anything.

13       Something else I agree with the Government on.  They

14  said during the openings, quote/unquote, The phones tell the

15  story.

16       And I have to tell you, you've been here for week

17  after week after week, and you've heard call after call after

18  call.  What didn't the Government give you during their

19  opening -- excuse me, their closing statement?  What's the one

20  thing they left out?

21       Think back to the end of the case.  Right at the end

22  of the case, they tried to slip something in.  Do you remember

23  what that was?

24       That's B-4104.  That was the only call in this case

25  that Randy Banks -- allegedly was to or from Randy Banks.

1          By "calls," I mean wiretap phone calls, jail calls,

2   texts, e-mails, social media.  This is it (indicating).  This

3   is the one call from him.

4          And I ask you a question:  Why didn't the Government

5   talk about this during their closing statements?  Is it because

6   it doesn't fit the theory of their case?

7          Let me specifically show you this call.

8          Again, it's July 25th, 2015.  It's about noontime.

9   Allegedly, it's between Randy Banks and an Adrian Spence.

10         If you look at this call, it is clear it is about a

11  night of drinking out on the town the night before.

12         I asked one of the agents up there -- and we can all

13  use our common sense and our life experience -- people when

14  they go out the night before drinking, having a good time,

15  often the next day talk to the people they were out with.

16         Do you remember when such-and-such happened?

17         Do you remember when so-and-so said this or they were

18  crazy or they made a fool of themselves?

19         That's exactly what this call is about.

20         Now, I'm showing you right here [reading]:  Yeah, that

21  "N" word Fish was having a little drunk episode and shit.

22         And, again, look at the time and date of the call,

23  July 25th, 2015.

24         You remember SM-22, Government exhibit.  It's about a

25  club called Paparazzi.  What's the date on this?  Friday,

1  July 24th (indicating), the night before.

2          Why is that the only call to or from Randy Banks?  You

3  spent literally over a month -- I think six weeks here --

4  hearing call after call after call, wire calls, jail calls.

5  Why is this the only call to or from Randy Banks?  All the

6  other defendants, calls everywhere.  Social media everywhere.

7  You heard the agent.  This is one of the best tools

8  law enforcement have.

9          And, clearly, the Government theory is this

10 organization talks all day long on the wires, on the

11 jail calls.  They can't stop talking.  They can't stop posting

12 to social media.

13         The Government's main thrust of their case are the

14 calls, the texts.  They talk all the time except for my guy.

15         Now, the Government's going to want you to think that

16 my guy is some criminal mastermind or criminal genius.

17         Really?  You've seen the evidence.

18         No offense against any of the defendants in this room

19 or anyone in this room.  Do the facts and the evidence support

20 any of these guys are particularly the criminal geniuses?

21         This call does not fit their theory of the case.  They

22 tried to sneak it in at the end.  They didn't even tell you

23 about it during their closing statements, because it doesn't

24 fit their theory of the case.

25         Now, what else did you hear about?  You heard about

1    numerous cooperating witnesses:  William Banks, Ferguson,

2    Lashley, Hankins, all kinds of cooperating witnesses.

3          What else didn't the Government show you?  You heard a

4    lot about certified records in this case, certified

5    wiretap calls, certified jail calls.

6          Why didn't the Government give you certified jail

7    records about when these cooperating witnesses were in jail and

8    when they were on the street?

9          You heard during cross-examination that a lot of

10   times, these cooperating witnesses spent tremendous amounts of

11   time in jail.

12         You also heard evidence that at times my client was in

13   jail.

14         How do you know that when these cooperating witnesses

15   are claiming what they're claiming that they were on the street

16   and not in jail?  How do you know that?  You don't.

17         Why didn't the Government give you the certified jail

18   records showing when William Banks -- not Randy Banks --

19   William Banks, Ferguson, Lashley, Hankins, all these people,

20   whether they were on the street or in jail?

21         For example, Lashley said my client, with his brother,

22   did a drug deal in 2010 or 2011.  Why didn't they give you the

23   certified jail records to prove if he was actually on the

24   street during that time frame?  You don't know that.  Why?  Is

25   it because it doesn't fit the theory of their case?

 1           Also, on cross-examination, several times I asked

 2   about other Randy Banks, other Dirts, other Sands.  I

 3   specifically asked about his 22-year-old son, Randy Banks, and

 4   his a/k/a's.  And you heard the agents.  They didn't look.

 5   They didn't know.

 6           Why not?  Do they even have the right Dirt or Sand

 7   when they're on those calls?

 8           My wife's from the South.  Her father's name is Earl.

 9   Her grandfather's name is Earl.  I can't tell you how many

10   conversations I've been around with that family when they're

11   like, "Earl," and all of a sudden they go, "Do you mean

12   Big Earl or do you mean Little Earl?"

13           And to make it more confusing, they have the same

14   nicknames.  So they always have to specify who they're talking

15   about.  Is it Big Earl or is it Little Earl?

16           Ladies and gentlemen, think back to opening statements

17   again.  I said this case was a massive overreach.

18           The Government's theory of the case is so expansive --

19   you've heard about these neighborhoods.  You could literally

20   scoop up entire neighborhoods under the theories of the case,

21   but it's important for you to remember, my client's only

22   charged with the two crimes, the conspiracies, RICO and drug

23   conspiracy; and to find him guilty of that, you have to find an

24   agreement.

25           Again, you're the deciders of the facts.  The judge

1   gave you or will give you the law.  You decide the facts.  You

2   decide the quality necessary for those facts to prove the case

3   beyond a reasonable doubt.

4           Only you.  We can't do it.  The Government can't do

5   it.  The Court can't do it.  It's your decision.

6           I ask you, when making a decision, were the

7   cooperating witnesses the type of quality any of you would make

8   an important decision on, any decision at all?

9           The answer, of course, is "no."

10          Also, on cross-examination I asked the case agents:

11  Did you do what is called a canvass?  Did you go to the

12  businesses around there?

13          And remember, the Government wasn't very clear.  There

14  are two BP stations.  Two.  Not one.  Two.

15          You heard a lot about the BP station at the 5200 block

16  of Windsor Mill.  You saw surveillance video.  You heard

17  endless amounts of testimony about that location.

18          What you didn't hear about was the BP station near

19  Gwynn Oak.  Why not?

20          Or the businesses there:  Chinese restaurant, liquor

21  store, the businesses there.  Why didn't you hear from the

22  business owners, the workers, the people who live and work in

23  those neighborhoods?

24          They didn't even go and ask, the case agent didn't.

25  He didn't even go try.

1          Why?  Why, I ask you?  Is it because it doesn't fit

2     the theory of their case?  It's not convenient for them.

3          Now, you've heard the instructions and the previous

4     defense counsel talk about enterprise.  And, again, if there

5     was an enterprise in this case, it was about rap music and

6     entertainment.

7          Now, you may not like rap music.  You may not like rap

8     entertainment, urban fiction, whatever you want to call it.  I

9     don't particularly like it either.  I don't like the lyrics.  I

10    don't like a lot of the themes in the music, the violence and

11    everything else.  But rap music is not reality.  Rap music is

12    fiction.

13         Let me ask you this:  You heard from expert

14    witnesses:  chemists, MEs, all kinds of people.

15         Where are the expert witnesses for two things?  Where

16    was the gang expert?  And where was the rap expert?

17         Because I've sat here through this trial, and I ask

18    you if it's clear to you where the line lies between what is

19    rap and what is gang.  Where is that line?

20         No offense against either case agent.  Neither of them

21    are rap experts or gang experts.  Where does that line fall

22    between what is rap and what is gang?

23         They couldn't find any Baltimore police officer to

24    come here and talk about gangs and gang signs and to clarify

25    that for you?

```
 1              Everyone in these neighborhoods seems to use signs.
 2     Everyone in rap music seems to use signs in these rap videos.
 3     When these signs come up and these various signs come up, is
 4     that about rap music?  Is that gang-related?  Is that because
 5     people are from certain neighborhoods?
 6              You don't know the answer to that.  It was not
 7     clarified for you.  They very -- could have easily called a rap
 8     expert or a gang expert, and they didn't do that.  Why?
 9              Why wouldn't they do such a simple thing?  Because it
10     doesn't fit the theory of their case.
11              They want to put this in a convenient little box, wrap
12     it up nicely with a bow.
13              But these facts, or the lack of these facts, don't fit
14     into those cases.
15              And these cooperating witnesses -- I'm not going to
16     repeat what's already been said by previous defense counsels
17     and what will be said after me -- they're murderers or
18     attempted murderers.  They're admitted liars.
19              But they're also highly inconsistent.
20              The issue of taxing came up during the case.  What did
21     Lashley say about taxing?
22              "I didn't have to pay a tax.  I'm from the
23     neighborhood.  I don't have to pay a tax."
24              Does that comport with the other cooperating
25     witnesses, what they said?
```

 1          And what else did the cooperating witnesses tell you?

 2   Makes me think of my kids.  They raised their hands and they

 3   said, Oh, we can help you, Government.

 4          You heard the cooperating witnesses.  Some of them

 5   found out what was going on 'cause apparently word was out.

 6   And they went to the Government and said, I can help you.  Let

 7   me help you.

 8          Now, the problem is, as I walked here this morning, I

 9   walked right past a psychic place.  You know the psychics that

10   read your palm and tell your future, tell your story?  They're

11   very good about sizing people up, about looking at them, and

12   then they tell them what they want to hear.

13          You heard previous defense counsel talk about the fact

14   they already had the discovery in this case.  They already knew

15   what they wanted to hear.

16          They heard word was out that they could get time off

17   their sentences.  And they voluntarily came in, raised their

18   hands, and said, I've got a story to tell you.

19          And all of them, every single one, wants a reduction

20   in their sentences.  It's up to the judge, but it's also up to

21   the Government to file motions and make certain

22   recommendations.

23          Ladies and gentlemen of the jury, they can't be

24   trusted.  You can't make an important decision based on those

25   witnesses.  Look at the hard evidence.  In this case the hard

1    evidence are the calls, the texts, the social media.  None of

2    that to or from my client.

3            Now, we admit, my client is from Baltimore.  Baltimore

4    has bad neighborhoods with violence, drug trafficking, and all

5    kinds of problems.  And you've seen the violence.

6            You heard about Mookie.  The facts and evidence show

7    you that Mookie was my client's cousin.

8            And a lot of this violence happened in the Gwynn Oak

9    area.  Is it any surprise that my client would want to know who

10   killed his cousin?

11           Use your reason and common sense and your life

12   experience.  If a person's cousin is murdered, killed, your

13   family member, your friend, someone you love, would you want to

14   know who killed them?  That's a family matter.  That's a family

15   issue.

16           You heard one of the cooperators testify about a

17   vigil, and my client went there angry at the vigil.  There were

18   40 people there or some outrageous number of people.

19           But you only heard from one witness, the cooperating

20   witness.  If there were 40 people there and people all over

21   this neighborhood at this vigil, why didn't you hear from

22   anyone else?  Why was it only from that one witness?

23           And all these cooperating witnesses shifted, changed

24   their stories.  They first would come meet with them and not

25   say anything about Randy Banks; and then later on,

```
 1    miraculously, they would remember things.

 2          Why did you only hear from that one witness if there

 3    were so many people there?  40 people or more.  Why did you

 4    only hear from that one witness, a cooperating witness?

 5          And, again, why does the Government need to rely on

 6    these cooperating witnesses?  Why can't they call the owners,

 7    workers, people who live there to testify about what happened?

 8          Open-air drug markets, sales going on all the time.

 9    You know the modern Baltimore.  There are cameras everywhere.

10    The Government proved that with 5200 Windsor Mill.  You saw

11    cameras of murderers, all kinds of awful things at the

12    5200 Windsor Mill BP location.

13          Where were the videos from the BP station at

14    Gwynn Oak?  Where was any of the videos from the Gwynn Oak

15    area?  Why are there no videos there?

16          Let's move to May of 2016.  You heard from

17    Officer DiPaola.  Officer DiPaola is standing back there,

18    across the street in some bushes at night and looking across

19    the way at a house.

20          And what did he testify about?  He testified at night

21    from the bushes across the street in a vacant alley or wherever

22    he was, a vacant lot, he saw Randy Banks talk to one or two

23    people and point (indicating).  That's it.  That was the

24    testimony.

25          Later they said they arrested people leaving the area
```

 1   with drugs.  I think it was three, basically three small

 2   packages of rock cocaine, which, by the way, was seized in May

 3   of 2016, but it took over two years to analyze that cocaine and

 4   those drugs.

 5         What about the chain of custody?  What happened with

 6   those drugs for two years when they just sat there?  Why was

 7   the case dismissed?

 8         Well, I can tell you why.  It wasn't a good case.  No

 9   fingerprints.  No DNA.  He didn't sell the drugs.  He didn't

10   touch the drugs.  That case was dismissed.

11         Why wasn't he charged in this case with that

12   substantive offense?  Because the Government can't prove it.

13   So they tried to roll it up into these two conspiracies.

14         The problem is no agreement equals "not guilty."  They

15   cannot prove an agreement to Randy Banks.

16         You're the jury.  Think about agreements -- follow the

17   judge's instructions, but think about agreements in everyday

18   life.

19         Agreement, it takes two to tango.  Two people have to

20   make an agreement.  Show me the statements, the call, the text,

21   the social media, one piece of evidence, even the cooperators,

22   one piece of evidence that proves my client ever agreed to

23   anything.  It simply does not exist.

24         Again, look how geographically diverse these areas

25   are.

1        The Government wants you to think this is all one big,

2   happy conspiracy, but the geography doesn't make sense and

3   doesn't support that.

4        Also, how many groups did you hear about?  MMP,

5   Mobbin' Bloods, BGF, Black Bloods, the 5200 boys.  People

6   allegedly in the gang making signs, people out of the gang

7   making signs, people just in the neighborhood making signs,

8   people in rap music videos making signs.  There's no

9   consistency about what these signs mean.

10       Apparently anyone in the neighborhood can and does

11  make these signs.

12       Now, because they can't find any calls to or from my

13  client, they've shown you calls where they allege people are

14  talking about my client.

15       But look in those calls.  You've heard calls talking

16  about "boy" and "girl" as code for drugs.  About grams,

17  specific amounts.

18       In those to-and-from calls that allegedly mention Dirt

19  or Sand -- which I don't think they can even prove they've even

20  got the right Dirt or Sand.  But let's just say you believe it

21  is my client they're talking about.  Find a call where they're

22  talking about drug trafficking with my client.  It does not

23  exist.

24       They're talking about:  Talk to Dirt or Sand about

25  finding him money to help with a lawyer or bail or bond.

1    Last time I checked, that's not a crime.

2    Everyone knows Randy.  He's a middle-aged guy from

3    Gwynn Oak.  Lived there his whole entire life.  Why was he such

4    an easy mark for the cooperating witnesses?  'Cause everyone

5    knows him.  Everyone knows his family.  He's lived in that area

6    his entire life.

7    And when your life is on the line and you're a

8    cooperating witness, the more you give, the more you get.  He's

9    an easy "mope," an easy target.

10    The charges, again, everyone else in this case has a

11    substantive charge.

12    Why is my client only charged with the conspiracy?

13    They can't prove an individual substantive count, so they tried

14    to charge him with a conspiracy.

15    But, again, that requires proof of an enterprise.  And

16    the only thing they've proved in this case is rap music and

17    urban fiction, and it requires an agreement.

18    Why didn't they charge him?  The elements the

19    Government showed you, an agreement (indicating).  That was for

20    RICO.

21    Drug conspiracy, agreement (indicating).

22    Another thing, look at my client.  Look at his face.

23    You've heard all kinds of evidence about tattoos, gang tattoos.

24    There has been no evidence in this case that my client has any

25    gang-related tattoos.  None.

 1          Look at his face.  You heard the evidence.  Are there

 2  any tattoos on his face?  Any gang-related tattoos on his face?

 3  No.

 4          It does not fit the theory of their case.

 5          Here's a picture from the house DiPaola said he was

 6  looking at.  Again, that case was dismissed.  It was a bad

 7  case.

 8          But even, for the sake of argument, you believe

 9  Randy Banks was involved in drugs in that place, what evidence

10  did you hear that this was part of a conspiracy and agreement

11  and not an individual act by Randy Banks?

12          You heard DiPaola testify.  What evidence is this is a

13  part of a conspiracy [sic]?  There is none.

14          What evidence that you believe he's involved in drug

15  trafficking, that this was not an individual act?  This is a

16  high-crime area with lots of drug trafficking going on.  If you

17  believe he was involved in something, that proof would be about

18  an individual act.

19          Where is the proof that this was part of an agreement,

20  that whatever happened on May 2016 was part of or on behalf of

21  a gang?  It does not exist.

22          Also, you saw the gang paperwork, which the Government

23  even called a script.  Say what you want about Dante Bailey,

24  but he's a prolific writer.  He writes day, writes night,

25  writes all the time.  It's a screenplay.

```
 1              I think someone talked about "Goodfellas."

 2              I'll talk about "The Godfather," Mario Puzo.  Is

 3    Mario Puzo a RICO guy because he wrote "The Godfather"?  Would

 4    you want to be held accountable for something written in

 5    someone else's script?

 6              Boss of finance, really?  Where'd all the money go?

 7    Where did the money go?

 8              I said that in my opening statements:  Where is the

 9    money?

10              All this drug trafficking going on, drugs everywhere,

11    open-air drug markets.  Money, money, money, money.  Where is a

12    huge bulk cash seizure from my client?  It doesn't exist.

13              Houses, doesn't exist.

14              They showed you a picture of a Benz, but did they

15    prove that he owned it, didn't rent it?

16              You heard about the Bentley with Bo.  What did that

17    turn out to be?  A rental car.

18              Where is the condo in the Inner Harbor?

19              The luxury homes?

20              $500,000 in bulk cash waiting to be laundered?

21              Where's all the money?  Where'd it all go?

22              It never existed in the first place.

23              Based on the mob, the mafia -- this is supposed to be

24    based on the New York mob, the mafia, the mob, Sicilian-Italian

25    organized crime.
```

```
 1           Omertà.  Omertà, that means silence.  Does it seem
 2   like silence was practiced in this case by any of these
 3   defendants?
 4           They talked all day long, all the time, talk, talk,
 5   talk, talk, post, post, post, post.
 6           Omertà?  Does that seem like that was actually
 7   practiced in the reality?  Or does that seem that's part of a
 8   script that someone wants to be a movie producer, movie star,
 9   movie writer, whatever?
10           Maybe not a reality.  Maybe Dante Bailey would never
11   be a movie star or movie producer, but that's a script.  That
12   is fiction.
13           This picture, the Government's talked about this
14   picture a lot, but what didn't they prove to you?
15           They didn't prove who took the photo.  When was it
16   taken?  Where was it taken?  What's the address, the location?
17   They have none of the details for that photo.
18           Now, we know there's three people in that photo.
19   Whoever is taking the photograph, Randy, and the guy next to
20   him.
21           If that's drug paraphernalia there, how do you know
22   that belongs to Randy?  And if you think it belongs to Randy,
23   where is the evidence that this was part of an agreement or a
24   conspiracy?  Why didn't the judge -- excuse me.
25           Why did the Government not charge him with that
```

1    substantive, individual offense?

2         I'll tell you why.  They can't prove who took the

3    photo, when it was taken, where it was taken, what substances

4    are there.  They can't prove that.

5         For the sake of argument, even if you think Randy was

6    involved in something he shouldn't have been there, there's no

7    evidence of an agreement or a conspiracy for anything.

8         The Government has or will show you this (indicating).

9    It's a spread of who they say all the major players are in this

10   case.

11        There's a lot of people in this case.  I'm not even

12   sure how many people are here.  There's even more people that

13   were involved in the case than are even listed here.  Does that

14   support a conspiracy or that this was a neighborhood?

15        A neighborhood.  A high-crime area of Baltimore where

16   people do drugs, deal drugs, and do bad things.

17        This supports -- this is much bigger.  It's that

18   entire neighborhood.  It's not Randy's fault that there's a

19   high-crime area where he comes from, Gwynn Oak.  It's a bad

20   area of Baltimore.  It's not his fault.

21        Not everybody from this neighborhood is a gang member.

22   Just because you grow up and live in the high-crime Gwynn Oak

23   area doesn't mean you're a gang member.

24        You can be a young man or a middle-aged man in Randy's

25   case and live there and not be a gang member.

1          Not everybody from these places are gang members, drug

2     dealers.

3          And guess what.  Some of the people in this area

4     probably get in trouble and commit crimes.  That doesn't mean

5     it's on behalf of some massive RICO or drug conspiracy.  People

6     commit individual crimes every single day.

7          Lastly, I want to show you the verdict form for

8     Randy Banks.

9          Again, this is a massive overreach.

10          Murder (indicating).  Really?  What evidence have you

11     ever heard in this entire case that anything was ever

12     reasonably foreseeable to Randy Banks as to murder?

13          The cooperating witnesses have or are much more likely

14     to kill people in this case than my client.  There is not a

15     shred of evidence that he was involved in any of these murders.

16     They brought up Mookie, that he was angry because someone

17     killed his cousin.

18          Really?  Is that surprising?

19          Robbery (indicating), extortion (indicating), witness

20     tampering (indicating), witness retaliation (indicating).

21          What's the only thing you've heard about my client in

22     this entire case?  Whether you believe it or not, it's one

23     thing.  It's drug trafficking, and it's one drug in particular,

24     cocaine.

25          Where is there evidence of anything else in this

1    entire case, heroin, fentanyl, marijuana, that any of that was

2    reasonably foreseeable to my client?

3            Again, the Government has a massive overreach in this

4    case, and they're stretching way too far.

5            Quantity, the Court's going to ask you to find the

6    quantity (indicating).  Think back to May of 2016, those were a

7    couple rocks that were seized.  They're going to want you to

8    find him guilty, or the Government is, over 280 grams.

9            Besides the drug trafficking, where is there any

10   evidence of anything?

11           Ladies and gentlemen of the jury, no agreement equals

12   not guilty.

13           You may not like Randy Banks.  You may not like these

14   neighborhoods.  You may not like rap music.  You may find these

15   areas high crime.  Why wasn't he charged with an individual

16   offense?  Why is he only charged with the agreements?

17           And the problem with that, the conspiracies, is they

18   do require an agreement.

19           Ladies and gentlemen of the jury, this will be my last

20   time I talk with you.

21           On Monday, I believe, the Government is going to get

22   up here and give what's called a rebuttal argument.  They can't

23   take back the fact they didn't show you that call in their

24   first closing statement.

25           Why not?  Why didn't they run down whether there are

 1   other Randy Banks or other Dirts or other Sands?  Why didn't
 2   they get the certified jail records of the cooperating
 3   defendants to show whether they were on the street or in jail?
 4   'Cause if they're in jail, they can't possibly have seen and
 5   heard what they heard.  Why didn't they do any of this?
 6   Because it doesn't fit the theory of their case, period.
 7          Just because you're from Gwynn Oak and you grew up in
 8   a bad, high-crime area of Baltimore -- I won't even call it
 9   bad -- a high-crime area of Baltimore doesn't mean that you're
10   responsible for the sins of Baltimore.
11          Not every man from Baltimore in those areas is a
12   criminal.  This is a massive, massive overreach.
13          I ask each of you to follow the law given by the
14   judge.  Look only at the facts and the law in this case.  And
15   if you do that, you will find my client not guilty, because
16   there was no evidence of an agreement in this case.
17          Thank you.
18          **THE COURT:**  Thank you, Mr. Sardelli.
19          **THE CLERK:**  Mr. Sardelli, microphone.
20          **THE COURT:**  Mr. Trainor.
21          **MR. TRAINOR:**  Thank you, Your Honor.
22          Ladies and gentlemen, good morning.  It's been six
23   weeks since I spoke to you at the opening of the case.  I hope
24   you remember that I am Harry Trainor.  I represent
25   Jamal Lockley.

1          Six weeks ago, at the beginning of the case, I told

2    you that Jamal Lockley was not a member of any gang, and that

3    is shown to be true.

4          Jamal Lockley grew up in the neighborhood, 5200 block

5    of Windsor Mill Road, Forest Park.  He knows many of the young

6    men in this case.  He knows many of the young men from the

7    neighborhood.  He's friendly with many of them.

8          But when the Treetop Pirus, TTP, dominated the

9    neighborhood, he didn't join.

10          And when the MMP became an influence in the

11    neighborhood, he didn't join.

12          He didn't join the Black Guerilla Family.

13          He didn't join the Black Blood Alliance, whatever that

14    is.

15          Jamal Lockley, by choice, never became a gang member.

16    He was not a member of Murdaland Mafia Piru.

17          And, importantly, the evidence does not establish

18    beyond a reasonable doubt that Mr. Lockley knowingly and

19    willfully agreed with any other person to conduct or

20    participate in the affairs of Murdaland Mafia Pirus.  And that

21    is very important, because that's an element of Count 1.

22          My client is charged in three counts.

23          Count 1 has to do with RICO, racketeering influenced

24    corrupt organization, which specifically is identified as the

25    Murdaland Mafia Piru group, which the Government has classified

1  as a gang.  That's what their argument is.

2      You've heard from dozens of witnesses.  Judge Blake

3  has read to you detailed instructions on the law.  You're going

4  to get 56 pages of them when you go into the jury room.

5      And, of course, I'm asking that you study them

6  carefully and get comfortable with them before you start

7  deliberating on the facts in the case.

8      There are a couple of instructions that are of

9  significant importance to the defense theory.  I ask, of

10  course, that you begin with the presumption of innocence, the

11  burden of proof that you will see, I believe, on Page 5 of your

12  written instructions, which says, in essence, that the burden

13  is on the Government to prove the defendant's guilt on each

14  element of an offense to a level called beyond a reasonable

15  doubt.

16      It also reminds you that the presumption of innocence

17  applied in the beginning of this case, it continues at this

18  moment; and it follows you into the jury room when you examine

19  the evidence and deliberate in the case.

20      So I ask you to keep that presumption of innocence in

21  mind.

22      And remember always throughout this case that, as you

23  deliberate, that the burden is very high.  It is beyond a

24  reasonable doubt.  Please keep those instructions clear in your

25  mind.

```
 1            There are a couple of other instructions that I think
 2   are particularly important in this case.
 3            For example, on Page 21 of the instructions, you will
 4   see -- and I'm just going to read a segment of it.
 5            [Reading]:  I want to caution you, however, that a
 6   defendant's mere presence at the scene of an alleged crime does
 7   not, by itself, make him or her a member of the conspiracy.
 8   Similarly, mere association with one or more members of the
 9   conspiracy does not automatically make a defendant a member.  A
10   person may know or be friendly with a criminal without being a
11   criminal himself.
12            And another similar instruction that is particularly
13   important to Count 1, which is the gang count, the RICO count,
14   is found on Page 29 of your instructions, and I'm going to read
15   that.
16            [Reading]:  You are also instructed that the RICO Act
17   does not criminalize mere association with an enterprise.  More
18   is required.  The Government must establish that the defendant
19   knowingly and intentionally agreed with another person to
20   conduct or participate in the affairs of the enterprise through
21   a pattern of racketeering activity.
22            And that is the point really I want to focus on with
23   Count 1, because that is the second element of Count 1, that
24   membership.
25            I want to remind you also -- and I think you'll see
```

1    this in your instructions.  I won't point it out, but -- and

2    you've heard it before, that Jamal Lockley is on trial by

3    himself, really.

4         You're actually conducting five separate deliberations

5    for five separate defendants.  They have to be considered

6    individually.  And I ask you to remember that, not to just

7    group everyone together.

8         Actually, you've heard from a number of witnesses who

9    never mentioned Jamal Lockley or only mentioned him in passing

10   in their testimony.  So I'm not going to go through every

11   witness who testified before you.  That would take probably

12   another five hours.

13        But I want to go through key issues and events that

14   may prove critical in how you view Jamal Lockley in this case.

15        The key issue as to Count 1, as I said, is the second

16   element which has to do with whether Mr. Lockley agreed to

17   participate in the conduct or the affairs of the alleged

18   enterprise, which is MMP.

19        I read you that instruction, Page 29.  I ask that you

20   read that, along with all your other instructions, when you

21   consider that element, because if that element is not

22   established beyond a reasonable doubt, then Count 1 for

23   Mr. Lockley is over.  He would be found not guilty on that.

24        Now, the alleged enterprise in the indictment, which

25   is summarized in here (indicating), is MMP.

 1          And we know Mr. Lockley is not a member of MMP.
 2   Virtually every cooperating witness claiming knowledge of MMP
 3   conceded that point.
 4          Also, the Government really conceded that point in
 5   opening statement and reiterated it in closing argument.  So
 6   that is a significant concession, because, as I said again, MMP
 7   is the alleged enterprise.
 8          Now, you heard from Jay Greer, also known as
 9   Champagne.  He claimed to know how to recognize MMP members and
10   associates by their tattoos, handshakes, et cetera.
11          He told us the person he called T-Roy, which is
12   Jamal Lockley, was not in MMP.  He classified Mr. Lockley as a
13   5200 boy.
14          We asked him to define what a 5200 boy was.  And I put
15   this in quotation from my notes, but check your notes and see
16   if this jibes with what you have.
17          I wrote:  "A person born in the 5200 block of
18   Windsor Mill or Forest Park in the projects."
19          That's what Jay Greer said a 5200 boy was.
20          Jay Greer told us that he could not be classified as a
21   5200 boy because he did not grow up in the neighborhood.
22          Now, we know that Mr. Lockley has no gang tattoos.
23   Certainly, if he had an M on him or if he had a lightning bolt
24   on him, you would have heard about it from the party that has
25   the burden of proof, the Government (indicating).

 1            You didn't hear anything about that.  He doesn't have

 2    'em.  There's no evidence of that.

 3            But I'd like to look at this in accord with the

 4    Government's theory of the case.

 5            They say MMP is the enterprise because it has

 6    structure.  It has written rules, the seven mob mandates.  You

 7    have to take an oath to get in.  You know, my honor is my

 8    blood, et cetera.

 9            There is this Omertà code they follow or supposedly

10    follow.  You have to earn these tattoos that are of some

11    significance.

12            They have a hierarchy.  They have The Don, the capos,

13    the boss, the underboss, ministers, as in a cabinet.  And

14    there's lots of gang paperwork floating around with all these

15    rules and mandates.

16            That's what an enterprise is, according to the

17    Government's theory.  That's what a RICO organization is,

18    according to the Government's theory.

19            But so what is -- what's the 5200 boys?  Well, they're

20    people who are born in the neighborhood.  You don't volunteer

21    to be a 5200 boy.  You're born a 5200 boy.  There is no

22    organization.

23            You look at your instructions regarding what an

24    enterprise is at Page 26 of your instructions.  It must have an

25    ongoing organization, either formal or informal.  And it must

```
 1   have personnel who function as a continuing unit.

 2           Now, that applies, according to the Government's

 3   theory, to MMP.

 4           But 5200 boys are people from the neighborhood.  There

 5   is no organization.  There is no hierarchy.  There is no

 6   leadership.  There is no structure.  They're just born that

 7   way.  You're born into your neighborhood.  You don't have a

 8   choice about that.

 9           And if you look at the indictment that is summarized

10   in your instruction, you will see that there's nothing about

11   5200 boys being an enterprise.

12           Now, I heard the Government in closing say, Well, MMP

13   folded in the 5200 boys.

14           Now, I don't know what that means.  That's not a legal

15   term.  I don't know how you would define "folded in."

16           The testimony in this case is that the 5200 boys were

17   the people who were born and lived in the neighborhood, that

18   some of the 5200 boys were in MMP.  And Jamal Lockley was not

19   in MMP.

20           So by the Government's theory of folding in the

21   5200 boys into the enterprise, they indict the whole

22   neighborhood, everybody in the neighborhood who can be labeled

23   a 5200 boy.  And that's not consistent with the testimony in

24   the case.

25           Another cooperator who testified was Devin Ferguson.
```

1    He had a different perspective.

2            He spoke from his perspective as a BGF member.  He was

3    from out at Gwynn Oak and Liberty Heights.

4            He testified about his knowledge of MMP, which he

5    called the Mobbin' Bloods.  He seemed to know who was a member,

6    who was not, who was associated with them and who was not.

7            He never mentioned Jamal Lockley as being part of the

8    mob, as he put it, part of the mob.  He was -- he never

9    mentioned it.  He didn't include him as a member of BGF or the

10   Black Blood Alliance.

11           You also heard from William Banks, Trouble, a man

12   whose credibility is questioned on a lot of things.

13           But he conceded that Mr. Lockley was not involved with

14   MMP, naming him again as a 5200 boy.  And he conceded on

15   cross-examination that the 5200 boy designation was really a

16   neighborhood thing designating the neighborhood where a person

17   is from.

18           So the enterprise in Count 1 is MMP.

19           Growing up in the neighborhood of

20   5200 Windsor Mill Road and finding a way to co-exist with

21   what's going on in your neighborhood does not make Mr. Lockley

22   a person who is conducting or participating in the affairs of

23   the enterprise.  Certainly not beyond a reasonable doubt.

24           So without that element of proof, your verdict sheet

25   will tell you on Count 1 that you don't proceed beyond that

1   point, because if one of the elements is not established beyond

2   a reasonable doubt, it says [reading]:  If you have found the

3   Defendant Jamal Lockley not guilty of Count 1, proceed to

4   Count 2.

5          But then, if you have found him guilty of Count 1, you

6   go on to consider a whole laundry list of illegal acts.  And

7   you have to determine whether he was -- these acts were

8   reasonably foreseeable to him unanimously and beyond a

9   reasonable doubt.

10         Now, you may never reach that question.  I submit that

11  you shouldn't.

12         But because it is a possibility, because it's on your

13  verdict sheet, I want to go through some of those acts.

14         Extortion, robbery, witness tampering, I don't

15  remember evidence of Jamal Lockley's involvement or anything

16  beyond a reasonable doubt reasonably foreseeable to him on

17  those issues.

18         There is a list of shootings and murders that really

19  have nothing to do with Mr. Lockley.

20         For example, Samartine Hill, who was shot at the

21  Mirage club by William Banks, Lockley was not even there, you

22  know.

23         You have a list of the people who went to the Mirage

24  club that night.  You have all their names in testimony.  It

25  won't include Jamal Lockley.

 1            There was Ricardo Johnson and James Edwards.  There's

 2    really nothing to support a finding beyond a reasonable doubt

 3    that before those things happened that that was foreseeable

 4    beyond a reasonable doubt to Jamal Lockley.  So I'm not going

 5    to spend a lot of time on that.

 6            What I would like to go into a little more deeply,

 7    because William Banks testified to it, is what happened on

 8    April 28th, 2016, with Anthony Hornes being shot and killed on

 9    Haddon Avenue, which is literally two blocks away from

10    Liberty Heights and Gwynn Oak.

11            I submit that Jamal Lockley did not have any role in

12    what happened to Mr. Hornes, and the proof doesn't support it

13    beyond a reasonable doubt.

14            Now, think of that event.  That's a murder.  Think of

15    it as if it was the only thing you were trying.  You're a jury

16    trying a murder case.  That's the only thing before you.  Can

17    you say beyond a reasonable doubt that Jamal -- that there's

18    proof that Jamal Lockley participated in the murder of

19    Anthony Hornes?

20            I submit no.  The credible evidence shows that the

21    phone attributed to Mr. Lockley, which is (443) 709-7780, was

22    in the Liberty Heights-Gwynn Oak area at some point after

23    Maurice Braham, Mookie, was shot on April 28th, 2016.

24            I think Trouble testified that, you know, word went

25    out very fast that somebody from the neighborhood had been

1   killed up there, and everybody sort of gathered down there.

2          So who do we have on that?  We have -- Agent Mat Wilde

3   testified.  And the exhibit is CSLI-2, which is his cellular

4   analysis report for that date.

5          And you will see, when you look at that back in the

6   jury room, that at the relevant time, April 28th, 2016, around

7   10:30 p.m., the phones that he traced were hitting off of the

8   same tower up on Liberty Heights.

9          You'll remember his testimony about cell phone towers

10  that have a 360-degree area that is broken into three segments

11  of 120-degree arcs.  And what that shows is the direction of

12  the signal, the direction of a radio signal.

13         What can be established with precision, he testified,

14  is the location of the tower.  And in this case the

15  Liberty Heights tower had T-Mobile signals on it.  It had

16  Sprint signals.  And I think it had AT&T.  So they were all on

17  the same pole or the same stanchion.

18         What he can't tell us from the evidence is where the

19  phones were located within that area.  Only that they're

20  hitting off of the same tower.  The tower can be identified

21  again with precision, but the location of any phone within the

22  range cannot be established.

23         Further, Agent Wilde testified that he couldn't say

24  from his study if any of the phones were together in the same

25  place on April 28th, 2016.

```
 1              So the CSLI evidence, the crime scene or the -- excuse
 2     me, the cell site location evidence does not establish presence
 3     at the scene of the Anthony Hornes homicide.
 4              The question that the Government put to Agent Wilde
 5     is:  Is it consistent with being on Haddon Avenue?
 6              Yes, it's consistent.  That's within the range.
 7              But it's also consistent with being in Gwynn Oak and
 8     Liberty Heights.  It's consistent with the phones being in that
 9     area at all and not together.
10              So that does not establish presence at a crime scene.
11              We're thinking about a murder here.  Are there
12     eyewitnesses to it?
13              No credible eyewitness.
14              Are there cameras to show the movements of the cars on
15     the commercial strip on Liberty Heights?
16              No.
17              Was any trace evidence collected from the crime scene?
18              Nothing collected from the crime scene that could
19     connect Jamal Lockley to it.
20              Was any gun recovered that could be traced to
21     Mr. Lockley or anybody else?
22              No, nothing like that.
23              There's no DNA.
24              There's no fingerprint evidence.
25              There's no forensic evidence of any kind which
```

1    connects Jamal Lockley to that shooting.

