# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

RANDY BANKS,

*Defendant - Appellant,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

**JOINT APPENDIX - VOLUME XIV OF XXII**
**(Pages 6637 - 7107)**

Gerald T. Zerkin
ATTORNEY AT LAW
P. O. Box 5665
Richmond, VA 23220
804-921-4885
*Counsel for Appellant*
 *Randy Banks*

Allen H. Orenberg
THE ORENBERG
LAW FIRM, PC
12505 Park Potomac Avenue
6th Floor
Potomac, MD 20854
301-984-8005
*Counsel for Appellant*
 *Jamal Lockley*

Adam B. Schwartz
SHEARMAN &
STERLING LLP
401 9th Street, NW
Suite 800
Washington, DC 20008
202-508-8009
*Counsel for Appellant*
 *Dante Bailey*

Stuart A. Berman
LERCH, EARLY &
BREWER, CHARTERED
7600 Wisconsin Avenue
Suite 700
Bethesda, MD 20814
301-657-0729
*Counsel for Appellant*
 *Shakeen Davis*

Carmen D. Hernandez
ATTORNEY AT LAW
7166 Mink Hollow Road
Highland, MD 20777
240-472-3391
*Counsel for Appellant*
 *Corloyd Anderson*

Counsel for Appellee on Inside Cover

Brandon K. Moore

Assistant United States Attorney

United States Attorney's Office for the District of Maryland

36 S. Charles Street, Fourth Floor

Baltimore, Maryland 21201

410-209-4826

*Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME XIV OF XXII

JA Page

Transcript of Sentencing Proceedings (Lockley)
Before the Honorable Catherine C. Blake
    On November 4, 2019 ..................................................................... 6637

Transcript of Sentencing (Dante Bailey)
Before the Honorable Catherine C. Blake
    On November 5, 2019 [ECF1500] ................................................... 6679

Judgment in a Criminal Case (Dante Bailey)
    Entered November 7, 2019 [ECF1337] ........................................... 6740

Judgment in a Criminal Case (Jamal Lockley)
    Entered November 7, 2019 [ECF1339] ........................................... 6747

Notice of Appeal (Jamal Lockley)
    Filed November 10, 2019 [ECF1341] ............................................. 6753

Notice of Appeal (Dante Bailey)
    Filed November 12, 2019 [ECF1342] ............................................. 6755

Transcript of Sentencing Proceedings (Corloyd Anderson)
Before the Honorable Catherine C. Blake
    On February 20, 2020 ..................................................................... 6757

Notice of Appeal (Corloyd Anderson)
    Filed March 3, 2020 [ECF1439] ..................................................... 6811

Judgment in a Criminal Case (Corloyd Anderson)
    Entered March 3, 2020 [ECF1440] ................................................. 6812

Government's Sentencing Memorandum as to
Dante D. Bailey (Redacted) with Exhibits
    Filed April 28, 2020 [ECF1491] ..................................................... 6818

      Ex. 1:    Excerpt of Jan. 6, 2019 Jail Call Transcript [ECF1491-1] ....... 6852

i

Ex. 2:     Excerpt of April 28, 2019 Jail Call Transcript [ECF1491-2] ... 6855

Ex. 3:     Excerpt of April 28, 2019 Jail Call Transcript [ECF1491-3] ... 6861

Ex. 4:     Copy of the kite [ECF1491-4]  ..................................................6865

Ex. 5:     Photograph of the kite and the K2 strip [ECF1491-5].............. 6866

Ex. 6:     Copy of the kite [ECF1491-6] .................................................... 6867

Ex. 7:     Aug. 20, 2019 Letter from Dante Bailey regarding
           sentencing [ECF1491-7] ........................................................... 6868

Ex. 8:     Jan. 13, 2011 Letter to Judge Quarles from Dante Bailey
           [ECF1491-8]............................................................................... 6874

Motion for New Trial by Defendants Dante Bailey, Randy Banks,
Jamal Lockley, Corloyd Anderson, And Shakeen Davis with
Attachments and Exhibits
     Filed June 3, 2020 [ECF1505]...................................................... 6886

Att. 1:    Memorandum in Support of Motion for New Trial by
           Defendants Dante Bailey, Randy Banks, Jamal Lockley,
           Corloyd Anderson, And Shakeen Davis [ECF1505-1]............. 6889

Att. 2:    Proposed Order [ECF1505-2] ..................................................... 6925

Ex. 1:     Information [ECF1505-3] ....................................................... 6926

Ex. 2:     Application for Interception of Wire Communications
           [ECF1505-4].............................................................................. 6931

Ex. 3:     Application for Interception of Wire Communications
           [ECF1505-5].............................................................................. 7021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

UNITED STATES OF AMERICA,    )
     Plaintiff,    )
                         )
     vs.            ) CRIMINAL CASE NO. CCB-16-0267
                         )
JAMAL LOCKLEY,              )
     Defendant.    )
_____)

Monday, November 4, 2019
Courtroom 7D
Baltimore, Maryland

BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE

SENTENCING

For the Plaintiff:

Christina Hoffman, Esquire
Assistant United States Attorneys

For the Defendant:

Harry J. Trainor, Jr., Esquire

Also Present:

Special Agent Timothy Moore, ATF
Stephanie D'Amato, U.S. Probation Officer
Manisha Garner, U.S. Probation Officer

Reported by:

Douglas J. Zweizig, RDR, CRR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland  21201

```
 1                    P R O C E E D I N G S
 2          (10:05 a.m.)
 3              THE COURT:  Good morning, everyone.  You can be
 4     seated, please.
 5              Do you want to call the case, Ms. Hoffman.
 6              MS. HOFFMAN:  This is United States versus
 7     Jamal Lockley, Case Number CCB-16-0267.  I'm Christina Hoffman
 8     on behalf of the United States.
 9              With me here at counsel table is Special Agent
10     Tim Moore of the ATF.
11              And we're here for Mr. Lockley's sentencing.
12              THE COURT:  All right.  Thank you.
13              MR. TRAINOR:  Good morning, Your Honor.
14              THE COURT:  Good morning.
15              MR. TRAINOR:  Harry Trainor, representing
16     Jamal Lockley, who is present on my right.
17              THE COURT:  All right.  Thank you.  You can be seated.
18              We are here for sentencing for Mr. Lockley following
19     his conviction by a jury, Count 1, 2, and 10 of the second
20     superseding indictment.  That was a conviction of a RICO
21     conspiracy and the drug conspiracy and the specific
22     distribution of cocaine base.
23              I have the presentence report, of course, as well as
24     sentencing memos from both defense counsel and Government
25     counsel.  Thank you.
```

1            As you know, I need to start with the presentence

2    report and the calculation of the advisory guideline range.

3            But before we discuss the guidelines, the presentence

4    report generally, Ms. Hoffman, any additions, corrections, or

5    modifications?

6            **MS. HOFFMAN:**  No, none from the Government.

7            **THE COURT:**  Okay.  Mr. Trainor, I know you've read it.

8    For the record, has your client had the chance to?

9            **MR. TRAINOR:**  Yes, he's read it and we've discussed it

10   several times.  And he does have some objections --

11           **THE COURT:**  Okay.

12           **MR. TRAINOR:**  -- to the content of it.

13           But these are -- well, let me just lay it out.

14           On Paragraphs 4 and 5 on Page 5 of the PSR refer to

15   851 notices that would be -- would enhance the mandatory

16   minimums.

17           Now, we've been notified that the Government is not

18   going forward on those.

19           We'd like to have some indication in the PSR that the

20   851 notices were withdrawn by the Government prior to

21   sentencing.

22           **THE COURT:**  Thank you.  Yes, that certainly was on my

23   list of things to address.

24           I interpreted your sentencing memo, Ms. Hoffman, as a

25   withdrawal of the 851 notice.

**MS. HOFFMAN:** Yes, that's right. And I did want to explain that briefly.

As Your Honor knows, the First Step Act was passed not too long before we went to trial in this case. And one of the things that the First Step Act did was to say that in order for the 25-year mandatory minimum to apply, the defendant's two prior drug felony convictions, he has to have served at least a year in prison on those convictions.

Now, in this case, Jamal Lockley does meet that requirement; however, we didn't put on proof of that at trial.

And so, in an abundance of caution, to avoid any possible Apprendi issue on appeal, we're not going to seek the enhanced mandatory minimum.

He does factually qualify for it, but just to avoid an appellate issue. Not conceding that there was any error, but we think it's better to proceed without it. His guidelines, of course, are higher than that minimum, in any case.

**THE COURT:** Okay. Well, I think what we'll do there is ask the probation officer to prepare an amended presentence report -- we'll see if there are any other changes -- but just to take out references to the applicability of 851 is probably the easiest way to do it.

**MS. HOFFMAN:** Sure. We have no objection.

**THE COURT:** And in that regard, then, counsel, the mandatory minimum, there would still be a mandatory minimum on

1  Count 2, the drug conspiracy, based on the quantity, is that

2  correct, but it's ten years?

3          **MS. HOFFMAN:**  It would be ten years.

4          **THE COURT:**  Okay.  All right.  Mr. Trainor, we'll make

5  that amendment.

6          **MR. TRAINOR:**  Your Honor, on Page 8 of the presentence

7  report, beginning at Paragraph 20, there's a section of the

8  report entitled "Racketeering Activity Proved at Trial."

9          And throughout that section, there are references to

10  homicides.  There is reference in 21 and certainly in

11  Paragraph 28 about the Hornes murder.  And the jury

12  specifically on the verdict sheet found that that was not

13  proven at trial.  And we would ask that that be stricken.

14          You know, the only way we can really tell what the

15  jury found at trial is the verdict sheet.  And it seems to me

16  that the best evidence of what they proved at trial is the

17  verdict sheet.

18          And either that section should be captioned, I think,

19  Evidence -- "Racketeering Activity that the Government Contends

20  was Proven at Trial," with the reference to the Hornes murder

21  stricken because they specifically did not find that.

22          My concern is that the PSR follows Mr. Lockley to the

23  Bureau of Prisons and will determine, to some extent, what

24  programs he gets involved in, what security level he's housed

25  at for perhaps a long time.

1          And I would hope that the presentence report would

2     reflect -- would not reflect that it was proven at trial that

3     he was involved in the Hornes murder.

4          **THE COURT:**  Okay.  Ms. Hoffman.

5          **MS. HOFFMAN:**  So the way that we styled our -- we

6     submitted a statement of facts proved at trial to the

7     U.S. Probation Office prior to the completion of the PSR, and

8     we styled it as a summary of the evidence presented at trial

9     that we believed proved these activities.

10          I think, of course, Mr. Trainor's right that the jury

11     did not find beyond a reasonable doubt unanimously that murder

12     was foreseeable to the defendant.

13          We still believe that we presented significant

14     evidence surpassing the preponderance-of-the-evidence threshold

15     that's applicable at sentencing that Mr. Lockley did

16     participate in Anthony Hornes's murder, and we do think it's

17     relevant information that should be included in the PSR.

18          If there's a different way to caption the factual

19     statement, you know, "Evidence Presented at Trial" or something

20     of that nature, I don't think we have an objection to that.

21          But we think the evidence is relevant to the PSR.  It

22     should be considered by the Bureau of Prisons.  It should not

23     be stricken from the PSR.  At most, perhaps we could change the

24     way it's styled.

25          **THE COURT:**  Something along the lines of "Evidence of

1   Racketeering Activity Presented by the Government"?

2         **MS. HOFFMAN:** "Presented by the Government at Trial."

3         **THE COURT:** "At Trial," followed immediately by noting

4   that the jury verdict is quite true, did not find murder

5   specifically foreseeable to Mr. Lockley.

6         It did find witness tampering and witness retaliation

7   foreseeable to Mr. Lockley, which, from the Government's point

8   of view, again, could be at least conspiracy to commit murder.

9         But do you have an understanding that may not be

10  precisely what you want, Mr. Trainor?  How would you feel about

11  modifying the caption that precedes those paragraphs, 20?

12        **MR. TRAINOR:**  I'm sorry?

13        **THE COURT:**  Oh, understanding it may not be everything

14  that you want, would it at least help if the caption before

15  Paragraph 20 was switched to something like "Evidence of

16  Racketeering Activity Presented by the Government at Trial"?

17        **MR. TRAINOR:**  Well, would Your Honor consider -- I

18  don't want to argue against myself, but our position is that

19  any reference to a homicide should be stricken from the PSR.

20        And alternatively, if the Court is not inclined to do

21  that, we'd ask that the caption above Paragraph 20 be changed.

22        And I'm trying to remember.  Judge Bredar was faced

23  with a similar situation in the Gerald Johnson case, and I have

24  a transcript in my briefcase.

25        But my recollection is what he did was also attach a

copy of the verdict sheet to show actually what the verdict was.

And the verdict sheet is, of course, filed as ECF No. -- I think I indicated the number in the sentencing memo.

**THE COURT:** Okay. That certainly seems like a possibility.

I was going to say, if we leave in, with that different heading, Paragraphs 20 through 36, but then make a new Paragraph 37 that says "jury verdict," perhaps, and lay out right there what the jury actually found -- I mean, I think it's in there already, but --

**MS. HOFFMAN:** It's in there at Paragraph 3, but we have no objection to attaching the verdict sheet as well. I think it is -- the jury's verdict is described in detail in Paragraph 3 on Page 5.

**MR. TRAINOR:** My client was just whispering in my ear.

But, for the record, to make it clear, he objects to this entire section being in the PSR.

**THE COURT:** Sure. And that objection will be preserved.

I think, in general, frankly, it's a fair summary of the evidence that was, in fact, presented at trial.

And I think the change in the caption, as we've just discussed, and a new Paragraph 37, to make it abundantly clear,

1    in addition to what's in Paragraph 3, that the jury did not

2    find murder as one of the acts reasonably foreseeable to

3    Mr. Lockley, and attaching the verdict sheet should make it

4    sufficiently clear.

5           But your client has his objection to its being in

6    there at all.

7           Okay.  Any other issues on the presentence report?

8           **MR. TRAINOR:**  I'm just going to say this too.  I mean,

9    this is an issue that Mr. Lockley feels is very important.

10          **THE COURT:**  Okay.

11          **MR. TRAINOR:**  He wants to make it clear throughout

12   these proceedings that he objects to the quantity of drugs that

13   was found to be foreseeable to him, and he wants me to make

14   sure that the record reflects that.

15          **THE COURT:**  Okay.  Absolutely.  It will reflect that.

16          I'm going to -- let's see, do I see the probation

17   officer?

18          **THE PROBATION OFFICER:**  Yes, Your Honor, I'm sorry.

19   Stephanie D'Amato from the Probation Office.

20          Your Honor, we would also just like to suggest also

21   one amendment to Paragraph 48.

22          **THE COURT:**  48?

23          **THE PROBATION OFFICER:**  Yes, Your Honor.

24          **THE COURT:**  Let me go to that.

25          **THE PROBATION OFFICER:**  So initially, Your Honor, we

1    assessed the defendant as a career offender, which he still is

2    a career offender, but we included Count 2 as part of our

3    reasoning, which was the conspiracy.

4         **THE COURT:**  Yes.

5         **THE PROBATION OFFICER:**  But in light, Your Honor, of

6    some of the changes, some of the new cases, specifically the

7    Norman case, the conspiracy to distribute, possession with

8    intent to distribute heroin is no longer considered a

9    controlled substance.

10        So we would just ask that our career offender

11   assessment is just based on the Count 10, which is distribution

12   of cocaine, which would still qualify him as a career offender.

13   But we're just basing it on the Count 10.

14        **THE COURT:**  Okay.  I will say this is a new -- it

15   probably shouldn't be new, but I haven't heard this before in

16   the context of applying career offender guidelines.

17        So you're saying that's U.S. v. Norman?

18        **THE PROBATION OFFICER:**  Correct, Your Honor.

19        **THE COURT:**  The conspiracy --

20        **THE PROBATION OFFICER:**  The conspiracy to be charged

21   with the career offender statute that the defendant would have

22   to be, according to where -- according with either a controlled

23   substances offense or a crime of violence.

24        So because of the results of that case, the controlled

25   substance offense, the conspiracy to distribute, possess with

1    intent to distribute is no longer considered a controlled

2    substance offense.

3          However, that doesn't change Count 10, which is still

4    considered to be a controlled substance offense.

5          THE COURT:  Okay.

6          THE PROBATION OFFICER:  So he still meets the career

7    offender criteria.  We just wanted to note that it's

8    specifically based on the conviction in Count 10.

9          THE COURT:  Okay.  Counsel, do you have any comment on

10   that?

11         MS. HOFFMAN:  I apologize.  I'm not familiar with the

12   case.

13         Is there a case cite, by any chance?

14         THE PROBATION OFFICER:  And, Your Honor, I apologize.

15   I'm covering this hearing for someone else, and I don't

16   actually have it on me.

17         If the Court allows me a couple of minutes, I can

18   actually get additional -- it's --

19         THE COURT:  Let's see, it's U.S. v. Norman.  It's

20   Fourth Circuit?

21         THE PROBATION OFFICER:  Yes, Your Honor.

22         THE COURT:  Perhaps I will ask Ms. Moyé to call one of

23   my law clerks to print U.S. v. Norman.

24         THE PROBATION OFFICER:  And, Your Honor, I apologize.

25   Our specialist is actually on her way.  She had a little bit of

1  an emergency this morning.

2      **THE COURT:**  Okay.  All right.  Well, we'll put that

3  issue, in terms of working out any revised language, on hold

4  for now until we have the case and the specialist.

5      But your point is that -- and, in fact, Paragraph 48

6  identifies both Count 2 and Count 10 as a basis for application

7  of the career offender guideline.  And as you're pointing out,

8  Count 10 is still clearly a controlled substance offense.

9      So the career offender guideline applies.  And we can

10 turn to the guidelines now.

11     It seemed to me -- I know there are some specific

12 disputes between the parties about the applicability of certain

13 enhancements, but it also seems to be overtaken, if you will,

14 by the fact that Mr. Lockley qualifies as a career offender and

15 that his guideline range would, therefore, be the 37 unless the

16 switch to Count 2 -- I mean to Count 10 would lower the

17 statutory maximum sentence, affects the calculation.

18     **MS. HOFFMAN:**  Yes, I think that would have an effect

19 because Count 10 is punishable by a max of 20 years, and so the

20 career offender guideline under 4B1.1(b)(3) would be

21 Offense Level 32.

22     I don't think -- in that case I don't think the career

23 offender guideline would control, however, because then you

24 would go back to the quantity guideline, the enhancement for

25 possession of a weapon, the enhancement for use of violence,

 1   the enhancement for obstruction of justice.  And so then you

 2   would get up to at least a 36, unless I'm forgetting some of

 3   the enhancements.

 4           **MR. TRAINOR:**  For the record, I don't think

 5   Mr. Lockley ever had a possession of a weapon in this case.

 6           **THE COURT:**  Let's see, the enhancements in the

 7   presentence report -- okay.  The computation starts at Page 11,

 8   bottom of Page 11.  There's an offense level, a base offense

 9   level of 30 because of the quantity of drugs -- and

10   understanding if Mr. Lockley disagrees that that amount was

11   foreseeable, but if that is the amount -- and it is, according

12   to the jury -- there's an offense level of 30.

13           Then there's an increase of two for use of violence or

14   credible threat to use violence or directing the use of

15   violence, which is consistent with the jury's verdict finding

16   witness retaliation or tampering foreseeable to Mr. Lockley.

17           And, in my opinion, there is at least proven by a

18   preponderance of the evidence that he was involved as a driver

19   in the April 28th, 2016, murder by Mr. Bailey of Mr. Hornes.

20           There is also the conversation with Mr. Bailey about

21   sending a cooperator to a hitman.

22           I think the evidence that I do find certainly has been

23   proved by a preponderance of the evidence, and, again,

24   consistent with the jury's finding about witness tampering and

25   retaliation, I think would support that two-level enhancement.

```
 1    It's not specifically possession of a firearm, but I think use
 2    of or credible threat to use or directing the use of violence
 3    would fit.
 4         MR. TRAINOR:  Your Honor, just to clarify the record,
 5    Mr. Lockley objects to any of those enhancements and all of
 6    them.
 7         THE COURT:  Sure.  I appreciate that.
 8         There is also a two-level enhancement for obstruction
 9    of justice, and that would be consistent with the jury's
10    finding that witness tampering and bringing retaliation were
11    foreseeable to him.  Understanding he disagrees, but that's an
12    offense level of 34.  I'm not sure that there's --
13         MS. HOFFMAN:  And, Your Honor, I don't know if I've
14    waived it by not raising it before the sentencing hearing.
15    Obviously, we thought the career offender guideline applied
16    and, therefore, it was moot.
17         But I would ask for a two-level enhancement because
18    there was possession of a firearm.  Notwithstanding the fact
19    that no firearm was ever seized from Mr. Lockley, I think the
20    same rationale for applying the two-level enhancement, based on
21    his participation in the Anthony Hornes murder and other acts
22    of violence in furtherance of the gang, he certainly -- it was
23    certainly foreseeable to him that firearms were used in
24    furtherance of this conspiracy by other members, and so we
25    would ask for that as well.
```

1    At least it's relevant under 3553(a), if Your Honor is

2    not inclined to . . .

3         **THE COURT:**  Right.

4         **MR. TRAINOR:**  Your Honor, we object to that.  I

5    mean --

6         **THE COURT:**  I'm not going to impose that.  I think

7    it's too late.  I'm sorry we all weren't aware of, and me, the

8    issue with the career offender.

9         Again, there's lots of room to argue 3553(a) factors,

10   and I think that's where it should be.

11        All right.  This is an unpublished decision.  I think

12   this must be the wrong Norman case or something.  This is an

13   unpublished decision having to do with a four-level enhancement

14   for using firearm in connection with a felony.  So there's

15   probably more than one Norman out there.

16        Okay.  So if the information about the career offender

17   is correct, then the career offender status would only be at a

18   Level 32.

19        Okay.  This appears to be -- I assume this is the one

20   that we are all being educated on.  This is

21   United States versus Norman, 935 F.3d 232, decided August 15th

22   of 2019.

23        The question, it appears -- it was not a career

24   offender issue.  It was an enhancement under the

25   felon-in-possession guidelines and the degree of enhancement

1 that would be applied for prior conviction.  There's a prior

2 conviction for conspiracy to possess cocaine and cocaine base.

3 Appears to be deciding that a Section 846 . . .

4   Well, it would require slightly more studying of this

5 opinion to be completely clear as to its applicability in this

6 case, so perhaps some alternative calculations should apply

7 here.

8   If the offense of conviction number in Count 2 as a

9 drug conspiracy does not count as a controlled substance

10 offense and if the career offender status must be based only on

11 Count 10, then in light of the lower statutory maximum, I think

12 we are agreeing that the offense level would be a 32.

13   **MS. HOFFMAN:**  Well, the 4B1.1 career offender

14 guideline provides that if the offense level for a career

15 offender from the table in this subsection is greater than the

16 offense level otherwise applicable, then the offense level from

17 the table applies.

18   But if it's otherwise greater, then you apply the

19 otherwise greater offense level.  And so I think it would be

20 the 34.

21   **THE COURT:**  Okay.  Yes.  And I was not, perhaps, being

22 quite clear in how I said it.

23   If the career offender level is only 32, then we would

24 go to the 34 --

25   **MS. HOFFMAN:**  Yes.

1      **THE COURT:** -- which I'm finding is applicable based

2  on quantity and threat of violence and obstruction of justice,

3  so the 34 would control.

4      **MS. HOFFMAN:**  That's correct.  That's our position.

5      **THE COURT:**  If the Norman case, for some reason, does

6  not apply to Count 2, then in that case the career offender

7  guideline would be higher.  It would be a 37 and it would be

8  controlling.

9      So for right now, I'm going to assume that an offense

10  level of 34 applies.

11      There is --

12      **MS. HOFFMAN:**  And I'm sorry, Your Honor, I did just

13  want to make clear for the record that in our statement of

14  facts to U.S. Probation, we did state that our position was

15  that the base offense level should be 43 based on murder, based

16  on the defendant's involvement in the Anthony Hornes murder,

17  which we believe we proved by at least a preponderance of the

18  evidence.

19      And so that is our position.  It's not what the PSR

20  concluded.  I just wanted to make that clear.

21      **THE COURT:**  Right.  Okay.  I appreciate that.  And I'm

22  declining to apply the Level 43 murder offense levels.

23      Criminal history category, let me turn to that, which

24  is the other part of the guidelines.

25      I am not aware of a dispute about that.  The criminal

1    history has been calculated at 18 points total, which clearly

2    puts Mr. Lockley into Category VI, that being 13 or more.

3          But tell me if there is any objection to the

4    Category VI.

5          **MS. HOFFMAN:**  No, none from us.

6          **MR. TRAINOR:**  We do not dispute that he has 18

7    criminal history points, Your Honor.

8          **THE COURT:**  Okay.  All right.  If the guidelines are

9    correctly calculated at an offense level of 34 and a criminal

10   history category of VI, that would be 262 to 327 months.

11         If they were correctly calculated at an offense level

12   of 37 and a criminal history category of VI, that would be 360

13   to life.

14         And, of course, if the Government's position for an

15   offense level of 43 had applied, that is a guideline range of

16   life at any criminal history category.

17         So the guidelines are obviously only one factor that I

18   need to consider.

19         And I will now hear from you all.  I've read the

20   memos, but I'm happy to hear anything you all would like to say

21   about a specific recommendation in this case.

22         **MS. HOFFMAN:**  Thank you, Your Honor.  And I apologize

23   about the confusion about the guidelines.

24         But regardless what the guidelines are, we do think

25   that a sentence of 35 years is sufficient but not greater than

necessary to comply with the purposes of sentencing set forth in 18 United States Code, 3553.

This is an extremely, extremely serious offense.  The defendant conspired to participate in a gang that was responsible for at least five murders, at least six nonfatal shootings, multiple additional conspiracies to commit murder and assaults, at least six years of high-volume street-level drug trafficking.

And as we outlined in our sentencing memo and at trial, as we established at trial, Mr. Lockley, he worked in concert with other MMP members over many years to traffic deadly drugs, such as heroin and cocaine, in the gang's territories.

He distributed heroin that caused a young woman to overdose.

He was the getaway driver for a retaliatory gang murder committed by the gang's leader, Dante Bailey.

He participated in other calls, wire calls discussing the use of murder to retaliate against rivals of the gang, such as Ricardo Johnson.

And he conspired with Dante Bailey to retaliate against a witness by sending him to a hitman for the gang.

I want to start with the drug trafficking.  There can be no doubt, notwithstanding Mr. Lockley's objection, that he was one of the most prolific sellers of heroin and

crack cocaine in the gang. That's borne out by thousands of wire calls and text messages, a small fraction of which were introduced at trial.

Mr. Lockley distributed massive quantities of these deadly drugs day in and day out over a period of many years.

The jury found that Mr. Lockley conspired to distribute over a kilogram of heroin and over 280 grams of crack cocaine, but that's likely an understatement.

Based on the drug weight found by the jury and Mr. Lockley's criminal history, the guidelines are already very, very high.

And this is a case -- regardless whether the career offender guideline technically applies in light of the Fourth Circuit's decision in <u>Norman</u> -- this is a case where I think the career offender guideline is supposed to apply.

Mr. Lockley is someone who has six prior felony drug convictions for drug trafficking. This is someone who has made his entire career and livelihood trafficking drugs, and that is something that is relevant under 3553 even if he doesn't turn out to be technically a career offender under the guidelines.

Six times he was convicted of drug trafficking, six times he returned to doing exactly what he did before, slowly working his way up to a larger- and larger-scale operation.

One of the things that makes Mr. Lockley's drug trafficking so terrible is that he knew that the heroin he was

1  selling was causing overdoses, and he went on selling it

2  anyway.

3         At trial, of course, we heard from a young woman who

4  overdosed and nearly lost her life because of the heroin that

5  Mr. Lockley distributed.

6         And we heard a chilling wire call immediately

7  afterwards in which her brother informed Mr. Lockley that he

8  should be careful because his friend had to go in an ambulance.

9         Mr. Lockley was completely unfazed by that call.  He

10  went right on selling heroin in the days and weeks and months

11  after that call, and that was, again, borne out by wire calls

12  and text messages.

13         He did not care whether his customers lived or died.

14  He knew exactly what the risks were, and he kept on peddling

15  his poison.

16         And it's also worth noting that the overdose is

17  something that would ordinarily, if we had charged it, it would

18  trigger a mandatory-minimum sentence of life in prison.

19         A person who is convicted under 21 U.S.C.,

20  841(a)(1)(A), if that person has a prior conviction for a

21  serious drug felony and if death or serious bodily injury

22  results from the use of such substance, the statute provides

23  for a mandatory life sentence.

24         And we, of course, didn't charge the case that way,

25  but I think it's relevant that this is someone who Congress has

1    determined, in these circumstances, is deserving of a life

2    sentence.  And that's just based on the drug trafficking and

3    just based on the overdose.

4         Of course, Mr. Lockley's most serious criminal conduct

5    isn't the drug trafficking and the overdose.  His most serious

6    criminal conduct is his participation in this extremely violent

7    gang, his participation in murder, his participation in witness

8    tampering, and witness retaliation.

9         Now, of course, we acknowledge that the jury did not

10   find unanimously beyond a reasonable doubt that Mr. Lockley was

11   responsible for murder, and that is a relevant consideration.

12        However, as Your Honor noted previously, and we

13   certainly agree, I think the evidence presented at trial

14   certainly established by a preponderance of the evidence that

15   Mr. Lockley served as the getaway driver for the Anthony Hornes

16   murder, and that is a really terrible murder.

17        In some ways it's the most tragic murder of all the

18   murders that we presented evidence about at trial because, as

19   it turned out, the victim, Anthony Hornes, had nothing to do

20   with the murder of Mookie that the gang thought they were

21   retaliating for.  He was in the wrong place at the wrong time,

22   and he was gunned down by the gang's leader, Dante Bailey, in a

23   senseless act of violence.

24        We did present substantial evidence that Mr. Lockley

25   was the getaway driver.  Of course, there was the testimony of

1    an eyewitness who was there in the car with them.

2         There was also cell site location information putting

3    Mr. Lockley, Mr. Bailey, and Mr. Banks all right there at the

4    scene together, moving towards the scene, and then disbursing

5    afterwards.

6         And then there was that jail call by members of the

7    conspiracy afterwards in which they actually read a newspaper

8    clipping about the murder and attribute it to Gutta, to

9    Dante Bailey.

10        So that obviously is extremely serious conduct.

11        And regardless of the jury's verdict, I mean, it's

12    hard to know exactly what was going through their minds.

13    Perhaps Mr. Lockley didn't know in advance that Mr. Bailey was

14    going to commit that murder, and that is certainly relevant.

15        However, our argument is that it had to be reasonably

16    foreseeable.  They were driving around with guns looking to

17    retaliate for the murder of an MMP member.

18        And certainly Mr. Lockley knew about the murder when

19    it happened and continued to participate in the gang

20    thereafter, continued to deal drugs, continued to conspire, to

21    retaliate against witnesses after that murder happened.

22        And so he continued to participate in the gang knowing

23    that murders were committed in furtherance of the gang, and

24    that's very significant.

25        The jury made a special finding that Mr. Lockley was

1    responsible for witness tampering and witness retaliation.

2          There was a wire call -- I'm sorry, not a wire call, a

3    jail call, of course, in which Mr. Lockley discussed with

4    Dante Bailey the fact that he was very surprised to hear that

5    William Banks, Trouble, was a CI; that he was cooperating

6    against members of the gang.  He reacts with kind of alarm and

7    fear.

8          And then they discuss -- Mr. Bailey directs him to

9    send him to M-Easy, who many witnesses at trial testified was a

10   known hitman for the gang.

11         We think it's obvious that they were talking about

12   having Mr. Banks murdered, particularly because of the comments

13   that Michael Singer makes in that call, or Blizz.

14   Michael Singer says, I don't want anything to go down at the

15   studio.  I'm afraid my contract's on the line.  I don't want to

16   hurt my relationship with the owners.

17         And Dante Bailey says, Don't worry, nothing's going to

18   happen at the studio.

19         We think it's pretty obvious from the full

20   conversation -- and we've attached a transcript to our

21   sentencing memo -- and those contextual clues that they were

22   talking about murder.  They were talking about murdering a

23   witness.

24         And there's a special need to deter gang activity when

25   it involves witness tampering and witness retaliation because

1  of the impact that it has on the criminal justice system as a

2  whole.

3        The stop-snitching culture was born in Baltimore, and

4  it's the single biggest obstacle to prosecuting violent crime

5  in the city.

6        A 35-year sentence will send a clear message that when

7  you conspire to participate in a violent gang, when you corrupt

8  the criminal justice system and perpetuate that stop-snitching

9  culture by conspiring to kill witnesses, you will be held

10  accountable with a lengthy prison sentence.

11        I think there can be an instinct at these sentencing

12  hearings to try to -- an understandable instinct to try to

13  reduce the defendant's criminal conduct to a few simple inputs

14  and use those to determine the sentence somewhat formulaically.

15  In other words, to categorize Lockley's criminal conduct as

16  drug trafficking, a nonfatal overdose, witness tampering, and

17  witness retaliation and stop there.

18        And we urge the Court not to do that in this case.

19  Every single piece of evidence, every wire call, every

20  jail call, every text message, every photograph, all of it is

21  important in getting the complete picture of Jamal Lockley and

22  his role in this gang.

23        And what all of the evidence shows is that Mr. Lockley

24  was in the thick of things.

25        Whether he labeled himself MMP or not, he functioned

1    as a member of the gang.

2         The murder and the bloodshed were eminently

3    foreseeable to him.  He knew all about it.  He was there when

4    plans were made to kill rivals and witnesses.  He embraced it.

5         He benefited from the violence committed by other MMP

6    members because that's what allowed him to monopolize the drug

7    market and to make his living peddling deadly drugs.

8         So we've outlined a lot of the evidence in our

9    sentencing memo, and I won't go through it all here.

10        But the rap video is important.  The video in which

11   Lockley is sitting next to Dante Bailey, he's nodding his head

12   as Dante Bailey talks about how his gang has, quote, teams for

13   money and murder, unquote.

14        Mr. Lockley knew all about the murder team.  The money

15   team couldn't succeed without the murder team.

16        The August 30th, 2015 jail call is important, and

17   that's the call where Melvin Lashley tells Dominick Wedlock

18   that Dontray Johnson, quote, beat the fuck out of, unquote,

19   someone who tried to steal one of the defendant's drug sales.

20   He broke his jaw and all that.

21        That was done for Mr. Lockley's benefit.  If the

22   Dontray Johnsons of the gang don't use violence to terrorize

23   competitors, the Jamal Lockleys of the gang can't maintain

24   their drug clientele.

25        The wire calls with his drug customers are also

     1     important.  There's the July 26th, 2016 call that we played at

     2     trial in which Mr. Lockley yelled -- he angrily yelled at a

     3     drug customer for questioning the quality of the heroin he had

     4     just bought, sending the message that he's not to be messed

     5     with, that they should take what he gives them without

     6     complaint.

     7          The July 29th, 2016 wire call with Dante Bailey is

     8     important.  This is the call where Mr. Lockley reports that

     9     Eastside, a member of MMP, Eastside was killed because he was

    10     playing the 50/50 game, and Bailey confirmed that that was

    11     supposed to happen.  That's what happens to people who are

    12     disloyal to MMP, and Mr. Lockley knew that.

    13          And then, of course, there are the calls about

    14     retaliating against Ricardo Johnson, and those are important

    15     too.

    16          There's the July 17th, 2016 call between Mr. Lockley

    17     and Dwight Jenkins, another MMP member, where Mr. Jenkins

    18     describes a fight that he had with Ricardo Johnson, Uncle Rick.

    19          And Mr. Lockley says ominously, quote, man, say no

    20     more.  Put yo together.  We going to put yo together, man.

    21     Unquote.

    22          And three weeks later, three weeks after that call,

    23     Ricardo Johnson is abducted, he's bound, he's blindfolded, he's

    24     shot over 20 times by another member of the conspiracy.

    25          And then days after that, Mr. Lockley is in another

call with Dante Bailey laughing about the murder. It's hilarious to them that Ricardo Johnson's life was ended in such a horrific fashion.

So all of those pieces of evidence are important and show the full picture of Mr. Lockley and his role in this gang.

Of course, he also has an extremely serious criminal history. As I mentioned before, he has six prior drug felony convictions. One of them involved a search warrant at a stash house that was used by Mr. Lockley where there was an assault rifle recovered. So Mr. Lockley's no stranger to guns and violence.

For all of these reasons, we believe that a sentence of 35 years is necessary to comply with the purposes of sentencing set forth in 3553.

**THE COURT:** Okay. Thank you, Ms. Hoffman.

Mr. Trainor.

**MR. TRAINOR:** Thank you, Your Honor.

Now, looking at this case from a 3553(a) perspective, of course, we're looking for a sentence that is sufficient but not greater than necessary to address the purposes of sentencing.

And the Court, of course, is going to review the case, as we have, and Mr. Lockley's background.

And if you look at his background, he really got off to a bad start in life.

His mom -- his mother was dead by the age of 15 and he's never known his father.

It's not that remarkable that by the time he was in the 11th grade, he was in the court system.  He left school in the 11th grade after he was arrested, and he went to jail apparently for three years that early in life.

I look at his record of convictions, and I don't see violence.  I see drugs, all Baltimore City court cases.

He had career offender points by the time he was 19.  So he did come up through some disadvantages.

Nevertheless, he's been in and out of jail and has maintained a relationship with his children's mother.  He has three children who he maintains regular contact with.

It's a little hard to explain to my client how so much of the talk at sentencing, in support of a very long sentence, would be about conduct that he was acquitted of.

I understand the law on that.  But when we look at the form situation, it was based primarily on the testimony of W.B., Mr. Banks.

And apparently the jury didn't believe him, and that's really their province.

Even if we were to credit Mr. Banks' testimony, I don't believe he said he ever saw Mr. Lockley with a gun.  I don't believe he -- I believe he did say that Mr. Bailey jumped out suddenly and just shot a guy.

1          But the jury heard all that.  They heard what

2    Mr. Banks said, and they didn't credit it at all, apparently.

3          As far as the conversation on August 19th, 2016, that

4    was the call from the Northern Neck Correctional Center down in

5    Wausau, Virginia, where Mr. Bailey was being held, and it went

6    to Mr. Singer's phone, who is at the recording studio where

7    apparently everybody gathered to record rap music.

8          And Singer answered the phone.  It sounded like the

9    phone was on a conference call or a speakerphone.  And

10   Mr. Lockley was called over the phone at some point.  All the

11   talking really was done by Bailey.

12         And there's no evidence that Mr. Lockley ever

13   initiated any witness tampering or made any moves towards

14   William Banks, as far as I recall.

15         So I'm asking the Court -- well, also there's a phone

16   call with Mr. Jenkins about Uncle Rick, and apparently he had

17   some -- Mr. Jenkins had some contact with this person.

18         And, as I recall, it was a -- like a traffic, a

19   road-rage incident, some disrespect shown there.

20         And mostly it sounded to me like small talk on the

21   phone.

22         And, again, there is no evidence that Mr. Lockley did

23   anything after that call other than to speak to Mr. Jenkins,

24   who I believe called him.

25         One thing that is clear is that -- and I believe the

Government has always agreed to this -- is that Mr. Lockley was
not a member of MMP; that he mostly was involved in some drug
sales around the gas station.

Certainly we have to look at 3553(a)(6) in this case,
which would indicate that the sentence should not create an
unwarranted disparity.

I've looked at the 21 or so sentences that the Court
has imposed so far, and there are -- no sentence rises to the
level that the Government is seeking today.

Dontray Johnson is -- I read his statement of facts
this morning on his plea.  He murdered Antoine Ellis on
November 22nd, 2012.  He shot him and killed him.

He was involved in other violent conduct, direct,
hands-on, and he got less than what the Government is seeking.

Adrian Spence got 180 months.  He was like on top of
the drug organization before he went to prison.

Shakeen Davis, who went to trial, had charges in
addition to what Mr. Lockley was found guilty of.  He had
firearms charges, and still he did not get a sentence at the
level that the Government's seeking for Mr. Lockley.

So I'd ask the Court to consider that and impose the
sentence that's proportional with these others.  Show -- of
course I know the Court will -- show respect for the jury's
verdict.

Because, you know, to me, if we take the situation

1  with the Hornes murder and do as the Government argues, go to a

2  murder guideline, treat him as a -- completed as a homicide, it

3  really doesn't promote respect for law enforcement, in my

4  opinion, because the jury decided that issue.

5        And, generally speaking, among lawyers, we understand

6  that at sentencing, the Court only has to make a finding by a

7  preponderance, but that's pretty hard to explain to a defendant

8  and to the public, really, who consider the jury's verdict to

9  be the ultimate word.

10       So I'm asking the Court to impose a sentence that

11  doesn't exceed a sentence that is already imposed for

12  Dontray Johnson, who was an actual killer.

13       Thank you, Your Honor.

14       **THE COURT:**  Okay.  Before I turn to your client, let

15  me also ask -- and I think you did address this in your

16  sentencing memo, Mr. Trainor -- but in terms of any specific

17  recommendations to the Bureau of Prisons, is it still -- I

18  think --

19       **MR. TRAINOR:**  Yes, he would like to request a

20  recommendation that he be designated to FCI Fairton in

21  New Jersey.

22       **THE COURT:**  I believe you have Fairton and then

23  Fort Dix as a second --

24       **MR. TRAINOR:**  I think Fort Dix is a low --

25       **THE COURT:**  So he might not be eligible for it.

1          **MR. TRAINOR:**  It would be, as an alternative,

2   Fort Dix.

3          But those are the -- his children are in

4   Harford County, I believe.  And either of those two may be the

5   closest two BOP facilities, Your Honor.

6          And, of course, he's entitled to all the time served,

7   which I believe goes back to September 27th of 2016.

8          **THE COURT:**  I think that's reflected in the

9   presentence report accurately.

10          **MR. TRAINOR:**  Oh, one more thing, Your Honor, if I

11   may.

12          **THE COURT:**  Of course.

13          **MR. TRAINOR:**  Mr. Lockley reminded me of this.

14          He has been sitting at CDF for three years.  The

15   conditions of confinement there, as the Court knows, have been

16   horrible over the years.  He's been through all of that.

17          He's been through times when it's incredibly hot.

18   He's been through times when the kitchen is closed and they

19   have to eat cold food that's brought from across the street.

20          The heating is poor and the ventilation is poor.  It's

21   really an overcrowded, substandard institution, and he's asking

22   the Court to consider a variance, downward variance, to reflect

23   the extra burden on him for the past three years in that

24   substandard facility.

25          **THE COURT:**  Okay.  Thank you.

1    Let me ask an additional question.  I just want to be

2    clear, again, before I turn to Mr. Lockley.  This deals with

3    supervised release, and I guess I'm addressing everyone,

4    including the probation officer, in case there's any change.

5    The presentence report had indicated -- let me find

6    it -- no more than five years of supervised release on Count 1

7    and then a required supervised release of at least ten years on

8    Count 2, but I was not clear if that may have been because of

9    the 851.

10    **MS. HOFFMAN:**  That's because of the 851, so I think it

11    would still be -- it would be changed to a minimum of five

12    years.

13    **THE COURT:**  Five years.

14    **MS. HOFFMAN:**  Yes.

15    **THE COURT:**  Okay.  Mr. Lockley, if there's anything

16    that you would like to say before I make a final decision about

17    the case, you have the right to do that.  You don't have to.  I

18    won't hold it against you, but you have the right to speak if

19    you'd like to.

20    **THE DEFENDANT:**  Yes, ma'am.

21    First of all, good morning, Your Honor.

22    **THE COURT:**  Good morning.

23    **THE DEFENDANT:**  I would like to say that I believe

24    that murder and participation in murder, like, that's too much.

25    And I just believe that this was -- this -- all this

1    is just -- it's -- it's too much.  It's too much.

2           And I wasn't found guilty for murder.  I wasn't found

3    guilty for participation in murder.  And witness intimidation,

4    that's not murder.

5           And it really -- William Banks testified that nobody

6    made contact with him.  The witness tampered with him.

7           So, like, I believe that's too much.

8           And, Your Honor, I just believe that murder is too

9    much.

10          That's all.

11          **THE COURT:**  Okay.  Thank you, Mr. Lockley.

12          Anything else anybody wants to say?  I'm going to take

13   a brief recess.  But anything else that needs to be addressed?

14          **MS. HOFFMAN:**  I don't think so.  Thank you.

15          (The defendant conferred with counsel.)

16          **THE COURT:**  Okay.  I will take a recess for 15

17   minutes.

18          (11:03 a.m.)

19          (Recess taken.)

20          (11:19 a.m.)

21          **THE COURT:**  Thank you.  You can be seated.

22          There is no forfeiture issue, issue of forfeiture in

23   this case; is that correct?

24          **MS. HOFFMAN:**  No.

25          **THE COURT:**  Okay.  All right.  Well, thank you, all.

```
1    I appreciate everything I've received from the Probation Office
2    and counsel on both sides and what Mr. Lockley had to say.
3            I'm reserving the right to edit, by the way, my oral
4    sentencing ruling here for the mistakes of grammar I'm sure to
5    make, without changing the substance.
6            I'm also incorporating in what I'm about to say
7    findings I have made in the course of the proceedings.
8            First of all, in terms of the guidelines, as I've
9    indicated, I'm going to assume that the Norman case does
10   control and that the career offender guideline, therefore,
11   would be lower than what I'll just call the ordinary or normal
12   guideline, that calculation being an offense level of 34 for
13   the reasons I've expressed, and adopting what's in the
14   presentence report, and the criminal history category being VI,
15   that would be a range of 262 to 327 months.
16           As we had noted, if the career offender guideline were
17   applicable as far as Count 2, the guidelines would be 360 to
18   life.
19           At just an absolute minimum, it seems to me, just
20   based on the drugs, we'd be at an offense level of 30, and a
21   criminal history category of VI is 168 to 210 months.
22           As I say, I believe, based on what's been presented to
23   me at the moment, that the Offense Level 34, Criminal History
24   Category VI is the correct one.
25           But I wanted to be absolutely clear, the guidelines
```

1  are only one factor, and the sentence I'm going to announce

2  would be the same, regardless of what the precise guideline

3  calculations are.

4         I also want to be clear, in response to what

5  Mr. Lockley most recently said, that I am not sentencing him as

6  if he were directly responsible for murder.  I've declined the

7  Offense Level 43.

8         But I think it is abundantly clear from the evidence

9  that Mr. Lockley was at least very much aware of violent acts

10  that were committed and planned by other members of the gang,

11  even if he has not been proven to directly carry them out.

12         As I indicated earlier, I think there's certainly a

13  preponderance of the evidence that he was in the car with

14  Mr. Bailey and the witness and observed Mr. Bailey murder

15  Mr. Hornes.

16         He clearly continued to stay in the conspiracy and

17  support the gang, participate in the conspiracy and support the

18  gang.  And at least he certainly was clearly discussing acts of

19  violence against others.

20         And, again, the jury did find unanimously beyond a

21  reasonable doubt that acts of witness intimidation and

22  retaliation were foreseeable to him.  This is part of what

23  makes this a very serious offense.

24         As the Government indicated, it's one of the major

25  obstacles, one of the major difficulties with successful

 1   arrests and prosecution of serious crime.  And, frankly, it's a

 2   threat to the judicial system and the ability to fairly try

 3   cases based on all the evidence when witnesses are intimidated

 4   and retaliated against, as they were in this case.

 5        This is also a very serious offense because of the

 6   drugs.  It's a very, very substantial quantity of drugs

 7   involved.

 8        Again, I fully agree with the jury's verdict about the

 9   quantity that was foreseeable to Mr. Lockley over the course of

10   the number of years he was involved.  That may well be an

11   understatement.

12        These drugs are poison.  They kill people.  We have in

13   this instance direct proof of an overdose that was caused by

14   drugs that Mr. Lockley distributed.  Fortunately, that

15   particular dose did not kill the individual, but certainly

16   there was an overdose.

17        And there was no indication that that caused any

18   concern or stopped Mr. Lockley's drug-selling activities for

19   which -- and this goes a little bit to relative culpability,

20   but I'll note that he has not accepted responsibility, as some

21   others have done in this case.

22        Mr. Lockley has a very lengthy criminal history, as

23   we've indicated.  It's 18 points.  He's Category VI, regardless

24   of the career offender status, six prior drug felonies, at

25   least one -- there's a conviction involving a gun in 2006.

1    I will note there was even indication of possession of

2  contraband while he was locked up.  There's a very high risk of

3  recidivism based on the consistency of his criminal record, at

4  least of drug distribution, and certainly a career offender in

5  the ordinary sense, even if not under the guidelines for

6  Count 2.

7    Now, Mr. Lockley's individual circumstances also need

8  to be considered, and I'll certainly accept that he has had a

9  lot of difficulties in his life, and particularly in his

10  childhood.  And he may have fallen into drugs as part of the

11  community as a young man.

12    Of course, he's older now.  That's less of an -- well,

13  it's never an excuse, but it's less understandable than perhaps

14  it is earlier, and it doesn't mitigate the danger to the

15  community that is indicated by Mr. Lockley's consistent

16  involvement in drug dealing.

17    I do think that relative culpability is important.  A

18  couple of the people that Mr. Trainor has referred us to, of

19  course, did accept responsibility, and they do get credit for

20  that.

21    But I think there are certainly some similarities to

22  Mr. Davis.

23    Now, Mr. Davis did have some additional convictions in

24  this case, including a 924(c) for a weapon.

25    On the other hand, Mr. Davis was a Criminal History

1   Category III, not a criminal history category of VI.

2          I have also taken into account the issue of

3   Mr. Lockley's being confined at the Chesapeake Detention

4   Facility for several years.

5          I will say, as I generally do, as an institutional

6   matter, the Court is aware of a number of problems, and,

7   frankly, I think has acted to try to alleviate some of those

8   problems over the past few years.

9          I don't find it is something that warrants a variance

10  from an otherwise appropriate sentence, however.

11                      Conference at the bench.

12     (It is the policy of this court that every guilty plea and

13  sentencing proceeding include a bench conference concerning

14  whether the defendant is or is not cooperating.)

15     **THE COURT:**  So when I balance all these factors and

16  try to decide on a sentence that is sufficient without being

17  greater than necessary, it is my finding that a sentence of 30

18  years, 360 months in the custody of the Bureau of Prisons, is

19  sufficient without being greater than necessary, and that is

20  the sentence, Mr. Lockley.

21         It's 30 years on Count 1, 30 years on Count 2, and 20

22  years on Count 10.  I'm going to announce this sentence and

23  then you all can tell me if I've left anything out or there are

24  any legal objections.  Those sentences would all be concurrent,

25  of course.

1      They would be followed by five years of supervised

2 release on Counts 1 and 2, three years on Count 10.  That's all

3 concurrent as well.

4      Mr. Lockley's financial circumstances don't permit any

5 fine.  There is no fine.

6      There is a required $100 special assessment on each

7 count.

8      There's no issue of forfeiture or restitution here.

9      I certainly would recommend to the Bureau of Prisons

10 that Mr. Lockley be designated to a facility consistent with

11 his security level that's as close to Harford County, Maryland,

12 as possible.  Possibly Fairton, FCI Fairton.  That he

13 participate in any substance abuse program he's eligible for

14 while he's in the Bureau of Prisons, as well as vocational

15 training.

16      Special conditions of supervised release are also

17 going to include any substance abuse testing or treatment the

18 probation officer recommends and any vocational programs that

19 the probation officer recommends.

20      And I think that is a reasonable sentence.

21      But tell me if I have left anything out.  Any legal

22 objection to any of that?

23      **MS. HOFFMAN:**  No, I don't think so.  Thank you.

24      **THE COURT:**  Okay.  Anything else, Mr. Trainor?

25      **MR. TRAINOR:**  No, Your Honor.

1          THE COURT:  Okay.  All right.  Mr. Lockley, as I'm

2    sure you know, you have the right to appeal from your judgment

3    of conviction and from this sentence.  I'm sure Mr. Trainor

4    will assist you with that.

5          You do have 14 days to note the appeal.

6          Do you understand that, sir?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  Okay.  All right.  Thank you, all.

9          THE CLERK:  Ms. Hoffman.

10         THE COURT:  I'm sorry, is there anything to dismiss?

11         MS. HOFFMAN:  Yes, we do move to dismiss the first

12   superseding indictment.

13         THE COURT:  Yes.  Okay.

14         MS. HOFFMAN:  Thank you.

15         THE COURT:  Thank you.

16      (Matter concluded at 11:30 a.m.)

17      I, Douglas J. Zweizig, RDR, CRR, FCRR, do hereby certify

18   that the foregoing is a correct transcript from the

19   stenographic record of proceedings in the above-entitled

20   matter.

21

22              _____/s/_____

23              Douglas J. Zweizig, RDR, CRR, FCRR
                   Registered Diplomate Reporter
                   Certified Realtime Reporter
24              Federal Official Court Reporter
                    DATE:  January 1, 2020

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                         NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
            Plaintiff,            )
 4                               )
          vs.                     ) CRIMINAL CASE NO. CCB-16-0267
 5                               )
     DANTE BAILEY,                )
 6        Defendant.              )
     _____ )
 7

 8

                         Tuesday, November 5, 2019
 9                           Courtroom 7D
                          Baltimore, Maryland
10

11         BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE

12
                              SENTENCING
13

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Assistant United States Attorney
16
     For the Defendant:
17
     Paul Enzinna, Esquire
18   Teresa Whalen, Esquire

19   Also Present:

20   Special Agent Timothy Moore, ATF
     Tracy Schrum, U.S. Probation Officer
21   _____

22
                           Reported by:
23
                   Douglas J. Zweizig, RDR, CRR, FCRR
24                 Federal Official Court Reporter
                   101 W. Lombard Street, 4th Floor
25                   Baltimore, Maryland  21201
```

```
 1                    P R O C E E D I N G S

 2        (10:06 a.m.)

 3            THE COURT:  Good morning, everyone.  You can be

 4   seated, please.

 5            Would you like to call the case, Ms. Hoffman.

 6            MS. HOFFMAN:  This is United States versus

 7   Dante Bailey, Case Number CCB-16-0267.  I'm Christina Hoffman

 8   on behalf of the United States.

 9            With me here at counsel table is Special Agent

10   Tim Moore of the ATF.

11            And we're here for Mr. Bailey's sentencing.

12            And I did want to note at the outset that we do have

13   some members of the victim's family here, one of the victim's

14   family here as well.

15            THE COURT:  All right.  Thank you.

16            And at the appropriate time, I'll ask whether anyone

17   wants to speak.

18            MS. HOFFMAN:  Thank you.

19            MR. ENZINNA:  Your Honor, Paul Enzinna and

20   Teresa Whalen for Mr. Bailey.

21            THE COURT:  Okay.

22            MS. WHALEN:  Good morning.

23            THE COURT:  All right.  Well, we are here for

24   sentencing for Mr. Bailey following his conviction by a jury on

25   a number of charges:  Count 1, RICO conspiracy; Count 2, drug
```

```
 1    conspiracy; Count 3, murder in aid of racketeering; Count 17
 2    was unlawful possession of a firearm; and Count 18, possession
 3    with intent to distribute heroin.
 4           As counsel know, I need to start with the presentence
 5    report.
 6           I should indicate that, of course, in addition to the
 7    presentence report, I have sentencing memoranda from both the
 8    defense and the Government.  Thank you.
 9           Let me turn to the presentence report.  And for the
10    moment, aside from the guideline issues, are there any
11    additions, corrections, or modifications that the Government
12    would want to suggest to the presentence report?  I have one
13    with a revised date of July 11th, 2019.
14           MS. HOFFMAN:  No, I don't believe so.
15           THE COURT:  Okay.  Mr. Enzinna?
16           MR. ENZINNA:  Your Honor, our primary objection to the
17    presentence report is the statement with regard to acceptance
18    of responsibility that we -- we believe that -- it says that
19    Mr. Bailey should not get the benefit of acceptance of
20    responsibility because he forced the Government to go to trial,
21    but it's our position, as you know, that we did not force the
22    Government to go to trial.
23           THE COURT:  Okay.  All right.
24           And I should just ask, for the record, obviously,
25    you've read the presentence report.
```

1      Has Mr. Bailey had the chance to review it with you?

2      **MS. WHALEN:**  Your Honor, if I could interject, yes,

3  Mr. Bailey has had the opportunity to review the different

4  versions of the presentence report.

5      I did want to just point out as well that there was a

6  paragraph -- I think it's 38 -- which included information

7  relating to telephone calls with Tiffany Bailey and a

8  characterization of those calls.  We objected to that being

9  included in the presentence report.

10      Since that time, the Government I want to say was -- I

11  think it was Wednesday morning or Thursday morning, we received

12  the Government's sentencing memorandum that included a

13  transcript and also those telephone calls.

14      And we would object to that being part of the

15  proceedings, one, because we don't think they're relevant,

16  number one.  And the Government has had them for months and

17  months and never shared them with us until sort of on the eve

18  of sentencing, when, unfortunately, because of the timing, I

19  couldn't mail them to my client for any response at all because

20  I knew it wouldn't get to him because he's at Northern Neck,

21  and the mail takes forever there.

22      And, secondly, our schedules didn't allow for us to

23  drive there.

24      And so my client has been able to review those very

25  briefly this morning when he got here from Northern Neck.  And

 1    so we've had absolutely no ability to challenge any of this.

 2          **THE COURT:**  Okay.  Can we find the paragraph.

 3          **MS. WHALEN:**  Oh, I'm sorry, I believe it's

 4    Paragraph 38.

 5          **THE COURT:**  It doesn't appear to be 38.  That relates

 6    to --

 7          **MS. WHALEN:**  Oh, that may have changed, Your Honor, I

 8    apologize, on this one.  I'll find it.

 9          Oh, maybe it's Page 38, I'm being told.

10          **MS. HOFFMAN:**  I believe it's -- is it Paragraph 187?

11          **MS. WHALEN:**  Yes.  Thank you very much.

12          **MS. HOFFMAN:**  And, Your Honor, we do intend to --

13    well, I'm sorry, I'll let Your Honor look at that paragraph

14    first.

15          **THE COURT:**  Well, most of Paragraph 187 appears to be

16    a fairly -- actual statement of the fact that I postponed

17    Mrs. Bailey's sentencing and I revoked her release because of

18    her almost daily communications with Mr. Bailey, which did not

19    surely involve their children; in fact, involved matters

20    relating to this case.

21          Now, that is separate from whether that has any

22    influence whatsoever on the sentence in that case.

23          The specific objection primarily would be the last

24    part of the last sentence?

25          **MS. WHALEN:**  Well, initially, it was as to all of

```
 1   this.  We have no independent knowledge.  That hearing, I
 2   believe, was Under Seal.  We were not privy to any of the phone
 3   calls until just the Government's sentencing memo.
 4           THE COURT:  I see.
 5           MS. WHALEN:  At this point, even though late
 6   disclosure, we are privy to some portion of that.
 7           But the very last sentence, we would take issue with
 8   the characterization and that that should not follow him to the
 9   Bureau of Prisons.
10           THE COURT:  Okay.
11           Ms. Hoffman.
12           MS. HOFFMAN:  Your Honor, we do intend to make the
13   three jail calls that were discussed in the Government's
14   sentencing memo a part of the record today.
15           First of all, I think it's a little misleading to
16   suggest that Mr. Bailey wasn't on notice of these calls.  Of
17   course, they're his own jail calls.  These are the words that
18   he spoke in his own jail calls.
19           We did turn them over last week to defense counsel.
20   They have had an opportunity to review them with the defendant.
21           We do think that they're important.  As Mr. Enzinna
22   just raised, they have made an argument that Mr. Bailey has
23   accepted responsibility, and we think that these jail calls are
24   important to rebut that argument.
25           They show that Mr. Bailey has continued to engage in
```

1    the same pattern of racketeering activity alleged in the

2    indictment throughout his pretrial detention in this case and

3    even after his conviction, and that's significant.

4            It's significant for purposes of determining whether

5    he should get a downward adjustment for acceptance of

6    responsibility.

7            And it's significant for another reason as well.  And

8    I don't want to rehash the defendant's motion to enforce the

9    plea agreement here.  I think the Court got it exactly right

10   and there was no agreement.

11           But the Fourth Circuit has held -- and this is a case

12   called United States versus West.  This is 2 F.3d 66.  It's a

13   Fourth Circuit case from 1993 that when a defendant breaches a

14   plea agreement, he forfeits any right to its enforcement.

15           And so I think that the continued pattern of criminal

16   conduct here is also important because it -- even if the

17   Fourth Circuit were to disagree as to whether there were a plea

18   agreement -- which we agree with the Court, of course, that

19   there was none -- but even if it were to disagree on that

20   point, there would be an alternative basis to affirm this

21   Court's ruling, which is that the defendant breached -- if

22   there were any agreement, the defendant breached it by

23   continuing to engage in a pattern of criminal activity.

24           And so we think it's relevant for that purpose as

25   well.

1          And the only reason that we brought these jail calls

2     to the Court's attention was because of defense counsel's

3     argument in its sentencing memo, which we had gotten just a few

4     days before we filed our own sentencing memo, that the

5     defendant is entitled to a downward adjustment for acceptance

6     of responsibility.

7          We got the defendant's sentencing memo, and in

8     responding to that argument, we attached these jail calls and

9     turned them over to the defense.

10          As I mentioned, they are the defendant's own

11     jail calls.  He's been on notice of them since he made them.

12     And there's no reason why they shouldn't be considered as part

13     of the record today.

14          **THE COURT:**  Okay.  And, of course, I'm assuming that

15     this summary, this Paragraph 187, has been contained in the

16     presentence report since July 11th, 2019?

17          **MS. HOFFMAN:**  Yes; and that was not something that the

18     Government submitted to U.S. Probation.  I think that's

19     something that they determined on their own.

20          **THE COURT:**  All right.

21          **MS. WHALEN:**  But I should tell the Court that we

22     objected to that initially with the probation agent.

23          **THE COURT:**  Sure.  All right.  Well, I'm going to

24     defer any sort of ruling on that.  I don't know that it is, as

25     I said, going to be relevant to my sentencing in this case.

1        Certainly, to the extent the Government wants to rely

2   on it as evidence of a breach of a plea agreement, if there was

3   an enforceable plea agreement, that is something the

4   Fourth Circuit would decide at a later point, not something

5   that I would be deciding today.  But we can come back to that

6   as we need to.

7        So that was Paragraph 187.

8        And, in general, on the acceptance of responsibility,

9   do you want to be heard on that?  Obviously, your memorandum

10  includes a very thorough collection of all the papers relating

11  to the motion to enforce the plea agreement.

12       **MR. ENZINNA:**  Your Honor, if I may, I'd like to

13  address at least a little bit of what the Government said in

14  response to it in their sentencing memo.

15       **THE COURT:**  Okay.

16       **MR. ENZINNA:**  The statute, Section 1959(a)(1), is

17  clear and unambiguous.  It provides alternative penalties.  The

18  Court may impose a sentence of life or death or a fine.

19       As this court found, as Chief Judge Bredar found, that

20  gives the Court discretion.

21       **THE COURT:**  Chief Judge Bredar did not find that in

22  any formal or opinion/written sort of way.  I believe that he

23  entertained that before case law had been brought to his

24  attention.

25       **MR. ENZINNA:**  Well, Your Honor, I will read to you

1   exactly what Judge Bredar said.

2        **THE COURT:**  You may.  I'm aware of it.  You attached

3   it to your memo.

4        **MR. ENZINNA:**  Well, what he said specifically was,

5   That's my ruling on the statutory question.

6        **THE COURT:**  Yes, I agree.

7        But, again, I believe that was in the course of an

8   oral ruling as to a sentence when he had not been fully advised

9   of the case law.

10        But setting that aside, fine, we'll assume for the

11   sake of argument that Judge Bredar made that ruling.

12        Move ahead.

13        **MR. ENZINNA:**  Okay.  The Under Seal case --

14        **THE COURT:**  Yes.

15        **MR. ENZINNA:**  -- in the Fourth Circuit that the

16   Government relies on, the Court's language in there about

17   1959(a)(1) was dicta.

18        It was the issue of whether or not 1959(a)(1)

19   permitted a sentence other than life or death.  It was not at

20   issue in that case.  It was assumed that it was by all the

21   parties.

22        Now, in terms of acceptance of responsibility, as

23   Your Honor knows -- and I won't rehash the arguments -- we

24   believe that Mr. Bailey did reach a plea agreement with the

25   Government.

1          But even if he did not, the record is very clear that

2     Mr. Bailey could -- there's nothing more Mr. Bailey could have

3     done to reach an agreement in this case.

4          He agreed to plead to conditions -- terms that were --

5     I mean, at one point we agreed to plead to 40 years in prison.

6     Given his age, he's 40 years old, given the life expectancy of

7     someone that age in prison, that is, most likely, almost

8     certainly a life sentence.

9          But it's different because what it does is it gives

10    him some hope.  It gives him a sliver, a tiny sliver of hope

11    that he might have a life outside of prison someday in his

12    mid 70s.

13         Now, I want to address the calls that were included in

14    the Government's memo as evidence that he supposedly has not

15    accepted responsibility.

16         First of all, the first of those calls is dated

17    January 2019, which was before the trial in this case and

18    before the plea discussions that we -- were the subject of our

19    motion.

20         So on that basis alone, I believe it's not relevant to

21    the issue of acceptance of responsibility.

22         But also, Your Honor, I believe the Government

23    overstates what happens in that call.

24         **THE COURT:**  Okay.  I want to make sure I'm following

25    you.  I'm looking at the Government's memo.  There's a

```
 1    jail call transcript from January 6 of 2019?
 2              MR. ENZINNA:  Yes, that's the one.
 3              THE COURT:  Okay.
 4              MR. ENZINNA:  It's Government's Exhibit 1.
 5              The Government characterizes this as Mr. Bailey -- I
 6    think it says that he instructs -- instructed his wife and
 7    co-defendant to assault a woman he suspected of cooperating
 8    against him.
 9              Now, the transcript does include Mr. Bailey's
10    statement, "Yeah, slap the shit out of her" and then, "You
11    should smack the shit out of her."
12              Now, it's pretty clear from the context of this
13    conversation that he is not saying, I want you to go assault
14    this person because they are cooperating.
15              I mean, it's just -- the language just does not
16    support that.
17              Mrs. Bailey -- Ms. Bailey, Tiffany Bailey, talks --
18    says, "That girl felt like she controlled the world.  I don't
19    know why she thought she was the boss.  I don't know who she
20    thought she was.  She thought she was a bad one."
21              Mrs. Bailey clearly just felt that this woman had a
22    bad attitude.  And Mr. Bailey isn't saying, I want you to
23    assault her so she won't cooperate against me.
24              The second call, the April 28th call at 6:33 p.m.,
25    that's the one where the Government says that Mr. Bailey's
```

 1    talking to the famous Chicken Box about smuggling drugs into

 2    the prison.

 3            Again, I think the Government is reading way too much

 4    into this call.  There's a discussion of "10-piece" and

 5    "50-piece," but you have to go pretty far outside the language

 6    of the transcript itself to conclude that's about smuggling it

 7    into the prison for Mr. Bailey.

 8            Moreover, the issue of smuggling -- I don't mean -- I

 9    don't want to defend smuggling drugs into prison.  It's

10    certainly not model behavior.  But it's not the conduct at

11    issue here.

12            And, finally, the third call, this is the one that the

13    Government characterizes as Mr. Bailey instructing people to go

14    after someone.

15            What this call is about --

16            **THE COURT:**  So now we're on April 28th at 7:00 p.m.

17            **MR. ENZINNA:**  Correct.  Exhibit 3 to the Government's

18    brief.

19            What this call is about, it's about Bandi, you

20    remember, Chiquetta Heath, was someone who supported Mr. Bailey

21    and Mr. Bailey thought of her as a sister.

22            And what he learned was that someone was threatening

23    to kill her.  And on the street, that could result in death.

24            And what he's saying in this call is you need to go

25    straighten this woman out.

1          Now, there's no indication in this call at all, that I

2     can see, that this involves MMP business.

3          So, Your Honor, based on all of that, we would request

4     that the Court grant Mr. Bailey a departure for acceptance of

5     responsibility of two or three levels, which would bring his

6     guideline offense level down to 40 or 41, which would permit

7     the Court to impose a sentence less than life, and that's what

8     we ask for.

9          Thank you, Your Honor.

10         **THE COURT:**  Thank you, Mr. Enzinna.

11         Ms. Hoffman.

12         **MS. HOFFMAN:**  Thank you, Your Honor.

13         Section 3E1.1 provides for a two-level downward

14    adjustment in the offense level, quote, "If the defendant

15    clearly demonstrates acceptance of responsibility for his

16    offense."

17         And the Government can move for a third level, the

18    Government can make a motion for a third level, if the

19    defendant, quote, "Has assisted authorities in the

20    investigation or prosecution of his own misconduct by timely

21    notifying authorities of his intention to enter a plea of

22    guilty, thereby permitting the Government to avoid preparing

23    for trial and permitting the Government and the Court to

24    allocate their resources efficiently," unquote.

25         Mr. Bailey has not come close to demonstrating

1    acceptance of responsibility as required under 3E1.1.

2         The fact that Mr. Bailey tried to get a plea offer on

3    his terms on the eve of trial, when Government counsel had

4    spent countless hours preparing for the case, when the Court

5    had ruled on dozens of pretrial motions, doesn't come close to

6    showing that he accepted responsibility for his offense.  It's

7    a last-ditch effort to avoid a life sentence when he realizes

8    that he had little hope of acquittal at trial.

9         In fact, as the Court knows -- and we attached this to

10   our sentencing memo as Government's Exhibit 1 -- on August 20th

11   of 2019, roughly four months after the jury's verdict,

12   Mr. Bailey sent the Court a letter denying responsibility for

13   the murder of James Edwards, which is the VICAR murder of which

14   he was convicted at trial.

15        That just completely flies in the face of the notion

16   of acceptance of responsibility.

17        And then, as discussed in our sentencing memo, we have

18   attached three jail calls and three kites intercepted at CDF

19   showing that throughout his pretrial incarceration and after

20   his conviction in this case, Mr. Bailey has continued to engage

21   in the exact same pattern of racketeering activity alleged in

22   the indictment, attempting to obstruct justice, causing harm to

23   witnesses, inciting other members of the gang to violence, and

24   trying to run a drug-smuggling operation in CDF.

25        I think that the Government's interpretation of these

1    jail calls is a completely fair one.

2           We have included as attachments -- I think it's

3    Attachments 1, 2, and 3 to our sentencing memo -- transcripts

4    of the -- full transcripts of the relevant portions of these

5    calls.  And the transcripts bear out exactly what we've laid

6    out in our sentencing memo.

7           Mr. Bailey -- and I apologize for spending too much

8    time on this, but I do just want to quickly rebut what

9    Mr. Enzinna has tried to do here.

10          In the January 6th call between Mr. Bailey and his

11   wife, he explicitly tells her that he thinks this woman Bandi

12   is cooperating.  This is at the top of Page 2 of the

13   transcript.

14          **THE COURT:**  Yes, it's the page before, I think.

15          **MS. HOFFMAN:**  Right.  And he again accuses her of

16   being hot.  "Hot" means telling.

17          And then when Mrs. Bailey says that Bandi has reached

18   out to her and wants to come meet up with her in Georgia,

19   that's when he says, "Slap the shit out of her.  Smack the shit

20   out of her."  It couldn't be more clear.

21          Maybe he's not telling her to kill Bandi, but he's

22   certainly telling her to assault Bandi based on the belief that

23   she's cooperating with law enforcement.

24          I think the calls on April 28th are equally clear.  He

25   talks about -- he's clearly talking about MMP business.  He

```
 1   talks about how it's against the rules, the MMP rules, for

 2   somebody to not come to the aid of a fellow MMP member if

 3   they're being threatened by a rival of the gang.

 4        He refers to how we've pledged allegiance to something

 5   together.  He's talking about MMP and he's attempting to incite

 6   Altoneyo Edges, Chicken Box, and this other gentleman, who goes

 7   by the name of Pic, to violence against this person Kev and

 8   this woman Flame because they supposedly are threatening a

 9   female member of the gang.

10        Again, the transcripts of the relevant portions were

11   included as exhibits to our sentencing memo.  We fairly

12   characterized them in our memo.

13        I would like to move the audio of those calls into

14   evidence, especially now given that Mr. Enzinna has also

15   brought them up.

16        And then I don't think he's made any mention of the

17   kites, but I don't think the kites that were sent in jail could

18   be any more explicit about the fact that Mr. Bailey was trying

19   to run a drug-smuggling ring in CDF and was -- I mean, it was

20   actually -- drugs were actually seized in one of these kites,

21   synthetic marijuana, and he made arrangements to pay $100 for a

22   7-inch strip of liquid K2.

23        So all of this belies the notion that he could

24   possibly have accepted responsibility as required under 3E1.1.

25        **THE COURT:**  Okay.  All right.
```

1          On the acceptance of responsibility issue, first of

2    all, we're not re-litigating my ruling on the motion to

3    enforce.

4          Whether or not a plea agreement would have been a

5    reasonable thing to do is beside the point.  You have your

6    objection.  And the ruling on the motion to enforce can

7    certainly go to the Fourth Circuit.

8          In terms of acceptance of responsibility, I don't need

9    to reach the meaning of the transcript of the calls, although I

10   think the Government's understanding of them is accurate, or

11   the fact of the kites because I have the letter from

12   Mr. Bailey, dated August 20th of 2019.

13         And it is certainly his right to tell me that he did

14   not commit the murder of Mr. Edwards, but the jury -- that was

15   one of the cases, that was one of the charges at the trial.

16   The jury found unanimously beyond a reasonable doubt that he

17   did commit that murder, and he has not accepted responsibility

18   for it.

19         So I don't believe that the acceptance of

20   responsibility downward adjustment would be appropriate for

21   that, among the other reasons.

22         I would also note that the offense level could well be

23   higher than a 43.  It is reduced to a 43 because that's the

24   highest that can be considered under the guidelines.

25         So I'm not sure that even granting a two-level

```
 1    downward adjustment for acceptance of responsibility, depending
 2    on where it came in the guidelines, would make a difference.
 3            But, in any event, for the reasons that I've just
 4    stated, I am not granting a two-level downward or three-level
 5    downward adjustment for acceptance of responsibility.
 6            And in regard to the argument -- well, Mr. Enzinna
 7    also argues that the life sentence on Count 3 is not mandatory
 8    because of Judge Bredar's ruling.  And Under Seal he believes
 9    is dictum.
10            Do you want to be heard on that, Ms. Hoffman?
11            MS. HOFFMAN:  I think we've laid out our argument in
12    the sentencing memo.
13            There are three Circuit Courts that have agreed with
14    the Fourth Circuit:  D.C. Circuit, Ninth Circuit, and I'm
15    forgetting now, I think it was the Second Circuit that there
16    is, in fact, a mandatory minimum life sentence for VICAR
17    murder.
18            But, as we point out, even if the statute could be
19    read to mean, according to its plain language, that a Court had
20    discretion to impose death, life, or a fine, there's no
21    discretion to impose a term of years.  It would be one of those
22    three options.
23            And I don't think, obviously, this is a case that
24    warrants just a fine.  And so the only other option is life.
25            THE COURT:  Okay.  On that issue, I agree with the
```

1    Government.  I think that <u>U.S. v. Under Seal</u> at 819 F.3d 715, I

2    don't think it's dictum.  And I think it was essential to the

3    holding in that case and it's fairly clear that it says life

4    imprisonment is the mandatory minimum punishment for this

5    offense.

6         It cites to the <u>James</u> case, which is at 239 F.3d 120,

7    which affirms a District Court's decision that

8    Section 1959(a)(1) carries a mandatory minimum sentence of life

9    in prison.  That's the Second Circuit.

10        There is a similar decision by the -- I think it's the

11   D.C. Circuit, <u>U.S. v. Mahdi</u>, 598 F.3d 883.

12        And the Ninth Circuit in <u>Rollness</u>, 561 F.3d 996, also

13   appears to hold the same way.

14        Regardless of what, again, Judge Bredar may or may not

15   have ruled at a particular moment, I am obviously bound to

16   follow the Fourth Circuit, and I believe that that's what the

17   Fourth Circuit has said.

18        So back to the presentence report and the guidelines.

19        I think we are -- I don't know if anybody wants to be

20   heard about anything else about the guidelines.  I believe that

21   the guideline is at an offense level of 43.  Mr. Bailey's

22   criminal history is a Category V with 12 points.

23        Criminal History Category V and a guideline of 43 -- I

24   mean, excuse me, and an offense level of 43 is a guideline

25   range of life in prison.

1           I think that's the guidelines, other than as to

2   Count 3.

3           The guidelines are just one factor, something I have

4   to consider.

5           I'm happy to hear whatever else anybody would like to

6   say.

7           And I'll start with the Government.  Do you know if

8   there's anyone who wants to be heard from?

9           **MS. HOFFMAN:**  We do have some members of some of the

10  victim's family here.  I am not sure whether any of them wish

11  to speak.

12          I'm seeing some heads shaking.

13          Maybe if I could start with my comments.

14          **THE COURT:**  Sure.

15          **MS. HOFFMAN:**  And in the meantime --

16          **THE COURT:**  You can speak.

17          **MS. HOFFMAN:**  -- we'll figure out whether anyone

18  wishes to speak.

19          **THE COURT:**  Yes.

20          **MS. HOFFMAN:**  Your Honor, a life sentence is mandated

21  by statute in this case.  It's the guideline sentence.

22          But it's also the only just sentence, taking into

23  account the purposes of sentencing set forth in

24  18 United States Code, 3553.

25          It's really hard to imagine a more serious offense

1    than this one or a more dangerous defendant.

2          The defendant was the founder and leader of a brutally

3    violent and destructive Bloods gang that was responsible for

4    dozens of murders, attempted murders, conspiracies to commit

5    murder, and assaults, as well as extortion, witness tampering,

6    and witness retaliation.

7          He built an economy based wholly on trafficking deadly

8    drugs, distributing large volumes of heroin and crack cocaine

9    in the gang's territories in Northwest Baltimore.

10         He ordered, and himself committed, numerous murders in

11   order to retaliate against rivals, impose discipline within the

12   gang, and eliminate potential witnesses to the gang --

13   witnesses against the gang.

14         He gunned down James Edwards for daring to question

15   his authority as the leader of the gang.

16         He gunned down Anthony Hornes for no reason other than

17   that he was in the wrong place at the wrong time.

18         Through his crimes, Mr. Bailey devastated

19   neighborhoods.  He left grieving families and wounded victims

20   in his wake.

21         Perhaps worst of all, he used violence to intimidate

22   and eliminate witnesses and create a culture of contempt for

23   the rule of law.

24         And I said this yesterday at Jamal Lockley's

25   sentencing, but I think it bears repeating today.  There is a

1    special need to deter gang violence that involves witness

2    tampering and witness retaliation because it threatens our

3    entire system of criminal justice.

4         The stop-snitching culture here in Baltimore is the

5    single greatest impediment to prosecuting violent crime in the

6    city, and Mr. Bailey proselytized that culture.

7         He sent the message that if you cooperate with

8    law enforcement, you wind up like Samartine Hill.  Or even

9    worse, you wind up like Ricardo Johnson.

10        And if it wasn't for the tireless efforts of

11   law enforcement officers in this case to disrupt Mr. Bailey's

12   plots against witnesses, you wouldn't have heard from W.B. or

13   J.G.  You wouldn't have heard them tell their stories on the

14   witness stand in this case.  You would have heard from two more

15   Medical Examiners.

16        Unlike many of the other defendants in this case,

17   Mr. Bailey was not thrust into this lifestyle.  He chose it.

18        By his own admission, in a letter that he sent to

19   Judge Quarles in 2011, which is attached as an exhibit to our

20   sentencing memo, Mr. Bailey was raised in a loving, middle

21   class family, and he even attended private school.  He's

22   educated.  He's smart.  He's articulate.  He writes well.  He

23   was given opportunities to succeed.

24        But instead of taking advantage of those

25   opportunities, he chose a life of crime.  He returned to it

1   again and again.

2           And what's even worse, he indoctrinated a generation

3   of less-fortunate youths from his neighborhood, people who

4   didn't have a chance to succeed like he did, he indoctrinated

5   them into a life of crime and senseless violence.

6           He took people like Dontray Johnson and William Banks

7   and Jay Greer under his wing.  He made them think that his

8   gang, Murdaland Mafia Piru, was going to be a family.  And he

9   taught them to be warriors.  He taught them to kill.  He

10  ordered them to kill.

11          He ordered William Banks to kill Samartine Hill

12  because he was rumored to be cooperating with law enforcement.

13          He ordered Dontray Johnson to kill Antoine Ellis

14  because he had allegedly shown disloyalty to the gang.

15          He green-lighted the murder of Ricardo Johnson because

16  he was alleged to be cooperating with law enforcement and

17  deemed to be an enemy of the gang.

18          He did all this because, in his own words, he wanted

19  to be, quote, a legend.  That's what we saw in his letter that

20  was Government's Exhibit GP-12B at trial.

21          He said, in his words, quote, "F this case.  No matter

22  what happens, I'll still be a legend."

23          After Mr. Bailey was arrested, he continued to conduct

24  the gang's affairs from behind bars, evading jail restrictions,

25  using dead drops in order to order hits on rivals and witnesses

1    and plot various ways to obstruct justice.

2         He has shown absolutely no remorse for his offenses

3    and no intention of stopping his criminal activity.  He

4    continues to present a grave danger to the public.

5         Only a sentence of life will protect the public from

6    future violent crimes by this defendant, and only a sentence of

7    life will send the message that this level of brutality will be

8    met with the most serious of sanctions.

9         **THE COURT:**  Thank you.

10        **MS. HOFFMAN:**  Your Honor, I'm told that the mother of

11   James Edwards, Mrs. Karen Edwards, would like to address the

12   Court.

13        **THE COURT:**  All right.

14        **KAREN EDWARDS:**  Good morning, Your Honor.

15        **THE COURT:**  Good morning.

16        **THE CLERK:**  Ma'am, please state your name for the

17   record.

18        **KAREN EDWARDS:**  Yes.  My name is Karen Edwards, the

19   mother of James Edwards.

20        **THE CLERK:**  Thank you.

21        **THE COURT:**  Good morning.

22        **KAREN EDWARDS:**  Giving this man life is not going to

23   deter him.  My son wanted out.  He didn't question.  He just

24   wanted out.

25        He has a little girl that's never going to see her

1    dad.  You know, she's just turning 6.  And, you know, every day

2    she's like, you know, Can I -- can I talk to him?  Can I

3    FaceTime him?

4         He has nieces and nephews who will only remember him

5    for a little while, you know.

6         And it's been almost five years that -- this is what I

7    have to deal with.  You know, I have to answer to my

8    grandchildren.  You know, Where is my uncle?  You know, Where's

9    Uncle Smooth?  'Cause that's what we called him, you know.

10        This man right here, he's not even a man, you know.

11   Life in prison is not going to deter him because, according to

12   this man (indicating), who has a glimmer.  My son doesn't have

13   that glimmer.

14        The people who he has killed, maimed, everything else,

15   they don't have that glimmer.  They're still scared that one

16   day he may actually get out.

17        Life is not life.  It's -- it's not.  To him, you

18   know, he's had it up.  He don't care.  He don't.  You know, he

19   went on an article in the City Paper saying, Yeah, I killed

20   him.  I did it.  He didn't order it.  He did it.

21        This is what I live with.  My son did not come from my

22   stomach.  I adopted him.  That was my child I chose.

23        And now I have to live with what somebody did to him

24   because they want to be big man in charge.  He a big man, all

25   right, but what's he in charge of?  What's he in charge of?

1    He's not even in charge of hisself right now.

2          But I think that the death penalty should have been

3    left on the table.  I don't think it should have been taken

4    off.  It shouldn't have been, because as far as he's concerned,

5    he's winning.  He's winning.  He's going to beat all of us.

6    He's going to outlive half of us.

7          You put him in jail, he's going to outlive all of us.

8    So what's the purpose?  What's the purpose of giving someone

9    like him life?  We're the ones that have life because we don't

10   have our loved ones.

11         My son was a rapper.  In fact, he wrote a song that

12   says, If I die, he (indicating) did it.  He foretold his own

13   death.  He told me, I won't live to see 25.

14         My son died six months to the day of his 25th

15   birthday.  He died February the 12th.  His birthday would have

16   been July the 12th.  He would have been 25.

17         How do you explain that to somebody that your child

18   didn't even reach 25 and he's 40?

19         I'm 60 years old.  I have 11 grandchildren.  All they

20   want is they Uncle Smooth back.  All I have is pictures.  I

21   have his music.  You know, at least I do get to hear his voice

22   'cause I have his music.

23         But just think of what could have been, what could

24   have been because somebody else decided to play God and take

25   his life.

```
 1              Thank you.
 2          THE COURT:  Thank you.  Thank you, Ms. Edwards.
 3          MS. HOFFMAN:  Your Honor, the mother of
 4   Ricardo Johnson is going to speak.
 5          THE CLERK:  Ma'am, please state your name for the
 6   record.
 7          TONI BURTON:  My name is Toni Burton.  I'm
 8   Ricardo Johnson's mother.
 9              I don't have much to say except for I pray for you.  I
10   pray for your family.  I pray that God will give you strength.
11   I pray that God will give your father strength -- I mean and
12   your parents strength and you strength.
13              All I want to say is that God gave my son to me.  He
14   allowed me to be a temporary steward.  No one did he allow to
15   take their life, and that's what you have to answer for, young
16   man.  Not that I'm not going to keep you in my prayers, because
17   I will.  But, again, he allowed me to be a temporary steward.
18   My son belonged to God.
19          THE COURT:  Thank you.
20          TONI BURTON:  My grandson said, "Pop-Pop's in heaven."
21          THE COURT:  That's right.
22              Thank you, all.
23              Ms. Whalen, Mr. Enzinna.
24          MS. WHALEN:  Court's indulgence.
25          (The defendant conferred with counsel.)
```

1          **MS. WHALEN:**  Thank you.

2          First, I want to say on behalf of this table,

3  including Mr. Bailey, that -- and he will address the Court --

4  that he does have remorse.  He has had a lot of insight -- and

5  I think you will hear that from some of his remarks -- into the

6  pain that he has caused all of these wonderful people and the

7  failure that he, I believe, feels that he could have used his

8  talents for in the neighborhood -- and tried, I think, to use

9  his talents in many ways to enrich the neighborhood.

10          Given Your Honor's finding that the sentence must be

11  life, much of what I say is sort of an exercise in futility,

12  but I ask for indulgence because it may very well be the last

13  time that anyone focuses on the good parts of Dante Bailey.

14          I've had the distinct pleasure over the years of

15  looking at cases from the side of the prosecution; and from

16  that lens, once you deem someone to have killed, everything at

17  that point, I think, focuses only on the bad aspects, as I

18  understand the job to be.  And so I fault no one for that.  I

19  myself, as I said, had that lens as well.

20          But I also suggest that what happens then is you

21  ignore or don't realize that we are all the sum of our parts.

22  And I know Your Honor has heard me say something like that --

23  maybe not those specific words -- in other cases.  But we are

24  all made up of the good, the bad, the ugly, and what our

25  environment brings to us.

1          And by that I say while Mr. Bailey said some things in

2    a letter to Your Honor that would not have been things that I

3    would want him to say, he did characterize, I think fairly

4    well, kind of what his thought process was and what I'm sure

5    many, many young men from Park Heights and many neighborhoods

6    in this city, what their thought process is growing up and how

7    they try to deal with the rules that they believe are imposed

8    upon them, the street justice, the things that they experience.

9          And, frankly, rules on the street are totally

10   different than the rules we know and we law-abiding people in

11   society have to abide by.

12         And I would suggest to Your Honor that he -- despite

13   his letter to Judge Quarles about, you know, "grew up in middle

14   class," that is a prospection from the moment in time that he

15   had when he was writing a letter asking the Court to give him

16   some consideration.  Because from our investigation of his

17   life, there were no protective factors.

18         There was a year or two, I think, in a private school,

19   but that didn't do anything to allow for a young person in the

20   streets to be exposed to the kinds of things that we

21   law-abiding, privileged people are exposed to.

22         So, for instance, what his life was made up of was

23   being beaten up; being exposed to violence all the time; being

24   exposed to drug dealing as the only method of getting ahead in

25   the neighborhood.

1          While I'm sure there were people in his life,

2    including his mother, who wanted to do better for him, there

3    just was no opportunity.

4          That's what he was exposed to, that's what he learned,

5    and that's what many young men learn.

6          I would suggest that those people in the city of

7    Baltimore who have the purse strings or who have the ability to

8    affect change on criminal justice and initiatives should meet

9    Dante Bailey or people like him and should have to spend time

10   understanding exactly what is needed, because that's where we

11   are failing our neighborhoods in Baltimore.

12         And what was needed was not to take him out of the

13   streets as a kid and put him in Savage Mountain, which was a

14   more violent -- or a very violent facility that just showed

15   him, once again, this is how you get ahead.  You have to use

16   your smarts.  You have to be better on the streets and follow

17   the rules because you don't want to get killed.  You not only

18   don't want to get killed, you want to provide for others.

19         So then, as he details one thing after another

20   happened, he committed crime.  That's what he's exposed to.

21   That's how you got money.

22         And then he was put in facilities that never exposed

23   him, again, to the choices and the options that he needed.  And

24   I'm not just talking about Dante Bailey here, so indulge me

25   that.  But he clearly needed some way to funnel the very good

```
 1    characteristics that he has, and that is a leadership ability.

 2            Unfortunately, his leadership ability has brought him

 3    here at age almost 41 to forfeiting the rest of his life in

 4    prison.

 5            They were choices, I agree with the Government,

 6    choices that he made.

 7            But we are all affected by our environment when we

 8    make those choices.

 9            For instance, I chose to go to law school.  I knew I

10    had options and I could do that.

11            He chose instead, when he got out of prison -- and I'm

12    not talking out of turn here because all of his writings that

13    we saw in trial detail this -- he chose when he got out of

14    prison and saw the bedlam and saw young people, younger than

15    him, where they had no future, he chose at that point, I think,

16    to try to do something to organize the bedlam and to stop young

17    people from getting killed.

18            That necessarily, in his world, meant imposing rules

19    and street justice too, because you can't all of a sudden take

20    someone in that environment and expect that they are going to

21    get a good-paying job and all of a sudden go get educated and

22    all of a sudden become like the rest of us who are somewhat

23    privileged in this life.  You can't expect that.  That, I

24    suggest, is the anomaly.

25            If you took me at any stage of my life -- younger,
```

1  stronger, whatever -- and you said, Go live in his world

2  (indicating), in his environment (indicating), I would fail.

3          That is the mind-set of a Dante Bailey or a young man

4  growing up in the world that he grew up.  It is that "I can't

5  live in that other world because I don't have the skills."

6          So what he ended up doing, I would suggest to

7  Your Honor, and those good things that he channeled -- he had

8  some leadership capability.  He had insight.  He reads and is

9  intelligent.  He still reads.  He's often getting books and

10 reading and ordering books and asking for books to educate his

11 mind and to further his mind.

12         And I would suggest he is over -- has over a period of

13 time become more insightful as to the pain that he has

14 inflicted on other people.

15         He was working in "Safe Streets."  He -- so, in other

16 words, in that neighborhood he was doing some good and positive

17 things and trying to change, but that doesn't mean that he was

18 able to change the structure of the neighborhood and the street

19 justice.

20         And that, I think, is where he has some insight as to

21 how he could have been a better servant to the neighborhood or

22 a better person.

23         I would suggest that his family who wrote letters,

24 there are people in this courtroom who experienced the good

25 things that Dante Bailey had to offer.

1          His extreme loyalty, once again, got him in trouble,

2     because if you're put on the prosecutor lens and you look at,

3     for instance, his call where he thought he was trying to get

4     people to go protect someone he was loyal to, Bandi, that just

5     putting out on the street information that someone is supposed

6     to be killed could get someone killed, and he knew that.

7          And so I would suggest that extreme loyalty now is

8     interpreted badly.  And you can take both sides, like I say,

9     put one lens on it.

10         But that loyalty is a good characteristic.  He was a

11    very good and still is a good father, to the extent he's able

12    to be, in the sense that he is still writing -- Your Honor

13    knows he is a prolific writer.  He writes urban fiction.  He's

14    trying to sell out of that.  All of that is to allow for him to

15    continue to try to provide for his kids and, to the extent

16    possible, for his wife.

17         So there are characteristics that are certainly not

18    such that under the circumstances we're in mean that Your Honor

19    should not punish him.  Of course he should be punished, and he

20    knows that.

21         And he really did try for a long period of time to

22    accept responsibility and to tell people, okay, I don't need to

23    put you through this trial.  I am doing something now to be

24    insightful and to try to stop the bleeding and the pain that

25    I've caused.

```
 1              Thank you.
 2         THE COURT:  Okay.  Thank you.
 3              I certainly appreciate the advocacy on both sides and
 4    the professionalism.  And thank you, both sides, for that.
 5              I am, of course, happy to hear from Mr. Bailey if
 6    there is anything he would like to say.  You don't have to.
 7         THE DEFENDANT:  Yes, ma'am.
 8         THE COURT:  Okay.  I'm happy to hear from you.
 9         THE DEFENDANT:  Before I start, I just wanted to
10    address something that you said, that I didn't accept
11    responsibility in the letter.  And I understand how you took
12    that.
13              But if you read the paragraph, the last paragraph of
14    my letter to you dated 8/20/19, the last paragraph was just
15    basically me telling you that that was my friend, not that I
16    didn't accept responsibility.  That's all I want to put on the
17    record.
18              And I'm going to begin with what I have to say.
19         THE COURT:  Sure.
20         THE DEFENDANT:  First and foremost, I'd like to thank
21    the creator of all things for blessing me with another day in
22    life.
23              Despite the circumstances, I am extremely grateful
24    that I'm still able to breathe.
25              Secondly, I would like to thank my family and the few
```

1   friends I do have left that Agent Timothy Moore could not

2   harass and intimidate.

3         I want to thank them for being supportive of me for

4   years of worrisome nights when I unintentionally placed them

5   second to the streets, attempting to place them first by being

6   a provider.

7         Next I want to apologize to everybody who lost someone

8   during what the Government called my reign of terror.

9         As a leader in my community, I take full

10  responsibility.

11        By far, this is no admission of guilt.  It's just me

12  taking in deep consideration my influence over people' lives

13  and recognizing the things that I could have done better to

14  advance my community in a more positive direction.

15        Each and every night before I restlessly go to sleep

16  and every time my consciousness is replenished, I am forced to

17  deal with the reality of the many deaths of young men who I

18  once mentored.

19        Since I've been absent from society, Your Honor,

20  dozens of kids who were compelled to go to school by my

21  influence have been murdered in cold blood.

22        Teenagers like Shaquan Trusty, who I mentored through

23  "Safe Streets" and helped graduate from middle school; and men

24  like Gerald Stokes, who I hired as security and listened to me

25  now when he was released from prison in 2015, both expressed

```
 1    the feeling of hopelessness because of my absence.
 2             Today they are dead, along with many others who never
 3    had a thought of death when I was present.
 4             Being unable to assist those I know are in need has
 5    been more psychologically devastating for me than the fear of
 6    losing my own life.
 7             If I had one penny for each time someone in society
 8    said, Gutta, I wish you was home or, I need you home, Dante, my
 9    children's children would inherit millions after their parents
10    die because I would be worth a few billion.
11             Your Honor, the kind of monster that the Government
12    attempted to make me out to be does not reflect my history in
13    society.
14             No matter how hard the Government's witnesses try, if
15    you summarize their interactions with me, each and every one of
16    them that was legitimately around me told you I was helping
17    them.
18             Derran Hankins told the Court that I would give him
19    money to flip in the casino.
20             The average adult with common sense knows that is not
21    a good idea.
22             I gave him money because I cared about him, not for a
23    profit from a casino gambling.
24             And in regards to Jay Greer, he was a homeless college
25    kid from Annapolis who lived and worked in the studio that the
```

1   company I took over operated in.

2           I took him into my home with my family, Your Honor,

3   because he didn't have anything.

4           He told the Court that I tortured him in the month of

5   February of 2015 and then he left.

6           If his life was in danger and that was the reason he

7   allegedly relocated, why did he come back?  Did he really ever

8   leave?

9           He slept in the room with my son, Your Honor.  My son.

10  The same son that he was in the house with when the

11  Baltimore County Police raided five months after the alleged

12  torture.

13          Do you think I would live -- or let my child and leave

14  him alone with someone I tortured?

15          Even in the case of William Banks, a kid I embraced

16  because of the pain I saw in his mother's eyes, I remember her

17  words like it was yesterday.  She looked me in my eyes deeply

18  and said, Please take -- take care of my son, Dante.  And

19  that's what I did.  I made sure he got home safely every night.

20          Now, with the help from him, the Government is

21  requesting that I never make it home again.

22          And, yes, I could have properly defended myself by

23  speaking truth at my trial.  To those who don't understand the

24  laws of this country, that would have been the right choice.

25          At an early age, I was taught that what I say or do

1   can be used against me in a court of law; therefore, any words

2   of defense from me would have become ammunition for the

3   Government to unseal a third superseding indictment against me.

4   They don't care about the truth, Your Honor.  They only care

5   about proof.

6           If they feel they can use something to paint a

7   picture, they will use it and make the contents fit the context

8   that they need it in for their theory.

9           I am definitely not proclaiming to be an angel --

10  though to some I am.

11          I am just -- I just want you to know that I am no

12  beast.  I am just a man who has been through a lot, who takes

13  pride in uplifting his people.

14          And without question, I am a proud United States

15  citizen who holds this court in high regard, but I do not

16  respect the tactics utilized of cooperation pleas by the

17  United States Attorney's Office.

18          The message they send is clear:  You can lie.  You can

19  steal.  And you can even kill.  As long as you cooperate with

20  us, you can go home.

21          In this case I signed two different documents that I

22  was under the impression were plea agreements before trial.

23  Conversations with my family were set up by my attorneys when I

24  was being held without human contact.

25          These conferences were for the sole purpose of

```
 1   accepting the offer which would commit me to the BOP for a very

 2   long time but would guarantee my freedom one day.

 3            This was most important to my loved ones, to be able

 4   to see me again beyond these walls.  Because the Government's

 5   cooperation technique landed on deaf ears and their joint plea

 6   failed, I was forced to trial after I had already signed.

 7            I say this to you, Your Honor, only to say that

 8   because I didn't cooperate, my plea agreement was nullified.

 9   But double agents like William Banks, who chose to cooperate

10   after he got caught in the web of lies about violence by his

11   own case manager, have gone free.

12            Productive, responsible men have been sentenced to

13   decades in prison, maybe even life after today, because of men

14   like him.  What kind of justice is that?  Especially when I

15   accepted responsibility for my actions before trial, and now

16   I'm not being given the three points off that would take me out

17   of the loop of receiving life in prison.

18            Lastly, I realize that nothing here is personal for

19   the Court, the Government, or even the attorneys that sit right

20   next to me, but this is my life, Your Honor, and I ask you to

21   become personal with me one time.

22            I have been a lot of things, but an animal is not one

23   of them.

24            I am deeply loved by many for the things I've done and

25   the things I continue to do as a people's champ.
```

1          What happens today, I have faith that it will not

2     defeat me because I have God in my corner.  His grace and

3     blessings have prepared me for everything that this world has

4     to offer.  His judgment has already been rendered.  My good

5     deeds outweigh my bad; thus, my life belongs to him.

6          I'm ready.

7          **THE COURT:**  All right.  Thank you, Mr. Bailey.

8          Is there anything else that anyone would like to say?

9          **MS. HOFFMAN:**  No, thank you.

10         **THE COURT:**  Is there any forfeiture issue in this

11    case?

12         **MS. HOFFMAN:**  Oh, no, Your Honor.  Sorry, I didn't

13    hear the question at first.

14         **THE COURT:**  Okay.  All right.

15                    Conference at the bench.

16       (It is the policy of this court that every guilty plea and

17    sentencing proceeding include a bench conference concerning

18    whether the defendant is or is not cooperating.)

19         **THE COURT:**  Well, let me start.

20         Sentencing is a very difficult job, in my opinion.  It

21    always carries some tragedy for many of the people involved.

22         And here, it is especially a tragic situation for the

23    families of the victims who have lost loved ones.

24         We can also say that it is a tragedy in the sense of I

25    will assume that Mr. Bailey could have done something much

```
1    better with his life than he did.
2           Mr. Bailey, I do not think of you as an animal or a
3    beast or anything like that.
4           I think of you as a man who unfortunately has
5    committed some very serious crimes, and that has been proved by
6    a jury, and I agree with the jury's verdict.
7           First of all are the drugs.  It's a very significant
8    quantity of drugs that you and other people in your
9    organization were involved with.  And drugs kill people, kill
10   people's families, poison people.  Just with the drugs, I think
11   it's a very serious offense.
12          And then, in addition, I believe the evidence shows
13   that you, in fact, ordered and/or personally committed murders.
14   You took people's lives or were responsible for that, as the
15   jury found.  There is not a more serious offense than that.
16          And in terms of the witnesses, I do not agree with you
17   and the opinion that you seem to hold of people who come in and
18   cooperate.
19          Obviously, it is important that they tell the truth.
20   But I think it is also an extremely important part of what
21   makes your conduct serious is the attempt to intimidate, at a
22   minimum, if not kill, people that are willing to come forward
23   and testify, such as J.G., and I think that was proved.
24          Now, again, you are a person.  You are a human being.
25   I appreciate some of the things that you wrote to me.
```

```
 1            I appreciate that you had many challenges in your

 2   early life.

 3            Certainly, Savage Mountain was a pretty violent place

 4   to be, and you were a young person.

 5            Unfortunately, what is in front of me now is that, in

 6   addition to the past offenses you've been convicted of,

 7   including the one here in front of Judge Quarles, I think the

 8   evidence has clearly shown that you have included -- you may

 9   have done good.  I'm sure you've done good for some people --

10   but overall, you have been engaged in very serious criminal

11   offenses.

12            There is a very strong need for deterrence of you.

13            There is a very strong need to recognize the

14   seriousness of the offense, particularly for the families that

15   lost loved ones.

16            So I want to say a couple things.

17            In terms of the sentence, I think it is correct that

18   there is a mandatory life sentence on Count 3, which I am

19   imposing.

20            Let me be clear, in case there is anything wrong about

21   the guidelines that have been calculated or if I am incorrect

22   in my interpretation of the law, as to Count 3, I would,

23   nonetheless, impose a life sentence.

24            I think it is the only sentence that is sufficient in

25   this case given the seriousness of the crimes that have been
```

1    committed and Mr. Bailey's criminal history and the need for

2    deterrence and all the factors that I've been through.

3            So that is the sentence, Mr. Bailey, on Count 1.  It

4    is life in prison.

5            On Count 2, it is life in prison.

6            On Count 3, it is life in prison.

7            On Count 17, it is 10 years, which is the maximum, in

8    prison.

9            And on Count 18, it is also a life sentence.

10           Obviously, those are concurrent.

11           Following that -- and regardless of the fact that

12   there's a life sentence -- I need to impose periods of

13   supervised release.  It is five years on Counts 1, 2, 3, and

14   18; and three years on Count 17, which are also concurrent.

15           Your financial circumstances don't permit a fine.

16           But I'm required to impose a $100 special assessment

17   on each count.

18           Special conditions of supervised release, should they

19   become relevant, are participating in any substance abuse

20   testing or treatment the probation officer recommends, any

21   vocational programs, and providing financial information to the

22   probation officer.

23           Counsel, were there any specific recommendations to

24   the Bureau of Prisons?

25           **MS. WHALEN:**  Yes, Your Honor.

1          We would ask that you recommend USP Allenwood first.

2     And then, as an alternative, USP Atlanta.

3          And then we would also ask that you recommend drug

4     treatment, specifically the residential drug treatment

5     program -- although we recognize that he will not be able to

6     earn credits.

7          And then -- although I do think it is a good program

8     for him.

9          And then we would also ask that you consider

10    vocational training.  We had specified HVAC and masonry.

11         **THE COURT:**  I'll be happy to make those

12    recommendations.  Obviously, it's ultimately up to the Bureau

13    of Prisons.

14         Have I left anything out?  Anything I have not

15    addressed?

16         Any legal objection to that sentence?

17         **MS. HOFFMAN:**  At this time the Government moves to

18    dismiss the original indictment and the superseding indictment

19    against Mr. Bailey.  He's been convicted on the second

20    superseding indictment.

21         **THE COURT:**  Okay.  Those will be dismissed.

22         Mr. Bailey, as I'm sure you understand, you have the

23    right to appeal from this sentence and from the convictions.

24         Your counsel can assist you in noting that appeal.

25         Any appeal needs to be noted within 14 days.

1          Do you understand that, sir?

2          **THE DEFENDANT:**  Yes, ma'am.

3          **THE COURT:**  Okay.  Thank you, all.

4      (Matter concluded at 11:14 a.m.)

5      I, Douglas J. Zweizig, RDR, CRR, FCRR, do hereby certify

6  that the foregoing is a correct transcript from the

7  stenographic record of proceedings in the above-entitled

8  matter.

9

                        _____/s/_____

10

                   Douglas J. Zweizig, RDR, CRR, FCRR
11                    Registered Diplomate Reporter
                     Certified Realtime Reporter
12                   Federal Official Court Reporter
                       DATE:  May 26, 2020
13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:16-cr-00267-CCB Document 1219 Filed 05/29/20 Page 4 of 61

KAREN EDWARDS: [3]  25/14
25/18 25/22
MR. ENZINNA: [11]  2/19 3/16
9/12 9/16 9/25 10/4 10/13
10/15 12/2 12/4 13/17
MS. HOFFMAN: [19]  2/6 2/18
3/14 5/10 5/12 6/12 8/17
14/12 16/15 19/11 21/9 21/15
21/17 21/20 25/10 28/3 41/9
41/12 45/17
MS. WHALEN: [11]  2/22 4/2
5/3 5/7 5/11 5/25 6/5 8/21
28/24 29/1 44/25
THE CLERK: [3]  25/16 25/20
28/5
THE COURT: [46]  2/3 2/15
2/21 2/23 3/15 3/23 5/2 5/5
5/15 6/4 6/10 8/14 8/20 8/23
9/15 9/21 10/2 10/6 10/14
11/24 12/3 13/16 14/10 16/14
17/25 19/25 21/14 21/16 21/19
25/9 25/13 25/15 25/21 28/2
28/19 28/21 35/2 35/8 35/19
41/7 41/10 41/14 41/19 45/11
45/21 46/3
THE DEFENDANT: [4]  35/7 35/9
35/20 46/2
TONI BURTON: [2]  28/7 28/20

**$**

$100 [2]  17/21 44/16

**'**

'Cause [2]  26/9 27/22

**/**

/s [1]  46/9

**0**

0267 [2]  1/4 2/7

**1**

10 [1]  44/7
10-piece [1]  13/4
101 [1]  1/24
10:06 a.m [1]  2/2
11 [1]  27/19
11:14 a.m [1]  46/4
11th [2]  3/13 8/16
12 [1]  20/22
120 [1]  20/6
12B [1]  24/20
12th [2]  27/15 27/16
14 [1]  45/25
17 [3]  3/1 44/7 44/14
18 [3]  3/2 44/14 44/14
18 United States Code [1]
21/24
187 [4]  5/10 5/15 8/15 9/7
19 [1]  35/14
1959 [4]  9/16 10/17 10/18
20/8
1993 [1]  7/13

**2**

2 F.3d 66 [1]  7/12
2011 [1]  23/19

2015 [2]  36/25 38/5
2019 [7]  1/8 3/13 8/16 11/17
12/1 15/11 18/12
2020 [1]  46/12
20th [2]  15/10 18/12
21201 [1]  1/25
239 F.3d 120 [1]  20/6
25 [3]  27/13 27/16 27/18
25th [1]  27/14
26 [1]  46/12
28th [3]  12/24 13/16 16/24

**3**

3553 [1]  21/24
38 [4]  4/6 5/4 5/5 5/9
3E1.1 [3]  14/13 15/1 17/24

**4**

40 [4]  11/5 11/6 14/6 27/18
41 [2]  14/6 32/3
43 [5]  18/23 18/23 20/21
20/23 20/24
4th [1]  1/24

**5**

50-piece [1]  13/5
561 F.3d 996 [1]  20/12
598 F.3d 883 [1]  20/11

**6**

60 [1]  27/19
66 [1]  7/12
6:33 p.m [1]  12/24
6th [1]  16/10

**7**

7-inch [1]  17/22
70s [1]  11/12
715 [1]  20/1
7:00 p.m [1]  13/16
7D [1]  1/9

**8**

8/20/19 [1]  35/14
819 F.3d 715 [1]  20/1
883 [1]  20/11

**9**

996 [1]  20/12

**A**

a.m [2]  2/2 46/4
abide [1]  30/11
abiding [2]  30/10 30/21
ability [4]  5/1 31/7 32/1
32/2
able [6]  4/24 33/18 34/11
35/24 40/3 45/5
about [20]  10/16 13/1 13/6
13/15 13/19 13/19 16/25 16/25
17/1 17/5 17/18 20/20 20/20
30/13 31/24 37/22 39/4 39/5
40/10 43/20
above [1]  46/7
above-entitled [1]  46/7
absence [1]  37/1
absent [1]  36/19
absolutely [2]  5/1 25/2
abuse [1]  44/19

accept [3]  34/22 35/10 35/16
acceptance [16]  3/17 3/19 7/5
8/5 9/8 10/22 11/21 14/4
14/15 15/1 15/16 18/1 18/8
18/19 19/1 19/5
accepted [6]  6/23 11/15 15/6
17/24 18/17 40/15
accepting [1]  40/1
according [2]  19/19 26/11
account [1]  21/23
accurate [1]  18/10
accuses [1]  16/15
acquittal [1]  15/8
actions [1]  40/15
activity [4]  7/1 7/23 15/21
25/3
actual [1]  5/16
actually [3]  17/20 17/20
26/16
addition [3]  3/6 42/12 43/6
additions [1]  3/11
address [5]  9/13 11/13 25/11
29/3 35/10
addressed [1]  45/15
adjustment [6]  7/5 8/5 14/14
18/20 19/1 19/5
admission [2]  23/18 36/11
adopted [1]  26/22
adult [1]  37/20
advance [1]  36/14
advantage [1]  23/24
advised [1]  10/8
advocacy [1]  35/3
affairs [1]  24/24
affect [1]  31/8
affected [1]  32/7
affirm [1]  7/20
affirms [1]  20/7
after [11]  7/3 13/14 15/11
15/19 24/23 31/19 37/9 38/11
40/6 40/10 40/13
again [14]  10/7 13/3 16/15
17/10 20/14 24/1 24/1 28/17
31/15 31/23 34/1 38/21 40/4
42/24
against [10]  12/8 12/23 17/1
17/7 22/11 22/13 23/12 39/1
39/3 45/19
age [4]  11/6 11/7 32/3 38/25
agent [4]  1/20 2/9 8/22 36/1
Agent Timothy Moore [1]  36/1
agents [1]  40/9
agree [6]  7/18 10/6 19/25
32/5 42/6 42/16
agreed [3]  11/4 11/5 19/13
agreement [12]  7/9 7/10 7/14
7/18 7/22 9/2 9/3 9/11 10/24
11/3 18/4 40/8
agreements [1]  39/22
ahead [3]  10/12 30/24 31/15
aid [2]  3/1 17/2
all [43]  2/15 2/23 3/23 4/19
5/25 6/15 8/20 8/23 9/10
10/20 11/16 14/1 14/3 17/23
17/25 18/2 22/21 24/18 25/13
26/24 27/5 27/7 27/19 27/20
28/13 28/22 29/6 29/21 29/24
30/23 32/7 32/12 32/19 32/21
32/22 34/14 35/16 35/21 41/7

Case 1:16-cr-00267-CCB Document 921 Filed 10/25/18 Page 48 of 51

**A**

all... [4]   41/14 42/7 44/2
 46/3
alleged [4]   7/1 15/21 24/16
 38/11
allegedly [4]   24/14 38/7
allegiance [1]   17/4
Allenwood [1]   45/1
allocate [1]   14/24
allow [4]   4/22 28/14 30/19
 34/14
allowed [2]   28/14 28/17
almost [4]   5/18 11/7 26/6
 32/3
alone [2]   11/20 38/14
along [1]   37/2
already [2]   40/6 41/4
also [16]   1/19 4/13 7/16
 11/22 17/14 18/22 19/7 20/12
 21/22 29/20 41/24 42/20 44/9
 44/14 45/3 45/9
alternative [3]   7/20 9/17
 45/2
although [3]   18/9 45/5 45/7
Altoneyo [1]   17/6
Altoneyo Edges [1]   17/6
always [1]   41/21
am [16]   19/4 20/15 21/10
 34/23 35/5 35/23 36/16 39/9
 39/10 39/11 39/11 39/12 39/14
 40/24 43/18 43/21
AMERICA [1]   1/3
ammunition [1]   39/2
among [1]   18/21
angel [1]   39/9
animal [2]   40/22 42/2
Annapolis [1]   37/25
anomaly [1]   32/24
another [3]   7/7 31/19 35/21
answer [2]   26/7 28/15
Anthony [1]   22/16
Anthony Hornes [1]   22/16
Antoine [1]   24/13
Antoine Ellis [1]   24/13
any [21]   3/10 4/19 5/1 5/21
 6/2 7/14 7/22 8/24 9/22 17/16
 17/18 19/3 21/10 32/25 39/1
 41/10 44/19 44/20 44/23 45/16
 45/25
anybody [2]   20/19 21/5
anyone [5]   2/16 21/8 21/17
 29/13 41/8
anything [9]   20/20 30/19 35/6
 38/3 41/8 42/3 43/20 45/14
 45/14
apologize [3]   5/8 16/7 36/7
appeal [3]   45/23 45/24 45/25
appear [1]   5/5
appears [2]   5/15 20/13
appreciate [3]   35/3 42/25
 43/1
appropriate [2]   2/16 18/20
April [3]   12/24 13/16 16/24
April 28th [3]   12/24 13/16
 16/24
are [33]   2/23 3/10 6/6 6/17
 6/23 8/10 12/14 16/24 17/8
 19/13 20/19 21/3 29/21 29/23

30/7 30/9 30/21 31/11 32/7
32/20 32/22 33/24 34/1 34/17
37/2 37/4 42/7 42/22 42/24
42/24 44/10 44/14 44/19
argues [1]   19/7
argument [7]   6/22 6/24 8/3
 8/8 10/11 19/6 19/11
arguments [1]   10/23
around [1]   37/16
arrangements [1]   17/21
arrested [1]   24/23
article [1]   26/19
articulate [1]   23/22
as [57]   2/14 3/4 3/21 4/5
 5/25 6/21 7/7 7/17 7/24 8/10
 8/12 8/24 9/2 9/6 9/19 9/19
 10/8 10/22 11/14 12/5 13/13
 13/21 15/1 15/9 15/10 15/17
 16/2 17/11 17/24 19/18 21/1
 22/5 22/5 22/15 23/19 27/4
 27/4 29/17 29/19 29/19 30/24
 31/13 31/19 33/13 33/20 36/9
 36/24 39/19 39/19 40/25 42/2
 42/4 42/14 42/23 43/22 45/2
 45/22
aside [2]   3/10 10/10
ask [8]   2/16 3/24 14/8 29/12
 40/20 45/1 45/3 45/9
asking [2]   30/15 33/10
aspects [1]   29/17
assault [4]   12/7 12/13 12/23
 16/22
assaults [1]   22/5
assessment [1]   44/16
assist [2]   37/4 45/24
Assistant [1]   1/15
assisted [1]   14/19
assume [2]   10/10 41/25
assumed [1]   10/20
assuming [1]   8/14
ATF [2]   1/20 2/10
Atlanta [1]   45/2
attached [5]   8/8 10/2 15/9
 15/18 23/19
attachments [1]   16/2 16/3
attempt [1]   42/21
attempted [2]   22/4 37/12
attempting [3]   15/22 17/5
 36/5
attended [1]   23/21
attention [2]   8/2 9/24
attitude [1]   12/22
Attorney [1]   1/15
Attorney's [1]   39/7
attorneys [2]   39/23 40/19
audio [1]   17/13
August [2]   15/10 18/12
August 20th [2]   15/10 18/12
authorities [2]   14/19 14/21
authority [1]   22/15
average [1]   37/20
avoid [2]   14/22 15/7
aware [1]   10/2

**B**

back [4]   9/5 20/18 27/20 38/7
bad [5]   12/20 12/22 29/17
 29/24 41/5
badly [1]   34/8

BAILEY [154]   1/5 2/7 2/20 2/24
 3/19 4/9 4/3 9/51
 6/22 6/25 10/24 11/2 11/2
 12/5 12/17 12/17 12/17 12/21
 12/22 13/7 13/13 13/20 13/21
 14/4 14/25 15/2 15/12 15/20
 16/7 16/10 16/17 17/18 18/12
 22/18 23/6 23/17 23/20 24/23
 29/3 29/13 30/1 31/9 31/24
 33/3 33/25 35/5 41/7 41/25
 42/2 44/3 45/19 45/22
Bailey's [7]   2/11 5/17 12/9
 12/25 20/21 23/11 44/1
Baltimore [7]   1/9 1/25 22/9
 23/4 31/7 31/11 38/11
Baltimore County [1]   38/11
Bandi [6]   13/19 16/11 16/17
 16/21 16/22 34/4
Banks [4]   24/6 24/11 38/15
 40/9
bars [1]   24/24
based [3]   14/3 16/22 22/7
basically [1]   35/15
basis [2]   7/20 11/20
be [50]   2/3 5/5 5/15 5/23
 7/20 8/12 8/25 9/5 9/9 16/20
 17/18 18/20 18/22 18/24 19/10
 19/18 19/21 20/19 21/8 24/8
 24/9 24/12 24/16 24/17 24/19
 24/22 25/7 26/24 28/14 28/17
 29/10 29/12 29/18 30/20 31/16
 34/6 34/12 34/19 34/23 37/10
 37/12 39/1 39/9 40/3 43/4
 43/20 45/5 45/11 45/21 45/25
bear [1]   16/5
bears [1]   22/25
beast [2]   39/12 42/3
beat [1]   27/5
beaten [1]   30/23
because [42]   3/20 4/15 4/18
 4/19 4/20 5/17 7/16 8/2 11/9
 12/14 17/8 18/11 18/23 19/8
 23/2 24/12 24/14 24/15 24/18
 26/11 26/24 27/4 27/9 27/24
 28/16 29/12 30/16 31/10 31/17
 32/12 32/19 33/5 34/2 37/1
 37/10 37/12 38/3 38/16 40/4
 40/8 40/13 41/2
become [5]   32/22 33/13 39/2
 40/21 44/19
bedlam [2]   32/14 32/16
been [31]   4/24 8/11 8/15 9/23
 10/8 18/4 26/6 27/2 27/3 27/4
 27/16 27/16 27/23 27/24 30/2
 33/21 36/19 36/21 37/5 38/24
 39/12 40/12 40/22 41/4 42/5
 43/6 43/10 43/21 43/25 44/2
 45/19
before [10]   1/11 8/4 9/23
 11/17 11/18 16/14 35/9 36/15
 39/22 40/15
begin [1]   35/18
behalf [2]   2/8 29/2
behavior [1]   13/10
behind [1]   24/24
being [14]   4/8 4/14 5/9 16/16
 17/3 30/23 30/23 30/23 36/3
 36/5 37/4 39/24 40/16 42/24
belief [1]   16/22

**B**

belies [1] 17/23
believe [16] 3/14 3/18 5/3
 5/10 6/2 9/22 10/7 10/24
 11/20 11/22 18/19 20/16 20/20
 29/7 30/7 42/12
believes [1] 19/8
belonged [1] 28/18
belongs [1] 41/5
bench [2] 41/15 41/17
benefit [1] 3/19
beside [1] 18/5
better [6] 31/2 31/16 33/21
 33/22 36/13 42/1
between [1] 16/10
beyond [2] 18/16 40/4
big [2] 26/24 26/24
billion [1] 37/10
birthday [2] 27/15 27/15
bit [1] 9/13
BLAKE [1] 1/11
bleeding [1] 34/24
blessing [1] 35/21
blessings [1] 41/3
blood [1] 36/21
Bloods [1] 22/3
Bloods gang [1] 22/3
books [3] 33/9 33/10 33/10
BOP [1] 40/1
boss [1] 12/19
both [5] 3/7 34/8 35/3 35/4
 36/25
bound [1] 20/15
Box [2] 13/1 17/6
breach [1] 9/2
breached [2] 7/21 7/22
breaches [1] 7/13
breathe [1] 35/24
Bredar [5] 9/19 9/21 10/1
 10/11 20/14
Bredar's [1] 19/8
brief [1] 13/18
briefly [1] 4/25
bring [1] 14/5
brings [1] 29/25
brought [4] 8/1 9/23 17/15
 32/2
brutality [1] 25/7
brutally [1] 22/2
built [1] 22/7
Bureau [3] 6/9 44/24 45/12
Burton [1] 28/7
business [2] 14/2 16/25

**C**

calculated [1] 43/21
call [13] 2/5 11/23 12/1
 12/24 12/24 13/4 13/12 13/15
 13/19 13/24 14/1 16/10 34/3
called [3] 7/12 26/9 36/8
calls [20] 4/7 4/8 4/13 6/3
 6/13 6/16 6/17 6/18 6/23 8/1
 8/8 8/11 11/13 11/16 15/18
 16/1 16/5 16/24 17/13 18/9
came [1] 19/2
can [21] 2/3 5/2 9/5 14/2
 14/17 14/18 18/6 18/24 21/16
 26/2 26/2 26/2 34/8 39/1 39/6
 39/18 39/18 39/19 39/20 41/24
 45/24
can't [3] 32/19 32/23 33/4
capability [1] 33/8
care [4] 26/18 38/18 39/4
 39/4
cared [1] 37/22
carries [2] 20/8 41/21
case [31] 1/4 2/5 2/7 5/20
 5/22 7/2 7/11 7/13 8/25 9/23
 10/9 10/13 10/20 11/3 11/17
 15/4 15/20 19/23 20/3 20/6
 21/21 23/11 23/14 23/16 24/21
 38/15 39/21 40/11 41/11 43/20
 43/25
cases [3] 18/15 29/15 29/23
casino [2] 37/19 37/23
Category [2] 20/22 20/23
Category V [2] 20/22 20/23
CATHERINE [1] 1/11
caught [1] 40/10
caused [2] 29/6 34/25
causing [1] 15/22
CCB [2] 1/4 2/7
CCB-16-0267 [2] 1/4 2/7
CDF [3] 15/18 15/24 17/19
certainly [9] 9/1 11/8 13/10
 16/22 18/7 18/13 34/17 35/3
 43/3
Certified [1] 46/11
certify [1] 46/5
challenge [1] 5/1
challenges [1] 43/1
champ [1] 40/25
chance [2] 4/1 24/4
change [3] 31/8 33/17 33/18
changed [1] 5/7
channeled [1] 33/7
characteristic [1] 34/10
characteristics [2] 32/1
 34/17
characterization [2] 4/8 6/8
characterize [1] 30/3
characterized [1] 17/12
characterizes [2] 12/5 13/13
charge [4] 26/24 26/25 26/25
 27/1
charges [2] 2/25 18/15
Chicken [2] 13/1 17/6
Chicken Box [2] 13/1 17/6
Chief [2] 9/19 9/21
Chief Judge Bredar [2] 9/19
 9/21
child [3] 26/22 27/17 38/13
children [2] 5/19 37/9
children's [1] 37/9
Chiquetta [1] 13/20
Chiquetta Heath [1] 13/20
choice [1] 38/24
choices [4] 31/23 32/5 32/6
 32/8
chose [8] 23/17 23/25 26/22
 32/9 32/11 32/13 32/15 40/9
Christina [2] 1/15 2/7
Christina Hoffman [2] 1/15
 2/7
Circuit [16] 7/11 7/13 7/17
 9/4 10/15 18/7 19/13 19/14
 19/14 19/14 19/15 20/9 20/11
 20/12 20/16 20/17 20/18 19/13
circuit courts [1] 19/13
circumstances [3] 34/18 35/23
 44/15
cites [1] 20/6
citizen [1] 39/15
city [4] 23/6 26/19 30/6 31/6
City Paper [1] 26/19
class [2] 23/21 30/14
clear [8] 9/17 11/1 12/12
 16/20 16/24 20/3 39/18 43/20
clearly [5] 12/21 14/15 16/25
 31/25 43/8
client [4] 4/19 4/24
close [2] 14/25 15/5
co [1] 12/7
co-defendant [1] 12/7
cocaine [1] 22/8
Code [1] 21/24
cold [1] 36/21
collection [1] 9/10
college [1] 37/24
come [9] 9/5 14/25 15/5 16/18
 17/2 26/21 38/7 42/17 42/22
comments [1] 21/13
commit [4] 18/14 18/17 22/4
 40/1
committed [5] 22/10 31/20
 42/5 42/13 44/1
common [1] 37/20
common sense [1] 37/20
communications [1] 5/18
community [2] 36/9 36/14
company [1] 38/1
compelled [1] 36/20
completely [2] 15/15 16/1
concerned [1] 27/4
concerning [1] 41/17
conclude [1] 13/6
concluded [1] 46/4
concurrent [2] 44/10 44/14
conditions [2] 11/4 44/18
conduct [4] 7/16 13/10 24/23
 42/21
conference [2] 41/15 41/17
conferences [1] 39/25
conferred [1] 28/25
consciousness [1] 36/16
consider [2] 21/4 45/9
consideration [2] 30/16 36/12
considered [2] 8/12 18/24
conspiracies [1] 22/4
conspiracy [2] 2/25 3/1
contact [1] 39/24
contained [1] 8/15
contempt [1] 22/22
contents [1] 39/7
context [2] 12/12 39/7
continue [2] 34/15 40/25
continued [4] 6/25 7/15 15/20
 24/23
continues [1] 25/4
continuing [1] 7/23
controlled [1] 12/18
conversation [1] 12/13
Conversations [1] 39/23
convicted [3] 15/14 43/6
 45/19
conviction [3] 2/24 7/3 15/20

Case 1:16-cr-00267-CCB Document 1500 Filed 05/26/20 Page 96 of 161

**C**

convictions [1]   45/23
cooperate [6]   12/23 23/7
39/19 40/8 40/9 42/18
cooperating [7]   12/7 12/14
16/12 16/23 24/12 24/16 41/18
cooperation [2]   39/16 40/5
corner [1]   41/2
correct [3]   13/17 43/17 46/6
corrections [1]   3/11
could [19]   4/2 11/2 11/2
13/23 17/17 17/23 18/22 19/18
21/13 27/23 27/23 29/7 32/10
33/21 34/6 36/1 36/13 38/22
41/25
couldn't [2]   4/19 16/20
counsel [7]   2/9 3/4 6/19 15/3
28/25 44/23 45/24
counsel's [1]   8/2
count [16]   2/25 2/25 3/1 3/1
3/2 19/7 21/2 43/18 43/22
44/3 44/5 44/6 44/7 44/9
44/14 44/17
Count 1 [2]   2/25 44/3
Count 17 [3]   3/1 44/7 44/14
Count 18 [2]   3/2 44/9
Count 2 [2]   2/25 44/5
Count 3 [6]   3/1 19/7 21/2
43/18 43/22 44/6
countless [1]   15/4
country [1]   38/24
Counts [1]   44/13
Counts 1 [1]   44/13
County [1]   38/11
couple [1]   43/16
course [7]   3/6 6/17 7/18 8/14
10/7 34/19 35/5
court [25]   1/1 1/24 7/9 7/18
8/21 9/18 9/19 9/20 14/4 14/7
14/23 15/4 15/9 15/12 19/19
25/12 29/3 30/15 37/18 38/4
39/1 39/15 40/19 41/16 46/12
Court's [5]   7/21 8/2 10/16
20/7 28/24
courtroom [2]   1/9 33/24
Courts [1]   19/13
crack [1]   22/8
crack cocaine [1]   22/8
create [1]   22/22
creator [1]   35/21
credits [1]   45/6
crime [4]   23/5 23/25 24/5
31/20
crimes [4]   22/18 25/6 42/5
43/25
criminal [10]   1/4 7/15 7/23
20/22 20/23 22/23 23/3 25/3 31/8
43/10 44/1
CRR [3]   1/23 46/5 46/10
culture [3]   22/22 23/4 23/6

**D**

D.C. [2]   19/14 20/11
D.C. Circuit [2]   19/14 20/11
dad [1]   26/1
daily [1]   5/18
danger [2]   25/4 38/6
dangerous [1]   22/1

DANTE [9]   1/5 2/7 29/13 31/9
31/24 33/3 33/25 37/8 38/18
DANTE BAILEY [7]   1/5 2/7
29/13 31/9 31/24 33/3 33/25
daring [1]   22/14
date [2]   3/13 46/12
dated [3]   11/16 18/12 35/14
day [5]   26/1 26/16 27/14
35/21 40/2
days [2]   8/4 45/25
dead [2]   24/25 37/2
dead drops [1]   24/25
deadly [1]   22/7
deaf [1]   40/5
deal [3]   26/7 30/7 36/17
dealing [1]   30/24
death [7]   9/18 10/19 13/23
19/20 27/2 27/13 37/3
death penalty [1]   27/2
deaths [1]   36/17
decades [1]   40/13
decide [1]   9/4
decided [1]   27/24
deciding [1]   9/5
decision [2]   20/7 20/10
deeds [1]   41/5
deem [1]   29/16
deemed [1]   24/17
deep [1]   36/12
deeply [2]   38/17 40/24
defeat [1]   41/2
defend [1]   13/9
defendant [15]   1/6 1/16 6/20
7/13 7/21 7/22 8/5 12/7 14/14
14/19 22/1 22/2 25/6 28/25
41/18
defendant's [3]   7/8 8/7 8/10
defendants [1]   23/16
defended [1]   38/22
defense [5]   3/8 6/19 8/2 8/9
39/2
defer [1]   8/24
definitely [1]   39/9
demonstrates [1]   14/15
demonstrating [1]   14/25
denying [1]   15/12
departure [1]   14/4
depending [1]   19/1
Derran [1]   37/18
Derran Hankins [1]   37/18
despite [2]   30/12 35/23
destructive [1]   22/3
detail [1]   32/13
details [1]   31/19
detention [1]   7/2
deter [3]   23/1 25/23 26/11
determined [1]   8/19
determining [1]   7/4
deterrence [2]   43/12 44/2
devastated [1]   22/18
devastating [1]   37/5
dicta [1]   10/17
dictum [2]   19/9 20/2
did [24]   2/12 3/21 4/5 5/18
6/19 9/21 10/24 11/1 18/13
18/17 24/4 24/18 26/20 26/20
26/21 26/23 27/12 28/14 30/3
34/21 38/7 38/7 38/19 42/1
didn't [11]   4/22 24/4 25/23

die [2]   27/12 37/10
died [2]   27/14 27/15
difference [1]   19/2
different [4]   4/3 11/9 30/10
39/21
difficult [1]   41/20
Diplomate [1]   46/11
direction [1]   36/14
disagree [2]   7/17 7/19
discipline [1]   22/11
disclosure [1]   6/6
discretion [3]   9/20 19/20
19/21
discussed [2]   6/13 15/17
discussion [1]   13/4
discussions [1]   11/18
disloyalty [1]   24/14
dismiss [1]   45/18
dismissed [1]   45/21
disrupt [1]   23/11
distinct [1]   29/14
distribute [1]   3/3
distributing [1]   22/8
DISTRICT [3]   1/1 1/1 20/7
District Court's [1]   20/7
ditch [1]   15/7
DIVISION [1]   1/2
do [27]   2/12 5/12 6/12 6/21
9/9 16/8 16/9 18/5 19/10 21/7
21/9 27/17 27/21 30/19 31/2
32/10 32/16 36/1 38/13 38/25
39/15 40/25 42/2 42/16 45/7
46/1 46/5
documents [1]   39/21
does [5]   11/9 12/9 12/15 29/4
37/12
doesn't [4]   5/5 15/5 26/12
33/17
doing [3]   33/6 33/16 34/23
don't [30]   3/14 4/15 7/8 8/24
12/18 12/19 13/8 13/9 17/16
17/17 18/8 18/19 19/23 20/2
20/19 26/15 26/18 26/18 27/3
27/9 28/9 29/21 31/17 31/18
33/5 34/22 35/6 38/23 39/4
44/15
done [6]   11/3 36/13 40/24
41/25 43/9 43/9
Dontray [2]   24/6 24/13
Dontray Johnson [2]   24/6
24/13
double [1]   40/9
doubt [1]   18/16
Douglas [3]   1/23 46/5 46/10
down [3]   14/6 22/14 22/16
downward [7]   7/5 8/5 14/13
18/20 19/1 19/4 19/5
dozens [3]   15/5 22/4 36/20
drive [1]   4/23
drops [1]   24/25
drug [6]   2/25 15/24 17/19
30/24 45/3 45/4
drug-smuggling [2]   15/24
17/19
drugs [8]   13/1 13/9 17/20
22/8 42/7 42/8 42/9 42/10
during [1]   36/8

---

**JA6728**

Case 1:16-cr-00267-CCB Document 1500 Filed 05/26/20 Page 51 of 61

**E**

each [4]   36/15 37/7 37/15
   44/17
early [2]   38/25 43/2
earn [1]   45/6
ears [1]   40/5
economy [1]   22/7
Edges [1]   17/6
educate [1]   33/10
educated [2]   23/22 32/21
Edwards [8]   15/13 18/14 22/14
   25/11 25/11 25/18 25/19 28/2
efficiently [1]   14/24
effort [1]   15/7
efforts [1]   23/10
eliminate [2]   22/12 22/22
Ellis [1]   24/13
else [5]   20/20 21/5 26/14
   27/24 41/8
embraced [1]   38/15
ended [1]   33/6
enemy [1]   24/17
enforce [4]   7/8 9/11 18/3
   18/6
enforceable [1]   9/3
enforcement [6]   7/14 16/23
   23/8 23/11 24/12 24/16
engage [3]   6/25 7/23 15/20
engaged [1]   43/10
enrich [1]   29/9
enter [1]   14/21
entertained [1]   9/23
entire [1]   23/3
entitled [2]   8/5 46/7
environment [4]   29/25 32/7
   32/20 33/2
Enzinna [9]   1/17 2/19 3/15
   6/21 14/10 16/9 17/14 19/6
   28/23
equally [1]   16/24
especially [3]   17/14 40/14
   41/22
Esquire [3]   1/15 1/17 1/18
essential [1]   20/2
evading [1]   24/24
eve [2]   4/17 15/3
even [17]   6/5 7/3 7/16 7/19
   11/1 18/25 19/18 23/8 23/21
   24/2 26/10 27/1 27/18 38/15
   39/19 40/13 40/19
event [1]   19/3
ever [1]   38/7
every [6]   26/1 36/15 36/16
   37/15 38/19 41/16
everybody [1]   36/7
everyone [1]   2/3
everything [3]   26/14 29/16
   41/3
evidence [5]   9/2 11/14 17/14
   42/12 43/8
exact [1]   15/21
exactly [4]   7/9 10/1 16/5
   31/10
Examiners [1]   23/15
except [1]   28/9
excuse [1]   20/24
exercise [1]   29/11
exhibit [5]   12/4 13/17 15/10
   23/18 24/20
Exhibit 1 [2]   12/4 15/10
Exhibit 3 [1]   13/17
exhibits [1]   17/11
expect [2]   32/20 32/23
expectancy [1]   11/6
experience [1]   30/8
experienced [1]   33/24
explain [1]   27/17
explicit [1]   17/18
explicitly [1]   16/11
exposed [7]   30/20 30/21 30/23
   30/24 31/4 31/20 31/22
expressed [1]   36/25
extent [3]   9/1 34/11 34/15
extortion [1]   22/5
extreme [1]   34/1 34/7
extremely [2]   35/23 42/20
eyes [2]   38/16 38/17

**F**

F.3d [5]   7/12 20/1 20/6 20/11
   20/12
face [1]   15/15
FaceTime [1]   26/3
facilities [1]   31/22
facility [1]   31/14
fact [10]   5/16 5/19 15/2 15/9
   17/18 18/11 19/16 27/11 42/13
   44/11
factor [1]   21/3
factors [2]   30/17 44/2
fail [1]   33/2
failed [1]   40/6
failing [1]   31/11
failure [1]   29/7
fair [1]   16/1
fairly [4]   5/16 17/11 20/3
   30/3
faith [1]   41/1
families [4]   22/19 41/23
   42/10 43/14
family [10]   2/13 2/14 21/10
   23/21 24/8 28/10 33/23 35/25
   38/2 39/23
famous [1]   13/1
far [3]   13/5 27/4 36/11
father [2]   28/11 34/11
fault [1]   29/18
FCRR [3]   1/23 46/5 46/10
fear [1]   37/5
February [2]   27/15 38/5
Federal [2]   1/24 46/12
feel [1]   39/6
feeling [1]   37/1
feels [1]   29/7
fellow [1]   17/2
felt [2]   12/18 12/21
female [1]   17/9
few [3]   8/3 35/25 37/10
fiction [1]   34/13
figure [1]   21/17
filed [1]   8/4
finally [1]   13/12
financial [2]   44/15 44/21
find [3]   5/2 5/8 9/21
finding [1]   29/10
fine [5]   9/18 10/10 19/20
   19/24 44/15

firearm [1]   3/2
first [19]   5/14 6/15 11/16
   11/16 11/18 29/2 35/20 36/5
   41/13 42/7 45/1
fit [1]   39/7
five [3]   26/6 38/11 44/13
Flame [1]   17/8
flies [1]   15/15
flip [1]   37/19
Floor [1]   1/24
focuses [2]   29/13 29/17
follow [3]   6/8 20/16 31/16
following [3]   2/24 11/24
   44/11
force [1]   3/21
forced [3]   3/20 36/16 40/6
foregoing [1]   46/6
foremost [1]   35/20
foretold [1]   27/12
forever [1]   4/21
forfeiting [1]   32/3
forfeits [1]   7/14
forfeiture [1]   41/10
forgetting [1]   19/15
formal [1]   9/22
forth [1]   21/23
fortunate [1]   24/3
forward [1]   42/22
found [4]   9/19 9/19 18/16
   42/15
founder [1]   22/2
four [1]   15/11
Fourth [9]   7/11 7/13 7/17 9/4
   10/15 18/7 19/14 20/16 20/17
Fourth Circuit [9]   7/11 7/13
   7/17 9/4 10/15 18/7 19/14
   20/16 20/17
frankly [1]   30/9
free [1]   40/11
freedom [1]   40/2
friend [1]   35/15
friends [1]   36/1
front [2]   43/5 43/7
full [2]   16/4 36/9
fully [1]   10/8
funnel [1]   31/25
further [1]   33/11
futility [1]   29/11
future [2]   25/6 32/15

**G**

gambling [1]   37/23
gang [12]   15/23 17/3 17/9
   22/3 22/12 22/12 22/13 22/15
   23/1 24/8 24/14 24/17
gang's [2]   22/9 24/24
gave [2]   28/13 37/22
general [1]   9/8
generation [1]   24/2
gentleman [1]   17/6
Georgia [1]   16/18
Gerald [1]   36/24
Gerald Stokes [1]   36/24
get [13]   3/19 4/20 7/5 15/2
   26/16 27/21 31/15 31/17 31/18
   32/21 32/21 34/3 34/6
getting [3]   30/24 32/17 33/9
girl [2]   12/18 25/25
give [4]   28/10 28/11 30/15

Case 1:16-cr-00267-CCB Document 1213 Filed 10/26/18 Page 98 of 475

**G**

give... [1]  37/18
given [7]  11/6 11/6 17/14
 23/23 29/10 40/16 43/25
gives [3]  9/20 11/9 11/10
giving [2]  25/22 27/8
glimmer [3]  26/12 26/13 26/15
go [14]  3/20 3/22 12/13 13/5
 13/13 13/24 18/7 32/9 32/21
 33/1 34/4 36/15 36/20 39/20
God [6]  27/24 28/10 28/11
 28/13 28/18 41/2
goes [1]  17/6
going [13]  8/23 8/25 24/8
 25/22 25/25 26/11 27/5 27/6
 27/7 28/4 28/16 32/20 35/18
gone [1]  40/11
good [20]  2/3 2/22 25/14
 25/15 25/21 29/13 29/24 31/25
 32/21 33/7 33/16 33/24 34/10
 34/11 34/11 37/21 41/4 43/9
 43/9 45/7
good-paying [1]  32/21
got [9]  4/25 7/9 8/7 31/21
 32/11 32/13 34/1 38/19 40/10
gotten [1]  8/3
Government [30]  3/8 3/11 3/20
 3/22 4/10 4/16 8/18 9/1 9/13
 10/16 10/25 11/22 12/5 12/25
 13/3 13/13 14/17 14/18 14/22
 14/23 15/3 20/1 21/7 32/5
 36/8 37/11 38/20 39/3 40/19
 45/17
Government's [13]  4/12 6/3
 6/13 11/14 11/25 12/4 13/17
 15/10 15/25 18/10 24/20 37/14
 40/4
Government's Exhibit [1]
 24/20
GP [1]  24/20
GP-12B [1]  24/20
grace [1]  41/2
graduate [1]  36/23
grandchildren [2]  26/8 27/19
grandson [1]  28/20
grant [1]  14/4
granting [2]  18/25 19/4
grateful [1]  35/23
grave [1]  25/4
greatest [1]  23/5
green [1]  24/15
green-lighted [1]  24/15
Greer [2]  24/7 37/24
grew [2]  30/13 33/4
grieving [1]  22/19
growing [2]  30/6 33/4
guarantee [1]  40/2
guideline [6]  3/10 14/6 20/21
 20/23 20/24 21/21
guidelines [7]  18/24 19/2
 20/18 20/20 21/1 21/3 43/21
guilt [1]  36/11
guilty [2]  14/22 41/16
gunned [2]  22/14 22/16
Gutta [1]  37/8

**H**

had [29]  4/1 4/3 4/16 5/1

6/20 8/3 9/23 10/8 12/21 15/2
 15/5 15/8 19/19 24/14 26/18
 29/4 29/14 29/19 30/15 32/10
 32/15 33/7 33/8 33/25 37/3
 37/7 40/6 43/1 45/10
half [1]  27/6
Hankins [1]  37/18
happened [1]  31/20
happens [4]  11/23 24/22 29/20
 41/1
happy [4]  21/5 35/5 35/8
 45/11
harass [1]  36/2
hard [2]  21/25 37/14
harm [1]  15/22
has [38]  4/1 4/3 4/16 4/24
 5/21 6/22 6/25 7/11 8/15
 11/14 14/19 14/25 15/20 16/9
 16/17 17/14 18/17 20/17 25/2
 25/25 26/4 26/12 26/14 29/4
 29/6 29/22 32/1 32/2 33/12
 33/13 33/20 37/4 39/12 41/3
 41/4 42/4 42/5 43/8
have [81]  2/12 3/7 3/12 5/7
 6/1 6/20 6/22 11/2 11/11 13/5
 15/17 16/2 17/24 18/4 18/5
 18/11 19/13 20/15 21/3 21/9
 23/12 23/13 23/14 24/4 26/7
 26/7 26/12 26/15 26/23 27/2
 27/3 27/4 27/9 27/10 27/15
 27/16 27/19 27/20 27/21 27/22
 27/23 27/24 28/9 28/15 29/4
 29/7 29/16 30/2 30/11 31/7
 31/7 31/9 31/15 31/16 33/5
 33/21 35/6 35/18 36/1 36/13
 36/21 38/3 38/22 38/24 39/2
 40/11 40/12 40/22 41/1 41/2
 41/3 41/23 41/25 43/8 43/9
 43/10 43/21 43/25 45/14 45/14
 45/22
he [157]  3/20 4/25 6/18 7/5
 7/14 8/11 9/22 10/4 10/8 11/1
 11/4 11/11 11/14 12/6 12/7
 12/13 13/22 15/6 15/7 15/8
 15/14 16/11 16/11 16/15 16/19
 16/24 16/25 17/4 17/21 17/23
 18/13 18/16 18/17 19/8 22/7
 22/10 22/14 22/16 22/17 22/19
 22/21 23/7 23/17 23/18 23/21
 23/22 23/22 23/25 23/25 24/2
 24/4 24/4 24/6 24/7 24/8 24/9
 24/9 24/11 24/12 24/13 24/14
 24/15 24/16 24/18 24/18 24/21
 24/23 25/2 25/3 25/23 25/23
 25/25 26/4 26/14 26/16 26/18
 26/18 26/18 26/20 26/20 26/24
 26/25 26/25 27/11 27/12 27/12
 27/13 27/15 27/16 28/13 28/14
 28/17 29/3 29/4 29/4 29/6
 29/7 29/7 30/3 30/12 30/14
 30/15 31/4 31/4 31/19 31/20
 31/22 31/23 31/25 32/1 32/6
 32/11 32/11 32/13 32/13 32/15
 33/4 33/6 33/7 33/7 33/8 33/8
 33/9 33/12 33/13 33/15 33/15
 33/16 33/17 33/20 33/21 34/1
 34/3 34/4 34/6 34/10 34/12
 34/13 34/13 34/19 34/19 34/21
 35/6 36/25 37/24 38/3 38/4

38/5 38/6 38/7 38/7 38/9
 38/10 38/12 40/10
he's [28]  4/20 8/11 11/6
 13/24 16/21 16/21 16/25 17/5
 17/5 17/16 23/21 23/22 23/22
 26/10 26/18 27/1 27/4 27/5
 27/5 27/5 27/6 27/7 27/18
 31/20 33/9 34/11 34/13 45/19
heads [1]  21/12
hear [6]  21/5 27/21 29/5 35/5
 35/8 41/13
heard [8]  9/9 19/10 20/20
 21/8 23/12 23/13 23/14 29/22
hearing [1]  6/1
Heath [1]  13/20
heaven [1]  28/20
Heights [1]  30/5
held [2]  7/11 39/24
help [1]  38/20
helped [1]  36/23
helping [1]  37/16
her [17]  5/17 5/18 12/10
 12/11 12/23 13/21 13/23 16/11
 16/15 16/18 16/18 16/19 16/20
 16/21 16/22 25/25 38/16
here [19]  2/9 2/11 2/13 2/14
 2/23 4/25 7/9 7/16 13/11 16/9
 21/10 23/4 26/10 31/24 32/3
 32/12 40/18 41/22 43/7
hereby [1]  46/5
heroin [2]  3/3 22/8
high [1]  39/15
higher [1]  18/23
highest [1]  18/24
Hill [2]  23/8 24/11
him [40]  4/20 6/8 11/10 11/10
 12/8 25/23 26/2 26/3 26/4
 26/9 26/11 26/17 26/20 26/22
 26/23 27/7 27/9 30/3 30/15
 31/2 31/9 31/12 31/13 31/15
 31/23 32/2 32/15 34/1 34/14
 34/19 37/18 37/22 37/22 38/2
 38/4 38/14 38/20 40/14 41/5
 45/8
himself [1]  22/10
hired [1]  36/24
his [67]  2/24 6/17 6/18 7/2
 7/3 9/23 11/6 11/11 12/6 14/5
 14/15 14/20 14/21 15/3 15/6
 15/19 15/20 16/10 18/13 22/15
 22/18 22/20 23/18 24/3 24/7
 24/7 24/18 24/19 24/21 25/2
 25/3 27/12 27/14 27/15 27/21
 27/21 27/22 27/25 29/5 29/7
 29/9 30/4 30/13 30/16 30/22
 31/1 31/2 32/2 32/3 32/12
 32/18 33/1 33/2 33/10 33/11
 33/23 34/1 34/3 34/5 34/16
 38/6 38/16 39/13 40/10 41/2
 41/4 42/1
hisself [1]  27/1
history [4]  20/22 20/23 37/12
 44/1
hits [1]  24/25
Hoffman [6]  1/15 2/5 2/7 6/11
 14/11 19/10
hold [2]  20/13 42/17
holding [1]  20/3
holds [1]  39/15

Case 1:16-cr-00267-CCB Document 1300 Filed 05/26/20 Page 53 of 61

**H**

home [6]   37/8 37/8 38/2 38/19 38/21 39/20
homeless [1]   37/24
Honor [33]   2/19 3/16 4/2 5/7 5/12 5/13 6/12 9/12 9/25 10/23 11/22 14/3 14/9 14/12 21/20 25/10 25/14 28/3 29/22 30/2 30/12 33/7 34/12 34/18 36/19 37/11 38/2 38/9 39/4 40/7 40/20 41/12 44/25
Honor's [1]   29/10
HONORABLE [1]   1/11
hope [3]   11/10 11/10 15/8
hopelessness [1]   37/1
Hornes [1]   22/16
hot [2]   16/16 16/16
hours [1]   15/4
house [1]   38/10
how [9]   17/1 17/4 27/17 30/6 31/15 31/21 33/21 35/11 37/14
human [2]   39/24 42/24
HVAC [1]   45/10

**I**

I'd [2]   9/12 35/20
I'll [6]   2/16 5/8 5/13 21/7 24/22 45/11
I'm [29]   2/7 5/3 5/9 5/13 8/14 8/23 10/2 11/24 11/25 18/25 19/14 21/5 21/12 25/10 27/19 28/7 28/16 30/4 31/1 31/24 32/11 35/8 35/18 35/24 40/16 41/6 43/9 44/16 45/22
I've [6]   19/3 29/14 34/25 36/19 40/24 44/2
idea [1]   37/21
ignore [1]   29/21
imagine [1]   21/25
impediment [1]   23/5
important [6]   6/21 6/24 7/16 40/3 42/19 42/20
impose [8]   9/18 14/7 19/20 19/21 22/11 43/23 44/12 44/16
imposed [1]   30/7
imposing [2]   32/18 43/19
impression [1]   39/22
imprisonment [1]   20/4
incarceration [1]   15/19
inch [1]   17/22
incite [1]   17/5
inciting [1]   15/23
include [2]   12/9 41/17
included [7]   4/6 4/9 4/12 11/13 16/2 17/11 43/8
includes [1]   9/10
including [3]   29/3 31/2 43/7
incorrect [1]   43/21
independent [1]   6/1
indicate [1]   3/6
indicating [4]   26/12 27/12 33/2 33/2
indication [1]   14/1
indictment [6]   7/2 15/22 39/3 45/18 45/18 45/20
indoctrinated [2]   24/2 24/4
indulge [1]   31/24
indulgence [2]   28/24 29/12

inflicted [1]   33/14
influence [3]   5/22 36/12 36/21
information [3]   4/6 34/5 44/21
inherit [1]   37/9
initially [2]   5/25 8/22
initiatives [1]   31/8
insight [3]   29/4 33/8 33/20
insightful [2]   33/13 34/24
instance [3]   30/22 32/9 34/3
instead [2]   23/24 32/11
instructed [1]   12/6
instructing [1]   13/13
instructs [1]   12/6
intelligent [1]   33/9
intend [2]   5/12 6/12
intent [1]   3/3
intention [2]   14/21 25/3
interactions [1]   37/15
intercepted [1]   15/18
interject [1]   4/2
interpretation [2]   15/25 43/22
interpreted [1]   34/8
intimidate [3]   22/21 36/2 42/21
investigation [2]   14/20 30/16
involve [1]   5/19
involved [3]   5/19 41/21 42/9
involves [2]   14/2 23/1
is [119]   2/6 2/9 3/17 5/10 5/21 7/11 7/12 7/16 7/21 8/5 8/24 9/3 9/16 11/1 11/7 11/9 11/16 12/13 13/3 13/12 13/15 13/19 13/24 15/13 16/1 16/12 16/12 18/5 18/10 18/13 18/23 19/7 19/9 19/16 19/23 19/24 20/4 20/6 20/10 20/21 20/22 20/24 21/20 22/25 23/4 23/19 25/18 25/22 26/6 26/8 26/11 26/17 26/21 27/20 27/20 28/4 28/7 28/13 29/11 29/20 30/6 30/14 31/10 31/15 32/1 32/24 33/3 33/4 33/8 33/12 33/20 34/5 34/7 34/10 34/11 34/12 34/13 34/14 35/6 36/11 36/16 37/20 38/20 39/18 40/14 40/18 40/20 40/22 41/8 41/10 41/16 41/18 41/18 41/20 41/22 41/24 42/15 42/19 42/20 42/21 43/5 43/5 43/12 43/13 43/17 43/18 43/20 43/24 43/24 44/3 44/4 44/5 44/6 44/7 44/7 44/9 44/13 45/7 46/6
isn't [1]   12/22
issue [9]   6/7 10/18 10/20 10/21 13/8 13/11 18/1 19/25 41/10
issues [1]   3/10
it [73]   3/18 4/1 4/11 4/20 5/5 5/8 5/10 5/25 7/9 7/16 7/19 7/22 8/24 9/2 9/14 9/17 10/2 10/3 10/18 10/19 10/20 10/20 11/9 11/9 11/10 12/6 13/6 16/20 17/19 18/13 18/18 18/23 19/2 19/15 19/21 20/2 20/3 20/6 22/25 23/2 23/10 23/17 23/25 26/18 26/20 26/20

26/20 27/3 27/4 27/12 29/12 33/4 34/5 38/17 38/21 39/7 39/8 41/1 41/16 41/20 41/22 41/24 42/19 42/20 43/17 43/24 44/3 44/5 44/6 44/7 44/9 44/13 45/7
it's [35]   3/21 4/6 5/3 5/9 5/10 6/15 7/4 7/7 7/12 7/24 11/9 11/20 12/4 12/12 12/15 13/9 13/10 13/19 15/6 16/2 16/14 17/1 20/2 20/3 20/10 21/21 21/22 21/25 26/6 26/17 26/17 36/11 42/7 42/11 45/12
its [3]   7/14 8/3 19/19
itself [1]   13/6

**J**

J.G [2]   23/13 42/23
jail [13]   6/13 6/17 6/18 6/23 8/1 8/8 8/11 12/1 15/18 16/1 17/17 24/24 27/7
jail call [1]   12/1
jail calls [9]   6/13 6/17 6/18 6/23 8/1 8/8 8/11 15/18 16/1
Jamal [1]   22/24
Jamal Lockley's [1]   22/24
James [5]   15/13 20/6 22/14 25/11 25/19
James Edwards [4]   15/13 22/14 25/11 25/19
January [3]   11/17 12/1 16/10
January 2019 [1]   11/17
January 6 [1]   12/1
January 6th [1]   16/10
Jay [2]   24/7 37/24
Jay Greer [2]   24/7 37/24
job [3]   29/18 32/21 41/20
Johnson [5]   23/9 24/6 24/13 24/15 28/4
Johnson's [1]   28/8
joint [1]   40/5
JUDGE [10]   1/11 9/19 9/21 10/1 10/11 19/8 20/14 23/19 30/13 43/7
Judge Bredar [3]   10/1 10/11 20/14
Judge Bredar's [1]   19/8
Judge Quarles [3]   23/19 30/13 43/7
judgment [1]   41/4
July [3]   3/13 8/16 27/16
July 11th [2]   3/13 8/16
jury [5]   2/24 18/14 18/16 42/6 42/15
jury's [2]   15/11 42/6
just [28]   3/24 4/5 6/3 6/22 8/3 12/15 12/15 12/21 15/15 16/8 19/3 19/24 21/3 21/22 25/23 26/1 27/23 31/3 31/14 31/24 34/4 35/9 35/14 36/11 39/11 39/11 39/12 42/10
justice [8]   15/22 23/3 25/1 30/8 31/8 32/19 33/19 40/14

**K**

K2 [1]   17/22
Karen [2]   25/11 25/18
Karen Edwards [1]   25/18
keep [1]   28/16

Case 1:16-cr-00267-CCB Document 841-1500 Filed 05/26/17 Page 5 of 51

**K**

Kev [1]  17/7
kid [3]  31/15 37/25 38/15
kids [2]  34/15 36/20
kill [10]  13/23 16/21 24/9
 24/10 24/11 24/13 39/19 42/9
 42/9 42/22
killed [8]  26/14 26/19 29/16
 31/17 31/18 32/17 34/6 34/6
kind [3]  30/4 37/11 40/14
kinds [1]  30/20
kites [5]  15/18 17/17 17/17
 17/20 18/11
knew [3]  4/20 32/9 34/6
know [24]  3/4 3/21 8/24 12/19
 12/19 20/19 21/7 26/1 26/1
 26/2 26/5 26/7 26/8 26/8 26/9
 26/10 26/18 26/18 27/21 29/22
 30/10 30/13 37/4 39/11
knowledge [1]  6/1
knows [5]  10/23 15/9 34/13
 34/20 37/20

**L**

laid [2]  16/5 19/11
landed [1]  40/5
language [4]  10/16 12/15 13/5
 19/19
large [1]  22/8
last [8]  5/23 5/24 6/7 6/19
 15/7 29/12 35/13 35/14
last-ditch [1]  15/7
Lastly [1]  40/18
late [1]  6/5
later [1]  9/4
law [13]  9/23 10/9 16/23
 22/23 23/8 23/11 24/12 24/16
 30/10 30/21 32/9 39/1 43/22
law enforcement [5]  16/23
 23/8 23/11 24/12 24/16
law-abiding [2]  30/10 30/21
laws [1]  38/24
leader [3]  22/2 22/15 36/9
leadership [3]  32/1 32/2 33/8
learn [1]  31/5
learned [2]  13/22 31/4
least [2]  9/13 27/21
leave [2]  38/8 38/13
left [5]  22/19 27/3 36/1 38/5
 45/14
legal [1]  45/16
legend [2]  24/19 24/22
legitimately [1]  37/16
lens [4]  29/16 29/19 34/2
 34/9
less [2]  14/7 24/3
less-fortunate [1]  24/3
let [5]  3/9 5/13 38/13 41/19
 43/20
letter [9]  15/12 18/11 23/18
 24/19 30/2 30/13 30/15 35/11
 35/14
letters [1]  33/23
level [12]  14/6 14/13 14/14
 14/17 14/18 18/22 18/25 19/4
 19/4 20/21 20/24 25/7
levels [1]  14/5
lie [1]  39/18

lies [1]  40/10
life [50]  9/18 10/19 11/6
 11/8 11/11 14/7 15/7 19/7
 19/16 19/20 19/24 20/3 20/8
 20/25 21/20 23/25 24/5 25/5
 25/7 25/22 26/11 26/17 26/17
 27/9 27/9 27/25 28/15 29/11
 30/17 30/22 31/1 32/3 32/23
 32/25 35/22 37/6 38/6 40/13
 40/17 40/20 41/5 42/1 43/2
 43/18 43/23 44/4 44/5 44/6
 44/9 44/12
lifestyle [1]  23/17
lighted [1]  24/15
like [26]  2/5 9/12 12/18
 17/13 21/5 23/8 23/9 24/4
 24/6 25/11 26/2 27/9 29/22
 31/9 32/22 34/8 35/6 35/20
 35/25 36/22 36/24 38/17 40/9
 40/14 41/8 42/3
likely [1]  11/7
liquid [1]  17/22
listened [1]  36/24
litigating [1]  18/2
little [5]  6/15 9/13 15/8
 25/25 26/5
live [6]  26/21 26/23 27/13
 33/1 33/5 38/13
lived [1]  37/25
lives [2]  36/12 42/14
Lockley's [1]  22/24
Lombard [1]  1/24
long [3]  34/21 39/19 40/2
look [3]  5/13 34/2
looked [1]  38/17
looking [2]  11/25 29/15
loop [1]  40/17
losing [1]  37/6
lost [3]  36/7 41/23 43/15
lot [3]  29/4 39/12 40/22
loved [5]  27/10 40/3 40/24
 41/23 43/15
loving [1]  23/20
loyal [1]  34/4
loyalty [3]  34/1 34/7 34/10

**M**

ma'am [4]  25/16 28/5 35/7
 46/2
made [10]  6/22 8/11 10/11
 17/16 17/21 24/7 29/24 30/22
 32/6 38/19
Mafia [1]  24/8
Mahdi [1]  20/11
mail [2]  4/19 4/21
maimed [1]  26/14
make [9]  6/12 11/24 14/18
 19/2 32/8 37/12 38/21 39/7
 45/11
makes [1]  42/21
man [10]  25/22 26/10 26/10
 26/12 26/24 26/24 28/16 33/3
 39/12 42/4
manager [1]  40/11
mandated [1]  21/20
mandatory [5]  19/7 19/16 20/4
 20/8 43/18
many [11]  23/16 29/9 30/5
 30/5 30/5 31/5 36/17 37/2

many challenges [1]  43/1
marijuana [1]  17/21
MARYLAND [3]  1/1 1/9 1/25
masonry [1]  45/10
matter [4]  24/21 37/14 46/4
 46/8
matters [1]  5/19
maximum [1]  44/7
may [10]  5/7 9/12 9/18 10/2
 20/14 20/14 26/16 29/12 43/8
 46/12
maybe [5]  5/9 16/21 21/13
 29/23 40/13
me [36]  2/9 3/9 12/23 18/13
 20/24 27/13 28/13 28/14 28/17
 29/22 31/24 32/25 35/15 35/21
 36/3 36/11 36/24 37/5 37/12
 37/15 37/16 38/17 39/1 39/2
 39/3 40/1 40/4 40/16 40/20
 40/21 41/2 41/3 41/9 42/25
 43/5 43/20
mean [9]  11/5 12/15 13/8
 17/19 19/19 20/24 28/11 33/17
 34/18
meaning [1]  18/9
means [1]  16/16
meant [1]  32/18
meantime [1]  21/15
Medical [1]  23/15
meet [2]  16/18 31/8
member [2]  17/2 17/9
members [3]  2/13 15/23 21/9
memo [17]  6/3 6/14 8/3 8/4
 8/7 9/14 10/3 11/14 11/25
 15/10 15/17 16/3 16/6 17/11
 17/12 19/12 23/20
memoranda [1]  3/7
memorandum [2]  4/12 9/9
men [6]  30/5 31/5 36/17 36/23
 40/12 40/13
mention [1]  17/16
mentioned [1]  8/10
mentored [2]  36/18 36/22
message [3]  23/7 25/7 39/18
met [1]  25/8
method [1]  30/24
mid [1]  11/12
mid 70s [1]  11/12
middle [3]  23/20 30/13 36/23
might [1]  11/11
millions [1]  37/9
mind [3]  33/3 33/11 33/11
mind-set [1]  33/3
minimum [4]  19/16 20/4 20/8
 42/22
misconduct [1]  14/20
misleading [1]  6/15
MMP [5]  14/2 16/25 17/1 17/2
 17/5
model [1]  13/10
modifications [1]  3/11
moment [3]  3/10 20/15 30/14
money [3]  31/21 37/19 37/22
monster [1]  37/11
month [1]  38/4
months [5]  4/16 4/17 15/11
 27/14 38/11
Moore [3]  1/20 2/10 36/1

Case 1:16-cr-00267-CCB Document 1306 Filed 10/26/20 Page 55 of 75

**M**

more [11]   11/2 16/20 17/18
 21/25 22/1 23/14 31/14 33/13
 36/14 37/5 42/15
Moreover [1]   13/8
morning [8]   2/3 2/22 4/11
 4/11 4/25 25/14 25/15 25/21
most [4]   5/15 11/7 25/8 40/3
mother [5]   25/10 25/19 28/3
 28/8 31/2
mother's [1]   38/16
motion [6]   7/8 9/11 11/19
 14/18 18/2 18/6
motions [1]   15/5
Mountain [2]   31/13 43/3
move [3]   10/12 14/17 17/13
moves [1]   45/17
Mr. [55]   2/11 2/20 2/24 2/15
 3/19 4/1 4/3 5/18 6/16 6/21
 6/22 6/25 10/24 11/2 11/2
 12/5 12/9 12/22 12/25 13/7
 13/13 13/20 13/21 14/4 14/10
 14/25 15/2 15/12 15/20 16/7
 16/9 16/10 17/14 17/18 18/12
 18/14 19/6 20/21 22/18 23/6
 23/11 23/17 23/20 24/23 28/23
 29/3 30/1 35/5 41/7 41/25
 42/2 44/1 44/3 45/19 45/22
Mr. Bailey [41]   2/20 2/24
 3/19 4/1 4/3 5/18 6/16 6/22
 6/25 10/24 11/2 11/2 12/5
 12/22 13/7 13/13 13/20 13/21
 14/4 14/25 15/2 15/12 15/20
 16/7 16/10 17/18 18/12 22/18
 23/6 23/17 23/20 24/23 29/3
 30/1 35/5 41/7 41/25 42/2
 44/3 45/19 45/22
Mr. Bailey's [6]   2/11 12/9
 12/25 20/21 23/11 44/1
Mr. Edwards [1]   18/14
Mr. Enzinna [7]   3/15 6/21
 14/10 16/9 17/14 19/6 28/23
Mrs. [5]   5/17 12/17 12/21
 16/17 25/11
Mrs. Bailey [3]   12/17 12/21
 16/17
Mrs. Bailey's [1]   5/17
Mrs. Karen Edwards [1]   25/11
Ms. [7]   2/5 6/11 12/17 14/11
 19/10 28/2 28/23
Ms. Bailey [1]   12/17
Ms. Edwards [1]   28/2
Ms. Hoffman [4]   2/5 6/11
 14/11 19/10
Ms. Whalen [1]   28/23
much [6]   5/11 13/3 16/7 28/9
 29/11 41/25
Murdaland [1]   24/8
Murdaland Mafia Piru [1]   24/8
murder [8]   3/1 15/13 15/13
 18/14 18/17 19/17 22/5 24/15
murdered [1]   36/21
murders [4]   22/4 22/4 22/10
 42/13
music [2]   27/21 27/22
must [1]   29/10
my [56]   4/19 4/24 8/25 10/5
 18/2 21/13 25/18 25/23 26/7

26/8 26/12 26/21 26/21 26/22
 27/11 27/14 28/7 28/13 28/16
 28/18 28/20 32/25 35/14 35/15
 35/25 36/8 36/9 36/12 36/14
 36/16 36/20 37/1 37/6 37/8
 37/12 38/2 38/2 38/9 38/9
 38/13 38/17 38/18 38/23 39/23
 39/23 40/2 40/3 40/8 40/15
 40/20 41/2 41/4 41/5 41/5
 41/20 43/22
myself [2]   29/19 38/22

**N**

name [5]   17/7 25/16 25/18
 28/5 28/7
necessarily [1]   32/18
Neck [2]   4/20 4/25
need [13]   3/4 9/6 13/24 18/8
 23/1 34/22 37/4 37/8 39/8
 43/12 43/13 44/1 44/12
needed [4]   31/10 31/12 31/23
 31/25
needs [1]   45/25
neighborhood [7]   24/3 29/8
 29/9 30/25 33/16 33/18 33/21
neighborhoods [3]   22/19 30/5
 31/11
nephews [1]   26/4
never [6]   4/17 25/25 31/22
 37/2 38/21
next [2]   36/7 40/20
nieces [1]   26/4
night [2]   36/15 38/19
nights [1]   36/4
Ninth [1]   19/14 20/12
Ninth Circuit [2]   19/14 20/12
no [22]   1/4 3/14 5/1 6/1 7/10
 8/12 14/1 19/20 22/16 24/21
 25/2 25/3 28/14 29/18 30/17
 31/3 32/15 36/11 37/14 39/11
 41/9 41/12
none [1]   7/19
nonetheless [1]   43/23
NORTHERN [3]   1/2 4/20 4/25
Northern Neck [2]   4/20 4/25
Northwest [1]   22/9
Northwest Baltimore [1]   22/9
not [65]   3/19 3/21 5/18 6/2
 6/8 8/17 9/4 9/21 10/8 10/18
 10/19 11/1 11/14 12/10 12/13
 12/15 13/10 13/10 14/25 16/21
 17/2 18/2 18/4 18/14 18/17
 18/25 19/4 19/7 20/14 21/10
 23/17 25/22 26/10 26/11 26/17
 26/17 26/21 27/1 28/16 28/16
 29/23 30/2 31/12 31/17 31/24
 32/12 34/17 34/19 35/15 36/1
 37/12 37/20 37/22 39/9 39/15
 40/16 40/22 41/1 41/18 42/2
 42/15 42/16 42/22 45/5 45/14
note [2]   2/12 18/22
noted [1]   45/25
nothing [2]   11/2 40/18
notice [2]   6/16 8/11
notifying [1]   14/21
noting [1]   45/24
notion [2]   15/15 17/23
November [1]   1/8
now [18]   5/21 10/22 11/13

**O**

object [1]   4/14
objected [2]   4/8 8/22
objection [4]   3/16 5/23 18/6
 45/16
obstruct [2]   15/22 25/1
obviously [7]   3/24 9/9 19/23
 20/15 42/19 44/10 45/12
off [2]   27/4 40/16
offense [12]   14/6 14/14 14/16
 15/6 18/22 20/5 20/21 20/24
 21/25 42/11 42/15 43/14
offenses [3]   25/2 43/6 43/11
offer [4]   15/2 33/25 40/1
 41/4
Office [1]   39/17
officer [3]   1/20 44/20 44/22
officers [1]   23/11
Official [2]   1/24 46/12
often [1]   33/9
Oh [4]   5/3 5/7 5/9 41/12
okay [18]   2/21 3/15 3/23 5/2
 6/10 8/14 9/15 10/13 11/24
 12/3 17/25 19/25 34/22 35/2
 35/8 41/14 45/21 46/3
old [2]   11/6 27/19
once [4]   29/16 31/15 34/1
 36/18
one [28]   2/13 3/12 4/15 4/16
 5/8 11/5 12/2 12/20 12/25
 13/12 16/1 17/20 18/15 18/15
 19/21 21/3 22/1 26/15 28/14
 29/18 31/19 34/9 37/7 37/15
 40/2 40/21 40/22 43/7
ones [5]   27/9 27/10 40/3
 41/23 43/15
only [12]   8/1 19/24 21/22
 25/5 25/6 26/4 29/17 30/24
 31/17 39/4 40/7 43/24
operated [1]   38/1
operation [1]   15/24
opinion [3]   9/22 41/20 42/17
opinion/written [1]   9/22
opportunities [2]   23/23 23/25
opportunity [2]   4/3 6/20 31/3
option [1]   19/24
options [3]   19/22 31/23 32/10
oral [1]   10/8
order [4]   22/11 24/25 24/25
 26/20
ordered [5]   22/10 24/10 24/11
 24/13 42/13
ordering [1]   33/10
organization [1]   42/9
organize [1]   32/16
original [1]   45/18
other [13]   10/19 15/23 17/6
 18/21 19/24 21/1 22/16 23/16
 29/23 33/5 33/14 33/15 42/8
others [2]   31/18 37/2
our [20]   3/16 3/21 4/22 8/4
 11/18 15/10 15/17 16/3 16/6

**12/9** 12/12 13/16 14/1 17/14
 19/15 20/23 29/7 34/7 34/23
 36/25 38/20 40/15 42/24 43/5
nullified [1]   40/8
number [3]   2/7 2/25 4/16
numerous [1]   22/10

Case 1:16-cr-00267-C... Document 1500 Filed 05/26/21 Page 56 of ...

**O**

our... [11]  17/11 17/12 19/11 23/2 23/19 27/10 29/21 29/24 30/16 31/11 32/7

out [24]  4/5 12/10 12/11 13/25 16/5 16/6 16/18 16/19 16/20 19/11 19/18 21/17 25/23 25/24 26/16 31/12 32/11 32/12 32/13 34/5 34/14 37/12 40/16 45/14

outlive [2]  27/6 27/7

outset [1]  2/12

outside [2]  11/11 13/5

outweigh [1]  41/5

over [7]  6/19 8/9 29/14 33/12 33/12 36/12 38/1

overall [1]  43/10

overstates [1]  11/23

own [11]  6/17 6/18 8/4 8/10 8/19 14/20 23/18 24/18 27/12 37/6 40/11

**P**

p.m [2]  12/24 13/16

page [3]  5/9 16/12 16/14

Page 2 [1]  16/12

Page 38 [1]  5/9

pain [4]  29/6 33/13 34/24 38/16

paint [1]  39/6

Paper [1]  26/19

papers [1]  9/10

paragraph [11]  4/6 5/2 5/4 5/10 5/13 5/15 8/15 9/7 35/13 35/13 35/14

Paragraph 187 [4]  5/10 5/15 8/15 9/7

Paragraph 38 [1]  5/4

parents [2]  28/12 37/9

Park [1]  30/5

Park Heights [1]  30/5

part [5]  4/14 5/24 6/14 8/12 42/20

participating [1]  44/19

particular [1]  20/15

particularly [1]  43/14

parties [1]  10/21

parts [2]  29/13 29/21

past [1]  43/6

pattern [4]  7/1 7/15 7/23 15/21

Paul [2]  1/17 2/19

Paul Enzinna [1]  1/17 2/19

pay [1]  17/21

paying [1]  32/21

penalties [1]  9/17

penalty [1]  27/2

penny [1]  37/7

people [24]  13/13 24/3 24/6 26/14 29/6 30/10 30/21 31/1 31/6 31/9 32/14 32/17 33/14 33/24 34/4 34/24 39/13 41/21 42/8 42/9 42/10 42/17 42/22 43/9

people' [1]  36/12

people's [3]  40/25 42/10 42/14

Perhaps [1]  22/21

period [2]  33/12 34/21

periods [1]  14/12

permit [2]  14/6 44/15

permitted [1]  10/19

permitting [2]  14/22 14/23

person [6]  12/14 17/7 30/19 33/22 42/24 43/4

personal [2]  40/18 40/21

personally [1]  42/13

phone [1]  6/2

Pic [1]  17/7

picture [1]  39/7

pictures [1]  27/20

piece [2]  13/4 13/5

Piru [1]  24/8

place [3]  22/17 36/5 43/3

placed [1]  36/4

plain [1]  19/19

Plaintiff [2]  1/3 1/14

play [1]  27/24

plea [15]  7/9 7/14 7/17 9/2 9/3 9/11 10/24 11/18 14/21 15/2 18/4 39/22 40/5 40/8 41/16

plead [2]  11/4 11/5

pleas [1]  39/16

please [4]  2/4 25/16 28/5 38/18

pleasure [1]  29/14

pledged [1]  17/4

plot [1]  25/1

plots [1]  23/12

point [9]  4/5 6/5 7/20 9/4 11/5 18/5 19/18 29/17 32/15

points [2]  20/22 40/16

poison [1]  42/10

Police [1]  38/11

policy [1]  41/16

Pop [1]  28/20

Pop's [1]  28/20

Pop-Pop's [1]  28/20

portion [1]  6/6

portions [2]  16/4 17/10

position [1]  3/21

positive [2]  33/16 36/14

possession [2]  3/2 3/2

possible [1]  34/16

possibly [1]  17/24

postponed [1]  5/16

potential [1]  22/12

pray [4]  28/9 28/10 28/10 28/11

prayers [1]  28/16

prepared [1]  41/3

preparing [2]  14/22 15/4

present [3]  1/19 25/4 37/3

presentence [10]  3/4 3/7 3/9 3/12 3/17 3/25 4/4 4/9 8/16 20/18

pretrial [3]  7/2 15/5 15/19

pretty [3]  12/12 13/5 43/3

pride [1]  39/13

primarily [1]  5/23

primary [1]  3/16

prison [19]  11/5 11/7 11/11 13/2 13/7 13/9 20/9 20/25 26/11 32/4 32/11 32/14 36/25 40/13 40/17 44/4 44/5 44/6 44/8

Prisons [3]  6/9 44/24 45/13

private [2]  23/21 30/18

privileged [2]  30/21 32/23

privy [2]  6/2 6/6

probation [5]  1/20 8/18 8/22 44/20 44/22

Probation Officer [1]  1/20

proceeding [1]  41/17

proceedings [2]  4/15 46/7

process [2]  30/4 30/6

proclaiming [1]  39/9

Productive [1]  40/12

professionalism [1]  35/4

profit [1]  37/23

program [2]  45/5 45/7

programs [1]  44/21

prolific [1]  34/13

proof [1]  39/5

properly [1]  38/22

prosecuting [1]  23/5

prosecution [2]  14/20 29/15

prosecutor [1]  34/2

proselytized [1]  23/6

prospection [1]  30/14

protect [2]  25/5 34/4

protective [1]  30/17

proud [1]  39/14

proved [2]  42/5 42/23

provide [2]  31/18 34/15

provider [1]  36/6

provides [2]  9/17 14/13

providing [1]  44/21

psychologically [1]  37/5

public [2]  25/4 25/5

punish [1]  34/19

punished [1]  34/19

punishment [1]  20/4

purpose [4]  7/24 27/8 27/8 39/25

purposes [2]  7/4 21/23

purse [1]  31/7

put [7]  27/7 31/13 31/22 34/2 34/9 34/23 35/16

putting [1]  34/5

**Q**

quantity [1]  42/8

Quarles [3]  23/19 30/13 43/7

question [5]  10/5 22/14 25/23 39/14 41/13

quickly [1]  16/8

quote [4]  14/14 14/19 24/19 24/21

**R**

racketeering [3]  3/1 7/1 15/21

raided [1]  38/11

raised [2]  6/22 23/20

range [1]  20/25

rapper [1]  27/11

RDR [3]  1/23 46/7 46/10

re [1]  18/2

re-litigating [1]  18/2

reach [4]  10/24 11/3 18/9 27/18

reached [1]  16/17

read [4]  3/25 9/25 19/19 35/13

Case 1:16-cr-00267-CCB Document 1500 Filed 05/25/20 Page 57 of 61

**R**

reading [2] 13/3 33/10
reads [2] 33/8 33/9
ready [1] 41/6
reality [1] 36/17
realize [2] 29/21 40/18
realizes [1] 15/7
really [3] 21/25 34/21 38/7
Realtime [1] 46/11
reason [5] 7/7 8/1 8/12 22/16
38/6
reasonable [2] 18/5 18/16
reasons [2] 18/21 19/3
rebut [2] 6/24 16/8
received [1] 4/11
receiving [1] 40/17
recognize [2] 43/13 45/5
recognizing [1] 36/13
recommend [2] 45/1 45/3
recommendations [2] 44/23
45/12
recommends [1] 44/20
record [8] 3/24 6/14 8/13
11/1 25/17 28/6 35/17 46/7
reduced [1] 18/23
refers [1] 17/4
reflect [1] 37/12
regard [3] 3/17 19/6 39/15
regardless [2] 20/14 44/11
regards [1] 37/24
Registered [1] 46/11
rehash [2] 7/8 10/23
reign [1] 36/8
relates [1] 5/5
relating [4] 4/7 5/20 9/10
release [3] 5/17 44/13 44/18
released [1] 36/25
relevant [7] 4/15 7/24 8/25
11/20 16/4 17/10 44/19
relies [1] 10/16
relocated [1] 38/7
rely [1] 9/1
remarks [1] 29/5
remember [3] 13/20 26/4 38/16
remorse [2] 25/2 29/4
rendered [1] 41/4
repeating [1] 22/25
replenished [1] 36/16
report [10] 3/5 3/7 3/9 3/12
3/17 3/25 4/4 4/9 8/16 20/18
Reported [1] 1/22
Reporter [4] 1/24 46/11 46/11
46/12
request [1] 14/3
requesting [1] 38/21
required [3] 15/1 17/24 44/16
residential [1] 45/4
resources [1] 14/24
respect [1] 39/16
responding [1] 8/8
response [2] 4/19 9/14
responsibility [27] 3/18 3/20
6/23 7/6 8/6 9/8 10/22 11/15
11/21 14/5 14/15 15/1 15/6
15/12 15/16 17/24 18/1 18/8
18/17 18/20 19/1 19/5 34/22
35/11 35/16 36/10 40/15
responsible [3] 22/3 40/12

43/14
rest [2] 32/3 32/22
restlessly [1] 36/15
restrictions [1] 24/24
result [1] 13/23
retaliate [1] 22/11
retaliation [2] 22/6 23/2
returned [1] 23/25
review [4] 4/1 4/3 4/24 6/20
revised [1] 3/13
revoked [1] 5/17
Ricardo [4] 23/9 24/15 28/4
28/8
Ricardo Johnson [3] 23/9
24/15 28/4
Ricardo Johnson's [1] 28/8
RICO [1] 2/25
right [20] 2/15 2/23 3/23 7/9
7/14 8/20 8/23 16/15 17/25
18/13 25/13 26/10 26/25 27/1
28/21 38/24 40/19 41/7 41/14
45/23
ring [1] 17/19
rival [1] 17/3
rivals [2] 22/11 24/25
Rollness [1] 20/12
room [1] 38/9
roughly [1] 15/11
rule [1] 22/23
ruled [2] 15/5 20/15
rules [7] 17/1 17/1 30/7 30/9
30/10 31/17 32/18
ruling [8] 7/21 8/24 10/5
10/8 10/11 18/2 18/6 19/8
rumored [1] 24/12
run [2] 15/24 17/19

**S**

Safe [2] 33/15 36/23
Safe Streets [2] 33/15 36/23
safely [1] 38/19
said [14] 8/25 9/13 10/1 10/4
20/17 22/24 24/21 28/20 29/19
30/1 33/1 35/10 37/8 38/18
sake [1] 10/11
Samartine [2] 23/8 24/11
Samartine Hill [2] 23/8 24/11
same [4] 7/1 15/21 20/13
38/10
sanctions [1] 25/8
Savage [2] 31/13 43/3
Savage Mountain [2] 31/13
43/3
saw [5] 24/19 32/13 32/14
32/14 38/16
say [18] 4/10 21/6 28/9 28/13
29/2 29/11 29/22 30/1 30/3
34/8 35/6 35/18 38/25 40/7
40/7 41/8 41/24 43/16
saying [4] 12/13 12/22 13/24
26/19
says [8] 3/18 12/6 12/18
12/25 16/17 16/19 20/3 27/12
scared [1] 26/15
schedules [1] 4/22
school [5] 23/21 30/18 32/9
36/20 36/23
Schrum [1] 1/20
Seal [4] 6/2 10/13 19/8 20/1

seated [1] 2/4
second [9] 5/17 19/15 20/9
36/5 45/19
Second Circuit [2] 19/15 20/9
secondly [2] 4/22 35/25
Section [3] 9/16 14/13 20/8
Section 1959 [2] 9/16 20/8
Section 3E1.1 [1] 14/13
security [1] 36/24
see [5] 6/4 14/2 25/25 27/13
40/4
seeing [1] 21/12
seem [1] 42/17
seized [1] 17/20
sell [1] 34/14
send [2] 25/7 39/18
sense [3] 34/12 37/20 41/24
senseless [1] 24/5
sent [4] 15/12 17/17 23/7
23/18
sentence [27] 5/22 5/24 6/7
9/18 10/8 10/19 11/8 14/7
15/7 19/7 19/16 20/8 21/20
21/21 21/22 25/5 25/6 29/10
43/17 43/18 43/23 43/24 44/3
44/9 44/12 45/16 45/23
sentenced [1] 40/12
sentencing [25] 1/12 2/11
2/24 3/7 4/12 4/18 5/17 6/3
6/14 8/3 8/4 8/7 8/25 9/14
15/10 15/17 16/3 16/6 17/11
19/12 21/23 22/25 23/20 41/17
41/20
separate [1] 5/21
serious [7] 21/25 25/8 42/5
42/11 42/15 42/21 43/10
seriousness [2] 43/14 43/25
servant [1] 33/21
set [3] 21/23 33/3 39/23
setting [1] 10/10
shaking [1] 21/12
Shaquan [1] 36/22
Shaquan Trusty [1] 36/22
shared [1] 4/17
she [9] 12/18 12/19 12/19
12/19 12/20 12/20 12/20 12/23
38/17
she's [3] 16/23 26/1 26/2
shit [4] 12/10 12/11 16/19
16/19
should [14] 3/6 3/19 3/24 6/8
7/5 8/21 12/11 27/2 27/3 31/8
31/9 34/19 34/19 44/18
shouldn't [2] 8/12 27/4
show [1] 6/25
showed [1] 31/14
showing [2] 15/6 15/19
shown [3] 24/14 25/2 43/8
shows [1] 42/12
side [1] 29/15
sides [3] 34/8 35/3 35/4
signed [2] 39/21 40/6
significant [4] 7/3 7/4 7/7
42/7
similar [1] 20/10
since [4] 4/10 8/11 8/16
36/19
single [1] 23/5
sir [1] 46/1

**S**

sister [1]  13/21
sit [1]  40/19
situation [1]  41/22
six [1]  27/14
skills [1]  33/5
slap [2]  12/10 16/19
sleep [1]  36/15
slept [1]  38/9
sliver [2]  11/10 11/10
smack [2]  12/11 16/19
smart [1]  23/22
smarts [1]  31/16
Smooth [2]  26/9 27/20
smuggling [6]  13/1 13/6 13/8
 13/9 15/24 17/19
snitching [1]  23/4
so [26]  3/14 4/24 5/1 7/15
 7/24 9/7 11/20 12/23 13/16
 14/3 17/23 18/19 18/25 19/24
 20/18 27/8 29/18 30/22 31/19
 31/24 33/6 33/15 34/7 34/17
 43/16 44/3
society [4]  30/11 36/19 37/7
 37/13
sole [1]  39/25
some [18]  2/13 6/6 11/10 21/9
 21/9 21/12 29/5 30/1 30/16
 31/25 33/8 33/16 33/20 39/10
 41/21 42/5 42/25 43/9
somebody [4]  17/2 26/23 27/17
 27/24
someday [1]  11/11
someone [13]  11/7 13/14 13/20
 13/22 27/8 29/16 32/20 34/4
 34/5 34/6 36/7 37/7 38/14
something [12]  8/17 8/19 9/3
 9/4 17/4 21/3 29/22 32/16
 34/23 35/10 39/6 41/25
somewhat [1]  32/22
son [11]  25/23 26/12 26/21
 27/11 27/14 28/13 28/18 38/9
 38/9 38/10 38/18
song [1]  27/11
sorry [5]  5/3 5/13 41/12
sort [4]  4/17 8/24 9/22 29/11
speak [5]  2/17 21/11 21/16
 21/18 28/4
speaking [1]  38/23
special [5]  1/20 2/9 23/1
 44/16 44/18
Special Agent [2]  1/20 2/9
specific [3]  5/23 29/23 44/23
specifically [2]  10/4 45/4
specified [1]  45/10
spend [1]  31/9
spending [1]  16/7
spent [1]  15/4
spoke [1]  6/18
stage [1]  32/25
stand [1]  23/14
start [5]  3/4 21/7 21/13 35/9
 41/19
state [2]  25/16 28/5
stated [1]  19/4
statement [3]  3/17 5/16 12/10
STATES [9]  1/1 1/3 1/15 2/6
 2/8 7/12 21/24 39/14 39/17

statute [3]  9/16 19/18 21/21
statutory [1]  10/5
steal [1]  39/19
stenographic [1]  46/7
steward [2]  28/14 28/17
still [6]  24/22 26/15 33/9
 34/11 34/12 35/24
Stokes [1]  36/24
stomach [1]  26/22
stop [3]  23/4 32/16 34/24
stop-snitching [1]  23/4
stopping [1]  25/3
stories [1]  23/13
straighten [1]  13/25
street [3]  1/24 13/23 30/8
 30/9 32/19 33/18 34/5
streets [5]  30/20 31/13 31/16
 33/15 36/5 36/23
strength [4]  28/10 28/11
 28/12 28/12
strings [1]  31/7
strip [1]  17/22
strong [2]  43/12 43/13
stronger [1]  33/1
structure [1]  33/18
studio [1]  37/25
subject [1]  11/18
submitted [1]  8/18
substance [1]  44/19
succeed [2]  23/23 24/4
such [2]  34/18 42/23
sudden [3]  32/19 32/21 32/22
sufficient [1]  43/24
suggest [10]  3/12 6/16 29/20
 30/12 31/6 32/24 33/6 33/12
 33/23 34/7
sum [1]  29/21
summarize [1]  37/15
summary [1]  8/15
superseding [3]  39/3 45/18
 45/20
superseding indictment [3]
 39/3 45/18 45/20
supervised [2]  44/13 44/18
support [1]  12/16
supported [1]  13/20
supportive [1]  36/3
supposed [1]  34/5
supposedly [2]  11/14 17/8
sure [11]  8/23 11/24 18/25
 21/10 21/14 30/4 31/1 35/19
 38/19 43/9 45/22
surely [1]  5/19
suspected [1]  12/7
synthetic [1]  17/21
system [1]  23/3

**T**

table [3]  2/9 27/3 29/2
tactics [1]  39/16
take [10]  6/7 27/24 28/15
 31/12 32/19 34/8 36/9 38/18
 38/18 40/16
taken [1]  27/3
takes [2]  4/21 39/12
taking [3]  21/22 23/24 36/12
talents [2]  29/8 29/9
talk [1]  26/2
talking [5]  13/1 16/25 17/5

statute [3]  9/16 19/18 21/21  31/21 32/12
talks [3]  22/17 16/25 17/1
tampering [2]  22/5 23/2
taught [3]  24/9 24/9 38/25
technique [1]  40/5
Teenagers [1]  36/22
telephone [2]  4/7 4/13
tell [5]  8/21 18/13 23/13
 34/22 42/19
telling [4]  16/16 16/21 16/22
 35/15
tells [1]  16/11
temporary [2]  28/14 28/17
Teresa [2]  1/18 2/20
Teresa Whalen [2]  1/18 2/20
term [1]  19/21
terms [6]  10/22 11/4 15/3
 18/8 42/16 43/17
territories [1]  22/9
terror [1]  36/8
testify [1]  42/23
testing [1]  44/20
than [11]  10/19 14/7 18/23
 21/1 22/1 22/16 30/10 32/14
 37/5 42/1 42/15
thank [24]  2/15 2/18 3/8 5/11
 14/9 14/10 14/12 25/9 25/20
 28/1 28/2 28/2 28/19 28/22
 29/1 35/1 35/2 35/4 35/20
 35/25 36/3 41/7 41/9 46/3
that [281]  2/12 3/6 3/11 3/18
 3/18 3/21 4/5 4/8 4/10
 4/12 4/14 5/5 5/7 5/13 5/16
 5/21 5/21 5/22 6/1 6/6 6/8
 6/8 6/13 6/16 6/17 6/21 6/22
 6/23 6/24 6/25 7/13 7/15 7/18
 7/19 7/21 7/24 8/1 8/4 8/8
 8/14 8/17 8/17 8/19 8/21 8/22
 8/24 8/24 9/3 9/5 9/5 9/7 9/9
 9/19 9/21 9/22 9/23 10/7
 10/10 10/11 10/11 10/15 10/20
 10/20 10/24 11/1 11/4 11/7
 11/7 11/11 11/13 11/14 11/18
 11/20 11/23 12/6 12/13 12/16
 12/18 12/21 12/25 13/12 13/22
 13/23 14/1 14/2 14/3 14/4
 15/2 15/6 15/8 15/15 15/19
 15/25 16/11 16/17 16/22 17/14
 17/17 17/18 17/23 18/13 18/14
 18/15 18/16 18/17 18/19 18/21
 18/22 18/24 18/25 19/3 19/7
 19/10 19/11 19/15 19/19 19/23
 19/25 20/1 20/3 20/3 20/7
 20/16 20/20 22/3 22/17 23/1
 23/6 23/7 23/18 24/7 24/19
 25/7 25/10 26/6 26/13 26/15
 26/15 26/22 27/2 27/9 27/11
 27/17 27/17 28/10 28/11 28/13
 28/16 29/3 29/4 29/5 29/6
 29/7 29/7 29/10 29/13 29/16
 29/17 29/18 29/19 29/20 29/21
 29/22 30/1 30/2 30/2 30/7
 30/8 30/12 30/14 30/14 30/19
 30/20 31/6 31/14 31/22 31/23
 31/25 32/1 32/1 32/6 32/10
 32/12 32/15 32/18 32/20 32/20
 32/23 32/23 33/3 33/4 33/4
 33/5 33/7 33/13 33/16 33/17
 33/17 33/20 33/23 33/25 34/4

# T

that... [78] 34/5 34/6 34/7
34/10 34/12 34/14 34/14 34/17
34/18 34/18 34/20 34/24 35/4
35/10 35/10 35/12 35/15 35/15
35/15 35/24 36/1 36/13 37/11
37/16 37/18 37/20 37/25 38/4
38/6 38/10 38/21 38/24 38/25
39/8 39/11 39/21 40/7 40/14
40/16 40/18 40/19 41/1 41/3
41/8 41/16 41/24 41/25 42/3
42/5 42/8 42/13 42/14 42/15
42/17 42/19 42/22 42/23 42/25
43/1 43/5 43/8 43/14 43/17
43/21 43/24 43/25 44/2 44/3
44/11 44/11 45/1 45/3 45/5
45/9 45/16 45/24 46/1 46/6

that's [25] 7/3 8/18 10/5
12/2 12/25 13/6 14/7 16/19
18/23 20/9 20/16 21/1 24/19
25/25 26/9 28/15 28/21 31/4
31/4 31/5 31/10 31/20 31/21
35/16 38/19

their [11] 5/19 8/19 9/14
14/24 23/13 28/15 30/6 37/9
37/15 39/8 40/5

them [25] 4/16 4/17 4/19 6/19
6/20 8/9 8/11 8/11 17/12
17/15 18/10 21/10 23/13 24/5
24/7 24/9 24/9 24/10 30/8
36/3 36/4 36/5 37/16 37/17
40/23

then [13] 12/10 15/17 16/17
17/16 29/20 31/19 31/22 38/5
42/12 45/2 45/3 45/7 45/9

theory [1] 39/8

there [30] 3/10 4/5 4/21 4/23
7/10 7/17 7/19 7/20 7/22 9/2
10/16 19/13 19/15 20/10 22/25
30/17 30/18 31/1 31/2 33/24
34/17 35/6 41/8 41/10 42/15
43/12 43/13 43/18 43/20 44/23

there's [8] 8/12 11/2 11/25
13/4 14/1 19/20 21/8 44/12

thereby [1] 14/22

therefore [1] 39/1

these [11] 6/16 6/17 6/23 8/1
8/8 15/25 16/4 17/20 29/6
39/25 40/4

they [28] 6/20 6/22 6/25 8/10
8/12 8/19 12/14 17/8 26/15
26/24 27/19 27/20 30/7 30/7
30/8 32/5 32/15 32/20 37/2
39/4 39/4 39/6 39/6 39/7 39/8
39/18 42/19 44/18

they're [5] 4/15 6/17 6/21
17/3 26/15

thing [2] 18/5 31/19

things [14] 30/1 30/2 30/8
30/20 33/7 33/17 33/25 35/21
36/13 40/22 40/24 40/25 42/25
43/16

think [50] 4/6 4/11 4/15 6/15
6/21 6/23 7/9 7/15 7/24 8/18
12/6 13/3 15/25 16/2 16/14
16/24 17/16 17/17 18/10 19/11
19/15 19/23 20/1 20/2 20/2
20/10 20/19 21/1 22/25 24/7

27/2 27/3 27/23 29/5 29/8
29/17 30/3 30/18 32/15 33/20
38/13 42/2 42/4 42/10 42/20
42/23 43/7 43/17 43/24 45/7

thinks [1] 16/11

third [4] 13/12 14/17 14/18
39/3

this [76] 2/6 4/25 5/1 5/8
5/20 6/1 6/5 7/2 7/11 7/12
7/20 8/15 8/15 8/25 9/19 11/3
11/17 12/5 12/12 12/14 12/21
13/4 13/12 13/15 13/19 13/24
13/25 14/1 14/2 15/9 15/20
16/8 16/11 16/12 17/6 17/7
17/8 17/23 19/23 20/4 21/21
22/1 22/24 23/11 23/14 23/16
23/17 24/18 24/21 25/6 25/7
25/22 26/6 26/10 26/12 26/21
29/2 30/6 31/15 32/13 32/23
33/24 34/23 36/11 38/24 39/15
39/21 40/3 40/7 40/20 41/3
41/10 41/16 43/25 45/17 45/23

thorough [1] 9/10

those [16] 4/8 4/13 4/24
11/16 17/13 19/21 23/24 29/23
31/6 32/8 33/7 37/4 38/23
44/10 45/11 45/21

though [2] 6/5 39/10

thought [8] 12/19 12/20 12/20
13/21 30/4 30/6 34/3 37/3

threatened [1] 17/3

threatening [2] 13/22 17/8

threatens [1] 23/2

three [9] 6/13 14/5 15/18
15/18 19/4 19/13 19/22 40/16
44/14

three-level [1] 19/4

through [5] 22/18 34/23 36/22
39/12 44/2

throughout [2] 7/2 15/19

thrust [1] 23/17

Thursday [1] 4/11

thus [2] 41/5

Tiffany [2] 4/7 12/17

Tiffany Bailey [2] 4/7 12/17

Tim [1] 2/10

Tim Moore [1] 2/10

time [15] 2/16 4/10 16/8
22/17 29/13 30/14 30/23 31/9
33/13 34/21 36/16 37/7 40/2
40/21 45/17

timely [1] 14/20

timing [1] 4/18

Timothy [2] 1/20 36/1

Timothy Moore [1] 1/20

tiny [1] 11/10

tireless [1] 23/10

today [7] 6/14 8/13 9/5 22/25
37/2 40/13 41/1

together [1] 17/5

told [6] 5/9 25/10 27/13
37/16 37/18 38/4

Toni [1] 28/7

Toni Burton [1] 28/7

too [3] 13/3 16/7 32/19

took [6] 24/6 32/25 35/11
38/1 38/2 42/14

top [1] 16/12

torture [1] 38/12

tortured [2] 38/4 38/14

totally [1] 30/9

Tracy [1] 1/20

Tracy Schrum [1] 1/20

trafficking [1] 22/7

tragedy [2] 41/21 41/24

tragic [1] 41/22

training [1] 45/10

transcript [7] 4/13 12/1 12/9
13/6 16/13 18/9 46/6

transcripts [4] 16/3 16/4
16/5 17/10

treatment [3] 44/20 45/4 45/4

trial [15] 3/20 3/22 11/17
14/23 15/3 15/8 15/14 18/15
24/20 32/13 34/23 38/23 39/22
40/6 40/15

tried [3] 15/2 16/9 29/8

trouble [1] 34/1

Trusty [1] 36/22

truth [3] 38/23 39/4 42/19

try [6] 30/7 32/16 34/15
34/21 34/24 37/14

trying [5] 15/24 17/18 33/17
34/3 34/14

Tuesday [1] 1/8

turn [3] 3/9 6/19 32/12

turned [1] 8/9

turning [1] 26/1

two [7] 14/5 14/13 18/25 19/4
23/14 30/18 39/21

two-level [3] 14/13 18/25
19/4

# U

U.S [1] 1/20

U.S. [3] 8/18 20/1 20/11

U.S. Probation [1] 8/18

U.S. v. Mahdi [1] 20/11

U.S. v. Under Seal [1] 20/1

ugly [1] 29/24

ultimately [1] 45/12

unable [1] 37/4

unambiguous [1] 9/17

unanimously [1] 18/16

uncle [3] 26/8 26/9 27/20

Uncle Smooth [2] 26/9 27/20

under [10] 6/2 10/13 15/1
17/24 18/24 19/8 20/1 24/7
34/18 39/22

Under Seal [3] 6/2 10/13 19/8

understand [5] 29/18 35/11
38/23 45/22 46/1

understanding [2] 18/10 31/10

unfortunately [4] 4/18 32/2
42/4 43/5

unintentionally [1] 36/4

UNITED [9] 1/1 1/3 1/15 2/6
2/8 7/12 21/24 39/14 39/17

United States [4] 2/6 2/8
39/14 39/17

United States versus West [1]
7/12

unlawful [1] 3/2

Unlike [1] 23/16

unquote [1] 14/24

unseal [1] 39/3

until [2] 4/17 6/3

up [15] 16/18 17/15 23/8 23/9

Case 1:16-cr-00267-CCB Document 1034 Filed 11/25/20 Page 60 of 91

**U**

up... [11]   26/18 29/24 30/6
 30/13 30/22 30/23 33/4 33/4
 33/6 39/23 45/12
uplifting [1]   39/13
upon [1]   30/8
urban [1]   34/13
us [8]   4/17 4/22 27/5 27/6
 27/7 29/25 32/22 39/20
use [4]   29/8 31/15 39/6 39/7
used [3]   22/21 29/7 39/1
using [1]   24/25
USP [1]   45/1 45/2
USP Allenwood [1]   45/1
USP Atlanta [1]   45/2
utilized [1]   39/16

**V**

v. [2]   20/1 20/11
various [1]   25/1
verdict [2]   15/11 42/6
versions [1]   4/4
versus [2]   2/6 7/12
very [17]   4/24 5/11 6/7 9/10
 11/1 29/12 31/14 33/25 34/11
 40/1 41/20 42/5 42/7 42/11
 43/10 43/12 43/13
VICAR [2]   15/13 19/16
victim's [3]   2/13 2/13 21/10
victims [2]   6/2 19/ 41/23
violence [7]   15/23 17/7 22/21
 23/1 24/5 30/23 40/10
violent [6]   22/3 23/5 25/6
 31/14 31/14 43/3
vocational [2]   44/21 45/10
voice [1]   27/21
volumes [1]   22/8
vs [1]   1/4

**W**

W.B [1]   23/12
wake [1]   22/20
walls [1]   40/4
want [26]   2/12 3/12 4/5 4/10
 7/8 9/9 11/13 11/24 12/13
 12/22 13/9 16/8 19/10 26/24
 27/20 28/13 29/2 30/3 31/17
 31/18 31/18 35/16 36/3 36/7
 39/11 43/16
wanted [5]   24/18 25/23 25/24
 31/2 35/9
wants [5]   2/17 9/1 16/18
 20/19 21/8
warrants [1]   19/24
warriors [1]   24/9
was [84]   3/2 4/5 4/10 4/11
 5/25 6/2 7/10 7/19 8/2 8/17
 9/2 9/7 10/4 10/7 10/17 10/18
 10/19 10/20 10/20 11/17 12/19
 12/20 12/20 13/20 13/22 13/22
 15/14 17/18 17/19 17/19 18/14
 18/15 19/15 20/2 22/2 22/3
 22/17 23/17 23/20 23/23 24/8
 24/12 24/16 24/24 24/23 26/22
 27/11 30/4 30/15 30/18 30/22
 30/22 31/3 31/4 31/12 31/12
 31/13 31/22 33/15 33/16 33/17
 34/3 34/4 34/10 35/14 35/15

36/25 37/3 37/8 37/16 37/16
 37/24 38/6 38/6 38/10 38/17
 38/25 39/22 39/24 40/3 40/6
 40/8 42/23 43/3
wasn't [2]   6/16 23/10
way [4]   9/22 13/3 20/13 31/25
ways [2]   25/1 29/9
we [59]   2/12 2/23 3/18 3/18
 3/21 4/8 4/11 4/14 4/15 5/2
 5/12 6/1 6/2 6/6 6/7 6/12
 6/19 6/21 6/23 7/18 7/24 8/1
 8/3 8/4 8/7 8/8 8/21 9/5 9/6
 10/23 11/5 11/18 14/3 14/8
 15/9 15/17 16/2 17/11 19/18
 20/19 21/9 24/19 26/9 27/9
 29/21 29/23 30/10 30/10 30/20
 31/10 32/7 32/7 32/13 41/24
 45/1 45/3 45/5 45/9 45/10
we'll [2]   10/10 21/17
we're [5]   2/11 13/16 18/2
 27/9 34/18
we've [4]   5/1 16/5 17/4 19/11
web [1]   40/10
Wednesday [1]   4/11
week [1]   6/19
well [19]   2/14 2/23 4/5 5/13
 5/15 5/25 7/7 7/25 8/23 9/5
 10/4 18/22 19/6 22/5 23/22
 29/12 29/19 30/4 41/19
went [1]   26/19
were [23]   6/2 6/13 7/17 7/17
 7/19 7/22 11/4 11/13 11/18
 17/10 17/17 17/20 30/17 31/1
 32/5 36/20 39/22 39/23 39/25
 42/9 42/14 43/4 44/23
West [1]   7/12
Whalen [3]   1/18 2/20 28/23
what [45]   9/13 10/1 10/4 11/9
 11/23 13/15 13/19 13/22 13/24
 14/7 16/5 16/8 20/14 20/16
 24/19 24/22 26/6 26/9 26/21
 26/23 27/23 27/23 28/15 29/11
 29/20 29/24 30/4 30/4 30/6
 30/22 31/4 31/4 31/5 31/10
 31/12 31/20 33/6 35/18 36/8
 38/19 38/25 40/14 41/1 42/20
 43/5
what's [5]   24/2 26/25 26/25
 27/8 27/8
whatever [2]   21/5 33/1
whatsoever [1]   5/22
when [19]   4/18 4/25 7/13 10/8
 15/3 15/4 15/7 16/17 16/19
 30/15 32/7 32/11 32/13 36/4
 36/25 37/3 38/10 39/23 40/14
where [7]   12/25 19/2 26/8
 31/10 32/15 33/20 34/3
Where's [1]   26/8
whether [9]   2/16 5/21 7/4
 7/17 10/18 18/4 21/10 21/17
 41/18
which [18]   4/6 5/18 7/18 7/21
 8/3 11/17 14/5 14/6 15/13
 15/13 20/6 20/7 23/19 31/13
 40/1 43/18 44/7 44/14
while [3]   26/5 30/1 31/1
who [29]   12/19 13/20 17/6
 21/8 24/3 26/4 26/12 26/14
 31/2 31/7 31/7 32/22 33/23

33/24 36/7 36/17 36/20 36/22
 36/24 39/2 37/25 38/23 39/12
 39/12 39/15 40/9 41/23 42/4
 42/17
wholly [1]   22/7
why [3]   8/12 12/19 38/7
wife [3]   12/6 16/11 34/16
will [15]   9/25 25/5 25/7 25/7
 26/4 28/10 28/11 28/17 29/3
 29/5 39/7 41/1 41/25 45/5
 45/21
William [4]   24/6 24/11 38/15
 40/9
William Banks [4]   24/6 24/11
 38/15 40/9
willing [1]   42/22
wind [2]   23/8 23/9
wing [1]   24/7
winning [2]   27/5 27/5
wish [2]   21/10 37/8
wishes [1]   21/18
within [2]   22/11 45/25
without [2]   39/14 39/24
witness [2]   22/5 22/6 23/1
 23/2 23/14
witnesses [8]   15/23 22/12
 22/13 22/22 23/12 24/25 37/14
 42/16
woman [5]   12/7 12/21 13/25
 16/11 17/8
won't [5]   10/23 12/23 27/13
wonderful [1]   29/6
words [7]   6/17 24/18 24/21
 29/23 33/16 38/17 39/1
worked [1]   37/25
working [1]   33/15
world [6]   12/18 32/18 33/1
 33/4 33/5 41/3
worrisome [1]   36/4
worse [2]   23/9 24/2
worst [1]   22/21
worth [1]   37/10
would [47]   2/5 3/12 4/14 5/23
 6/7 7/20 9/4 9/5 14/3 14/5
 14/6 17/13 18/4 18/20 18/22
 19/2 19/21 21/5 23/14 25/11
 27/15 27/16 30/2 30/3 30/12
 31/6 33/2 33/6 33/12 33/23
 34/7 35/6 35/25 37/9 37/10
 37/18 38/13 38/24 39/2 40/1
 40/2 40/16 41/8 43/22 45/1
 45/3 45/9
wouldn't [3]   4/20 23/12 23/13
wounded [1]   22/19
writer [1]   34/13
writes [2]   23/22 34/13
writing [2]   30/15 34/12
writings [1]   32/12
written [1]   9/22
wrong [3]   22/17 22/17 43/20
wrote [3]   27/11 33/23 42/25

**Y**

Yeah [2]   12/10 26/19
year [1]   30/18
years [10]   11/5 11/6 19/21
 26/6 27/19 29/14 36/4 44/7
 44/13 44/14
yes [13]   4/2 5/11 8/17 10/6

**Y**

yes... [9]   10/14 12/2 16/14
 21/19 25/18 35/7 38/22 44/25
 46/2
yesterday [2]   22/24 38/17
you [126]   2/3 2/5 2/15 2/18
 3/8 3/21 4/1 5/11 9/9 9/25
 10/2 10/2 11/25 12/10 12/13
 12/22 13/5 13/19 13/24 14/9
 14/10 14/12 18/5 19/10 21/7
 21/16 23/7 23/8 23/9 23/12
 23/13 23/14 25/9 25/20 26/1
 26/1 26/2 26/5 26/7 26/8 26/8
 26/9 26/10 26/17 26/18 27/7
 27/17 27/21 28/1 28/2 28/2
 28/9 28/10 28/12 28/15 28/16
 28/19 28/22 29/1 29/5 29/16
 29/20 30/13 31/15 31/15 31/16
 31/17 31/17 31/18 31/21 32/19
 32/23 32/25 33/1 34/2 34/8
 34/23 35/1 35/2 35/4 35/6
 35/8 35/10 35/11 35/13 35/14
 35/15 37/8 37/8 37/15 37/16
 38/13 39/11 39/18 39/18 39/19
 39/19 39/20 40/7 40/20 41/7
 41/9 42/2 42/4 42/8 42/13
 42/14 42/16 42/17 42/24 42/24
 42/25 43/1 43/4 43/8 43/8
 43/10 43/12 45/1 45/3 45/9
 45/22 45/22 45/24 46/1 46/3
you're [1]   34/2
you've [3]   3/25 43/6 43/9
young [9]   28/15 30/5 30/19
 31/5 32/14 32/16 33/3 36/17
 43/4
younger [2]   32/14 32/25
your [49]   2/19 3/16 4/2 5/7
 5/12 5/13 6/12 9/9 9/12 9/25
 10/3 10/23 11/22 14/3 14/9
 14/12 18/5 21/20 25/10 25/14
 25/16 27/17 28/3 28/5 28/10
 28/11 28/12 29/10 29/22 30/2
 30/12 31/16 33/7 34/12 34/18
 36/19 37/11 38/2 38/9 39/4
 40/7 40/20 41/12 42/8 42/21
 43/1 44/15 44/25 45/24
Your Honor [33]   2/19 3/16 4/2
 5/7 5/12 5/13 6/12 9/12 9/25
 10/23 11/22 14/3 14/9 14/12
 21/20 25/10 25/14 28/3 29/22
 30/2 30/12 33/7 34/12 34/18
 36/19 37/11 38/2 38/9 39/4
 40/7 40/20 41/12 44/25
Your Honor's [1]   29/10
youths [1]   24/3

**Z**

Zweizig [3]   1/23 46/5 46/10

Sheet 1 - Judgment in a Criminal Case with Supervised Release (Rev. 04/2018)                          Judgment Page 1 of 7

# United States District Court

## District of Maryland

FILED ____ ENTERED
Kam. ____
LOGGED ____ RECEIVED

NOV - 7 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| | (For Offenses Committed on or After November 1, 1987) |
| v. | |
| **DANTE D. BAILEY** | Case Number: CCB-1-16-CR-00267-001 |
| | Defendant's Attorney: Teresa Whalen, Esq. & Paul Enzinna, Esq. |
| | Assistant U.S. Attorney: Christina A Hoffman |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ___

☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.

☒ was found guilty on counts _One (1ss), Two (2ss), Three (3ss), Seventeen (17ss) & Eighteen (18ss) of the Second Superseding Indictment_____ after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18:1962(d) | Racketeering Conspiracy | 6/1/2017 | 1ss |
| 21:846 | Conspiracy To Distribute Controlled Substances | 6/1/2017 | 2ss |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through _7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by U.S. v. Booker, 543 U.S. 220 (2005).

☐ The defendant has been found not guilty on count(s) _____

☒ Original and 1st Superseding Indictments are dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

November 5, 2019
Date of Imposition of Judgment

_Catherine C. Blake_                    11/7/19
**Catherine C. Blake**                    Date
**United States District Judge**

Name of Court Reporter: Douglas Zweizig

**DEFENDANT:**     **DANTE D. BAILEY**
**CASE NUMBER:**   CCB-1-16-CR-00267-001

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Date Offense Concluded | Count Numbers |
|---|---|---|---|
| 18:1959(A)(1)& 2 | Murder In Aid Of Racketeering; Aiding and Abetting | 2/12/2015 | 3ss |
| 18:922(g) | Possession Of A Firearm and Ammunition By A Felon | 5/3/2016 | 17ss |
| 21:841 & 18:2 | Distribution and Possession With Intent To Distribute Controlled Substances; Aiding and Abetting | 5/17/2016 | 18ss |

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 04/2018)                                                Judgment Page 3 of 7

**DEFENDANT: Dante D. Bailey**                                                    CASE NUMBER: CCB-1-16-CR-00267-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of __life__ as to Counts 1ss, 2ss, 3ss, & 18ss to run concurrent to each other; and 120 months (10 years) as to Count 17ss to run concurrent to Counts 1ss, 2ss, 3ss, & 18ss for a total term of life.

☒ The court makes the following recommendations to the Bureau of Prisons:  (1) that the defendant participate in any substance abuse program for which he may be eligible including the Residential Drug Abuse Program; (2) that the defendant participate in any vocational training program for which he may be eligible which may include HVAC and masonry; and (3) that the defendant be designated to the __USP__ at either Allenwood or Atlanta for service of his sentence.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ a.m./p.m. on _____.
    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal.  If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

    ☐ before 2pm on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146.  If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147.  For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148.  Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By:_____
DEPUTY U.S. MARSHAL

Sheet 3 - Judgment in a Criminal Case with Supervised Release (Rev. 04/2018)                                                Judgment Page 4 of 7

**DEFENDANT: Dante D. Bailey**                                                    CASE NUMBER: CCB-1-16-CR-00267-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>5 years</u> as to Counts 1ss, 2ss, 3ss, and 18ss to run concurrent to each other; and <u>3 years</u> as to Count 17ss to run concurrent with Counts 1ss, 2ss, 3ss, and 18ss for a total term of <u>5 years</u>.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

## A.   MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.
2) You must not unlawfully possess a controlled substance.
3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4) ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5) You must cooperate in the collection of DNA as directed by the probation officer.
6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page

## B.   STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must answer truthfully the questions asked by your probation officer.
5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

**JA6743**

Sheet 4 - Judgment in a Criminal Case with Supervised Release (Rev. 04/2018)                                    Judgment Page 5 of 7

**DEFENDANT: Dante D. Bailey**                                           CASE NUMBER: CCB-1-16-CR-00267-001

9)  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that
    was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or
    tasers).
11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without
    first getting the permission of the court.
12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may
    require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the
    person and confirm that you have notified the person about the risk.
13) You must follow the instructions of the probation officer related to the conditions of supervision.

# C.   SUPERVISED RELEASE
# ADDITIONAL CONDITIONS

You must participate in a vocational services program and follow the rules and regulations of
that program. Such a program may include job readiness training and skills development
training.

You must submit to substance abuse testing to determine if you have used a prohibited
substance. You must not attempt to obstruct or tamper with the testing methods.

You must participate in a substance abuse treatment program and follow the rules and
regulations of that program. The probation officer will supervise your participation in the
program (provider, location, modality, duration, intensity, etc.).

You must provide the probation officer with access to any requested financial information and authorize the
release of any financial information. The probation office may share financial information with the U.S.
Attorney's Office.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this
judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised
Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____        Date _____

**DEFENDANT: Dante D. Bailey**                                                    CASE NUMBER: CCB-1-16-CR-00267-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 5B.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $500.00 | $ | waived | $.00 |

☐ CVB Processing Fee $30.00

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | |
|---|---|---|
| **TOTALS** | $ _____ | $ _____ |

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the  ☐ fine   ☐ restitution

☐ the interest requirement for the  ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**DEFENDANT: Dante D. Bailey**                                    CASE NUMBER: CCB-1-16-CR-00267-001

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A  ☒  In full immediately; or

B  ☐  $_____ immediately, balance due (in accordance with C, D, or E); or

C  ☐  Not later than _____; or

D  ☐  Installments to commence _____ day(s) after the date of this judgment.

E  ☐  In _____ (e.g. equal weekly, monthly, quarterly) installments of $_____ over a period of _____ year(s) to commence when the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☐ **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE FINANCIAL RESPONSIBILITY PROGRAM.**

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

☐  in equal monthly installments during the term of supervision; or

☐  on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☐  Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

**JA6746**

# United States District Court

## District of Maryland

*Kam*

FILED   ENTERED
LOGGED   RECEIVED

NOV - 7 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| | (For Offenses Committed on or After November 1, 1987) |
| v. | |
| | Case Number: CCB-1-16-CR-00267-008 |
| **JAMAL LOCKLEY** | Defendant's Attorney: Harry J Trainor, Jr., Esq. |
| | Assistant U.S. Attorney: Christina A Hoffman |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ___

☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.

☒ was found guilty on counts  One (1s), Two (2s), & Ten (10s) of the 2nd Superseding Indictment  after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Numbers |
|---|---|---|---|
| 18:1962(d) | Racketeering Conspiracy | 06/01/2017 | 1s |
| 21:846 | Conspiracy To Distribute Controlled Substances | 06/01/2017 | 2s |
| 21:841 | Distribution and Possession with Intent to Distribute Controlled Substances | 3/10/2016 | 10s |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through   6   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by U.S. v. Booker, 543 U.S. 220 (2005).

☐ The defendant has been found not guilty on count(s) _____

☒ Superseding Indictment   is dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

November 4, 2019
Date of Imposition of Judgment

11/7/19
Date

***Catherine C. Blake***
***United States District Judge***

Name of Court Reporter: Douglas Zweizig

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 04/2018)                                    Judgment Page 2 of 6

**DEFENDANT: Jamal Lockley**                                    CASE NUMBER: CCB-1-16-CR-00267-008

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of  360 months  as to Counts 1s & 2s; and  120 months  as to Count 10s to run concurrent to Counts 1s & 2s for a total term of  360 months.

☒  The court makes the following recommendations to the Bureau of Prisons: (1) that the defendant participate in any substance abuse program for which he may be eligible; (2) that the defendant participate in any vocational training program for which he may be eligible; and (3) that the defendant be placed in a facility consistent with his security level that is as close as possible to Harford County, Maryland preferably either FCI at Fairton  or Fort Dix so he may be close to his family.

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ a.m./p.m. on _____.
    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal.  If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

    ☐  before 2pm on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146.  If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147.  For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148.  Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By:_____
DEPUTY U.S. MARSHAL

Sheet 3 - Judgment in a Criminal Case with Supervised Release (Rev. 04/2018)          Judgment Page 3 of 6

**DEFENDANT: Jamal Lockley**          CASE NUMBER: CCB-1-16-CR-00267-008

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>5 years</u> as to Counts 1s & 2; and <u>3 years</u> as to Count 10s to run concurrent to Counts 1s & 2s for a total term of <u>5 years</u>.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

## A. MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.
2) You must not unlawfully possess a controlled substance.
3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4) ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5) You must cooperate in the collection of DNA as directed by the probation officer.
6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page

## B. STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must answer truthfully the questions asked by your probation officer.
5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

**DEFENDANT: Jamal Lockley**                                      CASE NUMBER: CCB-1-16-CR-00267-008

9)  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13) You must follow the instructions of the probation officer related to the conditions of supervision.

## C.   SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

You must participate in a vocational services program and follow the rules and regulations of that program. Such a program may include job readiness training and skills development training.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release (Rev. 04/2018)                                    Judgment Page 5 of 6

**DEFENDANT: Jamal Lockley**                                          CASE NUMBER: CCB-1-16-CR-00267-008

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 5B.

| | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $300.00 | $ | waived | $.00 |

☐ CVB Processing Fee $30.00

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the  ☐ fine  ☐ restitution

☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

\* Justice for Victims of Trafficking Act of 2015, pub. L. No. 114-22.
\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**DEFENDANT: Jamal Lockley**                                    CASE NUMBER: CCB-1-16-CR-00267-008

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A  ☒  In full immediately; or

B  ☐  $_____ immediately, balance due (in accordance with C, D, or E); or

C  ☐  Not later than _____; or

D  ☐  Installments to commence _____ day(s) after the date of this judgment.

E  ☐  In _____ (*e.g. equal weekly, monthly, quarterly*) installments of $_____ over a period of _____ year(s) to commence when the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☐  **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE FINANCIAL RESPONSIBILITY PROGRAM.**

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

☐  in equal monthly installments during the term of supervision; or

☐  on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☐  Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| **Plaintiff,** | * | |
| **vs.** | * | **Criminal No. CCB-16-CR-267-008** |
| **JAMAL LOCKLEY** | * | |
| **Defendant.** | * | |
| | * * * | |

## NOTICE OF APPEAL

Notice is hereby given that the defendant, Jamal Lockley, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the judgment of conviction and sentence imposed in this action as set forth in open Court on November 4, 2019 and entered in this case as a matter of record in the Judgment In A Criminal Case filed November 7, 2019 at ECF Doc. No. 1339.

Harry J. Trainor, Jr., who has represented the defendant as CJA appointed counsel in the United States District Court, hereby requests to be relieved as counsel and further requests that new counsel be appointed to represent Jamal Lockley on appeal.

Respectfully submitted,

_____/s/_____
HARRY J. TRAINOR, JR.
Fed. Trial Bar No. 00793
Trainor, Billman, Bennett & Milko, LLP
116 Cathedral Street, Suite E
Annapolis, Maryland 21401
Tel: (410) 280-1700  Fax: (410) 268-0031
Email: htrain@prodigy.net & htrainor@lawannapolis.com

**JA6753**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th  day of November, 2019 a copy of this Notice of Appeal was electronically filed with the Clerk via the ECF/CM system with electronic notice and access to all interested parties.


_____/s/_____
HARRY J. TRAINOR, JR.

**JA6754**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES of AMERICA | ) | |
| | ) | |
| vs. | ) | No. 16-cr-00267-CCB |
| | ) | |
| DANTE BAILEY, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF APPEAL**

Notice is hereby given that Dante Bailey, Defendant in the above-named case, hereby appeals to the United States Court of Appeals for the 4th Circuit from the final judgment entered in this action on the 7th day of November 2019.

Date:  November 12, 2019          Respectfully submitted,

Theresa Whalen
Law Office of Theresa Whalen
801 Wayne Avenue, Ste. 400
Silver Spring, MD 20910
301.588.1980
whalenesq@aol.com


_____/s/ Paul F. Enzinna_____
Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@ellermanenzinna.com


*Counsel for Defendant Dante Bailey*

**JA6755**

## CERTIFICATE OF SERVICE

I certify that on November 12, 2019, a copy of the foregoing Notice of Appeal was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

Respectfully submitted,

/s/ Paul F. Enzinna

Date: November 12, 2019

Ellerman Enzinna PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@ellermanenzinna.com

*Counsel for Defendant Dante Bailey*

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
           Plaintiff,             )
 4                                )
           vs.                    ) CRIMINAL CASE NO. CCB-16-0267
 5                                )
     CORLOYD ANDERSON,            )
 6         Defendant.             )
     _____)
 7

 8
                         Thursday, February 20, 2020
 9                           Courtroom 7D
                          Baltimore, Maryland
10

11         BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE

12
                              SENTENCING
13

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Assistant United States Attorneys

17   For the Defendant:

18   Carmen Hernandez, Esquire

19   Also Present:

20   Natalie Vallandingham, U.S. Probation Officer
     Judy Kahan, Defense Paralegal
21   _____

22
                            Reported by:
23
                   Douglas J. Zweizig, RDR, CRR, FCRR
24                  Federal Official Court Reporter
                    101 W. Lombard Street, 4th Floor
25                     Baltimore, Maryland  21201
```

```
 1                    P R O C E E D I N G S
 2        (2:45 p.m.)
 3            THE COURT:  Good afternoon, everybody.  You can be
 4    seated.
 5            Would you like to call the case.
 6            MS. HOFFMAN:  This is United States versus
 7    Corloyd Anderson, Case Number CCB-16-0267.
 8            I'm Christina Hoffman on behalf of the United States.
 9    With me here at counsel table is AUSA Lauren Perry.  And we're
10    here for Mr. Anderson's sentencing.
11            THE COURT:  All right.  Thank you.
12            MS. HERNANDEZ:  Good afternoon, Your Honor.
13    Carmen Hernandez with Mr. Anderson, who is sitting at counsel
14    table with me.
15            Also sitting at counsel table is Judy Kahan, who is
16    the paralegal.  She's been on the case from the beginning.
17            And Mr. Anderson's wife is present, his mother, and
18    several other family members are in the courtroom.
19            THE COURT:  Okay.  Thank you.
20            Well, we are here for sentencing for Mr. Anderson,
21    obviously, following his conviction by a jury on some counts.
22            Let me start preliminarily, actually, I think -- and
23    tell me if I've missed anything -- there was a motion to
24    dismiss the indictment filed by Mr. Anderson pro se back in
25    September.  It's Document Number 1282, and I'm not sure that
```

1  that had been ruled on.

2      There is also the Government's motion to dismiss

3  Count 24 of the second superseding indictment, specifically

4  that's the felon in possession charge because of Rehaif.

5      So nobody needs to say anything more about these

6  documents unless they want to.

7      I would be intending to deny Mr. Anderson's motion to

8  dismiss the indictment.  There's no basis for that.

9      But I would grant the Government's motion to dismiss

10 Count 24 without prejudice.

11     Any other preliminary matters that I've missed on the

12 docket that anybody can think of?

13     **MS. HOFFMAN:**  No, thank you.

14     **MS. HERNANDEZ:**  Just -- I guess I don't know if I have

15 to object to the "without prejudice," but if I do, I'm

16 objecting to "without prejudice."

17     **THE COURT:**  You certainly may object.  I think that I

18 will leave it the way it is.

19     But, obviously, should the Government at any point

20 attempt to resurrect this count, there will be issues, and it

21 can be decided at that point whether it's possible to do or

22 not.

23     Okay.  So, again, we're here for sentencing.

24 Mr. Anderson was convicted by a jury on Count 1, it's the RICO

25 conspiracy; and Count 2 was the -- excuse me, Count 5, I

1  believe it was, was the drug conspiracy.

2         And Count 24, which has been dismissed, the felon in

3  possession.

4         Counsel know I want to start with the presentence

5  report.

6         Now, there are various guidelines issues that we'll

7  get to.

8         But let me just first start with the presentence

9  report in general.

10         Does the Government have any additions, corrections,

11  or modifications?

12         And I should say the one I have was last revised

13  July 2nd of 2019.

14         Other than guidelines, any issues?

15         **MS. HOFFMAN:**  Other than the guidelines, no.

16         **THE COURT:**  Okay.

17         **MS. HOFFMAN:**  Thank you.

18         **THE COURT:**  And, Ms. Hernandez, I'm sure you've read

19  the presentence report.

20         For the record, has Mr. Anderson had the chance to

21  review it as well?

22         **MS. HERNANDEZ:**  Yes, Your Honor.

23         **THE COURT:**  Okay.  Other than guidelines issues?

24         **MS. HERNANDEZ:**  Well, the sentencing -- just for --

25  originally, before I came into the case, I understand that

2 everything in the presentence report Mr. Anderson objects to.

Ms. Amato submitted a statement to Probation that said
everything in the presentence report Mr. Anderson objects to.
Nothing specific, just a blanket.

But the sentencing memo that I filed does go paragraph
by paragraph objecting to certain allegations in the
presentence report.

**THE COURT:** Okay. Well, why don't we say generally --
and I certainly understand this was not a plea agreement or
anything -- Mr. Anderson disputes the entire case, and I think
that's understood.

What appears in terms of the factual statement in the
presentence report is the Government's version of the facts,
and I'll understand it that way.

As we're going along on various disputed sentencing or
guidelines issues, if there are certain things that we need to
take up in the way of getting a ruling on them, we can do that.

But, in general, otherwise I would just note that, of
course, Mr. Anderson disputes the basis for his conviction.

Okay. On the guidelines, I guess the first point to
note -- and the probation officer will be doing an amended
report after sentencing. Her report predates the
Fourth Circuit decision in Norman, and it would -- I'm
gathering that counsel at this point agree that given the
Fourth Circuit's decision, Count 5, the drug conspiracy, the
offense of conviction doesn't qualify as a controlled substance

1    offense anymore as a basis to calculate a career offender

2    guideline, so we're not doing that.

3           And the felon in possession is dismissed and the

4    Section 851 has been withdrawn, so we are calculating

5    guidelines just based on the two convictions, the RICO

6    conspiracy, the drug conspiracy, and, of course, criminal

7    history.

8           Is that basically correct?

9           **MS. HOFFMAN:**  That is basically correct.

10          I just would note that I believe the presentence

11   report incorrectly states that the drug-trafficking conspiracy

12   was Count 5 of the indictment.  It was actually Count 2.

13          **THE COURT:**  It was Count 2.  Okay.  Thank you.

14   Because I thought I had gotten it wrong, and I was going back

15   to Count 5.

16          But it's Count 2.  All right.  Okay.  So that was

17   Count 2.

18          And, in fact, of course, we did have a jury verdict, a

19   specific jury verdict form that counsel have referred to as

20   well.

21          But obviously that reflects the jury's general and

22   also specific findings as to what was foreseeable to

23   Mr. Anderson, and so that's what we'll be relying on.

24          Okay.  So in the absence of a career offender or ACCA

25   guidelines, we have, I think, agreed upon a base offense level

1  of 30 for the quantity of drugs that was found.  There is a

2  dispute about the two-level enhancement for the possession of a

3  firearm, I believe.

4       On the criminal history, there is a relatively recent

5  issue Ms. Hernandez has just raised this week about the

6  trespass conviction being counseled or not.

7       I did ask the probation officer for whatever records

8  she might have on that trespass conviction, and she's provided

9  them to me.  And I've given a copy to counsel to view for the

10 present purposes of discussing the guidelines that you need --

11 the documents do need to be returned, but let me start with

12 this issue.

13       Does the Government wish to express an opinion?

14       **MS. HOFFMAN:**  So we are just reviewing this document

15 for the first time.

16       I would note, it does say on Page 2 -- well, it's

17 repeated on Pages 2, 3, 4, 5, and 6, there's a section towards

18 the top right that says "CNSL" and then -- what's the word I'm

19 looking for?  Not an ellipses, but a colon, thank you.  And

20 then it says "C."  I assume that means "counsel."

21       I don't -- I mean, I would read that to suggest that

22 there was counsel, but I don't know for sure.  This is the

23 first time I've ever had to interpret a printout like this.

24       But, in general, I mean, I think what this amounts to

25 is essentially a collateral attack on a prior conviction.

1    I think it's been clear since the 1970s, since the

2    late 1970s, the Supreme Court has held that a defendant is

3    afforded the right to counsel whenever he's charged with an

4    offense -- well, first in 1972, the Supreme Court held that a

5    defendant is afforded the right to have counsel appointed to

6    represent him in any case where he's charged with an offense

7    that is punishable by prison, whether or not a prison sentence

8    is actually imposed.

9    And then later, I think in 1979 in Scott v. Illinois,

10   which is one of the cases that Ms. Hernandez has cited, the

11   Supreme Court walked that back a little bit and said the

12   defendant is afforded the right to counsel if he's charged with

13   an offense for which he's actually sentenced to time in prison.

14   Here, the record indicates that Mr. Anderson was

15   sentenced to 90 days in prison.

16   And so, I mean, I think given that it's been clear for

17   decades that the defendant does get counsel in that situation,

18   it would be very surprising to me if he was not afforded that

19   right in this case.

20   I think it's the defendant's -- certainly the

21   defendant's burden to come forward with some evidence that he

22   was not afforded counsel.  I don't think we have anything in

23   the record here.

24   And, as I said, I do think this printout, if anything,

25   suggests that he was afforded counsel before he was sentenced

1    to 90 days in prison.

2          So I do think that that trespassing conviction should

3    count under, and it should score points under, the guidelines.

4          **THE COURT:**  Ms. Hernandez.

5          **MS. HERNANDEZ:**  Your Honor, under <u>Nichols versus U.S.</u>,

6    a 1994 case, if, in fact, a defendant gets prison time and it

7    was uncounseled, it cannot count for criminal history points.

8          My -- I represent to the Court that Mr. Anderson's

9    position is that he was not counseled at that -- on that case.

10         My experience with court records -- and, by the way, I

11   was -- this document was not accessible online.  I checked, and

12   it doesn't come up.  So I wasn't able to do anything with it.

13         But my experience with these documents is that if

14   there's counsel, there is -- there's the name and address of

15   the counsel.  So it's not on here.

16         The other thing, as far as what the Government is

17   arguing, this is a District Court case in Baltimore City; that

18   is, it's not the Circuit Court.

19         I have no doubt that if this were a Circuit Court

20   case, there would be a whole colloquy about do you want

21   counsel, whatever.

22         District Court cases, my experience, is really

23   Traffic Court in many respects.

24         So I would -- as far as evidence, Mr. Anderson's

25   position -- I'm representing to the Court that there was no

 1    counsel, one.

 2         And the document that was submitted that the Court has

 3    allowed counsel to review does not show a -- does not show a --

 4    you know, defense counsel.

 5         **THE COURT:**  I think there is another Fourth Circuit

 6    case that I would point to as well, just in terms of the

 7    burdens and so forth.  It's United States versus Hondo,

 8    H-O-N-D-O, at 366 F.3d 363.

 9         It does recite -- and I don't think anybody's

10    disagreeing with it -- that while ordinarily someone in a -- a

11    defendant in a federal sentencing proceeding can't collaterally

12    challenge a prior conviction, the exception is if the

13    conviction was obtained in the absence of counsel.

14         There is burden on the defendant to go forward and

15    present some evidence of the lack of counsel.

16         Then the question would be, well, was there a knowing

17    and voluntary waiver of that right to representation?

18         I guess a preliminary question here is we could have

19    Mr. Anderson testify to this.  If we want to litigate it, I

20    guess we would have to start with that.

21         The document itself that we have, I think the

22    reasonable reading of it is that -- because there is no name of

23    counsel on any of this, but there is -- towards the end is the

24    name of the complaining officer, it would appear, and the

25    defendant.  And this is, of course, District Court.

There's also someone that's identified as a witness, so they have all those names, but no name of counsel.

I see the reference as counsel, and it says the letter "C" after it, but that's all we have.

**MS. HERNANDEZ:** I'm sorry, I have a similar document. It's not with respect to Mr. Anderson, but a similar readout from the Maryland Judicial Case Search, which is what this document is, which lists -- it's in the same format. It's a Circuit Court case. It lists the name of a defense attorney, their address. And I can submit it to the Court, if the Court wants.

(Counsel conferred.)

**MS. HERNANDEZ:** Let me pass it up.

**THE COURT:** Sure.

**MS. HERNANDEZ:** (Handing.)

**THE COURT:** Let me just take a look and I'll give it back to you.

**MS. HOFFMAN:** Your Honor, I would just point out, I think we are at a significant disadvantage here. This issue was just raised for the first time this morning. We haven't had a chance to look into it.

And so we don't have any evidence to put forward showing that Mr. Anderson was, in fact, represented by counsel at this proceeding.

However, I would reiterate that given that that is

1    unquestionably a Constitutional right and has been for decades,

2    I think the presumption should be that he did get counsel and

3    that either he had counsel at the trial or that he knowingly

4    waived it.

5         And that, as Your Honor has pointed out, it's his

6    burden to come forward with some evidence that it was

7    uncounseled.

8         **THE COURT:**  Well, then, if that is the Government's

9    position, then I think Mr. Anderson will need to take the stand

10   and testify if you choose to go forward on this.

11        **MS. HERNANDEZ:**  Sure.  I will -- I would like an

12   opportunity to speak to Mr. Anderson before I put him on the

13   stand, number one, Your Honor.

14        And I would like some clarification that we're talking

15   about asking a very limited scope of examination.

16        **THE COURT:**  Absolutely.  Only to do with this trespass

17   case and what happened in District Court in 2003.  Nothing

18   else.

19        **MS. HERNANDEZ:**  Okay.  With respect to the burden at

20   this point, Your Honor, if the burden at sentencing is

21   preponderance of the evidence, I would submit to the Court that

22   this document that doesn't show the name -- that the document

23   produced this morning from the Maryland Judiciary Case Search

24   that doesn't show the name of a counsel is sufficient to

25   make -- for the Court to make a finding at this point that this

1    is -- that he's not counseled in this -- that there was no

2    counsel in this case.

3            And so I would -- that would --

4        **THE COURT:**  I will take about a two-minute recess.

5    You can stand on that position.

6            I mean, frankly, I don't know that this is going to

7    make a great deal of difference.  I am required to calculate

8    the guidelines as accurately as possible, but we all know

9    that's only one factor under 3553(a).

10       **MS. HERNANDEZ:**  Correct.  And I also challenged that

11   conviction on staleness grounds also and also as an

12   overrepresentation.  That conviction takes two points for a

13   trespassing.

14           I must say, in terms of preponderance of the evidence,

15   any attorney that would allow a defendant to get sentenced to

16   90 days in District Court for a trespass seems like --

17       **THE COURT:**  I can't go there.  I mean, I --

18       **MS. HERNANDEZ:**  I understand.  But I'm just saying,

19   it's hard to believe that someone would get --

20       **THE COURT:**  I will take a --

21       **MS. HOFFMAN:**  Your Honor, I think we can save everyone

22   some time here.  I think -- you know, as Your Honor pointed

23   out, it's unlikely to be a big factor in the Court's

24   determination under 3553.

25           For purposes of today's proceeding, I think we're

1    willing to go forward on the assumption that we should not

2    include these two points for the trespassing conviction.  It

3    does not change our sentencing recommendation.  It does not

4    change our interpretation of the defendant's criminal history

5    as a whole.

6            **THE COURT:**  That's fine.

7            Ms. Hernandez, would you like to take this back?

8            **MS. HERNANDEZ:**  Yes, Your Honor.  Thank you.

9            **THE COURT:**  All right.  That still -- thank you --

10   leaves unresolved the issue of the two-level upward adjustment

11   for possession of a firearm.

12           There is, I assume, no dispute that Mr. Anderson was,

13   in fact, at the time of arrest and search of his home, that

14   there was a loaded, stolen firearm, a handgun, a Glock which he

15   admitted was his, but there's a dispute, apparently, about

16   whether it's applicable under the guidelines.

17           So I'll start with the Government.

18           Are you seeking that enhancement?

19           **MS. HOFFMAN:**  We are, Your Honor.

20           In Mr. Anderson's sentencing memo, he argues that the

21   enhancement shouldn't apply because the gun wasn't found in

22   close proximity to drugs.

23           There's nothing in the sentencing guidelines that says

24   that the gun has to be found in close proximity to drugs in

25   order for this enhancement to apply under United States

1  Sentencing Guideline Section 2D(b)(1).

2          **THE COURT:**  I think it's 2D1 --

3          **MS. HOFFMAN:**  I'm sorry, I missed -- yeah, 2D1.1(b)(1)

4  is the subsection that we're dealing with.

5          **THE COURT:**  Yes.

6          **MS. HOFFMAN:**  And the application note for that

7  provision says that, "The enhancement for weapon possession in

8  Subsection (b)(1) reflects the increased danger of violence

9  when drug traffickers possess weapons.  The enhancement should

10  be applied if the weapon was present unless it is clearly

11  improbable that the weapon was connected with the offense."

12          "For example, the enhancement would not be applied if

13  the defendant, arrested at the defendant's residence, had an

14  unloaded hunting rifle in the closet."

15          Here, Mr. Anderson possessed a loaded handgun, not a

16  rifle in his home.  It was under his mattress.  It was within

17  reaching distance of him while he slept.  And this was during

18  the same period of time in which the jury found that he was

19  involved in a conspiracy to distribute a kilogram or more of

20  heroin.

21          The officers also recovered a large amount of cash

22  from his home, $2,500, which was presumably the proceeds of

23  drug trafficking.

24          And in addition, Mr. Anderson admitted in his

25  postarrest interview that the gun was his, that it was loaded,

1   and that he had bought it off the street, quote, for

2   protection.

3           And when asked whether he was trying to protect

4   himself from any particular person, he said, "No.  Just for

5   general protection."

6           And I think this is exactly the kind of situation in

7   which the enhancement is meant to apply.

8           The Fourth Circuit has held that, of course, guns are

9   tools of the drug-trafficking trade and that they facilitate

10  drug trafficking by emboldening the drug trafficker and by

11  serving as protection for drugs and drug proceeds.

12          We included a transcript of Mr. Anderson's interview

13  as Exhibit -- I think it was Exhibit 1 to our sentencing

14  memorandum.

15          **THE COURT:**  Okay.

16          **MS. HERNANDEZ:**  So, Your Honor, the argument is made

17  in the sentencing memorandum.  Every Fourth Circuit case -- and

18  I don't dispute what the guideline application note says.  It

19  says what it says.

20          But there was -- let's be clear, there were no drugs

21  found in the house where Mr. Anderson -- where the gun was

22  recovered from and where he was arrested.

23          There is no allegation that he -- that there was any

24  drug trafficking in that house.

25          The $2,500 was related -- there was a receipt at the

time with the $2,500 which reflected it was a win or a -- some

sort of profit from gambling at the casino for that exact

amount.

So the Court can make its ruling, but the bottom line

is I cited three or four Fourth Circuit cases. Every single

one of them, there is some proximity. And it doesn't have to

be next to it, but there has to be some connection between the

gun and the -- or the location of the gun.

So in some of the cases, there were drug sales from

that location or there were drugs in the house even if not --

even if in a different room from where the gun was recovered,

or there were guns and -- there was a gun and drugs in the

same, like, briefcase or in the same car, that type of thing.

There has to be some connection of some kind for the gun bump

to apply. That's my argument.

And, as I said, the money, there was -- there is, in

fact, a receipt related to that money. I can produce -- I

guess I will try to produce it.

But there is, in fact, a receipt related to that

money. It's not drug proceeds, in general.

**THE COURT:** Okay. All right. Well, thank you.

Obviously, I did have a chance to look at this issue.

And I've looked at some of the Fourth Circuit case law. The

burden is on the Government to show that the enhancement under

2D1.1(b)(1) applies.

1          Relevant case law includes

2    United States versus Bolton, B-O-L-T-O-N, 858 F.3d at 905.  And

3    it says that, you know, initially the Government has the burden

4    of proving possession of a weapon in connection with the drug

5    activities by a preponderance of the evidence.  That's got to

6    be in connection with drug activity that's part of the same

7    kind of course of conduct and common scheme as the offense of

8    conviction.

9          It doesn't have to be precisely concurrent, the drug

10   trafficking and the weapon.  There's supposed to be some

11   temporal and spatial relation between the weapon, the

12   drug-trafficking activity, and the defendant.

13         And then if the Government's met that initial burden,

14   it would be up to the defendant to show that it's clearly

15   improbable.

16         What we have here is a jury verdict, of course, that

17   Mr. Anderson was involved in a drug conspiracy that involved

18   very substantial quantities of heroin.

19         The connection between drug trafficking and weapons --

20   in particular handguns, which is what we're talking about

21   here -- for protection has been well-recognized by the

22   Fourth Circuit.

23         What we have here, while there are no drugs in his

24   house, again, is overwhelming evidence of his involvement in

25   supplying large quantities of heroin in other areas, traveling

1    around, perhaps, to do that.  A gun, of course, is portable.

2            Not only was it a handgun, it was loaded.  It was

3    stolen.  It makes a great deal of sense that it was for the

4    purpose of Mr. Anderson, I'll just say, protecting himself and

5    drugs in the course of the conspiracy.

6            And the additional case I would cite for that is

7    United States versus Mondragon, which is 860 F.3d 227, also

8    from the Fourth Circuit.  It involved testimony of display of a

9    pistol while at the house of a co-defendant who was involved in

10   drug trafficking.

11           Certainly, I understand Ms. Hernandez's argument.  In

12   many cases, it is true, the gun is found in a location in the

13   immediate vicinity of drug paraphernalia or drugs.  I don't

14   think that is required.

15           And under the circumstances of this case, I think the

16   Government has met its burden.  And Mr. Anderson has not shown

17   that it was clearly improbable, so I'm going to apply the

18   two-level upward adjustment.  So we'll be at an offense level

19   of 32.

20           With the criminal history dropping down to six points,

21   that is a total -- a criminal history category of III, rather.

22           So I believe that we would be at a guideline range of

23   151 to 188 months.

24           **MS. HERNANDEZ:**  Your Honor, I just want to clarify

25   something on the offense level.  I haven't objected because

1    there's a jury verdict.

2         But just for purposes of the record, you know, I did

3    argue that the evidence was insufficient to support the jury

4    verdict.

5         But I'm not arguing for purposes of sentencing that

6    the Court can't -- that the jury verdict of 1 -- of 1 kilo is

7    somehow subject to our dispute.  I'm not disputing that.  I'm

8    just making the objection.

9         **THE COURT:**  Okay.

10        **MS. HERNANDEZ:**  I'm not -- we're not conceding that

11   it's -- that there was sufficient evidence on that.

12        **THE COURT:**  Right.  In light of the jury verdict of a

13   kilo or more, I will maintain that calculation.

14        Now, again, the guidelines are just one factor.

15   Obviously, there are a lot of other things that have to be

16   considered under 3553(a).

17        And I'm aware of the positions through reading the

18   sentencing memos, of course.

19        But I'm happy to hear any specific arguments that

20   anybody wants to make.

21        **MS. HOFFMAN:**  Thank you, Your Honor.

22        The Government believes that a sentence of 25 years is

23   sufficient but not greater than necessary to comply with the

24   purposes of sentencing set forth in 18 United States Code,

25   3553.

1          This is a very, very serious offense.  The defendant,

2   Corloyd Anderson, conspired to participate in an extremely

3   violent and destructive Bloods gang known as

4   Murdaland Mafia Piru, or MMP, which was responsible for

5   numerous murders, attempted murders, assaults, and large-scale

6   drug trafficking over a period of many years, from 2011 through

7   2017.

8          Defense counsel argues in their sentencing memorandum

9   that the jury unanimously concluded that Mr. Anderson was not

10  involved in any acts of violence in furtherance of the

11  conspiracy and that this case is really just about drug

12  trafficking, and that is not the case.

13         What the verdict shows is that the jury did not

14  unanimously agree that any murders or other acts of violence

15  were reasonably foreseeable to the defendant, but that is not

16  at all the same thing.

17         As the Court knows, sentencing courts can, and often

18  do, consider uncharged and acquitted conduct in determining a

19  sentence, so long as that conduct is proven by a preponderance

20  of the evidence.

21         And here, the evidence presented at trial demonstrated

22  that Corloyd Anderson was much more than just a drug

23  trafficker.  He was a high-ranking member of

24  Murdaland Mafia Piru.

25         And as a high-ranking member of the gang, Mr. Anderson

knew that MMP's fundamental goal was to monopolize the drug market in their territories by using violence to impose discipline within the gang, to retaliate against rivals, and to eliminate witnesses.

He knew that members of MMP were committing murders and shootings, and he continued to support them and work in tandem with them to further the gang's interests and his own because it allowed him to turn a substantial profit.

And, in fact, Mr. Anderson himself kept a loaded, stolen Glock firearm, a Glock handgun, within arm's reach during the period of this conspiracy.

He was unquestionably aware of and benefited from the violence and terror that defined MMP.

The evidence at trial showed that over a period of many years, Mr. Anderson distributed large volumes of heroin in MMP's territories in Northwest Baltimore, and specifically in that area of the 5200 block of Windsor Mill Road.

In 2015 and 2016, he had worked his way up to the rank of boss in the gang. He was supplying heroin to the gang's leader, Dante Bailey, and to other members and associates of MMP for distribution in that neighborhood.

As M.L. testified at trial, he also recruited young MMP members to sell for him.

And so he was directly responsible for significant quantities of this deadly drug that was being sold by members

of the gang.

The evidence at trial also established just how deadly and destructive heroin is. One of the people whom Mr. Anderson was responsible for distributing heroin to, who he regularly supplied heroin to, as evidenced by the wiretap calls, was Jamal Lockley, also known as T-Roy.

Mr. Anderson was T-Roy's main supplier of heroin during the summer of 2016, as we learned from all those wiretap calls.

And it was T-Roy who distributed heroin to a young woman -- I'll abbreviate her initials S.R. -- who testified at trial that she overdosed on that heroin and nearly lost her life.

So it's clear that Mr. Anderson, he earned a livelihood peddling in poison.

Mr. Anderson's criminal activity in furtherance of the gang wasn't limited to just drug dealing, though.

The Government did present evidence at trial that in 2012, he supplied a gun to MMP enforcer Dontray Johnson, who used that gun to murder Antoine Ellis, also known as Poopy.

There was no evidence presented at trial that Mr. Anderson conspired to commit that murder, that he was actually involved in the murder itself.

However, the testimony was that he did -- he was the source of that gun. He was the person who supplied the gun to

1    Dontray Johnson.  And that after the murder, he helped dispose

2    of that gun.

3           And certainly after the murder, he was on notice that

4    murder was one of the racketeering activities that this gang

5    engaged in.

6           He was also one of the first people to visit

7    Dante Bailey after Dontray Johnson visited Dante Bailey and

8    told him that he had just murdered Brian Johnson, or Nutty B,

9    for refusing to pay gang dues that Johnson was attempting to

10   collect for Bailey.

11          There was also video evidence showing that the

12   defendant was the person who dropped Dante Bailey off at the BP

13   gas station on the night of February 8th of 2015.  This was the

14   night that Dante Bailey shot at three individuals at a

15   neighboring gas pump.

16          Mr. Anderson wasn't there for the actual shooting, but

17   he was the person -- he's on video dropping Dante Bailey off at

18   the gas station that night.

19          Dante Bailey, of course, had a weapon on him.

20   Presumably Mr. Anderson knew that.

21          Mr. Anderson also has a very serious criminal history.

22          He has a July 2000 conviction for a handgun violation;

23   an August 2000 conviction for assault, second degree, and

24   discharging firearms; a November 2003 conviction for handgun

25   wear/carry; a March 2004 conviction for CDS, possession with

intent to distribute cocaine; an August 2004 conviction for

CDS, possession with intent to distribute involving

crack cocaine; and a March 2005 conviction for CDS, manufacture

distribute and CDS conspiracy involving heroin.

So although he's not technically a career offender

anymore under the Fourth Circuit's decision in Norman, he is

unquestionably a career offender under the ordinary sense of

those words. He was somebody who made a career out of dealing

drugs and carrying weapons to protect his drug-trafficking

business.

None of these convictions, obviously, deterred

Mr. Anderson from joining the MMP conspiracy and from

distributing large volumes of heroin to members of the gang.

None of them deterred him from possessing a loaded

firearm.

This wasn't just a single indiscretion or a handful of

misguided decisions by an irresponsible young man. It's

someone who returned again and again to dealing drugs and

carrying firearms. And there's a compelling need to protect

the public from future drug dealing and gun offenses by this

defendant.

There's also a compelling need for general deterrence

in this case.

Baltimore is overwhelmed by violent gangs like MMP

that deal in addictive, deadly drugs.

1          Gang violence and drug dealing have a devastating

2   impact on Baltimore communities, and combating them ought to be

3   a top criminal justice priority.

4          And, finally, there's a compelling need to avoid

5   unwarranted sentencing disparities in this case.

6          As Your Honor knows, one of the other defendants who

7   went to trial in this case was Randy Banks.  He was acquitted

8   of the RICO conspiracy.  He was convicted of drug-trafficking

9   conspiracy, but only detectable quantities of crack cocaine.

10          But there was substantial evidence presented at trial

11   that Randy Banks, like the defendant here, was a high-ranking

12   member of the gang.  And he was sentenced to 18 years in

13   prison.

14          Shakeen Davis and Jamal Lockley were both sentenced to

15   30 years in prison.

16          Now, there was evidence that Shakeen Davis was

17   personally involved in acts of violence, which puts him in a

18   different situation from Mr. Anderson.

19          However, Mr. Anderson has a much more serious criminal

20   history.  And he was also higher on the totem pole in this

21   gang.  He was a ranking member.  And he was somebody who

22   profited substantially from the drug dealing that this gang

23   involved in, and so that makes deterrence a really important

24   factor in this case.

25          For all these reasons, we do believe that a sentence

1    above the guidelines is appropriate in this case, and a

2    sentence of 25 years is appropriate.

3          And, finally, I do just want to note, we did, of

4    course, move to dismiss Count 24, which had charged

5    Mr. Anderson with possession of a firearm by a felon because of

6    the Supreme Court's decision in Rehaif.

7          But I did want to point out that Mr. Anderson is, in

8    fact, guilty of being a felon in possession of a firearm even

9    under the new elements that the Supreme Court has made clear

10   applies.

11         He did know that he had been convicted of a prior

12   felony that was punishable by more than one year in prison, and

13   that's abundantly clear from his postarrest interview during

14   which he admitted in that recording that he knew he was a felon

15   and he knew he wasn't supposed to have firearms.

16         And so, of course, he's not facing that 15-year

17   mandatory minimum that he otherwise would be facing if the

18   922(g) conviction stood.

19         But I do think it's a relevant sentencing factor to

20   consider, that he has three prior convictions for serious

21   drug-trafficking offenses and that he, knowing about those

22   convictions, did, again, possess a firearm and would otherwise

23   be subject to that 15-year mandatory minimum.

24         We believe 25 years is the appropriate sentence in

25   this case.

1          And I'm happy to answer any questions that the Court
2     might have.
3          **THE COURT:**  Okay.  That's fine.  That's fine for now.
4     Thank you.
5          Ms. Hernandez.
6          **MS. HERNANDEZ:**  I have some difficulty responding, for
7     one, Your Honor, because some of the evidence that is being
8     argued to the Court was not placed into the presentence report
9     or into the Government's sentencing memorandum.  And as the
10    Court knows, I was not trial counsel.
11         So I have no ability to know what was said during the
12    trial or to dispute the Government's assertions of facts.  I
13    only have had the ability to review the discovery.
14         So if the Court is going to rely on the Government's
15    representations of what the trial testimony was, then I -- in
16    order to adequately represent the defendant and not commit
17    malpractice, I think I'm required to review the transcripts.
18         I don't know how else -- I don't want to be
19    ineffective.  And I have some concern that if the Court is
20    going to be relying on trial testimony that -- I have -- I have
21    some sense because I've talked to -- barely to Ms. Amato.  She
22    spoke with me shortly.
23         I've spoken to the defendant.  I've been doing this
24    long enough to know that the defendant's view of the evidence
25    is not always accurate.

1     So I have real difficulty with proceeding under these

2     circumstances.

3          I was believing that since the Government -- since the

4     presentence report, as the probation officer rightly noted, was

5     the Government's position, I thought that's what we were here

6     to argue over.

7          **THE COURT:**  And what is it that you think is new in

8     the Government's argument?

9          **MS. HERNANDEZ:**  Well, they're talking about videos and

10    witnesses who -- he claims that -- you know, the Government is

11    claiming that Mr. Anderson drove Bailey somewhere at some point

12    before some shooting took place later on.

13         There's -- I didn't take all the notes down of what

14    Ms. Hoffman said, but there was a lot of -- there was -- the

15    argument was what was said at trial, what the witness testimony

16    was -- which I will say to the Court, I tried to find out what

17    the witness testimony was.  My understanding was that there

18    were four witnesses only who testified against Mr. Anderson and

19    their testimony was very narrow.

20         The one witness who supposedly claimed that

21    Mr. Anderson was the one who provided the murder weapon for the

22    2012 murder and then hid it, his -- all the discovery as to him

23    does not say anything about that.  And by that I mean his

24    Jencks and his grand jury testimony does not mention that.

25         I also indicate -- I just filed today that the person

1   who pled guilty to that murder, his presentence -- his

2   statement of facts says nothing about Mr. Anderson.

3          And it's been my experience that when the Government

4   has a conspiracy with multiple defendants and somebody's going

5   to plead, they throw in the names of the people that were

6   involved.

7          The other --

8   **THE COURT:** Perhaps I can alleviate some of this,

9   Ms. Hernandez.

10         I am not going to find Mr. Anderson personally

11   responsible for either of the two murders, if that helps.

12   **MS. HERNANDEZ:** That helps.

13   **THE COURT:** I think you can proceed on the basis of

14   what's in the presentence report, which obviously you've had

15   for a long time --

16   **MS. HERNANDEZ:** Yes.

17   **THE COURT:** -- and the Government's sentencing

18   memorandum.

19   **MS. HERNANDEZ:** Right.

20   **THE COURT:** And I think we'll be fine.

21   **MS. HERNANDEZ:** Okay. Okay. So that helps,

22   Your Honor.

23         At the same time, I understand that the Court is --

24   under 3661 is looking at the whole person. So even if you

25   don't find him responsible, I hope that that doesn't play a

1    part in the Court's sentencing decision.

2           And, again, the thrust of the Government's argument,

3    as I read in their sentencing memo and as I hear in the -- in

4    their presentation to the Court today, is that Mr. Anderson's

5    participation assisted, helped, maintained this very violent

6    gang.

7           And obviously they make a very nice presentation which

8    I assume they made to the jury after six weeks of testimony.

9    And the jury -- let me back up.

10          The Government -- I don't -- I think makes an

11   illogical argument that the fact that the jury -- that the fact

12   that the jury found that none of the acts of violence were

13   reasonably foreseeable to him under the RICO conspiracy doesn't

14   mean that the jury found that he wasn't involved in them.

15          I don't understand how -- because the burden is lower

16   to find a trafficking activity under a RICO -- under a RICO

17   conspiracy.  They don't have to find that he participated.

18   They just have to find that it was reasonably foreseeable.

19          It's illogical to me to say the jury could have or

20   might have found that he participated in these violent parts of

21   the conspiracy, but it was not reasonably foreseeable to him.

22   I don't think that's logical at all.

23          But -- so, as I say, my understanding of the evidence

24   is that -- and on the presentence report, there is a -- there

25   are some phone calls in August of 2016 which have been

interpreted to mean there's a -- drug-trafficking
conversations.

That is a very short period of time. That's the point
I was trying to make, that even accepting that every single
little statement in those conversations -- which I will say, my
understanding of the phone calls also had conversations about
cars which Mr. Anderson sold and that type of thing.

Let's accept, for purposes of this proceeding, that
those were conversations about drugs. Those conversations
absolutely don't amount to a thousand gram -- to a kilo of
heroin. They amount to some street quantities -- which I must
say, Mr. Anderson admitted to selling heroin when he was
arrested and he gave a statement because he has from time to
time done that.

The Government's argument that his criminal history
reflects serious drug trafficking, again, I don't understand
where they're getting this from.

His two Baltimore City -- and, by the way, I know the
Court made a ruling on criminal history. There are other
objections to the criminal history calculation. I don't know
if the Court is going to take those up at some point.

**THE COURT:** What is that?

**MS. HERNANDEZ:** Well, I object -- one of the prior
criminal history -- it's from a Baltimore City police officer
who has been discharged. And I have filed -- I'm in the

1    process of filing a coram nobis.

2         I've spoken to the Public Defender -- state

3    Public Defender who's involved in ferreting out that officer's

4    background.

5         And my understanding is that they're working because

6    the guy -- the man -- he has not been charged in federal court

7    with any crime of dishonesty, but he's been discharged from the

8    force and there are allegations that he is a corrupt officer.

9         That -- and he was involved in one of those -- one of

10   the serious prior drug-trafficking offenses that the Government

11   refers to is -- the description is that there were some kids on

12   the -- and I say "kids" 'cause he was in his 20s at the time --

13   on the street that appeared to be walking up to cars and

14   selling.

15        There isn't even a quantity in that -- in the

16   statement of facts.  And Mr. Anderson got six days, which was

17   essentially time served.

18        **THE COURT:**  Sure.  But, I mean, you're aware, you

19   don't have a basis at this point to set aside that conviction

20   if you're arguing to me as a 3553(a) matter that the history

21   isn't as serious as it looks, that's fine.

22        But that doesn't change the criminal history

23   calculation, which I thought was what you were telling me.

24        **MS. HERNANDEZ:**  Well, I am making -- I do -- well, I

25   have to preserve -- I'm told I have to preserve the objection

1    to that officer -- particular officer for purposes -- one.

2          But, two -- and I also made an argument for a criminal

3    history downward variance because of that and because of -- and

4    also the other argument I'm making is that the Government's

5    position is that Mr. Anderson has this serious prior criminal

6    history.

7          And what I'm saying is that the two -- that the two

8    Baltimore City prior drug conspiracies, one of which is this

9    corrupt officer -- and the other one, there isn't even a

10   drug -- I don't believe there's a -- let me not overstate.

11         But the description of the -- in both cases, he

12   received a sentence of six day -- three years, all but six days

13   suspended.

14         **THE COURT:**  Sure.

15         **MS. HERNANDEZ:**  But essentially -- and it said credit

16   for time -- for the time, so the six days from the record

17   appears to be -- he shows up.  When he shows up six days after

18   having been arrested or whatever, he served six days and the

19   judge says six days.  That does not reflect a serious drug

20   offense.

21         And the -- so that's -- so that's Paragraph 49 -- no.

22   That's -- I'm sorry -- 21 small plastic bags of suspected

23   crack cocaine, $91 -- and this isn't just him.  A number of

24   people who are together.

25         But the point is that if you're looking at prior

convictions in terms of what happened at the sentencing, if someone gets six days time served, that doesn't reflect a serious drug -- the point I'm trying to make, it does not reflect a serious prior criminal history.

And this is in 20 -- this is -- and for purposes of guideline sentences, they're not stale because of the way the ten-year -- these are --

**THE COURT:** Right.

**MS. HERNANDEZ:** -- there's a ten-year lag period. And they're not stale because he had violations of probation.

But let me just say this: Again, the violations of probations, all the Court did was continue him on probation, which, again, reflects that we're not talking about serious activity.

And if what the Court is supposed to do is look back and see what the judge did in the case to determine the severity of the offense, the fact that he got six days time served should reflect that these are not serious offenses.

And, again, they're not technically stale, but in the vernacular, they date back 15 years, 2003, 2004, at a time when he was 21 and 22 years old, when it's clear, I think, I would concede, that he's a young guy with not a lot of -- going on, grew up without a father, drops out of school in tenth grade, and he's -- I would think he's selling drugs on the street.

But he's not a drug -- he's not a -- I don't -- I

would argue to the Court that's not evidence of a serious

drug-trafficking offense -- history.

Again, the Government says that there was a lot of

evidence of his participation and his leadership and all this

other stuff.

The only concrete evidence that I see in the

presentence report is these phone calls for less than -- I

think in a couple -- it's July and August or just August, just

a handful of phone calls.

I understand that sometimes you don't have the

evidence, but the point is my understanding is there were four

people who testified. And except for that one witness who

talked about the gun and who, as I understand -- and as I read

the Jencks and the grand jury testimony, says nothing of any

substance about Mr. Anderson.

There's -- obviously, the jury was convinced that he

participated in a heroin conspiracy and was convinced that the

quantity was a thousand kilos -- I'm sorry, not a thousand

kilos. A kilo. It is what it is.

But at the same -- let me start where I was planning

to start.

I understand that the Court has the authority to take

acquitted conduct into consideration. And I understand the

Court has authority to take uncharged conduct into

consideration. And I understand that the -- even before the

```
 1    guidelines, courts did that.  Are you a good man?  Are you a
 2    bad person?
 3         But the idea -- and I put it in my sentencing memo,
 4    Watts is of questionable logical precedent because it was
 5    decided on a petition for certiorari without oral briefing in
 6    the Supreme Court and without oral argument.
 7         And even Justice Kennedy in there says, you know,
 8    there's -- if you're going to start using acquitted conduct to
 9    sentence somebody, it raises serious issues about --
10    Sixth Amendment issues, because what's the point of marshal --
11    investigating for years, marshaling all your evidence and
12    marshaling all your best evidence, bringing witnesses in,
13    having the jury say, I'm sorry, we're not going to convict him,
14    and then -- and I'm not attacking the prosecutors because I've
15    read this sentencing memoranda and many like it, which is the
16    same.  We might as well not have had a trial.  This sentencing
17    memorandum would probably be no different if he had been
18    convicted of all the things that they claim.
19         And the sentencing memorandum, which I don't
20    understand, continues to say that he was convicted of 280 grams
21    of crack cocaine.  I don't know where that comes from, if it's
22    just a mistake or if somehow they're trying to say that because
23    the -- he was convicted of a conspiracy involving heroin, he
24    also gets tagged with the crack.  I'm not sure.
25         THE COURT:  I think it's just the heroin.
```

1          **MS. HERNANDEZ:**  Okay.  I just -- the Court has a lot

2    of discretion.

3          I understand Baltimore City and every city in America

4    has problems with drugs.  I understand Baltimore has a lot of

5    violence.

6          But it is -- I would submit to the Court, it is just

7    as unjust and it is just as -- engenders disrespect for the law

8    if a person who's acquitted is sentenced as harshly or almost

9    as harshly as if he had been convicted.

10          And the Government's comparison to Randy Hanks --

11    Banks?  Randy Banks, my understanding, as best as I can

12    understand, is that there was a whole lot more evidence against

13    Randy Banks.

14          Apparently he had a very good lawyer, whom I happen to

15    know because he was at -- at one point he was a prosecutor for

16    the Department of Justice at the Narcotics and Dangerous Drug

17    Section.

18          But my understanding is that there was a whole lot

19    more evidence, concrete and otherwise, from many witnesses

20    about Mr. Banks' participation in this offense.

21          You've got four witnesses testifying against

22    Mr. Anderson, one of whom is, for multiple reasons, not

23    believable and who is -- I continue to say did not mention

24    Mr. Banks, firearm, or anything in his pretrial.

25          Then there's three other witness -- three other

witnesses, two of whom -- one of whom says he had, you know, gold teeth, which he doesn't. And I'm talking about what he said pretrial in his proffers. And none of them put him with any substantial or concrete evidence in the middle of this.

And you can tell -- I mean, I -- again, I'm at a loss, both in the court here -- so it's hard -- I don't like to be in a position where I -- where the Court heard all this evidence and I wasn't here, because I'm sure the Court walks away from a trial with a certain impression of who the different people are.

But, I mean, the assertions that are in the presentence report to link him to this RICO conspiracy are pretty slim.

He happens to be the stepbrother of the guy who supposedly was the leader of this.

So the fact that he is in with him on one or two occasions doesn't say a thing about his participation in this violent criminal conspiracy.

I am just asking the Court -- as I put in my sentencing memo, I mean, if you look at where he starts, he could have been William Banks, but that's not who he is.

He's married -- and I bring that out because I've been doing this for a long time and the Court has been doing this for a long time. We often are met with defendants who have 8 children or 20 children from 17 different women. And we're not

1   making moral judgments as to that.

2           But I do think, Your Honor, that the fact that he's

3   married to one woman, that it's his childhood girlfriend, that

4   he has three children by that one woman, tells you more about

5   him than a lot of the allegations that are made.

6           And I do think that the Court needs to take that into

7   consideration as the whole picture.

8           And he does have three children.  And part of the

9   tragedy of drugs and part of the tragedy of inner-city living

10  is that these children continue to live without fathers.

11          And those of us who have children understand the

12  significance and the need and the value of having a father,

13  because I'll be the first to admit that when my son turned

14  teenager, it was like "who created this monster in my house?"

15  And I am thankful that he had a father who was able to lead him

16  through those years.

17          And I do think that the fact that he has this steady,

18  strong relationship with this one woman, that they have raised

19  three children who are not in trouble, that those children need

20  their father.

21          And I must say that, you know, you could probably file

22  a RICO case in every drug conspiracy in the city or in every

23  city.

24          So there is some sort of -- I don't want to call it

25  manipulation, but there is some sort of -- the way the charges

1    are filed, there's a construct to it.

2            I just think that without evidence, as the Court is

3    saying, you're not going to hold him responsible for those two

4    murders, then what you've got is a drug conspiracy.

5            And then what you've got is a drug conspiracy with a

6    criminal history that is -- I mean, just -- just that he got 90

7    days for trespassing, I know you're not counting that, but

8    that's just a little bit ridiculous.

9            And if you look at those other criminal cases, they're

10   so relatively minor that to sentence him -- I mean, I know we

11   live in this universe, but in what universe is ten years in

12   prison not a substantial sentence?

13           Ten years in prison takes him away from his wife and

14   children and his mother and his family.  And he not only was --

15   you know, he had a business -- and you got the letters from

16   people.  And he -- he was a member of a bowling league.

17           And I just think that -- I'm just asking the Court to

18   look at the man in total and not just whatever was presented to

19   the Court at sentencing.

20           And, again, I do think that the Court ought to give

21   some deference to the jury's verdict because the truth is, most

22   juries -- I mean, they're people who also experience the

23   effects of drug crimes.  And I'm sure they were flabbergasted

24   or disgusted or distressed by the evidence of the violence.

25           So the idea that despite all of that, they ruled as

they did, I think they're entitled to some deference.

And I do believe that, as a matter of Sixth Amendment due process fundamental fairness, it just makes little sense to me.  I understand what the law is.  It makes little sense to say, Okay, jury, come in, come back with the verdict -- but, you know, you're just as guilty as you were.

And it's just -- the Court has discretion.  I'm exercising -- I'm ask -- and I know that the Court has shown mercy in some of my cases.  I understand they're not the same situation.

So I understand that the Court -- I understand you take these cases seriously and you consider them individually.

So I'm just asking you to do it now.  This is a -- whatever he did -- again, I'm at a loss because I wasn't the trial counsel -- he's more than that.  That's what I'm telling the Court.

And you can see it from the people in the courtroom and you can see it from his attempts at making better.  And I think you can see it in the reflection of his children.

So that's what I'm asking the Court, that I think a ten-year sentence is sufficient -- that's sufficient but not greater than necessary.  You know, one day more without a good basis is an illegal sentence.

Thank you.

**THE COURT:**  Thank you, Ms. Hernandez.  I appreciate

1    your representation.

2           I'll have a couple of more questions.

3           But, Mr. Anderson, if there's anything you'd like to

4    say before I make a final decision, you have the right to do

5    that.  You certainly don't have to.

6           Obviously, I understand there was a trial.  You have

7    the right to appeal.  So it's totally up to you.

8           But if you would like to say something, you have the

9    right to do that.

10          **THE DEFENDANT:**  I think she did good enough.  My

11   lawyer did good enough.  Thank you.

12          **THE COURT:**  Okay.  Thank you.

13          And I'm going to take just a short break.

14          But let me also ask, Ms. Hernandez, are there any

15   particular recommendations to the Bureau of Prisons or comments

16   about the recommended special conditions of supervised release?

17          **MS. HERNANDEZ:**  Surely, drug rehab.  I mentioned -- I

18   think I said he had been in a car accident.  He actually had

19   been in a motorcycle accident and got some painkillers, and

20   that made him -- so any kind of educational or vocational

21   training, I would request that the Court recommend that.

22          And as far as the facility, I don't have -- if the

23   Court's going to take a break, I'll talk to him about that.  I

24   don't have any particular facility.

25          But every -- everything that the Court can do to help

1   him move forward I would ask that the Court do.

2           **THE COURT:**  Sure.  Thank you.

3           **MS. HERNANDEZ:**  Thank you.

4           **THE COURT:**  Anything else on the Government's side?

5   There's no forfeiture or anything here?

6           **MS. HOFFMAN:**  No, no forfeiture.  Thank you.

7           **THE COURT:**  All right.  Okay.  I appreciate

8   everybody's argument.

9           I'm just going to take a 15-minute recess.

10      (3:49 p.m.)

11      (Recess taken.)

12      (4:10 p.m.)

13          **THE COURT:**  You can be seated, please.

14                      Conference at the bench.

15      (It is the policy of this court that every guilty plea and

16  sentencing proceeding include a bench conference concerning

17  whether the defendant is or is not cooperating.)

18          **THE COURT:**  Okay.  Well, first of all, let me, of

19  course, thank the probation officer for the presentence report,

20  and counsel on both sides.

21          There are a lot of factors that have to be taken into

22  account in connection with sentencing.  It's very difficult for

23  everyone concerned.  I understand that, and often particularly

24  the family.

25          But let me make some preliminary remarks.

1          First of all, we did have some discussion about the

2     guidelines and what the correct calculation was.  That is only

3     one factor.

4          And I would just like to make it clear that the

5     sentence I'm about to impose would be the same, regardless of

6     whether I may have made an error as to some aspect of the

7     guidelines.

8          The factors that I need to consider, in addition to

9     the guidelines, of course, start with the nature and

10    circumstances of the offense.  It's a very serious offense.

11         The jury found Mr. Anderson guilty of a drug

12    conspiracy, first of all, that did involve a kilo or more of

13    heroin.

14         The evidence, of course, it's fairly clear that heroin

15    kills people, destroys people's families.  It's poison.  That

16    would be clear without even the specific evidence of one

17    overdose that was introduced in the course of the trial, and I

18    don't think anybody really disputes that.

19         It should also be clear that the evidence of

20    Mr. Anderson's involvement that led the jury to their verdict

21    indicated that he was involved with a drug conspiracy for a

22    number of years.

23         Obviously, it's not limited to the wiretap calls with

24    Mr. Lockley.

25         The presentence report fairly summarized, I think, the

1  overall scope of the conspiracy, and the wiretap calls were

2  kind of examples.

3          The jury also found Mr. Anderson guilty of the RICO

4  charge, which means being a member of this what has to be

5  considered, generally, a violent gang and a gang involved in

6  significant drug dealing.

7          Now, when I say "violence," let me also say I am

8  aware, under the law, of my ability -- and to some degree my

9  responsibility -- to consider all the relevant evidence.

10          And I am aware that even conduct of which someone has

11  been acquitted is something I can consider if I find it's

12  proved by a preponderance of the evidence.

13          I do not think it would be reasonable, even under that

14  standard, to hold Mr. Anderson personally responsible for the

15  two murders that have been discussed here that Mr. Johnson

16  committed.

17          First of all, of course it is true that the jury

18  verdict did not find Mr. Anderson to be -- well, didn't find

19  any specific acts of murder to be reasonably foreseeable to

20  him.

21          Now, as the Government indicated, even with the one

22  witness -- that I did find generally credible -- who testified

23  about the gun, that's what it was.  There was one witness.

24  There was not otherwise evidence of a conspiracy or direct

25  personal responsibility, and I don't think that's sufficient

1    for me to fairly hold Mr. Anderson responsible for murder.

2         Same with the second murder, the coincidence of a jail

3    visit would not be sufficient.

4         Having said that, I think there was abundant evidence

5    that, in a general sense, Mr. Anderson would have been aware of

6    the possibility of violence through this gang that he was, I

7    believe the evidence showed, a reasonably high-ranking member

8    of.

9         Over the years, he certainly would have been aware of

10   the general rules and conduct and the fact that there were

11   shootings and murders.

12        And I think I clearly can rely specifically on the

13   fact that Mr. Anderson had a loaded, stolen handgun, one, at

14   the time of his arrest, that I do believe he possessed in

15   connection with drug dealing, and that's certainly going to

16   raise a possibility of violence just in itself.

17        So I do think this is a very serious offense because

18   of the RICO and the nature of the gang and the extent of the

19   drug dealing.

20        Mr. Anderson's criminal history, it is serious.  I

21   don't agree that the length of sentence on a case necessarily

22   or always reflects the seriousness of the case.

23        Unfortunately, we've seen a lot of these from

24   Baltimore City Circuit Court.

25        But, in any event, there are a number of convictions

1    that involve guns and drugs, to some degree, that I think have

2    to be taken into account.

3           Now, there are also a number, unfortunately, of

4    violations of probation.

5           And while there is certainly a gap in time between

6    some of those convictions and what Mr. Anderson later became

7    involved in, he's gotten himself, unfortunately, here in front

8    of me, there's a gap.

9           So we're also talking about a situation when

10   Mr. Anderson is more mature.  These are not the mistakes of a

11   young kid anymore.

12          And, unfortunately, what we see is that Mr. Anderson

13   is more involved in very serious quantities of drugs, and,

14   again, the continuing possession or repeated possession of a

15   gun that he knows he's not supposed to have, and that's

16   dangerous.

17          So that indicates to me that there is a need to deter

18   Mr. Anderson.

19          Obviously, there's a need to deter the public

20   generally and to show that we take this kind of offense

21   seriously and to protect the public from the really tragic

22   consequences of guns and drugs in this city.

23          Obviously, there are personal circumstances for

24   Mr. Anderson to consider as well.

25          I do appreciate that he appears to have a strong

1    family, children that he cares for.

2         I appreciate the letters of support that he received.

3         It's always complicated.  People are complicated.

4    They do things that are good as well as things that are bad,

5    obviously.  And I have to take all of that into account.

6         But there is very serious conduct involved in this

7    case.

8         I also looked at, as I think both counsel referred to,

9    there was an issue of relative culpability in sentences given

10   to other individuals involved in this case.

11        And the three most relevant comparisons would be

12   Mr. Banks and Mr. Lockley and Mr. Davis.

13        It seems to me Mr. Banks was not found by the jury

14   to -- found not guilty of the RICO conspiracy and guilty only

15   of a lesser quantity of drugs.

16        Now, there were a lot of factors about his involvement

17   that I legitimately think I took into account in connection

18   with sentencing, but that is certainly one factor.

19        The jury verdict did find him at a lesser level of

20   responsibility.

21        Mr. Lockley and Mr. Davis, who I believe each got 30

22   years, they had specific jury findings.

23        As to Mr. Davis, murder.  And I believe he also had a

24   924(c) charge.

25        Mr. Lockley, the jury did find involvement in witness

1   retaliation.  I think he also had a significant criminal

2   record.

3          I don't think Mr. Anderson should be at their level.

4   I do believe that his involvement is serious, and more so than

5   that of Mr. Banks.

6          And when I consider all that together, I am imposing

7   on Mr. Anderson a sentence of 22 years in the custody of the

8   Bureau of Prisons.  That is on Count 1, 22 years, which would

9   be concurrent on Count 2.

10         In stating this sentence, you all can tell me if there

11   is any legal objection to it.  Obviously, any general

12   disagreement.

13         But that would be the sentence on Count 1 and Count 2.

14         The other charge has been dismissed.

15         There is going to be a required and important period

16   of five years of supervised release once Mr. Anderson comes out

17   of the Bureau of Prisons.

18         Special conditions, including any substance abuse

19   testing or treatment the probation officer recommends.

20         Any vocational or educational programs the probation

21   officer recommends.

22         Not possessing any controlled substances unless he's

23   got a legitimate prescription for them.

24         And providing the financial information to the

25   probation officer if they might want to see it.

1          In terms of recommendations to the Bureau of Prisons,

2     was there anything specific, Ms. Hernandez?

3          **MS. HERNANDEZ:**  Your Honor, obviously, close to home.

4     I don't have a particular place in mind.

5          Possibly Fort Dix.  But if the Court is okay with

6     that, would you allow me to send an e-mail to chambers

7     tomorrow, with a copy to the Government, of a particular

8     facility?

9          **THE COURT:**  That would be fine.

10          If you can, if you have --

11          **MS. HERNANDEZ:**  Or maybe this afternoon.

12          **THE COURT:**  -- a specific reason that could be

13     advanced, that would be helpful.

14          In general, I would, of course, recommend a facility,

15     consistent with his security level, that's as close to home as

16     possible and would also recommend that he participate in any

17     substance abuse program he's eligible for while he's in the

18     Bureau of Prisons, since that does seem to be an issue.

19          His financial circumstances don't permit a fine.

20     There is not any fine.

21          I'm required to impose a $100 special assessment on

22     each count, so I am doing that.

23          And I think that's a reasonable sentence.

24          But tell me if I've left anything out.  Anything I

25     have misstated?

1      **MS. HOFFMAN:**  I don't believe so.

2          But the Government at this time moves to dismiss the

3   superseding indictment against Mr. Anderson.

4          **THE COURT:**  Okay.  That will be dismissed.

5          Ms. Hernandez?

6          **MS. HERNANDEZ:**  So, Your Honor, as I understand the

7   Court's ruling today, you found his offense level to be 32 and

8   his criminal history to be III, which resulted in a range of

9   151 to 188.

10         **THE COURT:**  That's correct.

11         **MS. HERNANDEZ:**  And you've imposed an upward variance

12  or departure.

13         **THE COURT:**  It's a variance.  It's an upward variance

14  for the reasons that I explained, yes.

15         **MS. HERNANDEZ:**  Okay.  So if I have to object, I would

16  say the reasons the Court gave are not sufficient.

17         **THE COURT:**  Sure.

18         All right.  And, Mr. Anderson, obviously, you have the

19  right to appeal from the convictions and from this sentence.

20  That has to be done within 14 days.  I'm sure Ms. Hernandez

21  will assist you with that.

22         But do you understand it needs to be done within 14

23  days, sir?

24         **THE DEFENDANT:**  Yes, ma'am.

25         **THE COURT:**  Okay.

1          **MS. HERNANDEZ:**  Your Honor, I'm sorry.

2          I know I asked for drug rehab.  Could I specifically

3    ask for the 500-hour RDAP?

4          **THE COURT:**  I'm happy to recommend that.  I --

5          **MS. HERNANDEZ:**  With 22 years, it may be --

6          **THE COURT:**  It is likely -- well, the other issue is,

7    to the extent that there is a benefit in some circumstances of

8    early release, he may or may not qualify for that because of

9    the gun convictions, but that's up to him and Bureau of

10   Prisons.

11         I'm happy to recommend any substance abuse program

12   he's eligible for, which may include the Residential Drug

13   Treatment Program.

14         **MS. HERNANDEZ:**  And to the extent the Court found that

15   you weren't going to find him liable for the two murders --

16   that's Paragraph 23 and 25 of the presentence report -- would

17   the Court -- I would request that those be deleted.

18         **THE COURT:**  Why don't we do this.  I'll talk to the

19   probation officer.  I think it would be fair to at least

20   indicate that I did not find Mr. Anderson responsible for those

21   two murders.

22         **MS. HERNANDEZ:**  At a minimum -- that would be at the

23   minimum satisfactory, Your Honor.

24         Thank you.

25         **THE COURT:**  All right.  Anything else?

1          **MS. HOFFMAN:**  No.  Thank you very much.

2          **THE COURT:**  Okay.  Thank you.

3       (Court adjourned at 4:24 p.m.)

4

5       I, Douglas J. Zweizig, RDR, CRR, FCRR, do hereby certify

6    that the foregoing is a correct transcript from the

7    stenographic record of proceedings in the above-entitled

8    matter.

9

                        _____/s/_____

10
                    Douglas J. Zweizig, RDR, CRR, FCRR
11                     Registered Diplomate Reporter
                       Certified Realtime Reporter
12                    Federal Official Court Reporter
                         DATE:  June 15, 2020
13

14

15

16

17

18

19

20

21

22

23

24

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **Case No.  1:16-cr-00267-11 (CCB)** |
| **CORLOYD ANDERSON** | * | |
| **Defendant.** | * | |

**\*\*\*\*\*\***

### NOTICE OF APPEAL

Corloyd Anderson, by undersigned counsel, appointed under the Criminal Justice Act, hereby appeals from his conviction, after jury trial, and sentencing held on February 20, 2020 before the Honorable Catherine C. Blake, United States District Judge.  His sentencing represents a Final Order in this case.

Respectfully submitted,

/s/ *Carmen D. Hernandez*

_____

**Carmen D. Hernandez**
MD Trial Bar No. 03366
7166 Mink Hollow Rd
Highland, MD 20777
240-472-3391; 301-854-0076 (fax)

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the instant Notice of Appeal was served via ECF this 3d day of March, 2020.

/s/ *Carmen D. Hernandez*

_____

**Carmen D. Hernandez**

**JA6811**

# United States District Court

## District of Maryland

FILED *KAM'*
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2020 MAR -3 PM 4: 47

CLERK'S OFFICE
AT BALTIMORE

_____ DEPUTY

UNITED STATES OF AMERICA

v.

**CORLOYD ANDERSON**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed on or After November 1, 1987)

Case Number: CCB-1-16-CR-00267-011
Defendant's Attorney: Carmen D Hernandez, Esq.
Assistant U.S. Attorney: Christina A Hoffman &
Lauren E. Perry

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ___
☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.
☒ was found guilty on counts _1s and 2s of the 2nd Superseding Indictment_ after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Numbers |
|---|---|---|---|
| 18:1962(d) | Racketeering Conspiracy | 6/1/2017 | 1s |
| 21:846 | Conspiracy To Distribute Controlled Substances | 6/1/2017 | 2s |

    The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through __6__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by U.S. v. Booker, 543 U.S. 220 (2005).

☐ The defendant has been found not guilty on count(s) _____
☒ Superseding Indictment and Count 24s of the 2nd Superseding Indictment is dismissed on the motion of the United States.

    **IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

February 20, 2020
Date of Imposition of Judgment

_Catherine C. Blake_          3/3/20
**Catherine C. Blake**          Date
**United States District Judge**

Name of Court Reporter: Douglas Zweizig

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                    Judgment Page 3 of 7

DEFENDANT: Corloyd Anderson                              CASE NUMBER: CCB-1-16-CR-00267-011

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of <u>22 years (264 months)</u> as to Counts 1s & 2s to run concurrent to each other.

☒  The court makes the following recommendations to the Bureau of Prisons: (1) that the defendant participate in any substance abuse program for which he may be eligible including the Residential Drug Abuse Program; (2) that the defendant participate in any vocational programs such as automotive mechanics or computer and electrical maintenance for which he may be eligible; and (3) that the defendant be placed in a facility consistent with his security level that is as close as possible to Baltimore, Maryland so he may be close to his family, if possible either <u>FCI</u> at <u>Fort Dix</u> or <u>Fairton</u>.

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ a.m./p.m. on _____.
    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

    ☐  before 2pm on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By:_____
DEPUTY U.S. MARSHAL

**JA6813**

DEFENDANT: Corloyd Anderson                                CASE NUMBER: CCB-1-16-CR-00267-011

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>5 years</u> as to Counts 1s and 2s to run concurrent to each other.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

## A.   MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.
2) You must not unlawfully possess a controlled substance.
3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4) ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5) You must cooperate in the collection of DNA as directed by the probation officer.
6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page

## B.   STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must answer truthfully the questions asked by your probation officer.
5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

**JA6814**

**DEFENDANT: Corloyd Anderson**                                    CASE NUMBER: CCB-1-16-CR-00267-011

9)  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13) You must follow the instructions of the probation officer related to the conditions of supervision.

# C.   SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

You must participate in an educational services program and follow the rules and regulations of that program. Such programs may include high school equivalency preparation, English as a Second Language classes, and other classes designed to improve your proficiency in skills such as reading, writing, mathematics, or computer use.

You must participate in a vocational services program and follow the rules and regulations of that program. Such a program may include job readiness training and skills development training.

You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

You must not use or possess any controlled substances without a valid prescription. If you do have a valid prescription, you must disclose the prescription information to the probation officer and follow the instructions on the prescription.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                                  Judgment Page 6 of 7

**DEFENDANT: Corloyd Anderson**                                        CASE NUMBER: CCB-1-16-CR-00267-011

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 5B.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $200.00 | $.00 | waived | $.00 | |

☐ CVB Processing Fee $30.00

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss***** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|

**TOTALS**                    $ _____          $ _____

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

---

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**JA6816**

DEFENDANT: Corloyd Anderson                                    CASE NUMBER: CCB-1-16-CR-00267-011

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A  ☒  In full immediately; or

B  ☐  $_____ immediately, balance due (in accordance with C, D, or E); or

C  ☐  Not later than _____; or

D  ☐  Installments to commence _____ day(s) after the date of this judgment.

E  ☐  In _____ (e.g. equal weekly, monthly, quarterly) installments of $_____ over a period of _____ year(s) to commence when the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☐  **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE FINANCIAL RESPONSIBILITY PROGRAM.**

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

    ☐  in equal monthly installments during the term of supervision; or

    ☐  on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**JA6817**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **UNDER SEAL** |
| **v.** | * | |
| | * | **Criminal No.  CCB-16-0267** |
| **DANTE BAILEY,** | * | |
| | * | |
| **a/k/a Gutta,** | * | |
| **a/k/a Almighty,** | * | |
| **a/k/a Wolf,** | * | |
| | ******* | |
| **Defendant.** | | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant, Dante BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf," was the founder and leader of an extremely violent and destructive Bloods gang known as Murdaland Mafia Piru, or MMP.  He ordered and committed numerous murders in order to retaliate against rivals, impose discipline within the gang, and eliminate potential witnesses against the gang.  He distributed large volumes of heroin and crack cocaine in the gang's territories in Northwest Baltimore.  He indoctrinated a generation of youths from his neighborhood into a life of crime and senseless violence.  After he was arrested, he continued to conduct the gang's affairs from behind bars, ordering hits on rivals and witnesses, and plotting various ways to obstruct justice.  He has showed absolutely no remorse for his offenses and no intention of stopping his criminal activity.  He continues to present a grave danger to the public.

On May 1, 2019, following a roughly six-week trial, a jury convicted BAILEY of one count of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count One); one count of conspiracy to distribute a kilogram or more of heroin and 280 grams or more of crack cocaine, in violation of 21 U.S.C. § 846 (Count Two); one count of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Three); one count of possession of

firearms by a felon, in violation of 18 U.S.C. § 922(g) (Count Seventeen); and one count of possession with intent to distribute heroin (Count Eighteen).  With respect to Count One, the jury found that it was reasonably foreseeable to BAILEY that the pattern of racketeering activity carried out in furtherance of the conspiracy would include murder, extortion, conspiracy to distribute drugs, drug distribution, witness tampering, and witness retaliation.

As discussed more fully below, the sentencing guidelines call for life imprisonment, which is also the mandatory minimum sentence under 18 U.S.C. § 1959(a)(1).  But regardless what sentencing guidelines apply or whether any mandatory minimum sentence applies, the government respectfully submits that a sentence of life imprisonment is necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553, namely, (1) to reflect the seriousness of the offense, which involved horrible murders, shootings, long-term trafficking of deadly drugs, and efforts to obstruct justice including by killing witnesses; (2) to afford adequate deterrence for criminal activity that has a devastating impact on the community; and (3) to protect the public from a defendant with a serious criminal history and high likelihood of recidivism.

## I.  FACTUAL SUMMARY

The evidence in the case stems from a lengthy investigation conducted by the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), the Department of Homeland Security, Homeland Security Investigations ("HSI"), and state and local law enforcement.  The investigation involved 3 ATF-led wiretaps in July and August 2016, 8 HSI-led wiretaps in June and July 2015, roughly 26 controlled purchases of narcotics and firearms; search warrants executed on over 22 residences and vehicles, 86 cell phones, and 26 social media accounts; cell site location information for over a dozen cell phones; hundreds of recorded jail calls and visits; dozens of

intercepted jail mailings; DNA and ballistic evidence; and the testimony of numerous cooperating witnesses.  Over the course of the investigation, law enforcement officers seized roughly 42 firearms, over a kilogram of heroin, over 280 grams of crack cocaine, and gang paperwork from a variety of locations.

Over the course of the roughly six-week trial, the government called over 50 witnesses and introduced over 1,000 exhibits.  Below is a summary of relevant facts supported by the evidence presented at trial.

### A. Background Regarding Murdaland Mafia Piru (MMP)

Murdaland Mafia Piru ("MMP"), also known as the "Mob" or "Mobsters," was a violent subset of the Bloods gang that for many years controlled the drug trade in large swaths of Northwest Baltimore City and neighboring Baltimore County.  MMP also had offshoots in East Baltimore City and other cities such as Washington, DC.  MMP was descended from the Tree Top Piru ("TTP") subset of the Bloods gang, and was founded and led by the Defendant, Dante BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf."  After his release from prison in 2011, BAILEY flew to California to meet with West Coast leaders of TTP and gain their official approval for the MMP set in Maryland.  *See* Gov. Exs. IC14; SM1, at 77–82, 104–07.

BAILEY organized MMP hierarchically, with a "Don" or "Godfather" at the top (BAILEY) and various "Bosses," "Underbosses," "Capos," "Lieutenants," and "Mobsters" underneath.  *See* Gov. Ex. GP2a.  BAILEY also wrote and disseminated MMP gang paperwork laying out certain rules of conduct by which members were governed, including that "retaliation is a must," "[w]hen at war fight like you are ready to die," and "[w]henever we are forced to strike, our only option is to kill."  *Id*.  The most important rule was a rule against cooperation with law

**JA6820**

enforcement or "snitching." MMP gang paperwork explained that "co-operation with authorities that lead[s] to incriminating others" was punishable by death. *Id.* MMP members enhanced their status in the gang by carrying out acts of violence; for instance, members could earn a "lightning bolt" tattoo for "killing for the Mob." BAILEY has multiple lightning bolt tattoos on his face. *See* Gov. Ex. GP11a.

Prospective members of MMP were required to successfully complete an initiation process and recite an oath of loyalty called the "Omerta Code." *See* Gov. Ex. GP2a. MMP members were sometimes required to pay dues to the gang consisting of a portion of the proceeds of their criminal activities, and they were subject to reprisal—and sometimes murder—for failing to do so.

MMP members operated street-level drug distribution shops in various locations in Baltimore City, where they sold heroin, cocaine, crack cocaine, fentanyl, and marijuana, among other controlled substances. MMP's primary drug shops were at the BP gas station in the 5200 block of Windsor Mill Road (which was considered to be the gang's headquarters), and at the intersection of Gwynn Oak Avenue and Liberty Heights Avenue. The drug shop in the 5200 block of Windsor Mill Road was particularly lucrative because of its close proximity to Interstate 70, which made it easily accessible to drug customers driving from western Maryland and neighboring states. It was not unusual for MMP members and associates to sell over a kilogram of heroin per week at this location, which, at a retail price of $100 to $120 per gram, could translate to over $100,000 in drug revenue. MMP members in both locations were required to pay dues to the gang's leaders whenever it was demanded of them, and they were subject to reprisal—and sometimes murder—for failing to do so. Non-members who wished to sell drugs in MMP's

territories were forced to pay a "tax" or were targeted for violence, unless they had special approval from the gang's leaders.

MMP members, including BAILEY, used social media websites such as Instagram, Facebook, and YouTube to enhance the gang's status, assert MMP's claim to particular drug territories, intimidate rival gangs and drug traffickers, and enhance individual members' status within the gang.  They commonly posted photographs and videos to these social media websites in which they flaunted firearms, drugs, or drug proceeds, and threatened harm to those who stood in the way of the gang.

At trial, the government presented evidence that BAILEY and his gang were responsible for five murders, six non-fatal shootings, multiple additional conspiracies to commit murder, assaults, and robberies, and at least six years of high-volume street-level drug trafficking.

### B.  BAILEY's Criminal Activity in Furtherance of MMP

At trial, multiple witnesses testified that BAILEY was the founder, leader, and undisputed shot-caller of MMP.  The government introduced hundreds of pages of MMP gang writings authored by BAILEY, as well as dozens of social media photographs of BAILEY making MMP gang signs.  Additional evidence established that BAILEY ran the drug trafficking organization in the 5200 block of Windsor Mill Road; supplied heroin and crack cocaine to other members of the gang for distribution; extorted those who sold drugs in the area (members and non-members alike); and ordered and committed murders in order to eliminate rivals and witnesses and discipline members of the gang.

On October 15, 2012, BAILEY directed MMP member William BANKS to murder ███ because he was believed to be cooperating with law enforcement.  BAILEY told BANKS that

MMP Boss Adrian Jamal SPENCE, a/k/a "Spittle," had put up money for hit.  BANKS shot ███

multiple times in the head and torso with a .45 caliber firearm outside the Club Mirage nightclub

in downtown Baltimore.  A bystander was also struck in the leg while attempting to flee.  A closed-

circuit television ("CCTV") camera captured the incident, and showed BAILEY arriving at Club

Mirage shortly before the shooting with William BANKS, Randy BANKS, Dontray JOHNSON,

Devon DENT, and James Edwards.  JOHNSON was wearing a red shirt with the words "MOBB

SQUAD" on the back, and he filmed the victim with a tablet device shortly before the shooting.

Gov. Ex. SF1, SF1a–n. ████████████████████████████████

████████████████████████████

   BAILEY recounted the events surrounding the attempted murder of ███ in a semi-

autobiographical screenplay that investigators recovered from his residence at 7607 Reserve Circle

in Owings Mills, Maryland on May 17, 2016.  Gov. Ex. GP12G.  The screenplay, which was

introduced at trial, includes a scene in which BAILEY learns that ███ is "a rat" and a scene in

which ███ "gets hit" at "Club Mirage."  *See* Gov. Ex. GP12H.  In the scene where ███ gets shot,

BAILEY and "Dirt" (Randy BANKS) see ███ standing in line outside the club, and they decide

to "shut this bitch down" and "make it look like 4th of July."  *Id.*

   In November 2012, BAILEY ordered the murder MMP member Antoine Ellis, a/k/a

"Poopy," because Ellis had joined BGF and was trying to "play both sides."  On Thanksgiving

Day 2012, Dontray JOHNSON shot Ellis to death in the field across the street from the BP gas

station in the 5200 block of Windsor Mill Road.  A few hours before the murder, JOHNSON had

posted a comment to his Facebook profile, "gbino2," that said: "**198 n risen**"—a reference to that

year's murder tally in Baltimore City, which he was about to increase by one.  *See* Gov. Ex. SM2,

at 20.  After the murder, BAILEY attempted to reward JOHNSON with $200 for his loyalty.  On

November 24, 2012, at 2:12a.m., JOHNSON posted a Facebook comment that said: "**Nigga told

me I'm one of the loyalist young nigga he knows then gave me a couple hunnid…I said what's

this for he said for being u .started to give it back but I ain't want to b rude.**"  In response,

BAILEY, using Facebook profile "DantetheGreat," commented: "**Oh yeah**…"  *Id.* at 18–19.  ██████

testified at trial that BAILEY ordered Ellis's murder because Ellis had shown disloyalty to MMP

by associating with the Black Guerilla Family (BGF).

On November 1, 2013, MMP members posted a rap video entitled "Boy You Lying" to the

social media website YouTube, for the purpose of enhancing the gang's status, intimidating rivals,

and discouraging anyone from selling drugs in the gang's territories without paying its members.

*See* Gov. Exs. YT1, YT1T.  The video stars BAILEY, William BANKS, and Dontray JOHNSON,

who take turns brandishing a firearm with an extended magazine while rapping about killing

people who do not "stay in line."  *See id.*  The video includes a skit in which a young drug dealer

dressed in red takes a call from "Gutta" (*i.e.*, BAILEY) and promises him drug money, telling him

he "just sold 100 packs today."  *Id.*  When BAILEY and several older males dressed in red arrive

to collect the money, the young drug dealer claims he "ain't got that money."  BAILEY and the

older males accuse him of lying and begin beating him.  *Id.*

On November 1, 2013, MMP members posted a rap video entitled "Str8 Mobbin" to

YouTube for the purpose of enhancing the gang's status and asserting MMP's dominance over its

drug territories.  *See* Gov. Exs. YT2, YT2T.  The video features BAILEY, William BANKS,

Dontray JOHNSON, Randy BANKS, Adrian Jamal SPENCE, Takuma TATE, and other MMP

members, as well as footage of MMP's drug territories at the intersections of Windsor Mill Road

and Forest Park Avenue, Gwynn Oak Avenue and Liberty Heights Avenue, Lauretta Avenue and Warwick Avenue, 27th Street and Boone Street, and Edmonson Avenue and Loudon Avenue. *Id.* In the opening scene, BAILEY takes a telephone call from William BANKS, who tells him that "nig**s talkin' about they run the city; it's time to turn up on these nig**s, man." BAILEY replies, "Say no more; just get the Mob together, and we gonna show these nig**s what it is." *Id.* The rap lyrics include references to killing people who stand in the way of the gang, and JOHNSON and another MMP member brandish actual firearms in the video. *See id.*

On February 8, 2015, BAILEY, William BANKS, Dominick WEDLOCK, and William JONES were at the BP gas station in the 5200 block of Windsor Mill Road. WEDLOCK confronted a group of three men who were pumping gas, and then asked BAILEY for a gun. BAILEY fired multiple shots at the three men with a .40 caliber firearm, causing them to flee. JONES slashed a tire on the victims' car before leaving the scene with WEDLOCK. *See* Gov. Exs. SF4, SF4a-o.

On February 12, 2015, in the 300 block of Collins Avenue, BAILEY murdered MMP member James Edwards, a/k/a "Bangout," using the same .40 caliber firearm he had discharged at the BP gas station on February 8, 2015. Several witnesses testified that BAILEY killed Edwards because he was showing disloyalty to MMP and making threats against its leaders. The jury found BAILEY guilty of VICAR murder based on this offense.

In February 2015, Dante BAILEY and Tiffany BAILEY filmed a video with Tiffany BAILEY's juvenile son. The three held hands while the juvenile son said, "Dear Lord, please kill all these snitches." Dante BAILEY and Tiffany BAILEY then said, "Amen." *See* Gov. Ex. IC132.

8

**JA6825**

On or about April 23, 2015, near the intersection of Windsor Mill Road and Beverly Avenue, BAILEY and MMP member Altoneyo Edges, a/k/a "Chickenbox," possessed with intent to distribute approximately 21 grams of heroin.  The drugs were recovered from a sweater belonging to BAILEY.  *See* Gov. Exs. AP2a, AP2b.  Edges attempted to take the charge for BAILEY, but could not accurately describe the quantity of drugs.

On April 25, 2015, in a recorded jail call, Dante BAILEY and his wife Tiffany BAILEY used coded language to discuss their heroin inventory.  See Gov. Exs. J-16, J-16T.

On May 25, 2015, Dante BAILEY took a photograph of himself holding a Sturm, Ruger & Co. 9mm caliber firearm with an extended magazine.  *See* Gov. Ex. IC66.

On June 12, 2015, Kenneth TORRY sent a text message to Dante BAILEY asking when BAILEY would be ready with the payment for 100 grams of heroin that had been provided to him on consignment.  In a reply text message, BAILEY indicated that he would not be able to sell off the heroin until the police presence in the area died down.  Bailey stated: "It's scorching. He can get this hundon back until it cool down. When I'm done I will take u to c the president." *See* Gov. Ex. CELL14a, at 10–11.

On June 18, 2015, in the 1900 block of Forest Park Avenue, Dante BAILEY possessed with intent to distribute approximately 33 grams of marijuana.  As he was being arrested, BAILEY instructed Ivan Potts, a/k/a "Spotty," that he needed to take the marijuana charge for him.  Potts then advised police that the marijuana in BAILEY's vehicle belonged to him.  Baltimore Police officers also recovered a loaded handgun from the wheel well of a nearby vehicle.  In a wiretap call between BAILEY and Adrian Jamal SPENCE after the arrest, BAILEY indicated to SPENCE that he knew the gun was there. *See* Gov. Ex. WIREB, Call B-912.

On July 3, 2015, Tiffany BAILEY possessed with intent to distribute approximately 26 grams of heroin and 21 grams of cocaine base.  Later that day, members of the Baltimore County Police Department executed a search warrant at the BAILEYS' residence at 3901 Princely Way in Pikesville, Maryland.  The officers recovered drug packaging material, a money counter, MMP gang paperwork, a loaded Smith & Wesson .357 caliber firearm (serial number CNW4373), and a loaded Beretta 9mm caliber firearm (serial number BER421485Z).  ████████████████

████████████████████████████████████████

████████████

On July 4, 2015, Dante BAILEY made a series of recorded jail calls to Jay GREER from the Baltimore County Detention Center.  In the first call, BAILEY reprimanded GREER for failing to take the gun charge for him the previous day.  BAILEY also instructed GREER to continue mixing drugs together while he was locked up and "get everybody together and make 'em push everything."  GREER told BAILEY that Adrian Jamal SPENCE had "front[ed]" drugs to him the day before and that he was going to "try to help get some of that cheese together" to "pay[] for the bills."  GREER also informed BAILEY that the search warrant paperwork left at BAILEY's residence said "something about a CI [*i.e.*, confidential informant]."  *See* Gov. Exs. J-18, J-18T, J-19, J-19T, J-20, J-20T.

In subsequent recorded jail calls the same day, BAILEY advised Kenneth TORRY that he would continue to work through Adrian Jamal SPENCE and his wife (Tiffany BAILEY) from jail. BAILEY instructed TORRY to collect $700 from the members of the organization and give it to Tiffany BAILEY so that she could pay for his bail.  BAILEY also instructed TORRY to supply Jay GREER with 200 grams of heroin on consignment.  When TORRY expressed reluctance,

BAILEY said, "How you going to dictate what I do with my business?" TORRY then agreed to supply 100 grams of heroin to GREER and another 100 grams of heroin to BAILEY when he was released from jail. In a later call, BAILEY informed GREER that TORRY was about to give GREER 100 grams of heroin, which would amount to at least "ten bands" (*i.e.*, $10,000). BAILEY said "ain't no excuse" and asked, "You understand what we in?" GREER said he understood. *See* Gov. Exs. J-21, J-21T, J-22, J-22T.

On July 7, 2015, in wire call B-2535, Adrian Jamal SPENCE told BAILEY that he had heard "somebody might be tryin' to set me up or something." BAILEY asked whether SPENCE wanted "to turn it up." SPENCE told BAILEY "it could be anybody." BAILEY again offered "turn it up" on "whoever" SPENCE thought it might be. *See* Gov. Ex. WIREB.

On July 20, 2015, law enforcement officers executed a search warrant at 532 Coventry Lane, a stash house that SPENCE used to store and package heroin he supplied to other members and associates of MMP, including BAILEY. There, they recovered approximately 608 grams of heroin and a kilogram press used to compress heroin and adulterants into kilogram bricks. *See* Gov. Exs. SW2a-i.

On July 21, 2015, in a recorded jail call, BAILEY ordered MMP member Altoneyo Edges, a/k/a "Chickenbox," who was incarcerated in the Baltimore City Detention Center, to assault another inmate as retaliation for cooperating with law enforcement against Dontray JOHNSON. BAILEY told Edges: "You supposed to slap the shit out shorty. . . . Punish that nig**, yo! Punish that nig**!" Edges agreed to carry out the assault. BAILEY said, "I got you. I'll send you a money order. . . . Destroy that nig**, yo!" *See* Gov. Exs. J-24, J-24T.

On July 22, 2015, at the BP gas station in the 5200 block of Windsor Mill Road, BAILEY, now-deceased BGF member Dominick Kane, a/k/a "Fish," and Ivan Potts, a/k/a "Spotty," attempted to murder ███. BAILEY engaged ███ in conversation while Kane and Potts approached in a vehicle and shot ███ multiple times in the back and legs.  In response, ███'s associates returned fire from another vehicle and hit Maurice POLLOCK, a/k/a "Reese," and now-deceased MMP member Brian Johnson, a/k/a "Nutty B." ████████████████

████████████████████████████ ███ was hospitalized with multiple gunshot wounds, and a photograph of his injuries was introduced at trial.  *See* Gov. Ex. CS4-25.

On July 23, 2015, in a recorded telephone call, Adrian Jamal SPENCE told Jarmal HARRID what had happened at the BP gas station the previous night.  SPENCE explained that "there was a nig** out there with the jeans and shit" (referring to ███), and "Big Man" (*i.e.*, BAILEY) and them was tryin' to really fix him up," but "while they fixin' him up," the "nig*as that was with him" began shooting back and "hit Reese and Nutty."  SPENCE added: "It was basically a shootout, for real.  . . . Nig**s was really dumpin', for real."  SPENCE also advised HARRID that around ten minutes before the shootout, members of MMP had assaulted another individual, D.S., because he was selling drugs on their turf.  As SPENCE described it: "Nig**s knocked yo out.  Whole jaw was hanging in a big-ass puddle of blood."  *See* Gov. Ex. WIREG, Call G-232.

Between in July 2015 and April 2016, BAILEY attempted to recruit another inmate at the Baltimore County Detention Center to join MMP.  In undated papers recovered from the inmate's jail cell on April 8, 2016, BAILEY wrote: "The science behind being 25% Piru 75% MOB is a

**JA6829**

representation of our roots which is Piru & our bloodline which is Mafia.  EMM$ come before all.

M1 P2, I will murder you for Piru."  *See* Gov. Ex. GP11a.  BAILEY also recounted the history of

MMP, beginning with its creation on March 2, 2009, when "Bad Guy," who was an "OOOG of

TTP," set out "to separate the real brothers from the fake" after "the Don of Tree Top told the Feds

on his brothers."  *Id.*  BAILEY continued: "In 2010, Bad Guy & Wolf [BAILEY] finally reunited

in USP Lee County & the structure of the MOBB was put into effect. . . . Bad Guy & Wolf made

history together for the MOBB by smashing the New York & New Jersey Blood sets in USP Lee,

sending a message to the Bloods on the East Coast that we, Murdaland Mafia, run Murdaland."

*Id.*  BAILEY explained that by 2012, "Mobsters had taken over Greenmount and Ilchester, 27th

and Boone, Lauretta & Warwick, & a part of North & Pulaski."  *Id.*  BAILEY also wrote about

tattoos MMP members could earn: an "M" for "taking the Mafia oath," a lightning bolt for "killing

for the MOB," a "pink rose" for a "Mafia wife," a "badge of honor" for a "Made Man," a "wolf

imprint" for a "direct descendant of Werewolf, who has killed," or a "Mafia shield" for a "Capo

of the MOBB."  *Id.*

On August 10, 2015, a third party published a rap video and interview with BAILEY to the

social media website YouTube.  *See* Gov. Exs. YT14, TY14T.  The rap video featured BAILEY,

Jamal LOCKLEY, William JONES, Dwight JENKINS, William BANKS, and other MMP

members wearing items of red clothing and making gang signs at the intersection of Windsor Mill

and Forest Park.  In the interview following the rap video, BAILEY described his crew at Forest

Park and Windsor Mill, explaining: "You get out of line, you get ran over. ***We got teams for money***

***and murder***. . . We get money.  If y'all ain't doin' it, you get lost."

13

On August 14, 2015, in a recorded jail call, William JONES told Melvin LASHLEY that people were paying him respect in jail because of his membership in MMP. JONES said: "Nig\*\*s really respect our Mob in here . . . And the first thing they say is, 'Yo, you know that—what's that big nig\*\* name with the tattoos, yo? Gutta [*i.e.*, BAILEY]—that's him.' Nig\*\*s really scared of him." *See* Gov. Exs. J-28, J-28T.

On August 23, 2015, in a recorded jail call, a female MMP associate advised Adrian Jamal SPENCE that BAILEY was "sending threats and sh\*\*, talking about nig\*\*s got to give up $150 every week." *See* Gov. Exs. J-29, J-29T.

On September 29, 2015, Dontray JOHNSON murdered MMP member Brian Johnson, a/k/a "Nutty B," because he refused to pay gang dues JOHNSON was collecting for BAILEY. A few hours after the murder, JOHNSON visited BAILEY at the Baltimore County Detention Center and recounted what happened. In a recorded conversation, BAILEY approved the murder, saying "*I told you about this . . . Blow a fucking head off! Blow another nigga's head off! I said I'm through. . . . Don't play with 'em. Make 'em scared!*" *See* Gov. Exs. J-34, J-34T. JOHNSON assured BAILEY he would continue enforcing the gang dues and ordering MMP members to "*kick that money out*." *Id.* BAILEY instructed JOHNSON to "holler at Randy [BANKS] and tell him we raising the fourth generation. . . . *We going at everybody. . . . We ain't fu\*\*ing with nothing*." *Id.* BAILEY also promised to put together a list of "who is who" in the gang and give it to JOHNSON and Randy BANKS. *Id.* ▮▮▮▮▮▮▮▮ testified about the murder at trial. They explained that JOHNSON killed "Nutty B" because BAILEY had instructed him to kill anyone who did not pay gang dues.

14

On April 28, 2016, BAILEY and LOCKLEY armed themselves and went looking to retaliate against members of a rival drug organization they believed were responsible for killing MMP member Maurice Braham, a/k/a "Mookie."   BAILEY and LOCKLEY drove to the rival drug organization's territory, where BAILEY observed Anthony Hornes, who BAILEY suspected—wrongly—had been involved in Braham's murder.  BAILEY shot Hornes in the head, killing him.  LOCKLEY was the getaway driver.  ███████████████████████

███████████████████████████████████████████████████████████ the government presented cell site location data showing that the cell phones in use by LOCKLEY, BAILEY, ██████ were ██ in the vicinity of the murder at the approximate time of the murder. *See* Gov. Ex. CLSI2.  The government also played a recorded jail call from MMP member Darius Stepney, a/k/a "Conehead," to a co-conspirator on April 29, 2016, the day after the Hornes murder. During the call, the co-conspirator indicated that "Gutta [*i.e.*, BAILEY] and them" had committed the Hornes murder as retaliation for Braham's murder.  The co-conspirator even read a newspaper clipping about the murder, saying: "It say 4700 block of Haddon, 34-year-old Anthony Hornes of the 3800 block of Ferndale suffered from a gunshot wound, pronounced deceased by the doctors." *See* Gov. Exs. J-56, J-56T.

As it turned out, Hornes had nothing to do with the murder of Maurice Braham.  His wife reported that Hornes had spent the day at Yellow Cab training for a job and the evening at home with her and her children.  He walked to the store to buy cigarettes and never returned.  He was simply in the wrong place at the wrong time, gunned down in a senseless act of violence.

On May 3, 2016, Dante BAILEY and Tiffany BAILEY went to an indoor shooting range, where they purchased 150 rounds of ammunition and rented a Ruger .22 caliber firearm (serial

number 363-75990), a Springfield .45 caliber firearm (serial number MG500105), and a Beretta 9mm caliber firearm (serial number BER659285).  *See* Gov. Exs. SF8a-d, SF9a-c.  Dante BAILEY posted a video of himself firing one of the handguns to his Instagram account with the comment "ALMIGHTY LIFE [emojis of revolvers, explosions, 1000] BLACK BLOOD BROTHERHOOD."

On May 17, 2016, ATF agents executed a search warrant at Dante BAILEY's residence at 7607 Reserve Circle in Owings Mills, Maryland.  ATF agents recovered approximately 94 grams of heroin; letters between BAILEY and other MMP members discussing MMP business; an autobiographical screenplay featuring the members of MMP and describing acts of violence very similar to ones MMP members are known to have carried out; and a handwritten note containing the MMP oath and a list of disciplinary actions for "Level 1," "Level 2," and "Level 3" violations.  *See* Gov. Exs. GP12a-i.

In the early morning hours of August 10, 2016, Sydni FRAZIER and one or more co-conspirators abducted, bound, robbed, and murdered Ricardo Johnson, a/k/a "Uncle Rick," and then attempted to set his body on fire.  Later that day, FRAZIER fled from police and discarded the two murder weapons—a Smith & Wesson 9mm caliber firearm (serial number HAE0456) and a Taurus 9mm caliber firearm (serial number TJN73204)—as well as a pair of gloves that were found to have FRAZIER's DNA on the inside and the victim's DNA on the outside.  ▮ testified that BAILEY authorized Johnson's murder based on a belief that he was cooperating with law enforcement.  ▮ testified that FRAZIER carried out the murder because he wanted to rob Johnson of his drug stash.

On August 19, 2016, in a recorded jail call, BAILEY and LOCKLEY conspired to murder ▮ based on a belief that he was cooperating with law enforcement in a federal case against MMP Boss Adrian Jamal SPENCE.  *See* Gov. Exs. J-65, J-65T.  BAILEY called unindicted co-conspirator Michael Singer, a/k/a "Blizz," who was at a recording studio with LOCKLEY at the time of the call.  During the call, BAILEY advised LOCKLEY that ▮ was no longer "part of the team" because he was cooperating with law enforcement officers in a federal case against the gang.  BAILEY explained: "***Spittle [i.e., SPENCE] said, in his paperwork, that*** ▮ ***who they said is the CI***."  LOCKLEY reacted incredulously, saying, "***What?!***"  LOCKLEY then dialed a third party known as "Granny," who confirmed what BAILEY had said about ▮.  LOCKLEY told BAILEY, "***That's real, huh?***"  BAILEY replied "***Yeah.***"  BAILEY then directed LOCKLEY to send ▮ to Lamar Stephens a/k/a "M-Easy," who several witnesses testified was a known hitman for the gang.  LOCKLEY agreed, saying, "***Alright. Say no more.***"  BAILEY emphasized that ▮'s cooperation was "***still occurring now***" and "***this shit is not a game no more***." LOCKLEY said, "***Right***."  Singer piped up, saying he did not want ▮ to be killed at the studio because it would jeopardize his relationship with the studio's owners: "***I don't want nothing to go down at the studio yo because . . . that's gonna put this on the line.  I ain't even gonna lie to you with the people that own this place.***"  BAILEY agreed, saying, "***Nothing goes down at the studio***."

In the same conversation, BAILEY joked with LOCKLEY about the recent murder of Ricardo Johnson.  Specifically, BAILEY said, "I heard about your uncle"—a reference to Johnson, a/k/a "Uncle Rick."  LOCKLEY replied, "Oh yeah?"  This prompted hilarious laughter.  BAILEY added: "He was trying to catch the light rail"—a reference to the fact that Johnson's body had been found by the light rail tracks.  *See* Gov. Exs. J-65, J-65T.

17

**JA6834**

On or about September 29, 2017, BAILEY directed co-conspirator Kevin Forrest, a/k/a "Hollywood" to have ███ murdered because BAILEY believed (correctly) that ███ was cooperating with federal law enforcement against MMP.  BAILEY arranged for the hit by exchanging letters with a female inmate at Northern Neck Regional Jail.  During a search of the female inmate's jail cell, law enforcement officers recovered many of these letters, which were written in BAILEY's distinctive handwriting and signed by him.  In one letter, BAILEY wrote: "I need you to send a letter to Hollywood & give him this address [address redacted]. Tell Hollywood to give this address to Crazy. Tell him to tell Crazy to ███████████████."  *See* Gov. Ex. GP16a. ████████████████████  The address BAILEY provided was a known (former) address of ███'s.  "Crazy" is the known alias of Malik Thompson, who was identified by multiple witnesses (including ███) as a hitman for BAILEY.  BAILEY also provided the female inmate with Hollywood's legal name—Kevin Forrest—and the address of his residence in Baltimore.  *See* Gov. Ex. GP16b.  The evidence established that the letter was an instruction to Forrest to have Thompson kill ███ to prevent him from testifying in the case.

On October 2, 2017, the ATF executed a search warrant at Forrest's residence in Baltimore. ATF agents recovered three loaded firearms, roughly two hundred rounds of ammunition, Forrest's iPhone, and the "hit" letter from the female inmate at NNRJ.  *See* Gov. Exs. SW11a-z.  The hit letter stated: "Hollywood, How are you? My name is [name redacted]. Im Gutta's friend. I was told to give you this address [address redacted].  Give this address to Crazy & tell him to ███████ ████████████████"  *See* Gov. Ex. GP17.  As they were executing the search warrant, ATF agents observed that Forrest's iPhone showed a "missed call" from a contact saved as "Crazy Homey"—believed to be Malik Thompson, the intended hitman.  *See* Gov. Ex. SW11y.

18

Furthermore, a search of Forrest's iPhone revealed that he purchased one of the recovered firearms through a straw purchaser shortly after the hit letter was sent. *See* Gov. Ex. SW11z.

In an undated letter, BAILEY wrote to an unknown MMP member, advising him that he had "failed to follow the protocol" and that, "for the next 90 days I will keep a close eye on you." BAILEY went on to explain: "Everyone who says the Omerta Code is royalty. That is not for everyone anymore. When your cheeks get kissed, you become a Made Man. . . . You are a Made Man who runs his own table now. This means you need a U.B. [Under Boss], a Capo, & a LT [Lieutenant]. . . . Those 3 positions become Made Men also. You must kiss there [sic] cheeks. They must be able to spit the 2 M's." In a postscript to the letter, BAILEY wrote: "Fu** this case. No matter what happens, I'll still be a legend." *See* Gov. Ex. GP12b.

**C. Recent Criminal Activity**

BAILEY's criminal activity has continued unabated throughout his pretrial detention and since being convicted. He has attempted to obstruct justice, cause harm to witnesses, spur other gang members to violence, and run a drug smuggling operation in CDF. Not only has he failed to accept responsibility for his crimes, he has not shown any hint of remorse.

In a jail call on January 6, 2019, at 9:57 p.m., roughly nine weeks before trial was to begin, BAILEY instructed his wife and co-defendant Tiffany BAILEY to assault a woman he suspected of cooperating against him. BAILEY asked Tiffany to go online and find out where "Bino" (*i.e.*, MMP Boss Dontray JOHNSON) was being housed. BAILEY indicated that he wanted to get in touch with JOHNSON to discuss a suspected cooperator named █████████████████ ████████████████████████ (███ was not, in fact, a witness for the government.) BAILEY said he believed ████ was providing information about the murder of James Edwards

19

a/k/a "Bangout" because ▮ name appeared in the homicide file.  Tiffany told BAILEY the Bureau

of Prisons (BOP) website indicated JOHNSON was not in BOP custody yet, and his projected

release date was "11/20/2041."  Tiffany also mentioned that ▮ had been contacting her about

meeting up.  BAILEY instructed Tiffany to bring harm to ▮, saying: "***You should smack the***

***shit out shorty! You should smack [inaudible]!***"  BAILEY also stated that he would soon get the

rest of his paperwork, and, "***All those people who said anything—they can't hide no more***."  A

transcript of the relevant portion of this call is attached as Exhibit 1.

In a jail call April 28, 2019 at 6:33 p.m., three days before the jury verdict, BAILEY talked

to MMP Altoneyo Edges, a/k/a "Chicken Box," about smuggling drugs into the jail for him.  Edges

said his source had a "10-piece."  BAILEY asked why Edges could not get a "50-piece."  Later in

the call, Edges initiated a three-way call with Chiquetta Heath, a/k/a "Bandi."  Heath complained

that another MMP member named "Kev" was "rocking with" a female named "Flame" who was

threatening Heath and her children.  BAILEY became irate and said he would "handle" the

situation.  BAILEY then instructed Edges to initiate a three-way call with "Kev."  BAILEY

confronted "Kev" about Heath's accusation, saying: "***There's some broad that's supposed to be***

***looking for [Heath], and you're rockin' with the broad.  Is this true?***"  "Kev" denied that he was

"riding with the other side."  After "Kev" hung up, BAILEY expressed skepticism about "Kev's"

denial.  A transcript of the relevant portion of this call is attached as Exhibit 2.

In a subsequent call at 7:12 p.m., BAILEY reprimanded Edges for failing to come to

Heath's defense and take action against "Kev" and "Flame."  BAILEY instructed Edges to "***go***

***find [Kev], and show him how he in violation***."  BAILEY also instructed Edges to "look for" the

female who had been threatening Heath ("Flame"), saying, "***It's your obligation to fix her, to***

**JA6837**

*discipline her.*"  At other points in the conversation, BAILEY reminded Edges that they "*took a motherfucking pledge, they pledge[d] allegiance to something together*," and it was "*one of the major . . . rules*" to come to an MMP brother or sister's defense when threatened by an outsider. Edges told BAILEY he knew what BAILEY was saying but did not "*wanna say everything on the fucking phone*."  A transcript of the relevant portion of this call is attached as Exhibit 3.

On or about May 7, 2019, six days after BAILEY was found guilty, a jail missive or "kite" was intercepted from BAILEY to another inmate at the Chesapeake Detention Center (CDF) named Bernard Bey.  In the kite, BAILEY used coded language to tell Bey that he wanted to purchase a 7-inch strip of synthetic marijuana or "K2" for $100, and asked Bey to send him details about how to transfer the money via Cash App.  BAILEY also asked Bey to "send more" contraband, because he could "move it" in the jail.  A copy of the kite is attached as Exhibit 4.

On or about May 8, 2019, a reply kite was intercepted from Bey to BAILEY.  The kite included a long, thin strip of black paper soaked in liquid K2.  Bey gave BAILEY a phone number to call in order to provide the $100 via Cash App, and provided his pricing scheme for K2 in the jail.  A photograph of the kite and the K2 strip is attached as Exhibit 5.

Later that week, another kite was intercepted from BAILEY to Bey.  BAILEY requested that Bey send him more K2 because he had "people lined up" in the jail.  BAILEY added ominously: "Also, my brother said something about something as far as hollering at somebody. Let me know what you need and I got that…"  A copy of the kite is attached as Exhibit 6.

## II. DISCUSSION

### A.  Standard of Proof at Sentencing

Unlike a jury's verdict, which must be based on proof beyond a reasonable doubt, the standard of proof for findings of fact at sentencing is a simple preponderance of the evidence.  *See, e.g.*, *United States v. Grubbs*, 585 F.3d 793, 798–803 (4th Cir. 2009); U.S.S.G. § 6A1.3, Cmt. ("[U]se of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").  Furthermore, a sentencing court may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence.  *United States v. Watts*, 519 U.S. 148, 154 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."); *Rita v. United States*, 551 U.S. 338, 352 (2007) (noting that "many individual [Sentencing] Guidelines apply higher sentences in the presence of special facts," and "[i]n many cases, the sentencing judge, not the jury, will determine the existence of those facts"); *Witte v. United States*, 515 U.S. 389, 399–401 (1995); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 361 (1984); *Grubbs*, 585 F.3d at 798–800 (collecting cases).

### A.  Advisory Sentencing Guidelines Calculation

The relevant guideline for a violation of 18 U.S.C. § 1962(d) is U.S.S.G. § 2E1.1, which provides that the base offense level is the greater of 19, or "the offense level applicable to the underlying racketeering activity."  The application notes further explain: "Where there is more

**JA6839**

than one underlying offense, treat each underlying offense as if contained in a separate count of conviction." U.S.S.G. § 2E1.1, App. Note 1.

Here, the jury unanimously determined that murder, extortion, conspiracy to distribute drugs, distribution and possession with intent to distribute drugs, witness tampering, and witness retaliation were racketeering activities that were reasonably foreseeable to BAILEY in furtherance of the racketeering conspiracy. As described below, we calculate the guidelines slightly differently than they are calculated in the Presentence Investigation Report, but we ultimately end up in the same place: BAILEY's total offense level is 43+, and the advisory guidelines sentence is life imprisonment.

### 1.    Count 1/Group 1—Attempted Murder of ████

The base offense level is 33 pursuant to U.S.S.G. § 2A2.1(a)(1) because the object of the offense would have constituted first-degree murder. There is a 4-level upward adjustment under to U.S.S.G. § 2A2.1(b)(1)(B) because "the victim sustained permanent or life-threatening bodily injury." As discussed above, ████ was shot numerous times in the head and torso at close range with a .45 caliber firearm. There is another 4-level upward adjustment pursuant to U.S.S.G. § 2A1.5(b)(2) because the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder. ████████████████████████████████ ████████████████████████████ Finally, there is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct. As discussed above, the government proved that BAILEY

directed the murder of ███ on August 19, 2016, and directed the murder of ███ on September 29, 2017, because he believed (correctly) that ███ and ███ were cooperating with federal law enforcement officers against MMP.  Based on this evidence and other evidence, the jury unanimously determined that witness tampering and witness retaliation were reasonably foreseeable racketeering activities to BAILEY.  The adjusted offense level is **43**.

### 2.   Count 1/Group 2—Murder of Antoine Ellis, a/k/a Poopy

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.  There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level for this group is **45**.

### 3.   Count 1/Group 3—Murder of James Edwards, a/k/a Bangout

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.  There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level for this group is **45**.

### 4.   Count 1/Group 4—Attempted Murder of ███

The base offense level is 33 pursuant to U.S.S.G. § 2A2.1(a)(1) because the object of the offense would have constituted first-degree murder.  There is a 4-level upward adjustment under

to U.S.S.G. § 2A2.1(b)(1)(B) because "the victim sustained permanent or life-threatening bodily injury."   As discussed above, ██ was shot numerous times in the back and legs and was hospitalized with serious injuries.  There is also a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level is **37**.

### 5.    Count 1/Group 5—Murder of Anthony Hornes

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.  There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level for this group is **45**.

### 6.    Count 1/Group 6—Murder of Ricardo Johnson, a/k/a Uncle Rick

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.  There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level for this group is **45**.

### 7.   Counts 1 & 2/Group 7—Drug Trafficking

The base offense level is 30 pursuant to U.S.S.G. § 2D1.1(c)(5) because the jury found that it was reasonably foreseeable to BAILEY that at least 1 kilogram of heroin and 280 grams of crack cocaine would be distributed in furtherance of the drug trafficking conspiracy, and combining these quantities using the drug equivalency tables results in approximately 2,000 kilograms of "converted drug weight."

There is a 2-level upward adjustment pursuant to U.S.S.G. § 2D1.1(b)(1) because a dangerous weapon was possessed.  There is another 2-level adjustment pursuant to U.S.S.G. § 2D1.1(b)(2) because the defendant used violence, made a credible threat to use violence, or directed the use of violence.  There is a further 4-level upward adjustment pursuant to U.S.S.G. § 3B1.1(a) because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  Finally, there is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level is **40**.

### 8.   Total Adjusted Offense Level for All Groups

The total offense level for Group 1 (43), Group 2 (45), Group 3 (45), Group 4 (37), Group 5 (45), Group 6 (45), and Group 7 (40) is **50**.  *See* U.S.S.G. §§ 3D1.2, 3D1.3, 3D1.4, 5G1.1.  As noted in the Presentence Investigation Report, there are other groups of racketeering activity—for instance, the attempted murder of three men at the BP gas station on February 8, 2015 (PSR ¶¶ 98–103), the conspiracy to assault an inmate as retaliation for cooperating with law enforcement on

26

July 21, 2015 (PSR ¶¶ 104–109), the conspiracy to murder ███ on August 19, 2016 (PSR ¶¶ 110–115), and the conspiracy to murder ███ on September 29, 2017 (PSR ¶¶ 116–121).  However, none of these groups impact the total offense level because they are all nine or more levels less serious than the most serious group under U.S.S.G. § 3D1.4.

### 9.   Count 3—VICAR Murder of James Edwards, a/k/a Bangout

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.  There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level for this group is 45.

### 10.   Count 17—Possession of Firearms by a Felon on May 3, 2016

The base offense level is 20 pursuant to U.S.S.G. § 2K2.1(a)(4)(A) because BAILEY committed the instant offense subsequent to sustaining one felony conviction for a crime of violence, specifically, Robbery with Deadly Weapon in Baltimore City Circuit Case No. 597120012.  This group does not impact the total offense level because it is nine or more levels less serious than the most serious group under U.S.S.G. § 3D1.4.

### 11.   Count 18—Possession with Intent to Distribute Heroin on May 17, 2016

The base offense level is 22 pursuant to U.S.S.G. § 2D1.1(c)(9) because the offense involved at least 80 grams but less than 100 grams (specifically, approximately 94 grams) of heroin.  This group does not impact the total offense level because it is nine or more levels less serious than the most serious group under U.S.S.G. § 3D1.4.

**12.   The Defendant is Not Entitled to a Downward Adjustment for Acceptance of Responsibility**

Although defense counsel argues that BAILEY has accepted responsibility, it is completely belied by his conduct.  As recently as August 20, 2019, he denied having any involvement in the murder of James Edwards in a publically filed letter.  *See* Exhibit 7.  Furthermore, as discussed above, from the date of his incarceration in this case up until at least May 2019, BAILEY continued to engage in the same pattern of racketeering activity—attempting to bring harm to witnesses and rivals, obstructing justice, and trafficking dangerous drugs in the detention facility where he was housed.  There can be no doubt that he has not accepted responsibility as is required by U.S.S.G. § 3E1.1.

**13.   Criminal History Category**

The government agrees with U.S. Probation that BAILEY is in criminal history category V with 12 criminal history points.

**14.   Guidelines Ranges and Statutory Maxima**

The government's position is that the total offense level for Counts 1, 2, 3, 17, and 18 is **50**, resulting in a total punishment of **life imprisonment**.  *See* U.S.S.G. §§ 3D1.2, 3D1.3, 3D1.4, 5G1.1.  The applicable guideline for Count One (50/V) is **life imprisonment**.  The applicable guideline for Count Two (40/V) is **360 months to life imprisonment**.  The applicable guideline for Count Three (45/V) is **life imprisonment, and this sentence is mandatory by statute**.  The applicable guideline for Count Seventeen (20/V) is **63 to 78 months imprisonment**, and the statutory maximum is **10 years**.  The applicable guideline for Count Eighteen (24/V) is **92 to 115 months imprisonment**, and the statutory maximum is **20 years**.

**JA6845**

**B.  Count Three Carries a Mandatory Life Sentence**

Contrary to defense counsel's arguments, murder in aid of racketeering carries a mandatory

sentence of death or life imprisonment.  The statute provides, in relevant part, that an individual

convicted of such a murder "shall be punished . . . by death or life imprisonment, or a fine under

this title, or both."  18 U.S.C. § 1959(a)(1).  In *United States v. Under Seal*, 819 F.3d 715, 717 (4th

Cir. 2016), the Fourth Circuit held that violations of § 1959(a)(1) "carr[y] a mandatory statutory

penalty of either death or life imprisonment."   In doing so, the Court grappled with and rejected

the exact argument defense counsel advances.  The Court reasoned:

> As § 1959(a)(1) reflects, a person convicted of murder in aid of racketeering is also
> subject to a fine. However, we do not believe Congress intended a fine to be a stand-
> alone penalty for committing this offense.  Rather, we agree with the Second
> Circuit's analysis in *United States v. James*, 239 F.3d 120 (2d Cir. 2000), which
> observed that it would be "deeply problematic" for Congress to have authorized a
> penalty of a fine only as an alternative to "death or life imprisonment," and that this
> cannot have been what Congress intended.  As such, the better construction of this
> statute is that it authorizes a fine in addition to either "death or life imprisonment."
> *Id.* at 126–27; *see also United States v. Mahdi*, 598 F.3d 883, 897 n. 13 (D.C. Cir.
> 2010) (reaching this same "common sense conclusion").

*Id.* at 717 n.5.  As noted in the Fourth Circuit's opinion, the Second Circuit and the D.C. Circuit

have reached the same conclusion.  *See also United States v. Rollness*, 561 F.3d 996, 997–98 (9th

Cir. 2009) (joining the Second and D.C. Circuits in holding that § 1959(a)(1) imposes a minimum

term of imprisonment of life for VICAR murder).  The government is not aware of any Circuit

Court that has reached a different result.

It is misleading to suggest that Judge Bredar ruled that § 1959(a)(1) gives the sentencing

court authority to impose a sentence other than death or life in prison.  When Judge Bredar made

the comments quoted in defense counsel's memorandum, he had not yet been pointed to the Fourth

Circuit's decision in *Under Seal*.  When made aware of the ruling, Judge Bredar stated that it was

"generally a safe strategy" to follow Fourth Circuit precedent and that he would "look at the case." ECF 1312-4, at 34–36.  Because Judge Bredar found that life imprisonment was the appropriate sentence under 18 U.S.C. § 3553, it was not necessary for him to decide whether § 1959(a)(1) permitted any other result.  His ruminations on the matter are classic dicta.

In any event, even if the plain language of the statute permits imposition of a fine instead of a sentence of death or life imprisonment, it does *not* permit the result defense counsel is seeking—*imposition of a term of years less than life*.  The three options would be: (a) death, (b) life, or (c) a fine.  There is no fourth option.  No judge, including Judge Bredar, has ever found that there is.  For all these reasons, the Court should reject defense counsel's request that the Defendant be sentenced to a term of imprisonment of 40 years on Count Three.

### C.  Analysis of Factors Under 18 U.S.C. § 3553

It is hard to imagine more serious conduct, a more violent defendant, and a more compelling need for protecting the public and promoting respect for the law.  Dante BAILEY founded and led a brutally violent street gang that was responsible for at least five murders, six attempted murders, and multiple additional conspiracies to commit murder, assaults, extortion, witness tampering, and witness retaliation.  Its members built an economy based wholly on the trafficking of deadly drugs.  And to protect that way of life, they threatened and intimidated those who would testify against them.  Through these activities, MMP devastated neighborhoods in Northwest Baltimore.  They left grieving families and wounded victims in their wake.  They intimidated witnesses and profited from the scourge of addiction.  Individually and as a group, they acted without regard for human life and with contempt for our system of justice.  They left behind a legacy of fear, misery, and contempt for the rule of law.

No lawyer's rhetoric can capture the seriousness of BAILEY's crimes.  The evidence, however, speaks for itself.  By the time it imposes sentence, the Court will have presided over twenty guilty plea hearings, twenty-one sentencings, and six weeks of trial, during the course of which dozens of victims, co-conspirators, investigators, experts, and ordinary citizens have exposed the truth about BAILEY and MMP.

The truth is that BAILEY relished his role as the leader and shot-caller of MMP.  He fully embraced MMP's culture of murder and obstruction of justice.  He wanted nothing more than to gain notoriety as a dangerous crime boss.  He ordered members of MMP to commit murders in order to retaliate against rivals, eliminate potential informants against the gang, and impose discipline within the gang.  He committed murders with his own hand.  He distributed large volumes of heroin and crack cocaine in the gang's territories in Northwest Baltimore.  He bragged about how he was able to cash in on addiction and suffering—referring to his customers as "junkies" and "fiends."  He indoctrinated a generation of youths from his neighborhood into a life of crime and senseless violence.  After he was arrested, he continued to conduct the gang's affairs from behind bars, ordering hits on rivals and witnesses, and plotting various ways to obstruct justice.  He has showed absolutely no remorse for his offenses and no intention of stopping his criminal activity.  He continues to present a grave danger to the public.

BAILEY has a long and extremely serious criminal history that runs the gamut of drug crimes, violent crimes, property crimes, and handgun offenses.  He has Maryland state convictions for Possession with Intent to Distribute Cocaine in 1994 (as a juvenile); Handgun Wear/Carry in 1995; Reckless Endangerment in 1996; Robbery with a Deadly Weapon and Handgun on Person in 1997; Second Degree Assault in 2002; and Deadly Weapon Conceal in 2002.  BAILEY also has

a previous *federal* felony conviction.   On November 5, 2004, BAILEY was convicted of possession of a firearm by a convicted felon in the United States District Court for the District of Maryland (Case No. WDQ-05-0254) and sentenced to 86 months in prison.   The stipulation of facts in the plea agreement indicates that on March 2, 2004, BPD officers were in the 5200 block of Windsor Mill Road when they were notified by several people that BAILEY was in the playground of Dickey Hill Elementary School assaulting a woman.   The officers responded to the school and observed BAILEY standing in the playground and a woman, approximately 10 yards away, crying.   BAILEY resisted a command to place his hands over his head and fled from the officers.   As he fled, he pulled out a loaded 9mm caliber pistol.   He was apprehended when he tripped and fell, dropping the firearm.

BAILEY attempts to excuse away these crimes in his sentencing letter of August 20, 2019, blaming them on a childhood trauma, abuse, and lack of positive role models.  *See* Exhibit 7.   But this description is at odds with a letter he wrote to U.S. District Judge William D. Quarles, Jr. on January 13, 2011, in which he advocated for a concurrent sentence designation for his federal firearm conviction. In that letter, BAILEY acknowledged that he had been raised in a loving, middle-class family, and had even benefitted from private school education.   He wrote:

> I don't hail from a poverty-stricken family.  My entire immediate family on my mother's side are of the middle class. I was raised to be a productive citizen in the African American society. I was put through private education & I am a devout Christian.  I continue to have the support of a loving family, but it took me years to understand & comprehend that.  Because of my actions, treading the wrong path, I am in prison today.  The decisions I made are the things that got me here, no one else's.  Today I acknowledge that & I want to apologize to society, my family, my friends & most of all those that I have hurt during my path of destruction.  I repent.

*See* Exhibit 8.

Notwithstanding his expressions of remorse to Judge Quarles in 2011, almost as soon as BAILEY was released later that year, he began recruiting people to join MMP and engaging in the pattern of murder, extortion, drug tampering, witness tampering, and witness retaliation that landed him here today. Based on BAILEY's history, the Court should harbor no illusion that a message of specific deterrence has any hope of reaching him. Instead, the Court should focus on the other goals of sentencing—protecting the public and deterring similar crimes by others. Only a sentence of life will protect the public from future violent crimes by this defendant. Only a sentence of life will send the message that this level of brutal, senseless violence will be met with the most serious of sanctions.

### III.    CONCLUSION

The government respectfully submits that a sentence of life imprisonment is necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553, namely, (1) to reflect the seriousness of the offense, leadership of a violent gang and participation in numerous murders, shootings, and the distribution of deadly drugs; (2) to afford adequate deterrence for criminal activity that has a devastating impact on the community; and (3) to protect the public from a defendant with a very serious criminal history and high likelihood of recidivism.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:  _____/s/_____
      Christina A. Hoffman
      Lauren E. Perry
      Assistant United States Attorneys
      36 S. Charles St., Fourth Floor
      Baltimore, Maryland 21201

33

**JA6850**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 30, 2019, a copy of the foregoing Government's

Sentencing Memorandum was served electronically to the Clerk of the United States District Court

using CM/ECF, and sent via e-mail to:

Teresa Whalen and Paul Enzinna,
Counsel for the Defendant

_____/s/_____ _____
Christina A. Hoffman

**Jail Call Transcript**

**Date & Time**:          January 6, 2019 at 9:57 p.m.

**Inmate**:               Dante Bailey (Northern Neck Regional Jail)

**Dialed #**:             (770) 595-9760 (Tiffany Bailey)


@ 1:11

D. Bailey:    What's the nigga's name on Facebook?

T. Bailey:    Who?

D. Bailey:    The nigga ██████████.

T. Bailey:    Hold on. [long pause] It's um, his name.

D. Bailey:    His real name?

T. Bailey:    Yeah.

D. Bailey:    The █████ [long pause]

T. Bailey:    Didn't you say he told?

D. Bailey:    Huh?

T. Bailey:    Didn't you say he told?

D. Bailey:    I can't hear you.

T. Bailey:    Didn't you say he told?

D. Bailey:    Huh?

T. Bailey:    Didn't you say he told on you?

D. Bailey:    Told on who?

T. Bailey:    You.

D. Bailey:    Yeah. I don't know. I think everybody told. Fuck ya mean?  I mean . . . that's what I'm about to find out.

T. Bailey:    Do you think he's gonna say yeah I did?

D. Bailey:    He can't have no opportunity because I'm gonna get the paperwork, like, I'm a get the paperwork. He can't say no. I'm tryin' to get a fair chance to find out what he said to prepare me, to be in a better situation. If he did do it, there's no way possible for him to say that he didn't. . . . [unintelligible]. The ██████, his name's in it now. A nigga can't play those games no more, 'cause it's all about to

**JA6852**

come out. . . . Just like with ▮▮▮▮▮▮▮▮. I told Bino to holler at her, ask her what the fuck, what did she say. 'Cause I just ran across, in the uh, Bangout little file that they got, all the way in the back of it, it's a jump with her name. And then there's a [unintelligible], but it's all redacted, that mean it's all black, and it won't reveal it. When it's all black, that means it won't get revealed until two weeks before trial, and that means they was telling. They said something incriminating, like they cooperating.

T. Bailey:  Who, the wife?

D. Bailey:  No, ▮▮▮.

T. Bailey:  Who?

D. Bailey:  ▮▮▮!

T. Bailey:  Oh.

D. Bailey:  That's why she was so adamant about saying you was hot. Cause she did some goofy shit. That's probably when she did it, though!

T. Bailey:  Naw, she did it before that. She did it when they came to her house and picked her up.

D. Bailey:  Yeah! When'd they do that, though? I ain't know they did that.

T. Bailey:  Yes you did. [pause]

D. Bailey:  Yeah.

T. Bailey:  Yeah. [unintelligible]

D. Bailey:  Huh?

T. Bailey:  [unintelligible]

D. Bailey:  Yeah. [pause] I told her, I mean I told Bino, like, ask her like what she said. 'Cause it's about to come out if she said something. If she did, let me know, so I can be prepared. Cause it's about to come out. There ain't no more hiding. But then they rolled him out, [unintelligible] some motherfucking way.

T. Bailey:  He what?

D. Bailey:  Oklahoma, I don't know where he going. Matter of fact, look on the jump to see if he got wherever he was going.

T. Bailey:  Hold on. Shit.

D. Bailey:  Yeah, see, all the motherfuckers, all the people who said anything, they can't hide no more. And, I even see her name, I know they had to go get her because her

name is too frequent.  Like, they got a whole list in this file, of all types of people.  And that's just [unintelligible].

T. Bailey:      Mm-hmm. [pause]  Dontray Johnson?

D. Bailey:      Yeah.

T. Bailey:      He 33?

D. Bailey:      Yeah.

T. Bailey:      Man, he ain't gonna get out until 11/20/2041.  Not in BOP custody.

D. Bailey:      Yeah, it must ain't update. Cause he in Oklahoma.  He just uh, Wednesday. So it'll probably update tomorrow.

T. Bailey:      That's why she's so adamant, talking about she's coming down here to see her sister, which is what's his name's baby mama, and she wanna see me and Almighty.  Girl, we not friends.

D. Bailey:      Who?

T. Bailey:      Her.

D. Bailey:      Who's baby mother?

T. Bailey:      Uh, Bangout's baby mama.  Oh, yeah.

T. Bailey:      Yeah, we not friends. Yeah, alright, yeah, you can see me.

D. Bailey:      Yeah.  Slap the shit out her!

T. Bailey:      I ain't gonna be the one to see her.

D. Bailey:      Yeah, you should smack the shit out her!  You should smack her [unintelligible].

T. Bailey:      [unintelligible]

D. Bailey:      I should have let Dinka trash her some more.

T Bailey:       That girl felt like she controlled the world. I don't know why she thought she was the boss. I don't know who she thought she was.  She thought she was a bad one.

**Jail Call Transcript**

**Date & Time**:          April 28, 2019 at 6:33 p.m.

**Inmate**:          Dante Bailey (using inmate account of Marquise McCants) (CDF)

**Dialed #**:          (240) 553-4046 (Altoneyo Edges, a/k/a Chicken Box)

**Other Participants**:  Chiquetta Heath, a/k/a "Bandi"; "Pick," and "Kev"


@ 1:11

Bailey:          Hello.

Edges:          His mother say she ain't coming all the way over here.

Bailey:          Alright.  That's even better for me.

Edges:          She only has a 10-piece anyway.

Bailey:          I was trying to get as many as possible cause this the last, know what I mean, bop bop bop.  I don't know why [unintelligible] 20.

Edges:          Who's got 20?  I already had 20, didn't I?

Bailey:          Yeah, but I'm talking about I don't know why you didn't get a 50-piece.

Edges:          He only had that, though!


@ 7:35

Edges:          I'm about to call Badgirl.

Bailey:          Alright.  For what?  [pause]

Heath:          Hello?

Edges:          What's Lady G's number?

Heath:          I texted it to you already, dummy!

Edges:          No you didn't.

Heath:          I just text it to you in a text message, yes I did.

Edges:          Oh.  This Gutta right here.

Bailey:          Hey baby.


**JA6855**

@ 11:08

| | |
|---|---|
| Bailey: | What's goin' on though? |
| Heath: | Well some bitch—what's her name? |
| Edges: | [unintelligible] |
| Heath: | Not Raze, Flame. Some bitch named Flame was mad that I had Tracy [unintelligible] at my house, talkin' about [unintelligible] and all this other shit, and I shouldn't be rolling with her. And then her and Kev, they like are [unintelligible] or something 'cause they were [unintelligible]. |
| Bailey: | I can't hear you, what you say? |
| Heath: | I didn't know that she was looking for me. Like, I didn't know the bitch wanted smoke, like she threatening my kids and everything, and I'm just like bitch who are you? I don't even know you. |
| Bailey: | So what I gotta holler at Kayo for? |
| Heath: | 'Cause he'll tell you more about who [unintelligible] He was like niggas really mad, like [unintelligible]. And he just told me that recently. The politics that you was talking about is about me. Get what I'm saying, that you telling me to shut up about, that I can't because it's about me. And then you supposed to be like with me, I don't get that. Niggas is telling you half-assed stories. I don't like that shit. |
| Bailey: | Hey listen, I don't know what you talkin' about. |
| Heath: | The simple fact that it's not me out here tweakin and geekin, these niggas is. |
| Bailey: | What niggas yo? |
| Heath: | The nigga with all the missing teeth in his mouth [unintelligible]. |
| Edges: | [laughing] |
| Heath: | It ain't fucking funny, Box, 'cause that's your man. |
| Edges: | No [unintelligible] |
| Heath: | Didn't he say point blank [unintelligible]? |
| Edges: | I said he was out of order. I said he was out of order. |
| Heath: | [unintelligible] That was totally out of order, that was just disrespectful! |
| Bailey: | Alright now, what happened? |
| Heath: | That was just, I couldn't imagine somebody on the phone talking about one of my brothers like that. |
| Bailey: | Alright what you talking about? |

Heath:      Like I don't care how [unintelligible]

Edges:      He still upset 'cause you called him a hot nigga.

Heath:      Listen, you know why I called him a hot nigga, 'cause he was acting like one! I
            was ready to pat his ass down to see if he was wearing a wire!  Fuck you talking
            about.

Bailey:     What you all talking about though, yo?  What you all be doing that in public?

Heath:      Alright so listen. Fuck no, hell no. No, no, listen. Hell no. What's gonna happen
            to him is gonna definitely probably be in…  Listen, don't you know the nigga
            who got his teeth knocked out of his head?

Edges:      They didn't get knocked out.

Heath:      They got knocked the fuck out, trust me, I know.

Edges:      [unintelligible]

Heath:      Anyway, you remember that nigga, right?

Bailey:     Yeah.

Heath:      So the girl supposed to have been on my ass.  He knew about it, and he said fuck
            me, and he said he knew about the bitch tryin' to do something to me, and he
            rockin' with shorty.

Bailey:     Damn. Oh yeah?

Heath:      Yeah. I swear on my damn life, I swear to god, yo was on the phone excited. Like,
            man fuck her.  That bitch on her ass.  She know what I know, she better run.  Like
            he was [unintelligible].  Am I lying, Chicken Box?

Edges:      No, you ain't lying.

Bailey:     So why you all ain't take care of that?

Edges:      I got on him though.

Bailey:     You got on him?

Heath:      Listen, this is what I'm saying.  [unintelligible] They was just with him last night.

Bailey:     Alright, I'm a take care of it.  Listen, alright, stop talking. It's alright, don't worry
            about it.  Where Pick at?


@ 19:15

Bailey:     Chick

**JA6857**

Edges:      Yeah

Heath:      Let me tell you [unintelligible]

Bailey:     Naw, that even important. The important part is that a nigga that supposed to be—
            lemme take care of this, yo.  Lemme speak to Pick, yo.


@ 20:20

Bailey:     Alright we ain't gonna talk about—alright, what I need you to take care of right
            now is this situation with the bro.

Pick:       What bro?

Bailey:     Kev. Call Kev right now, uh, Box.

Edges:      Alright.

Bailey:     You need to get out the room with your girl.

Pick:       I ain't in the room.

Bailey:     Alright.

Kev:        Hello?

Bailey:     I need you to give me your understanding of the situation between you and your
            your sister.  Where you at first of all?

Kev:        You saying me and my sister?  I'm on the Avenue.

Bailey:     What you in the house?

Kev:        Naw I'm on my way to the house.

Bailey:     I need to holler about you about a situation.  I need you to give me a
            understanding of the situation between you and Bandi.

Kev:        It ain't really no situation.  She called me something I ain't never been called
            before.

Bailey:     I ain't talkin about that. I ain't talkin about that. I'm talking about the situation
            with the broad. There's some broad that's supposed to be looking for her, and you
            rockin' with the broad.  Is that true?

Kev:        You talkin' about the [unintelligible]?

Edges:      Naw, the bitch uh—

Bailey:     No, some female.

Edges:      The bitch Flame.

**JA6858**

Kev:        Yeah, yeah, that's who, yeah.  I don't know nothing about directly what happened.  You talking about somebody, a female?

Bailey:     No I'm talking about, is it true that you said you rockin' with the female against your sister?

Kev;        No, no, hell no. No, no, no, no, no, no. That's not true. I can't stand her fuckin' guts, but I ain't never riding with the other side.  Don't even—come on, bro. Even though I get in my feelings sometimes. But no, hell no. Come on, bro.

Bailey:     Alright.

Kev:        I know what you saying, but hell no. No.

Bailey:     Alright.

Kev:        That ain't gonna never happen.  I ain't gonna never put my—can't stand her but hell no.  That'd be—

Bailey:     Alright bro.  Heartbeat.

Kev:        Alright, Doubletime. [hangs up]

Bailey:     Hey, Box.  Alright, what you was saying? What you say, when you was just agreeing with Badgirl, you was just agreeing with her that he did say he was rocking with the bitch?

Edges:      I ain't heard rocking, he say yeah I fuck with her, she say she gonna fuck Bandi up. He ain't say like he was going to bank her or nothing.

Bailey:     I ain't said he say he was gonna bank her.  But he say he fuck with a bitch who say she gonna beat up his sister?

Edges:      Yeah, he said that.

Bailey:     And he was, and he would allow that?

Pick:       Yeah.

Edges:      Yeah.  Pick was on the phone too.

Pick:       Yeah he said it like [unintelligible].

Bailey:     I'm asking you, Box.

Edges:      I said yeah. I mean, yeah.

Bailey:     So you saying that he said that he was rocking with a broad that wanted to fight Bandi, and like he fucked with her?

Edges:          No he said, he be rocking, he fucked with, he be rocking with her, and she looking
                for Bandi, and he don't give a fuck, because she called him a rat, so he say he
                don't give a fuck.

**Jail Call Transcript**

**Date & Time**:          April 28, 2019 at 7:12 p.m.

**Inmate**:               Dante Bailey (using inmate account of Tariq White) (CDF)

**Dialed #**:             (240) 553-4046 (Altoneyo Edges, a/k/a Chicken Box)

**Other Participants**:  "Pick"


@ 1:45

Bailey:     Man yo, I don't understand that shit.  So that's how y'all are rocking?

Edges:      Naw it ain't like how Bandi put it.

Bailey:     Fuck what Bandi saying, is that how y'all are rocking?  Fuck what she saying. It ain't involve her.  It involve you, Scar, and Pick. That's it. You heard him say—

Edges:      He say he rocking with her.

Bailey:     Alright! That's all that—

Edges:      Naw, he ain't say like he rocking with her like to get Bandi.  That's what she trying to put it.  He say yeah I'm rocking with her [unintelligible]—

Bailey:     Alright, well—

Edges:      He ain't put it on [unintelligible] that she looking for her or none of that.

Bailey:     Alright, but he said he rocking with the bitch, and she better look out because the bitch looking for her. That means he know the bitch looking for her!  How he know?  Cause she told him!

Edges:      Yeah.

Bailey:     Alright, all I'm saying to you is.  So you telling me, fuck this Bandi.  Say it's you, and he tell you—that's how I look at life.  ***I don't give a fuck if they arguing. Niggas took a motherfucking pledge, they pledge allegiance to something together.  It don't matter if they hate each other.***  Because the overall bigger picture is the one thing.  Now, imagine him telling you that, how you would feel. Yeah, I'm rocking with this nigga, and he on your ass.

Edges:      I'd be fucked up.

Bailey:     What you mean you'd be fucked up?  I ain't talking about no regular life. You ain't livin' no regular life. That's what you all fail to realize. I'm tired of this shit.

Edges:      ***I don't wanna say everything on the fucking phone. I know what you saying. But I don't wanna say everything on the phone.***

1

**JA6861**

Bailey:   But you already hip to this situation, why the fuck do I gotta, it gotta get to me? Like you know the—

Edges:    Everybody don't be around at one time, that's what I'm saying.

Bailey:   What you mean, yo. But you can go look for him.  What you talking about?

Edges:    Oh alright.

Bailey:   Niggas can go look for him.

Edges:    [unintelligible]

Bailey:   Yeah, it gotta be!

Edges:    Alright, say no more.  Say no more.

Bailey:   Like you talk like—y'all are crazy.  **But it don't have nothing to do with Bandi. That's what I'm saying.  I don't want him to think that.  Like a motherfucker taking her side over his side.  No.  It's the rules! That's one of the major— that's the rules, yo!**  How the fuck you gonna tell me—that's like telling me, I'm rocking, yeah, yo on your ass boy … that's like me telling you, yeah, yo on your ass nigga, and I fuck with yo.

Edges:    I got you.

Bailey:   How the fuck a nigga. That means if the nigga told me he was on your ass in front of my face and I ain't even do nothing, and you supposed to be my bro.

Edges:    Yeah, you right.

Bailey:   That shit don't make no sense.

Edges:    Want me to call Pick back?

Bailey:   No, you can talk to him yourself, yo.  Yeah call Pick on his phone, 443-744-8075.

[pause]


@ 9:00

Bailey:   Pick, listen, yo.  **Niggas need to, you need to go find yo, and show him how he in violation.**  Explain to him because I don't want it to seem like, that he's in violation, and I don't want it to seem like it's over Bandi.  It's about—he's in violation because if he did that with anybody.

Pick:     Yeah, I know.

Bailey:   That's anybody. It ain't just because of her.  It's anybody. **If he say he rocking with someone else, or he fucking with somebody, and somebody told him that**

2

**JA6862**

*they wanna do something to one of his brothers or sisters, and he still fuck with him, then he in violation.*

Pick:      Yeah. That's—I know.

Bailey:    So he need to understand why he in violation and he need to learn not to do that again.

Pick:      Already.

Bailey:    And then now we need to address the situation of who the fuck is Flame?  Who the fuck is this Flame?

Pick:      I don't know.

Bailey:    ***Y'all need to be looking for her.  Y'all need to look for her! Y'all need to look for her!***

Pick:      ***Alright, say no more.***

Bailey:    I ain't even supposed to have to take care of this shit. I'm in the joint, I might even get life in the penitentiary, and I still need to take care of shit in the streets? If niggas ain't active, they ain't active, it's over.  If you active, this is what it is. This is the shit that come with it.  ***How the fuck is a bitch in the street talking about what she gonna do, and ain't nobody looking for her?***

Pick:      Nobody know who she is except Bandi.

Bailey:    Okay so then that's who you need to talk to.  I don't care if it's just to burn down on her, yo who the fuck is you?  We them niggas, yo.  Fuck y'all forgot?  That's why I'm telling you, ***Box, you gotta turn, you gotta sit down and make a plan about how you gonna make your brothers look good again.***  It's not up to me, I'm in here.  You in position to do so, dog.  Cause motherfuckers is thinking niggas is anything.  Like don't nobody play like that.  How the fuck is—yeah, I'm looking for Bandi.  Who the fuck gonna tell another I'm looking for Bandi, I'm a smash that bitch, and you talking to another nigga that's the same thing as her? Come on, yo.  That don't make sense.  That means' that all y'all bitches.  Y'all don't see that?  That means they think that all y'all whores.  Ain't no respect. Yeah, I'm gonna smash that bitch, I'm gonna crush that bitch.  Do y'all realize, I don't give a fuck how dirty the bitch talk out her mouth.  ***It's your obligation to fix her, to discipline her, and make her understand her wrong.***  But do you understand, when a motherfucker think he can say fuck any of y'all, ***if they think they can disrespect one of y'all, that means they don't have respect for none of y'all.  Do you understand that?***

Edges:     Yeah.

Pick:      Yeah.

3

**JA6863**

@ 13:53

Bailey:     I ain't lose my life for this shit for it to be like that, yo. Hell no, man! Hell no, man! ***I don't give a fuck if it's only ten of y'all, five of y'all. Everybody need to be looked like, niggas need to be respected.***

@ 15:08

Bailey:     It ain't even no presence or nothing.  Like you talking about the nigga Slink talking about y'all relaxed, like it's a joke.  I remember that nigga used to be scared as shit when I come around!  I remember he didn't even have nowhere to go. He wanted to be down bad as shit. Fuck no. You're lucky you used to come around your own neighborhood.  We allowed that.  We allowed him to stay in his own neighborhood.

@ 19:25

Bailey:     Y'all need to handle the situation the right way.  That's all the advice I can give you.  But I need to see some type of growth and development, because I ain't losing my life for that shit to be going like that.  Fuck that, y'all niggas crazy. Like y'all don't know what the fuck goin' on.  ***That's my sister yo, y'all supposed to protect shorty at all cost.***

4

**JA6864**

T.B.,

I want to send you some Bread For That. I know you say The 7 inches For The Hondon. Send That & The # pp. Aus send more, cuz I can move it.

G☆

☆ we lost ☆

I'm good

JA6865



JA6866

That #, nebody ever answers, so I got The Buck For you, plus I got A Few Hundred more. Send me something And A good # where The Bread goes & I will get it Their ASAP. Send me I got People lined up. Let me handle over here.

Also, my brother said something about something As Far as Hollering at somebody. Let me know what you need and I got That....

**UNITED STATES DISTRICT COURT**
DISTRICT OF MARYLAND

CHAMBERS OF
CATHERINE C. BLAKE
UNITED STATES DISTRICT JUDGE

U.S. COURTHOUSE
101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-3220
Fax (410) 962-6836

September 16, 2019

Theresa Whalen, Esquire
801 Wayne Avenue
Suite 400
Silver Spring, Maryland 20910

Christina A. Hoffman, Esquire
US Attorney's Office
36 S. Charles Street
Suite 400
Baltimore, Maryland 21201

   Re: *United States v. Dante Bailey*
     <u>Criminal No. CCB-16-0267</u>

Dear Counsel:

  Enclosed is a letter which I have received from Dante Bailey regarding sentencing.

       Sincerely yours,

       Catherine C. Blake
       United States District Judge

CATHERINE C. BLAKE

SEP 04 2019

UNITED STATES DISTRICT JUDGE

To the Honorable Judge Catherine Blake;

On March 18th, 2019 I began a trial for Rico in front of you. On April 30th, 2019, a verdict of Guilty of all counts was rendered by a jury. My name is Dante Bailey and I am facing life in prison.

The reason I am writing you today is, just like everyone else involved in my case, even the government witnesses, it is up to you to determine my sentence. Instead of me just sitting back and acting hopeless with a nonchalant attitude, I sit to write, especially since all you have to go on to make your final judgement is what you saw & heard at trial and the PSR's (46) pages that allegedly sums up my entire existence. Looking from your prospective, if that was all I had to judge you on, your chances of receiving a favorable result would be slim to none. In my case, not receiving a life sentence is most definitely a favorable result.

Now I will not waste my time speaking about the prosecution mis-conduct or the ineffectiveness of counsel that was appointed to me. You will receive those arguments in legal form in bulk in the future. Today I just want to focus on me.

I am a 40-year-old man who has spent over half of his life in custody In November of 1993, I was 14 years old inside of a stolen vehicle. Because I was the passenger I was charged with theft. I was aware the car was stolen. Where I come from that was cool. In April of 1993, I was in a group fight in my neighborhood (5200) Clifton Ave. and the parents all called the police and we were arrested for assaulting each other.

At the age of 15, I was sent to Savage Mountain Truth Center for possession of cocaine with intent to distribute in my neighborhood. In actuality the police found the guy who ran and stashed the product, I was charged because I would not tell them who he was. This got me sent away from home for (8) months as a child. At the age of 15, I became a prisoner in a boot camp like setting where the staff not only abused me by making me and all the other kids participate in shock treatments. Have you ever gotten splashed with an iced cold bucket of water as an alarm clock at 4:00AM in the morning by a blatant racist who was hired to torture you? In a place where you are timed in the cafeteria like its an eating contest and once you are finished your rushed out to a wooded trail in the wee hours of the morning to jog a mile to a site where you had to saw tree trunks and make loads of lumber. As an adult, this is strenuous, so imagine what I felt as a 15 year old kid coming from a major U.S. city mostly populated by blacks never seeing white people besides in a uniform that resembled everything I was taught to hate, going into the mountains with scary Caucasians with klansmen-like mentalities, something happened to my mind there.

While I was in the juvenile justice system, my grandmother (Bernice Bailey) was accidently killed by my Uncle, her son (Carlos Bailey) in a car crash. He fell asleep behind the wheel and smashed my grandmother's side of the vehicle into a tree. I was allowed to go to the funeral, but I could not stand the sight of seeing my grandmother dead, so I ran away for the entire week I was allowed to be on leave. This is when I began experimenting with drugs. It was reflected in my urine when I was tested at the youth center on my return. In June of 1995, I was discharged from the youth center because I could not adjust after my grandmother's death.

After a month of being free, I was robbed at gunpoint and shot on a public street in Baltimore city. On July 2nd, 1995, I was shot in my left side walking ro the sore in the neighborhood I lived in (5200).

45 days later, I was arrested in Towson Town Center in Abercrombie & Fitch store for trying on a shirt I was buying for a Wu-tang Clan concert. I had a firearm in my waste band. I was charged with battery because I pushed the mall cop and ran. I didn't want to go back to jail. I was caught at the entrance because the county police had the mall surrounded because someone was attempting suicide y jumping off the roof. I had already thrown the gun, so I wasn't armed. When I got to the police station, they asked me why I had a gun. My only explanation was for my own protection. My attitude after getting shot was, I'd rather have it on me & live, then not and die...

After that, about a year later I was jumped by a rival neighborhood group of males and pistol whipped over a mopad that my Uncle bought me. Two weeks after I recovered from the assault, I saw (2) of the culprits at the gas station in my neighborhood (5200) and my friends and I retaliated. This led to robbery and assault charges, whereas I could have taken the same route when they assaulted me, but instead I fought street justice because that was what I was becoming accustomed to do.

On the same day, but 6AM, I was riding a dirt bike in Takuma Tate's mother's community over in the Cedonia area when 2 patrol cars attempted to hit me off the bike, but I dived onto the grassy knoll. When they realized that AI was a juvenile they were upset because back then, I could only receive traffic violations, so they assaulted me. I fought back, wrestled with the white officer who pulled his gun out on me, and the officer pulled the trigger attempting to shoot me, so I dived on the ground and was cuffed. To justify his actions, I was charged with over 40counts in Baltimore city and received no bail. At the age of 17 years old, I was almost assassinated by the Baltimore city police department and sent to the notorious Baltimore city jail, where I was introduced to the evil that young men will do to one another when they are caged in.

Your Honor, I did not eat my first (4) days over there. Not because I didn't want to, but because I couldn't. The other kids gave out trays and would take everything off my tray that was good and leave me with scraps, I was forced to fight to eat. When your stomach begins to howl like a werewolf, you have no choice, but to let the beast come out. When you start smelling waffles & syrup, but when you get your tray all you can see are smears of molasses and oatmeal with roach legs in it your mind begins to think bestial, even as a kid. I wasn't trying to live just to eat, I was just trying to eat to live. This led to me getting stabbed in my spine and in my temple and me almost dying. This was in 1996. I didn't return to society for (6) years.

During that incarceration, I was sent t place where I cold count on my fingers who didn't have life in prison, and out of those ten, I was the only one that had a single digit sentence. The other (9) had football numbers. This is where I joined a gang and eventually, I was almost killed by that gang. My lung punctured (8) months before I was supposed to be released by the person who sponsored me into the gang .l Why? Because he was in love with escaping reality by getting high and I was more of a money man. My trust factor has been brutalized ever since. Especially when it's the one you idolize. Hat really attempted to kill me. I have never been the same. It was like sensibilities went numb. I'm not trying to hold anything back from you, Ms. Blake, I was in a state of mind whereas, I didn't care about anything. My mom had left the state because of the police harassment, which was the effect of why I went to jail. So four months after my release5/31/02, I was back in custody fighting another assault charge. I spent 13 months locked up and was released in November of 2003, but I came right back home to no one and nothing once again. I tried to work, but I just couldn't adjust to the hours of the job at this construction

Place. Because they hired felons, they believed that since they gave you a chance, you owed them. They payed $8.00 an hour, for 40 hours a week position, but we worked 55-60 hours a week and only got payed for 40. By this time, I had been fighting all my life and couldn't allow someone to treat me like that, so I quit and ended right back in jail for a handgun charge.

Four months after my release in November 2003, I was arrested for anther handgun. This was March 2004 and by June 2004 Mayor Sheila Dixon had implemented what was known as Project Exile. If you got arrested with a gun and you were a felon, you were going to be charged Federal. *I was a 25-year-old young man with nothing,* but I was being shipped off to the Federal Bureau of Prisons for a handgun charge. I was stunned. I received 86 months in November of 2004, and I was released in 2011. So, from 1996 – 2011, I was only in society for 8 months.

Now, from 2011- 2016, is the time frame of the indictment. Your Honor, I was homeless when I got out. After all those years a supposedly friend said he had a place for me to stay. He took me to an apartment where kids were inside cooking crack and smoking weed. He pulled out a duffle bag and an air mattress, then he left. When I opened the duffel, it wasn't filled with money Ms. Blake, it was a machine gun. Fresh out of Federal prison after 71/2 years, I was surrounded by crack, weed & guns. This is what I came home to, not glitz & glamor nor gold. Not thousands of dollars. I came home to nothing.

Your Honor, I didn't create a gang. The gang was already there. I will not try to deny my participation in furthering the gang's agenda. I did that and I've been accept my responsibility for that since day one, but the government as well as my court-appointed attorney's attempted tp badger me into becoming a government informant and I was not with that behavior. They arrested my wife and ft her into these theories, just to put more pressure on me. They know fully well that she had nothing to do with **Anything** I had going on. I also informed them of that from the start, but to make me out to be a senseless monster they had to incorporate her. Even when it came to them revoking her release. Now inside of my PSI its written as if I used her to harm people when that is far from the truth. My wife is a very loving & loyal woman. We created, not only a family but a household together. A household with kids and all. I would never have jeopardized her or the kids for that matter because I am a man amongst men.

Now, in reference to the (5) years that this indictment covered, did you know that I was locked up half of that and before I was locked up, I was living in Georgia. This is where they arrested me in August of 2014. Because of the bogus gun charge that the city put on me resulting from a house raid they did on someone else and that person who was the target of the warrant told them that they were my weapons. I was charged. The crazy thing about it was, I was incarcerated for months and knew nothing about this person's house being raided. That was May of 2013. I wasn't informed about the charge until June of 2014 at which time I was at the Federal halfway house. His forced me to abscond (9) hours before my release and I went straight to Georgia.

I know from my encounters with the police like Wayne Jenkins, that Baltimore wasn't the place for me. I have copies of letters that I wrote to my lawyer, both Reamy and Whalen in reference to those cops, in particular Jenkins, months before they were indicted like everything else I told them, they didn't use in my defense because they said I hade to cooperate and snitch on others just to get the truth out. I was really at war with those cops. They even tried to kill me in front of my home and held my wife at gunpoint. No fabrication this is real life and you can ask Mrs. Whalen did I speak with her about

it, because when they got indicted, she sent me a letter that I still have that spoke on their arrest being helpful to our case in the long run. The only people it benefitted was the government who revamped their entire strategy and disregarded everything even the officers they originally were building the case with like Agent Hood, who you didn't see at trial. Agent Hood was deeply involved with Jenkins and the entire Southwestern district.

I've said a lot and I can go on and on, but I won't. Your Honor, I have been dealing with the deaths of (3) of the victims in my case for years. I have bee found guilty of murdering my friends and this only comes second to destroying my wife's chances of pursuing her career in the medical field. I did not murder James Edwards and I would stand before GOD and say that because he knows. He knows the money I spent for him to be properly buried as well as the retaliatory actions that occurred because of his death. This was a kid that when you saw me, you saw him. A kid who my mom bailed out of Fulton County Jail in Atlanta. There was no animosity between us. The animosity was between *Trouble*. And Bangout. Over multiple females including Tierra Williams who the government decided not to use as a witness at the last minute. At trial, the government never proved I did the murder in which the Vicar means, but in her rebuttal, Ms. Hoffman told the jury, If they find that I aided and abetted int hat homicide then I could be found guilty? That is not true. I am not asking you for leniency I'm begging for justice, your Honor. I am 40 and haven't ever gotten a chance to live and I want to be able to one day come home and try. Please consider. Please....

Sincerely sent

Mr. Dante Bailey

2019 SEP 18  PM 3:24

RECEIVED-MAIL ROOM
U.S. ATTORNEY'S OFFICE
BALTIMORE, MARYLAND

LAW OFFICES

**DONALD DANEMAN, P.A.**

ASSOCIATES
ROBERT D. COLE, JR.
ERIKA R DANEMAN SLATER

349 N. CALVERT STREET
BALTIMORE, MARYLAND 21202

January 13, 2011

OFFICE: 410-727-3033
FACSIMILE: 410-528-9616
RESIDENCE: 410-876-1411

Hon. Willam D. Quarles, Jr.
United States District Court
District of Maryland
101 W. Lombard Street
Baltimore, MD 21201

     Re:    <u>United States v. Dante Bailey</u>
              Case No. WDQ 04-0254
              Our File No.: 04-1106

Dear Judge Quarles:

     Thank you for the opportunity to supplement my original response to the Court's letter of December 2, 2010 regarding Mr. Bailey's request for the Court to grant him a retroactive (concurrent) designation.

     Enclosed please find a sincere letter from Mr. Bailey which reflects the remorse he feels for his actions and the many steps he has taken to rehabilitate himself within the Bureau of Prisons. In addition to the letter, I have attached copies of his Inmate Education Transcript and seven Certificates of Achievement, including a certificate documenting his completion of the six mandatory components of the Release Preparation Program at U.S.P. Big Sandy.

     Given the length of the period of incarceration Mr. Bailey has already served, the fact that Judge Pierson did not order that his sentence run consecutively to the sentence in this case and Mr. Bailey's genuine expression of remorse and efforts towards rehabilitation, I ask that the Court grant his request.

                      Very truly yours,

                      Robert D. Cole, Jr.
                      Donald Daneman, P.A.

RDCjr./rc
encl.
cc: AUSA Barbara Sale

**JA6874**

12/20/10

Mr. Cole,

I am in receipt of your "Good News". Just the consideration makes my heart skip a beat. I appreciate your efforts, especially being as though it was almost I year ago that I was sentenced.

Now, I would like you to include this letter, entirely, or parts thereof that you deem fit to present to the courts to get the best results. I will deal only in truth.

First & Foremost, I am not an angel my rap sheet speaks volumes. I am not a sugar coater either, so some things I say or have said has hurt people, mainly myself. On December 7th 2010 I turned 32 years old. Besides 4 months in 2002 (May 31st - Oct. 2nd) & another 4 months (Nov. 4th 2003 - Mar. 2nd 2004), I have not been in society since I was 17 years old. I am not saying this looking for sympathy, I say this because. If sympathy. I don't hail from a poverty-stricken family. My entire immediate family on my mother's side are of the middle class. I was raised to be a productive citizen in the African American society. I was put through private education & I am a devout Christian. I continue to have the support of a loving family, but it took me years to understand & comprehend that because of "my" actions, treading the wrong path, I am in prison today. The decisions I made are the things that got me here, no one else's. Today I acknowledge that & I want to apologize to secret my family, my friends, & most of all those that I have hurt during my path of destruction I repent. I thank God that I am still alive & I pray that he continues to bless me as I strive to become successful, making a difference in, not only my life, but ever one around me.

Over the past 6 years 9 months since I was federally indicted I received many wake up calls, many negative & many positive. I've lost several family members, my aunt Suzette Scott, battling MS, my grandfather can not walk anymore, & their is no one to physically tend to both my elderly grandparents in Baltimore, because my uncle Mr. Rodney Staples, has recently relocate to the state of Georgia to reside with my mother who has been living there for the last 13 1/2 years. On top of that, I have lost 3 of my closest friends to the street culture &

**JA6875**

gang LiFe ThaT has plaqued The STaTe oF Maryland. The positive note up calls haD have Been in The success of my writing skills ThaT Bloomed Because of a close Friend oF mines name April Clay inspired me. I have since written 2 non Fiction Books, now has 3 urBan novels. My Financial situation disallows me From prospering. The FI only Pays you 13¢ & dollar, ThaTs iF you are lucky. $5.25 is The average pay For The majority oF inmates, A MonTH! I have also Completed a 215 Hour MicrosoFT computer class, became a certiFied Residential Electrician thru STratFord Institute, I've helped numerous amounts oF Inmates receive Their G.E.D, I've completed The 10 Hour Real estate literate class, I've Taken up leather as a HoBBy, & I've completed every last Release Preparation Program ThaT The FBOP Has To offer. From learning how To point out Identity Theives To How To recieve my Driver's licence. I've done all oF This in The midst oF some oF The worst criminal's in The country. I Thank GoD ThaT I am still alive Today aFTer I was assaulted By a member oF The Mexican Mafia & I deFended myselF & HaD To suFFer. I continue To suFFer Today Because noT only am I now Housed inside a USP, but I AM always Threatened with Harm Because These Mexicans who call Themselves surenos are everywhere. They want Peace but As soon As a racial riot Breaks ouT, I am on The List. This is noT comForTable but I survive & I continue To prepare For my Future. My mind is eighT, now all I Have To Do is put action Behind iT. I Have To get Home.

I Have a Beautiful support system To Be released To. My GrandParents House is in The suburBs oF NorthEastern Balimore By Morgan State University To conFirm, The #is 410-426-4 (443-468-6169) My BackBone is my cousin James ScoTT who has Been an entrepeneur since His release From Federal custody in Mar of 2008. He now has His own USAD car company as well as A Tractor Trailer business ThaT He has linked up For me to go straight To All state on Broening thru upon my release To learn how To operate Trailers & recieve my CDL's. I have a Beautiful woman in my LiFe By The name oF April Clay (443-854-3778). She has a greaT career ahead oF Her in The music & enterTainment Business. I am ready Than ever BeFore To Become apart of society again.

**JA6876**

Lastly, enclosed is my programming sheet. I've Been doing what I Have To do. On The Day That The courts were Talking, I was participating in 6 programs Attempting To make a Change. I Know iT will Be a struggle also, but I plan on winning The war, but I cannoT Begin To rehabilitate until I am Free. The prison system is not The same anymore. Because of The violence, They have litterally Turned These USP's into concentration camps. No College educations, No Real intellectual programming. No self Help classes, just The atmosphere of prison. The 3 years I have left according To The FBop's calculation can not Help me. I am only locked up For a Handgun. If I was To do all of The Time, I would Have 10 years 2 months & 1 week Day For Day For a Possession of a Handgun By a Felon. My actual release DATE is 5-10-15. The government gave my Projected release DATE with Good Time. I also Have 3 years on supervised release, so altogether, For A possession of a Firearm I am looking AT Either 10 years To get off paper or 14 years To Be off paper. That is a very long Time. I would also like To include That The Hon. Michael Pierson STATED on Record That The 5years He Sentence me To would Run concurrent with The 86 months I received with The FEDS. That should Be a Factor Because I do not dictate where I go. Also, I was arrested For only THis 1 count of 922g on March 2nd, 2004. I was not on A writ From The STATE of Maryland To The FEDS. I only had That one Charge. & Because of That Charge I was violated. The STATE of Maryland waited For The outcome of The Federal Charge To determine what They would do. IN 2004 Baltimore City Detention Center we Housing Federal inmates. I was one of Them. I got Fired From A Job AS AN INMATE cunselman on The executive Board Because of THE Federal case. They said That Federal detained inmates couldnot Have Jobs over There. The CHief of Security was Named McBarto I was not in custody For a violation of probation. I was in custody Because of The Handgun Violation. That caused The violation To occur on 3/22/04. Please consider my release. I will Become The man That I Know I am. I Just need The Chance.

P.S. I Have certificates

**JA6877**

*1172*

```
  BSY3K        *        INMATE EDUCATION DATA      *    12-20-2010
  PAGE 001 OF 001 *            TRANSCRIPT          *    17:29:15

  REGISTER NO: 41513-037      NAME..: BAILEY            FUNC: PRT
  FORMAT.....: TRANSCRIPT     RSP OF: BSY-BIG SANDY USP

  ------------------------- EDUCATION INFORMATION -------------------------
  FACL ASSIGNMENT DESCRIPTION               START DATE/TIME STOP DATE/TIME
  BSY  ESL HAS   ENGLISH PROFICIENT         06-03-2008 1151 CURRENT
  BSY  GED HAS   COMPLETED GED OR HS DIPLOMA 06-03-2008 1151 CURRENT

  ------------------------- EDUCATION COURSES -------------------------
  SUB-FACL      DESCRIPTION              START DATE  STOP DATE EVNT AC LV  HRS
  BSY           RPP6;PARENTAL RESPBLTY SEM 12-14-2010 12-14-2010  P  C  P    1
  BSY           RPP2;RESUME&COV.LETTER SEMINAR 12-14-2010 12-14-2010 P  C  P  1
  BSY           RPP1;HEALTHY FOOD CHOICES  12-14-2010 12-14-2010  P  C  P    1
  BSY           RPP3;BASIC BANKING SEMINAR 12-14-2010 12-14-2010  P  C  P    1
  BSY           RPP4;PERSONAL IDENT. SEMINAR 12-14-2010 12-14-2010 P  C  P   1
  BSY           RPP5;RELEASE REQ.SEMINAR   12-14-2010 12-14-2010  P  C  P    1
  LEE           SHU ACE- PERSONAL FINANCE 1 08-16-2010 09-20-2010 P  C  P   10
  LEE           RPP5 RPP ORIENTATION       03-04-2010 03-04-2010  P  C  P    1
  LEE           RPP1 AIDS AWARENESS        03-04-2010 03-04-2010  P  C  P    1
  MCK           READ.IS FUND.TH.6;30-8:30  04-23-2009 07-15-2009  P  C  P   20
  MCK           RPP-LEISURE TIME ATT:RANSOM 08-05-2009 08-07-2009 C  C  P    2
  MCK           RPP POINT OF VIEW          06-13-2009 06-13-2009  P  C  P    2
  MCK           RPP POINT OF VIEW          03-14-2009 03-14-2009  P  C  P    2
  MCK           LEATHER CLASS SAT-SUN730A-930A 03-02-2009 05-11-2009 P C P  40
  MCK           CREDIT UNIO.ORIE.TH.9:00-11:00 08-11-2008 08-11-2008 P C P   2
  MCK           RPP(1) WELLNESS            04-15-2009 04-15-2009  P  C  P    2
  MCK           COMPTR OFFICE 2000 10:00-11:30 10-07-2008 03-24-2009 P C M 115
  MCK           FAM RELATIONS M/T/W/F 745-1000 01-20-2009 03-04-2009 P C P  50
  MCK           PARENTING ROOM ORIENTATION 02-26-2009 02-26-2009  P  C  P    1
  MCK           RPP(4)-COMMUNITY CORRECTIONS 12-18-2008 12-18-2008 P  C  P   2
  MCK           RPP(3) AVOIDMONEYTRAP      02-05-2009 02-05-2009  P  C  P    1
  MCK           RPP (2) GETTING THE JOB    10-29-2008 10-29-2008  P  C  P    2
  MCK           SOUL & R&B TU.&TH.12:30-3:30 09-15-2008 10-30-2008 P  C  P  42
  MCK           RPP(5)RELEASE REQ/PROCED.-CMC 10-09-2008 10-09-2008 P C P    2
  MCK           RPP (6) DAD'S TRNSITION HOME 07-17-2008 07-17-2008 P  C  P   3
  MCK           RPP(4)-COMMUNITY ASSISTANCE 05-29-2008 05-29-2008 P  C  P    2
  MCK           RPP(1) WELLNESS            05-31-2008 05-31-2008  P  C  P    2

  G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

**JA6878**



# Certificate of Achievement

awarded to:

## Dante Bailey

for completion of the
six mandatory components of the
Release Preparation Program
at U.S.P. Big Sandy

December 14, 2010

_G. Bratcher, Supervisor of Education_

_S. Edwards, RPP Coordinator_



# Certificate of Achievement

This certifies that

## Dante Bailey

Has satisfactorily completed

## Leisure Time Pre-release Class

Consisting of 2 Hours of Training

This certificate is hereby issued this 06th day of August, 2009

_____
Gary "Rusty" Ransom, I.S.D.& R.C.

_____
Dr. Dani McKinney, SUNY Fredonia

Case 1:16-cr-00267-CCB   Document 1491-8   Filed 04/28/20   Page 7 of 12



*Certificate of Completion*

This certifies that

**Dante Bailey**

Has successfully completed the

**Reading is Fundamental Class at FCI McKean**

This certificate is hereby issued on this 15th day of July 2009

_____
*Teacher*

_____
*Supervisor of Education*

Case 1:16-cr-00267-LKG Document 1681-8 Filed 04/29/20 Page 8 of 12

**JA6881**

# Certificate of Achievement

*This certificate is awarded to:*

## Dante Bailey

*For satisfactorily completing*

**Computer Vocational Training**
In
**Microsoft Office 2000**

*Consisting of 115 Hours of instruction in Keyboarding Skills, Word, Excel, Access, and PowerPoint with a Final Grade of 96%.*

*Given this 24th day of March 2009*

G. Smith, *Computer VT Instructor*

D. Flatt, *Supervisor of Education*

Case 1:16-cr-00267-CCB  Document 1491-8  Filed 04/28/20  Page 9 of 12



## Certificate of Achievement

This certifies that

# Dante Bailey

has satisfactorily completed

## Keys to Healthy Family Relationships

Consisting of __50__ Hours of Training

This certificate is hereby issued this __3rd__ day of __March__ , 20__09__

_____
Maryanne Agnobin, Teacher

_____
Dennis J. Platt, Supervisor of Education

# Certificate of Achievement

*Awarded to:*

## Dante Bailey

*For successful completion of:*

## Leather Class

*On this 11th day of May 2009*

D.J. Whitmore, Recreation Specialist

J. Yurkewicz, Supervisor of Recreation

JA6884

# F.C.I. McKean
# Certificate of Achievement

This Certifies That
Dante Bailey
Has Satisfactorily Completed
The Legends Of Classic Soul & R & B Class
As Of October 30, 2008

Thomas Perry

Thomas Perry, Recreation Specialist

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. CCB-16-0267** |
| | * | |
| **DANTE BAILEY, et al.,** | * | |
| | * | |
| **Defendants** | * | |
| | ******* | |

## MOTION FOR NEW TRIAL BY DEFENDANTS DANTE BAILEY, RANDY BANKS, JAMAL LOCKLEY, CORLOYD ANDERSON, AND SHAKEEN DAVIS

Defendants Dante Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, and Shakeen Davis, by and through undersigned counsel, move pursuant to Fed. R. Crim. 33 for a new trial on grounds of (1) newly-discovered evidence involving criminal conduct by the task force officer who swore out wiretap and search warrant affidavits in this case; and (2) the government's failure to disclose material *Brady/Giglio* information, known to the government, regarding the task force officer.

The grounds for this motion are set forth in detail in a separate memorandum of law.

Respectfully submitted,

/s/ Lisa M. Lorish
Lisa M. Lorish
Federal Public Defenders Office
401 E. Market Street, Suite 106
Charlottesville, VA 22902-5264
434-220-3380
lisa_lorish@fd.org
*Attorney for Randy Banks*

/s/ Allen H. Orenberg
Allen H. Orenberg (Bar. No. 06278)
The Orenberg Law Firm, P.C.
12505 Park Potomac Ave., 6th Floor
Potomac, MD 20854
301-984-8005
aorenberg@orenberglaw.com
*Attorney for Jamal Lockley*

/s/ Stuart A. Berman
Stuart A. Berman (Bar No. 08489)
Lerch Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, MD 20814
301-657-0729
saberman@lerchearly.com
*Counsel for Shakeen Davis*

/s/ Richard S. Stolker
Richard S. Stolker (Bar No. 00259)
Uptown Law, LLC
2275 Research Boulevard, Suite 500
Rockville, MD 20850
301-294-9500
rstolker@stolker.com
*Attorney for Dante Bailey*

/s/ Carmen D. Hernandez
Carmen D. Hernandez (Bar No. 03366)
7166 Mink Hollow Road
Highland, MD 20777
240-472-3391
Chernan7@aol.com
*Attorney for Corloyd Anderson*

Dated:  June 3, 2020

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2020, this motion, exhibits, accompanying memorandum of law and proposed order were served electronically on counsel of record by the Court's CM/ECF system.

/s/ Stuart A. Berman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | CRIMINAL NO. CCB-16-0267 |
| | * | |
| DANTE BAILEY, *et al.*, | * | |
| | * | |
| Defendants | * | |
| | ******* | |

MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL
BY DEFENDANTS DANTE BAILEY, RANDY BANKS, JAMAL LOCKLEY,
<u>CORLOYD ANDERSON, AND SHAKEEN DAVIS</u>

Respectfully submitted,

/s/ Lisa M. Lorish
Lisa M. Lorish
Federal Public Defenders Office
401 E. Market Street, Suite 106
Charlottesville, VA 22902-5264
434-220-3380
lisa_lorish@fd.org
*Attorney for Randy Banks*

/s/ Allen H. Orenberg
Allen H. Orenberg (Bar. No. 06278)
The Orenberg Law Firm, P.C.
12505 Park Potomac Ave., 6th Floor
Potomac, MD 20854
301-984-8005
aorenberg@orenberglaw.com
*Attorney for Jamal Lockley*

/s/ Stuart A. Berman
Stuart A. Berman (Bar No. 08489)
Lerch Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, MD 20814
301-657-0729
saberman@lerchearly.com
*Counsel for Shakeen Davis*

/s/ Richard S. Stolker
Richard S. Stolker (Bar No. 00259)
Uptown Law, LLC
2275 Research Boulevard, Suite 500
Rockville, MD 20850
301-294-9500
rstolker@stolker.com
*Attorney for Dante Bailey*

/s/ Carmen D. Hernandez
Carmen D. Hernandez (Bar No. 03366)
7166 Mink Hollow Road
Highland, MD 20777
240-472-3391
Chernan7@aol.com
*Attorney for Corloyd Anderson*

Dated:  June 3, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii-v

INTRODUCTION .......................................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 2

I.      MISCONDUCT BY DET. IVO LOUVADO .................................................................... 2

II.     LOUVADO'S ROLE IN THE INVESTIGATION ........................................................... 4

III.    THE GOVERNMENT'S NONDISCLOSURE OF INFORMATION ABOUT
        LOUVADO'S MISCONDUCT .......................................................................................... 9

ARGUMENT ................................................................................................................................ 12

I.      DEFENDANTS ARE ENTITLED TO A NEW TRIAL BASED ON
        NEWLY-DISCOVERED EVIDENCE ............................................................................ 12

        A.      The Evidence Set Forth in the *Louvado* Information Is Newly-Discovered ........ 13

        B.      Defendants Exercised Due Diligence .................................................................... 13

        C.      The Evidence Is Not Merely Cumulative or Impeaching ...................................... 13

        D.      The Evidence Set Forth in the *Louvado* Information Is Material ......................... 16

        E.      The Evidence Set Forth in the *Louvado* Information Would Probably
                Produce an Acquittal .............................................................................................. 20

        F.      The Good Faith Exception to the Exclusionary Rule Does Not Apply ................. 21

II.     DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE OF THE
        GOVERNMENT'S *BRADY/GIGLIO* VIOLATION ....................................................... 22

        A.      The Concealed Evidence Was Favorable Because It Would Have
                Impeached Louvado ............................................................................................... 24

        B.      The Evidence Was Material to the Defense ........................................................... 24

        C.      The Government Was Responsible for Disclosing *Brady/Giglio* Information
                About Louvado ...................................................................................................... 24

        D.      If the Record Requires Expansion, the Court Should Compel the
                Government to Produce Additional Information and Documents About the
                Louvado Investigation to Defendants or for *In Camera* Inspection ..................... 27

CONCLUSION ............................................................................................................................. 30

i

**JA6890**

## TABLE OF AUTHORITIES

### CASES

*Biles v. United States*, 101 A.3d 1012 (D.C. 2014) ......................................................23

*Brady v. Maryland,* 373 U.S. 83 (1963) ......................................................22

*Dahda v. United States,* 138 S.Ct. 1491 (2018) ......................................................21

*Franks v. Delaware,* 438 U.S. 154 (1978) ......................................................13

*Giglio v. United States,* 405 U.S. 150 (1972) ...................................................... *passim*

*Illinois v. Gates*, 462 U.S. 213 (1983) ......................................................19

*Kyles v. Whitley,* 514 U.S. 419 (1995) ......................................................16, 25, 27

*Love v. Johnson,* 57 F.3d 1305 (4th Cir. 1995) ......................................................29, 30

*Nardone v. United States*, 308 U.S. 338 (1939) ......................................................19

*Pennsylvania v. Ritchie,* 480 U.S. 39 (1987) ......................................................29

*Rehaif v. United States,* 139 S. Ct. 2191 (2019) ......................................................21

*Segura v. United States*, 468 U.S. 796 (1984) ......................................................19

*Smith v. Black,* 904 F.2d 950 (5th Cir. 1990), *vacated on other grounds,*
    503 U.S. 930 (1992) ......................................................23

*United States v. Auten*, 632 F.2d 478 (5th Cir. 1980) ......................................................27

*United States v. Bagley,* 473 U.S. 667 (1985) ......................................................16

*United States v. Bartko,* 728 F.3d 327 (4th Cir. 2013) ......................................................24

*United States v. Barton*, 995 F.2d 931 (9th Cir. 1993) ......................................................23

*United States v. Brewer,* 204 F. App'x 205 (4th Cir. 2006) ......................................................21

*United States v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992) ......................................................26

*United States v. Clenney,* 631 F.3d 658 (4th Cir. 2011) ......................................................23

*United States v. Colkley,* 899 F.2d 297 (4th Cir. 1990) ...................................................... *passim*

*United States v. Cronic,* 466 U.S. 648 (1984) ......................................................12

ii

*United States v. Custis*, 988 F.2d 1355 (4th Cir. 1993) .................................................................12

*United States v. Doyle,* 650 F.3d 460 (4th Cir. 2011).................................................................22

*United States v. Fisher,* 711 F.3d 460 (4th Cir. 2013).......................................................... *passim*

*United States v. Gaines*, 668 F.3d 170 (4th Cir. 2012)................................................................20

*United States v. Gary,* 954 F.3d 194 (4th Cir. 2020) ..................................................................21

*United States v. Glover*, 736 F.3d 509 (D.C. Cir. 2013)..............................................................21

*United States v. Hornsby,* 666 F.3d 296 (4th Cir. 2012)  ............................................................20

*United States v. Jones,* 942 F.3d 634 (4th Cir. 2019) ............................................................16, 22

*United States v. King,* 628 F.3d 693 (4th Cir. 2011) ...................................................................29

*United States v. Leon*, 468 U.S. 897 (1984)...........................................................................21, 22

*United States v. Lull*, 824 F.3d at 118...........................................................................17, 18, 19

*United States v. Malekzadeh*, 855 F.2d 1492 (11th Cir. 1988)....................................................21

*United States v. Osorio*, 929 F.2d 753 (1st Cir. 1991)................................................................26

*United States v. Parker,* 790 F.3d 550 (4th Cir. 2015) ...............................................................24

*United States v. Perdomo*, 929 F.3d 967 (3d Cir. 1991)..............................................................26

*United States v. Rice*, 478 F.3d 704 (6th Cir. 2007) ...................................................................21

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010) ...............................................12, 25, 27

*United States v. Rooney,* 37 F.3d 847 (2d Cir. 1994) ..................................................................20

*In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887 (D.C. Cir. 1999) .................26

*United States v. Spadaccino*, 800 F.2d 292 (2d Cir. 1986)..........................................................21

*United States v. Tate*, 524 F.3d 449 (4th Cir. 2008) ...................................................................18

*United States v. Taylor,* Md. 942 F.3d 205 (4th Cir. 2019)................................................9, 10, 25

*United States v. Trevino*, 89 F.3d 187 (4th Cir. 1996).................................................................30

*United States v. Ventresca,* 380 U.S. 102 (1965).........................................................................17

*United States v. Wellman,* 663 F.3d 224 (4th Cir. 2011) ...........................................................22

*United States v. Wharton*, 840 F.3d 163 (4th Cir. 2016) ........................................16, 22

*United States v. Wolf,* 860 F.3d 175 (4th Cir. 2017)........................................................22

*United States v. Zolin*, 491 U.S. 554, 571 (1989) ........................................ 29

## STATUTES

18 U.S.C. § 4........................................................................................10

18 U.S.C. § 1503..................................................................................10

18 U.S.C. § 1512..................................................................................10

21 U.S.C. § 841....................................................................................10

21 U.S.C. § 846....................................................................................10

26 U.S.C. § 7201 .................................................................................10

26 U.S.C. § 7206 .................................................................................10

28 U.S.C. § 2255..................................................................................10

MD Code, Criminal Law, §§ 5-612 ....................................................10

MD Code, Criminal Law, §§ 5-613 ....................................................10

MD Code, Criminal Law, § 7-104 .......................................................9

MD Code, Criminal Law, § 9-306 .......................................................10

MD Code, Tax, § 13-1007(c)................................................................10

## RULES AND PUBLICATIONS

Fed. R. Crim. P. 33 ....................................................................... *passim*

Restatement (Second) of Agency (1958)..............................................22

S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 M.C.A.N. 2112, 2185 ....................................22

**JA6893**

**INTRODUCTION**

Ivo Louvado, an officer with the Baltimore City Police Department ("BPD") and a task

force officer for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), was a

critical member of the investigative team that secured evidence the government used at the trial

of defendants Dante Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, and Shakeen

Davis. As a federal task force officer, Louvado appeared before a United States District Judge

and several United States Magistrate Judges and signed sworn affidavits in support of

applications for two Title III wiretaps and 15 search warrants. The government incorporated his

wiretap affidavit by reference in to documents it submitted to the Court obtain two more wiretap

orders, and used evidence from search warrants he secured to obtain additional evidence. He

testified at a motions hearing in this case.

In fact, at the times Louvado appeared before multiple judicial officers of this Court, he

was a criminal. In 2009, he participated in a brazen scheme to steal cocaine that BPD had seized

from a drug dealer, resell the drugs, and pocket the proceeds. He committed multiple violations

of federal and state criminal laws. Eventually, Louvado came under the scrutiny of the

government's long-running investigation into criminal misconduct by BPD officers. By May 28,

2018 – nearly a year before the trial of this case, and two days before the motions hearing at

which Louvado testified – an agent and task force officer of the Federal Bureau of Investigation

("FBI") had developed sufficient predication about Louvado's involvement in felony crimes that

they interviewed him about his role in the 2009 drug theft. Louvado lied to them.

Prior to, during, and after the June 1, 2018 motions hearing, and the trial that began on

March 18, 2019 and concluded on April 30, 2019, the United States never disclosed the

impeachment information it possessed about the officer whose sworn affidavits helped the

government obtain some of its most important evidence. Louvado's crimes and lies remained a

1

**JA6894**

secret to defendants until March 11, 2020, when the same office that prosecuted defendants filed

a felony criminal charge alleging that Louvado made false statements to the FBI.

The recently disclosed information about Louvado's egregious misconduct and

government's failure to disclose critical impeachment information about a crucial figure in its

investigation justifies a new trial on the basis of newly-discovered evidence and violation of the

prosecutors' *Brady/Giglio* obligations. Defendants have timely moved, pursuant to Fed. R. Crim.

P. 33, for a new trial. For the reasons set forth below, the Court should grant the motion on the

current record. If the Court believes additional facts are necessary, it should expand the record by

compelling the government to disclose information and documents about its investigation of

Louvado, either directly to defense counsel, in the alternative, for *in camera* review.

## FACTUAL BACKGROUND

### I.      MISCONDUCT BY DET. IVO LOUVADO

The following factual summary is drawn from Louvado's own statements in affidavits he

submitted to this Court and Exhibit 1, the criminal information filed in *United States v. Louvado,*

Crim. No. CCB-20-098, ECF 1 (D. Md. filed Mar. 11, 2020) ("*Louvado* Information").[1]

Louvado earned a bachelor's of science degree in criminal justice and began working

BPD in November 1999. *See* Ex. 2, ECF 779-3 at 17, ¶ 3. He was promoted to detective in 2008

(Ex. 1, *Louvado* Information, ¶ 3) and was assigned to ATF as a task force officer in January

2010. Ex. 2, ECF 779-3 at 17, ¶ 3.

---

[1] While many of the documents referenced in this memorandum have been previously
filed in this case and elsewhere, for ease of reference defendants are attaching copies to this
memorandum.

2

**JA6895**

In February 2009, Louvado served on a squad with five other officers identified by their

initials:  W.J., C.J., P.G., K.G., and V.R.[2] The *Louvado* Information alleges that:

- Prior to February 19, 2009, Louvado learned from other officers "about a large-scale narcotics trafficker operating out of a residence on the 1400 block of Ellamont Street, in Baltimore, Maryland" (¶ 5);

- On February 19, 2009, Louvado and other officers conducted surveillance of T.M. on that block. Other officers claimed to have recovered cocaine residue from trash thrown from a car that had been driven from the residence. Louvado and others stayed in the house until a search warrant was obtained. Louvado participated in the search and took photographs, including photographs of a jacket that contained a large amount of cash (¶¶ 6-7);

- Other officers found car keys and used them to activate an alarm in a nearly pickup truck. Louvado and other officers went to the pickup truck, found a large quantity of cocaine, and waited for a SWAT team to provide protection as the cocaine was transported to BPD headquarters. Louvado followed the SWAT team as they drove the cocaine to headquarters in a surveillance van (¶¶ 8-9);

- Forty-one kilograms of cocaine were turned into the BPD's Evidence Control Unit on February 20, 2009 and used to bring charges against T.M [Trenell Murphy] In addition, Louvado and two other officers "discovered 3 additional kilograms of cocaine in the surveillance van that had been used to transport the 41 kilograms that were turned into BPD." The cocaine came from the same truck. (¶¶ 11-13);

- Louvado and two other officers "agreed to sell the cocaine and split the proceeds from its sale." One of the other officers used a source to sell the cocaine. "Ultimately, LOUVADO received $10,000 in drug proceeds from the sale of the cocaine seized from T.M.'s pickup truck that had not been turned in to BPD" (¶¶ 14-15);

- The FBI interviewed Louvado about the cocaine on May 30, 2018 (¶ 18); and

- During the interview, Louvado "conceal[ed] and cover[ed] up material facts, namely, that he and two other officers had split the proceeds from selling three of

---

[2]  Counsel believe W.J. is Wayne Jenkins, who was convicted of racketeering conspiracy and other offenses in *United States v. Gondo, et al.*, Crim. No. CCB-17-0106 (D. Md. filed Feb. 23, 2017). K.G. is Keith Allen Gladstone, convicted of civil rights conspiracy in *United States v. Gladstone,* Crim. No. CCB-19-0094 (D. Md. filed Feb. 27, 2019). V.R. is Victor Romero, who has been charged with the same crime as Louvado for lying about the drug theft during an interview on November 1, 2019. *United States v. Romero,* Crim. No. CCB-20-0127 (D. Md. filed Apr. 15, 2020).

the kilograms of cocaine that BPD had seized on February 19 and 20, 2009"
(¶ 19).

## II.   LOUVADO'S ROLE IN THE INVESTIGATION

On June 30, 2016, the government submitted applications to conduct Title III wiretaps on

cellular phones used by Dwight Jenkins (TT1) and Jacob Bowling (TT2) and to obtain

"geolocation information and the cell site data" where the target telephones were being used. Ex. 2,

ECF 779-3 at 7, 8. Assistant United States Attorney ("AUSA") Christina A. Hoffman's

application stated that she had "discussed all of the circumstances of the above offenses

with Task Force Officer Ivo Louvado of the Bureau of Alcohol, Tobacco, Firearms & Explosives

("ATF"), who has been directly involved in conducting this investigation, and [that she had]

examined the affidavit of TFO Louvado, which is attached to this Application, as Exhibit B, and

is incorporated herein by reference." Ex. 2, ECF 779-3 at ¶¶ 4, 5.

In his affidavit in support of the Title III application, Louvado recited several forms of

specialized training and expertise for the Court's consideration, including (1) 136 hours in

specialized narcotics training; (2) 16 hours of training related to devices using the Global

Positioning System; (3) 48 hours in additional training from BPD and ATF; and (4) a 40-hour

course relating cellular technologies, including call detail and cell tower data. *Id.* at 17-19,

¶¶ 4-7. Louvado did not disclose any of the misconduct set forth in the *Louvado* Information,

even as he submitted many paragraphs of background material about his training, experience,

and expertise in narcotics investigations. The government's submission to the Court relied

heavily on Louvado's account of five confidential informants that investigators used to make

controlled purchases, and who otherwise provided relevant information. *Id.* at 32-38, ¶¶ 30-50.

Louvado personally attested that he believed each of the five to be reliable. *Id.* On the basis of

the government's application and Louvado's affidavit, Judge Ellen L. Hollander entered an

Order Authorizing the Interception of Wire Communications and a Service Provider Order. *Id.* at 77-90.

On July 21, 2016, the government submitted an application to conduct a Title III wiretap on a cellular phone used by Jamal Lockley (TT3). The application contains multiple references to information obtained from TT1 and TT2 intercepts and incorporates by reference Louvado's affidavit relating to TT1 and TT2. *See* Ex. 3, ECF 779-4 at ¶¶ 47 ("The affidavit for **TARGET TELEPHONES 1 & 2** is incorporated by reference herein."). On the basis of the government's submission, including the incorporated Louvado affidavit, Judge Hollander entered an Order Authorizing the Interception of Wire Communications and a Service Provider Order. *Id.* at 67-87.

On August 23, 2016, the government submitted an application to conduct a Title III wiretap on a cellular phone belonging to Corloyd Anderson (TT4). The application contains multiple references to information obtained from TT1 and TT2 intercepts and incorporates by reference the Louvado affidavit. *See* Ex. 4, ECF 779-5 at ¶ 51 ("The affidavit for **TARGET TELEPHONES 1 & 2**, as well as the affidavit for **TARGET TELEPHONE 3**, are incorporated by reference herein.").

In its consolidated response to defendants' pretrial motions, the government stated that the TT4 wiretap failed to intercept any calls because Anderson had discontinued using the TT4 phone by the time the wiretap order was issued. But the wiretap yielded GPS data for the phone that investigators relied upon in applying for a warrant to search Anderson's residence in Owings Mills, Maryland. ECF 779 at 32-33. The government maintained that "the defendants do not, and cannot, point to a single probable cause deficiency in any of the wire applications and affidavits

at issue in this case," and recapped the information from the Louvado affidavit concerning the

various confidential sources. *Id.* at 34.

The government described the fruits of the wiretaps as follows:

The roughly two-month long wiretap investigation was ultimately
successful in gathering sufficient evidence to obtain search warrants for a
number of residences and vehicles. The search warrants relied heavily on
intercepted communications. The warrants were very successful, resulting in the
seizure of five firearms; over 120 rounds of ammunition; body armor;
distribution quantities of heroin, cocaine, and marijuana; MMP gang paperwork;
numerous cell phones and other electronic devices; drug proceeds (including
over $2,500 from ANDERSON and over $1,300 from DELEON), and other
evidence. The investigation also resulted in a federal indictment charging
twenty-four defendants with racketeering conspiracy and drug trafficking
conspiracy, among other crimes. Much of the evidence used to obtain the
indictment derived directly from the wiretap authorizations.

*Id.* at 40-41.

On September 26, 2016, Louvado swore out applications for search warrants for 12

locations. Ex. 5, ECF 779-14. The ten premises and two vehicles were:

- Premises Known as 225 South Herring Court, Baltimore, MD 21231 (residence of
  Dwight Jenkins)

- Premises Known as 1868 Oxford Square, Bel Air, MD 21015 (residence of Jamal
  Lockley)

- Premises Known as 6808 Townbrook Drive, Apartment F, Gwynn Oak, MD
  21207 (residence of Jacob Bowling)

- Premises Known as 3410 Aurora Lane, Apartment D, Gwynn Oak, MD 21207
  (residence of Timothy Galloway)

- Premises Known as 32 Stockmill Road, Apartment E, Pikesville, MD 21208
  (residence of Ayinde Deleon)

- Premises Known as 38 Windbluff Court, Owings Mills, MD 21117 (residence of
  Corloyd Anderson)

- Premises Known as 5000 Wabash Avenue, Unit A, Baltimore, MD 21215
  (premises used by Corloyd Anderson)

**JA6899**

- Premises Known as 609 Collett Street, Baltimore, MD 21217 (residence of Takuma Tate)

- Premises Known as 4130 Edmondson Avenue, Baltimore, MD 21229 (residence of Shakeen Davis)

- Black 2009 Nissan Maxima, VIN# 1N4AA51E19C841416, Registration No. 2BL5357 (vehicle used by Jacob Bowling and Timothy Galloway)

- Gray 2007 Hyundai, VIN# 5NPET46C67H233187 (vehicle used by Jacob Bowling and Timothy Galloway)

- Premises Known as 2525 Eutaw Place, Apartment 503, Baltimore, MD 21217 (residence of Melvin Lashley)

Louvado did not disclose the misconduct set forth in the *Louvado* Information. Instead, the Louvado affidavit referenced the TT1 Jenkins wiretap and TT2 Bowling wiretap, citing the same five confidential sources utilized in his wiretap affidavit, as well as one additional confidential informant. On the basis of Louvado's application and affidavit, Magistrate Judge A. David Copperthite issued the requested warrants.

On February 10, 2017, Louvado swore out an application for a search warrant for three cellular phones seized from Sydni Frazier on January 25, 2017. Ex. 6, ECF 779-17. On February 22, 2017, Louvado swore out an application for a search warrant for Frazier's Instagram account. Ex. 7, ECF 779-24. Both of these affidavits relied in part on the TT1 Jenkins wiretap. On March 21, 2017, Louvado swore out an application for a search warrant for four cellular phones seized from Shakeen Davis on February 24, 2017. Ex. 8, ECF 1470-4. Again, Louvado did not disclose any of the matters set forth in the *Louvado* Information. On the basis of Louvado's applications and affidavits, Magistrate Judges J. Mark Coulson (ECF 779-17 and 1470-4) and A. David Copperthite (ECF 779-24) issued the requested warrants.

At trial, the government utilized evidence from many of these sources, including:

- WIRE 1 exhibits (from TT1 Jenkins wiretap);

7

**JA6900**

- WIRE 2 exhibits (from TT2 Bowling wiretap);

- WIRE 3 exhibits (from TT3 Lockley wiretap);

- Summary exhibits that included GPS data from TT4;

- CELL 3a (from search of Davis phones);

- CELL 7a (from search of Frazier phones);

- IG15, IG16, and IG18 (from search of Frazier Instagram account);

- Items seized pursuant to the execution of the warrants Louvado obtained, including SW5A-V, SW6A-G, SW7A-Y, SW8A-G, SW9A-E, SW13A-1, D 21, D22, F20/20a, F25/25a.[3]

The government also used evidence from other locations that it searched pursuant to warrants secured with applications and affidavits that included information from Louvado's earlier wiretaps and warrants.[4]

Louvado testified at a motions hearing on June 1, 2018, regarding a statement made by defendant Devon Dent on October 26, 2016. He did not testify at trial.

Defendants Bailey, Davis, Lockley, Anderson, and Banks were tried before a jury between March 18, 2019 and April 30, 2019. The defendants were convicted of multiple offenses and received the following sentences:

- Bailey: RICO conspiracy, narcotics conspiracy, murder in aid of racketeering, possession of firearm by convicted felon, and possession with intent to distribute heroin. Life sentence.

- Banks: Narcotics conspiracy. 216-month sentence.

---

[3] These items are derived from the government's exhibit list. Counsel, who did not represent defendants at trial, have not completed their review of the trial transcript and have not had the opportunity to confirm that all of these items were admitted into evidence.

[4] Counsel are still reviewing the trial record to determine the full scope of the evidence derived indirectly from the Louvado warrants Accordingly, counsel respectfully request the opportunity to supplement this memorandum if additional relevant information comes to light.

**JA6901**

- Lockley: RICO conspiracy, narcotics conspiracy, and distribution of cocaine base. 360-month sentence.

- Anderson: RICO conspiracy, narcotics conspiracy, and possession of firearm by convicted felon (later dismissed). 264-month sentence.

- Davis: RICO conspiracy, narcotics conspiracy, possession of firearm by convicted felon, possession with intent to distribute cocaine base, and possession of firearm in furtherance of drug trafficking crime. 360-month sentence.

## III.   THE GOVERNMENT'S NONDISCLOSURE OF INFORMATION ABOUT LOUVADO'S MISCONDUCT

Having presided over *United States v. Gondo, et al.*, Crim. No. CCB-17-0106 (D. Md. filed Feb. 23, 2017), this Court is all too familiar with felony crimes committed by BPD officers. As the Fourth Circuit recounted in *United States v. Taylor,* 942 F.3d 205 (4th Cir. 2019), seven officers from BPD's Gun Trace Task Force ("GTTF") were convicted of racketeering conspiracy and other offenses for "robbing citizens during the course of their police service, taking money, jewelry, and other items." *Id.* at 210. The officers "conducted illegal searches and stole money, drugs and other items while acting in a law enforcement capacity" and "submitted overtime forms for themselves and for other GTTF officers for hours they had not worked." *Id.* at 212. The AUSAs who led the GTTF investigation and prosecuted the *Gondo* case also filed the *Louvado* Information.

The evidence set forth in the *Louvado* Information demonstrates *at an absolute minimum* that almost a year before the trial of this case – that is, no later than May 30, 2018 – the United States Attorney's Office and its law enforcement partners possessed evidence that between 2009 and the time Louvado swore out affidavits in 2016 and 2017, and testified in 2018, he had committed or likely committed the following crimes:

- Theft, in violation of Maryland law (currently codified at MD Code, Criminal Law, § 7-104, formerly cited as MD Code, Art. 27, § 340);

9

**JA6902**

- Conspiracy to distribute cocaine, distribution of cocaine, and aiding and abetting distribution of cocaine, in violation of 21 U.S.C. §§ 846, 841, and 2, and MD Code, Criminal Law, §§ 5-612, 613 (formerly cited as MD Code, Art. 27, § 286, and Maryland common law of conspiracy);

- Obstruction of justice and evidence tampering, in violation of 18 U.S.C. §§ 1503 and 1512, and MD Code, Criminal Law, § 9-306 (formerly cited as MD Code, Art. 27, § 26);

- Misprision of a felony, in violation of 18 U.S.C. § 4; and

- If (as seems highly likely) Louvado did not declare the funds he received from the cocaine sale as income, tax evasion and filing a false tax return, in violation of 26 U.S.C. § 7201 and 7206 and MD Code, Tax, § 13-1007(c).

Notably, in the months following Louvado's interview, the government would have had every reason to ensure that any AUSAs who had utilized Louvado were aware of his involvement in the cocaine theft and resale and lies to the FBI. At that very time, the government was defending a motion for a new trial following the trial of two defendants in the *Gondo* case, GTTF officers Daniel Thomas Hersl and Marcus Roosevelt Taylor. In that motion, the government was accused of failing to disclose an ongoing narcotics investigation of one of the government's witnesses at that trial. *See* Crim. No. CCB-17-0106, ECF 374 (motion for new trial filed May 12, 2018); *see also Taylor*, 942 F.3d at 223-26.

Beyond the facts set forth in the *Louvado* Information, the government possessed other information about his misconduct. One of the defendants in the *Gondo* case was Wayne Jenkins, "W.J." in the *Louvado* Information. *See* Ex. 1 at ¶¶ 4, 6, 17. After the *Gondo* charges were announced, Trenell Murphy – the person identified in the *Louvado* Information as "T.M.," *id.* at ¶¶ 6, 12 – filed a motion to vacate conviction under 28 U.S.C. § 2255 on June 30, 2017, alleging misconduct by the BPD officers involved his arrest (but not specifically identifying Louvado by name). *See* Ex. 9, Crim. No. ELH-09-098, ECF 71. The government secured numerous extensions of time to respond to the motion. The government also caused Murphy to be

transferred from FCI Loretto to the Maryland for a debriefing related to the *Gondo* case and its

investigation of BPD misconduct. *Id.* at ECF 77.  Then, on February 4, 2019 – more than six

weeks before trial began in this case – the parties filed a joint motion to reduce sentence. *See* Ex.

10, Crim. No ELH-09-098, ECF 94. The motion noted that Murphy's motion "asserts various

issues related to alleged police misconduct" and that, while "[t]he Government does not concede

that [he] would be entitled to relief on those grounds," it agreed "that the unique circumstances

of this case warrant some relief under section 2255…." Judge Hollander reduced Murphy's

sentence from 240 months imprisonment (ECF 23) to 180 months imprisonment (ECF 95, 96).

The government filed the *Louvado* Information on March 11, 2020. At no time prior to,

during, or after the motions hearing (June 1, 2018) and trial (March 18 – April 30, 2019) did the

government disclose to the defense any information about Louvado's misconduct. The

government filed charges against Louvado five days after convicting codefendant Sydni Frazier

on March 6, 2020. ECF 1453. Frazier's counsel read about the case in the media and requested

information. His correspondence with the government is docketed at ECF 1458, 1470, 1472.

On April 30, 2020, counsel for defendant Davis, joined by counsel for defendants Bailey,

Banks, Lockley, and Anderson, wrote a letter to AUSAs Hoffman and Lauren E. Perry asking for

information regarding the Louvado investigation and the United States Attorney's Office's

knowledge of misconduct by Louvado before and during trial. *See* Ex. 11. On May 8, 2020,

AUSAs Hoffman and Perry responded, in pertinent part: "Louvado was not a witness at trial, nor

is there any suggestion that he engaged in any misconduct in the case. Therefore, no *Giglio* or

*Brady* obligations ever arose as to him." The prosecutors also noted that Louvado's testimony at

the June 1, 2018 motions hearing was limited to Devon Dent and that Louvado "never provided

information about your client or any of the defendants who went to trial." *See* Ex. 12.

## ARGUMENT

Defendants are entitled to a new trial on two grounds: newly-discovered evidence and the government's violation of its *Brady/Giglio* obligations.

**I.    DEFENDANTS ARE ENTITLED TO A NEW TRIAL BASED ON NEWLY-DISCOVERED EVIDENCE**

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial to that defendant if the interests of justice so requires." Fed. R. Crim. P. 33(a). "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. Fed. R. Crim. P. 33(b)(1). Defendants have filed this motion within three years of the jury verdicts returned on April 30, 2019 verdict. This Court has jurisdiction to consider the motion under *United States v. Cronic,* 466 U.S. 648 (1984).[5]

 In order for new evidence to warrant a new trial:

> (a) the evidence must be, in fact, newly discovered, *i.e.*, discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) (quoting *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993)).

---

[5]   To be precise, this Court possesses jurisdiction "to entertain the motion and either deny the motion on its merits, or certify [the] intention to grant the motion to the Court of Appeals, which could then entertain a motion to remand the case." *Cronic*, 466 U.S. at 667 n.42.

**JA6905**

###### A.  The Evidence Set Forth in the *Louvado* Information Is Newly-Discovered

Prior to March 11, 2020, the defense did not know the facts set forth in the *Louvado* Information.

###### B.  Defendants Exercised Due Diligence

As reflected by the extensive motions practice and cross-examination of government witnesses at motions hearings and at trial, defense counsel extensively investigated all issues relevant to this case. The government's criminal investigation of Louvado was confidential. No amount of due diligence could have alerted counsel to Louvado's misconduct in 2009 or his lies in a non-public interview in 2018.

###### C.  The Evidence Is Not Merely Cumulative or Impeaching

The facts related to Louvado are not merely cumulative or impeaching. Indeed, they do not relate to the credibility of any trial witness. Defendants have not unearthed additional impeachment information about cooperating witnesses such as William Banks, Jay Greer, or Malcolm Lashley, whose credibility issues were explored extensively. Rather, the facts in the *Louvado* Information are brand-new to the defense and establish impermissible government misconduct in the acquisition of the prosecution's most important evidence. Those facts obliterate the credibility of the affiant on multiple documents submitted to the Court during the pre-indictment investigative phase of the case. Had the defendants been aware of the recently-disclosed facts regarding Louvado, they could have moved pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978), and other authority to suppress the fruits of the wiretaps and search warrants where Louvado was the affiant, where his affidavits were incorporated, and where later-acquired evidence constituted fruit of the poisonous tree.

**JA6906**

*United States v. Fisher,* 711 F.3d 460 (4th Cir. 2013), establishes that defendants are

entitled to a new trial because Louvado's failure to disclose critical information to Judges

Hollander, Copperthite, and Coulson constituted extraordinary misconduct that this Court can

and must remedy. Like this case, *Fisher* involved a crooked BPD officer who was assigned as a

task force officer to a federal agency, in that instance the Drug Enforcement Administration

("DEA"). The agent, Lunsford, was the affiant on the application for a search warrant that

yielded the evidence leading directly to Fisher's arrest and conviction. Lunsford himself later

pleaded guilty to fraud and theft offenses relating to his duties as a DEA task force officer. He

admitted that his misconduct included falsifying information about confidential informants in

wiretap and criminal complaint affidavits. *Id.* at 462-63. The district court denied Fisher's

motion to vacate his guilty plea because of Lunsford's misconduct, but the Fourth Circuit

reversed.

Agreeing with Fisher's claim "that the officer's deliberate misrepresentation underpins

the entire case against him" and tainted his guilty plea, *id.* at 465, the panel majority held that

relief was appropriate because "gross police misconduct goes to the heart of the prosecution's

case." *Id.* at 466. The prosecutors in that case candidly and appropriately acknowledged that if

the government had "learned of Lunsford's misconduct prior to [Defendant's] guilty plea, it

would have disclosed that information to the defense." *Id.* at 476. While the individual

prosecutors knew nothing about Lunsford's misconduct, "[n]either the timing, nor the

prosecution's good faith, however, negates the undisputed fact that the evidence the prosecution

presented to Defendant and his counsel during deliberations as to whether Defendant should

plead guilty was obtained under a search warrant issued solely on the basis of an untruthful law

enforcement affidavit." *Id.* (citations omitted). The court therefore concluded:

> In sum, Defendant has successfully shown that impermissible government conduct – an officer's deliberate lie that led to the warrant that led to the discovery of the evidence against him – occurred.

*Id.* at 467.

After analyzing an issue not present here – whether the misconduct induced defendant's guilty plea – the court granted relief. The opinion in *Fisher* concluded by stating that "allowing a defendant's [conviction] to stand when a police officer intentionally lies in a search warrant affidavit undermines public confidence in our judicial system. 'Whether to prosecute, issue a warrant, indict and convict are serious matters that are decided in large measure based on what a police officer relates. So when an officer does not tell the whole truth, public confidence in the fair administration of criminal justice inevitably is eroded.'" *Id.* at 469 (citation omitted).

While this case involves a trial rather than a guilty plea and affidavits in which critical facts were concealed rather than falsified, criminal and civil statutes and volumes of case law make clear that materially false declarations and concealment of material information are two sides of the same coin. The Fourth Circuit has held that egregious acts of concealment justify suppression of warrants and has applied *Franks* to intentional, material omissions in a series of cases beginning with *United States v. Colkley,* 899 F.2d 297 (4th Cir. 1990). To successfully attack an affidavit based on omitted information, the defendant must show: (1) that the omission is the product of a deliberate falsehood or of a reckless disregard for the truth, and (2) inclusion of the omitted information in the affidavit would defeat probable cause. *Id.* at 301–302. *Franks* "protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate." *Colkley*, 899 F.2d at 301 (citation omitted) (emphasis in original). For omitted information to be deemed material, its inclusion

15

**JA6908**

must defeat probable cause. *United States v. Jones,* 942 F.3d 634, 641 (4th Cir. 2019); *United States v. Wharton*, 840 F.3d 163, 168-69 (4th Cir. 2016).

In this case, Louvado's deliberate omission of information about his past criminal conduct caused the issuance of the wiretap orders and search warrants that led to the discovery of evidence that was at the heart of the government's case against the defendant. His gross misconduct permeated the prosecution's presentation. The evidence the government presented to the jury was obtained pursuant to court orders issued following submission of an affidavit that was untruthful by willful concealment. Accordingly, evidence of Louvado's misconduct is not merely cumulative or impeaching.

### D.       The Evidence Set Forth in the *Louvado* Information Is Material

While the Fourth Circuit's case law does not define the meaning of the term "material" in the context of a Rule 33 motion based on newly-discovered evidence, it is logical to apply the definition used in the *Brady/Giglio* context, discussed below – namely, that materiality exists if there "is a 'reasonable probability' of a different result," or when the undisclosed information "undermines confidence in the outcome of the trial." *Kyles v. Whitley,* 514 U.S. 419 434 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 678 (1985)). Here, if the defendants had possessed the recently-disclosed information about Louvado, they potentially could have persuaded the Court to suppress evidence that was the heart of the government's case: evidence obtained from the four wiretaps and 15 search warrants, and downstream evidence that was obtained using information derived from the wiretaps and searches. The government's use of critical evidence that the Court vetted for compliance with the Fourth Amendment based on an untruthful and incomplete submission undermines confidence in the outcome of the trial.

In pre-indictment, *ex parte* proceedings relating to the issues of warrants and other investigative process, a presumption of reliability is afforded to the information provided by law enforcement officers. *Fisher,* 711 F.3d at 470; *cf. United States v. Ventresca,* 380 U.S. 102, 111 (1965). The withheld information in this case would have forcefully rebutted that presumption. Simply put, a district judge reviewing a Title III wiretap affidavit and magistrate judges reviewing search warrant affidavits would have looked at the affidavits very differently had the judicial officers been informed that the affiant was a member of a conspiracy to steal seized narcotics evidence and resell the drugs for personal profit. Had Judge Hollander known that the government's Title III wiretap affiant had committed these egregious offenses and concealed them for years, she would have escorted him and the prosecutors from her chambers without signing the requested orders. Had Magistrate Judges Copperthite and Coulson known the same information, they would have escorted Louvado and a stack of unsigned search warrants from their chambers. (For that matter, had Louvado's unsavory past been disclosed to the Criminal Division of the Department of Justice, and then-Attorney General Loretta E. Lynch, the government's wiretap application never would have been authorized.)

This Court must look to the "totality of the circumstances" to assess the materiality of the omission. *United States v. Lull*, 824 F.3d at 118. This includes an evaluation of "the affidavit as a whole and all circumstances set forth within." *Id.* Critically, "[w]hen the information forming the basis for probable cause comes from an informant, the informant's 'veracity' and 'reliability' are critical to the totality of the circumstances test." *Id.* Moreover, the Fourth Circuit has held that "a judicial officer's assessment of probable cause . . . *must* include a review of the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Id.*

In *Lull*, the affiant executed a search warrant of Lull's house and recovered drugs and weapons, after swearing that an undercover informant had advised him that "Lull was selling

17

**JA6910**

quantities of Cocaine, Marijuana and other illegal drugs from his home address," and that this informant "had recently bought illegal drugs from ... Lull." 824 F.3d at 109, 118-20. What the officer failed to disclose was that immediately after completing a controlled buy with Lull, the informant tried to steal some of the money police had given him to make the buy. The Fourth Circuit held that this omission fundamentally undermined the informant's reliability, invalidating the search warrant. *Id.* at 111-13. Because the informant was inherently unreliable, the court excised his statements from the affidavit, *id.* at 118, and then found that without the informant's statements, nothing in the affidavit "identifie[d] Lull specifically as the seller or otherwise connect[ed] him to the drug transaction." *Id.* at 119.

If this omission in *Lull* was material, *id.* at 120, then a law enforcement affiant's omission of facts about his own criminality is also material. The Fourth Circuit has previously held that a defendant should have received a *Franks* hearing when there was evidence of affiant misconduct. In *United States v. Tate*, 524 F.3d 449, 451 (4th Cir. 2008), the Fourth Circuit held that a defendant should have received a *Franks* hearing when the affiant officer failed to disclose that he had trespassed to search defendant's trash. Striking the information obtained from this illegal activity from the record left an affidavit that failed to establish probable cause. *Id.* at 457.

Central to the Fourth Circuit's decisions in *Lull* and *Tate* was that the *Franks* omissions undermined the foundational core of the affidavits. By omitting information about his crimes and corruption during the course of his official duties even as he loaded the affidavit with his supposed experience and training, Louvado interfered with the independent evaluation to assess probable cause that the Fourth Amendment reposed in Judge Hollander and Magistrate Judges Copperthite and Coulson. Instead of assessing Louvado's "veracity" in the course of making the probable cause determination, these judicial officers accorded Louvado's sworn affidavits a

presumption of regularity that was undeserved. *See Lull,* 824 F.3d at 118. Even more concerning,

Louvado was largely recounting information obtained by and from unnamed confidential

informants. And Louvado personally attested to the trustworthiness of these confidential

informants who were at the heart of his TT1 and TT2 wiretap application. An informant's

reliability is of course a central inquiry for any probable cause determination. *Illinois v. Gates*,

462 U.S. 213, 217 (1983). If Louvado was willing to steal and conspire to sell drugs in 2009 and

cover up those crimes for years afterwards, there is good reason to question his personal

assurances to Judge Hollander that the confidential informants at the heart of the wiretap

application in 2016 were trustworthy – as confirmed by the fact that he lied to the FBI in May

2018.

     Applying these precedents to the investigative activity in this case, the proper result

would have been suppressing all evidence that the government obtained as a result of (1) the two

wiretaps, TTI and TT2, for which Louvado was the affiant; (2) two additional wiretaps, TT3 and

TT4, where the affidavit incorporated by reference Louvado's affidavit; and (3) the 15 search

warrants where Louvado was the affiant on the search warrant applications.

     Beyond that, many of the other search warrants in this case were obtained using

information derived from the results of these tainted wiretaps and searches. The exclusionary

rule, of course, directs courts to exclude evidence from a criminal trial if it was obtained in

violation of the Fourth Amendment and extends beyond evidence that is the direct result of an

illegal search or seizure to "evidence later discovered and found to be derivative of an illegality"

– the so-called "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804,

(1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Nothing about the trial

record suggests that this is a case where "where there is sufficient attenuation between the

unlawful search and the acquisition of evidence [such that] the 'taint' of that unlawful search is

purged," and the evidence need not be suppressed. *United States v. Gaines*, 668 F.3d 170, 173

(4th Cir. 2012).

> **E.**     **The Evidence Set Forth in the *Louvado* Information Would Probably**
> **Produce an Acquittal**

Had the wiretaps, search warrants, and derivative evidence been suppressed, the

government certainly could not have proven the racketeering conspiracy (Count 1) charges

against defendants Bailey, Davis, Anderson and Lockley, and the narcotics conspiracy (Count 2)

charges against defendants Bailey, Banks, Lockley, Anderson, and Davis. All convictions on

other counts were tainted by prejudicial spillover from the unlawfully-obtained wiretap and

search warrant evidence, which made it impossible for the jury to fairly assess the discrete drug

distribution and firearms charges against the defendants. "Prejudicial spillover analysis requires a

finding that there was a spillover of evidence from the reversed count that would have been

inadmissible at a trial limited to the remaining count." *United States v. Hornsby,* 666 F.3d 296,

311 (4th Cir. 2012) (citing *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994)).

Louvado's misconduct also undermines the basis for the substantive charges for which

certain defendants were convicted. For example, three non-conspiracy counts against Davis –

felon in possession of a firearm, possession with intent to distribute cocaine base, and possession

of a firearm in furtherance of a drug trafficking crime (Counts 30-32 of the Second Superseding

Indictment) – relate to evidence that law enforcement agents seized when they arrested him on

February 24, 2017, pursuant to a warrant issued on the basis of the Superseding Indictment. That

indictment and warrants would not have existed without the wiretap and warrant evidence that

was tainted by Louvado's misconduct. The same is true for the felon-in-possession charge

against Anderson, which was based on a Louvado search warrant and search that also led to a

statement that was introduced against Anderson at trial. Furthermore, as the government

recognized when it dismissed the felon-in-possession charge against defendant Anderson (Count

24) at his sentencing, all of the § 922(g)(1) charges in this case (Count 16 and 30 against Davis,

Count 17 against Bailey, and Count 24 against Anderson) run afoul of *Rehaif v. United States,*

139 S. Ct. 2191 (2019). *See United States v. Gary,* 954 F.3d 194 (4th Cir. 2020). When these

factors are taken into account, had defendants possessed the evidence set forth in the *Louvado*

Information in time to use it in motions to suppress the wiretaps and search warrants, the likely

result would have been no convictions of any defendant.

### F.     The Good Faith Exception to the Exclusionary Rule Does Not Apply

Finally, the government's position cannot be salvaged through application of the good

faith exception to the exclusionary rule. Under *United States v. Leon,* 468 U.S. 897 (1984),

evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be

excluded if the officer's reliance was "objectively reasonable." *Id.* at 922. As a threshold matter,

the Fourth Circuit has never held in a published opinion that the good faith exception applies to

Title III wiretaps. Reliance on the unpublished opinion in *United States v. Brewer*, 204 F. App'x

205, 207 (4th Cir. 2006), is disfavored pursuant to Fourth Circuit LR 32.1. Moreover,

*Brewer* provided no rationale for extending *Leon* to wiretaps other than citing out of circuit

authority, *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994); *United States v.*

*Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988). Other courts of appeals have held

that *Leon* does not apply to wiretaps. *See*, *e.g.*, *United States v. Glover,* 736 F.3d 509, 515-16

(D.C. Cir. 2013)*, abrogated on other grounds, Dahda v. United States,* 138 S.Ct. 1491 (2018)*;*

*United States v. Rice*, 478 F.3d 704, 712-14 (6th Cir. 2007); *United States v. Spadaccino*, 800

F.2d 292, 296 (2d Cir. 1986). In *Rice,* the Sixth Circuit observed that "the Senate Report

**JA6914**

discussing Title III indicates no desire 'to press the scope of the suppression role beyond

*present* search and seizure law.' S. Rep. No. 90–1097 (1968), *as reprinted in* 1968 M.C.A.N.

2112, 2185 (emphasis supplied). Title III was passed in 1968; *Leon* was decided in 1984." 478

F.3d at 713.

Even if *Leon* does apply to wiretap orders as well as search warrants, good faith analysis

has no place in this case. Under *Leon,* an officer's reliance does not qualify as "objectively

reasonable" under a number of circumstances, one of which is "when the affiant based his

application on knowing or reckless falsity…." *United States v. Wellman,* 663 F.3d 224, 228-29

(4th Cir. 2011) (citing *United States v. Doyle,* 650 F.3d 460, 467 (4th Cir. 2011)). As recent

Fourth Circuit cases such as *Colkley, Jones* and *Wharton* make clear, knowing and reckless

concealment is the equivalent of knowing and reckless falsity. Good faith is simply not

applicable on these facts.

For these reasons, defendants have satisfied the Rule 33(b) standard for a new trial based

on newly discovered evidence.

## II.   DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE OF THE GOVERNMENT'S *BRADY/GIGLIO* VIOLATION

Defendants are also entitled to receive a new trial based on the government's

*Brady/Giglio* violation. Under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny, "the

suppression by the prosecution of evidence favorable to an accused … violates due process

where the evidence is material either to guilty or to punishment, irrespective of the good faith or

bad faith of the prosecution." *Id.* at 87. To satisfy that standard, they must "show that the

undisclosed evidence was (1) favorable to them either because it is exculpatory, or because it is

impeaching; (2) material to the defense, *i.e.*, prejudice must have ensued; and (3) that the

prosecution had materials and failed to disclose them." *United States v. Wolf,* 860 F.3d 175, 189-

**JA6915**

90 (4th Cir. 2017) (citations omitted). While the Fourth Circuit has instructed courts to be

"cautious … about importing the panoply of *Brady* protections from trial practice into warrant

application proceedings," *Colkley,* 899 F.3d at 302, this case amply satisfies *Colkley*'s

requirement that "a strong preliminary showing that the affiant excluded critical information

from the affidavit with the intent to mislead the magistrate" permits "a subsequent attack on the

affidavit's integrity." *Id.* at 303.[6] Additionally, the concern expressed in *Colkley* "that the

non-lawyers who normally secure warrants in the heat of a criminal investigation should not be

burdened with the same duty to assess and disclose information as a prosecutor who possesses a

mature knowledge of the entire case," 899 F.2d at 303, does not apply to the present case.

Louvado's wiretap affidavit was submitted to the Court as part of an application by an AUSA

and had been approved at literally this highest level of the Department of Justice. Under standard

practice at the United States Attorney's Office, prosecutors would have reviewed the search

warrant affidavits.

---

[6] Counsel are aware of language in *United States v. Clenney,* 631 F.3d 658 (4th Cir. 2011) that cited *Colkley* for the proposition that "the protections of *Brady* … do not apply to warrant application proceedings." *Id.* at 665. That statement is not an accurate summary of *Colkley*'s holding permitting *Brady* arguments in suppression proceedings upon a strong preliminary showing that the affiant excluded critical information with the intent to mislead. Notably, in addressing the search warrant issues in *Fisher,* two years after *Clenney,* the Fourth Circuit did not hold that *Brady* did not apply in that context, instead holding that *Brady* issues did not need to be reached. 711 F.3d at 469. Other courts have applied *Brady* to warrants and suppression hearings. *See, e.g., United States v. Barton,* 995 F.2d 931 (9th Cir. 1993); *Smith v. Black,* 904 F.2d 950 (5th Cir. 1990), *vacated on other grounds,* 503 U.S. 930 (1992); *Biles v. United States,* 101 A.3d 1012 (D.C. 2014). Moreover, the United States Attorney's Office acknowledged in *Fisher* that its *Brady/Giglio* obligations apply to search warrant affidavits, when it advised the Fourth Circuit that if the government had "learned of Lunsford's misconduct prior to [Defendant's] guilty plea, it would have disclosed that information to the defense." *Id.* at 476.

23

### A.     The Concealed Evidence Was Favorable Because It Would Have Impeached Louvado

For all the reasons set forth previously, the concealed evidence was favorable to the defendants. Here, the facts set forth in the *Louvado* Information clearly demonstrate that Louvado tried to mislead Judge Hollander, Judge Copperthite, and Judge Coulson into thinking he was a trustworthy, experienced narcotics investigator when in fact he was a drug conspirator and thief.

### B.     The Evidence Was Material to the Defense

Likewise, for all of the reasons set forth above, the information about Louvado was material. There is a "reasonable possibility that its disclosure would have produced a different result" with regard to potential suppression of the wiretaps and warrants, with or without need for a *Franks* hearing. *United States v. Bartko,* 728 F.3d 327, 338 (4th Cir. 2013). "This standard does not require a showing that a jury more likely than not would have returned a different verdict." *United States v.,* 790 F.3d 550, 550 (4th Cir. 2015) (citing *Bartko*).

### C.     The Government Was Responsible for Disclosing *Brady/Giglio* Information About Louvado

The sole remaining question is whether the United States Attorney's Office possessed *Brady* information about Louvado at the time it prosecuted defendants. Applying controlling case law to the existing record, the answer is yes. But, to the extent the factual record requires additional development, this Court should order the government to produce information and documents to defendants or, alternatively, for *in camera* consideration.

The Fourth Circuit recently clarified the standards that govern this issue. As the Court knows, a similar issue arose in the *Gondo* GTTF case, where the United States Attorney's Office brought narcotics charges against a cooperating government witness, Antonio Santiful, shortly

after the trial of officers Daniel Hersl and Marcus Taylor. On the facts presented in that case, this

Court denied defendants' motion for a new trial. In affirming, the Fourth Circuit reaffirmed

> that the *Brady* disclosure requirement covers material "known only to police
> investigators and not to the prosecutor[s]." *Kyles v. Whitley*, 514 U.S. 419, 438
> (1995); *see also United States v. Robinson*, 627 F.3d [at] 951 … ("*Brady*'s
> commands do not stop at the prosecutor's door; the knowledge of some of those
> who are part of the investigative team is imputed to prosecutors regardless of
> prosecutors' actual awareness"). But this principle is not boundless.
> Specifically, *Kyles* recognized that "the individual prosecutor has a duty to learn
> of any favorable evidence *known to the others acting on the government's
> behalf in the case*, including the police." 514 U.S. at 437 (emphasis added).

*United States v. Taylor,* 942 F.3d 205, 225 (4th Cir. 2019). *Brady* was not violated because the

ATF agents investigating the government witness were not part of the same "investigative team"

as the prosecutors and FBI agents prosecuting the case against appellants. *Id.* at 225-26

(collecting cases).

This case is starkly different. At the time Louvado swore out his wiretap and search

warrant affidavits, he was an ATF federal task force officer. ATF was the lead investigating

agency in this case. ATF supervisors – and perhaps ATF's Office of Professional Responsibility

and Security Operations, Internal Affairs Division – were surely aware that one of their task

force officers was under investigation by the United States Attorney's Office and the FBI. The

prosecutors in this case worked in the same division (Northern Division) of the same United

States Attorney's Office (Maryland) operating out of the same office (Baltimore) and involving

the same geographic territory (Baltimore City). Knowledge of one member of

the prosecutor's office will be imputed to the whole office. *See Giglio v. United States,* 405 U.S.

150, 154 (1972) ("A prosecutor's office is an entity and as such it is the spokesman for the

Government. A promise made by one attorney must be attributed, for [*Brady*] purposes to the

Government.") (citing Restatement (Second) of Agency (1958)). "An Assistant United States

25

**JA6918**

Attorney using a witness with an impeachable past has a constitutionally derived duty to search

for and produce impeachment information requested regarding the witness…. Trial counsel for

'the government' will not have discharged that duty unless all those in the government in a

position to know of such information have been canvassed." *United States v. Osorio*, 929 F.2d

753, 761–62 (1st Cir. 1991); *United States v. Perdomo*, 929 F.3d 967, 970 (3d Cir. 1991) ("The

[federal] prosecutor was obliged to produce information regarding [witness]'s background

because such information was available to him.") (citing *United States v. Auten*, 632 F.2d 478,

481 (5th Cir. 1980)).

 Even if AUSAs Hoffman and Perry were not personally aware of the investigation into

Louvado, their superiors certainly were. Through day-to-day supervisory activity and the case

review process, supervisory AUSAs were surely aware of all aspects of the BPD investigation,

including the investigation of Louvado, at the same time they were supervising the present case.

Supervisors had to approve the joint motion to reduce sentence that was filed in Trenell

Murphy's case shortly before this trial. As the government acknowledged in *Fisher,* the United

States Attorney's Office had an institutional obligation to ensure that *Brady/Giglio* information

about Louvado was disclosed in cases where he had been involved. Addressing that issue in a

case decided after *Kyles,* the D.C. Circuit held that within the much larger United States

Attorney's Office for the District of Columbia "the prosecutor is responsible (at a minimum) for

all Brady information in the possession of that office." *In re Sealed Case No. 99-3096 (Brady*

*Obligations)*, 185 F.3d 887, 896 (D.C. Cir. 1999); *see also United States v. Brooks*, 966 F.2d

1500, 1503 (D.C. Cir. 1992) ( "[g]iven the close working relationship between the Washington

metropolitan police and the U.S. Attorney for the District of Columbia (who prosecutes both

federal and District crimes, in both the federal and Superior courts), a relationship obviously at

work in this prosecution, the duty must reach the police department's homicide and Internal

Affairs Division files."); *see also Robinson,* 627 F.3d at 952 ("We draw no hard and fast lines

here about the scope of *Brady* imputation, and we reiterate that prosecutors have a duty to learn

of exculpatory evidence gathered by those acting on the government's behalf.").

> **D.** **If the Record Requires Expansion, the Court Should Compel the Government to Produce Additional Information and Documents About the Louvado Investigation to Defendants or for *In Camera* Inspection**

Prior to filing the present motion, defendants requested that the prosecutors in this

case provide the following information:

- When did the GTTF investigation first become aware of the incident described in the *Louvado* information, the seizure of three kilograms of cocaine on February 19 and 20, 2009?

- When did the GTTF investigation first learn of possible misconduct related to the three kilograms of cocaine?

- When did the GTTF investigation first learn that Det. Louvado may have been involved in or aware of the theft and sale of the cocaine?

- At what point during or after the interview of Det. Louvado on May 30, 2018 did the GTTF investigation conclude that Det. Louvado may have made false statements or concealed material information regarding the 2009 seizure?

- Please identify which prosecutors and agents associated with the investigation and prosecution of the captioned case, including USAO supervisors, were aware of Det. Louvado's lack of candor. In each instance, when did they learn of his lack of candor?

- The filing of a criminal information rather than an indictment indicates that Det. Louvado has signed a plea agreement. When did Det. Louvado sign the plea agreement? When did Det. Louvado first acknowledge to the GTTF investigation, directly or through counsel, that he had made false statements or concealed material information during his May 30, 2018 interview?

- Please identify all times when Det. Louvado was present or participated in surveillance, execution of searches, interrogations/questioning, inventory of evidence, chain of custody, prepping of witnesses, or other activities in connection with the investigation and prosecution of the captioned case.

**JA6920**

- Please identify all times when information provided by Det. Louvado was used by other agents/TFOs to prepare affidavits, testify, or take any other part in the investigation and prosecution of the case.

- Your letter to [Chris Davis, Esq., counsel for Sydni Frazier (*see* ECF 1458, 1470, and 1472),] states that Det. Louvado did not testify at Mr. Frazier's trial or at any hearing related to Mr. Frazier. Det. Louvado did not testify at the trial of Mr. Davis and his co-defendants in March-April 2019, but did testify at the June 1, 2018 motions hearing. Please identify any other times that Det. Louvado testified in connection with the investigation and prosecution of the captioned case, including testimony before the grand jury.

- Det. Louvado was interviewed as part of a criminal investigation two days before the motions hearing and nearly ten months before trial. Given the importance of the search warrant evidence outlined in ECF 1470, please explain why *Brady/Giglio* information about his misconduct was not disclosed prior to the filing of the *Louvado* information. If such information was disclosed, please indicate when and how the disclosure occurred and provide copies of any written disclosure.

*See* Ex. 11.

As noted above, AUSAs Hoffman and Perry declined to answer these questions. Ex. 12.

The Court, however, can order them to provide the requested information and documents related to the question of the United States Attorney's Office collective knowledge of Louvado's misconduct. Defendants request that the information be disclosed directly to defense counsel. In addition, in light of the government's position in this case (a reversal of its position in *Fisher*) that its obligation to disclose *Brady/Giglio* information only applies if a crooked officer testifies at trial, defendants also request that the Court direct the United States to disclose other *Brady/Giglio* information related to Louvado, including other felonious conduct, perjury, false declarations, false police reports, and/or misconduct related to informants.[7]

---

[7] Counsel have become aware that in at least one previous case before this Court in which Louvado was an investigating agent, the United States Attorney's Office dismissed charges following a vigorously contested suppression hearing. *See United States v. Tyrone Powell and Gregory Fitzgerald,* Crim. No. L-09-0373 (now CCB-09-0373), ECF 63 (order of dismissal as to defendant Fitzgerald).

As an alternative, the Fourth Circuit held in *United States v. King,* 628 F.3d 693 (4th Cir. 2011), that district courts can compel *in camera* inspection of material to determine whether it contains *Brady* information:

> In a few atypical cases, however, "it is impossible to say whether" requested information "may be relevant to [a] claim of innocence." *Pennsylvania v. Ritchie,* 480 U.S. 39, 57 (1987). In those cases, in which "an accused cannot possibly know, but may only suspect, that particular information exists which meets [the *Brady*] requirements, he is not required ... to make a particular showing of the exact information sought and how it is material and favorable." *Love v. Johnson,* 57 F.3d 1305, 1313 (4th Cir. 1995). In such circumstances, a defendant need only "make some plausible showing" that exculpatory material exists. *Ritchie,* 480 U.S. at 58 n. 15; *Love,* 57 F.3d at 1313. Once he has done so, he becomes "entitled ... to have the information" – not immediately disclosed to him – but "submitted to the trial court for *in camera* inspection" to determine if in fact the information is *Brady* material subject to disclosure. *Love,* 57 F.3d at 1313; *see also Ritchie,* 480 U.S. at 58. In making the requisite "plausible showing" of the existence of exculpatory information, a defendant must "identify the requested confidential material with some degree of specificity." *United States v. Trevino,* 89 F.3d 187, 189 (4th Cir. 1996).

> In this case, the Government deprived King of any access to the grand jury testimony and so prevented him from specifically proving its materiality. King, however, made the required "plausible showing" of possible exculpatory information by identifying the grand jury transcript of one particular witness – an identification more specific than that which the Supreme Court or we have previously held sufficient to trigger such an *in camera* inspection. *See Ritchie,* 480 U.S. at 60–61 (finding that defendant became entitled to an *in camera* examination of all of a victim's records with Pennsylvania's Children and Youth Services agency); *Love,* 57 F.3d at 1307 (granting *in camera* examination in response to request for "alleged victim's entire file maintained by the Wake County Department of Social Services"). The Government certainly could have granted King's request for this one particular document pertaining to one grand jury witness without embarking on a "groundless fishing expedition[]." *Trevino,* 89 F.3d at 192 (quoting *United States v. Zolin,* 491 U.S. 554, 571 (1989)). King thus identified the information sought with sufficient particularity so as to trigger his right to an *in camera* inspection.

*Id.* at 703.

Similarly, in this case, there is no question that exculpatory material – evidence that Louvado conspired to steal and sell drugs and then lied about it – existed at the time of

defendants' trial in the spring of 2019.  Defendants have made a more than plausible showing

that the information was known or should have been known to the trial team in this case, directly

or through their supervisors, colleagues, and law enforcement partners at ATF. At a minimum,

then, the Court should compel the government submit *in camera* answers to the questions set

forth above and any additional *Brady/Giglio* information regarding Louvado, including all

documents relating to its internal communications or communications with other law

enforcement agencies about Louvado.[8]

## CONCLUSION

For these reasons, the Court should grant a new trial to defendants Bailey, Davis,

Lockley, Anderson, and Davis, and establish a schedule for defendants to file renewed motions

to suppress evidence based on the information set forth above.  If an expanded record is deemed

necessary, the Court should compel the United States Attorney's Office to produce to defense

counsel, or in the alternative submit for *in camera* review, all information and documents

specified above about the government's knowledge of and failure to disclose to the defense,

exculpatory and impeachment information related to the criminal misconduct of Det. Ivo

Louvado.

---

[8]  In addition to the arguments set forth above, defendants Banks, Bailey, Lockley, Anderson, and Davis adopt the arguments set forth in the separate motion to reopen suppression hearing and for a new trial filed by codefendant Sydni Frazier. ECF 1502.

**JA6923**

Respectfully submitted,

/s/ Lisa M. Lorish
Lisa M. Lorish
Federal Public Defenders Office
401 E. Market Street, Suite 106
Charlottesville, VA 22902-5264
434-220-3380
lisa_lorish@fd.org
*Attorney for Randy Banks*

/s/ Allen H. Orenberg
Allen H. Orenberg (Bar. No. 06278)
The Orenberg Law Firm, P.C.
12505 Park Potomac Ave., 6th Floor
Potomac, MD 20854
301-984-8005
aorenberg@orenberglaw.com
*Attorney for Jamal Lockley*

/s/ Stuart A. Berman
Stuart A. Berman (Bar No. 08489)
Lerch Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, MD 20814
301-657-0729
saberman@lerchearly.com
*Counsel for Shakeen Davis*

/s/ Richard S. Stolker
Richard S. Stolker (Bar No. 00259)
Uptown Law, LLC
2275 Research Boulevard, Suite 500
Rockville, MD 20850
301-294-9500
rstolker@stolker.com
*Attorney for Dante Bailey*

/s/ Carmen D. Hernandez
Carmen D. Hernandez (Bar No. 03366)
7166 Mink Hollow Road
Highland, MD 20777
240-472-3391
Chernan7@aol.com
*Attorney for Corloyd Anderson*

Dated:  June 3, 2020

31

**JA6924**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. CCB-16-0267** |
| | * | |
| **DANTE BAILEY, et al.,** | * | |
| | * | |
| **Defendants** | * | |

\*\*\*\*\*\*\*

## <u>ORDER</u>

On consideration of the motion for new trial filed jointly by defendants Dante Bailey,

Randy Banks, Jamal Lockley, Corloyd Anderson, and Shakeen Davis, and good cause having

been shown,

IT IS ORDERED that the motion is granted. The judgments of conviction for all

defendants are vacated. The Court will contact counsel to arrange a scheduling conference.


_____
Catherine C. Blake
United States District Judge

**JA6925**

LJW/DEH: USAO#2020R00018

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2020 MAR 11    PM 3: 44

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. DKC-20-098 |
| | * | |
| IVO LOUVADO, | * | **(False Statement to Federal Law** |
| | * | **Enforcement, 18 U.S.C. § 1001(a)(2))** |
| Defendant. | * | |
| | * | |
| | * | |
| | ****** | |

**INFORMATION**

The United States Attorney for the District of Maryland charges that:

**COUNT ONE**
**(False Statement to Federal Law Enforcement)**

**Introduction**

1. The Baltimore Police Department ("BPD") is an agency of the State of Maryland whose

   law enforcement jurisdiction includes Maryland's largest city, Baltimore.

2. Sworn members of the BPD must abide by the Law Enforcement Officer's Code of

   Ethics, which provides, in pertinent part:

   > As a Law Enforcement Officer, my fundamental duty is to serve the
   > community; to safeguard lives and property; to protect the innocent
   > against deception, the weak against oppression or intimidation; the
   > peaceful against violence or disorder; and to respect the
   > constitutional rights of all to liberty, equality and justice. Honest in
   > thought and deed both in my personal and official life, I will be
   > exemplary in obeying the law and the regulations of my department
   > … I recognize the badge of my office as a symbol of public faith
   > and I accept it as a public trust to be held so long as I am true to the
   > ethics of police service.

**EXHIBIT 1**

3. IVO LOUVADO ("LOUVADO") joined the BPD on November 21, 1999. LOUVADO was promoted to Detective in 2008.

4. In February 2009, LOUVADO was serving on a squad with W.J., C.J., P.G., K.G., and V.R. that was supervised by W.K.

**The Seizure of More Than 41 Kilograms of Cocaine in February 2009**

5. Prior to February 19, 2009, W.J. and C.G. told LOUVADO that they had received information from a confidential informant about a large-scale narcotics trafficker operating out of a residence on the 1400 block of Ellamont Street, in Baltimore, Maryland.

6. On February 19, 2009, LOUVADO, and other members of the squad were conducting surveillance in the 1400 block of Ellamont Street targeting an individual whose initials are T.M. Other officers participating in the law enforcement action followed a car from that residence. Those officers claimed to have recovered trash that contained cocaine residue that had been thrown from the car they had followed. LOUVADO and other officers then responded to the residence that the man was allegedly observed leaving and made entry. LOUVADO and other officers remained in the house until W.J. and C.J. obtained a search warrant from a Baltimore City District Court judge.

7. LOUVADO ultimately participated in the search of the residence and took photographs of items that BPD seized. At some point, LOUVADO was alerted to the presence of a jacket hanging behind a door that contained a large amount of cash in it, which LOUVADO photographed.

- 2 -

**JA6927**

8. While in the house, officers found car keys, including a key that had the ability to activate an alarm in a vehicle remotely. A BPD officer activated the alarm and officers heard the alarm sound in a pickup truck that was parked nearby. LOUVADO had never seen the truck before the alarm was activated and had no knowledge of its existence until this time.

9. LOUVADO and other officers went to the pickup. The back of the pickup truck had an opaque cover over it that could be locked. The cover was opened and in the back of the pickup truck, under construction debris, a significant quantity of cocaine was found. LOUVADO and other officers waited with the cocaine until a SWAT team arrived. The SWAT team was called to provide protection during the transportation of the cocaine to BPD headquarters because it was such a large quantity. In order to transport the cocaine from the scene to BPD headquarters, it was loaded into a BPD surveillance van driven by K.G.

10. After the cocaine was loaded into the surveillance van, LOUVADO followed the SWAT team to BPD headquarters to maintain chain-of-custody over the cocaine.

11. Forty-one (41) kilograms of cocaine was turned into the BPD's Evidence Control Unit on February 20, 2009.

12. Later that day, a criminal complaint was filed in the United States District Court for the District of Maryland charging T.M. with possessing with intent to distribute five or more kilograms of cocaine.

- 3 -

**The Sale of Three Kilograms of Cocaine from the February 2009 Seizure**

13. Subsequent to the seizure, LOUVADO, K.G. and V.R. discovered 3 additional kilograms of cocaine in the surveillance van that had been used to transport the 41 kilograms that were turned in to BPD. These kilograms of cocaine had come from the seizure from T.M.'s pickup truck on February 19 and 20, 2009, but had not be turned into the BPD on February 20, 2009.

14. Rather than turn this cocaine into BPD, LOUVADO, K.G. and V.R. agreed to sell the cocaine and split the proceeds from its sale.

15. V.R. sold the cocaine to a confidential informant of his, V.R.'s, who trafficked in cocaine. The source proceeded to sell the cocaine in Baltimore City. V.R. received the proceeds of the sale from his source and then shared them with LOUVADO and K.G. Ultimately, LOUVADO received $10,000 in drug proceeds from the sale of the cocaine seized from T.M.'s pickup truck that had not been turned in to BPD.

**The FBI Interviewed the Defendant About the Cocaine Seizure in February 2009**

16. In January 2010, LOUVADO became a federal task force officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). As an ATF TFO, LOUVADO knew it was a crime to provide false information, or to conceal or cover up material facts, during voluntary interviews with federal law enforcement.

17. On March 1, 2017, seven members of the BPD's Gun Trace Task Force were arrested on federal racketeering charges, including W.J. Following the filing of charges, the FBI continued to investigate misconduct by members of the BPD.

- 4 -

**JA6929**

18. On May 30, 2018, LOUVADO agreed to participate in a voluntary interview with an FBI special agent and an FBI task force officer (collectively, "the FBI agents"). The FBI agents questioned LOUVADO about the seizure of cocaine on February 19 and 20, 2009.

### The Charge

19. On or about May 30, 2018, in the District of Maryland, the defendant,

### IVO LOUVADO,

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by concealing and covering up material facts, namely, that he and two other officers had split the proceeds from the sale of three of the kilograms of cocaine that had been seized by BPD on February 19 and 20, 2009. **LOUVADO** knew that the FBI was investigating police corruption and was questioning him about the seizures that day in order to determine if police misconduct had occurred.

18 U.S.C. § 1001.

Date: March **11**, 2020

Robert K. Hur
United States Attorney

**JA6930**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

FILED
LODGED                    ENTERED
                          RECEIVED

JUN 3 0 2016

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY

DEPUTY

IN THE MATTER OF THE APPLICATION OF THE
UNITED STATES OF AMERICA FOR
AUTHORIZATION TO INTERCEPT WIRE
COMMUNICATIONS OCCURRING OVER THE
CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (443) 301-8819 AND BEARING IMSI
NUMBER 310410801883553, AND WIRE
COMMUNICATIONS OCCURRING OVER THE
CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (443) 766-6957 AND BEARING IMSI
NUMBER 310260637910168

MISC. NO. 16 mc 438

(UNDER SEAL)

### APPLICATION FOR INTERCEPTION
### OF WIRE COMMUNICATIONS

Christina Hoffman, Assistant United States Attorney for the District of Maryland, being

duly sworn, states:

1.     I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by

law to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title

18, United States Code.  I am also an attorney for the Government as defined in Rule 1(b)(1) of

the Federal Rules of Criminal Procedure, and, therefore, pursuant to Section 2516(3) of Title 18,

United States Code, I am authorized to make an application to a federal judge of competent

jurisdiction for an order authorizing the interception of wire and electronic communications.

2.     This Application is for an order pursuant to Section 2518 of Title 18, United

States Code, and seeks authorization to intercept (1) wire communications occurring to and from

the cellular telephone currently assigned call number (443) 301-8819, and bearing IMSI number

310410801883553, with service provided by T-Mobile US, Inc., and with unknown subscriber

1

**EXHIBIT 2**

information, but in active use by Dwight JENKINS a/k/a "Huggie," (hereinafter, "**TARGET TELEPHONE 1**," or "**TT1**"); and (2) wire communications occurring to and from the cellular telephone currently assigned call number (443) 766-6957 and bearing IMSI number 310260637910168, with service provided by T-Mobile US, Inc., subscribed to Maurice Love, with an address of 5200 W. North Ave. Baltimore, Maryland 21207, but in active use by Jacob BOWLING a/k/a "Jakey" (hereinafter, "**TARGET TELEPHONE 2**," or "**TT2**"). The requested authorization would apply to wire communications of Dwight JENKINS a/k/a "Huggie" a/k/a "Unc"; Jacob BOWLING a/k/a "Ghost" a/k/a "Jakey" a/k/a "Fats"; Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Jamal LOCKLEY a/k/a "T-Roy"; Tiffany BAILEY; Randy BANKS a/k/a "Dirt"; Corloyd ANDERSON a/k/a "Bo"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray"; Adrian Jamal SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a "SP"; Dominick WEDLOCK a/k/a "Rage" a/k/a "Nic"; William JONES a/k/a "Bill"; Jarmal HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dominique ROZZELL a/k/a "Boozie"; Maurice POLLOCK a/k/a "Reese"; Ayinde DELEON a/k/a "Murda"; Jay GREER a/k/a "Champagne"; Kenneth TORRY a/k/a "Kenny"; Michael STEWART; Jawaun TALLEY; Charles BLACKWELL; Shakeen DAVIS; Takuma TATE a/k/a "Oop"; Sidney FRAISER a/k/a "Sid"; Queontaye FORTUNE; Kenyon PATTERSON a/k/a "Konan"; Chiquetta HEATH a/k/a "Bandi"; Michael SINGER a/k/a "Blizz"; Delante LEE; Eddie MCCARGO; and other known and unknown co-conspirators (collectively, the "**Target Subjects**").

3. **TARGET TELEPHONES 1 AND 2** are being used in the District of Maryland and elsewhere by certain of the above-named persons concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses enumerated in 18 U.S.C. § 2516: (i) distribution of, and possession with intent to distribute, controlled substances, in violation of 21

2

**JA6932**

U.S.C. § 841(a)(1); (ii) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (iii) use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); (iv) maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861; (vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; (vii); the laundering of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18 U.S.C. § 2 (collectively, the "**Target Offenses**"). There is probable cause to believe these offenses are being committed by certain of the Target Subjects.

4.    Pursuant to Section 2516 of Title 18, United States Code, the Attorney General of the United States has specially designated the Assistant Attorney General, any Acting Assistant Attorney General, any Deputy Assistant Attorney General or any acting Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by Section 2516 of Title 18, United States Code, to authorize this Application. Under the power designated by special designation of the Attorney General pursuant to Attorney General Order Number 3536-2015, dated June 11, 2015, Richard W. Downing, Acting Deputy Assistant Attorney General of the Criminal Division, has authorized this Application. Attached to this Application, as Exhibit A, are copies of the Attorney General's order of special designation and the Memorandum of Authorization approving this Application.

5.    I have discussed all of the circumstances of the above offenses with Task Force Officer Ivo Louvado of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), who has been directly involved in conducting this investigation, and I have examined the affidavit of TFO Louvado, which is attached to this Application, as Exhibit B, and is incorporated herein by reference. Based upon that affidavit, your Applicant states upon information and belief that:

3

A.  There is probable cause to believe that certain of the Target Subjects have committed, are committing, and will continue to commit crimes of (i) distribution of, and possession with intent to distribute, controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (iii) use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); (iv) maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861; (vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; (vii) the laundering of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18 U.S.C. § 2.

B.  There is probable cause to believe that particular wire communications concerning the above-described offenses will be obtained through the interception of wire communications over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**.  In particular, these communications will concern:

   a.  the methods of operation of this armed drug trafficking conspiracy, including the precise nature and scope of illegal activities described herein and the relationship of the organization to other drug and firearms trafficking organizations;

   b.  the identities and roles of other participants in the conspiracy, accomplices, and aiders and abettors, including the sources of supply of controlled substances and firearms to the TARGET SUBJECTS, and the purchasers of controlled substances distributed by the TARGET SUBJECTS;

   c.  the management of the conspiracy, including the way orders and instructions are disseminated to subordinates;

4

**JA6934**

d.  the collection of gang "dues" from members of the gang and/or imposition of "taxes" on nonmembers who operate in the gang's territories;

e.  the methods used by the conspiracy to protect its members, territories, and assets (*e.g.*, firearms, controlled substances, and proceeds derived from the sale of controlled substances);

f.  the use of firearms in furtherance of the conspiracy;

g.  the times, dates, and locations of meetings at which persons involved in this conspiracy pick up drugs and/or firearms, exchange money, and meet to discuss the conspiracy and the progress of their illegal activities;

h.  the quantities and types of controlled substances involved in this drug trafficking conspiracy,

i.  the manner of shipment or movement of controlled substances distributed in connection with this conspiracy and firearms used in furtherance of this conspiracy;

j.  the methods of paying for the controlled substances and firearms involved in the conspiracy, and the location, movement and disposition of all proceeds from illicit drug activity associated with this conspiracy, including efforts to launder drug proceeds;

k.  the identification of other locations and facilities used in furtherance of the TARGET OFFENSES, as well as contraband, firearms, and money derived from and used in furtherance of such offenses;

l.  the existence and location of records of the purchase and sale of narcotics and firearms associated with this conspiracy;

m. the methods used by the TARGET SUBJECTS and others to elude law

5

**JA6935**

enforcement detection; and

n.  the identification of additional communication devices or telephone instruments used by the TARGET SUBJECTS and others in furtherance of the TARGET OFFENSES.

C.  Normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, as is described in further detail in the attached affidavit;

D.  There is probable cause to believe that **TARGET TELEPHONE 1**, from which wire communications are to be intercepted, and **TARGET TELEPHONE 2**, from which wire communications are to be intercepted, are being used and will continue to be used in connection with the commission of the above-described offenses in and around the District of Maryland and elsewhere.

6.  The attached affidavit contains a full and complete statement of facts concerning all previous applications which are known to have been made to any judge of competent jurisdiction for approval of the interception of the oral, wire, and/or electronic communications of any of the same individuals, facilities, or premises specified in this Application. The Applicant is aware of no previous applications made to any judge for authorization to intercept the wire communications of any of the persons or involving the facilities specified in this Application, except the applications referenced in the affidavit.

7.  The authorization sought is intended to apply not only to **TARGET TELEPHONES 1 and 2**, but also to any other telephone number or telephone accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through **TARGET TELEPHONES 1 and 2**, within the thirty-day period. The authorization is also intended to apply to **TARGET TELEPHONES 1 and 2** regardless of service provider.

6

8.     Your Applicant further requests that the service provider be ordered to provide information related to the location where **TARGET TELEPHONES 1 and 2** are being used. The affidavit of TFO Louvado demonstrates probable cause to believe that the users of **TARGET TELEPHONES 1 and 2** are using the telephones to commit the violations listed above, within and outside the District of Maryland.  The affidavit also sets forth probable cause to believe that both precise geolocation information and the cell site data will be evidence of criminal activity in violation of the above listed statutes.

**WHEREFORE**, your Applicant believes that there is probable cause to believe that the certain of the Target Subjects are engaged in the commission of offenses involving (i) distribution of, and possession with intent to distribute, controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (iii) use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); (iv) maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861; (vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; (vii); the laundering of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18 U.S.C. § 2, in the District of Maryland and elsewhere; that certain of the Target Subjects are using **TARGET TELEPHONES 1 and 2** in connection with the commission of the above-described offenses; and that certain of the Target Subjects will be intercepted over the above-described telephone facilities.

**IT IS REQUESTED** that, based on the allegations set forth in this application and on the affidavit of TFO Ivo Louvado, a copy of which is attached, this Court issue an order pursuant to the power conferred upon it by Section 2518 of Title 18, United States Code, authorizing the

7

**JA6937**

ATF and participating law enforcement agencies to intercept wire communications to and from the above-described facilities, until such communications are intercepted that reveal the manner in which the named Target Subjects and others unknown participate in the specified offenses and reveal the identities of their co-conspirators, place(s) of operation, and nature of the conspiracy, or for a period not to exceed a period of thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

**IT IS FURTHER REQUESTED** that the authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty-day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use. It is further requested that the service provider be ordered to provide precise location information with respect to **TARGET TELEPHONES 1 and 2**.

**IT IS FURTHER REQUESTED** that in the event that the service provider changes during the course of the interception, interception may continue with the new service provider without further order of this Court. The United States will advise the Court of the change of service provider in the periodic progress reports submitted to this Court.

**IT IS FURTHER REQUESTED**, pursuant to 18 U.S.C. § 2518(3), that in the event that that **TARGET TELEPHONES 1 and 2** are used outside the territorial jurisdiction of this Court, interceptions of the transferred facility may continue to take place in the District of Maryland where all communications will first be heard and minimized, regardless of where the wire communications are placed to or from.

8

IT IS FURTHER REQUESTED that this Court issue an order pursuant to Section 2518(4) of Title 18, United States Code, directing T-Mobile, which is the electronic communication service providers as defined in Section 2510(15) of Title 18, United States Code, and any subsequent service provider or providers that provide service to **TARGET TELEPHONES 1 and 2**, to furnish and continue to furnish the ATF with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting communications over the above-described telephone. The Applicant further requests that this Court issue an order to the service provider pursuant to the authority granted in 18 U.S.C. § 3123, authorizing the installation and use of a pen register and trap and trace device to collect the dialing, routing, addressing, and signaling information identifying the destination of outbound communications transmitted from **TARGET TELEPHONES 1 and 2**, and the source of incoming communications transmitted to **TARGET TELEPHONES 1 and 2**. The Applicants further request that this Court order the service provider, pursuant to 18 U.S.C. § 3124, to furnish all information, facilities, and technical assistance necessary to accomplish such installation and use unobtrusively and with a minimum of interference with the services that the service provider accords to the user of **TARGET TELEPHONES 1 and 2**. The service provider shall be compensated by the ATF for reasonable expenses incurred in providing such information, facilities, and technical assistance.

IT IS FURTHER REQUESTED, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), that the Court issue an Order authorizing agents of the ATF to ascertain the physical locations of **TARGET TELEPHONES 1 and 2**, including but not limited to E-911 Phase II data or other precise location information concerning **TARGET**

9

**TELEPHONES 1 and 2** (the "Requested Location Information"), during the authorized period of interception. Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by **TARGET TELEPHONES 1 and 2** at the start and end of any call, pursuant to 18 U.S.C. §§ 3122-24, 18 U.S.C. § 2703(c)(1)(A), and Federal Rule of Criminal Procedure 41. As explained in more detail in the affidavit of ATF TFO Ivo Louvado, there is probable cause to believe that the locations of **TARGET TELEPHONES 1 and 2** during that period will constitute evidence of the Target Offenses.

IT IS FURTHER REQUESTED that the Court direct T-Mobile to disclose the Requested Location Information concerning **TARGET TELEPHONES 1 and 2** during the authorized period of interception, and to initiate a signal to determine the location of **TARGET TELEPHONES 1 and 2** on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the information, facilities and technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of **TARGET TELEPHONES 1 and 2**, at any time of day or night, owing to the potential need to locate **TARGET TELEPHONES 1 and 2** outside of daytime hours.

IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize delay of notice of the acquisition of the Requested Location Information for a period not to exceed 120 days from the date that the order is entered. There is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of **TARGET TELEPHONES 1 and 2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence,

10

**JA6940**

change patterns of behavior, notify confederates, and flee from prosecution. The period of delay may thereafter be extended by the court for good cause shown.

**IT IS FURTHER REQUESTED**, to avoid prejudice to this criminal investigation, that the Court order the provider of electronic communication service and their agents and employees not to disclose or cause a disclosure of this Court's order or the request for information, facilities, and assistance by the ATF or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services requested. In particular, said providers and their agents and employees should be ordered not to make such disclosure to lessees, telephone subscribers, or any interceptee or participant in the intercepted communications.

**IT IS FURTHER REQUESTED** that this Court direct that its order be executed as soon as practicable after it is signed and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Subjects or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.    If the conversation is minimized, the monitoring agent shall use reasonable spot monitoring to ensure that minimized calls have not become criminal in nature.   Special attention will be given to minimize all privileged communications.   Monitoring will be conducted by ATF TFO Ivo Louvado and/or other ATF agents, task force officers, certified support personnel, or contract personnel under the supervision of investigative or law enforcement officers authorized to

11

conduct the interception. The interception of wire communications authorized by this Court's order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty days measured from the date of the Court's order, whichever is earlier.

**IT IS FURTHER REQUESTED** that the Court order that either the Applicant or any other Assistant United States Attorney familiar with the facts of the case provide the Court with a report after the first 15 days of interceptions, and then for each subsequent 15 day interval thereafter, showing what progress has been made toward achieving the authorized objectives and the need for continued interception. These reports shall be due as soon as practicable after the completion of each 15-day period.

**IT IS FURTHER REQUESTED** that the Court order that its orders, this Application and the accompanying affidavit and proposed orders, and all interim reports filed with the Court with regard to this matter be sealed until further order of this Court, except that copies of the orders, in full or redacted form, may be served on the ATF, and the United States Attorney's Office for the District of Maryland, and the service provider as necessary to effectuate the Court's order as set forth in the proposed orders accompanying this Application.

DATED this 30th day of June, 2016.

_Christina Hoffman_
Christina A. Hoffman
Assistant United States Attorney

SUBSCRIBED and SWORN to before me this 30th day of June, 2016.

_Ellen K. Hollander_ @ 3.50 P.M.
The Honorable Ellen L. Hollander
United States District Judge, District of Maryland

12

I hereby attest and certify on _6/30/16_
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.
FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
By_____ Deputy



U.S. Department of Justice

Criminal Division

Washington, D.C.  20530

**MEMORANDUM**                                    JUN 3 0 2016

TO:        Monique Perez Roth, Director
           Office of Enforcement Operations
           Criminal Division

ATTN:      Christina Hoffman
           Jason Medinger

FROM:      Leslie R. Caldwell
           Assistant Attorney General
           Criminal Division

SUBJECT:   Authorization for Interception Order Application

     This is with regard to your recommendation that
an appropriately designated official of the Criminal Division
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period the
initial interception of wire communications occurring to and
from the cellular telephones bearing the numbers (443) 301-8819,
with no known subscriber information, and accessed through
International Mobile Subscriber Identity ("IMSI") number
310410801883553, and (443) 766-6957, subscribed to by Maurice
Love, 5200 W. North Ave., Baltimore, Maryland, and accessed
through IMSI number 310260637910168, in connection with an
investigation into possible violations of Title 18, United
States Code, Sections 2, 371, 922, and 924; Title 21, United
States Code, Sections 841, 843, 846, and 856; and Title 26,
United States Code, Section 5861, by Dwight Jenkins, Jacob
Bowling, Dante Bailey, Jamal Lockley, Tiffany Bailey, Randy
Banks, Corloyd Anderson, Melvin Lashley, Dontray Johnson, Adrian
Jamal Spence, Dominick Wedlock, William Jones, Jarmal Harrid,
Jamal Smith, Dominique Rozzell, Maurice Pollock, Ayinde DeLeon,
Jay Greer, Kenneth Torry, Michael Stewart, Jawaun Talley,
Charles Blackwell, Shakeen Davis, Takuma Tate, Sidney Fraiser,
Queontaye Fortune, Kenyon Patterson, Chiquetta Heath,  Michael
Singer, Delante Lee, Eddie McCargo, and others as yet unknown.

**JA6943**

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 3536-2015, dated June 11, 2015, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications.  As a duly designated official in the Criminal Division, this power is exercisable by the undersigned.  WHEREFORE, acting under this delegated power, the appropriately designated official authorizes the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty (30) day period.  The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

<div style="margin-left:40%">

_____

Leslie R. Caldwell
Assistant Attorney General
Criminal Division

**JUN 3 0 2016**

_____

Date

</div>

**RICHARD W. DOWNING**
**ACTING DEPUTY ASSISTANT ATTORNEY GENERAL**
**CRIMINAL DIVISION**



# Office of the Attorney General
Washington, D.C.

ORDER NO. 3536-2015

SPECIAL DESIGNATION OF CERTAIN OFFICIALS OF THE CRIMINAL DIVISION AND
NATIONAL SECURITY DIVISION TO AUTHORIZE APPLICATIONS FOR COURT
ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS

By virtue of the authority vested in me as the Attorney General, including 28 U.S.C.
§ 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in order to preclude any contention that the
designations by the prior Attorney General have lapsed, the following officials are hereby
specially designated to exercise the power conferred by Section 2516(1) of Title 18, United
States Code, to authorize applications to a Federal judge of competent jurisdiction for orders
authorizing or approving the interception of wire and oral communications by the Federal
Bureau of Investigation or a Federal agency having responsibility for the investigation of the
offense(s) as to which such application is made, when such interception may provide evidence of
any of the offenses specified in Section 2516 of Title 18, United States Code:

1.      The Assistant Attorney General in charge of the Criminal Division, any Acting
Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney
General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the
Criminal Division;

2.      The Assistant Attorney General for National Security, any Acting Assistant
Attorney General for National Security, any Deputy Assistant Attorney General for National
Security, and any Acting Deputy Assistant Attorney General for National Security, with respect
to those matters delegated to the supervision and responsibility of the Assistant Attorney General
for National Security. These officials of the National Security Division shall exercise this
authority through, and in full coordination with, the Office of Enforcement Operations within the
Criminal Division.

Attorney General Order No. 3055-2009 of February 26, 2009, is revoked effective at
11:59 p.m. of the day following the date of this order.

11 June 2015
_____
Date

Loretta E. Lynch
Attorney General

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

</div>

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING TO AND FROM THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 301-8819 AND BEARING IMSI NUMBER 310410801883553 ("TARGET TELEPHONE 1"), AND WIRE COMMUNICATIONS OCCURRING TO AND FROM THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 766-6957 AND BEARING IMSI NUMBER 310260637910168 ("TARGET TELEPHONE 2") | MISC. NO. _____<br><br>(UNDER SEAL) |

<div align="center">

**AFFIDAVIT IN SUPPORT OF APPLICATION**
**FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS**

</div>

I, Ivo Louvado, a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, depose and state as follows:

**I.   INTRODUCTION**

1.   I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.   I submit this affidavit in support of an application for an order pursuant to 18 U.S.C. § 2518, authorizing the interception of (1) wire communications to and from the cellular telephone currently assigned call number (443) 301-8819, and bearing IMSI number 310410801883553, with service provided by T-Mobile US, Inc., and with unknown subscriber information, but in active use by Dwight JENKINS a/k/a "Huggie" a/k/a "Unc" ("**TARGET TELEPHONE 1**"), and (2) wire communications to and from the cellular telephone currently

<div align="center">

1

</div>

<div align="center">

**JA6946**

</div>

assigned call number (443) 766-6957 and bearing IMSI number 310260637910168, with service provided by T-Mobile US, Inc., subscribed to Maurice Love, with an address of 5200 W. North Ave. Baltimore, Maryland 21207, but in active use by Jacob BOWLING a/k/a "Jakey" a/k/a "Ghost" (**"TARGET TELEPHONE 2"**).

## II.     AFFIANT BACKGROUND

3.      I am a Task Force Officer ("TFO") with the ATF, and I am currently assigned to a joint task force comprised of ATF agents and detectives from the Baltimore Police Department ("BPD"). I have been employed by the BPD since November 1999, and I have been assigned to the ATF since 2010. Prior to becoming a police officer, I attended the John Jay College of Criminal Justice, where I obtained a Bachelor of Science Degree in Criminal Justice. As a member of the BPD, my assignments have included uniform patrol in the Northeastern District, the Northeastern District Operations Unit, the Organized Crime Division Narcotics Enforcement, and the Violent Crime Impact Section Major Case Unit.

4.      I attended the Maryland Police Corps Academy from June 1999 through November 1999, where I received 40 hours of specialized training in narcotics enforcement. I have received approximately 40 hours of training in narcotics enforcement provided by the BPD Education and Training Division through in-service training. In February 2003, I received 40 hours of specialized training provided by the Southeastern Public Safety Institute in St. Petersburg College, Florida, focusing on undercover operations and drug identification. In October 2005, I received another 24 hours of specialized training provided by the Southeastern Public Safety Institute at St. Petersburg College, Florida. This training focused on vehicle searches, hidden compartments, evidence handling, commercial vehicle narcotics smuggling, and officer safety. In April 2006, I attended a 16-hour course provided by the High Intensity Drug Trafficking Area

2

(HIDTA).   This course focused numerous topics, including search and seizure warrants, court testimony, case preparation, major case investigations, surveillance, narcotics identification, methods of narcotics distribution, undercover operations, and confidential informants.

5.     In May 2009 I received a 16-hour course provided by the Richmond Police Department focusing on Global Positioning Systems ("GPS").   The course topics included GPS tracking devices, installation, global positioning software training, and electronic surveillance methods.

6.     In January 2010, I attended a 16-hour course provided by ATF.   The course topics included firearms enforcement programs, TFO training, undercover operations, use of confidential informants, surveillance methods and techniques, and TFO standard operating procedures.   In March 2013, I attended an eight-hour course provided by the BPD and the ATF that focused on characteristics of armed persons and firearms identification.   In July 2014, I attended a 24-hour course provided by the ATF that focused on gun tracing and identification, electronic surveillance, wire intercept procedure, and undercover operations.

7.     I have participated in the arrest of approximately 1,000 persons for controlled dangerous substances ("CDS"), violent crime, and/or firearms violations. I have authored and/or executed more than 150 search and seizure warrants related to CDS, violent crime, and/or firearms violations.   I have participated in previous investigations utilizing the interception of wire and electronic communications.   I have become familiar with electronic surveillance equipment, including video recorders, tape recorders, and Kel-set devices, used for monitoring street level distribution.   Additionally, I have become familiar with Dialed Number Recorders ("DNR"), and equipment necessary for the interception of electronic communications.   I have worked with different organizations, such as the ATF, the Drug Enforcement Administration

3

**JA6948**

("DEA"), and the Federal Bureau of Investigation ("FBI"), for the purpose of investigating drug organizations and firearms traffickers in Baltimore City and elsewhere in the State of Maryland.

8.      I have been recognized as an expert in the identification, methods of distribution, and prices of controlled dangerous substances, as a firearms recognition expert, and as a wiretap procedure expert.   I have testified as an expert in the federal United States District Court for the District of Maryland, the District Court of Maryland, the Circuit Court for Baltimore City, as well as in the Baltimore City Grand Jury.

9.      I have participated in numerous investigations focusing on CDS trafficking, home invasions, gangs, and illegal firearms trafficking and possession.   I have conducted covert surveillance of suspected CDS traffickers; interviewed numerous individuals involved in gangs and the CDS trafficking trade; participated in several Title III wiretap investigations as an affiant, monitor, and member of surveillance teams; participated in the execution of numerous state and federal search and arrest warrants involving CDS traffickers and violent offenders, including home invasion crews; and participated in the seizure of numerous firearms and controlled dangerous substances.   Through my training, education, and experience, I have become familiar with the manner in which illegal CDS is transported, stored, and distributed, the methods of payment for such CDS, the manner in which CDS traffickers communicate with each other, and the use of firearms to protect CDS and CDS proceeds.

### III.      BASIS OF INFORMATION

10.      The instant investigation is being conducted by the ATF and the BPD.   I have personally participated in this investigation and make this affidavit based upon my personal participation in this investigation and upon information I believe to be reliable from the following sources: my training and experience investigating violations of the federal narcotics and firearms

4

laws; oral and written reports, as well as documents regarding this investigation that I have received from members of the ATF, other federal agencies, and state and local law enforcement; discussions I have had personally concerning this investigation with experienced narcotics and firearms investigators; physical surveillance conducted by the ATF and state and local law enforcement agencies, the results of which have been reported to me either directly or indirectly; evidence seized as a result of arrests of the TARGET SUBJECTS and/or search warrants executed at their residences; public records; and toll records, pen register and trap & trace information, and subscriber information relating to the telephones used by the TARGET SUBJECTS and others.

11.    Because this affidavit is being submitted for the limited purpose of obtaining authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation.   Rather, I have included only those facts that I believe are necessary to establish probable cause for an order authorizing the requested interceptions.

## IV.    BACKGROUND OF INVESTIGATION

12.    Since roughly January 2016, the ATF has been investigating a violent subset of the Bloods gang that is trafficking drugs in Northwest Baltimore known as "**Murdaland Mafia Piru**" (hereinafter, "**MMP**" or "**the DTO**").   MMP's central operating areas are the 5200 block of Windsor Mill Road (in particular, the BP gas station located at the intersection of Windsor Mill Road and Forest Park Avenue) and the intersection of Gwynn Oak Avenue and Liberty Heights Avenue.   The leader of MMP is Dante BAILEY a/k/a "Gutta" a/k/a "Almighty."   Randy BANKS a/k/a "Dirt" is also high-ranking member of MMP who heads the DTO's Gwynn Oaks/Liberty Heights drug shop.

5

**JA6950**

13.     Based on evidence gathered to date, including information from confidential sources, observations of law enforcement officers, and controlled purchases of heroin and cocaine, investigators believe that members of the DTO are responsible for trafficking large quantities of heroin and cocaine in Northwest Baltimore and neighboring Baltimore County. Investigators believe that the street-level distributors, commonly referred to as "hitters," include, among others, Dwight JENKINS a/k/a "Huggie" a/k/a "Unc"; Jacob BOWLING a/k/a "Jakey" a/k/a "Ghost"; Jamal LOCKLEY a/k/a "T-Roy"; Maurice POLLOCK a/k/a "Reese"; Sidney FRAISER a/k/a "Sid"; Delante LEE, and Melvin LASHLEY a/k/a "Menace."

14.     In addition, based on evidence gathered to date, investigators know that members of MMP frequently carry and employ firearms.   Investigators believe that members of MMP are using firearms and acts of violence to intimidate rival drug dealers and to protect and expand their drug operation.   As discussed further in Section VII below, MMP is believed to be responsible for numerous murders and nonfatal shootings in Baltimore over the last four years.

## V.     PURPOSE OF AFFIDAVIT

15.     I submit this affidavit in support of an application for an order pursuant to 18 U.S.C. § 2518, authorizing the interception of (1) wire communications of Dwight JENKINS a/k/a "Huggie" a/k/a "Unc"; Jacob BOWLING a/k/a "Ghost" a/k/a "Jakey" a/k/a "Fats"; Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Jamal LOCKLEY a/k/a "T-Roy"; Tiffany BAILEY; Randy BANKS a/k/a "Dirt"; Corloyd ANDERSON a/k/a "Bo"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray"; Adrian Jamal SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a "SP"; Dominick WEDLOCK a/k/a "Rage" a/k/a "Nic"; William JONES a/k/a "Bill"; Jarmal HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dominique ROZZELL a/k/a "Boozie"; Maurice POLLOCK a/k/a "Reese"; Ayinde DELEON

6

**JA6951**

a/k/a "Murda"; Jay GREER a/k/a "Champagne"; Kenneth TORRY a/k/a "Kenny"; Michael STEWART; Jawaun TALLEY; Charles BLACKWELL; Shakeen DAVIS; Takuma TATE a/k/a "Oop"; Sidney FRAISER a/k/a "Sid"; Queontaye FORTUNE; Kenyon PATTERSON "Konan"; Chiquetta HEATH a/k/a "Bandi"; Michael SINGER a/k/a "Blizz"; Delante LEE; Eddie MCCARGO; and other known and unknown co-conspirators (hereinafter, the "**TARGET SUBJECTS**") to and from the cellular telephone currently assigned call number 443-301-8819, and bearing IMSI number 310410801883553, with service provided by T-Mobile US, Inc., and with unknown subscriber information, but in active use by Dwight JENKINS a/k/a "Huggie" a/k/a "Unc" (**TARGET TELEPHONE 1**); and (2) wire communications of the TARGET SUBJECTS to and from the cellular telephone currently assigned call number (443) 766-6957 and bearing IMSI number 310260637910168, with service provided by T-Mobile US, Inc., subscribed to Maurice Love, with an address of 5200 W. North Ave. Baltimore, Maryland 21207, but in active use by Jacob BOWLING a/k/a "Jakey" a/k/a "Ghost" (**TARGET TELEPHONE 2**).

16.     As a result of my personal participation in this investigation and reports made to me by other law enforcement agents and officers, as well as information obtained from undercover agents and confidential sources, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I respectfully submit that the facts contained in this affidavit establish probable cause to believe that Dwight JENKINS is using **TARGET TELEPHONE 1**, and Jacob BOWLING is using **TARGET TELEPHONE 2**, in connection with and in furtherance of ongoing violations of federal criminal law (collectively, the "**TARGET OFFENSES**").    The TARGET OFFENSES include the following:

        a. distribution of, and possession with intent to distribute, controlled substances, in

<div align="center">7</div>

<div align="center">**JA6952**</div>

violation of 21 U.S.C. § 841(a)(1);

b. conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846;

c. use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b);

d. maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1);

e. firearms offenses, in violation of 18 U.S.C. §§ 922, 924 and 26 U.S.C. § 5861;

f. conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; and

g. aiding and abetting such offenses, in violation of 18 U.S.C. § 2.[1]

17.    In addition, there is probable cause to believe that the interception of wire communications of the TARGET SUBJECTS to and from **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** will identify and provide admissible evidence of the TARGET OFFENSES.

18.    Specifically, interception of wire communications of the TARGET SUBJECTS over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**, involving the TARGET OFFENSES, is likely to identify and provide admissible evidence regarding:

a. the methods of operation of this armed drug trafficking conspiracy, including the precise nature and scope of illegal activities described herein and the relationship of the organization to other drug and firearms trafficking organizations;

b. the identities and roles of other participants in the conspiracy, accomplices, and aiders and abettors, including the sources of supply of controlled substances and firearms to the TARGET SUBJECTS, and the purchasers of controlled substances

---

[1]  Aiding and abetting is not a predicate offense under Title 18, United States Code, Section 2516.

8

distributed by the TARGET SUBJECTS;

c.  the management of the conspiracy, including the way orders and instructions are disseminated to subordinates;

d.  the collection of gang "dues" from members of the gang and/or imposition of "taxes" on nonmembers who operate in the gang's territories;

e.  the methods used by the conspiracy to protect its members, territories, and assets (*e.g.*, firearms, controlled substances, and proceeds derived from the sale of controlled substances);

f.  the use of firearms in furtherance of the conspiracy;

g.  the times, dates, and locations of meetings at which persons involved in this conspiracy pick up drugs and/or firearms, exchange money, and meet to discuss the conspiracy and the progress of their illegal activities;

h.  the quantities and types of controlled substances involved in this drug trafficking conspiracy,

i.  the manner of shipment or movement of controlled substances distributed in connection with this conspiracy and firearms used in furtherance of this conspiracy;

j.  the methods of paying for the controlled substances and firearms involved in the conspiracy, and the location, movement and disposition of all proceeds from illicit drug activity associated with this conspiracy, including efforts to launder drug proceeds;

k.  the identification of other locations and facilities used in furtherance of the TARGET OFFENSES, as well as contraband, firearms, and money derived from

9

and used in furtherance of such offenses;

l.  the existence and location of records of the purchase and sale of narcotics and firearms associated with this conspiracy;

m. the methods used by the TARGET SUBJECTS to elude law enforcement detection; and

n.  the identification of additional communication devices or telephone instruments used by the TARGET SUBJECTS in furtherance of the TARGET OFFENSES.

19.     The requested authorization would last until the government fully achieves the goals of this investigation, or for a period of 30 days, whichever occurs first, pursuant to 18 U.S.C. § 2518(5).   Pursuant to 18 U.S.C. § 2518(5), it is further requested that the 30-day period be measured from the date on which investigative or law enforcement officers begin to conduct interception pursuant to a lawful order, or 10 days from the date of such order is signed, whichever occurs first.

20.     The requested authorization is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, to any other IMSI numbers accessed through the target telephone numbers referenced above, and to any other telephone numbers subsequently assigned to or used by the instruments bearing the same electronic serial number used by **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**, regardless of service provider, within the authorized period of interception.   The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** while the telephones are off the hook or otherwise in use.

10

**JA6955**

21.     It is further requested, pursuant to 18 U.S.C. § 2518(3), that in the event that **TARGET TELEPHONE 1** or **TARGET TELPEPHONE 2** is transferred outside the territorial jurisdiction of this Court, interceptions of the transferred facilities may continue to take place in the District of Maryland, where all communications will first be heard or read and minimized regardless of where the wire communications are placed to or from.

22.     In connection with the telecommunication companies that provide service for **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**, all interceptions over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** will automatically be routed to Baltimore, Maryland, regardless of where the telephone calls are placed to or from.   During the requested wire and electronic surveillance, all monitoring will be performed in Baltimore, Maryland, by law enforcement officers authorized under 18 U.S.C. § 2510(7), including Special Agents of the ATF, officers of the BPD, and government employees or individuals operating under a contract with the government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

23.     As more fully described below, interception of wire communications is necessary to obtain the evidence needed to prosecute the TARGET OFFENSES because normal investigative procedures have either been tried to no avail, reasonably appear unlikely to meet with success if tried, or are too dangerous to employ.

## VI.    TARGET SUBJECTS

24.     During this investigation, I have obtained information relating to the TARGET SUBJECTS from the sources listed in paragraph 9, as well as from the National Crime Information Center (NCIC) and the State of Maryland.

25.     The TARGET SUBJECTS are Dwight JENKINS a/k/a "Huggie" a/k/a "Unc" (the

11

**JA6956**

user of **TARGET TELEPHONE 1**); Jacob BOWLING a/k/a "Jakey" a/k/a "Ghost" (the user of

**TARGET TELEPHONE 2**); Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Jamal LOCKLEY

a/k/a "T-Roy"; Tiffany BAILEY; Randy BANKS a/k/a "Dirt"; Corloyd ANDERSON a/k/a "Bo";

Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a

"Tray"; Adrian Jamal SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a "SP"; Dominick WEDLOCK

a/k/a "Rage" a/k/a "Nic"; William JONES a/k/a "Bill"; Jarmal HARRID a/k/a "J-Rock"; Jamal

SMITH a/k/a "Lil Mal"; Dominique ROZZELL a/k/a "Boozie"; Maurice POLLOCK a/k/a

"Reese"; Ayinde DELEON a/k/a "Murda"; Jay GREER a/k/a "Champagne"; Kenneth TORRY

a/k/a "Kenny"; Michael STEWART; Jawaun TALLEY; Charles BLACKWELL; Shakeen

DAVIS; Takuma TATE a/k/a "Oop"; Sidney FRAISER a/k/a "Sid"; Queontaye FORTUNE;

Kenyon PATTERSON a/k/a "Konan"; Chiquetta HEATH a/k/a "Bandi"; Michael SINGER a/k/a

"Blizz"; Delante LEE; Eddie MCCARGO; and their known and unknown co-conspirators.

26.    **Dwight JENKINS** a/k/a "Huggie" a/k/a "Unc" is the user of **TARGET

TELEPHONE 1**.   JENKINS is a black male with date of birth 05/11/1968 and Maryland SID #

1017016.   Based on information from confidential sources, JENKINS is a lieutenant within

MMP and is responsible for overseeing the daily street sales of heroin and cocaine for the

organization.    JENKINS' criminal convictions include: a 1992 conviction for CDS

Possession-Not Marijuana and CDS Admin Equip Possess/Distribute in the Baltimore City

District Court (Case No. 00367762B3); a 1997 conviction for CDS-Unlawful Possession in the

Baltimore City Circuit Court (Case No. 897041009); and a 1997 conviction for CDS-Unlawful

Manufacture Etc. in the Baltimore City Circuit Court (Case No. 194308030).

27.    **Jacob BOWLING** a/k/a "Jakey" a/k/a "Ghost" is the user of **TARGET

TELEPHONE 2**.   BOWLING is a black male with DOB 01/25/1986 and Maryland SID #

12

2324361.   Based on information from confidential sources, he is a member of MMP and sells

heroin and crack cocaine in the area of Windsor Mill Road and Forest Park Avenue.   His

criminal convictions include: a 2005 conviction for CDS Possession in the Baltimore City Circuit

Court (Case No. 805238017); a 2007 conviction for Assault-First Degree, Assault-Second

Degree, and Narcotics Possess w/Intent-Large Amount in the Baltimore City Circuit Court (Case

No. 106073030–32); a 2013 conviction for Possess Contraband-Place of Confinement in the

Baltimore City Circuit Court (Case No. 212278024); a 2013 conviction for Handgun-Wear/Carry

in the Baltimore City Circuit Court (Case No. 112121032); and a 2014 conviction for Handgun in

Vehicle in the Baltimore City Circuit Court (Case No. 113192009).

     28.   A number of the other TARGET SUBJECTS have convictions for CDS offenses,

firearms offenses, and violent crimes.   The following is a non-exhaustive list of some of these

convictions:

    a.   **Dante BAILEY** a/k/a "Gutta" a/k/a "Almighty" has criminal convictions that
       include: a 1995 conviction for Handgun Wear/Carry in the Circuit Court for
       Baltimore County (Case No. 95CR3716); a 1997 conviction for Reckless
       Endangerment in the Circuit Court for Baltimore City (Case No. 597078039–40); a
       1997 conviction for Robbery w/ Deadly Weapon and Handgun Wear/Carry in the
       Circuit Court for Baltimore City (Case No. 597120012); a 2002 conviction for
       Assault-Second Degree in the Circuit Court for Baltimore City (Case No.
       802338001); and a 2004 conviction for Possession of a Firearm by a Felon in
       violation of 18 U.S.C. § 922(g) in the U.S. District Court for the District of
       Maryland (Case No. WDQ-04-0254).   BAILEY is currently in federal custody
       pending trial on a charge of Possession of a Firearm by a Felon in violation of 18
       U.S.C. § 922(g) in the U.S. District Court for the District of Maryland (Case No.
       CCB-16-0267).

    b.   **Jamal LOCKLEY** a/k/a "T-Roy" has criminal convictions that include: a 1998
       conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense in the
       Circuit Court for Baltimore City (Case No. 597330016); a 1999 conviction for
       CDS: Possession w/ Intent Manufacture/Distribute/Dispense in the Circuit Court
       for Baltimore City (Case No. 299132018); a 2003 conviction for CDS: Possession
       w/ Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City
       (Case No. 201101001); a 2008 conviction for CDS: Possession w/ Intent
       Manufacture/Distribute/Dispense and CDS: Possession of Firearms in the Circuit

13

Court for Baltimore City (Case No. 106256012–13); and a 2016 conviction for CDS: Possession-Marijuana 10 Grams+ in the Circuit Court for Baltimore City (Case No. 816011024).

c. **Randy BANKS** a/k/a "Dirt" has criminal convictions that include: a 1999 conviction for CDS: Possession w/Intent Manufacture/Distribute/Dispense and Conspiracy in the Circuit Court for Baltimore City (Case No. 299041003); a 1999 conviction for Assault-Second Degree in the District Court for Baltimore City (Case No. 3B00303467); a 2003 conviction for CDS: Distribution and CDS: Possession of Firearms in the Circuit Court for Baltimore City (Case Nos. 203043032–33); and a 2009 conviction for Deadly Weapon/Conceal in the Circuit Court for Baltimore City (Case No. 809345014).

d. **Corloyd ANDERSON** a/k/a "Bo" has criminal convictions that include: a 2005 conviction for CDS: Manufacture/Distribute/Dispense-Narcotics and Conspiracy in the Circuit Court for Baltimore City (Case No. 105096011); a 2005 conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City (Case No. 2043000034); and a 2006 conviction for Handgun Wear/Carry in the Circuit Court for Baltimore County (Case No. 03K03000661).

e. **Melvin LASHLEY** a/k/a "Menace" has criminal convictions that include: a 2009 conviction for CDS Possession in the Baltimore City Circuit Court (Case No. 809012037); a 2009 conviction for CDS: Possession-Marijuana in the Baltimore City District Court (Case No. 5B02024048); a 2009 conviction for CDS Possession-Not Marijuana in the Baltimore City District Court (Case No. 5B01965024); a 2012 conviction for Assault-First Degree in the Baltimore City Circuit Court (Case No. 511082015); and a 2012 conviction for CDS-Unlawful Possession Etc. in the Baltimore City Circuit Court (Case No. 812195026).

f. **Dontray JOHNSON** a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray" has criminal convictions that include: a 2004 conviction for CDS: Possession with Intent to Distribute in the Circuit Court for Baltimore City (Case No. 104120060); a 2004 conviction for CDS-Unlawful Possession in the Circuit Court for Baltimore City (Case No. 804202025); a 2004 conviction for CDS: Manufacture/Distribute/ Dispense Narcotic in the Circuit Court for Baltimore City (Case No. 104194045); a 2005 conviction for Possession of a Firearm by a Felon in the U.S. District Court for the District of Maryland (Case No. WDQ-05-0545); and a 2006 conviction for CDS: Possession with Intent to Distribute in the Circuit Court for Baltimore City (Case No. 206125010).   He is currently in federal custody awaiting trial on charges of Possession with Intent to Distribute Heroin and Cocaine in violation of 21 U.S.C. § 841, Possession of a Firearm and Ammunition by a Felon in violation of 18 U.S.C. § 922(g), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c) in the U.S. District Court for the District of Maryland (Case No. CCB-15-0587).

14

**JA6959**

g.  **Adrian SPENCE** a/k/a "Spittle" a/k/a "SP" has criminal convictions that include: a 2010 conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City (Case No. 210168015).   He is currently in federal custody awaiting trial on charges of Conspiracy to Distribute One Kilogram or More of Heroin in violation of 21 U.S.C. § 846 and Possession of a Firearm by a Felon in violation of 18 U.S.C. § 922(g) in the U.S. District Court for the District of Maryland (Case No. RDB-15-0541).

h.  **Dominick WEDLOCK** a/k/a "Rage" a/k/a "Nic" has criminal convictions that include: a 2006 conviction for CDS-Manufacture/Distribute/Dispense: Narcotics: Conspiracy in the Baltimore City Circuit Court (Case No. 105311018); a 2007 conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense and CDS: Possession w/ Intent Manufacture/Distribute/Dispense-Conspiracy in the Baltimore City Circuit Court (Case No. 106269001); a 2007 conviction for CDS-Possession of Firearms in the Baltimore City Circuit Court (Case No. 106269003); and a 2010 conviction for Possession With Intent to Distribute Cocaine in the U.S. District Court for the District of Maryland (Case No. JFM-10-0054).   He is currently serving a sentence of 72 months in the Bureau of Prisons pursuant to a 2015 conviction in the U.S. District Court for the District of Maryland for Possession of Counterfeit Obligations (Case No. JFM-15-0512).

i.  **William JONES** a/k/a "Bill" has criminal convictions that include: a 2011 conviction for CDS-Unlawful Possession in the Circuit Court for Baltimore City (Case No. 811186018); and a 2012 conviction for CDS: Possession of Firearms in the Circuit Court for Baltimore City (Case No. 111228014).

j.  **Dominique ROZZELL** a/k/a "Boozie" has criminal convictions that include: a 2006 conviction for CDS: Possession-Marijuana in the District Court for Baltimore City (Case No. 3B01781895); a 2007 conviction for Burglary-Fourth Degree in the Circuit Court for Baltimore City (Case No. 807110042); a 2008 conviction for CDS Possession in the Circuit Court for Baltimore City (Case No. 808141027); a 2009 conviction for CDS Possession in the Circuit Court for Baltimore City (Case No. 809076049); a 2011 conviction for CDS Manufacture/Distribute-Narcotic in the Circuit Court for Baltimore County (Case No. 03K09001511); a 2013 conviction for Handgun on Person: Wear/Carry and CDS: Distribute-Narcotics in the Circuit Court for Baltimore City (Case No. 112104037–38); a 2013 conviction for CDS Possession-Conspiracy in the Circuit Court for Baltimore City (Case No. 113073025); a 2014 conviction for CDS: Possession Marijuana-Less Than 10G in the District Court for Baltimore City (Case No. 6B02252767); a 2015 conviction for Assault-Second Degree in the Circuit Court for Baltimore County (Case No. 03K15002787); and a 2016 conviction for CDS-Possession-Not Marijuana in the Circuit Court for Baltimore County (Case No. 03K15002413).

k.  **Maurice POLLOCK** a/k/a "Reese" has criminal convictions that include: a 2013 conviction for Possession of a Firearm by a Minor in the Circuit Court for Baltimore   City   (Case   No.   313268003);   a   2013   conviction   for

15

Conspiracy-CDS-Distribution-Narcotics and CDS-Possession w/ Intent Manufacture/Distribute/Dispense-Narcotics in the Circuit Court for Baltimore City (Case No. 112180014); and a 2016 conviction for CDS: Possession-Not Marijuana and CDS: Possession Paraphernalia in the District Court for Baltimore City (Case No. 4B02319195).

l. **Ayinde DELEON** a/k/a "Murda" has criminal convictions that include: a 2004 conviction for Handgun in Vehicle in the Circuit Court for Baltimore City (Case No. 204015005); and a 2007 conviction for Conspiracy to Commit Murder-First Degree and Assault-First Degree in the Circuit Court for Anne Arundel County (Case No. 02-K-06-002852).

m. **Jay GREER** a/k/a "Champagne" has criminal convictions that include: a 2011 conviction for Armed Robbery in the Circuit Court for Baltimore City (Case No. 111210012).

n. **Kenneth TORRY** a/k/a "Kenny" has criminal convictions that include: a 1996 conviction for CDS Possession in the District Court for Baltimore City (Case No. 6B00096158); a 1999 conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City (Case No. 298079007); a 2005 conviction for CDS-Possession-Not Marijuana in the District Court for Baltimore City (Case No. 6B01738736); a 2007 conviction for CDS: Possession-Marijuana in the District Court for Baltimore City (Case No. 4B01859218).

o. **Michael STEWART** has criminal convictions that include: a 2015 conviction for Handgun on Person in the District Court for Baltimore City (Case No. 3B02310941).

p. **Jawaun TALLEY** has criminal convictions that include: a 2015 conviction for CDS: Possession-Not Marijuana and Possession of a Regulated Firearm in the Circuit Court for Baltimore County (Case No. 03K14003648).

q. **Charles BLACKWELL** has criminal convictions that include: a 2015 conviction for Assault-Second Degree in the Circuit Court for Baltimore City (Case No. 815005006); and a 2015 conviction for Handgun on Person: Carry/Wear in the Circuit Court for Baltimore City (Case No. 414358003).

r. **Takuma TATE** a/k/a "Oop" has criminal convictions that include: a 1996 conviction for Handgun in Vehicle in the Circuit Court Baltimore City (Case No. 896338004); a 2003 conviction for CDS-Manufacture/Distribute/Dispense-Narcotics-Conspiracy in the Circuit Court for Baltimore City (Case No. 803211009); and a 2006 conviction for Assault-Second Degree in the District Court for Baltimore City (Case No. 1B01751660).

s. **Shakeen DAVIS** has criminal convictions that include: a 2012 conviction for

16

Handgun on Person and Possession of Firearm/Ammo/Minor in the District Court for Baltimore City (Case No. 3B02191227); and a 2015 conviction for CDS: Possess Paraphernalia in the Circuit Court for Baltimore County (Case No. 03K14006030).

t. **Michael SINGER** a/k/a "Blizz" has criminal convictions that include: a 2005 conviction for Attempted CDS Manufacture/Distribute-Narcotics in the Circuit Court for Baltimore City (Case No. 805152013); a 2012 conviction for Escape-Second Degree in the District Court for Anne Arundel County (Case No. 0A00246904); and a 2015 conviction for Accessory After the Fact (to murder) in the Circuit Court for Baltimore County (Case No. 03K13004516).

u. **Delante LEE** has criminal convictions that include: a 2013 conviction for Illegal Possession-Regulated Firearm in the Circuit Court for Baltimore County (Case No. 00896338004).

v. **Eddie MCCARGO** has criminal convictions that include: a 2004 conviction for Robbery in the Circuit Court for Baltimore City (Case No. 204064035); a 2010 conviction for Robbery in the Circuit Court for Baltimore City (Case No. 110049007); and a 2016 conviction for CDS: Possession w/ Intent Distribute-Narcotic in the Circuit Court for Baltimore County (Case No. 03K15003153).

## VII.   INFORMATION PROVIDED BY CONFIDENTIAL SOURCES

29.     Information concerning the activities of the TARGET SUBJECTS has been obtained from the following confidential sources:

### A.   CONFIDENTIAL SOURCE #1

30.     Confidential Source #1 ("CS-1"), has conducted a controlled purchase of cocaine from Jamal LOCKLEY, a member of MMP whom he/she knows as "T-Roy." CS-1 was introduced to LOCKLEY by Confidential Source # 2 ("CS-2.")

31.     As discussed further below, on March 9, 2016 CS-2 placed a recorded telephone call to 443-709-7780, used by LOCKLEY, to arrange for the purchase of one half ounce of cocaine base from LOCKLEY by CS-1. LOCKLEY said he would meet the two CS's the following day. On March 10, 2016, CS-1 and CS-2 purchased approximately 14 grams of cocaine from Jamal LOCKLEY for $600.

17

32.     CS-1 has provided law enforcement with accurate, independently-corroborated information about narcotics and narcotics organizations in the past.   CS-1's information has led to the execution of search warrants that resulted in the seizure of illegal narcotics, firearms, and U.S. currency.   CS-1 has also conducted controlled purchases under the direction of law enforcement.   CS-1 has prior convictions for possession of narcotics, vehicle theft, and burglary. CS-1 is working with law enforcement for monetary compensation.   CS-1 has been working with law enforcement for approximately six years.   Based on the aforementioned facts, I believe CS-1 to be reliable.

**B.     CONFIDENTIAL SOURCE #2**

33.     CS-2 is a member of MMP and close associate of Dante BAILEY, whom he/she knows as "Gutta."   CS-2 is cooperating with ATF on this investigation in exchange for monetary compensation.

34.     CS-2 advised law enforcement that BAILEY is the leader of MMP or "Don of Maryland."   According to CS-2, BAILEY traveled to California in 2012 to get approval from a Piru leader for the creation of MMP in Maryland.   CS-2 identified roughly 30 photographs of MMP members and affiliates.   CS-2 stated that MMP's headquarters are located at the BP gas station in the 5200 block of Windsor Mill Road in Baltimore City, and its other territories are Gwynn Oak and Liberty Heights, the 46s Liquor Store, 27th Street and Boone, and Greenmount Avenue and 21st Street.   According to CS-2, MMP distributes all types of drugs, including heroin and cocaine.

35.     CS-2 advised law enforcement that MMP members frequently carry and employ firearms.   Specifically, CS-2 knows from personal experience that the employees of the BP gas station that MMP considers to be its headquarters have no problem allowing MMP members to

18

stash firearms and/or drugs in and around the building.   Employees of the gas station have even been known to conceal firearms and/or drugs behind the counter for suspected MMP members when the police come to the area.   CS-2 also knows that MMP members will frequently hide firearms in public areas nearby when they are outside so they can be readily accessed and used. Typical stash spots include nearby fields, on top of the tires of parked cars, or inside parked cars operated by MMP members.

36.    CS-2 has also provided information about numerous acts of violence carried out by members of MMP.   For instance, CS-2 advised that MMP member James Edwards a/k/a "Bangout" was responsible for the nonfatal shooting of Samartine Hill a/k/a "Snook" at the Mirage nightclub in Baltimore City in October 2012, which CS-2 said was carried out at BAILEY's direction because "Snook" had stolen a drug customer from BAILEY.   CS-2 also provided information about the September 29, 2015 murder of Brian Johnson a/k/a "Nutty B" in the 5200 block of Windsor Mill Road.   CS-2 advised that MMP member Dontray JOHNSON a/k/a "Bino" told CS-2 that he shot and killed "Nutty B" (a fellow MMP member) because he would not pay gang dues that JOHNSON was collecting for BAILEY.   CS-2's information has been corroborated by video surveillance footage of the murder, based on which law enforcement officers familiar with JOHNSON were able to identify him as the shooter.

37.    CS-2 also advised investigators that members of MMP have obtained firearms from a supplier based in Frederick, Maryland named Michael BUCK a/k/a "Beezy."   According to CS-2, on numerous occasions BUCK traveled to the BP gas station located at Windsor Mill Road and Forest Park Avenue and traded firearms for heroin from members of MMP.   BUCK would then drive back to Frederick and re-sell the heroin.

38.    On March 7, 2016, at the direction of the ATF, CS-2 conducted a controlled

19

**JA6964**

purchase of an assault rifle and ammunition from BUCK at a location in Baltimore County. CS-2 provided BUCK with $2,000 in ATF funds in exchange for a Ruger Rifle 308 (Model SR762, Serial Number # 56112242), three magazines, and 109 rounds of .308 caliber ammunition.

39.     CS-2 has provided members of law enforcement with accurate, independently corroborated information about narcotics and narcotics organizations in the past.   CS-2 has also provided accurate, independently corroborated information about organized gang activity to the BPD Gang Intelligence section.   CS-2 has provided information that has led to the execution of search warrants that have resulted in the seizure of U.S. currency, illegal narcotics, and firearms. CS-2 has prior convictions for burglary, theft, robbery, and attempted first-degree murder.   CS-2 initially began cooperating with law enforcement with the expectation of receiving a favorable disposition in a then-pending criminal case, and he/she has continued cooperating with law enforcement since then in exchange for monetary compensation. CS-2 has been working with law enforcement for approximately four years.   Based on the aforementioned facts, I believe CS-2 to be reliable.

C.     **CONFIDENTIAL SOURCE #3**

40.     Confidential Source #3 ("CS-3") has conducted controlled purchases of heroin and cocaine base from Dwight JENKINS a/k/a "Huggie," who is the user of **TARGET TELEPHONE 1**.   These controlled purchases are described in more detail in Section IX below. CS-3 has also discussed with JENKINS the possibility of purchasing firearms from him.

41.     CS-3 has provided law enforcement with accurate, independently-corroborated information about narcotics and narcotics organizations in the past, including information that led to the recovery of illegal narcotics and firearms.   CS-3 has been working with law enforcement

20

**JA6965**

since 2011.   CS-3 has previous convictions for larceny, possession of narcotics, resisting arrest, and forgery.   CS-3 is working for monetary compensation. Base on the aforementioned facts, I believe CS-3 to be reliable.

### D.   CONFIDENTIAL SOURCE #4

42.   Confidential Source # 4 ("CS-4") stated that he/she has known Dante BAILEY a/k/a "Gutta" for roughly six years.   According to CS-4, BAILEY is the leader of a gang that CS-4 knows primarily as the "Mobsters," and that is also referred to as "Murdaland Mafia." CS-4 stated that "no one does anything without a go ahead from [BAILEY]."   CS-4 advised that everyone is scared of BAILEY and that BAILEY was extorting money from everyone who sold drugs at Windsor Mill and Forest Park.   CS-4 advised that he/she always sees BAILEY with a gun either on his person or inside of his vehicle.   CS-4 has observed BAILEY put a gun in people's face and shoot at people.   CS-4 believes that BAILEY is "demonically crazy."

43.   CS-4 identified photographs of a number of BAILEY's associates in the "Mobsters," including, but not limited to, Dwight JENKINS a/k/a "Huggie" or "Unc"; Dominick WEDLOCK a/k/a "Rage," Randy BANKS a/k/a "Dirt," Dominique ROZZELL a/k/a "Boosie," Jacob BOWLING a/k/a "Fats"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Bino"; and Adrian SPENCE a/k/a "SP."   CS-4 stated that "Dirt" (*i.e.*, Randy BANKS) is right under BAILEY in the gang hierarchy, that he is a cocaine and heroin supplier for BAILEY, and that he operates in the Gwynn Oaks/Liberty Heights area in Baltimore City.

44.   CS-4 advised investigators that although he/she has never been a member of the "Mobsters," CS-4 was important to the organization because he/she would help BAILEY and his associates launder drug money and provide vehicles for the organization.   CS-4 stated that he/she had laundered drug money for both BAILEY and BANKS, including through casinos in

21

**JA6966**

and around Baltimore City.

45.     According to CS-4, BAILEY was also getting heroin from an individual CS-4 knows as "Harvey Brewer." CS-4 stated that at one point—possibly Summer 2014—CS-4 drove BAILEY to a location near North Avenue in Baltimore, where he/she observed BAILEY obtain what CS-4 estimated was 200 or 300 grams of heroin from "Harvey Brewer."

46.     CS-4 also advised investigators that most MMP members frequently have firearms either on their person or nearby in concealed spots for immediate access and use. CS-4 also knows that MMP members frequently store guns in houses that are either vacant or owned by drug users. Furthermore, CS-4 knows that on many occasions, MMP members trade narcotics for guns and ammunition with drug buyers coming from Western Maryland or West Virginia.

47.     CS-4 also provided information about numerous acts of violence carried out by members of the "Mobsters." For instance, CS-4 provided information about the February 12, 2015 murder of James Edwards a/k/a "Bangout." CS-4 advised that MMP member Dominick WEDLOCK a/k/a "Rage" told CS-4 that BAILEY ordered a hit against "Bangout" for making threats against the gang, and that BAILEY was going to send WEDLOCK to carry out the hit, but that BAILEY ultimately had someone else take care of it.

48.     CS-4 has prior convictions for aiding and abetting bank fraud, possession with intent to distribute CDS, and a handgun violation. CS-4 is working with the hope of receiving a favorable disposition in a pending criminal case. No promises have been made to CS-4 regarding his/her case. CS-4 has been working with law enforcement for approximately ten years. Based on the aforementioned facts, I believe CS-4 to be reliable. ₸ some of which have been independently corroborated, ¾¾ CCH

E.     **CONFIDENTIAL SOURCE #5**

49.     Confidential Source #5 ("CS-5") has conducted a controlled purchase of cocaine

22

**JA6967**

base from Jacob BOWLING a/k/a "Jakey," who is the user of **TARGET TELEPHONE 2**.
This controlled purchase is described in more detail in Section IX.B below.   CS-5 has also
discussed with BOWLING the possibility of purchasing additional narcotics from him.

50.   CS-5 has provided law enforcement with accurate, independently-corroborated
information about narcotics transactions and narcotics organizations in the past, including
information that led to the recovery of illegal narcotics and firearms.   CS-5 has been working
with law enforcement since 2014.   CS-5 provided information that has led to the recovery of
illegal narcotics and firearms.   CS-5 has previous convictions for minor theft.   CS-5 is working
for monetary compensation.   Based on the aforementioned facts, I believe CS-5 to be reliable.

## VIII.   PRIOR APPLICATIONS

51.   A check of electronic surveillance files maintained by the ATF, FBI, DEA, and
HSI, and the U.S. Attorney's Office for the District of Maryland was completed on or about May
31, 2016 (for **TARGET TELEPHONE 1**) and on or about June 22, 2016 (for **TARGET
TELEPHONE 2**).   As a result, I located previous applications for the interception of wire and
electronic communications involving persons specified in this Affidavit.

52.   Specifically, on June 4, 2015, the Honorable Justin King, Circuit Judge for the
Circuit Court of Baltimore County, authorized for a period of 30 days the interception of wire and
electronic communications over the following telephone lines:   (1) 410-746-1240 (A-Line); (2)
410-831-8811 (B-Line); (3) 443-454-9490 (C-Line).   On June 10, 2015, Judge King authorized
for a period of 30 days the interception of wire and electronic communications over the following
telephone line: 443-707-5054 (D-Line).   On June 22, 2015, Judge King authorized for a period of
30 days the interception of wire and electronic communications over the following telephone line:
443-854-2252 (E-Line).   On July 1, 2015, Judge King authorized for a period of 30 days the

23

**JA6968**

interception of wire and electronic communications over the following telephone line: 443-216-7849 (F-Line). Also on July 1, 2015, Judge King authorized the continued interception of communications on the A-Line, B-Line, and D-Line phones. On July 18, 2015, Judge King authorized for a period of 30 days the interception of wire and electronic communications over the following telephone line: 323-594-7941 (G-Line). Finally, on July 23, 2015, Judge King authorized for a period of 30 days the interception of wire and electronic communications over the following telephone line: 443-720-9471 (H-Line). None of the interceptions listed in this paragraph are active.

53.     During the course of the aforementioned interceptions, communications between and among some of the TARGET SUBJECTS were intercepted. Specifically, Adrian SPENCE a/k/a "Spittle" a/k/a "SP" was identified as a user of A-Line, B-Line, D-Line, and G-Line phones and was intercepted on these lines. Jarmal HARRID a/k/a "J-Rock" was intercepted over the D-Line, F-Line, and G-Line phones. Dante BAILEY a/k/a "Gutta" a/k/a "Almighty" was intercepted over the A-Line phone. Jamal SMITH a/k/a "Lil Mal" was intercepted over the A-Line, D-Line, and G-Line phones. Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray" was intercepted over the B-Line phone. William JONES a/k/a "Bill" was intercepted over the B-Line, D-Line, and G-Line phones. Tiffany BAILEY was intercepted on the B-Line phone. Takuma TATE a/k/a "Oop" was intercepted over the D-line phone and the G-line phone. Jamal LOCKLEY a/k/a "T-Roy" was intercepted on the D-line phone. Additional TARGET SUBJECTS may have been intercepted over the aforementioned wiretapped phones unbeknownst to law enforcement.

54.     Other than the above-mentioned applications, a search of the above-mentioned law enforcement indices uncovered no record of previous applications for interceptions of wire, oral,

24

**JA6969**

or electronic communications involving persons, telephones, and/or premises specified in this affidavit.

IX.    **FACTS SUPPORTING PROBABLE CAUSE**

A.    **TARGET TELEPHONE 1**

1.    **May 10, 2016 Controlled Purchase of Heroin from Dwight JENKINS a/k/a Huggie Using TARGET TELEPHONE 1**

55.    On May 9, 2016, CS-3 was interviewed by investigators and advised that he/she had met with "Huggie" (known to investigators as Dwight JENKINS) in the 2200 block of Tucker Lane Baltimore, Maryland 21207 on May 5, 2016. CS-3 further advised that "Huggie" told CS-3 that he could supply CS-3 with heroin for $90 per gram.

56.    CS-3 was shown a picture of Dwight JENKINS and positively identified him as the individual that he/she knew as "Huggie." CS-3 further reported that JENKINS uses cellular telephone number **(443) 301-8819** (**TARGET TELEPHONE 1**) to conduct narcotics transactions and that CS-3 could contact Dwight JENKINS to set up a purchase of heroin at that number.

57.    On May 9, 2016 at approximately 4:12 p.m. CS-3 made a recorded telephone call in the presence of investigators to JENKINS on **TARGET TELEPHONE 1** to arrange for the purchase of heroin. Investigators saw CS-3 dial TARGET TELEPHONE 1. The recording of the call was placed into ATF evidence. Below is an approximate transcript of the relevant portion of that conversation:

JENKINS:    Ok, um you know what it is?

CS-3:    I was going to ask you would you do six for five?

JENKINS:    Six for five I don't think they are going to do that cause I don't have it so…

CS-3:    So I got to do the 540?

25

JENKINS:    Yeah, I guess, I mean I got to talk to them and see what they want for them
            first though baby, but um, yeah, hey hold on for one minute You all good?
            Yo good, you all good? Well look what time you think you coming
            tomorrow?

CS-3:       About 3:30, 4:00

JENKINS:    Alright I'm going to go get that for you tonight and I'm going to have it for
            you when you get here.

CS-3:       Alright...

58.     Based on my training and experience, during this call, the CS-3 was asking

JENKINS if he could sell CS-3 six grams of heroin for $500 ("I was going to ask you would you

do six for five?").   JENKINS responded that he did not believe that he could get the discounted

price ("Six for five, I don't think they are going to do that cause I don't have it so..."). CS-3 asked

whether he/she would have to pay $540, which would bring the price to $90 per gram of heroin,

as originally discussed.   JENKINS responded that he thought the price would be $90.00 per

gram, but that he would check with his supplier to see what his supplier was expecting to be paid.

At the end of the call, CS-3 and JENKINS agreed upon a time that CS-3 would purchase the

heroin on the following day.

59.     On May 10, 2016 at approximately 3:00 p.m., prior to conducting the controlled

purchase, CS-3 made a telephone call in the presence of investigators to Dwight JENKINS on

**TARGET TELEPHONE 1** to advise that he/she was coming.   Investigators saw CS-3 dial

TARGET TELEPHONE 1.   JENKINS told CS-3 that he was at his program, and then he would

be coming out to meet CS-3.

60.     Prior to the controlled purchase, the CS-3's vehicle was equipped with electronic

transmitting and video/audio recording equipment.   CS-3 was checked by investigators for

narcotics and found to be devoid of same.   At approximately 4:00 p.m., CS-3 drove to the area

26

of the 2200 block of Tucker Lane, Baltimore, Maryland to meet Dwight JENKINS. At approximately 4:03 p.m., law enforcement observed Dwight JENKINS, wearing a black jacket, black t-shirt with white letters and a red stripe, black hat, and blue jeans, enter the passenger side of CS-3's vehicle. Dwight JENKINS handed CS-3 a clear plastic baggie containing a tan powder substance (suspected heroin). CS-3 asked JENKINS "how much," and JENKINS replied $450. CS-3 and JENKINS engaged in a brief conversation. During this conversation, the CS-3 handed JENKINS $460 in pre-recorded Agent Cashier Funds. JENKINS proceeded to count the money. CS-3 advised JENKINS that he owed him/her $10 in change on their next meet. CS-3 asked JENKINS how much he gave him/her. JENKINS replied "five grams." CS-3 and JENKINS continued to engage in conversation. During this conversation, JENKINS related to CS-3 that he has been dealing with "dope" for a long time and that he has never "cut" anything, "coke" or "dope." JENKINS stated "if I get any it's gonna be raw." JENKINS departed CS-3's vehicle after a short period of time.

61.    CS-3 drove back to a predetermined location and handed investigators the tan powder substance that he/she purchased from JENKINS. The purchased evidence was taken back to ATF Baltimore Group III and subsequently field tested. The sample tested positive for the presence of heroin. The purchased evidence was submitted to BPD evidence control.

## 2. May 16, 2016 Controlled Purchase of Heroin and Crack Cocaine from Dwight JENKINS a/k/a Huggie, Using TARGET TELEPHONE 1

62.    On May 16, 2016, members of ATF Baltimore Group III with CS-3, conducted a controlled purchase of suspected heroin and crack cocaine from Dwight JENKINS a/k/a "Huggie" in the 2200 block of Tucker Lane in Baltimore City.

63.    On May 16, 2016 at approximately 12:18 p.m., prior to conducting the controlled purchase, CS-3 made a recorded telephone call in the presence of investigators to JENKINS on

27

**TARGET TELEPHONE 1** to verify the cost of the heroin and cocaine and to advise that he/she was coming. Investigators saw CS-3 dial TARGET TELEPHONE 1. JENKINS and CS-3 agreed that the price for the crack cocaine was $1,450 and the cost of the heroin was $100 per gram. The recording of the call was placed into ATF custody. Below is a rough transcript of the relevant portion of the call:

| | |
|---|---|
| JENKINS: | Hello. |
| CS-3: | Huggy bear, |
| JENKINS: | Hey. |
| CS-3: | Hey, I just finished getting my tattoo, I'm on my way to you. |
| JENKINS: | Alright, I'm leaving out the house now. |
| CS-3: | Listen we agreed for the, you know I'm fucked up with these fucking words, the boy 1450 I mean the girl 1450 and the boy 100 a gram right. |
| JENKINS: | Yeah but you talking too much over the phone |
| CS-3: | Ok alright, I love you, I love you goodbye. |

64.     Prior to making the controlled purchase, CS-3's vehicle was equipped with electronic transmitting and video/audio recording equipment. CS-3 was checked by investigators for narcotics and found to be devoid of same.

65.     At approximately 1:00 p.m., the CS-3 drove into the area of the 2200 block of Tucker Lane, Baltimore, Maryland to meet JENKINS. At approximately 1:05 p.m., law enforcement observed JENKINS, wearing a yellow and black hooded sweatshirt with the word "Steelers" on the front and jeans, enter the passenger side of CS-3's vehicle. JENKINS handed CS-3 a clear plastic bag that contained five clear plastic bags, each of which contained a white rock substance (suspected cocaine base), along with one plastic bag that contained a tan powder

28

**JA6973**

substance (suspected heroin). CS-3 and JENKINS then engaged in a brief conversation.  During

this conversation the CS-3 handed JENKINS $2,450 in pre-recorded Agent Cashier Funds.

CS-3 asked JENKINS to count the money, but JENKINS declined and exited the vehicle shortly

thereafter.

66.    CS-3 drove back to a predetermined location and handed investigators the heroin

and white rock substance and the tan powder substance that he/she purchased from JENKINS.

The purchased evidence was taken back to ATF Baltimore Group III and subsequently field tested

by investigators. The sample of suspected cocaine base tested positive for the presence of cocaine

and the sample of suspected heroin tested positive for the presence of heroin. The suspected

cocaine base had an approximate weight of 29.2 grams. The suspected heroin had an approximate

weight of 10 grams.

67.    The purchased narcotics evidence was submitted to the BPD evidence control.

An audio recording and a video/audio recording of the controlled purchase were placed into ATF

custody.

### 3.  May 26, 2016 Controlled Purchase of Heroin and Cocaine Base from Dwight JENKINS a/k/a Huggie Using TARGET TELEPHONE 1

68.    On May 26, 2016, members of ATF Baltimore Group III with CS-3, conducted a

controlled purchase of suspected heroin and cocaine base from Dwight JENKINS a/k/a "Huggie"

in the 2200 block of Tucker Lane in Baltimore City.   This purchase was arranged by CS-3 by

means of telephone calls to JENKINS on **TARGET TELEPHONE 1**.   During these

conversations, which were not recorded or monitored, JENKINS advised CS-3 that he could only

get powder cocaine.   CS-3 agreed to purchase the powder cocaine for $1,400 and heroin for

$100 a gram.

69.    At approximately 11:00 a.m. on May 26, 2016, CS-3 notified investigators that

29

**JA6974**

JENKINS had contacted her/him and advised that he (JENKINS) was heading to the area of the meet location.   Accordingly, ATF responded to the meet location and conducted the controlled purchase without any further contact with JENKINS.

70.     Prior to making the controlled purchase, CS-3's vehicle was equipped with electronic transmitting and video/audio recording equipment. CS-3 was checked by investigators for narcotics and found to be devoid of same.

71.     At approximately 12:15 p.m., the CS-3 drove into the area of the 2200 block of Tucker Lane, Baltimore, Maryland to meet JENKINS.   At approximately 12:22 p.m., law enforcement observed Dwight JENKINS, wearing a white t-shirt, jeans, and a black skull cap, enter the passenger side of CS-3's vehicle.   JENKINS handed CS-3 a clear plastic bag that contained a second clear plastic bag.   Both of these bags contained a white rock substance (suspected crack cocaine). JENKINS also handed CS-3 one plastic bag that contained a tan powder substance (suspected heroin). CS-3 and JENKINS engaged in a brief conversation, part of which was in reference to the fact that JENKINS was able to get the crack cocaine instead of the powder.   During this conversation, CS-3 handed JENKINS $2,400 in pre-recorded Agent Cashier Funds.   After the transaction was completed, the conversation continued briefly, and JENKINS advised CS-3 that if he could acquire any firearms, he would let CS-3 know. JENKINS then exited the vehicle after a short period of time, and CS-3 left the area.

72.     CS-3 drove back to a predetermined location and met with investigators. Investigators recovered the white rock substance and tan powder substance from CS-3's vehicle, and CS-3 was again checked for any contraband, with negative results.

73.     The purchased narcotics evidence was taken back to ATF Baltimore Group III and subsequently field tested. The white rock substance tested positive for the presence of cocaine,

30

and the tan powder substance tested positive for the presence of heroin. The cocaine base had an approximate weight of 28 grams. The heroin had an approximate weight of 10 grams.

74.    The purchased evidence was submitted to the BPD evidence control unit.  A recording of the controlled purchase by CS-3 was placed into ATF custody.

## B.    TARGET TELEPHONE 2

### 1.  June 2, 2016 Controlled Purchase of Cocaine Base from Jacob BOWLING a/k/a JAKEY Using TARGET TELEPHONE 2

75.    On June 2, 2016, members of ATF Baltimore Group III used CS-5 to conduct a controlled purchase of suspected crack cocaine from Jacob BOWLING a/k/a "Jakey" in the 2300 block of Lyndhurst Avenue Baltimore, Maryland.  CS-2 provided BOWLING's telephone number to investigators.

76.    On June 2, 2016, at 12:51 p.m., prior to conducting the controlled purchase, CS-2 made a recorded telephone call to Jacob BOWLING a/k/a "Jakey" on telephone number **443-766-6957 (TARGET TELEPHONE 2)** to introduce CS-5 as a purchaser of cocaine.[2] During the call, CS-2 told BOWLING that someone contacted him about buying "girl." I know from my training and experience that "girl" is a code word used by illicit narcotics dealers and buyers to refer to cocaine.   BOWLING advised that he was just about to get some cocaine and agreed to sell CS-5 an eighth of an ounce for $200.   BOWLING told CS-2 to provide CS-5 with his phone number and that he (BOWLING) would sell CS-5 the cocaine.   BOWLING also discussed the purity of the cocaine during the call.

77.    Prior to making the controlled purchase, CS-5's vehicle was equipped with electronic transmitting and audio recording equipment.   CS-5 was checked by TFO Bradley

---

[2]    Investigators verified that this call took place based on data from a consensual wiretap on CS-2's telephone, which is discussed further below in Section XII.G.

31

**JA6976**

Hood for narcotics and found to be devoid of same.   CS-5 made a recorded and monitored

telephone call to BOWLING at telephone number **443-766-6957** (**TARGET TELEPHONE 2**),

the number that had been provided to CS-5 by CS-2.   An agent watched CS-5 dial **TARGET**

**TELEPHONE 2** in his presence.   During the call, CS-5 asked BOWLING to purchase two

"EBs."   I know based on my training and experience that "EB" is an abbreviation for "eight

ball," which is a commonly used drug term for an eighth of an ounce of cocaine.   Below is a

rough transcript of the recorded call:

> BOWLING:   Hello.
>
> CS-5:   Hey what's good man? Hey, it's **[CS-5]**. Did **[CS-2]** tell you
> I was calling?
>
> BOWLING:   Yeah.
>
> CS-5:   Arright, Arright. Cool, Cool. Hey, uh, I got 400, uh, can you
> do two EBs?
>
> BOWLING:   Arright.
>
> CS-5:   Arright that's cool. Well I'm on my way up there now, so,
> uh, I'll hit you when I get close.
>
> BOWLING:   Arright. About what time? How long will it take?
>
> CS-5:   Uh, I'm on 95 now so probably about 15-20 minutes
> probably.
>
> BOWLING:   Arright.
>
> CS-5:   Arright, cool.

78.   At approximately 2:30 p.m., CS-5 drove into the area of Forest Park and Windsor

Mill Road in Baltimore, Maryland to meet BOWLING.   CS-5 again spoke with BOWLING and

advised that he was in the area. BOWLING directed CS-5 to the 2300 block of Lyndhurst

Avenue.   Upon CS-5's arrival in the 2300 block of Lyndhurst Avenue, law enforcement

**JA6977**

observed BOWLING get out of the passenger side of a parked black Honda Accord with an unknown temporary registration number and enter CS-5's vehicle. BOWLING discussed the prices and quantities of illicit narcotics he sold. BOWLING advised that he was willing to sell an eighth of an ounce of cocaine for $450. A conversation ensued and BOWLING then handed CS-5 two clear plastic bags containing a white rock substance (suspected crack cocaine) after removing a small amount from the bag. BOWLING advised that he had prepared two eighth-ounce bags of cocaine and had to remove some because CS-5 was only paying $400. CS-5 handed BOWLING $400 of pre-recorded Agent Cashier Funds. BOWLING advised CS-5 to contact him directly in the future if CS-5 needed to purchase any additional cocaine. BOWLING departed the vehicle and returned to the passenger side of the black Honda Accord.

79. CS-5 drove back to a predetermined location and met with TFO Hood and S/A Esposito. TFO Hood recovered the white rock substance that CS-5 purchased from BOWLING. TFO Hood showed CS-5 a single photograph of Jacob BOWLING, and CS-5 immediately identified BOWLING as the person from whom he had just purchased the suspected crack cocaine.

80. Law enforcement took the purchased narcotics evidence back to ATF Baltimore Group III and field tested it. The sample tested positive for the presence of cocaine. The purchased evidence was submitted to the BPD evidence control unit.

81. A recording of the call by CS-5 to Jacob BOWLING on June 2, 2016 was placed into ATF custody. An audio recording of CS-5's controlled purchase was also placed into ATF custody.

## 2. June 10, 2016 Text Exchange with Jacob BOWLING a/k/a "Jakey" Via TARGET TELEPHONE 2 Regarding Purchase of More Cocaine Base

82. On June 10, 2016, at the direction of ATF, CS-5 initiated a text message exchange

33

with Jacob BOWLING a/k/a Jakey on **TARGET TELEPHONE 2** regarding the purchase of more cocaine base. At 4:33 p.m., CS-5 sent a text message to BOWLING on **TARGET TELEPHONE 2** that said, "Yo wuts good homie." BOWLING replied to CS-5 via a text message that read, "What's up bro." At 4:34 p.m., CS-5 replied to BOWLING via a text message that read, "Yo that shit was good last time...I need a half oz, how much?" CS-5 sent investigators a photograph of the text message exchange on CS-5's telephone, which was placed into evidence. Investigators also verified via toll records for **TARGET TELEPHONE 2** that CS-5 exchanged messages with **TARGET TELEPHONE 2** at the times in question.

83. CS-5 advised that shortly after this text message exchange, BOWLING called CS-5 from **TARGET TELEPHONE 2** and said (in substance) that BOWLING would have it (*i.e.*, the half-ounce of cocaine) and that CS-5 should call him the following week. This call was not recorded or monitored.

84. At 4:43 p.m., BOWLING sent CS-5 a text message from **TARGET TELEPHONE 2** that read, "Yo you good for today?" At 4:44 p.m., CS-5 replied via text message that read, "Yea, ima come up next week." At 4:45 p.m., BOWLING replied via a text message that read, "Cool." Based on my training, and experience, when BOWLING said "Yo you good for today," he was using coded language to ask CS-5 whether he needed more cocaine base that day or whether he had what he needed for the day. CS-5 sent investigators a photograph of the text message exchange on CS-5's telephone, which was placed into evidence. Investigators also verified via toll records for **TARGET TELEPHONE 2** that CS-5 exchanged messages with **TARGET TELEPHONE 2** at the times in question.

## X.   PEN REGISTER AND TOLL ANALYSIS OF TARGET TELEPHONE 1

85. On May 17, 2016, the ATF obtained court-authorized toll records and initiated a

real-time pen register on **TARGET TELEPHONE 1**, which remains active to this date.   Based on an analysis of the active, daily updated pen registers, as well as historical toll records for **TARGET TELEPHONE 1**, I have learned the following:

86.   During the period from May 18, 2016 through June 13, 2016, **TARGET TELEPHONE 1** made and received approximately 570 calls, or an average of approximately 21 calls per day.   A large portion of the calls, approximately 538, were 2 minutes or less in duration.   (**TARGET TELEPHONE 1** also sent and received approximately 58 text messages during this period, or an average of approximately 2 text messages per day.   Investigators are not at this time seeking to intercept text messages to and from **TARGET TELEPHONE 1**.)

87.   Based upon my training, knowledge, and experience, I know that drug traffickers typically coordinate with their customers and co-conspirators by cellular telephone.   As a result, drug traffickers make a large volume of short duration calls daily.   Accordingly, the high volume of incoming and outgoing calls and text messages over **TARGET TELEPHONE 1**, along with their brief duration, is consistent with telephone use by narcotics traffickers.

88.   Additionally, **TARGET TELEPHONE 1** made calls to, and received calls from, telephone numbers that are known to be associated with or involved in narcotics trafficking, including calls to and from other TARGET SUBJECTS, as specified below.

89.   Between May 18, and June 13, 2016, there were 58 calls between **TARGET TELEPHONE 1** and telephone number 443-709-7780, a telephone subscribed to James Kenner with an address of 1909 N. Forest Park Ave., Baltimore, Maryland, but known by investigators to be used by Jamal LOCKLEY a/k/a "T-Roy."   Based on information from CS-2, LOCKLEY is a high ranking member of MMP and a drug distributor.   On March 9, 2016, CS-1 placed a recorded call to LOCKLEY at telephone number 443-709-7780 to arrange for the purchase of one

35

**JA6980**

half ounce of cocaine base. This phone number was provided to CS-1 by CS-2. On March 10, 2016, ATF used CS-1 to conduct a controlled purchase of approximately 14 grams of cocaine base from LOCKLEY in exchange for $600. CS-2 was with CS-1 during the controlled buy, and confirmed that the person from whom CS-1 purchased the cocaine base was LOCKLEY. LOCKLEY also has six prior convictions for felony distribution of narcotics.

90.     The most recent telephone call between **TARGET TELEPHONE 1** and telephone number 443-709-7780, used by Jamal LOCKLEY, was on June 13, 2016.

### XI.     PEN REGISTER AND TOLL ANALYSIS OF TARGET TELEPHONE 2

91.     On June 3, 2016, the ATF obtained court-authorized toll records and initiated a real-time pen register on **TARGET TELEPHONE 2**, analysis of this pen register commenced on June 7, 2016 and remains active to this date. Based on an analysis of the active, daily updated pen registers, as well as historical toll records for **TARGET TELEPHONE 2**, I have learned the following:

92.     During the period from June 7, 2016 to June 14, 2016, **TARGET TELEPHONE 2** made and received approximately 571 activations as well as 163 text messages. This is an average of approximately 71 calls and 20 text messages per day. A large portion of the calls, 547, were two minutes or less in duration. (**TARGET TELEPHONE 2** also sent and received approximately 163 text messages during this period, or an average of approximately 20 text messages per day. Investigators are not at this time seeking to intercept text messages to and from **TARGET TELEPHONE 2**.)

93.     Based upon my training, knowledge, and experience, I know that drug traffickers typically coordinate with their customers and co-conspirators by cellular telephone. As a result, drug traffickers make a large volume of short duration calls daily. Accordingly, the high volume

36

of incoming and outgoing calls over **TARGET TELEPHONE 2**, along with their brief duration, is consistent with telephone use by narcotics traffickers.

94.     Additionally, **TARGET TELEPHONE 2** made calls to, and received calls from, telephone numbers that are known to be associated with or involved in narcotics trafficking, including calls to and from other TARGET SUBJECTS, as specified below.

95.     Between June 7, 2016, and June 13, 2016, there were 4 calls between **TARGET TELEPHONE 2** and telephone number 443-709-7780, a telephone subscribed to James Kenner with an address of 1909 N. Forest Park Ave., Baltimore, Maryland, but known by investigators to be used by Jamal LOCKLEY a/k/a "T-Roy."   As described above, based on information from CS-2, LOCKLEY is a high ranking member of MMP and a drug distributor.   CS-1 conducted a controlled purchase of approximately 14 grams of cocaine base from LOCKLEY on March 10, 2016.

96.     The most recent call between **TARGET TELEPHONE 2** and LOCKLEY was on June 13, 2016.

### XII.   THE NEED FOR INTERCEPTION OF WIRE COMMUNICATIONS AND THE EXHAUSTION OF ALTERNATIVE INVESTIGATIVE TECHNIQUES

97.     As described further above, the goals of this investigation are to identify, locate, and arrest the members of MMP; identify the organization's suppliers of narcotics and firearms and the means by which the organization obtains and receives narcotics and firearms; determine how the organization processes and launders narcotics proceeds; determine how the organization evades detection by law enforcement; and determine the method and means by which the members of the organization obtain and use firearms in furtherance of their illegal activities. Insofar as the TARGET SUBJECTS make extensive use of wire communications in furtherance of the TARGET OFFENSES, interception of these communications over **TARGET**

37

**TELEPHONE 1** and **TARGET TELEPHONE 2** will provide valuable evidence against the TARGET SUBJECTS. It is only through the interception of such communications that the agents expect to fully identify the TARGET SUBJECTS, who have been partially identified thus far, and fully realize the objectives of this investigation.

98.     As indicated below, several investigative techniques have been tried and have failed, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives.

A.  **CONFIDENTIAL SOURCES**

99.     Although confidential informants have proven valuable to date, investigators do not believe that use of these sources will enable investigators to accomplish the objectives of this investigation.

100.    Although CS-1, CS-3, and CS-5 have been able to conduct controlled purchases from members of the DTO, they are not members of the DTO, and they do not know all members of the DTO. These controlled purchases have been from street-level distributors of the DTO. Therefore, it is unlikely that CS-1, CS-3, or CS-5 would be introduced to any members of the DTO above this level. Also, CS-1, CS-3 and CS-5 cannot provide real-time intelligence regarding the activities surrounding the DTO's drug shops. They do not have knowledge of the full extent of the DTO's operations, *e.g.*, the identity of the organization's sources of supply of narcotics, the locations of the organization's stash houses for narcotics or firearms, or whether the organization maintains additional drug shops in Baltimore. More importantly, CS-1, CS-3 and CS-5 have had no advance information about impending acts violence committed by members of MMP.

101.    While CS- 2 and CS-4 have provided some historical information to investigators,

38

they are unable to participate in a proactive manner or in an undercover capacity and, therefore, will be of limited use to this investigation.   Although CS-2 has previously been able to provide real-time intelligence regarding the activities surrounding the open-air drug shop, CS-2 has stated that he/she is no longer involved in the everyday operation of the DTO, and is unable to purchase narcotics from members of the DTO without arousing suspicion.   CS-2 has been unable to obtain telephone numbers for all of the middle and upper-level members of the DTO.   It is unlikely that CS-2 will be able to gain knowledge of the inner workings of the current drug operation or the identity of all members of the conspiracy and sources of supply of narcotics to the DTO. Furthermore, CS-2 does not have up-to-date knowledge of the full extent of the DTO's operations, e.g., the identity of the organization's source of supply of narcotics, or the locations of the DTO's stash houses for narcotics and firearms.   Although CS-4 has been able to provide important historical information regarding MMP, CS-4 cannot provide current information or operational assistance because CS-4 is currently incarcerated.

102.   More generally, based on my training and experience, I know that the highly compartmentalized manner in which large-scale narcotics traffickers do business makes it nearly impossible for any single source to learn the identities and roles of all of the persons engaged in a drug-dealing operation.   I am aware that drug trafficking organizations typically have multiple sources of supply of narcotics and none of the confidential sources in this case knows the identity of all of the MMP sources of supply or all of the ways in which MMP obtains heroin or firearms. Additionally, narcotics traffickers are usually reluctant to introduce customers, like CS-1 and CS-3, to their sources of supply of narcotics, for fear of losing the customers' business. Accordingly, I know that it is unlikely that a CS introduced to the street level of the organization, such as CS-1 and CS-3, will be able to gain first-hand knowledge of the structure and workings of

39

the entire operation.

## B.   UNDERCOVER OFFICERS

103.   Investigators have been able to introduce an undercover officer ("UC") to Maurice POLLOCK, who is believed to be a member of the MMP DTO.   Between March 22 and April 4, 2016, the UC was able to purchase a total of approximately 11.3 grams of heroin from POLLOCK. However, on May 15, 2016, POLLOCK was sentenced to one year in jail for an unrelated CDS possession charge, a sentence that is extraordinarily long for a possession charge by Baltimore City standards.   As such, the connection that the UC established with POLLOCK was effectively severed.   More importantly, the ability of the UC to approach other members of the MMP DTO has been jeopardized because some members of MMP may be aware that the UC was one of POLLOCK's customers and may suspect the UC of being a police officer or cooperator based on POLLOCK's conviction and abnormally long sentence.   As such, for safety reasons, that particular UC is no longer viable as an option to conduct purchases from MMP.

104.   On May 6, 2016, a second ATF UC attempted to make a CDS purchase from Sidney FRAZIER, who investigators believe is a member of the MMP DTO.   The transaction was initially scheduled to occur at a CVS in West Baltimore; however, over the course of an hour and numerous phone calls, FRAZIER made the UC move to no less than four separate locations before finally giving him an instruction to park his car outside of a high-end hotel and enter the hotel. At that point, investigators decided to cancel the transaction out of a concern for the UC's safety. Later that evening, on an Instagram account believed to be operated by FRAZIER, the user posted a picture with two photos: one of a man dressed down with the appearance of a drug dealer and a second photo with the same man dressed in a police uniform. The caption on the photo gave investigators the impression that at some point during the transaction, FRAZIER became aware

40

**JA6985**

that he was dealing with an undercover officer and started moving him from place to place purely for his own enjoyment but with no intention to distribute CDS whatsoever. Accordingly, investigators cannot use that specific UC again for fear that FRAZIER has told the others about him.

105.   Additionally, even if a CS could make an introduction of other UC's to members of the organization, based on my training and experience, narcotics traffickers are generally reluctant to speak freely with individuals outside the organization, a fact clearly supported by the failed attempt to purchase narcotics from FRAZIER. Therefore, I do not expect these undercover agents, if used, to have any contact with the TARGET SUBJECTS beyond those that the confidential sources have already had contact with. Finally, the MMP DTO is a violent organization and multiple CS's have observed firearms in close proximity to the area where the organization operates.   Given this, the safety risk to a third UC would be high if he/she were to try to infiltrate the organization.   The risk to the investigation, and more importantly the life of the UC, is therefore too great to attempt such an investigative technique.

### C.   PHYSICAL SURVEILLANCE

106.   Although physical surveillance of some activities of the TARGET SUBJECTS has been possible, most recently in May 2016, the ability of law enforcement officers to consistently conduct such surveillance has been, and will continue to be, limited.   First, such surveillance is limited by the nature of the areas to be surveilled.   Members and associates of the MMP DTO live in the immediate areas surrounding the open-air drug shops and as a result, it is difficult to establish stationary positions to conduct surveillance without being observed by the TARGET SUBJECTS.   For the same reason, "drive-by" surveillance is not a viable option. Additionally, investigators    are    aware    that    the    TARGET    SUBJECTS    are    actively    conducting

41

counter-surveillance to thwart efforts by law enforcement; information provided by CS's has verified as much. Specifically, in the attempted controlled purchase referenced above from FRAZIER, he directed the UC to move a number of times, quite possibly to determine if he was being shadowed by police. Although surveillance could be increased, such a course of action risks alerting the TARGET SUBJECTS to the existence of this investigation, making continued investigation more difficult (*e.g.*, by causing the TARGET SUBJECTS to move locations, conduct more effective counter-surveillance, etc.).

107.   Investigators installed a pole camera to monitor the activities of the MMP DTO at the Gwynn Oak and Liberty Heights area. Although this camera has been a beneficial tool, it is limited in the information it can provide. First, the pole camera cannot record audio. Thus, while investigators could use the camera to see that the TARGET SUBJECTS are interacting with one another, the camera offers no insight into the subject matter of the discussion. Additionally, pole camera footage cannot be viewed in "real time." Rather, the footage is viewed by investigators on a 3-7 second delay, depending on the quality of the internet connection. As a result of this delay and the slow response time of the camera when operators try to adjust the camera angle or zoom, it is difficult to maintain surveillance of a moving target. Obviously, when viewed after the fact, pole camera footage is limited to the scenes that were recorded at the time and investigators may not be able to track or zoom on individuals or vehicles of interest. Another problem is that the view of the pole camera is limited to a particular geographic location and is obstructed by trees, businesses, and the side of the building to which it is adjacent. Additionally, the camera was installed just after the series of three murders and one non-fatal shooting occurred in late April and early May; those acts of violence precipitated an increased police presence in the area which subsequently forced the MMP DTO members to move to a

42

different, as yet unknown location to continue their activities. Finally, I know based on surveillance and undercover purchases that the TARGET SUBJECTS frequently conduct narcotics transactions inside of buildings and/or vehicles, thereby making surveillance by a pole camera less effective. For the reasons mentioned above, I believe based on my training, knowledge and experience that the continued use of a pole camera and the installation of new pole cameras are unlikely to be productive means of meeting the goals of this investigation. However, law enforcement will install additional pole cameras if circumstances are favorable.

108. Therefore, the information that can be obtained from wire interception for which authorization is sought herein will help law enforcement agents to determine the identities of the subjects involved and to track their activities, thereby enhancing the prospects for fruitful physical surveillance. In addition, with the knowledge provided beforehand by wire interception that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, thus minimizing the risks of discovery inherent in following subjects or remaining at target locations for long periods of time.

**D.  TELEPHONE TOLL RECORDS/PEN REGISTERS**

109. Telephone toll records have been used in this investigation but have provided, and will continue to provide, only limited information. Toll records and pen register information cannot identify the actual users of the telephones nor can they reveal the content of the conversations. At present, individuals can purchase cellular telephones with or without providing accurate subscriber, billing, or user information, and I am aware that it is common practice for drug traffickers to purchase a cellular telephone in the name of a nominee or through a company that sells cellular telephones. Indeed, **TARGET TELEPHONE 2** (used by Jacob BOWLING) is a pre-paid telephone subscribed to "Maurice Love." Therefore, without access to

43

the content of the intercepted wire communications, toll information will be of little investigative value.

### E.    INTERVIEWS OF WITNESSES/USE OF THE GRAND JURY

110.    Previously, witnesses have provided interviews and grand jury testimony in the furtherance of this investigation.    Although this technique was successful in obtaining information about the organization, it was limited in nature.    Witness interviews and grand jury testimony are unable to expose the full nature and scope of the criminal activity, or the identities of all the participants in this investigation.

111.    To date, investigators have conducted or attempted to conduct independent interviews of individuals with knowledge of the drug trafficking activities of the TARGET SUBJECTS and their associates.    Although these interviews have provided investigators with historical information regarding the MMP DTO, investigators have not been able to obtain real time information that has led to the successful dismantling of the organization.

112.    Generally speaking, calling additional witnesses before a grand jury would likely be unsuccessful in gathering sufficient evidence of the full scope, nature, or identities of all the participants in this criminal organization.    Only individuals who are currently involved in the criminal activity at the highest levels have the requisite knowledge regarding the full scope and nature of the present operation.

113.    Similarly, the continuous use of a federal grand jury does not appear to be a promising method of investigation.    Witnesses who could provide relevant evidence to a grand jury would themselves, likely be participants in the narcotics-trafficking activities under investigation.    Such individuals would face prosecution themselves, and it is therefore unlikely that any of them would testify voluntarily.    Nor would it be desirable at this time to seek

44

immunity for such individuals and to compel their testimony.   Immunizing them could thwart the public policy that they be held accountable for their crimes.   Additionally, the issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation.   For similar reasons, conducting numerous interviews at this point in the investigation would not be successful in obtaining evidence of the criminal activities under investigation.   Only the individuals who participate in the criminal conversations or transactions are knowledgeable of their contents, making these individuals subjects of this investigation.   It has been my experience, and the experience of other agents and law enforcement officers involved in this investigation, that interviews with individuals who are involved in the sale and distribution of narcotics are not productive.   These individuals do not wish to disclose their own criminal activity, and do not wish to implicate others, due to fear for their own safety, and/or a loyalty to other subjects of this investigation.

114.   Therefore, I believe that any grand jury investigation or interview of the TARGET SUBJECTS or their associates would be unsuccessful in exposing the full nature and scope of the criminal activity, or the identities of all the participants in this investigation.   Additionally, should the focus of the investigation and magnitude of the potential penalties involved be disclosed to the TARGET SUBJECTS, it is possible that they would: (1) become more secretive in their criminal activities; (2) conduct their criminal activities at different locations; (3) possibly harm suspected government agents and/or informants; (4) threaten potential witnesses; (5) possibly flee the jurisdiction; and (6) conceal or destroy evidence.

F.   SEARCH WARRANTS

115.   Although search warrants have been executed at locations associated with several

45

**JA6990**

of the TARGET SUBJECTS, additional searches are unlikely to uncover the full nature and scope of this conspiracy.

116. On May 17, 2016, a search and seizure warrant was executed at the home of Dante BAILEY and Tiffany BAILEY at 7607 Reserve Circle, Apt 203, Baltimore, Maryland. Dante BAILEY was arrested pursuant to a federal arrest warrant for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Investigators obtained an arrest warrant for Dante BAILEY after learning on May 3, 2016 that Dante BAILEY and Tiffany BAILEY visited an indoor pistol range and engaged in target shooting. Dante BAILEY is prohibited from possessing a firearm due to multiple disqualifying felony convictions.

117. The search of the BAILEY's residence resulted in the recovery of approximately 89 grams of heroin, a digital scale, over $700 in cash, several cellular telephones, and numerous items of gang-related paraphernalia and paperwork.

118. Dante BAILEY was arrested at the location and transported to the ATF Baltimore Field Division. Investigators again delivered Miranda warnings to him and conducted an interview with him. BAILEY admitted membership in MMP, stating that MMP members were previously Tree Top Piru ("TTP") and that MMP was formed as a result of the indictment of TTP in 2008. BAILEY stated he traveled to the "OGs" on Tree Top in Compton, California to get approval to start MMP. BAILEY stated that there was a picture of him meeting with these individuals on a Facebook profile used by him that was seized by police. BAILEY advised that Murdaland Mafia Piru is 75% Mob and 25% Piru. BAILEY did not reveal MMP's criminal purposes, and he denied his participation in, or knowledge about, a number of recent murders and shootings.

119. Although this search warrant resulted in evidence against Dante and Tiffany

46

**JA6991**

BAILEY, it has not led to evidence against other members of the DTO, nor revealed the full extent of the DTO's operations.   No other members of MMP were arrested based on this incident.

120.   As mentioned above, MMP considers its "headquarters" to be the BP gas station located at the intersection of Windsor Mill Road and Forest Park Avenue in Baltimore City. Investigators have not applied for a warrant to search this location, for a number of reasons. First, the execution of a search warrant at this location could not be done without the knowledge of the community and the targets of the investigation, who would then be less likely to frequent the gas station going forward due to suspicion that employees at the gas station may be given incentive to cooperate with law enforcement.   In fact, a search warrant at this location could put the gas station employees at risk of violence or threats of violence by members of MMP. Second, the Baltimore City Police Department recently forced the closure of the gas station due to the high number of criminal complaints originating at this location over the past several years. As of June 21, the gas station is padlocked and fenced in, and therefore, a search warrant would not be practicable or fruitful.

121.   At present, investigators have not established probable cause to search any other locations associated with the MMP DTO.   Even if new locations could be identified and probable cause could be developed to search them, the execution of search warrants, and the recovery of drugs and/or other evidence will not meet the goals of this investigation.   A search warrant on a single location, even if drugs or firearms were recovered, could lead to charges against only a handful of the individuals responsible for this pervasive and on-going conspiracy. Those who were not present at the time of the execution of the warrant could claim they were completely unaware of the use of the dwelling and/or the criminal activities of the occupants.

47

**JA6992**

Further, without the intercepted conversations identifying and connecting the targets of the investigation, who do not reside at the searched residence, many of the individuals responsible for this drug trafficking enterprise would escape prosecution. It is only through the wire interception sought herein that law enforcement officers will be able to learn the timing of cocaine and heroin deliveries, the location(s) where drugs and firearms are stored, and the identities of all of the individuals responsible for delivering, processing, and packaging the cocaine and heroin for retail sale, as well as committing acts of violence using firearms. Accordingly, I believe that the execution of search warrants will not alone or in connection with other conventional investigative techniques satisfy the goals of this investigation.

122. Additionally, I am aware that the execution of search warrants in most cases cannot be done without the knowledge of the community and without the knowledge of the targets of the investigation. I also know that when targets of an investigation learn that members of their organization have been subjected to the execution of a search warrant, they are less likely to associate with those members going forward due to suspicion that targets of search warrants may be given incentive to cooperate with law enforcement.

123. For instance, in this case, investigators received information from CS-2 that after the search of the BAILEY's residence, members of MMP began looking for an alternative residence for Dante BAILEY's wife Tiffany BAILEY. In addition, CS-2 relayed that members of MMP became concerned that Tiffany BAILEY had given law enforcement consent to search her cellular telephone that was seized during the search, and that some members were likely to change telephone numbers soon as a result. Thus, continued use of search warrants would likely alert the TARGET SUBJECTS to the existence of the investigation and, thereby make it more difficult to expose the full nature and scope of MMP's criminal activity.

48

**JA6993**

## G.    CONSENSUAL WIRETAP

124.    During the course of the investigation into the MMP DTO, investigators have utilized a consensual wiretap on CS-2's phone since February 2016. While a consensual wiretap can be an effective tool in some instances, in this case it cannot accomplish the goals of the investigation.   One of the main problems is that the TARGET SUBJECTS are wary of talking about illegal activity over the phone, particularly with people they do not know well.   CS-2 is not close with a number of the TARGET SUBJECTS and, as such, it would be extremely out of the ordinary for CS-2 to call many of the TARGET SUBJECTS and start talking about CDS, firearms, or acts of violence.   Accordingly, many of the conversations occurring over the consensual wiretap have been of a general, non-illicit nature.

125.    In addition, investigators believe there may be concern amongst the TARGET SUBJECTS that CS-2 is cooperating with the police and, accordingly, many of the TARGET SUBJECTS may be suspect of CS-2 in general.   Were CS-2 to attempt to engage them in conversation about illicit activity over the phone, it would almost certainly arouse suspicion, and potentially even put CS-2's security in danger.   For the foregoing reasons, your Affiant is of the belief that continued use of the consensual wiretap will not help investigators uncover the identities of all of the TARGET SUBJECTS or discover the methods and means by which the TARGET SUBJECTS are acquiring and distributing their narcotics.

## H.    TRASH RUNS

126.    I am aware that a possible investigative technique is to recover the trash from a suspected stash location or house and ascertain whether any contraband or other items indicating illegal activity have been discarded, which could lead to probable cause to search the suspected location.   In this investigation, however, trash runs have proven to be of limited utility.

49

**JA6994**

Throughout the course of this investigation, members of law enforcement attempted to conduct trash inspection at the home residence of Dante BAILEY and other members of the MMP DTO. Investigators were unable to collect trash from BAILEY and other members of the DTO because they reside in apartment complexes, where trash is placed in a common area for pick up.   Even if trash was available for inspection, the trash run would supply probable cause to search only one location, which, as noted above, has its own limitations.   Without arresting all the members of the organization inside the premise with the narcotics, several members of the organization could claim that they were completely unaware of the nature and or use of the locations.   As a result, the entire organization cannot be prosecuted simply by executing a warrant on a location where law enforcement believes narcotics are present.

## I.   OTHER WIRETAPS

127.     As noted above, I located previous applications for an interception of wire and electronic communications involving persons, telephones, or premises specified in this Affidavit. Specifically, in Summer 2015, the U.S. Immigration and Customs Enforcement/Homeland Security Investigations and the Baltimore County Police Department conducted a wiretap investigation into Adrian Jamal SPENCE a/k/a "Spittle" a/k/a "SP," a heroin distributor in the Baltimore metropolitan area.   The investigation was limited in scope, and was focused on SPENCE and a small number of suppliers and associates believed to be responsible for trafficking large volumes of heroin.   As a result of that investigation, the U.S. Attorney's Office for the District of Maryland obtained an indictment charging Adrian Jamal SPENCE, Kenneth Dixon, Robert Burrell, Kameron Wilson, and Darius Spence with conspiracy to distribute one kilogram or more of heroin (Case No. RDB-15-0541, U.S. District Court for the District of Maryland).

128.     During the course of the wiretap investigation into SPENCE, law enforcement also

50

**JA6995**

intercepted certain wire and electronic communications involving others who are currently under investigation, namely, Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Jarmal HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray"; William JONES a/k/a "Bill"; Tiffany BAILEY; Takuma TATE a/k/a "Oop"; and Jamal LOCKLEY a/k/a "T-Roy."   Some of these communications related to suspected narcotics or firearms transactions.   In connection with other evidence, these wiretap communications led to drug and/or firearms-related charges being brought against some of the TARGET SUBJECTS in state and/or federal court.   Specifically, Dante BAILEY was charged with conspiracy to distribute narcotics and possession with intent to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15004054).   Jarmal HARRID was charged with possession with intent to distribute narcotics and conspiracy to possess with intent to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15005884).   Jamal SMITH was charged with conspiracy to possess with intent to distribute narcotics and possession with intent to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15005892). William JONES was charged with conspiracy to possess with intent to distribute narcotics and possession with intent to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15005893).   Takuma TATE was charged with distribution of narcotics and conspiracy to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15005890).   Tiffany BAILEY was charged with conspiracy to distribute narcotics and possession with intent to distribute narcotics in the Circuit Court for Baltimore City (Case No. 03K15004053).   Jamal LOCKLEY was charged with conspiracy to distribute narcotics and distribution of narcotics in the Circuit Court for Baltimore County (Case No. 03K15005891).   Dontray JOHNSON was charged in the U.S. District Court for the District of Maryland with possession with intent to

51

distribute heroin in violation of 21 U.S.C. § 841 and possession of ammunition by a felon in violation of 18 U.S.C. § 922(g).

129.   So far as investigators are aware, neither the user of **TARGET TELEPHONE 1**, Dwight JENKINS a/k/a "Huggie," nor the user of **TARGET TELEPHONE 2**, Jacob BOWLING a/k/a "Jakey," was intercepted during the 2015 wiretap investigation into SPENCE.   Moreover, because the SPENCE investigation was limited in scope and focused on heroin trafficking in Baltimore County in June and July 2015, it did not lead to the discovery of evidence necessary to accomplish the goals of this investigation.   For instance, the 2015 wiretap investigation did not lead to the discovery of evidence regarding Murdaland Mafia Piru (MMP), the identities and roles of members of MMP, the management of the gang, its meeting places and stash houses, the methods by which it protects its territories and assets, or any murders and other acts of violence carried out in furtherance of the gang.   In particular, it did not—and could not—have led to the discovery of evidence relating to the roughly six murders and nonfatal shootings believed to be carried out by or at the direction of members of MMP *since* July 2015.   Accordingly, it is believed that the interception of communications over **TARGET TELEPHONES 1 and 2** will lead to new and important evidence pertaining to ongoing criminal activities of MMP that could not be discovered through prior wiretaps.

J.   **FINANCIAL INVESTIGATION**

130.   The financial aspect of this investigation has been limited.   Investigators issued a grand jury subpoena to Equifax requesting consumer credit reports for certain of the TARGET SUBJECTS and their associates.   The response to this request produced limited or no intelligence.   Investigators also issued grand jury subpoenas to the casinos that CS-4 stated he/she used to launder drug proceeds for Dante BAILEY and Randy BANKS.   The responses to

52

**JA6997**

these subpoenas are pending.

131.   It is my experience that drug trafficking organizations, particularly heroin-based organizations, generally deal with cash or cash cards and do not use traditional banking services. To date, no commercial bank accounts have been identified for JENKINS or BOWLING. Requests for additional bank account records for these and other TARGET SUBJECTS are forthcoming.   Although the financial information may provide additional information about what the TARGET SUBJECTS are doing with the proceeds of their illegal activities, in addition to confirming that they do not have any legitimate sources of income, the financial information is unlikely to confirm specifically which assets were obtained using proceeds from narcotics trafficking and other illegal activities.   It is also unlikely to further other objectives of the investigation, such as identifying MMP's suppliers of narcotics and firearms and the organization's methods of acquiring, transporting, and storing narcotics and firearms.   While the financial investigation will continue, such information is also unlikely, alone or in combination with other traditional investigative means, to permit investigators to achieve all of the goals of this investigation.

### XIII.   MINIMIZATION

132.   As stated earlier, this case is being investigated by the ATF and the BPD.   It is anticipated that during the period of interception, all monitoring will be performed in Baltimore City, Maryland, by law enforcement officers authorized under 18 U.S.C. § 2510(7), including Special Agents of the ATF, officers of the BPD, and government employees or individuals operating under a contract with the government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

133.   All monitoring of wire communications over **TARGET TELEPHONE 1** and

53

**JA6998**

**TARGET TELEPHONE 2** will be minimized in accordance with 18 U.S.C. § 2510, *et seq.*

The "investigative or law enforcement officers of the United States" and translators, if necessary,

who are to carry out the requested interception of wire communications, will be instructed

concerning the steps they should take to avoid infringing upon any attorney-client privilege or

other recognized privileges.   In addition, all communications intercepted will be conducted in

such a way as to minimize the interception of communications not otherwise criminal in nature or

subject to interception under 18 U.S.C. § 2510, *et seq..*   Specifically, all monitoring will cease

when it is determined that the monitored wire conversation is not criminal in nature.

Interception will be suspended immediately when it is determined through voice identification,

physical surveillance, or otherwise, that no TARGET SUBJECTS or any of their confederates,

when identified, are participants in the conversation, unless it is determined during the portion of

the conversation already overheard that the conversation is criminal in nature.   If an interception

is minimized, monitoring agents shall spot check to ensure that the conversation has not turned to

criminal matters.

134.   It is anticipated that the monitoring location will not be staffed at all times, and

will be kept secure with access limited to authorized personnel.   When personnel are not present

in the monitoring location all calls will be minimized.

135.   It is requested that the order provide that, if necessary, translators be authorized to

assist in conducting this wire surveillance and to receive disclosure of intercepted

communications.   It may be necessary to secure the services of translators in order to assist the

agents in monitoring the wire surveillance and translating the intercepted communications.   All

such translators will be under contract to the agencies and will be directly supervised by the

agencies.   It is further requested, pursuant to 18 U.S.C. § 2518(5), United States Code, that in the

54

event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

### XIV.  AUTHORIZATION REQUEST

136.    Based on the foregoing, it is my opinion that the interception of wire communications occurring over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** is essential to uncover the full scope of the illegal activity described herein.

137.    Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of 30 days, whichever is earlier.    The 30-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or 10 days from the date of this Court's Order.

138.    In addition, there is probable cause to believe that the locations of **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** at times determined by investigators will constitute evidence of the TARGET OFFENSES.    As more fully described above, the objectives of this investigation include identifying all of the locations where the MMP DTO conducts narcotics transactions, stores and packages narcotics, and collects and stores narcotics proceeds. Additionally, objectives will also include how members of the organization obtain, store and utilize firearms in furtherance of their illegal enterprise.    Accordingly, for the reasons set forth above, it is also requested, pursuant to 18 U.S.C. § 2703(c)(1)(A) and 28 U.S.C. § 1651 (the All

55

**JA7000**

Writs Act) and consistent with the probable-cause evidentiary standard set forth in Fed. R. Crim. P. 41, that the Service Providers be directed to provide the agencies with location-based data that will assist law enforcement in determining the locations of **TARGET TELEPHONE 1** and **TARGET TELPHONE 2** (differentiated from the first or last cell site used to make or receive a call, which simply identifies the location of the third-party provider's infrastructure). This request for location-based data includes the request for an Order directing the Service Providers to employ and to disclose to the agencies the results (through any means reasonably available) of all available location-based services, including but not limited to Global Positioning System (GPS) or any geo-location coordinates associated with this handset, if applicable, and any "Enhanced-911" services developed by the Service Providers.

139. It is also requested, pursuant to 18 U.S.C. §§ 2703(c) and (d), that the Court issue an Order directing the Service Providers and any other telecommunications-related carrier provide the agencies with subscriber information (published, unpublished or unlisted) and billing information, including the names, addresses, and customer service records of the subscribers, for any numbers dialed and pulsed from and to **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** during the period for which interception is authorized. The investigation described above is continuing, and there exist specific and articulable facts showing that there are reasonable grounds to believe that the information being sought is relevant and material to the ongoing investigation. For the reasons set forth above, that information is needed to help identify other TARGET SUBJECTS and others involved in the distribution of narcotics by the MMP DTO.

140. Pursuant to the provisions of 18 U.S.C. § 2518(4), it is requested that it be ordered the Service Providers, and any other service providers, furnish the technical assistance necessary

56

to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all dial digits—including all incoming and outgoing calls—pen register information, and audio interception capability whether the cellular telephone is in roaming mode or otherwise). The assistance of this provider is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the agencies. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

Ivo Louvado
Task Force Officer, ATF

Sworn to before me this _30_ day of June 2016 at _4:51_ hours.

The Honorable Ellen L. Hollander
United States District Judge
District of Maryland

57

I hereby attest and certify on _6/30/16_
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By_____ Deputy

JA7002

FILED _____ ENTERED
LODGED _____ RECEIVED

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JUN 3 0 2016

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING OVER THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 301-8819 AND BEARING IMSI NUMBER 310410801883553, AND WIRE COMMUNICATIONS OCCURRING OVER THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 766-6957 AND BEARING IMSI NUMBER 310260637910168 | BY ____ DEPUTY<br><br>MISC. NO. 16 mc 738<br>(UNDER SEAL) |

## SERVICE PROVIDER ORDER

This matter has come before the Court pursuant to the application of the United States for

an Order pursuant to 18 U.S.C. § 2518, authorizing the interception and recording of (1) wire

communications over the cellular telephone currently assigned call number (443) 301-8819, and

bearing IMSI number 310410801883553, with service provided by T-Mobile US, Inc., and with

unknown subscriber information, but in active use by Dwight JENKINS a/k/a "Huggie"

("**TARGET TELEPHONE 1**" or "**TT1**"); and (2) wire communications occurring to and from

the cellular telephone currently assigned call number (443) 766-6957 and bearing IMSI number

310260637910168, with service provided by T-Mobile US, Inc., subscribed to Maurice Love,

with an address of 5200 W. North Ave. Baltimore, Maryland 21207, but in active use by Jacob

BOWLING a/k/a "Jakey" (hereinafter, "**TARGET TELEPHONE 2**," or "**TT2**").

IT APPEARING that the Court, having reviewed the application and having found that it

conforms in all respects to the requirements of 18 U.S.C. §§ 2516 and 2518, and having issued

an Order conforming to the provisions of 18 U.S.C. § 2518 authorizing agents, officers and

1

**JA7003**

investigators of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and other investigative and law enforcement officers (collectively "the Agencies"), as defined in 18 U.S.C. § 2510(7), assisted, if necessary, by authorized translators, to intercept and record wire communications occurring over TARGET TELEPHONE 1 and TARGET TELEPHONE 2 for a period of thirty days; and

IT FURTHER APPEARING that the applicant has requested that the Service Provider and any other service providers be directed to furnish to the Agencies forthwith all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with minimum interference with the services accorded the persons whose communications are to be intercepted,

## AUTHORIZATION

**IT IS HEREBY ORDERED** that the Service Provider and any other telecommunications-related carrier shall provide the Agencies with subscriber information (published, non-published or unlisted) and billing information, including the names, addresses, and customer service records of the subscribers, for any numbers dialed and pulsed from and to TARGET TELEPHONE 1 and TARGET TELEPHONE 2 during the period for which interception is authorized;

**IT IS FURTHER ORDERED** that the service provider and any other service providers shall furnish to the Agencies forthwith all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services accorded the persons whose communications are to be intercepted, including all dial digits (including all incoming and outgoing calls), pen register information, and audio interception capability (whether the cellular telephone is in roaming mode or otherwise), and that

2

**JA7004**

the Service Provider shall be compensated by the Agencies for reasonable expenses incurred in providing such facilities or assistance;

**IT IS FURTHER ORDERED** that the authorization to intercept wire communications granted herein shall apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty day period;

### LOCATION INFORMATION

**IT IS FURTHER ORDERED**, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), that agents of the ATF are authorized to ascertain the physical locations of TARGET TELEPHONE 1 and TARGET TELEPHONE 2, including but not limited to E-911 Phase II data or other precise location information concerning TARGET TELEPHONE 1 and TARGET TELEPHONE 2 (the "Requested Location Information"), during the authorized period of interception. Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by TARGET TELEPHONE 1 and TARGET TELEPHONE 2 at the start and end of any call, pursuant to 18 U.S.C. §§ 3122-24, 18 U.S.C. § 2703(c)(1)(A), and Federal Rule of Criminal Procedure 41. There is probable cause to believe that the locations of TARGET TELEPHONE 1 and TARGET TELEPHONE 2 during that period will constitute evidence of the offenses under investigation.

**IT IS FURTHER ORDERED** that the Service Provider shall disclose the Requested Location Information concerning TARGET TELEPHONE 1 and TARGET TELEPHONE 2 during the authorized period of interception, and shall initiate a signal to determine the locations of TARGET TELEPHONE 1 and TARGET TELEPHONE 2 on the service provider's network

**JA7005**

or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and shall furnish the information, facilities and technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the users of TARGET TELEPHONE 1 and TARGET TELEPHONE 2, at any time of day or night, owing to the potential need to locate TARGET TELEPHONE 1 and TARGET TELEPHONE 2 outside of daytime hours.

**IT IS FURTHER ORDERED** that the furnishing of said information, facilities, and technical assistance by the Service Provider shall terminate thirty days measured from the earlier of the day on which the investigative or law enforcement officers begin to conduct the interception of wire communications, pursuant to this Order or ten days from the date that the order is entered, unless otherwise ordered by this Court.

**IT IS FURTHER ORDERED** that the furnishing of such information, facilities and assistance by the Service Provider shall be compensated for by the United States at the prevailing rate.

## TIME PERIOD

**IT IS FURTHER ORDERED** that the furnishing of said information, facilities, and technical assistance by the Service Provider shall terminate in thirty days.  The thirty-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order.  During the period of this Court's Order, the furnishing of such information, facilities and assistance by the Service Provider and other communication service providers, shall be compensated for by the United States at the prevailing rate;

4

**JA7006**

## NON-DISCLOSURE

**IT IS FURTHER ORDERED** that in order to avoid prejudice to this criminal investigation, the Service Provider and any other service providers and their agents and employees shall not disclose or cause the disclosure of this Order, the interception that it authorizes, the request for information, facilities, and assistance by the Agencies, or the existence of the investigation, to any person other than those of its agents and employees who require said information to accomplish the interception of wire communications hereby ordered.   In particular, the Service Provider and its agents and employees shall in no event make or cause such disclosure to the telephone users involved, to any lessee or subscriber, or to any actual or potential interceptee until otherwise ordered by this Court;

**IT IS FURTHER ORDERED** that this order is binding upon any subsequent service provider to TARGET TELEPHONE 1 or TARGET TELEPHONE 2 after service of a certified copy of this order without further order of this Court being required;

**IT IS FURTHER ORDERED** that in the event that TARGET TELEPHONE 1 or TARGET TELEPHONE 2 is transferred outside of the territorial jurisdiction of this Court during the thirty day period of authorization, interceptions may take place in any other jurisdiction;

**IT IS FURTHER ORDERED** that this Order be placed under seal except that copies of said Order may be served upon the Agencies, the Service Provider and any other service providers as may be necessary to effectuate this Order.

10/30/16
DATE

4:53 p.m.
TIME

_Ellen L. Hollander_
The Honorable Ellen L. Hollander
United States District Judge,
District of Maryland

I hereby attest and certify on __6/30/16__
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By _____ Deputy

5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

```
_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

JUN 3 0 2016

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY
```

IN THE MATTER OF THE APPLICATION OF THE
UNITED STATES OF AMERICA FOR
AUTHORIZATION TO INTERCEPT WIRE
COMMUNICATIONS OCCURRING OVER THE
CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (443) 301-8819 AND BEARING IMSI
NUMBER 310410801883553, AND WIRE
COMMUNICATIONS OCCURRING OVER THE
CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (443) 766-6957 AND BEARING IMSI
NUMBER 310260637910168

MISC. NO. 16 mc 438

(UNDER SEAL)

## ORDER AUTHORIZING THE INTERCEPTION
## OF WIRE COMMUNICATIONS

Application under oath having been made before me by Christina Hoffman, Assistant

United States Attorney for the District of Maryland, who is an investigative or law enforcement

officer of the United States within the meaning of Section 2510(7) of Title 18, United States

Code, for an Order authorizing the interception of wire communications pursuant to Section

2518 of Title 18, United States Code, and full consideration having been given to the matter set

forth therein, the Court finds:

A. There is probable cause to believe that Dwight JENKINS a/k/a "Huggie" a/k/a "Unc";

Jacob BOWLING a/k/a "Ghost" a/k/a "Jakey" a/k/a "Fats"; Dante BAILEY a/k/a "Gutta" a/k/a

"Almighty"; Jamal LOCKLEY a/k/a "T-Roy"; Tiffany BAILEY; Randy BANKS a/k/a "Dirt";

Corloyd ANDERSON a/k/a "Bo"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a

"Gambino" a/k/a "Bino" a/k/a "Tray"; Adrian Jamal SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a

"SP"; Dominick WEDLOCK a/k/a "Rage" a/k/a "Nic"; William JONES a/k/a "Bill"; Jarmal

1

HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dominique ROZZELL a/k/a "Boozie";

Maurice POLLOCK a/k/a "Reese"; Ayinde DELEON a/k/a "Murda"; Jay GREER a/k/a

"Champagne"; Kenneth TORRY a/k/a "Kenny"; Michael STEWART; Jawaun TALLEY;

Charles BLACKWELL; Shakeen DAVIS; Takuma TATE a/k/a "Oop"; Sidney FRAISER a/k/a

"Sid"; Queontaye FORTUNE; Kenyon PATTERSON a/k/a "Konan"; Chiquetta HEATH a/k/a

"Bandi"; Michael SINGER a/k/a "Blizz"; Delante LEE; Eddie MCCARGO; and other known

and unknown co-conspirators (hereinafter, the "**Target Subjects**"), are using **TARGET**

**TELEPHONES 1 and 2** concerning the offenses of (i) distribution of, and possession with

intent to distribute, controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to

commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (iii) use of a

communication facility in the commission of narcotics trafficking offenses, in violation of 21

U.S.C. § 843(b); (iv) maintaining premises for drug distribution, in violation of 21 U.S.C.

§ 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861;

(vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; (vii); the laundering

of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation

of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18

U.S.C. § 2 (collectively, the "**Target Offenses**").

  B.  There is probable cause to believe that particular wire communications of the

Target Subjects will constitute evidence of the Target Offenses. In particular, there is probable

cause to believe that the interception of (1) wire communications occurring to and from the

cellular telephone currently assigned call number (443) 301-8819, and bearing IMSI number

310410801883553, with service provided by T-Mobile US, Inc., and with unknown subscriber

information, but in active use by Dwight JENKINS a/k/a "Huggie," (hereinafter, "**TARGET**

2

**TELEPHONE 1**," or "**TT1**"); and (2) wire communications occurring to and from the cellular telephone currently assigned call number (443) 766-6957 and bearing IMSI number 310260637910168, with service provided by T-Mobile US, Inc., subscribed to Maurice Love, with an address of 5200 W. North Ave. Baltimore, Maryland 21207, but in active use by Jacob BOWLING a/k/a "Jakey" (hereinafter, "**TARGET TELEPHONE 2**," or "**TT2**"), will concern the specifics of the above offenses, including the manner and means of the commission of the offenses. In particular, the communications will concern: (i) the methods of operation of this armed drug trafficking conspiracy, including the precise nature and scope of illegal activities described herein and the relationship of the organization to other drug and firearms trafficking organizations; (ii) the identities and roles of other participants in the conspiracy, accomplices, and aiders and abettors, including the sources of supply of controlled substances and firearms to the TARGET SUBJECTS, and the purchasers of controlled substances distributed by the TARGET SUBJECTS; (iii) the management of the conspiracy, including the way orders and instructions are disseminated to subordinates; (iv) the collection of gang "dues" from members of the gang and/or imposition of "taxes" on nonmembers who operate in the gang's territories; (v) the methods used by the conspiracy to protect its members, territories, and assets (*e.g.*, firearms, controlled substances, and proceeds derived from the sale of controlled substances); (vi) the use of firearms in furtherance of the conspiracy; (vii) the times, dates, and locations of meetings at which persons involved in this conspiracy pick up drugs and/or firearms, exchange money, and meet to discuss the conspiracy and the progress of their illegal activities; (viii) the quantities and types of controlled substances involved in this drug trafficking conspiracy, (ix) the manner of shipment or movement of controlled substances distributed in connection with this conspiracy and firearms used in furtherance of this conspiracy; (x) the methods of paying for the

3

**JA7010**

controlled substances and firearms involved in the conspiracy, and the location, movement and disposition of all proceeds from illicit drug activity associated with this conspiracy, including efforts to launder drug proceeds; (xi) the identification of other locations and facilities used in furtherance of the TARGET OFFENSES, as well as contraband, firearms, and money derived from and used in furtherance of such offenses; (xii) the existence and location of records of the purchase and sale of narcotics and firearms associated with this conspiracy; (xiii) the methods used by the TARGET SUBJECTS and others to elude law enforcement detection; (xiv) the identification of additional communication devices or telephone instruments used by the TARGET SUBJECTS and others in furtherance of the TARGET OFFENSES; and (viii) other evidence necessary for the successful prosecution and conviction of the above described criminal activity. In addition, the communications are expected to constitute admissible evidence of the commission of the above-described offenses.

C. It has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

D. There is probable cause to believe that **TARGET TELEPHONES 1 and 2** have been used and will continue to be used in connection with the commission of the above-described offenses in the District of Maryland and elsewhere.

E. There is probable cause to believe that geolocation and cell site data for **TARGET TELEPHONES 1 and 2** will be evidence of activity in violation of the above-described Target Offenses.

**WHEREFORE**, it is hereby,

**ORDERED**, that Special Agents and Task Force Officers of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and participating law enforcement agencies are

4

authorized, pursuant to an Application authorized by Richard W. Downing, Acting Deputy Assistant Attorney General of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code, and pursuant to Attorney General Order Number 3536-2015, dated June 11, 2015, to intercept wire communications to and from the above-described target telephones.

**PROVIDED** that such interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or shall terminate thirty (30) days measured from the date interceptions begin, or ten days after this Order is entered, whichever is earlier. It is

**FURTHER ORDERED** that this Order is binding on any subsequent service provider that provides service to the subject telephones upon service of a certified copy of this Order without further order of this Court being required. It is

**FURTHER ORDERED** that the authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty day period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider. It is

5

**JA7012**

**FURTHER ORDERED** pursuant to 18 U.S.C. §2518(3), that in the event that **TARGET TELEPHONES 1 and 2** are used outside the territorial jurisdiction of this Court, interceptions of the transferred facilities may continue to take place in the District of Maryland where all communications will first be heard and minimized regardless of where the wire communications are placed to or from. It is

**FURTHER ORDERED** that, based upon the request of the Applicant, pursuant to Section 2518(4) of Title 18, United States Code, T-Mobile, which is the electronic communication service provider, as defined in Section 2510(15) of Title 18, United States Code, and any subsequent service providers that provide service to **TARGET TELEPHONES 1 and 2**, shall furnish the ATF and its participating law enforcement agencies with all information, facilities, and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted with the service provider to be compensated by the ATF for reasonable expenses incurred in providing such facilities or assistance. It is

**FURTHER ORDERED,** pursuant to the authority granted in 18 U.S.C. § 3123, that agents of the ATF are authorized to install and use a pen register and trap and trace device to collect the dialing, routing, addressing, and signaling information identifying the destination of outbound wire communications transmitted from **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2,** and the source of incoming wire communications transmitted to **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2**. Furthermore, pursuant to 18 U.S.C. § 3124, the service providers are ordered to furnish all information, facilities, and technical assistance necessary to accomplish such installation and use unobtrusively and with a minimum of interference with the services that the service providers accord to the users of **TARGET**

6

**JA7013**

**TELEPHONES 1 and 2**. The service providers shall be compensated by the ATF for reasonable expenses incurred in providing such information, facilities, and technical assistance. It is

**FURTHER ORDERED**, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), that agents of the ATF are authorized to ascertain the physical locations of **TARGET TELEPHONES 1 and 2**, including but not limited to E-911 Phase II data or other precise location information concerning **TARGET TELEPHONES 1 and 2** (the "Requested Location Information"),[1] during the authorized period of interception. There is probable cause to believe that the locations of **TARGET TELEPHONES 1 and 2** during that period will constitute evidence of the Target Offenses. It is

**FURTHER ORDERED** that T-Mobile shall disclose the Requested Location Information concerning **TARGET TELEPHONES 1 and 2** during the authorized period of interception, and shall initiate a signal to determine the locations of **TARGET TELEPHONES 1 and 2** on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and shall furnish the information, facilities and technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of **TARGET TELEPHONES 1 and 2**, at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONES 1 and 2** outside of daytime hours. It is

**FURTHER ORDERED** that this order be executed on T-Mobile no later than 10 days from the date that the order is entered. It is

---

[1]     Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** at the start and end of any call, pursuant to 18 U.S.C. §§ 3122-24, 18 U.S.C. § 2703(c)(1)(A), and Federal Rule of Criminal Procedure 41.

7

**JA7014**

**FURTHER ORDERED** that the furnishing of said information, facilities, and technical assistance by T-Mobile shall terminate thirty days measured from the earlier of the day on which the investigative or law enforcement officers begin to conduct the interception of wire communications, pursuant to this Order or ten days from the date that the order is entered, unless otherwise ordered by this Court. It is

**FURTHER ORDERED** that the furnishing of such information, facilities and assistance by T-Mobile shall be compensated for by the United States at the prevailing rate. It is

**FURTHER ORDERED** that the warrant for the Requested Location Information be returned to the issuing judicial officer within 10 days after the termination of the authorized period of interception. It is

**FURTHER ORDERED**, pursuant to 18 U.S.C. § 3101a(b) and Federal Rule of Criminal Procedure 41(f)(3), that service of notice of the acquisition of the Requested Location Information may be delayed for a period not to exceed 120 days from the date that the order is entered. There is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **TARGET TELEPHONES 1 and 2** would seriously jeopardize the ongoing investigation, as such a disclosure would give the person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. The period of delay may thereafter be extended by the court for good cause shown. It is

**FURTHER ORDERED** that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employees are ordered not to disclose or cause a disclosure of the Order or the request for information, facilities, and assistance by the ATF and its participating law enforcement agencies

8

or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said providers and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications. It is

**FURTHER ORDERED** that this Order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation. The interception of wire communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the date interceptions begin, or ten days after this Order is entered, whichever is earlier. It is

**FURTHER ORDERED** that monitoring of wire conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications. A memorandum outlining all of the guidelines for minimization and application of privileges, as well as a copy of the application and this Order, will be provided to all monitors. It is

**FURTHER ORDERED** that translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communications. Pursuant to Section

9

**JA7016**

2518(5), Title 18, United States Code, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.   Monitoring will be conducted by Special Agents or deputized task force officers of the ATF, under the supervision of investigative or law enforcement officers authorized to conduct the interception.   Pursuant to 18 U.S.C. § 2518(5), interception and monitoring also will be conducted in part by other government personnel, or by individuals operating under a contract with the ATF, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.   These other, non-agent individuals, will be fully informed of the contents of the Court's authorization Order, as well as the minimization requirements and limits on disclosures set forth in Chapter 119 of Title 18, United States Code.  It is

**FURTHER ORDERED** that Assistant United States Attorney Christina Hoffman, Jason Medinger or any other Assistant United States Attorney familiar with the facts of this case shall provide this Court with a report on or about the fifteenth, and thirtieth days following the date interception begins, or as soon thereafter as practicable, showing what progress has been made toward achieving the authorized objectives and the need for continued interception.  It is

**FURTHER ORDERED** that this Order, the Application, Affidavit and proposed Orders, and all interim reports filed with this Court with regard to this matter shall be sealed until further order of this Court, except that copies of the Orders, in full or redacted form, may be served on the ATF, and its participating law enforcement agencies and the service providers as necessary to effectuate this order.  It is

**JA7017**

**FURTHER ORDERED** that file stamped and certified copies of the Application and Affidavit and three certified copies of the Order and the Order to the Service Providers shall be provided by the Clerk of this Court to the Office of the United States Attorney for the District of Maryland.

The Honorable Ellen L. Hollander
United States District Judge, District of Maryland

Dated this _____30th_____ day of June, 2016.

Time: 4.53 p.m.

I hereby attest and certify on __6/30/16__
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By _____ Deputy

11

**JA7018**

## WARRANT ON WRITTEN AFFIDAVIT
## FOR CELL PHONE LOCATION DATA

| 𝔘nited 𝔖tates 𝔇istrict 𝔠ourt | |
|---|---|
| | **District of Maryland** |

| **UNITED STATES OF AMERICA** | DOCKET NO | MAGISTRATE'S CASE NO |
|---|---|---|
| **v.** | | |
| **PREMISES KNOWN AND DESCRIBED AS A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 301-8819 AND IMSI NUMBER 310410801883553 AND A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 766-6957 AND BEARING IMSI NUMBER 310260637910168** | To:     ANY AUTHORIZED FEDERAL AGENT | |

Affidavit having been made before me by the below-named affiant to obtain precise location information concerning the following cell phones (the "Premises"):

**A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 301-8819 AND IMSI NUMBER 310410801883553**

**A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 766-6957 AND IMSI NUMBER 310260637910168**

and as I am satisfied that there is good cause for the acquisition of precise location information concerning the Premises,

YOU ARE HEREBY COMMANDED to acquire precise location data concerning the Premises named above for a period of thirty (30) days starting within ten (10) days of the date of this order, during any time of day; to return this warrant to the U.S. District Judge designated in this warrant within ten (10) days after the execution of the warrant has ended; and pursuant to 18 U.S.C. § 3103a(b)(3) authorizing delayed notification, to serve notice no later than 120 days from the date that the accompanying order authorizing interception of communications is entered.

| NAME OF AFFIANT TFO Ivo Louvado | SIGNATURE OF U.S. DISTRICT JUDGE : Ellen L. Hollander | DATE/TIME ISSUED |
|---|---|---|
| TFO IVO LOUVADO | Ellen L. Hollander | 6/30/16 4·54 A M. |

**JA7019**

RETURN

DATE AND TIME ACQUISITION OF LOCATION DATA FIRST INITIATED AND PERIOD DURING WHICH IT WAS ACQUIRED:

## CERTIFICATION

I swear that this information contained on this return is true and accurate:

_____

Subscribed, sworn to, and returned before me this date.

*Federal Judge*                                    *Date*

**JA7020**

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

JUL 2 1 2016

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE APPLICATION OF THE
UNITED STATES OF AMERICA FOR
AUTHORIZATION TO INTERCEPT WIRE
COMMUNICATIONS OCCURRING TO AND FROM
THE CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (443) 709-7780 AND BEARING IMSI
NUMBER 310260674625701 ("TARGET
TELEPHONE 3")

MISC. NO. 16 mc 499

(UNDER SEAL)

## APPLICATION FOR INTERCEPTION
## OF WIRE COMMUNICATIONS

Christina Hoffman, Assistant United States Attorney for the District of Maryland, being

duly sworn, states:

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by

law to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title

18, United States Code. I am also an attorney for the Government as defined in Rule 1(b)(1) of

the Federal Rules of Criminal Procedure, and, therefore, pursuant to Section 2516(3) of Title 18,

United States Code, I am authorized to make an application to a federal judge of competent

jurisdiction for an order authorizing the interception of wire and electronic communications.

2.      This Application is for an order pursuant to Section 2518 of Title 18, United

States Code, and seeks authorization to intercept wire communications occurring to and from the

cellular telephone currently assigned call number (443) 709-7780, and bearing IMSI number

310260674625701, with service provided by T-Mobile US, Inc., subscribed to James Kenner at

1909 North Forest Park Avenue, Baltimore, Maryland 21207, but in active use by Jamal

1

**EXHIBIT 3**

**JA7021**

LOCKLEY a/k/a "T-Roy" (hereinafter, **"TARGET TELEPHONE 3"** or **"TT3"**). The requested authorization would apply to wire communications of Jamal LOCKLEY a/k/a "T-Roy"; Dwight JENKINS a/k/a "Huggie" a/k/a "Unc"; Jacob BOWLING a/k/a "Ghost" a/k/a "Jakey" a/k/a "Fats"; Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Tiffany BAILEY; Randy BANKS a/k/a "Dirt"; Corloyd ANDERSON a/k/a "Bo"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray"; Adrian Jamal SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a "SP"; Dominick WEDLOCK a/k/a "Rage" a/k/a "Nic"; William JONES a/k/a "Bill"; Jarmal HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dominique ROZZELL a/k/a "Boozie"; Maurice POLLOCK a/k/a "Reese"; Ayinde DELEON a/k/a "Murda"; Jay GREER a/k/a "Champagne"; Kenneth TORRY a/k/a "Kenny"; Michael STEWART; Jawaun TALLEY; Charles BLACKWELL; Shakeen DAVIS; Takuma TATE a/k/a "Oop"; Sidney FRAISER a/k/a "Sid"; Queontaye FORTUNE; Kenyon PATTERSON a/k/a "Konan"; Chiquetta HEATH a/k/a "Bandi"; Michael SINGER a/k/a "Blizz"; Delante LEE; Eddie MCCARGO; Dante PARRISH, and other unknown co-conspirators (hereinafter, the **"TARGET SUBJECTS"**).

3.     **TARGET TELEPHONE 3** is being used in the District of Maryland and elsewhere by certain of the above-named persons concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses enumerated in 18 U.S.C. § 2516: (i) distribution of, and possession with intent to distribute, controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (iii) use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); (iv) maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861; (vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C.

2

§ 371; (vii); the laundering of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18 U.S.C. § 2 (collectively, the "**Target Offenses**"). There is probable cause to believe these offenses are being committed by certain of the Target Subjects.

4.      Pursuant to Section 2516 of Title 18, United States Code, the Attorney General of the United States has specially designated the Assistant Attorney General, any Acting Assistant Attorney General, any Deputy Assistant Attorney General or any acting Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by Section 2516 of Title 18, United States Code, to authorize this Application.  Under the power designated by special designation of the Attorney General pursuant to Attorney General Order Number 3536-2015, dated June 11, 2015, Paul O'Brien, Acting Deputy Assistant Attorney General of the Criminal Division, has authorized this Application.  Attached to this Application, as Exhibit A, are copies of the Attorney General's order of special designation and the Memorandum of Authorization approving this Application.

5.      I have discussed all of the circumstances of the above offenses with Special Agent Timothy Moore of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), who has been directly involved in conducting this investigation, and I have examined the affidavit of Special Agent Timothy Moore, which is attached to this Application, as Exhibit B, and is incorporated herein by reference.  Based upon that affidavit, your Applicant states upon information and belief that:

A.      There is probable cause to believe that certain of the Target Subjects have committed, are committing, and will continue to commit crimes of (i) distribution of, and possession with intent to distribute, controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (iii) use

3

of a communication facility in the commission of narcotics trafficking offenses, in violation of
21 U.S.C. § 843(b); (iv) maintaining premises for drug distribution, in violation of 21 U.S.C.
§ 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861;
(vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; (vii); the laundering
of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation
of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18
U.S.C. § 2.

    B.    There is probable cause to believe that particular wire communications
concerning the above-described offenses will be obtained through the interception of wire
communications over **TARGET TELEPHONE 3**.   In particular, these communications will
concern:

    a.  the methods of operation of this armed drug trafficking conspiracy, including the
        precise nature and scope of illegal activities described herein and the relationship
        of the organization to other drug and firearms trafficking organizations;

    b.  the identities and roles of other participants in the conspiracy, accomplices, and
        aiders and abettors, including the sources of supply of controlled substances and
        firearms to the TARGET SUBJECTS, and the purchasers of controlled substances
        distributed by the TARGET SUBJECTS;

    c.  the management of the conspiracy, including the way orders and instructions are
        disseminated to subordinates;

    d.  the collection of gang "dues" from members of the gang and/or imposition of
        "taxes" on nonmembers who operate in the gang's territories;

    e.  the methods used by the conspiracy to protect its members, territories, and assets
        (*e.g.*, firearms, controlled substances, and proceeds derived from the sale of

controlled substances);

f.  the use of firearms in furtherance of the conspiracy;

g.  the times, dates, and locations of meetings at which persons involved in this conspiracy pick up drugs and/or firearms, exchange money, and meet to discuss the conspiracy and the progress of their illegal activities;

h.  the quantities and types of controlled substances involved in this drug trafficking conspiracy,

i.  the manner of shipment or movement of controlled substances distributed in connection with this conspiracy and firearms used in furtherance of this conspiracy;

j.  the methods of paying for the controlled substances and firearms involved in the conspiracy, and the location, movement and disposition of all proceeds from illicit drug activity associated with this conspiracy, including efforts to launder drug proceeds;

k.  the identification of other locations and facilities used in furtherance of the TARGET OFFENSES, as well as contraband, firearms, and money derived from and used in furtherance of such offenses;

l.  the existence and location of records of the purchase and sale of narcotics and firearms associated with this conspiracy;

m.  the methods used by the TARGET SUBJECTS and others to elude law enforcement detection; and

n.  the identification of additional communication devices or telephone instruments used by the TARGET SUBJECTS and others in furtherance of the TARGET OFFENSES.

5

**JA7025**

C. Normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, as is described in further detail in the attached affidavit;

D. There is probable cause to believe that **TARGET TELEPHONE 3**, from which wire communications are to be intercepted, is being used and will continue to be used in connection with the commission of the above-described offenses in and around the District of Maryland and elsewhere.

6. The attached affidavit contains a full and complete statement of facts concerning all previous applications which are known to have been made to any judge of competent jurisdiction for approval of the interception of the oral, wire, and/or electronic communications of any of the same individuals, facilities, or premises specified in this Application. The Applicant is aware of no previous applications made to any judge for authorization to intercept the wire communications of any of the persons or involving the facilities specified in this Application, except the applications referenced in the affidavit.

7. The authorization sought is intended to apply not only to **TARGET TELEPHONE 3**, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through **TARGET TELEPHONE 3**, within the thirty-day period. The authorization is also intended to apply to **TARGET TELEPHONE 3** regardless of service provider.

8. Your Applicant further requests that the service provider be ordered to provide information related to the location where **TARGET TELEPHONE 3** is being used. The affidavit of Special Agent Moore demonstrates probable cause to believe that the user of **TARGET TELEPHONE 3** is using the telephone to commit the violations listed above, within and outside the District of Maryland. The affidavit also sets forth probable cause to believe that

6

**JA7026**

both precise geolocation information and the cell site data will be evidence of criminal activity in violation of the above listed statutes.

**WHEREFORE**, your Applicant believes that there is probable cause to believe that certain of the Target Subjects are engaged in the commission of offenses involving (i) distribution of, and possession with intent to distribute, controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (iii) use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); (iv) maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861; (vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; (vii); the laundering of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18 U.S.C. § 2, in the District of Maryland and elsewhere; that certain of the Target Subjects are using **TARGET TELEPHONE 3** in connection with the commission of the above-described offenses; and that certain of the Target Subjects will be intercepted over the above-described telephone facilities.

**IT IS REQUESTED** that, based on the allegations set forth in this application and on the affidavit of Special Agent Timothy Moore, a copy of which is attached, this Court issue an order pursuant to the power conferred upon it by Section 2518 of Title 18, United States Code, authorizing the ATF and participating law enforcement agencies to intercept wire communications to and from the above-described facilities, until such communications are intercepted that reveal the manner in which the named Target Subjects and others unknown participate in the specified offenses and reveal the identities of their co-conspirators, place(s) of operation, and nature of the conspiracy, or for a period not to exceed a period of thirty (30) days

7

measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this order or ten (10) days after this order is entered, whichever is earlier.

**IT IS FURTHER REQUESTED** that the authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone number referenced above, within the thirty-day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use. It is further requested that the service provider be ordered to provide precise location information with respect to **TARGET TELEPHONE 3**.

**IT IS FURTHER REQUESTED** that in the event that the service provider changes during the course of the interception, interception may continue with the new service provider without further order of this Court. The United States will advise the Court of the change of service provider in the periodic progress reports submitted to this Court.

**IT IS FURTHER REQUESTED**, pursuant to 18 U.S.C. § 2518(3), that in the event that that **TARGET TELEPHONE 3** is used outside the territorial jurisdiction of this Court, interceptions of the transferred facility may continue to take place in the District of Maryland where all communications will first be heard and minimized, regardless of where the wire communications are placed to or from.

**IT IS FURTHER REQUESTED** that this Court issue an order pursuant to Section 2518(4) of Title 18, United States Code, directing T-Mobile, which is the electronic communication service providers as defined in Section 2510(15) of Title 18, United States Code, and any subsequent service provider or providers that provide service to **TARGET**

8

**JA7028**

**TELEPHONE 3**, to furnish and continue to furnish the ATF with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting communications over the above-described telephone. The Applicant further requests that this Court issue an order to the service provider pursuant to the authority granted in 18 U.S.C. § 3123, authorizing the installation and use of a pen register and trap and trace device to collect the dialing, routing, addressing, and signaling information identifying the destination of outbound communications transmitted from **TARGET TELEPHONE 3**, and the source of incoming communications transmitted to **TARGET TELEPHONE 3**. The Applicants further request that this Court order the service provider, pursuant to 18 U.S.C. § 3124, to furnish all information, facilities, and technical assistance necessary to accomplish such installation and use unobtrusively and with a minimum of interference with the services that the service provider accords to the user of **TARGET TELEPHONE 3**. The service provider shall be compensated by the ATF for reasonable expenses incurred in providing such information, facilities, and technical assistance.

**IT IS FURTHER REQUESTED**, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), that the Court issue an Order authorizing agents of the ATF to ascertain the physical location of **TARGET TELEPHONE 3**, including but not limited to E-911 Phase II data or other precise location information concerning **TARGET TELEPHONE 3** (the "Requested Location Information"), during the authorized period of interception. Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by **TARGET TELEPHONE 3** at the start and end of any call, pursuant to 18 U.S.C. §§ 3122-24, 18 U.S.C. § 2703(c)(1)(A), and Federal Rule of Criminal

9

**JA7029**

Procedure 41. As explained in more detail in the affidavit of ATF Special Agent Moore, there is probable cause to believe that the locations of **TARGET TELEPHONE 3** during that period will constitute evidence of the Target Offenses.

**IT IS FURTHER REQUESTED** that the Court direct T-Mobile to disclose the Requested Location Information concerning **TARGET TELEPHONE 3** during the authorized period of interception, and to initiate a signal to determine the location of **TARGET TELEPHONE 3** on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the information, facilities and technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of **TARGET TELEPHONE 3**, at any time of day or night, owing to the potential need to locate **TARGET TELEPHONE 3** outside of daytime hours.

**IT IS FURTHER REQUESTED**, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize delay of notice of the acquisition of the Requested Location Information for a period not to exceed 120 days from the date that the order is entered. There is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of **TARGET TELEPHONE 3** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. The period of delay may thereafter be extended by the court for good cause shown.

**IT IS FURTHER REQUESTED**, to avoid prejudice to this criminal investigation, that the Court order the provider of electronic communication service and their agents and employees

10

**JA7030**

not to disclose or cause a disclosure of this Court's order or the request for information, facilities, and assistance by the ATF or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services requested. In particular, said providers and their agents and employees should be ordered not to make such disclosure to lessees, telephone subscribers, or any interceptee or participant in the intercepted communications.

**IT IS FURTHER REQUESTED** that this Court direct that its order be executed as soon as practicable after it is signed and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Target Subjects or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall use reasonable spot monitoring to ensure that minimized calls have not become criminal in nature. Special attention will be given to minimize all privileged communications. Monitoring will be conducted by ATF Special Agent Timothy Moore and/or other ATF agents, task force officers, certified support personnel, or contract personnel under the supervision of investigative or law enforcement officers authorized to conduct the interception. The interception of wire communications authorized by this Court's order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty days measured from the date of the Court's order, whichever is earlier.

11

**IT IS FURTHER REQUESTED** that the Court order that either the Applicant or any other Assistant United States Attorney familiar with the facts of the case provide the Court with a report after the first 15 days of interceptions, and then for each subsequent 15 day interval thereafter, showing what progress has been made toward achieving the authorized objectives and the need for continued interception. These reports shall be due as soon as practicable after the completion of each 15-day period.

**IT IS FURTHER REQUESTED** that the Court order that its orders, this Application and the accompanying affidavit and proposed orders, and all interim reports filed with the Court with regard to this matter be sealed until further order of this Court, except that copies of the orders, in full or redacted form, may be served on the ATF, and the United States Attorney's Office for the District of Maryland, and the service provider as necessary to effectuate the Court's order as set forth in the proposed orders accompanying this Application.

DATED this ___21st___ day of July, 2016.

Christina A. Hoffman
Assistant United States Attorney

SUBSCRIBED and SWORN to before me this ___21st___ day of July, 2016.

The Honorable Ellen L. Hollander
United States District Judge, District of Maryland

I hereby attest and certify on ___7/21/16___ that the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody.

FELICIA C CANNON
CLERK U.S DISTRICT COURT
DISTRICT OF MARYLAND

By_____ Deputy

**JA7032**



U.S. Department of Justice

Criminal Division

*Office of Enforcement Operations*                                    *Washington, D.C. 20530*

### Title III Implementation Information

With regard to the attached authorization of your request to apply for a court order authorizing an interception pursuant to Title III, please be advised of the following:

**Review Authorization Memorandum** - It is the final responsibility of the applicant to review the Authorization Memorandum to ensure accuracy. The Authorization Memorandum must be ATTACHED when submitting your application for court authorization. In particular, please verify that the target facility identifiers, statutory violations, and target subjects are accurate and consistent with the affidavit, application, and order you submitted for review to OEO.

**Pending Charges / Privileged Communications** - Monitoring personnel must exercise care to avoid intercepting communications involving a recognized privilege or communications of persons under indictment that may pertain to the strategy that they contemplate employing as a defense. If such a communication is overheard inadvertently, monitoring personnel are to make notation of the incident in the intercept log and make an immediate report to the attorney who is supervising the interception.

**Sealing** - It is the obligation of the supervising attorney to ensure that recordings of intercepted conversations are protected adequately, and are sealed by the court on a regular basis. This should occur at the end of each 30-day period, preferably even if the interception is authorized to continue beyond the initial 30-day period. If there is a break in the interception period, the supervising attorney should ensure that recordings are sealed by the court as soon as practicable thereafter.

**Computation of the 30-Day Period** - Because of conflicting court decisions regarding the counting of the 30-day period for purposes of Title III interceptions, the supervising attorney should ensure that the method of computing time complies with District precedent and practice. Monitoring personnel should be alerted to the date interceptions must be discontinued absent an extension by court order authorizing continued interceptions.

**Extensions** - All extensions MUST be approved by the Criminal Division before they are filed with the court.

**Reporting** - Section 2519 of Title 18, United States Code, requires that the Attorney General make an annual report to the Administrative Office of the United States Courts (AOUSC) each year regarding electronic surveillance by a federal agency under Title III. The statute requires you, through your investigative agency, to report specific post surveillance information, i.e., the number of resulting trials, the number of motions to suppress, whether the motions were granted or denied, and the number of convictions. These reports are compiled by AOUSC and provided to Congress and the public.

**Contact and Submission** - OEO's Electronic Surveillance Unit (ESU) can be reached at (202) 514-6809. The ESU duty attorney can be reached at (202) 353-5265. Requests for surveillance authorized under T-III must be submitted to ESU by email through ESU.Requests@usdoj.gov or through our FAX-to-email server on (803) 726-2180.



# Office of the Attorney General
Washington, D.C.

ORDER NO. 3536-2015

SPECIAL DESIGNATION OF CERTAIN OFFICIALS OF THE CRIMINAL DIVISION AND
NATIONAL SECURITY DIVISION TO AUTHORIZE APPLICATIONS FOR COURT
ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS

By virtue of the authority vested in me as the Attorney General, including 28 U.S.C. § 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in order to preclude any contention that the designations by the prior Attorney General have lapsed, the following officials are hereby specially designated to exercise the power conferred by Section 2516(1) of Title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire and oral communications by the Federal Bureau of Investigation or a Federal agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in Section 2516 of Title 18, United States Code:

1.  The Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division;

2.  The Assistant Attorney General for National Security, any Acting Assistant Attorney General for National Security, any Deputy Assistant Attorney General for National Security, and any Acting Deputy Assistant Attorney General for National Security, with respect to those matters delegated to the supervision and responsibility of the Assistant Attorney General for National Security. These officials of the National Security Division shall exercise this authority through, and in full coordination with, the Office of Enforcement Operations within the Criminal Division.

Attorney General Order No. 3055-2009 of February 26, 2009, is revoked effective at 11:59 p.m. of the day following the date of this order.

11 June 2015
Date

Loretta E. Lynch
Attorney General



**U.S. Department of Justice**

Criminal Division

Washington, D.C.  20530

**MEMORANDUM**                                    JUL 2 0 2016

TO:       Monique Perez Roth, Director
          Office of Enforcement Operations
          Criminal Division

ATTN:     Christina Hoffman
          Jason Medinger

FROM:     Leslie R. Caldwell
          Assistant Attorney General
          Criminal Division

SUBJECT:  Authorization for Interception Order Application

        This is with regard to your recommendation that
an appropriately designated official of the Criminal Division
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period the
initial interception of wire communications occurring to and
from the cellular telephones bearing the number (443) 709-7780,
subscribed to by James Kenner, 1909 North Forest Park Avenue,
Baltimore, Maryland, and accessed through International Mobile
Subscriber Identity ("IMSI") number 310260674625701, in
connection with an investigation into possible violations of
Title 18, United States Code, Sections 2, 371, 922, 924, 1956,
and 1957; Title 21, United States Code, Sections 841, 843, 846,
and 856; and Title 26, United States Code, Section 5861, by
Jamal Lockley, Dwight Jenkins, Jacob Bowling, Dante Bailey,
Tiffany Bailey, Randy Banks, Corloyd Anderson, Melvin Lashley,
Dontray Johnson, Adrian Jamal Spence, Dominick Wedlock, William
Jones, Jarmal Harrid, Jamal Smith, Dominique Rozzell, Maurice
Pollock, Ayinde DeLeon, Jay Greer, Kenneth Torry, Michael
Stewart, Jawaun Talley, Charles Blackwell, Shakeen Davis, Takuma
~~Tate, Sidney Fraiser, Queontaye Fortune, Kenyon Patterson,~~
Chiquetta Heath,  Michael Singer, Delante Lee, Eddie McCargo,
Dante Parris, and others as yet unknown.

**JA7035**

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 3536-2015, dated June 11, 2015, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is exercisable by the undersigned. WHEREFORE, acting under this delegated power, the appropriately designated official authorizes the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the target telephone number referenced above, within the thirty (30) day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

Leslie R. Caldwell
Assistant Attorney General
Criminal Division

JUL 2 0 2016

Date

PAUL O'BRIEN
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

**JA7036**

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING TO AND FROM THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 709-7780 AND BEARING IMSI NUMBER 310260674625701 ("TARGET TELEPHONE 3") | MISC. NO. 16mc499

(UNDER SEAL) |

### AFFIDAVIT IN SUPPORT OF APPLICATION
### FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS

I, Timothy Moore, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"), being duly sworn, depose and state as follows:

### I.   INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States, within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18, United States Code.

2.      I submit this affidavit in support of an application for an order pursuant to 18

U.S.C. § 2518, authorizing the interception of (1) wire communications to and from the cellular

telephone currently assigned call number (443) 709-7780, and bearing IMSI number

310260674625701, with service provided by T-Mobile US, Inc., subscribed to James Kenner at

1909 North Forest Park Avenue, Baltimore, Maryland 21207, but in active use by Jamal

LOCKLEY a/k/a "T-Roy" ("**TARGET TELEPHONE 3**").

### II.   AFFIANT BACKGROUND

3.      I am a Special Agent with the ATF and am currently assigned to a joint task force

1

**JA7037**

comprised of ATF agents and detectives from the Baltimore City Police Department ("BPD").   I have been employed by the ATF since 2007.  I have participated in numerous investigations focusing on Controlled Dangerous Substance ("CDS") trafficking, home invasions, gangs, and illegal firearms.   I have conducted covert surveillance of suspected CDS traffickers, interviewed numerous individuals involved in gangs and the CDS trafficking trade, participated in several Title III wiretap investigations as an affiant, monitor, and member of surveillance teams, participated in the execution of numerous state and federal search and arrest warrants involving CDS traffickers and violent offenders, including home invasion crews, and participated in the seizure of numerous firearms and controlled dangerous substances.  Through my training, education, and experience, I have become familiar with the manner in which illegal CDS is transported, stored, and distributed, the methods of payment for such CDS, the manner in which CDS traffickers communicate with each other, and the use of firearms to protect CDS and CDS proceeds.

### III.   BASIS OF INFORMATION

4.      The instant investigation is being conducted by the ATF and the BPD.   I have personally participated in this investigation and make this affidavit based upon my personal participation in this investigation and upon information I believe to be reliable from the following sources: my training and experience investigating violations of the federal narcotics and firearms laws; oral and written reports, as well as documents regarding this investigation that I have received from members of the ATF, other federal agencies, and state and local law enforcement; discussions I have had personally concerning this investigation with experienced narcotics and firearms investigators; physical surveillance conducted by the ATF and state and local law enforcement agencies, the results of which been reported to me either directly or indirectly;

2

**JA7038**

evidence seized as a result of arrests of the TARGET SUBJECTS and/or search warrants executed at their residences; public records; and toll records, pen register and trap & trace information, and subscriber information relating to the telephones used by the TARGET SUBJECTS and others.

5.     Because this affidavit is being submitted for the limited purpose of obtaining authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation.   Rather, I have included only those facts that I believe are necessary to establish probable cause for an order authorizing the requested interceptions.

## IV.     BACKGROUND OF INVESTIGATION

6.     Since roughly January 2016, the ATF has been investigating a violent, armed subset of the Bloods gang that is trafficking drugs in Northwest Baltimore City known as "**Murdaland Mafia Piru**" (hereinafter, "**MMP**" or "**the DTO**").   MMP's central operating areas are the 5200 block of Windsor Mill Road and the intersection of Gwynn Oak Avenue and Liberty Heights Avenue.   The leader of MMP is Dante BAILEY a/k/a "Gutta" a/k/a "Almighty." Randy BANKS a/k/a "Dirt" is also a high-ranking member of MMP who heads the DTO's Gwynn Oak/Liberty Heights drug shop.

7.     Based on evidence gathered to date, including information from confidential sources, observations of law enforcement officers, and controlled purchases of heroin and cocaine, investigators believe that members of the DTO are responsible for trafficking large quantities of heroin and cocaine in Northwest Baltimore City and neighboring Baltimore County. Investigators believe that the street-level distributors, commonly referred to as "hitters," include, among others, Dwight JENKINS a/k/a "Huggie" a/k/a "Unc"; Jacob BOWLING a/k/a "Jakey"

3

a/k/a "Ghost"; Maurice POLLOCK a/k/a "Reese"; Sidney FRAISER a/k/a "Sid"; Delante LEE, and Melvin LASHLEY a/k/a "Menace." Investigators believe that the user of TARGET TELEPHONE 3, Jamal LOCKLEY a/k/a "T-Roy," is a mid-level distributor of cocaine and heroin.

8.      In addition, based on evidence gathered to date, investigators know that members of MMP frequently carry and employ firearms. Investigators believe that members of MMP are using firearms and acts of violence to intimidate rival drug dealers and to protect and expand their drug operation. Analysis of the National Integrated Ballistics Information Network (NIBIN) system has revealed that firearms used in homicides believed to have been carried out by MMP members (based on information from confidential sources described further in Section VII below) have also been used in other murders and non-fatal shootings. I know based on my training and experience that armed DTO's typically share the same firearms amongst themselves and will simply pass them around when a member requests a firearm for a specific purpose, or to avoid detection by law enforcement.   As discussed further in Section VII below, MMP members are also believed to be responsible for a number of other violent acts.

V.      **PURPOSE OF AFFIDAVIT**

9.      I submit this affidavit in support of an application for an order pursuant to 18 U.S.C. § 2518, authorizing the interception of wire communications of Jamal LOCKLEY a/k/a "T-Roy"; Dwight JENKINS a/k/a "Huggie" a/k/a "Unc"; Jacob BOWLING a/k/a "Ghost" a/k/a "Jakey" a/k/a "Fats"; Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Tiffany BAILEY; Randy BANKS a/k/a "Dirt"; Corloyd ANDERSON a/k/a "Bo"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray"; Adrian Jamal SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a "SP"; Dominick WEDLOCK a/k/a "Rage" a/k/a "Nic"; William

4

JONES a/k/a "Bill"; Jarmal HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dominique ROZZELL a/k/a "Boozie"; Maurice POLLOCK a/k/a "Reese"; Ayinde DELEON a/k/a "Murda"; Jay GREER a/k/a "Champagne"; Kenneth TORRY a/k/a "Kenny"; Michael STEWART; Jawaun TALLEY; Charles BLACKWELL; Shakeen DAVIS; Takuma TATE a/k/a "Oop"; Sidney FRAISER a/k/a "Sid"; Queontaye FORTUNE; Kenyon PATTERSON a/k/a "Konan"; Chiquetta HEATH a/k/a "Bandi"; Michael SINGER a/k/a "Blizz"; Delante LEE; Eddie MCCARGO; Dante PARRISH, and other unknown co-conspirators (hereinafter, the "**TARGET SUBJECTS**") to and from the cellular telephone currently assigned call number 443-709-7780, and bearing IMSI number 310260674625701, with service provided by T-Mobile US, Inc., subscribed to James Kenner at 1909 North Forest Park Avenue, Baltimore, Maryland 21207, but in active use by Jamal LOCKLEY a/k/a "T-Roy" (**TARGET TELEPHONE 3**).

10.    As a result of my personal participation in this investigation and reports made to me by other law enforcement agents and officers, as well as information obtained from undercover agents and confidential sources, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I respectfully submit that the facts contained in this affidavit establish probable cause to believe that Jamal LOCKLEY is using **TARGET TELEPHONE 3** in connection with and in furtherance of ongoing violations of federal criminal law (collectively, the "**TARGET OFFENSES**").    The TARGET OFFENSES include the following:

a. distribution of, and possession with intent to distribute, controlled substances, in violation of 21 U.S.C. § 841(a)(1);

b. conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846;

5

    c.   use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b);

    d.   maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1);

    e.   firearms offenses, in violation of 18 U.S.C. §§ 922, 924 and 26 U.S.C. § 5861;

    f.   conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371;

    g.   the laundering of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation of 18 U.S.C. § § 1956 and 1957; and

    h.   aiding and abetting such offenses, in violation of 18 U.S.C. § 2.[1]

11.    In addition, there is probable cause to believe that the interception of wire communications of the TARGET SUBJECTS to and from **TARGET TELEPHONE 3** will identify and provide admissible evidence of the TARGET OFFENSES.

12.    Specifically, interception of wire communications of the TARGET SUBJECTS over **TARGET TELEPHONE 3** involving the TARGET OFFENSES, is likely to identify and provide admissible evidence regarding:

    a.   the methods of operation of this armed drug trafficking conspiracy, including the precise nature and scope of illegal activities described herein and the relationship of the organization to other drug and firearms trafficking organizations;

    b.   the identities and roles of other participants in the conspiracy, accomplices, and aiders and abettors, including the sources of supply of controlled substances and firearms to the TARGET SUBJECTS, and the purchasers of controlled substances distributed by the TARGET SUBJECTS;

    c.   the management of the conspiracy, including the way orders and instructions are

---

[1] Aiding and abetting is not a predicate offense under Title 18, United States Code, Section 2516.

6

disseminated to subordinates;

d. the collection of gang "dues" from members of the gang and/or imposition of "taxes" on nonmembers who operate in the gang's territories;

e. the methods used by the conspiracy to protect its members, territories, and assets (*e.g.*, firearms, controlled substances, and proceeds derived from the sale of controlled substances);

f. the use of firearms in furtherance of the conspiracy;

g. the times, dates, and locations of meetings at which persons involved in this conspiracy pick up drugs and/or firearms, exchange money, and meet to discuss the conspiracy and the progress of their illegal activities;

h. the quantities and types of controlled substances involved in this drug trafficking conspiracy,

i. the manner of shipment or movement of controlled substances distributed in connection with this conspiracy and firearms used in furtherance of this conspiracy;

j. the methods of paying for the controlled substances and firearms involved in the conspiracy, and the location, movement and disposition of all proceeds from illicit drug activity associated with this conspiracy, including efforts to launder drug proceeds;

k. the identification of other locations and facilities used in furtherance of the TARGET OFFENSES, as well as contraband, firearms, and money derived from and used in furtherance of such offenses;

l. the existence and location of records of the purchase and sale of narcotics and

7

**JA7043**

firearms associated with this conspiracy;

m.  the methods used by the TARGET SUBJECTS to elude law enforcement detection; and

n.  the identification of additional communication devices or telephone instruments used by the TARGET SUBJECTS in furtherance of the TARGET OFFENSES.

13.   The requested authorization would last until the government fully achieves the goals of this investigation, or for a period of 30 days, whichever occurs first, pursuant to 18 U.S.C. § 2518(5).   Pursuant to 18 U.S.C. § 2518(5), it is further requested that the 30-day period be measured from the date on which investigative or law enforcement officers begin to conduct interception pursuant to a lawful order, or 10 days from the date of such order is signed, whichever occurs first.

14.   The requested authorization is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, to any other IMSI numbers accessed through the target telephone number referenced above, and to any other telephone numbers subsequently assigned to or used by the instrument bearing the same electronic serial number used by **TARGET TELEPHONE 3**, regardless of service provider, within the authorized period of interception.   The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of **TARGET TELEPHONE 3** while the telephone is off the hook or otherwise in use.

15.   It is further requested, pursuant to 18 U.S.C. § 2518(3), that in the event that **TARGET TELEPHONE 3** is transferred outside the territorial jurisdiction of this Court, interception of the transferred facilities may continue to take place in the District of Maryland,

8

where all communications will first be heard and minimized regardless of where the wire communications are placed to or from.

16. In connection with the telecommunication company that provides service for **TARGET TELEPHONE 3**, all interceptions over **TARGET TELEPHONE 3** will automatically be routed to Baltimore, Maryland, regardless of where the telephone calls are placed to or from. During the requested wire interception, all monitoring will be performed in Baltimore, Maryland, by law enforcement officers authorized under 18 U.S.C. § 2510(7), including Special Agents of the ATF, officers of the BPD, and government employees or individuals operating under a contract with the government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

17. As more fully described below, interception of wire communications is necessary to obtain the evidence needed to prosecute the TARGET OFFENSES because normal investigative procedures have either been tried to no avail, reasonably appear unlikely to meet with success if tried, or are too dangerous to employ.

## VI.   TARGET SUBJECTS

18. During this investigation, I have obtained information relating to the TARGET SUBJECTS from the sources listed in paragraph 10, as well as from the National Crime Information Center (NCIC) and the State of Maryland.

19. The TARGET SUBJECTS are Jamal LOCKLEY a/k/a "T-Roy"(the user of **TARGET TELEPHONE 3**) Dwight JENKINS a/k/a "Huggie" a/k/a "Unc" (the user of **TARGET TELEPHONE 1**); Jacob BOWLING a/k/a "Jakey" a/k/a "Ghost" (the user of **TARGET TELEPHONE 2**); Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Tiffany BAILEY; Randy BANKS a/k/a "Dirt"; Corloyd ANDERSON a/k/a "Bo"; Melvin LASHLEY a/k/a

9

"Menace"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray"; Adrian Jamal

SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a "SP"; Dominick WEDLOCK a/k/a "Rage" a/k/a "Nic";

William JONES a/k/a "Bill"; Jarmal HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal";

Dominique ROZZELL a/k/a "Boozie"; Maurice POLLOCK a/k/a "Reese"; Ayinde DELEON

a/k/a "Murda"; Jay GREER a/k/a "Champagne"; Kenneth TORRY a/k/a "Kenny"; Michael

STEWART; Jawaun TALLEY; Charles BLACKWELL; Shakeen DAVIS; Takuma TATE a/k/a

"Oop"; Sidney FRAISER a/k/a "Sid"; Queontaye FORTUNE; Kenyon PATTERSON a/k/a

"Konan"; Chiquetta HEATH a/k/a "Bandi"; Michael SINGER a/k/a "Blizz"; Delante LEE; Eddie

MCCARGO; Dante PARRISH; and other unknown co-conspirators.

20.     **Jamal LOCKLEY** a/k/a "T-Roy" is the user of **TARGET TELEPHONE 3.**

LOCKLEY has criminal convictions that include: a 1998 conviction for CDS: Possession w/

Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City (Case No.

597330016); a 1999 conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense

in the Circuit Court for Baltimore City (Case No. 299132018); a 2003 conviction for CDS:

Possession w/ Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City

(Case No. 201101001); a 2008 conviction for CDS: Possession w/ Intent

Manufacture/Distribute/Dispense and CDS: Possession of Firearms in the Circuit Court for

Baltimore City (Case No. 106256012–13); and a 2016 conviction for CDS: Possession-Marijuana

10 Grams+ in the Circuit Court for Baltimore City (Case No. 816011024).

21.     A number of the other TARGET SUBJECTS have convictions for CDS offenses,

firearms offenses, and violent crimes.  The following is a non-exhaustive list of some of these

convictions:

      a.   **Dante BAILEY** a/k/a "Gutta" a/k/a "Almighty" has criminal convictions that
         include: a 1995 conviction for Handgun Wear/Carry in the Circuit Court for

<center>10</center>

<center>**JA7046**</center>

Baltimore County (Case No. 95CR3716); a 1997 conviction for Reckless Endangerment in the Circuit Court for Baltimore City (Case No. 597078039–40); a 1997 conviction for Robbery w/ Deadly Weapon and Handgun Wear/Carry in the Circuit Court for Baltimore City (Case No. 597120012); a 2002 conviction for Assault-Second Degree in the Circuit Court for Baltimore City (Case No. 802338001); and a 2004 conviction for Possession of a Firearm by a Felon in violation of 18 U.S.C. § 922(g) in the U.S. District Court for the District of Maryland (Case No. WDQ-04-0254).  BAILEY is currently in federal custody pending trial on a charge of Possession of a Firearm by a Felon in violation of 18 U.S.C. § 922(g) in the U.S. District Court for the District of Maryland (Case No. CCB-16-0267).

b. **Dwight JENKIN**S a/k/a "Huggie" a/k/a "Unc" is the user of TARGET TELEPHONE 1.   JENKINS' criminal convictions include: a 1992 conviction for CDS Possession-Not Marijuana and CDS Admin Equip Possess/Distribute in the Baltimore City District Court (Case No. 00367762B3); a 1997 conviction for CDS-Unlawful Possession in the Baltimore City Circuit Court (Case No. 897041009); and a 1997 conviction for CDS-Unlawful Manufacture Etc. in the Baltimore City Circuit Court (Case No. 194308030).

c. **Jacob BOWLING** a/k/a "Jakey" a/k/a "Ghost" is the user of TARGET TELEPHONE 2. His criminal convictions include: a 2005 conviction for CDS Possession in the Baltimore City Circuit Court (Case No. 805238017); a 2007 conviction for Assault-First Degree, Assault-Second Degree, and Narcotics Possess w/Intent-Large Amount in the Baltimore City Circuit Court (Case No. 106073030–32); a 2013 conviction for Possess Contraband-Place of Confinement in the Baltimore City Circuit Court (Case No. 212278024); a 2013 conviction for Handgun-Wear/Carry in the Baltimore City Circuit Court (Case No. 112121032); and a 2014 conviction for Handgun in Vehicle in the Baltimore City Circuit Court (Case No. 113192009).

d. **Randy BANKS** a/k/a "Dirt" has criminal convictions that include: a 1999 conviction for CDS: Possession w/Intent Manufacture/Distribute/Dispense and Conspiracy in the Circuit Court for Baltimore City (Case No. 299041003); a 1999 conviction for Assault-Second Degree in the District Court for Baltimore City (Case No. 3B00303467); a 2003 conviction for CDS: Distribution and CDS: Possession of Firearms in the Circuit Court for Baltimore City (Case Nos. 203043032–33); and a 2009 conviction for Deadly Weapon/Conceal in the Circuit Court for Baltimore City (Case No. 809345014).

e. **Corloyd ANDERSON** a/k/a "Bo" has criminal convictions that include: a 2005 conviction for CDS: Manufacture/Distribute/Dispense-Narcotics and Conspiracy in the Circuit Court for Baltimore City (Case No. 105096011); a 2005 conviction

11

for CDS: Possession w/ Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City (Case No. 2043000034); and a 2006 conviction for Handgun Wear/Carry in the Circuit Court for Baltimore County (Case No. 03K03000661).

f.  **Melvin LASHLEY** a/k/a "Menace" has criminal convictions that include: a 2009 conviction for CDS Possession in the Baltimore City Circuit Court (Case No. 809012037); a 2009 conviction for CDS: Possession-Marijuana in the Baltimore City District Court (Case No. 5B02024048); a 2009 conviction for CDS Possession-Not Marijuana in the Baltimore City District Court (Case No. 5B01965024); a 2012 conviction for Assault-First Degree in the Baltimore City Circuit Court (Case No. 511082015); and a 2012 conviction for CDS-Unlawful Possession Etc. in the Baltimore City Circuit Court (Case No. 812195026).

g.  **Dontray JOHNSON** a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray" has criminal convictions that include: a 2004 conviction for CDS: Possession with Intent to Distribute in the Circuit Court for Baltimore City (Case No. 104120060); a 2004 conviction for CDS-Unlawful Possession in the Circuit Court for Baltimore City (Case No. 804202025); a 2004 conviction for CDS: Manufacture/Distribute/ Dispense Narcotic in the Circuit Court for Baltimore City (Case No. 104194045); a 2005 conviction for Possession of a Firearm by a Felon in the U.S. District Court for the District of Maryland (Case No. WDQ-05-0545); and a 2006 conviction for CDS: Possession with Intent to Distribute in the Circuit Court for Baltimore City (Case No. 206125010).   He is currently in federal custody awaiting trial on charges of Possession with Intent to Distribute Heroin and Cocaine in violation of 21 U.S.C. § 841, Possession of a Firearm and Ammunition by a Felon in violation of 18 U.S.C. § 922(g), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c) in the U.S. District Court for the District of Maryland (Case No. CCB-15-0587).

h.  **Adrian SPENCE** a/k/a "Spittle" a/k/a "SP" has criminal convictions that include: a 2010 conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City (Case No. 210168015).   He is currently in federal custody awaiting trial on charges of Conspiracy to Distribute One Kilogram or More of Heroin in violation of 21 U.S.C. § 846 and Possession of a Firearm by a Felon in violation of 18 U.S.C. § 922(g) in the U.S. District Court for the District of Maryland (Case No. RDB-15-0541).

i.  **Dominick WEDLOCK** a/k/a "Rage" a/k/a "Nic" has criminal convictions that include: a 2006 conviction for CDS-Manufacture/Distribute/Dispense: Narcotics: Conspiracy in the Baltimore City Circuit Court (Case No. 105311018); a 2007 conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense and CDS: Possession w/ Intent Manufacture/Distribute/Dispense-Conspiracy in the Baltimore City Circuit Court (Case No. 106269001); a 2007 conviction for CDS-Possession of Firearms in the Baltimore City Circuit Court (Case No. 106269003); and a 2010 conviction for Possession With Intent to Distribute

12

Cocaine in the U.S. District Court for the District of Maryland (Case No.
JFM-10-0054).   He is currently serving a sentence of 72 months in the Bureau of
Prisons pursuant to a 2015 conviction in the U.S. District Court for the District of
Maryland for Possession of Counterfeit Obligations (Case No. JFM-15-0512).

j.  **William JONES** a/k/a "Bill" has criminal convictions that include: a 2011
conviction for CDS-Unlawful Possession in the Circuit Court for Baltimore City
(Case No. 811186018); and a 2012 conviction for CDS: Possession of Firearms in
the Circuit Court for Baltimore City (Case No. 111228014).

k.  **Dominique ROZZELL** a/k/a "Boozie" has criminal convictions that include: a
2006 conviction for CDS: Possession-Marijuana in the District Court for Baltimore
City (Case No. 3B01781895); a 2007 conviction for Burglary-Fourth Degree in the
Circuit Court for Baltimore City (Case No. 807110042); a 2008 conviction for
CDS Possession in the Circuit Court for Baltimore City (Case No. 808141027); a
2009 conviction for CDS Possession in the Circuit Court for Baltimore City (Case
No. 809076049); a 2011 conviction for CDS Manufacture/Distribute-Narcotic in
the Circuit Court for Baltimore County (Case No. 03K09001511); a 2013
conviction for Handgun on Person: Wear/Carry and CDS: Distribute-Narcotics in
the Circuit Court for Baltimore City (Case No. 112104037–38); a 2013 conviction
for CDS Possession-Conspiracy in the Circuit Court for Baltimore City (Case No.
113073025); a 2014 conviction for CDS: Possession Marijuana-Less Than 10G in
the District Court for Baltimore City (Case No. 6B02252767); a 2015 conviction
for Assault-Second Degree in the Circuit Court for Baltimore County (Case No.
03K15002787); and a 2016 conviction for CDS-Possession-Not Marijuana in the
Circuit Court for Baltimore County (Case No. 03K15002413).

l.  **Maurice POLLOCK** a/k/a "Reese" has criminal convictions that include: a 2013
conviction for Possession of a Firearm by a Minor in the Circuit Court for
Baltimore City (Case No. 313268003); a 2013 conviction for
Conspiracy-CDS-Distribution-Narcotics and CDS-Possession w/ Intent
Manufacture/Distribute/Dispense-Narcotics in the Circuit Court for Baltimore City
(Case No. 112180014); and a 2016 conviction for CDS: Possession-Not Marijuana
and CDS: Possession Paraphernalia in the District Court for Baltimore City (Case
No. 4B02319195).

m.  **Ayinde DELEON** a/k/a "Murda" has criminal convictions that include: a 2004
conviction for Handgun in Vehicle in the Circuit Court for Baltimore City (Case
No. 204015005); and a 2007 conviction for Conspiracy to Commit Murder-First
Degree and Assault-First Degree in the Circuit Court for Anne Arundel County
(Case No. 02-K-06-002852).

n.  **Jay GREER** a/k/a "Champagne" has criminal convictions that include: a 2011
conviction for Armed Robbery in the Circuit Court for Baltimore City (Case No.
111210012).

13

**JA7049**

o. **Kenneth TORRY** a/k/a "Kenny" has criminal convictions that include: a 1996 conviction for CDS Possession in the District Court for Baltimore City (Case No. 6B00096158); a 1999 conviction for CDS: Possession w/ Intent Manufacture/Distribute/Dispense in the Circuit Court for Baltimore City (Case No. 298079007); a 2005 conviction for CDS-Possession-Not Marijuana in the District Court for Baltimore City (Case No. 6B01738736); a 2007 conviction for CDS: Possession-Marijuana in the District Court for Baltimore City (Case No. 4B01859218).

p. **Michael STEWART** has criminal convictions that include: a 2015 conviction for Handgun on Person in the District Court for Baltimore City (Case No. 3B02310941).

q. **Jawaun TALLEY** has criminal convictions that include: a 2015 conviction for CDS: Possession-Not Marijuana and Possession of a Regulated Firearm in the Circuit Court for Baltimore County (Case No. 03K14003648).

r. **Charles BLACKWELL** has criminal convictions that include: a 2015 conviction for Assault-Second Degree in the Circuit Court for Baltimore City (Case No. 815005006); and a 2015 conviction for Handgun on Person: Carry/Wear in the Circuit Court for Baltimore City (Case No. 414358003).

s. **Takuma TATE** a/k/a "Oop" has criminal convictions that include: a 1996 conviction for Handgun in Vehicle in the Circuit Court Baltimore City (Case No. 896338004); a 2003 conviction for CDS-Manufacture/Distribute/Dispense-Narcotics-Conspiracy in the Circuit Court for Baltimore City (Case No. 803211009); and a 2006 conviction for Assault-Second Degree in the District Court for Baltimore City (Case No. 1B01751660).

t. **Shakeen DAVIS** has criminal convictions that include: a 2012 conviction for Handgun on Person and Possession of Firearm/Ammo/Minor in the District Court for Baltimore City (Case No. 3B02191227); and a 2015 conviction for CDS: Possess Paraphernalia in the Circuit Court for Baltimore County (Case No. 03K14006030).

u. **Michael SINGER** a/k/a "Blizz" has criminal convictions that include: a 2005 conviction for Attempted CDS Manufacture/Distribute-Narcotics in the Circuit Court for Baltimore City (Case No. 805152013); a 2012 conviction for Escape-Second Degree in the District Court for Anne Arundel County (Case No. 0A00246904); and a 2015 conviction for Accessory After the Fact (to murder) in the Circuit Court for Baltimore County (Case No. 03K13004516).

v. **Delante LEE** has criminal convictions that include: a 2013 conviction for Illegal Possession-Regulated Firearm in the Circuit Court for Baltimore County (Case No. 00896338004).

14

**JA7050**

    w. **Eddie MCCARGO** has criminal convictions that include: a 2004 conviction for Robbery in the Circuit Court for Baltimore City (Case No. 204064035); a 2010 conviction for Robbery in the Circuit Court for Baltimore City (Case No. 110049007); and a 2016 conviction for CDS: Possession w/ Intent Distribute-Narcotic in the Circuit Court for Baltimore County (Case No. 03K15003153).

## VII.   INFORMATION PROVIDED BY CONFIDENTIAL SOURCES

22.   Information concerning the activities of the TARGET SUBJECTS has been obtained from the following confidential sources:

### A.   CONFIDENTIAL SOURCE #1

23.   Confidential Source #1 ("CS-1"), has conducted a controlled purchase of cocaine from Jamal LOCKLEY, a member of MMP whom he/she knows as "T-Roy." CS-1 was introduced to LOCKLEY by Confidential Source # 2 ("CS-2.")

24.   As discussed further below, on March 9, 2016 CS-2 placed a recorded telephone call to **TARGET TELEPHONE 3**, used by LOCKLEY, to arrange for the purchase of one half ounce of cocaine base from LOCKLEY by CS-1. LOCKLEY said he would meet the two CS's the following day. On March 10, 2016, CS-1 and CS-2 purchased approximately 14 grams of cocaine from Jamal LOCKLEY for $600.

25.   CS-1 has been working with law enforcement for approximately six years in exchange for monetary compensation. CS-1 has provided law enforcement with accurate, independently-corroborated information about narcotics and narcotics organizations in the past. CS-1's information has led to the execution of search warrants that resulted in the seizure of illegal narcotics, firearms, and U.S. currency. CS-1 has also conducted controlled purchases under the direction of law enforcement. CS-1 has prior convictions for possession of narcotics, vehicle theft, and burglary. Based on the aforementioned facts, I believe CS-1 to be reliable.

### B.   CONFIDENTIAL SOURCE #2

15

26.     CS-2 is a member of MMP and a close associate of Dante BAILEY, whom he/she knows as "Gutta."    CS-2 is cooperating with ATF on this investigation in exchange for monetary compensation.

27.     CS-2 advised law enforcement that BAILEY is the leader of MMP or "Don of Maryland."    According to CS-2, BAILEY traveled to California in 2012 to get approval from a Tree Top Piru leader for the creation of MMP in Maryland.    CS-2 identified roughly 30 photographs of MMP members and affiliates, including Jamal LOCKLEY, a/k/a "T-Roy."    CS-2 stated that MMP's headquarters are located at the BP gas station in the 5200 block of Windsor Mill Road in Baltimore City, and its other territories are Gwynn Oak and Liberty Heights, the 4Gs Liquor Store, 27th Street and Boone, and Greenmount Avenue and 21st Street.    According to CS-2, MMP distributes all types of drugs, including heroin and cocaine.

28.     CS-2 advised law enforcement that MMP members frequently carry and employ firearms.    Specifically, CS-2 knows from personal experience that the employees of the MMP-controlled BP gas station have no problem allowing MMP members to stash firearms and/or drugs in and around the building.    Employees of the gas station have even been known to conceal firearms and/or drugs behind the counter for suspected MMP members when the police come to the area.    CS-2 also knows that MMP members will frequently hide firearms in public areas nearby when they are outside so they can be readily accessed and used.    Typical stash spots include nearby fields, on top of the tires of parked cars, or inside parked cars operated by MMP members.

29.     CS-2 has also provided information about numerous acts of violence carried out by members of MMP.    For instance, CS-2 advised that MMP member James Edwards a/k/a "Bangout" was responsible for the nonfatal shooting of Samartine Hill a/k/a "Snook" at the

16

Mirage nightclub in Baltimore City in October 2012, which CS-2 said was carried out at BAILEY's direction because "Snook" had stolen a drug customer from BAILEY.   CS-2 also provided information about the September 29, 2015 murder of Brian Johnson a/k/a "Nutty B" in the 5200 block of Windsor Mill Road.   CS-2 advised that MMP member Dontray JOHNSON a/k/a "Bino" told CS-2 that he shot and killed "Nutty B" (a fellow MMP member) because he would not pay gang dues that JOHNSON was collecting for BAILEY.   CS-2's information has been corroborated by video surveillance footage of the murder, based on which law enforcement officers familiar with JOHNSON were able to identify him as the shooter.

30.   CS-2 also advised investigators that members of MMP have obtained firearms from a supplier based in Frederick, Maryland named Michael BUCK a/k/a "Beezy."   According to CS-2, on numerous occasions BUCK traveled to the BP gas station located at Windsor Mill Road and Forest Park Avenue and traded firearms for heroin from members of MMP.   BUCK would then drive back to Frederick and re-sell the heroin.

31.   On March 7, 2016, at the direction of the ATF, CS-2 conducted a controlled purchase of an assault rifle and ammunition from BUCK at a location in Baltimore County. CS-2 provided BUCK with $2,000 in ATF funds in exchange for a Ruger Rifle 308 (Model SR762, Serial Number # 56112242), three magazines, and 109 rounds of .308 caliber ammunition.

32.   CS-2 has been working with law enforcement for approximately four years.   CS-2 initially began cooperating with law enforcement with the expectation of receiving a favorable disposition in a then-pending criminal case, and he/she has continued cooperating with law enforcement since then in exchange for monetary compensation.   CS-2 has provided members of law enforcement with accurate, independently corroborated information about narcotics and

17

**JA7053**

narcotics organizations in the past.    CS-2 has also provided accurate, independently corroborated information about organized gang activity to the BPD Gang Intelligence section.   CS-2 has provided information that has led to the execution of search warrants that have resulted in the seizure of U.S. currency, illegal narcotics, and firearms. CS-2 has prior convictions for burglary, theft, robbery, and attempted first-degree murder.     Based on the aforementioned facts, I believe CS-2 to be reliable.

### C.    CONFIDENTIAL SOURCE #3

33.    Confidential Source #3 ("CS-3") has conducted controlled purchases of heroin and cocaine base, as well as a firearm, from Dwight JENKINS a/k/a "Huggie," who is the user of **TARGET TELEPHONE 1**.   The controlled purchases of heroin and cocaine base are described in more detail in the affidavit for **TARGET TELEPHONES 1 & 2**, incorporated by reference herein. The controlled purchase of the firearm took place on June 24, 2016.   Prior to meeting JENKINS, CS-3 was equipped with electronic transmitting and video-audio recording equipment and given $1,500 in ATF funds.   CS-3 then drove to the 1600 block of East Pratt Street in Baltimore City and met with JENKINS, who gave CS-3 a .380 caliber semi-automatic pistol loaded with 14 rounds of .380 caliber ammunition and a home theatre system in exchange for the $1,500 in ATF funds.

34.    CS-3 has been working with law enforcement since 2011. CS-3 is working for monetary    compensation.   CS-3    has    provided    law    enforcement    with    accurate, independently-corroborated information about narcotics and narcotics organizations in the past, including information that led to the recovery of illegal narcotics and firearms.   CS-3 has previous convictions for larceny, possession of narcotics, resisting arrest, and forgery.   Based on the aforementioned facts, I believe CS-3 to be reliable.

18

**JA7054**

**D.    CONFIDENTIAL SOURCE #4**

35.    Confidential Source #4 ("CS-4") stated that he/she has known Dante BAILEY a/k/a "Gutta" for roughly six years.    According to CS-4, BAILEY is the leader of a gang that CS-4 knows primarily as the "Mobsters," and that is also referred to as "Murdaland Mafia." CS-4 stated that "no one does anything without a go ahead from [BAILEY]."    CS-4 advised that everyone is scared of BAILEY and that BAILEY was extorting money from everyone who sold drugs at Windsor Mill and Forest Park.    CS-4 advised that he/she always sees BAILEY with a gun either on his person or inside of his vehicle.    CS-4 has observed BAILEY put a gun in people's face and shoot at people.    CS-4 believes that BAILEY is "demonically crazy."

36.    CS-4 identified photographs of a number of BAILEY's associates in the "Mobsters," including, but not limited to, Dwight JENKINS a/k/a "Huggie" or "Unc"; Dominick WEDLOCK a/k/a "Rage," Randy BANKS a/k/a "Dirt," Dominique ROZZELL a/k/a "Boosie," Jacob BOWLING a/k/a "Fats"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Bino"; and Adrian SPENCE a/k/a "SP."    CS-4 stated that "Dirt" (*i.e.*, Randy BANKS) is right under BAILEY in the gang hierarchy, that he is a cocaine and heroin supplier for BAILEY, and that he operates in the Gwynn Oaks/Liberty Heights area in Baltimore City.

37.    CS-4 advised investigators that although he/she has never been a member of the "Mobsters," CS-4 was important to the organization because he/she would help BAILEY and his associates launder drug money and provide vehicles for the organization.    CS-4 stated that he/she had laundered drug money for both BAILEY and BANKS, including through casinos in and around Baltimore City.    CS-4's information is consistent with documents received in response to grand jury subpoenas issued to the Horseshoe Casino in Baltimore, Maryland and the Hollywood Casino in Perryville, Maryland, which show that CS-4 made large cash deposits and

19

withdrawals at these casinos in the 2014 and 2015 time period.

38.     According to CS-4, BAILEY was also getting heroin from an individual CS-4 knows as "Harvey Brewer."   CS-4 stated that at one point—possibly Summer 2014—CS-4 drove BAILEY to a location near North Avenue in Baltimore, where he/she observed BAILEY obtain what CS-4 estimated was 200 or 300 grams of heroin from "Harvey Brewer."

39.     CS-4 also advised investigators that most MMP members frequently have firearms either on their person or nearby in concealed spots for immediate access and use. CS-4 also knows that MMP members frequently store guns in houses that are either vacant or owned by drug users.   Furthermore, CS-4 knows that on many occasions, MMP members trade narcotics for guns and ammunition with drug buyers coming from Western Maryland or West Virginia.

40.     CS-4 also provided information about numerous acts of violence carried out by members of the "Mobsters."   For instance, CS-4 provided information about the February 12, 2015 murder of James Edwards a/k/a "Bangout."   CS-4 advised that MMP member Dominick WEDLOCK a/k/a "Rage" told CS-4 that BAILEY ordered a hit against "Bangout" for making threats against the gang, and that BAILEY was going to send WEDLOCK to carry out the hit, but that BAILEY ultimately had someone else take care of it.

41.     CS-4 has been working with law enforcement for approximately ten years.   CS-4 is working with the hope of receiving a favorable disposition in a pending criminal case.   No promises have been made to CS-4 regarding his/her case.   CS-4 has prior convictions for aiding and abetting bank fraud, possession with intent to distribute CDS, and a handgun violation. Based on the aforementioned facts, some of which have been independently corroborated, I believe CS-4 to be reliable.

## VIII.   PRIOR APPLICATIONS

20

**JA7056**

42.     A check of electronic surveillance files maintained by the ATF, FBI, DEA, and HSI, and the U.S. Attorney's Office for the District of Maryland was completed on or about July 7, 2016 for **TARGET TELEPHONE 3.** As a result, I located previous applications for the interception of wire and electronic communications involving persons specified in this Affidavit.

43.     Specifically, on June 4, 2015, the Honorable Justin King, Circuit Judge for the Circuit Court of Baltimore County, authorized for a period of 30 days the interception of wire and electronic communications over the following telephone lines:   (1) 410-746-1240 (A-Line); (2) 410-831-8811 (B-Line); (3) 443-454-9490 (C-Line).   On June 10, 2015, Judge King authorized for a period of 30 days the interception of wire and electronic communications over the following telephone line: 443-707-5054 (D-Line).   On June 22, 2015, Judge King authorized for a period of 30 days the interception of wire and electronic communications over the following telephone line: 443-854-2252 (E-Line).   On July 1, 2015, Judge King authorized for a period of 30 days the interception of wire and electronic communications over the following telephone line: 443-216-7849 (F-Line).   Also on July 1, 2015, Judge King authorized the continued interception of communications on the A-Line, B-Line, and D-Line phones.   On July 18, 2015, Judge King authorized for a period of 30 days the interception of wire and electronic communications over the following telephone line: 323-594-7941 (G-Line).   Finally, on July 23, 2015, Judge King authorized for a period of 30 days the interception of wire and electronic communications over the following telephone line: 443-720-9471 (H-Line).   None of the interceptions listed in this paragraph are active.

44.     During the course of the interceptions listed in paragraph 43, communications between and among some of the TARGET SUBJECTS were intercepted.   Specifically, Adrian SPENCE a/k/a "Spittle" a/k/a "SP" was identified as a user of A-Line, B-Line, D-Line, and

21

G-Line phones and was intercepted on these lines. Jarmal HARRID a/k/a "J-Rock" was intercepted over the D-Line, F-Line, and G-Line phones. Dante BAILEY a/k/a "Gutta" a/k/a "Almighty" was intercepted over the A-Line phone. Jamal SMITH a/k/a "Lil Mal" was intercepted over the A-Line, D-Line, and G-Line phones. Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray" was intercepted over the B-Line phone. William JONES a/k/a "Bill" was intercepted over the B-Line, D-Line, and G-Line phones. Tiffany BAILEY was intercepted on the B-Line phone. Takuma TATE a/k/a "Oop" was intercepted over the D-line phone and the G-line phone. Jamal LOCKLEY a/k/a "T-Roy" was intercepted on the D-line phone. Additional TARGET SUBJECTS may have been intercepted over the aforementioned wiretapped phones unbeknownst to law enforcement.

45.     On June 30, 2016, the Honorable Judge Ellen L. Hollander, District Court Judge for the United States District of Maryland, authorized for a period of 30 days the interception of wire and communications over the following telephone lines: (1) 443-301-8819 (**TARGET TELEPHONE 1**); and (2) 443-766-6957 (**TARGET TELEPHONE 2**). Interception of both **TARGET TELEPHONES 1 & 2** began on July 1, 2016 is ongoing at this time. Interception is scheduled to end on July 30, 2016, but one or both of the authorizations could be renewed.

46.     During the course of the interceptions listed in paragraph 45, communications between some of the TARGET SUBJECTS were intercepted. Specifically, Dwight JENKINS a/k/a "Huggie" a/k/a "Unc," was confirmed as the user of **TARGET TELEPHONE 1**, and was intercepted on that line. Jacob BOWLING was confirmed as the user of **TARGET TELEPHONE 2**, and was intercepted on that line. Jamal LOCKLEY a/k/a "T-Roy" was identified as the user of **TARGET TELEPHONE 3**, and was intercepted over **TARGET TELEPHONES 1 & 2**. Additional TARGET SUBJECTS may have been intercepted over

22

**TARGET TELEPHONES 1 & 2** unbeknownst to law enforcement.

47.    Other than the above-mentioned applications, a search of the above-mentioned law enforcement indices uncovered no record of previous applications for interceptions of wire, electronic, or oral communications involving persons, telephones, and/or premises specified in this affidavit.    The affidavit for **TARGET TELEPHONES 1 & 2** is incorporated by reference herein.

## IX.    FACTS SUPPORTING PROBABLE CAUSE

### 1.    March 10, 2016 Controlled Purchase of Cocaine Base from Jamal LOCKLEY a/k/a T-Roy

48.    On March 9, 2016, at approximately 10:04 p.m., CS-2 made a controlled call to Jamal LOCKLEY on **TARGET TELEPHONE 3** to arrange for the purchase of one half ounce of cocaine base, to be purchased by CS-1 for $600.    LOCKLEY agreed to the deal and instructed both CS's to come by the following day.    This conversation was recorded and verified by investigators by means of a consensual wiretap on CS-2's cellular telephone (described further in Section XI.G below). Investigators initially identified LOCKLEY's phone number through information from CS-2.

49.    On March 10, 2016, prior to the controlled purchase, CS-1's vehicle was equipped with electronic transmitting and video/audio recording equipment and CS-1 was given $600 in previously recorded ATF funds.    CS-1 and CS-2 were checked by investigators for narcotics and other illicit material and found to be devoid of same.    CS-1 and CS-2 then drove to the area where CS-2 knew LOCKLEY to distribute his narcotics. While on the way to this location, CS-2 made a number of controlled calls to LOCKLEY on **TARGET TELEPHONE 3** to update him as to their progress and get more specific details on their meeting place for the narcotics transaction. These calls were recorded via both the consensual wiretap on CS-2's cellular telephone, and the

23

audio/video recording equipment secreted in the vehicle, and they were verified by investigators.

50.     At approximately 4:49 p.m., the CS's drove to the area of Elsinore Avenue just north of Clifton Avenue in Baltimore, Maryland, whereupon they double-parked next to LOCKLEY's vehicle.   In the video recording of the incident, LOCKLEY can be seen exiting his vehicle and approaching the passenger side of CS-1's car, whereupon he played a new rap song for the two CS's.   CS-2 then pulled up the street a few feet and parked the car, at which time LOCKLEY approached the driver's side window and handed CS-2 a small plastic bag containing suspected cocaine base in exchange for $600 in previously recorded ATF funds, which was given to CS-2 by CS-1.   During the transaction, LOCKLEY told CS-1 "you got any complaints baby, please let [CS-2] know cuz [he/she] gonna let me know and we gonna fix any problems that you got. But you ain't gonna have none though, I'm just letting you know though, that's how we rock."   A few seconds later, LOCKLEY asked CS-1, "you know how to cook?"   Based on my training, knowledge, and experience, I know that LOCKLEY was advising CS-1 that he/she wouldn't have any problems with the cocaine base because it was high quality and, later in the conversation, LOCKLEY was asking CS-1 if he/she knew how to make cocaine into cocaine base, with the implication being that LOCKLEY could sell CS-1 powdered cocaine instead of crack cocaine.

51.     CS-1 and CS-2 left the area a short while later.   CS-2 drove back to a predetermined location and handed investigators the suspected cocaine base that he/she and CS-1 had purchased from LOCKLEY.   Both CS's were again searched and found to be devoid of any other narcotics or illicit substances. The purchased evidence was taken back to ATF Baltimore Group III and field tested. The sample tested positive for the presence of cocaine base.   The purchased evidence was submitted to the BPD evidence control unit for processing.

24

2.   **Intercepted Calls Between TARGET TELEPHONE 1 and TARGET TELEPHONE 3**

52.   On July 2, 2016 at approximately 12:05 p.m., a call was placed by Dwight

JENKINS from **TARGET TELEPHONE 1** to Jamal LOCKLEY on **TARGET TELEPHONE**

3.   An approximate transcript of the call is below:

| | |
|---|---|
| LOCKLEY: | Yeah yeah. |
| JENKINS: | Yo, wassup baby? |
| LOCKLEY: | Wassup. |
| JENKINS: | Nothing, just getting up. Getting ready to get dressed. |
| LOCKLEY: | Oh alright, I thought you… |
| JENKINS: | Huh? |
| LOCKLEY: | I said I thought you had some of that. |
| JENKINS: | No. Oh, I got dots. |
| LOCKLEY: | That's what I'm saying. |
| JENKINS: | Yeah, I do. |
| LOCKLEY: | I got some peoples for you, that's why I called this morning. |
| JENKINS: | Oh, ok. Alright, well I'm getting ready to get dressed man. |
| LOCKLEY: | I'll swing right there. |
| JENKINS: | Alright. |
| LOCKLEY: | Alright. |

53.   Based on my training, knowledge, and experience, I believe that in the

above-described call, LOCKLEY was asking JENKINS if he had any heroin ("some of that") that

JENKINS could distribute to some customers who had approached LOCKLEY looking for heroin

("I got some peoples for you"). JENKINS confirmed that he had heroin ("Oh, I got dots").

Investigators believe that "dots" is a reference to the specific packaging used by JENKINS to sell

his heroin.   Based on information provided by CS-2, investigators believe that LOCKLEY

typically distributes cocaine base while JENKINS typically distributes heroin.   Based on

conversations between CS-3 and JENKINS during past controlled purchases, investigators further

believe that JENKINS outsources sales of cocaine base to LOCKLEY, whereas it appears from

the above-described call that LOCKLEY outsources sales of heroin to JENKINS.

54.   On July 2, 2016, at approximately 1:01 p.m., a call was received by Dwight

25

**JA7061**

JENKINS on **TARGET TELEPHONE 1** from Jamal LOCKLEY on **TARGET TELEPHONE**

3.   An approximate transcript of the call is below:

| | |
|---|---|
| JENKINS: | Yo. |
| LOCKLEY: | Yo, where you at yo? |
| JENKINS: | Yeah yo, what's wrong? |
| LOCKLEY: | Yo, when you get up the way yo. |
| JENKINS: | Yeah? |
| LOCKLEY: | You talk to Melvin right? |
| JENKINS: | Yeah. |
| LOCKLEY: | Yo, tell Melvin to stop doing threats to them niggas, man. |
| JENKINS: | Ok, alright. I'll, I'll. |
| LOCKLEY: | Fuck he saying, boy talking bout he gonna kill all ya'll, I'm gonna kill all ya'll. Yo, tell him shut the fuck up and stop, yo. |
| JENKINS: she | Alright, let me deal with her cuz um (unintelligible) been up and |
| | be getting ready to get ready to move and I be up there man. But, he gone, what, he went back down there? |
| LOCKLEY: | Yeah. |
| JENKINS: | What's the point of going back down there? |
| LOCKLEY: | Motherfucker said he rolled past talking bout all ya'll gonna die. He opened the door up or rolled the windows down or slowed down or something. |
| JENKINS: | Alright. |
| LOCKLEY: | Alright. |

55.   Based on my training, knowledge, and experience, I believe that in the above-described call, LOCKLEY called JENKINS to ask him to go to one of their CDS distribution locations ("up the way") and tell one of the workers ("Melvin") to stop making threats to members of another drug shop ("tell him to stop doing threats to them niggas, man"). I believe that LOCKLEY was mad at "Melvin" for threatening members of another drug shop because of possible problems the threats could cause for the MMP DTO. Based on my knowledge of DTO's, I know that when sales are high and money is coming in steadily, much as it is for LOCKLEY and JENKINS, drug traffickers try to keep the violence to a minimum and under control, lest it draw the attention of police and interrupt narcotics sales. Accordingly, I believe LOCKLEY asked JENKINS to get "Melvin" to stop threatening other drug traffickers in

26

the area so that they (LOCKLEY, JENKINS and their associates) could continue making good money from their drug distribution activities without any police interference.  Investigators believe "Melvin" is Melvin LASHLEY, a/k/a "Menace," a known MMP member who was released from the Baltimore Central Booking and Intake Facility in April 2016.

## X.   PEN REGISTER AND TOLL ANALYSIS OF TARGET TELEPHONE 3

56.    On March 16, 2016, the ATF obtained court-authorized toll records and initiated a real-time pen register on **TARGET TELEPHONE 3**, which expired 60 days later on May 15, 2016.   On May 6, 2016, the ATF obtained court-authorized toll records and initiated a real-time pen register on telephone number 443-220-7958, which was believed to be a new telephone used by LOCKLEY based on information from CS-2 and the consensual wiretap.   Thereafter, CS-2 informed the ATF that LOCKLEY had returned to using **TARGET TELEPHONE 3**.   On July 1, 2016, the ATF obtained a second court-authorized real-time pen register on **TARGET TELEPHONE 3,** which is still in operation. Based on an analysis of the active, daily updated pen register, as well as historical toll records for **TARGET TELEPHONE 3**, I have learned the following:

57.    During the period from July 12, 2016 through July 20, 2016, **TARGET TELEPHONE 3** made and received approximately 941 calls, or an average of approximately 105 calls per day.  A large portion of the calls, approximately 886, were 2 minutes or less in duration.  (**TARGET TELEPHONE 3** also sent and received approximately 596 text messages during this period. At this time investigators are not seeking to intercept text messages to and from **TARGET TELEPHONE 3.**)

58.    Based upon my training, knowledge, and experience, I know that drug traffickers typically coordinate with their customers and co-conspirators by cellular telephone.  As a result,

27

**JA7063**

drug traffickers make a large volume of short duration calls daily.   Accordingly, the high volume of incoming and outgoing calls and text messages over **TARGET TELEPHONE 3**, along with their brief duration, is consistent with telephone use by narcotics traffickers.

59.    Additionally, **TARGET TELEPHONE 3** made calls to, and received calls from, telephone numbers that are known to be associated with or involved in narcotics trafficking, including calls to and from other TARGET SUBJECTS, as specified below.

60.    Between July 12 and July 20, 2016, there were 6 calls between **TARGET TELEPHONE 3** and telephone number 410-622-0701, a telephone with unknown subscriber information but known by investigators to be used by Tiffany BAILEY.   Investigators know the phone is in use by Tiffany BAILEY based on jail calls made by Dante BAILEY to Tiffany BAILEY at 410-622-0701, during which they discuss personal, gang-related, and narcotics trafficking-related information. For instance, on June 22, 2016, at 8:18 p.m., Dante BAILEY made a recorded jail call to Tiffany BAILEY on telephone number 410-622-0701, in which he instructed her to "holler at dude, and tell him to holler at Kim's boyfriend, with two packs." Dante BAILEY asked Tiffany BAILEY if she understood "what is two packs," and she replied, "I don't wanna say it."   Based on their training and experience, investigators know that drug traffickers often use the term "pack" to refer to a quantity of narcotics.   Investigators believe Dante BAILEY was using coded language to instruct Tiffany BAILEY to facilitate an illicit narcotics transaction between two unknown males, and that Tiffany BAILEY was reluctant to make this explicit on the call because she knew that jail calls are monitored.   Investigators know Tiffany BAILEY's voice based on a search warrant executed at her residence on May 17, 2016 while she was home; investigators spoke with her at length and are able to identify her voice based on that incident. Tiffany BAILEY is currently out on bail awaiting trial on charges of CDS

28

possession with the intent to distribute in the Circuit Court of Maryland for Baltimore County. Furthermore, during the search warrant at her residence mentioned above, over 90 grams of heroin were recovered from beside the bed in the master bedroom, which she was not charged with at that time.

61.     The most recent telephone call between **TARGET TELEPHONE 3** and telephone number 410-622-0701, used by Tiffany BAILEY, was on July 18, 2016.

## XI.     THE NEED FOR INTERCEPTION OF WIRE COMMUNICATIONS AND THE EXHAUSTION OF ALTERNATIVE INVESTIGATIVE TECHNIQUES

62.     As described further above, the goals of this investigation are to identify, locate, and arrest the members of MMP; identify the organization's suppliers of narcotics and firearms and the means by which the organization obtains and receives narcotics and firearms; determine how the organization processes and launders narcotics proceeds; determine how the organization evades detection by law enforcement; and determine the method and means by which the members of the organization obtain and use firearms in furtherance of their illegal activities. Insofar as the TARGET SUBJECTS make extensive use of wire communications in furtherance of the TARGET OFFENSES, interception of these communications over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** have provided some insight into the operations of the DTO but have certainly not revealed all the participants or the manners in which DTO members store and distribute narcotics. Investigators are of the belief that the interception of wire communications over **TARGET TELEPHONE 3** will provide valuable evidence against the TARGET SUBJECTS. It is only through the interception of such communications that the agents expect to fully identify the TARGET SUBJECTS, who have been partially identified thus far, and fully realize the objectives of this investigation.

63.     As indicated below, several investigative techniques have been tried and have

29

**JA7065**

failed, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives.

## A. CONFIDENTIAL SOURCES

64.     Although confidential informants have proven valuable to date, investigators do not believe that use of these sources will enable investigators to accomplish the objectives of this investigation.

65.     Although CS-1 and CS-3 have been able to conduct controlled purchases from members of the DTO, they are not members of the DTO, and they do not know all members of the DTO. These controlled purchases have been made from street-level distributors of the DTO. Therefore, it is unlikely that CS-1 and CS-3 would be introduced to any members of the DTO above this level. Also, CS-1 and CS-3 cannot provide real-time intelligence regarding the activities surrounding the DTO's drug shops. They do not have knowledge of the full extent of the DTO's operations, *e.g.*, the identity of the organization's sources of supply of narcotics, the locations of the organization's stash houses for narcotics or firearms, or whether the organization maintains additional drug shops in Baltimore. More importantly, CS-1 and CS-3 have had no advance information about impending acts violence committed by members of MMP. Finally, while CS-3 has made a controlled purchase of a firearm from Dwight JENKINS, neither CS-2, CS-3, nor investigators are able to determine the source of said firearms.

66.     While CS- 2 and CS-4 have provided some historical information to investigators, they are unable to participate in a proactive manner or in an undercover capacity and, therefore, are of limited use to this investigation. Although CS-2 has previously been able to provide real-time intelligence regarding the activities surrounding the open-air drug shop, CS-2 has stated that he/she is no longer involved in the everyday operation of the DTO, and is unable to purchase

30

narcotics from members of the DTO without arousing suspicion. CS-2 has been unable to obtain telephone numbers for all of the mid and upper-level members of the DTO. It is unlikely that CS-2 will be able to gain knowledge of the inner workings of the current drug operation or the identity of all members of the conspiracy and sources of supply of narcotics to the DTO. Furthermore, CS-2 does not have up-to-date knowledge of the full extent of the DTO's operations, e.g., the identity of the organization's source of supply of narcotics, or the locations of the DTO's stash houses for narcotics and firearms. Additionally, the consensual Title III wiretap that was in operation on CS-2's cell phone was discontinued on June 22, 2016 due to a lack of pertinent phone calls. With regards to CS-4, who has been able to provide important historical information regarding MMP, s/he cannot provide current information or operational assistance because CS-4 is currently incarcerated.

67.     More generally, based on my training and experience, I know that the highly compartmentalized manner in which large-scale narcotics traffickers do business makes it nearly impossible for any single source to learn the identities and roles of all of the persons engaged in a drug-dealing operation. I am aware that drug trafficking organizations typically have multiple sources of supply of narcotics and none of the confidential sources in this case knows the identity of all of the MMP sources of supply or all of the ways in which MMP obtains narcotics or firearms. Additionally, narcotics traffickers are usually reluctant to introduce customers, like CS-1 and CS-3 to their sources of supply of narcotics for fear of losing the customers' business. Accordingly, I know that it is unlikely that a CS introduced to the street level of the organization, such as CS-1 or CS-3 would be able to gain first-hand knowledge of the structure and workings of the entire operation.

**B.     UNDERCOVER OFFICERS**

31

68.     Investigators were been able to introduce an undercover officer ("UC") to Maurice POLLOCK, who is believed to be a member of the MMP DTO. Between March 22 and April 4, 2016, the UC was able to purchase a total of approximately 11.3 grams of heroin from POLLOCK. However, on May 15, 2014, POLLOCK was sentenced to one year in jail for an unrelated CDS possession charge, a sentence that is extraordinarily long for a possession charge by Baltimore City standards. As such, the connection that the UC established with POLLOCK was effectively severed. More importantly, the ability of the UC to approach other members of the MMP DTO has been jeopardized because some members of MMP may be aware that the UC was one of POLLOCK's customers and may suspect the UC of being a police officer or cooperator based on POLLOCK's conviction and abnormally long sentence.   As such, for safety reasons, that particular UC is no longer viable as an option to conduct purchases from MMP.

69.     On May 6, 2016, a second ATF UC attempted to make a CDS purchase from Sidney FRAZIER, who investigators believe is a member of the MMP DTO. The transaction was initially scheduled to occur at a CVS in West Baltimore; however, over the course of an hour and numerous phone calls, FRAZIER made the UC move to no less than four separate locations before finally giving him an instruction to park his car outside of a high-end hotel and enter the hotel. At that point, investigators decided to cancel the transaction out of a concern for the UC's safety. Later that evening, on an Instagram account believed to be operated by FRAZIER, the user posted a picture with two photos: one of a man dressed down with the appearance of a drug dealer and a second photo with the same man dressed in a police uniform. The caption on the photo gave investigators the impression that at some point during the transaction, FRAZIER became aware that he was dealing with an undercover officer and started moving him from place to place purely for his own enjoyment but with no intention to distribute CDS whatsoever. Accordingly,

32

investigators cannot use that specific UC again for fear that FRAZIER has told the others about him.

70.     Additionally, even if a CS could make an introduction of other UC's to members of the organization, based on my training and experience, narcotics traffickers are generally reluctant to speak freely with individuals outside the organization, a fact clearly supported by the failed attempt to purchase narcotics from FRAZIER. Therefore, I do not expect these undercover agents, if used, to have any contact with the TARGET SUBJECTS beyond those that the confidential sources have already had contact with. Finally, the MMP DTO is a violent organization and multiple CS's have observed firearms in close proximity to the area where the organization operates. Given this, the safety risk to a third UC would be high if he/she were to try to infiltrate the organization. The risk to the investigation, and more importantly the life of the UC, is therefore too great to attempt such an investigative technique.

## C.     PHYSICAL SURVEILLANCE

71.     Although physical surveillance of some activities of the TARGET SUBJECTS has been possible, most recently in June 2016, the ability of law enforcement officers to consistently conduct such surveillance has been, and will continue to be, limited. First, such surveillance is limited by the nature of the areas to be surveilled. Members and associates of the MMP DTO live in the immediate areas surrounding the open-air drug shops and as a result, it is difficult to establish stationary positions to conduct surveillance without being observed by the TARGET SUBJECTS. For the same reason, "drive-by" surveillance is not a viable option. Additionally, investigators are aware that the TARGET SUBJECTS are actively conducting counter-surveillance to thwart efforts by law enforcement; information provided by CS's has verified as much. Specifically, in the attempted controlled purchase referenced above from

33

FRAZIER, he directed the UC to move a number of times, quite possibly to determine if he was being shadowed by police. Although surveillance could be increased, such a course of action risks alerting the TARGET SUBJECTS to the existence of this investigation, making continued investigation more difficult (*e.g.*, by causing the TARGET SUBJECTS to move locations, conduct more effective counter-surveillance, etc.). With regards to LOCKLEY specifically, he is believed to be distributing narcotics in an area difficult for law enforcement to observe because of extremely tight confines that provide little in the way of covert surveillance spots, along with local residents who are friendly to the DTO's operation, and who frequently alert the organization to the presence of law enforcement, thereby severely limiting any opportunities for productive physical surveillance.

72. Investigators installed a pole camera to monitor the activities of the MMP DTO at the Gwynn Oak and Liberty Heights area. Although this camera has been a beneficial tool, it is limited in the information it can provide. First, the pole camera cannot record audio. Thus, while investigators could use the camera to see that the TARGET SUBJECTS are interacting with one another, the camera offers no insight into the subject matter of the discussion. Additionally, pole camera footage cannot be viewed in "real time." Rather, the footage is viewed by investigators on a 3-7 second delay, depending on the quality of the internet connection. As a result of this delay and the slow response time of the camera when operators try to adjust the camera angle or zoom, it is difficult to maintain surveillance of a moving target. Obviously, when viewed after the fact, pole camera footage is limited to the scenes that were recorded at the time and investigators may not be able to track or zoom on individuals or vehicles of interest. Another problem is that the view of the pole camera is limited to a particular geographic location and is obstructed by trees, businesses, and the side of the building to which it is adjacent. Additionally, the camera was

34

installed just after the series of three murders and one non-fatal shooting occurred in late April and early May; those acts of violence precipitated an increased police presence in the area which subsequently forced the MMP DTO members to move to a different, as yet unknown location to continue their activities. Finally, I know based on surveillance and undercover purchases that the TARGET SUBJECTS frequently conduct narcotics transactions inside of buildings and/or vehicles, thereby making surveillance by a pole camera less effective. For the reasons mentioned above, I believe based on my training, knowledge and experience that the continued use of a pole camera and the installation of new pole cameras are unlikely to be productive means of meeting the goals of this investigation. However, law enforcement will install additional pole cameras if circumstances are favorable.

73.     Therefore, the information that can be obtained from wire interception for which authorization is sought herein will help law enforcement agents to determine the identities of the subjects involved and to track their activities, thereby enhancing the prospects for fruitful physical surveillance. In addition, with the knowledge provided beforehand by wire interception that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, thus minimizing the risks of discovery inherent in following subjects or remaining at target locations for long periods of time.

### D.     TELEPHONE TOLL RECORDS/PEN REGISTERS

74.     Telephone toll records have been used in this investigation but have provided, and will continue to provide, only limited information. Toll records and pen register information cannot identify the actual users of the telephones nor can they reveal the content of the conversations. At present, individuals can purchase cellular telephones with or without providing accurate subscriber, billing, or user information, and I am aware that it is common practice for

35

drug traffickers to purchase a cellular telephone in the name of a nominee or through a company that sells cellular telephones. Therefore, without access to the content of the intercepted wire communications, toll information will be of little investigative value.

### E.    INTERVIEWS OF WITNESSES/USE OF THE GRAND JURY

75.    Previously, witnesses have provided interviews and grand jury testimony in the furtherance of this investigation. Although this technique was successful in obtaining information about the organization, it was limited in nature. Witness interviews and grand jury testimony are unable to expose the full nature and scope of the criminal activity, or the identities of all the participants in this investigation.

76.    To date, investigators have conducted or attempted to conduct independent interviews of individuals with knowledge of the drug trafficking activities of the TARGET SUBJECTS and their associates. Although these interviews have provided investigators with historical information regarding the MMP DTO, investigators have not been able to obtain real time information that has led to the successful dismantling of the organization.

77.    Generally speaking, calling additional witnesses before a grand jury would likely be unsuccessful in gathering sufficient evidence of the full scope, nature, or identities of all the participants in this criminal organization. Only individuals who are currently involved in the criminal activity at the highest levels have the requisite knowledge regarding the full scope and nature of the present operation.

78.    Similarly, the continuous use of a federal grand jury does not appear to be a promising method of investigation. Witnesses who could provide relevant evidence to a grand jury would themselves, likely be participants in the narcotics-trafficking activities under investigation. Such individuals would face prosecution themselves, and it is therefore unlikely

36

that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony. Immunizing them could thwart the public policy that they be held accountable for their crimes. Additionally, the issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation. For similar reasons, conducting numerous interviews at this point in the investigation would not be successful in obtaining evidence of the criminal activities under investigation. Only the individuals who participate in the criminal conversations or transactions are knowledgeable of their contents, making these individuals subjects of this investigation. It has been my experience, and the experience of other agents and law enforcement officers involved in this investigation, that interviews with individuals who are involved in the sale and distribution of narcotics are not productive. These individuals do not wish to disclose their own criminal activity, and do not wish to implicate others, due to fear for their own safety, and/or a loyalty to other subjects of this investigation.

79.    Therefore, I believe that any grand jury investigation or interview of the TARGET SUBJECTS or their associates would be unsuccessful in exposing the full nature and scope of the criminal activity, or the identities of all the participants in this investigation. Additionally, should the focus of the investigation and magnitude of the potential penalties involved be disclosed to the TARGET SUBJECTS, it is possible that they would: (1) become more secretive in their criminal activities; (2) conduct their criminal activities at different locations; (3) possibly harm suspected government agents and/or informants; (4) threaten potential witnesses; (5) possibly flee the jurisdiction; and (6) conceal or destroy evidence.

F.    SEARCH WARRANTS

37

80.    Although search warrants have been executed at locations associated with several of the TARGET SUBJECTS, additional searches are unlikely to uncover the full nature and scope of this conspiracy.

81.    On May 17, 2016, a search and seizure warrant was executed at the home of Dante BAILEY and Tiffany BAILEY at 7607 Reserve Circle, Apt 203, Baltimore, Maryland. Dante BAILEY was arrested pursuant to a federal arrest warrant for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Investigators obtained an arrest warrant for Dante BAILEY after learning on May 3, 2016 that Dante BAILEY and Tiffany BAILEY visited an indoor pistol range and engaged in target shooting. Dante BAILEY is prohibited from possessing a firearm due to multiple disqualifying felony convictions.

82.    The search of the BAILEY's residence resulted in the recovery of approximately 89 grams of heroin, a digital scale, over $700 in cash, several cellular telephones, and numerous items of gang-related paraphernalia and paperwork.

83.    Dante BAILEY was arrested at the location and transported to the ATF Baltimore Field Division. Investigators again delivered Miranda warnings to him and conducted an interview with him. BAILEY admitted membership in MMP, stating that MMP members were previously Tree Top Piru ("TTP") and that MMP was formed as a result of the indictment of TTP in 2008. BAILEY stated he traveled to the "OGs" on Tree Top in Compton, California to get approval to start MMP. BAILEY stated that there was a picture of him meeting with these individuals on a Facebook profile used by him that was seized by police. BAILEY advised that Murdaland Mafia Piru is 75% Mob and 25% Piru. BAILEY did not reveal MMP's criminal purposes, and he denied his participation in, or knowledge about, a number of recent murders and shootings.

38

**JA7074**

84.     Although this search warrant resulted in evidence against Dante and Tiffany BAILEY, it has not led to evidence against other members of the DTO, nor revealed the full extent of the DTO's operations. No other members of MMP were arrested based on this incident.

85.     As mentioned above, MMP considers its "headquarters" to be the BP gas station located at the intersection of Windsor Mill Road and Forest Park Avenue in Baltimore City. Investigators have not applied for a warrant to search this location, for a number of reasons. First, the execution of a search warrant at this location could not be done without the knowledge of the community and the targets of the investigation, who would then be less likely to frequent the gas station going forward due to suspicion that employees at the gas station may be given incentive to cooperate with law enforcement. In fact, a search warrant at this location could put the gas station employees at risk of violence or threats of violence by members of MMP. Second, the Baltimore City Police Department recently forced the closure of the gas station due to the high number of criminal complaints originating at this location over the past several years. As of June 21, the gas station is padlocked and fenced in and, therefore, a search warrant would not be practicable or fruitful.

86.     At present, investigators have not established probable cause to search any other locations associated with the MMP DTO and interception of wire communications over **TARGET TELEPHONES 1 & 2** have not yet led investigators to any new locations for which search warrants would be appropriate. Even if new locations could be identified and probable cause developed to search them, the execution of search warrants and the recovery of drugs and/or other evidence will not meet the goals of this investigation. A search warrant on a single location, even if drugs or firearms were recovered, could lead to charges against only a handful of the individuals responsible for this pervasive and on-going conspiracy. Those who were not present at

39

**JA7075**

the time of the execution of the warrant could claim they were completely unaware of the use of the dwelling and/or the criminal activities of the occupants. Further, without the intercepted conversations identifying and connecting the targets of the investigation who do not reside at the searched residence, many of the individuals responsible for this drug trafficking enterprise would escape prosecution. It is only through the wire interception sought herein that law enforcement officers will be able to learn the timing of cocaine and heroin deliveries, the location(s) where drugs and firearms are stored, and the identities of all of the individuals responsible for delivering, processing, and packaging the cocaine and heroin for retail sale, as well as committing acts of violence using firearms. Accordingly, I believe that the execution of search warrants will not alone or in connection with other conventional investigative techniques satisfy the goals of this investigation.

87.     Additionally, I am aware that the execution of search warrants in most cases cannot be done without the knowledge of the community and without the knowledge of the targets of the investigation. I also know that when targets of an investigation learn that members of their organization have been subjected to the execution of a search warrant, they are less likely to associate with those members going forward due to suspicion that targets of search warrants may be given incentive to cooperate with law enforcement. Furthermore, they are likely to curtail their illicit activities for a period of time following the execution of search warrants until they feel that law enforcement is no longer a threat, thereby making it more difficult for investigators to fully realize the goals of this investigation.

88.     For instance, in this case, investigators received information from CS-2 that after the search of the BAILEY's residence, members of MMP began looking for an alternative residence for Dante BAILEY's wife Tiffany BAILEY. In addition, CS-2 relayed that members of

40

MMP became concerned that Tiffany BAILEY had given law enforcement consent to search her cellular telephone that was seized during the search and that some members were likely to change telephone numbers soon as a result. Thus, continued use of search warrants would likely alert the TARGET SUBJECTS to the existence of the investigation and thereby make it more difficult to expose the full nature and scope of MMP's criminal activity.

### G.    CONSENSUAL WIRETAP

89.    During the course of the investigation into the MMP DTO, investigators have utilized a consensual wiretap on CS-2's phone since February 2016. While a consensual wiretap can be an effective tool in some instances, in this case it cannot accomplish the goals of the investigation. One of the main problems is that the TARGET SUBJECTS are wary of talking about illegal activity over the phone, particularly with people they do not know well. CS-2 is not close with a number of the TARGET SUBJECTS and, as such, it would be extremely out of the ordinary for CS-2 to call many of the TARGET SUBJECTS and start talking about CDS, firearms, or acts of violence. Accordingly, many of the conversations occurring over the consensual wiretap have been of a general, non-illicit nature.

90.    In addition, investigators believe there may be concern amongst the TARGET SUBJECTS that CS-2 is cooperating with the police and, accordingly, many of the TARGET SUBJECTS may be suspect of CS-2 in general. Were CS-2 to attempt to engage them in conversation about illicit activity over the phone, it would almost certainly arouse suspicion and potentially put CS-2 in danger.    Finally, the consensual wiretap on CS-2's phone was discontinued on June 22, 2016 due to the lack of pertinent calls intercepted. For the foregoing reasons, I am of the belief that continuing a consensual wiretap on CS-2's phone will not help investigators uncover the identities of all of the TARGET SUBJECTS or discover the methods

41

and means by which the TARGET SUBJECTS are acquiring and distributing their narcotics and, in fact, could instead jeopardize CS-2's safety.

**H. TRASH RUNS**

91.     I am aware that a possible investigative technique is to recover the trash from a suspected stash location or house and ascertain whether any contraband or other items indicating illegal activity have been discarded, which could lead to probable cause to search the suspected location. In this investigation, however, trash runs have proven to be of limited utility. Throughout the course of this investigation, members of law enforcement attempted to conduct trash inspection at the home residence of Dante BAILEY and other members of the MMP DTO. Investigators were unable to collect trash from BAILEY and other members of the DTO because they reside in apartment complexes, where trash is placed in a common area for pick up. Even if trash was available for inspection, the trash run would supply probable cause to search only one location, which, as noted above, has its own limitations. Without arresting all the members of the organization inside the premise with the narcotics, several members of the organization could claim that they were completely unaware of the nature and or use of the locations. As a result, the entire organization cannot be prosecuted simply by executing a warrant on a location where law enforcement believes narcotics are present. With regards to LOCKLEY, at this time investigators are unware of the location of his residence or any place he regularly sleeps, which prohibits employing the use of a trash pull. Additionally, LOCKLEY is believed to be distributing narcotics in an open-air setting, a fact which obviates any use of a trash pull as it relates specifically to LOCKLEY.

**I. OTHER WIRETAPS**

92.     As noted above, I located previous applications for an interception of wire and

42

electronic communications involving persons, telephones, or premises specified in this Affidavit. Specifically, in Summer 2015, the U.S. Immigration and Customs Enforcement/Homeland Security Investigations and the Baltimore County Police Department conducted a wiretap investigation into Adrian Jamal SPENCE a/k/a "Spittle" a/k/a "SP," a heroin distributor in the Baltimore metropolitan area. The investigation was limited in scope, and was focused on SPENCE and a small number of suppliers and associates believed to be responsible for trafficking large volumes of heroin. As a result of that investigation, the U.S. Attorney's Office for the District of Maryland obtained an indictment charging Adrian Jamal SPENCE, Kenneth Dixon, Robert Burrell, Kameron Wilson, and Darius Spence with conspiracy to distribute one kilogram or more of heroin (Case No. RDB-15-0541, U.S. District Court for the District of Maryland).

93.     During the course of the wiretap investigation into SPENCE, law enforcement also intercepted certain wire and electronic communications involving others who are currently under investigation, namely, Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Jarmal HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray"; William JONES a/k/a "Bill"; Tiffany BAILEY; Takuma TATE a/k/a "Oop"; and Jamal LOCKLEY a/k/a "T-Roy." Some of these communications related to suspected narcotics or firearms transactions. In connection with other evidence, these wiretap communications led to drug and/or firearms-related charges being brought against some of the TARGET SUBJECTS in state and/or federal court. Specifically, Dante BAILEY was charged with conspiracy to distribute narcotics and possession with intent to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15004054). Jarmal HARRID was charged with possession with intent to distribute narcotics and conspiracy to possess with intent to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15005884). Jamal SMITH was charged with

43

JA7079

conspiracy to possess with intent to distribute narcotics and possession with intent to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15005892). William JONES was charged with conspiracy to possess with intent to distribute narcotics and possession with intent to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15005893). Takuma TATE was charged with distribution of narcotics and conspiracy to distribute narcotics in the Circuit Court for Baltimore County (Case No. 03K15005890). Tiffany BAILEY was charged with conspiracy to distribute narcotics and possession with intent to distribute narcotics in the Circuit Court for Baltimore City (Case No. 03K15004053). Jamal LOCKLEY was charged with conspiracy to distribute narcotics and distribution of narcotics in the Circuit Court for Baltimore County (Case No. 03K15005891). Dontray JOHNSON was charged in the U.S. District Court for the District of Maryland with possession with intent to distribute heroin in violation of 21 U.S.C. § 841 and possession of ammunition by a felon in violation of 18 U.S.C. § 922(g).

94.     While Jamal LOCKLEY a/k/a "T-Roy" (**TARGET TELEPHONE 3**) was intercepted during the 2015 wiretap investigation into SPENCE and subsequently charged in state court, it clearly did not stop LOCKLEY from continuing his drug trafficking operations and those of his MMP associates; investigators know this based upon the March 10, 2016 controlled purchase of cocaine base and the calls intercepted over **TARGET TELEPHONE 1** described above regarding drug trafficking activities between JENKINS and LOCKLEY. Moreover, because the SPENCE investigation was limited in scope and focused on heroin trafficking in Baltimore County in June and July 2015, it did not lead to the discovery of evidence necessary to accomplish the goals of this investigation. For instance, the 2015 wiretap investigation did not lead to the discovery of evidence regarding MMP, the identities and roles of members of MMP, the management of the gang, its meeting places and stash houses, the methods by which it

44

**JA7080**

protects its territories and assets, or any murders and other acts of violence carried out in furtherance of the gang. In particular, it did not—and could not—have led to the discovery of evidence relating to the roughly six murders and nonfatal shootings believed to be carried out by or at the direction of members of MMP *since* July 2015. In addition, interceptions over TT1 and TT2 have not been sufficient to satisfy all goals of the investigation. Interceptions over TT1 and TT2 have given only a limited window into the gang's entire operations. To date, monitoring of the TT1 and TT2 has produced pertinent conversations, but not to the extent necessary to reveal the full nature and scope of the TARGET SUBJECTS' drug trafficking organization and the identities of all those persons involved. Interception of TT1 and TT2 has led to the partial identification, by voice and by telephone number, of additional possible co-conspirators. Interception has also revealed the manner in which some of the TARGET SUBJECTS are participating in the specified offenses and the identities of possible suppliers of firearms, cocaine, and heroin. While progress is being made toward achievement of the authorized objectives, it is believed that the interception of wire communications over **TARGET TELEPHONES 3** will lead to new and important evidence pertaining to ongoing criminal activities of MMP that could not be discovered through prior wiretaps.

### J. FINANCIAL INVESTIGATION

95. The financial aspect of this investigation has been limited. Investigators issued a grand jury subpoena to Equifax requesting consumer credit reports for certain of the TARGET SUBJECTS and their associates. The response to this request produced limited or no intelligence. Investigators also issued grand jury subpoenas to casinos in Maryland for records associated with CS-4. The responses to these subpoenas corroborated CS-4's statement that he/she had laundered drug money for both BAILEY and BANKS through casinos in and around Baltimore

45

City.   The responses from Horseshoe Casino in Baltimore, Maryland and the Hollywood Casino in Perryville, Maryland show that CS-4 made large cash deposits and withdrawals at these casinos in the 2014 and 2015 time period.

96.     It is my experience that drug trafficking organizations generally deal with cash or cash cards and do not use traditional banking services. To date, no commercial bank accounts have been identified for LOCKLEY, JENKINS, or BOWLING. Although financial information may provide additional information about what the TARGET SUBJECTS are doing with the proceeds of their illegal activities, in addition to confirming that they do not have any legitimate sources of income, the financial information is unlikely to confirm specifically which assets were obtained using proceeds from narcotics trafficking and other illegal activities. It is also unlikely to further other objectives of the investigation, such as identifying MMP's suppliers of narcotics and firearms and the organization's methods of acquiring, transporting, and storing narcotics and firearms. While the financial investigation will continue, such information is also unlikely, alone or in combination with other traditional investigative means, to permit investigators to achieve all of the goals of this investigation.

## XII.   MINIMIZATION

97.     As stated earlier, this case is being investigated by the ATF and the BPD. It is anticipated that during the period of interception, all monitoring will be performed in Baltimore City, Maryland, by law enforcement officers authorized under 18 U.S.C. § 2510(7), including Special Agents of the ATF, officers of the BPD, and government employees or individuals operating under a contract with the government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

98.     All monitoring of wire communications over **TARGET TELEPHONE 3** will be

46

**JA7082**

minimized in accordance with 18 U.S.C. § 2510, *et seq.*   The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges. In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under 18 U.S.C. § 2510, *et seq.*   Specifically, all monitoring will cease when it is determined that the monitored wire conversation is not criminal in nature.   Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that no TARGET SUBJECTS or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.   If an interception is minimized, monitoring agents shall spot check to ensure that the conversation has not turned to criminal matters.

99.    It is anticipated that the monitoring location will not be staffed at all times, and will be kept secure with access limited to authorized personnel. When personnel are not present in the monitoring location all calls will be minimized.

100.    It is requested that the order provide that, if necessary, translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communications. It may be necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications. All such translators will be under contract to the agencies and will be directly supervised by the agencies. It is further requested, pursuant to 18 U.S.C. § 2518(5), United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that

47

code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

## XIII.   AUTHORIZATION REQUEST

101.    Based on the foregoing, it is my opinion that the interception of wire communications occurring over **TARGET TELEPHONE 3** is essential to uncover the full scope of the illegal activity described herein.

102.    Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of 30 days, whichever is earlier. The 30-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or 10 days from the date of this Court's Order.

103.    In addition, there is probable cause to believe that the location of **TARGET TELEPHONE 3** at times determined by investigators will constitute evidence of the TARGET OFFENSES. As more fully described above, the objectives of this investigation include identifying all of the locations where the MMP DTO conducts narcotics transactions, stores and packages narcotics, and collects and stores narcotics proceeds. Additionally, objectives will also include how members of the organization obtain, store and utilize firearms in furtherance of their illegal enterprise. Accordingly, for the reasons set forth above, it is also requested, pursuant to 18 U.S.C. § 2703(c)(1)(A) and 28 U.S.C. § 1651 (the All Writs Act) and consistent with the probable-cause evidentiary standard set forth in Fed. R. Crim. P. 41, that the Service Providers be

48

directed to provide the agencies with location-based data that will assist law enforcement in determining the locations of **TARGET TELEPHONE 3** (differentiated from the first or last cell site used to make or receive a call, which simply identifies the location of the third-party provider's infrastructure). This request for location-based data includes the request for an Order directing the Service Provider to employ and to disclose to the agencies the results (through any means reasonably available) of all available location-based services, including but not limited to Global Positioning System (GPS) or any geo-location coordinates associated with this handset, if applicable, and any "Enhanced-911" services developed by the Service Provider.

104. It is also requested, pursuant to 18 U.S.C. §§ 2703(c) and (d), that the Court issue an Order directing the Service Provider and any other telecommunications-related carrier provide the agencies with subscriber information (published, unpublished or unlisted) and billing information, including the names, addresses, and customer service records of the subscribers, for any numbers dialed and pulsed from and to **TARGET TELEPHONE 3** during the period for which interception is authorized. The investigation described above is continuing, and there exist specific and articulable facts showing that there are reasonable grounds to believe that the information being sought is relevant and material to the ongoing investigation. For the reasons set forth above, that information is needed to help identify other TARGET SUBJECTS and others involved in the distribution of narcotics by the MMP DTO.

105. Pursuant to the provisions of 18 U.S.C. § 2518(4), it is requested that it be ordered the Service Provider, and any other service providers, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the persons whose communications are to be intercepted (including all dial digits—including all incoming and outgoing calls—pen register information, and audio

49

interception capability whether the cellular telephone is in roaming mode or otherwise). The assistance of this provider is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the agencies. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

Timothy Moore
Special Agent, ATF

Sworn to before me this ⅔¹ˢᵗ day of July, 2016 at 2:45 hours.  (2:45p.m.) EZH

The Honorable Ellen L. Hollander
United States District Judge
District of Maryland

I hereby attest and certify on ___7/21/16___
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
(DISTRICT OF MARYLAND

By_____ Deputy

50

FILED _____ ENTERED
LODGED _____ RECEIVED

JUL 2 1 2016

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING TO AND FROM THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 709-7780 AND BEARING IMSI NUMBER 310260674625701 ("TARGET TELEPHONE 3") | MISC. NO. _16mc 499_ (UNDER SEAL) |

**SERVICE PROVIDER ORDER**

This matter has come before the Court pursuant to the application of the United States for an Order pursuant to 18 U.S.C. § 2518, authorizing the interception and recording of wire communications over the cellular telephone currently assigned call number (443) 709-7780, and bearing IMSI number 310260674625701, with service provided by T-Mobile US, Inc., subscribed to James Kenner at 1909 North Forest Park Avenue, Baltimore, Maryland 21207, but in active use by Jamal LOCKLEY a/k/a "T-Roy" (hereinafter, "**TARGET TELEPHONE 3**" or "**TT3**").

IT APPEARING that the Court, having reviewed the application and having found that it conforms in all respects to the requirements of 18 U.S.C. §§ 2516 and 2518, and having issued an Order conforming to the provisions of 18 U.S.C. § 2518 authorizing agents, officers and investigators of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and other investigative and law enforcement officers (collectively "the Agencies"), as defined in 18 U.S.C. § 2510(7), assisted, if necessary, by authorized translators, to intercept and record wire communications occurring over TARGET TELEPHONE 3 for a period of thirty days; and

1

IT FURTHER APPEARING that the applicant has requested that the Service Provider and any other service providers be directed to furnish to the Agencies forthwith all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with minimum interference with the services accorded the persons whose communications are to be intercepted,

## AUTHORIZATION

**IT IS HEREBY ORDERED** that the Service Provider and any other telecommunications-related carrier shall provide the Agencies with subscriber information (published, non-published or unlisted) and billing information, including the names, addresses, and customer service records of the subscribers, for any numbers dialed and pulsed from and to TARGET TELEPHONE 3 during the period for which interception is authorized;

**IT IS FURTHER ORDERED** that the service provider and any other service providers shall furnish to the Agencies forthwith all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services accorded the persons whose communications are to be intercepted, including all dial digits (including all incoming and outgoing calls), pen register information, and audio interception capability (whether the cellular telephone is in roaming mode or otherwise), and that the Service Provider shall be compensated by the Agencies for reasonable expenses incurred in providing such facilities or assistance;

**IT IS FURTHER ORDERED** that the authorization to intercept wire communications granted herein shall apply not only to the target telephone number listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI number, and

2

**JA7088**

to any other IMSI numbers accessed through the target telephone number referenced above, within the thirty day period;

## LOCATION INFORMATION

**IT IS FURTHER ORDERED**, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), that agents of the ATF are authorized to ascertain the physical location of TARGET TELEPHONE 3, including but not limited to E-911 Phase II data or other precise location information concerning TARGET TELEPHONE 3 (the "Requested Location Information"), during the authorized period of interception. Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by TARGET TELEPHONE 3 at the start and end of any call, pursuant to 18 U.S.C. §§ 3122-24, 18 U.S.C. § 2703(c)(1)(A), and Federal Rule of Criminal Procedure 41. There is probable cause to believe that the location of TARGET TELEPHONE 3 during that period will constitute evidence of the offenses under investigation.

**IT IS FURTHER ORDERED** that the Service Provider shall disclose the Requested Location Information concerning TARGET TELEPHONE 3 during the authorized period of interception, and shall initiate a signal to determine the location of TARGET TELEPHONE 3 on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and shall furnish the information, facilities and technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user of TARGET TELEPHONE 3, at any time of day or night, owing to the potential need to locate TARGET TELEPHONE 3 outside of daytime hours.

**JA7089**

**IT IS FURTHER ORDERED** that the furnishing of said information, facilities, and technical assistance by the Service Provider shall terminate thirty days measured from the earlier of the day on which the investigative or law enforcement officers begin to conduct the interception of wire communications, pursuant to this Order or ten days from the date that the order is entered, unless otherwise ordered by this Court.

**IT IS FURTHER ORDERED** that the furnishing of such information, facilities and assistance by the Service Provider shall be compensated for by the United States at the prevailing rate.

## TIME PERIOD

**IT IS FURTHER ORDERED** that the furnishing of said information, facilities, and technical assistance by the Service Provider shall terminate in thirty days. The thirty-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order. During the period of this Court's Order, the furnishing of such information, facilities and assistance by the Service Provider and other communication service providers, shall be compensated for by the United States at the prevailing rate;

## NON-DISCLOSURE

**IT IS FURTHER ORDERED** that in order to avoid prejudice to this criminal investigation, the Service Provider and any other service providers and their agents and employees shall not disclose or cause the disclosure of this Order, the interception that it authorizes, the request for information, facilities, and assistance by the Agencies, or the existence of the investigation, to any person other than those of its agents and employees who require said information to accomplish the interception of wire communications hereby ordered. In

4

**JA7090**

particular, the Service Provider and its agents and employees shall in no event make or cause such disclosure to the telephone users involved, to any lessee or subscriber, or to any actual or potential interceptee until otherwise ordered by this Court;

**IT IS FURTHER ORDERED** that this order is binding upon any subsequent service provider to TARGET TELEPHONE 3 after service of a certified copy of this order without further order of this Court being required;

**IT IS FURTHER ORDERED** that in the event that TARGET TELEPHONE 3 is transferred outside of the territorial jurisdiction of this Court during the thirty day period of authorization, interceptions may take place in any other jurisdiction;

**IT IS FURTHER ORDERED** that this Order be placed under seal except that copies of said Order may be served upon the Agencies, the Service Provider and any other service providers as may be necessary to effectuate this Order.

7/21/16
DATE

2:47 P. M.
TIME

*Ellen L. Hollander*
The Honorable Ellen L. Hollander
United States District Judge,
District of Maryland

7/21/16

I hereby attest and certify on ____
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By_____ Deputy

5

**JA7091**



UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

**JUL 2 1 2016**

| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING TO AND FROM THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 709-7780 AND BEARING IMSI NUMBER 310260674625701 ("TARGET TELEPHONE 3") | MISC. NO. 16 mc 499 (UNDER SEAL) |
| --- | --- |

### ORDER AUTHORIZING THE INTERCEPTION
### OF WIRE COMMUNICATIONS

Application under oath having been made before me by Christina Hoffman, Assistant United States Attorney for the District of Maryland, who is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, for an Order authorizing the interception of wire communications pursuant to Section 2518 of Title 18, United States Code, and full consideration having been given to the matter set forth therein, the Court finds:

A. There is probable cause to believe that Jamal LOCKLEY a/k/a "T-Roy"; Dwight JENKINS a/k/a "Huggie" a/k/a "Unc"; Jacob BOWLING a/k/a "Ghost" a/k/a "Jakey" a/k/a "Fats"; Dante BAILEY a/k/a "Gutta" a/k/a "Almighty"; Tiffany BAILEY; Randy BANKS a/k/a "Dirt"; Corloyd ANDERSON a/k/a "Bo"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino" a/k/a "Tray"; Adrian Jamal SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a "SP"; Dominick WEDLOCK a/k/a "Rage" a/k/a "Nic"; William JONES a/k/a "Bill"; Jarmal HARRID a/k/a "J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dominique ROZZELL

1

**JA7092**

a/k/a "Boozie"; Maurice POLLOCK a/k/a "Reese"; Ayinde DELEON a/k/a "Murda"; Jay GREER a/k/a "Champagne"; Kenneth TORRY a/k/a "Kenny"; Michael STEWART; Jawaun TALLEY; Charles BLACKWELL; Shakeen DAVIS; Takuma TATE a/k/a "Oop"; Sidney FRAISER a/k/a "Sid"; Queontaye FORTUNE; Kenyon PATTERSON a/k/a "Konan"; Chiquetta HEATH a/k/a "Bandi"; Michael SINGER a/k/a "Blizz"; Delante LEE; Eddie MCCARGO; Dante PARRIS; and other unknown co-conspirators (hereinafter, the "**Target Subjects**"), are using **TARGET TELEPHONE 3** concerning the offenses of (i) distribution of, and possession with intent to distribute, controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; (iii) use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); (iv) maintaining premises for drug distribution, in violation of 21 U.S.C. § 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861; (vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; (vii); the laundering of proceeds of specified unlawful activity, *i.e.*, distribution of controlled substances, in violation of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18 U.S.C. § 2 (collectively, the "**Target Offenses**").

B.       There is probable cause to believe that particular wire communications of the Target Subjects will constitute evidence of the Target Offenses.  In particular, there is probable cause to believe that the interception of wire communications occurring to and from the cellular telephone currently assigned call number (443) 709-7780, and bearing IMSI number 310260674625701, with service provided by T-Mobile US, Inc., subscribed to James Kenner at 1909 North Forest Park Avenue, Baltimore, Maryland 21207, but in active use by Jamal LOCKLEY a/k/a "T-Roy" (hereinafter, "**TARGET TELEPHONE 3**" or "**TT3**"), will concern

2

**JA7093**

the specifics of the above offenses, including the manner and means of the commission of the offenses. In particular, the communications will concern: (i) the methods of operation of this armed drug trafficking conspiracy, including the precise nature and scope of illegal activities described herein and the relationship of the organization to other drug and firearms trafficking organizations; (ii) the identities and roles of other participants in the conspiracy, accomplices, and aiders and abettors, including the sources of supply of controlled substances and firearms to the TARGET SUBJECTS, and the purchasers of controlled substances distributed by the TARGET SUBJECTS; (iii) the management of the conspiracy, including the way orders and instructions are disseminated to subordinates; (iv) the collection of gang "dues" from members of the gang and/or imposition of "taxes" on nonmembers who operate in the gang's territories; (v) the methods used by the conspiracy to protect its members, territories, and assets (*e.g.*, firearms, controlled substances, and proceeds derived from the sale of controlled substances); (vi) the use of firearms in furtherance of the conspiracy; (vii) the times, dates, and locations of meetings at which persons involved in this conspiracy pick up drugs and/or firearms, exchange money, and meet to discuss the conspiracy and the progress of their illegal activities; (viii) the quantities and types of controlled substances involved in this drug trafficking conspiracy, (ix) the manner of shipment or movement of controlled substances distributed in connection with this conspiracy and firearms used in furtherance of this conspiracy; (x) the methods of paying for the controlled substances and firearms involved in the conspiracy, and the location, movement and disposition of all proceeds from illicit drug activity associated with this conspiracy, including efforts to launder drug proceeds; (xi) the identification of other locations and facilities used in furtherance of the TARGET OFFENSES, as well as contraband, firearms, and money derived from and used in furtherance of such offenses; (xii) the existence and location of records of the

3

**JA7094**

purchase and sale of narcotics and firearms associated with this conspiracy; (xiii) the methods used by the TARGET SUBJECTS and others to elude law enforcement detection; (xiv) the identification of additional communication devices or telephone instruments used by the TARGET SUBJECTS and others in furtherance of the TARGET OFFENSES; and (viii) other evidence necessary for the successful prosecution and conviction of the above described criminal activity. In addition, the communications are expected to constitute admissible evidence of the commission of the above-described offenses.

C. It has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

D. There is probable cause to believe that **TARGET TELEPHONE 3** has been used and will continue to be used in connection with the commission of the above-described offenses in the District of Maryland and elsewhere.

E. There is probable cause to believe that geolocation and cell site data for **TARGET TELEPHONE 3** will be evidence of activity in violation of the above-described Target Offenses.

**WHEREFORE**, it is hereby,

**ORDERED**, that Special Agents and Task Force Officers of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and participating law enforcement agencies are authorized, pursuant to an Application authorized by Paul O'Brien, Acting Deputy Assistant Attorney General of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code, and pursuant to Attorney

4

**JA7095**

General Order Number 3536-2015, dated June 11, 2015, to intercept wire communications to and from the above-described target telephone.

**PROVIDED** that such interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or shall terminate thirty (30) days measured from the date interceptions begin, or ten days after this Order is entered, whichever is earlier. It is

**FURTHER ORDERED** that this Order is binding on any subsequent service provider that provides service to the subject telephones upon service of a certified copy of this Order without further order of this Court being required. It is

**FURTHER ORDERED** that the authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI number, and to any other IMSI numbers accessed through the target telephone number referenced above, within the thirty day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider. It is

**FURTHER ORDERED** pursuant to 18 U.S.C. §2518(3), that in the event that

**TARGET TELEPHONE 3** is used outside the territorial jurisdiction of this Court, interceptions of the transferred facilities may continue to take place in the District of Maryland where all

5

**JA7096**

communications will first be heard and minimized regardless of where the wire communications are placed to or from. It is

FURTHER ORDERED that, based upon the request of the Applicant, pursuant to Section 2518(4) of Title 18, United States Code, T-Mobile, which is the electronic communication service provider, as defined in Section 2510(15) of Title 18, United States Code, and any subsequent service providers that provide service to **TARGET TELEPHONE 3**, shall furnish the ATF and its participating law enforcement agencies with all information, facilities, and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted with the service provider to be compensated by the ATF for reasonable expenses incurred in providing such facilities or assistance. It is

FURTHER ORDERED, pursuant to the authority granted in 18 U.S.C. § 3123, that agents of the ATF are authorized to install and use a pen register and trap and trace device to collect the dialing, routing, addressing, and signaling information identifying the destination of outbound wire communications transmitted from **TARGET TELEPHONE 3**, and the source of incoming wire communications transmitted to **TARGET TELEPHONE 3**. Furthermore, pursuant to 18 U.S.C. § 3124, the service provider is ordered to furnish all information, facilities, and technical assistance necessary to accomplish such installation and use unobtrusively and with a minimum of interference with the services that the service provider accords to the user of **TARGET TELEPHONE 3**. The service provider shall be compensated by the ATF for reasonable expenses incurred in providing such information, facilities, and technical assistance. It is

6

**FURTHER ORDERED**, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), that agents of the ATF are authorized to ascertain the physical locations of **TARGET TELEPHONE 3**, including but not limited to E-911 Phase II data or other precise location information concerning **TARGET TELEPHONE 3** (the "Requested Location Information"),[1] during the authorized period of interception. There is probable cause to believe that the location of **TARGET TELEPHONE 3** during that period will constitute evidence of the Target Offenses. It is

**FURTHER ORDERED** that T-Mobile shall disclose the Requested Location Information concerning **TARGET TELEPHONE 3** during the authorized period of interception, and shall initiate a signal to determine the location of **TARGET TELEPHONE 3** on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and shall furnish the information, facilities and technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of **TARGET TELEPHONE 3**, at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONE 3** outside of daytime hours. It is

**FURTHER ORDERED** that this order be executed on T-Mobile no later than 10 days from the date that the order is entered. It is

**FURTHER ORDERED** that the furnishing of said information, facilities, and technical assistance by T-Mobile shall terminate thirty days measured from the earlier of the day on which

---

[1]      Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by **TARGET TELEPHONE 3** at the start and end of any call, pursuant to 18 U.S.C. §§ 3122-24, 18 U.S.C. § 2703(c)(1)(A), and Federal Rule of Criminal Procedure 41.

7

the investigative or law enforcement officers begin to conduct the interception of wire communications, pursuant to this Order or ten days from the date that the order is entered, unless otherwise ordered by this Court.  It is

**FURTHER ORDERED** that the furnishing of such information, facilities and assistance by T-Mobile shall be compensated for by the United States at the prevailing rate.  It is

**FURTHER ORDERED** that the warrant for the Requested Location Information be returned to the issuing judicial officer within 10 days after the termination of the authorized period of interception.  It is

**FURTHER ORDERED**, pursuant to 18 U.S.C. § 3101a(b) and Federal Rule of Criminal Procedure 41(f)(3), that service of notice of the acquisition of the Requested Location Information may be delayed for a period not to exceed 120 days from the date that the order is entered.  There is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of **TARGET TELEPHONE 3** would seriously jeopardize the ongoing investigation, as such a disclosure would give the person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  The period of delay may thereafter be extended by the court for good cause shown.  It is

**FURTHER ORDERED** that, to avoid prejudice to the government's criminal investigation, the provider of the electronic communications service and its agents and employees are ordered not to disclose or cause a disclosure of the Order or the request for information, facilities, and assistance by the ATF and its participating law enforcement agencies or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered.  In particular, said

8

providers and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications. It is

**FURTHER ORDERED** that this Order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation. The interception of wire communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the date interceptions begin, or ten days after this Order is entered, whichever is earlier. It is

**FURTHER ORDERED** that monitoring of wire conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications. A memorandum outlining all of the guidelines for minimization and application of privileges, as well as a copy of the application and this Order, will be provided to all monitors. It is

**FURTHER ORDERED** that translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communications. Pursuant to Section 2518(5), Title 18, United States Code, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available

9

**JA7100**

during the interception period, that minimization may be accomplished as soon as practicable after such interception. Monitoring will be conducted by Special Agents or deputized task force officers of the ATF, under the supervision of investigative or law enforcement officers authorized to conduct the interception. Pursuant to 18 U.S.C. § 2518(5), interception and monitoring also will be conducted in part by other government personnel, or by individuals operating under a contract with the ATF, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception. These other, non-agent individuals, will be fully informed of the contents of the Court's authorization Order, as well as the minimization requirements and limits on disclosures set forth in Chapter 119 of Title 18, United States Code. It is

**FURTHER ORDERED** that Assistant United States Attorney Christina Hoffman, Jason Medinger or any other Assistant United States Attorney familiar with the facts of this case shall provide this Court with a report on or about the fifteenth, and thirtieth days following the date interception begins, or as soon thereafter as practicable, showing what progress has been made toward achieving the authorized objectives and the need for continued interception. It is

**FURTHER ORDERED** that this Order, the Application, Affidavit and proposed Orders, and all interim reports filed with this Court with regard to this matter shall be sealed until further order of this Court, except that copies of the Orders, in full or redacted form, may be served on the ATF, and its participating law enforcement agencies and the service providers as necessary to effectuate this order. It is

**FURTHER ORDERED** that file stamped and certified copies of the Application and Affidavit and three certified copies of the Order and the Order to the Service Provider shall

**JA7101**

be provided by the Clerk of this Court to the Office of the United States Attorney for the District

of Maryland.

_Ellen L Hollander_

The Honorable Ellen L. Hollander
United States District Judge, District of Maryland

Dated this 21st day of July, 2016.

Time: 2:46 P.M. -

I hereby attest and certify on   7/21/16
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By_____ Deputy

11

**JA7102**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING TO AND FROM THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 709-7780 AND BEARING IMSI NUMBER 310260674625701 ("TARGET TELEPHONE 3") | MISC. NO. 16-499 <br><br> (UNDER SEAL) |

## APPLICATION TO SEAL RECORDING
## OF INTERCEPTED WIRE ELECTRONIC COMMUNICATIONS

The United States of America, by and through undersigned counsel, pursuant to Title 18, United States Code, Section 2518(8)(a), applies for an Order as follows:

1.     Sealing the following, accompanying disc:

(a) one (1) magnetic optical disc installed for the purpose of recording communications intercepted between July 21, 2016 and August 20, 2016, which were intercepted pursuant to the Order of the United States District Court, dated July 21, 2016, authorizing the interception of wire communications occurring to and from the cellular telephone currently assigned call number **(443) 709-7780**, and bearing IMSI number 310260674625701, with service provided by T-Mobile US, Inc., subscribed to James Kenner at 1909 North Forest Park Avenue, Baltimore, Maryland, but in active use by Jamal LOCKLEY a/k/a "T-Roy" (**"TARGET TELEPHONE 3"**).

2.     Directing that custody of the aforementioned disc be held in a place designated by the Court for a period of ten (10) years from the date of this Order in a manner so as to prevent editing, alteration, and/or destruction; and

3.     Directing that the contents of the disc be disclosed only upon the order of this Court or any other Court of competent jurisdiction, except that disclosure may be made to other law enforcement agencies, and by law enforcement officers to the extent appropriate in the proper

1

performance of their duties, pursuant to Title 18, United States Code, Section 2517.

4.      In support of this Application, the United States of America shows as follows:

5.      On July 21, 2016, this Court authorized the interception of wire communications

occurring over **Target Telephone 3**.    This Court determined that there was probable cause to

believe that Dwight JENKINS a/k/a "Huggie" a/k/a "Unc" (the user of TARGET TELEPHONE

1); Jacob BOWLING a/k/a "Jakey" a/k/a "Ghost" (the user of TARGET TELEPHONE 2); Dante

BAILEY a/k/a "Gutta" a/k/a "Almighty"; Jamal LOCKLEY a/k/a "T-Roy" (the user of TARGET

TELEPHONE 3); Tiffany BAILEY; Randy BANKS a/k/a "Dirt"; Corloyd ANDERSON a/k/a

"Bo"; Melvin LASHLEY a/k/a "Menace"; Dontray JOHNSON a/k/a "Gambino" a/k/a "Bino"

a/k/a "Tray"; Adrian Jamal SPENCE a/k/a "AJ" a/k/a "Spittle" a/k/a "SP"; Dominick

WEDLOCK a/k/a "Rage" a/k/a "Nic"; William JONES a/k/a "Bill"; Jarmal HARRID a/k/a

"J-Rock"; Jamal SMITH a/k/a "Lil Mal"; Dominique ROZZELL a/k/a "Boozie"; Maurice

POLLOCK a/k/a "Reese"; Ayinde DELEON a/k/a "Murda"; Jay GREER a/k/a "Champagne";

Kenneth TORRY a/k/a "Kenny"; Michael STEWART; Jawaun TALLEY; Charles

BLACKWELL; Shakeen DAVIS; Takuma TATE a/k/a "Oop"; Sidney FRAISER a/k/a "Sid";

Queontaye FORTUNE; Kenyon PATTERSON a/k/a "Konan"; Chiquetta HEATH a/k/a "Bandi";

Michael SINGER a/k/a "Blizz"; Delante LEE; Eddie MCCARGO; and their known and unknown

co-conspirators, and others yet to be identified (collectively, the "Target Subjects") were

committing, and would continue to commit offenses enumerated in Section 2516 of Title 18,

United States Code, that is: (i) distribution of, and possession with intent to distribute, controlled

substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit narcotics trafficking

offenses, in violation of 21 U.S.C. § 846; (iii) use of a communication facility in the commission

of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); (iv) maintaining premises for

2

drug distribution, in violation of 21 U.S.C. § 856(a)(1); (v) firearms offenses, in violation of 18 U.S.C. § § 922, 924, and 26 U.S.C. § 5861; (vi) conspiracy to commit firearms offenses, in violation of 18 U.S.C. § 371; (vii); the laundering of proceeds of specified unlawful activity, i.e., distribution of controlled substances, in violation of 18 U.S.C. § § 1956 and 1957; and (viii) aiding and abetting such offenses, in violation of 18 U.S.C. § 2 (collectively, the "Target Offenses").

6. The accompanying disc was installed to record all communications intercepted over **Target Telephone 3** and was subsequently removed from the system.

7. Section 2518(8)(a) of Title 18 of the United States Code requires that immediately upon the expiration of the period of the Interception Order, the recordings must be made available to the judge issuing the Order, and sealed under her direction. This immediate sealing is a prerequisite for the use or disclosure of the contents of the wire and electronic communications as evidence.

WHEREFORE, pursuant to Section 2518(8)(a) of Title 18 of the United States Code, the United States respectfully requests that the Court grant this Application to seal the accompanying disc to maintain the integrity of the recordings for use as evidence in future legal proceedings.

Respectfully submitted,

__/s/_____

Jason D. Medinger
Christina Hoffman
Assistant United States Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201

3

**JA7105**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS OCCURRING TO AND FROM THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (443) 709-7780 AND BEARING IMSI NUMBER 310260674625701 ("TARGET TELEPHONE 3") | MISC. NO. 16-499<br><br>(UNDER SEAL) |

**ORDER TO SEAL RECORDING**
**OF INTERCEPTED WIRE ELECTRONIC COMMUNICATIONS**

The Application of the United States of America for an order sealing recordings of intercepted wire communications having been read and considered, it is hereby ORDERED:

1.     That the accompanying disc: one (1) magnetic optical disc installed for the purpose of recording communications intercepted between July 21, 2016 and August 20, 2016, which were intercepted pursuant to the Order of the United States District Court, dated July 21, 2016, authorizing the interception of wire communications occurring to and from the cellular telephone currently assigned call number **(443) 709-7780**, and bearing IMSI number 310260674625701, with service provided by T-Mobile US, Inc., subscribed to James Kenner at 1909 North Forest Park Avenue, Baltimore, Maryland, but in active use by Jamal LOCKLEY a/k/a "T-Roy" ("**TARGET TELEPHONE 3**") is hereby SEALED;

2.     That the aforementioned disc be held in the custody of the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), United States Department of Justice for a period of ten (10) years from the date of this Order in a manner so as to prevent editing, alteration, and/or destruction; and

3.     That the contents of the said disc be disclosed only upon the order of this Court or any other Court of competent jurisdiction, except that disclosure may be made to other law

4

**JA7106**

enforcement agencies, and by law enforcement officers to the extent appropriate in the proper performance of their duties, pursuant to Title 18, United States Code, Section 2517.

SO ORDERED this 23rd day of August, 2016.

The Honorable Ellen L. Hollander
United States District Judge

JA7107