IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

Nos. 19-4620(L), 19-4826, 20-4193, 20-4250, 20-4266

————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

RANDY BANKS, et al.,

*Appellants*.

————————

Appeal from the United States District Court
for the District of Maryland, at Baltimore
*The Honorable Catherine C. Blake, Senior District Judge*

————————

BRIEF OF THE UNITED STATES

————————

Erek L. Barron
United States Attorney

Jefferson M. Gray
Brandon K. Moore
Assistant United States Attorneys

36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4800

November 13, 2023                    *Attorneys for the United States*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... v

JURISDICTIONAL STATEMENT ................................................1

ISSUES PRESENTED ....................................................................1

STATEMENT OF THE CASE .........................................................3

    A.    MMP's History And Structure ...................................................4

    B.    MMP Members' Violent Crimes ...............................................9

        1.    The October 15, 2012, Attempted Murder Of Samartine "Nooks" Hill ...................................................... 9

        2.    The November 22, 2012, Murder Of Antoine "Poopy" Ellis ..................................................... 10

        3.    The February 8, 2015, Attempted Murder At The BP Station Committed By Dante Bailey................................. 10

        4.    The February 12, 2015, Murder Of MMP Member James "Bangout" Edwards ........................................................11

        5.    The May 30, 2015, Attempted Murder At The BP Station Involving Shakeen "Creams" Davis ..................................12

        6.    The September 2015 Murder Of Brian "Nutty B" Johnson ..........................................................................13

        7.    The April 28, 2016, Murder Of Maurice "Mookie" Braham And The Subsequent Murder Of Anthony Hornes...........14

        8.    The August 10, 2016, Murder of Ricardo "Uncle Ric" Johnson ..........................................................................15

        9.    Bailey's Plots To Kill "Trouble" Banks And Jay Greer In August And September 2016...........................................16

SUMMARY OF ARGUMENT ........................................................17

ARGUMENT.............................................................................17

I.  THE DISTRICT COURT PROPERLY DENIED APPELLANTS'
    MOTIONS FOR A NEW TRIAL........................................17

    A.  Standard of Review.................................................17

    B.  Factual And Procedural Background .......................17

    C.  A New Trial Is Unwarranted....................................21

    D.  The Government Complied With *Brady* And *Giglio* ...............25

    E.  Even If A New Trial Were Granted, Appellants Could Not
        Prevail On A Claim Based On *Franks*.....................26

II. THE DISTRICT COURT PROPERLY ADMITTED SOCIAL-MEDIA
    AND MUSIC-VIDEO EVIDENCE.....................................27

    A.  Standard of Review.................................................27

    B.  Appellants' Argument Fails Under Plain Error Review...........28

    C.  The District Court Properly Admitted The Challenged
        Evidence ...............................................................29

III. THE DISTRICT COURT PROPERLY DENIED BAILEY'S MOTION
     TO ENFORCE A PURPORTED PLEA AGREEMENT .......................33

    A.  Standard of Review.................................................33

    B.  There Was No Meeting Of The Minds As To Any Potential Plea
        Agreement ..............................................................33

    D.  Bailey's Ineffective Assistance Of Counsel Claim Is
        Without Merit ..........................................................35

ii

IV.   BALLISTICS TESTIMONY WAS PROPERLY ADMITTED ............... 36

   A.   Standard of Review ................................................... 36

   B.   Factual Background ................................................. 36

   C.   Examiner Wagster's Ballistics Testimony Complied With The
        Court's Ruling ......................................................... 37

V.    THE EVIDENCE WAS SUFFICIENT TO SUPPORT DAVIS'S
      CONVICTIONS ................................................................ 38

   A.   Standard of Review ................................................... 38

   B.   Substantial Evidence Supported The Jury's Verdicts ............... 39

VI.   THE EVIDENCE WAS SUFFICIENT TO SUPPORT ANDERSON'S
      CONVICTIONS ................................................................ 40

   A.   Standard of Review ................................................... 40

   B.   Substantial Evidence Supported the Jury's Verdicts ............... 40

VII.  THE PROSECUTORS DID NOT ENGAGE IN MISCONDUCT .......... 41

   A.   Standard of Review ................................................... 41

   B.   Facts .................................................................... 41

VIII. DAVIS'S FELON-IN-POSSESSION CONVICTIONS SHOULD BE
      AFFIRMED BECAUSE DAVIS CANNOT SHOW THAT ANY *REHAIF*
      ERROR AFFECTED HIS SUBSTANTIAL RIGHTS ........................... 43

   A.   Standard of Review ................................................... 43

   B.   Davis Cannot Show A Reasonable Probability That The
        Outcome Would Have Been Different Had The Jury Been
        Properly Instructed .................................................. 43

IX.   ANY SPILLOVER EFFECTS WOULD HAVE BEEN HARMLESS

BEYOND A REASONABLE DOUBT ................................................. 47

X.   THE COURT SHOULD AFFIRM BANK'S NARCOTICS CONSPIRACY CONVICTION ........................................... 49

    A.   Standard of Review ................................................ 49

    B.   The Jury Instructions And Verdict Form Were Proper ........... 50

    C.   Bank's Argument Regarding The Sentencing Guidelines Is Unavailing ....................................................... 52

XI.   THE DISTRICT COURT PROPERLY REJECTED A "MULTIPLE CONSPIRACIES" INSTRUCTION .................................... 54

    A.   Standard of Review ................................................ 54

    B.   Defendants Were Not Entitled To A Multiple Conspriacies Instruction ....................................................... 54

    C.   Defendants Cannot Show Prejudice ........................... 55

XII.   APPELLANTS' SENTENCES ARE PROPER ...................... 56

    A.   Standard of Review ................................................ 56

    B.   Bank's Sentence Is Proper ....................................... 56

    C.   Davis's Sentence Is Proper ....................................... 57

    D.   Lockley's Sentence Is Proper .................................... 60

    E.   Anderson's Sentence Is Proper ................................. 62

CONCLUSION ............................................................. 63

# TABLE OF AUTHORITIES

## CASES

*Alleyne v. United States*, 570 U.S. (2013) .................................................. 51

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ......................................... 51

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................... 25

*Delatorre v. United States*, 847 F.3d 837 (7th Cir. 2017) ......................... 36

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ................................. 46

*Franks v. Delaware*, 438 U.S. 154 (1978)................................................ 26

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................... 19, 25

*Glasser v. United States*, 315 U.S. 60 (1942) .......................................... 39

*Greer v. United States*, 141 S. Ct. 2090 (2021) .................................. 43, 44

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................ 39

*Rehaif v. United States*, 139 S. Ct. 2191 (2019) ...................... 43, 44, 45, 47

*Strickler v. Greene*, 527 U.S. 263–81 (1999) ............................................ 25

*United States v. Banks*, 29 F.4th 168 (4th Cir. 2022) ............................... 28

*United States v. Barefoot*, 754 F.3d 226 (4th Cir. 2014) ..................... 46, 47

*United States v. Barronette*, 46 F.4th 177 (4th Cir. 2022) ................. 44, 45

*United States v. Bartko*, 728 F.3d 327 (4th Cir. 2013) ................. 26, 54, 56

*United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010) ........................... 29

*United States v. Bell*, 667 F.3d 431 (4th Cir. 2011) ................................. 57

*United States v. Bolton*, 858 F.3d 905 (4th Cir. 2017) ............................. 62

*United States v. Chavis*, 880 F.2d 788 (4th Cir. 1989) ....................... 17, 21

*United States v. Colkley*, 899 F.2d 297 (4th Cir. 1990) ........................... 25

*United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013) ....................... 22, 23

*United States v. Fowler*, 58 F.4th 142 (4th Cir. 2023) ............................. 56

*United States v. Freeman*, 24 F.4th 320 (4th Cir. 2022) (en banc) .... 33, 35

*United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011) .......................... 31

*United States v. Grubbs*, 585 F.3d 793–803 (4th Cir. 2009) .............. 53, 61

*United States v. Harvey*, 791 F.2d 294 (4th Cir. 1986) ............................ 33

*United Souates v. Hassouneh*, 199 F.3d 175 (4th Cir. 2000) ...................... 36

*United States v. Howard*, 773 F.3d 519 (4th Cir. 2014) ...................... 59, 60

*United States v. Jones*, 942 F.3d 634 (4th Cir. 2019) ............................... 26

*United States v. Keita*, 742 F.3d 184 (4th Cir. 2014) ................................ 28

*United States v. Moore*, 639 F.3d 443 (8th Cir. 2011) .............................. 31

*United States v. Moore*, 709 F.3d 287 (4th Cir. 2013) .............................. 17

*United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015) .......................... 29, 31

*United States v. Recio*, 884 F.3d 230 (4th Cir. 2018) .................. 27, 29, 32

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010) ................... 22, 24

*United States v. Smith*, 441 F.3d 254 (4th Cir. 2006) .............................. 27

*United States v. Tate*, 524 F.3d 449 (4th Cir. 2008) ............................... 26

*United States v. Watts*, 519 U.S. 148 (1997) ................................... 53, 57, 61

*United States v. Wood*, 378 F.3d 342 (4th Cir. 2004) ............................. 33

## STATUTES

18 U.S.C. § 922 ................................................. 24, 40, 44, 47, 48

21 U.S.C. § 841 ............................................................. 50,

21 U.S.C. § 846 ......................................................... 36, 50

## RULES

Fed. R. Evid. 404 ........................................................ 29, 32

Fed. R. Evid. 702 ............................................................ 38

## OTHER AUTHORITIES

Md. Code Ann., Crim. Law § 4-203 ........................................................... 44

## JURISDICTIONAL STATEMENT

Appellants were members of a murderous Baltimore gang that called itself "Murdaland Mafia Piru" ("MMP"). A jury found appellants guilty of numerous charges, including racketeering, drug trafficking, and various firearm offense. *Id.* The district court had jurisdiction over these cases pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## ISSUES PRESENTED

1. Whether the district court properly denied appellants' motions for a new trial based on new evidence concerning an investigating officer's prior criminal conduct, where the conduct was unrelated to the investigation, the officer's statements in affidavits were independently verified, and the officer did not testify at trial.