2        What we have is the testimony of William Banks,

3    period.

4        Now, the Government in closing said of William Banks:

5    He has not earned our unwavering trust.

6        That's an understatement.  He has not earned our

7    unwavering trust, but you should believe him because everything

8    he says is corroborated.

9        So let's look at corroboration of what he said, what

10   Trouble said about April 28th, 2016.  And we have to look at it

11   in context, first, starting with a very rich history of

12   deception on his part when it serves his purposes or when he

13   thinks it serves his purposes.

14       He lied, we know, about his attempted murder of

15   Samartine Hill.  He placed it on a friend.  Mr. Banks was the

16   triggerman for sure.  He put it on Bangout, who was his friend,

17   who's now dead.

18       He lied to the ATF.  He lied to the Baltimore Police

19   Department.  He lied about shooting the man who had his

20   2-year-old in the car during a traffic dispute.

21       But more significantly, look what is uncorroborated

22   about what happened on Haddon Avenue.

23       Mr. Banks says he texted his handler but didn't say

24   anything about witnessing a shooting at first.  He said it the

25   next day, I think.  And it might have been -- also been a phone

1    call to his handler.

2          Now, the corroboration for that would bring -- would

3    have been to bring in the handler, Special Agent Hood, from the

4    ATF.  But he didn't testify at all.  At all.  He was Mr. Banks'

5    handler.

6          If Mr. Banks contacted him, the corroboration would

7    have been, yes, Mr. Banks contacted me; but he wasn't even

8    brought into the courtroom.

9          There are no texts admitted showing any communication

10   between Mr. Banks and his handler.

11         The Government certainly has the texts.  They have

12   every text that was sent by these gentlemen over here

13   (indicating).

14         William Banks is the person, you have to remember, who

15   the ATF terminated in August of 2016 as a paid

16   confidential informant because he was a liar.

17         And as Agent Moore told us, he was no longer useful

18   because the ATF can't employ a liar.  He had signed a contract

19   in the beginning that he would be completely truthful.

20         During the time he was under contract and during

21   April 28th, 2016, Mr. Banks was a heroin user who was addicted.

22         He told us in his own words that this was a time in

23   his life when he was untruthful and unreliable.

24         Now he's facing life, life imprisonment, for the acts

25   of violence, horrible acts of violence that he's committed.

1    And he's trying to get that sentence reduced.

2            So he has an incentive to lie.

3            You have to examine him as a witness with great care.

4            But you can't say that, honestly, that his testimony

5    regarding the events of April 28th, 2016, is corroborated.

6    It's simply not corroborated.

7            So in order to accept that what he said about

8    Mr. Hornes is true, you have to believe William Banks.

9            And I submit to you that there simply has to be a

10   doubt about whether you can take his word for any important

11   fact, take his uncorroborated word for what happened that

12   night, particularly -- go back to the CSLI.

13           He was in the area, too.  This is a man who has a

14   history of doing shootings.  He's done it before and then lied

15   and put it on somebody else.

16           So his shooting of the man is consistent with the

17   CSLI.  All that's consistent -- I don't know that he did that.

18   There isn't evidence that he did that.  But there isn't

19   evidence that -- any more evidence that Mr. Lockley was

20   involved in that either.

21           So you can't trust William Banks' word without plenty

22   of corroboration, and it's not there on that.

23           Let's take a look at the controlled buy on March 10th

24   of 2016.

25           Now, this is an important event in Count 1; Count 2,

DEFENDANT LOCKLEY'S CLOSING ARGUMENT

 1   which is drug distribution; and Count 3, which is simply --

 2   it's all of Count 3, which is what happened on March 10th of

 3   2016.

 4          Again, we're talking about William Banks there.

 5          And there are some questionable circumstances

 6   surrounding the March 10th, 2016 transaction.

 7          Now, you know from the testimony of

 8   Special Agent Moore that William Banks and an unidentified

 9   female who was a CI, confidential informant, they were both

10   paid informants for the ATF on March 10th, 2016, signed up by

11   Special Agent Hood, who didn't testify.

12          The ATF took over the investigation -- Agent Moore's

13   team, he said, took it over in March 2016.

14          March 10th, they've already got William Banks out in a

15   car trusting him and the unidentified female with ATF money.

16   And they go out to make a drug buy.

17          Now, we don't know much about the CI, the female,

18   because Special Agent Moore didn't know her background.  You'll

19   remember I asked him about her felony convictions, and

20   Agent Moore said he didn't know.

21          And one of the reasons he didn't know is because

22   Special Agent Bradley J. Hood was the handler on that

23   transaction.  And Bradley J. Moore did not come in and tell us

24   what he knew about it or what he knew about the other

25   informant.

1          We know that Banks was given an ATF car that was wired

2     up with audio and video.  Banks was the driver, and this female

3     passenger was seated in the driver's -- the right front

4     passenger seat.

5          Now, you have to remember at that time, apparently

6     completely unknown to ATF and the handler, Agent Hood,

7     Mr. Banks was using drugs.  He was addicted to heroin.  He was

8     stashing guns and drugs in his house.  He was double-dealing,

9     selling drugs on his own.

10          He had persistently lied to the ATF.  They hadn't

11     caught him yet.  He had persistently lied to the Baltimore

12     Police Department.

13          He told us about -- Mr. Banks himself told us about

14     his experience in successfully hiding drugs during a traffic

15     stop in, I suppose, his posterior region, let's say that.

16          He admitted that this was a time in his life when he

17     was untruthful, unreliable, and untrustworthy.  So that is the

18     context that we go into that transaction with.

19          Unbeknownst to the ATF, they have put a very

20     unreliable drug addict, who was double-dealing with them --

21     they had given him the money and sent him out to conduct a drug

22     deal.

23          Now, you've seen video.  Mr. Lockley is seen on the

24     video at the passenger side window.  He's friendly towards the

25     occupants of the car.  He's rapping and doing music with them.

1          The camera doesn't show William Banks.  William Banks

2    is the driver, but the camera is sort of aimed at the female.

3          This all took place not at the BP gas station, but at

4    a different location completely, Clifton Avenue and Elsinore.

5          Also -- I mean, just as an aside, there was other

6    surveillance of Mr. Lockley in other neighborhoods like the

7    Longwood neighborhood, but there's very little surveillance

8    that puts Lockley at this BP gas station that's supposed to be

9    the headquarters of MMP.

10          But Agent Moore testified that they wired up the

11    vehicle.  They gave them $600 -- or I'm not sure he said 600.

12    Maybe that was in my question.  But he gave him an amount of

13    money.  Perhaps Agent Moore wasn't sure of the exact amount.

14    But they went out to -- they left the rendezvous point and

15    drove two miles or so towards Elsinore and Clifton Avenue.

16          Now, the witness, Agent Moore, was not able to surveil

17    the alleged drug exchange in the case, so we don't have that.

18          We don't have the actual drug exchange on camera, as

19    Mr. Banks said, and we will have to take his word for it.

20          And details can be important on that.  If you remember

21    Banks' testimony at trial -- and I checked my notes on this,

22    and I encourage you to do the same -- he testified that it

23    involved an eight ball of crack cocaine.

24          And we know from our education in this case that an

25    eight ball of crack cocaine would be an eighth of an ounce.  An

1  ounce would be 28 grams.  An eighth of that should be,

2  according to my math, 3.5 grams, in that area.

3         That's what Banks said.  He said he was getting paid.

4  His pay would be higher as a CI if he was able to get more

5  drugs for the ATF task force.

6         But at trial in this case, it wasn't an eight ball

7  that was turned in.  It was 13.42 grams, not 3.5 grams.

8         The gross weight -- if you look at DL-14, which is the

9  chemist's report and the chain-of-custody report, you're going

10  to see that the gross weight of what was recovered -- and who

11  was it recovered by?  Special Agent Bradley J. Hood recovered

12  it.  That's what he turned in.  The chemist weighed it.  The

13  net weight was approximately 12.45 grams.

14         So significantly more than what William Banks

15  testified to.

16         So ask:  What's going on here?  Has this been

17  explained in the evidence?  Who was the female CI?  Who can

18  attest to her reliability in all of this?

19         William Banks?  He didn't say anything about her.

20         Special Agent Moore candidly admitted that he didn't

21  know.

22         And Special Agent Hood was not even called to testify.

23         So there's no explanation in the record as to what

24  happened, how that drug amount increased from 3.5 grams to

25  13 grams or 14 grams.

1          We know that from -- that the chain-of-custody report,

2    DL-14, is signed by Bradley Hood.  We didn't hear from him.  So

3    there's doubt about that transaction.

4          There's -- and I submit there are too many unanswered

5    questions to have a lot of faith in the reliability of that

6    transaction.  And it's hard to make a reliable judgment based

7    on the facts and to say that you've made that judgment beyond a

8    reasonable doubt.

9          There has to be doubt about what really happened on

10   March 10th of 2016.

11         I want to move on to August 19th of 2016.

12         That was the date -- there's a phone call on that.

13   It's a jail call, J-65, I believe it is, where Dante Bailey

14   places a call from the Northern Neck Regional Jail in Warsaw,

15   Virginia, to Michael Singer's phone.

16         Michael Singer is Blizz, the rapper who allegedly

17   Mr. Bailey recruited to be part of MMP.

18         Now, through a bit of advocacy, I would say, in which

19   the Government stretched the facts just a little, Ms. Perry

20   classified what went down on August 19th, 2016, as a gang

21   meeting.

22         You'll recall that the evidence is that there was a

23   gathering at the recording studio where Mr. Greer said people

24   come and do recordings of rap music.  That is what's going on.

25         I don't believe there's evidence beyond a reasonable

1    doubt that there was some organized gang meeting.

2           It so happens that Mr. Singer or Singer is at the

3    recording studio when Bailey calls in.

4           And it sounds like, if you -- I urge you to listen to

5    the call.  It sounds like Blizz, Singer, put his phone on

6    speaker and there are a lot of people around that phone.

7           Singer recites to Bailey the names of people who were

8    there at the studio.  And he gets to the point where he says,

9    Trouble's on the way.

10          And Bailey asks, Well, who invited Trouble to the

11   studio?

12          And Singer says, It was T-Roy.

13          That's where Bailey says, Put T-Roy on.

14          And there's a conversation.  And somebody named

15   "Ranny" gets on the phone, an older woman, I take it.  And

16   Bailey is reciting his complaints that Trouble may be snitchin'

17   on somebody.

18          Lockley sounds surprised.

19          He also -- if you listen to the call, I submit he

20   sounds distracted, like he's doing something else at the

21   studio.

22          And after a minute or so, Lockley says, All right.

23   Say no more, and that's the end of it.

24          Now, that's of no particular significance, because

25   Agent Moore told us that "say no more" is one of those terms of

 1    jargon that is picked up on the thousands of recordings that he

 2    made and has no -- it's devoid of any specific meaning.  It's

 3    said over and over again when somebody wants to get off the

 4    phone.

 5         So I submit to you that Lockley's peripheral

 6    participation in the August 19, '16 phone call does not form a

 7    conspiracy to harm or murder William Banks.

 8         If you think about it, nothing ever happened to

 9    William Banks.  There is no evidence that he was threatened.

10    There's no evidence that anybody came after him or anything was

11    done to hurt him.

12         Certainly Lockley did nothing to threaten Trouble with

13    any harm.

14         And if you examine that event, the August 19th, 2016

15    event with the presumption of innocence in mind and the

16    Government's burden of proof beyond a reasonable doubt in mind,

17    I think you will determine that it's not established that

18    Mr. Lockley was involved in any plan or conspiracy to kill

19    William Banks.

20         There are a couple of other important thoughts that I

21    have during your deliberations, one -- about recordings.  There

22    are a lot of recordings in this case, and voice recognition is

23    not a science.  There are no voice-recognition experts who

24    testified in this case.  There is no software that's used to

25    analyze voices.

 1            It's your opinion that really matters in this.  Whose

 2    voice was it?  It's up to you to decide.  And the only way you

 3    can decide that fairly and reasonably is for you to listen to

 4    the call.

 5            Some of the transcripts are flawed.  These are

 6    unofficial transcripts.  They were prepared by a police officer

 7    with no specific training in voice recognition.

 8            So it's important that you examine what's on the

 9    recording and determine for yourself.  That's a reason for the

10    instruction that is contained in here (indicating), that

11    transcripts are not the evidence.  It's what you hear on the

12    recording that is the evidence.

13            So if you think the interpretation of a call may be

14    important, please, please, listen to the call.

15            I'm going to give you just a couple quick examples of

16    calls that we think are important enough for you to listen to

17    and not rely on the transcript.

18            There's on Line Number 3, TT-3-5298, there's one word

19    on that transcript which we think is wrong.  It is the word

20    "business" versus -- and I won't say the word, but it's a word

21    that sounds like "business" but is an impolite reference to a

22    lady.  That changes -- it changes the whole context of the

23    call.

24            But if you listen to it, you'll hear it.  I listened

25    to it five times before I realized what was actually being

1    said.

2          Another example on the same line -- there are two

3    other examples:  Call No. 7934 and Call 7392.

4          Now, 7934 purports to be a call between Lockley and

5    Lashley.  We think there's some question about that.  We ask

6    you to listen to that if you think that call's important.

7          And 7392 is a call between Lockley and Anderson on the

8    transcript.  If you think that call is important, please listen

9    to it, because we're not sure that that voice recognition is

10   accurate.

11         And it's really up to you, not to us, to determine

12   whose voice it was.  So please listen to that and make your own

13   judgment regarding the speakers and the substance of the

14   message on the recordings, and I ask you to be very careful in

15   doing that.

16         Now, another area is -- I think we can learn a lot

17   from search warrants in this case.  Search warrants are court

18   orders that allow the police to go in with teams of people,

19   usually in the very early morning hours, to catch people at

20   home.  For officer safety, it's just good police procedure to

21   go in early, quietly, and search.

22         They did that in Mr. Lockley's case.  They did it in

23   virtually -- they did a lot.  You've heard about a lot of

24   searches.

25         But on September 27th, 2016, in the early morning

1   hours, they entered 1868 Oxford Square with a search warrant.

2   And Mr. Lockley was there.  I think multiple other people lived

3   in the house as well.

4        But unlike many of the other search warrant

5   executions, Mr. Lockley's home contained no evidence of drugs,

6   no evidence of guns.  There were no drugs.  There was no

7   paraphernalia.  There was no packaging material or processing

8   devices, no kilo press.  There was nothing like that.

9        There was no scale for weighing drugs.  There was no

10  firearm, no ammunition of any kind.  There were no gun boxes or

11  weapons of any kind.  There was no safe.  There was no large

12  cash hoard.

13       There was a total of $1500 on September 27th, 2016,

14  that was in what I would submit would be Mr. Lockley's pants

15  pocket.  They found $1500 in a pants pocket three days before

16  rent is due.

17       They found a few cell phones.  There were a number of

18  other people who lived in that address.

19       And significantly, I think, there was no gang

20  paperwork or any writing connecting Mr. Lockley to any RICO

21  enterprise, which is something they found in many of the other

22  searches, the jail cell searches, all of that.  But you won't

23  find that as to Mr. Lockley.

24       Now, this goes back to the second element of Count 1

25  again, membership in MMP.  We're talking about gang paperwork.

 1   So I ask you to take a careful look at that.

 2         The gang paperwork exhibits that you'll get have --

 3   they're GP exhibits.  And they're all numbered, and there are

 4   many, many exhibits in that group.

 5         So look at the GP exhibits, and I ask you:  Is there

 6   any document suggesting that Jamal Lockley conducts or

 7   participates in the affairs of the alleged RICO enterprise?

 8         There is no evidence that Mr. Lockley ever saw that

 9   paperwork.  There is no evidence that he had anything or ever

10   had in his hands the seven rules of death or the seven mob

11   mandates or anything about the Black Blood Brotherhood.

12         I know there's been testimony about Mr. Bailey's

13   somewhat prolific writing.  Much has been said about a

14   screenplay.  That's in the GP-A exhibits.  Is it fact?  Is it

15   fiction?  Is it based on fact?  It doesn't matter with

16   Mr. Lockley.

17         Let's say it is fact.  That's the Government's theory.

18   It's based on fact.  Look at the screenplay.  Lockley has no

19   part.  His name isn't in the screenplay.  He's not part of

20   that.

21         That's supposed to be, according to the Government,

22   keeping it real, you know, these writings about the Mirage and

23   what happened and bringing people's names in it.  Mr. Lockley

24   is not in any autobiographical screenplay.  There's no part for

25   him.

 1          And if you read it, I think you'll see that Lockley --

 2    it's another fact that suggests that Lockley is not part of

 3    that enterprise, certainly not beyond a reasonable doubt when

 4    you apply the presumption of innocence.

 5          So let me move on to drug dealing.  If you find

 6    Mr. Lockley involved in drug dealing, I submit that any

 7    involvement is not the large-scale conspiracy charged in

 8    Count 2 and certainly not in the large quantities charged.

 9          Now, if you get to the point on your verdict sheet on

10    the second or third page, you'll find that you have to

11    designate what drugs are reasonably foreseeable.  You have to

12    be unanimous.  You have to decide that beyond a reasonable

13    doubt.

14          You have to decide quantities unanimously beyond a

15    reasonable doubt.

16          I ask you to please be conservative and apply the

17    presumption of innocence and the requirement of proof beyond a

18    reasonable doubt in calculating drug quantity, if you reach

19    that question.

20          And I want to point out two examples of why that is so

21    important.

22          There is -- for example, the Government has thrown

23    into the mix some 600 grams of heroin found on July 20th, 2015,

24    inside somebody named Kameron Wilson's futon in his bedroom.

25          There's very little evidence on this other than it was

```
 1   seized.

 2            I think one officer said or suggested that

 3   Kameron Wilson was holding that 600 grams for Spence.

 4            But, in all fairness, is there any evidence connecting

 5   Jamal Lockley to Kameron Wilson?  I don't think so.

 6            And is the evidence established beyond a reasonable

 7   doubt that whatever those 600 grams were, were reasonably

 8   foreseeable to Jamal Lockley?  I don't think so.

 9            And another example would be just according to the

10   testimony of Jay Greer, there was a time when he was supposedly

11   cooking crack.  And he mentioned the quantity 500 grams in some

12   trap house that is supposed to be affiliated with somebody in

13   this case, not Mr. Lockley.

14            There's no evidence that Jamal Lockley knew about that

15   or knew where it was.

16            So if you get to the point of calculating quantities,

17   please be conservative and careful and fair.

18            And when you decide what's foreseeable, just don't

19   jump to those big numbers.  Please examine it carefully.

20            I ask you again to remember the presumption of

21   innocence at all times.  Apply it in your deliberations.  Be

22   careful, cautious, and conservative in evaluating the

23   credibility of William Banks.  Is this a person that a

24   reasonable person would believe on an important matter without

25   corroboration?
```

```
1              Probably no way.

2              I submit that certainly Jamal Lockley is not guilty of

3    Count 1 because the second element is not established beyond a

4    reasonable doubt.

5              And I ask for consideration also on Counts 2 and 3.

6    Consider a not-guilty verdict on that as well.

7              Now, everyone so far has thanked you for your

8    attention in the beginning.  I'm going to do it at the end.

9              I know it's been a long ordeal for you.  I appreciate

10   your attention to this matter and your focus on this case, and

11   I'm confident that you will render a fair and reasonable

12   verdict for Jamal Lockley.

13             Thank you.

14        THE COURT:  Thank you, Mr. Trainor.

15        Do you have the microphone?

16        THE CLERK:  Mr. Trainor.

17        THE COURT:  Ms. Moyé wants that mic back.

18        MR. TRAINOR:  You want it back?

19        THE CLERK:  Yes.  Thank you.

20        MR. TRAINOR:  (Handing.)

21        THE CLERK:  Thank you.

22        THE COURT:  Thank you.

23        All right.  I think this is a good time for a recess,

24   so we'll start by excusing the jury.

25        (Jury left the courtroom at 10:46 a.m.)
```

1          **THE COURT:**  All right.  And we'll excuse the gallery.

2          All right.  When we come back, we will hear from

3     Ms. Amato.

4          And in accordance with our agreement from yesterday,

5     we will reserve Mr. Hazlehurst and the Government's rebuttal

6     for Monday morning.

7          So we'll take the recess.  Thank you.

8       (Recess taken.)

9          **THE COURT:**  All right.  We'll bring in the jury.

10      (Jury entered the courtroom at 11:09 a.m.)

11         **MS. AMATO:**  Sorry, Your Honor.  I put this in front of

12    you.

13         **THE COURT:**  Just making sure everybody is back and

14    you've got the mic.

15         Ms. Amato, I'll be happy to hear from you.

16         **MS. AMATO:**  Thank you.

17         Good morning, ladies and gentlemen.

18         Mr. Anderson was not a member of MMP.

19         Let's not forget that Mr. Bailey had a music-recording

20    business.  And we learned that Mr. Anderson was involved in

21    that music-recording business, involved in buying T-shirts,

22    T-shirts which would have "Team Cash" written on it.

23         The music-recording business of Mr. Bailey, that we

24    heard, was called Team Cash Gutta Music Group.  And we learned

25    that Mr. Anderson was involved in getting T-shirts and getting

1  the outfits for the performers.

2          So, ladies and gentlemen, when you see a photo like

3  Government's Exhibit 1C-58, this photo does not mean -- does

4  not prove --

5          **THE COURT:**  I'm sorry.  We need to get it on the

6  monitor.

7          **MS. AMATO:**  Ms. Moyé is working it.

8          **THE CLERK:**  Yes.  There you go.

9          **MS. AMATO:**  Okay.  All right.

10         So when we see this photo such as IC-58, this does not

11  mean -- this does not prove that Mr. Anderson is a part of a

12  street gang, three people here doing different hand signs.  We

13  don't even know who this third person is, the taller person

14  with the hat.

15         Mr. Anderson was not a member of MMP, whatever MMP

16  stands for.

17         Now, how do we know that Mr. Anderson was not a member

18  of MMP?  Well, there's a lot of reasons, but I'm going to start

19  out first with the cooperators.

20         And we heard from four cooperators that the

21  prosecution called and asked to identify Mr. Anderson.

22         And they identified Mr. Anderson.  They knew

23  Mr. Anderson as Bo.  And each one of those four cooperators

24  were asked:  Was Mr. Anderson a member?

25         I'm going to start in the reverse order that we heard

```
 1   from these cooperators.

 2           So taking Mr. Lashley, Malcolm Lashley, first,

 3   Mr. Malcolm Lashley said -- Mr. Lashley said that Mr. Anderson

 4   was not a member.

 5           Now, he was someone who was asked to identify member

 6   after member after member.  And he also told us that, according

 7   to him, his brother was a member.  So he would have known who

 8   was a member and who wasn't.

 9           Derran Hankins:  Mr. Anderson was not a member.

10           Now we get to Jay Greer.  And Jay Greer told us that

11   he believed Mr. Anderson was a member because of the front

12   teeth, the gold teeth that he observed while he and

13   Mr. Anderson were locked up together on the same tier, waiting

14   basically on this case.

15           And he said that he saw Mr. Anderson when he would

16   talk to him.  And Mr. Anderson had gold teeth in front, these

17   gold implants with two M's on it (indicating).

18           Well, every picture that we've seen of Mr. Anderson

19   with his mouth open, every video that we've seen with

20   Mr. Anderson with his mouth open, there was no gold teeth.

21   There's no implants.  There's no M's.

22           And we also heard from Agent Aanonsen, who took

23   Mr. Anderson into custody.  And Agent Aanonsen said that he

24   obviously had interaction -- a lot of interaction with

25   Mr. Anderson.  He interviewed Mr. Anderson.  No gold teeth.
```

1          And not only that, Agent Anderson [sic] said that he

2    had to wait while Mr. Anderson got dressed.  He searched the

3    clothes that Mr. Anderson was going to put on and put on.  No

4    gold teeth.

5          So Mr. Greer is mixing -- he's confused.  He's mixing

6    Mr. Anderson with someone else.

7          He was locked up in that tier, he said, with at

8    least -- there were at least 20 other individuals, 20 other

9    people.  He's confused.  He's mixing up Mr. Anderson with

10   someone else that he was locked up with that he spoke with who

11   had those gold teeth with those M's.

12         And so, quite frankly, everything that Mr. Greer has

13   said about Mr. Anderson you can just disregard because he is

14   confusing Mr. Anderson with someone else.

15         And what else did he say?  He came up with this story

16   that Mr. Anderson was supposedly selling drugs out on

17   Edmondson Street.  Now, he said he wouldn't hang out on

18   Edmondson Street, but supposedly he had this information.

19         Rumors?

20         He also claimed that that person with those gold front

21   teeth (indicating) with the M's was out selling on the

22   Windsor Park area when Mr. Bailey was locked up.

23         Again, ladies and gentlemen, he is confusing whoever

24   he is talking about with Mr. Anderson.  So you can just

25   disregard what he said.

1        That brings us to Mr. Banks.  And Mr. Banks claimed

2   that Mr. Anderson, excuse me, was a boss.

3        Now, maybe Mr. Banks said that Mr. Anderson was a boss

4   of MMT -- MMP because Mr. Banks also testified, the only one,

5   that Mr. Anderson and Mr. Bailey were brothers.  So maybe he

6   thought if he says they're brothers, then it's kind of credible

7   that Mr. Anderson's also a boss.  Or maybe because he saw this

8   video, this rap video, IC-126-A, which at 1:02 is a photograph

9   of Mr. Anderson, and it says [reading]:  Fat Tony, Da Boss.

10        Well, we heard that none of these witnesses, when

11   asked to identify Mr. Anderson (indicating), what did they call

12   him by, they said "Bo."

13        So here we've got this "Fat Tony, Da Boss," it was

14   also Defense Exhibit 11, which is basically a still shot at 102

15   or 103.

16        I submit to you that this rap video collage with a

17   photo of Mr. Anderson's face, smiling face, is but a character

18   that was created just using his face and creating this

19   character, Fat Tony, Da Boss.

20        Another thing about Banks that Banks said regarding

21   Mr. Anderson being a boss that didn't make sense was that we

22   heard Mr. Banks say that while Mr. Anderson was a boss of the

23   Windsor Park -- Windsor Mill, excuse me,

24   Windsor Mill-Forest Park area; but then we heard him say that,

25   Oh, well, SP, Spence, was also a boss in that area.

 1              Well, it doesn't make sense that there's two bosses in

 2    one area.

 3              There is no evidence that corroborates Mr. Banks'

 4    assertion that Anderson was a boss.

 5              Banks stated there were these gang -- excuse me.

 6              Banks stated that there were no members that worked.

 7              Now, of course, we know that that doesn't apply to

 8    Mr. Anderson.  He worked.  He had a shop.  We've seen

 9    photographs -- and I'll go through them a little later -- of

10    Mr. Anderson's business.  He was someone that was working.

11              So, yeah, okay, the gang didn't -- gang members didn't

12    have jobs.  I guess they didn't.  But Mr. Anderson was not a

13    gang member.

14              Now, leaving the cooperators and looking at the rest

15    of the evidence, in the rest of the evidence, likewise, we find

16    nothing to support that Mr. Anderson was a member of MMP or a

17    boss.

18              We heard about meetings that the gang had meetings.

19    There is not one meeting in which Mr. Anderson is present.

20              Now, the Government played SF-2, which is a video of

21    October of 2012 and that Mr. Anderson was present.

22              But we also learned, ladies and gentlemen, that the

23    reason that these guys were together that night was to go

24    across the street to a strip joint, to Norma Jean's.

25              (Video played.)

1       **MS. AMATO:**  And so they were just being guys, guys

2  being guys going to a strip joint, Norma Jean's, right across

3  the street.

4            Norma Jean's.

5            There was no testimony of Mr. Anderson giving any

6  orders.  There was no testimony of Mr. Anderson collecting

7  dues.

8            There was no testimony of Mr. Anderson's underboss,

9  lieutenant, capo, soldier.  There was none of that.

10            We saw photograph after photograph after photograph of

11  groups of people together, and Mr. Anderson was not in any of

12  those.

13            We even saw this photograph -- and I'm going to change

14  to this -- of the all-white party.

15            And Mr. Anderson was not a part of this either,

16  although we learned about this guy on the end (indicating) who

17  was there whose name was Bowl, B-O-W-L.

18            The only photographs that we saw of Mr. Anderson with

19  more than one other person were the first one that I showed

20  you, IC-58, where Mr. Anderson is with Mr. Bailey and some

21  other unknown person.

22            And IC-59, in which Mr. Anderson is again with various

23  people.  And, again, there was one person that Mr. Banks

24  couldn't identify.  And clearly, they're all drinking and it's

25  a night out of drinking.

 1          But we don't have Mr. Anderson in all those other

 2     photographs.

 3          The calls we heard -- and I'm going to get back to

 4     them later.

 5          But in terms of the calls, we heard there's certain

 6     language MMP members would use, double time, heartbeat.  We

 7     didn't hear that in the calls of Mr. Anderson.

 8          Now, also, quite frankly, I submit to you that even

 9     law enforcement did not believe that Mr. Anderson was a member

10     when they went to his house and they arrested him, because,

11     otherwise, ladies and gentlemen, they would have made sure to

12     look at his body to look for those tattoos, to look for that M,

13     look for that lightning bolt; right?

14          Okay.  Agent Aanonsen was a little embarrassed.

15     Mr. Anderson was nude.  Fine.  Mr. Anderson puts on his

16     underwear.  Take a look at him.  Mr. Anderson puts on his

17     pants.  But they didn't.  They didn't need to because they

18     didn't even believe that he was a member.  They didn't expect

19     to find those tattoos on him.

20          There is no evidence that Mr. Anderson was a member.

21          They search his residence.  They're searching his

22     residence to find things that they can bring into court to

23     present to prove that Mr. Anderson was a part of MMP.  They

24     found nothing.  They searched his business.  Nothing.

25          There is no evidence to corroborate that Mr. Anderson

 1    was a member of MMP.

 2           Now, don't be confused with mere presence and mere

 3    association of people with other people.

 4           Judge Blake instructed you yesterday with a lot of

 5    instructions.  And one of the instructions that she read to you

 6    was that a defendant's mere presence at the scene of the

 7    alleged crime does not, by itself, make him or her a member of

 8    the conspiracy.

 9           Similarly, mere association with one or more members

10    of the conspiracy does not automatically make a defendant a

11    member.

12           So when you see Mr. Anderson driving up to the BP gas

13    station --

14        (Video was played but not reported.)

15        **MS. AMATO:**  -- mere presence is not enough, ladies and

16    gentlemen.

17           And when you see Mr. Anderson playing cards --

18        (Video played.)

19        **MS. AMATO:**  -- with Mr. Bailey, merely playing cards,

20    ladies and gentlemen, is not enough.  Mere association is not

21    enough to find someone involved in a conspiracy.

22           Mr. Banks told us that Mr. Bailey would use FaceTime

23    to communicate -- to talk to people and that he would talk to

24    Mr. Anderson with FaceTime because he didn't want his calls to

25    be recorded.

1              To try to -- they're trying to insinuate -- Mr. Banks
2    is trying to insinuate that somehow whatever Mr. Banks --
3    excuse me, whatever Mr. Bailey and Mr. Anderson was talking
4    about was somehow criminal.
5              Well, the prosecution showed us two photographs of
6    these FaceTime conversations.  And we see Mr. Anderson, and we
7    see Mr. Bailey.  And they look -- seem to be happy.  Looks to
8    be a happy conversation.
9              And I'm sure you've all heard the saying that what
10   stays -- what happens in Vegas stays in Vegas, or something
11   like that.
12             Well, clearly, Mr. Anderson is letting Mr. Bailey know
13   a little bit about what's happening to him when he's in Vegas.
14             We've seen Mr. Anderson before with the fake necklace
15   and that shirt.  And, lo and behold, Defense Exhibit No. 13 --
16        (Video played.)
17        **MS. AMATO:**  -- he has that shirt, that necklace.
18             So this photograph that we just saw, the FaceTime
19   photograph, is a photograph of Mr. Anderson talking to
20   Mr. Bailey when he was in Vegas.
21             And the Government also showed you IC-112, which also
22   appears to just be another FaceTime conversation of
23   Mr. Anderson telling Mr. Bailey what he's up to in Vegas.
24             He's got the fake jewelry around his neck, appears to
25   be in that rented Bentley that four of them had rented

1    together.  That's what those conversations were about.

2         So, ladies and gentlemen, there is no evidence that

3    Mr. Anderson was a member of MMP and that he was a boss of MMP.

4         The cooperators testified about Mr. Anderson being out

5    there supplying drugs.

6         Now, firstly, neither Hankins, Greer, or Lashley said

7    they ever got drugs from Mr. Anderson, never got drugs from

8    Mr. Anderson.

9         But Lashley wants you all to believe that a while ago,

10   one time Mr. Anderson approached him and basically offered to

11   sell him or to supply him drugs.

12        And Mr. Lashley came into court here and he told all

13   of us that Anderson said to him, asked -- said to him if I was

14   all right or if I need anything.

15        Well, and then, of course, it comes out that those

16   words were not the words that he told the prosecution and

17   law enforcement when he spoke to them about this supposed offer

18   that -- the same day that he took his plea agreement, he went

19   in and he met with law enforcement and the prosecution.

20        At that time he said to them that Anderson supposedly

21   said to him -- that Anderson said to him that you need to get

22   with him.

23        You need to get with me.

24        So Mr. Lashley clearly has no problems changing his

25   words up, doesn't care, because the bottom line to him is he

1    wants to say something that's going to help the prosecution so

2    he can get out of jail quickly.

3           And regardless, Mr. Anderson never supplied him

4    anything.

5           So bottom line is he can't really tell us what

6    Mr. Anderson was offering to him.  He had to admit that he knew

7    that Mr. Anderson was someone who sold cars, that Mr. Anderson

8    had the ability to go to auctions and purchase cars and sell

9    cars.

10          And we heard -- and I'll talk about it a little later,

11   but we heard of people seeking to purchase cars from

12   Mr. Anderson.

13          Now -- and, of course, in those conversation -- excuse

14   me.

15          And, of course, Mr. Lashley also said that -- or I

16   should say he never said anything about quantity, that there

17   was nothing in the conversations about quantity, quality, type

18   of drug, nothing.  It was just this supposed offer to him which

19   he wants you all to believe was an offer to purchase drugs.

20          But, again, we know that he knew that Mr. Anderson was

21   buying and selling cars and that it would be perfectly

22   legitimate for Mr. Anderson to have approached him and said,

23   Hey, you need to get with me to buy a car.

24          Another thing to show the unreliability of Mr. Lashley

25   and his desire to curry favor from the Government is that he

1    said that, oh, the reason he didn't obtain drugs from

2    Mr. Anderson was because he didn't want to owe Mr. Anderson

3    anything.

4         Well, then it came out that, actually, Mr. Lashley had

5    admitted to law enforcement that he had, in fact -- when he

6    would purchase drugs from Reese, he would actually usually most

7    of the time get fronted those drugs.

8         And so if he was fronted those drugs, in other words,

9    it would mean that he would receive the drugs first and then he

10   would have to owe that person.

11        So he's not even consistent in his stories.  And,

12   clearly, the fact that he had told law enforcement that he had

13   been fronted drugs by Reese pokes a hole in his story that he

14   didn't want to owe Mr. Anderson, because he was owing,

15   obviously, Reese when he was out there.

16        Now, Banks wants us to believe that he had obtained

17   drugs from Mr. Anderson.  And he says -- he talks about a time

18   in which he and Kane had been stopped by police.

19        And he told us that that time that he and Kane had

20   been stopped by police, that he had been supplied by Anderson,

21   that he had drugs on him that he was supplied by Anderson.

22        But then, of course, it comes out:  Well, Mr. Banks,

23   police searched you; right?

24        Yes.

25        Police didn't find any drugs on you.

1          No, they didn't.

2          So there's nothing to corroborate Mr. Banks' story

3    that he obtained drugs from Mr. Anderson.

4          And as we know and you've heard before -- and I have

5    to repeat some of it, because it is important -- Mr. Banks is a

6    liar.  He's admitted to the lies he was caught in.  He's lied

7    to law enforcement.  He's lied to prosecutors.  He's lied to

8    people on the street.

9          And they say the more you lie, the easier it becomes.

10         He was working as a double agent.  Maybe he was proud

11   of that.  He was working with law enforcement.  He was out

12   there doing covert, undercover buys for them.  At the same

13   time, very quickly, he went back to his usual criminal

14   behavior.

15         And he had to admit that on January 12th of 2016 when

16   he signed with the ATF to be a -- to work with them, he

17   admitted that part of that agreement, he would not be out there

18   selling drugs or doing criminal activity.  And then two weeks

19   later, barely two weeks later, he's already out there

20   possessing guns and doing criminal activity.

21         So he is not to be trusted.  He is not a witness that

22   you can stand on his testimony alone.

23         And further, if Mr. Banks was really being supplied by

24   Mr. Anderson, don't you think there would have been a

25   recording?

 1          He was working with law enforcement.  There were

 2   recordings of Mr. Banks going out there and purchasing drugs.