2. Whether the district court properly admitted social-media and music-video evidence.

3. Whether the district court properly denied Bailey's motion to enforce an alleged plea agreement because there was no meeting of the minds on material terms.

1

4.     Whether the district court properly exercised its discretion in admitting expert testimony on toolmark- and firearm-identification evidence.

5.     Whether sufficient evidence supported the jury's verdict that Davis was a part of the racketeering enterprise.

6.     Whether sufficient evidence supported the jury's verdict that Anderson was a part of the racketeering enterprise.

7.     Whether the district court properly rejected defendants' claims about alleged misstatements during closing argument.

8.     Whether Davis's *Rehaif* claim fails.

9.     Whether Davis and Anderson's "spillover" arguments are not well-taken, and whether the inclusion of any such evidence was harmless.

10.    Whether the district court properly exercised its discretion in instructing the jury and providing a verdict form as to Banks' drug trafficking.

11.    Whether the district court properly exercised its discretion in denying defendants' request for a multiple-conspiracy jury instruction.

12.    Whether the district court's sentencings of Banks, Davis, Lockley, and Anderson were proper.

## STATEMENT OF THE CASE

Appellants Randy Banks, Dante Bailey, Jamal Lockley, Corloyd Anderson, and Shakeen Davis were members or associates of Murdaland Mafia Piru (MMP), a Baltimore-based violent subset of the Bloods gang. JA2601, JA2607. Between 2011 and September 2016, MMP members trafficked massive quantities of narcotics (including cocaine, crack cocaine, heroin, fentanyl, and opioids). JA2621–25. And they engaged in a series of violent acts to secure MMP's control of drug territories; to compel respect for the gang; to punish potential defectors or informants; and simply to settle personal scores.

During a six-week trial in March and April 2019, the prosecution presented evidence demonstrating that the appellants and their various co-conspirators were responsible for at least five murders; six attempted murders (three of which resulted in life-threatening bodily injury); various assaults and robberies; and a high-volume street-level drug trafficking. This evidence took many forms and was derived from a comprehensive range of sources, including the following:

- Sixty witnesses, including former MMP members, rivals and victims, drug customers, and homicide detectives;

- Wiretaps obtained by the Department of Homeland Security (DHS) and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF);

- Twenty-six controlled purchases of narcotics and firearms by undercover law enforcement agents and confidential informants;

- Search warrants executed on 22 residences and vehicles, 86 cell phones, and 27 individual social media accounts;

- Cell site location information for over a dozen cell phones;

- Hundreds of recorded jail visits and telephone calls; and

- Surveillance film obtained from street cameras.

### A.    MMP's History And Structure

MMP was descended from the California-based Tree Top Piru subset of the Bloods gang.  JA2592–93.  In the late 2000s, the gang that came to be known as MMP began to coalesce at various facilities within the federal penal system.  JA7597, ¶41.

**Dante Bailey** – Bailey was MMP's undisputed leader.  Bailey was released from federal prison in January 2011 after serving an 86-month sentence on a federal firearm charge.  JA7973.  While still in prison, Bailey had already identified himself with the developing new organization that became known as MMP.  Bailey was fond of saying that he had a team for money (including appellants Corloyd "Bo" Anderson and Randy "Dirt" Banks) and a team for murder (including William "Trouble" Banks, Dontray "Gambino" Johnson, and Lamar "M-Easy" Stephens).  JA7959, ¶52.

4

MMP was organized hierarchically. Bailey was at the top, various underbosses or lieutenants were below him, and soldiers were below them. JA2601–02; JA7960, ¶55; JA2601. Prospective members of MMP underwent an initiation ritual and recited an oath of loyalty. JA2596. MMP members enhanced their status within the gang by carrying out acts of violence against rivals. JA2612–13.

MMP members and associates conducted street-level drug distribution in Baltimore City. MMP's primary drug markets were located at a BP gas station with an adjoining convenience store and a barbershop in the 5200 block of Windsor Mill Road (which functioned as MMP's headquarters), JA2661–63, and at the intersection of Gwynn Oak Avenue and Liberty Heights Avenue. JA2619–20.

MMP members were supposed to pay gang dues consisting of a portion of their drug sales. JA2608–09. Non-members who wished to sell drugs in MMP's territories were required to pay what was essentially a tax on their earnings, JA2641–42, although an exemption was granted to those—known as "5200 boys"—who had grown up in the housing project located at 5200 Windsor Mill Road. JA2614–15, 2620. Outsiders who refused or failed to do so were targeted for violence. JA2642.

**Randy Banks –** Randy "Dirt" Banks[1] was MMP's boss in the lucrative Gwynn Oaks and Liberty Heights neighborhoods. JA2603. He was largely responsible for MMP's supplies of cocaine and crack cocaine, JA2623, and was accordingly associated with multiple "trap" houses where drugs were prepared for sale. JA2603, 2632–38; GXs IC-53, MISC-9. He was identified as MMP's "Boss of Finance." JA8004.

**Corloyd "Bo" Anderson –** Anderson was the boss of MMP's Windsor Mill and Forest Park territory, its most lucrative market. JA2604. Along with Bailey, he was largely responsible for ensuring the gang's supply of heroin. JA2623. In 2012, he maintained a stash house near Rogers Avenue where he kept crack and stored guns. JA2631. Like "Dirt" Banks, he took operational security seriously. JA7923. Anderson was identified as having supplied (and helping dispose of) the gun that Dontray "Gambino" Johnson used to kill Antoine "Poopy" Ellis. JA7923. When investigators executed a search warrant at his house during the mass takedown on September 27, 2016, they found a loaded Glock pistol underneath his mattress that he admitted was his. JA7924.

---

[1] Not to be confused with "Trouble" Banks, a non-relative who was a government co-operating witness at trial.

6

**Jamal "T-Roy" Lockley** – Lockley was a "5200 boy" who sold heroin and cocaine. JA2644. He was allowed to do so even without being a "made" member of MMP because he and Bailey were close. JA2643–47.

**Shakeen Davis** – Shakeen "Creams" or "Creams Dinero" Davis was deeply invested in the gang's ideology and flaunted his membership on social media posts. JA7895–96. He served the gang as both a drug dealer and a shooter. Evidence presented by the prosecution at trial established at least five occasions between September 2012 and February 2017 when Davis was in possession of firearms, including at least two different AR-15s. JA2743–45. On one of these occasions, Davis used one of his AR-15s to spray a car containing two individuals whom he understood had robber another MMP member, even though it was the middle of the day on a well-trafficked street. JA2744–46.

Several MMP members or associates testified as government co-operating witnesses at trial. These included William "Trouble" Banks; Jay Greer; and Malcolm Lashley. "Trouble" Banks[2] was charged along with the appellants and 19 others in the second superseding indictment and pled

---

[2] Hereinafter referred to as "Trouble" to avoid confusion with Appellant Randy Banks.

guilty to the RICO conspiracy charge (Count 1) and further admitted to participating in two attempted murders. JA2590–91.

While this appeal involves five members or associates of MMP, the first superseding indictment charged 19 other individuals in addition to the six (the present five appellants plus Sydni Frazier[3]) who originally went to trial in this case in March 2019. All of the remaining defendants subsequently pled guilty and most of them received sentences of between 10- and 30-years' incarceration. JA1–41.

MMP is believed to have been responsible for dozens of murders and shootings in and around Baltimore between 2011 and 2017. At trial, the prosecution focused on a smaller universe of five murders, six attempted murders, and several additional conspiracies to commit murder that involved members of the gang. The next section discusses those violent crimes for which the appellants were convicted at trial.

---

[3] Frazier was severed from the original trial after his counsel developed health issues, and his appeal is proceeding independently as Appeal No. 22-4368.

### B.    MMP Members' Violent Crimes

### 1.    The October 15, 2012, Attempted Murder Of Samartine "Nooks" Hill

In October 2012, Bailey issued a hit order against suspected informer Samartine "Nooks" Hill, a non-MMP member.  While the hit order was pending, Bailey and seven other MMP members and associates went out to a Baltimore nightclub on the evening of October 15, 2012.  When they arrived, the MMP group found that Hill was part of a substantial crowd that was seeking admittance to the club.  "Trouble" Banks testified at trial that Bailey directed him to kill Hill.  JA2674–75.  "Trouble" and "Bangout" Edwards retrieved a .45 handgun from Bailey's car.  "Trouble" testified that he waited a moment, watching Hill, and then "started shootin' him."   JA2676.  "Trouble" believed Hill was dead, JA2676, but remarkably, Hill survived.  "Trouble" and Edwards later met up with Bailey and the other gang members who had been present at another restaurant downtown, where Bailey congratulated "Trouble" and paid him $300.  JA2677.

Surveillance footage recorded the scene.  The resulting film footage was admitted at trial as GX SF-1, with individual screen shots admitted as GXs SF-1(A)–(H).  These corroborated "Trouble's" account of what had occurred.  JA2678–82.

9

### 2. The November 22, 2012, Murder Of Antoine "Poopy" Ellis

"Trouble" further testified at trial about the November 22, 2012, murder of MMP member Antonine "Poopy" Ellis, which took place shortly after the Hill shooting. Bailey considered Ellis disloyal and ordered "Trouble" to kill Ellis. Before "Trouble" had the opportunity to act on Bailey's instruction, Dontray "Gambino" Johnson encountered Ellis at the BP gas station. Johnson shot and killed Ellis with a 9mm Ruger he had obtained from Corloyd "Bo" Anderson. JA2684–88. Surveillance camera footage corroborated "Trouble's" testimony about the Ellis homicide.

Contemporaneous social media posts to Johnson's Facebook profile "gambinommp" provided additional evidence. That same day, Johnson posted a comment to his Facebook account reading "198 n risn"—a reference to that year's murder tally in Baltimore City, which he increased by one. JA7954. Johnson admitted to murdering Ellis as part of his guilty plea. D. Md. 16-267, Dkt. No. 897.

### 3. The February 8, 2015, Attempted Murder At The BP Station Committed By Dante Bailey

On the night of February 8, 2015, "Trouble" Banks was sitting in his car with Bailey at the BP gas station. MMP member Dominick "Nick" Wedlock got into an argument with three men who were pumping gas into their car.