 3   Not one recording, ladies and gentlemen, because he was not

 4   being supplied by Mr. Anderson.

 5          Now, Banks decided to go further than just saying

 6   Mr. Anderson was involved in drug-supplying to him.  He

 7   claimed -- he came up with this whole thing about overhearing

 8   that Gambino had told him that Mr. Anderson had given Gambino a

 9   gun to hold.

10          And then it comes out that, well, Gambino apparently

11   used that gun to shoot Antoine Ellis.

12          And then Mr. Banks says that he overheard, again, that

13   Mr. Anderson supposedly then got the gun back and then disposed

14   of it somewhere.

15          There's nothing to corroborate those stories that he

16   told us.  We heard from no other witness anything about that.

17          And, again, this is the person who had no problems

18   pointing the finger at someone else for the Samartine Hill

19   murder -- killing -- shooting.  Excuse me.

20          And if it hadn't been for law enforcement having

21   videos and being able to identify who the shooter was, he had

22   intended to go to his grave with that lie.

23          Now, focusing on the allegations about the drugs, no

24   drugs found in Mr. Anderson's residence.  It was searched.

25          No drugs found at his business.  It was searched.

1          We've heard that at many other places, they found

2     drugs, baggies, scales, other items to indicate there was

3     drug-supplying and drug involvement.  Not from Mr. Anderson.

4          What they did find at Mr. Anderson's residence was

5     money.  They found $2,500.

6          But we all learned -- you all learned that

7     Mr. Anderson had won, just two days prior to the search, $8,100

8     (indicating).  And this is something that Maryland records had,

9     and the parties stipulated to that.

10          So there's nothing wrong, nothing that would seem out

11     of place in finding $2,500 in cash when someone just won $8,100

12     at the casino.

13          And that's very different than the scenario of

14     Spittle, SP, where law enforcement found $25,000 in cash at his

15     residence.  And there's been no assertion that he was out

16     gambling and winning anything.

17          Now, Banks also claimed that Anderson had a

18     stash house in 2012.

19          Well, Banks didn't give law enforcement any type of

20     specific address, a specific house number, a way for

21     law enforcement to actually go to that residence; ascertain

22     whether, in fact, it's correct, the information that Mr. Banks

23     is giving is correct; if it's accurate, search the residence.

24          So he gave them just enough to just kind of get their

25     interest, but not enough for them to actually corroborate and

1  follow through with what he told them.  So it's just his story.
2  It's just his word again.

3       And surveillance, there was a lot of surveillance.
4  Law enforcement was out at the BP gas station.  Law enforcement
5  was out at Windsor Park -- excuse me.  I keep mixing them up --
6  Windsor Mill Road and Forest Park.  And not once did they see
7  Mr. Anderson with drugs or supplying anyone.

8       And, more importantly, not only were they surveying
9  that location, but they were actually watching -- we heard that
10 there were law enforcement that were watching Mr. Anderson.
11 And not one of those law enforcement officers that was watching
12 Mr. Anderson observed him with any drugs or supplying anyone.

13      Mr. Anderson was involved in his -- in 2016 his car
14 wash and car detail business as well as buying and selling
15 vehicles.

16      Now, the phone calls.  So you may ask, Well, what
17 about the phone calls?

18      There is nothing to corroborate the interpretation and
19 the spin that the Government wants you all to place on those
20 phone calls.

21      We heard -- again, going back to surveillance, we
22 learned that at the same time that these phone calls were being
23 recorded, there was someone that was listening in realtime.
24 They were even preparing line sheets part of the time at the
25 time that these calls were coming in.

 1          And at the same time these calls were coming in and

 2    there was someone in that office listening to these calls, they

 3    had law officers on the scene in the area and they were

 4    communicating them -- to them in realtime.

 5          And we learned that when they were hearing certain

 6    things on these calls, they would then have an officer take

 7    proactive activity.  And not any of these phone calls amounted,

 8    in the calls in which they identified Mr. Anderson's voice,

 9    amount to any kind of corroboration on the street that, oh,

10    yeah, Mr. Anderson is somehow supplying Lockley or someone

11    else.

12          Now, the phone calls.  We heard about a phone call in

13    which a Charlie is mentioned.

14          And then you also learned that not all the phone calls

15    in which they identify the voice of Mr. Anderson and the voice

16    of Mr. Lockley were played for you and that there were other

17    phone calls.  And there were other calls, in fact, in which

18    this Charlie -- not Charles -- Charlie was mentioned.

19          In fact, on the same day of the phone call that they

20    played on August 10th of 2016, you all learned that there was a

21    phone call in which Lockley, the voice of Lockley, is speaking

22    to the voice identified as Mr. Anderson that Charlie was

23    interested in purchasing a BMW truck from Mr. Anderson and

24    whether Mr. Anderson still had that truck.

25          So, ladies and gentlemen, here is a phone call that

1     you didn't hear but then you learned that existed, and so it

2     has to give you pause as to the interpretation the Government

3     wants you to place on these phone calls and realize, well, if

4     Mr. Lockley, the voice of Lockley is calling the voice of

5     Mr. Anderson about someone else, Charlie, wanting to purchase a

6     vehicle from Mr. Anderson, then it makes sense that

7     Mr. Anderson and Mr. Lockley would be in other phone calls

8     discussing that and discussing prices and discussing things

9     pertaining to the purchase of the vehicle.

10          The same thing goes to -- you also heard that there

11     were line sheets for a phone call on August the 11th of 2016 in

12     which there was discussion between the voice identified as

13     Lockley and the voice identified as Anderson regarding the need

14     to purchase 15 T-shirts; that Lor Sean was going to have a

15     performance; and they needed to buy these T-shirts and put "TC"

16     for Team Cash on the T-shirts; that they wanted to buy hats and

17     an outfit for the artist.

18          So, again, we hear there's another legitimate reason,

19     separate and apart from the spin the Government wants to place

20     on these phone calls, in which the voice of Lockley and the

21     voice identified as Anderson are discussing things together.

22          And then we also hear that there was a conversation

23     recorded between the voice of Lockley and the voice of Tiffany

24     Bail -- Bailey, excuse me, and that Tiffany Bailey also went

25     through Lockley to speak about obtaining a vehicle, to purchase

1  a vehicle from Anderson.

2       She was interested in purchasing a vehicle and wanted

3  to know if Anderson might be able to sell her this vehicle.

4  And she specifically didn't want to go directly to Anderson.

5  She went through Lockley.

6       So, again, we have these other phone calls that when

7  you, in the whole context, the full context of these phone

8  calls, you realize that there are other reasons than the spin

9  and the interpretation that the Government wants to place on

10 these phone calls.

11      Judge Blake, in one of her instructions, informed you

12 that you should -- that the words -- the recordings themselves

13 are the evidence, not the transcripts.

14      You've seen the transcripts.  You'll get the

15 transcripts, most probably, but it's the recordings themselves

16 that is the evidence.

17      So it's for you all to listen to determine what is

18 being said on these recordings.

19      And I say that to you because sometimes when you have

20 a transcript and you listen to something with the transcript in

21 front of you, you automatically assume and you're ready to hear

22 the words that you read on that transcript.

23      So, for example, I ask you, when you listen to these

24 calls, put those transcripts aside and just listen to the words

25 themselves.  And when you do that, when you listen just to the

1    words, for example, Call No. 4903 on August the 3rd, 2016, when

2    you listen without the transcripts, listen to hear for, instead

3    of the word "Creams," which is written on the transcript,

4    "beans."

5            The same thing for Call 6217.  When you listen without

6    the transcript, listen for the words by the voice of

7    Mr. Anderson "playing a lot of motherfucking games" rather than

8    what's on the transcript "dropping a lot of motherfucking

9    names."

10           And in Call 4910, that's the call where there is a lot

11   of other noise.  And you can't -- at a very important time, you

12   can't really hear.  It's very difficult to hear what's being

13   said in all of that noise, but listen to that call.

14           Now, obviously it would help if you had headphones so

15   that you could really hear that the voice during that rumbling

16   is saying "rental office opens," "rental office opens at

17   9:00 a.m."

18           Now, another thing that's really important with those

19   phone call -- well, the phone calls and the cooperator

20   testimony is that not one cooperator testified that

21   Mr. Anderson supplied Mr. Lockley.  Not one.  We didn't hear

22   that.  Not one.

23           And yet again, the calls the Government wants to --

24   the spin the Government wants to put on those calls is that

25   Mr. Anderson was, I guess, supplying Mr. Lockley.

 1              But not one cooperator testified that Anderson was

 2      supplying Mr. Lockley.

 3              Another aspect of these phone calls, which is really

 4      important, remember this glossary that the Government put

 5      before all of us (indicating)?  They had Mr. Banks on the

 6      stand, and they went one by one with these words.  And they

 7      asked Mr. Banks to interpret what these words really meant.

 8              Not one of the words in this handy-dandy glossary for

 9      heroin do we hear Mr. Corloyd Anderson say on those phone

10      calls.

11              Now, we hear -- once we heard him say the word "girl,"

12      but we also heard him right after that say "good looking."

13      Good-looking girl.  Girl good looking.

14              But remember, the supply -- excuse me.

15              The cooperators testified that Anderson was supposedly

16      a heroin supplier.  So "girl" is out of the picture, even if

17      she is good looking.

18              All the other words that Mr. Banks identified as

19      heroin, boy, we don't hear that.  Dope, raw, smack, yams, gg,

20      ten pieces, pieces, onion, dimes, nickels, testers, on deck,

21      reup, touchdown, plug, trap house, hustle, brick -- we didn't

22      hear any of these words in those phone calls.

23              Again, ladies and gentlemen, it's because Mr. Anderson

24      was not out there supplying anybody.

25              There is reasonable doubt as to the spin and the

```
 1    interpretation that the Government wants to place on these
 2    phone calls.
 3            Now, we heard there were eight wiretaps out.
 4    Law enforcement had eight wiretaps, and only on one of those
 5    was Mr. Anderson's phone intercepted.
 6            And recall there were these telephone extractions that
 7    law -- that we saw.
 8            And, for example, CELL-16-A, there was this telephone
 9    extraction.
10            And the Government, of course, wanted to highlight
11    that there was a Bruh Bo here with a number.
12            And then in CELL-1-A, for example, again, there was a
13    B, space, O, space.
14            But law enforcement had to admit that those numbers
15    were not associated with Mr. Anderson.
16            And so when you look at this Government's exhibit,
17    there is nothing to associate Mr. Anderson either with this Bo
18    (indicating) that's listed here.
19            Remember, we heard about a C-Bo -- C, hyphen, B-O.
20    And we heard, of course, about Bowl, B-O-W-L.
21            Now, while we're on the topic of cell phones, there
22    was this idea that they wanted to put out to you that
23    Mr. Anderson had this stack of cell phones, right?
24            I guess they want to make it seem like, well, Mr. --
25    drug suppliers have a stack of cell phones, and Mr. Anderson
```

1 had a stack of cell phones.  And, therefore, aha, he's a drug

2 seller.

3          So -- and to that end, they showed you, of course, the

4 video of the card playing between Mr. Bailey and Mr. Anderson.

5          Well, it makes sense, ladies and gentlemen, two

6 people, there's going to be two cell phones; right?  In this

7 day and age, basically everybody has a cell phone.  So if you

8 have two people together, you're going to see two cell phones,

9 at least.

10          And then there is the phones that were recovered at

11 Mr. Anderson's residence.  And maybe they want to throw those

12 in as well and say "stack of cell phones," because there was a

13 picture of three phones that were found at the residence of

14 Mr. Anderson.

15          And, again, what do we know?  There were three adults

16 at that house when it was searched:  Mr. Anderson; his wife,

17 Latoya; and then there was a third adult female.  There were

18 also three children.

19          And I'm told that in this day and age, a lot of

20 parents do give their children, at least of a certain age, a

21 cell phone so they can stay in contact with the child and the

22 child can stay in contact with them.  So use your common sense.

23          Three phones, three adults, three children makes

24 sense.  And they only -- law enforcement recovered one phone;

25 right?  Because, of course, they were able to determine which

 1  of those phones actually belonged to Mr. Anderson.  And so they

 2  seized that phone, would have searched that phone.

 3         Of course, there was no extraction provided to you all

 4  of what was on that phone, because clearly there was nothing

 5  that was worthy of evidence to present.

 6         But the other phones, they didn't need to seize those

 7  phones.  They didn't need the extractions of those phones,

 8  because they determined through their search who those phones

 9  belonged to, and they didn't belong to Mr. Anderson.

10  Common sense.

11         Anderson's business.  Government wants to claim that

12  it's just a front.  Nothing was really happening there.

13         But we heard from Mr. Bobby Lee Davis.  And he said he

14  went to the open house of Mr. Anderson's business, the business

15  in which he not only detailed cars but had a car washing

16  service that he offered.

17         And in this business, we actually see a vehicle that's

18  being worked on (indicating).

19         And there's a sign up here to inform people that they

20  should take all the belongings out of their vehicle before the

21  service is started (indicating).

22         There is an area for people to sit and wait for their

23  car as it's being washed.

24         There is the area, another area, part of an area where

25  cars can be washed and worked on.

1          Supplies.

2          Books, receipt books.

3          And, again, the car being worked on.

4          And Government will say, Oh, well, I guess now they'll

5     say, Oh, only one car?  First, they said there were no cars,

6     but now they'll say probably, Oh, well, one car doesn't mean

7     that there's really a business going on.

8          And, quite frankly, ladies and gentlemen, we heard

9     that these places are searched early in the morning; right?

10    So, of course, early in the morning there's not going to be a

11    lot going on.

12         Not only that; Mr. Anderson at that point, at 6:00,

13    6:15 a.m., is already in custody.  So he's not able to come and

14    open up his shop.

15         And, also, car washes are the kind of places that you

16    go -- you don't leave your vehicle there overnight.  You go;

17    you may wait for maybe 10, 15, 20 minutes; and then you go on

18    your way.

19         So it makes sense that there's not going to be a lot

20    of cars overnight at a car wash place because it's the kind of

21    business where you go, you take your car, you wait, and then

22    you leave.

23         We also learned, of course, that Mr. Anderson was also

24    involved -- and we've talked about this already -- about the

25    buying and selling of vehicles.

1          We -- and there was actually at his residence even,

2    there was a document that was found that talked about the

3    purchase of a vehicle by someone else from Mr. Anderson.  We

4    have for $15,200 (indicating), Corloyd Anderson was the seller

5    (indicating).  And this was the purchaser (indicating).  And

6    this was a receipt from back in 8/28 of 2013.

7          But besides this, again, we heard about other people

8    who had been interested in purchasing vehicles from

9    Mr. Anderson, including Tiffany and Charlie.

10          And then we heard about Mr. Anderson trying to send --

11    he had sent his uncle to Texas to purchase some vehicles for

12    him.  And his uncle didn't get very far.  Police stopped his

13    uncle.

14          But then Mr. Anderson came to the airport to take back

15    his money.

16          And, now, when the uncle was stopped, supposedly the

17    uncle gave some story about that he was on his way to Vegas,

18    even though, of course, his ticket showed that he was -- to

19    Texas.

20          Well, maybe the uncle had in his mind that after he

21    went to Texas to work for his uncle for the purchase of

22    vehicles, that then he was going to go on his way to Vegas.  We

23    don't know, ladies and gentlemen, what was going on in his

24    mind.

25          But we do know that Mr. Anderson himself came to the

```
 1    airport to clear things up.  He brought his access --
 2    AutoACCESS card.
 3            And the agent admitted that Mr. Anderson's story --
 4    what Mr. Anderson's explanation was made sense in terms of the
 5    uncle being there with the ticket to Texas and that the uncle,
 6    as Mr. Anderson had explained, was being sent to help
 7    Mr. Anderson in the purchase of vehicles.
 8            And the other thing is Mr. Anderson -- oh, let me
 9    just -- before I say this, there was some testimony from
10    Hankins that, supposedly, someone by the name of S-Dot called
11    Mr. Hankins saying something about some money at the airport
12    and Mr. Anderson.
13            Well, we know that Mr. Anderson never called
14    Mr. Hankins.  Mr. Anderson did not need to call Mr. Hankins.
15    Mr. Anderson went straight to the airport.  He had his
16    documentation in place.
17            He provided to the agent there the documentation to
18    show that he had won at least about 70 -- close to $73,000.
19    70,000 of that he had won just two months, not three, two
20    months prior, in December.  And he provided that documentation
21    to law -- to Agent Schmidt.
22            And we had the stipulation as well, again, that
23    Mr. Anderson had won 70,000 on December 13th.  And he had won
24    two times in two different transactions 1,420 on August 30th,
25    and Maryland Live! Casino records do have that information.
```

```
 1            So when Mr. Anderson went to the airport, he was able
 2   to provide these W-2G forms.
 3            And, also, it's important to note in these W-2G forms
 4   that no federal tax income [sic] had been withheld; no state
 5   income had been withheld.  So he received the full amount for
 6   the 1,420, as well as for the $70,000 (indicating).
 7            All right.  Mr. Anderson is also charged with a
 8   weapon.  And as to the cooperators, we heard Hankins claim that
 9   he saw Mr. Anderson with a gun in his dip, D-I-P, but he
10   admitted his memory was murky on the issue of the gun.
11            We heard from Lashley, who claims that he saw
12   Mr. Anderson with a gun not in his D-I-P, but in his hip, H-I-P
13   (indicating).
14            But when he was asked more questions, it was clear
15   that his memory was, quote/unquote, murky and was contrived.
16            A weapon was supposedly found at Mr. Anderson's
17   residence.
18            We heard from office -- Agent Shea [sic].  But
19   prosecution decided not to put on the agent that actually found
20   the weapon.  Remember, we never heard from the agent that
21   actually found the weapon.
22            The agent that was put on, he testified.  He said he
23   was there just to seize items.  And he really didn't know
24   anything about anything, but he found this -- he testified that
25   he was asked to seize this weapon.
```

 1          We know that law enforcement did not test the weapon

 2   for DNA.  We know that there was no DNA tying that gun to

 3   Mr. Anderson.  We know there's no fingerprints tying that gun

 4   to Mr. Anderson.

 5          We also heard that there were people that came to the

 6   residence, adults, the week prior to the search and the finding

 7   of this weapon.  So there were other adults coming and going to

 8   that residence.

 9          Mr. Anderson certainly did in his interview -- we

10   heard and we saw -- admit to a gun.  He signed a statement.  He

11   apologized.

12          But remember one thing, and that is that there was

13   about a 20- to 30-minute time period before Mr. Anderson signed

14   that form regarding the gun, possessing of the gun.

15          We don't know what happened during that 20- to

16   30-minute time period.  We don't know what was said to him.  We

17   don't know what he was told to encourage him and to get him to

18   write that statement.

19          So we have a gap in what transpired prior to

20   Mr. Anderson signing that statement.

21          Now, it could have -- he could have been recorded.  We

22   heard that Agent Aanonsen had a cell phone.  He could have

23   recorded Mr. Anderson during that time period.

24          So that most important part prior to Mr. Anderson

25   writing down that he possessed a gun we don't have.

 1          Now, certainly, Mr. Anderson didn't want his wife, who

 2     was still in the house with his children, to have to be held

 3     responsible for that weapon, even if it wasn't hers, even if it

 4     wasn't his.

 5          We also learned that there was a third adult, the

 6     female who was in the residence at the time that

 7     law enforcement say that they found this gun.

 8          Anderson didn't know too much about the gun.  He

 9     didn't know -- when you listen to the recording, he was a

10     little bit hazy about where it was purchased.

11          He believed it had ammo, but he wouldn't -- he didn't

12     say how many bullets or rounds were in the gun.  So he didn't

13     know too much about the gun.

14          And then there's also the statement -- and, again,

15     it's written and then we have the oral statement -- that

16     Mr. Anderson had sold 50 grams of heroin one time in the last

17     year.

18          And, again, I remind you to think about that time

19     period before that written statement is made.  We don't know

20     what was told to him at that point.

21          But we do know that in that written statement, he

22     writes the words "apologize" two times.

23          And we know that he was told that what he says, what

24     he said to law enforcement during that encounter would be told

25     to the prosecution and that he was cooperating.  We heard in

```
 1    the recording Agent Aanonsen say, "Cooperating.  You are

 2    cooperating."

 3            And it makes sense to, in the heat of the moment, to

 4    be cooperative, to give law enforcement what they want, and

 5    then to just deal with it later -- common sense in the hopes of

 6    maybe getting less jail time, in hopes of being released from

 7    custody.

 8            But it's also something I want you to think about that

 9    if you do believe that Mr. Anderson did sell 50 grams, you

10    heard Judge Blake mention a buyer-seller transaction.  And a

11    one-time, 50-gram sale in one year is a buyer-seller

12    relationship.  It's not sufficient to find someone involved in

13    a conspiracy.

14            Also in the statement, neither the written statement

15    or the oral statement, do we hear Mr. Anderson saying anything

16    that supports his involvement or membership in MMP, in any type

17    of conspiracy with any of the other co-defendants, any type of

18    conspiracy with any of the other names that we've heard.

19            I am coming to the close of my closing statement.  I

20    don't get a chance to come and speak with you a second time.

21    But, as you heard, the prosecution does.  And that's because

22    the burden is on them.

23            So when they come back up on Monday and they speak to

24    you and they say things about Mr. Anderson, think about, Well,

25    what would Ms. Amato say in response?
```

1        And when you go back and you deliberate and you talk

2  about Mr. Anderson, think about, Well, what would Ms. Amato say

3  in response to the things that may come up?

4        Again, it is the Government who has the burden of

5  proof in this case.

6        And that brings me to a little thing I want to say to

7  have you think about when you think about the cooperators.

8        Let's say you went to your doctor and your doctor told

9  you that you had to have an operation, and all the information

10  that you had that you had to have an operation came from your

11  doctor, Dr. No Good.

12        And then you learned that Dr. No Good stood to gain a

13  lot of money from your having this operation and that

14  Dr. No Good had a couple of felonies.  Would you want a second

15  opinion?

16        And if you go to Dr. No Good and you say, "I need a

17  second opinion," and Dr. No Good says, "Okay.  No problem.

18  I'll send you to my colleague, Dr. Believe Me Not," and you go

19  to Dr. Believe Me Not and then you realize that he's a liar and

20  a cheat and he has his own self-interest as well for wanting

21  you to have that operation, would you not want yet a third

22  opinion?

23        On behalf of Mr. Anderson, we both thank you for all

24  the time that you've given these past six weeks, and we thank

25  you as well for the time and consideration that we know that

```
 1   you're going to give when you go back and you deliberate.
 2         And we ask that you find Mr. Anderson not guilty on
 3   the charges.
 4         Thank you.
 5         THE COURT:  Thank you.  Appreciate it.
 6         And after you're unhooked from everything, I'll see
 7   counsel at the bench for just a moment.
 8      (Bench conference on the record:
 9         THE COURT:  I'm just planning to ask the jury to come
10   back at 9:30 Monday, if that's all right with everyone.  Okay.
11         MR. HAZLEHURST:   Thank you.)
12      (Bench conference concluded.)
13         THE COURT:  All right.  So, ladies and gentlemen, as I
14   mentioned, we were not going to be able to finish everything
15   today.  I do need to turn this courtroom back over for an event
16   this afternoon.
17         You have still one more defense counsel to hear from.
18   And the Government does have rebuttal, as you've learned.  And
19   then I'll have some very brief, final instructions for you on
20   Monday.
21         I appreciate you all coming in this morning.  And I'm
22   going to suggest 9:30 on Monday, if everyone can be back at
23   9:30 on Monday.
24         Again, absent something I can't imagine at the moment,
25   you will get the case on Monday and be able to begin
```

```
1    deliberations at some point.  You do have additional argument

2    to listen to, as I've said, and some additional instruction.

3            But the case is not yet over.  You haven't heard the

4    final arguments.

5            Please continue to keep an open mind.  Don't talk

6    about the case.

7            We'll see you Monday morning.

8            I can't see quite everybody there, but there you are.

9    I will see you Monday morning at 9:30.

10           Thank you very much.  The jury is excused.

11       (Jury excused at 12 o'clock noon.)

12       THE COURT:  All right.  Any issues anybody feels the

13   need to anticipate for Monday?

14       (No response.)

15       THE COURT:  Okay.  If you think of anything, you can

16   let me know.

17           We'll excuse the gallery at this time.

18       MS. WHALEN:  Your Honor, just one quick request really

19   of the Government.

20           If there's going to be a PowerPoint, we'd like it

21   sufficiently in advance so we can make any challenges that we

22   may need to make.

23       MS. HOFFMAN:  I'm not planning to use a PowerPoint;

24   but if that changes, I'll let them know.

25       MS. WHALEN:  Thank you.
```

1            **THE COURT:**  Thank you.

2            All right.  And Ms. Moyé can advise us for sure; but,

3    again, as you've gathered, there will be another proceeding

4    here later this afternoon.  So we need to clean things out.

5            **THE CLERK:**  Take everything.

6            **THE COURT:**  In fact, I'm going to ask for Ms. Moyé's

7    help on a couple of books I've got over here.

8            Okay.  All right.  Thank you, all.  I'll see you

9    Monday morning at 9:30.

10        (Court adjourned at 12:02 p.m.)

11

12        I, Douglas J. Zweizig, RDR, CRR, FCRR, do hereby certify

13    that the foregoing is a correct transcript from the

14    stenographic record of proceedings in the above-entitled

15    matter.

16

                      _____/s/_____

17
                      Douglas J. Zweizig, RDR, CRR, FCRR
18                       Registered Diplomate Reporter
                       Certified Realtime Reporter
19                      Federal Official Court Reporter
                         DATE:  November 20, 2019
20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
          Plaintiff,              )
 4                                )
          vs.                     ) CRIMINAL CASE NO. CCB-16-0267
 5                                )
     DANTE BAILEY, et al.,        )
 6        Defendants.             )
     _____)
 7

 8

                         Monday, April 29, 2019
 9                         Courtroom 1A
                         Baltimore, Maryland
10

11        BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                   (AND A JURY)
12

13                         VOLUME XXI

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Assistant United States Attorneys

17   For the Defendant Dante Bailey:

18   Paul Enzinna, Esquire
     Teresa Whalen, Esquire
19
     _____
20

21

22
                         Reported by:
23
                 Douglas J. Zweizig, RDR, CRR, FCRR
24               Federal Official Court Reporter
                 101 W. Lombard Street, 4th Floor
25                 Baltimore, Maryland  21201
```

1    For the Defendant Randy Banks:

2    Brian Sardelli, Esquire

3

     For the Defendant Corloyd Anderson:

4    Elita Amato, Esquire

5

6    For the Defendant Jamal Lockley:

7    Harry Trainor, Esquire

8

     For the Defendant Shakeen Davis:

9    Paul Hazlehurst, Esquire

10

11   Also Present:

12   Special Agent Christian Aanonsen, ATF

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2          (9:40 a.m.)

 3              THE COURT:  Good morning.

 4          May I see counsel at the bench, please.

 5      (Bench conference on the record:

 6              THE COURT:  Good morning.

 7              So I just wanted to put on the record up here at the

 8      bench that when Mr. Shakeen Davis was searched coming into the

 9      courthouse, the marshals found, I'm told, two razor blades in

10      his shoe.

11              For that reason, they requested -- and I authorized --

12      that he be placed in three-point restraints, which I believe

13      has been done.

14              The marshals also provided -- made sure he has a shirt

15      or a sweatshirt of some kind such that if he chooses to keep

16      his hands and arms at his side, the jury will not be able to

17      view the fact that he is in cuffs.

18              I have been further advised that he is pulling up the

19      sleeves of his shirt.  If he chooses to do that, it may become

20      obvious to the jury that he is in restraints.

21              I don't know what else I can say about that at the

22      moment.

23              On a different topic, it has occurred to me,

24      Mr. Sydni Frazier's leaving the trial, counsel reasonably were

25      concerned that perhaps the jury might think that he had pled
```

```
 1    guilty -- of course, I told them that doesn't make any

 2    difference anyway.

 3            What I was thinking, that in case -- one thing I might

 4    do, if you would like, to sort of reinforce that, in fact, it

 5    was because of Mr. Davis's illness, is just to say, "I thought

 6    you'd like to know Mr. Davis came through the surgery very

 7    well."

 8            MS. HOFFMAN:  Good.

 9            MS. AMATO:  I would like that.  I think that would be

10    great.

11            MR. TRAINOR:  I actually talked to him Friday, and

12    that is true.

13            THE COURT:  Yes.  I got the message from Ms. Essex.

14    So I do believe it's true, which is great news.

15            MS. HOFFMAN:  Yep, we're fine with that.

16            THE COURT:  All right.  The other thing, unless it's

17    buried in here somewhere, I may have lost the -- or misplaced

18    the redacted version of the indictment, the extra -- at some

19    point before we --

20            MS. PERRY:  I can reprint it.

21            THE COURT:  You can reprint it.

22            Any comments?  Anything else anybody wants to say?

23            MS. AMATO:  Just in terms of scheduling, then, so

24    we'll go, first, with one more closing argument.  Do we take a

25    break at that point?  Or do we wait until the Government
```

```
 1    finishes their rebuttal?  Or how does Your Honor want to handle
 2    the morning in terms of . . .
 3             THE COURT:  How long do you think you're going to be?
 4             MR. HAZLEHURST:  Probably 45, 50 minutes, Your Honor.
 5             THE COURT:  Okay.
 6             MR. HAZLEHURST:  Depends on how verbose I am.
 7             THE COURT:  I mean, I'd just as soon we go directly
 8    from there into rebuttal.
 9             But then I would have -- I guess I'd have to take a
10    break at some point because I have a few more pages and words
11    afterwards.
12             MS. HOFFMAN:  I think mine is about an hour and a
13    half.
14             THE COURT:  Hour and a half, okay.
15             MR. HAZLEHURST:  Your Honor, just in regard to
16    Mr. Davis, obviously, I have no ability to -- no fact-finding
17    ability to say exactly what happened.  And obviously at this
18    point, I have to rely on the marshals.
19             Mr. Davis, one, is concerned that he will not be able
20    to write, given the restraints on his wrists.  And the only way
21    he would be able to write would be if he essentially had to
22    expose those restraints.
23             And that's my greatest concern because I don't want
24    the jury, after having seen him throughout the trial writing,
25    taking notes, having his hands and wrists free, that he is now
```

```
 1    in restraints.
 2              So I'm not sure what other alternative the Court could
 3    possibly have.
 4              But, again, I want to state Mr. Davis's concern on the
 5    record.
 6              And my greater concern, obviously, is that the
 7    restraints do become visible.
 8         THE COURT:  Whether the restraints become visible is
 9    entirely under Mr. Davis's control.
10              I strongly urge him -- and I am sure you feel the same
11    way -- that he not do anything to make those restraints
12    visible --
13         MR. HAZLEHURST:  I agree.
14         THE COURT:  -- to the jury.
15              I think the fact that he's not writing can easily be
16    explained by the fact the evidence is done.  He's listening to
17    you argue.
18              And there's not -- you know, it's not as though he
19    needs to give you advice on questions or anything like that.
20    You're arguing.
21              So I think it is in his interest not to write and not
22    to expose those restraints to the jury.  And I certainly hope
23    he sees it that way.
24              But I have no alternative to the restraints, given
25    what the marshals found this morning.
```

 1              **MR. HAZLEHURST:**  I understand.

 2              **THE COURT:**  Okay.  All right.  Then I think we're

 3   ready to bring in the jury.

 4              **MR. HAZLEHURST:**  Thank you.

 5              **MS. HOFFMAN:**  Thanks.)

 6         (Bench conference concluded.)

 7              **MR. HAZLEHURST:**  Your Honor.  Mr. Davis did not have a

 8   headset during that last bench conference.

 9              **THE COURT:**  Oh.

10              **MR. HAZLEHURST:**  So he was not aware of the Court's

11   comments.

12              **THE COURT:**  If you would like to come back up, I'd be

13   happy to repeat it --

14              **MR. HAZLEHURST:**  I would, Your Honor.

15              **THE COURT:**  -- as soon as he has that headset.

16         (Jury entered the courtroom at 9:47 a.m.)

17              **MR. HAZLEHURST:**  Your Honor, if we may approach?

18              **THE COURT:**  Yes.

19         (Bench conference on the record:

20              **THE COURT:**  I'm going to repeat the matters that I

21   mentioned earlier, not realizing that Mr. Davis did not have

22   his headset.

23              First of all, I was advised by the marshals this

24   morning that they found two razor blades in Mr. Davis's shoes

25   when he was searched on his arrival to the courthouse today.

1          For that reason, they requested -- and I granted --

2    that he be placed in three-piece restraints, essentially, that

3    his hands be restrained.

4          The marshals also have provided him a shirt or

5    sweatshirt such that if he keeps his hands in his pockets, the

6    jury will not be able to see the restraints.

7          Mr. Hazlehurst expressed a concern on behalf of

8    Mr. Davis that he preferred to be able to write and be taking

9    notes as he has during the other parts of the trial.

10          I have indicated that, unfortunately, at this point

11    that is simply not an option; that, however, I did not think it

12    would appear out of the ordinary that he not be taking notes

13    now because the evidence is done.

14          There are no questions to be asked of witnesses.  It

15    is Mr. Hazlehurst giving his argument, which he will do

16    without, in the midst of it, consulting with his client.

17          So it's perfectly normal that he would not be taking

18    notes at this point.

19          I also strongly urged that Mr. Davis would see it in

20    his interest not to expose to the jury that he, in fact, has

21    restraints on his hands because he hasn't throughout the trial.

22    There's no reason the jury should know that now unless

23    Mr. Davis chooses to make that fact obvious, which I would

24    strongly advise him not to.

25          I assume his counsel feels the same way.

1    The only other thing I mentioned on the record is that

2   I intended to advise the jury of Mr. Davis's successful

3   recovery from surgery, just to emphasize to them that

4   Mr. Frazier is not here because -- that we told the truth,

5   essentially, that Mr. Davis's condition, medical condition, is

6   the reason that Mr. Frazier is not here.

7        Anything else?

8        **MR. HAZLEHURST:**  No, Your Honor.  Thank you.

9        **MS. HOFFMAN:**  Thank you.)

10    (Bench conference concluded.)

11       **THE COURT:**  Sorry, ladies and gentlemen.  And welcome

12   back.

13       All right.  In just a moment, we will be proceeding

14   with the continuation of the argument.

15       I believe we'll have Mr. Hazlehurst, and then there

16   will be a Government rebuttal.

17       So whenever you're ready.

18       **MR. HAZLEHURST:**  Your Honor, if I may, just one

19   moment?

20       **THE COURT:**  Of course.

21    (The defendant conferred with counsel.)

22       **MR. HAZLEHURST:**  Thank you, Your Honor.

23       **THE COURT:**  Sure.

24       **MR. HAZLEHURST:**  Ms. Moyé, I will switch on the

25   microphone.

```
 1            THE CLERK:  Thank you.

 2            MR. HAZLEHURST:  Shakeen Davis did not join and did

 3    not associate himself with Murdaland Mafia Piru.

 4            Shakeen Davis did not join or associate himself with a

 5    racketeering conspiracy charged in Count 1 of the indictment.

 6            And Shakeen Davis did not join or associate himself

 7    with the drug-trafficking conspiracy charged in Count 2 of the

 8    indictment.

 9            And the United States Government cannot and did not

10    prove that he did.

11            Good morning again, ladies and gentlemen.  I think you

12    probably know who I am by now, but, again, my name is

13    Paul Hazlehurst, and I represent Shakeen Davis.

14            Now, those assertions may seem bold after we've been

15    here for what seems like over a year, but really is about -- I

16    think now this is the seventh week.

17            We've heard from scores of witnesses.  You've seen

18    what -- to my mind, hundreds of exhibits.

19            But those statements are accurate because trials

20    ultimately aren't about the quantity of evidence; they're about

21    the quality of the evidence.

22            And even though you go through week after week of

23    trial and you hear from witness after witness after witness and

24    see exhibit upon exhibit upon exhibit, trials aren't about:

25    Well, it must be that the defendant is guilty; it has to be
```

1    that the defendant is guilty; how could it not be that a

2    defendant is guilty?

3            Trials are about proof, and proof beyond a reasonable

4    doubt.

5            When we began this case, I told you that when the

6    Government elects to accuse someone of committing a crime or

7    crimes and hails them into a courtroom and puts them in a chair

8    like Shakeen Davis is sitting in today (indicating), it makes a

9    promise to all of you.

10           It makes a promise that it can prove that that person

11   (indicating) committed those crimes beyond a reasonable doubt

12   and that it is the Government and only the Government that has

13   an obligation to, one, produce evidence and to prove those

14   charges.

15           Now, you've heard other defense counsel comment on

16   that.  You've actually heard Judge Blake reiterate that those

17   burdens never shift.  They're the sole responsibility of the

18   United States Government (indicating).

19           Now, to me, when I think of that obligation the

20   Government has, I envision a bridge, a bridge that has to be

21   constructed from mere accusation on one side across a very deep

22   and a very wide divide to beyond reasonable doubt on the other

23   side.

24           And that bridge can't be based on speculation, can't

25   be based on insinuation, can't be based on assumption.  It's

1    got to be based on reliable evidence, truthful testimony.

2    Can't have holes.  Can't have missing pieces.

3           It's got to be strong enough based on worthy

4    foundations because, ultimately, ladies and gentlemen, what the

5    Government's asking you to do is to have that bridge bear the

6    burden and the weight of a man's life.