Wedlock came over to Bailey's car and asked him for a gun. Bailey responded, "No. I'll do it." JA2723. Bailey jumped out of his car "and started shooting," using a .40 caliber firearm. JA2723. The three men scattered; remarkably, all escaped injury. JA2723–27. Once again, "Trouble's" account of this episode was corroborated by film footage from nearby surveillance cameras. GX SF-4 & GX MAP-22.

### 4. The February 12, 2015, Murder Of MMP Member James "Bangout" Edwards

Days later, on the night of February 11–12, 2015, Bailey murdered fellow MMP member James "Bangout" Edwards. Bailey employed the same .40 caliber firearm he had used in the gas station shooting barely 72 hours earlier to shoot Edwards repeatedly.

Multiple witnesses testified about the murder. "Trouble" and Jay Greer testified that Bailey killed "Bangout" because "Bangout" was showing disloyalty to MMP. JA2739–41, JA3466–69. Greer provided details about the way "Bangout" was killed that were corroborated by crime scene photographs and by the medical examiner. JA5789–90. A third witness, Derran Hankins, testified about the brewing hostility and mistrust between Bailey and "Bangout" leading up to the murder. JA3945–46.

A firearms comparison expert determined that the casings and projectiles from the murder scene were fired from the same gun as the

11

casings and projectiles discharged during the shooting at the BP station just three days earlier.  JA3883–93.

### 5. The May 30, 2015, Attempted Murder At The BP Station Involving Shakeen "Creams" Davis

On May 30, 2015, Davis attempted to murder D.G. and D.J., firing at least nine rounds at them with an assault rifle as they sat in their car next to the BP gas station.  Witness Malcolm Lashley testified that he was across the street and witnessed Davis hanging out the passenger window of his car firing a machine gun at the victims.  Lashley explained that Davis was retaliating against the victims because they had pulled a gun on a fellow MMP member, Brian "Nutty B" Johnson earlier that day.  "Trouble" also testified about the shooting at trial.  "Trouble" had a conversation with Davis and another co-conspirator shortly after the incident.  With Davis present, the co-conspirator explained to "Trouble" that Davis had just shot some guys who had tried to rob "Nutty B."  JA2744–46.  "Trouble" also testified that Davis changed the color of his car—an Infiniti—shortly after the shooting.  JA2744–46.  Finally, the government introduced jail calls and evidence from Davis's April 26, 2016 arrest indicating that he was commonly in possession of assault rifles.  JA7895-96.

12

### 6. The September 2015 Murder Of Brian "Nutty B" Johnson

On July 3, 2015, the Baltimore County Police Department executed a search warrant at Bailey's residence that resulted in the recovery of two loaded handguns, MMP paperwork describing the gang's history and precepts, and a money counter and drug packaging material. Bailey was also arrested, and he spent several months continuing to direct MMP's operations from the Baltimore County Detention Center.

Once he was incarcerated and needed money to pay for legal counsel and bail, Bailey strictly insisted on payment of gang dues. Things boiled over on September 29, 2015, when Dontray "Gambino" Johnson murdered fellow MMP member "Nutty B" because "Nutty B" refused to pay gang dues being collected for Bailey. Surveillance camera footage that showed "Gambino" and other MMP members and associates confront and shoot the victim outside the convenience store. A few hours after the murder, "Gambino" visited the incarcerated Bailey and used coded language to recount what had happened in a conversation that was recorded. Bailey approved the murder, telling Johnson to keep enforcing the dues system. Later, when "Trouble" spoke to Bailey about Nutty B's murder, Bailey coolly described it as a simple matter of business. JA2758. Finally, Johnson admitted to murdering Nutty B as part of his guilty plea. D. Md. 16-267, Dkt. No. 897.

13

### 7. The April 28, 2016, Murder Of Maurice "Mookie" Braham And The Subsequent Murder Of Anthony Hornes

On April 26, 2016, shortly after Bailey was released on bail, a drug dealer belonging to another gang was murdered. Two days later, on April 28, his gang struck back by killing MMP member Maurice "Mookie" Braham. On learning of Braham's murder, Bailey, "Trouble," and Lockley set out in a car for Howard Park, near the other gang's territory, where they saw a pedestrian walking on the street. "Trouble" testified that Bailey instructed Lockley to stop. Bailey then jumped out of the car and shot the pedestrian. Bailey returned to the car and the three men drove away without speaking. JA2769–72. The victim was 34-year-old Anthony Hornes, a civilian with no known connection to Braham's murder. When subsequent newspaper reports made it apparent that Hornes had nothing to do with Braham's murder, MMP members redoubled their efforts to determine who did. They identified another potential suspect with the street name "Ro Ro," who was a close friend of an MMP member named "Eastside." When "Eastside" would not divulge where "Ro Ro" could be found, his gang brothers killed him. JA2774–75.

### 8. The August 10, 2016, Murder Of Ricardo "Uncle Ric" Johnson

While he remained out on bail, Bailey also ordered the murder of Ricardo "Uncle Ric" Johnson, a local, non-MMP heroin dealer and suspected "rat." JA2776–77. Johnson was abducted outside his residence on August 10. JA7959. Johnson's body was discovered several hours later in a stolen van parked beside railroad tracks in Baltimore. Johnson's wrists and ankles had been bound, and he had been shot over twenty times in the head, neck, torso, and buttocks. There was partially burned flammable material stuffed in the gas tank fill spout, suggesting that the killers had tried to set the van on fire. Numerous 9mm caliber casings and projectiles were recovered. JA2776–77.

Late that same afternoon, Baltimore police officers attempted to arrest Sydni Frazier for an unrelated offense. Frazier was able to escape, but he discarded a backpack and the gloves he had been wearing. JA7959. Frazier's abandoned backpack contained a jacket, two cell phones, and two loaded 9mm caliber handguns. Both guns were a ballistic match to the casings recovered earlier that morning from the Johnson murder scene. In addition, DNA testing determined that DNA found on the jacket in the backpack matched a sample in a database associated with Frazier. DNA testing further determined that Frazier's DNA profile matched DNA from the jacket and

15

from the insides of the gloves recovered next to the backpack.  DNA from the outsides of the gloves matched that of Ricardo Johnson.  JA7959.

### 9. Bailey's Plots To Kill "Trouble" Banks And Jay Greer In August And September 2016

Bailey was returned to federal custody following his arrest on the initial indictment in this case.  By mid-August, Bailey had come to suspect that his long-time trusted lieutenant "Trouble" Banks was co-operating with the federal investigators.  Accordingly, on August 19, 2016, Bailey directed that "Trouble" be murdered.  Before the plan could be carried out, "Trouble" was taken into federal custody.

Bailey's final attempt to kill a potential cooperator came three days after the First Superseding Indictment was handed down on September 26, 2016.  Suspecting that Jay "Champagne" Greer was co-operating with the investigators, Bailey prepared a series of letters to a female fellow inmate. The letters instructed her to pass a message to a hitman:  "Tell him to tell Crazy to pop a bottle of Champagne for me."  JA7959.  Bailey's letters were seized by jail officials before others could act on them.

 This case proceeded to trial in April 2019.  After hearing testimony from more than 50 witnesses and after the government introduced more

than 1,000 exhibits, the jury convicted the defendants on numerous counts. JA6354–69.  This consolidated appeal followed.[4]

## SUMMARY OF ARGUMENT

Defendants raise fifteen arguments on appeal.  Those various arguments fail, and this Court should affirm.

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY DENIED APPELLANTS' MOTIONS FOR A NEW TRIAL

### A. Standard of Review

A motion for a new trial should be granted if: (1) evidence is newly discovered; (2) the movant exercised due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence would likely result in acquittal. *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989).  This Court reviews the denial of a motion for a new trial for abuse of discretion.  *United States v. Moore*, 709 F.3d 287, 292 (4th Cir. 2013).

### B. Factual and Procedural Background

Ivo Louvado was a Baltimore police officer who was detailed to a federal narcotics task force with the ATF in 2010.  "The investigation of MMP

---

[4] Additional facts relative to the specific arguments on appeal are set forth below.

was years in the making, and it was conducted by over a hundred federal, state and local law enforcement officers even before Louvado's and the ATF's involvement." *United States v. Bailey*, 2022 WL 1451653, at *1 (D. Md. May 9, 2022); JA7642. The ATF (and Louvado) became involved only in March 2016, just six months prior to the return of the First Superseding Indictment. JA7706.

During his work on the investigation, Louvado did only two things alone: (1) during an audio/video recorded controlled purchase in July 2016, he was the sole person who checked the confidential informant in advance to ensure that the informant did not have contraband; and (2) Louvado observed and recorded Lockley leave his home and business in Bel Air, Maryland in August 2016. JA7707.

In addition, Louvado authored affidavits or portions of affidavits certain Title III interceptions and search warrants. Specifically:

(1) Louvado authored a June 2016 Title III affidavit for Dwight Jenkins ("TT1") and Jacob Bowling ("TT2"). JA7708. The probable cause was based on four controlled buys which were audio and video recorded and text messages with confidential informants. JA7708.

(2) Another ATF investigator incorporated Louvado's Title III affidavit by reference to obtain Title III authorization for an intercept of a phone line used by appellant Lockley ("TT3") in July 2016. JA7708–09.

(3) In September 2016, Louvado applied for a warrant to search several residences and vehicles in connection with the mass takedown in

18

connection with the return of the First Superseding Indictment. JA7710–7711. The probable cause was based on intercepted calls, a recorded controlled buy (during which Louvado was accompanied at all times), and information provided by a confidential informant. JA7710–7711.

(4) In February 2017, four months after the first superseding indictment was returned, Louvado was the affiant for a warrant to search Shakeen Davis's cellphones. JA7712. The probable cause was based on the circumstances of Davis's arrest, in which Louvado was not involved. JA7712.

(5) That same month, Louvado sought a warrant to search Davis's Instagram accounts. JA7712. The probable cause was based on Davis's arrest and his public Instagram posts. JA7712.

Of the government's 748 trial exhibits, only 22 were derived from the warrants discussed above and appellants have standing to challenge only 12. JA7719–20. Louvado was not called to testify either at appellants' pretrial motions hearings or at appellants' trial. JA7737.