7           Now, the Government sought to prove that Mr. Davis was

8    associated with MMP through four different means:

9           One, cooperating witnesses;

10           Two, intercepted and recorded telephone calls;

11           Three, seized cell phones;

12           And, four, social media.

13           Let's talk, first, a little bit about cooperating

14    witnesses.

15           Now, I don't think that my profession is the only

16    profession that suffers this.  But lawyers, I believe, are

17    immune sometimes to the idea that the terms that we use in

18    everyday life are accessible to people who walk into courtrooms

19    for the first time.

20           And we talked about -- a lot about cooperating

21    witnesses in this case.  And it sounds so helpful.  It's a

22    cooperating witness.  It sounds like it's somebody who's going

23    to help an old lady across the street.

24           But, ladies and gentlemen, the people that we're

25    talking about when we're talking about cooperating witnesses

 1 are not solid citizens.

 2          You have seen, I'm sure, in airports, train stations

 3 the posters that say, If you see something, say something.  If

 4 you see something that's suspicious, if you see a crime,

 5 basically report it.

 6          But these are not the people who are going to go up

 7 and tap a police officer on the shoulder and say, I just saw

 8 something.

 9          In fact, we've heard in this case that they didn't do

10 that on several occasions.

11          These are the people who wait to see what's in it for

12 them before they say anything.

13          Now, Ms. Perry made a point during her argument that

14 when witnesses have a common piece of information they're

15 trying to get across, if they use different words to express

16 it, it's a hallmark of the truth because when things sound

17 exactly the same, looks like it's been rehearsed.  It doesn't

18 sound like it's the truth.

19          Well, using that criterion, you know that at least on

20 one point, all of these witnesses were rehearsed because each

21 one of them, each one of these cooperating witnesses, when they

22 got on the witness stand, said uniformly, My job is to tell the

23 truth.

24          And any reduction in my sentence is up to the judge

25 (indicating).

1          Well, we found out that's not completely true because

2    for a witness to even have a chance to get a reduction in their

3    sentence, the Government, Government counsel, has got to

4    approve what they say.  It's essentially got to vouch for the

5    witness and say they provided substantial assistance.  They

6    cooperated with us.

7          And remember, we talked about this.  In fact, I think

8    I asked several witnesses.  Cooperating witnesses aren't

9    cooperating with anybody who's on this side of the courtroom

10   (indicating).  Cooperating witnesses are cooperating with only

11   people on this side of the courtroom (indicating).

12         And so it's not to say that cooperating witnesses

13   can't tell the truth; but their clear incentive is to try and

14   get home sooner, to take a sentence that may be ten years or

15   longer and reduce it.  And the only means for them to be able

16   to do that is to help the Government.

17         And so that means, ladies and gentlemen, that the

18   Government's got to say, Yeah, you helped.  You helped us.

19         And though that, again, cooperating witnesses can tell

20   the truth, that's a very powerful incentive to make sure that

21   whatever you say -- and whatever you have said before you ever

22   come into this courtroom -- conforms to the Government's

23   version of the facts.

24         Now, Ms. Perry told you that all of the cooperating

25   witnesses agreed that Mr. Davis was a member of MMP.

1          That's not really true.  There were only three

2   cooperating witnesses who said that Mr. Davis was a member of

3   MMP:  William Banks, Jay Greer, and Malcolm -- not Melvin --

4   Malcolm Lashley.

5          But I submit to you, ladies and gentlemen, that none

6   of those assertions that those witnesses made can really

7   withstand scrutiny.

8          I'll start with William Banks.

9          If you look beneath the bridge that the Government is

10  building here, the main pillar is William Banks.  And, quite

11  frankly, there could be no more suspect foundation for a

12  bridge.

13         When we began, I think I described Mr. Banks to you

14  like a pirate of old.  And what I meant was -- and mainly, my

15  knowledge of pirates comes from old pirate movies.  But the

16  trick was that pirates would keep a flag of every nation

17  onboard.  And when they were threatened by somebody they

18  thought could do them harm, they would strike their flag and

19  run up the flag that was friendly to whoever was threatening

20  them because at that point they would be friends.  They could

21  either run away; they could bide for time; they could make a

22  deal.

23         But it kept them from being destroyed.

24         Now, I stand by that reference to Mr. Banks because I

25  think he's -- he proved it himself.  I think the term that he

 1    used when he was testifying was "I was a double agent."

 2         The question was:  Double agent for which side?

 3    Because he played both sides against the middle, and he did it

 4    more than once.

 5         Now, Mr. Banks got in trouble in the state for almost

 6    killing a man and his child.  But he wrote what appeared to be

 7    a very heartfelt letter saying that he'd seen the error of his

 8    ways; that he was going to convert; he was going to do the

 9    right thing; he was going to help stop crime, not be part of

10    crime.

11         Ultimately, he was released; and he immediately, upon

12    release, became a paid informant for the Baltimore City Police

13    Department.

14         But we know, basically from Mr. Banks' own words, that

15    he almost immediately went back and started committing crimes

16    again.

17         And one of the crimes that he ultimately committed you

18    saw played out again and again and again on video, the shooting

19    of Samartine Hill.

20         Ladies and gentlemen, he went up to somebody and shot

21    them point-blank in the head.

22         Quite frankly, I've never seen anything more

23    disturbing in a courtroom.  You had to see it again and again

24    and again.

25         But then he lied about committing that crime.  Never

 1   disclosed it to the Baltimore City Police; we know that.

 2        He also never disclosed it to the ATF, Alcohol,

 3   Tobacco and Firearms, that Agent Aanonsen is part of,

 4   Agent Moore is part of, because he went from being an informant

 5   for the Baltimore City Police to the ATF.

 6        He lied about it.  He lied about it.  In fact, he

 7   tried to say that someone else was responsible for committing

 8   that homicide.

 9        And then he finally got caught, and he ends up back

10   here sitting in that chair (indicating).

11        Now, cooperating witnesses aren't that unusual in

12   federal court.  They're a part of how the federal government

13   makes its cases.

14        And I think even they would describe that as making a

15   deal with the devil.

16        But the Government in this case did not just make a

17   deal with the devil in regard to Mr. Banks; essentially made

18   him, again, the primary foundation of its case.

19        He's the witness that the Government used to define

20   all terms for all other witnesses.

21        He is the witness that the Government used to describe

22   MMP practices, things that would define who was in MMP.  He's

23   the one who described, for instance, the handshake that

24   supposedly was used.

25        And, ladies and gentlemen, it's no mistake -- and if

1    you've listened closely, and I know you have -- that the

2    Government never sought to ask another cooperating witness to

3    describe any of the things that Mr. Banks did.

4         No one else ever said, when they talked about a

5    handshake, what it looked like.  Only Mr. Banks did.

6         And just so you know, maybe it's a little insider

7    information, it's a maxim that all attorneys follow or should

8    follow, that once you get the answer that you want from a

9    witness, you don't go and ask that same witness the same

10   question again and you don't ask another witness the same

11   question 'cause you might get a different answer.

12        Now, Mr. Banks, with all his obvious sins -- and maybe

13   some we don't know about -- again, was the Government's primary

14   witness.  He's the one, the cooperating witness they relied

15   upon the most.

16        Now, Mr. Banks said he was a member of MMP.  He

17   transitioned while he was in the state correctional system from

18   one branch of the Bloods into MMP, said he'd put in work while

19   he was there.  Putting in work meant stabbing people.  So he

20   was acceptable to MMP because he had already proved himself as

21   a member of another Bloods sect.

22        He was asked to describe the common characteristics of

23   MMP gang members.  He said, at least in part, they wore the

24   color burgundy -- not red; he specified burgundy.

25        They had a handshake.  And if you recall, ladies and

DEFENDANT DAVIS'S CLOSING ARGUMENT

1    gentlemen, there was a slideshow, again, of this handshake that

2    involved the interlocking of pinkies of one hand and then the

3    interlocking of the thumbs; that they had tattoos of M's or

4    lightning bolts; and that they threw signs, M signs, something,

5    I think, like that (indicating).  Doesn't even really describe

6    it.

7         He was asked twice whether Mr. Davis was a member of

8    MMP.

9         On the first day of his testimony, he said that

10   Mr. Davis was a rapper and he was a member of MMP.  He never

11   said why or how he knew that Mr. Davis was a member.  He just

12   said he was.

13        But then he was asked to view a video of Mr. Davis --

14   and, hopefully, this will help you remember that specific

15   video.

16        There were a couple of what I call sideways videos in

17   this case where the Government, through -- and I'm not going to

18   condemn their technological abilities because it can happen to

19   all of us, but this video was shown sideways.

20        And it was Mr. Davis walking into, essentially, the

21   lobby area of the BP gas station and greeting several other

22   people who were in that area.  And he shook their hands.

23        And the handshake he used was five fingers

24   (indicating) and then two fingers (indicating).

25        And Mr. Banks identified that, not as the MMP

1  handshake, but something to do with something called the

2  5200 boys.

3          On the second day he testified -- you remember there

4  were two -- he was asked point-blank by the Government:  And

5  was Creams a member of MMP?

6          Remember, Creams is a nickname that's associated by

7  witnesses with Mr. Davis (indicating).

8          Now, the Government broke the rule in that situation.

9  And what happened was Mr. Banks said, No.  He's a 5200 boy,

10  which he defined to be people from the neighborhood, local kids

11  from the 5200 block of Windsor Mill Road.

12          And he said that some -- but not all -- of those

13  people were associated with MMP.  And he didn't specify whether

14  at that point Mr. Davis was or wasn't.

15          Now, Mr. Banks was at best contradictory about whether

16  Mr. Davis was a member of MMP or not.  And Mr. Greer, quite

17  frankly, was no more convincing.

18          Mr. Greer said that he himself was not an MMP member,

19  though there was some dispute about that later on because

20  another cooperating witness, Derran Hankins, said he was.

21          Mr. Greer said that, again, Mr. Davis (indicating) was

22  a rapper; he made music.  And he came to the studio where

23  Mr. Greer worked.

24          And if you recall, Mr. Greer's sort of chronology, he

25  began working at a music studio where some of the people that

1   you've heard about in this case would come to make music.

2          He said that Mr. Davis hung around with kids his own

3   age.

4          And, ladies and gentlemen, I will bring this back up

5   again; but if you look and if you've seen, you know that

6   Mr. Davis is 24 years old right now.  He was arrested in 2012.

7   And he was, I believe, 17 at that point, maybe 18.  So -- but I

8   think -- but right now he's 24.  He's a relatively young man

9   compared to the other people who are sitting on that side of

10  the courtroom (indicating).

11         Mr. Greer said he knew that Mr. Davis was MMP because

12  he saw him doing a handshake, but he was never asked what that

13  handshake was.  And he didn't, of his own volition, elaborate

14  on what that handshake was.

15         He also said he knew because of Mr. Davis's rap songs.

16  But he never described them, and we never heard them.  So we

17  don't know exactly what they were about.

18         Finally, he said that Mr. Davis made M signs.  Again,

19  maybe like this (indicating).  I can't do the other one, I'm

20  sorry.  My fingers don't work that well.  But we don't know

21  exactly what he was describing.

22         Now, finally, we get to Malcolm Lashley.  Mr. Lashley

23  said that he went to the Government.  He actually pursued the

24  Government to be able to cooperate.  He was that eager to be

25  able to try and reduce the sentence that he ultimately would

 1    have to serve.

 2          And you remember, Mr. Lashley pleaded guilty to two

 3    counts:  one racketeering conspiracy; the other was a

 4    drug-trafficking conspiracy that carried for him a

 5    mandatory-minimum sentence of ten years.

 6          Mr. Lashley said he knew that people were in MMP from

 7    seeing them do handshakes and from their tattoos.  He never

 8    said he saw Mr. Davis performing any handshake.

 9          We certainly know that he never saw a tattoo on

10    Mr. Davis.

11          He said he knew that Mr. Davis was MMP from just being

12    in the neighborhood with him.  The Government didn't ask any

13    further questions, and Mr. Lashley didn't elaborate on that

14    point.  We were moving fast through a lot of defendants.  There

15    was no more information.

16          Now, no other cooperating witnesses identified

17    Mr. Davis as being MMP.  And we know that none of the

18    cooperating witnesses that did really provided any meaningful

19    detail to support their testimony.

20          We also know that Mr. Banks, the uber-cooperator in

21    this case, contradicted himself on the point.

22          But that's not where the Government left the issue.

23    It expended great effort to prove that Mr. Davis was MMP by

24    putting on evidence that he had shot at a car on May 30th,

25    2015, allegedly as an act of retaliation related to the gang.

1          To do so, it relied heavily, again, on two cooperating

2     witnesses, Mr. Banks and Mr. Lashley, but also the fact that

3     Mr. Davis was arrested ultimately for possessing a rifle,

4     what's been described as an assault rifle.

5          Now, we know that on April 26th, 2016, Mr. Davis was

6     stopped for speeding.  Events occurred and ultimately he was

7     arrested.  And in his possession he was found to have a

8     handgun, and in the trunk of his car there was an AR-15.

9          Now, I wish that were not so.  I wish I could stand

10    before you today and say that didn't happen or here's a reason

11    it didn't happen or that Mr. Davis really didn't possess it.

12    But I can't.  That occurred.

13         But as to that weapon and the May 30th, 2015 shooting,

14    the takeaway is this:  that that rifle that was seized on -- in

15    April of 2016 was submitted for ballistics testing, and that

16    examination showed that there was no match.

17         There's no evidence in this case that the gun, that

18    AR-15 that Mr. Davis was found to be in possession of in

19    April 2016, matched any of those shell casings that

20    Detective Carvell described as being recovered at the scene of

21    that May 30th, 2015 shooting.

22         So though there is an insinuation that Mr. Davis had

23    to be responsible for that May 30th shooting because he was

24    stopped with an AR-15 and because there was apparently some

25    talk around the neighborhood that he carried AR-15s, the one

1  AR-15 we know he possessed, the one and only one he was ever

2  found to be in possession of, did not match that shooting.

3       Once again, though, the Government turned to Mr. Banks

4  and Mr. Lashley.  And I would submit to you, ladies and

5  gentlemen, they provide no more convincing testimony in this

6  context than they did in regard to whether Mr. Davis is MMP or

7  not.

8       Mr. Banks admitted that he had not seen any shooting,

9  but he heard about it later.

10      Mr. Lashley said he had seen the shooting; but if you

11 look at his testimony and the exhibits that the Government used

12 in this case, you can see that there is absolutely no way he

13 could have seen what he said he saw.

14      Now, the funny thing about the truth is it's really

15 easy.  When you see something -- especially something that is

16 memorable or unusual -- it's stuck in your brain.  It's easy to

17 recall.  It is what it is.  It doesn't evolve.  Details don't

18 get added and subtracted.  Things don't change about the truth.

19      But that's certainly not true about the stories that

20 were told about Mr. Banks and Mr. Lashley, and chronologies

21 really are helpful for both witnesses.

22      Remember, the shooting in the car occurred on

23 May 30th, 2015.  Mr. Banks at that time was two years into his

24 stint as a paid informant for the Baltimore City Police

25 Department.

1          He had a police handler, someone who had to sign off

2    on him providing information for which he was paid.

3          And I don't know if you recall -- I hope you do -- but

4    we went through a series -- I went through a series of

5    Mr. Banks going through those particular vouchers that he had

6    to sign.  And then he would be paid, and he would be paid by

7    his Baltimore City Police detective handler.

8          Now, if you also recall, Mr. Banks said, I had lost my

9    legitimate job.

10         I don't know how many legitimate jobs he had, but he

11   lost that one.  I think it was in a meatpacking plant.  And he

12   was depending on police payments to basically live.

13         So he had every reason, every reason to want to give

14   as much information as he could, as complete information as he

15   could to the police, more than I would say than any average

16   citizen.

17         Now, hopefully, we would all report a crime if we saw

18   it.  Mr. Banks might not have.  But Mr. Banks was getting paid.

19   That was his livelihood.

20         Now, I asked him about whether he had provided that

21   information about this shooting to his police handler.  And

22   initially when he testified, he said he couldn't remember

23   whether he ever told the handler.  And then he said, Yeah,

24   yeah, I -- I did.  I did.

25         So if you take him at his word when he testified, he

1  would have transmitted information about an attempt to kill two

2  people with an assault rifle in Baltimore City where he

3  supposedly knew the person who was responsible for that act.

4        And I know that you all know that the police would

5  probably be very interested in that sort of information.

6        But there was no evidence that Mr. Davis was ever

7  investigated.  There's no evidence that he was ever arrested.

8  No evidence that he was ever prosecuted in the state for that

9  incident.

10        Now, that suggests that Mr. Banks may not have been

11  telling the truth about what he said; that he may not have told

12  his handler about this because maybe he really didn't know

13  anything to tell.

14        But there is an easy, easy way that the Government

15  could have confirmed his testimony.  There -- Mr. Banks was

16  telling the truth -- there is a Baltimore City Police detective

17  who was his handler that the Government could have called, put

18  on the stand simply to say, Yes, he told me about that.  Yeah.

19  We didn't go after it.  We didn't do something.

20        They maybe had an explanation for it.  I don't know.

21  But you never heard from that witness who could have easily

22  confirmed that testimony.

23        You could have taken somebody who's a sworn

24  law enforcement officer and had him buttress the testimony of

25  somebody who's basically over time a sworn liar.

1          So you're stuck with Mr. Banks' bald assertion that,

2     yeah, I told my handler about it, but we don't really know the

3     truth of that.

4          What we do know is that Mr. Banks -- again, who

5     transitioned from being a Baltimore City Police informant to

6     being an ATF informant -- was ultimately arrested on

7     August 26th, 2016, after the ATF finally figured out that he

8     was the person who shot Samartine Hill; figured out that he'd

9     been lying all along; figured out that he'd actually wrongfully

10     accused someone else of doing it to hide his own tracks.

11          When I talked to him in cross-examination, I said,

12     That must have been the worst day of your life.

13          And he didn't disagree with me.

14          And I said, You know, you had a yard sale that day,

15     didn't you?  You cleared out the closets.

16          Because at that point it was a custodial

17     interrogation.  It wasn't a meeting.  It wasn't what we've

18     called proffers.  It was a meeting with somebody who was then

19     under arrest, and they put it on video.

20          That's not the normal course for proffers, ladies and

21     gentlemen.  They were basically recording it because they knew

22     they couldn't trust what he said, and they wanted to have an

23     independent record that didn't depend on anybody's notes.

24          Remember what he said.  He goes, I told them

25     everything and then some, because at that point he just struck

1   his MMP flag; the Government flag was going back up the

2   flagpole.  He just switched sides again because he was in

3   trouble, not 'cause he had best intentions, not because he's an

4   angel, not because he wanted to be a good person or a good

5   citizen.  Because he felt trapped and now was the time to turn

6   things around.

7        Again, huge incentive, huge incentive to try to get on

8   the right side of this thing, the right side for him.

9        He talked about everybody.  I think he may have

10  mentioned everybody in this courtroom and then some.

11       But the one person, at least that I know he didn't

12  talk about in that postarrest statement, was Shakeen Davis.  He

13  never said anything about that May two thousand -- May 2015

14  shooting.

15       The first time we know on the record that

16  William Banks said Shakeen Davis was responsible for that

17  shooting was when he appeared before the grand jury as a

18  cooperating witness on September 15th, 2016.

19       But when he testified, he said, Mr. Davis told me

20  about it.

21       Mentioned no other name.

22       That didn't come until May 17th, 2017.  It was two

23  years after this incident when, for the first time,

24  William Banks said that Kenyon Patterson, known to him as

25  Konan, told him about the shooting with Mr. Davis standing

1    there.

2          Mr. Banks acknowledged that on cross-examination, that

3    it took him two years to come up with that name.

4          But, again, ladies and gentlemen, the Government

5    didn't just have to rely on Mr. Banks for this point.

6          If what he said was true, there is another witness

7    that they could have brought in, they could have put in that

8    chair.  It's Kenyon Patterson.

9          Kenyon Patterson is not a defendant in this case.

10   Kenyon Patterson could be compelled to come in here and

11   testify, but you never saw him.

12         And, again, all he would have had to say is, Yeah, I

13   was there that day.  Yeah, Mr. Banks was there too.

14         But they didn't do it.

15         So what you're left to rely on is the pirate,

16   William Banks.  And that is a foundation that, quite frankly,

17   just will not bear weight.

18         Now, look at Mr. Lashley.  The facts have really

19   evolved for him too.

20         Again, Mr. Lashley came to the Government, said, I

21   want to cooperate.

22         He pursued them.  They weren't pursuing him, according

23   to his testimony.

24         He does face sentencing on two charges.  One is a

25   ten-year, mandatory-minimum sentence.

 1              And the only way out from that, again, it's not just

 2      by telling the truth and hoping that the judge will change it.

 3      He's got to tell a story.  And the Government has got to say,

 4      Yes, that story helped us.

 5              And then, and only then, if the Government says,

 6      "Yeah, you helped us," does the judge have any option to

 7      consider reducing that sentence.

 8              To be honest with you, ladies and gentlemen -- and I

 9      don't mean to be disrespectful about Mr. Lashley -- Mr. Lashley

10      didn't, quite frankly, seem to be all that mentally acute.  He

11      had difficulty with questions.  A lot of things had to be

12      repeated.

13              Now, he met with government agents on September 28th,

14      2018.  So the shooting happened May of 2015.  Mr. Lashley first

15      met with government agents September of 2018, and not once is

16      there anything that we know of that he ever mentioned this to

17      anybody else.  Never went to a police officer.  Never said

18      anything to anybody, said, I know this.

19              So we're talking three years afterwards.  And when he

20      talked about it with the agents, he said, yeah, he saw the

21      shooting, but he couldn't remember whether it happened in 2015

22      or 2016.  Couldn't remember the year.

23              He said he was standing across the street from the BP

24      station with a girl when it happened.

25              Now, Mr. Lashley never testified before the

1    grand jury.  He never testified under oath until he was sitting

2    in this courtroom.

3            And when he testified here, again, things evolved.  He

4    said he had seen Mr. Davis shooting from the passenger seat of

5    a car.  Didn't otherwise describe the car, didn't say what

6    color it was, what make it was, nothing like that.

7            He also didn't mention any girl.

8            But for the first time when he was sitting here

9    (indicating), he brought up someone named Kane.  And he said,

10   later on the day of that incident, back in May of 2015, that

11   Kane pretty much told me what happened.

12           On cross-examination I asked Mr. Lashley, Why didn't

13   you mention the girl when you were on the witness stand?

14           He said, Well, you know what?  They -- meaning

15   Government counsel -- didn't ask.

16           Then I asked him whether he had provided the name of

17   the girl he'd said he'd been with on the day of that shooting

18   when he met with government agents in September of 2018.

19           He said, Nope, no, I didn't.  Said the agents didn't

20   ask for that information.

21           Also admitted that when he met with the agents, he had

22   not mentioned Kane.

23           Now, again, let's think about incentives.  This is a

24   man who's looking, at the very least, at a ten-year

25   mandatory-minimum sentence.  He has come up to the Government

 1   and said, I want to help you.  I want to be on your side

 2   because he knows and he's admitted:  That's the way I get home

 3   faster.

 4         You would think that had the information that he had

 5   was true, if it was true, he would have been pushing it on the

 6   Government agents.

 7         He would have been saying, Listen, here's who she is.

 8   Here's where she lives.  Here's the numbers I had for her.

 9   She'll back up everything that I say.

10         But, again, he said they didn't ask.

11         Well, if the Government didn't ask, then shame on the

12   Government because, again, instead of having to rely on

13   Malcolm Lashley, the cooperator, if what Mr. Lashley was saying

14   was true, you could have had a witness on the witness stand who

15   was -- again, using a term we kind of use around here because

16   it helps differentiate -- a civilian witness, somebody who

17   doesn't have something they're trying to work off, somebody who

18   is not trying to help one side or the other but is simply

19   testifying to facts as they know them.

20         And that person's not here.

21         The Government could also have called Kane as a

22   witness.  Again, Kane's not charged in this case.  They can put

23   him on the witness stand to confirm, at the very least, what

24   Mr. Lashley had said.

25         Instead, what you end up with is one witness, one

1   cooperating witness whose story has evolved in a way that is

2   inconsistent with it being the truth.

3          Now, there's an additional reason to believe that

4   Mr. Lashley wasn't telling the truth.  I gave it a little bit

5   of foreshadowing because, quite frankly, ladies and gentlemen,

6   there's absolutely no way he could have seen what he said he

7   saw on the day of that shooting.

8          If you recall, when Mr. Lashley was being asked

9   questions by Government counsel about the shooting, Ms. Perry

10  asked him to refer to Government's Exhibit MAP-34.  And she

11  asked him to indicate where he was when he had observed what he

12  said he had observed.

13         And I think he may have surprised Ms. Perry a little

14  bit because, if you'll recall, she goes, Oh, looks like you

15  already did.

16         And the mark that Mr. Lashley made was not

17  somewhere -- if you can follow my mouse.  I hope you can.  This

18  is about the extent of my technological abilities -- wasn't

19  alongside Windsor Mill Road (indicating).  It wasn't alongside

20  North Forest Park Avenue (indicating).  It was on the infield

21  of the baseball diamond where the mouse pointer is now

22  (indicating).

23         Well, the car that was the target of the shooting

24  ended up, if you can follow the mouse pointer again, here

25  (indicating).  We know that because the Government also showed

1  you another exhibit, Crime Scene 3-3.

2          You can see, ladies and gentlemen, that, one, if you

3  go back to MAP-34, that between -- and, again, there's no scale

4  on this map.  You can't -- there's nothing that says, Well,

5  this is what the distance is in feet or yards or miles.

6          But you can see there's a fairly significant

7  different -- or distance between the infield of the baseball

8  diamond and where the car ended up.

9          In between where Mr. Lashley said he was and where the

10  car ended up, there is a stand of trees; there are several

11  lanes of traffic.

12          And if you look at CS-3-3, you'll also notice that the

13  car is actually downhill.  It's not elevated.  It's not even at

14  the same level.  It's downhill from the other side of the

15  street.

16          You see where the BP station is (indicating)?  You see

17  where the car is (indicating)?  These are the trees

18  (indicating).

19          And, ladies and gentlemen, look.  Look at those trees.

20  Look at those cars.  And, again, looking downhill.

21          Now, you also heard Mr. Lashley say that Mr. Davis was

22  shooting from the passenger seat of a car.  So that means,

23  ladies and gentlemen, if you look -- and, again, I wasn't

24  there.  But in looking at those cones that Detective Carvell

25  said were shell casings that were recovered after the incident,

1    they were expelled alongside and then moving up the hill from

2    the car that was shot.

3            The passenger side of a vehicle that did that would be

4    closest to the car that was shot.

5            So basically, what you're looking at is a situation

6    where to see what he said he saw, Mr. Lashley would have had to

7    have seen a great distance, through the trees, across several

8    lanes of traffic, downhill, and essentially through an

9    automobile.

10            Not even Arlen Specter and the Warren Commission could

11    have explained that.

12            Now, the Government also made one other argument to

13    support its theory that Mr. Davis was responsible for the

14    May 30th shooting.  It relies on testimony from Mr. Banks that

15    Mr. Davis changed the color of his car, which he believed to be

16    an Acura, after the incident, to evade detection.

17            And Mr. Banks testified that after this incident,

18    according to his recollection, that Mr. Davis had all the paint

19    scraped off his car.

20            I'm not sure I've ever seen a car that looked like

21    that.  He never said it was painted another color.  He simply

22    said he had all the paint scraped off it.

23            Yet the Government played a recorded jail call from

24    Sydni Frazier to Mr. Davis.  That call, J-17, was on July 1st

25    of 2015, a month after the incident.  And it makes reference to

1    Mr. Frazier saying [reading]:  What color -- and I apologize

2    for language -- what color your shit is.

3         And Mr. Davis responds [reading]:  I did some dumb

4    stuff out there.  That on the green tip now.

5         Now, I submit to you, ladies and gentlemen, that that

6    is a reference to drugs and selling drugs and the color,

7    potentially, of what Mr. Davis may have been distributing his

8    drugs in.

9         The Government, on the other hand, insinuates that

10   that was a reference to the color, the new color of the car.

11        There's nothing that supports that in regard to other

12   testimony.

13        And, in fact, the Government really contradicts itself

14   because in an effort to prove that Mr. Davis was selling drugs,

15   it also played another call, TT-3-3533, in which it alleged

16   that Mr. Davis and Jamal Lockley were having a conversation

17   about drugs.

18        And that highlighted portion -- and, again, this shows

19   an unidentified male.  The person who supposedly identified

20   this as Mr. Davis was Malcolm Lashley, ultimately -- said

21   [reading]:  All right.  Yeah, um, I'm trying, um, to get with

22   you on sister tip.

23        And the Government used that call, using that word, as

24   evidence that Mr. Davis was dealing drugs.

25        So not only does the Government not have supporting

 1    evidence to show that the first call about the green tip was in

 2    reference to a car, it really contradicts itself by, again,

 3    giving you evidence of another call using the same word as a

 4    variable refers to drugs.

 5          Ultimately, ladies and gentlemen, you know these

 6    things about Shakeen Davis and MMP.

 7          There is no evidence that he was ever initiated into

 8    any gang, none whatsoever.  We heard that there were initiation

 9    processes, but nothing we've heard about, at least in regard to

10    Mr. Davis.

11          There is no evidence that he ever attended any MMP

12    meeting -- though, according to Mr. Banks, meetings were held.

13          According to Jay Greer, he got one -- once got notice

14    through a misdelivered text message from Tiffany Bailey that an

15    MMP meeting was being held.  Mr. Davis was never alleged to be

16    at any MMP meeting.

17          He has no tattoos of any kind.  You know and have seen

18    the stipulation entered into with the Government that Mr. Davis

19    does not have any tattoos, much less anything to do with MMP.

20          He's never been found to be in possession of any MMP

21    paperwork.  And there's been a lot of that floating around

22    through this case.

23          More important, he is never mentioned in any MMP

24    paperwork.  There are other people who are, and he's not

25    mentioned in anything that would be potentially construed as an

 1   alleged screenplay.  He's just not there.

 2        The rest of the Government's evidence does not

 3   establish ties between Mr. Davis and MMP.

 4        And before I go into that in some greater detail,

 5   ladies and gentlemen, I do want you to consider this:  MMP came

 6   to live in Mr. Davis's neighborhood, the place where he grew

 7   up, the place where he came of age, if you will.  Again, when

 8   you first encounter him in 2012, he's not even 18 yet.  They

 9   came to live there.  He had no choice over that.

10        The people who comprised MMP, the people who were part

11   of it, they were the ones who populated the streets around the

12   places that Mr. Davis lived.

13        If you look at MAP-34 again, ladies and gentlemen,

14   we've talked in great detail throughout this case about these

15   neighborhoods.  We've heard about apartment complexes.  We've

16   heard about houses.  We've heard about different streets.

17        But the only commercial area, the only commercial area

18   in this surrounding area is that BP station, that Subway, that

19   little market.  That's it.

20        The people who were in MMP had some money, but they

21   had some apparent power.

22        So it's understandable, one, because they were around

23   that neighborhood, that they're going to show up in pictures.

24   People take pictures.

25        I don't do social media, ladies and gentlemen.  I

1    don't do Instagram.  I don't do Facebook.  I don't do any of

2    that stuff.

3         But people do, and they put pictures out there of

4    people who are in their lives, for better, for worse.  Whether

5    they know 'em that well or not, take candid photos; you post

6    'em.

7         It's also understandable because these people from MMP

8    had some money and some power in the neighborhood -- and,

9    again, that Mr. Davis being a young person and relatively

10   younger than anybody else that's involved in this case, as you

11   can see -- might mimic, might mimic them in some way, might

12   parrot them, make signs that they made, put things out there,

13   sayings that he'd heard and overheard.

14        Now, again, I just told you, I don't do social media

15   because to me, social media is about posturing.  It's about

16   presenting a face to the world that really is not always

17   altogether true.

18        Now, you've seen the Government in the ubiquitous red

19   boxes of the social media posts, and I believe it's SM-10 was

20   Mr. Davis's.

21        The number of posts that Mr. Davis put on there that

22   the Government highlighted in that exhibit tied to Mr. Davis on

23   his social media posts, they're minimal.

24        Remember -- and I want you to remember this 'cause we

25   talked about this during examinations -- these are the

1    Government's greatest hits.  These are the best things for

2    them.  These are the things that are the most incriminating

3    pieces they can find and put before you.

4          And if you look at the pagination, the page number on

5    those Instagram records, the Government kept referring to it as

6    Page 14 or 15.

7          And I know I for one, but other counsel will say, Can

8    you give us the number that's on the upper right-hand corner

9    because that's the one that we can match up with what we can

10   see on our screens.

11         Those pages appear to have run into the thousands.

12   Yet, by my count, there are 28 posts in red boxes on that

13   exhibit.  And only seven, by my count, relate to MMP or

14   MMP-related terms.  Again, that's pretty weak support for the

15   Government's bridge.

16         Likewise, the wire and jail calls really don't span

17   the gap.

18         The only jail calls made to Mr. Davis are from

19   Sydni Frazier.  Sydni Frazier, when he was here, was the only

20   person who appears to be a contemporary, same age as Mr. Davis.

21   And, clearly, they grew up in the same neighborhood.

22         There are seven calls, by my count, between

23   Mr. Frazier and Mr. Davis:  five during August 2014 and two in

24   July 2015.  Again, these are the Government's selections for

25   the calls to be presented.

1          At worst, ladies and gentlemen, it appears, based on

2     reading those calls, hearing those calls, that what's going on

3     in those calls is that Mr. Frazier, who was the person who was

4     locked up or in detention, is the one who had -- he's the one

5     who called out.  Mr. Davis couldn't call in.  They're talking

6     about what's going on in the neighborhood.  They're talking

7     about current events.

8          And, unfortunately, in that neighborhood sometimes

9     things may have verged on what was happening with MMP because

10    that had some sway over that neighborhood, regardless of what

11    Mr. Davis did.  They're catching up on current events.  It

12    doesn't show -- those calls don't show Mr. Davis was a part of

13    MMP.

14         Now, as to the wire calls, there were four wiretaps

15    conducted in this case, four of them.  Mr. Davis shows up on

16    one, and that line belonged to Jamal Lockley.

17         And of the hundreds, if not possibly thousands of

18    calls on all of these wiretaps that were captured, in reviewing

19    those calls on that line connected to Jamal Lockley, one call,

20    one call positively identified as Mr. Davis.  And that's the

21    one the Government relied on to talk about drugs and use the

22    words "sister tip," TT-3-3533.

23         Finally, we get to the cell phone excerpts.  Mr. Davis

24    had cell phones seized twice:  once when he was arrested on

25    April 26th, 2016, when the gun -- a handgun and the AR-15 were

1    seized; second time when he was arrested on February 24th,

2    2017.

3           Cell phones were analyzed.  And let me make sure I get

4    these correct.  Extracts were prepared.  And then from

5    extracts -- extracts, excerpts were prepared.  And excerpts

6    were what we saw.

7           Now, the Government highlighted that CELL-2-A, which

8    was a phone that was seized in April of 2016, showed addresses

9    and telephone numbers for people who were in MMP.

10          And, ladies and gentlemen, again, I would submit to

11   you that the people that surround the area that you live in,

12   that you come into contact with on a somewhat daily basis, you

13   may have their contact information.  You may have telephone

14   numbers, but it doesn't mean you call 'em.  Doesn't mean you

15   contact 'em.

16          And, again, there is no record that Mr. Davis ever

17   e-mailed or called these people.  The only person that you know

18   he called is Sydni Frazier, and we'll get to that in a couple

19   seconds.

20          Both excerpts also show text messages selected by the

21   Government to support its case.

22          In both of those phones, none of those text messages

23   are going to anybody there (indicating).  They're text messages

24   that go back and forth between people that Mr. Davis appears to

25   be selling drugs to.

1          And, again, as much as I would like to deny that, as

2   much as I would like to say, you know, "Mr. Davis didn't sell

3   drugs," he did.  I think there is absolutely evidence that he

4   individually sold drugs, but that doesn't make him part of MMP.

5          All of the cooperating witnesses said that pretty much

6   everybody in the area sold drugs:  MMP, 5200, et cetera.

7          Now, you heard testimony from Mr. Banks and

8   Mr. Lashley that 5200 boys were permitted to sell drugs in the

9   neighborhood.

10          They also testified that if you weren't MMP and you

11   weren't 5200, that you got taxed or that you were subject to

12   being sanctioned or harmed somehow if you tried to sell drugs

13   in that area, that 5200 block of Windsor Mill Road.

14          And that's a really convenient theory for the

15   Government because in essence, what that means is if you sold

16   drugs in that neighborhood, then it meant you had to either be

17   part of MMP or associated with MMP.

18          In essence, to borrow a phrase I believe Mr. Trainor

19   used the other day when he was speaking with you, it allowed

20   the Government to indict this entire neighborhood.

21          But there has never been any testimony or evidence,

22   other than Mr. Banks, other than Mr. Lashley, potentially other

23   cooperating witnesses, saying there was this tax process; there

24   was the potential sanction; there was an approval if you were

25   5200 that let you be able to sell drugs.

1        There is nothing that shows us in terms of any gang

2   paperwork.  There is nothing in terms of text messages.  There

3   is nothing in terms of telephone calls.  There is nothing that

4   corroborates that.