In April 2019, while the trial in this case was underway, federal investigators discovered evidence of Louvado's involvement in the theft and sale of the seized cocaine back in February 2009. Because of Louvado's involvement in the MMP investigation, investigators notified the U.S. Attorney's Office of Louvado's misconduct. The Office's ethics attorneys advised trial counsel that they had no *Giglio* obligation to disclose this evidence to defense counsel because (1) Louvado was not a trial witness and (2) the information in Louvado affidavits was independently verifiable. In

addition, investigations were still ongoing at that time, and potential covert steps remained to be taken.

In January 2020, eight months after this trial ended, Louvado was identified as a criminal target. Louvado subsequently agreed to enter a guilty plea on a false-statements charge.

Upon learning of Louvado's guilty plea, appellants moved to hold the proceedings below in abeyance and moved for a new trial. JA6886. Judge Blake—the district judge who presided over appellants' trial—denied the motion in a carefully reasoned opinion. JA7633, 7642–63; 2022 WL 1451653. The district court stressed Louvado's belated and limited involvement in the MMP investigation. 2022 WL 1451653 at *2. The district court then noted that the new evidence regarding Louvado did not support some alternative theory of the crimes charged or provide a legal justification for the defendants' actions. *Id.* at 7. It further emphasized that Louvado's misconduct "is not directly relevant to the purpose of his initial affidavit, in which he vouched for the credibility of key informants." *Id.*

With regard to the materiality of the omitted information about Louvado's past conduct, the district court found that "the Louvado evidence was not material to this case." *Id.* at *8. The court stressed that Louvado "did not engage in misconduct related to the defendant's trial," that the

20

"substance of his affidavit remains unchallenged," and that "[h]e was accompanied by other officers at all times during controlled buys and search warrant executions. *Id*. at *9.

The district court further found that "given the tenuous connection between the misconduct and the case and given the tremendous corroboration available from confidential informants, other investigators, and trial witnesses," *id*. at *9, knowledge of Louvado's misconduct would not likely result in acquittal at a new trial. *Id*. at 10.

## C.   A New Trial Is Unwarranted

The district court correctly applied the *Chavis* test. Appellants' argument sidesteps the central question: Does the new evidence of Louvado's misconduct in an unrelated case in 2009 weigh heavily against the verdicts returned by the jury? It does not.

Louvado never testified at trial and none of the trial evidence rested upon observations Louvado made or actions he took that were incapable of independent corroboration. And at no point do appellants identify so much as one piece of evidence or testimony presented at trial that they maintain is now shown to be unreliable.[5]

---

[5] Appellants assert that Louvado "was the officer who 'discovered' the drugs at Bailey's residence" during the search on May 17, 2016. App.Br. 29 n.3. But the record pages consist merely of a search warrant and affidavit sworn out

Nor do the cases cited by the appellants support their claim that some "taint" arising from Louvado's past conducts is a sufficient basis for discarding all evidence obtained as a result of any search warrants or wiretap orders with which he was associated. *United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) is instructive here. There, officers were found to have engaged in misconduct unrelated to the federal investigation at issue. *Id.* at 946–48. Like Louvado, the officers in question were paired with federal investigators who did not engage misconduct, and their investigative steps were recorded on audio and video recorded. This Court concluded that the officers' unrelated misconduct may "cast doubt" on their testimony but it did not warrant a new trial because it "does not directly support some alternate theory of the crimes, nor does it provide any legal justification for [the defendant's] actions." *Id.* So too here.

Appellants' reliance on *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), is misplaced. They argue that, had Louvado included his misconduct in the affidavits, no judge would proceed past the affiant background to analyze the underlying probable cause. In *Fisher*, an affiant who had committed fraud and theft lied in the *sole* sworn affidavit underpinning a

---

by another agent, JA924–51, and an evidence control sheet showing that Louvado submitted cocaine to evidence control but not necessarily that he discovered the material, JA6344–46.

search warrant for the defendant's residence and vehicle. *Id.* at 462. In contrast to the circumstances here, *Fisher* dealt with police misconduct that went "to the heart of the prosecution's case" and formed the sole basis for acquiring the incriminating evidence against the defendant. *Id.* at 466. And here, unlike in *Fisher*, Louvado's wrongdoing involved conduct unrelated to the present case. As the district court pointed out below, the "*Fisher* court did not make much of the officer-affiant's theft not being noted in the affidavit; instead, the untruthful statements in question concerned the informants and information *central to the probable cause determination in Fisher's case specifically*." *Id.* at 7.

The district court also correctly found that the evidence derived from searches based upon Louvado's supporting affidavits was cumulative. As to Bailey and Banks, none of the 22 Louvado-derived exhibits implicated them. Neither Bailey nor Banks were intercepted over any TT1 or TT2 calls, and the other cellphone records, social media evidence, and physical evidence did not pertain them. As for Lockley, he was intercepted on just five calls on TT1 and TT2, and his cellphone was recovered during the search of his residence. JA7752. Lockley was intercepted on dozens of calls over other lines, including TT3, discussing drug distribution with other MMP members and talking very explicitly about drug sales with customers. JA7752, JA7860.

23

Moreover, drug customers testified about purchasing heroin from Lockley and his drug hitters. JA7752.

The only Louvado-derived evidence that implicated Anderson at trial was a handgun recovered from his residence in September 2016. JA7752. This gun was the basis of a § 922(g) firearms chare that the government later dismissed. JA7752.

As for Davis, the only Louvado-derived evidence implicating him at trial consisted of a handful of posts from his Instagram account and the excerpts from his cellphone seized on February 24, 2017 (consisting of texts with drug customers). JA7753. They were cumulative with other evidence proving the same points, including photographs of Davis holding a gun or making MMP gang signs, Davis's text messages seized from other people's phones, and the testimony of multiple cooperating witnesses that Davis dealt heroin and crack cocaine in MMP's territories. JA7753–54.

Finally, the district court correctly found that Louvado's past misconduct was immaterial. As in *Robinson,* the Louvado-derived evidence was of limited significance. And because Louvado did not testify, he could not have been impeached.

### D.    The Government Complied With *Brady* And *Giglio*

The district court also appropriately exercised its discretion when declining to grant a new trial based on *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

To establish a *Brady*/*Giglio* violation, the defendant must show that the undisclosed evidence was: (1) "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "suppressed by the State, either willfully or inadvertently," and (3) material to the defense, such that prejudice resulted from its suppression. *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999).

First, appellants have cited no case extending *Brady* to a search warrant affiant who did not testify at trial.  Indeed, this Court has cautioned against expanding *Brady* to warrant affidavits and warrant application proceedings.  *See United States v. Colkley*¸ 899 F.2d 297, 302 (4th Cir. 1990).

Second, Louvado's misconduct is not "impeaching" under *Brady* because Louvado never testified at trial.  And it is not "exculpatory" because what Louvado did in February 2009 has no bearing on the appellants' guilt or innocence.

Finally, Louvado's past misconduct was not material at appellants' trial. Credibility evidence may be "material where the witness in question supplied the only evidence linking the defendant to the crime" or "the only evidence of an essential element of the offense." *United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013). That was not the case with Louvado.

### E. Even If A New Trial Were Granted, Appellants Could Not Prevail On A Claim Based On *Franks*

Appellants finally advance a claim arguing that, had a new trial been granted, they could have successfully suppressed much of the government's trial evidence pursuant to a *Franks* challenge. App.Br. 31–32. Appellants had no realistic chance of prevailing under *Franks*.

To trigger a *Franks* hearing, the defendant must make "a substantial preliminary showing" that (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56.

Here, the omission of Louvado's misconduct was not material, as it bore only on his credibility, not the facts of the case. *Franks* deals with omissions of potentially *exculpatory* evidence, not *impeachment* evidence against an affiant. *See, e.g.*, *United States v. Jones*, 942 F.3d 634, 641 (4th Cir. 2019); *United States v. Tate*, 524 F.3d 449, 457 (4th Cir. 2008).

26

Moreover, excluding any statements relating to Louvado's reliability would still have left sufficient facts to establish probable cause, as most of the information in his affidavits came from sources other than Louvado, and Louvado's observations were independently verifiable by other means. Accordingly, the district court appropriately exercised its discretion in denying the appellants' motion seeking a new trial.

## II. THE DISTRICT COURT PROPERLY ADMITTED SOCIAL-MEDIA AND MUSIC-VIDEO EVIDENCE

Appellants challenge the introduction of "music videos, lyrics, and social-media" evidence, apparently on the basis that this evidence is irrelevant, unduly prejudicial, or inadmissible. App.Br. at 33–34. This Court should review for plain error and affirm. Even if appellants' argument is preserved, the Court should affirm because the evidence was properly admitted.

### A. Standard of Review

The Court reviews a district court's evidentiary rulings for abuse of discretion and reverses only if any error was not harmless. *United States v. Recio*, 884 F.3d 230, 234 (4th Cir. 2018). Where defendants fail to object to the admission of evidence, this Court reviews for plain error. *United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006).

**B.    Appellants' Argument Fails Under Plain Error Review**

Appellants claim they moved below "to suppress various artwork and music videos allegedly created by or involving Defendants."  App.Br. at 33. They point to a single motion filed by just Shakeen Davis.  That motion is insufficient.  To preserve an objection, a defendant must make a "specific and timely objection at trial." *United States v. Keita*, 742 F.3d 184, 189 (4th Cir. 2014).  Davis's motion was neither.  It was made approximately sixteen months before trial and made no effort to identify purportedly objectionable evidence with specificity.  And the motion was devoid of argument—in fact, it consisted of just one substantive paragraph.

Defendants claim that "vast quantities" of evidence was improperly admitted, App.Br. at 33, but they do not identify the purportedly objectionable evidence with specificity or point to places in the trial record where they objected to evidence on the same ground that they raise on appeal.  In the absence of any citations to specific objections in the record, this Court should review for plain error.  Defendants do not attempt to address their plain error burden, so their evidentiary argument fails on that basis alone.  *See United States v. Banks*, 29 F.4th 168, 180 (4th Cir. 2022).