5        Again, that's a real linchpin of the Government's

6   case, but that just comes from two cooperating witnesses who

7   both have real problems with their credibility.

8        You take that away, that means that not everybody who

9   sold drugs in that area was MMP or associated with MMP.  And,

10  in fact, I submit to you that Mr. Davis was not.

11       In regard to the concept that Mr. Davis was part of

12  MMP -- was part of the drug-trafficking conspiracy that was

13  essentially carried on by MMP, there are other questions:

14       Supply.  Again, there's a one-word "yeah" text

15  response to Kenneth Torry that the Government alleges Mr. Torry

16  was working with MMP and selling drugs.

17       There is the one call, TT-3-3533, between Mr. Lockley

18  and Mr. Davis.

19       And then some additional, quite frankly, innocuous

20  text messages which I believe actually talk about music, not

21  drugs.

22       But it also begs the question:  If MMP was an entity

23  and MMP was running a drug conspiracy, then why would Mr. Davis

24  be buying drugs from MMP members?  Doesn't make any sense.

25       If you're working for the common good of the gang, why

1    wouldn't Mr. Davis at least be -- we've heard the term "fronted
2    drugs"?  He takes drugs; they go this way.  He takes money,
3    goes this way, and it goes back up to the hierarchy.  But we
4    don't -- we don't know that.
5            There is, again, no consistent evidence that
6    establishes that Mr. Davis was part of a drug-trafficking
7    conspiracy.  There are no ledgers.  There are no records.
8    There's no paper trail.
9            Quite frankly, there's not any kind of trail that
10   shows Mr. Davis was selling drugs on behalf of or as a
11   conspirator with a gang.
12           On the other hand, you do have cooperating witness
13   Jay Greer.  Jay Greer said, yeah, You know what?  He used to
14   hang out with other people his age.  The other thing is, he
15   used to work by himself.  He didn't work with anybody.  That's
16   from Jay Greer, Government's witness.
17           Now, Cell Phone Exhibit 3-A seems to really
18   corroborate this whole idea too.  That's a cell phone that was
19   seized from Mr. Davis on February 24th, 2017.
20           And I asked Agent Moore, I said, You know what?
21   You've got all these text messages that are going back and
22   forth between people who appear to be buying drugs and selling
23   drugs, but there are no text messages to anybody over here
24   (indicating).  There are no text messages to anybody who's a
25   part of the gang that would indicate Mr. Davis was getting

1    drugs from them.

2            And he admitted, Yes, that's correct.

3            Now, the Government in rebuttal says, Well, you know

4    what?  That's because -- and Agent Moore actually tried to hint

5    it.  He said, Yeah, He was a fugitive at that time.

6            Everybody else had been already arrested at that time.

7    How could he have contacted them?

8            But that, again, begs a question.  If Mr. Davis was

9    out selling drugs and everybody else, or at least most

10   everybody else had been arrested, how does he sustain himself

11   selling drugs?  Where is he getting his drugs from?

12           If his source was the gang, how come he doesn't stop

13   selling drugs when the gang gets arrested?  It's an interesting

14   question.

15           There are many questions that are begged and

16   assumptions that are really not supported in the Government's

17   case, and I'm going to leave you with three of them.

18           The first, in her closing, Ms. Perry argued that

19   Mr. Davis possessed 25 grams of cocaine base on February 24th,

20   2017, when he was arrested.  Excuse me.

21           And what the chemist testified to, ladies and

22   gentlemen, was that she tested one of four bags of white powder

23   that were recovered from Mr. Davis that day.

24           She said it was the practice of the Baltimore Police

25   lab to only weigh one container.  And if, in their opinion, the

1    other containers appeared to have the same consistency or the

2    same color, well, they didn't -- they didn't bother to test

3    'em.

4            But she also said that to test samples from the other

5    three bags that were recovered would have taken five minutes

6    apiece.  So a total of 20 minutes if she'd done all four.  15

7    minutes to do the extra three.

8            So what you know, what you know is that one of those

9    bags contained cocaine base.

10           What you're based -- or asked to accept and assume is

11   true is that the other three bags also contained cocaine base,

12   based on a very unscientific but a time-saving opinion given by

13   the chemist.  To get to where Ms. Perry wants you to go, you

14   have to assume.  And that's not what trials are for.

15           Ms. Perry also argued that Mr. Davis reasonably could

16   foresee that Ricardo Johnson would be murdered.  She based this

17   conclusion on three things.

18           One, according to Malcolm Lashley -- who, again, I

19   would submit to you is not the most reliable witness --

20   Mr. Davis was present when Mr. Frazier said he wanted to rob

21   Mr. Johnson.

22           Two, on August 5th, 2016, five days before the

23   homicide was supposed to have occurred, according to an excerpt

24   of an extract -- and I got those terms right, Mr. Frazier's

25   cell phone contained -- in Government's Exhibit CELL-5-A

1  contained two text messages to a number that was associated

2  with Mr. Davis talking about:  Grab three black Jimmy Macks,

3  two including you, which Ms. Perry interpreted to mean "get

4  guns."

5        Three, at 3:07 a.m. on the morning of August 10th,

6  again, the day/morning, not sure, because we don't know

7  specifically when it happened, the homicide was alleged to have

8  occurred, that Mr. Frazier called that same number associated

9  with Mr. Davis for 11 seconds.

10        But to get where Ms. Perry wants you to go, you would

11  have to ignore information she did not include, make several

12  assumptions, and guess at at least one thing.

13        You'd have to, first of all, believe Malcolm Lashley

14  that Mr. Davis was actually present and paying attention or

15  able to even hear when Mr. Frazier talked about

16  Ricardo Johnson.

17        You would have to assume that at some point

18  Mr. Frazier changed from what Mr. Lashley said he said he

19  wanted to do, change that from robbery to murder.

20        You would have to assume that Mr. Davis possessed the

21  cell phone to which Mr. Frazier's texts and calls were directed

22  on August 5th and August 10th.  You'd have to assume that

23  Jimmy Macks meant guns, as Ms. Perry argues.

24        And you would have to ignore the fact -- but it's

25  right there in front of you, ladies and gentlemen, on this

1   record -- that the number that was associated with Mr. Davis in

2   regard to the "grab three black Jimmy Macks and two including

3   you" to that number, that that was somehow acted on.  But

4   there's no response.

5           There's nothing that says, Yeah, I'm going to do it.

6   Yes, okay, I got it.  What do you mean?

7           Nothing.  Silence.  Crickets.

8           Again, you have to assume.

9           And, ultimately, you would have to guess at what

10  happened in that August 10th call.

11          Now, Agent Moore, for his part, he admitted he

12  couldn't tell you who was on the August 10th call or what

13  happened during those 11 seconds.  Nobody can.

14          But, again, it's a leap and another leap and another

15  assumption, speculation.  You've got to do all those things to

16  believe that point and believe that Mr. Frazier did that, but

17  also that Mr. Davis was someone who could -- said to have been

18  reasonably for -- he could have reasonably foreseen what would

19  happen to Mr. Johnson.

20          I'm going to leave you with one last one.  And I

21  apologize.  I know I've been going on for some time.  If you

22  were my wife, you would have walked out of the room about 30

23  minutes ago.  Happens all the time.

24          The most blatant example of the Government asking you

25  to rely on an assumption and take a big leap of faith was one

1  of the last things you heard about.  And Ms. Perry actually

2  cited it in her closing argument.  It's called J-6.

3          The next-to-the-last time that Agent Moore testified,

4  Ms. Hoffman said, Are you familiar with calls that involved the

5  hiding of guns in the 5200 block of Windsor Mill Road?

6          And then she suggested Call J-6, and that was a call

7  from Mr. Frazier to Mr. Davis.  Again, Mr. Frazier is arrested,

8  detained.  Mr. Davis is not.

9          She asked him to listen to the call and then directed

10  him to a passage -- and I'm going to show you that.  And I've

11  highlighted it there where Mr. Davis is alleged to have spoken.

12          He says [reading]:  They were eight deep walking

13  around all day and that -- through the woods.  And I put two of

14  them -- and I apologize again for the language -- bitches up

15  there, and I can't even go up there and pay -- and get my --

16  again, excuse my language -- shit 'cause I don't know if they

17  still over there, man.

18          Ms. Hoffman then asked Agent Moore, Was that call

19  about the hiding of firearms in the 5200 block of

20  Windsor Mill Road?

21          And he responded, Yes.

22          Now, I kept waiting for Ms. Hoffman to ask the

23  follow-up question:  And how did you know, Agent Moore, that

24  they were talking about the 5200 block of Windsor Mill Road?

25          But that question never came.  And I kept waiting for

1   a follow-up question from Ms. Hoffman and Agent Moore:  You

2   know or you found or someone found or some way somehow there

3   was guns that were found in that area that temporally in time

4   connected to that call?

5        But that question never came.

6        And so I asked those questions.

7        And Agent Moore answered the questions that I posed to

8   him the same way.  He assumed.  He assumed that Mr. Frazier and

9   Mr. Davis were discussing the 5200 block of Windsor Mill Road,

10   but that's not in that call.  And he said he assumed that they

11   were discussing guns.

12        But he also said, to his knowledge, because he

13   certainly didn't do it, no one at the time of that call in that

14   general time frame recovered guns that could be related to that

15   call.

16        Assumptions are not evidence, ladies and gentlemen.

17        But the Government's case against Shakeen Davis is

18   based on numerous assumptions, insinuations, as well as

19   testimony from inherently incredible witnesses.

20        No bridge could stand with such faulty supports,

21   especially one that has to cross such a broad and critical

22   divide as going from mere accusation to beyond reasonable doubt

23   and carry the weight of a man's life (indicating).

24        At the beginning of this case, I told you that one

25   thing here is not like the other, that one thing here does not

1  belong.

2       The Government did not prove that Shakeen Davis ever

3  joined or associated with Murdaland Mafia Piru.

4       The Government did not prove that Mr. Davis ever

5  joined the racketeering conspiracy as it's charged in the

6  indictment.

7       The Government did not prove that Mr. Davis ever

8  joined the drug-trafficking conspiracy as it's charged in the

9  indictment.

10       In short, ladies and gentlemen, the Government never

11  proved that Mr. Davis belongs.

12       Thank you.

13       **THE COURT:**  Thank you, Mr. Hazlehurst.

14       We will take a break before we hear from the

15  Government in rebuttal, which will be the last part of the

16  argument.

17       I will start by excusing the jury.

18       (Jury left the courtroom at 11:05 a.m.)

19       **THE COURT:**  All right.  Excuse my voice, which I

20  appear to be losing.

21       I will excuse the gallery at this time.

22       Okay.  We'll take a recess.

23       (Recess taken.)

24       **THE COURT:**  All right.  We're ready to bring the jury

25  back in.

```
 1              If you don't mind, Ms. Hoffman, I'll make the
 2     announcement -- I'll tell them about Mr. Davis's recovery.
 3          (Jury entered the courtroom at 11:28 a.m.)
 4          THE COURT:  So, ladies and gentlemen, before we move
 5     on to the Government's rebuttal, I just wanted to give you what
 6     I hope you will think is good news, sort of an update.
 7              You'll remember it was a week or two ago now I told
 8     you that Mr. Frazier would not be here anymore because of his
 9     counsel having a medical situation.
10              He'd been having some tests done.  I won't go into
11     great detail, but he did need emergency surgery, Mr. Davis.
12              And I'm glad to tell you that it went well, that he's
13     out of it and recovering well.  He will need some therapy and
14     so forth.
15              But I just thought you'd like to know he did do okay
16     with his situation.
17              All right.  Ms. Hoffman.
18          MS. HOFFMAN:  Good morning.  I have a habit of talking
19     too fast; so if I do that, just signal me.
20              The defense attorneys have asked you to discredit
21     every single thing that every single cooperator told you unless
22     it advances their position.
23              Believe William Banks when he tells you that
24     Jamal Lockley is a 5200 boy.  Don't believe William Banks when
25     he tells you about all the murders and shootings these
```

1    defendants committed.

2           Believe Jay Greer when he tells you that the

3    defendants wanted to make it as rappers.  Don't believe

4    Jay Greer when he tells you that the things they rapped about

5    were true.

6           That's a really tough position to take.

7           And let's be clear:  Murdaland Mafia Piru was not a

8    rap group.  This case isn't about rap.

9           Frankly, that's pretty insulting to the victims of the

10   defendants' crimes.  Antoine Ellis, James Edwards,

11   Brian Johnson, Anthony Hornes, Ricardo Johnson, they didn't

12   lose their lives because of a rap group.

13          The defendants were part of a real gang that committed

14   real crimes with real victims.  No one is being prosecuted for

15   being a rapper or an aspiring artist or writer.

16          Did Dante Bailey want to make it as a rapper?

17          Sure.

18          Did he want to sell books?

19          Maybe.  Maybe he'll go on to have a successful career

20   as an urban fiction writer.  That doesn't mean he wasn't the

21   leader of a horribly violent Bloods gang responsible for the

22   murder and mayhem that you heard about over the last six weeks.

23          You've heard from over 50 witnesses in this case, but

24   you don't have to take the witnesses' word for it.  You've

25   heard about the defendants' crimes from the defendants

1  themselves in their gang paperwork, their jail calls, their

2  wire calls, their text messages, their social media posts,

3  their iCloud accounts.  You've seen ballistic evidence and DNA

4  evidence.  You've seen boxes full of drugs and guns pedaled by

5  this organization.

6         And what all this evidence shows is that for more than

7  six years, Murdaland Mafia Piru and these five defendants

8  reigned terror on West Baltimore.  They ruled with a gun,

9  taking over intersections and turning them into open-air drug

10 markets.

11        They shot and killed outsiders who posed a threat to

12 the gang.

13        They turned on their own fellow gang members for the

14 slightest of offenses.

15        And sometimes they engaged in violence for seemingly

16 no rational purpose at all.

17        And the victims of their crimes were unfortunate

18 citizens of Baltimore like Anthony Hornes, who was in the wrong

19 place at the wrong time.

20        Worst of all, MMP and these five defendants used

21 violence and threats of violence to systematically silence

22 witnesses to their criminal activities so that they could

23 continue to operate outside the rule of law.

24        They used Facebook and Instagram and YouTube to send

25 the message that they controlled the neighborhood and snitches

 1    would be punished by death.

 2         They plotted to murder two of the witnesses who you

 3    heard testify in this case.  And that tells you a lot.  Right?

 4         The defense attorneys want you to discredit virtually

 5    everything the cooperators told you, but that doesn't explain

 6    why the defendants tried to kill them.

 7         Why worry about William Banks and Jay Greer unless

 8    they had damaging information?  You know why they tried to kill

 9    William Banks; you know why they tried to kill Jay Greer,

10    because they knew too much.

11         They desperately wanted to keep Trouble and Champagne

12    off that witness stand.  They desperately wanted to keep them

13    from telling you about their crimes.

14         And they almost succeeded.  At least with respect to

15    Jay Greer, they almost succeeded.  If law enforcement officers

16    hadn't intervened in the nick of time, you wouldn't have heard

17    from Jay Greer during this trial.  Instead, you would have

18    heard from another Medical Examiner.

19         There were five defense attorneys, and I'm not going

20    to be able to address all of their arguments in the time that I

21    have today.

22         I'm going to start with some of the common themes that

23    we heard from a number of the defense attorneys, and then I'll

24    walk through some specific arguments to each defendant.

25         I want to start with the law on racketeering

```
 1   conspiracy.  This is Count 1.

 2          The defense attorneys spent quite a lot of time trying

 3   to poke holes in the evidence of specific murders and specific

 4   shootings.

 5          And listening to those arguments, you might have

 6   thought that you were being asked to return verdicts as to

 7   those individual crimes, and that's not true.

 8          Except for the murder of James Edwards, charged in

 9   Count 3, and the other separately charged counts that you heard

10   about from Ms. Perry, you're not being asked to determine

11   whether these defendants are guilty beyond a reasonable doubt

12   of any particular murder or any particular shooting or drug

13   deal.

14          With racketeering conspiracy, the crime is the

15   agreement itself.

16          All that you're required to find is three things:

17          First, the gang Murdaland Mafia Piru existed.

18          Second, the gang engaged in the kinds of racketeering

19   activity that we've been talking about.  That's the murder,

20   drug dealing, witness tampering, et cetera.

21          And, third, that the defendants agreed to participate

22   in the gang's affairs, knowing that its members would commit at

23   least two racketeering acts.

24          So it could be as simple as agreeing that its members

25   would sell drugs on two different occasions.  That's enough.
```

1          Now, you heard a lot more than that over the last six

2    weeks, and you have a lot more in front of you.  But that's all

3    you need to find on Count 1, the racketeering conspiracy.

4          So you're not being asked to find beyond a reasonable

5    doubt that Sydni Frazier robbed and killed Ricardo Johnson,

6    just to give you an example.  He did do that, but you're not

7    being asked to find that.

8          The reason you heard about all those specific murders

9    and shootings and drug deals was to help you determine the

10   scope of the defendants' agreement to participate in the

11   charged racketeering enterprise, to help you determine what was

12   reasonably foreseeable to each defendant.

13         It's the defendants' agreement and the scope of that

14   agreement that matters.

15         Now, Mr. Trainor was absolutely right when he said

16   mere association is not enough.

17         You heard Judge Blake's instructions.  It's not enough

18   that a defendant is from the neighborhood.  It's not enough

19   that he's friendly with members of the gang.  Of course not.

20   That would be crazy.  This isn't guilt by association.

21         The defendant has to knowingly and intentionally

22   participate in the gang's affairs with knowledge of its

23   criminal purposes and with the intention of aiding those

24   criminal purposes.  And that's exactly what Jamal Lockley and

25   every other defendant here did, and I'm going to come back to

```
 1    that later.

 2              So I know you heard 50-some pages of jury

 3    instructions, and there's a lot of legalese in there.  But at

 4    the end of the day, it's not really that complicated.

 5              The gang Murdaland Mafia Piru existed.  Members agreed

 6    that the gang would commit crimes.  The defendants joined that

 7    agreement.  They agreed to participate in the crimes that the

 8    gang was committing.

 9              And then once you make that determination, you'll be

10    asked to determine which of those crimes were reasonably

11    foreseeable to the defendants.

12              Defense counsel talked a lot about drug quantity,

13    particularly Mr. Trainor.  And I want to spend some time on

14    that.

15              You heard instructions from Judge Blake that the

16    question is not whether each individual defendant personally

17    sold a kilogram of heroin and 280 grams of crack cocaine.  In

18    fact, you don't need to find that any defendant dealt even a

19    single gram of drugs.

20              The test is what's reasonably foreseeable within the

21    scope of the conspiracy.

22              So the question you're being asked to decide is:  Was

23    it reasonably foreseeable to the defendants that members of the

24    conspiracy would distribute or attempt to distribute or plan to

25    distribute a kilogram or more of heroin and 280 grams or more
```

1   of crack cocaine over the lifetime of the conspiracy?

2        And I think you'll find the evidence shows that the

3   defendants conspired to distribute far, far more than the

4   quantities charged in the indictment.

5        Like Ms. Perry told you, the quantities charged in the

6   indictment are really just a drop in the bucket for this gang.

7        You heard from witness after witness that MMP's drug

8   shops at Windsor Mill and Forest Park and Gwynn Oak and

9   Liberty Heights, they were open-air drug markets:  Heroin,

10  crack, cocaine, marijuana.  You name it; they sold it.

11  Sometimes the heroin was cut with fentanyl to increase the

12  potency, and you heard evidence of overdoses and the testimony

13  and saw it in the text messages.

14       At the BP gas station, customers would come by car via

15  Interstate 70 all day long, day in and day out.  They'd

16  typically buy at least a half gram of heroin per transaction,

17  sometimes multiple grams.  You saw that in the text messages.

18       William Banks told you he could sell 60 grams of

19  heroin himself personally on a good day, and there were usually

20  a dozen or more MMP members out there selling every day.

21       He told you, based on what he personally sold and what

22  he observed with his own eyes, the gang sold at least a

23  kilogram of heroin per week at the BP gas station.

24       But you don't have to take his word for it.  You heard

25  from two of the gang's drug customers.  Jarrud Dixon told you

```
 1   that he bought gram quantities of heroin from
 2   Adrian Jamal Spence and Dante Bailey on a near-daily basis for
 3   years.
 4          Brandon Robinson told you that he bought a half gram
 5   of heroin from Jamal Lockley every day or every other day for a
 6   year.  That's two customers, hundreds of grams of heroin.
 7          And you know from the text messages that the gang had
 8   scores and scores of customers, countless customers.
 9          You saw hundreds of pages of drug texts, excerpted
10   from the cell phones recovered from Jamal Lockley,
11   Shakeen Davis, Sydni Frazier, Adrian Jamal Spence, just to name
12   a few.
13          And I know it was painful going through those
14   text messages, and we only read a portion of them.  Pages and
15   pages of texts such as [reading]:  I need four total.  Divide
16   it into two and two.
17          Or [reading]:  Yo, I'm 20 -- I'm 20 minutes out, and I
18   need 2 gs.
19          Or [reading]:  I need two whole ones and a 50 of girl.
20          Day in and day out.  Think about the blast texts that
21   Shakeen Davis sent out from his phones -- "That good with boy
22   and girl" -- advertising heroin and cocaine to multiple
23   customers at the same time.
24          You also listened to probably three full days' worth
25   of wire calls.  And, again, I know they became very repetitive,
```

1    and we only played a sample of them for you.

2           But the point of playing all those calls and reading

3    all those text messages was so you could hear how the

4    organization operated.  There didn't need to be a lot said.

5    These guys know each other, and they know how to run the drug

6    shop.

7           So they don't need to call one another up and say,

8    Hey, I need to buy 50 grams of heroin.  Or, You need to sell

9    2 grams of crack to Gary.

10          They don't need to be that explicit.  That's not how

11   it works.

12          Sometimes they are explicit, and you heard a lot of

13   pretty explicit drug talk by Lockley and Bailey and even Davis

14   over the phone, at least in text messages.

15          Anderson was much more cautious.  You heard him berate

16   Lockley for talking too loosely on the phone, but you still got

17   the gist of it.

18          Lockley would say -- Lockley would ask Anderson if he

19   had it.

20          Anderson would say he was going to swing through.  He

21   would ask Lockley if he had the money.

22          Anderson would complain about the count being off.

23          You heard about some pretty big seizures of drugs in

24   this case.  You heard about roughly 600 grams of heroin

25   recovered from Adrian Jamal Spence, Spittle's stash house, on

1    July 20th of 2015.  600 grams of heroin on a single occasion.

2    And I want to talk about that one because Mr. Trainor tried to

3    distance his client from this.

4          But you heard from the witnesses and the wire calls

5    that Spence was an MMP boss who was supplying heroin to members

6    of the gang for distribution.  He was supplying Jamal Lockley,

7    William Jones, Jarmal Harrid, to name a few.

8          Spence was using Kameron Wilson's residence at

9    532 Coventry Lane to stash the heroin, but it was an MMP

10   stash house.

11         You heard it from the witnesses, but you also heard it

12   in wire call after wire call.  You heard Spence telling Wilson

13   to bag up 200 for the a.m.; Spence telling Wilson to start

14   stomping on it, start crushing it down real quick.

15         You saw surveillance photos of Spence going in and out

16   of the residence at 532 Coventry Lane.

17         Now, Mr. Trainor tried to tell you there wasn't

18   anything connecting Jamal Lockley to that stash house, and that

19   couldn't be further from the truth.

20         You actually heard dozens of wire calls between Spence

21   and Lockley talking about heroin transactions during that same

22   time period.

23         So you heard Call D-307.  This was on June 23rd of

24   2015, about a month before that heroin seizure.  Lockley asked

25   Spence to bring him a ten-piece.  That's ten grams of heroin.

1          You heard Call D-466, June 29th of 2015.  Lockley

2     tells Spence there's a one-piece at the pump in a silver Honda.

3     That means there's a drug customer looking to buy a gram of

4     heroin at the BP gas station pumps.

5          You heard Call D-644, July 6th of 2015.  Spence agrees

6     to give Lockley a 40-piece.  That's 40 grams of heroin.

7          Call G-78, July 20th of 2015, the same day the

8     600 grams of heroin was recovered, you heard Lockley tell

9     Spence he's about to pull up; and he asks if Spence still needs

10    the clock.  That's a reference to the digital scale.

11         And Spence says, yeah, he needs the clock and the

12    sandwich bags, too.

13         The very next day, Call G-148, Lockley tells Spence he

14    needs 50.  That's 50 grams of heroin.

15         And Spence tells him to hold on 'cause the knockers --

16    that's the police -- are up there.  And that's telling.  MMP's

17    drug operation doesn't come to a screeching halt after the

18    search warrant at 532 Coventry Lane.  Law enforcement officers,

19    they hit the stash spot; they recover 600 grams of heroin that

20    the gang keeps right on selling.

21         The very next day, Lockley is getting 50 grams of

22    heroin from Spence.

23         So that's one of the ways you know that 600 grams of

24    heroin was just a drop in the bucket.

25         And, by the way, law enforcement officers also

1    recovered a kilo press from that stash house, and you don't

2    have a kilo press unless you're working with kilogram

3    quantities of drugs.

4           You heard from Jay Greer.  He told you about a time in

5    2015 when he went with Dante Bailey and Randy Banks, Dirt, to

6    Dirt's trap house in Gwynn Oak and Liberty Heights area.

7           And he watched Dirt cook up half a kilogram of

8    crack cocaine.  That's 500 grams of crack on a single occasion,

9    so you're already past the 280-gram threshold.

10          And you don't have to take Greer's word for it alone.

11   You saw a photo of the trap house from Dominick Wedlock's

12   cell phone.  You saw Randy Banks, Dirt, and Wedlock standing

13   next to each other behind a table that had newspaper and a

14   sifter and baking soda, so the tools of their crack cocaine

15   cooking operation on display in front of them.

16          You heard about a surveillance operation of

17   Randy Banks on May 12th of 2016 when law enforcement recovered

18   baggies of crack from three drug customers who had come from

19   Dirt's nighttime drug shop, affectionately called "the hole,"

20   as Jay Greer told you.

21          And we heard a lot of argument from Mr. Sardelli that

22   that was -- it was just a minuscule quantity; it was less than

23   a gram of crack cocaine.

24          And that's true, but each of those three sales took

25   seconds at that drug shop (snaps fingers).

1          And you heard testimony that Randy Banks was out there

2    every night.  He was cooking up crack.  He was distributing it

3    to his hitters.  He was overseeing the drug operation at

4    Gwynn Oak and Liberty Heights.

5          And, by the way, Mr. Sardelli also told you that -- he

6    said, Well, you only heard evidence that Randy Banks sold

7    crack.  You didn't hear any evidence that he sold heroin.

8          And that's not the test.  The test is a reasonable

9    foreseeability.

10         So if you remember, William Banks told you that he

11   mainly sold dope, heroin.  He didn't really sell crack.  But

12   that doesn't mean that he didn't know that Dirt was supplying

13   crack to other members of the gang.

14         Of course, he knew that.  And, of course, Dirt knew

15   that others in the gang were selling heroin.  He was a

16   high-ranking member of the gang with knowledge of what was

17   going on at its drug shops.

18         You heard a lot -- you heard about a lot of other

19   seizures in the case, and I'm not going to give you a laundry

20   list of them.

21         But even when you consider just the drugs that have

22   actually been seized and are in evidence, you're already

23   approaching a kilogram of heroin.  And that's just what

24   law enforcement did on a few days of 2015 and 2016.  That's not

25   taking into account the wire calls, the text messages, and the

 1  witness testimony.

 2          So over the course of six years, a kilogram of heroin

 3  is a drop in the bucket.  280 grams of crack cocaine is a drop

 4  in the bucket.

 5          Even if the individual defendants didn't personally

 6  distribute those quantities themselves -- and the evidence

 7  suggests that they did -- but even if they didn't, they

 8  certainly understood the scope of what was going on.  You would

 9  only have to work in the drug shop for a few days to understand

10  the scope of what was going on.

11          So Mr. Trainor asked you to be conservative in

12  determining drug weight.  And he's right.  You should be

13  conservative.  That's exactly what we've asked you to do.

14          We could have asked you to find the defendants

15  conspired to distribute 10 kilograms, 20 kilograms,

16  100 kilograms, six years at a kilogram per week would be

17  312 kilograms of heroin.  We're not asking you to find that.

18          The quantities that you're being asked to find are

19  about as conservative as we could get, given the evidence in

20  this case.

21          So I'm going to move on to witness credibility.

22          The thrust of all the defense closings was about

23  witness credibility, because it had to be.

24          You heard from over 50 witnesses, including ten

25  civilian witnesses.  And, like I said, the defense counsel want

 1   you to discredit virtually everything all of them told you, and
 2   that's a really tough position to take.
 3            If this case rested on just William Banks or just
 4   Malcolm Lashley's testimony, I would understand.
 5            But you didn't hear from just one or two cooperators.
 6   You heard from six cooperators, as well as drug customers and
 7   residents of the community in which these defendants operated.
 8            And listening to the defense attorneys, you would
 9   think that that's the Government's entire case, that there
10   wasn't a wiretap and search warrants and gang paperwork and
11   jail calls and text messages and social media.  Just ignore all
12   of that.  That's what the defense attorneys want you to do.
13            And when we're focused on the cooperators, they want
14   you to look at them one at a time, individually, in a vacuum.
15   And that's exactly what you're not supposed to do.
16            You're supposed to look at the entire case, all of the
17   evidence, and how it fits together, because especially in a
18   case like this, each piece of evidence informs the rest of the
19   case.
20            So one cooperator's testimony informs another; one
21   piece of ballistic evidence informs a cooperator's testimony;
22   the wire calls inform cooperator testimony.  All of it is
23   linked together.
24            And all of the defense counsel, they want to associate
25   these cooperators with the Government.  You heard all of them

 1   say that; they work for the Government.

 2          But they really got it backwards.  The cooperators are

 3   not our friends.  They're their friends (indicating).  That's

 4   who they hang out with.

 5          William Banks, Jay Greer, Malcolm Lashley,

 6   Derran Hankins -- these are all friends of the defendants.

 7   They're their associates.  And you know that because you saw

 8   them in photos together.  You heard them in calls together.

 9          We didn't choose these witnesses; the defendants did.

10   They're the people who the defendants chose to commit their

11   crimes with.

12          William Banks is the obvious scapegoat in this case.

13   He committed terrible crimes.  He lied about the Mirage

14   shooting.

15          There was some confusion about this in

16   Mr. Hazlehurst's closing.  The Mirage shooting happened in

17   2012, by the way.  William Banks didn't become a CI until 2015.

18          But he did lie about the Mirage shooting.  That's a

19   big lie.  He's paying for that lie, and he's going to continue

20   to pay for it for a long time to come.

21          But defense counsel took it about ten levels too far.

22   They told you that because he's done bad things, because he

23   lied in the past, that means you shouldn't believe anything he

24   told you.  And that's not right.

25          You heard him testify.  He came in here, and he owned

1   up to the terrible things that he did for MMP.

2        When Dante Bailey told him to kill Snook because he

3   was a rat, he tried to kill Snook.  He stood over him and fired

4   again and again.

5        When his fellow gang member Spittle, Spence, started

6   shooting at Terrell Gale, he joined in.  And why did he do

7   those things?

8        Well, he read the gang paperwork.  He knew what he had

9   to do to work his way up in the ranks in the gang.  He knew

10   cooperation with authorities was punishable by death.  He knew

11   retaliation is a must.  He wanted to win Dante Bailey's

12   approval.  He bought into the gang's culture.  He wanted to be

13   someone in the gang.

14        But what William Banks told you about the gang has

15   been corroborated over and over again in the past six weeks.

16   This case does not rest on William Banks.  He's one small piece

17   of it.

18        This case is ugly.  There's a lot of ugliness.  The

19   murders, the violence, the overdoses.

20        These crimes didn't take place in a church or a

21   hospital.  We can't call a local reverend or a doctor to come

22   in and tell you what happened.  We have to call the

23   William Banks of the world.  We have to call the

24   Devin Fergusons of the world.

25        But, again, we didn't just call one, and we didn't

1  just offer up their testimony in a vacuum.  The case is ugly,

2  and the witnesses the Government called reflect that reality.

3        The cooperators have committed crimes; and some of

4  them got paid, although much of that was for relocation and

5  safety reasons.  But they got paid, nonetheless.

6        In fact, when I gave my opening statement, I told you

7  to be more skeptical of their testimony than anybody else that

8  you would hear from.

9        I told you that the cooperators had committed crimes,

10  that they were looking to get lighter sentences, that they had

11  been paid.

12        I told you about all that because I wanted you to know

13  up front what you are going to be hearing, that you are going

14  to be hearing from people who committed terrible crimes and to

15  give their testimony careful scrutiny.

16        But the defense counsel want you to think that because

17  they're not good people, they shouldn't be believed.  And

18  that's not the test.

19        Ms. Amato gave you the example of going to Dr. No Good

20  for advice about a medical procedure.  You wouldn't hire these

21  cooperators as your doctor.  Of course not.  Your doctor

22  doesn't hang around 5200 Windsor Mill Road and sell heroin and

23  witness murders.

24        These guys are easy to beat up.  They don't use good

25  grammar.  They don't speak into the microphone.  They mumble.

1   They give short answers.  They're hard to understand.

2          Mr. Hazlehurst said Malcolm Lashley didn't seem very

3   acute.  They're not good witnesses in that sense.  They're not

4   professional witnesses.  They slouch.  How many times did

5   Malcolm Lashley have to be told to sit up?  And he still

6   slouched.

7          How many times did Jay Greer have to be told to speak

8   into the microphone?

9          But consider for a minute what it's like for them.

10  Maybe when they come in here to testify in this courtroom, in

11  front of these defendants (indicating), when there's 30 to 40

12  people in the courtroom, maybe it's a little bit intimidating.

13  Maybe it's hard for them to come in here.

14         Maybe it's hard for someone like Malcolm Lashley, who

15  grew up in the 5200 block of Windsor Mill Road, whose own

16  brother is in the gang, who has a close relationship with some

17  of the defendants, to testify against them?

18         Maybe it's hard for someone like Jay Greer, who

19  thought that this gang, MMP, was supposed to be his family.

20         Maybe they're terrified and they don't want to be

21  there.  Maybe they want to be anywhere else in the world except

22  for that witness stand, talking about what they're talking

23  about, because it's not like they're talking about bank fraud.

24  They're talking about murder.  They're talking about plots to

25  murder snitches.  In some cases they're talking about plots to

1    murder them themselves (indicating).

2         Defense counsel expect them to waltz in here and

3    deliver their testimony like trained actors, to use exactly the

4    same wording that they used in proffers and in the grand jury,

5    just like they're reading a script.  And that's not how it

6    works.

7         I want to move on to the individual defendants,

8    starting with Dante Bailey and some of the arguments that

9    Mr. Enzinna made.

10        Mr. Enzinna didn't try to claim that

11   Murdaland Mafia Piru was a fiction, because he couldn't

12   realistically.  The evidence is too overwhelming.

13        But he did try to spin it in a more favorable light.

14        If I can get this to work.

15        He did try to spin it in a more favorable light, so he

16   put the seven mob mandates up on the screen.  This was from

17   GP-21, and it's from the gang paperwork that Officer DiPaola

18   recovered.  And William Banks identified it as gang paperwork

19   that Dante Bailey gave him to read when he joined MMP.

20        Thank you so much.

21        And Mr. Enzinna, he conceded that this was paperwork

22   written by Dante Bailey.  But he asked you to look at the other

23   mob mandates, not just "retaliation is a must," but "family

24   first" and "find God.  Pray for your family."

25        So the argument is Dante Bailey created MMP, but it

1  wasn't a criminal gang.  It was about family.

2          Let's think about that.  Think about Dante Bailey

3  ordering Bino to kill MMP member Antoine Ellis just because he

4  associated with members of a rival gang.  Is that family?

5          Dante Bailey threatening to kill anyone in the gang

6  who wouldn't fork over money to pay for his lawyer, is that

7  family?

8          Dante Bailey ordering a hit on Jay Greer because he

9  suspected him of cooperating with law enforcement, is that

10  family?

11          Jay Greer told you that when Gutta first told him

12  about MMP, he wanted to join in part because it seems like a

13  family.

14          Greer grew up in foster care.  He didn't have a family

15  of his own.  And that's how Bailey sold it to him in the

16  beginning, My All Family I Am.  You saw that in a lot of

17  Bailey's gang paperwork when he was trying to recruit people to

18  join MMP.

19          And at first, Greer bought into it.  He did the things

20  Bailey told him to do.  When Bailey told him to sell drugs, he

21  sold drugs.  When Bailey told him to hide guns in the car, he

22  hid guns in the car.

23          But over time it became clear that MMP wasn't exactly

24  as it had been advertised.  Greer got sanctioned for silly

25  things like eating someone else's hot dog and losing the keys

1    to the barbershop where they stashed drugs.  He got beaten so

2    badly he had to go to the hospital.

3          Then Bailey reamed him out for not taking a gun charge

4    for him.  You heard that jail call where Bailey says you got to

5    safeguard the big homies.

6          Next thing Greer knew, Bailey was shoving a gun in

7    Greer's hand and ordering him to kill some guy he'd never met.

8          And remember how Greer described that.  He said Bailey

9    tried to give him a guilt trip.  Bailey said, They shot your

10   brothers.  They shot your family.  You think you're one of us.