28

### C.     The District Court Properly Admitted The Challenged Evidence

Even if Defendants preserved their objections and the Court reviews for abuse of discretion, Defendants' evidentiary arguments nonetheless fail. The evidence at issue was relevant, not unduly prejudicial, and not barred by Rule 404(b).

First, the evidence is highly relevant. Social media posts or music videos can be relevant if, for example, they match details of the alleged crime; bear on a defendant's knowledge and motive; demonstrate loyalty among co-conspirators; or tend to show an affiliation among individuals. *Recio*, 884 F.3d at 235; *see also United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015); *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir. 2010).

The content posted by Defendants to social media were relevant because they served to identify MMP members, assert the gang's claim to drug territories, intimidate others, and enhance MMP's status. As argued at trial, gang members frequently identified with various symbols and terms, including the letter "M" and the number "5200" (a reference to the 5200 block of Windsor Mill Road where MMP was active). Much of the challenged evidence depicts MMP members using gang hand symbols or otherwise using MMP terminology or imagery.

For example, one photo featured Bailey standing beneath a "Piru Street" sign, "making an M with his hands." JA2442. The jury also saw additional social media posts featuring other defendants also making "M" signs with their hands, JA2456, or saw social media evidence depicting individuals with distinctive tattoos that also reflected their status as MMP members, JA2446. As witnesses explained, other social media comments and posts made by appellants also referenced gang terminology. JA2449; JA4014.

Appellants discuss in detail just one exhibit: a rap video that features appellants Bailey and Lockley, among others. JA6339–43. The video includes the lyrics "Piru n**** alert," a reference to MMP's name, Murdaland Mafia Piru; makes numerous references to Forest Park, Chelsea, and Windsor Mill, neighborhoods in which the gang was active; refers to "smack life" and "caine flippin," both allusions to dealing narcotics; and proclaims "M's or nothin,'" another reference to MMP. JA6339. Elsewhere in the video, Bailey identifies himself as a "5200 boy"—a reference to MMP's territory.

Far from being "vague and generic," App.Br. at 37, the video is highly probative. Bailey's statement that he is a "5200 boy" makes it more likely that he was in fact a member of MMP. And statements about "smack life"

30

and "caine flipping"—thinly coded references to dealing narcotics—make it more likely that the appellants featured in the video dealt drugs. Courts faced with similar forms of evidence have had no difficulty concluding that the evidence is highly probative. *See Pierce*, 785 F.3d at 841; *United States v. Moore*, 639 F.3d 443, 447–48 (8th Cir. 2011).

Nor is the considerable probative value of the evidence substantially outweighed by unfair prejudice. Undue prejudice exists when there is "a genuine risk that the emotions of the jury will be excited to irrational behavior and that this risk is disproportionate to the probative value of the proffered evidence." *Id.* Here, as explained, the probative value of the evidence is significant. As to undue prejudice, appellants principally rely on *United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011). That case is distinguishable. There, the Eleventh Circuit found an unfair risk of prejudice where the government introduced a rap video that contained "violence, profanity, sex, promiscuity, and misogyny," *but which did not feature the defendant himself*. *Id.* at 493. The Eleventh Circuit emphasized that there was nothing to suggest the defendant "authored the lyrics of that the views and values reflected in the video were, in fact, adopted or shared by [the defendant]." *Id.* Here, the social media and rap videos depict the appellants

31

themselves using gang terminology or otherwise referencing MMP, its gang territory, or illegal activities done by gang members.

Next, appellants appear to argue that the evidence at issue should have been excluded under Rule 404(b). App.Br. at 34. Under Rule 404(b), evidence of prior misconduct "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, the challenged evidence was evidence "of the charged crime itself," *Recio*, 884 F.3d at 237, *not* evidence of other acts from which the jury could infer appellants' character. Evidence of Defendants' status as MMP gang members or evidence of drug dealing is all probative of the crimes charged.

Finally, even if the district court erroneously admitted the evidence, such error was harmless. Over the course of several weeks, the jury heard from scores of witnesses and reviewed hundreds of exhibits, of which the challenged evidence was a small subset. Appellants fail to explain how the outcome of this case could have turned on song lyrics or music videos.

32

## III. THE DISTRICT COURT PROPERLY DENIED BAILEY'S MOTION TO ENFORCE A PURPORTED PLEA AGREEMENT

### A. Standard of Review

This Court reviews *de novo* questions involving the interpretation of a plea agreement. *United States v. Wood*, 378 F.3d 342, 348 (4th Cir. 2004). As to Bailey's ineffective-assistance-of-counsel claim, to prevail Bailey must show (1) that counsel's performance was objectively unreasonable and (2) that counsel's deficient performance was prejudicial. *See United States v. Freeman*, 24 F.4th 320, 326 (4th Cir. 2022) (en banc). When such a claim is made on direct appeal, the Court reviews de novo and "will reverse only if it *conclusively appears in the trial record* itself that the defendant was not provided effective representation." *Id*. at 326 (cleaned up) (emphasis in original).

### B. There Was No Meeting Of The Minds As To Any Potential Plea Agreement

When determining whether a plea agreement has been formed, courts draw on contract law. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986). The district court properly denied Bailey's motion to enforce a plea deal because there was no meeting of the minds as to essential elements of a deal.

33

Here, the parties remained at odds throughout the course of their negotiations as to the sentence associated with any potential plea, among other terms. In August 2018, Bailey's counsel and the government began discussing the possibility of a plea deal. Communications among counsel make clear these discussions remained tentative and fluid throughout this time. Contrary to Bailey's suggestion, *see* App.Br. at 42, the parties remained far apart through October 2018. On October 3, there was a discussion of a proposal by defense counsel in which Bailey received a sentence of a "straight 35" years' imprisonment—a proposal the government rejected. JA6579. In response to another defense proposal—the prospect of a "c" plea to 37 years—government counsel responded noncommittally. JA6579. The lack of mutual assent is confirmed by an email exchange a few days later, on October 5, 2018, in which defense counsel indicated that she was "waiting on a response from the Gov" regarding a resolution of Bailey's case. JA6580. On October 10, 2018, defense counsel contacted government counsel to suggest "all of us sitting down . . . to try to figure out a plea." JA6583. That email belies any suggestion that the government had offered a formal plea deal.

Nor did a renewed round of plea negotiations in early 2019 result in an enforceable plea agreement. On February 6, 2019, defense counsel emailed government counsel expressing her understanding that the government had

"discussed a plea for 35 years . . . and the response was that [G]overnment will not offer less than 37." JA6584. A statement that the Government "will not offer less than 37" is not a proposal by the government to in fact offer a term of 37 years' imprisonment. A follow-up exchange on February 8, 2019, confirms the lack of mutual assent: Defense counsel expressed her understanding that Bailey would accept a "c" plea of 37 years. Government counsel said only that it was "talking it over." JA6585.

Notwithstanding this patent lack of mutual assent, Bailey argues that he signed a document purporting to "confirm[] the plea agreement." JA6626. That document was never executed by government counsel. A purported agreement adopted by only one party, against the backdrop of an ongoing back-and-forth among counsel, is the very opposite of mutual assent.

## C.    Bailey's Ineffective Assistance of Counsel Claim Is Meritless

Bailey alternatively argues that if there was no enforceable plea agreement, that is only because his counsel was constitutionally ineffective in securing one. But Bailey cannot show that "the ineffectiveness of counsel conclusively appears in the trial record itself," *Freeman*, 24 F.4th at 331, as he must to succeed on his claim on direct review.

The record does not conclusively show that Bailey's trial counsel performed objectively unreasonably. Bailey faults his trial counsel for failing

to secure a plea agreement. App.Br. at 47. But an ineffective-assistance-of-counsel claim generally is inapt where (as here) a defendant "was never formally offered a plea agreement" in the first place. *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017). That is because the "successful negotiation of a plea agreement involves factors beyond the control of counsel, including . . . the cooperation of the prosecutor, who had no obligation to offer such an agreement." *Id.* at 846.

Bailey seeks to blame his trial counsel for a result that was beyond their control. During the plea negotiation process, Bailey was ably represented by two criminal defense attorneys who advocated for a plea deal to Government counsel, going so far as to move to enforce a purported plea agreement on Bailey's behalf. However, the parties were too far apart to reach an accord.

## IV.    BALLISTICS TESTIMONY WAS PROPERLY ADMITTED

### A.    Standard of Review

This Court reviews evidentiary rulings for abuse of discretion. *United States v. Hassouneh*, 199 F.3d 175, 182 (4th Cir. 2000).

### B.    Factual Background

Before trial, Bailey moved to limit or exclude testimony that cartridges recovered from the scene of James "Bangout" Edwards's homicide on February 12, 2015, were fired from the same firearm as cartridges recovered

from the 5200 block of Windsor Mill Road on February 8, 2015. JA1401. The district court allowed the examiner to testify that, in his opinion, the cartridges came from firearm or that they matched to reasonable degree of certainty. JA3858.

BPD firearms examiner James Wagster testified at trial to his conclusion: that based on his observations, the cartridges from both incidents were fired from the same firearm. JA3890. Wagster repeatedly couched this as his "conclusion" based on a "sufficient agreement" in the markings seen on the cartridges. JA3885-91, JA3898. And on cross-examination, Wagster testified that he did not precisely measure the markings, but rather compared the markings by "eyeballing" them. JA3898.

In addition, the Government introduced evidence that Bailey had fired a .40 caliber firearm on February 8 and that a .40 caliber firearm was used to kill James Edwards four days later. JA3603, JA3614–15, JA7954. Multiple witnesses testified that Bailey killed James Edwards or that he was with James Edwards the night of the murder. JA2739, JA3467, JA3945, JA4941–42.

### C. Examiner Wagster's Ballistics Testimony Complied with the District Court's Ruling

On appeal, Bailey argues that Wagster offered "unequivocal" testimony in defiance of the district court. The record belies that claim. An expert may

testify about his opinion if, among other things, "the testimony is based on sufficient facts or data." Fed. R. Evid. 702(b). Here, the district court allowed Wagster to testify about his "opinion" based on a "reasonable degree of certainty." JA3858. That is precisely what Wagster did. Wagster testified as to his opinion ("conclusion") based on a reasonable degree of certainty (a "sufficient agreement" in the markings). JA3885, JA3887, JA3889, JA3890–3891, JA3898. And on cross-examination, Wagster acknowledged that he "eyeballed" the markings without using a precise measuring tool. JA3898.