11   You've got to do something about this.

12         And Jay Greer, maybe he never had a family.  But he

13   knew that's not how family's supposed to work.  Family is not

14   supposed to manipulate you into committing murder.  Family is

15   not supposed to have you killed because you know too much.

16         Jay Greer realized three years too late, maybe, but he

17   realized that he'd been manipulated; he'd been sold a pack of

18   lies.

19         Ms. Whalen said something in her opening statement

20   that I found interesting.  She said that the cooperators in

21   this case had sold the Government a bill of goods.  I think she

22   got it exactly backwards.  Dante Bailey sold Jay Greer a bill

23   of goods.

24         MMP was not a family.  MMP was a vicious gang, a

25   ruthless criminal organization that left behind a legacy of

1    fear, misery, and contempt for the rule of law.  It wasn't

2    remotely close to a family.

3            Mr. Enzinna also talked about Dante Bailey's

4    screenplay, and Mr. Sardelli did too.  And they tried to liken

5    it to "Goodfellas" or "The Godfather."

6            Mario Puzo didn't commit the crimes that he wrote

7    about in "The Godfather."

8            And, likewise, they argue Dante Bailey didn't commit

9    the crimes he wrote about in his screenplay.

10           But Dante Bailey is not Mario Puzo.  You know that

11   when Dante Bailey writes in his screenplay about Nooks getting

12   hit at club Mirage, he's writing about a shooting that he

13   ordered because you saw it on video and you heard it from the

14   shooter himself.

15           You know that when Dante Bailey writes about the

16   lucrative heroin shop at 5200 Windsor Mill Road, about the

17   junkies coming from Western Maryland and other states, about

18   the hitters and the lookouts, about Spittle and Bo supplying

19   heroin and directing customers, you know he's not pulling that

20   out of thin air.  He's writing about what he knows.

21           You know because you heard it from the addicts who

22   bought heroin from these defendants on a daily basis over a

23   period of years.  You know because you heard the wire calls.

24   You know because you heard from the law enforcement officers

25   who recovered the drugs.  This is not some fiction.  This is

 1    what Dante Bailey knew and lived.

 2            Art imitates life.  And sometimes the reverse is true

 3    also:  Life imitates art.

 4            I have no doubt that Dante Bailey has seen the movie

 5    "The Godfather."  I have no doubt that he has learned some

 6    things about the Italian mafia from pop culture, and he

 7    appropriated some of those ideas when he was forming his

 8    Bloods gang.

 9            The Omertà code, the bosses, the capos, the made

10    men -- he was creating a brand, and he adopted ideas from pop

11    culture.  There's nothing unusual about that.  Art imitates

12    life, and life imitates art.  But art is not a defense to real

13    crimes with real victims.

14            You also heard from Mr. Enzinna -- and some of the

15    other defense attorneys talked about this, too.  They said MMP

16    was too disorganized; it was too unstructured to be an

17    enterprise.

18            They said you heard about all these different

19    groups -- MMP, 5200 boys, Get Money Boys.  Anyone could sell

20    drugs at the BP.  Clearly, this wasn't a conspiracy.

21            And that's not right.

22            All the cooperators told you the same thing in

23    different words.  If you wanted to sell drugs in that area, in

24    MMP's territory, you either had to be a member of MMP or you

25    had to have special permission from its leaders.

1          Sometimes you got a pass because you were a 5200 boy.

2    You grew up selling drugs in the neighborhood.  You had close

3    personal friendships with members of the gang.

4          Maybe you were like Jay Greer and you got a pass

5    because you were close friends with Dante Bailey or mixing and

6    remastering music for him.

7          The bottom line, though, is that you had to be on

8    Team MMP.

9          You had to play by MMP's rules.  You had to kick out

10   money when they told you to.

11         If you weren't on Team MMP and you tried to sell drugs

12   in that area, you'd get robbed, beaten up, or killed.

13         So it's true that the 5200 boys was a name for people

14   who grew up in that neighborhood, in the 5200 block of

15   Windsor Mill Road.  Not all 5200 boys were members of MMP.

16   Many of them were, but some were not.

17         But the 5200 boys who were not members of MMP still

18   had to be on Team MMP in order to sell there.

19         So take Malcolm Lashley or Spook.  He's a good

20   example.  Malcolm Lashley was a 5200 boy who grew up selling

21   drugs in the neighborhood.

22         And his older brother, Melvin Lashley, the one with

23   the M tattoo on his forehead, was a member of MMP.  So

24   Malcolm Lashley had a pass because he grew up there and his

25   brother was in the gang.

1      But he also had to play by MMP's rules.  You heard a

2  wire call from William Jones to Jacob Bowling, both of whom are

3  MMP members.  This was Call TT-2-682.

4      And in that call, Jacob Bowling was with

5  Malcolm Lashley when William Jones called.  And you heard Jones

6  say, quote, Tell Spook kick that money out.  Get that cash out.

7  Tell Spook I'ma ball his fat ass up when I come home.

8      Excuse my language.  It was expected of

9  Malcolm Lashley.

10      By virtue of the fact that he sold drugs there, it was

11  expected that he would kick out money when members of MMP told

12  him to.

13      Now, there was some confusion about a tax, I think.

14  Ms. Whalen asked Malcolm Lashley on cross-examination if he had

15  to pay a tax to sell drugs at the BP.

16      And he said, No.  He didn't think of it as a tax.

17      That's kind of a lawyer's term, and he didn't think of

18  it that way.  Maybe it wasn't so formal and explicit, but it

19  was a normal cost of doing business.  He had to be on Team MMP.

20  He had to work together with the other members.  He had to pay

21  money for their bails if they asked him to, and there was

22  always the threat of violence.

23      And a good example of that is Call J-32, which you

24  also heard.

25      And that was a call -- Call J-32 was a call from

1  Dominick Wedlock, Nick, to Melvin Lashley, Spook's older

2  brother, both of whom are MMP members.

3      And you heard Lashley tell Wedlock that someone named

4  Dorian had, quote, burnt T-Roy's sale, meaning that he had

5  stolen a drug customer from T-Roy, Jamal Lockley.

6      And you heard Melvin Lashley say that in response,

7  Bino, Dontray Johnson, also an MMP member, quote, beat the fuck

8  out of him, broke his jaw, and all that, unquote.

9      And they laughed about that.  That was commonplace.

10 That was routine.  That's what happens when you're not on

11 Team MMP.

12     If you set up shop there without permission, if you

13 sell drugs to someone you're not supposed to sell drugs to, you

14 get beat up, robbed, or killed, just like the cooperators told

15 you.

16     Jamal Lockley and Sydni Frazier are also good

17 examples.  They're both 5200 boys.  They both grew up selling

18 drugs in the neighborhood.  They're both close with Gutta and

19 other members of MMP.

20     They both worked in concert to sell drugs with other

21 members of MMP.  They both kicked out money for Bailey's bail

22 when he got locked up.  You heard that in wire calls and

23 jail calls.  They both were involved in murders for the gang.

24     So Lockley and Frazier are on Team MMP, even though

25 they're not actual members.  That's why they're allowed to sell

1   in MMP's territory.

2          Mr. Enzinna used the example of a farmer's market, and

3   I like that example.  He said, If you have ten guys with pickup

4   trucks selling their goods at the same farmer's market, that

5   doesn't necessarily mean they're in a conspiracy together.

6          And that's absolutely right.  That's a good example.

7          But now imagine that those ten guys band together to

8   obtain their product, to stash their product, to mix it up, to

9   distribute it.  They agree to refer customers to one another.

10  They agree to serve as lookouts for one another.  They show up

11  in red pickup trucks at the farmer's market armed with guns.

12  They tell all the other farmers, "You're not allowed to sell

13  here anymore unless you do as we say."  They kill three farmers

14  who resist.  They spray-paint, "Pull up at your own risk" at

15  the market's entrance, and they bail each other out if they get

16  arrested.  That's what we have here.  That's a conspiracy.

17         I want to talk about the Bangout murder.  Mr. Enzinna

18  spent a lot of time talking about the Bangout murder because

19  Bailey is charged with this murder in Count 3, and that means

20  that you do actually need to find beyond a reasonable doubt

21  that Dante Bailey committed this murder.

22         Mr. Enzinna started out by claiming that there were

23  too many different stories about the motive for the murder and

24  no coherent theory, and that's not what I recall.

25         I think your memory recalls, but the witnesses

 1    actually gave remarkably consistent testimony on this point.

 2         What I recall is that William Banks testified that

 3    Bailey and Bangout were on bad terms after they got arrested

 4    together in Atlanta.  He said Bailey confided in him that he

 5    killed Bangout because he heard Bangout was trying to get SP,

 6    that's Spence, robbed.

 7         Jay Greer testified that Bailey told him that he and

 8    Bangout were having a disagreement, and Bangout was talking

 9    about taking out the dudes at the top, meaning the higher-ups

10    in the gang.

11         Bailey found out about it, and that's when Bailey

12    decided that Bangout had to be killed.  So that's consistent

13    with William Banks.

14         Derran Hankins testified that Bailey told him that

15    Bangout was upset about what happened in Georgia.  Hankins

16    actually overheard a phone conversation between Bailey and

17    Bangout in which Bangout was complaining that Bailey had left

18    him high and dry down in Georgia when they got locked up and

19    didn't send him any money.

20         And according to Bailey, Bangout was making threats

21    and saying he was going to shoot up the gas station or

22    something along those lines.

23         So, again, consistent.

24         The witnesses had different perspectives, slightly

25    different details.  They used different wording.  Maybe Bailey

1  used different wording when talking to each of them.

2  But the sum and substance of their testimony was the

3  same. They all testified that Bailey and Bangout were on bad

4  terms after they got arrested in Atlanta; Bangout was unhappy

5  about how he was being treated; and he started making threats

6  against the gang. In other words, Bangout was showing

7  disloyalty for MMP, and for that reason he had to be killed.

8  And that's what makes it murder in aid of racketeering.

9  So remember Judge Blake instructed you that you can

10 consider evidence that the crime was committed in order to

11 maintain discipline within the enterprise and serve to maintain

12 the defendant's position in the enterprise, and that's exactly

13 what happened here.

14 Bangout was threatening Bailey's authority. He was

15 violating protocol. Killing him served to maintain Bailey's

16 role as the undisputed leader in the gang. You go against the

17 gang, you get murdered.

18 Mr. Enzinna also tried to cast doubt on Jay Greer's

19 testimony about the murder, because he had to. Jay Greer gave

20 damning testimony about Bailey's confession that matched up

21 with the grizzly details of the crime.

22 Greer said Bailey told him he shot Bangout in his

23 face. Bangout tried to run. He tried to crawl up some steps.

24 Bailey shot him two more times. Nizzy and Nick were with him.

25 You saw the autopsy photos. You saw the crime scene

1    photos.  You saw the blood-spattered steps.  Greer could not

2    have known those details unless he talked to the killer.

3           Mr. Enzinna tried to suggest -- I think he said that

4    Greer came forward with this information after Bailey had been

5    charged with that murder, and that's not true.

6           Remember, you heard that Greer testified in the

7    grand jury in February of 2017.  The indictment that you have

8    in front of you was returned June of 2017.  Greer came forward

9    with what he knew months before Bailey was charged with the

10   Bangout murder.

11          You didn't see the crime scene photos.  He didn't see

12   the other witness statements.  He didn't see the phone records

13   with Nizzy and Nick.  The only thing Greer knew was what Bailey

14   told him.

15          Mr. Enzinna also challenged the idea that Bailey would

16   tell Jay Greer about this murder even though Greer hadn't

17   gotten his hands dirty for the gang.

18          And I think Greer gave a perfectly reasonable response

19   to that question on cross-examination.  He said, "People get

20   locked up; they get confessional."

21          And you know that's true with respect to Dante Bailey.

22   You saw the gang paperwork that was recovered from the

23   Baltimore County Detention Center.  Bailey basically wrote down

24   all the incriminating details about how MMP was formed and its

25   criminal purposes.  He wrote a screenplay depicting actual

GOVERNMENT'S REBUTTAL ARGUMENT

 1    crimes that he committed.

 2            Bailey gets confessional when he gets locked up.

 3            Greer's testimony alone would be damning, but that's

 4    just the tip of the iceberg.

 5            You have William Banks' testimony that Bailey

 6    confessed to him the night of their rap show at Paparazzi in

 7    July of 2015, and I'm going to talk more about that later.

 8            You have Derran Hankins' testimony that

 9    Dominick Wedlock, Nick, told him that Bangout himself was

10    afraid that Bailey was going to have him killed.

11            You have Malcolm Lashley's testimony that Jamal Smith

12    said he dropped Bangout off to Gutta the night of the murder.

13            And these four witnesses are corroborated by hard

14    physical evidence.

15            You know that Bailey used the same gun to commit a

16    shooting at the BP gas station just three nights before the

17    murder.  You saw the video footage.  You saw Bailey there

18    dressed in all black.  You saw the shooter emerge from the

19    driver's seat of Bailey's Lexus.  It lined up perfectly with

20    what William Banks told you happened that night -- another

21    example of Bailey firing indiscriminately at whoever he

22    perceives to be a threat to MMP.

23            And, by the way, Mr. Enzinna argued that the firearm

24    examiner's determination is subjective.  And Mr. Wagster did

25    tell you that there's an element of subjectivity to it, to be

 1    sure.  You're matching up microscopic markings.

 2         But he also told you that he has several decades of

 3    experience.  He's conducted thousands of examinations.  He's

 4    testified as an expert in over 900 cases.  And he concluded

 5    that the casings from the two scenes were fired with the same

 6    gun.

 7         His co-examiner, Daniel Lamont, independently

 8    concluded that they were fired with the same gun.

 9         Two firearms experts, same conclusion.

10         Neither of them knew anything about the case.  They

11    just looked at the evidence.

12         You also have Bailey's phone records.  18

13    text messages with Bangout in the hours leading up to his

14    murder, no communication afterwards.

15         Calls to Nizzy, calls to Nick, calls from Nick to Mal,

16    Jamal Smith, corroborating what Jay Greer and Malcolm Lashley

17    told you about who was involved that night.

18         You have the BPD Twitter post -- and this is really

19    significant.

20         11:20 a.m. that same day, the next morning, of

21    February 12th, Dante Bailey is checking up on his handiwork.

22    The victim is still unknown.  The location is all the way over

23    in Irvington.

24         It would be one thing if the murder happened in MMP

25    territory during daytime hours, like Mookie's murder.  Then you

1   might expect that word would travel quickly and that Bailey

2   might take an interest.

3        But that's not what happened here.  The Bangout murder

4   happened on a desolate residential street in the middle of the

5   night in Irvington, miles away from MMP's territory.  No

6   eyewitnesses.  The victim was unknown.  There is no reason for

7   Bailey to take an interest in that murder unless, of course,

8   he's checking to see what police have found.

9        And I think Mr. Enzinna got it wrong.  Bailey wasn't

10  checking to see if Bailey -- Bailey wasn't checking to see if

11  Bangout was really dead.  He knew Bangout was dead.  He was

12  checking to see if the police had found the body.  He was

13  checking to see if they had any leads, because that's exactly

14  what a killer does after he commits a murder.  He wants to

15  know:  Did he leave behind a trail of evidence?  Is he going to

16  get caught?  What do the police have?

17       And, finally, you have the cell site and the GPS which

18  show Bailey moving south in the direction of the crime scene

19  from 12:23 a.m. to 12:32 a.m.  He's just a ten-minute drive

20  from the crime scene at 12:23 -- I'm sorry, at 12:32 a.m.  Then

21  he's off the grid.

22       And then he's back to his house at 3901 Princely Way

23  at 1:28 a.m.  Same path of flight as the night of the shooting

24  at the BP on February 8th.

25       And Mr. Enzinna asked you, he said, Would you commit a

1    murder if you were on an ankle monitor?  And that's not really

2    the right question to ask.

3            The question isn't:  Would you commit a murder if you

4    were on an ankle monitor?

5            The question is:  Would Dante Bailey, the man who

6    calls himself Almighty, the man whose Instagram handle is

7    bgm_omnipotence, the man who committed a shooting on camera at

8    the BP gas station three nights earlier, the man who wrote a

9    screenplay about his crimes, the man who put out a hit on a

10   cooperating witness while he was pending trial for murder?

11   Would Dante Bailey commit murder while he was on an ankle

12   monitor?

13           And remember, this isn't your average ankle monitor.

14   You heard from Jay Greer.

15           I asked him, Who was Bailey being monitored by?

16           And he said, Nobody.

17           I said, Who was he supposed to be monitored by?

18           And he said, It was a private company called ASAP.

19           And Greer said that he would basically help Bailey

20   circumvent the ankle monitoring.  He would make up schedules

21   for Bailey, different clubs and bars, and fax the schedules to

22   ASAP so that Bailey could move around freely at all hours of

23   the night.

24           And he said it worked.  He said they never had any

25   interruptions.  He never heard about Bailey being violated.

1           So it's easy to see why Bailey might think that no one

2    was paying attention to where he was.

3           And, as it turns out, nobody was.  There's this

4    unexplained gap starting at 12:32 a.m. that night.

5           And Mr. Enzinna pointed out that there's a column in

6    the records.  This is -- you have this in evidence as MISC-12.

7    There's a column in the records that says [reading]:  Strap

8    tamper detected.

9           And you said the letter N throughout.  And I think

10   it's reasonable to assume that that means Bailey didn't try to

11   remove the ankle bracelet.  I think that's fair.

12          But there are also a whole bunch of other columns.

13   For instance, you'll see that there's a column called "battery

14   level."  And that makes sense because the thing is

15   battery-powered, so you have to keep it charged in order for it

16   to work.

17          And there are some numbers in that column, and they

18   range from 376 to 396.

19          And you can see that during the period in question,

20   from 12:25 a.m. to 12:32 a.m. on February 12th of 2015, the

21   battery level is down at 376, 377.

22          So that raises the question:  Did he let it run out of

23   battery?

24          And we don't know.  We don't know the answer.  But the

25   point is:  There are logical reasons why he might not have been

 1   concerned about the ankle monitor when he murdered Bangout.

 2           Finally, I want to say something about aiding and

 3   abetting.

 4           Judge Blake instructed you that if you find that

 5   Dante Bailey aided and abetted the murder, meaning that he

 6   willfully and knowingly sought by some act to help the crime

 7   succeed, then you should find him guilty of Count 3.

 8           And I want to be clear about this.  The overwhelming

 9   evidence demonstrates that Bailey killed Bangout himself

10   personally.  This is just an alternative theory of liability.

11           Even if you're not all in agreement about who pulled

12   the trigger, if you unanimously conclude that Bailey ordered

13   the murder or that he supplied the gun to the shooter to commit

14   the murder, then he's just as guilty.  It's just another way

15   that you can find him guilty.  That's all that is.

16           I'm going to move on to Randy Banks.

17           Mr. Sardelli described the Government's case as,

18   quote, a massive overreach.  I think he used that term half a

19   dozen times.

20           He stood up here and he told you there is no evidence

21   that his client was part of a gang conspiracy.  No calls.  No

22   texts.  No social media.

23           Maybe Mr. Sardelli sat through a different trial than

24   I did.

25           I heard five witnesses testify that Randy Banks was a

 1    high-ranking member of MMP and the leader of the

 2    Gwynn Oak-Liberty Heights drug shop.

 3         I saw photo after photo of Randy Banks making MMP gang

 4    signs with other MMP members.

 5         I'm going to flip through a few here quickly.

 6         I saw drug O sheets from Bailey's iCloud account

 7    referencing Dirt.

 8         We talked about the photo of Randy Banks making an MMP

 9    gang sign with Wedlock while standing in front of their

10    crack cocaine cooking operation.

11         We saw MMP gang paperwork seized from several

12    different locations describing Dirt as a leader in Gwynn Oak

13    and the boss of finance.

14         And Mr. Sardelli asked:  Why should my client be held

15    accountable for something Bailey wrote down somewhere?

16         And that's not really the point.  The point isn't to

17    look at the gang paperwork by itself in isolation.  The point

18    is that it's compelling corroboration for what all the

19    witnesses told you.  They didn't know what Bailey was going to

20    write down in his notebook or upload to his iCloud account.

21         We listened to probably a dozen jail calls where

22    members of MMP talked about Dirt as the money man, the guy they

23    went to for bail money or lawyer money or commissary money when

24    they got locked up.

25         And it's true, of course, that bailing someone out of

 1    jail is not a crime.

 2         But when there's a consistent pattern of Randy Banks

 3    supplying money for members of MMP after they've been arrested

 4    for crimes committed in furtherance of the gang, that's pretty

 5    good evidence that he's part of the conspiracy.

 6         Remember the jail call from Dontray Johnson, or Bino,

 7    instructing his female associate to collect money from Dirt.

 8    That was five days after Johnson had killed Nutty B for

 9    refusing to pay MMP gang dues.  That timing tells you

10    something.

11         One of the most damning pieces of evidence against

12    Dirt is the video of the Snook shooting at club Mirage.  And

13    Mr. Sardelli, I don't think he even mentioned this video.

14    Maybe he was hoping you'd forget about it.

15         But you saw Randy Banks walk up to club Mirage with

16    the other leaders of the gang:  Dante Bailey, Dontray Johnson,

17    William Banks, Devon Dent, and others.

18         You saw that Johnson was even wearing a red shirt that

19    said "Mobb Squad" on it, broadcasting his membership in MMP.

20         Dirt was standing right there with his MMP

21    confederates when Trouble gunned down Snook on Dante Bailey's

22    orders.

23         And in case there was any doubt about his complicity,

24    Bailey wrote about it in his screenplay.  He and Dirt talked

25    about making it look like 4th of July.  Snook was a rat, and he

```
 1   had to be killed.
 2           Dirt was in on it.  That's just one of the ways you
 3   know that murder and witness tampering were foreseeable to him.
 4           Here's another way you know that murder was
 5   foreseeable to Randy Banks.
 6           Wire Call B-4104, Mr. Sardelli talked at length about
 7   this wire call.  And I'm really glad he did, because I noticed
 8   something that I hadn't noticed before.
 9           Mr. Sardelli pointed out that this call, this wire
10   call, was on July 25th of 2015, which was the day after the
11   Paparazzi show that Bailey and William Banks performed at.
12           And they're talking about leaving the club and Fish
13   having a drunk episode.  And remember, Mr. Sardelli put the
14   flyer of the show up on the screen for you.
15           So why is that significant?  It took me a while to
16   realize it, but think back to what Trouble told you about that
17   show.  He told you that's the night he learned that Bailey had
18   killed Bangout.  He told you he was with Gutta and Dirt leaving
19   the show when Bailey told him about the murder.
20           That wire call is incredibly corroborative of what
21   William Banks told you.  Dirt was there when Bailey told him
22   that he killed Bangout for violating MMP rules.
23           Trouble couldn't have known about that call.  The
24   Government didn't even realize its significance.  It
25   corroborates Trouble, and it also corroborates Jay Greer.
```

1          Jay Greer testified -- I asked Jay Greer, Did Gutta

2    tell you whether anyone else knew about him killing Bangout?

3          And he said, Yes.

4          He said, Dirt knew too.

5          So there's another way you know that murder was

6    foreseeable to Randy Banks.

7          The most obvious way you know murder was foreseeable

8    to him was the testimony of Devin Ferguson.

9          Ferguson was a member of BGF, a rival gang.  Ferguson

10   testified that after Mookie was killed, Dirt showed up at Los's

11   candlelight vigil, armed with a gun, and threatened to kill

12   Ferguson and every member of the gang by the end of summer.

13         And you heard about some of the murders and shootings

14   that took place after that threat.

15         So you heard about Eastside.  Eastside was a member of

16   MMP who was killed in summer of 2016.

17         And William Banks testified that the members of the

18   Gwynn Oak-Liberty Heights drug shop, they found out who had

19   killed Mookie.  They found out it was this guy named Ro-Ro.

20   And Eastside, who was a member of MMP, was friends with Ro-Ro,

21   and he was protecting him.

22         William Banks testified Eastside wouldn't give up the

23   whereabouts of Mookie's killer; or, in his words, Eastside

24   wouldn't tell the homies where Ro-Ro was.  So they killed him.

25         And you heard a wire call between Dante Bailey and

1   Jamal Lockley that confirmed what Trouble told you.  This was

2   Call TT-3-4106.

3          Lockley said [reading]:  Eastside got killed because

4   he was playing the 50/50 game.

5          That means he was playing both sides of the fence.

6          And Bailey confirmed that Eastside's death was

7   planned.  He said, That was already said and done when Fat Man

8   came home.

9          That's a reference to Dirt.

10          Another way you know murder was foreseeable.

11          And on the subject of Mookie, Mr. Sardelli argued

12   that, well, Mookie was Randy Banks' cousin; so, of course, he

13   was upset when his cousin was killed.  It wasn't a gang thing;

14   it was a family thing.

15          I'm not sure it's in evidence that Mookie was

16   Randy Banks' cousin, but maybe it is.

17          Regardless, there cannot truly be any question in your

18   mind that Dirt's hunger to avenge was about MMP, not family.

19          Remember the bizarre video you saw of Mookie's

20   funeral, and this is a picture from Mookie's funeral.

21          Remember the bizarre video you saw where they draped

22   the MMP banner over his casket like they were performing

23   military honors.  They co-opted his funeral and made it into a

24   gang ceremony.  It wasn't about family.  It was about MMP.

25          Threatening to kill every member of a rival gang,

 1    that's gang vengeance.  That's not family bereavement.

 2           And, by the way, jumping around a bit, Devin Ferguson

 3    also told you about Dirt being involved in extortion.

 4           If you remember, Ferguson testified that in 2012, he

 5    tried to sell drugs at Liberty Heights and Gwynn Oak; and Dirt

 6    confronted him and said, You can't sell around here unless you

 7    pay a 10 percent tax.

 8           Basically, get off my turf.

 9           And Ferguson, he didn't want to pay the tax, so he

10    went elsewhere.

11           But that's extortion, another racketeering act that

12    was foreseeable to Dirt because he committed it himself.

13           Mr. Sardelli faulted the Government for not

14    researching whether there were any other "Dirts" in the city of

15    Baltimore.

16           And I have to admit, I find it admirable that

17    Mr. Sardelli persisted with this theory of mistaken identity,

18    despite the fact that he struck out with every single witness.

19           Every single witness he asked said they hadn't heard

20    of a different Dirt.  They all pointed at Randy Banks and said,

21    "That's Dirt."

22           Mr. Sardelli also asked -- he asked, Where did all the

23    money go?

24           And I think the evidence before you is that some of it

25    went back into drugs.

1          If you think about all the drugs that were seized, the

2     600 grams of heroin, that's $60,000 worth of heroin right

3     there; the 80,000 seized from Anderson at the airport; the

4     $26,000 seized from Spence.

5          But you also heard about --

6          **MS. AMATO:**  Objection.

7          **MS. HOFFMAN:**  -- how the gang operated.

8     (Interruption.)

9          **THE COURT:**  I'm sorry.  Stop, please.

10          I will just remind the jury this is not evidence.

11    This is argument by counsel only.

12          **MS. HOFFMAN:**  You heard about how the gang operated

13    and the lifestyle they led.  You heard about Dirt's

14    Mercedes-Benz.  You heard he had multiple cars and multiple

15    houses.

16          You saw how the defendants dressed.  Diamond chains.

17    You heard about casinos and Bentleys.  It's not hard to imagine

18    where the money went.

19          The whole thrust of Mr. Sardelli's argument -- and

20    some of the other defense attorneys did this too -- was to

21    criticize the investigation, to point to the things that the

22    Government didn't do.

23          The Government didn't call a rap expert.  We didn't

24    call a gang expert.  We didn't call the other 40 people at

25    Los's candlelight vigil.

 1        You heard that kind of argument from Mr. Trainor, too.

 2   He faulted the Government for not calling William Banks'

 3   handler, Brad Hood.

 4        And if you remember, William Banks testified that he

 5   had three or four different handlers over time.

 6        Mr. Hazlehurst faulted us for not calling Kane and not

 7   calling Konan.  This trial might have gone on for another two

 8   or three weeks if we had called all of those people.  I think

 9   you're probably glad we didn't make it into an eight- or

10   nine-week trial.

11        More importantly, Judge Blake instructed you that the

12   Government is not required to call any particular witnesses or

13   use any particular investigative techniques.  That's not the

14   jury's concern.  Your job is to focus on the evidence that you

15   do have in front of you and whether it proves the defendants

16   guilty beyond a reasonable doubt.

17        So I'm going to move on to Jamal Lockley.  Mr. Trainor

18   spent a lot of time talking about how Jamal Lockley was not a

19   member of MMP.  And if you remember, I told you that in my

20   opening statement.

21        Lockley wasn't a member of MMP.  But that doesn't

22   matter.

23        The Government doesn't have to prove that the

24   defendants were members of MMP; just that they were members of

25   the conspiracy, meaning that they agreed to participate in the

1    gang's affairs through a pattern of racketeering activity.

2         Lockley was every bit as much a part of that

3    conspiracy as the other defendants.  He worked with other MMP

4    members to sell drugs in MMP's territory:  Dante Bailey,

5    Corloyd Anderson, Adrian Jamal Spence, Shakeen Davis.  You

6    heard wire calls with all of them.

7         He put up money for Dante Bailey's bail when he was

8    incarcerated.  He was in call after call with Bailey and others

9    discussing gang business.

10        So you heard the call of Dwight Jenkins where they

11   talk about -- Jenkins tells them about getting into a fight

12   with Rick.  And Lockley says, Let's put yo together.

13        You heard the call with Bailey where they talk about

14   how Eastside was killed for playing the 50/50.

15        You heard the call with Bailey where they conspired to

16   kill Trouble because he's cooperating against the gang.

17        Lockley was also the getaway driver for a retaliatory

18   murder committed by Bailey, the Anthony Hornes murder.  And I'm

19   going to come back to that in a minute.

20        There can't really be any question that Lockley was

21   steeped in the gang's affairs.  And he benefited from the

22   violence committed by other members to silence witnesses and

23   defend MMP's drug territory because that's how he made his

24   money.

25        Remember, Ms. Perry told you, a team for money and a

1    team for murder.

2           Day in and day out, Lockley sold heroin and cocaine in

3    MMP's territory around the 5200 block of Windsor Mill Road, and

4    he benefited from the violence you heard about.

5           He doesn't get a pass just because he didn't jump

6    through the formal hoops of becoming a member of the gang.  You

7    don't have to be a member of MMP to be a member of the

8    conspiracy, and there's good reason for the law being that way.

9           You wouldn't want people who do dirty work for the

10   gang to be able to shield themselves from accountability just

11   because they didn't go to a formal initiation ceremony.

12          You don't need to have an MMP tattoo.  You don't have

13   to have an Instagram account.

14          What matters is that Lockley, just like the other four

15   defendants, knowingly and intentionally participated in MMP's

16   affairs through a pattern of criminal activity.

17          I want to talk about Count 10, which charges Lockley

18   with distribution of crack cocaine based on the March 10th,

19   2016, controlled purchase by William Banks and a female CI.

20          Mr. Trainor has argued that you can't trust that these

21   drugs were actually purchased from Lockley because this was

22   during William Banks' unreliable period, and the video of the

23   controlled purchase doesn't show the actual drugs in Lockley's

24   hand.

25          And that's a clever argument, but it doesn't hold up.

1           It doesn't hold up because of what Agent Moore told

2   you about how this controlled purchase went down.  Banks and

3   the female CI were searched beforehand.  They were searched

4   afterward.  The entire transaction was surveilled by

5   law enforcement officers.

6           But more importantly, it doesn't hold up because of

7   what the video actually shows.  You see Banks and the female CI

8   pull up to meet Lockley.

9           You see the female CI hand Lockley the money.

10          **DEFENDANT LOCKLEY:**  Where?

11          **MS. HOFFMAN:**  There's the money in the CI's hand.

12          And you hear them have a conversation about cooking

13  crack cocaine.  And remember we were having some audio problems

14  on the day that we played the video.

15          And William Banks couldn't hear what was being said

16  from the witness stand.  So I want to watch the video again

17  now.

18      (Video was played but not reported.)

19          **MS. HOFFMAN:**  So Banks says, It's six; right?

20          He's referring to the $600.

21          Lockley says, Uh-huh.

22          Then you see the female CI hand over the money.

23          Lockley says, You got any complaints, baby, please let

24  Trouble know, 'cause he going to let me know and we going to

25  fix any problems that you got.

 1          You hear Lockley counting out the money, making sure
 2   it's $600.
 3          Lockley says, But you ain't gonna have none, though.
 4   I'm just letting you know, though, that's how we rock.
 5          The female CI says, Okay.
 6          Then Trouble says to the CI, to the female CI, So you
 7   don't mind gettin' it like that every time; right?
 8          He's talking to the female CI.
 9          And she says, No.  I can get it like that.
10          And then Lockley says, You know how to cook?
11          That's a reference to cooking powder into
12   crack cocaine.
13          And she says, No.  I want it like that.
14          And Lockley says, Like that?  All right.
15          So let's go back and watch it one more time.
16      (Video was played but not reported.)
17      **MS. HOFFMAN:**  She didn't just buy $600 of baked goods
18   from Lockley.  They're not talking about cooking brownies.
19   They're talking about crack cocaine.
20          He's asking her whether she always wants it as crack
21   or whether she wants it as powder so that she can cook it into
22   crack herself.  And she's telling him she doesn't know how to
23   cook; she wants it precooked into crack.
24          Now, Mr. Trainor pointed out that when he was asked
25   about this controlled buy, William Banks said he thought it was

1    an eight ball of crack that he purchased from T-Roy.

2            And you heard the chemist testify that he tested the

3    drugs that were purchased that day.  And it was -- actually, it

4    was more than that.  It was closer to 12 grams of crack.

5            So Trouble got it wrong.  He couldn't remember how

6    much it was, and he guessed conservatively.  He said, I think

7    an eight ball.

8            And that's to his credit; right?  He didn't try to

9    exaggerate.  He guessed conservatively.  That's exactly what

10   you want from a cooperator.  It was over three years ago.  He

11   erred on the side of underestimating.  That's exactly what he

12   should have done.

13           So how does this controlled buy fit into the bigger

14   picture?  It's another example of the defense attorneys taking

15   it ten levels too far.

16           Did William Banks commit terrible crimes?

17           You bet he did.

18           Was he a crummy CI?

19           He was.

20           Did he plant evidence?

21           Absolutely not.

22           Jamal Lockley sold him 12 grams of crack cocaine, and

23   you know that because it's on video.

24           And time after time what William Banks told you has

25   been confirmed by hard evidence.  The video footage, the wire

1    calls, the jail calls, the social media posts.

2         So let's move on to something else that William Banks

3    told you about, which is the murder of Anthony Hornes.

4         Now, Mr. Trainor asked you to consider this murder as

5    a charged murder, and that's exactly what you're not supposed

6    to do.

7         Lockley is not charged with this murder, nor is

8    Bailey.  We don't have to prove it beyond a reasonable doubt.

9         We did prove it, but we don't have to.  It's just

10   another way of showing that murder was a foreseeable

11   racketeering activity.

12        Mr. Trainor said you have to believe William Banks to

13   believe Lockley was involved in this murder.

14        And that's fair.  You do.

15        But that doesn't mean we're asking you to take him at

16   his word alone.  We're not.

17        What Trouble told you about this murder is

18   corroborated in significant ways.

19        First, there's the cell site location mapping.  When

20   Mr. Trainor asks you to discard that totally, he says, Lockley

21   could have just been in the area to mourn Mookie.

22        And that's true.  That's fair.

23        But it's still highly corroborative of Trouble that

24   his phone, Bailey's phone, and Lockley's phone are all pinging

25   right in the area of the murder around the time of the murder,

 1   especially given that this isn't Lockley's normal turf.

 2        This is Gwynn Oak and Liberty Heights.  Lockley's turf

 3   is 5200 Windsor Mill.

 4        So it's highly unlikely that William Banks took a

 5   random, lucky guess on this and all three cell phones happened

 6   to be pinging right there at the time of the murder.

 7        Then you have the jail call.  This was Call J-56.  And

 8   Mr. Trainor didn't talk about this.  But the day after the

 9   murder, MMP member Darius Stepney, Conehead, calls a

10   co-conspirator and they talk about Mookie's murder.  And

11   Stepney asks if they retaliated.

12        He said, They want some Snook out that way.  Where

13   Gutta and them at?

14        And the co-conspirator says, Yeah, they did retaliate.

15        He says, quote, I ain't gonna lie.  Something already

16   happened about that.

17        And then he reads from the newspaper article about

18   Anthony Hornes -- about Anthony Hornes getting murdered.  That

19   jail call is also highly corroborative of Trouble.  This was

20   Gutta's doing, and everyone knew it.

21        Finally, the details of the crime.

22        Trouble told you that Gutta shot Anthony Hornes once

23   in the head or the face at close range, and that's exactly what

24   you heard from the Medical Examiner.

25        Now, Mr. Trainor pointed out that Trouble has a

1    history of lying.  He lied about the Mirage shooting, and he

2    didn't own up to that shooting until he was confronted with the

3    video footage.  And that's true.

4           But think how different this situation is.

5           Mr. Trainor told you there was no video of this

6    murder.  There were no cameras in the area.  There were no

7    eyewitnesses.  There were no fingerprints, no DNA, no gun

8    recovered.  The Homicide detective told you he had no leads and

9    no suspects.

10          There was absolutely nothing tying Trouble to this

11   murder scene, so what possible incentive would he have to lie

12   and implicate himself in this murder if he wasn't really there?