Nevertheless, any error is harmless given the remaining evidence. Absent the ballistics testimony, the evidence still showed that Bailey possessed a similar caliber firearm just days before James Edwards was killed. JA3603, JA3614–3615, JA7954. Multiple witnesses testified about Bailey's role in the murder. JA2739, JA3467, JA3945, JA4941–4942. And cell-site location information corroborated that Bailey participated. JA3729.

## V. THE EVIDENCE WAS SUFFICIENT TO SUPPORT DAVIS'S CONVICTIONS

### A. Standard of Review

In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

38

of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury, not the reviewing court, weighs the credibility of the evidence. *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994). With respect to conspiracy charges, "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" *Glasser v. United States,* 315 U.S. 60, 80 (1942). The government need not prove that the defendant knew all of the particulars of the conspiracy or all of its members. *Id.* There need only be a showing that the defendant knew of the conspiracy's purpose and some action indicating his knowing participation. *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984).

## B.    Substantial Evidence Supported the Jury's Verdicts

Given space constraints, a full accounting of Davis's involvement in the conspiracy is impossible. However, as discussed in the Statement of the Case, the jury heard testimony implicating Davis in a May 30, 2015 attempted murder at the BP gas station. Specifically, there was witness testimony that on this occasion, Davis used a firearm to spray with bullets a car containing two individuals whom he understood had robbed (or attempted to rob) another MMP member. JA2744–46. In addition, there

39

was testimony that Davis drove an Infiniti, the color of which he changed "immediately after the shootin.'" JA2746.

A full discussion of the evidence relating to Davis's participation in the two conspiracies can be found in the Pre-Sentence Report, JA7892–97, and in the government's sentencing memo at ECF #1293, as well as in the district court's comments at his sentencing hearing. JA6465.

## VI. THE EVIDENCE WAS SUFFICIENT TO SUPPORT ANDERSON'S CONVICTIONS

### A. Standard of Review

Because Anderson likewise challenges the sufficiency of the evidence to support his conspiracy convictions on Counts 1 and 2, the authorities previously cited in section V.A govern.

### B. Substantial Evidence Supported the Jury's Verdicts

Again, given space constraints, a full accounting of Anderson's involvement in the conspiracy is not possible. However, as discussed in the Statement of the Case, the jury heard testimony that Anderson provided the gun used to kill Antoine "Poopy" Ellis. JA2684–88. A full discussion of the evidence relating to Anderson's participation in the two conspiracies can be found in his Pre-Sentence Report, JA7922–24, and in the district court's comments at his sentencing hearing, JA6801–02. It should also be stressed that the jury clearly evaluated the evidence against Anderson carefully, as the

findings on his verdict form reflect. The jury found that the only types of racketeering activity that were reasonably foreseeable to him were those that involved drug trafficking, and not those relating to murder, extortion, robbery, or witness tampering and intimidation. The jury further found that heroin was the only type of narcotics that it was reasonably foreseeable to Anderson would be trafficked by the conspirators. JA6361–64.

## VII. THE PROSECUTORS DID NOT ENGAGE IN MISCONDUCT

### A. Standard of Review

"[R]eversible prosecutorial misconduct generally has two components, that: (1) the prosecutor's remarks or conduct must have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Chorman*, 910 F.2d 102, 103 (4th Cir. 1990); *United States v. Scheetz*, 293 F.3d 175, 185-86 (4th Cir. 2002).

### B. Facts

On February 15, 2014, Anderson's uncle, C.B., was stopped going through security at BWI Airport with a ticket to Texas when it was discovered that he was carrying $80,000 cash in random denominations stuffed into two postal envelopes. JA5184–85. C.B. claimed that his nephew had documentation of where the money came from, and that he would call him

to come out to the airport. *Id.* Anderson arrived and claimed that he had won the money gambling. Anderson was able to produce genuine receipts from a casino that totaled roughly $80,000.00, so the officers let him keep the money. The parties also entered into a stipulation, JA3053, reflecting that Anderson had won money at the casino on several occasions.

Consistent with the stipulation, government counsel argued in the opening closing argument that even if Anderson had in recent months won a roughly comparable sum of money gambling, the casino would hardly have paid it in the manner in which the cash was discovered. JA5811. Government counsel argued that there was a reasonable inference to be drawn that even if Anderson did occasionally win at the casino, the cash at issue was drug proceeds and was being taken to Texas to buy a substantial quantity of narcotics.

The government's other trial counsel returned to this issue in her rebuttal closing argument, saying, "the airport seizure . . . I do think it's important to consider the facts carefully." JA6074. Defense counsel objected and at a bench conference argued that the government should acknowledge that the money had ultimately been returned to Anderson after he provided receipts. Government counsel did so, then addressed the suspicious circumstances of the seizure without objection by defense counsel

42

until appellant Anderson suddenly yelled, "Tell 'em I got my money back!"
The Court then instructed the jury to remember that it would be their
recollection of the evidence that controlled. *Id.*

None of the comments by the two prosecutors were either inaccurate
or improper. The objection initially made by Anderson's counsel during
rebuttal was resolved with a bench conference and a statement by the
prosecutor to the jury that addressed the expressed concern. The whole issue
was, in any case, an extremely minor one in the context of this trial and in no
way deprived Anderson of a fair trial.

## VIII. DAVIS'S FELON-IN-POSSESSION CONVICTIONS SHOULD BE AFFIRMED BECAUSE DAVIS CANNOT SHOW THAT ANY *REHAIF* ERROR AFFECTED HIS SUBSTANTIAL RIGHTS

### A.    Standard of Review

Because Davis's *Rehaif* claim was not raised below, this Court reviews
for plain error. *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021)

### B.    Davis Cannot Show A Reasonable Probability That The Outcome Would Have Been Different Had The Jury Been Properly Instructed

Davis urges this Court to reverse his felon-in-possession conviction,
arguing that the district court plainly erred by failing to instruct the jury that
the Government must show that Davis was a felon barred from possessing a

firearm. *See Rehaif v. United States*, 139 S. Ct. 2191 (2019). Davis's argument should be rejected.

After trial in this case, the Supreme Court in *Rehaif* clarified that in § 922(g) prosecutions, the Government must prove that the defendant knew he was a felon when he possessed the firearm. *See id.* at 2199–2200. Later, in *Greer*, the Court addressed the standard a defendant must show to obtain plain-error relief for an unpreserved *Rehaif* claim. As to the "substantial rights" prong of the plain-error analysis, the Court held that the defendant bears the burden of showing that, had the jury been properly instructed, "there is a reasonable probability that he would have been acquitted." 141 S. Ct. at 2097 (internal quotation marks omitted). Few defendants will be able to make the "uphill climb" because "absent a reason to conclude otherwise, a jury will usually find that a defendant *knew* he was a felon based on the fact that he *was* a felon." *Id.*

The Government introduced evidence that Davis was convicted of illegally possessing a handgun in violation of Md. Code Ann., Crim. Law § 4-203. JA5439–44, JA6164–67. Although termed a misdemeanor under state law, that crime is punishable by up to three years in prison. *See* § 4-203(c)(2)(i). Davis received a suspended two-year sentence and two years of probation. JA6167.

Davis principally relies on *United States v. Barronette*, 46 F.4th 177 (4th Cir. 2022), in which this Court reversed a felon-in-possession conviction under *Rehaif* and *Greer*. In that case, a defendant was convicted of misdemeanors under Maryland state law and the defendant maintained he did not know he was a felon. The Court agreed that there was a reasonable probability that, but for the *Rehaif* error, the outcome may have been different. *Id*. at 200–201.

*Barronette* is distinguishable. The Government acknowledges that Davis, like the defendant in *Barronette*, was convicted of a crime labeled a misdemeanor and—although sentenced to two years' imprisonment—his sentence was suspended. Unlike in *Barronette*, however, here there is evidence supporting the conclusion that Davis knew he was prohibited from possessing weapons—and, therefore, that he knew of his status as a prohibited person. Specifically, in August 2014 Davis participated in a series of recorded jail calls in which he discussed drug trafficking and gang business. In one such call, Davis stated that he put two "bitches" (coded language for guns) in the woods and that he could not retrieve them because "knockers" (police) were over there. JA7895.

This exchange is evidence of Davis's inculpatory mental state. By hiding a cache of firearms and acknowledging he must keep them hidden

from police, Davis plainly understood the importance of concealing his possession of guns from law enforcement. A jury could reasonably infer from this exchange that Davis concealed his possession of guns because he understood he was not permitted to possess them—and, implicitly, that he knew he belonged to a class of persons prohibited from possessing firearms. *See District of Columbia v. Wesby*, 583 U.S. 48, 59 (2018) ("In fact, deliberately furtive actions and flight at the approach of law officers are *strong* indicia of *mens rea*." (internal quotation marks and alterations omitted)).

Even if the Court concluded that Davis's felon-in-possession convictions should be reversed, resentencing is not warranted. Rather, remand should be limited for the district court "to perform a strictly ministerial correction to enter an amended judgment reflecting the dismissal." *United States v. Barefoot*, 754 F.3d 226, 250 (4th Cir. 2014) (internal quotation marks omitted). That is because in cases where "it is clear that a conviction that is being reversed did not cause a district court to impose a harsher sentence on a conviction that is being affirmed, remand for re-sentencing is not necessary." *Id.*

This is such a case. Government counsel asked the Court to "find explicitly that the sentence that the Court is imposing on . . . Counts 1, 2, and

46

32"—Davis's non-felon-in-possession convictions—"would be imposed independent of whether the Fourth Circuit determined that the defendant was entitled a new trial on the 922(g) convictions." JA6526–27. The district court did so, stating that even if the felon-in-possession convictions were vacated, it would "absolutely . . . still believe that the 25 years on the other counts, followed by the five years on Count 32, would be reasonable and sufficient without being greater than necessary." JA6527. If Davis's felon-in-possession convictions are vacated the district court should be instructed to only "amend the judgment to dismiss [the felon-in-possession counts], nullifying the convictions and sentences relating thereto." *Barefoot*, 754 F.3d at 250.