13   It doesn't make any sense.

14          He could have kept quiet.  No one ever would have been

15   the wiser, but he put himself there.

16          He told you, I was there even though I wasn't supposed

17   to be there.  I was a CI at the time.  I got in that car with

18   Gutta and T-Roy.  I knew they were looking to retaliate.  I got

19   in that car, and I sat there and watched as Gutta killed

20   someone.

21          There's no reason for him to implicate himself in that

22   murder unless he was really there.

23          And what would Trouble's incentive be to put Lockley

24   at the scene if he wasn't really the getaway driver?  Why

25   Lockley?  That doesn't make sense either.

1      Mr. Trainor faulted us for not calling Trouble's

2  handler, Brad Hood.  And I talked about this earlier.

3      It's true.  We could have called his handler.  We

4  could have called all four of his handlers.  We didn't do that.

5      But you did hear the testimony about the text

6  messages, and I think Ms. Whalen even read from some of them on

7  cross-examination.

8      So now fast-forward to the August 19th, 2016 jail call

9  from Bailey to Lockley, the one where they conspired to kill

10  Trouble for being a CI.  And this is Call J-65.

11      Mr. Trainor tried to argue that Lockley was distracted

12  in this call.  That's not what I heard.

13      Maybe he was distracted in the beginning.  But as soon

14  as Bailey said, Trouble told on Spittle, that Trouble was a CI,

15  Lockley snapped to attention.

16      You heard him.  He sounded incredulous at first.  He

17  said, What?

18      He said it again, What?

19      And then he immediately called Granny, presumably

20  Spittle's grandmother, to confirm.

21      That's not someone who's distracted.  That's someone

22  who cares deeply.  Why does Lockley care so much?

23      He cares because of Anthony Hornes.  He cares because

24  of the March 10th controlled buy.  It dawns on him, if Trouble

25  is a CI, then I'm in deep, deep trouble.

1          So then Bailey tells Lockley to send Trouble to

2   M-Easy, and I don't think anyone has really disputed what this

3   means.

4          M-Easy is a known enforcer for the gang.  He has the

5   lightning bolt tattoo on his face.  "Send him to M-Easy" means

6   "have M-Easy kill him."

7          And Lockley says in response, Say no more.

8          Now, Mr. Trainor argues that "say no more" is just a

9   meaningless expression; Lockley uses it all the time to get off

10  the phone.  I don't think that's what the evidence shows.

11         First of all, Lockley doesn't get off the phone after

12  he says "say no more."  The call continues.  They continue to

13  discuss killing Trouble.

14         Michael Singer, Blizz, says he doesn't want it to go

15  down in the studio because he's worried about his contract with

16  the owners.  They discuss options.  They talk for several more

17  minutes.

18         So "say no more" isn't Lockley trying to get off the

19  phone.  "Say no more" is confirmation.

20         You heard a lot of wire calls where Lockley uses this

21  expression.

22         A drug customer will say something like, I'm on my way

23  down and I want two.

24         And Lockley will say, Say no more.

25         Dwight Jenkins tells Lockley he got in a fight with

1    Rick.  And Lockley says, Say no more.  We going to put yo

2    together.

3            That's TT-1-1202.  "Say no more" is affirmation.  It's

4    a way of saying, "Okay.  Understood.  I got you."

5            And remember, right after Bailey told Lockley to send

6    Trouble to M-Easy, right after Lockley says, "Say no more,"

7    they start talking about the murder of Ricardo Johnson,

8    Uncle Rick.

9            Bailey immediately after that says, I heard about your

10   uncle.  He was trying to catch the Light Rail.

11           And they all burst out laughing.  They're talking

12   about another rumored snitch who got what was coming to him.

13           The juxtaposition is telling.

14           Send Trouble to M-Easy, then Uncle Rick.

15           Same transgression:  Cooperating with law enforcement.

16           Same outcome:  Murder.

17           Mr. Trainor also argued, well, nothing ever happened

18   to Trouble.  They couldn't have really been planning to kill

19   Trouble because nothing ever happened to him.  And I think

20   that's a red herring.

21           The call J-65 happened on August 19th of 2016.  You

22   heard that Trouble was arrested on August 26th of 2016, one

23   week later.

24           So the fact that they didn't successfully murder

25   Trouble within one week doesn't mean they weren't planning to

 1    kill him.  They absolutely were.  This was a conspiracy to

 2    murder a witness against a gang.  There's no other way to look

 3    at it.

 4         And that brings me to a related point.  Mr. Trainor

 5    said -- he said, There's no evidence Lockley ever read the MMP

 6    gang paperwork or the seven mob mandates.

 7         And I actually think that's fair.  I think he's right

 8    on that.

 9         As to the other defendants, we know murder was

10    foreseeable to them because they took the oath.  They read the

11    gang paperwork.

12         But Lockley wasn't a member of MMP, so we can't assume

13    that he read the gang paperwork.  We can't check the boxes for

14    him just based on membership alone.

15         It ends up not mattering, though, because it's clear

16    in a dozen other ways that murder and witness tampering and

17    witness retaliation were foreseeable to Lockley.  It's clear

18    from the August 19th call.  It's clear from the call with

19    Jenkins about putting Rick together.  It's clear from his

20    participation in the Hornes murder.

21         One final note on Lockley.  Mr. Trainor pointed out

22    that they didn't find any drugs or drug paraphernalia at

23    Lockley's residence when they executed the search warrant in

24    September of 2016.

25         But you heard it's not unusual for drug dealers to

```
 1   stash drugs off-site rather than keeping them in their homes.
 2   So that's not really that surprising.
 3          More importantly, what they did find in Lockley's home
 4   was the cell phone, the 7780 number that was the subject of the
 5   wiretap and that was filled with hundreds, if not thousands, of
 6   drug texts.
 7          So now we come to Corloyd Anderson, Bo.
 8          Ms. Amato wants you to believe that Bo was both the
 9   luckiest man in the world and the unluckiest man in the world.
10   He's the luckiest man in the world because he routinely wins
11   large cash payouts at casinos.
12          He's the unluckiest man in the world because he's been
13   tragically confused with someone named C-Bo or Bowl who deals
14   drugs and slings guns, and he was somehow manipulated into
15   confessing to a gun that was left in some rented furniture at
16   his house.
17          I don't think I need to spend too long on the mistaken
18   identity theory.  Every witness who came in here pointed at
19   Corloyd Anderson and said, That's Bo.
20          That's the Bo that was a boss of MMP.  That's the Bo
21   who had a set of gold teeth with M's.  That's the Bo who
22   supplied large volumes of heroin to members of the gang.
23   That's the Bo who carried guns.  That's the Bo who supplied the
24   gun that Bino used to kill Antoine Ellis and disposed of it
25   afterwards.
```

 1           Now, Ms. Amato was right that there were some

 2   inconsistencies in the witness testimony as far as Anderson's

 3   membership in the gang.  William Banks and Jay Greer testified

 4   that Bo was a high-ranking member of MMP, a boss.

 5           Malcolm Lashley and Derran Hankins said they didn't

 6   know Anderson to be a member.

 7           And that's not really that surprising.  They all had

 8   different perspectives, different bases of knowledge.

 9           Banks and Greer were very close to Dante Bailey.

10   Banks was a ranking member of MMP himself.  Greer lived in

11   Bailey's house and was recruited to join the gang.  They knew

12   who was in the gang and who was out.

13           Lashley and Hankins were further out.  They told you

14   they didn't know all the inner workings of the gang or the rank

15   structure.

16           So, no, their testimony doesn't line up perfectly, and

17   that's normal.  That's how you know they're not being coached.

18   They're not getting their stories straight.  They're each

19   telling it from their own perspective.

20           But the evidence shows that Banks and Greer had it

21   right because of what the gang paperwork says.

22           Remember, Greer told you that Gutta sometimes referred

23   to Bo as Fat Tony.  And we saw that in Bailey's MMP slideshows

24   in his iCloud account, there's a photo of Anderson with the

25   label "Fat Tony" and "Boss."

 1          William Banks told you that Gutta sometimes referred

 2    to Bo as Jim.  We saw gang paperwork recovered from Bailey's

 3    house in July of 2015 where he identifies Jim as a boss of

 4    5200.  That's GP-4-A.

 5          Also in the screenplay recovered from Bailey's

 6    residence in May of 2016, Bailey refers to Bino, Spittle, and

 7    Bo as bosses of the gang.

 8          Bailey also repeatedly refers to Bo as someone who

 9    supplies heroin in the 5200 block of Windsor Mill Road.

10          And, again, we're not asking you to find Anderson

11    guilty based on these writings alone, but they do corroborate

12    Banks and Greer as to his membership in the gang.

13          Ms. Amato talked about the surveillance footage of

14    Anderson, Dante Bailey, and William Banks on October 18th of

15    2012.  And she showed the camera panned to Norma Jean's, and

16    she said this was just guys being guys going to a strip club.

17          And I don't think there's ever been any dispute,

18    actually, that they were going to a strip club that night.

19    That's, in fact, exactly what William Banks testified to.

20          It wasn't a gang meeting, but that doesn't change the

21    fact that three days after the Snook shooting at club Mirage,

22    Anderson meets up with Dante Bailey and William Banks and Banks

23    is wearing an MMP sweatshirt.  It literally says

24    "Murdaland Mafia" and "MMP" on it.

25          So that's why we showed you that clip.  Is it proof

 1    that Anderson was a member?  No, of course not.  But it's

 2    evidence of Anderson's knowledge.  It's hard to argue that he

 3    was oblivious to what MMP was, given those circumstances.

 4         Another point on the witness testimony,

 5    Ms. Anderson [sic] wants to have it both ways -- I'm sorry.

 6         Ms. Amato wants to have it both ways.  She wants you

 7    to believe that Malcolm Lashley and Derran -- she wants you to

 8    believe Malcolm Lashley and Derran Hankins when they said they

 9    didn't know Bo to be a member of MMP, but she wants you not to

10    believe them when they tell you that Bo supplied heroin to

11    members of the gang.  And that's not really reasonable.  You

12    can't slice it that finely.

13         All of the witnesses, all of them knew that Bo was a

14    large-scale heroin supplier for the gang.  And if you believe

15    that, then he was a member of the conspiracy.

16         Even if you don't believe that Anderson was a member

17    of the gang -- and he was -- but even if you're not sure, he

18    was undoubtedly a member of the conspiracy.

19         Now, the airport seizure, I want to talk about that

20    briefly.

21         I do think it's important to consider the facts

22    carefully.

23         Corloyd Anderson said --

24         **MS. AMATO:**  Your Honor, I'm going to object, again,

25    for the record.

1        **THE COURT:**  Can I see counsel at the bench.

2     (Bench conference on the record:

3        **THE COURT:**  What is the basis of the objection?

4        **MS. AMATO:**  So Government counsel and I had agreed

5  that -- the seizure, the word of the seizure, okay, that there

6  was actual money seized from the airport.

7        **MS. HOFFMAN:**  Oh, yeah.

8        **MS. AMATO:**  So one thing is that they stopped the

9  uncle and there was a question about the money, and Anderson

10  came and he brought his proof.

11        But to actually say that it was taken, that's where

12  the problem is because we -- I didn't move forward with the

13  proof that I have that he actually ultimately received the

14  money.

15        And we had agreed that they would not say that the

16  money was taken so that I wouldn't introduce that the money was

17  returned.  So that's where my problem is.

18        **MS. HOFFMAN:**  I wasn't planning to say anything about

19  the money being taken.

20        **THE COURT:**  Okay.

21        **MS. HOFFMAN:**  I wasn't planning to say anything about

22  the money being taken.

23        **THE COURT:**  Is the objection to the use of the word

24  "seizure"?

25        **MS. AMATO:**  Yes.

```
 1               THE COURT:  Okay.  If you could clarify -- I mean, it
 2     was temporarily seized.
 3               MS. AMATO:  Temporarily.  Exactly.  Right.
 4               THE COURT:  But returned.
 5               So please make that clear.
 6               MS. AMATO:  Thank you.
 7               THE COURT:  Thank you.)
 8          (Bench conference concluded.)
 9               THE COURT:  Just clarify the reference, Ms. Hoffman.
10               MS. HOFFMAN:  I wanted to talk about the stop at
11     BWI Airport in which money was temporarily seized.  And I want
12     to consider the facts carefully.
13               So Corloyd Anderson sends $80,000 in cash with
14     Charles Milton Banks to Texas, a border state.  It's in random
15     denominations, stuffed in U.S. envelopes -- U.S. postal
16     envelopes.
17               And when the cash is found, Charles Milton Banks
18     claims he's going to Vegas.  His airplane ticket is to Texas.
19               Anderson shows up and says, Hey, there's been a big
20     misunderstanding.  I'm sending the cash with my uncle to Texas
21     to a car auction, and he shows a car auction pass and some
22     W-2Gs showing that he won $70,000 at a casino two months
23     earlier.
24               So let's consider the plausibility of that theory.
25               First, even if Anderson does have a car auction pass,
```

```
 1   why would he purchase cars at auction in Texas if he lives and

 2   works in Maryland?  Wouldn't he lose his entire investment in

 3   the cost of flying to Texas and shipping the cars back to

 4   Maryland to sell?

 5           Second, if he was planning to buy cars at auction with

 6   his auction pass, why was he sending the money with his uncle?

 7   His uncle didn't show a car auction pass, so how was that

 8   supposed to work?

 9           Third, why would his uncle say he was going to Vegas?

10           And, fourth, last time I checked, casinos don't give

11   out cash in random denominations.  It's in neat, crisp bills.

12           **DEFENDANT ANDERSON:**  Tell 'em I got the money back.

13           **THE COURT:**  All right.  All right.  All right.

14           **MS. AMATO:**  Objection, Your Honor.

15           **THE COURT:**  The phrase was "temporary seizure."  The

16   money was returned.  It is the jury's recollection of the

17   evidence that controls.  Argument is not evidence.

18           **MS. HOFFMAN:**  You saw the photographs of Anderson's

19   auto shop.  You saw that it was a big, mostly empty property

20   with maybe one car on the lot, maybe two.  No cars in the bay

21   being serviced.  Maybe one small garden hose in the corner.

22   How was he washing all those cars with one small garden hose?

23   It's not exactly what you'd expect of an auto shop that was

24   generating a lot of income.

25           So now we come to the wire calls with Lockley.  And
```

```
 1    Ms. Amato had some arguments.  She said maybe Anderson was
 2    supplying Lockley with cars to sell or maybe he was supplying
 3    him with T-shirts to sell, something about T-shirts.
 4         But this is another situation where context matters.
 5    You can't look at the calls between Anderson and Lockley in
 6    isolation, in a vacuum, because you know what Lockley was
 7    selling in the summer of 2016.
 8         You heard it in call after call after call.  You saw
 9    it in text after text after text.  Lockley was selling drugs.
10    He was selling heroin and crack cocaine.  That is the one and
11    only thing that Lockley was selling.
12         That's how you know that when Lockley says, "We gave
13    you thirty-four fifty.  It was thirty-five, and I took fifty
14    out for Charlie," he's not talking about a car.  He's not
15    talking about T-shirts.
16         He's talking about heroin.  He's talking about paying
17    his hitter, Charlie, for his work and giving the rest of what
18    he owes to Anderson.
19         And when Lockley says, "Did you get that other girl?"
20    he's not talking about a literal girl.  He's talking about
21    cocaine.
22         And when Anderson gets mad at Lockley for getting so
23    dumb over the phone, he's not worried about law enforcement
24    figuring out that he's selling cars or selling T-shirts.  He's
25    worried about getting caught selling heroin.  He's cautious.
```

 1    He's more cautious than Lockley.

 2            The gun in the mattress.

 3            The gun in the mattress was not left behind in rented

 4    furniture.  It didn't belong to one of the females in the

 5    house.

 6            It was Anderson's gun.  That's why he was able to

 7    describe it.  That's why he was able to tell Agent Aanonsen

 8    where it was before it was even found.  That's why he confessed

 9    to it.  There's no trick.  There's no big aha moment, it was

10    his gun, and he admitted to it.

11            The interview couldn't have been more polite.  You saw

12    it.  Agent Aanonsen couldn't have been more accommodating.

13    Anderson admitted it was his gun, and he admitted to dealing

14    heroin.

15            And we don't know why Anderson made the decision he

16    did, but he did.  Maybe he thought they'd let him go.  I don't

17    know.  But it was his gun, and he did deal heroin.

18            So, finally, we come to Shakeen Davis, Creams, and I'm

19    nearing the end.

20            Mr. Hazlehurst argued that the Government put

21    Mr. Davis in that chair.  And that's not right.  Mr. Davis put

22    himself in that chair.

23            He put himself in that chair by joining MMP, by

24    pedaling its drugs, by toting guns, by firing those guns at

25    rivals of the gang.

```
 1            You don't need witnesses to tell you that Creams was
 2   in MMP.  He told you himself with social media post after
 3   social media post.
 4            And I'm going to show you a couple here.
 5            Here's one [reading]:  5-Deuce boss.  Death before
 6   dishonor.  Omertà code.
 7            Here's another [reading]:  Have a mob meeting with a
 8   mob boss.
 9            You saw others where Davis was making the M sign
10   (indicating) for MMP and saying, Murdaland Mafia, the world is
11   ours.
12            I don't know how you walk away from that.
13   Mr. Hazlehurst faulted the Government for only -- only picking
14   out seven social media posts that relate to MMP.  I don't know
15   how many you need before you can conclude that he was actually
16   a member of MMP.
17            Mr. Hazlehurst said that William Banks was
18   inconsistent in identifying Creams as a member of MMP, and
19   that's not how I recalled the testimony.
20            I recall -- your memory controls -- I recall
21   William Banks being definitive about the fact that Creams was
22   MMP.  He said he was a 5200 boy.
23            But as you learned, those two things weren't mutually
24   exclusively.  You could be a 5200 boy and also be a member of
25   MMP.
```

```
 1              Mr. Hazlehurst pointed out that Jay Greer testified --
 2    he was asked whether Creams worked with anyone else selling
 3    drugs.
 4              And he said, No.
 5              And that's fine.  I'm sure that's how Jay Greer saw
 6    it.  Maybe Creams wasn't out there selling drugs with other
 7    members in spring of 2015 when Jay Greer was out there, but
 8    it's also not the full story because you heard wire calls and
 9    jail calls showing that he did work with other members of MMP.
10    There's the wire call with Lockley where Creams says he wants
11    to get with Lockley on the sister tip.
12              There's the wire call between Anderson and Lockley
13    where Anderson says Creams has been calling his phone.
14              There's O sheets from Bailey's iCloud account, such as
15    IC-2, which refer to Creams.
16              There's the jail call with Sydni Frazier.  This was
17    Call J-4.  And if you remember, in this call, Sydni Frazier
18    calls Creams, Shakeen Davis.  And they're using coded language
19    to talk about selling off the shablooki.  That's coded language
20    for drugs.  And they're talking about Mugs and Ed or E-Money,
21    who you heard were also members of MMP.
22              And Frazier says, quote, We got to work together.
23    That's the whole point of the situation.
24              So they were a team.  That's also consistent with what
25    William Banks told you.  He testified that Creams was a member
```

 1    of MMP who sold drugs with E-Money and Mugs.

 2            So Creams did work with members of MMP to sell drugs,

 3    but he also helped defend MMP's turf and retaliate against

 4    rivals.

 5            On May 30th of 2015, when a couple guys come through

 6    and pull a gun on Nutty B, he whips out an AR-15 and unloads on

 7    them in broad daylight in the middle of traffic.

 8            Malcolm Lashley witnessed it with his own eyes.

 9            And Mr. Hazlehurst, he said Malcolm Lashley couldn't

10    have possibly seen this because he drew a dot on the screen

11    showing that he was in the baseball field, and there were trees

12    in between the baseball fields and the street.

13            Again, your memory controls.  I don't remember exactly

14    where Malcolm Lashley placed that dot.  But what I do remember

15    is that he said he was across the street.  He said he was right

16    across the street.

17            What I also remember is that the photo that

18    Mr. Hazlehurst showed you of the car, the victim's car after

19    it's being shot up, it is going uphill.  And you get an angle

20    that shows the tops of the trees there.

21            But if you think back to when we watched the

22    Antoine Ellis video -- remember we watched that lengthy video

23    that Ms. Perry played for you with Detective Juan Diaz on the

24    stand.  And it was from the BP gas station, and it was looking

25    across the street.

1          And you watched over a period of several minutes as

2    Dontray Johnson and Antoine Ellis walked across the street to

3    that baseball field where Dontray Johnson then killed

4    Antoine Ellis.

5          There are trees, yes, but you can see -- below where

6    the leaves are, you can see through to where they walked across

7    to the baseball field, so you can see across the street to the

8    baseball field.

9          Furthermore, the crime scene photo that Mr. Hazlehurst

10   showed you shows that the cones were placed where the casings

11   were recovered.

12         And the cones, if you look, are -- they start where

13   the victim's car is, and they move up the street towards the

14   baseball field.

15         So basically, I believe what Detective Carvell

16   testified to was that this indicates that the shooter's vehicle

17   was moving past the victim's car as the shots were being fired,

18   which means that the shooter's car would have driven right past

19   that baseball field.

20         So it makes perfect sense that Malcolm Lashley would

21   have seen this from across the street.  There's no reason to

22   doubt that.

23         William Banks testified that he heard about it

24   immediately afterward.  And Mr. Hazlehurst faulted Mr. Banks

25   for not mentioning Konan in the grand jury, and I think he

1    makes too much of that.

2          William Banks testified that he went up to the BP gas

3    station right after the shooting, and Konan told him what

4    happened.  And he said Creams was standing right there as Konan

5    told him.

6          So Creams was basically part of the conversation.  And

7    we can assume that what Konan was saying while Creams was

8    standing right there was basically adopted by Creams.

9          So you have Malcolm Lashley's eyewitness account.  You

10   have Creams' admission, what amounts to an admission to

11   William Banks afterward.  And then you have the jail call with

12   Sydni Frazier.

13         And Mr. Hazlehurst argued that when he says

14   "green tip" in this call, he's talking about drugs, not about a

15   car.  And I encourage you to go back and listen to the call,

16   review the transcript.

17         They are talking about a car.  They are talking about

18   Shakeen Davis's coupe.  And Sydni Frazier asks him what color

19   it is.  He specifically asks what color the car is.

20         And that's when Shakeen Davis says that he had it

21   repainted 'cause he, quote, did some dumb shit out of there.

22         Now, Mr. Hazlehurst made a big deal of the fact that

23   the AR-15 that was recovered from Creams in April 2016 was not

24   the AR-15 that Creams used to shoot at those guys.

25         And I think I told you that in my opening statement,

 1  and that's not too surprising.  It's almost a year later when

 2  that AR-15 is recovered from Shakeen Davis.  It's almost a year

 3  after the shooting.

 4       So it's not surprising that in that time, he would

 5  have gotten rid of the gun that he used to commit a shooting.

 6  He would have gotten a new gun.

 7       And you heard -- you heard from Jarrud Dixon, among

 8  other witnesses, how easy it was for members of the gang to

 9  acquire firearms from drug customers driving in from

10  Western Maryland and other states.

11       But it still goes to his modus operandi.  He had a

12  penchant for AR-15s.  You saw it in his text messages too.  He

13  kept one in his trunk.  That was his MO.

14       I think Mr. Hazlehurst, he also mentioned hearing

15  about the shooting from Kane.  And I think there may have been

16  some confusion on this point.

17       Again, your memory controls, but I believe

18  Malcolm Lashley testified that he heard about the Nutty B

19  murder from Kane, not that he heard about the shooting by

20  Creams from Kane.  He saw the shooting by Creams himself with

21  his own eyes, but he heard about the Nutty B murder from Kane

22  after the fact.

23       So I want to talk very briefly about the verdict forms

24  that you're going to be asked to fill out, and I'm about to

25  wrap up.

```
 1              If you find the defendant guilty of Count 1,
 2    racketeering conspiracy, you'll then be asked to make a
 3    determination as to which racketeering activities were
 4    reasonably foreseeable to the defendant in furtherance of the
 5    conspiracy.
 6              And there's going to be a list for you, and I believe
 7    Mr. Sardelli put it up on the screen for you.  It will be
 8    murder, witness tampering, witness retaliation, drug
 9    trafficking, drug-trafficking conspiracy, and so on.
10              And remember that you're not being asked to find:  Did
11    this defendant commit a murder?  Did he commit witness
12    tampering?
13              You are simply being asked whether those types of
14    crimes were reasonably foreseeable to him as part of the
15    conspiracy.
16              Of course, if you find that the defendant personally
17    committed a murder or ordered a murder or attempted to commit a
18    murder in furtherance of the gang or conspired to commit a
19    murder, then murder was reasonably foreseeable to him.
20              But there are a lot of other ways you could find that
21    murder was foreseeable to these defendants.
22              I think I told you in opening, you really couldn't
23    join this gang without knowing that its members would commit
24    murder.  Murder was built into the oath, the rules, and the
25    name of the gang itself.
```

 1           Remember the Omertà code:  My blood is my honor.  My

 2    honor is my blood.  If I ever dishonor, take my blood.

 3           One of the founding rules of the gang was that

 4    cooperating with law enforcement is punishable by death, and we

 5    saw that rule put into practice again and again.

 6           The attempted murder of Snook outside club Mirage.

 7           The murder of Ricardo Johnson.

 8           The plot to kill Trouble when it was learned he was

 9    cooperating against Spittle.

10           The plot to kill Champagne after he entered a

11    cooperation plea agreement.

12           So murder and witness tampering and witness

13    retaliation are baked into the rules of the gang.

14           They make their money selling drugs.  But they need

15    violence to protect their turf, enforce their rules, and

16    prevent successful prosecution by law enforcement.  That's what

17    allowed this gang to dominate the drug market for so many

18    years.

19           So, in conclusion, ladies and gentlemen, this wasn't a

20    fiction.  This wasn't just a rap lyric.  It was over six years

21    of murder and mayhem.

22           And by intimidating and retaliating against witnesses,

23    the defendants created a culture of fear and contempt for the

24    rule of law, all with the goal of never ending up here in a

25    court of law, facing a jury of citizens just like you.

1          Mr. Enzinna was absolutely right when he said that the

2    right to a trial by jury is one of the most important rights

3    that we as citizens have in this country, and we're indebted to

4    you for your service as jurors in this case.

5          The beyond-a-reasonable-doubt standard is high, as it

6    should be.  But the evidence in this case far surpasses it.

7          The word "verdict" comes from the Latin "verdictus,"

8    which means "to speak the truth."

9          You have the opportunity in this case to speak the

10   truth.  Find the defendants guilty.

11         Thank you.

12         **THE COURT:**  Thank you, Ms. Hoffman.

13         In conclusion, ladies and gentlemen, let me remind you

14   that your verdict must be unanimous, reflecting the judgment of

15   each and every one of you.

16         You should consider it in the jury room deliberately

17   and carefully, in light of the instructions I've given you.

18         You should use the same common sense and the same

19   intelligence that you would use in determining any important

20   matter that you have to decide in the course of your own

21   affairs.

22         It is your duty as jurors to consult with one another

23   and deliberate with a view to reaching an agreement, if you can

24   do so without violence to individual judgment.

25         So each of you must decide the case for yourself, but

1   do so only after an impartial consideration of the evidence

2   with your fellow jurors.

3        In the course of your deliberations, do not hesitate

4   to re-examine your own views and change your opinion, if

5   convinced it is erroneous.

6        But do not surrender your honest conviction as to the

7   weight or effect of evidence solely because of the opinion of

8   your fellow jurors or for the mere purpose of returning a

9   verdict.

10        If, after carefully considering all of the evidence

11   and the arguments of your fellow jurors, you entertain a

12   conscientious view that differs from the others, you are not to

13   yield your conviction simply because you are outnumbered.

14        Now, as I think I mentioned a long time ago back at

15   the beginning of this case, when you retire to the jury room,

16   one of your first duties will be to elect a foreperson.  It can

17   be any one of you.  The foreperson does not get an extra vote,

18   but that person will preside over your deliberations and be

19   your spokesperson in court.

20        If it becomes necessary during your deliberations to

21   communicate with the Court, you can send out a note.  There

22   will be a court security officer posted outside the door.

23        You should not attempt to communicate with the Court

24   except in writing.

25        You'll be able to tell from the oath that the court

 1    security officer takes that he, as well as all other persons,

 2    are forbidden from communicating in any way or manner with any

 3    member of the jury on any subject touching the merits of the

 4    case.  I mean your discussion of the evidence.

 5              And you should also keep in mind that you should not

 6    tell the Court or anyone else how you stand in terms of any

 7    numerical division, any vote that you might take, until after

 8    you've reached a unanimous verdict.

 9              As I've told you and counsel have mentioned, to record

10    your verdicts in this case, there are verdict forms.  There is

11    one for each defendant, and you consider them separately and

12    consider the counts separately, as I've told you.

13              I'm not going to review them all with you again

14    because I did that earlier, but it will take you through

15    Counts 1 and 2 and any other count that are applicable,

16    depending on the defendant you are considering.  And there will

17    be certain questions for you to answer unanimously.

18              Once you've reached a unanimous agreement, your

19    foreperson should fill out the verdict form in accordance with

20    the agreement and sign it and date it.  There's a place at the

21    end for the date and signature of the foreperson.

22              Once you have agreed and finished completing all the

23    verdict forms, the foreperson should just knock on the door,

24    let the clerk or the court security officer know simply that

25    you have agreed upon a verdict.

1    You shouldn't disclose or indicate in any way what the

2    verdicts are at that time because the verdicts have to be

3    announced for the first time in open court.

4    So when you come back to the jury box, after your

5    deliberation is done, the clerk will ask something like:  Have

6    you agreed upon your verdict?

7    And we hope you will collectively respond that you

8    have.

9    The clerk will ask something like:  Who shall speak

10   for you?

11   And you should respond your foreperson, whoever that

12   is.

13   The foreperson will be asked to stand and present the

14   verdict forms to the clerk.  She'll show them to me.

15   And after they are reviewed, the clerk and the

16   foreperson, most likely, will be asked to read the verdicts out

17   loud in open court.

18   I'll just remind you, as you've already been told, but

19   this also applies, of course, to your deliberations:  You

20   should not be conducting any research.  You should not use any

21   outside source to learn more about this case.  You should not

22   communicate with anyone other than your fellow jurors about

23   this case, again, the merits, your discussions of the evidence,

24   any of that.

25   Until the jury comes back and returns its verdicts in

1   open court, you should just not comment in any way -- in

2   person, over the telephone, through the Internet, or any other

3   means -- about this case.  It's only to be discussed with your

4   fellow jurors.

5          Now, while you are in the jury deliberation room --

6   and I'm sure Ms. Moyé will make this clear as well -- your

7   electronic devices, if any, must be completely off.

8          Only when you are on a break from deliberations may

9   you turn on your cell phone or any other electronic device to

10  communicate with anyone outside of your fellow jurors.  Again,

11  only to discuss matters that are not related to this trial.

12         All right.  The last thing that I have to do before

13  sending you out -- and I never know whether this is going to

14  make people happy or unhappy -- but we do have four alternates

15  in this case.

16         It is extremely important to have alternates.  In

17  fact, it's quite remarkable that all of the jurors are still

18  here and still serving.  We're very glad of that fact.

19         I am not allowed, unfortunately, to include the

20  alternates in the deliberations, so I'm going to excuse the

21  alternates at this time.

22         However, having said that, just in case -- we

23  certainly hope not -- but if there is any issue with any of the

24  other jurors before deliberations are finished, I will ask the

25  four alternates -- instruct the four alternates to continue to

 1   follow the instructions.

 2        Don't discuss this case with anyone.  Don't talk about

 3   it.  Don't do any research on it.  Don't Facebook, Internet,

 4   anything like that.

 5        And please make sure that Ms. Moyé knows how to reach

 6   you just in case you would be needed at some point during the

 7   deliberations.

 8        But at this point, I have to excuse you.  I'll ask you

 9   to go back in the jury room with Ms. Moyé.

10        (Alternate jurors excused at 1:09 p.m.)

11        **THE COURT:**  All right.  If I could see counsel at the

12   bench just briefly.

13        (Bench conference on the record:

14        **THE COURT:**  Just to be clear, what I'm going to do

15   now, what I'll tell the jury is I will be sending in the

16   instructions.  I'll probably give them several copies.

17        We'll be sending -- Counts 1 through 3 are contained

18   in there, but they'll get copies of the other ones.  You can

19   look at them and make sure -- but eventually the exhibits will

20   be sent in.

21        I'm going to tell them that if they need to see any of

22   the alleged drugs or firearms or listen to recordings, that

23   they will need to send out a note and come back in for that

24   purpose; but, otherwise, we'll gather up the exhibits and send

25   them back in.

1      **MS. AMATO:**  Do they begin deliberation immediately?

2  Or do they go to lunch?  Or how --

3      **THE COURT:**  They have had lunch ordered for them.

4      **MS. AMATO:**  Oh, okay.  So they have lunch if they need

5  one.

6      **THE COURT:**  So they do not need to go out.

7      We will also tell them that the length of their

8  deliberations is entirely up to them; that if we haven't heard

9  anything from them by 5 o'clock, I'll be calling them back in

10  to see if they want to continue deliberating or retire and go

11  home and come back the next day.

12      Okay.  All right.  Thank you.)

13      (Bench conference concluded.)

14      **THE COURT:**  All right.  Ladies and gentlemen, in just

15  a moment we'll have the court security officer take the oath,

16  and you'll be going back into the deliberation room.

17      It will take a few minutes, but we will be gathering

18  together -- I'll give you several copies of the jury

19  instructions.

20      The jury instructions incorporate -- they include

21  Counts 1 through 3.

22      There were some other counts, separate counts that I

23  mentioned.  We'll send separate copies of those other counts

24  back in just so that you can follow them easily along with the

25  verdict form.

JURY INSTRUCTIONS

 1          We will also be gathering up most of the exhibits and

 2   sending them back in to you.

 3          We will not be sending in the alleged narcotics and

 4   firearms and the actual recordings of conversations.  You'll

 5   have the transcripts.  But, again, as I told you, the

 6   transcripts are just an aid.

 7          If you want to hear any of the recordings again, if

 8   for any reason you wish to see any of the evidence that has not

 9   been sent back, such as the alleged narcotics or firearms,

10   you'll need to let us know.  And we'll bring you back into

11   court in order that you can examine that evidence or listen to

12   those recordings again.

13          The other thing is that the length of your

14   deliberations is entirely up to you.

15          If we have not heard from you by about 5 o'clock, I

16   will probably -- I will gather again.  I'll bring you back into

17   court and just ask you whether you wish to continue

18   deliberating past 5 o'clock or go home and come back and

19   continue the deliberations tomorrow morning.

20          So that would be the schedule.

21          We'll have the court security officer sworn.

22          **THE CLERK:**  Please raise your right hand.

23           DAVID COBB, COURT SECURITY OFFICER, SWORN.

24          **THE CLERK:**  Please state your name for the record.

25          **COURT SECURITY OFFICER:**  David Cobb, C-O-B-B.

```
 1              THE CLERK:  Thank you.

 2              THE COURT:  All right.  Ladies and gentlemen, if you

 3     would, you can, of course, gather up any notes or things that

 4     you have and go into the jury deliberation room.  And you will

 5     also have lunch.  There is lunch for you.

 6              THE CLERK:  It's there.

 7         (Jury retired to begin deliberations at 1:14 p.m.)

 8              THE COURT:  All right.  We'll excuse the gallery.

 9         (Pause.)

10              THE COURT:  All right.  I'm going to have some

11     additional copies of the instructions and the verdict forms

12     made and send them back down.

13              And if counsel can also take a look and get the extra

14     counts of the indictment that you all agree upon can be sent

15     back, and, of course, agree on the exhibits going back so that

16     only the correct exhibits go back.  And be somewhere where

17     Ms. Moyé can reach you after that quickly in case there's a

18     question or anything from the jury.

19              Other than that, we will -- yes, Mr. Hazlehurst?

20              MR. HAZLEHURST:  Your Honor, I had lodged an objection

21     originally when the Government was questioning Mr. Banks in

22     regard to DEM-6, which was the glossary that the Government was

23     preparing as he testified.  And I believed it to be inaccurate.

24              Also, Your Honor, quite frankly, I still believe that

25     the jury's memory, because they were all taking notes as he
```

```
1    testified, should control.

2         So I would like to note an objection to DEM-6 going

3    back.  And I think at the time when I made the objection, I

4    think Your Honor -- it was very early on in the trial -- and

5    said, Well, we'll get to that.

6         But, again, I just wanted to reiterate that objection

7    and note it for the record.

8         THE COURT:  Okay.

9         MR. SARDELLI:  And, Your Honor, just so I understand

10   this correctly, you know, as to the counts Mr. Banks was

11   charged with, the indictment's not going back; correct?

12        THE COURT:  That is correct.  We are not sending back

13   the full indictment with everything in there for Counts 1, 2 --

14   for that matter, 3.

15        We are sending back -- and you can certainly look at

16   them before they go back, just to make sure that it's what you

17   think it is, but it's supposed to be just the separate pages

18   of -- and for your client, that's nothing because it's only 1

19   and 2.

20        MR. SARDELLI:  Yes, Your Honor.  Thank you.

21        THE COURT:  Okay.  Any other objection or issue

22   relating to the exhibits?

23        MS. HOFFMAN:  I think we should probably discuss -- so

24   as to the social media exhibits, Ms. Whalen had filed a motion

25   to exclude all social media that hadn't yet come into evidence.
```

 1          And I think we ended up kind of dealing with it on a

 2    case-by-case basis.  But then the question remains:  What

 3    actually goes back to the jury now?