## IX. ANY SPILLOVER EFFECTS WOULD HAVE BEEN HARMLESS BEYOND A REASONABLE DOUBT

After trial, in light of the Supreme Court's decision in *Rehaif*, the government dismissed Anderson's conviction of the felon-in-possession charge in Count 24. Notwithstanding dismissal of Anderson's felon-in-possession conviction, Anderson suffered no prejudicial spillover from the evidence of his felon status.[6]

---

[6] Appellant Davis was likewise convicted of two felon-in-possession charges in counts Sixteen and Thirty; however, as set forth above, the government maintains that Davis's conviction remains proper. *See* Section VIII. To the

First, appellants assert that evidence of a defendant's status as a convicted felon is "devastating and incurably prejudicial," App.Br. at 77, but that is not the law. If it were, then the fate at trial of any defendant charged with 18 U.S.C. § 922(g) would be a foregone conclusion. The Supreme Court's decision in *Old Chief v. United States*, 519 U.S. 172 (1997), recognizes that defendants in such cases may be avoid undue prejudice by stipulating to the existence of a prior conviction. By leaving a jury with no means of knowing the seriousness, number, or age of a defendant's prior criminal conviction(s), the possibility of undue prejudice is greatly reduced.

In addition, the doctrine of prejudicial spillover recognizes that undue prejudice is not inevitable even when a defendant's convictions at trial are later set aside. Even if some distinct evidence relating solely to the reversed charge has come before the jury, a reviewing court still must assess "the likelihood that the jury, in considering one particular count or defendant, was affected by evidence that was relevant only to a different count or defendant." *United States v. Hamilton*, 334 F.3d 170, 182 (2d Cir. 2003). The Second Circuit has established a three-part test to determine whether there likely is prejudicial spillover from subsequently reversed or vacated

---

extent the Court disagrees, the government's prejudicial-spillover argument with respect to Anderson applies with equal force to Davis.

counts. It asks whether the (1) evidence in support of the vacated count was highly "inflammatory" (2) dismissed count and remaining counts are similar; and (3) government's evidence on the remaining counts is strong. *Hamilton*, 334 F.3d at 182.

Applying that standard here, Anderson's spillover claim fails. The mere fact that one is legally prohibited from possessing a weapon based on some unknown felony conviction is certainly far less prejudicial than the evidence presented at trial of Anderson's large-scale heroin trafficking, or Davis's violent conduct. The individual firearm-possession counts involved significantly different elements and factual circumstances (and, thus, much more limited proof) than Davis's and Anderson's remaining counts of conviction. And the government's proof on the remaining non-firearms counts was extremely strong. Accordingly, both Anderson's prejudicial spillover claim and Davis's potential one are wholly without merit.

## X. The Court Should Affirm Banks's Narcotics Conspiracy Conviction

### A. Standard of Review

Banks does not argue that he objected to the jury instructions or verdict form below. This Court should therefore review for plain error.

**B.    The Jury Instructions And Verdict Form Were Proper**

The district court's instructions and verdict form properly directed the jury to determine the quantity of cocaine base reasonably foreseeable to Banks as part of Count 2.

Count 2 charged appellants, including Banks, with conspiring to distribute a kilogram or more of heroin and 280 grams or more of crack cocaine (among other drugs), in violation of 21 U.S.C. § 846.  JA297.  The quantity of narcotics is significant because 21 U.S.C. § 841(b) sets forth different penalties depending on the type and quantity of the controlled substance.  *See* 21 U.S.C. §§ 841(b)(1)(A), (B).  With respect to cocaine base, a drug quantity of 280 grams or more triggers a 10-year minimum mandatory sentence, with a statutory maximum of life imprisonment.  *Id.* § 841(b)(1)(A).  Where the quantity of cocaine base is 28 grams or more, the minimum penalty is 5 years, and the maximum is 40 years.  *Id.* § 841(b)(1)(B).  If the government does not charge or prove one of these statutorily enumerated quantities, the defendant is exposed to a lower sentence: no mandatory minimum and a statutory maximum of 20 years' incarceration.  *Id.* § 841(b)(1)(C).

The verdict form as to Count 2 asked the jury to answer three questions: (1) whether Banks was guilty of conspiracy to distribute and

50

possess with intent to distribute controlled substances; (2) if guilty, what types of drugs were reasonably foreseeable to Banks; and (3) if cocaine base was among those drugs, what quantity was reasonably foreseeable to Banks. JA6356. As to cocaine base quantity, the verdict form gave the jury two options: 280 grams or more; or less than 280 grams. The jury selected "less than 280 grams." JA6356.

Banks complains that the district court erred by failing to instruct the jury on the third potential statutory 28-gram threshold. He appears to contend that this purported error "alter[ed] the legally prescribed punishment so as to aggravate it," and, thus, the court created a "new offense." App.Br. at 78.

Banks misunderstands the statutory scheme. Any fact that increases the statutory minimum or maximum penalty must be found by a jury beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Alleyne v. United States*, 570 U.S. 99,103 (2013). The verdict form did just that. It gave the jury the option to find less than 280 grams, in which case the lowest possible 'default' sentence (0 to 20 years) would apply; or to find 280 grams or more, in which case the highest sentence (10 years to life) would apply. At sentencing, the district judge correctly treated the jury's verdict as implicating a statutory maximum sentence of 20 years.

51

Banks identifies no authority suggesting that a trial court must present every available statutory drug threshold to the jury. But even if there were any such error, Banks cannot show prejudice. That is because any error in failing to instruct on the 28-gram threshold *benefitted* Banks. Imagine the jury determined 100 grams of cocaine base were reasonably foreseeable to Banks. Using the verdict form that was given in this case, the jury would have found less than 280 grams and Banks would have been subject to a statutory sentence range of 0 to 20 years' imprisonment. Had the jury been given a form that instructed it as to all three statutory thresholds, as Banks wishes, it would have determined that more than 28 grams of cocaine base was reasonably foreseeable to Banks. In that case, Banks would have faced a statutory sentencing range of 5 to 40 years. If Banks got the verdict form he now demands, he could only have been exposed to a greater sentencing range.

## C. Banks's Argument Regarding The Sentencing Guidelines Is Unavailing

At sentencing, the district court determined that Banks's base offense level was 28 after concluding that the trial evidence established that Banks was responsible for at least 196 grams of cocaine base. JA6431. Banks challenges this conclusion, arguing that the court "should have provided the

jury with the ability to find either of the actual lesser offenses: (1) 28 grams or more, or (2) some lesser amount." App.Br. at 79.

Unlike a jury's verdict, the standard of proof for findings of fact at sentencing is a preponderance of the evidence. *United States v. Grubbs*, 585 F.3d 793, 798–803 (4th Cir. 2009). Furthermore, a sentencing court may consider uncharged and acquitted conduct in determining a sentence if that conduct is proven by a preponderance of the evidence. *E.g.*, *United States v. Watts*, 519 U.S. 148, 154 (1997); *Grubbs*, 585 F.3d at 798–800 (collecting cases).

Here, the district court correctly understood the relevant standards. It acknowledged the preponderance-of-the-evidence standard and—having heard all the evidence from trial—found Banks responsible for at least 196 grams of crack cocaine under that standard. JA6430–31. It summarized the basis for this finding, including: observations by a police officer in May 2012 of Banks directing drug customers to purchase cocaine base; the purchase of 7 grams of cocaine base by a co-defendant; and evidence from cooperating witnesses regarding cooking powder cocaine into crack cocaine, which involved 500 grams. JA6431–32. The court also explained that the 196-gram conclusion was also corroborated by a picture of Banks with co-defendant Bailey "in the trap house," as well as witness testimony that Banks

53

oversaw a drug shop for years. JA6432. Accordingly, Banks's conviction and sentence should be affirmed.

## XI. THE DISTRICT COURT PROPERLY REJECTED DEFENDANTS' "MULTIPLE CONSPIRACIES" INSTRUCTION

### A. Standard of Review

The Court reviews a decision not to give a jury instruction for abuse of discretion. *United States v. Bartko*, 728 F.3d 327, 343 (4th Cir. 2013).

### B. Defendants Were Not Entitled to a Multiple Conspiracies Instruction

"[A] district court must issue a 'multiple conspiracies' instruction where the evidence supports a finding that multiple conspiracies existed." *United States v. Stockton*, 349 F.3d 755, 762 (4th Cir. 2003). This instruction is not required "unless the proof at trial demonstrates that appellant[] w[as] involved only in a separate conspiracy unrelated to the overall conspiracy charged in the indictment." *United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005) (cleaned up).

Even assuming the defendants' proffered instruction was a correct statement of the law, they cannot demonstrate that they were involved "only in a separate conspiracy unrelated to the overall conspiracy charged in the indictment." *Id.* As explained above, the government presented substantial evidence of the MMP gang structure, code, rules, and the relationships

between and among the appellants in furthering MMP as an enterprise. Bailey was the mastermind/architect (JA2610–11); Davis flaunted his MMP status on social media (JA7895-96), and he retaliated against rivals who disrespected an MMP member (JA2744–46); Banks maintained the drug supply for MMP's shops (JA2623), and he was identified as MMP's "Boss of Finance" (JA8004); and Anderson was the boss of MMP's Windsor Mill and Forest Park territory (JA2604) and he supplied instruction to other MMP members (JA7923) and he gave the gun to Johnson to perpetrate a murder (JA7923). They all played a part in furtherance of the enterprise. This is more than sufficient to show they shared a common purpose and hence a separate conspiracy instruction was unwarranted. *Nunez*, 432 F.3d at 578. And while the defendants harp on the geographic diversity of MMP's shops, this only proves the defendants were part of a unified gang working in several areas and were not siloed drug dealers simply working near each other.