 4          We have, similar to the text messages where we, you

 5    know, pulled out certain excerpts from cell phones and then

 6    only read certain parts of it into the jury, we did the same

 7    thing with the social media excerpts.  So we picked out

 8    excerpts.  We only ended up reading certain parts of them to

 9    the jury.

10          We would like to send all of them back to the jury

11    except for the things that have been objected to and Your Honor

12    has sustained.

13          But we wanted to know what Your Honor's ruling would

14    be on that.

15          I assume Ms. Whalen objects and only wants what's

16    come -- the literal pages that have come in to go back.

17          **MS. WHALEN:**  And that is correct, Your Honor.  I think

18    the whole notion -- or the whole motion was relating to our

19    ability to have notice of what's going to be played or played

20    and/or shown to a witness and to be able to object.

21          And so whatever has been shown and you've overruled

22    objections, of course, we have no problem with that going back

23    to the jury.

24          But these extra items that are out there that we have

25    not seen or heard about, we do object.

```
1            THE COURT:  I guess my assumption on the social media

2     was that what was shown to the jury was what was being

3     admitted.  I mean was going to go back to the jury as well,

4     that you had the opportunity to pick out and show quite a bit,

5     and that anything else was going to be cumulative and didn't

6     add to the evidence.  I think it's a lot safer to just send

7     back what the jury saw.

8            MS. HOFFMAN:  I think it's slightly complicated for us

9     because then we need to go through and figure out exactly which

10    pages were put on the screen.  We can do that, but it will take

11    us a little bit of time.

12           So I think probably, if that's Your Honor's ruling,

13    we'll have to send everything else back to the jury first and

14    then take some time going through to figure out --

15           THE COURT:  Okay.

16           MS. HOFFMAN:  -- going through our notes, because I

17    believe Ms. Moyé stamped the whole -- you know, the whole --

18    the same for the text messages; right?

19           THE COURT:  Right.

20           MS. HOFFMAN:  So we're going to have to look through

21    our notes to figure out what pages were put on the screen and

22    redact the -- we'll want to keep the same pagination so that

23    the record is clear on appeal.

24           So I think we'll just have to -- if there is a page

25    that didn't -- wasn't shown, then we'll have to redact that
```

1    page, basically.

2         **THE COURT:**  Okay.  All right.  Well, you're right;

3    that will, unfortunately, take some time.  But it seems like

4    the safest thing to do.  Okay.

5         And in the absence of any additional objection, I

6    think the argument that it is -- well, let's see.

7         The demonstrative exhibit that's being objected to is

8    just Mr. Banks' list of terms; is that right?

9         **MR. HAZLEHURST:**  On behalf of Mr. Davis, yes, that is

10   the objection, Your Honor.

11        **THE COURT:**  Okay.

12        **MR. TRAINOR:**  Your Honor, my client had a question.

13        As to the transcripts that are going back, are those

14   only the transcripts of calls that were actually played for the

15   jury?

16        **THE COURT:**  I would think so.  Is that going to

17   require -- are there a lot of calls in the transcript books

18   that weren't played?

19        **MS. HOFFMAN:**  There are.  There are a significant

20   number of calls that we didn't end up playing.  They all came

21   into evidence on a disc -- well, there were several wire discs

22   and a jail disc.  But there were calls that weren't played.

23        **THE COURT:**  All right.  Which means that at this point

24   we should retrieve the transcript books and remove the

25   transcripts of calls that were not played.

```
 1              Okay.  Thank you.
 2              Do you want to be heard on the Demonstrative No. 6,
 3     Mr. Banks' list of words?
 4         MS. HOFFMAN:  Sure.
 5              Just briefly, though, on the latter point, does that
 6     mean that -- so if the transcripts of the calls that aren't
 7     played are not going back, does that mean that the calls that
 8     weren't played are not in evidence?
 9         THE COURT:  Not in evidence for the jury to consider
10     at this point.  I don't know exactly if there's some other
11     way -- if you want to preserve the fact that they were all in
12     evidence at one point, I mean, that they exist.
13              But it's going to be -- I think it would be a little
14     difficult to let the jury be sort of flipping through
15     transcripts of calls that they didn't hear.
16         MS. HOFFMAN:  Sure.
17         THE COURT:  So I do think those need to come out.
18         MS. HOFFMAN:  Okay.
19         THE COURT:  They're identified.  They're part of the
20     evidence in that sense, I mean.
21         MS. HOFFMAN:  As to DEM- -- now I can't remember if
22     it's DEM-5 or -6.
23         THE COURT:  -6.
24         MS. HOFFMAN:  The glossary, we do ask that that be
25     sent back to the jury.  I do think it's a helpful memory aid to
```

1    them.

2         As Your Honor knows, typically in cases like this, the

3    Government will call some kind of drug expert to talk about the

4    meaning of various drug terminology.  We didn't do that in this

5    case.  We thought it would save time and maybe even be more

6    credible coming from someone on the street.

7         But we do think it's an important and helpful memory

8    aid for them.

9         **THE COURT:**  All right.  And I will let that one go

10   back.  I see it sort of in the same category as the chart of

11   photographs and nicknames.  It's part of the evidence, and it's

12   something that helps them make sense of what's been a long,

13   complicated trial.

14        So Ms. Moyé can get the transcript books back, and

15   counsel can begin the process of making clear that only the

16   appropriate exhibits go back.

17        In the meantime, the jury presumably can have lunch

18   for a little while, and I will get some additional copies of

19   the instructions and the verdict forms.

20        **MR. SARDELLI:**  Just one issue, Your Honor.  Since they

21   have taken them back there already -- and I don't know if they

22   have taken them back during the course of the trial.  Do we

23   need an instruction about if they've already previously looked

24   at the calls and stuff?  Because they may be back there right

25   now already looking through the calls and going through the

1    evidence.  And so that could cause a problem for the record,

2    Your Honor.

3         **THE COURT:**  I think I was pretty clear on the

4    recordings being the evidence and that's -- the transcripts

5    being only an aid.

6         And so the only thing they could be considering are

7    the recordings that were played.  So I appreciate that.

8         But I think if we get the transcripts back and they

9    listen to all my other instructions, it should be not a

10   problem.

11        Anything else?

12       (No response.)

13        **THE COURT:**  Okay.  We'll be in recess until we hear

14   from the jury or until 5 o'clock, at which point everybody

15   should be back in court.

16        Thank you.

17       (Recess taken.)

18       (5:03 p.m.)

19        **THE COURT:**  All right.  Good afternoon, everybody.

20        I have a note to send in to the jury which says

21   [reading]:  Dear jurors, do you want to continue deliberating

22   until 5:30 today?  Do you want to come back tomorrow at 9:00,

23   9:30, or 10:00?

24        So I would propose to send them the note and see what

25   response we get.

1          And while we're waiting, I assume counsel were able to

2    go through and remove the transcripts and take care of the

3    social media exhibits and all that sort of thing?

4          **MS. HOFFMAN:**  We're still working on it.  We made some

5    progress, but we are still making copies of the new set of

6    transcripts.  The binders were double-sided, so we have to redo

7    everything.

8          And we have iCloud exhibits we finished going through.

9    We just have to compare with Defense.

10         And we've gone through about half of the social media,

11   and we'll then have to compare with the defense.

12         And so we probably won't be able to have it ready to

13   go back to the jury until tomorrow morning.

14         **THE COURT:**  Tomorrow morning.  Okay.

15       (Pause.)

16         **THE COURT:**  Okay.  Excuse me.  The answer to the first

17   question, "Do you want to continue deliberating until

18   5:30 today?" is "no."

19         And the answer to the second question is, "Do you want

20   to come back tomorrow?" and they've circled "9:00."  They would

21   like to come back at 9 o'clock.

22         I am going to invite them in, give them the usual

23   closing instructions, and tell them they can come back at 9:00.

24         I do not need counsel and everybody in court at 9:00.

25   I will just tell them not to begin deliberating until they are

```
 1    all together.
 2          (Jury entered the courtroom at 5:07 p.m.)
 3          THE COURT:  So, ladies and gentlemen, thank you for
 4    your response to the note.  I think you're ready to go home
 5    today and starting tomorrow morning at 9 o'clock.  Thank you.
 6          I will just give you the usual instructions:  Leave
 7    all your notes here.  Don't talk about the case.
 8          When you come back tomorrow morning, don't begin
 9    deliberating until you're all back together again.  Once you're
10    all together, then you can begin the deliberations again.
11          My understanding is that you have received some
12    exhibits, not all.  Counsel are in the process of making sure
13    that only, for example, from the social media, that you get
14    what was shown to you; and that as far as the transcripts and
15    the books, to make sure that you have the transcripts for the
16    recordings that you actually listened to.
17          As I told you, the recordings are the evidence, and so
18    we want to make sure that you have the transcripts just for
19    those recordings.
20          So I think that tomorrow morning at some point, I hope
21    early, the rest of that will be ready to come in to you.
22          So, in any event, thank you very much.
23          Again, leave your notes here.  Don't talk about the
24    case.  And when you're all back together tomorrow morning at
25    9 o'clock, you may continue deliberating.
```

 1              Thank you very much.

 2         (Jury excused at 5:09 p.m.)

 3              **THE COURT:**  Counsel, any issues?

 4              **MS. HOFFMAN:**  No issues; but if defense counsel can

 5    stick around.

 6              **THE COURT:**  I'm sorry.  I can't hear you.

 7              **MS. HOFFMAN:**  If defense counsel could remain just to

 8    go through what we've pulled out of the exhibits, that would be

 9    helpful so we can at least get on the same page about the ones

10    we've gone through.

11              **THE COURT:**  Okay.  That would be helpful.

12              All right.  We'll excuse the gallery.

13              All right.  And I expect everyone will be here and

14    available again by 9:00 in the morning, but we don't need to

15    all gather.  We'll wait to hear something from the jury.

16              Okay.  We're in recess.  Thank you.

17         (Court adjourned at 5:11 p.m.)

18         I, Douglas J. Zweizig, RDR, CRR, FCRR, do hereby certify

19    that the foregoing is a correct transcript from the

20    stenographic record of proceedings in the above-entitled

21    matter.

22              _____/s/_____

23              Douglas J. Zweizig, RDR, CRR, FCRR
                  Registered Diplomate Reporter
24                Certified Realtime Reporter
                Federal Official Court Reporter
25                  DATE:  November 20, 2019

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
            Plaintiff,            )
 4                               )
            vs.                   )  CRIMINAL CASE NO. CCB-16-0267
 5                               )
     DANTE BAILEY, et al.,        )
 6          Defendants.           )
     _____ )
 7

 8

                        Tuesday, April 30, 2019
 9                        Courtroom 1A
                        Baltimore, Maryland
10

11        BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                      (AND A JURY)
12

13                        VOLUME XXII

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Assistant United States Attorneys

17   For the Defendant Dante Bailey:

18   Paul Enzinna, Esquire
     Teresa Whalen, Esquire
19
     _____
20

21

22
                        Reported by:
23
                  Douglas J. Zweizig, RDR, CRR, FCRR
24               Federal Official Court Reporter
                 101 W. Lombard Street, 4th Floor
25                  Baltimore, Maryland  21201
```

1   For the Defendant Randy Banks:

2   Brian Sardelli, Esquire

3

    For the Defendant Corloyd Anderson:

4   Elita Amato, Esquire

5

6   For the Defendant Jamal Lockley:

7   Harry Trainor, Esquire

8

    For the Defendant Shakeen Davis:

9   Paul Hazlehurst, Esquire

10

11  Also Present:

12  Special Agent Christian Aanonsen, ATF

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2        (Jury resumed deliberations at 9 o'clock a.m.)

 3        (11:41 a.m.)

 4        THE COURT:  All right.  As I think you all know, we

 5   have a note from the jury which simply says:  Do we or can we

 6   have May 12th, 2016 arrest report involving Randy Banks?

 7            It would be my recollection that that was not admitted

 8   into evidence.  And so I might -- I can call them back in and

 9   tell them that, or I can simply write a note back to them.

10        MR. SARDELLI:  Either way is acceptable to the

11   defense, Your Honor.

12        THE COURT:  Okay.

13        MS. HOFFMAN:  We defer to the Court.

14            If I simply say, "The report was not admitted into

15   evidence, so we cannot give it to you," satisfactory?

16        MR. SARDELLI:  Yes, ma'am.

17        MS. HOFFMAN:  Yes.

18        THE COURT:  Okay.  Perhaps counsel could update me on

19   the status of all the exhibits and transcripts and so forth.

20            Ms. Hoffman.

21        MS. HOFFMAN:  So the transcript binders were

22   completed, and they went back to the jury this morning.

23            And we are getting close to being done with the social

24   media.  We sent the pages that our records reflect came into

25   evidence to defense counsel last night, and we're just
```

1   finishing making the redactions now.

2          **THE COURT:**  All right.  So far, satisfactory to

3   defense counsel?

4          **MS. WHALEN:**  Yes, Your Honor.

5          **THE COURT:**  All right.  Then I will just send that

6   answer to the note back in and we can be in recess again until

7   we hear from the jury.

8          (Recess taken.)

9          (2:06 p.m.)

10         **THE COURT:**  All right.  We have a note from the jury,

11  and I believe you've all been given a copy.

12         But for the record, the note says [reading]:

13  Judge Blake, the jury is unable to reach a verdict on

14  Randy Banks.  We have had a hard look at the evidence but are

15  split about equally as to his guilt.

16         So there are various options, obviously, at this time

17  and which I have thought about and found a couple of perhaps

18  relevant cases on.

19         I would note that part of what I might say back to

20  them is to remind them that I told them not to tell us what

21  their numerical division was until they had reached a unanimous

22  decision, so they seem to have missed that point.

23         Would anyone like to be heard?  I can tell you what I

24  am contemplating is essentially a version of an <u>Allen</u> charge.

25         But something along the lines of telling the jury that

```
 1   there are five defendants on trial and that they should

 2   continue deliberating as to the other defendants and that at a

 3   later point, they may decide to return to their consideration

 4   of Mr. Banks, and to give them the generally approved version

 5   of the Allen charge, which, of course, tells them that the

 6   majority should consider the minority as well as the minority

 7   considering the majority and so forth.

 8            But I am happy to hear what anybody wants to suggest.

 9   It's obviously not been a very long time yet.

10            In fact, while you're thinking, part of what I'm

11   looking at -- it's unpublished, but it's a Fourth Circuit

12   opinion from just 2016, a case in front of Judge Bredar where

13   the jury sent out a note after -- it was only three weeks of

14   trial, ten hours of deliberation.  They sent out a note

15   essentially indicating a deadlock for one defendant, and there

16   were three defendants.  And Judge Bredar told them to keep

17   deliberating, essentially.

18            MR. SARDELLI:  Your Honor, I've talked to my client,

19   Your Honor, and I understand the Court's inclination.

20            But, for the record, we would object to the Allen

21   charge, and we would ask for a mistrial.

22            THE COURT:  All right.  So your alternative would just

23   be a mistrial at this point as to Mr. Banks?

24            MR. SARDELLI:  Yes, ma'am.

25            THE COURT:  Okay.  Anybody else want to be heard?
```

1          **MS. HOFFMAN:**  Your Honor, we do think that, you know,

2    not much time has passed.  It is too soon for that.  And we do

3    agree with Your Honor's suggestion of an <u>Allen</u> charge.

4          **THE COURT:**  Okay.  We can get the jury.

5          (Jury entered the courtroom at 2:11 p.m.)

6          **THE COURT:**  All right.  So, ladies and gentlemen, I do

7    have a note from you which I assume you are all aware of.  But

8    just to be absolutely clear, I'll read it.

9          It says [reading]:  Judge Blake, the jury is unable to

10   reach a verdict on Randy Banks.  We have had a hard look at the

11   evidence but are split about equally as to his guilt.

12         So I have a response for you at this time.

13         First of all, of course, there are five defendants on

14   trial.  We did give you five verdict sheets.  And I suggest

15   that you continue deliberating as to the other defendants.  And

16   at a later point, you may decide to return to your

17   consideration of Mr. Banks.

18         Please keep in mind for the future that I did ask you

19   not to tell us what your numerical division is until after you

20   reach a unanimous verdict.

21         Let me say something about your reaching a verdict,

22   your process of reaching a verdict generally.

23         In order to return a verdict that will finally decide

24   this case, either guilty or not guilty as to any defendant, it

25   does require a unanimous decision.  All 12 of you have to

1    agree.

2             This has been a lengthy case.  There are a lot of

3    exhibits.  And you're conscientious, obviously.  It's not

4    surprising that it might take some time to resolve the issues.

5             Like all cases in this courthouse, it's important to

6    both the defendants and to the Government that there be a

7    decision if it's possible without doing violence to anyone's

8    conscientious conviction about the weight of the evidence.

9             There's no reason to believe that another jury of 12

10   other women and men would be any better able to sift through

11   the evidence and come to a just verdict, so I do ask you to

12   continue talking.

13            Whether you are in the majority or in the minority on

14   these questions, I would ask that you reconsider your position

15   in light of the fact that there are other jurors who were just

16   as conscientious and impartial as you who have come to a

17   different conclusion.

18            Each juror who finds himself in the majority should

19   consider the views of the minority and vice versa.

20            Please -- and I don't suggest that you're doing

21   this -- but please don't just turn your back and refuse to

22   listen to your fellow jurors.  It's important to continue

23   deliberating.

24            Thank you very much.  Ms. Moyé will take you back in.

25            (Jury left the courtroom at 2:14 p.m.)

 1          **THE COURT:**  All right.  If we don't hear from them

 2    before 5 o'clock, we'll reconvene again at 5 o'clock and see

 3    what their plans are.

 4          Thank you.

 5       (Recess taken.)

 6       (3:23 p.m.)

 7          **THE COURT:**  All right.  As I think you know, we have

 8    another note from the jury which indicates that they have

 9    reached a verdict on all charges.

10          So we will bring them out.

11       (Jury entered the courtroom at 3:24 p.m.)

12          **THE COURT:**  All right, ladies and gentlemen.  We

13    understand you've reached a verdict on all charges.

14          Ms. Moyé.

15       **THE CLERK:**  We are here to receive the verdict in

16    Criminal No. CCB-16-0267, United States of America versus

17    Dante Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, and

18    Shakeen Davis.

19          Members of the jury, will you please answer to

20    roll call.

21          Juror No. 1?

22       **JUROR NO. 1:**  Here.

23       **THE CLERK:**  Juror No. 2?

24       **JUROR NO. 2:**  Present.

25       **THE CLERK:**  Juror No. 3?

```
 1              JUROR NO. 3:  Here.

 2         THE CLERK:  Juror No. 4?

 3         JUROR NO. 4:  Here.

 4         JUROR NO. 5:  Here.

 5         THE CLERK:  No; this one.

 6         JUROR NO. 5:  Okay.

 7         THE CLERK:  Juror No. 5?

 8         JUROR NO. 5:  Here.

 9         THE CLERK:  Juror No. 6?

10         JUROR NO. 6:  Here.

11         THE CLERK:  Juror No. 7?

12         JUROR NO. 7:  Here.

13         THE CLERK:  Juror No. 8?

14         JUROR NO. 8:  Here.

15         THE CLERK:  Juror No. 9?

16         JUROR NO. 9:  Here.

17         THE CLERK:  Juror No. 10?

18         JUROR NO. 10:  Here.

19         THE CLERK:  Juror No. 11?

20         JUROR NO. 11:  Here.

21         THE CLERK:  And Juror No. 12?

22         JUROR NO. 12:  Here.

23         THE CLERK:  Members of the jury, have you agreed on

24  your verdict?

25         THE JURY:  Yes.
```

 1          **THE CLERK:**  Who shall speak for you?

 2          **THE JURY:**  Our foreperson.

 3          **THE CLERK:**  Mr. Foreman, will you please rise.

 4          Has the verdict form which was submitted to the jury

 5     been answered, signed, and dated by you?

 6          **JURY FOREPERSON:**  It has.

 7          **THE CLERK:**  It's desired by the clerk to present to

 8     the Court.

 9        (The Court reviewed the verdict form.)

10          **THE COURT:**  Thank you (handing).

11          **THE CLERK:**  Mr. Foreman, as I read the questions,

12     please provide the answers.

13          Verdict form as to Dante Bailey:

14          How do you find the Defendant Dante Bailey as to

15     Count 1 of the indictment, conspiracy to participate in the

16     affairs of a racketeering enterprise?

17          **JURY FOREPERSON:**  Guilty.

18          **THE CLERK:**  What type or types of racketeering

19     activity were reasonably foreseeable to Mr. Bailey in

20     furtherance of the racketeering conspiracy?

21          **JURY FOREPERSON:**  Murder, extortion, conspiracy to

22     distribute and possess with the intent to distribute controlled

23     substances, distribution and possession with the intent to

24     distribute controlled substances, witness tampering, witness

25     retaliation.

1    **THE CLERK:**  What type or types of drugs were

2 reasonably foreseeable to Mr. Bailey as part of that

3 racketeering activity?

4    **JURY FOREPERSON:**  Heroin, cocaine, cocaine base.

5    **THE CLERK:**  What is the quantity of heroin foreseeable

6 to Mr. Bailey as part of that racketeering activity?

7    **JURY FOREPERSON:**  1 kilogram or more.

8    **THE CLERK:**  What is the quantity of cocaine base

9 (crack) foreseeable to Mr. Bailey as part of that racketeering

10 activity?

11    **JURY FOREPERSON:**  280 grams or more.

12    **THE CLERK:**  As to Count 2, how do you find the

13 Defendant Dante Bailey as to Count 2 of the indictment,

14 conspiracy to distribute and possess with the intent to

15 distribute controlled substances?

16    **JURY FOREPERSON:**  Guilty.

17    **THE CLERK:**  What type or types of drugs were

18 reasonably foreseeable to Mr. Bailey in furtherance of the

19 drug-trafficking conspiracy?

20    **JURY FOREPERSON:**  Heroin, cocaine, cocaine base.

21    **THE CLERK:**  What amount or quantity of heroin was

22 reasonably foreseeable to Mr. Bailey?

23    **JURY FOREPERSON:**  1 kilogram or more.

24    **THE CLERK:**  What amount or quantity of cocaine base

25 (crack) was reasonably foreseeable to Mr. Bailey?

1        **JURY FOREPERSON:**  280 grams or more.

2        **THE CLERK:**  As to Count 3, how do you find the

3   Defendant Dante Bailey as to Count 3 of the indictment, murder

4   in aid of racketeering?

5        **JURY FOREPERSON:**  Guilty.

6        **THE CLERK:**  Count 17:  How do you find the

7   Defendant Dante Bailey as to Count 17 of the indictment,

8   possession of firearms by a felon?

9        **JURY FOREPERSON:**  Guilty.

10        **THE CLERK:**  Count 18:  How do you find the

11   Defendant Dante Bailey as to Count 18 of the indictment,

12   possession with intent to distribute heroin?

13        **JURY FOREPERSON:**  Guilty.

14        **THE CLERK:**  Thank you.

15        Mr. Banks:

16        Count 1:  How do you find the Defendant Randy Banks as

17   to Count 1 of the indictment, conspiracy to participate in the

18   affairs of a racketeering enterprise?

19        **JURY FOREPERSON:**  Not guilty.

20        **THE CLERK:**  Okay.  Count 2:  How do you find the

21   Defendant Randy Banks as to Count 2 of the indictment,

22   conspiracy to distribute and possess with the intent to

23   distribute controlled substances?

24        **JURY FOREPERSON:**  Guilty.

25        **THE CLERK:**  What type or types of drugs were

```
 1   reasonably foreseeable to Mr. Banks in furtherance of the
 2   drug-trafficking conspiracy?
 3            JURY FOREPERSON:  Cocaine base.
 4            THE CLERK:  What amount or quantity of heroin was
 5   reasonably foreseeable to Mr. Banks?
 6            JURY FOREPERSON:  We didn't find heroin.
 7            THE CLERK:  What amount or quantity of cocaine base
 8   (crack) was reasonably foreseeable to Mr. Banks?
 9            JURY FOREPERSON:  Less than 280 grams.
10            THE CLERK:  Mr. Lockley:
11            Count 1:  How do you find the Defendant Jamal Lockley
12   as to Count 1 of the indictment, conspiracy to participate in
13   the affairs of a racketeering enterprise?
14            JURY FOREPERSON:  Guilty.
15            THE CLERK:  What type or types of racketeering
16   activity were reasonably foreseeable to Mr. Lockley in
17   furtherance of the racketeering conspiracy?
18            JURY FOREPERSON:  Conspiracy to distribute and possess
19   with the intent to distribute controlled substances,
20   distribution and possession with the intent to distribute
21   controlled substances, witness tampering, and witness
22   retaliation.
23            THE CLERK:  What type or types of drugs were
24   reasonably foreseeable to Mr. Lockley as part of that
25   racketeering activity?
```

1          **JURY FOREPERSON:**  Heroin, cocaine, cocaine base.

2          **THE CLERK:**  What quantity or amount of heroin was

3     foreseeable to Mr. Lockley as part of that racketeering

4     activity?

5          **JURY FOREPERSON:**  1 kilogram or more.

6          **THE CLERK:**  What quantity or amount of cocaine base

7     (crack) was foreseeable to Mr. Lockley as part of that

8     racketeering activity?

9          **JURY FOREPERSON:**  280 grams or more.

10         **THE CLERK:**  Count 2:  How do you find the

11    Defendant Jamal Lockley as to Count 2 of the indictment,

12    conspiracy to distribute and possess with the intent to

13    distribute controlled substances?

14         **JURY FOREPERSON:**  Guilty.

15         **THE CLERK:**  What type or types of drugs were

16    reasonably foreseeable to Mr. Lockley in furtherance of the

17    drug-trafficking conspiracy?

18         **JURY FOREPERSON:**  Heroin, cocaine, cocaine base.

19         **THE CLERK:**  What amount or quantity of heroin was

20    reasonably foreseeable to Mr. Lockley?

21         **JURY FOREPERSON:**  1 kilogram or more.

22         **THE CLERK:**  What amount or quantity of cocaine base

23    (crack) was reasonably foreseeable to Mr. Lockley?

24         **JURY FOREPERSON:**  280 grams or more.

25         **THE CLERK:**  Count 10:  How do you find the

1   Defendant Jamal Lockley as to Count 10 of the indictment,

2   distribution of cocaine base?

3            **JURY FOREPERSON:**  Guilty.

4            **THE CLERK:**  Thank you.

5            Mr. Anderson:

6            Count 1:  How do you find the

7   Defendant Corloyd Anderson as to Count 1 of the indictment,

8   conspiracy to participate in the affairs of a racketeering

9   enterprise?

10           **JURY FOREPERSON:**  Guilty.

11           **THE CLERK:**  What type or types of racketeering

12  activity were reasonably foreseeable to Mr. Anderson in

13  furtherance of the racketeering conspiracy?

14           **JURY FOREPERSON:**  Conspiracy to distribute and possess

15  with the intent to distribute controlled substances,

16  distribution and possession with the intent to distribute

17  controlled substances.

18           **THE CLERK:**  What type or types of drugs were

19  reasonably foreseeable to Mr. Anderson as part of that

20  racketeering activity?

21           **JURY FOREPERSON:**  Heroin.

22           **THE CLERK:**  What amount or quantity of heroin was

23  foreseeable to Mr. Anderson as part of that racketeering

24  activity?

25           **JURY FOREPERSON:**  1 kilogram or more.

1    **THE CLERK:**  Count 2:  How do you find the

2   Defendant Corloyd Anderson as to Count 2 of the indictment,

3   conspiracy to distribute and possess with the intent to

4   distribute controlled substances?

5    **JURY FOREPERSON:**  Guilty.

6    **THE CLERK:**  What type or types of drugs were

7   reasonably foreseeable to Mr. Anderson in furtherance of the

8   drug-trafficking conspiracy?

9    **JURY FOREPERSON:**  Heroin.

10    **THE CLERK:**  What quantity or amount of heroin was

11   reasonably foreseeable to Mr. Anderson?

12    **JURY FOREPERSON:**  1 kilogram or more.

13    **THE CLERK:**  Count 24:  How do you find the

14   Defendant Corloyd Anderson as to Count 24 of the indictment,

15   possession of a firearm by a felon?

16    **JURY FOREPERSON:**  Guilty.

17    **THE CLERK:**  Mr. Davis:

18    Count 1:  How do you find the Defendant Shakeen Davis

19   as to Count 1 of the indictment, conspiracy to participate in

20   the affairs of a racketeering enterprise?

21    **JURY FOREPERSON:**  Guilty.

22    **THE CLERK:**  What type or types of racketeering

23   activity were reasonably foreseeable to Mr. Davis in

24   furtherance of the racketeering conspiracy?

25    **JURY FOREPERSON:**  Murder, conspiracy to distribute and

1  possess with the intent to distribute controlled substances,

2  distribution and possession with the intent to distribute

3  controlled substances.

4       **THE CLERK:**  What type or types of drugs were

5  reasonably foreseeable to Mr. Davis as part of that

6  racketeering activity?

7       **JURY FOREPERSON:**  Heroin, cocaine base.

8       **THE CLERK:**  What quantity or amount of heroin was

9  foreseeable as to Mr. Davis as part of that racketeering

10  activity?

11       **JURY FOREPERSON:**  1 kilogram or more.

12       **THE CLERK:**  What amount or quantity of cocaine base

13  (crack) was foreseeable to Mr. Davis as part of that

14  racketeering activity?

15       **JURY FOREPERSON:**  280 grams or more.

16       **THE CLERK:**  Count 2:  How do you find the

17  Defendant Shakeen Davis as to Count 2 of the indictment,

18  conspiracy to distribute and possess with the intent to

19  distribute controlled substances?

20       **JURY FOREPERSON:**  Guilty.

21       **THE CLERK:**  What type or types of drugs were

22  reasonably foreseeable to Mr. Davis in furtherance of the

23  drug-trafficking conspiracy?

24       **JURY FOREPERSON:**  Heroin, cocaine base.

25       **THE CLERK:**  What amount or quantity of heroin was

1    reasonably foreseeable to Mr. Davis?

2              **JURY FOREPERSON:**  1 kilogram or more.

3              **THE CLERK:**  What amount or quantity of cocaine base

4    (crack) was reasonably foreseeable to Mr. Davis?

5              **JURY FOREPERSON:**  280 grams or more.

6              **THE CLERK:**  Count 16:  How do you find the

7    Defendant Shakeen Davis as to Count 16 of the indictment,

8    possession of firearms by a felon?

9              **JURY FOREPERSON:**  Guilty.

10             **THE CLERK:**  Count 30:  How do you find the

11   Defendant Shakeen Davis as to Count 30 of the indictment,

12   possession of a firearm by a felon?

13             **JURY FOREPERSON:**  Guilty.

14             **THE CLERK:**  Count 31:  How do you find the

15   Defendant Shakeen Davis as to Count 31 of the indictment,

16   possession with intent to distribute cocaine base?

17             **JURY FOREPERSON:**  Guilty.

18             **THE CLERK:**  Count 32:  How do you find the

19   Defendant Shakeen Davis as to Count 32 of the indictment,

20   possession of a firearm in furtherance of a drug-trafficking

21   crime?

22             **JURY FOREPERSON:**  Guilty.

23             **THE COURT:**  Thank you.

24             Would anyone like the jury polled?

25             **MR. ENZINNA:**  Yes, Your Honor, we would.

```
 1              MS. AMATO:  We would as well, Your Honor.
 2              MR. HAZLEHURST:  On behalf of Mr. Davis, yes,
 3    Your Honor.
 4              MR. SARDELLI:  Yes, Your Honor.
 5              MR. TRAINOR:  Yes, Your Honor.
 6              THE CLERK:  Juror No. 4, will you please rise.
 7              Having delivered the verdict of the jury, is that your
 8    verdict?
 9              JURY FOREPERSON:  It is.
10              THE CLERK:  Thank you.  You may be seated.
11              Juror No. 1, will you please rise.
12              Having heard the verdict of your foreperson, is that
13    your verdict also?
14              JUROR NO. 1:  Yes.
15              THE CLERK:  Thank you.  You may be seated.
16              Juror No. 2, will you please rise.
17              Having heard the verdict of your foreperson, is that
18    your verdict also?
19              JUROR NO. 2:  Yes.
20              THE CLERK:  Thank you.  You may be seated.
21              Juror No. 3, will you please rise.
22              Having heard the verdict of your foreperson, is that
23    your verdict also?
24              JUROR NO. 3:  Yes.
25              THE CLERK:  Thank you.  You may be seated.
```

1           Juror No. 5, will you please rise.

2           Having heard the verdict of your foreperson, is that

3    your verdict also?

4           **JUROR NO. 5:**  Yes.

5           **THE CLERK:**  Thank you.  You may be seated.

6           Juror No. 6, will you please rise.

7           Having heard the verdict of your foreperson, is that

8    your verdict also?

9           **JUROR NO. 6:**  Yes, ma'am.

10          **THE CLERK:**  Thank you.  You may be seated.

11          Juror No. 7, will you please rise.

12          Having heard the verdict of your foreperson, is that

13   your verdict also?

14          **JUROR NO. 7:**  Yes, it is.

15          **THE CLERK:**  Thank you.  You may be seated.

16          Juror No. 8, will you please rise.

17          Having heard the verdict of your foreperson, is that

18   your verdict also?

19          **JUROR NO. 8:**  Yes.

20          **THE CLERK:**  Thank you.  You may be seated.

21          Juror No. 9, will you please rise.

22          Having heard the verdict of your foreperson, is that

23   your verdict also?

24          **JUROR NO. 9:**  Yes.

25          **THE CLERK:**  Thank you.  You may be seated.

1          Juror No. 10, will you please rise.

2          Having heard the verdict of your foreperson, is that

3    your verdict also?

4          **JUROR NO. 10:**  Yes.

5          **THE CLERK:**  Speak a little louder.

6          **JUROR NO. 10:**  Yes.

7          **THE CLERK:**  Thank you.

8          Juror No. 11, will you please rise.

9          Having heard the verdict of your foreperson, is that

10   your verdict also?

11         **JUROR NO. 11:**  Yes.

12         **THE CLERK:**  Thank you.

13         And Juror No. 12, will you please rise.

14         Having heard the verdict of your foreperson, is that

15   your verdict also?

16         **JUROR NO. 12:**  Yes, it is.

17         **THE CLERK:**  Thank you.  You may be seated.

18         Members of the jury, you have heard the verdicts and

19   answers thereto as delivered by your foreperson, and they have

20   been recorded; and each of you do agree?

21         **THE JURY:**  Yes.

22         **THE CLERK:**  Verdict recorded.

23         **THE COURT:**  All right.  Thank you very much, ladies

24   and gentlemen.

25         We all very much appreciate your service.

1          A couple of things.

2          First of all, I have been telling you as we went along

3    that you could not discuss this case with anyone else.

4          At this point, now that your verdict is in, you are

5    free of that obligation.

6          You don't have to talk to anyone else.  But if you

7    wish to talk to anyone else about your service, you may do so.

8          Counsel are still not allowed to talk to you without

9    permission of the Court.

10          Those of you who would like to, if you don't mind

11    waiting in the jury room a few minutes, I always appreciate the

12    opportunity to come back and say thank you in person, not to

13    talk about the case, but to come back and just tell you thank

14    you and see if you have any suggestions for future jurors,

15    anything like that.

16          So at this point, unless there's anything else for the

17    jury, we will excuse the jury with Ms. Moyé.  And I'll be back

18    in shortly.

19        (Jury discharged at 3:44 p.m.)

20          **THE COURT:**  Counsel, I suggest that we not try to set

21    sentencing dates at this particular moment.

22          I will start the process of having presentence reports

23    prepared for everyone.

24          But we can actually pick sentencing dates at a later

25    point, if that's acceptable.

1              Okay.  All right.  We'll excuse the gallery.

2         (Pause.)

3              **THE COURT:**  Perhaps I'll go with Ms. Moyé into the

4    jury room, and then --

5              **MS. AMATO:**  Your Honor, excuse me?

6              **THE COURT:**  Yes?

7              **MS. AMATO:**  May we have additional time to file any

8    posttrial motions, if we are to file any?  And at this point I

9    don't know if I'm going to file anything or not, but I would

10   ask, instead of the usual time frame, if I could have 30 days.

11             **THE COURT:**  I think it would be a good idea to put

12   that in writing.  I can't imagine that I would have any

13   difficulty giving you some extra time if you need it.

14             **MS. AMATO:**  Thank you.

15             **THE COURT:**  But to preserve the record, if you would

16   put it in writing if you do want an extension.

17             All right.  I'm going to go with Ms. Moyé into the

18   jury room, and then we'll be adjourned.

19        (Court adjourned at 3:46 p.m.)

20        I, Douglas J. Zweizig, RDR, CRR, FCRR, do hereby certify
     that the foregoing is a correct transcript from the
21   stenographic record of proceedings in the above-entitled
     matter.
22                       _____/s/_____

23                  Douglas J. Zweizig, RDR, CRR, FCRR
                       Registered Diplomate Reporter
24                     Certified Realtime Reporter
                     Federal Official Court Reporter
25                       DATE:  November 19, 2019