## C.    Defendants Cannot Show Prejudice

Defendants cannot demonstrate any prejudice from the failure to receive a multiple conspiracies instruction. The bar here is high: "the evidence of multiple conspiracies must have been so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy

instruction." *Bartko*, 728 F.3d at 344 (cleaned up).  For the reasons stated above, defendants cannot clear this bar.  The evidence of defendants' coordinated dealings within the MMP structure, coupled with the social media and wiretap evidence, pointed strongly in the direction of a single conspiracy.

## XII.  Appellants' Sentences Are Proper

### A.    Standard of Review

This Court reviews a sentence for procedural and substantive reasonableness "under a deferential abuse-of-discretion standard." *United States v. Fowler*, 58 F.4th 142, 150 (4th Cir. 2023) (citation omitted). Procedural reasonableness includes whether the Guidelines were properly calculated. *Id.* (citation omitted).

### B.    Banks's Sentence Is Proper

Banks was convicted of one count of conspiracy to distribute crack cocaine (Count 2).  The court found by a preponderance of the evidence that Banks was responsible for at least 196 grams of cocaine, resulting in an offense level of 28.  JA6431.  After applying various enhancements, the district court calculated an offense level of 34 with a criminal history category of III, resulting in a guidelines range of 188 to 235 months.  JA6436.  The district court imposed a within-guidelines sentence of 216 months.  JA6437.

The district court properly found that at least 196 grams of cocaine was attributable to Banks by a preponderance of the evidence. *See United States v. Bell*, 667 F.3d 431, 441 (4th Cir. 2011). As explained above, *see* Section X.C, ample evidence supported the district court's finding. Evidence included observations by a police officer in May 2012 of Banks directing drug customers to purchase cocaine base; the purchase of 7 grams of cocaine base by a co-defendant; and evidence from cooperating witnesses regarding Banks's involvement at a trap house. As stated above, a trial court in sentencing may consider conduct not found beyond a reasonable doubt, "so long as that conduct has been proved by a preponderance of the evidence." *Watts*, 519 U.S. at 154. Here, the district court found "certainly no doubt, by more than a preponderance of the evidence" that Banks was connected to the manufacture of approximately 500 grams of narcotics. JA6431–32. Banks cannot show that the district court clearly erred in calculating the drug quantity attributable to him.

## C.    Davis's Sentence Is Proper

Davis argues that his sentence is substantively unreasonable because, in his view, the district court "relied on an improper factor": a criminal history category that "overstated the seriousness of Davis's prior conduct." App.Br. at 91. This argument lacks merit.

57

Davis was convicted of one count of conspiracy to participate in a racketeering enterprise (Count 1); one count of conspiracy to distribute a kilogram or more of heroin and 280 grams or more of crack cocaine (Count 2); one count of possession with intent to distribute cocaine base (Count 31); two counts of possession of a firearm by a felon (Counts 16 and 30); and one count of possession of a firearm in furtherance of a drug trafficking crime (Count 32).  The district court calculated an offense level of 38 and a criminal history category III, resulting in a guidelines range of 292–365 months.  JA6486.  The court imposed a within-guidelines sentence of 300 months, plus a mandatory 60-month consecutive sentence on Count 32.

To the extent Davis argues that the district court miscalculated his criminal history category, he is wrong.  The district court held that a 2012 handgun conviction scored one criminal history point because it was prior relevant conduct relating to the racketeering conspiracy.  JA6484.  That conclusion was proper given that the 2012 firearm conviction was followed by four years of virtually uninterrupted criminal activity in furtherance of the charged racketeering conspiracy.  The district court also correctly increased Davis's offense level by two levels under U.S.S.G. § 4A1.1(d) because Davis was "under a criminal justice sentence" at the time of the instant offense:  a sentence of probation resulting from his 2012 conviction until 2014, during

which time he was actively participating in the racketeering conspiracy. A criminal history category of III therefore applied. JA6484.

More importantly, there is nothing to suggest that the district court improperly "relied on" Davis's prior offenses in imposing a within-guidelines sentence. App.Br. at 91. The district court emphasized Davis's *current* conduct, including the huge quantity of drugs at issue, his culpability relative to other defendants, his participation in violent activity, and his attempt to smuggle razor blades into the courtroom during trial. JA6521–24. The court mentioned Davis's juvenile offenses only in passing. JA6523.

Davis's reliance on *United States v. Howard,* 773 F.3d 519 (4th Cir. 2014), is misplaced. There, the government argued that the defendant's criminal history category underrepresented the seriousness of the defendant's criminal history and requested an upward departure. *Id.* at 524. The district court instead treated the forty-one-year-old defendant as a "'de facto' career offender" based on numerous stale juvenile offenses. *Id.* That decision increased the applicable guidelines range from 140 to 175 months to 420 months to life. The district court then imposed a *life sentence—* despite the prosecutor twice urging the court to impose a substantially lower sentence, *id.* at 533–34. The Fourth Circuit concluded that the district court erroneously "focused on a single factor"—the defendant's stale juvenile

59

convictions—to in effect justify a life sentence. *Id*. 531. The facts of this case are a far cry from *Howard*. To begin, the district court considered Davis's juvenile offenses only as part of its duty to accurately calculate Davis's criminal history category. JA6484. The district court also emphasized that while the criminal history category is necessary to determine the advisory guideline range, that range "is just one factor" for the court to consider. JA6486. And, as noted, the district court considered all sentencing factors, emphasizing the gravity of Davis's current conduct.

### D.    Lockley's Sentence Is Proper

Lockley was convicted of one count of conspiracy to participate in a racketeering enterprise (Count 1); one count of conspiracy to distribute a kilogram or more of heroin and 280 grams or more of crack cocaine (Count 2); and one count of possession with intent to distribute crack cocaine (Count 10). JA6638. The district court found that an offense level of 34 and a criminal history category VI applied, resulting in a guidelines-range of 262 to 327 months. JA6672. The district court imposed a 360-month sentence. JA6676.

Lockley primarily argues that the district court erred by considering conduct—his involvement in a retaliatory gang murder—that was not found by the jury. The government argued that while the jury did not find beyond

60

a reasonable doubt that Lockley was responsible for the murder, the preponderance of the evidence—including eyewitness testimony, a recorded jail call, and cell site location information—established that he served as the getaway driver for that murder. JA6658. The district court agreed. It explicitly stated that it was not "sentencing [Lockley] as if he were directly responsible for the murder" and declined to apply the higher murder guidelines, JA6673, but found "there's certainly a preponderance of the evidence" that Lockley observed another gang member commit murder and helped drive the getaway car. JA6673. The district court was entitled to consider Lockley's involvement in the murder, as proved by a preponderance of the evidence. *Watts*, 519 U.S. at 154; *Grubbs*, 585 F.3d at 798–803.

Nor did Lockley's sentence result in an unwarranted sentencing disparity. Lockley's conduct was extremely serious: The preponderance of the evidence supported the conclusion that Lockley was involved in a retaliatory murder; acts of witness intimidation and retaliation were foreseeable to Lockley; Lockley was involved in dealing "a very, very substantial quantity of drugs," including to one individual who overdosed; Lockley did not demonstrate any contrition; he had a lengthy criminal history; and he posed "a very high risk of recidivism." JA6673–75.

### E.    Anderson's Sentence Is Proper

Anderson was convicted of one count of conspiracy to participate in a racketeering enterprise (Count 1) and one count of conspiracy to distribute a kilogram or more of heroin and 280 grams or more of crack cocaine (Count 2).  The district court calculated an offense level of 32.  JA6775.  As relevant, that calculation was based in part on a finding that an upward enhancement under U.S.S.G. § 2D1.1(b)(1) applied.  With a criminal history category of III, the resulting guidelines range was 151 to 188 months.  JA6775.  The district court imposed a 264-month sentence.  JA6800–06.

Anderson first argues that the district court improperly applied a 2-level enhancement under U.S.S.G. § 2D1.1(b)(1).  That enhancement applies if a firearm "'was possessed' in connection with a drug trafficking offense unless the connection between the firearm and the offense was 'clearly improbable.'" *United States v. Bolton*, 858 F.3d 905, 911 (4th Cir. 2017).  The enhancement applies here.  When Anderson was conspiring to distribute a heroin, he possessed a loaded handgun.  JA6771; *see Bolton*, 858 F.3d at 912 (noting "handguns are more likely to be connected with drug trafficking than long guns").  Anderson also kept in his home a large amount of cash—presumable proceeds from drug trafficking—and Anderson admitted in a statement that he kept the handgun for protection.  JA6771–72.  The district

court explained that while there was no evidence that Anderson kept drugs in his house, there was "overwhelming evidence of his involvement in supplying large quantities of heroin in other areas, traveling around . . . to do that. A gun, of course, is portable." JA6774–75.

Finally, Anderson complains that the district court's upward variance to a 264-month sentence was unreasonable because it was unsupported by sufficiently specific reasoning. The upward variance was done in part to eliminate any disparity with the similarly culpable Banks. Banks's challenge to his sentence is unavailing, and Anderson's disparity argument fails with it.

Anderson also complains that the upward variance was based on a factor—the quantity of drugs—for which the guidelines already accounted. However, the sentence was also based on Anderson's relative culpability, his status in the gang, his serious criminal history, and the need for deterrence. JA6803–06.

## CONCLUSION

This Court should affirm.

Respectfully Submitted,

Erek L. Barron
United States Attorney

_____/s/_____
Jefferson M. Gray
Brandon K. Moore
Assistant United States Attorneys

November 13, 2023

64

## STATEMENT ON ORAL ARGUMENT

The United States respectfully submits that given the length of this trial and the subsequent post-trial proceedings, as well as the voluminous character of the trial exhibits and the number of issues raised by the five appellants, oral argument is merited in this case. Indeed, the Court may well want to consider granting additional time for oral argument.

## CERTIFICATE OF COMPLIANCE

1. This brief was prepared using Microsoft Word, Georgia type, 14-point font.

2. Excluding the corporate disclosure statement; table of contents; table of authorities; statement on oral argument; any addendum containing statutes, rules, or regulations; and the certificate of service, this brief contains 12,998 words.

## CERTIFICATE OF SERVICE

I certify that, on November 13, 2023, I electronically served a copy of this brief to all counsel of record via CM/ECF.

_____/s/_____
Jefferson M. Gray
Brandon K. Moore
Assistant United States Attorneys
